ORAL ARGUMENT SCHEDULED FOR NOVEMBER 24, 2025

**No. 25-5109**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————

ASSOCIATED PRESS,

*Plaintiff-Appellee*,

v.

TAYLOR BUDOWICH, et al.,

*Defendants-Appellants*.

————————

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-00532-TNM, Judge Trevor N. McFadden

————————

**BRIEF OF AMICI CURIAE FIRST AMENDMENT SCHOLARS
IN SUPPORT OF PLAINTIFF-APPELLEE SEEKING
AFFIRMANCE OF THE DISTRICT COURT'S ORDER**

————————

Connor P. Mui
Tamara S. Skinner
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036-4504
+1 202.955.8500
cmui@gibsondunn.com
tskinner@gibsondunn.com

Theodore J. Boutrous, Jr.
Katie Townsend
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA  90071-3197
+1 213.229.7000
tboutrous@gibsondunn.com
ktownsend@gibsondunn.com

*Counsel for Amici Curiae First
Amendment Scholars*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), amici curiae submit this certificate as to parties, rulings, and related cases.

### A.    PARTIES AND AMICI

Amici curiae Genevieve Lakier, RonNell Andersen Jones, Jack M. Balkin, Erwin Chemerinsky, Heidi Kitrosser, Christina Koningisor, Michael W. McConnell, Robert Post, Jacob M. Schriner-Briggs, Geoffrey R. Stone, and Sonja R. West file this brief in support of Plaintiff-Appellee The Associated Press ("AP").  All other amici curiae and parties appearing in this Court are listed in the Brief of Plaintiff-Appellee.

### B.    RULINGS UNDER REVIEW

The ruling under review, published at 780 F. Supp. 3d 32 (D.D.C. 2025), is a Memorandum Order issued by the Honorable Trevor N. McFadden on April 8, 2025, granting the Associated Press's Amended Motion for Preliminary Injunction.

### C.    RELATED CASES

This case has not previously been before this Court–except on the government's motion to stay pending appeal, which was decided by a special panel–or any court other than the District Court.  Undersigned

i

counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

## CERTIFICATE OF COUNSEL REGARDING AUTHORITY TO FILE

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief.

Pursuant to D.C. Circuit Rule 29(d), counsel for amici curiae certify that they are not aware of any other non-government amicus brief addressing the subject of this brief, which provides historical evidence of the Founders' and earlier generations' understanding of central First Amendment principles. As scholars who have taught courses in constitutional law and/or the First Amendment, published articles and books on these topics, and dedicated significant attention to the study of First Amendment protections, amici are particularly well-suited to provide the Court with historical background and context to assist it in resolving the issues presented in this appeal.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................................v

IDENTITY AND INTEREST OF *AMICI CURIAE* ..................................1

INTRODUCTION....................................................................................4

ARGUMENT ..........................................................................................6

II.    Since the Founding Era, the First Amendment has been
       understood to protect against viewpoint-based burdens on
       speech.........................................................................................6

III.   Since the Founding Era, the First Amendment has been
       understood to prevent the government from denying the
       press subsidies or other benefits because of their
       viewpoint...................................................................................17

       A.    Postal Subsidies..................................................................18

       B.    Access to Congress.............................................................23

IV.    The White House's viewpoint-based exclusion of the AP
       contravenes historical understandings of freedom of
       speech and of the press.............................................................32

CONCLUSION .....................................................................................35

CERTIFICATE OF COMPLIANCE.......................................................37

CERTIFICATE OF SERVICE................................................................38

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*303 Creative LLC v. Elenis*,
      600 U.S. 570 (2023)................................................................7

*Associated Press v. Budowich*,
      2025 WL 1095385 (D.D.C. Apr. 11, 2025) ..........................34

*Associated Press v. Budowich*,
      2025 WL 1649265 (D.C. Cir. June 6, 2025)...........................25, 33, 34

*Boy Scouts of America v. Dale*,
      530 U.S. 640 (2000)................................................................7

*Citizens United v. Fed. Election Comm'n*,
      558 U.S. 310 (2010)................................................................10, 12

*FCC v. League of Women Voters of Cal.*,
      468 U.S. 364 (1984)................................................................7

*Hannegan v. Esquire, Inc.*,
      327 U.S. 146 (1946)................................................................22

*Iancu v. Brunetti*,
      588 U.S. 388 (2019)................................................................8

*McCullen v. Coakley*,
      573 U.S. 464 (2014)................................................................7

*Moody v. NetChoice, LLC*,
      603 U.S. 707 (2024)................................................................7

*N.Y. Times Co. v. Sullivan*,
      376 U.S. 254 (1964)................................................................16

*The People v. Croswell*,
      3 Johns.Cas. 337 (N.Y. Sup. Ct. Feb. 13, 1804) ..................11

# TABLE OF AUTHORITIES

*(continued)*

Page(s)

*Vidal v. Elster*,
    602 U.S. 286 (2024) .................................................................... 4

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) .................................................................... 6

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) .................................................................. 32

**Constitutional Provisions**

U.S. Const. Art I., § 5 ................................................................ 23

**Statutes**

1 Stat. 596 (1798) ...................................................................... 12

**Other Authorities**

1 Annals of Cong. (1789) ............................................ 24, 25, 26, 27, 35

2 Annals of Cong. (1790) ........................................................ 21, 35

3 Annals of Cong. (1791) ........................................................ 19, 21

4 Annals of Cong. (1794) ......................................................... 7, 27, 28

12 Reg. of Debates App. (1836) ................................................... 22

29 Cong. Globe (1847) ......................................................... 29, 30, 32

Anuj C. Desai, *The Transformation of Statutes into
    Constitutional Law: How Early Post Office Policy Shaped
    Modern First Amendment Doctrine*,
    58 Hastings L.J. 671 (2007).................................................. 18, 20, 21

