**SCHEDULED FOR ORAL ARGUMENT ON NOVEMBER 24, 2025**
**No. 25-5109**

_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

ASSOCIATED PRESS,

Plaintiff-Appellee,

v.

TAYLOR BUDOWICH, *et al.*,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-532 (Hon. Trevor N. McFadden)

_____

**BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR**
**FREEDOM OF THE PRESS, THE WHITE HOUSE CORRESPONDENTS'**
**ASSOCIATION AND 46 NEWS AND MEDIA ORGANIZATIONS IN**
**SUPPORT OF PLAINTIFF-APPELLEE**

_____

Simon A. Latcovitch
Alexandra M. Gutierrez
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, DC 20024
Telephone: (202) 434-5000
slatcovitch@wc.com
*Counsel for the White House*
 *Correspondents' Association*

Bruce D. Brown
Lisa Zycherman
Gabriel Rottman
Mara Gassmann
Grayson Clary
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, DC 20005
Telephone: 202.795.9300
bruce.brown@rcfp.org
*Counsel of Record for Amici Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), amici curiae the Reporters Committee for Freedom of the Press, the White House Correspondents' Association, and 46 news and media organizations ("amici") certify as follows:

A.    <u>Parties and Amici</u>

There have been no changes to the parties, intervenors, and amici since the filing of the parties' briefs, except for the above-named additional amici, who were not amici in the district court:  Advance Publications, Inc., Agence France-Presse, American Broadcasting Companies, Inc., The Atlantic Monthly Group LLC, Axios Media Inc., Bloomberg News, Boston Globe Media Partners, LLC, Cable News Network, Inc., CBS Broadcasting Inc., The Center for Investigative Reporting, Committee to Protect Journalists, Courthouse News Service, First Amendment Coalition, Fox News Network, LLC, HuffPost, Inter American Press Association, The Intercept Media, Inc., Los Angeles Times Communications LLC, The Media Institute, Media Law Resource Center, National Freedom of Information

Coalition, The National Press Club, The National Press Club Journalism

Institute, National Press Photographers Association, National Public Radio,

Inc., NBCUniversal Media, LLC, The New York Times Company, News

Media Guild–TNG-CWA, Newsday LLC, News/Media Alliance, The

NewsGuild - CWA, Online News Association, PEN America, POLITICO

LLC, The Press Freedom Center at the National Press Club, Pro Publica,

Inc., Pulitzer Center on Crisis Reporting, Reuters News & Media Inc., The

Seattle Times Company, Slate, Society of Environmental Journalists, Society

of Professional Journalists, Student Press Law Center, Vox Media, LLC, The

Washington Post, and White House News Photographers Association.

B.    <u>Rulings Under Review</u>

References to the rulings at issue appear in Appellants' and

Appellee's briefs.

C.    <u>Related Cases</u>

This case has not previously been before this Court or any court other

than the district court.  Counsel is aware of no related cases within the

meaning of Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, amici certify as follows:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The White House Correspondents' Association certifies is a nonprofit 501(c)(3) organization with no parent company, no subsidiaries, and no stock.

Advance Publications, Inc. certifies that it has no parent corporation and no publicly held corporation owns any of its stock.

Agence France-Presse ("AFP") is an independent multi-lingual, multicultural news agency established by statute under French law and whose mission is to provide accurate, balanced, and impartial coverage of news around the globe.  It has no parent company and does not issue stock, and its statute protects the Agency from external influences.  AFP's decision-making body is an 18-member board of directors.  The board

consists of representatives from French media organizations, public officials, and other qualified individuals, as well as staff representatives.

American Broadcasting Companies, Inc. is an indirect, wholly-owned subsidiary of The Walt Disney Company, a publicly traded corporation.

The Atlantic Monthly Group LLC is a privately-held media company, owned by Emerson Collective and Atlantic Media, Inc. No publicly held corporation owns 10% or more of its stock.

Axios Media Inc. is a privately owned company, and no publicly held company owns 10% or more of its stock.

Bloomberg News is published by Bloomberg L.P., which is a limited partnership. Its general partner is Bloomberg Inc., which is privately held. No publicly held corporation owns 10 percent or more of Bloomberg L.P.'s limited partnership interests.

Boston Globe Media Partners, LLC, is a privately held company. No publicly held corporation owns 10% or more of its stock.

Cable News Network, Inc. is ultimately a wholly-owned subsidiary of Warner Bros. Discovery, Inc., a publicly traded corporation. Warner

Bros. Discovery, Inc. has no parent company and, to the best of Cable News Network, Inc.'s knowledge, no publicly held company owns ten percent or more of Warner Bros. Discovery, Inc.'s stock.

CBS Broadcasting Inc. is a wholly owned subsidiary of Paramount Global.  Paramount Global is a wholly owned subsidiary of Paramount Skydance Corporation, a publicly traded company.

The Center for Investigative Reporting, Inc. is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code.  It has no statutory members and no stock.

The Committee to Protect Journalists is a nonprofit organization with no parent corporation and no stock.

Courthouse News Service is a privately held corporation with no parent corporation and no publicly held corporation holds more than 10 percent of its stock.

First Amendment Coalition is a nonprofit organization with no parent company.  It issues no stock and does not own any of the party's or amicus' stock.

Fox News Network, LLC (DE) is directly, wholly-owned by Fox Television Stations, LLC (DE) which is directly, wholly-owned by Fox Television Holdings, LLC (DE), which is directly, wholly-owned by Foxcorp Holdings LLC (DE), which is directly, wholly-owned by Fox Corporation (DE) (the ultimate parent and publicly-owned entity). All of the entities except Fox Corporation are privately held entities.

HuffPost is owned by BuzzFeed Inc., which is a privately owned company. National Broadcasting Company (NBC) owns 10% or more of Buzzfeed's stock.

The Inter American Press Association is a not-for-profit organization with no corporate owners.

The Intercept Media, Inc., publisher of The Intercept, is a non-profit non-stock corporation. It has no parent, subsidiaries, or affiliates.

Los Angeles Times Communications LLC is wholly owned by NantMedia Holdings, LLC.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

The Media Law Resource Center has no parent corporation and issues no stock.

The National Freedom of Information Coalition is a nonprofit organization that has not issued any shares or debt securities to the public, and has no parent companies, subsidiaries, or affiliates that have issued any shares or debt securities to the public.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

The National Press Club Journalism Institute is a not-for-profit corporation that has no parent company and issues no stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

National Public Radio, Inc. is a privately supported, not-for-profit membership organization that has no parent company and issues no stock.

NBC:  Comcast Corporation and its consolidated subsidiaries own 100% of the common equity interests of NBCUniversal Media, LLC.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  No publicly held company owns 10% or more of its stock.

Newsday LLC is a Delaware limited liability company whose members are Tillandsia Media Holdings LLC and Newsday Holdings LLC. Newsday Holdings LLC is an indirect subsidiary of Cablevision Systems Corporation.  Cablevision Systems Corporation is (a) directly owned by Altice USA, Inc., a Delaware corporation which is publicly traded on the New York Stock Exchange and (b) indirectly owned by Altice N.V., a Netherlands public company.

News/Media Alliance represents the newspaper, magazine, and digital media industries, including nearly 2,200 diverse news and magazine publishers in the United States and internationally.  It is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia.  It has no parent company.

The News Guild – CWA is an unincorporated association.  It has no parent and issues no stock.

The News Media Guild, TNG-CWA is an unincorporated association. It has no parent and issues no stock.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

PEN American Center, Inc. has no parent corporation, and no publicly held company owns 10% or more of its stock.

POLITICO LLC is wholly owned by POLITICO Media Group LLC, which is, in turn, wholly owned by Axel Springer SE, and no publicly held corporation owns ten percent or more of its stock.

The Press Freedom Center at the National Press Club is a fiscally sponsored entity of the National Press Club Journalism Institute, the 501(c)(3) affiliate of the National Press Club, created to further advance work on behalf of threatened journalists. It has no other parents, no subsidiaries, and issues no stock.

