**ORAL ARGUMENT SCHEDULED NOVEMBER 24, 2025**

**No. 25-5109**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

—————————

ASSOCIATED PRESS,

Plaintiff-Appellee,

v.

STEVEN CHEUNG, in his official capacity as Assistant to the
President and White House Director of Communications; KAROLINE
C. LEAVITT, in her official capacity as White House Press Secretary;
and SUSAN WILES, in her official capacity as White House Chief of
Staff,

Defendants-Appellants.

—————————

On Appeal from the United States District Court
for the District of Columbia

—————————

**REPLY BRIEF FOR APPELLANTS**

—————————

YAAKOV M. ROTH
  *Principal Deputy Assistant
  Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
STEVEN A. MYERS
  *Attorneys, Appellate Staff
  Civil Division, Room 7232
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-8648*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

### A.    Parties and Amici

Plaintiff-appellee is the Associated Press.  Defendants-appellants are Steven Cheung, in his official capacity as Assistant to the President and White House Director of Communications;[1] Karoline C. Leavitt, in her official capacity as White House Press Secretary; and Susan Wiles, in her official capacity as White House Chief of Staff.  The White House Correspondents' Association, the Reporters Committee for Freedom of the Press, the Center for American Rights, the Knight First Amendment Institute at Columbia University, and the State Democracy Defenders Fund participated as amici curiae in district court.  In this Court, the following parties have appeared as amici:  the Reporters Committee for Freedom of the Press, the White House Correspondents

---

[1] Plaintiff initially named Taylor Budowich, in his official capacity as White House Deputy Chief of Staff.  Mr. Budowich no longer holds that position, and Mr. Cheung is now exercising any responsibilities previously held by Mr. Budowich that are pertinent to this case.

i

Association, 46 News and Media Organizations,[2] the Knight First

Amendment Institute at Columbia University, Reporters Without

Borders, Inc., the American Civil Liberties Union, the American Civil

Liberties Union of the District of Columbia, and a group of First

Amendment scholars.[3]

---

[2] Amici are Advance Publications, Inc., Agence France-Presse, American Broadcasting Companies, Inc., The Atlantic Monthly Group LLC, Axios Media Inc., Bloomberg News, Boston Globe Media Partners, LLC, Cable News Network, Inc., CBS Broadcasting Inc., The Center for Investigative Reporting, Committee to Protect Journalists, Courthouse News Service, First Amendment Coalition, Fox News Network, LLC, HuffPost, Inter American Press Association, The Intercept Media, Inc., Los Angeles Times Communications LLC, The Media Institute, Media Law Resource Center, National Freedom of Information Coalition, The National Press Club, The National Press Club Journalism Institute, National Press Photographers Association, National Public Radio, Inc., NBCUniversal Media, LLC, The New York Times Company, News Media Guild–TNG-CWA, Newsday LLC, News/Media Alliance, The NewsGuild - CWA, Online News Association, PEN America, POLITICO LLC, The Press Freedom Center at the National Press Club, Pro Publica, Inc., Pulitzer Center on Crisis Reporting, Reuters News & Media Inc., The Seattle Times Company, Slate, Society of Environmental Journalists, Society of Professional Journalists, Student Press Law Center, Vox Media, LLC, The Washington Post, and White House News Photographers Association.

[3] Amici are Genevieve Lakier, RonNell Andersen Jones, Jack M. Balkin, Erwin Chemerinsky, Heidi Kitrosser, Christina Koningisor, Michael W. McConnell, Robert Post, Jacob M. Schriner-Briggs, Geoffrey R. Stone, and Sonja R. West.

**B.    Rulings Under Review**

The ruling under review (issued by Judge Trevor N. McFadden) is a memorandum opinion and order filed April 8, 2025, granting the Associated Press's motion for a preliminary injunction.  JA387-427.  It is reported at 780 F. Supp. 3d 32.

**C.    Related Cases**

This case has not previously been before this Court or any court other than the district court.  Undersigned counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Steven A. Myers*

Steven A. Myers

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................1

ARGUMENT .......................................................................5

I.  The AP's First Amendment Claim Is Meritless. .............................5

    A.  Forum Doctrine Does Not Apply To Restrictions On Access To Newsgathering In Sensitive Presidential Areas. ......................................................................5

    B.  Elected Officials Routinely And Permissibly Consider Viewpoint When Interacting With Journalists. ..................12

        1.  Precedent Refutes The AP's Suggestion That Strict Viewpoint Neutrality Governs Elected Officials' Interactions With Journalists......................12

        2.  The Historical Record Favors The Government..........18

        3.  The Preliminary Injunction Threatens Unending, Sensitive Compliance Litigation. ................................21

    C.  The AP's Retaliation Claim Is Equally Flawed. ...................23

II.  This Court Should Decline To Reach The AP's Fifth Amendment Claim, Which Is Meritless. .......................................25

III.  The AP Did Not Satisfy The Remaining Preliminary Injunction Factors. ..........................................................29

    A.  The AP Failed To Establish Irreparable Harm. ...................29

    B.  The Preliminary Injunction Harms The Government And The Public Interest........................................................30

CONCLUSION ...................................................................32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Associated Press v. FCC,*
  452 F.2d 1290 (D.C. Cir. 1971) ............................................................. 8

*Association of Flight Attendants v. USAir, Inc.,*
  24 F.3d 1432 (D.C. Cir. 1994) ............................................................. 17

