APPEAL,JURY,TYPE−D

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: <u>1:25−cv−00532−TNM</u>
### *Internal Use Only*

ASSOCIATED PRESS v. BUDOWICH et al

Assigned to: Judge Trevor N. McFadden

Cause: 28:1331 Fed. Question

Date Filed: 02/21/2025

Jury Demand: Plaintiff

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: U.S. Government Defendant

**Plaintiff**

**ASSOCIATED PRESS**                    represented by

**Charles D. Tobin**

BALLARD SPAHR LLP

1909 K Street, NW

12th Floor

Washington, DC 20006

202−661−2218

Fax: 202−661−2299

Email: tobinc@ballardspahr.com

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Maxwell S. Mishkin**

BALLARD SPAHR LLP

1909 K Street, NW

12th Floor

Washington, DC 20006

(202) 508−1140

Fax: (202) 661−2299

Email: mishkinm@ballardspahr.com

*ATTORNEY TO BE NOTICED*

**Sasha (Alexandra) Dudding**

BALLARD SPAHR LLP

1675 Broadway, 19th Floor

New York, NY 10019

917−583−6114

Email: duddings@ballardspahr.com

*ATTORNEY TO BE NOTICED*

**Jay Ward Brown**

BALLARD SPAHR LLP

1909 K Street, NW

Suite 12th Floor

Washington, DC 20006−1157

202−508−1136

Fax: 202−661−2299

Email: brownjay@ballardspahr.com

*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **TAYLOR BUDOWICH** <br> *in his official capacity as White House Deputy Chief of Staff* | represented by | **Brian P. Hudak** <br> U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA <br> 601 D Street, NW <br> Washington, DC 20530 <br> (202) 252−2549 <br> Fax: (202) 252−2599 <br> Email: brian.hudak@usdoj.gov <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **KAROLINE LEAVITT** <br> *in her official capacity as White House Press Secretary* | represented by | **Brian P. Hudak** <br> (See above for address) <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **SUSAN WILES** <br> *in her official capacity as White House Chief of Staff* | represented by | **Brian P. Hudak** <br> (See above for address) <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |

**Movant**

| | | |
|---|---|---|
| **STATE DEMOCRACY DEFENDERS FUND** | represented by | **Norman Larry Eisen** <br> NORMAN EISEN PLLC <br> 2022 Columbia Road NW <br> # 214 <br> Washington, DC 20009−1309 <br> 202−753−9667 <br> Email: norman@statedemocracydefenders.org <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **WHITE HOUSE CORRESPONDENTS' ASSOCIATION** | represented by | **Simon A. Latcovich** <br> WILLIAMS & CONOLLY LLP <br> 680 Maine Avenue, S.W. <br> Washington, DC 20024 <br> 202−434−5967 <br> Email: slatcovich@wc.com <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS** | represented by | **Bruce D. Brown**<br>REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS<br>1156 15th St, NW<br>Suite 1020<br>Washington, DC 20005<br>(202) 795−9301<br>Fax: (202) 795−9310<br>Email: bbrown@rcfp.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **CENTER FOR AMERICAN RIGHTS** | represented by | **Christopher Ernest Mills**<br>SPERO LAW LLC<br>557 East Bay Street<br>#22251<br>Charleston, SC 29413<br>843−606−0640<br>Email: cmills@spero.law<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY** | represented by | **Jameel Jaffer**<br>KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY<br>475 Riverside Drive<br>Suite 302<br>New York, NY 10115<br>(646) 745−8500<br>Email: jameel.jaffer@knightcolumbia.org<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 02/21/2025 | 1 | COMPLAINT against TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES with Jury Demand ( Filing fee $ 405 receipt number ADCDC−11497024) filed by THE ASSOCIATED PRESS. (Attachments: # 1 Summons to T. Budowich, # 2 Summons to K. Leavitt, # 3 Summons to S. Wiles, # 4 Summons to US Attorney for District of DC, # 5 Summons to US Attorney General, # 6 Civil Cover Sheet)(Brown, Jay) (Entered: 02/21/2025) |
| 02/21/2025 | 2 | MOTION for Temporary Restraining Order by THE ASSOCIATED PRESS. (Attachments: # 1 Memo in Support, # 2 Rule 65.1 Statement, # 3 Decl. of Z. Miller, # 4 Proposed Order)(Brown, Jay) (Entered: 02/21/2025) |
| 02/21/2025 | 3 | MOTION for Preliminary Injunction by THE ASSOCIATED PRESS. (Attachments: # 1 Memo in Support, # 2 Decl. of Z. Miller, # 3 Proposed Order)(Brown, Jay) (Entered: 02/21/2025) |

| 02/21/2025 | 4 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by THE ASSOCIATED PRESS (Brown, Jay) (Entered: 02/21/2025) |
|---|---|---|
| 02/21/2025 | 5 | NOTICE of Appearance by Jay Ward Brown on behalf of THE ASSOCIATED PRESS (Brown, Jay) (Entered: 02/21/2025) |
| 02/21/2025 | 6 | NOTICE of Appearance by Charles D. Tobin on behalf of THE ASSOCIATED PRESS (Tobin, Charles) (Entered: 02/21/2025) |
| 02/21/2025 | 7 | NOTICE of Appearance by Maxwell S. Mishkin on behalf of THE ASSOCIATED PRESS (Mishkin, Maxwell) (Entered: 02/21/2025) |
| 02/21/2025 | 8 | NOTICE of Appearance by Sasha (Alexandra) Dudding on behalf of THE ASSOCIATED PRESS (Dudding, Sasha (Alexandra)) (Entered: 02/21/2025) |
| 02/21/2025 | | Case Assigned to Judge Trevor N. McFadden. (zsl) (Entered: 02/21/2025) |
| 02/21/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 1 COMPLAINT against TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES with Jury Demand ( Filing fee $ 405 receipt number ADCDC−7497024) filed by THE ASSOCIATED PRESS. (Attachments: # 1 Summons to T. Budowich, # 2 Summons to K. Leavitt, # 3 Summons to S. Wiles, # 4 Summons to US Attorney for District of DC, # 5 Summons to US Attorney General, # 6 Civil Cover Sheet)(Brown, Jay).

Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney−renewal.

Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 2/28/2025. (zsl) 2/24/2025 (zapb). (Entered: 02/21/2025) |
| 02/21/2025 | 9 | ENTERED IN ERROR.....SUMMONS (5) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(zsl) Modified on 2/24/2025 (mg). (Entered: 02/21/2025) |
| 02/22/2025 | 10 | NOTICE of Appearance by Brian P. Hudak on behalf of All Defendants (Hudak, Brian) (Entered: 02/22/2025) |
| 02/22/2025 | | NOTICE of Hearing: The parties shall take notice that a hearing on the 2 Motion for Temporary Restraining Order only is set for February 24, 2025, at 3:00 PM in Courtroom 2 − In Person before Judge Trevor N. McFadden. Given the expedited timeframe, Defendants are not expected to file an opposition brief before the hearing. (lctnm1) (Entered: 02/22/2025) |
| 02/23/2025 | 11 | NOTICE of Filing by ASSOCIATED PRESS re 3 Motion for Preliminary Injunction, 2 Motion for TRO (Attachments: # 1 Declaration J. Pace Decl., # 2 Exhibit Ex. A to J. Pace Decl., # 3 Exhibit Ex. B to J. Pace Decl.)(Tobin, Charles) (Entered: 02/23/2025) |
| 02/23/2025 | 12 | MOTION for Leave to File Amicus Curiae Brief by WHITE HOUSE CORRESPONDENTS' ASSOCIATION. (Attachments: # 1 Exhibit Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Latcovich, Simon) (Entered: 02/23/2025) |

| | | |
|---|---|---|
| 02/24/2025 | | MINUTE ORDER: The 12 Motion for Leave to File Amicus Curiae Brief by White House Correspondents' Association is GRANTED. The Clerk of Court is directed to docket the [12−1] amicus curiae brief. SO ORDERED. Signed by Judge Trevor N. McFadden on 2/24/2025. (lctnm1) (Entered: 02/24/2025) |
| 02/24/2025 | 13 | STANDING ORDER Establishing Procedures for Cases Before Judge Trevor N. McFadden. The parties are hereby ORDERED to read and comply with the directives in the attached standing order. Signed by Judge Trevor N. McFadden on 2/24/2025. (lctnm2). (Entered: 02/24/2025) |
| 02/24/2025 | 14 | Memorandum in opposition to re 2 Motion for TRO filed by TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES. (Attachments: # 1 Text of Proposed Order)(Hudak, Brian) (Entered: 02/24/2025) |
| 02/24/2025 | 15 | SUMMONS (5) Issued Electronically as to TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(mg) (Entered: 02/24/2025) |
| 02/24/2025 | 16 | NOTICE *of Filing (Table of Authorities)* by TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES re 14 Memorandum in Opposition (Attachments: # 1 Exhibit Table of Authorities)(Hudak, Brian) (Entered: 02/24/2025) |
| 02/24/2025 | 17 | MOTION for Leave to File *Amicus Brief* by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Brown, Bruce) (Entered: 02/24/2025) |
| 02/24/2025 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Motion Hearing held on 2/24/2025 re 2 MOTION for Temporary Restraining Order filed by ASSOCIATED PRESS. Order Forthcoming. Motion for Preliminary Injunction due by 3/3/2025. Opposition due by 3/11/2025. Reply due by 3/17/2025. Motion Hearing set for 3/20/2025 at 10:00 AM in Courtroom 2− In Person before Judge Trevor N. McFadden.Court Reporter Lisa Edwards. (ztl) Modified to edit Motion for Preliminary Injunction due date on 2/25/2025 (hmc). (Entered: 02/24/2025) |
| 02/24/2025 | | MINUTE ORDER: The 17 Motion for Leave to File Amicus Curiae Brief by Reporters Committee for Freedom of the Press is GRANTED. The Clerk of Court is directed to docket the [17−1] amicus curiae brief. SO ORDERED. Signed by Judge Trevor N. McFadden on 2/24/2025. (lctnm2). (Entered: 02/24/2025) |
| 02/24/2025 | 18 | ORDER denying Plaintiff's 2 Motion for Temporary Restraining Order. See attached Order for details. Signed by Judge Trevor N. McFadden on 2/24/2025. (lctnm1) (Entered: 02/24/2025) |
| 02/24/2025 | 20 | AMICUS BRIEF by WHITE HOUSE CORRESPONDENTS' ASSOCIATION. (mg) (Entered: 02/25/2025) |
| 02/24/2025 | 21 | AMICUS BRIEF by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (mg) (Entered: 02/25/2025) |
| 02/25/2025 | 19 | TRANSCRIPT OF MOTION HEARING before Judge Trevor N. McFadden held on February 24, 2025; Page Numbers: 1−64. Date of Issuance: February 25, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number Lisa_Edwards@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form |