Congressional Research Service,
    *Congressional News Media and the House and Senate
    Press Galleries* (Apr. 13, 2017) ............................................. 28, 30, 31

# TABLE OF AUTHORITIES

*(continued)*

Page(s)

Culver S. Smith, The Press, Politics and Patronage:
The American Government's Use of Newspapers 1789-
1875 (1977) ........................................................................ 31

David A. Anderson, *The Origins of the Press Clause,* 30
UCLA L. Rev. 455 (1983) ............................................... 7, 11

David M. Rabban, *The First Amendment in Its Forgotten
Years*, 90 Yale L.J. 514 (1981) ........................................... 16

Elizabeth Gregory McPherson, *Reporting the Debates of
Congress*, 28 Quarterly J. Speech 141 (1942) .............. 24, 28

Genevieve Lakier, *The Non-First Amendment Law of
Freedom of Speech*, 134 Harv. L. Rev. 2299 (2021) ........... 20

Geoffrey R. Stone, Perilous Times: Free Speech in Wartime
From the Sedition Act of 1798 to the War on "Terrorism
(2004) .................................................................................. 13

H.R. Rep. No. 86, 26th Cong., 1st Sess. (1840) ...................... 16

James Madison, *The Report of 1800*, National Archives
(Jan. 7, 1800), https://perma.cc/9FTC-TUNH ............... 14, 15

James Madison, *Virginia Resolutions of 1798*, 4 The Debates
in the Several State Conventions on the Adoption of the
Federal Constitution (1836) ............................................... 13

John Quincy Adams, *Letter to Rufus King* (Oct. 8, 1802), 3
Writings of John Quincy Adams 7 (Worthington Chauncey
Ford ed., 1913-1917) .......................................................... 15

Joseph Adelman, Revolutionary Networks: The Business and
Politics of Printing, 1763-1789 (2019) ............................ 9, 10

Jud Campbell, *Natural Rights and the First Amendment*,
127 Yale L.J. 246 (2017) ................................................... 8, 11

# TABLE OF AUTHORITIES

*(continued)*

Page(s)

*The Kentucky Resolutions of 1798*, National Archives (1798),
　　https://perma.cc/4G7H-U2WM ............................................................ 14

Marion Tinling, *Thomas Lloyd's Reports of the First Federal
　　Congress*, 18 William & Mary Q. 519 (1961) ................................. 25, 27

Richard John, Spreading the News: The American Postal
　　System from Franklin to Morse (1995) ................................... 19, 20, 21

Robert Post, *Defaming Public Officials: On Doctrine and
　　Legal History*, 12 Am. Bar Found. Research J. 539 (1987) ................ 12

Stephen Feldman, Free Expression and Democracy in
　　America: A History (2008) .................................................... 9, 10, 12, 13

Thomas Gordon, *Cato's Letter No. 15*: *Of Freedom of Speech:
　　That the same is inseparable from publick Liberty*, FIRE,
　　https://perma.cc/MDG7-RM4N ............................................................. 5

Thomas Jefferson, *Letter to Abigail Adams*, National
　　Archives (July 22, 1804), https://perma.cc/M5H8-HDBE .................. 15

Wendell Bird, Criminal Dissent: Prosecutions Under the
　　Alien and Sedition Acts of 1798 (2020) .......................................... 9, 13

Wendell Bird, *The Revolution in Freedoms of Press and
　　Speech: From Blackstone to the First Amendment and
　　Fox's Libel Act*, Canopy Forum (Aug. 20, 2020),
　　https://perma.cc/C4JC-SGMX............................................................... 8

William Stewart, *John Lennox and the "Greenock
　　Newsclout": A Fight against the Taxes on Knowledge,* 15
　　Scottish Hist. Rev. 322 (1915) ........................................................... 10

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

Amici are the following First Amendment scholars who have taught courses in constitutional law and/or the First Amendment, published articles and books on these topics, and dedicated significant attention to the study of First Amendment protections. Drawing from their experience, amici submit this brief to assist the Court in deciding the issues presented by this case and to describe the historical evidence concerning the Founders' and earlier generations' understanding of the central First Amendment principles imperiled by the White House's exclusion of The Associated Press from the White House press pool. Amici act in their individual capacities and do not speak for their employers.

Genevieve Lakier
Professor of Law
Herbert and Marjorie Fried Teaching Scholar
The University of Chicago Law School

RonNell Andersen Jones
University Distinguished Professor
Lee E. Teitelbaum Chair in Law

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than amici curiae or their counsel contributed money that was intended to fund preparing or submitting the brief.  All parties have consented to the filing of this brief.

The University of Utah College of Law

Jack M. Balkin
Knight Professor of Constitutional Law and the First Amendment
Yale Law School

Erin Carroll
Professor of Law
Georgetown Law

Erwin Chemerinsky
Dean and Jesse H. Choper Distinguished Professor of Law
University of California, Berkeley, School of Law

Heidi Kitrosser
William W. Gurley Professor of Law
Northwestern, Pritzker School of Law

Christina Koningisor
Associate Professor of Law
UC Law San Francisco

Michael W. McConnell
Richard and Frances Mallery Professor of Law
Director, Constitutional Law Center
Stanford Law School

Robert Post
Sterling Professor of Law
Yale Law School

Jacob M. Schriner-Briggs
Visiting Assistant Professor
Chicago-Kent College of Law

Geoffrey R. Stone
Edward H. Levi Distinguished Service Professor of Law
University of Chicago Law School

2

Sonja R. West
Otis Brumby Distinguished Professor in First Amendment Law
University of Georgia School of Law

## INTRODUCTION

Amici First Amendment scholars submit this brief to provide the Court with an overview of the historical evidence that speaks to the central First Amendment issues presented in this case.