Pro Publica, Inc. is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no

statutory members and no stock.

Pulitzer Center on Crisis Reporting is a non-profit organization with no parent corporation and no stock.

Reuters News & Media Inc. is a Delaware corporation whose parent is Thomson Reuters U.S. LLC, a Delaware limited liability company. Reuters News & Media Inc. and Thomson Reuters U.S. LLC are indirect and wholly owned subsidiaries of Thomson Reuters Corporation, a publicly-held corporation, which is traded on the New York Stock Exchange and Toronto Stock Exchange.  There are no intermediate parent corporations or subsidiaries of Reuters News & Media Inc. or Thomson Reuters U.S. LLC that are publicly held, and there are no publicly-held companies that own 10% or more of Reuters News & Media Inc. or Thomson Reuters U.S. LLC shares.

The Seattle Times Company: The McClatchy Company, LLC owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

Slate is part of The Slate Group, a wholly owned subsidiary of

Graham Holding Company.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization. It has no parent corporation and issues no stock.

The Society of Professional Journalists is a non-stock corporation with no parent company.

Student Press Law Center is a 501(c)(3) not-for-profit corporation that has no parent and issues no stock.

Vox Media, LLC has no parent corporation. NBCUniversal Media, LLC, a publicly held corporation, owns at least 10% of Vox's stock.

The White House News Photographers Association is a 501(c)(6) nonprofit organization dedicated to supporting the efforts of professional visual journalists covering the White House, Washington, and beyond.

WP Company LLC d/b/a The Washington Post is a wholly-owned subsidiary of Nash Holdings LLC, a holding company owned by Jeffrey P. Bezos. WP Company LLC and Nash Holdings LLC are both privately held companies with no securities in the hands of the public.

# TABLE OF CONTENTS

**Page:**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES...........i

CORPORATE DISCLOSURE STATEMENT ................................................... iii

TABLE OF AUTHORITIES ................................................................ xiv

STATUTES AND REGULATIONS ...................................................xix

STATEMENT OF IDENTITY, INTEREST, & AUTHORITY TO FILE ........xix

RULE 29(a)(4)(E) CERTIFICATION ............................................xxi

CERTIFICATE REGARDING SEPARATE BRIEFING .................................xxi

INTRODUCTION ...............................................................................1

ARGUMENT ......................................................................................6

I.    For decades, the White House press pool has played an essential role in informing the public about the office of the presidency..............6

II.   The threat of retaliatory ejection from the pool would chill a reasonable news outlet from candidly covering the presidency. ..........12

    A.  Retaliatory revocation of a benefit can chill a reasonable news organization even if extending the benefit was discretionary.........14

    B.  The White House's own right to speak does not entail a right to eject news outlets from the pool on retaliatory grounds. ............18

    C.  Retaliation remains retaliation when the government closes an entire forum in order to punish one news organization. ............23

III.  Even where other news organizations remain free to cover the same event, the retaliatory ejection of any one outlet undermines

the public's right to know and skews the news that reaches the
public. ................................................................................................25

CONCLUSION ...................................................................................27

CERTIFICATE OF COMPLIANCE.................................................28

CERTIFICATE OF SERVICE.............................................................29

ADDENDUM:  STATEMENTS OF INTEREST OF INDIVIDUAL
AMICI CURIAE .................................................................................30

## TABLE OF AUTHORITIES

**Page(s):**

**Cases**

*Am. Broad. Cos., Inc. v. Cuomo,*
570 F.2d 1080 (2d Cir. 1977) ........................................................................3, 27

*Am. Freedom Def. Initiative v. WMATA,*
901 F.3d 356 (D.C. Cir. 2018)................................................................17, 22, 24

*Associated Press v. United States,*
326 U.S. 1 (1945)............................................................................................5, 26

*Ateba v. Leavitt,*
133 F.4th 114 (D.C. Cir. 2025).............................................................................24

*Balt. Sun Co. v. Ehrlich,*
437 F.3d 410 (4th Cir. 2006) .........................................................................13, 19

*Cable News Network, Inc. v. Am. Broad. Cos., Inc.,*
518 F. Supp. 1238 (N.D. Ga. 1981)...........................................3, 5, 6, 9, 10, 16

*Chicago Reader v. Sheahan,*
141 F. Supp. 2d 1142 (N.D. Ill. 2001)..............................................................15

*Citizens United v. FEC,*
558 U.S. 310 (2010).............................................................................................5

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
473 U.S. 788 (1985)................................................................................11, 16, 18

*Counterman v. Colorado,*
600 U.S. 66 (2023)..............................................................................................14

*Cummings v. Missouri,*
71 U.S. (4 Wall.) 277 (1866)..............................................................................25

*El Dia, Inc. v. Rossello,*
    165 F.3d 106 (1st Cir. 1999) .................................................................16

*Frank v. Herter,*
    269 F.2d 245 (D.C. Cir. 1959) .........................................................16, 18

*Getty Images News Servs., Corp. v. Dep't of Defense,*
    193 F. Supp. 2d 112 (D.D.C. 2002) ...................................................16

*Hartman v. Moore,*
    547 U.S. 250 (2006) ...........................................................................14

*Houston Cmty. Coll. Sys. v. Wilson,*
    595 U.S. 468 (2022) ........................................................................4, 14

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers,*
    994 F.3d 602 (7th Cir. 2021) ...............................................................17

*Matal v. Tam,*
    582 U.S. 218 (2017) ...........................................................................20

*Miami Herald Publ'g Co. v. Tornillo,*
    418 U.S. 241 (1974) ...........................................................................12

*Mo. Knights of the Ku Klux Klan v. Kansas City,*
    723 F. Supp. 1347 (W.D. Mo. 1989) .................................................24

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ......................................................................12, 25

*N. Miss. Commc'ns, Inc. v. Jones,*
    792 F.2d 1330 (5th Cir. 1986) ............................................................16

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ...........................................................................14

*N.Y. Times Co. v. United States,*
    403 U.S. 713 (1971) ...........................................................................23

xv

*NAACP v. Button,*
371 U.S. 415 (1963)...................................................................4

*Nation Mag. v. U.S. Dep't of Defense,*
762 F. Supp. 1558 (S.D.N.Y. 1991) ...................................16

*Pell v. Procunier,*
417 U.S. 817 (1974)...............................................................15

*Perry v. Sindermann,*
408 U.S. 593 (1972)...........................................................4, 15

*PETA v. Tabak,*
109 F.4th 627 (D.C. Cir. 2024)........................................21, 22

*Pleasant Grove City v. Summum,*
555 U.S. 460 (2009)...............................................................19

*Richmond Newspapers, Inc. v. Virginia,*
448 U.S. 555 (1980).............................................................6, 23

*Rust v. Sullivan,*
500 U.S. 173 (1991)...............................................................17

*Sherrill v. Knight,*
569 F.2d 124 (D.C. Cir. 1977).............................2, 10, 13, 19

*Shurtleff v. City of Boston,*
596 U.S. 243 (2022)...............................................................20

*Stewart v. D.C. Armory Bd.,*
863 F.2d 1013 (D.C. Cir. 1988).............................................21

*TGP Commc'ns, LLC v. Sellers,*
No. 22-16826, 2022 WL 17484331 (9th Cir. Dec. 5, 2022)........................12, 17

*United States v. Associated Press*,
  52 F. Supp. 362 (S.D.N.Y. 1943),
  *aff'd*, 326 U.S. 1 (1945).................................................................5, 26

**Other Authorities**

Aaron Blake, *Obama: 'Of Course' Fox News Is Unfair*,
  Wash. Post (Feb. 4, 2014),
  https://bit.ly/4beCEjB.....................................................................8

*An Evolutionary Portrait*, White House Correspondents' Ass'n
  (last visited Feb. 20, 2025),
  https://whca.press/about/history/...................................................11