*Ateba v. Leavitt,*
  133 F.4th 114 (D.C. Cir. 2025),
  *petition for cert. filed*, No. 25-338 (U.S. Sept. 23, 2025) ................... 8, 9

*Baltimore Sun Co. v. Ehrlich,*
  437 F.3d 410 (4th Cir. 2006) .......................................... 2, 13, 14, 15, 23

*Bauer v. FDIC,*
  38 F.4th 1114 (D.C. Cir. 2022) ........................................................... 25

*Brandenburg v. Ohio,*
  395 U.S. 444 (1969) (per curiam) ....................................................... 18

*Cable News Network, Inc. v. American Broadcasting Cos.,*
  518 F. Supp. 1238 (N.D. Ga. 1981) .................................................... 27

*Center for Nat'l Sec. Stud. v. U.S. Dep't of Just.,*
  331 F.3d 918 (D.C. Cir. 2003) (plurality opinion) .............................. 26

*Cheney v. U.S. Dist. Ct. for D.C.,*
  542 U.S. 367 (2004) ........................................................................... 30

*Cohen v. California,*
  403 U.S. 15 (1971) ............................................................................. 18

*Getty Images News Services Corp. v. Department of Defense,*
  193 F. Supp. 2d 112 (D.D.C. 2002) .................................................... 27

*Houchins v. KQED, Inc.,*
  438 U.S. 1 (1978) ............................................................................... 26

*Houston Cmty. Coll. Sys. v. Wilson,*
   595 U.S. 468 (2022) ............................................................ 24

*John C. Flood of Va., Inc. v. John C. Flood, Inc.,*
   642 F.3d 1105 (D.C. Cir. 2011) ........................................ 17

*John K. MacIver Institute for Public Policy, Inc. v. Evers,*
   994 F.3d 602 (7th Cir. 2021) ........................................ 9, 31

*Nation Magazine v. U.S. Department of Defense,*
   762 F. Supp. 1558 (S.D.N.Y. 1991) .................................. 27

*National Endowment for the Arts v. Finley,*
   524 U.S. 569 (1998) ............................................................ 13

*Price v. Garland,*
   45 F.4th 1059 (D.C. Cir. 2022) ............................... 5, 6, 7, 8

*Rosenberger v. Rectors & Vistors of the Univ. of Va.,*
   515 U.S. 819 (1995) ............................................................ 13

*Rutan v. Republican Party of Ill.,*
   497 U.S. 62 (1990) .............................................................. 13

*Scahill v. District of Columbia,*
   909 F.3d 1177 (D.C. Cir. 2018) ........................................ 26

*Sherley v. Sebelius,*
   644 F.3d 388 (D.C. Cir. 2011) .......................................... 25

*Sherrill v. Knight,*
   569 F.2d 124 (D.C. Cir. 1977) ................................... 9, 27, 28

*Snyder v. Phelps,*
   562 U.S. 443 (2011) ............................................................ 18

*United States v. Nassif,*
   97 F.4th 968 (D.C. Cir. 2024) ............................................. 9

*United States v. Texas,*
   144 S. Ct. 797 (2024) ......................................................... 32

vii

*Wilkie v. Robbins*,
　　551 U.S. 537 (2007) ............................................................... 23

*Zemel v. Rusk*,
　　381 U.S. 1 (1965) .................................................................. 27

**Other Authorities**

Blaire Atherton French,
　　*The Presidential Press Conference: Its History and Role in the
　　American Political System* (1982) ......................................... 19

Brian Lamb, et al.,
　　*The Supreme Court: A C-Span Book Featuring the Justices in Their
　　Own Words* (2010) ................................................................ 11

Harold Holzer,
　　*The Presidents vs. The Press: The Endless Battle Between the White
　　House and the Media—from the Founding Fathers to Fake News*
　　(2020) ...................................................................................... 2

Jonathan Swan,
　　*Democrat Joe Manchin Gets In With Breitbart*, Axios (Feb. 27, 2017),
　　https://perma.cc/PCK5-ST4W .............................................. 11

U.S. House of Representatives:  Hist., Art & Archives,
　　*Whereas: Stories from the People's House, Not Horsing Around:
　　Speaker Sedgwick Attempts to Rein in the Press* (May 20, 2024),
　　https://perma.cc/RF2Z-LWVB ............................................. 20

# GLOSSARY

| | |
|---|---|
| AP | Associated Press |
| JA | Joint Appendix |

## INTRODUCTION

The Associated Press (AP)'s brief is premised on what it describes as an "essential distinction" between efforts to "*interact*" with officials and efforts to obtain access to "the spaces opened to the pool to observe and report on official business." AP Br. 17. But as we observed in our opening brief, the AP conceded at the stay hearing that the President may be selective not only when selecting journalists to interview him, but also when determining which journalists may be invited to silently observe him from within the Oval Office. *See* Gov't Br. 32.

The AP resists the stay panel's conclusions that these "concessions give away the game," Stay Op. 18, by characterizing them as relating only to interviews and not to access more generally. *See* AP Br. 29-30. But the concessions were not so limited. At the stay hearing, Judge Katsas informed the AP that he was "[t]rying to take out the access dimension from the speak with the President dimension," and posed a hypothetical in which the President was "picking journalists who will be not allowed to speak with him, but just follow him around and observe him in order to write articles." Stay Arg. 1:14:18-1:14:37. In such a

scenario, Judge Katsas asked, can the President still "pick his favorite one or two or five reporters based on viewpoint?" Stay Arg. 1:14:40-1:14:45. The AP acknowledged that "[h]e can pick" and confirmed that "[h]e can pick a couple of people and say, follow me for the day, absolutely." Stay Arg. 1:14:46-1:14:53.