| | | |
|---|---|---|
| | | For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/18/2025. Redacted Transcript Deadline set for 3/28/2025. Release of Transcript Restriction set for 5/26/2025.(Edwards, Lisa) (Entered: 02/25/2025) |
| 02/28/2025 | 22 | NOTICE by TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES (Hudak, Brian) (Entered: 02/28/2025) |
| 02/28/2025 | 23 | RESPONSE re 22 Notice (Other) filed by ASSOCIATED PRESS. (Attachments: # 1 Exhibit Ex. A − List of Events)(Tobin, Charles) (Entered: 02/28/2025) |
| 03/03/2025 | 24 | Unopposed MOTION for Leave to File *Amicus Brief by The Center for American Rights* by THE CENTER FOR AMERICAN RIGHTS. (Attachments: # 1 Exhibit Proposed Brief, # 2 Text of Proposed Order Proposed Order)(Mills, Christopher) (Entered: 03/03/2025) |
| 03/03/2025 | 25 | Unopposed MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Daniel Robert Suhr, Filing fee $ 100, receipt number ADCDC−11513314. Fee Status: Fee Paid. by THE CENTER FOR AMERICAN RIGHTS. (Attachments: # 1 Declaration Declaration for Pro Hac Vice Admission)(Mills, Christopher) (Entered: 03/03/2025) |
| 03/03/2025 | | MINUTE ORDER: The 24 Motion for Leave to File Amicus Curiae Brief by The Center for American Rights is GRANTED. The Clerk of Court is directed to docket the [24−1] amicus curiae brief. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/3/2025. (lctnm2). (Entered: 03/03/2025) |
| 03/03/2025 | | MINUTE ORDER granting 25 Motion for Leave to Appear Pro Hac Vice as to Daniel Robert Suhr. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/3/2025. (lctnm1) Modified event title on 3/3/2025 (hmc). (Entered: 03/03/2025) |
| 03/03/2025 | 26 | AMENDED COMPLAINT against TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES filed by ASSOCIATED PRESS. (Attachments: # 1 Redlined Amended Complaint)(Brown, Jay) (Entered: 03/03/2025) |
| 03/03/2025 | 27 | Amended MOTION for Preliminary Injunction by ASSOCIATED PRESS. (Attachments: # 1 Memorandum in Support, # 2 Second Decl. of Julie Pace, # 3 Ex. A to Second Decl. of Julie Pace, # 4 Ex. B to Second Decl. of Julie Pace, # 5 Second Decl. of Zeke Miller, # 6 Ex. A to Second Decl. of Zeke Miller, # 7 Ex. B to Second Decl. of Zeke Miller, # 8 Decl. of John Elswick, # 9 Decl. of George E. Condon Jr., # 10 Ex. A to Condon Decl., # 11 Ex. B to Condon Decl., # 12 Ex. C to Condon Decl., # 13 Ex. D to Condon Decl., # 14 Proposed Order)(Brown, Jay) Modified docket text on 3/7/2025 (mg). (Entered: 03/03/2025) |

| 03/03/2025 | 28 | DECLARATION *Corrected Second Declaration of Julie Pace* by ASSOCIATED PRESS re 27 MOTION for Preliminary Injunction . (Attachments: # 1 Ex. A to Second Pace Decl., # 2 Ex. B to Second Pace Decl., # 3 Ex. C to Second Pace Decl.)(Brown, Jay) (Entered: 03/03/2025) |
|---|---|---|
| 03/03/2025 | 30 | AMICUS BRIEF by THE CENTER FOR AMERICAN RIGHTS. (mg) (Entered: 03/05/2025) |
| 03/04/2025 | 29 | NOTICE *Regarding Amicus Brief* by THE CENTER FOR AMERICAN RIGHTS (Mills, Christopher) (Entered: 03/04/2025) |
| 03/04/2025 | | MINUTE ORDER: In light of Plaintiff's 27 Amended Motion for Preliminary Injunction, the Court DENIES AS MOOT Plaintiff's previous 3 Motion for Preliminary Injunction. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/4/2025. (lctnm1) (Entered: 03/04/2025) |
| 03/05/2025 | 31 | MOTION for Leave to File *Amicus Curiae Brief* by KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY. (Attachments: # 1 Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 03/05/2025) |
| 03/07/2025 | | MINUTE ORDER: The 31 Motion for Leave to File Amicus Curiae Brief by the Knight First Amendment Institute is GRANTED. The Clerk of Court is directed to docket the [31−1] amicus curiae brief. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/7/2025. (lctnm2). (Entered: 03/07/2025) |
| 03/07/2025 | 32 | AMICUS BRIEF by KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY. (mg) (Entered: 03/07/2025) |
| 03/11/2025 | 33 | Memorandum in opposition to re 27 Motion for Preliminary Injunction,, filed by TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES. (Attachments: # 1 Exhibit 1 (Budowich Decl.), # 2 Text of Proposed Order)(Hudak, Brian) (Entered: 03/11/2025) |
| 03/12/2025 | 34 | Unopposed MOTION for Leave to File by STATE DEMOCRACY DEFENDERS FUND. (Attachments: # 1 Supplement Amicus Curiae Brief)(Eisen, Norman) (Entered: 03/12/2025) |
| 03/13/2025 | 35 | NOTICE of Proposed Order re 34 by STATE DEMOCRACY DEFENDERS FUND (Eisen, Norman) Modified on 3/13/2025 to add link (mg). (Entered: 03/13/2025) |
| 03/13/2025 | | MINUTE ORDER: The Motion Hearing set for March 20, 2025, is rescheduled to March 27, 2025, at 9:30 AM in Courtroom 2 − In Person before Judge Trevor N. McFadden. In light of the parties' factual disputes, each party may offer up to two live witnesses with a total direct examination time of one hour per side. The Court will allow reasonable time for cross examination and redirect examination. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/13/2025. (lctnm1) (Entered: 03/13/2025) |
| 03/13/2025 | | MINUTE ORDER: The 34 Motion for Leave to File Amicus Curiae Brief by State Democracy Defenders Fund is GRANTED. The Clerk of Court is directed to docket the [34−1] amicus curiae brief. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/13/2025. (lctnm1) (Entered: 03/13/2025) |
| 03/13/2025 | 36 | AMICUS BRIEF by STATE DEMOCRACY DEFENDERS FUND. (mg) (Entered: 03/17/2025) |
| 03/17/2025 | 37 | |

| | | |
|---|---|---|
| | | REPLY to opposition to motion re 27 Motion for Preliminary Injunction,, filed by ASSOCIATED PRESS. (Attachments: # 1 Declaration of K. Heitmann, # 2 Declaration (Third) of Z. Miller, # 3 Exhibit A to 3d Decl. of Z. Miller, # 4 Exhibit B to 3d Decl. of Z. Miller, # 5 Exhibit C to 3d Decl. of Z. Miller, # 6 Exhibit D to 3d Decl. of Z. Miller)(Brown, Jay) (Entered: 03/17/2025) |
| 03/19/2025 | | MINUTE ORDER: The Court recognizes and appreciates the various amici that have filed briefs to date. The Court particularly invites and welcomes originalist research on the First and Fifth Amendment issues in this case. Any filings should be made by March 26, 2025. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/19/2025. (hmc) Modified on 3/19/2025 (hmc). (Entered: 03/19/2025) |
| 03/24/2025 | 38 | NOTICE re 21 Amicus Brief by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Brown, Bruce) Modified to add link on 3/26/2025 (znmw). (Entered: 03/24/2025) |
| 03/25/2025 | 39 | NOTICE of Joinder re 36 Amicus Brief by STATE DEMOCRACY DEFENDERS FUND (Eisen, Norman) Modified to add link on 3/26/2025 (znmw). (Entered: 03/25/2025) |
| 03/25/2025 | 40 | NOTICE *of Filing* re 27 Amended Motion for Preliminary Injunction by TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES (Attachments: # 1 Affidavit)(Hudak, Brian) Modified to add link on 3/26/2025 (znmw). (Entered: 03/25/2025) |
| 03/26/2025 | 41 | MOTION for Leave to File Amicus Brief by KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY. (Attachments: # 1 Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 03/26/2025) |
| 03/26/2025 | 42 | MOTION to Strike 40 Notice (Other) *Supplemental Declaration of Taylor Budowich, ECF No. 40−1* by ASSOCIATED PRESS. (Attachments: # 1 Decl. of Charles D. Tobin, # 2 Ex. 1, # 3 Ex. 2, # 4 Ex. 3, # 5 Ex. 4, # 6 Proposed Order)(Tobin, Charles) (Entered: 03/26/2025) |
| 03/27/2025 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Preliminary Injunction Hearing held on 3/27/2025. Plaintiff's 42 Motion to Strike 40 Notice, DENIED. Plaintiff's Witnesses: Evan Vucci, Zeke Miller. Amended Motion for Preliminary Injunction held under advisement. (Court Reporter: Lisa Edwards.) (hmc) (Entered: 03/28/2025) |
| 03/27/2025 | 43 | Exhibit List by ASSOCIATED PRESS. (hmc) (Entered: 03/28/2025) |
| 03/27/2025 | 44 | Exhibit List by BUDOWICH et al. (hmc) (Entered: 03/28/2025) |
| 04/01/2025 | 45 | TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING before Judge Trevor N. McFadden held on March 27, 2025; Page Numbers: 1−247. Date of Issuance: April 1, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number Lisa_Edwards@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter. |

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/22/2025. Redacted Transcript Deadline set for 5/2/2025. Release of Transcript Restriction set for 6/30/2025.(Edwards, Lisa) (Entered: 04/01/2025) |
| 04/08/2025 | 46 | MEMORANDUM ORDER GRANTING Plaintiff's 27 Amended Motion for Preliminary Injunction. See attached Order for details. Signed by Judge Trevor N. McFadden on 4/8/2025. (lctnm1) (Entered: 04/08/2025) |
| 04/08/2025 | 47 | ORDER STAYING the 46 Memorandum Order Granting Plaintiff's 27 Amended Motion for Preliminary Injunction. See attached Order for details. Signed by Judge Trevor N. McFadden on 4/8/2025. (lctnm1) (Entered: 04/08/2025) |
| 04/08/2025 | | MINUTE ORDER: The 41 Motion for Leave to File Amicus Curiae Brief by Knight First Amendment Institute at Columbia is GRANTED. The Clerk of Court is directed to docket the [41−1] amicus curiae brief. SO ORDERED. Signed by Judge Trevor N. McFadden on 4/8/2025. (lctnm2). (Entered: 04/08/2025) |
| 04/08/2025 | | MINUTE ORDER: After considering the Reporters' Committee for Freedom of the Press's 38 Notice, and the State Democracy Defenders Fund's 39 Notice of Joinder, the amici are directed to file amended briefs with the proper signatories. SO ORDERED. Signed by Judge Trevor N. McFadden on 4/8/2025. (lctnm2). (Entered: 04/08/2025) |
| 04/08/2025 | 48 | AMICUS BRIEF by KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY. (mg) (Entered: 04/09/2025) |
| 04/09/2025 | 49 | AMICUS BRIEF *AMENDED* by STATE DEMOCRACY DEFENDERS FUND. (Eisen, Norman) (Entered: 04/09/2025) |
| 04/09/2025 | 50 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 46 Order on Motion for Preliminary Injunction by KAROLINE LEAVITT, TAYLOR BUDOWICH, SUSAN WILES. Fee Status: No Fee Paid. Parties have been notified. (Hudak, Brian) (Entered: 04/09/2025) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

               Plaintiff,

      v.

TAYLOR BUDOWICH,
White House Deputy Chief of Staff, et al.,

               Defendants.

Civil Action No. 25-0532 (TNM)

## NOTICE OF APPEAL

Defendants—Taylor Budowich, in his official capacity as White House Deputy Chief of Staff; Karoline Leavitt, in her official capacity as White House Press Secretary; and Susan Wiles, in her official capacity as White House Chief of Staff—respectfully provide notice that they hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Court's Memorandum Order of April 8, 2025 (ECF No. 46), which granted the motion for a preliminary injunction filed by Plaintiff the Associated Press and entered a preliminary injunction against Defendants.