Amici take no position in this brief on the degree of importance that courts should accord historical evidence regarding the original meaning of the Speech and Press Clauses. The profound technological and social changes that have occurred since ratification of the Bill of Rights in 1791 mean that many of the First Amendment questions that courts confront have no clear eighteenth century analogues. For this reason, many members of the Supreme Court have cautioned against relying solely upon evidence of history and tradition to resolve questions about the First Amendment's scope and limits. *See, e.g., Vidal v. Elster*, 602 U.S. 286, 311 (2024) (Kavanaugh, J., concurring in part) (joined by Roberts, J.) (rejecting the necessity of relying on evidence of historical tradition to determine the constitutionality of a content-based but viewpoint-neutral ban on the federal registration of certain trademarks); *see also id.* at 311–12 (Barrett, J., concurring in part) (same) (joined by J. Sotomayor, Kagan, and Jackson).

Nevertheless, the Supreme Court has often looked to historical evidence to bolster its understanding of the principles underlying the First Amendment, and amici believe that an examination of that history will aid the Court in applying the two central First Amendment principles at issue in this appeal: that access to government property, events, and other benefits may not be conditioned on viewpoint; and that the government may not retaliate against speech based on viewpoint.

These core principles, as illustrated in the historical evidence described herein, support the injunction entered by the District Court. The White House's exclusion of The Associated Press ("AP") from the press pool was explicitly based on its disapproval of how the AP reports the news, including its editorial choices about what terms to use. The decision to withdraw the AP's access to the press pool based on its viewpoint contravenes the Founding generation's concern that the government not be able to control the press, the great "bulwark of liberty," by penalizing them for their editorial and expressive choices. Thomas Gordon, *Cato's Letter No. 15*: *Of Freedom of Speech: That the same is inseparable from publick Liberty*, FIRE, https://perma.cc/MDG7-RM4N. These guiding principles have been repeatedly confirmed by the

5

Supreme Court for nearly a century and are foundational to the democratic purposes of the First Amendment.

## ARGUMENT

## II.    Since the Founding Era, the First Amendment has been understood to protect against viewpoint-based burdens on speech.

The animating purpose of the First Amendment's Speech and Press Clauses has not changed since 1791: to ensure that "[a]uthority here is to be controlled by public opinion, not public opinion by authority." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943). In other words, the First Amendment is intended to safeguard the fundamentally democratic character of our system of government, by ensuring that it is the people, not the government, who decide what views win or lose in the marketplace of ideas, and ultimately sway elections. *Id.* ("We set up government by consent of the governed, and the Bill of Rights denies those in power any legal opportunity to coerce that consent.").

This is how the Supreme Court understands the purpose of the Speech and Press Clauses today. As it recently noted, the Free Speech Clause was designed "to protect the 'freedom to think as you will and to speak as you think.' … By allowing all views to flourish, the framers

understood, we may test and improve our own thinking both as individuals and as a Nation." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584–85 (2023) (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 660–61 (2000)); *see also, e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024) ("However imperfect the private marketplace of ideas, here was a worse proposal—the government itself deciding when speech was imbalanced, and then coercing speakers to provide more of some views or less of others."); *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (noting that the purpose of the First Amendment is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail") (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984)).

This is also how the First Amendment was understood in the Founding Era. As James Madison noted in 1794 on the floor of the House of Representatives, "[o]pinions" cannot be made "objects of legislation" without threatening "the liberty of speech, and of the press." 4 Annals of Cong. 934 (1794) (Rep. Madison). This is because, Madison explained, it is "the nature of Republican Government … that the censorial power is in the people over the Government, and not in the Government over the people." *Id.*; *see also* David A. Anderson, *The Origins of the Press Clause,*

7

30 UCLA L. Rev. 455, 491 (1983) (explaining that the "freedom of the press" was viewed as "a necessary concomitant of self-government").

Freedom of speech and of the press was consequently understood in the eighteenth and early nineteenth centuries to prohibit government actions that penalized private speakers and associations of speakers for the opinions they expressed. Just as today we recognize that "[v]iewpoint discrimination is poison to a free society," *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito J., concurring), modern scholarship demonstrates that "the Founders widely thought that the freedom to make well-intentioned statements of one's views belonged to a subset of natural rights, known as 'unalienable' natural rights, that could not be restricted in promotion of the public good and thus fell outside legislative authority to curtail." Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 255–56 (2017).

As the historian Wendell Bird has chronicled, by the 1770s and 1780s, a "broad understanding of freedoms of press and speech had been the prevalent and then dominant publicly expressed view for a generation before 1798, in both England and America." Wendell Bird, *The Revolution in Freedoms of Press and Speech: From Blackstone to the*

*First Amendment and Fox's Libel Act*, Canopy Forum (Aug. 20, 2020), https://perma.cc/C4JC-SGMX. Printers regularly asserted the idea that freedom of the press granted them the right to "discuss[] public men and measures" and even "to censure the most exalted Patrician." Wendell Bird, Criminal Dissent: Prosecutions Under the Alien and Sedition Acts of 1798, at 5 (2020) (quoting the printer Benjamin Franklin Bache); *see also* Stephen Feldman, Free Expression and Democracy in America: A History, 58 (2008) ("[B]y the late 1780s and early 1790s … [n]umerous Americans" embraced the idea of "[f]reedom of the press [a]s the grand palladium, the bulwark of liberties").