*Covering the White House*, White House Correspondents' Ass'n
  (last visited Feb. 19, 2025),
  https://perma.cc/3WNR-LSZ9 .................................................1, 7, 12

David Bauder, *Trump Says AP Will Be Curtailed at the White House
  Until It Changes Its Style to Gulf of America*,
  Associated Press (Feb. 18, 2025),
  https://bit.ly/3EMlSMw ...................................................................9

*Guide to the White House Beat*, White House Correspondents' Ass'n
  (last visited Feb. 20, 2025),
  https://perma.cc/ZF7Z-GPXX......................................................1, 7

Jim Rutenberg, *Behind the War Between White House and Fox*,
  N.Y. Times (Oct. 22, 2009),
  https://bit.ly/3CZoRk2 ...................................................................10

Laurie Kellman, *The Relationship Between the White House and Its Press
  Corps Is Time-Tested — and Can Be Contentious*,
  Associated Press (Feb. 12, 2025),
  https://bit.ly/42XdfbX ...............................................................6, 7, 20

*Media Coalition to White House: Restore AP Access to Press Pool,*
    Reporters Comm. for Freedom of the Press (Feb. 20, 2025),
    https://www.rcfp.org/white-house-ap-press-pool-letter/ .............................8

*With Fox Dispute Intensifying, White House Pledges to Cooperate*,
    Reporters Comm. for Freedom of the Press (Oct. 20, 2009),
    https://perma.cc/DC23-SJV6 .............................................................................8

## STATUTES AND REGULATIONS

All applicable statutes are contained in the brief for Appellants.

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE

Amici curiae are the Reporters Committee for Freedom of the Press ("Reporters Committee"), the White House Correspondents' Association, Advance Publications, Inc., Agence France-Presse, American Broadcasting Companies, Inc., The Atlantic Monthly Group LLC, Axios Media Inc., Bloomberg News., Boston Globe Media Partners, LLC, Cable News Network, Inc., CBS Broadcasting Inc., The Center for Investigative Reporting, Committee to Protect Journalists, Courthouse News Service, First Amendment Coalition, Fox News Network, LLC, HuffPost, Inter American Press Association, The Intercept Media, Inc., Los Angeles Times Communications LLC, The Media Institute, Media Law Resource Center, National Freedom of Information Coalition, The National Press Club, The National Press Club Journalism Institute, National Press Photographers Association, National Public Radio, Inc., NBCUniversal Media, LLC, The New York Times Company, News Media Guild–TNG-CWA, Newsday

LLC, News/Media Alliance, The NewsGuild - CWA, Online News

Association, PEN America, POLITICO LLC, The Press Freedom Center at

the National Press Club, Pro Publica, Inc., Pulitzer Center on Crisis

Reporting, Reuters News & Media Inc., The Seattle Times Company, Slate,

Society of Environmental Journalists, Society of Professional Journalists,

Student Press Law Center, Vox Media, LLC, The Washington Post, and

White House News Photographers Association. (together, "amici").[1]  Amici

have a strong interest in the disposition of this appeal because, while"[t]he

many news organizations reporting on the White House have varied

editorial approaches[,] all have the same collective interest in ensuring that

no one is excluded based on their constitutionally protected choices."

*Media Coalition to White House: Restore AP Access to Press Pool,* Reporters

Comm. for Freedom of the Press (Feb. 20, 2025),

https://www.rcfp.org/white-house-ap-press-pool-letter/.

---

[1]      A statement of interest for each amicus organization is set forth in the addendum below.

All parties to this appeal have consented to the filing of this brief, and amici file it pursuant to Fed. R. App. P. 29(a)(2) and Circuit Rule 29(b).

## RULE 29(a)(4)(E) CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than amici, their members, or counsel—contributed money that was intended to fund preparing or submitting the brief.

## CERTIFICATE REGARDING SEPARATE BRIEFING

Pursuant to Circuit Rule 29(d), amici certify that this brief is necessary to provide broader context for the immediate and future consequences that reversal of the District Court's decision would have for other news organizations that cover the presidency and further certify that amici are uniquely positioned to provide the Court with that perspective.

## INTRODUCTION

"For nearly a century, the story of the American presidency has been written through the eyes of the 'press pool,' the small team of writers, photographers and technicians assigned each day to cover the commander-in-chief" as he performs his official duties in spaces that cannot accommodate the entirety of the press corps. *Covering the White House*, White House Correspondents' Ass'n (last visited Feb. 19, 2025), https://perma.cc/3WNR-LSZ9. Those dispatches are then "shared with all members of the press corps" whether or not they participate in the White House pool directly, and they go on to "provide a daily record of the presidency that forever lives in the archives of news organizations." *Id.*

Because the pool serves the public, not the presidency, the White House had established a neutral process for allocating the seats, by delegating that authority to a self-regulating association of White House journalists. *See Guide to the White House Beat*, White House Correspondents' Ass'n (last visited Feb. 20, 2025), https://perma.cc/ZF7Z-GPXX. But in response to news coverage that the President disliked, the White House

upended that arrangement this year—excluding the Associated Press from

spaces otherwise open to members of the press pool "based on its refusal to

refer to the Gulf of America" rather than the Gulf of Mexico "in its

stylebook and news reporting."  Appellants' Br. at 9 (agreeing that motive

is "undisputed").  The White House now claims "absolute discretion over

access to the Oval Office, Air Force One, and other comparably sensitive

spaces," JA455, asserting the right to retaliate in the future against any

news outlet whose coverage of the presidency upsets the Executive Branch.

Amici write to underline the threat posed in this case to the historic

function of the White House press pool, which—across administrations of

both parties—has played a unique role in guaranteeing the free flow of

information about the presidency to the public.  "Not only newsmen and

the publications for which they write, but also the public at large have an

interest protected by the first amendment in assuring that restrictions on

newsgathering be no more arduous than necessary, and that individual

newsmen not be arbitrarily excluded from sources of information."  *Sherrill*

*v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977).  That bedrock principle

applies with full force to "White House pool coverage," an "enduring and vital tradition" that makes possible the public understanding of the presidency "necessary for a determination by the public of the adequacy of the President's performance." *Cable News Network, Inc. v. Am. Broad. Cos., Inc.*, 518 F. Supp. 1238, 1244–45 (N.D. Ga. 1981) (citation omitted).

In keeping with that tradition, the District Court's thorough opinion found that "under the First Amendment, if the Government opens its doors to some journalists—be it to the Oval Office, the East Room, or elsewhere—it cannot then shut those doors to other journalists because of their viewpoints." JA388.  Any other result would predictably chill forthright coverage of the presidency, because "the danger would be that those of the media who are in opposition or who the [President] thinks are not treating him fairly would be excluded.  And thus we think it is the public which would lose." *Am. Broad. Cos., Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977).  But the White House insists that the threat of retaliatory ejection from a space open to other media is simply "inherent in the nature of a competitive press corps competing for influence and coverage,"

Appellants' Br. at 51, and that there will be news enough about the

presidency regardless of whether the AP prevails, *see* Appellants' Br. at 54–

55. The White House is mistaken, and its position here misunderstands the

press's role in our constitutional system.

Like other First Amendment freedoms, the right to gather the news—

while "supremely precious"—is also "delicate and vulnerable." *NAACP v.

Button*, 371 U.S. 415, 433 (1963). And while the Constitution does not

require the government to favor the press, or spare it criticism, retaliation

that would "chill a person of ordinary firmness in the plaintiff's position

from engaging in future First Amendment activity" crosses a different line,

*Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) (citation and

internal quotation marks omitted), regardless of whether an adverse action

comes in the form of exacting a sanction or "deny[ing] a benefit," *Perry v.