The AP may now wish to back away from these concessions, but it cannot attempt to do so if it is unwilling to even acknowledge that they were made. And in any event, the concessions were appropriate. Elected officials "without liability evaluate reporters and reward them with advantages of access" because such conduct is part of the "pervasive and everyday relationship between government officials and the press." *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 418 (4th Cir. 2006). That is the basic principle that permitted President Jefferson to choose a favored newspaper to receive first access to official news, Harold Holzer, *The Presidents vs. The Press: The Endless Battle Between the White House and the Media—from the Founding Fathers to Fake News* 39 (2020), that permitted President Theodore Roosevelt to place disfavored reporters in a "purgatory of ostracism," *id.* at 100, and

that permitted President Obama to spurn Fox News as an "act of revenge" for its editorial choices, *id.* at 379.

The AP largely ignores all of this history, and instead focuses its argument on analogies to spaces with no resemblance to the sensitive presidential spaces at issue here. Although the precise bounds of its legal theory are not clear, to the extent it has a limiting principle that principle appears to be that access is required for newsgathering in "spaces opened to the pool." AP Br. 17. If this phrase is meant to refer to areas that are generally made open to credentialed members of the press, it is legally correct but factually irrelevant, as this case does not concern such areas but instead concerns places as to which the White House has expressly reserved the right to restrict access to only a small handful of reporters.

If the AP means to suggest that the White House lacks authority to limit who may engage in newsgathering activities from sensitive areas of the White House, it is legally mistaken. Although the President once outsourced his authority over the Oval Office to the Correspondents' Association (which in turn conferred uniquely privileged access upon the AP), the White House permissibly declined to

continue to do so, and the AP does not suggest otherwise. *See* JA391 n.2. As the stay panel explained, "the AP cannot adversely possess a seat in the Oval Office, no matter how long its tradition of access." Stay Op. 23.

The AP also essentially ignores the fundamental point that the First Amendment focuses on restrictions on speech. In this respect, the AP's "essential distinction" undermines its own position. The AP is correct that this case is about access to physical spaces and information rather than communication, but that observation underscores the error in the AP's position that the limitations at issue in this case should be treated as a restriction on speech in a forum rather than as a restriction on the noncommunicative conduct of accessing sensitive presidential spaces to obtain information. The fundamental point is that the AP has no constitutional right to access those spaces in the first place. This Court should therefore vacate the preliminary injunction.

## ARGUMENT

**I.    The AP's First Amendment Claim Is Meritless.**

**A.    Forum Doctrine Does Not Apply To Restrictions On Access To Newsgathering In Sensitive Presidential Areas.**

The AP cannot defend the central premise underlying the district court's injunction: that limitations on access to highly restricted presidential spaces like the Oval Office, Air Force One, and Mar-a-Lago become subject to the same principles governing restrictions on speech on streets and university campuses simply because the President sometimes chooses to invite journalists into them to silently observe presidential events.

**1.**    As the stay panel correctly explained, "forum analysis applies only to communicative activities."  Stay Op. 14 (quoting *Price v. Garland*, 45 F.4th 1059, 1070 (D.C. Cir. 2022)).  Indeed, even the AP's brief tacitly acknowledges that forum doctrine is about restrictions on *speech*.  *See* AP Br. 19 (forum doctrine governs when "a speech restriction is constitutional" (quoting *Price*, 45 F.4th at 1068)).  This case does not involve restrictions on speech in a forum; it is about who may attempt to obtain information by silently observing the President within highly restricted presidential spaces.  The journalists whom the

5

President invites into spaces like the Oval Office are engaged in "observational newsgathering," which "is not itself a communicative activity." Stay Op. 14. It is instead a "noncommunicative step in the production of speech." *Price*, 45 F.4th at 1068; *see* Stay Op. 14.

The AP contends that it "engages in communicative activity when it reports from the press pool," AP Br. 20, because its journalists communicate with their editors, AP Br. 21. But this case is not about that communication. The government has not allowed some reporters, but not others, to communicate with their editors, much less restricted those communications based on their content or viewpoint. Instead, those communications are limited only indirectly, based on where the reporter is permitted to be physically located. The stay panel thus correctly noted the absence of a nexus between the speech and the "restricted spaces in which it occurs." Stay Op. 15.

Were the law otherwise, any restriction on access to a physical space could be recharacterized as a restriction on speech. Such a theory is utterly illogical, nor would it make any sense to suppose that a forum exists anywhere members of the public may use their cellphones to post to social media. *See* Stay Op. 17 ("The mere possibility of

communicating through the internet while on government property cannot transform every government space into a forum protected by the First Amendment.").  Indeed, on the AP's theory, the constitutional status of restricted presidential spaces depends on the quality of communications networks:  if cellular service is available within the Oval Office, it is a forum; if the in-flight Wi-Fi stops working, then Air Force One is not.

Nor can the AP treat restrictions on access to physical spaces as restrictions on speech by invoking a First Amendment right to engage in "newsgathering."  Once again, nothing about this case involves a restriction on newsgathering activities such as filming or recording.  Instead, this case concerns a restriction on access to locations where newsworthy events might occur.  That sort of restriction raises no First Amendment concern.  The AP underscores the error of its analysis by focusing on the fact that the restriction on commercial filming in *Price* had an exception for newsgathering.  That aspect of *Price* was relevant only because the restriction at issue in that case limited filming, which is a form of First Amendment activity.  The restrictions at issue here are on access and do not limit expressive activity of any kind.  AP Br.