Dated:  April 9, 2025
          Washington, DC

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

By:  _____/s/ Brian P. Hudak_____
       BRIAN P. HUDAK
       Chief, Civil Division
       601 D Street, NW
       Washington, DC 20530
       (202) 252-2549

*Attorneys for the United States of America*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ASSOCIATED PRESS**, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00532 (TNM) |
| **TAYLOR BUDOWICH**, in his official capacity as White House Deputy Chief of Staff, *et al.*, | |
| Defendants. | |

### ORDER

The Associated Press ("AP") moved for a preliminary injunction against the White House Chief of Staff, Deputy Chief of Staff, and Press Secretary (collectively, "the Government"). Am. Mot. Preliminary Inj., ECF No. 27. It sought to enjoin the Government from denying the AP access to the Oval Office, Air Force One, and other limited spaces because of the AP's viewpoint. The Court granted the AP's preliminary injunction request. Mem. Order, ECF No. [46]. The Court now, on its own motion, stays its Memorandum Order imposing a preliminary injunction through April 13, 2025, to provide the Government time to seek an emergency stay from a higher court and to prepare to implement the Court's injunction. This stay automatically dissolves after April 13, absent further relief from a higher court.

For this reason, it is hereby

**ORDERED** that the Court's [46] Memorandum Order Granting Plaintiff's [27] Amended Motion for Preliminary Injunction is **STAYED** through April 13, 2025. **SO ORDERED.**

2025.04.08
16:43:52 -04'00'

Dated: April 8, 2025                                    TREVOR N. McFADDEN

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ASSOCIATED PRESS**,<br><br>          Plaintiff,<br><br>          v.<br><br>**TAYLOR BUDOWICH**, in his official<br>capacity as White House Deputy Chief of<br>Staff, *et al*.,<br><br>          Defendants. | Case No. 1:25-cv-00532 (TNM) |

## MEMORANDUM ORDER

About two months ago, President Donald Trump renamed the Gulf of Mexico the Gulf of America. The Associated Press did not follow suit. For that editorial choice, the White House sharply curtailed the AP's access to coveted, tightly controlled media events with the President. The AP now sues the White House chief of staff, her communications deputy, and the press secretary (collectively, "the Government"), seeking a preliminary injunction enjoining the Government from excluding it because of its viewpoint.

Today, the Court grants that relief. But this injunction does not limit the various permissible reasons the Government may have for excluding journalists from limited-access events. It does not mandate that all eligible journalists, or indeed *any* journalists at all, be given access to the President or nonpublic government spaces. It does not prohibit government officials from freely choosing which journalists to sit down with for interviews or which ones' questions they answer. And it certainly does not prevent senior officials from publicly expressing their own views.

No, the Court simply holds that under the First Amendment, if the Government opens its doors to some journalists—be it to the Oval Office, the East Room, or elsewhere—it cannot then shut those doors to other journalists because of their viewpoints. The Constitution requires no less.

## I. BACKGROUND

The White House has been abuzz with journalists for nearly 150 years. *See* Am. Compl., ECF No. 26, ¶ 37. Today, about 1,355 reporters have access to the White House in some capacity. Not all journalists enjoy the same level of access though, and White House reporters are split into two main groups.

The first is the "press pool"—one or two percent of credentialed White House journalists. The press pool (1) attends limited-space events in the Oval Office, the Cabinet Room, and elsewhere; (2) travels with the President domestically and abroad on Air Force One; and (3) attends any other limited-access events to which the President may invite them, including at his personal home in Mar-a-Lago. Decl. of Taylor Budowich, ECF No. 33-1, ¶¶ 6–10. The press pool acts as "the eyes and ears of the full press corps, of news outlets outside of Washington, DC, and of the public." Am. Compl. ¶ 31. Traditionally, the pool has had a set number of spots distributed between different types of media; those spots have rotated between "well-established" outlets. Gov't Opp'n Br., ECF No. 33, at 11.[1] And the AP had two permanent spots—one print reporter and one photographer—for over a century. Gov't Opp'n Br. at 11; Am. Compl. ¶ 40; Second Decl. of Zeke Miller, ECF No. 27-5, ¶ 5.

---

[1] This opinion uses CM/ECF pagination rather than internal pagination.

The second group of journalists is the larger White House press corps, currently numbering well above 1,000 members.  Budowich Decl. ¶¶ 3–4.  They undergo a rigorous application process to earn a "hard pass," a credential allowing general access to all White House press facilities between 5:30 a.m. and 10:30 p.m.  *Id.*; Gov't Opp'n Br. at 9; *see generally Ateba v. Leavitt*, --- F.4th ---, No. 24-5004, slip op. at 3–6 (D.C. Cir. 2025).  The D.C. Circuit has imbued these hard passes with significant due process protections.  *See Sherrill v. Knight*, 569 F.2d 124, 126 (D.C. Cir. 1977).  Press pool members also belong to this larger, second group. Journalists without hard passes can still attend events at the White House, but they must seek a temporary "day pass" from the Secret Service.  Gov't Opp'n Br. at 9.

The White House has long voluntarily opened certain spaces for hard pass holders to report on the news of the day.  *Id.* at 8–9; *Sherrill*, 569 F.2d at 129.  Prime among them is the James S. Brady Briefing Room, which has 49 seats that 65 media outlets occupy or share to receive daily press briefings from the White House press secretary.  Budowich Decl. ¶ 4; Gov't Opp'n Br. at 9.  The AP has the front-row, center seat in that room.  Gov't Opp'n Br. at 9; Second Miller Decl. ¶ 15.  Then there is the East Room, which can accommodate up to 180 journalists for press conferences, meetings with foreign leaders, and the like.  Budowich Decl. ¶ 12.  Journalists may RSVP for the East Room and similar space-capped events through an online tool.  *Id.* ¶ 13.  Other areas have acquired nicknames over the years, including "Pebble Beach," a space on the north grounds where television journalists record standups, and the South Lawn, where Marine One arrives and departs.  *Id.* ¶ 4.

### A.  The Press Pool

There are several iterations of the press pool of varying sizes for different spaces.  Pl. Ex. A to Second Miller Decl., ECF No. 27-6.  For example, the "in-house pool" that attends most

White House events in the Oval Office and other small spaces has 21 members.  *Id.* at 2.  The smallest iteration travels with the President on Air Force One and includes only 13 journalists. *Id.*  The pool has historically included four photographers, three network television journalists, a radio correspondent, three wire reporters, and one print reporter.  Second Miller Decl. ¶ 7.

News wire services, like the AP, are syndicated outlets that distribute their text reporting and photography by "wire" to subscribers across the country and the globe.  *Wire Service*, Merriam Webster (2025) [https://perma.cc/9H6G-JNAC].  So wire services generally have the broadest reach.  Am. Compl. ¶ 38.  The AP, for example, boasts that "[m]ore than half the world's population sees AP journalism every day."  *Associated Press: Advancing the Power of Facts*, AP.org (2025) (bottom page caption) [https://perma.cc/DU66-VCDD].  Local news outlets are particularly reliant on wire services for news from Washington, D.C.  *The Role of Wire Services*, Pew Rsch. Ctr. (Dec. 3, 2015) [https://perma.cc/HWW3-4CG5].

Getting a spot in any version of the press pool has always been difficult.  At minimum, journalists needed to be hard-pass holders.  But that was not enough.  Gov't Opp'n Br. at 10. Eligible journalists still had to be selected by the White House Press Correspondents' Association ("WHCA"), a private entity that controlled the pool's composition.  Budowich Decl. ¶ 8; Compl., ECF No. 1, ¶¶ 22–25.  The AP says that the WHCA had always prioritized wire services because they have the "broadest reach."  Am. Compl. ¶ 38.  The AP was a founding member of the WHCA.  *Id.* ¶ 37.

Seniority offered privileges.  The AP was "guaranteed" two of the 13 core spots in the pool.  Budowich Decl. ¶ 8.  And the AP's photographer was always "the line leader" and "first person through the door."  Hr'g Tr., ECF No. 45, at 43:10–17, 82:24.  The remaining pool seats typically rotated among the largest and most well-established media companies.  Gov't Opp'n

4

Br. at 11; Hr'g Tr. at 97:15–24.  Generally, a member of the White House communications office joined to document the President's activities and prepare its own press releases.  Hr'g Tr. at 106:12–107:11 (Miller testimony).  The White House maintained editorial control of its own media team.  *Id.*

But during this litigation, press pool procedures abruptly changed.  White House Press Secretary Karoline Leavitt announced on February 25 that the Government—not the WHCA—would now choose which hard pass holders gained access to the press pool.[2]  Notice, ECF No. 22, at 1.  She said that the Government wanted to promote "new media" that "historically" "have long been denied the privilege" of participating in the pool.  *Id.*; White House, Press Secretary Karoline Leavitt Briefs Members of the Media, YouTube (Feb. 25, 2025), at 5:30–7:30 [https://perma.cc/F3ZN-MMW7].  According to the AP, the practical result has been that the newly arranged press pool trades out one wire service seat and one photography seat for two "new media" seats, leaving one rotating wire service seat.  *See* Pl. Reply Br., ECF No. 37, at 25.  The White House has permitted a second wire service reporter at some pool events—just not the AP.  Am. Compl. ¶ 84.  In fact, during the pendency of this litigation, one or both of the other two wire services have always obtained a press pool slot.  *See* Pl. Ex. D to Third Miller Decl., ECF No. 37-6.  The WHCA continues to assign, "at the White House's discretion," the seats in the Brady Briefing Room.  Budowich Decl. ¶ 4.  In short, new media has benefitted at AP's expense under the new management.  Little else has changed.

The Government maintains that under these new procedures, "[t]here is no categorical ban on media outlets that are critical of the President or that refuse to use the proper name for the Gulf of America."  Gov't Opp'n Br. at 12.  Indeed, it has continued to admit outlets to the pool,

---

[2]  The AP does not challenge the Government's decision to take control of this process.

such as the New York Times, that "have been highly critical of the President and have continued to refer to the former name." *Id.* In fact, all members of the original press pool have continued to use the Gulf of Mexico name while noting President Trump's order. Am. Compl. ¶ 85.

So why has the AP alone been penalized? The AP claims, and the Court now finds, that the Government has singled out the AP because of its refusal to update the Gulf's name in its Stylebook, an influential writing and editing guide. Am. Compl. ¶ 13. On February 11, shortly after the AP refused to rename the Gulf, Leavitt summoned AP Chief White House Correspondent Zeke Miller to her office. Am. Compl. ¶ 49. "She told [Miller] that, at President Trump's direction, the AP would no longer be permitted in the Oval Office as part of the press pool until and unless the AP revised its Stylebook" to use Gulf of America instead. *Id.*

Later that day, an AP text journalist was barred from an executive order signing and press conference with Elon Musk in the Oval Office that was open to the press pool. *Id.* ¶ 54. That night, an AP reporter again was excluded from a press pool event in the Diplomatic Reception Room. *Id.* ¶ 56. The AP photographer still could attend that event. *Id.* But for the AP's text reporting, journalists had to wait for a video feed to issue breaking news alerts, which "caused delays." *Id.*

Two days later, the Government barred the AP altogether from attending three other Oval Office press pool events. *Id.* ¶ 61. The AP protested. *Id.* ¶ 62. In response, Deputy Chief of Staff Taylor Budowich issued a stronger statement: "The Associated Press continues to ignore the lawful geographic name change of the Gulf of America." @Taylor47, X (Feb. 14, 2025) [https://perma.cc/KB7A-HUVB]. He acknowledged that "their right to irresponsible and dishonest reporting is protected by the First Amendment," but stressed that "it does not ensure their privilege of unfettered access to limited spaces, like the Oval Office and Air Force One."