That members of the Founding generation embraced a relatively expansive view of press freedom reflected the important role the press was believed to play in the democratic system they were attempting to create. As Professor Joseph Adelman notes, the dominant political theory of the era assumed that "the political world functioned as a constant struggle for power" and that "officials were always at risk of becoming corrupt and attempting to curtail people's liberty." Joseph Adelman, Revolutionary Networks: The Business and Politics of Printing, 1763–1789, at 46 (2019). By these lights, the press—and most significantly,

9

newspapers—played a vital role in safeguarding the liberty of the people against their endemic vulnerability to the corrupt exercise of power. "Given their structural disadvantage within the political system, the people required recourse to the press in order to expose the corrupt actions of government whenever it threatened the people's liberty." *Id.*

Ensuring the press could comment critically on the activities of government was thus a central concern of the period. As the Supreme Court has explained, the First Amendment was "a response to the repression of speech and the press that had existed in England and the heavy taxes on the press that were imposed in the Colonies." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 353 (2010). These taxes were quite obviously meant to punish newspapers that criticized the crown. The first of what became known as "taxes on knowledge" was imposed by Parliament in 1715 in response to Queen Anne's complaints about the "great license [that newspapers took] in publishing false and scandalous libels such as are a reproach to any Government." William Stewart, *John Lennox and the "Greenock Newsclout": A Fight against the Taxes on Knowledge,* 15 Scottish Hist. Rev. 322, 325 (1915). Similar taxes on knowledge were later extended to the colonies. Feldman, at 49.

10

Because they hoped it would protect against a repetition of this kind of viewpoint-based retaliation by the government many of the participants in the ratifying debates pressed for the addition to the Constitution of an explicit guarantee of press freedom. Anderson, *The Origins of the Press Clause*, 30 UCLA L. Rev. at 468. As one participant put it, absent a guarantee of expressive liberty, "[c]annot Congress, when possessed of the immense authority proposed to be devolved [to it], restrain the printers, and put them under regulation?" *Id.* at 468–69.

To be clear, there was disagreement in the eighteenth century about how broadly the First Amendment's protections for the press extended. Even "Americans who shared an understanding of speech and press freedoms as natural rights … profoundly disagreed about the *legal implications* of the First Amendment," and more specifically, about the degree to which it protected newspapers and others who criticized the government in sharp and intemperate ways. Campbell, 127 Yale L.J. at 254. Thus, for example, eighteenth century judges believed that legislators and other actors could punish speakers when they failed to state their views with good intention and instead spoke maliciously or to achieve bad purposes. *See, e.g., The People v. Croswell*, 3 Johns.Cas. 337,

354 (N.Y. Sup. Ct. Feb. 13, 1804); Robert Post, *Defaming Public Officials: On Doctrine and Legal History*, 12 Am. Bar Found. Research J. 539, 552 (1987) (noting that courts defined the scope of the category of well-intentioned opinions about public matters with "a strong normative sense of the proper spirit in which public discussion should be conducted"). At the same time, many members of the Founding generation interpreted the government's power to restrict the expression of opinions on matters of public concern quite narrowly, particularly when it came to political opinions, and particularly when it came to the newspapers that represented "the most important means of mass communication of that era." *Citizens United*, 558 U.S. at 353.

This disagreement about the scope of the First Amendment became starkly evident after Congress enacted the controversial Sedition Act of 1798. Feldman, at 79. The Act made it a crime to "publish[] any false, scandalous and malicious writing or writings against the government of the United States." 1 Stat. 596 (1798) (expired 1801). It thereby appeared to engage in much the same kind of viewpoint-based targeting of the press that had led the colonists to reject the yoke of the British monarch.

Indeed, the Act, although phrased in general terms, was clearly intended to target the press. Bird, Criminal Dissent at 361.

Defenders of the Sedition Act argued that it was nonetheless constitutional because it provided those accused of sedition the right to defend against the charges by establishing before a jury their "good motives" and the truth of what they said, and that was all the First Amendment required. *See* Geoffrey R. Stone, Perilous Times: Free Speech in Wartime From the Sedition Act of 1798 to the War on Terrorism 44 (2004); Feldman, at 79–80 ("Federalists, mindful of the American tradition of dissent … enacted the most liberal seditious libel statute then imaginable.").

But others vigorously disagreed. In 1798 the Virginia legislature enacted a Resolution that asserted that "[The Sedition Act] exercises … a power not delegated by the Constitution, but, on the contrary, expressly and positively forbidden by one of the amendments thereto … because it is levelled against the right of freely examining public characters and measures, and of free communication among the people thereon, which has ever been justly deemed the only effectual guardian of every other right." James Madison, *Virginia Resolutions of 1798*, 4 The Debates in

13

the Several State Conventions on the Adoption of the Federal Constitution, 553–54 (1836). The Kentucky legislature similarly declared its belief that Congress lacked all constitutional power to enact a law of this kind. *The Kentucky Resolutions of 1798*, National Archives (1798), https://perma.cc/4G7H-U2WM. And James Madison—the primary drafter of the First Amendment and drafter of the Virginia Resolution as well— argued in a public defense of the Virginia Resolution that the Sedition Act was unconstitutional, even if it was true that the press acted at times irresponsibly. "Some degree of abuse," Madison wrote, "is inseparable from the proper use of every thing; and in no instance is this more true, than in that of the press." Indeed, Madison pointed out, "[h]ad 'Sedition acts,' forbidding every publication that might bring the constituted agents into contempt or disrepute, or that might excite the hatred of the people against the authors of unjust or pernicious measures, been uniformly enforced against the press" during the revolutionary period, when the government they targeted was Great Britain, "might not the United States have been languishing at this day, under the infirmities of a sickly confederation? Might they not possibly be miserable colonies, groaning under a foreign yoke?" James Madison, *The Report of*