Sindermann*, 408 U.S. 593, 597 (1972). When any one news outlet is chilled

as a result, the press and public as a whole lose out, no matter how many

reporters or cameras remain in the room, because "[i]n the production of

news every step involves the conscious intervention of some news

gatherer, and two accounts of the same event will never be the same."
*United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)
(Learned Hand, J.), *aff'd*, 326 U.S. 1 (1945).

The First Amendment therefore favors "the widest possible
dissemination of information from diverse and antagonistic sources,"
*Associated Press v. United States*, 326 U.S. 1, 20 (1945), over the government's
own judgment that the public knows enough already.  The predictable
result of the White House's position, by comparison, would be to skew
coverage systematically in the President's preferred direction.  That vision
violates the First Amendment first principle that "to command where a
person may get his or her information or what distrusted source he or she
may not hear" is incompatible with our "freedom to think for ourselves."
*Citizens United v. FEC*, 558 U.S. 310, 356 (2010).  To protect the core function
of the White House pool—to provide the "public insight . . . necessary for a
determination by the public of the adequacy of the President's
performance," *Cable News Network*, 518 F. Supp. at 1244—amici respectfully
urge this Court to affirm the District Court's injunction.

## ARGUMENT

I. **For decades, the White House press pool has played an essential role in informing the public about the office of the presidency.**

Since its inception, pool coverage of the presidency has followed the same basic logic:  While the President, press, and public all benefit from "the fullest press coverage of White House and presidential activities possible under the circumstances," on occasion "space limitations or other considerations require limiting the number of media representatives who may cover a given event."  *Cable News Network*, 518 F. Supp. at 1239.  Under those circumstances, a smaller group of outlets—one that has traditionally included the AP—serves "as eyes and ears for the others who can't get in," Laurie Kellman, *The Relationship Between the White House and Its Press Corps Is Time-Tested — and Can Be Contentious*, Associated Press (Feb. 12, 2025), https://bit.ly/42XdfbX, and ultimately as "surrogates for the public," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion).

The first White House pool reporter was an AP reporter—Franklin Trusdell, who, after the shooting of President James Garfield in 1881, "sat

outside his sick room" at the White House, "listening to him breathe and
sharing updates with other correspondents."  Kellman, *supra*.  In the
century since, the pool has provided a firsthand, independent view of some
of the most significant moments in the history of the presidency, including
the assassination of President John F. Kennedy, the attempted assassination
of President Ronald Reagan, and the moment in which President George
W. Bush learned of the September 11 attacks, *see Covering the White House*,
*supra*, to say nothing of the enormous volumes of daily presidential
business that pool reporters have documented over the last century.  As a
matter of longstanding policy, "[t]he White House d[id] not pick the
members of the press pool that goes in to the Oval Office" and other
limited-access spaces; instead, to preserve the pool's function as an
independent chronicler of the presidency, "[t]he pool makeup [was]
decided by the members of the press corps themselves."  Kellman, *supra*;
*see also Guide to the White House Beat*, *supra* (noting that pool seats on Air
Force One were allocated by the White House Correspondents'

Association).  That arrangement dates to the Eisenhower Administration,

*see* JA43, and continued uninterrupted until this year, *see id.*

That independent view has long been closely guarded, as the

outpouring of support for the AP across diverse news organizations should

illustrate.  *See Media Coalition to White House: Restore AP Access to Press Pool*,

Reporters Comm. for Freedom of the Press (Feb. 20, 2025),

https://www.rcfp.org/white-house-ap-press-pool-letter/ (stressing that

"[t]he many news organizations reporting on the White House have varied

editorial approaches but all have the same collective interest in ensuring

that no one is excluded based on their constitutionally protected choices").

The current administration, after all, is hardly the first to find a particular

pool outlet's coverage allegedly "unfair."  Aaron Blake, *Obama: 'Of Course'*

*Fox News Is Unfair*, Wash. Post (Feb. 4, 2014), https://bit.ly/4beCEjB; *compare,*

*e.g.*, *With Fox Dispute Intensifying, White House Pledges to Cooperate*,

Reporters Comm. for Freedom of the Press (Oct. 20, 2009),

https://perma.cc/DC23-SJV6 (quoting President Obama's statement that

"I've got one television station entirely devoted to attacking my

administration" and that "you'd be hard-pressed, if you watched the entire day, to find a positive story about me"), *with* David Bauder, *Trump Says AP Will Be Curtailed at the White House Until It Changes Its Style to Gulf of America*, Associated Press (Feb. 18, 2025), https://bit.ly/3EMlSMw (quoting President Trump's statement that the AP "has been very, very wrong on the election on Trump and the treatment of Trump").  And Presidents are free, of course, to advance their own criticisms of news coverage they find unfair or lacking balance.  But official retaliation against members of the press pool has never previously been tolerated.

When the Reagan Administration, for instance, briefly excluded all television journalists from the pool, the networks quickly mounted a legal challenge to their disparate treatment—and just as quickly won an injunction reversing the Press Office's decision.  *See Cable News Network*, 518 F. Supp. at 1245–46.  And when the Obama Administration attempted to exclude Fox News from a pool interview with White House adviser Kenneth Feinberg—on the theory that Fox was "not a news network"— uniform backlash from Fox's peer organizations in the press room swiftly

prompted the administration to change course.  Jim Rutenberg, *Behind the War Between White House and Fox*, N.Y. Times (Oct. 22, 2009), https://bit.ly/3CZoRk2.  Never, to amici's knowledge, has an administration successfully asserted the right to eject a news organization from the pool on the basis of a President's taste for coverage.  And to do so would be incompatible with the pool's function: to provide the "public insight . . . necessary for a determination by the public of the adequacy of the President's performance," *Cable News Network*, 518 F. Supp. at 1244, rooted in a full, candid account of the facts.

In the teeth of that history, the White House boldly purports to identify a tradition of presidents retaliating against news organizations on the basis of their viewpoint.  *See* Appellants' Br. at 41–46.  But the lion's share of its examples involves "the discretion of the President to grant interviews or briefings with selected journalists," *Sherrill*, 569 F.2d at 129, instances that—unlike this case—implicate the President's own right to speak or stay silent, *see infra* Section II.C.  Others involve press availabilities that were never extended on nondiscriminatory terms in the first instance.

10

*See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (government violates First Amendment by ejecting speaker from a nonpublic forum "solely to suppress the point of view he espouses *on an otherwise includible subject*" (emphasis added)).  And the only example that the White House cites that arguably resembles this case—where President Wilson changed course over time from a policy of equal access to his press conferences in favor of more selective interviews—gives no indication that the motive was retaliatory.  *See* Appellants' Br. at 43; *see also An Evolutionary Portrait*, White House Correspondents' Ass'n (last visited Feb. 20, 2025), https://whca.press/about/history/ ("[T]he consensus among the correspondents was that Wilson simply found press conferences tiresome[.]").

Nothing in those anecdotes refutes the reality that, from the Eisenhower Administration through the decades that followed, the White House press pool was insulated against viewpoint-based tampering by the government.  And only with that independence can the pool ensure that

the public "never come[s] to depend on a president's aides alone" to understand the nation's highest office.  *Covering the White House*, *supra*.

## II.    The threat of retaliatory ejection from the pool would chill a reasonable news outlet from candidly covering the presidency.

The First Amendment backstops that tradition of independence, as the District Court rightly concluded.  The Constitution leaves the choice of how to cover "public issues"—"whether fair or unfair"—to each independent news organization, not the federal government.  *Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024) (quoting *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)).  To eject the AP from the pool because it exercised "editorial control and judgment" in a manner that angered the President, *Tornillo*, 418 U.S. at 258, therefore "violates our foundational notions of a free press," *TGP Commc'ns, LLC v. Sellers*, No. 22-16826, 2022 WL 17484331, at *5 (9th Cir. Dec. 5, 2022) (viewpoint-based exclusion of reporter from county press conference violated the First Amendment).