7

20, 22.  Beyond that, any special treatment for newsgathering activities in *Price* arose not because it was constitutionally required, but as "an example of the unremarkable practice of the [government] 'sometimes granting the press special privileges and immunities.'"  45 F.4th at 1075 (alteration omitted) (quoting *Associated Press v. FCC*, 452 F.2d 1290, 1298 (D.C. Cir. 1971)).

2.    Even if forum doctrine were applicable to noncommunicative activities as a general matter, it would be extraordinary—and entirely unprecedented—to treat highly restricted presidential spaces like the Oval Office and Air Force One as First Amendment forums.  Such spaces unquestionably have not been "made available to the public or press for expressive activity," Knight First Amendment Inst. Br. 4; instead, when reporters are invited into these highly restricted spaces, it is because the President has determined that extending such invitations will facilitate dissemination of the government's message.

As the AP observes, it is circuit law that the White House Press Area—which includes the briefing room and press office space—is a nonpublic forum.  *See* AP Br. 21 (citing *Ateba v. Leavitt*, 133 F.4th 114 (D.C. Cir. 2025), *petition for cert. filed*, No. 25-338 (U.S. Sept. 23, 2025)).

Unlike the Oval Office, Air Force One, and Mar-a-Lago, however, the Press Area has been specifically set aside for all members of the press who satisfy viewpoint-neutral criteria; these spaces are accordingly "perceived as being open to all bona fide Washington-based journalists." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) (footnote omitted); *see also* Stay Op. 11 ("When the White House opens its facilities to the press generally, as it does in the Brady Briefing Room, it cannot exclude journalists based on viewpoint.").  The Oval Office, on the other hand, is not and has not ever been open to all credentialed journalists, and even for those who are admitted it is not generally held open for expressive activity.  It is thus entirely incorrect suggest the government's position in this case would abrogate *Ateba*, AP Br. 31; that case involved access to an entirely different type of space.[4]

---

[4] Nor does *John K. MacIver Institute for Public Policy, Inc. v. Evers*, 994 F.3d 602, 610-11 (7th Cir. 2021), *cited in* AP Br. 31, support the AP's position.  The question in that case was whether certain viewpoint-neutral accreditation criteria comported with the First Amendment; the Wisconsin governor did not purport to consider viewpoint, and any statement that the court made about the permissibility of doing so is plainly dicta.  *See also* Stay Op. 15 n.6 (explaining that *MacIver* is "of limited relevance to the inquiry here").  As for *United States v. Nassif*, 97 F.4th 968, 977-88 (D.C. Cir. 2024), *cited in* AP Br. 19, that case concerned the forum status of the Capitol

*Continued on next page.*

9

In an attempt to make the Oval Office and Air Force One look more like the briefing room, the AP incants that these spaces are "open to the pool."  AP Br. 11, 16, 31, 43, 53.  That argument sounds as though the White House had announced that the Oval Office is open to any journalists that the Correspondents Association might choose other than the AP.  But that is unquestionably not what the White House is doing:  the President is instead inviting a limited number of media outlets to observe him in spaces that are otherwise *closed* to the press— and as noted above, the AP is not challenging the White House's authority to control access to the Oval Office in this manner.  *See* JA391 n.2.  The White House is thus simply inviting reporters to "small press availabilities with the President," Stay Op. 18, and "[a]llowing a handful of selected journalists into the President's personal office cannot transform it into the Brady Briefing Room," Stay Op. 18-19.  These small press availabilities fall entirely within the category of conduct that the AP has conceded is lawful.

---

Rotunda, *id.* at 972, 975, not the personal office space of a member of Congress.

10

The AP's suggestion that a government official creates a public forum whenever he opens a space to "some reporters," AP Br. 19 (quoting JA416), is not correct. Members of Congress regularly consider viewpoint when choosing which reporters to invite into their offices. *See, e.g.*, Jonathan Swan, *Democrat Joe Manchin Gets In With Breitbart*, Axios (Feb. 27, 2017), https://perma.cc/PCK5-ST4W (noting that Senator Manchin "welcomed the Breitbart News editorial team to his Capitol Hill office" in an attempt "to establish warmer relations with the right-wing news outlet"). And when "all the living Supreme Court justices … granted interviews to a single television network," Brian Lamb, et al., *The Supreme Court: A C-Span Book Featuring the Justices in Their Own Words* ix (2010), it is hardly surprising that they chose an outlet known for not having any ideological viewpoint. *See also id.* at xviii (highlighting the "access uniquely granted to us by the chief justice and his current and former colleagues"). The AP offers no persuasive theory of why Supreme Court Justices may choose the reporters to invite into their chambers but the President may not exercise equivalent control over the Oval Office. The point is not that there is an "intimate presidential spaces" exception to forum doctrine,

11

AP Br. 23 (quotation marks omitted), but instead that senior government officials do not create First Amendment forums by granting a small subset of the press corps privileged access to government spaces or information.

### B. Elected Officials Routinely And Permissibly Consider Viewpoint When Interacting With Journalists.

Irrespective of whether this case is analyzed through forum doctrine, the fundamental point is that government officials may permissibly consider a wide range of factors when evaluating which journalists to call on, which journalists to provide exclusive interviews, and which journalists to grant discretionary access to spaces or information unavailable to other members of the press corps.