6

*Id.* After this statement issued, the AP was not allowed on an Air Force One flight to Palm Beach. Am. Compl. ¶¶ 64, 67.

On February 18, White House Chief of Staff Susan Wiles responded to the AP's repeated complaints. Pl. Ex. B to Second Pace Decl., ECF No. 28-2, at 2. She said that the AP's "Stylebook" had "misused, and at times weaponized" its "influence" to "push a divisive and partisan agenda." *Id.* "[T]he guidance relating to the renamed Gulf of America should be appropriately reflected, not denied. . . . Denying such, denies the appropriate authority of the duly elected President. . . . [We] remain hopeful that the name of the water body in question will be appropriately reflected in the Stylebook where American audiences are concerned." *Id.*

Later that day, the President publicly stated that the AP "ha[d] been very, very wrong on the election, on Trump and the treatment of Trump," and that "they're doing us no favors and I'm not doing them any favors." Am. Compl. ¶ 69. The AP had been barred from the press conference at Mar-a-Lago where he said this. *Id.* Four days later, an AP photographer and text journalist were barred from the Republican Governors Association dinner in Washington, D.C., a press-pool event, where the President delivered remarks asserting that he was "holding [the AP] out of any news conferences" because of the AP's "Gulf-of-Mexico" terminology. *Remarks by President Trump at Republican Governors Association*, The White House (Feb. 20, 2025) [https://perma.cc/MF2F-CYNG].

Since then, the AP's hard pass holders have not been admitted to meetings like President Trump's Oval Office discussion with Ukrainian President Volodymyr Zelenskyy and his meeting with Polish President Andrzej Duda at a Maryland convention center. Am. Compl. ¶¶ 76, 90. The AP's veteran White House photographer, Evan Vucci, testified that a Ukraine-based AP videographer managed to get into the Zelenskyy meeting as part of Zelenskyy's entourage. Hr'g

Tr. at 36:16–40:22 (Vucci testimony).  But even so, the AP's reporting quality suffered.  *Id.*  The

foreign correspondent did not transmit photos and text updates live, so the AP had to wait for the

long meeting to conclude before issuing photography, "40 minutes behind" competitors.  *Id.* at

39:21–40:8.  More, because the foreign correspondent specialized in video rather than

photography, he did not produce images that conformed to the usual AP standards.  *Id.* at 37:15–

38:22.

     In sum, AP hard pass holders have not been admitted in any form or fashion to the press

pool since February 14.  Hr'g Tr. at 117:23–118:2; 146:19–24 (Miller testimony and redirect).

And although the Government claims the AP is still "eligible" for these pool events, this

eligibility hinges on the outlet changing its terminology.  Suppl. Decl. T. Budowich, ECF No.

40-1, ¶ 3; Hr'g Tr. at 190:10–13.  The Government offers no reason besides the Gulf issue for

the exclusion.  Hr'g Tr. at 190:14–24 (Government counsel: "[A]lthough the AP is eligible, like

any hard pass holder, to be selected, they are not being selected. . . .  And they're not being

selected, as I understand it – and I think the record is clear . . . because they refuse to adhere to

what the President believes is the law . . . that the body of water is called the Gulf of America.

That is my understanding of why they are not in the Oval Office.").

### B.  East Room and Limited-Access Events

     Now consider the larger, pre-credentialed media events.  The AP complains that it has

been systematically excluded from nearly every East Room event and other large limited-access

briefings open to the broader White House press corps.  Am. Compl. ¶ 3.  The Government

contests that the AP's concerns are unfounded.  Gov't Opp'n Br. at 7, 13 (stating that the AP

"enjoy[s] the same general media access to the White House press facilities as all other hard pass

holders").  The AP journalists, it says, are "eligible, at the President's discretion, to be admitted

8

to those events" by the reservation process.  Budowich Decl. ¶ 15.  The parties agree that no AP employee's hard pass has been revoked.  Gov't Opp'n Br. at 9.

The Court finds that the AP indeed has been excluded from large events far more often than its peers.  Hr'g Tr. at 79:18–80:4 (Vucci cross) ("[B]efore, if there w[ere] ten events that week, we would be in all ten.  Now, [] it's a win for us to get into one event a week. . . .  [M]y competitors . . . are going into these things every single day.");  Pl. Ex. B to Second Miller Decl., ECF No. 27-7, at 2–4 (detailing East Room and similar limited-access events on February 13, 20, 24, and 27 that the AP was not allowed to attend);  Pl. Ex. A to Third Decl. of Zeke Miller, ECF No. 37-3, at 2–5 (detailing limited-access events on March 3, 5, and 14 that the AP was excluded from and on March 12 allowing only the photographer without the text journalist).

At an evidentiary hearing, the AP's witnesses made clear that its text reporters have been systematically and almost completely excluded from events open to the broader White House press corps since February 13, while its photographers have suffered curtailed access.  The Government declined to offer witnesses in rebuttal.  The Court credits the detailed timeline that the AP built through testimony and evidence.

On February 13, two days after Leavitt's first indication of the Government's displeasure, an AP text journalist was barred from an East Room press conference, though an AP photographer was allowed to attend.  Am. Compl. ¶ 60; Second Miller Decl. ¶¶ 24–25.  Miller testified that another journalist told him that he did not RSVP as Miller had, but that the other journalist was still admitted to the event.  Hr'g Tr. at 118:12–119:12.  The next week, in West Palm Beach, the Government excluded the AP from an executive-order signing ceremony and from the President's subsequent speech.  Am. Compl. ¶¶ 67–68.  Two days later, the AP was barred from the East Room for a Black History Month reception open to dozens of White House

press corps members, even though it had a confirmed RSVP.  Pl. Ex. B to Second Miller Decl. at 3; Hr'g Tr. at 136:5–15.  In late February, AP journalists were excluded from the National Governors Association Evening Dinner in the East Room.  Am. Compl. ¶ 76.

Sometimes, *foreign* AP correspondents got into White House events.  French President Macron and British Prime Minister Starmer visited the East Room for press conferences.  Gov't Opp'n Br. at 13.  AP correspondents from these countries attended the press conferences as part of the foreign dignitaries' entourages.  *Id.*; Hr'g Tr. at 132:19–133:18 (Miller cross); Am. Compl. ¶ 79 ("[A] Paris-based AP reporter flown overseas at the AP's expense *was* permitted to enter the East Room—but only as part of President Macron's press pool.").  But the AP's hard pass holders were not admitted to either event.  Second Decl. of Julie Pace, ECF No. 27-2, ¶¶ 5– 6; Am. Compl. ¶ 77.  Admittedly, these were limited-access events to which many journalists could not gain admission.  Gov't Opp'n Br. at 13.  For the event with Macron, 310 media members requested access and only 136 received it; for the event with Starmer, 308 asked to attend and only 172 were allowed.  Budowich Decl. ¶¶ 17–18.

The AP also has been excluded from limited-access press events beyond the White House.  For example, members of the broader White House press corps usually observe the President alight from Air Force One on a nonpublic airport tarmac in West Palm Beach and elsewhere.  *Id.* ¶ 19; Am. Compl. ¶ 19; Hr'g Tr. at 70:6–8.  The AP contends that there are "no space constraints whatsoever on the airport tarmac" yet it was still prohibited from accessing this reporting space on February 28.  Hr'g Tr. at 69:16–18 (government implying agreement); Am. Compl. ¶¶ 12, 92.  Nonetheless, its photographers and text journalists have been admitted to all subsequent tarmac events.  Hr'g Tr. at 136:17–21 (Miller cross).

10

AP reporters were also excluded from President Trump's March 14 speech at the Department of Justice in its "sizable Great Hall" even though the Government opened it to the press pool and DOJ-credentialed media. Third Decl. of Zeke Miller, ECF No. 37-2, ¶ 11. Finally, the Government refused the AP access to the First Lady's Capitol Hill event and the Vice President's Texas event in a large park near the U.S.-Mexico border. *Id.* ¶ 12.

As winter has turned to spring, the AP's freeze out has thawed slightly. In March, the Government began allowing AP photographers into some East Room and limited-access events while continuing to bar its text journalists. On March 12, an AP photographer gained access to the East Room for a St. Patrick's Day reception with the President and the Taoiseach of Ireland, though the text journalist was rejected. Third Miller Decl. ¶ 10. Ditto for an education executive order signing, a Greek Independence Day celebration, and a Women's Day Event in the East Room, held on March 20, 24, and 26 respectively. Hr'g Tr. at 144:18–145:6 (Miller cross), 73:23–74:5 (Vucci cross). An AP text reporter was also excluded from the Women's Day event even though the Government had approved the RSVP. *Id.* at 200:7–19. (The Government proffered without evidence that a security issue required excluding 40 confirmed RSVPs. *See id.*).

The Government's questioning on cross-examination implied that the AP has had at least one journalist or photographer in every "pre-credentialed media event," that is, every limited-access event open to the White House press corps. Hr'g Tr. at 129:6–12. The Court credits the AP's abundant evidence and testimony that this is incorrect. *E.g.*, Pl. Ex. B to Second Miller Decl. (detailing "pre-credentialed" limited-access events on February 13, 20, 24, and 27 that AP was not allowed to attend); Pl. Ex. A to Third Miller Decl. at 2–5 (detailing limited-access events

11

on March 3, 5, and 14 that AP was excluded from and on March 12 allowing only the photographer without the text journalist).

In sum, the Court credits the AP's testimony and evidence that its text journalists have been systematically banned from large, limited-access events open to the entire White House press corps since, at the latest, February 13.  Hr'g Tr. at 132:10–18 (Miller testimony); Am. Compl. ¶ 60 (detailing the first East Room exclusion on February 13).  The Court also credits the AP's testimony and evidence that its photographers have experienced more limited access to such events compared to other hard pass holders.  Hr'g Tr. at 79:18–80:5 (Vucci cross).

### C. Procedural History

The AP filed this suit on February 21, 2025, about ten days after the first signs of its exclusion from the press pool.  *See* Compl.  After a subsequent hearing, the Court denied the AP's motion for a temporary restraining order.  Order, ECF No. 18.  Among other reasons, the Court noted that there were "differences between this case and prior cases that ma[d]e full briefing particularly important."  Hr'g Tr., ECF No. 19, at 57:13–18.  *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), the leading case on White House press access, dealt with hard passes. *Id.*  But both parties agreed that the AP's hard pass status had been unchanged.  *Id.* at 57:19–21. More, there were important contested questions about the scope of the AP's ban and the resulting effect on its business.  *Id.* at 57:19–58:3.  The Court thus ordered expedited briefing for a preliminary injunction and allowed both parties to present up to two live witnesses.  *Id.* at 57:2– 7; 03/13/2025 Min. Order.  The AP presented its two most senior hard pass holders.  The Government offered no witnesses.  The issues are now fully briefed and ripe for consideration.