14

*1800*, National Archives (Jan. 7, 1800), https://perma.cc/9FTC-TUNH. The point was clear: democratic government requires significant protection for a critical press—one that is unafraid to "excite the hatred of the people against the authors of unjust or pernicious measures"—if it is to exist in the first place. *Id.*

The Sedition Act became the biggest issue in the presidential election of 1800, and the critics of the Act—the Jeffersonians—prevailed. John Quincy Adams wrote in 1802 that "there was never a system of measures more completely and irrevocably abandoned and rejected by the popular voice" than the Alien and Sedition Acts. John Quincy Adams, *Letter to Rufus King* (Oct. 8, 1802), 3 Writings of John Quincy Adams 7, 9 (Worthington Chauncey Ford ed., 1913–1917). One of Thomas Jefferson's first acts as president was to pardon all those who had been convicted and sentenced under the Sedition Act. Jefferson later explained that he had done so because he believed the Sedition Act to be a constitutional "nullity as absolute and as palpable as if Congress had ordered us to fall down and worship a golden image." Thomas Jefferson, *Letter to Abigail Adams*, National Archives (July 22, 1804), https://perma.cc/M5H8-HDBE. And when in 1840 Congress repaid the

fines imposed on those found guilty under the Act, it affirmed in the strongest terms its view of the uncontestable unconstitutionality of the Act. H.R. Rep. No. 86, 26th Cong., 1st Sess. (1840); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964) ("Although the Sedition Act was never tested in this Court, the attack upon its validity has carried the day in the court of history.").

By the first few decades of the nineteenth century, then, it was largely settled that the government could not punish members of the press simply because it disliked how they reported news and information. Bird, Criminal Dissent at 359 ("[D]espite the defendants' losses in their prosecutions for criminal dissent, the battle over the Bill of Rights ended in victory for freedoms of press and speech in two senses.").

This did not mean that newspapers were immune from prosecution for what they printed. Libel laws, obscenity laws, and other kinds of "public morals" prohibitions constrained newspapers' editorial choices. *See generally* David M. Rabban, *The First Amendment in Its Forgotten Years*, 90 Yale L.J. 514 (1981). But it did mean that, then as now, the government had to show some reason other than its dislike of their partisan affiliation, their opinions, or their style of reporting to justify

sanctioning the press, either directly or indirectly. Donna Lee Dickerson, The Course of Tolerance: Freedom of the Press in Nineteenth Century America, at xii (1990).

## III.  Since the Founding Era, the First Amendment has been understood to prevent the government from denying the press subsidies or other benefits because of their viewpoint.

Punishment was not the only government action understood in the eighteenth and nineteenth centuries to be constrained by the First Amendment and the natural rights it reaffirmed. Lawmakers recognized that even when they acted not to *restrain* the press but to *empower* it—by providing newspapers and others with subsidies or benefits intended to enable them to more effectively provide the people with the information they needed to govern themselves—free speech principles required that those benefits be provided in a manner that did not enable government officials to control the press.

Founding-era lawmakers concluded as much because they recognized that benefits provided government actors an effective means of controlling the press and manipulating the flow of information to the public. This recognition was the fruit of bitter experience. During the colonial period, British postmaster-generals had used their control over

access to the significant communications technology that was the royal postal service to favor certain publishers, and disfavor others. Anuj C. Desai, *The Transformation of Statutes into Constitutional Law: How Early Post Office Policy Shaped Modern First Amendment Doctrine*, 58 Hastings L.J. 671, 679–80 (2007) ("Recognizing that a monopoly over the 'conduit' through which people communicated provided unique opportunities for disseminating 'content,' early eighteenth century postmasters began to take on another role—printer—and to provide a complementary service to postal delivery: publishing news. … As one might imagine, control over the postal network gave postmasters the ability to undermine competing printers."). Benjamin Franklin himself was impacted by this kind of discrimination when the postmaster general of Philadelphia refused to permit his newspaper access to the mail. *Id.* at 680 (noting that "[i]n order to distribute his publication, Franklin had to bribe the post-riders.").

### A.    Postal Subsidies

Founding-era lawmakers' belief about what freedom of speech and of the press required of the government when it provided benefits to the press was articulated most passionately, and extensively, during the

18

three years of congressional debates that preceded the enactment of the Postal Act of 1792. The Act represents the most significant piece of postal legislation ever enacted in the United States and brought about a radical change to federal postal policy. Richard John, Spreading the News: The American Postal System from Franklin to Morse 30 (1995). Prior to 1792, the American postal service, like the royal postal service that preceded it, had been run as a money-making venture for the government. The Act embraced instead an "educational" rather than a fiscal rationale for the postal service—one that viewed the purpose of the U.S. mails to disseminate information to the body politic, rather than to raise money for the government. *Id.* at 30. It therefore granted newspapers access to the mails at subsidized rates, in order to ensure, as Elbridge Gerry, a supporter of the new law, put it in 1791, that "information, contained in any one paper within the United States, might immediately spread from one extremity of the continent to the other; thus the whole body of the citizens will be enabled to see and guard against any evil that may threaten them." 3 Annals of Cong. 289 (1791).

While there was broad agreement in Congress about the importance of facilitating the circulation of newspapers in this way,

lawmakers were uncertain at first how broadly the subsidies should extend. Early in the debates, some proposed allowing only a few newspapers to access the mail at the subsidized rates. John, at 33. They argued such a policy was necessary to ensure the system was not overwhelmed by the flood of newspapers. Desai, at 691.