Insisting otherwise, the White House urges that this case involves nothing more than the everyday sparring of "the journalist's accepted role in the 'rough and tumble' political arena," Appellants' Br. at 22 (quoting

12

*Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 419 (4th Cir. 2006)), and therefore cannot give rise to a retaliation claim. But as creatively as the White House might try to characterize its conduct, the unprecedented ejection of the AP from the pool bears no resemblance—practical or doctrinal—to the workaday dynamics "of a competitive press corps competing for influence and coverage," *id.* at 51. Even if the White House need never have established a press pool, its discretion to decide how to structure press availabilities in the first instance does not come bundled with the power to revoke a benefit on retaliatory grounds. *See Sherrill*, 569 F.2d at 129–30 ("where the White House has voluntarily decided to establish press facilities," otherwise-qualified news organizations cannot "be arbitrarily excluded"). And while the President may freely speak (or not speak) to whomever he chooses, *see id.* at 129, he enjoys no authority to revoke *other* benefits from a news organization on the basis of its own protected speech.

At base, to let the threat of retaliation hang over the White House press pool—able to report freely only to the extent it avoids angering the President—would be incompatible with the insight that the "'uninhibited,

13

robust, and wide-open' debate that the First Amendment is intended to protect" depends on an independent press. *Counterman v. Colorado*, 600 U.S. 66, 78 (2023) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). The predictable chill of such a holding plainly undermines the White House's suggestion that no meaningful retaliation unfolded here.

### A. Retaliatory revocation of a benefit can chill a reasonable news organization even if extending the benefit was discretionary.

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out," *Hartman v. Moore*, 547 U.S. 250, 256 (2006), and the parties agree that government action amounts to retaliation when it would "chill a person of ordinary firmness in the plaintiff's position from engaging in future First Amendment activity," *Houston Cmty. Coll. Sys.*, 595 U.S. at 477 (citation and internal quotation marks omitted). Against that backdrop, much of the White House's position amounts to insisting that no one could be chilled by the AP's ejection from the pool because journalists already know that any degree of press access to presidential spaces is discretionary. But the point is a non sequitur; the Supreme Court has made

14

it more than clear that "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons," it may not do so "on a basis that infringes [a speaker's] constitutionally protected interests—especially, his interest in freedom of speech." *Sindermann*, 408 U.S. at 597.  And that rule has repeatedly been applied to protect the press in particular against the sort of retaliation at issue here.

For instance, while the First Amendment does not guarantee the press a "right of access to prisons or their inmates beyond that afforded the general public," *Pell v. Procunier*, 417 U.S. 817, 834 (1974), it nevertheless prohibits *revoking* on retaliatory grounds access that was previously granted, *see Chicago Reader v. Sheahan*, 141 F. Supp. 2d 1142, 1146 (N.D. Ill. 2001).  And intuitively so, because otherwise "[a] reporter might well tone down a critical article if she feared that jail officials might terminate, or even restrict, her future access." *Id*.[2]  The same basic guarantee of

---

[2]    To similar effect, courts have consistently concluded that—while the government of course need not place advertisements in a newspaper in the first instance—the "withdrawal of advertisements from [a] newspaper in

nondiscrimination has been recognized in contexts as diverse as press access to the facilities at Guantanamo Bay, *see Getty Images News Servs., Corp. v. Dep't of Defense*, 193 F. Supp. 2d 112, 120 (D.D.C. 2002); the battlefield, *see id.* (citing *Nation Mag. v. U.S. Dep't of Defense*, 762 F. Supp. 1558, 1574–75 (S.D.N.Y. 1991)); the selection of correspondents to travel to foreign soil otherwise off-limits to the public, *see Frank v. Herter*, 269 F.2d 245, 247–48 (D.C. Cir. 1959) (Burger, J., concurring); and, of course, the White House pool itself, *see Cable News Network*, 518 F. Supp. at 1245.

The related First Amendment rules governing public and nonpublic fora reinforce that conclusion. The government need not create particular opportunities for speech or newsgathering in the first instance, and may make distinctions "based on subject matter and speaker identity" when establishing a nonpublic forum at the outset that would not be permissible grounds for regulating speech in other contexts. *Cornelius*, 473 U.S. at 806. But having laid down the rules of the road, officials can alter them only for

retaliation for critical editorials and news violates the First Amendment." *El Dia, Inc. v. Rossello*, 165 F.3d 106, 110 (1st Cir. 1999); *see also N. Miss. Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1337 (5th Cir. 1986) (same).

nondiscriminatory reasons; "[f]or the Government to *change* the nature of a forum in order to deny access to a particular speaker or point of view surely would violate the First Amendment." *Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 365 (D.C. Cir. 2018) (emphasis added). And other courts of appeals have therefore consistently concluded that, even where government officials hold a "limited-access press conference" best understood as a nonpublic forum, the government may not go on to exclude otherwise-eligible journalists on the basis of their editorial viewpoint. *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610 (7th Cir. 2021); *TGP Commc'ns, LLC*, 2022 WL 17484331, at \*4–5 (same).

Those principles make clear that the White House is wrong to think the District Court's decision jeopardizes the President's freedom to create press availabilities for select news organizations outside the context of the pool. Just as the government may choose to fund the study of democracy without funding the study of fascism, *see Rust v. Sullivan*, 500 U.S. 173, 194 (1991), the President can opt to hold a confab in the Oval Office only for business publications, or only for newspapers from Wisconsin, or along

any number of other lines "based on subject matter and speaker identity" that he believes will advance his agenda, *Cornelius*, 473 U.S. at 806. But having previously established a neutral process that allowed the White House Correspondents' Association to assign participants to the pool, the White House cannot turn around and eject "otherwise includible" outlets on retaliatory grounds. *Id.*; *cf. Frank*, 269 F.2d at 247 ("If, for example, the choice [of correspondents permitted to travel to Communist China] was limited only to Democrats or only to Republicans, obviously that would be improper and would fall." (Burger, J., concurring)).

Because the White House freely confesses that it did just that in this case, its expulsion of the AP violated the First Amendment.

## B.    The White House's own right to speak does not entail a right to eject news outlets from the pool on retaliatory grounds.

In a related misdirection, the White House emphasizes that the President has always been free to speak—or not speak—to any journalist, to grant exclusives to outlets he thinks friendly and deny them to ones he thinks hostile. True enough, and the President can continue to do so under the preliminary injunction. But the White House is mistaken to think that

18

"the discretion of the President to grant interviews or briefings with selected journalists," *Sherrill*, 569 F.2d at 129, rests on the premise that the fear of losing an interview on retaliatory grounds would not influence a news organization's speech; of course it might. Instead, the White House's examples of past presidents favoring one outlet with a scoop while shunning another square with the First Amendment because the President's own words are, intuitively enough, the government's own speech, and "Government is not restrained by the First Amendment from controlling its own expression." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) (citation omitted); *see Ehrlich*, 437 F.3d at 413–14 (no First Amendment claim where governor ordered officials not to "speak with" particular reporters but news organization itself had "not been denied any access by the directive"). That proposition does the White House no good in this case—the President's remarks at the briefing podium may be government speech, but the aggregation of reporters covering the briefing is not.

19

The analysis of whether the government is speaking for itself or providing the occasion for others' speech and newsgathering looks to "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). Those considerations make clear that the composition of the press pool is anything but the government's own message. For one, since the Eisenhower Administration, the White House has never (successfully) disturbed the composition of the pool and never exercised control over the independent messages conveyed by its members. *See supra* Section I. And far from relaying the government's preferred point of view uncritically, the pool's questioning can be adversarial, even "rowdy." Kellman, *supra*. The resulting news coverage, for its part, conveys the full diversity of perspectives on the presidency, with one outlet no doubt routinely contradicting another's opinion on an event. *See Matal v. Tam*, 582 U.S. 218, 236 (2017) (finding it "far-fetched to

suggest" that a program is government speech if the result would be that "the Federal Government is babbling prodigiously and incoherently").