#### 1. Precedent Refutes The AP's Suggestion That Strict Viewpoint Neutrality Governs Elected Officials' Interactions With Journalists.

At times, the AP appears to suggest that viewpoint discrimination is always impermissible in any context. AP Br. 26-32; *cf.* Stay Dissent 7-9. But that is obviously wrong: to take just two examples, *see* Gov't Br. 37, the government may consider viewpoint when hiring senior policymaking officials, *see Rutan v. Republican Party of Ill.*, 497 U.S. 62,

70 (1990), or when engaging in its own speech, *Rosenberger v. Rectors & Vistors of the Univ. of Va.*, 515 U.S. 819, 833 (1995).  And the AP appears to back away from its extreme position by drawing a distinction between providing "access to interviews" and providing "access to limited spaces open to the pool."  AP Br. 31 (quotation marks omitted). The AP's platitudes about viewpoint discrimination as a general matter thus have little to do with resolving this case, which instead requires an analysis of whether the AP is correct that a more rigorous First Amendment doctrine applies to access to physical spaces—an activity with no evident expressive content—than to engaging in communicative back-and-forth with government officials.

The central teaching of *Ehrlich* thus fully applies here: "government officials regularly subject all reporters to some form of differential treatment based on whether they approve of the reporters' expression."  *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 418 (4th Cir. 2006).  Whatever rule applies to the distribution of limited arts funding, *see National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), *cited in* AP Br. 25, that is not what this case is about.

The AP suggests that *Ehrlich* is distinguishable because the journalists there "continued attending press conferences" but "were solely banned from being called on or granted interviews."  AP Br. 29; *see also* AP Br. 17 (suggesting that *Ehrlich* "held that Maryland's Governor did not act unconstitutionally in denying interviews to certain journalists").  But much like the AP does here, one of the plaintiff reporters in *Ehrlich* contended that he was "excluded from a 'press briefing' conducted in the Governor's conference room" and "not invited" to a second one.  437 F.3d at 414.  It is thus clear from the face of the Fourth Circuit's opinion that the court did not adopt the distinction the AP seeks to draw here.  *See also* Supplemental Declaration of David Nitkin ¶ 7, *Baltimore Sun Co. v. Ehrlich*, No. 1:04-cv-03822 (D. Md. Jan. 11, 2005), Dkt. No. 18-1 ("When the doors opened, all of the approximately half-dozen State House print reporters who were waiting for the conference to begin were permitted to enter the room, except me."); *id.* ¶¶ 11-12 (describing press gathering to which "all other full-time State House reporters" were invited but declarant was not).  The Fourth Circuit nevertheless held that it was lawful for the government to "disadvantage some reporters because of their reporting and

14

simultaneously advantage others by granting them unequal access to nonpublic information." *Ehrlich,* 437 F.3d at 418. That is exactly what the AP is complaining about here: a reduction in access to nonpublic information that it would like to obtain from within the Oval Office. Whether a journalist would obtain that information by interviewing the President or by silently observing him from within a highly restricted presidential space is of no constitutional consequence.

The AP is, of course, correct that *Ehrlich* is not binding on this Court. But as noted above, the AP has advanced no plausible First Amendment theory as an alternative to the one the Fourth Circuit set out in *Ehrlich.* It would be an extraordinary departure to suggest that government officials must adhere to principles of viewpoint neutrality in all their dealings with the press, and as noted the AP at times shies away from such an argument. But even the AP's fallback position that interviews may be awarded based on a viewpoint-based criteria but access must be free to all would be extraordinary. That is clear from the hypothetical that was posed at the stay hearing, about whether the President may "invite his favorite twenty journalists into the Oval [Office] on a viewpoint basis." Stay Arg. 1:13:05-1:13:10. It would be

15

startling if the President's authority to provide access to the Oval Office were limited in that way, and the AP properly conceded that it is not.

The AP now denies having made any concession about access to "spaces where White House journalists observe and report on the President while he conducts official business." AP Br. 29 (emphases omitted). But its position at the hearing was quite clear. In particular, Judge Katsas wanted to be sure that he understood the AP's position, and thus asked a question to "try to pin down what's doing work and what's not." Stay Arg. 1:14:13-1:14:16. As he explained, he wanted to "take out the access dimension from the speak with the President dimension," and thus asked, if the President is "picking journalists who will be not allowed to speak with him, but just follow him around and observe him in order to write articles," do the same rules apply? Stay Arg. 1:14:18-1:14:37. Can he still "pick his favorite one or two or five reporters based on viewpoint?" Stay Arg. 1:14:40-1:14:45. The AP's answer was unequivocal: "He can pick. … Yeah, sure. He can pick a couple of people and follow me for the day, absolutely." Stay Arg. 1:14:46-1:14:53. The AP's concessions thus went far beyond the President's discretion to grant an "exclusive interview." AP Br. 30.