## II.  LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right," but as an exercise of discretion by a court sitting in equity.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The movant faces a high bar for success, as it must establish four elements "upon a clear showing": (1) that it is likely to succeed on the merits; (2) that it likely will suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities supports granting the relief; and (4) that the public interest favors the injunction.  *Id.* at 20, 22.  Where, as here, the Government is the party opposing injunctive relief, the latter two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A district court should hold an evidentiary hearing and make factual findings if faced with disputed issues of material fact on a motion for a preliminary injunction.  *See Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004).  These findings of fact receive "special deference" on appeal and will not be disturbed absent clear error.  *City of Las Vegas v. Lujan*, 891 F.2d 927, 931 (D.C. Cir. 1989).  Given the contested factual issues here, the Court held such a hearing, and its factual determinations are reflected in this Memorandum Order.

## III.  ANALYSIS

### A.  First Amendment History

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.

By now these words are familiar.  But at the founding, their necessity and import were hotly debated.  Indeed, the Anti-Federalists resisted ratification of the Constitution until it

13

contained an express guarantee of a free press, among other things. *See* Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L. J. 246, 296–99 (2017); *see also* Andrew S. Oldham, *The Anti-Federalists: Past As Prologue*, 12 NYU J. L. & Liberty 451, 456 (2019) ("[T]he Anti-Federalists' papers [help] to elucidate the original public understanding of the Constitution.").[3] Pseudonymic writer Philadelphiensis, for instance, stressed that the free press was "the scourge of tyrants, oppressors, villains, and bloodsuckers; the bulwark of freedom, that causes the haughtiest lordling to tremble; an inestimable jewel, that places the poorest citizen on a level with the richest demagogue." 3 *The Complete Anti-Federalist* 124 (Herbert J. Storing, ed., 1981). Federal Farmer likewise argued that "the freedom of the press is a fundamental right" that "ought not to be restrained by any taxes, duties, or in any manner whatever." 2 *The Complete Anti-Federalist* 329 (Herbert J. Storing, ed., 1981). And he feared that the right could be eroded if it were not explicitly enshrined in the new Constitution. *Id.* at 329–30. It is no spoiler to reveal that the Anti-Federalists' position here triumphed. The precious right was ultimately protected in parchment.

But that was only half the battle. Liquidation of this right's reach came next. In 1789, Representative Aedanus Burke believed newspapermen reporting from the floor of the House chamber "misrepresented the[] debates in the most glaring deviations from the truth, often distorting the arguments of the members from the true meaning." 1 Annals of Cong. 917

---

[3]  The founding generation likely saw more pronounced distinctions between the freedom of speech and the freedom of the press than modern doctrine allows. Campbell, 127 Yale L. J. at 298–99. But the concepts were "equivalent as natural rights," meaning the founders understood their right to speech included the right to disseminate their "well-intentioned statements of one's thoughts." *Id.* at 286, 288–89.

(1789).[4]  So he introduced a resolution to censure them.  Burke's resolution would bar newspapers from reporting on House debates altogether or, at the least, remove reporters from the House floor and relegate them to the public gallery.  *Id.* at 952, 954.

But it was Burke who would be rebuked.  Congressmen lined up to condemn his proposal.  James Madison stressed that it was "improper to throw impediments in the way" of the reporting "as the House had hitherto permitted from the purest motives."  *Id.* at 919–20.  Representative Thomas Hartley proclaimed that Burke's resolution was "an attack upon the liberty of the press."  *Id.* at 919.  Other members agreed.  *See id.* at 918.  Burke ultimately withdrew the resolution.  *Id.*  In the aftermath, the House settled on a practice of reserving space for reporters on the House floor but permitting the reporters to allocate the slots among themselves.  *See* Elizabeth Gregory McPherson, *Reporting the Debates of Congress*, 28 Quarterly J. Speech 141, 142 (1942); Congressional Rsch. Serv., *Congressional News Media and the House and Senate Press Galleries,* at 1 (Apr. 13, 2017).  The Senate took a similar approach, and it soundly rejected an effort by a senator several decades later to exclude reporters from the upper house chamber.  *See* Second Brief for the Knight First Amendment Institute at Columbia University as Amicus Curiae in Support of Plaintiff, ECF No. 41-1, at 20–22.

To be sure, as anyone familiar with the Sedition Act knows, the Founding Fathers did not always live up to the promise of the First Amendment.  For instance, the Sedition Act of 1798 made it a crime to "publish[] any false, scandalous and malicious writing or writings against the government of the United States."  1 Stat. 596 (1798).  Yet the Act faced immediate constitutional challenges.  *See, e.g.*, James Madison, *Virginia Resolutions of 1798*, 4 The Debates

---

[4]  This anecdote, among others, comes from the Knight First Amendment Institute's helpful amicus brief.  ECF No. 41-1.  The Court acknowledges the many amici who offered their valuable insights to this case.

in the Several State Conventions on the Adoption of the Federal Constitution, 553–54 (1836)

(state resolution declaring the Act "exercises . . . a power not delegated by the Constitution, but,

on the contrary, expressly and positively forbidden").  The next President promptly pardoned all

those who had been convicted under the Sedition Act on constitutional grounds, and Congress

ultimately repaid their fines, agreeing that the Act had been unconstitutional.  *See* Second Brief

for the Knight Institute as Amicus Curiae at 11; *see also N.Y. Times Co. v. Sullivan*, 376 U.S.

254, 276 (1964) ("Although the Sedition Act was never tested in this Court, the attack upon its

validity has carried the day in the court of history.").

These immediate and forceful backlashes to attacks on the press underscore how

Americans understood the First Amendment in the early centuries.  They saw this foremost

protection as safeguarding their natural right to heap honest criticism upon the Government

without fear of official reprisal.  *See* Campbell, 127 Yale L. J. at 280 ("[B]y the late eighteenth

century, Americans widely embraced the idea that the government could not prohibit well-

intentioned statements of one's thoughts."); *see also The People v. Croswell,* 3 Johns.Cas. 337,

352 (Sup. Ct. of N.Y. Feb. 13, 1804) ("The liberty of the press consist[s] in publishing with

impunity, truth with good motives, and for justifiable ends, whether it related to men or to

measures.").

All of this to say:  The AP's predicament comes with considerable prologue.  *See*

William Faulkner, *Requiem for a Nun* 73 (1951) ("The past is never dead.  It's not even past.").

History and tradition guide the Court's understanding of the First Amendment, but that does not

settle this matter.  Modern First Amendment caselaw—binding on this Court—is an intricate

web, and more is needed to untangle it.  *See, e.g.*, *Vidal v. Elster*, 602 U.S. 286, 311 (2024)

16

(Kavanaugh, J., concurring in part); *id.* at 311–17 (Barrett, J., concurring in part).  So the Court now turns to contemporary speech doctrine.

## B.  Modern Forum Jurisprudence

In modern jurisprudence, forum analysis controls the extent to which the government may restrict access to public property for First Amendment activities.  *Price v. Garland*, 45 F.4th 1059, 1067 (D.C. Cir. 2022).  The type of forum dictates the scope of permissible government regulation there.  *Id.*  To classify a space, courts look to its nature, how it is used, and whether the public has traditionally had access to it for First Amendment activities.  *Id.*  Under this rubric, the public and the press enjoy coextensive access.  *See Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) ("[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.").

On one end of the spectrum are traditional public fora—places that have historically fostered societal discourse by the public.  Parks and streets are quintessential examples.  *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).  The law zealously safeguards First Amendment activities in these locations and permits only "narrowly tailored" government interference.  *Id.*

Then comes the designated public forum, which is "government property that has not traditionally been regarded as a public forum, but [that] the Government has intentionally opened up for that purpose."  *Price*, 45 F.4th at 1067 (cleaned up).  To fit this description, the location must have been opened to the public for expressive activity; not merely for a select few people or groups.  *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021).  Think:  a state university expressly opening its meeting facilities to registered student groups.  *Widmar v. Vincent*, 454 U.S. 263, 267 (1981).  First Amendment protections for these spaces are

the same as for public forums. *Evers*, 994 F.3d at 609. That is because "[s]o long as the government chooses to retain the open character of the property, it is bound by the same standards" as a traditional public forum. *Price*, 45 F.4th at 1067–68.

On the other side of the spectrum are fora that may be more tightly regulated by the government. A nonpublic forum is "government property that is not by tradition or designation a forum for public communication"—such as "museums *and offices*." *Price*, 45 F.4th at 1068 (emphasis added). Limited-access press conferences in government facilities can also fit the bill. *Evers*, 994 F.3d at 610. Ditto for the U.S. Capitol buildings. *See United States v. Nassif,* 97 F.4th 968, 976-77 (D.C. Cir. 2024).

In nonpublic fora, restrictions on First Amendment activities are "examined only for reasonableness." *Price*, 45 F.4th at 1068. So the Government may discriminate "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). Safe to say, the Government has extensive control over access to nonpublic fora. But even in nonpublic fora, it must wield that control in a way that is viewpoint neutral and not a subterfuge "to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46. Viewpoint discrimination is an "egregious form of content discrimination," which occurs when the government "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). And the D.C. Circuit has accorded significance to government actions that "preclude some speakers from using a forum altogether" even in the nonpublic forum context. *Ateba*, No. 24-5004, slip op. at 10.

In *Evers*, for example, two journalists alleged viewpoint discrimination after being excluded from a state governor's limited-access press event in a conference room. The Seventh Circuit classified the conference room as a nonpublic forum because the "event [was] not open to the public" and the government had not otherwise "dedicated [the room] to open communication." 994 F.3d at 610. The government can properly "consider limited space constraints, address security concerns, and ensure that those in attendance will maximize the public's access to newsworthy information, and be more likely to abide by professional journalistic standards." *Id*. In that same vein, the government can also "prioritize[] access by journalists whose reporting will reach wider audiences, while also allowing room for smaller media outlets." *Id*. The only thing the government cannot do is suppress expression because of the reporters' viewpoint. *Id*. Because the governor offered an unrebutted viewpoint-neutral justification for his limitations, the journalists' case was doomed. *Id.* at 615.

### C. The AP's Likelihood of Success on the Merits

The AP seeks restored eligibility for two categories of White House media events: press pool events and larger events held in the East Room and other limited-access spaces. It contends that its exclusion from consideration for these events based on the AP's viewpoint violates its First Amendment rights. It also argues that it has suffered unlawful retaliation for exercising its speech rights. The Court concludes that the AP is likely to succeed on the merits of its First Amendment viewpoint-discrimination and retaliation claims for both its press pool and East Room allegations.

19

### 1.  First Amendment Viewpoint-Discrimination Claims

#### a.  Press Pool Events

The Court starts with the AP's allegations that its exclusion from the press pool is impermissible viewpoint discrimination.  Recall that the press pool is selectively invited for various small events with the President.  At the heart of this case lies one press pool site in particular: the Oval Office.  It scarcely need be said that the Oval Office is a highly controlled location.  It is shrouded behind a labyrinth of security protocols, and few members of the public will ever approach the *Resolute* Desk.  Thus, the AP has no standalone right of access to the Oval Office.  *Houchins v. KQED, Inc.*, 438 U.S. 1, 10 (finding no "constitutional right of access to news sources" or restricted locations).  The Government could exclude all journalists from the Oval Office without offending the First Amendment.  On this, the parties agree.  *Compare* Gov't Opp'n Br. at 18 (stating there is no "First Amendment right . . . [to] access[] the White House) *with* Pl. Reply Br. at 16 ("The AP does not claim otherwise.").