This proposal was soundly rejected, however, because lawmakers feared "that if Congress awarded this privilege selectively, it would greatly increase the ability of the government to manipulate the electorate." John, at 34. No one objected to the distinctions the law drew between newspapers and other kinds of publications, such as books and magazines. Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 Harv. L. Rev. 2299, 2314–15 (2021) (noting the Act gave newspapers far more favorable subsidies because "members of Congress believed that the information that newspapers conveyed was more politically valuable than the information that magazines and books conveyed"). But lawmakers expressed alarm at the possibility that, were Congress or the Postmaster General vested with the power to decide which newspapers could enter the mails, they could use this power, just as the royal postmasters once had, to permit newspapers they favored,

but not newspapers they disliked, to access the mails. Desai, at 691 (In an era in which the Postmasters General had significant partisan connections, "[lawmakers] worried that selective admission would provide the government with a tool for propaganda."). The result, Gerry warned, would be to establish the kind of "Court Press" that had no place in a democratic system. 2 Annals of Cong. 1680 (1790).

When enacted, the Act therefore granted all newspapers, regardless of their content, access to the mails at very modest rates. John, at 36. Few of the lawmakers who voted for the Act believed the significant economic benefits the new law provided newspapers were constitutionally required. But the statements of lawmakers during the legislative debates strongly suggest they believed that a law that either explicitly or in effect discriminated against newspapers because of their viewpoint would raise serious constitutional questions. As one lawmaker put it, when deciding what rates applied to what newspapers, lawmakers should proceed carefully, "lest some infringement of the liberty of the press … be the consequence." 3 Annals of Cong. 286 (1791) (Rep. Page).

By the mid-nineteenth century, this view of how the freedom of press applied to the mails—that it did not require postal subsidies but

required viewpoint neutrality—had become well accepted. Even as avowed a defender of slavery as John C. Calhoun argued in 1836, in response to efforts to exclude abolitionist newspapers from the mails, that these "incendiary publications" had the same constitutional right to access the mails as any other newspapers because "if it be admitted that Congress has the right to discriminate in reference to their character, what papers shall or what shall not be transmitted by the mail, [it] would subject the freedom of the press, on all subjects, political, moral, and religious, completely to its will and pleasure." 12 Reg. of Debates App. 73, 1st Sess. (1836).

The Supreme Court later ratified this constitutional understanding in *Hannegan v. Esquire* when it recognized that the First Amendment imposes significant constraints on the government's ability to exclude speech from the mails. *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 155–56 (1946) ("[G]rave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld *on any grounds whatsoever*. Under that view the second-class rate could be granted on condition that certain economic or political ideas not be disseminated …. [We will not] assume that Congress made such a

22

radical departure from our traditions and undertook to clothe the Postmaster General with the power to supervise the tastes of the reading public of the country." (emphasis added)).

### B.    Access to Congress

This understanding of how First Amendment protections apply when members of the press seek to access government benefits—including the benefit of access to government facilities—was not limited to the postal context. Particularly relevant here, lawmakers articulated a very similar view of how First Amendment constraints applied to a very different kind of government benefit: press access to the floor of the House and Senate chambers.

Press access to the houses of Congress was not something that was understood in the eighteenth and nineteenth centuries to be constitutionally mandated. The Constitution requires each house to "keep a Journal of its Proceedings, and from time to time publish the same," U.S. Const. Art I., § 5, but says nothing about whether journalists might be let into the house to provide a more detailed account of the proceedings. Eighteenth-century lawmakers therefore felt empowered to exclude not only the press but members of the public from their

23

chamber—as the Senate did until 1795. Elizabeth Gregory McPherson, *Reporting the Debates of Congress*, 28 Quarterly J. Speech 141 (1942).

Nevertheless, an early debate about rights of access to the House—which did permit members of the public and the press access to the chamber as early as April 1789, *id.*—makes clear lawmakers understood that, even if the right of access was not constitutionally compelled, the First Amendment nevertheless limited the bases on which members of the press could be denied that access. The debate was triggered by Representative Burke's introduction, in 1789, of a resolution to censure the newspapers that had reported on the House debates thus far. 1 Annals of Cong. 952 (1789). The resolution concerned several newspapers that had been permitted access not only to the galleries of the House, which were generally open to the public, but also to the space-constrained floor of the chamber, where it was easier to hear what representatives said. The resolution—echoing the current Administration's criticism of the AP—claimed that newspapers that had been granted floor access "misrepresented these debates in the most glaring deviations from the truth, often distorting the arguments of the members from the true

meaning … thus throwing over the whole proceedings a thick veil of misrepresentation and error." 1 Annals of Cong. 952 (1789).

That reporters were allowed access to the "very foot of the Speaker's chair," Burke argued, meant that these misrepresentations carried with them the tacit endorsement of the House. *Id*.; *Associated Press v. Budowich*, 2025 WL 1649265 (D.C. Cir. June 6, 2025), at *9 (suggesting that "messages conveyed in the Oval Office are government speech"). As such, Burke moved to have the reporters barred from reporting on the House debates altogether, or at least, removed to the public gallery. 1 Annals of Cong. 954 (1789) (statement of Rep. Page) (interpreting the resolution as an attempt to "driv[e] the gentlemen who were at the foot of the Speaker's chair to the gallery").