In a similar vein, the White House's emphasis that the Oval Office at times functions as the President's "personal office" and the White House as his "private residence" has little bearing on whether the composition of the press pool is the government's own speech, Appellants' Br. at 31, because the First Amendment status of a given physical space is not frozen in amber. As this Court explained in another context, for instance, the public cannot take the field for expressive purposes while the Washington Commanders are playing, but "the bare fact that the property in question is a football stadium" does not resolve where and when the public is entitled to speak at RFK Stadium, *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1018 (D.C. Cir. 1988), because "stadiums may not have the same public forum status in all places at all times," *id.* at 1018 n.8. And just as the topics available to speakers at a schoolboard meeting may change from meeting to meeting held in the same room, *see PETA v. Tabak*, 109 F.4th 627, 634 (D.C. Cir. 2024), the scope of a press availability in a given space may vary

depending on whether "the government prospectively sets restrictions,"
*id*., with different eligibility criteria for hard passes, for the press pool, or a
one-off group interview in the Oval Office.

But the key word there is "prospectively"—the boundaries of an
opportunity to speak or gather news must be defined in advance by
"objective, workable standards," not ad-hoc or on-the-fly discrimination.
*Id.* at 636 (citation omitted).  In other words, the government cannot
gerrymander the scope of a forum after the fact with intent to censor.  *See
Am. Freedom Def. Initiative*, 901 F.3d at 365.  And whatever the criteria the
White House may use to decide who can sleep in the Lincoln Bedroom or
attend purely internal meetings, *see* Appellants' Br. at 31 (emphasizing the
President's control over "his private residence"), it has never previously
purported to restrict the composition of the pool in order to enforce
orthodoxy with the President's own message.  That the Oval Office or Air
Force One is sometimes used for the President's own remarks or his own
work does not transform everything that unfolds there into the
government's own speech.

In light of our constitutional tradition, then—which makes clear that "[t]he Government's power to censor the press was abolished so that the press would remain forever free to censure the Government," *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring)—it would be bizarre to suggest that the public sees the White House press corps primarily as an extension of the presidency, *see* Appellants' Br. at 30 (describing pool coverage as "a presentation that the government actor himself designs and controls"), rather than as "surrogates for the public," *Richmond Newspapers*, 448 U.S. at 573 (plurality opinion).  The President's power to compose his own remarks affords the White House no right to retaliate against the Associated Press for its own editorial choices.

### C.    Retaliation remains retaliation when the government closes an entire forum in order to punish one news organization.

In a fallback position, the White House at times suggests that the AP cannot obtain relief now that the White House has done away with the role of the White House Correspondents' Association in choosing pool participants entirely.  *See* Appellants' Br. at 38–39.  But whether the AP's "exclusion is accomplished by individual censorship or elimination of the

forum is inconsequential; the result is the same." *Mo. Knights of the Ku Klux Klan v. Kansas City*, 723 F. Supp. 1347, 1352 (W.D. Mo. 1989). As already discussed above, "[f]or the Government to change the nature of a forum in order to deny access to a particular speaker or point of view surely would violate the First Amendment." *Am. Freedom Def. Initiative*, 901 F.3d at 365. And that much remains true even if the government proffers superficially viewpoint-neutral reasons for the change of heart. *See id.* Anything less than a "viewpoint neutral and reasonable" pool selection process therefore runs afoul of the First Amendment. *Ateba v. Leavitt*, 133 F.4th 114, 123 (D.C. Cir. 2025) (finding that access to the White House Press Area is governed by the First Amendment rules regulating nonpublic fora).

For that reason, the White House can neither reconstitute the pool entirely nor single out the AP for mistreatment if its goal is to exclude the AP because of its editorial choices. Either way, "[t]he Constitution deals with substance, not shadows," *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1866), and the White House's retaliation against a news organization for making editorial choices that it dislikes violates the First Amendment.

III.    **Even where other news organizations remain free to cover the same event, the retaliatory ejection of any one outlet undermines the public's right to know and skews the news that reaches the public.**

Finally, much as the White House insists that the ejection of the AP is just another day in the news business, the White House maintains that its actions have worked no harm because the news will go on without the AP—that "[t]he President is the most covered public figure on the planet, and he will remain so no matter how this litigation is resolved." Appellants' Br. at 55.  But that argument only underlines that the White House's fundamental quarrel is with the role of the press in our system, because the Constitution assigns the federal government no role in deciding when the public knows enough about its leaders for its own good.

As the Supreme Court recently reiterated, the government has no power to tinker with "the speech of private actors in order to achieve its own conception of speech nirvana." *Moody*, 603 U.S. at 742.  Instead, the First Amendment trusts "that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public," *Associated Press*, 326 U.S. at 20, and in that free flow

of information "it is impossible to treat two news services as

interchangeable," *Associated Press*, 52 F. Supp. at 372.  Each outlet in the

pool exercises its own judgment "in preparing a dispatch," and its own

judgment "in deciding what events are important enough to appear at all."

*Id.*  These are decisions about which journalists "will differ widely; as we

often find, when one service 'carries' what others have thought too trivial;

or may indeed have missed altogether."  *Id.*  There is no knowing what the

AP's perspective might have added on the days its journalists were shut

out, and that injury to the public's right to know is irreparable.

There can be no doubt, though, of the net direction in which

government actors would prefer to push the content of the news: in their

own favor.  The White House makes no bones of the fact that it hopes to

commandeer pool selection "to best amplify [the President's] message."

Appellants' Br. at 1.  It presumably hopes, in other words, that under threat

of retaliatory ejection, questioning will be friendlier—that outlets will face

pressure to pull their punches, to gloss over mistakes or unartful remarks,

to avoid pressing for answers.  And were it to succeed, the core function of

the pool—to offer a complete, candid record of the presidency—would atrophy. Serious enough as those harms to the AP and a free press are on their own terms, ultimately "it is the public which would lose." *Am. Broad. Cos., Inc.*, 570 F.2d at 1083. The District Court's injunction would guard against just those constitutional harms. This Court should affirm.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to affirm the preliminary injunction entered by the District Court.

Dated: October 6, 2025                    Respectfully submitted,

                                          */s/ Bruce D. Brown*
                                          Bruce D. Brown
                                             *Counsel of Record for Amici Curiae*
                                          Lisa Zycherman
                                          Gabriel Rottman
                                          Mara Gassmann
                                          Grayson Clary
                                          REPORTERS COMMITTEE FOR
                                            FREEDOM OF THE PRESS
                                          1156 15th Street NW, Ste. 1020
                                          Washington, DC 20005
                                          Telephone: 202.795.9300
                                          bruce.brown@rcfp.org

                                          *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains 5,586 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Palatino Linotype font.

Dated: October 6, 2025                     */s/ Bruce D. Brown*
                                           Bruce D. Brown
                                           *Counsel of Record for Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on October 6, 2025, I electronically filed the foregoing

brief with the United States Court of Appeals for the District of Columbia

Circuit using the appellate CM/ECF system.  All parties are registered

CM/ECF users, and service upon them will be accomplished by the

appellate CM/ECF system.

Dated: October 6, 2025                          /s/ *Bruce D. Brown*
                                                Bruce D. Brown
                                                *Counsel of Record for Amici Curiae*

29

## ADDENDUM: STATEMENTS OF INTEREST
## OF INDIVIDUAL AMICI CURIAE

**The Reporters Committee for Freedom of the Press** is an

unincorporated nonprofit association of reporters and editors founded by

leading journalists and media lawyers in 1970, when the nation's press

faced an unprecedented wave of government subpoenas forcing reporters

to name confidential sources. Today, its attorneys provide pro bono legal

representation, amicus curiae support, and other legal resources to protect

First Amendment freedoms and the newsgathering rights of journalists..