16

The Court is entitled to rely on the AP's concessions for their own sake. *Cf., e.g.*, *Association of Flight Attendants v. USAir, Inc.*, 24 F.3d 1432, 1438 (D.C. Cir. 1994) (refusing to consider contention that was "expressly conceded … at oral argument"); *John C. Flood of Va., Inc. v. John C. Flood, Inc.*, 642 F.3d 1105, 1111 (D.C. Cir. 2011) (similar). At a minimum, if the AP wishes to try to abandon the position it took at the stay hearing, it must first acknowledge that it is doing so. The more fundamental point, however, is that the AP's concessions reflect a common-sense understanding of how elected officials interact with journalists. Indeed, the AP identifies no logical reason why it would make sense to distinguish between restrictions on interviews and restrictions on physical access. For example, as noted in our opening brief, President Obama refused to appear on Fox News in an act of "revenge" for Fox's editorial choices. Gov't Br. 44-45. Because the consequences involved interviews, the AP presumably thinks that President Obama's choices were lawful. But if President Obama had excluded Fox from silently observing a White House event, then as the AP's response brief portrays the law, that would violate the First Amendment. Yet in both cases, Fox would be losing something of

17

unquestionable journalistic (and commercial) value as a result of its editorial choices. There is no logical reason why one would be constitutional when the other is not.

Finally, the AP's position would lead to remarkable consequences. All sorts of speech is protected by the First Amendment: hate speech, *see Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam); other outrageous and offensive speech, *e.g.*, *Snyder v. Phelps*, 562 U.S. 443 (2011); and vulgarity, *e.g.*, *Cohen v. California*, 403 U.S. 15 (1971). The government cannot ban such protected speech, and it is not suggesting otherwise here. But on the AP's theory, if a neo-Nazi took over the AP and began reporting the news from a grotesquely racist and antisemitic perspective, the President would be obligated to maintain its historically privileged access to the Oval Office and Air Force One because it is always unconstitutional to consider a publication's viewpoint in any context. To state that position is to refute it.

## 2. The Historical Record Favors The Government.

The AP makes virtually no effort to rebut the government's demonstration that Presidents have picked and chosen among journalists on the basis of viewpoint since the early days of the

Republic.  *See* Gov't Br. 41-46.  The AP observes that some of the examples identified by the government involve interviews.  *See, e.g.*, Gov't Br. 44 (describing how President Johnson "tried to use personal interviews as a means of reward and punishment" (quoting Blaire Atherton French, *The Presidential Press Conference: Its History and Role in the American Political System* 18 (1982)).  As set out above, the AP provides no basis for giving that distinction dispositive significance.  In any case, many of the other examples identified by the government involve physical access or access to discretionary information—as when President Theodore Roosevelt threatened journalists whose reporting he disliked with exclusion from the White House.  *See* Gov't Br. 42-43, 43 n.8; *see also, e.g.*, Gov't Br. 43-44 (explaining that President Hoover barred disfavored reporters from press conferences).  The essential point is that it has been uncontested, for centuries, that Presidents get to consider viewpoint when choosing which journalists will receive privileged access.

Rather than addressing this history of interactions between the President and the press, the AP looks further afield.  The AP suggests that the first Congress rejected a resolution that would "bar from the

House floor newspapers that had reported on House debates."  AP Br.
33.  Even if that is correct, the House floor is in no sense comparable to
intimate presidential spaces like the Oval Office and Air Force One.
Moreover, the rejection of a resolution is not equivalent to a
determination that adopting it would have violated the First
Amendment.

    The AP also gets the history wrong even as to the House floor.  In
1801, Speaker Theodore Sedgwick sought to bar the editor of a
newspaper whose coverage he disfavored from the House floor and the
gallery.  Congress ultimately "backed Sedgwick and rejected multiple
resolutions that would have limited the Speaker's power to expel
visitors."  U.S. House of Representatives:  Hist., Art & Archives,
*Whereas: Stories from the People's House, Not Horsing Around: Speaker
Sedgwick Attempts to Rein in the Press* (May 20, 2024),
https://perma.cc/RF2Z-LWVB.  Accordingly, "Smith remained banned
from the floor until Democratic Republicans gained control of the
House."  *Id.*  This history does not support the AP's claim that the
House regarded it as impermissible to limit access based on the content
of a journalist's work.

20

Moving even further from the facts of this case, the AP notes that Congress rejected a proposal that would have subsidized postal rates for only certain publishers. *See* AP Br. 34; *see also* First Amendment Scholars Br. (addressing various historical evidence, but none concerning admission of journalists to secure presidential spaces); Reporters Committee Br. (same). The government's point, however, is obviously not that consideration of viewpoint is always permissible—it is that there are certain limited contexts where it is permissible. The President's selection of a small number of journalists for superior access is one of them.

### 3. The Preliminary Injunction Threatens Unending, Sensitive Compliance Litigation.

The AP further fails to rebut the government's demonstration that the preliminary injunction will bring about constant compliance litigation. *See* Gov't Br. 47-49. As the government explained, when journalists are not invited into the Oval Office any given day (as the overwhelming majority of journalists will not be), the injunction will permit them to test the White House's reasons for their exclusion. And even if reporters are invited for certain events, they may still contend

21

that their competitors received access to more desirable events.  *See generally* Gov't Br. 47-49.

The AP's conduct in this case confirms the point, but it was hardly the government's "sole basis" for this argument.  AP Br. 35.  To the contrary, the risk of such compliance litigation is obvious from the AP's theory, which is why the government's reply in support of its stay motion—filed before the AP filed its compliance motion in district court—warned of a flood of "litigation from the many journalists who must necessarily be excluded from Oval Office events."  Gov't Stay Reply 6.  And although the AP has an incentive to be restrained while it is actively litigating the propriety of the injunction, that incentive would dissipate if it were to prevail.