But the Government has chosen to open the Oval Office to reporters in limited circumstances.  That is, it has opened government property for "selective access" to a "particular class of speakers" whose members must "obtain permission" to be there in the first place.  *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998); *see also Perry*, 460 U.S. at 47 (nonpublic forum created in school mailbox system where it was not "open for use by the general public" and "[p]ermission to use the system" had to be "secured from the . . . principal.").  Thus the Oval Office is properly classified as a nonpublic forum, at least when the Government has

20

voluntarily opened it and journalists are present. *Accord Evers*, 994 F.3d at 610 (holding that a "limited-access press conference" hosted by a state governor was a nonpublic forum).[5]

This means official authority to restrict expression in the Oval Office is at its zenith. But still, there is a limit: Access restrictions must be reasonable and not viewpoint based. *Cornelius*, 473 U.S. at 806; *see also Forbes*, 523 U.S. at 682 (stressing that "the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property"). So while the AP does not have a constitutional right to enter the Oval Office, it does have a right to not be excluded *because of its viewpoint*. And the AP says that is exactly what is happening. *See* Mot. Preliminary Inj., ECF No. 27-1, at 45.

The Court agrees. Indeed, the Government has been brazen about this. Several high-ranking officials have repeatedly said that they are restricting the AP's access *precisely* because of the organization's viewpoint. *See supra* Section I.A. Government counsel admitted that the AP was not being chosen for access, despite its "eligibility," because of its viewpoint. Hr'g Tr. at 190:17–24 ("I think the record is clear. . . . [T]hey are not being selected for Oval Office access because they refuse to adhere to what the President believes is the law of the United States . . . that the body of water is called the Gulf of America."). The Government offers no other plausible explanation for its treatment of the AP. The Constitution forbids viewpoint discrimination, even in a nonpublic forum like the Oval Office.

---

[5] If the government opens a nonpublic forum for "use by certain groups" or for the "discussion of certain subjects," the space becomes a "limited public forum." *Price*, 45 F.4th at 1068 (quoting *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009)). But the distinction appears analytically irrelevant here. *Id.* at 1067–68 (applying the same "reasonableness" and "viewpoint neutral" analysis to both). The Court need not decide whether the Oval Office has been used as a limited public forum because the Government's defenses fail regardless.

That the Government recently took control of press pool composition and now exercises sole discretion over who enters the Oval Office only bolsters this conclusion. The Government is still "reserv[ing] eligibility for participation" in Oval Office media events to certain "classes of speakers" and, indeed, the Government is explicitly the one that is "ma[king] individual, non-ministerial judgments as to which of the eligible [outlets] would participate." *Forbes*, 523 U.S. at 680. Indeed, the Government's enhanced discretion is a fundamental feature of nonpublic fora, where the "government retains the choice of whether to designate its property as a forum for specified classes of speakers." *Id.* This change did not alter the Government's constitutional obligation to refrain from viewpoint discrimination in selecting media outlets for participation.

This conclusion is also unaffected by the government speech doctrine. This doctrine recognizes that "[a] government entity has the right to 'speak for itself'" because the "Free Speech Clause . . . does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (cleaned up). Put plainly, when expressing its own views, the Government can freely decide what message to convey. *See Shurtleff v. City of Boston,* 596 U.S. 243, 251 (2022). The question, of course, is what counts as government speech. Courts look to "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 252.

But the Government expressly disclaims this doctrine, and for good reason. Hr'g Tr. at 192:14–16 (Government counsel: "I wouldn't go so far as saying government speech. I think this falls in the right-of-access cases."). The undisputed focal point of this case is the Government's selection of reporters for Oval Office access—not anything the Government has said or any message it has conveyed. The act of curating the press pool is not itself a form of

22

speech.  The press pool "independently cover[s] the President" and is "not an organ of the Government."  *Id.* at 176:2–3 (argument of AP counsel).  Indeed, for decades and until weeks ago, the WHCA—not the White House—decided which reporters participated in the press pool.  Curating press pool membership thus looks more like "government inten[t] . . . to regulate private expression" than an attempt by the Government to "speak for itself."  *Shurtleff*, 596 U.S. at 252; *see also id.* at 267 (Alito, J, concurring) ("[G]overnment speech occurs if—but only if—a government purposefully expresses a message of its own through persons authorized to speak on its behalf.").  And even now, the only notable change from the *ancien régime* is the AP's total exclusion.

Finally, the Government's ability to convey its own message does not turn on the composition of the press pool.  The White House media team speaks for the Government and "push[es] out [messages] in real time . . . from the same Oval Office events" that "bona fide journalists" are covering.  Hr'g Tr. at 106:24–107:11.  This reinforces the conclusion that control of the press pool is a method by which the Government modulates private speech rather than expressing itself.  The government speech doctrine thus plays no role here.

Forum analysis offers a difficult path to victory for the Government.  So it comes as no surprise that the Government disputes the threshold applicability of forum analysis to the Oval Office.  *See* Gov't Opp'n Br. at 29–30.  In support, it points to *Price*.  There, the D.C. Circuit concluded that forum analysis did not apply when evaluating restrictions on filming a documentary in a national park.  Because the final documentary would be disseminated "at some other time . . . in some other location," the filming was not itself "speech" and instead was "merely a noncommunicative step in the *production* of speech."  *Price*, 45 F.4th at 1068, 1070

23

(emphasis added).  The court warned against "apply[ing] the speech-protective rules of [forum analysis] to regulation of" pre-speech activities.  *Id.* at 1068.

The Government implicitly contends that the media's photojournalism and notetaking in the Oval Office are also pre-speech.  And *Price* admonishes that courts should be wary of "extending the public forum doctrine in a mechanical way to contexts that meaningfully differ from those in which the doctrine has traditionally been applied."  *Id.* (cleaned up).  Thus, the Government insists, forum analysis is the wrong test.

But *Price* does not help the Government.  For starters, while *Price* involved only pre-speech, AP journalists are engaged in full-fledged expression when they report from the Oval Office.  AP photographer Vucci described near-instantaneous transmission of photos to his editors when covering events in the Oval Office.  The lag time between a picture's creation and its publication online to the entire world is sometimes as short as "30 seconds to 45 seconds." Hr'g Tr. at 35:2–3.  Real-time publication is so vital to his role that he is "hard-wired directly into" three mobile internet devices, each on a different network, to ensure he can always transmit from the White House.  *Id.* at 28:19–21, 29:4–13.  He also brings his cellphone into the Oval Office because "an editor or a reporter" may text him asking for specific photographic content— content he can provide on the spot by taking a photo and sending it in under a minute.  *Id.* at 29:16–21, 35:2–3.

Vucci is not the only journalist who communicates live from the Oval Office.  Print journalists sometimes text their editors "[i]f there's huge news" so the editors can "send out [news] alerts in real time" to the public.  Hr'g Tr. at 30:18–22.  Miller can draft news alerts on his phone "while the event is still going on."  *Id.* at 102:3–8.  He is also in constant contact with his colleagues "[a]t pretty much every event" he covers.  *Id.* at 107:13–17.  He keeps a "running

conversation" going where they all exchange "notes and feeds" as events unfold in front of them. *Id.* at 107:19–21.  When Miller is covering an Oval Office event, other reporters from around the world "can point out something interesting" to him and "respond in real time to an announcement"—all of which "help[s] inform" his reporting.  *Id.* at 108:15–22.  Simply put, AP journalists are "speaking" from inside the Oval Office.  *See Price*, 45 F.4th at 1070.

In any case, even restrictions on *noncommunicative* activity are subject to reasonableness review, and thus pre-speech acts are also immune from viewpoint discrimination.  *Price*, 45 F.4th at 1072.  And *Price* explained that "blanket prohibition[s] against the recording of a public official performing public duties on public property" are per se unreasonable, as that activity "implicates unique first amendment interests."  *Id.* at 1071–72.  In short, *Price* counsels that even if any of the reporters' actions are noncommunicative, the proper inquiry is still a nonpublic forum analysis which never tolerates viewpoint discrimination.

Finally, newsgathering was not at issue in *Price* because the statute there had an express carveout exempting newsgathering activities from its restrictions.  *Price*, 45 F.4th at 1064.  So *Price* did not disapprove of applying forum analysis to journalistic endeavors like "[g]athering information about government officials in a form that can readily be disseminated to others."  *Id.* at 1070–71.

The Court heeds the Circuit's admonition that it should not "mechanical[ly]" extend the public forum doctrine to non-traditional contexts.  *Price*, 45 F.4th at 1068.  It also takes the Government's point that the Oval Office is no ordinary government space.  *See* Gov't Opp'n Br. at 7.  But given the square directive of *Price* that forum analysis applies to communicative activity, this Court is bound to follow that precedent.

25

To recap, unlike in *Price*, the communication here is not deferred to some future time and location; it is happening in real time as reporters gather information about government officials and witness history in the Oval Office. *See also Price*, 45 F.4th at 1071 n.*** ("Forum analysis may well apply to live streaming, which is communicative activity" and not merely a "step[] in the creation of speech."). Thus AP reporters are actively "communicating thoughts," "discussing public questions," and "disseminat[ing] information and opinion" while in the Oval Office. *Id.* at 1069. This is precisely the sort of newsgathering that *Price* distinguished, and these activities make forum analysis the appropriate paradigm here. And once forum analysis applies, the D.C. Circuit has long been clear that the Government may not exercise "unbridled discretion" without offending the First Amendment. *Ateba*, No. 24-5004, slip op. at 18.

The Government's other primary talisman is *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006). There, two journalists annoyed Maryland's governor by "failing to objectively report" on his administration. *Id.* at 413. In response, the governor forbade state government officials from speaking with them. Yet the Fourth Circuit found the conduct unobjectionable. *Baltimore Sun* is undoubtedly the Government's strongest case because it involved a government edict that inhibited journalists' contact with government officials in situations that bear some similarity to the circumstances here. Still, *Baltimore Sun* does not get the Government where it needs to go.

For one, *Baltimore Sun* did not discuss the forum doctrine and thus is of little weight in countering the analysis above. *Baltimore Sun* was a retaliation case focused on *dialogue* with government officials, not restrictions on *physical access* to government property for newsgathering. As the plaintiffs described it, they were challenging "a no-comment policy." *Id.* at 417. The chief complaint was that government officials were "not return[ing] [the reporters']

26

telephone calls." *See id.* at 413–14.  While one of the reporters lost access to two small, invite-only press briefings, his colleagues could attend them.  *Id.* at 414.  So the Fourth Circuit did not apply forum analysis because it was not the appropriate test:  The case turned on an alleged right to interact and speak with government officials, not a right of access to a physical forum for observational newsgathering.

To be sure, the Government seemingly views these Oval Office events as akin to dialogues, not observational newsgathering.  And perhaps there is something to that comparison.  After all, intimate events in places like the Oval Office might be framed as more closely resembling sit-down, one-on-one interviews—which are clearly "dialogue"—than broader press briefings.  *See* Gov't Opp'n Br. at 21–22.  And the AP concedes that the Government may engage in viewpoint discrimination in selecting what reporters can *interview* senior officials.  *See* Pl. Reply Br. at 17, 20.  But the Government neither called witnesses nor presented any evidence to support this analogy.

The Court instead credits the AP's chief White House correspondent's testimony that there is a clear distinction between interviews and the press pool availabilities at issue.  Miller is well-suited to offer these observations as he has taken part in the press pool and presidential interviews.  *See* Hr'g Tr. at 104:2–11, 105:12–22.  Interviews usually involve a one-on-one or small-group conversation at the invitation of the President.  *See id.*  They are "exclusive" and the press has more "control" over the process than it does over journalistic conditions in Oval Office press pool events.  *Id*. at 105:22–24.  The news outlet works with the White House to decide the time and place of interviews.  *Id.*  The interview would not happen but for the outlet's presence.  *Id.*  Interviews also lack the "sense of competitive pressure that you get from a pool event."  *Id*. at 106:1–2.