Although many members of the House had expressed, in other contexts, criticisms about the quality of newspaper reporting on their debates, *see* Marion Tinling, *Thomas Lloyd's Reports of the First Federal Congress*, 18 William & Mary Q. 519, 533 (1961) ("The question of the accuracy of the newspaper reports and the advisability of closing the doors to reporters were of perennial interest in the House"), Representative Burke's efforts to censure the press and perhaps also

25

drive them from the chamber drew sharp criticism as a perceived attack on the independence of the press. One representative argued, for example, that despite newspapers putting "into his mouth sentiments which his heart never felt, nor his head comprehended," he would never choose to suppress the "valuable information" that reporters provided to the public. 1 Annals of Cong. 953 (1789) (Rep. Stone). Representative Page agreed, noting he "would rather submit to all the inconveniences of ridicule than sacrifice what he thought a valuable publication of useful and interesting information." *Id.* at 954. Another representative argued in starkly constitutional terms that Burke's resolution "involv[ed] … an attack upon the liberty of the press." *Id.* at 954  (Rep. Hartley). And James Madison expressed his view that it was "improper to throw impediments in the way of such information as the House had hitherto permitted." *Id.* at 955. These criticisms reflected strong unease among members of the First Congress—who were uniquely positioned to understand the original meaning of the First Amendment—with an effort to exclude the press from the House because representatives disliked the content of their reporting.

Burke attempted to defend himself by clarifying that the motion was not intended to prevent reporters from sitting in on the debates but rather to express disapproval of one reporter—the well-connected William Lloyd—and his monopolization of the prime spot on the floor. *Id.* at 954. *See also* Tinling, at 534. Burke nevertheless agreed to withdraw the resolution. 1 Annals of Cong. 954 (1789). That did not prove the end of the matter, however. Even though the motion was withdrawn, reporters evidently felt no longer welcome on the floor of the House and withdrew to the gallery. This departure prompted other complaints. Representative Page complained, for example, that the newspapers had "given great satisfaction to many of the constituents of that House" and expressed his wish that the reporters return "lest it might be insinuated by the jealous enemies of our Government, that the House of Representatives were more republican and indulgent the last session than this." *Id.* at 1095–96. Another representative acknowledged that, although ultimately it was the right of members of the House to decide whether to grant the press access in the first place, it was best to leave it to the reporters themselves to decide "the admission of such persons as

thought themselves qualified and were inclined to take down and publish their debates and proceedings." *Id.* at 1097 (Rep. White).

Ultimately the House settled on a practice under which space was reserved for reporters on the tightly controlled floor of the House, but representatives did not dictate who had access to those spaces. McPherson, at 142 ("When Congress transferred from New York to Philadelphia, four seats … were provided for the use of reporters."). And the Senate too settled on something like this approach when it began to permit regular access to the press in the late eighteenth century. Congressional Research Service, *Congressional News Media and the House and Senate Press Galleries* (Apr. 13, 2017)*,* at 1 ("By the middle of the 1800s, each chamber had established its own designated reporters' gallery space. In 1877, the House and Senate decided to create a committee of correspondents to oversee press gallery membership and administration.").

Another prominent discussion by lawmakers about the right of the press to access the government on viewpoint-neutral terms came in 1847, when Senator Yulee introduced two resolutions. The first accused the newspaper the *Union* of having published a "libel upon the character of

this body," and provided that the newspaper's editors "be excluded from the privilege of admission to the floor of the Senate." 29 Cong. Globe 366 (1847). The second resolution provided that the reporters from the *Union* be excluded even from the public gallery of the House for the rest of the session. *Id.* These resolutions generated an extensive and passionate debate about the meaning of the freedom of the press as it related to questions of press access to Congress. Some Senators defended the propriety of Yulee's motion by arguing that access to the chamber was a privilege that they had every right to deny. *Id.* at 406 (Sen. Westcott).

Others, however, compared Yulee's resolutions to the now infamous Sedition Acts, because of their viewpoint-based targeting of the press. Senator James Mason argued for example that just as the Sedition Act attempted "to manacle the press," Yulee's resolutions attempted to do "that which the American people wisely decided both Houses of Congress concurrently cannot do." 29 Cong. Globe 411 (1847). As Mason argued,

> In the Constitution which we all here have sworn to support, it is expressly declared that Congress shall pass no law abridging the freedom of the press; …. What were the terms of that sedition law? The terms were, that if any should print or publish any defamatory matter of the President or the Congress, or either House, with intent to bring them into contempt or disrepute, they should be fined and imprisoned. Now, what is the extent of this resolution? It is, that if the

29

> printer to the Senate shall print or publish a libel, or matter
> defamatory of the Senate, tending to bring it into contempt
> and disrepute, not that they shall be fined or imprisoned, but
> that they shall be cut off in their business relations and
> intercourse with this Chamber … a penalty equal to a fine, if
> not a very heavy fine, if not equal to imprisonment.

*Id.* Senator Cass similarly insisted that the Senate lacked the power to

"punish … newspaper editors, or … newspaper writers who may call in

question its actions, or the motives of its members" except in perhaps the

most extreme cases, "far different than this," when "summary

interference is necessary to protect [the Senate] in the execution of its

duties." *Id.* at 415.

In the face of the withering criticism of his colleagues, Senator

Yulee agreed to withdraw the second resolution. *Id.* at 411. The first

resolution narrowly passed, but only after supporters insisted it would

have no effect on the ability of the newspaper's reporters to access the

floor of the chamber but would merely prevent the newspaper's

publishers from profiting from "business relations" they conducted with

Senators while on the floor. *Id.* at 411. And by the end of the nineteenth

century, both houses of Congress had moved to a practice that denied

members of either body the right to admit or exclude members of the

press. Congressional Research Service, at 1 (noting that since 1877,

decisions about access have been made by "committee[s] of [private] correspondents" not lawmakers themselves).