**The White House Correspondents' Association** ("WHCA") is a

nonprofit association incorporated in the District of Columbia, whose

primary mission is to advocate for the newsgathering rights of the press on

behalf of journalists who cover the White House and on behalf of

Americans who rely on the press to provide information about the

activities of their elected officials. Founded more than 100 years ago, the

WHCA has consistently and effectively worked to ensure that the

individuals who gather and report the news from the White House can

seek answers from powerful officials, including the President of the United

States.  It is an independent, self-organized association of journalists who cover the White House on a full- or part-time basis.  The WHCA has nearly 800 members, who together represent nearly 300 news organizations.  Since the Eisenhower administration, the WHCA has coordinated logistics related to the White House press pool and briefing room.  In so doing, the WHCA has, for more than a dozen presidential administrations, served as a bulwark against government influence over White House news coverage.

**Advance Publications, Inc.** ("Advance") is a diversified privately-held company that operates and invests in a broad range of media, communications and technology businesses.  Its operating businesses include Conde Nast's global magazine and digital brand portfolio, including titles such as Vogue, Vanity Fair, The New Yorker, Wired, and GQ, local news media companies producing newspapers and digital properties in 10 different metro areas and states, and American City Business Journals, publisher of business journals in over 40 cities.

**Agence France-Press** ("AFP") is a leading global news agency providing comprehensive and verified coverage of the events shaping the

world and of the issues affecting the daily lives of people inside the U.S., Europe, and around the world. Drawing from an unparalleled news gathering network across 150 countries, AFP is also a world leader in digital verification. With 2,600 staff representing 100 different nationalities, AFP covers the world in six languages, with a unique quality of multimedia storytelling spanning video, text, photos and graphics. AFP has journalists actively covering the White House on a fulltime basis and has continuously covered the US presidential beat since the 1940s.

**American Broadcasting Companies, Inc.** is a broad-based communications company. Alone or through its subsidiaries, it owns ABC News, abcnews.com, and local broadcast television stations that regularly gather and report news to the public. ABC News produces the television programs *World News with David Muir*, *Good Morning America*, *Nightline*, *20/20*, and *This Week*, among others.

**The Atlantic Monthly Group LLC** is the publisher of The Atlantic and TheAtlantic.com. Founded in 1857 by Oliver Wendell Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others, The Atlantic

continues its 160-year tradition of publishing award-winning journalism

that challenges assumptions and pursues truth, covering national and

international affairs, politics and public policy, business, culture,

technology and related areas.

**Axios Media Inc.** is a digital media company with a mission to

deliver news in an efficient format that helps professionals get smarter

faster across an array of topics, including politics, science, business, health,

tech, media, and local news.

**Bloomberg News** is owned and operated by Bloomberg L.P.

Bloomberg's newsroom of more than 2,700 journalists and analysts delivers

thousands of stories a day, producing content that is featured across

multiple platforms, including digital, TV, radio, print and live events.

**Boston Globe Media Partners, LLC** publishes The Boston Globe, the

largest daily newspaper in New England.

**Cable News Network, Inc.** ("CNN"), a Delaware corporation, is a

portfolio of two dozen news and information services across cable, satellite,

radio, wireless devices and the Internet in more than 200 countries and

territories worldwide.  Domestically, CNN reaches more individuals on

television, the web and mobile devices than any other cable TV news

organization in the United States; internationally, CNN is the most widely

distributed news channel reaching more than 271 million households

abroad; and CNN Digital is a top network for online news, mobile news

and social media.  Additionally, CNN Newsource is the world's most

extensively utilized news service partnering with hundreds of local and

international news organizations around the world.

**CBS Broadcasting Inc.** produces and broadcasts news, public affairs

and entertainment programming. Its CBS News Division produces

morning, evening and weekend news programming, as well as news and

public affairs newsmagazine programs, such as "60 Minutes" and "48

Hours."  CBS Broadcasting Inc. also directly owns and operates television

stations across the country, including WCBS-TV in New York City, which

produces daily news programming.

**The Center for Investigative Reporting, Inc.** is the nation's oldest

nonprofit investigative newsroom in the country that runs the brands

Mother Jones, Reveal, and CIR Studios.  Mother Jones is a reader-supported news magazine and website known for ground-breaking investigative and in-depth journalism on issues of national and global significance.  Reveal produces investigative journalism for the Reveal national public radio show and podcast, and CIR Studios produces feature length documentaries distributed on Netflix, Hulu and other streaming channels.  Reveal often works in collaboration with other newsrooms across the country.

**The Committee to Protect Journalists** ("CPJ") is an independent, nonprofit organization that promotes press freedom worldwide.  We defend the right of journalists to report the news without fear of reprisal.  CPJ is made up of about 40 experts around the world, with headquarters in New York City.  A board of prominent journalists from around the world helps guide CPJ's activities.

**Courthouse News Service** is a California-based legal news service that publishes a daily news website with a focus on politics and law.  The news service also publishes daily reports on new civil actions and appellate

rulings in both state and federal courts throughout the nation.  Subscribers

to the daily reports include law firms, universities, corporations,

governmental institutions, and a wide range of media including

newspapers, television stations and cable news services.

**First Amendment Coalition** ("FAC") is a nonprofit public interest

organization dedicated to defending free speech, free press and open

government rights in order to make government, at all levels, more

accountable to the people.  The Coalition's mission assumes that

government transparency and an informed electorate are essential to a self-

governing democracy.  FAC advances this purpose by working to improve

governmental compliance with state and federal open government laws.

FAC's activities include free legal consultations on access to public records

and First Amendment issues, educational programs, legislative oversight

of California bills affecting access to government records and free speech,

and public advocacy, including extensive litigation and appellate work.

FAC's members are news organizations, law firms, libraries, civic

organizations, academics, freelance journalists, bloggers, activists, and ordinary citizens.

**Fox News Network LLC ("Fox News")** owns and operates the Fox News Channel, the top rated 24/7 all news national cable channel, and the Fox Business Network, as well as Foxnews.com, Foxbusiness.com, and the Fox News Radio Network.

**HuffPost** is a news and information website owned by BuzzFeed, Inc., a social news and entertainment company that provides shareable breaking news, original reporting, entertainment, and video across the social web to its global audience of more than 200 million.

**The Inter American Press Association** ("IAPA") is a not-for-profit organization dedicated to the defense and promotion of freedom of the press and of expression in the Americas. It is made up of more than 1,300 publications from throughout the Western Hemisphere and is based in Miami, Florida.

**The Intercept Media, Inc.** is a non-profit digital media venture committed to rigorous, adversarial journalism in the public interest.

**Los Angeles Times Communications LLC** is one of the largest daily newspapers in the United States. Its popular news and information website, www.latimes.com, attracts audiences throughout California and across the nation.

**The Media Institute** is a nonprofit foundation specializing in communications policy issues founded in 1979.  The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism.  Its program agenda encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

**The Media Law Resource Center, Inc.** ("MLRC") is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as policy issues.  These include news and analysis of legal, legislative and regulatory developments; litigation resources and practice guides; and national and international media law conferences and meetings.  The MLRC also works with its membership to respond to

legislative and policy proposals, and speaks to the press and public on media law and First Amendment issues.  It counts as members over 125 media companies, including newspaper, magazine and book publishers, TV and radio broadcasters, and digital platforms, and over 200 law firms working in the media law field.  The MLRC was founded in 1980 by leading American publishers and broadcasters to assist in defending and protecting free press rights under the First Amendment.

**The National Freedom of Information Coalition** ("NFOIC") is a national nonprofit, nonpartisan organization of state and regional affiliates representing 45 states and the District of Columbia.  Through its programs and services and national member network, NFOIC promotes press freedom, litigation and legislative and administrative reforms that ensure open, transparent and accessible state and local governments and public institutions.