Nor is it relevant that "no flood of litigation has followed each of the press pass cases."  AP Br. 36.  Such passes have historically been made available, without a numerical cap, to any journalist who satisfies the eligibility criteria.  It is thus possible for the White House to administer the hard-pass program without creating hundreds of disappointed journalists with an incentive to sue.  The same cannot be said for access to the Oval Office and Air Force One, where physical

22

constraints on the number of journalists who may be admitted create a
zero-sum game.  And the AP's contention that concerns about spawning
litigation were addressed by Justice Ginsburg's opinion in *Wilkie v.
Robbins*, 551 U.S. 537, 581 (2007), ignores that Justice Ginsburg was
*dissenting* on the relevant point; to the extent that case is relevant at
all, the majority opinion demonstrates that the potential to spawn
litigation is a legitimate concern.

### C.    The AP's Retaliation Claim Is Equally Flawed.

The AP's retaliation claim is foreclosed by the same principle
addressed above:  Granting some journalists better access than others
(whether to interviews, information, or physical spaces) does not
constitute First Amendment retaliation because such decisions form
part of the "pervasive and everyday relationship between government
officials and the press."  *Ehrlich*, 437 F.3d at 418; *see id.* at 418-19
(rejecting First Amendment retaliation claim in light of "the journalist's
accepted role in the 'rough and tumble' political arena").

The AP's response brief suggests that there is a rigid
constitutional rule that the government may never curtail a benefit in
response to an individual's speech.  *See* AP Br. 37-38.  But the AP does

not *actually* think that, which is why it has conceded that the President may lawfully cancel a "one-on-one scheduled with a favored reporter" if the reporter "says something the President doesn't like."  Stay Arg. 1:15:04-1:16:35.  The AP does not even acknowledge—let alone attempt to walk back—this dispositive concession.

The AP's rote application of the factors that govern ordinary retaliation claims, *see* AP Br. 38-43, is thus beside the point.  But to the extent that those factors are relevant, the government has not acted in a way "sufficient to chill the speech of a similarly situated person of ordinary firmness."  AP Br. 39.  To the contrary, the district court recognized that the AP's loss of privileged access "has not impacted [the AP's] editorial tone in reporting at the White House" and that "other outlets have [not] altered their tone in reaction" to the White House's actions, either.  JA422.  That finding shows that the "government's challenged conduct" would not "'chill a person of ordinary firmness' in the plaintiff's position from engaging in 'future First Amendment activity.'"  *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022).  The AP elsewhere highlights the clear-error standard that applies to a

district court's factual findings, *see* AP Br. 21, but it has no response to this finding that forecloses its retaliation theory.

## II.    This Court Should Decline To Reach The AP's Fifth Amendment Claim, Which Is Meritless.

The AP further asserts that it is entitled to relief on the Fifth Amendment claim that the district court did not reach.  *See* AP Br. 43-47.  The Court should decline to reach that claim, and in any case it is meritless.

1.    This Court should not reach the AP's Fifth Amendment claim.  The AP suggests that the government "completely ignores" this claim, but there is an obvious reason why: the district court did not reach it.  Because this Court is a "court of review, not of first view," "where the merits went unaddressed below," it is this Court's "general practice to remand to the district court" to address those issues in the first instance.  *Bauer v. FDIC*, 38 F.4th 1114, 1126 (D.C. Cir. 2022) (citation modified).  That practice is particularly important in reviewing preliminary-injunction orders, because "the decision whether to grant a preliminary injunction is a matter of discretion, not a question of right." *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011).  This Court has explained that, "in every such case, it is for the district court to

25

determine, in the first instance, whether the plaintiffs' showing on a particular claim warrants preliminary injunctive relief." *Id.*; *see id.* ("[T]he plaintiffs have not identified, nor have we found, any precedent for upholding a preliminary injunction based upon a legal theory not embraced by the district court.").

2.     Even if it were properly before this Court, the AP's Fifth Amendment claim is meritless because the AP does not have a protected liberty interest in newsgathering from the Oval Office, Air Force One, or other highly restricted presidential spaces. Its Fifth Amendment claim therefore fails at the threshold. *See, e.g.*, *Scahill v. District of Columbia*, 909 F.3d 1177, 1186 (D.C. Cir. 2018) (no due process claim absent protected liberty or property interest).

The First Amendment "does not 'mandate a right of access to government information or sources of information within the government's control.'" *Center for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 934 (D.C. Cir. 2003) (plurality opinion) (alteration omitted) (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978)). It is therefore well established that no one, journalist or otherwise, has a constitutional right of access to the White House. *See Zemel v. Rusk*,

26

381 U.S. 1, 17 (1965).  To the extent that the AP is suggesting that there is a general Fifth Amendment right to access government spaces for the purposes of newsgathering, it is mistaken.[5]

Under the law of this Circuit, there is one relevant exception:  the Court has ruled that a journalist has a liberty interest in accessing "press facilities" that are "perceived as being open to all bona fide Washington-based journalists."  *Sherrill*, 569 F.2d at 129 (footnote omitted).  Because those spaces "hav[e] been made publicly available as a source of information for newsmen," *id.*, "the interest of a bona fide

---

[5]  The AP's various district court cases are not to the contrary. The district court decision in *Getty Images News Services Corp. v. Department of Defense*, 193 F. Supp. 2d 112 (D.D.C. 2002), did not concern access to highly restricted presidential spaces, and the government did not assert a right to consider viewpoint.  Beyond that, the district court *denied* a preliminary injunction for want of irreparable harm.  *See id.* at 123.  *Nation Magazine v. U.S. Department of Defense*, 762 F. Supp. 1558 (S.D.N.Y. 1991), also declined to enter preliminary injunctive relief, finding that "the right of access claims, and particularly the equal access claims, are not sufficiently in focus at this time" to constitute a case or controversy.  *Id.* at 1575.  And *Cable News Network, Inc. v. American Broadcasting Cos.*, 518 F. Supp. 1238, 1239 (N.D. Ga. 1981), which considered a policy banning all television networks from the White House press pool, is irreconcilable with Supreme Court cases making clear that journalists have no freestanding right of access to the White House or other secure government spaces—the same principle that permits this Court to bar television cameras from broadcasting its proceedings.