27

In contrast, Oval Office press pool availabilities involve a gaggle of reporters, all vying for space and information. In "very many" of these "pool sprays," journalists are relegated to watching events unfold from 20–30 yards away and have no interaction with the President or other officials. Hr'g Tr. at 104:16–20; 106:12–23. The event would happen whether any particular outlet had a reporter there or not. *Id.*

In these conditions, journalists "can't have . . . a substantive conversation" with officials like they can "in an interview." Hr'g Tr. at 104:21–24. Instead, the reporters are "just there to witness what is said and what the reaction is, [and] what else is happening in the room." *Id.* at 105:2–4. And though journalists in the Oval Office do engage in dialogue, that dialogue is directed to other members of the media and the public to whom they are transmitting news in real time—not to government officials. More, unlike in exclusive interviews, the Government is not dependent on private media organizations to convey its messages to the American people; the White House's media team is present to broadcast events and can do so whether or not other journalists do so. *See Id.* at 106:10–107:11.

It would be a strange affair for the President to accept an interview and then refuse to speak with his interviewer, but it is commonplace for the President to invite journalists into the Oval Office without speaking to them. *See* Hr'g Tr. at 104:12–20. This is typical of the misfit between the journalistic activities in *Balitmore Sun* and those here. In *Balitmore Sun*, the plaintiffs claimed a right to interact with government officials—a right to ask questions and have them answered. In contrast, the AP expressly disavows any right to interact or speak with the President and disputes only its physical exclusion from places like the Oval Office. Pl. Reply Br. at 17.

Though the Government does not concede this distinction, it agrees that it is solely up to the President whether he takes questions in the Oval Office.  Suppl. Decl. T. Budowich ¶ 7. Miller's testimony and the Government's declaration both reflect *Baltimore Sun*'s position that government officials cannot be forced to speak with reporters.  And both implicitly demonstrate that this is a dispute over forum access for firsthand journalistic observation, not a right to speak with the President.  *See* Pl. Reply Br. at 20 (acknowledging that "the First Amendment does not require officials to *interact* with [] journalists).  In short, the Court is persuaded that press pool activities in the Oval Office are not analogous to exclusive interviews, so *Baltimore Sun* is inapposite.

The comparison is further ill-suited because the *Baltimore Sun* reporters experienced only unremediable, "*de minimis* inconvenience."  *Balt. Sun*, 437 F.3d at 420.  As discussed below, the AP is in a much different position, having suffered significant, concrete harms.  *See infra* Section III.C.2.  *Baltimore Sun* thus cannot support the weight the Government places on it.

In sum, precedent is unequivocal that the press does not enjoy any standalone right of access to highly restricted government locations like the Oval Office.  Instead, forum analysis applies because the Government has chosen to open the Oval Office to some reporters for newsgathering.  Under forum analysis, the Oval Office is a nonpublic forum, so the Government enjoys wide latitude on its restrictions, if they are viewpoint neutral.  The AP presented evidence that the Government has discriminated against it based on its viewpoint, a claim the Government all but concedes.  The AP is thus likely to succeed on its claim that its exclusion from eligibility to access the Oval Office violates its First Amendment rights.

The same reasoning and conclusions apply to other press pool locations and events. Whether the press pool travels on Air Force One, goes to a Mar-a-Lago press briefing, or attends

a press-pool-only event elsewhere, the Government has chosen to open the doors of nonpublic spaces for some journalists.  The Government thus cannot exclude the AP from access based on its viewpoint.  The parties' evidence and arguments have understandably focused on the Oval Office, but nothing before the Court suggests Oval Office press pool events are analytically distinct from the other press pool environments.  The Court makes the same factual findings on the Government's rationale for exclusion in these spaces as in the Oval Office context.  *See supra* Sections I.A–I.B.  So the Court reaches the same legal conclusions and finds the AP is likely to succeed on its claims of viewpoint discrimination in these other press-pool-only locations.

### b.  East Room and Limited-Access Events

Now consider the AP's contention that its exclusion from the East Room and similar limited-access events rests on impermissible viewpoint discrimination.  Like the Oval Office, the East Room fits snugly into the definition of a nonpublic forum.  It is a government facility closed to the public that has not historically been a place for societal discourse.  *Price*, 45 F.4th at 1068.  The Government voluntarily opens it for limited-access press briefings.  Thus viewpoint-based criteria are constitutionally unacceptable.

The Government portrays the East Room claim as moot because all hard pass holders, including the AP, are "eligible" to attend events there.  Gov't Opp'n Br. at 33–34.  But the facts belie mootness.  Sure, foreign-based AP journalists accessed one East Room event through the French president's press entourage.  *See* Am. Compl. ¶ 79.  But it is unclear whether the Government knew the reporter worked for the AP before granting her access.  *See* Hr'g Tr. at 133:2–134:8.  And, more saliently, the relevant comparison here is access among journalists seeking entry through the established channels for *hard pass holders*.  Foreign correspondents do

30

not have hard passes. *Id.* at 157:20–158:2. So a foreigner's periodic admittance to the East

Room and the Oval Office does not dampen the AP's claim that other hard pass holders enjoy

greater access and fewer restrictions than its hard pass holders.

No AP text reporters have been admitted to the East Room since February 11, despite

submitting RSVPs and showing up in person. *See* Hr'g Tr. at 117:23–118:23; 136:5–15. The

Government does not dispute this record. Instead, it argues that all is well because an AP

photographer sometimes gets access to the East Room. *See* Gov't Opp'n Br. at 16. And true,

Vucci testified that he has been allowed in to photograph a handful of events. *See* Hr'g Tr. at

79:18–24. Still, Vucci's access has been sporadic and inconsistent, even though he has followed

the RSVP process. *See Id.* at 81:1–7. In contrast, photographers working for AP competitors

attend limited access-events nearly every day. *Id.* at 79:23–80:1. So even if all media outlets

remain theoretically "eligible" for admission, the practical outcome for the AP has been frequent

exclusion.

While it is possible to theorize viewpoint-neutral reasons the AP is not getting into the

East Room, the Court must deal in facts, not conjecture. The only evidence favoring the

Government is a declaration from Deputy Chief of Staff Taylor Budowich, who did not testify at

the hearing and thus was not subject to cross-examination. *See* Suppl. Decl. T. Budowich ¶ 15

("[T]he Associated Press remains completely eligible for selection, as all hard pass holders are,

for a wide range of White House coordinated press events."). And even this averment was

undermined at oral argument, when the Government placed it in context. *See* Hr'g Tr. at

190:14–21 ("So although the AP is eligible, like any hard pass holder, to be selected, they are not

being selected[] . . . because they refuse to adhere to what the President believes."). On the other

side of the scale is ample evidence that the AP is being intentionally excluded from East Room

events because it refuses to endorse the "Gulf of America" designation. *See supra* Section I.A.

Thus the evidence before the Court shows that the AP is being largely kept out of East Room

events based on its viewpoint. The Court finds the AP is likely to succeed in its claim that the

Government is impermissibly excluding it from the East Room.

The Court reaches the same conclusions for limited-access events held in places other

than the East Room: the President's speech at the Department of Justice, the First Lady's

Capitol Hill event, and the Vice President's event in Texas. *See* Third Miller Decl. ¶¶ 11–12.

The one exception is the tarmac at Palm Beach when Air Force One lands. *See* Am. Compl. ¶¶

12, 19. The Court finds the Government is not limiting the AP's tarmac access. Despite initially

being excluded from one presidential arrival on February 28, text and photojournalists from the

AP have since enjoyed regular access to the Palm Beach tarmac. *See* Hr'g Tr. at 69:16–70:10.

So for purposes of a preliminary injunction, the AP has not shown it is likely to succeed vis-à-vis

tarmac access. But that is the exception: It has shown it is likely to succeed on the merits of its

First Amendment claims for the other limited access events.

### 2. Retaliation Claims

Next the Court turns to the AP's likelihood of success on its retaliation claim. The AP

alleges that its exclusion from press pool, East Room, and limited-access events is in retaliation

for its speech. It is well-established that the Government "may not deny a benefit to a person on

a basis that infringes his constitutionally protected interests—especially, his interest in freedom

of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Even when the Government can

withhold a benefit, "[a]n ordinarily permissible exercise of discretion may become a

constitutional deprivation if performed in retaliation for the exercise of a First Amendment

right." *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) (cleaned up).

Any rule to the contrary "would allow the government to produce a result which it could not command directly." *Sindermann*, 408 U.S. at 597 (cleaned up).

Thus, an organization alleging retaliation "must establish that the government responded to [its] constitutionally protected activity with conduct or speech that would chill or adversely affect [its] protected activity." *Baltimore Sun*, 437 F.3d at 416. Courts use an objective standard when evaluating adverse effect; whether a plaintiff himself was chilled is relevant but not dispositive. *Id.* at 416, 419.

The analysis is straightforward. The AP made an editorial decision to continue using "Gulf of Mexico" in its Stylebook. The Government responded publicly with displeasure and explicitly announced it was curtailing the AP's access to the Oval Office, press pool events, and East Room activities. If there is a benign explanation for the Government's decision, it has not been presented here. At the evidentiary hearing, the Government conceded that the record reveals viewpoint-discriminatory motives, so all indicators point to retaliation. Hr'g Tr. at 192:4–7 ("[I]t's the style guide and their treatment of the legal name Gulf of America . . . [that] is the reason that the record currently reveals for that treatment."). All that remains is whether the Government's conduct has chilled or adversely affected the AP.

The ramifications for the AP have undoubtedly been adverse. Start with photography. The AP's total loss of access to the Oval Office and stifled East Room access has sent damaging ripples across its reporting capabilities. Put more bluntly, the AP is getting "absolutely [] slaughtered." Hr'g Tr. at 37:22 (Vucci testimony). Though some other photographers have let the AP use a selection of their own photos out of solidarity, they are not providing it with the most desirable pictures. *Id.* at 34:5–20. These images are qualitatively and quantitatively inferior to what the AP would produce itself. *See id.* Considerable artistic discretion and

33

individual creativity factor into the production of each image, and there is no real replacement for the missed photos. *Cf. United States v. Long*, 92 F.4th 481, 486 (3d Cir. 2024) ("[W]ritten descriptions . . . are imperfect substitutes because photos and videos convey a pictorial accuracy and detail that words cannot duplicate." (cleaned up)). More, the AP does not get access to its competitors' photos in real time, so whatever images it eventually uses are delayed. Hr'g Tr. at 34:17–20. And this time lapse has a significant adverse impact on AP's competitive profile. *See Id.* at 35:19–36:6. All told, as for photographing these events, the AP is "basically dead in the water." *Id.* at 34:19. Thus, there are not any "other sources" the AP can resort to as an adequate substitute. *Balt. Sun*, 437 F.3d at 419.

This erosion of quality and capability is not limited to AP photojournalists—its wire reporting service for White House news is a shadow of its former self too. Text and print wire services "vigorously compete[] with each other to provide the fastest and most accurate news reporting" during and after the press pool events.[6] Am. Compl. ¶ 43. Often this reporting is "instantaneous" and reporters can live-post breaking news alerts directly or notify their editors of important developments from the inside of a meeting or briefing. *Id.*; Pl. Reply Br. at 11.