Lawmakers' commitment to the principle of government neutrality when it came to the dissemination of government benefits had limits. It was widely assumed, for example, that decisions about which newspapers would receive the valuable contracts to print government notices that helped fund the press throughout the nineteenth century would be made, at least partly, on the basis of partisan considerations. Culver S. Smith, The Press, Politics and Patronage: The American Government's Use of Newspapers 1789-1875, at 81 (1977).

These awards were different from access to press galleries, however, insofar as what they achieved was to effectively conscript the newspaper to communicate the government's own message—and in cases where different government actors wanted to communicate different messages, they chose different printers to do so. *Id.* at 79 (noting the frequent changes in who received government printing contracts prompted by shifting political dynamics in both Congress and the White House). In these decisions involving what would today be viewed as "government speech," government officials evidently felt considerable

31

freedom to decide on the basis of their political sympathies. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.").

In contrast, when it came to the vital question of who was permitted to access the House and Senate legislative chambers, lawmakers recognized that the "inevitable consequence" of permitting members of Congress to exclude newspapers from their chambers because they did not like how those newspapers reported on their legislative activities would be "to hold a rod over the editor, thereby restraining the press." 29 Cong. Globe 411 (1847).

## IV.  The White House's viewpoint-based exclusion of the AP contravenes historical understandings of freedom of speech and of the press.

The historical evidence strongly supports the conclusion that White House officials' exclusion of the AP from the White House press pool because they dislike the AP's editorial decisions violates the First Amendment as it would have been understood in the late eighteenth and early nineteenth centuries. Members of the Founding generation, and lawmakers and jurists in the early decades of the Republic, recognized

32

that the freedom of speech and of the press prevent the government from discriminating against the press because it dislikes how they report the news. The history demonstrates also that this important principle of viewpoint neutrality applied not only to punishments or other burdens the government imposed, but also to decisions to deny certain news organizations benefits that others received.

This history undercuts key premises of the decision of a motions panel of this Court to stay the District Court's injunction. *See Budowich*, 2025 WL 1649265.

*First*, the motions panel concluded that the Oval Office is not a "nonpublic forum" where access must be viewpoint-neutral because journalists in the Oval Office generally engage in "observational newsgathering" rather than speaking. *Budowich*, 2025 WL 1649265, at *8–9. But the First Congress thought otherwise about the analogous floors and galleries of the House and Senate. It did not matter that the press primarily observed Congress rather than speaking with representatives; they could not be excluded based on their viewpoints.

*Second*, in concluding that the government's viewpoint discrimination is permissible, the motions panel described the Oval

33

Office as a "restricted space" not open to "private speech between private parties." *Budowich*, 2025 WL 1649265, at *5. In particular, it referred to the Oval Office as "the President's personal office," distinguishing it from the Brady Briefing Room. *Id.* at *9. But the District Court found as a matter of fact that "the Oval Office is not just a 'personal workspace'" but a "formal office, to which Defendants regularly invite" a "gaggle of reporters"; the President "has other personal workspaces" that are "truly 'intimate spaces.'" *Associated Press v. Budowich*, 2025 WL 1095385, at *1 (D.D.C. Apr. 11, 2025). The Oval Office is therefore more like the tightly restricted floors and galleries of Congress—a space to observe the workings of government—than a truly private space. As the First Congress understood, viewpoint-discriminatory restrictions on access to such spaces is unconstitutional even if access generally is restricted.

*Third*, the motions panel concluded that denying certain members of the press access to a restricted space like the Oval Office is not the sort of materially adverse action that can support a retaliation claim. *Budowich*, 2025 WL 1649265, at *11–12. Again, the First Congress saw it differently. It rejected Representative Burke's proposal to punish journalists who allegedly "misrepresented" debates by cutting off their

access to the House floor. 1 Annals of Cong. 952 (1789). Members of the First Congress saw such viewpoint-based retaliation as "an attack upon the liberty of the press." *Id.* at 954.

In sum, though the evolving and dynamic nature of our free speech tradition means that historical practice is not usually sufficient to determine the outcome of disputes that involve the regulation of speech, the history presented here demonstrates how profoundly the viewpoint-based denial of access to the AP violates fundamental principles of the American free speech tradition—principles that have been recognized, not only in the modern case law, but since ratification of the First Amendment in 1791. It threatens to create the very thing the First Amendment is intended to prevent: a "Court Press." 2 Annals of Cong. 1737 (1790).

## CONCLUSION

For the foregoing reasons, the historical evidence concerning the First Amendment supports the AP's First Amendment claim. This Court should affirm the District Court's preliminary injunction.

October 6, 2025

Respectfully submitted,

*/s/ Theodore J. Boutrous*

Theodore J. Boutrous
Katie Townsend
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197
+1 213.229.7000
tboutrous@gibsondunn.com
ktownsend@gibsondunn.com

Connor P. Mui
Tamara S. Skinner
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036-4504
+1 202.955.8500
cmui@gibsondunn.com
tskinner@gibsondunn.com

*Counsel for Amici Curiae First*
 *Amendment Scholars*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 29(a)(5) because the brief contains 6488 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1); and

2.     This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook font.

October 6, 2025                         Respectfully submitted,

                                        */s/ Theodore J. Boutrous, Jr.*
                                        Theodore J. Boutrous, Jr.
                                        GIBSON, DUNN & CRUTCHER LLP
                                        333 South Grand Ave.
                                        Los Angeles, CA 90071-3197
                                        +1 213.229.7000
                                        tboutrous@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2025, I caused a true and correct copy of this brief to be electronically filed through the Court's CM/ECF system, which will send a notice of filing to all registered users.

October 6, 2025

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197
+1 213.229.7000
tboutrous@gibsondunn.com