**The National Press Club** is the world's leading professional organization for journalists.  Founded in 1908, the Club has 3,100 members representing most major news organizations.  The Club defends a free

press worldwide.  Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

**The National Press Club Journalism Institute** is the non-profit affiliate of the National Press Club, founded to advance journalistic excellence for a transparent society.  A free and independent press is the cornerstone of public life, empowering engaged citizens to shape democracy.  The Institute promotes and defends press freedom worldwide, while training journalists in best practices, professional standards and ethical conduct to foster credibility and integrity.

**The National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution.  NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its

forms, especially as it relates to visual journalism.  The submission of this

brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**National Public Radio, Inc.** ("NPR") is a non-profit multimedia

organization and the leading provider of non-commercial news,

information, and entertainment programming to the American public.

NPR's fact-based, independent journalism helps the public stay on top of

breaking news, follow the most critical stories of the day, and track

complex issues over the long term.  NPR reaches approximately 60 million

people each week on broadcast radio, podcasts, NPR apps, NPR.org, and

YouTube video content.  NPR distributes its radio broadcasts through more

than 1,000 non-commercial, independently operated radio stations,

licensed to more than 260 NPR members and numerous other NPR-

affiliated entities.

**NBCUniversal Media, LLC** is one of the world's leading media and

entertainment companies in the development, production and marketing of

news, entertainment and information to a global audience.  Among other

businesses, NBCUniversal Media, LLC owns and operates the NBC

television network, the Spanish-language television network Telemundo,

NBC News, several news and entertainment networks, including MSNBC

and CNBC, and a television-stations group consisting of owned-and-

operated television stations that produce substantial amounts of local

news, sports and public affairs programming.  NBC News produces the

"Today" show, "NBC Nightly News with Lester Holt," "Dateline NBC"

and "Meet the Press."

**The New York Times Company** is the publisher of The New York

Times and operates the news website nytimes.com.

**Newsday LLC** ("Newsday") is the publisher of the daily newspaper,

Newsday, and related news websites.  Newsday is one of the nation's

largest daily newspapers, serving Long Island through its portfolio of print

and digital products. Newsday has received 19 Pulitzer Prizes and other

esteemed awards for outstanding journalism.

**The News/Media Alliance** represents over 2,200 diverse publishers

in the U.S. and internationally, ranging from the largest news and

magazine publishers to hyperlocal newspapers, and from digital-only

outlets to papers who have printed news since before the Constitutional Convention.  Its membership creates quality journalistic content that accounts for nearly 90 percent of daily newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties.  The Alliance diligently advocates for newspapers, magazine, and digital publishers, on issues that affect them today.

**The News Guild-CWA** is a labor organization representing more than 25,000 employees of newspapers, newsmagazines, news services and other media enterprises. Guild representation comprises, in the main, the editorial and online departments of these media outlets.  The News Guild is a sector of the Communications Workers of America. CWA is America's largest communications and media union, representing over 500,000 men and women in both private and public sectors.

**News Media Guild, TNG-CWA** is labor organization that serves as the direct collective bargaining representative of the journalists at the Associated Press and other news organizations.  It is a local of the international union TNG-CWA.

**The Online News Association** ("ONA") is the world's largest association of digital journalists.  ONA's mission is to inspire innovation and excellence among journalists to better serve the public.  Membership includes journalists, technologists, executives, academics and students who produce news for and support digital delivery systems.  ONA also hosts the annual Online News Association conference and administers the Online Journalism Awards.

**PEN American Center, Inc.** ("PEN America") is a nonpartisan nonprofit organization working at the intersection of literature and human rights.  Founded in 1922, PEN America advocates for free expression and the interests of writers and journalists in the United States and abroad.  Its membership includes more than 5,000 writers, journalists, literary professionals, and readers nationwide.  PEN America protects press freedom and journalists by combatting disinformation, defending journalists against online abuse, and supporting local news.

**POLITICO** is a global news and information company at the intersection of politics and policy.  Since its launch in 2007, POLITICO has

44

grown to nearly 300 reporters, editors and producers.  It distributes 30,000

copies of its Washington newspaper on each publishing day and attracts an

influential global audience of more than 35 million monthly unique visitors

across its various platforms.

**The Press Freedom Center at the National Press Club** is dedicated to

defending press freedom and supporting those who risk their lives to

report the truth.  Because journalists around the world face growing

threats—from imprisonment and violence to exile and dislocation—The

Press Freedom Center assists detained, threatened or exiled journalists

through advocacy, direct support and community.

**Pro Publica, Inc.** ("ProPublica") is an independent, nonprofit

newsroom that produces investigative journalism in the public interest.  It

has won six Pulitzer Prizes, most recently a 2020 prize for national

reporting, the 2019 prize for feature writing, and the 2017 gold medal for

public service.  ProPublica is supported almost entirely by philanthropy

and offers its articles for republication, both through its website,

propublica.org, and directly to leading news organizations selected for

maximum impact. ProPublica has extensive regional and local operations, including ProPublica Illinois, which began publishing in late 2017 and was honored (along with the Chicago Tribune) as a finalist for the 2018 Pulitzer Prize for Local Reporting, an initiative with the Texas Tribune, which launched in March 2020, and a series of Local Reporting Network partnerships.

**The Pulitzer Center on Crisis Reporting**, based in Washington, DC, was founded in 2006 as a non-profit journalism center dedicated to supporting in-depth engagement with underreported global affairs through sponsorship of quality international journalism across all media platforms and a unique program of outreach and education to schools and universities. The Center supports over 150 international reporting projects each year, working in tandem with major international news outlets.

**Reuters**, the news and media division of Thomson Reuters, is the world's largest multimedia news provider. Founded in 1851, it is committed to the Trust Principles of independence, integrity and freedom from bias. With unmatched coverage in over 16 languages, and reaching

billions of people worldwide every day, Reuters provides trusted

intelligence that powers humans and machines to make smart decisions. It

supplies business, financial, national and international news to

professionals via desktop terminals, the world's media organizations,

industry events and directly to consumers.

**The Seattle Times Company**, locally owned since 1896, publishes the

daily newspaper The Seattle Times, together with the Yakima Herald-

Republic and Walla Walla Union-Bulletin, all in Washington state.

**The Slate Group** publishes Slate, a daily online magazine. Slate

features articles and podcasts analyzing news, politics and contemporary

culture.

**The Society of Environmental Journalists** is the only North

American membership association of professional journalists dedicated to

more and better coverage of environment-related issues.

**The Society of Professional Journalists** ("SPJ") is dedicated to

improving and protecting journalism. It is the nation's largest and most

broad-based journalism organization, dedicated to encouraging the free

practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**Student Press Law Center** ("SPLC") is a nonprofit, nonpartisan organization which, since 1974, has been the nation's only legal assistance agency devoted exclusively to educating high school and college journalists about the rights and responsibilities embodied in the First Amendment to the Constitution of the United States.  SPLC provides free legal assistance, information and educational materials for student journalists on a variety of legal topics.

**Vox Media, LLC** owns New York Magazine and several web sites, including Vox, The Verge, The Cut, Vulture, SB Nation, and Eater, with 170 million unique monthly visitors.

**The Washington Post** (formally, WP Company LLC d/b/a The Washington Post) is a news organization based in Washington, D.C.  It

publishes The Washington Post newspaper and the website

www.washingtonpost.com, and produces a variety of digital and mobile

news applications.  The Post has won Pulitzer Prizes for its journalism,

including the award in 2020 for explanatory reporting.

  **The White House News Photographers Association** ("WHNPA"),

founded in 1921, is a membership organization that advances and protects

the interests of still and video photographers assigned to cover the White

House as well as news events in and beyond Washington.  WHNPA

believes that there is a link between the survival of a democratic society

and an accurate and free press and in the public's natural and legal right to

be informed about the world.  Members of the WHNPA maintain the

highest standards of ethical conduct in serving the public interest and

strive to produce images that are independent and objective.  The

organization provides professional and student education, and its Eyes on

History contests, held since 1941, celebrate the still, video and multimedia

disciplines and the remarkable world-changing images that WHNPA

members generate while on assignment.