Washington correspondent in obtaining a White House press pass is protected by the first amendment," *id.* at 130.  At the same time, *Sherrill* was explicit that this principle did not extend to discretionary access to information made available only to a small fraction of the press corps:  "It would certainly be unreasonable to suggest that because the President allows interviews with some bona fide journalists, he must give this opportunity to all."  *Id.* at 129.

This case does not fall within the *Sherrill* holding, as it does not concern restrictions on access or information otherwise available to all bona fide journalists.  To the contrary, this case involves the President extending a discretionary invitation, to a small number of reporters, to receive access to the Oval Office and other highly restricted spaces.  That is functionally the same as giving "briefings with selected journalists," *Sherrill*, 569 F.2d at 129, the scenario that *Sherrill* went out of its way to distinguish from general media access to the White House.  The Constitution does not entitle the AP to guaranteed status in such spaces.

Finally, the AP observes that *if* a protected liberty interest attaches, the government has "not contested" its failure to provide the

28

constitutionally requisite process. AP Br. 47. But the process that the AP thinks is required simply underscores why no constitutional interest attaches in the first place. In other words, the AP contends that whenever a media outlet is not selected to join a limited media availability in the Oval Office or aboard Air Force One, it is entitled to a pre-deprivation notice, an opportunity to respond, and a final written statement of reasons—with judicial review presumably available on the back end in each case. *See* AP Br. 46-47. Such a system would be utterly unworkable given the hundreds of credentialed White House journalists who are necessarily excluded from all Oval Office events. And the AP's insistence that such process is necessary is difficult to square with its simultaneous insistence that its preferred constitutional rule will not lead to unending litigation.

## III. The AP Did Not Satisfy The Remaining Preliminary Injunction Factors.

### A.    The AP Failed To Establish Irreparable Harm.

Even if the AP were likely to succeed on the merits, it failed to establish irreparable harm. The AP asserts that its exclusion from the Oval Office "harms the AP's ability to provide … comprehensive and informative reporting," AP Br. 48-52, and the government is not

disputing that the AP's exclusion from the Oval Office and Air Force One has affected its reporting in some respects.  The government's point is instead that any such injuries simply reflect the AP's loss of the uniquely privileged status that it enjoyed prior to 2025—status better than any other media outlet in the country enjoyed, status that the Constitution did not require, and status to which the AP would not be entitled even under the preliminary injunction.  To the extent that the AP built a business model that depended on the assumption that it would maintain this favored status in perpetuity, that is hardly the government's fault.

### B.    The Preliminary Injunction Harms The Government And The Public Interest.

On the other side of the ledger, the injunction harms the government and the public interest by intruding upon "the Executive Branch's interests in maintaining the autonomy of its office."  *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004).  The point is not that undermining the President's authority over the Oval Office will "inconvenience" him in some tangible way, AP Br. 53, but instead that the injunction represents an affront to the President's constitutional authority.  *See* Stay Op. 26 (explaining that the injunction "intrudes on

30

the independence of the Executive Branch and burdens the President's exercise of core executive powers").

Finally, the AP contends that its reporting on the White House benefits the public.  *See* AP Br. 54-55.  Yet the White House is continuing to invite journalists into the Oval Office and aboard Air Force One to cover the President's events, and there remains ample coverage of such events from a wide range of media outlets across the ideological spectrum.  While the AP evidently believes that its coverage is superior to that of its competitors, "First Amendment rights do not turn on, nor are they calibrated to, the quality of the reporting."  *John K. MacIver Inst.*, 994 F.3d at 614.  The only pertinent question is whether, given the limited space available in the locations at issue, the public interest specifically requires *the AP*—as opposed to one of the many other news services in the country—to be admitted to those spaces.  This Court ought not adopt a constitutional rule that uniquely privileges the AP over its competitors.[6]

---

[6] Finally, the AP suggests that the preliminary injunction preserves the last uncontested status quo.  AP Br. 55 n.12.  That contention depends entirely upon how the last uncontested status quo is defined.  *See United States v. Texas*, 144 S. Ct. 797, 798 n.2 (2024)

*Continued on next page.*

31

## CONCLUSION

For the foregoing reasons, this Court should vacate the

preliminary injunction.

Respectfully submitted,

YAAKOV M. ROTH
   *Principal Deputy Assistant*
      *Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney*
      *General*

MARK R. FREEMAN
DANIEL TENNY
 */s/ Steven A. Myers*
STEVEN A. MYERS
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7232*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-8648*
   *Steven.A.Myers@usdoj.gov*

October 2025

---

(Barrett, J., concurring) (noting that status quo "is a tricky metric, because there is no settled way of defining the status quo" (quotation marks omitted)).  Here, before the dispute arose, the President enjoyed plenary power over whom to invite into the Oval Office or aboard Air Force One.

32

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6396 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Steven A. Myers*
Steven A. Myers

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Steven A. Myers*
Steven A. Myers