To state the obvious, if the AP's wire reporters are not in the room when news happens, they can hardly be the first to break the news. Instead, they are forced to wait and pick up

---

[6] The Government claimed that all press pool members share notes, video, and audio after an event. Gov't Opp'n Br. at 10–11. But it offered little support for that position, while the AP offered testimony to the contrary from a press pool member. Hr'g Tr. at 98:2–9, 98:19–99:4 (Miller testimony). The Court credits the AP's testimony that only the *print* (not wire) pool reporter must share notes with other print organizations, and only after the event is over. *Id.* at 98:2–9, 98:19–99:4 (Miller testimony); Pl. Reply Br. at 11. More, the Government's evidence relied on WHCA protocols, but the Government recently eliminated the WHCA's press pool role. *See* White House, Press Secretary Karoline Leavitt Briefs Members of the Media, YouTube (Feb. 25, 2025), at 6:15–6:47 [https://perma.cc/F3ZN-MMW7]. Even if the Government were right—and it is not—the AP would still be disadvantaged by having to wait until *after* an event for the shared reports.

whatever scraps of verifiable information they can find as they watch their competitors break the story first. *See* Hr'g Tr. at 115:20–117:15 (discussing how lack of access significantly delays the AP in sending news alerts because it cannot immediately verify the information), 28:15–18 ("So if my competitors can get an image out a minute before me or three minutes before me on a major story, then I might as well delete my entire take because it's worthless."). True, the wire reporters sometimes get access to a video feed of an event. *See Id.* at 113:23–115:1. But reporting through secondhand sources simply does not allow for the "same level of completeness" in their reporting as if they had "been there in person." *Id.* They cannot look around the room and use all five senses to craft a unique message for publication. And, as Miller pointed out, reporters "don't know what [they're] not there to see." *Id.* Finally, and obviously, they cannot ask questions from outside a closed door. Those questions, if the President chose to answer, could lead to incisive and cutting-edge reporting that the AP cannot reproduce by watching from afar.

These disadvantages have poisoned the AP's business model. As its ability to rapidly supply new photographs and breaking news has dwindled, the AP's customers have expressed concerns and turned to other sources for their needs. *See* Decl. of Kristin Heitmann, ECF No. 37-1, ¶ 9; *see also* Hr'g Tr. at 87:22–88:16 (discussing the AP's "loss of opportunity" to have customers use its reporting). These concerns also led an advertiser to cancel a $150,000 deal. Heitmann Decl. ¶ 9. The facts reflect the precarious realities of life in the fast-paced world of journalism: A delay in capturing photos and details of breaking news can be catastrophic.

In the face of this evidence, the Government doubles down. It compares the situation to *Baltimore Sun* and maintains that any potential retaliation is not actionable. Recall that in *Baltimore Sun*, a governor ordered his employees not to speak with two reporters who had failed

to "objectively report" on his administration.  437 F.3d at 413.  The Fourth Circuit found the

newspaper's subsequent retaliation claim was unactionable because the reporters suffered only

"*de minimis* inconvenience."  437 F.3d at 420.  The reporters "continue[d] to write as frequently

as before" the no-comment policy was put into place, "despite the inconvenience of relying on"

sources other than government officials for information.  *Id.* at 419.  Neither reporter claimed to

have been chilled.  *Id.* at 419 & n.1.

Not so here.  As discussed above, there are not adequate alternative sources the AP can

use for photographs or breaking news reports and the exclusion has unquestionably harmed the

AP's reporting.  This is no mere "*de minimis* inconvenience."  Although the AP's witnesses

testified the ban has not impacted their editorial tone in reporting at the White House, *see* Hr'g

Tr. at 76:23–77:6 (Vucci testimony), nor is there evidence that the Court credits that other outlets

have altered their tone in reaction to the AP's ban, the AP has demonstrated that its business has

been adversely affected by the Government's discrimination.  And the Court finds that these

impacts are objectively likely under the circumstances the AP currently faces.  The AP has thus

shown that the Government retaliated against it for an exercise of its First Amendment freedoms,

and that its speech has been adversely affected as a result.  It is therefore likely to succeed on the

merits of its retaliation claim.

*    *    *

In short, the AP has shown that it is likely to succeed on the merits of its First

Amendment and retaliation claims, both for its exclusion from eligibility for press pool and

limited-access events.  The Court therefore turns to the remaining preliminary injunction factors.

36

### D. Irreparable Harm and Balancing the Equities

The AP's showing of irreparable harm flows naturally from the analysis above. "The loss of First Amendment freedoms, for even minimal periods of time," constitutes irreparable harm when the plaintiff demonstrates that its "First Amendment interests are either threatened or in fact being impaired at the time relief is sought." *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (Thomas, J.) (cleaned up). The AP provided abundant evidence that its First Amendment right to gather and quickly disseminate news about the President has been severely hampered by—and continues to be hampered by—the ban on press pool admission and the highly circumscribed access to limited-access events. *See supra* Section III.C.2; *see also Branzburg*, 408 U.S. at 681 ("Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated."). And the AP has shown that it remains subject to viewpoint discriminatory exclusions from places that the Government has opened as nonpublic fora. *See Sherrill*, 569 F.2d at 129–30. Because the AP has shown that the ban "directly limits" its protected activity, it has established irreparable harm. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006).

The AP's irreparable harm is not limited to constitutional injuries. This situation has cut deeply into the AP's business, both financially and in terms of lost opportunities. *See supra* Section III.C.2. While solely financial harm is typically not irreparable, the dynamic can change in suits against the Government. *See Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335–36 (D.D.C. 2012). The Government "generally enjoy[s] sovereign immunity for any monetary damages," so there is no guarantee of future remediation—making the financial harm irreparable. *Wages & White Lion Invs., L.L.C. v.*

*United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); *see also Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm.").[7]  Still, *de minimis* harm does not trigger this paradigm shift; "[t]he wiser formula requires that the economic harm be significant, even where it is irretrievable because a defendant has sovereign immunity."  *Air Transp. Ass'n*, 840 F. Supp. 2d at 335.

The AP has been economically hemorrhaging for the last two months, and its condition will only worsen as its customers flee to other news services absent injunctive relief.  *See supra* Section III.C.2; *see also* Heitmann Decl. ¶¶ 6–9; *Air Transp. Ass'n*, 840 F. Supp. 2d at 335 ("The loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms.").  Yet despite this ongoing financial harm, the AP's prospect of recovering monetary damages in a future suit are dim in the face of sovereign immunity.  And the Government never suggests the AP will be able to recoup these damages.  So the AP's "lack of a guarantee of eventual recovery is another reason that its alleged harm is irreparable."  *Wages & White Lion.*, 16 F.4th at 1142 (cleaned up).

---

[7]  Both cases involved agency defendants, but the premise translates easily because the AP likely has no path to recover monetary damages against the White House officials.  The Supreme Court "repeatedly has observed that the [Federal Tort Claims Act] does not cover claims against Government employees for violations of the Constitution of the United States."  *Egbert v. Boule*, 596 U.S. 482, 524 n.7 (2022) (Sotomayor, J., concurring in part) (cleaned up); *see also F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994) (holding the same).  Instead, the AP's path to monetary damages runs through *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).  *See Boule*, 596 U.S. at 524 n.7.  But the Supreme Court has "never held that *Bivens* extends to First Amendment claims" and has expressly rejected its use for First Amendment retaliation claims.  *Id.* at 498 (cleaned up).  Even if there were a *Bivens* cause of action, the White House officials would still have qualified immunity from civil damages.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).

The balance of equities and public interest also favor the AP.  While "the White House surely has a legitimate interest in maintaining a degree of control over media access to the White House complex," policy goals may never triumph over the Constitution.  *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020).  Put more simply: "enforcement of an unconstitutional law is always contrary to the public interest."  *Id.*  The AP has made its final showing.

*    *    *

Because the Court decides the present motion under a First Amendment rubric, it need not reach the AP's Fifth Amendment, right to petition, or compelled-speech claims.  *Accord Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 300 n.15 (D.D.C. 2020).  While these claims incorporate much of the First Amendment analysis above, the Fifth Amendment also implicates a potentially significant expansion of the due process rights *Sherrill* afforded to journalists when applying for hard passes.  *See* 569 F.2d at 130.  Perhaps the AP will be ultimately entitled to such relief, but the Court doubts that *Sherrill*'s written notice-and-appeal rights for permanent hard passes map neatly onto potential daily decisions about admittance into the Oval Office and limited access events.  This thorny question is not well-suited to an emergency injunction when the Court can grant substantial relief today.[8]

The Government has not requested that the AP post bond.  *See* Fed. R. Civ. P. 65(c).  District courts have "broad discretion . . . to determine the appropriate amount of an injunction bond."  *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).  This includes discretion "not only to set the amount of security but to dispense with any security requirement whatsoever where the restraint will do the defendant 'no material damage.'"  *Fed. Prescription Serv., Inc. v.*

---

[8]  In any event, the AP's proposed order does not include *Sherrill*-like due process requirements. *See* Prop. Order, ECF 27-14.

39

*Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980). Exercising this discretion and given no objection from the Government, the Court agrees with the AP that bond is unnecessary because preliminary injunctive relief will not materially damage the Government. *See* Mot. Preliminary Inj. at 51 n.8.

One final note is in order. The Government repeatedly characterizes the AP's request as a demand for "extra special access." Gov't Opp'n Br. at 12; *see also id.* at 10–11, 17. But that is not what the AP is asking for, and it is not what the Court orders. All the AP wants, and all it gets, is a level playing field. *See* Mot. Preliminary Inj. at 45 ("[T]he AP's journalists seek access to a forum—opened by the White House—on the same terms as other journalists." (cleaned up)); *see also* Hr'g Tr. at 186:1–187:25. In framing things otherwise, the Government fails to fully engage with forum analysis and retaliation caselaw. Rather than grappling with the implication of these doctrines, the Government tries to sidestep them. Defendants may pursue their favored litigation tactics, but the Court must address the merits of the relief requested.

The AP seeks restored eligibility for admission to the press pool and limited-access press events, untainted by an impermissible viewpoint-based exclusion. That is all the Court orders today: For the Government to put the AP on an equal playing field as similarly situated outlets, despite the AP's use of disfavored terminology. The Court does not order the Government to grant the AP permanent access to the Oval Office, the East Room, or any other media event. It does not bestow special treatment upon the AP. Indeed, the AP is not necessarily entitled to the "first in line every time" permanent press pool access it enjoyed under the WHCA. But it cannot be treated worse than its peer wire services either. The Court merely declares that the AP's

exclusion has been contrary to the First Amendment, and it enjoins the Government from continuing down that unlawful path.[9]

## IV.  CONCLUSION

For these reasons, it is

**ORDERED** that Plaintiff's [27] Amended Motion for Preliminary Injunction is **GRANTED**; and it is further

**ORDERED** that

1. Defendants shall immediately rescind the denial of the AP's access to the Oval Office, Air Force One, and other limited spaces based on the AP's viewpoint when such spaces are made open to other members of the White House press pool.

2. Defendants shall immediately rescind their viewpoint-based denial of the AP's access to events open to all credentialed White House journalists.

3. This preliminary injunction shall remain in effect until further order of this Court.

4.  This preliminary injunction issues without the requirement of any security bond.

2025.04.08
16:34:19 -04'00'

Dated: April 8, 2025

TREVOR N. McFADDEN
United States District Judge

---

[9] The Court notes that the President is not a party to this case, and defense has not argued that an injunction would affect his constitutional authority in any way.