# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

ASSOCIATED PRESS,

Plaintiff-Appellee,

v.

TAYLOR BUDOWICH, in his official capacity as White House Deputy Chief of Staff; KAROLINE C. LEAVITT, in her official capacity as White House Press Secretary; and SUSAN WILES, in her official capacity as White House Chief of Staff,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Columbia

---

## EMERGENCY MOTION FOR A STAY PENDING APPEAL
## AND AN IMMEDIATE ADMINISTRATIVE STAY

---

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

MARK R. FREEMAN
JOSHUA M. SALZMAN
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8648*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Plaintiff-appellee is the Associated Press.  Defendants-appellants are Taylor Budowich, in his official capacity as White House Deputy Chief of Staff; Karoline C. Leavitt, in her official capacity as White House Press Secretary; and Susan Wiles, in her official capacity as White House Chief of Staff.  The White House Correspondents' Association, the Reporters Committee for Freedom of the Press, the Center for American Rights, the Knight First Amendment Institute at Columbia University, and the State Democracy Defenders Fund participated as amici curiae in district court.

### B.    Rulings Under Review

The ruling under review (issued by Judge Trevor N. McFadden) is a memorandum opinion and order filed April 8, 2025, granting the Associated Press's motion for a preliminary injunction.  It is available on Westlaw at 2025 WL 1039572.

## C.    Related Cases

This case has not previously been before this Court or any court other than the district court.  Undersigned counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

                                  */s/ Steven A. Myers*
                                  STEVEN A. MYERS

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................... 1

STATEMENT ........................................................................... 4

ARGUMENT ........................................................................... 12

I.   The First Amendment Permits Government Officials To
     Consider The Content Of Journalists' Coverage When
     Providing Journalists Discretionary Access To Restricted
     Locations. ...................................................................... 12

II.  The Remaining Factors Support A Stay. ....................... 21

CONCLUSION .......................................................................... 23

CERTIFICATE OF COMPLIANCE

ADDENDUM

## INTRODUCTION

The district court entered a preliminary injunction governing the terms on which the President of the United States controls access to some of the most sensitive locations in the world, including the Oval Office and Air Force One. That order hinged on the court's view that although the Constitution undisputedly protects the President's authority to express his dissatisfaction with the Associated Press's (AP's) coverage by refusing to speak to its journalists, an entirely different constitutional rule applies to his decision to exclude them from these sensitive locations. Such a theory threatens to constitutionalize every interaction between elected officials and the journalists who cover them, despite the longstanding practice by which elected officials "frequently and without liability evaluate reporters and reward them with advantages of access." *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 417-18 (4th Cir. 2006). Because the district court's injunction is legally erroneous and wrongfully intrudes on the constitutional independence of the Executive Branch, this Court should enter a stay pending appeal, as well as an immediate administrative stay while the motion is under consideration.

The White House currently provides more than 1300 journalists—including 33 from the AP—permanent press passes granting them on-demand access to the White House press areas. *See* Dkt. No. 33-1, ¶¶ 3-4. In maintaining the AP's uninterrupted access to these areas, the White House has heeded this Court's precedent, which provides that reporters may have a due process interest in accessing "press facilities [that] are perceived as being open to all bona fide Washington-based journalists." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) (footnote omitted). But while this Court's precedent suggests that journalists may have a limited due process interest in entering *press facilities* that have been opened to all bona fide White House reporters, it has never held that any such right extends to other portions of the White House (including the Oval Office and the East Room) or Air Force One, many of which can accommodate only one or two dozen journalists at a time.

Just as the President need not be viewpoint neutral when picking among reporters to call on at a press conference or choosing to whom to grant an exclusive interview, so too may the President exercise discretion in deciding which journalists to invite into his office,

airplane, or private residence.  The district court was wrong to hold otherwise.

The remaining equitable factors favor the government.  In purporting to regulate the terms on which the President controls access to the White House and Air Force One, the district court has intruded on core presidential prerogatives.  The AP, on the other hand, is not irreparably harmed by the President's exercise of discretion in deciding which journalists will be permitted access to limited spaces.  It is a basic reality that the vast majority of credentialed White House reporters are not routinely admitted to the Oval Office, Air Force One, and similar sensitive locations.  Nevertheless, the White House has admitted AP journalists to numerous press events since the initiation of this suit.  *See* Dkt. No. 33-1, ¶¶ 16-18; Dkt. No. 40-1, ¶¶ 12-14, 20-21.

The government therefore respectfully requests that this Court enter a stay pending appeal, as well as an immediate administrative stay while the motion is under consideration.  At a minimum, the government requests that the Court stay the district court's order

through April 20, 2025, in order to permit the Solicitor General time to seek relief from the Supreme Court.[1]

## STATEMENT

1.      Across the country, thousands of journalists—representing publications large and small and leaning left, right, and center—cover the White House.  Of those journalists, more than 1300 report on the White House with such regularity that they hold so-called "hard passes," which permit them to come and go from the White House press areas (including the briefing room and dedicated press office space) on demand.  Dkt. No. 33-1, ¶¶ 3-4.  The AP's access to the White House press areas via hard passes has not changed and is not at issue.  Dkt. No. 46, at 12 (Op.).

In addition to providing this access to dedicated press facilities, the White House selectively admits small groups of journalists into more restricted areas.  Depending on the President's schedule on any given day, these areas may include the Oval Office, Air Force One, and

---

[1] The district court entered a limited stay through April 13 on its own motion.  *See* Dkt. No. 47.  In compliance with Federal Rule of Appellate Procedure 8(a)(1), the government subsequently asked the district court for a full stay pending appeal.  *See* Dkt. No. 52.  We will notify this Court if the district court acts.

Mar-a-Lago. Given space and security constraints, only a miniscule fraction of the White House press corps (13 journalists on Air Force One or 21 journalists in the Oval Office) may be admitted into these locations at any one time. This smaller group of journalists is referred to as the "pool." *See generally* Op. 2-4.

Before February 25, 2025, the pool's composition was determined by the White House Correspondents' Association. Op. 4. Under that system, the AP had two permanent spots in the pool—one for a reporter and one for a photographer. *See id.* Guaranteed spaces were also available for reporters from Reuters and Bloomberg, as well as for photographers from Reuters, AFP, and the New York Times. *See* Dkt. No. 26, ¶ 32. No other media organization in the country—including brand-name media outlets like the Washington Post, the Wall Street Journal, USA Today, etc.—enjoyed such guaranteed access. Instead, their reporters rotated in and out of the pool on an ad hoc basis. *See* Dkt. No. 33-1, ¶ 8.[2]

_____

[2] On February 25, 2025, the Press Secretary announced that on a prospective basis, "the Government—not the [White House Correspondents' Association]—would now choose which hard pass holders gained access to the press pool." Op. 5.

In addition to events that are open only to the pool, the President sometimes holds events in spaces like the East Room, "which can accommodate up to 180 journalists for press conferences, meetings with foreign leaders, and the like." Op. 3. Journalists typically "RSVP for the East Room and similar space-capped events through an online tool." *Id.* There are often more journalists interested in attending these events than there is space available. *See* Op. 10 (referencing one event in which 310 media members requested access and only 136 were admitted and another in which 308 journalists requested access and only 172 were admitted).

**2.** On January 20, 2025, the President signed Executive Order 14,172, which directed the Secretary of the Interior to "take all appropriate actions to rename as the 'Gulf of America' the U.S. Continental Shelf area bounded on the northeast, north, and northwest by the States of Texas, Louisiana, Mississippi, Alabama and Florida and extending to the seaward boundary with Mexico and Cuba in the area formerly named as the Gulf of Mexico." Restoring Names That Honor American Greatness, Exec. Order No. 14,172, § 4(b), 90 Fed. Reg. 8629, 8630 (Jan. 31, 2025). The Department of the Interior effectuated

that order by revising the Geographic Names Information System to reflect that new name. *See* U.S. Dep't of the Interior, Order No. 3423, *The Gulf of America* (Feb. 7, 2025), https://perma.cc/3R7R-UPPH; *see also* U.S. Geological Survey, *As Directed by the President, the Gulf of America Enters the USGS Official Place Names Database* (Feb. 14, 2025), https://perma.cc/A37H-3GRY. Nevertheless, on January 23, 2025, the AP announced that it would refer to the Gulf "by its original name while acknowledging the new name Trump has chosen." Amanda Barrett, *AP Style Guidance on Gulf of Mexico, Mount McKinley*, AP (Jan. 23, 2025), https://perma.cc/K4WS-FZAB.

On February 11, 2025, the Press Secretary informed the AP's lead White House reporter that given the AP's unwillingness to refer to the Gulf of America using that terminology, its journalists would not be permitted to access the Oval Office as members of the press pool. Op. 6. Three days later, the White House Deputy Chief of Staff posted online that the AP's journalists would be prohibited from "access to limited spaces, like the Oval Office and Air Force One," in light of its refusal to use the Gulf of America terminology. *Id.* (quotation marks omitted). And on February 18, the White House Chief of Staff wrote to the AP to

explain that it had no constitutional right to access "certain areas, including the Oval Office and Air Force One"; given "the nature of their size, [the White House is] restricted as to how many people can physically be accommodated." Dkt. No. 27-4, at 1. It is thus undisputed that the White House has used its discretion to exclude the AP from participation in the pool—and from corresponding access to the Oval Office, Air Force One, and other intimate spaces—based on its refusal to refer to the Gulf of America in its stylebook and news reporting.

The AP has also complained of certain instances in which some of its journalists have been denied access to events in the East Room. Although the AP remains "eligib[le]" to be admitted to East Room events, Dkt. No. 40-1, ¶ 17, the district court found that the AP "has been excluded from large events far more often than its peers," though sometimes "foreign AP correspondents got into White House events" and "[i]n March, the Government began allowing AP photographers into some East Room and limited-access events." Op. 8-11 (emphasis omitted).

**3.** The AP commenced this action by filing a complaint, alongside a motion for a temporary restraining order, on February 21,

2025, contending that the government's actions violated its rights under the First and Fifth Amendments.  *See* Dkt. Nos. 1, 2.  On February 24, the district court denied the AP's motion for a temporary restraining order.  *See* Dkt. No. 18.

On April 8, the district court granted the AP's motion for a preliminary injunction.  The court found that the AP was likely to succeed on its claims of viewpoint discrimination.  *See* Op. 20-32.  The court recognized that "the AP has no standalone right of access to the Oval Office" and that the government "could exclude all journalists from the Oval Office without offending the First Amendment."  Op. 20.  It nevertheless found that because the President sometimes invites reporters into the Oval Office, that space "is properly classified as a nonpublic forum, at least when the Government has voluntarily opened it and journalists are present."  Op. 20-21.  The court thus concluded that the White House has no discretion to bar access based on viewpoint.  *See* Op. 21.

The district court rejected the government's contention that forum analysis did not apply because the act of entering and being present in the Oval Office is not speech.  Instead, the court reasoned, "AP

journalists are engaged in full-fledged expression when they report from the Oval Office." Op. 24. The district court further rejected the government's analogy to *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006), which held that the Governor of Maryland could permissibly instruct his staff not to speak with certain reporters based on the content of their reporting. *See* Op. 26 (reasoning that *Ehrlich* "focused on dialogue with government officials, not restrictions on physical access to government property for newsgathering" (emphases omitted)).

The district court found that the East Room is likewise a nonpublic forum in which the government has no discretion to engage in viewpoint discrimination. *See* Op. 30. Although the government had contended that the AP's claims concerning the East Room were moot because AP journalists had been admitted to East Room events since March, the district court rejected that contention, finding that "the AP is being intentionally excluded from East Room events because it refuses to endorse the 'Gulf of America' designation." Op. 31-32. The court reached the "same conclusions for limited-access events held in places other than the East Room," except for "the tarmac at Palm Beach

when Air Force One lands," as the court found that the AP has "enjoyed regular access to the Palm Beach tarmac." Op. 32.

The district court also concluded that the AP was likely to succeed on its retaliation claims. The court observed that the government has "conceded that the record reveals viewpoint-discriminatory motives" and that the ramifications for the AP "have undoubtedly been adverse." Op. 33.

The district court further held that the remaining preliminary injunction factors were satisfied. It found that the AP's asserted loss of First Amendment freedoms represented per se irreparable harm, *see* Op. 37, and that the AP was also suffering injuries to its journalism and business, *id.* And while the court recognized the government's "legitimate interest in maintaining a degree of control over media access to the White House complex," Op. 39 (quoting *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020)), it held that these concerns did not apply on the theory that the government was acting unconstitutionally, *id.*

The district court thus entered a preliminary injunction

providing that (1) the government must "immediately rescind the denial of the AP's access to the Oval Office, Air Force One, and other limited spaces based on the AP's viewpoint when such spaces are made open to other members of the White House press pool," and (2) the government must "immediately rescind their viewpoint-based denial of the AP's access to events open to all credentialed White House journalists." Op. 41. Immediately thereafter, the district court entered a separate order staying the injunction through April 13, "to provide the Government time to seek an emergency stay from a higher court and to prepare to implement the Court's injunction." Dkt. No. 47, at 1.

## ARGUMENT

The government is likely to succeed on the merits and will be irreparably injured absent a stay, and the balance of equities and public interest support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009). The Court should therefore grant a stay pending appeal.

## I. The First Amendment Permits Government Officials To Consider The Content Of Journalists' Coverage When Providing Journalists Discretionary Access To Restricted Locations.

The district court's essential reasoning is that when the President admits journalists into spaces like the Oval Office, Air Force One, and

the East Room, he creates a nonpublic forum and, therefore, may not condition access based on viewpoint. Such a rule finds no support in the case law, and it would upend the traditional give-and-take between officials and journalists—in which officials seek to influence coverage and journalists compete for access.

    **A.**    The district court's analysis proceeds from the startlingly counterintuitive premise that the personal workspace of the President of the United States—one of the most restricted locations in the world—is subject to forum analysis. That premise is mistaken. While the President sometimes elects to selectively admit small teams of journalists to his most intimate spaces, he has not relinquished his absolute discretion to determine who should be admitted.

    To begin with, not all property owned by the government is subject to forum analysis. *Cf. Ark. Educ. TV Comm'n v. Forbes*, 523 U.S. 666, 678 (1998) ("Where the property is not a traditional public forum and the government has not chosen to create a designated public forum, the property is either a nonpublic forum *or not a forum at all*." (emphasis added)). The government is unaware of any case in this Circuit which has applied forum analysis to the personal office space of

a specific public official merely because title to the building resided in the government.  And how the President decides to spend his time in his personal office—whether in the White House or on Air Force One— falls far afield of the usual application of forum analysis.

Forum analysis is particularly inapposite because journalists have no right to speak in the Oval Office or other restricted areas of the White House.  The district court seemed to agree, but it held that journalists may have a right to be physically present in the Oval Office to engage in newsgathering, not to communicate with the President or others physically present in the putative forum.  But as this Court has explained, "forum analysis applies only to communicative activities, not to activities that, even if generally protected by the First Amendment, are not communicative."  *Price v. Garland*, 45 F.4th 1059, 1070 (D.C. Cir. 2022); *see also American Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*, 901 F.3d 356, 364 (D.C. Cir. 2018) ("Our analysis of *a restriction on speech* on government property begins with the forum doctrine." (emphasis added)).

The district court sought to distinguish *Price* on the theory that AP journalists and photographers engage in expression through their

nearly instantaneous communications with their editors and, ultimately, the news-reading public (*i.e.*, individuals physically outside the White House). Op. 24. But this proves too much. If communicating with individuals outside the physical space at issue is sufficient to transform a secure location into a venue to which forum analysis applies, *every* government space might be subjected to forum analysis because it is at least capable of being a location from which real-time coverage could occur. And though *Price* reserved the question of whether livestreaming might transform a space into a forum because it involves real-time communication, *Price*, 45 F.4th at 1071 n.\*\*\*, the applicability of forum analysis should not hinge on whether there is a tape delay.

Accordingly, the district court's conclusion that the President creates a forum in the Oval Office and aboard Air Force One whenever he chooses to permit journalists into those spaces is erroneous.[3]

---

[3] This Court's recent decision in *Ateba v. Leavitt*, No. 24-5004, 2025 WL 1036451, at \*4 (D.C. Cir. Apr. 8, 2025), employed a forum analysis in rejecting a journalist's claim regarding "hard pass" access to the White House. It did so, however, only on the assumption that the journalist had suffered a First Amendment injury, and without considering the government's argument that a forum analysis was

*Continued on next page.*

**B.**     The district court also erred in holding that even restrictions on non-communicative activity must be viewpoint neutral.  Op. 25.  It is well-established that officials may—and routinely do—consider journalists' prior coverage when evaluating which journalists to call on, which journalists to grant exclusive interviews, and which journalists to grant special access unavailable to other members of the press corps. That basic insight is why Rachel Maddow has no constitutional claim when President Trump appears on *Hannity* and why *Fox and Friends* could not sue when President Biden appeared on *Morning Joe*.

The Fourth Circuit's decision in *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 417-18 (4th Cir. 2006), is particularly instructive.  In that case, the Governor of Maryland instructed his staff not to speak with certain reporters because they were "failing to objectively report on any issue dealing with the" Governor's administration.  *Id.* at 413 (quotation marks omitted).  The newspaper argued that the restriction violated the First Amendment because it was retaliatory and a content-based regulation of the newspaper's speech.  *Id.*

---

inappropriate because the journalist's claims "implicate only a 'noncommunicative, preparatory step in the production of speech' and therefore enjoy no First Amendment protections."  *Id.* at *4 n.7.

The Fourth Circuit disagreed.  In a unanimous opinion, it explained that there is a "common and widely accepted practice among politicians of granting an exclusive interview to a particular reporter" and an "equally widespread practice of public officials declining to speak to reporters whom they view as untrustworthy because the reporters have previously violated a promise of confidentiality or otherwise distorted their comments."  *Ehrlich*, 437 F.3d at 418 (quoting *Snyder v. Ringgold*, 133 F.3d 917, 1998 WL 13528, at *4 (4th Cir. 1998) (per curiam) (unpublished table decision)).[4]  Indeed, the newspaper expressly conceded that "government officials frequently and without

_____

[4] *Snyder* involved a claim that a police department's press officer refused to permit a journalist to participate in an interview or obtain information because of "his displeasure with her stories."  1998 WL 13528, at *2.  The court rejected the reporter's claim, noting the absence of authority holding "that reporters have a constitutional right of equal or nondiscriminatory access to government information."  *Id.* at *3.  A contrary rule, the court explained, "would presumably preclude the common and widely accepted practice among politicians of granting an exclusive interview to a particular reporter," and it "would preclude the equally widespread practice of public officials declining to speak to reporters whom they view as untrustworthy."  *Id.* at *4.  Beyond that, the court explained, it would presumably "preclude the White House's practice of allowing only certain reporters to attend White House press conferences, even though space constraints make it impractical to open up the conference to all media organizations."  *Id.*

liability evaluate reporters and reward them with advantages of access—*i.e.*, that government officials regularly subject all reporters to some form of differential treatment based on whether they approve of the reporters' expression." *Id.* Accordingly, the court concluded that permitting the newspaper to proceed with its constitutional claim would "'plant the seed of a constitutional case' in 'virtually every' interchange between public official and press." *Id.*[5]

**C.** Although the district court recognized that the President is permitted to decline the AP's requests for interviews and to ignore their questions at press conferences based on its choice of nomenclature, it nevertheless rejected the analogy to cases like *Ehrlich*, which it believed "focused on *dialogue* with government officials, not restrictions on *physical access* to government property." Op. 26; *see also* Op. 27 ("The case turned on an alleged right to interact and speak with government officials, not a right of access to a physical forum for observational newsgathering."). Yet that conclusion—which, at bottom,

---

[5] Viewpoint neutrality is not mandated in certain other contexts as well. *See, e.g.*, *Branti v. Finkel*, 445 U.S. 507, 518 (1980); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 74 (1990) (recognizing that government officials may consider individuals' viewpoints in hiring individuals to serve as senior policymakers).

requires the President to admit the AP to intimate spaces while permitting him to ignore the AP once inside—finds no support from either the case law or first principles.

Instead, as the cases make clear, the point is that when the President deals with the press, he is permitted to consider the nature of a journalist's coverage in deciding how much access to give them. There is no reason why the form of access at issue (verbal or physical) would be imbued with constitutional import. Government officials routinely offer or deny journalists things that they value in an attempt to shape coverage, and whether that valuable thing is an interview or physical access lacks constitutional significance. Indeed, given the parties' agreement that the President has no constitutional obligation to speak to the reporters he admits into the Oval Office, Air Force One, and similar locations, it would disserve both the public and the government to require the government to admit a journalist to whom the President has no intention of speaking, especially in the context of confined spaces where the President must be particularly selective.[6]

---

[6] The same analysis dooms the AP's retaliation claim. As *Ehrlich* makes plain, competition among journalists for access and cultivation of

*Continued on next page.*

The analogy to cases like *Ehrlich* is perhaps most obvious for spaces like the Oval Office and Air Force One, which can only accommodate one or two dozen journalists. In selecting the tiny fraction of journalists from the broader White House press corps who will be permitted to enter such spaces, it is entirely reasonable for the White House to consider which journalists it thinks will best serve its communications strategy. Thus, just as the President might permissibly invite his five preferred business reporters to a financial briefing in the Oval Office, *see* Dkt. No. 40-1, ¶ 4, he likewise may exclude journalists that he does not believe are providing fair coverage.

That essential insight, however, extends beyond small spaces like the Oval Office and Air Force One and applies equally to larger spaces like the East Room. The underlying point is not that space constraints give the government license to violate the First Amendment, but instead that it does not implicate the First Amendment to grant some journalists better access than others because that sort of conduct is part

---

journalists for messaging purposes is how modern media and government functions—not the stuff of which constitutional claims are made.

of the ordinary interplay between government officials and the journalists who cover them.  To the extent that space constraints are required, however, the record shows that there are routinely more journalists who want to be admitted to East Room events than there are spaces available.  *See supra* p.6.

For all these reasons, the AP's claims fail.  The White House, Air Force One, and Mar-a-Lago lie at the core of the President's sphere of personal and constitutional autonomy, and the district court could not properly encroach on the President's absolute discretion over whom he will admit into those spaces.  Under the political question doctrine, "some issues cannot be resolved by federal courts" even in the face of a First Amendment challenge.  *See Lee v. Garland*, 120 F.4th 880, 888, 895 (D.C. Cir. 2024).  This is such a case.  Judicial intrusion into the President's personal spaces fails to accord due respect for a coordinate branch of government.

## II.    The Remaining Factors Support A Stay.

The remaining equitable factors favor the government.  As set out above, the preliminary injunction—which restricts the White House's discretion from making its own judgments about whom it will admit

into some of the most restricted spaces on the planet—is unprecedented. Never before has any court directed the White House to provide such access to intimate presidential spaces. In superintending the grounds on which the White House must admit journalists into these "highly controlled location[s]," Op. 20, the preliminary injunction represents a remarkable intrusion upon the Article II prerogatives of the President. This Court has already alluded to the "serious separation-of-powers concerns" that would be "raised by a statute mandating disclosure of the President's daily activities," *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 216 (D.C. Cir. 2013), and those concerns are exacerbated by a judicial order governing whom the President must permit to observe him while those activities are occurring.

On the other side of the ledger, the district court's principal conclusion was that the AP's First Amendment injury represented irreparable harm per se. *See* Op. 37. That analysis simply conflates the merits with irreparable harm, and for the reasons set out above the AP is not suffering constitutional injury. Beyond that, significant evidence at the preliminary injunction hearing made clear that the AP remains able to cover the White House. *See* PI Hr'g Tr., at 145 ("Q: And so for

each of the pre-credentialed media events, aside from maybe—we have

a dispute over February 28th—at each of those, the AP has had a

journalist, be it a text journalist, through a foreign correspondent, or a

photojournalist at each of those events.  Correct?  A. In one way, shape

or form.  Yes.").  The AP's financial harms are also no greater than

those suffered by any other media outlet that lacks a presence in the

press pool.  They are merely the costs of doing business in a competitive

journalistic environment that often turns on being provided

discretionary access to newsmakers.

## CONCLUSION

This Court should grant an administrative stay while Defendants'

stay motion is pending and stay the preliminary injunction pending

appeal.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney*
    *General*

MARK R. FREEMAN
JOSHUA M. SALZMAN
 */s/ Steven A. Myers*
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8648*
  *steven.a.myers@usdoj.gov*

APRIL 2025

24

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion satisfies the type-volume requirements set out in Rule 27(d)(2)(A) because it contains 4575 words. This motion was prepared using Microsoft Word in Century Schoolbook, 14-point font, a proportionally spaced typeface.

*/s/ Steven A. Myers*

Steven A. Myers

# ADDENDUM

# TABLE OF CONTENTS

Memorandum Order
 (Apr. 8, 2025) (Dkt. No. 46).......................................................ADD.1

Order
 (Apr. 8, 2025) (Dkt. No. 47).....................................................ADD.42

Amended Complaint
 (Mar. 3, 2025) (Dkt. No. 26) ...................................................ADD.43

Exhibit B to Second Declaration of Julie Pace
 (Mar. 3, 2025) (Dkt. No. 27-4)................................................ADD.75

Declaration of Taylor Budowich
 (Mar. 11, 2025) (Dkt. No. 33-1)..............................................ADD.77

Supplemental Declaration of Taylor Budowich
 (Mar. 25, 2025) (Dkt. No. 40-1)..............................................ADD.82

Exercepts from Preliminary Injunction Hearing Transcript
 (Mar. 27, 2025) ........................................................................ADD.87

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ASSOCIATED PRESS**,

               Plaintiff,

               v.

**TAYLOR BUDOWICH**, in his official
capacity as White House Deputy Chief of
Staff, *et al.*,

               Defendants.

Case No. 1:25-cv-00532 (TNM)

---

## <u>MEMORANDUM ORDER</u>

About two months ago, President Donald Trump renamed the Gulf of Mexico the Gulf of America. The Associated Press did not follow suit. For that editorial choice, the White House sharply curtailed the AP's access to coveted, tightly controlled media events with the President. The AP now sues the White House chief of staff, her communications deputy, and the press secretary (collectively, "the Government"), seeking a preliminary injunction enjoining the Government from excluding it because of its viewpoint.

Today, the Court grants that relief. But this injunction does not limit the various permissible reasons the Government may have for excluding journalists from limited-access events. It does not mandate that all eligible journalists, or indeed *any* journalists at all, be given access to the President or nonpublic government spaces. It does not prohibit government officials from freely choosing which journalists to sit down with for interviews or which ones' questions they answer. And it certainly does not prevent senior officials from publicly expressing their own views.

ADD.1

No, the Court simply holds that under the First Amendment, if the Government opens its doors to some journalists—be it to the Oval Office, the East Room, or elsewhere—it cannot then shut those doors to other journalists because of their viewpoints. The Constitution requires no less.

## I.  BACKGROUND

The White House has been abuzz with journalists for nearly 150 years. *See* Am. Compl., ECF No. 26, ¶ 37. Today, about 1,355 reporters have access to the White House in some capacity. Not all journalists enjoy the same level of access though, and White House reporters are split into two main groups.

The first is the "press pool"—one or two percent of credentialed White House journalists. The press pool (1) attends limited-space events in the Oval Office, the Cabinet Room, and elsewhere; (2) travels with the President domestically and abroad on Air Force One; and (3) attends any other limited-access events to which the President may invite them, including at his personal home in Mar-a-Lago. Decl. of Taylor Budowich, ECF No. 33-1, ¶¶ 6–10. The press pool acts as "the eyes and ears of the full press corps, of news outlets outside of Washington, DC, and of the public." Am. Compl. ¶ 31. Traditionally, the pool has had a set number of spots distributed between different types of media; those spots have rotated between "well-established" outlets. Gov't Opp'n Br., ECF No. 33, at 11.[1] And the AP had two permanent spots—one print reporter and one photographer—for over a century. Gov't Opp'n Br. at 11; Am. Compl. ¶ 40; Second Decl. of Zeke Miller, ECF No. 27-5, ¶ 5.

---

[1] This opinion uses CM/ECF pagination rather than internal pagination.

The second group of journalists is the larger White House press corps, currently numbering well above 1,000 members.  Budowich Decl. ¶¶ 3–4.  They undergo a rigorous application process to earn a "hard pass," a credential allowing general access to all White House press facilities between 5:30 a.m. and 10:30 p.m.  *Id.*; Gov't Opp'n Br. at 9; *see generally Ateba v. Leavitt*, --- F.4th ---, No. 24-5004, slip op. at 3–6 (D.C. Cir. 2025).  The D.C. Circuit has imbued these hard passes with significant due process protections.  *See Sherrill v. Knight*, 569 F.2d 124, 126 (D.C. Cir. 1977).  Press pool members also belong to this larger, second group. Journalists without hard passes can still attend events at the White House, but they must seek a temporary "day pass" from the Secret Service.  Gov't Opp'n Br. at 9.

The White House has long voluntarily opened certain spaces for hard pass holders to report on the news of the day.  *Id.* at 8–9; *Sherrill*, 569 F.2d at 129.  Prime among them is the James S. Brady Briefing Room, which has 49 seats that 65 media outlets occupy or share to receive daily press briefings from the White House press secretary.  Budowich Decl. ¶ 4; Gov't Opp'n Br. at 9.  The AP has the front-row, center seat in that room.  Gov't Opp'n Br. at 9; Second Miller Decl. ¶ 15.  Then there is the East Room, which can accommodate up to 180 journalists for press conferences, meetings with foreign leaders, and the like.  Budowich Decl. ¶ 12.  Journalists may RSVP for the East Room and similar space-capped events through an online tool.  *Id.* ¶ 13.  Other areas have acquired nicknames over the years, including "Pebble Beach," a space on the north grounds where television journalists record standups, and the South Lawn, where Marine One arrives and departs.  *Id.* ¶ 4.

### A.  The Press Pool

There are several iterations of the press pool of varying sizes for different spaces.  Pl. Ex. A to Second Miller Decl., ECF No. 27-6.  For example, the "in-house pool" that attends most

White House events in the Oval Office and other small spaces has 21 members.  *Id.* at 2.  The

smallest iteration travels with the President on Air Force One and includes only 13 journalists.

*Id.*  The pool has historically included four photographers, three network television journalists, a

radio correspondent, three wire reporters, and one print reporter.  Second Miller Decl. ¶ 7.

 News wire services, like the AP, are syndicated outlets that distribute their text reporting

and photography by "wire" to subscribers across the country and the globe.  *Wire Service*,

Merriam Webster (2025) [https://perma.cc/9H6G-JNAC].  So wire services generally have the

broadest reach.  Am. Compl. ¶ 38.  The AP, for example, boasts that "[m]ore than half the

world's population sees AP journalism every day."  *Associated Press: Advancing the Power of*

*Facts*, AP.org (2025) (bottom page caption) [https://perma.cc/DU66-VCDD].  Local news

outlets are particularly reliant on wire services for news from Washington, D.C.  *The Role of*

*Wire Services*, Pew Rsch. Ctr. (Dec. 3, 2015) [https://perma.cc/HWW3-4CG5].

 Getting a spot in any version of the press pool has always been difficult.  At minimum,

journalists needed to be hard-pass holders.  But that was not enough.  Gov't Opp'n Br. at 10.

Eligible journalists still had to be selected by the White House Press Correspondents'

Association ("WHCA"), a private entity that controlled the pool's composition.  Budowich Decl.

¶ 8; Compl., ECF No. 1, ¶¶ 22–25.  The AP says that the WHCA had always prioritized wire

services because they have the "broadest reach."  Am. Compl. ¶ 38.  The AP was a founding

member of the WHCA.  *Id.* ¶ 37.

 Seniority offered privileges.  The AP was "guaranteed" two of the 13 core spots in the

pool.  Budowich Decl. ¶ 8.  And the AP's photographer was always "the line leader" and "first

person through the door."  Hr'g Tr., ECF No. 45, at 43:10–17, 82:24.  The remaining pool seats

typically rotated among the largest and most well-established media companies.  Gov't Opp'n

Br. at 11; Hr'g Tr. at 97:15–24. Generally, a member of the White House communications office joined to document the President's activities and prepare its own press releases. Hr'g Tr. at 106:12–107:11 (Miller testimony). The White House maintained editorial control of its own media team. *Id.*

But during this litigation, press pool procedures abruptly changed. White House Press Secretary Karoline Leavitt announced on February 25 that the Government—not the WHCA—would now choose which hard pass holders gained access to the press pool.[2] Notice, ECF No. 22, at 1. She said that the Government wanted to promote "new media" that "historically" "have long been denied the privilege" of participating in the pool. *Id.*; White House, Press Secretary Karoline Leavitt Briefs Members of the Media, YouTube (Feb. 25, 2025), at 5:30–7:30 [https://perma.cc/F3ZN-MMW7]. According to the AP, the practical result has been that the newly arranged press pool trades out one wire service seat and one photography seat for two "new media" seats, leaving one rotating wire service seat. *See* Pl. Reply Br., ECF No. 37, at 25. The White House has permitted a second wire service reporter at some pool events—just not the AP. Am. Compl. ¶ 84. In fact, during the pendency of this litigation, one or both of the other two wire services have always obtained a press pool slot. *See* Pl. Ex. D to Third Miller Decl., ECF No. 37-6. The WHCA continues to assign, "at the White House's discretion," the seats in the Brady Briefing Room. Budowich Decl. ¶ 4. In short, new media has benefitted at AP's expense under the new management. Little else has changed.

The Government maintains that under these new procedures, "[t]here is no categorical ban on media outlets that are critical of the President or that refuse to use the proper name for the Gulf of America." Gov't Opp'n Br. at 12. Indeed, it has continued to admit outlets to the pool,

---

[2] The AP does not challenge the Government's decision to take control of this process.

such as the New York Times, that "have been highly critical of the President and have continued to refer to the former name." *Id.*  In fact, all members of the original press pool have continued to use the Gulf of Mexico name while noting President Trump's order.  Am. Compl. ¶ 85.

So why has the AP alone been penalized?  The AP claims, and the Court now finds, that the Government has singled out the AP because of its refusal to update the Gulf's name in its Stylebook, an influential writing and editing guide.  Am. Compl. ¶ 13.  On February 11, shortly after the AP refused to rename the Gulf, Leavitt summoned AP Chief White House Correspondent Zeke Miller to her office.  Am. Compl. ¶ 49.  "She told [Miller] that, at President Trump's direction, the AP would no longer be permitted in the Oval Office as part of the press pool until and unless the AP revised its Stylebook" to use Gulf of America instead.  *Id.*

Later that day, an AP text journalist was barred from an executive order signing and press conference with Elon Musk in the Oval Office that was open to the press pool.  *Id.* ¶ 54.  That night, an AP reporter again was excluded from a press pool event in the Diplomatic Reception Room.  *Id.* ¶ 56.  The AP photographer still could attend that event.  *Id.*  But for the AP's text reporting, journalists had to wait for a video feed to issue breaking news alerts, which "caused delays."  *Id.*

Two days later, the Government barred the AP altogether from attending three other Oval Office press pool events.  *Id.* ¶ 61.  The AP protested.  *Id.* ¶ 62.  In response, Deputy Chief of Staff Taylor Budowich issued a stronger statement:  "The Associated Press continues to ignore the lawful geographic name change of the Gulf of America."  @Taylor47, X (Feb. 14, 2025) [https://perma.cc/KB7A-HUVB].  He acknowledged that "their right to irresponsible and dishonest reporting is protected by the First Amendment," but stressed that "it does not ensure their privilege of unfettered access to limited spaces, like the Oval Office and Air Force One."

*Id.* After this statement issued, the AP was not allowed on an Air Force One flight to Palm Beach. Am. Compl. ¶¶ 64, 67.

On February 18, White House Chief of Staff Susan Wiles responded to the AP's repeated complaints. Pl. Ex. B to Second Pace Decl., ECF No. 28-2, at 2. She said that the AP's "Stylebook" had "misused, and at times weaponized" its "influence" to "push a divisive and partisan agenda." *Id.* "[T]he guidance relating to the renamed Gulf of America should be appropriately reflected, not denied. . . . Denying such, denies the appropriate authority of the duly elected President. . . . [We] remain hopeful that the name of the water body in question will be appropriately reflected in the Stylebook where American audiences are concerned." *Id.*

Later that day, the President publicly stated that the AP "ha[d] been very, very wrong on the election, on Trump and the treatment of Trump," and that "they're doing us no favors and I'm not doing them any favors." Am. Compl. ¶ 69. The AP had been barred from the press conference at Mar-a-Lago where he said this. *Id.* Four days later, an AP photographer and text journalist were barred from the Republican Governors Association dinner in Washington, D.C., a press-pool event, where the President delivered remarks asserting that he was "holding [the AP] out of any news conferences" because of the AP's "Gulf-of-Mexico" terminology. *Remarks by President Trump at Republican Governors Association*, The White House (Feb. 20, 2025) [https://perma.cc/MF2F-CYNG].

Since then, the AP's hard pass holders have not been admitted to meetings like President Trump's Oval Office discussion with Ukrainian President Volodymyr Zelenskyy and his meeting with Polish President Andrzej Duda at a Maryland convention center. Am. Compl. ¶¶ 76, 90. The AP's veteran White House photographer, Evan Vucci, testified that a Ukraine-based AP videographer managed to get into the Zelenskyy meeting as part of Zelenskyy's entourage. Hr'g

Tr. at 36:16–40:22 (Vucci testimony).  But even so, the AP's reporting quality suffered.  *Id.*  The

foreign correspondent did not transmit photos and text updates live, so the AP had to wait for the

long meeting to conclude before issuing photography, "40 minutes behind" competitors.  *Id.* at

39:21–40:8.  More, because the foreign correspondent specialized in video rather than

photography, he did not produce images that conformed to the usual AP standards.  *Id.* at 37:15–

38:22.

    In sum, AP hard pass holders have not been admitted in any form or fashion to the press

pool since February 14.  Hr'g Tr. at 117:23–118:2; 146:19–24 (Miller testimony and redirect).

And although the Government claims the AP is still "eligible" for these pool events, this

eligibility hinges on the outlet changing its terminology.  Suppl. Decl. T. Budowich, ECF No.

40-1, ¶ 3; Hr'g Tr. at 190:10–13.  The Government offers no reason besides the Gulf issue for

the exclusion.  Hr'g Tr. at 190:14–24 (Government counsel: "[A]lthough the AP is eligible, like

any hard pass holder, to be selected, they are not being selected. . . .  And they're not being

selected, as I understand it – and I think the record is clear . . . because they refuse to adhere to

what the President believes is the law . . . that the body of water is called the Gulf of America.

That is my understanding of why they are not in the Oval Office.").

### B.  East Room and Limited-Access Events

Now consider the larger, pre-credentialed media events.  The AP complains that it has

been systematically excluded from nearly every East Room event and other large limited-access

briefings open to the broader White House press corps.  Am. Compl. ¶ 3.  The Government

contests that the AP's concerns are unfounded.  Gov't Opp'n Br. at 7, 13 (stating that the AP

"enjoy[s] the same general media access to the White House press facilities as all other hard pass

holders").  The AP journalists, it says, are "eligible, at the President's discretion, to be admitted

to those events" by the reservation process.  Budowich Decl. ¶ 15.  The parties agree that no AP employee's hard pass has been revoked.  Gov't Opp'n Br. at 9.

The Court finds that the AP indeed has been excluded from large events far more often than its peers.  Hr'g Tr. at 79:18–80:4 (Vucci cross) ("[B]efore, if there w[ere] ten events that week, we would be in all ten.  Now, [] it's a win for us to get into one event a week. . . .  [M]y competitors . . . are going into these things every single day."); Pl. Ex. B to Second Miller Decl., ECF No. 27-7, at 2–4 (detailing East Room and similar limited-access events on February 13, 20, 24, and 27 that the AP was not allowed to attend); Pl. Ex. A to Third Decl. of Zeke Miller, ECF No. 37-3, at 2–5 (detailing limited-access events on March 3, 5, and 14 that the AP was excluded from and on March 12 allowing only the photographer without the text journalist).

At an evidentiary hearing, the AP's witnesses made clear that its text reporters have been systematically and almost completely excluded from events open to the broader White House press corps since February 13, while its photographers have suffered curtailed access.  The Government declined to offer witnesses in rebuttal.  The Court credits the detailed timeline that the AP built through testimony and evidence.

On February 13, two days after Leavitt's first indication of the Government's displeasure, an AP text journalist was barred from an East Room press conference, though an AP photographer was allowed to attend.  Am. Compl. ¶ 60; Second Miller Decl. ¶¶ 24–25.  Miller testified that another journalist told him that he did not RSVP as Miller had, but that the other journalist was still admitted to the event.  Hr'g Tr. at 118:12–119:12.  The next week, in West Palm Beach, the Government excluded the AP from an executive-order signing ceremony and from the President's subsequent speech.  Am. Compl. ¶¶ 67–68.  Two days later, the AP was barred from the East Room for a Black History Month reception open to dozens of White House

press corps members, even though it had a confirmed RSVP.  Pl. Ex. B to Second Miller Decl. at 3; Hr'g Tr. at 136:5–15.  In late February, AP journalists were excluded from the National Governors Association Evening Dinner in the East Room.  Am. Compl. ¶ 76.

Sometimes, *foreign* AP correspondents got into White House events.  French President Macron and British Prime Minister Starmer visited the East Room for press conferences.  Gov't Opp'n Br. at 13.  AP correspondents from these countries attended the press conferences as part of the foreign dignitaries' entourages.  *Id.*; Hr'g Tr. at 132:19–133:18 (Miller cross); Am. Compl. ¶ 79 ("[A] Paris-based AP reporter flown overseas at the AP's expense *was* permitted to enter the East Room—but only as part of President Macron's press pool.").  But the AP's hard pass holders were not admitted to either event.  Second Decl. of Julie Pace, ECF No. 27-2, ¶¶ 5– 6; Am. Compl. ¶ 77.  Admittedly, these were limited-access events to which many journalists could not gain admission.  Gov't Opp'n Br. at 13.  For the event with Macron, 310 media members requested access and only 136 received it; for the event with Starmer, 308 asked to attend and only 172 were allowed.  Budowich Decl. ¶¶ 17–18.

The AP also has been excluded from limited-access press events beyond the White House.  For example, members of the broader White House press corps usually observe the President alight from Air Force One on a nonpublic airport tarmac in West Palm Beach and elsewhere.  *Id.* ¶ 19; Am. Compl. ¶ 19; Hr'g Tr. at 70:6–8.  The AP contends that there are "no space constraints whatsoever on the airport tarmac" yet it was still prohibited from accessing this reporting space on February 28.  Hr'g Tr. at 69:16–18 (government implying agreement); Am. Compl. ¶¶ 12, 92.  Nonetheless, its photographers and text journalists have been admitted to all subsequent tarmac events.  Hr'g Tr. at 136:17–21 (Miller cross).

AP reporters were also excluded from President Trump's March 14 speech at the Department of Justice in its "sizable Great Hall" even though the Government opened it to the press pool and DOJ-credentialed media. Third Decl. of Zeke Miller, ECF No. 37-2, ¶ 11. Finally, the Government refused the AP access to the First Lady's Capitol Hill event and the Vice President's Texas event in a large park near the U.S.-Mexico border. *Id.* ¶ 12.

As winter has turned to spring, the AP's freeze out has thawed slightly. In March, the Government began allowing AP photographers into some East Room and limited-access events while continuing to bar its text journalists. On March 12, an AP photographer gained access to the East Room for a St. Patrick's Day reception with the President and the Taoiseach of Ireland, though the text journalist was rejected. Third Miller Decl. ¶ 10. Ditto for an education executive order signing, a Greek Independence Day celebration, and a Women's Day Event in the East Room, held on March 20, 24, and 26 respectively. Hr'g Tr. at 144:18–145:6 (Miller cross), 73:23–74:5 (Vucci cross). An AP text reporter was also excluded from the Women's Day event even though the Government had approved the RSVP. *Id.* at 200:7–19. (The Government proffered without evidence that a security issue required excluding 40 confirmed RSVPs. *See id.*).

The Government's questioning on cross-examination implied that the AP has had at least one journalist or photographer in every "pre-credentialed media event," that is, every limited-access event open to the White House press corps. Hr'g Tr. at 129:6–12. The Court credits the AP's abundant evidence and testimony that this is incorrect. *E.g.*, Pl. Ex. B to Second Miller Decl. (detailing "pre-credentialed" limited-access events on February 13, 20, 24, and 27 that AP was not allowed to attend); Pl. Ex. A to Third Miller Decl. at 2–5 (detailing limited-access events

on March 3, 5, and 14 that AP was excluded from and on March 12 allowing only the photographer without the text journalist).

In sum, the Court credits the AP's testimony and evidence that its text journalists have been systematically banned from large, limited-access events open to the entire White House press corps since, at the latest, February 13. Hr'g Tr. at 132:10–18 (Miller testimony); Am. Compl. ¶ 60 (detailing the first East Room exclusion on February 13). The Court also credits the AP's testimony and evidence that its photographers have experienced more limited access to such events compared to other hard pass holders. Hr'g Tr. at 79:18–80:5 (Vucci cross).

### C.  Procedural History

The AP filed this suit on February 21, 2025, about ten days after the first signs of its exclusion from the press pool. *See* Compl. After a subsequent hearing, the Court denied the AP's motion for a temporary restraining order. Order, ECF No. 18. Among other reasons, the Court noted that there were "differences between this case and prior cases that ma[d]e full briefing particularly important." Hr'g Tr., ECF No. 19, at 57:13–18. *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), the leading case on White House press access, dealt with hard passes. *Id.* But both parties agreed that the AP's hard pass status had been unchanged. *Id.* at 57:19–21. More, there were important contested questions about the scope of the AP's ban and the resulting effect on its business. *Id.* at 57:19–58:3. The Court thus ordered expedited briefing for a preliminary injunction and allowed both parties to present up to two live witnesses. *Id.* at 57:2–7; 03/13/2025 Min. Order. The AP presented its two most senior hard pass holders. The Government offered no witnesses. The issues are now fully briefed and ripe for consideration.

## II.  LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right," but as an exercise of discretion by a court sitting in equity.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The movant faces a high bar for success, as it must establish four elements "upon a clear showing": (1) that it is likely to succeed on the merits; (2) that it likely will suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities supports granting the relief; and (4) that the public interest favors the injunction.  *Id.* at 20, 22.  Where, as here, the Government is the party opposing injunctive relief, the latter two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

 A district court should hold an evidentiary hearing and make factual findings if faced with disputed issues of material fact on a motion for a preliminary injunction.  *See Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004).  These findings of fact receive "special deference" on appeal and will not be disturbed absent clear error.  *City of Las Vegas v. Lujan*, 891 F.2d 927, 931 (D.C. Cir. 1989).  Given the contested factual issues here, the Court held such a hearing, and its factual determinations are reflected in this Memorandum Order.

## III.  ANALYSIS

### A.  First Amendment History

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.

By now these words are familiar.  But at the founding, their necessity and import were hotly debated.  Indeed, the Anti-Federalists resisted ratification of the Constitution until it

contained an express guarantee of a free press, among other things.  *See* Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L. J. 246, 296–99 (2017); *see also* Andrew S. Oldham, *The Anti-Federalists: Past As Prologue*, 12 NYU J. L. & Liberty 451, 456 (2019) ("[T]he Anti-Federalists' papers [help] to elucidate the original public understanding of the Constitution.").[3]  Pseudonymic writer Philadelphiensis, for instance, stressed that the free press was "the scourge of tyrants, oppressors, villains, and bloodsuckers; the bulwark of freedom, that causes the haughtiest lordling to tremble; an inestimable jewel, that places the poorest citizen on a level with the richest demagogue." 3 *The Complete Anti-Federalist* 124 (Herbert J. Storing, ed., 1981).  Federal Farmer likewise argued that "the freedom of the press is a fundamental right" that "ought not to be restrained by any taxes, duties, or in any manner whatever." 2 *The Complete Anti-Federalist* 329 (Herbert J. Storing, ed., 1981).  And he feared that the right could be eroded if it were not explicitly enshrined in the new Constitution.  *Id.* at 329–30.  It is no spoiler to reveal that the Anti-Federalists' position here triumphed.  The precious right was ultimately protected in parchment.

But that was only half the battle.  Liquidation of this right's reach came next.  In 1789, Representative Aedanus Burke believed newspapermen reporting from the floor of the House chamber "misrepresented the[] debates in the most glaring deviations from the truth, often distorting the arguments of the members from the true meaning." 1 Annals of Cong. 917

---

[3]  The founding generation likely saw more pronounced distinctions between the freedom of speech and the freedom of the press than modern doctrine allows.  Campbell, 127 Yale L. J. at 298–99.  But the concepts were "equivalent as natural rights," meaning the founders understood their right to speech included the right to disseminate their "well-intentioned statements of one's thoughts."  *Id.* at 286, 288–89.

(1789).[4]  So he introduced a resolution to censure them.  Burke's resolution would bar newspapers from reporting on House debates altogether or, at the least, remove reporters from the House floor and relegate them to the public gallery.  *Id.* at 952, 954.

But it was Burke who would be rebuked.  Congressmen lined up to condemn his proposal.  James Madison stressed that it was "improper to throw impediments in the way" of the reporting "as the House had hitherto permitted from the purest motives."  *Id.* at 919–20.  Representative Thomas Hartley proclaimed that Burke's resolution was "an attack upon the liberty of the press."  *Id.* at 919.  Other members agreed.  *See id.* at 918.  Burke ultimately withdrew the resolution.  *Id.*  In the aftermath, the House settled on a practice of reserving space for reporters on the House floor but permitting the reporters to allocate the slots among themselves.  *See* Elizabeth Gregory McPherson, *Reporting the Debates of Congress*, 28 Quarterly J. Speech 141, 142 (1942); Congressional Rsch. Serv., *Congressional News Media and the House and Senate Press Galleries,* at 1 (Apr. 13, 2017).  The Senate took a similar approach, and it soundly rejected an effort by a senator several decades later to exclude reporters from the upper house chamber.  *See* Second Brief for the Knight First Amendment Institute at Columbia University as Amicus Curiae in Support of Plaintiff, ECF No. 41-1, at 20–22.

To be sure, as anyone familiar with the Sedition Act knows, the Founding Fathers did not always live up to the promise of the First Amendment.  For instance, the Sedition Act of 1798 made it a crime to "publish[] any false, scandalous and malicious writing or writings against the government of the United States."  1 Stat. 596 (1798).  Yet the Act faced immediate constitutional challenges.  *See, e.g.*, James Madison, *Virginia Resolutions of 1798*, 4 The Debates

---

[4]  This anecdote, among others, comes from the Knight First Amendment Institute's helpful amicus brief.  ECF No. 41-1.  The Court acknowledges the many amici who offered their valuable insights to this case.

in the Several State Conventions on the Adoption of the Federal Constitution, 553–54 (1836)

(state resolution declaring the Act "exercises . . . a power not delegated by the Constitution, but,

on the contrary, expressly and positively forbidden").  The next President promptly pardoned all

those who had been convicted under the Sedition Act on constitutional grounds, and Congress

ultimately repaid their fines, agreeing that the Act had been unconstitutional.  *See* Second Brief

for the Knight Institute as Amicus Curiae at 11; *see also N.Y. Times Co. v. Sullivan*, 376 U.S.

254, 276 (1964) ("Although the Sedition Act was never tested in this Court, the attack upon its

validity has carried the day in the court of history.").

These immediate and forceful backlashes to attacks on the press underscore how

Americans understood the First Amendment in the early centuries.  They saw this foremost

protection as safeguarding their natural right to heap honest criticism upon the Government

without fear of official reprisal.  *See* Campbell, 127 Yale L. J. at 280 ("[B]y the late eighteenth

century, Americans widely embraced the idea that the government could not prohibit well-

intentioned statements of one's thoughts."); *see also The People v. Croswell,* 3 Johns.Cas. 337,

352 (Sup. Ct. of N.Y. Feb. 13, 1804) ("The liberty of the press consist[s] in publishing with

impunity, truth with good motives, and for justifiable ends, whether it related to men or to

measures.").

All of this to say:  The AP's predicament comes with considerable prologue.  *See*

William Faulkner, *Requiem for a Nun* 73 (1951) ("The past is never dead.  It's not even past.").

History and tradition guide the Court's understanding of the First Amendment, but that does not

settle this matter.  Modern First Amendment caselaw—binding on this Court—is an intricate

web, and more is needed to untangle it.  *See, e.g.*, *Vidal v. Elster*, 602 U.S. 286, 311 (2024)

(Kavanaugh, J., concurring in part); *id.* at 311–17 (Barrett, J., concurring in part).  So the Court now turns to contemporary speech doctrine.

### B.  Modern Forum Jurisprudence

In modern jurisprudence, forum analysis controls the extent to which the government may restrict access to public property for First Amendment activities.  *Price v. Garland*, 45 F.4th 1059, 1067 (D.C. Cir. 2022).  The type of forum dictates the scope of permissible government regulation there.  *Id.*  To classify a space, courts look to its nature, how it is used, and whether the public has traditionally had access to it for First Amendment activities.  *Id.*  Under this rubric, the public and the press enjoy coextensive access.  *See Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) ("[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.").

On one end of the spectrum are traditional public fora—places that have historically fostered societal discourse by the public.  Parks and streets are quintessential examples.  *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).  The law zealously safeguards First Amendment activities in these locations and permits only "narrowly tailored" government interference.  *Id.*

Then comes the designated public forum, which is "government property that has not traditionally been regarded as a public forum, but [that] the Government has intentionally opened up for that purpose."  *Price*, 45 F.4th at 1067 (cleaned up).  To fit this description, the location must have been opened to the public for expressive activity; not merely for a select few people or groups.  *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021).  Think:  a state university expressly opening its meeting facilities to registered student groups.  *Widmar v. Vincent*, 454 U.S. 263, 267 (1981).  First Amendment protections for these spaces are

the same as for public forums.  *Evers*, 994 F.3d at 609.  That is because "[s]o long as the government chooses to retain the open character of the property, it is bound by the same standards" as a traditional public forum.  *Price*, 45 F.4th at 1067–68.

On the other side of the spectrum are fora that may be more tightly regulated by the government.  A nonpublic forum is "government property that is not by tradition or designation a forum for public communication"—such as "museums *and offices*."  *Price*, 45 F.4th at 1068 (emphasis added)*.*  Limited-access press conferences in government facilities can also fit the bill.  *Evers*, 994 F.3d at 610.  Ditto for the U.S. Capitol buildings.  *See United States v. Nassif,* 97 F.4th 968, 976-77 (D.C. Cir. 2024).

In nonpublic fora, restrictions on First Amendment activities are "examined only for reasonableness."  *Price*, 45 F.4th at 1068.  So the Government may discriminate "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum."  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).  Safe to say, the Government has extensive control over access to nonpublic fora.  But even in nonpublic fora, it must wield that control in a way that is viewpoint neutral and not a subterfuge "to suppress expression merely because public officials oppose the speaker's view."  *Perry*, 460 U.S. at 46.  Viewpoint discrimination is an "egregious form of content discrimination," which occurs when the government "targets not subject matter, but particular views taken by speakers on a subject."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  And the D.C. Circuit has accorded significance to government actions that "preclude some speakers from using a forum altogether" even in the nonpublic forum context.  *Ateba*, No. 24-5004, slip op. at 10.

In *Evers*, for example, two journalists alleged viewpoint discrimination after being excluded from a state governor's limited-access press event in a conference room. The Seventh Circuit classified the conference room as a nonpublic forum because the "event [was] not open to the public" and the government had not otherwise "dedicated [the room] to open communication." 994 F.3d at 610. The government can properly "consider limited space constraints, address security concerns, and ensure that those in attendance will maximize the public's access to newsworthy information, and be more likely to abide by professional journalistic standards." *Id.* In that same vein, the government can also "prioritize[] access by journalists whose reporting will reach wider audiences, while also allowing room for smaller media outlets." *Id.* The only thing the government cannot do is suppress expression because of the reporters' viewpoint. *Id.* Because the governor offered an unrebutted viewpoint-neutral justification for his limitations, the journalists' case was doomed. *Id.* at 615.

### C. The AP's Likelihood of Success on the Merits

The AP seeks restored eligibility for two categories of White House media events: press pool events and larger events held in the East Room and other limited-access spaces. It contends that its exclusion from consideration for these events based on the AP's viewpoint violates its First Amendment rights. It also argues that it has suffered unlawful retaliation for exercising its speech rights. The Court concludes that the AP is likely to succeed on the merits of its First Amendment viewpoint-discrimination and retaliation claims for both its press pool and East Room allegations.

**1. First Amendment Viewpoint-Discrimination Claims**

**a. Press Pool Events**

The Court starts with the AP's allegations that its exclusion from the press pool is impermissible viewpoint discrimination. Recall that the press pool is selectively invited for various small events with the President. At the heart of this case lies one press pool site in particular: the Oval Office. It scarcely need be said that the Oval Office is a highly controlled location. It is shrouded behind a labyrinth of security protocols, and few members of the public will ever approach the *Resolute* Desk. Thus, the AP has no standalone right of access to the Oval Office. *Houchins v. KQED, Inc.*, 438 U.S. 1, 10 (finding no "constitutional right of access to news sources" or restricted locations). The Government could exclude all journalists from the Oval Office without offending the First Amendment. On this, the parties agree. *Compare* Gov't Opp'n Br. at 18 (stating there is no "First Amendment right . . . [to] access[] the White House) *with* Pl. Reply Br. at 16 ("The AP does not claim otherwise.").

But the Government has chosen to open the Oval Office to reporters in limited circumstances. That is, it has opened government property for "selective access" to a "particular class of speakers" whose members must "obtain permission" to be there in the first place. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998); *see also Perry*, 460 U.S. at 47 (nonpublic forum created in school mailbox system where it was not "open for use by the general public" and "[p]ermission to use the system" had to be "secured from the . . . principal."). Thus the Oval Office is properly classified as a nonpublic forum, at least when the Government has

voluntarily opened it and journalists are present.  *Accord Evers*, 994 F.3d at 610 (holding that a "limited-access press conference" hosted by a state governor was a nonpublic forum).[5]

This means official authority to restrict expression in the Oval Office is at its zenith.  But still, there is a limit:  Access restrictions must be reasonable and not viewpoint based.  *Cornelius*, 473 U.S. at 806; *see also Forbes*, 523 U.S. at 682 (stressing that "the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property").  So while the AP does not have a constitutional right to enter the Oval Office, it does have a right to not be excluded *because of its viewpoint*.  And the AP says that is exactly what is happening.  *See* Mot. Preliminary Inj., ECF No. 27-1, at 45.

The Court agrees.  Indeed, the Government has been brazen about this.  Several high-ranking officials have repeatedly said that they are restricting the AP's access *precisely* because of the organization's viewpoint.  *See supra* Section I.A.  Government counsel admitted that the AP was not being chosen for access, despite its "eligibility," because of its viewpoint.  Hr'g Tr. at 190:17–24 ("I think the record is clear. . . . [T]hey are not being selected for Oval Office access because they refuse to adhere to what the President believes is the law of the United States . . . that the body of water is called the Gulf of America.").  The Government offers no other plausible explanation for its treatment of the AP.  The Constitution forbids viewpoint discrimination, even in a nonpublic forum like the Oval Office.

---

[5]  If the government opens a nonpublic forum for "use by certain groups" or for the "discussion of certain subjects," the space becomes a "limited public forum."  *Price*, 45 F.4th at 1068 (quoting *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009)).  But the distinction appears analytically irrelevant here.  *Id.* at 1067–68 (applying the same "reasonableness" and "viewpoint neutral" analysis to both).  The Court need not decide whether the Oval Office has been used as a limited public forum because the Government's defenses fail regardless.

That the Government recently took control of press pool composition and now exercises sole discretion over who enters the Oval Office only bolsters this conclusion. The Government is still "reserv[ing] eligibility for participation" in Oval Office media events to certain "classes of speakers" and, indeed, the Government is explicitly the one that is "ma[king] individual, non-ministerial judgments as to which of the eligible [outlets] would participate." *Forbes*, 523 U.S. at 680. Indeed, the Government's enhanced discretion is a fundamental feature of nonpublic fora, where the "government retains the choice of whether to designate its property as a forum for specified classes of speakers." *Id.* This change did not alter the Government's constitutional obligation to refrain from viewpoint discrimination in selecting media outlets for participation.

This conclusion is also unaffected by the government speech doctrine. This doctrine recognizes that "[a] government entity has the right to 'speak for itself'" because the "Free Speech Clause . . . does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (cleaned up). Put plainly, when expressing its own views, the Government can freely decide what message to convey. *See Shurtleff v. City of Boston,* 596 U.S. 243, 251 (2022). The question, of course, is what counts as government speech. Courts look to "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 252.

But the Government expressly disclaims this doctrine, and for good reason. Hr'g Tr. at 192:14–16 (Government counsel: "I wouldn't go so far as saying government speech. I think this falls in the right-of-access cases."). The undisputed focal point of this case is the Government's selection of reporters for Oval Office access—not anything the Government has said or any message it has conveyed.   The act of curating the press pool is not itself a form of

speech.  The press pool "independently cover[s] the President" and is "not an organ of the Government."  *Id.* at 176:2–3 (argument of AP counsel).  Indeed, for decades and until weeks ago, the WHCA—not the White House—decided which reporters participated in the press pool. Curating press pool membership thus looks more like "government inten[t] . . . to regulate private expression" than an attempt by the Government to "speak for itself."  *Shurtleff*, 596 U.S. at 252; *see also id.* at 267 (Alito, J, concurring) ("[G]overnment speech occurs if—but only if—a government purposefully expresses a message of its own through persons authorized to speak on its behalf.").  And even now, the only notable change from the *ancien régime* is the AP's total exclusion.

Finally, the Government's ability to convey its own message does not turn on the composition of the press pool.  The White House media team speaks for the Government and "push[es] out [messages] in real time . . . from the same Oval Office events" that "bona fide journalists" are covering.  Hr'g Tr. at 106:24–107:11.  This reinforces the conclusion that control of the press pool is a method by which the Government modulates private speech rather than expressing itself.  The government speech doctrine thus plays no role here.

Forum analysis offers a difficult path to victory for the Government.  So it comes as no surprise that the Government disputes the threshold applicability of forum analysis to the Oval Office.  *See* Gov't Opp'n Br. at 29–30.  In support, it points to *Price*.  There, the D.C. Circuit concluded that forum analysis did not apply when evaluating restrictions on filming a documentary in a national park.  Because the final documentary would be disseminated "at some other time . . . in some other location," the filming was not itself "speech" and instead was "merely a noncommunicative step in the *production* of speech."  *Price*, 45 F.4th at 1068, 1070

(emphasis added). The court warned against "apply[ing] the speech-protective rules of [forum analysis] to regulation of" pre-speech activities. *Id.* at 1068.

The Government implicitly contends that the media's photojournalism and notetaking in the Oval Office are also pre-speech. And *Price* admonishes that courts should be wary of "extending the public forum doctrine in a mechanical way to contexts that meaningfully differ from those in which the doctrine has traditionally been applied." *Id.* (cleaned up). Thus, the Government insists, forum analysis is the wrong test.

But *Price* does not help the Government. For starters, while *Price* involved only pre-speech, AP journalists are engaged in full-fledged expression when they report from the Oval Office. AP photographer Vucci described near-instantaneous transmission of photos to his editors when covering events in the Oval Office. The lag time between a picture's creation and its publication online to the entire world is sometimes as short as "30 seconds to 45 seconds." Hr'g Tr. at 35:2–3. Real-time publication is so vital to his role that he is "hard-wired directly into" three mobile internet devices, each on a different network, to ensure he can always transmit from the White House. *Id.* at 28:19–21, 29:4–13. He also brings his cellphone into the Oval Office because "an editor or a reporter" may text him asking for specific photographic content— content he can provide on the spot by taking a photo and sending it in under a minute. *Id.* at 29:16–21, 35:2–3.

Vucci is not the only journalist who communicates live from the Oval Office. Print journalists sometimes text their editors "[i]f there's huge news" so the editors can "send out [news] alerts in real time" to the public. Hr'g Tr. at 30:18–22. Miller can draft news alerts on his phone "while the event is still going on." *Id.* at 102:3–8. He is also in constant contact with his colleagues "[a]t pretty much every event" he covers. *Id.* at 107:13–17. He keeps a "running

conversation" going where they all exchange "notes and feeds" as events unfold in front of them. *Id.* at 107:19–21. When Miller is covering an Oval Office event, other reporters from around the world "can point out something interesting" to him and "respond in real time to an announcement"—all of which "help[s] inform" his reporting. *Id.* at 108:15–22. Simply put, AP journalists are "speaking" from inside the Oval Office. *See Price*, 45 F.4th at 1070.

In any case, even restrictions on *noncommunicative* activity are subject to reasonableness review, and thus pre-speech acts are also immune from viewpoint discrimination. *Price*, 45 F.4th at 1072. And *Price* explained that "blanket prohibition[s] against the recording of a public official performing public duties on public property" are per se unreasonable, as that activity "implicates unique first amendment interests." *Id.* at 1071–72. In short, *Price* counsels that even if any of the reporters' actions are noncommunicative, the proper inquiry is still a nonpublic forum analysis which never tolerates viewpoint discrimination.

Finally, newsgathering was not at issue in *Price* because the statute there had an express carveout exempting newsgathering activities from its restrictions. *Price*, 45 F.4th at 1064. So *Price* did not disapprove of applying forum analysis to journalistic endeavors like "[g]athering information about government officials in a form that can readily be disseminated to others." *Id.* at 1070–71.

The Court heeds the Circuit's admonition that it should not "mechanical[ly]" extend the public forum doctrine to non-traditional contexts. *Price*, 45 F.4th at 1068. It also takes the Government's point that the Oval Office is no ordinary government space. *See* Gov't Opp'n Br. at 7. But given the square directive of *Price* that forum analysis applies to communicative activity, this Court is bound to follow that precedent.

To recap, unlike in *Price*, the communication here is not deferred to some future time and location; it is happening in real time as reporters gather information about government officials and witness history in the Oval Office. *See also Price*, 45 F.4th at 1071 n.*** ("Forum analysis may well apply to live streaming, which is communicative activity" and not merely a "step[] in the creation of speech."). Thus AP reporters are actively "communicating thoughts," "discussing public questions," and "disseminat[ing] information and opinion" while in the Oval Office. *Id.* at 1069. This is precisely the sort of newsgathering that *Price* distinguished, and these activities make forum analysis the appropriate paradigm here. And once forum analysis applies, the D.C. Circuit has long been clear that the Government may not exercise "unbridled discretion" without offending the First Amendment. *Ateba*, No. 24-5004, slip op. at 18.

The Government's other primary talisman is *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006). There, two journalists annoyed Maryland's governor by "failing to objectively report" on his administration. *Id.* at 413. In response, the governor forbade state government officials from speaking with them. Yet the Fourth Circuit found the conduct unobjectionable. *Baltimore Sun* is undoubtedly the Government's strongest case because it involved a government edict that inhibited journalists' contact with government officials in situations that bear some similarity to the circumstances here. Still, *Baltimore Sun* does not get the Government where it needs to go.

For one, *Baltimore Sun* did not discuss the forum doctrine and thus is of little weight in countering the analysis above. *Baltimore Sun* was a retaliation case focused on *dialogue* with government officials, not restrictions on *physical access* to government property for newsgathering. As the plaintiffs described it, they were challenging "a no-comment policy." *Id.* at 417. The chief complaint was that government officials were "not return[ing] [the reporters']

telephone calls." *See id.* at 413–14.  While one of the reporters lost access to two small, invite-only press briefings, his colleagues could attend them.  *Id.* at 414.  So the Fourth Circuit did not apply forum analysis because it was not the appropriate test:  The case turned on an alleged right to interact and speak with government officials, not a right of access to a physical forum for observational newsgathering.

To be sure, the Government seemingly views these Oval Office events as akin to dialogues, not observational newsgathering.  And perhaps there is something to that comparison. After all, intimate events in places like the Oval Office might be framed as more closely resembling sit-down, one-on-one interviews—which are clearly "dialogue"—than broader press briefings.  *See* Gov't Opp'n Br. at 21–22.  And the AP concedes that the Government may engage in viewpoint discrimination in selecting what reporters can *interview* senior officials.  *See* Pl. Reply Br. at 17, 20.  But the Government neither called witnesses nor presented any evidence to support this analogy.

The Court instead credits the AP's chief White House correspondent's testimony that there is a clear distinction between interviews and the press pool availabilities at issue.  Miller is well-suited to offer these observations as he has taken part in the press pool and presidential interviews.  *See* Hr'g Tr. at 104:2–11, 105:12–22.  Interviews usually involve a one-on-one or small-group conversation at the invitation of the President.  *See id.*  They are "exclusive" and the press has more "control" over the process than it does over journalistic conditions in Oval Office press pool events.  *Id.* at 105:22–24.  The news outlet works with the White House to decide the time and place of interviews.  *Id.*  The interview would not happen but for the outlet's presence. *Id.*  Interviews also lack the "sense of competitive pressure that you get from a pool event."  *Id.* at 106:1–2.

In contrast, Oval Office press pool availabilities involve a gaggle of reporters, all vying for space and information. In "very many" of these "pool sprays," journalists are relegated to watching events unfold from 20–30 yards away and have no interaction with the President or other officials. Hr'g Tr. at 104:16–20; 106:12–23. The event would happen whether any particular outlet had a reporter there or not. *Id.*

In these conditions, journalists "can't have . . . a substantive conversation" with officials like they can "in an interview." Hr'g Tr. at 104:21–24. Instead, the reporters are "just there to witness what is said and what the reaction is, [and] what else is happening in the room." *Id.* at 105:2–4. And though journalists in the Oval Office do engage in dialogue, that dialogue is directed to other members of the media and the public to whom they are transmitting news in real time—not to government officials. More, unlike in exclusive interviews, the Government is not dependent on private media organizations to convey its messages to the American people; the White House's media team is present to broadcast events and can do so whether or not other journalists do so. *See Id.* at 106:10–107:11.

It would be a strange affair for the President to accept an interview and then refuse to speak with his interviewer, but it is commonplace for the President to invite journalists into the Oval Office without speaking to them. *See* Hr'g Tr. at 104:12–20. This is typical of the misfit between the journalistic activities in *Balitmore Sun* and those here. In *Balitmore Sun*, the plaintiffs claimed a right to interact with government officials—a right to ask questions and have them answered. In contrast, the AP expressly disavows any right to interact or speak with the President and disputes only its physical exclusion from places like the Oval Office. Pl. Reply Br. at 17.

Though the Government does not concede this distinction, it agrees that it is solely up to the President whether he takes questions in the Oval Office. Suppl. Decl. T. Budowich ¶ 7. Miller's testimony and the Government's declaration both reflect *Baltimore Sun*'s position that government officials cannot be forced to speak with reporters. And both implicitly demonstrate that this is a dispute over forum access for firsthand journalistic observation, not a right to speak with the President. *See* Pl. Reply Br. at 20 (acknowledging that "the First Amendment does not require officials to *interact* with [] journalists). In short, the Court is persuaded that press pool activities in the Oval Office are not analogous to exclusive interviews, so *Baltimore Sun* is inapposite.

The comparison is further ill-suited because the *Baltimore Sun* reporters experienced only unremediable, "*de minimis* inconvenience." *Balt. Sun*, 437 F.3d at 420. As discussed below, the AP is in a much different position, having suffered significant, concrete harms. *See infra* Section III.C.2. *Baltimore Sun* thus cannot support the weight the Government places on it.

In sum, precedent is unequivocal that the press does not enjoy any standalone right of access to highly restricted government locations like the Oval Office. Instead, forum analysis applies because the Government has chosen to open the Oval Office to some reporters for newsgathering. Under forum analysis, the Oval Office is a nonpublic forum, so the Government enjoys wide latitude on its restrictions, if they are viewpoint neutral. The AP presented evidence that the Government has discriminated against it based on its viewpoint, a claim the Government all but concedes. The AP is thus likely to succeed on its claim that its exclusion from eligibility to access the Oval Office violates its First Amendment rights.

The same reasoning and conclusions apply to other press pool locations and events. Whether the press pool travels on Air Force One, goes to a Mar-a-Lago press briefing, or attends

a press-pool-only event elsewhere, the Government has chosen to open the doors of nonpublic spaces for some journalists.  The Government thus cannot exclude the AP from access based on its viewpoint.  The parties' evidence and arguments have understandably focused on the Oval Office, but nothing before the Court suggests Oval Office press pool events are analytically distinct from the other press pool environments.  The Court makes the same factual findings on the Government's rationale for exclusion in these spaces as in the Oval Office context.  *See supra* Sections I.A–I.B.  So the Court reaches the same legal conclusions and finds the AP is likely to succeed on its claims of viewpoint discrimination in these other press-pool-only locations.

### b.  East Room and Limited-Access Events

Now consider the AP's contention that its exclusion from the East Room and similar limited-access events rests on impermissible viewpoint discrimination.  Like the Oval Office, the East Room fits snugly into the definition of a nonpublic forum.  It is a government facility closed to the public that has not historically been a place for societal discourse.  *Price*, 45 F.4th at 1068.  The Government voluntarily opens it for limited-access press briefings.  Thus viewpoint-based criteria are constitutionally unacceptable.

The Government portrays the East Room claim as moot because all hard pass holders, including the AP, are "eligible" to attend events there.  Gov't Opp'n Br. at 33–34.  But the facts belie mootness.  Sure, foreign-based AP journalists accessed one East Room event through the French president's press entourage.  *See* Am. Compl. ¶ 79.  But it is unclear whether the Government knew the reporter worked for the AP before granting her access.  *See* Hr'g Tr. at 133:2–134:8.  And, more saliently, the relevant comparison here is access among journalists seeking entry through the established channels for *hard pass holders*.  Foreign correspondents do

not have hard passes.  *Id.* at 157:20–158:2.  So a foreigner's periodic admittance to the East

Room and the Oval Office does not dampen the AP's claim that other hard pass holders enjoy

greater access and fewer restrictions than its hard pass holders.

No AP text reporters have been admitted to the East Room since February 11, despite

submitting RSVPs and showing up in person.  *See* Hr'g Tr. at 117:23–118:23; 136:5–15.  The

Government does not dispute this record.  Instead, it argues that all is well because an AP

photographer sometimes gets access to the East Room.  *See* Gov't Opp'n Br. at 16.  And true,

Vucci testified that he has been allowed in to photograph a handful of events.  *See* Hr'g Tr. at

79:18–24.  Still, Vucci's access has been sporadic and inconsistent, even though he has followed

the RSVP process.  *See Id.* at 81:1–7.  In contrast, photographers working for AP competitors

attend limited access-events nearly every day.  *Id*. at 79:23–80:1.  So even if all media outlets

remain theoretically "eligible" for admission, the practical outcome for the AP has been frequent

exclusion.

While it is possible to theorize viewpoint-neutral reasons the AP is not getting into the

East Room, the Court must deal in facts, not conjecture.  The only evidence favoring the

Government is a declaration from Deputy Chief of Staff Taylor Budowich, who did not testify at

the hearing and thus was not subject to cross-examination.  *See* Suppl. Decl. T. Budowich ¶ 15

("[T]he Associated Press remains completely eligible for selection, as all hard pass holders are,

for a wide range of White House coordinated press events.").  And even this averment was

undermined at oral argument, when the Government placed it in context.  *See* Hr'g Tr. at

190:14–21 ("So although the AP is eligible, like any hard pass holder, to be selected, they are not

being selected[] . . . because they refuse to adhere to what the President believes.").  On the other

side of the scale is ample evidence that the AP is being intentionally excluded from East Room

events because it refuses to endorse the "Gulf of America" designation.  *See supra* Section I.A.

Thus the evidence before the Court shows that the AP is being largely kept out of East Room

events based on its viewpoint.  The Court finds the AP is likely to succeed in its claim that the

Government is impermissibly excluding it from the East Room.

The Court reaches the same conclusions for limited-access events held in places other

than the East Room:  the President's speech at the Department of Justice, the First Lady's

Capitol Hill event, and the Vice President's event in Texas.  *See* Third Miller Decl. ¶¶ 11–12.

The one exception is the tarmac at Palm Beach when Air Force One lands.  *See* Am. Compl. ¶¶

12, 19.  The Court finds the Government is not limiting the AP's tarmac access.  Despite initially

being excluded from one presidential arrival on February 28, text and photojournalists from the

AP have since enjoyed regular access to the Palm Beach tarmac.  *See* Hr'g Tr. at 69:16–70:10.

So for purposes of a preliminary injunction, the AP has not shown it is likely to succeed vis-à-vis

tarmac access.  But that is the exception:  It has shown it is likely to succeed on the merits of its

First Amendment claims for the other limited access events.

### 2.  Retaliation Claims

Next the Court turns to the AP's likelihood of success on its retaliation claim.  The AP

alleges that its exclusion from press pool, East Room, and limited-access events is in retaliation

for its speech.  It is well-established that the Government "may not deny a benefit to a person on

a basis that infringes his constitutionally protected interests—especially, his interest in freedom

of speech."  *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).  Even when the Government can

withhold a benefit, "[a]n ordinarily permissible exercise of discretion may become a

constitutional deprivation if performed in retaliation for the exercise of a First Amendment

right."  *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) (cleaned up).

Any rule to the contrary "would allow the government to produce a result which it could not command directly." *Sindermann*, 408 U.S. at 597 (cleaned up).

Thus, an organization alleging retaliation "must establish that the government responded to [its] constitutionally protected activity with conduct or speech that would chill or adversely affect [its] protected activity." *Baltimore Sun*, 437 F.3d at 416. Courts use an objective standard when evaluating adverse effect; whether a plaintiff himself was chilled is relevant but not dispositive. *Id.* at 416, 419.

The analysis is straightforward. The AP made an editorial decision to continue using "Gulf of Mexico" in its Stylebook. The Government responded publicly with displeasure and explicitly announced it was curtailing the AP's access to the Oval Office, press pool events, and East Room activities. If there is a benign explanation for the Government's decision, it has not been presented here. At the evidentiary hearing, the Government conceded that the record reveals viewpoint-discriminatory motives, so all indicators point to retaliation. Hr'g Tr. at 192:4–7 ("[I]t's the style guide and their treatment of the legal name Gulf of America . . . [that] is the reason that the record currently reveals for that treatment."). All that remains is whether the Government's conduct has chilled or adversely affected the AP.

The ramifications for the AP have undoubtedly been adverse. Start with photography. The AP's total loss of access to the Oval Office and stifled East Room access has sent damaging ripples across its reporting capabilities. Put more bluntly, the AP is getting "absolutely [] slaughtered." Hr'g Tr. at 37:22 (Vucci testimony). Though some other photographers have let the AP use a selection of their own photos out of solidarity, they are not providing it with the most desirable pictures. *Id.* at 34:5–20. These images are qualitatively and quantitatively inferior to what the AP would produce itself. *See id.* Considerable artistic discretion and

individual creativity factor into the production of each image, and there is no real replacement for the missed photos. *Cf. United States v. Long*, 92 F.4th 481, 486 (3d Cir. 2024) ("[W]ritten descriptions . . . are imperfect substitutes because photos and videos convey a pictorial accuracy and detail that words cannot duplicate." (cleaned up)). More, the AP does not get access to its competitors' photos in real time, so whatever images it eventually uses are delayed. Hr'g Tr. at 34:17–20. And this time lapse has a significant adverse impact on AP's competitive profile. *See Id.* at 35:19–36:6. All told, as for photographing these events, the AP is "basically dead in the water." *Id.* at 34:19. Thus, there are not any "other sources" the AP can resort to as an adequate substitute. *Balt. Sun*, 437 F.3d at 419.

This erosion of quality and capability is not limited to AP photojournalists—its wire reporting service for White House news is a shadow of its former self too. Text and print wire services "vigorously compete[] with each other to provide the fastest and most accurate news reporting" during and after the press pool events.[6] Am. Compl. ¶ 43. Often this reporting is "instantaneous" and reporters can live-post breaking news alerts directly or notify their editors of important developments from the inside of a meeting or briefing. *Id.*; Pl. Reply Br. at 11.

To state the obvious, if the AP's wire reporters are not in the room when news happens, they can hardly be the first to break the news. Instead, they are forced to wait and pick up

---

[6] The Government claimed that all press pool members share notes, video, and audio after an event. Gov't Opp'n Br. at 10–11. But it offered little support for that position, while the AP offered testimony to the contrary from a press pool member. Hr'g Tr. at 98:2–9, 98:19–99:4 (Miller testimony). The Court credits the AP's testimony that only the *print* (not wire) pool reporter must share notes with other print organizations, and only after the event is over. *Id.* at 98:2–9, 98:19–99:4 (Miller testimony); Pl. Reply Br. at 11. More, the Government's evidence relied on WHCA protocols, but the Government recently eliminated the WHCA's press pool role. *See* White House, Press Secretary Karoline Leavitt Briefs Members of the Media, YouTube (Feb. 25, 2025), at 6:15–6:47 [https://perma.cc/F3ZN-MMW7]. Even if the Government were right—and it is not—the AP would still be disadvantaged by having to wait until *after* an event for the shared reports.

whatever scraps of verifiable information they can find as they watch their competitors break the story first. *See* Hr'g Tr. at 115:20–117:15 (discussing how lack of access significantly delays the AP in sending news alerts because it cannot immediately verify the information), 28:15–18 ("So if my competitors can get an image out a minute before me or three minutes before me on a major story, then I might as well delete my entire take because it's worthless."). True, the wire reporters sometimes get access to a video feed of an event. *See Id.* at 113:23–115:1. But reporting through secondhand sources simply does not allow for the "same level of completeness" in their reporting as if they had "been there in person." *Id.* They cannot look around the room and use all five senses to craft a unique message for publication. And, as Miller pointed out, reporters "don't know what [they're] not there to see." *Id.* Finally, and obviously, they cannot ask questions from outside a closed door. Those questions, if the President chose to answer, could lead to incisive and cutting-edge reporting that the AP cannot reproduce by watching from afar.

These disadvantages have poisoned the AP's business model. As its ability to rapidly supply new photographs and breaking news has dwindled, the AP's customers have expressed concerns and turned to other sources for their needs. *See* Decl. of Kristin Heitmann, ECF No. 37-1, ¶ 9; *see also* Hr'g Tr. at 87:22–88:16 (discussing the AP's "loss of opportunity" to have customers use its reporting). These concerns also led an advertiser to cancel a $150,000 deal. Heitmann Decl. ¶ 9. The facts reflect the precarious realities of life in the fast-paced world of journalism: A delay in capturing photos and details of breaking news can be catastrophic.

In the face of this evidence, the Government doubles down. It compares the situation to *Baltimore Sun* and maintains that any potential retaliation is not actionable. Recall that in *Baltimore Sun*, a governor ordered his employees not to speak with two reporters who had failed

to "objectively report" on his administration. 437 F.3d at 413. The Fourth Circuit found the newspaper's subsequent retaliation claim was unactionable because the reporters suffered only "*de minimis* inconvenience." 437 F.3d at 420. The reporters "continue[d] to write as frequently as before" the no-comment policy was put into place, "despite the inconvenience of relying on" sources other than government officials for information. *Id.* at 419. Neither reporter claimed to have been chilled. *Id.* at 419 & n.1.

Not so here. As discussed above, there are not adequate alternative sources the AP can use for photographs or breaking news reports and the exclusion has unquestionably harmed the AP's reporting. This is no mere "*de minimis* inconvenience." Although the AP's witnesses testified the ban has not impacted their editorial tone in reporting at the White House, *see* Hr'g Tr. at 76:23–77:6 (Vucci testimony), nor is there evidence that the Court credits that other outlets have altered their tone in reaction to the AP's ban, the AP has demonstrated that its business has been adversely affected by the Government's discrimination. And the Court finds that these impacts are objectively likely under the circumstances the AP currently faces. The AP has thus shown that the Government retaliated against it for an exercise of its First Amendment freedoms, and that its speech has been adversely affected as a result. It is therefore likely to succeed on the merits of its retaliation claim.

*        *        *

In short, the AP has shown that it is likely to succeed on the merits of its First Amendment and retaliation claims, both for its exclusion from eligibility for press pool and limited-access events. The Court therefore turns to the remaining preliminary injunction factors.

### D.  Irreparable Harm and Balancing the Equities

The AP's showing of irreparable harm flows naturally from the analysis above.  "The loss of First Amendment freedoms, for even minimal periods of time," constitutes irreparable harm when the plaintiff demonstrates that its "First Amendment interests are either threatened or in fact being impaired at the time relief is sought."  *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (Thomas, J.) (cleaned up).  The AP provided abundant evidence that its First Amendment right to gather and quickly disseminate news about the President has been severely hampered by—and continues to be hampered by—the ban on press pool admission and the highly circumscribed access to limited-access events.  *See supra* Section III.C.2; *see also Branzburg*, 408 U.S. at 681 ("Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated.").  And the AP has shown that it remains subject to viewpoint discriminatory exclusions from places that the Government has opened as nonpublic fora.  *See Sherrill*, 569 F.2d at 129–30.  Because the AP has shown that the ban "directly limits" its protected activity, it has established irreparable harm.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006).

The AP's irreparable harm is not limited to constitutional injuries.  This situation has cut deeply into the AP's business, both financially and in terms of lost opportunities.  *See supra* Section III.C.2.  While solely financial harm is typically not irreparable, the dynamic can change in suits against the Government.  *See Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335–36 (D.D.C. 2012).  The Government "generally enjoy[s] sovereign immunity for any monetary damages," so there is no guarantee of future remediation—making the financial harm irreparable.  *Wages & White Lion Invs., L.L.C. v.*

*United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); *see also Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm.").[7]  Still, *de minimis* harm does not trigger this paradigm shift; "[t]he wiser formula requires that the economic harm be significant, even where it is irretrievable because a defendant has sovereign immunity."  *Air Transp. Ass'n*, 840 F. Supp. 2d at 335.

The AP has been economically hemorrhaging for the last two months, and its condition will only worsen as its customers flee to other news services absent injunctive relief.  *See supra* Section III.C.2; *see also* Heitmann Decl. ¶¶ 6–9; *Air Transp. Ass'n*, 840 F. Supp. 2d at 335 ("The loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms.").  Yet despite this ongoing financial harm, the AP's prospect of recovering monetary damages in a future suit are dim in the face of sovereign immunity.  And the Government never suggests the AP will be able to recoup these damages.  So the AP's "lack of a guarantee of eventual recovery is another reason that its alleged harm is irreparable."  *Wages & White Lion.*, 16 F.4th at 1142 (cleaned up).

---

[7]  Both cases involved agency defendants, but the premise translates easily because the AP likely has no path to recover monetary damages against the White House officials.  The Supreme Court "repeatedly has observed that the [Federal Tort Claims Act] does not cover claims against Government employees for violations of the Constitution of the United States."  *Egbert v. Boule*, 596 U.S. 482, 524 n.7 (2022) (Sotomayor, J., concurring in part) (cleaned up); *see also F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994) (holding the same).  Instead, the AP's path to monetary damages runs through *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).  *See Boule*, 596 U.S. at 524 n.7.  But the Supreme Court has "never held that *Bivens* extends to First Amendment claims" and has expressly rejected its use for First Amendment retaliation claims.  *Id.* at 498 (cleaned up).  Even if there were a *Bivens* cause of action, the White House officials would still have qualified immunity from civil damages.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).

The balance of equities and public interest also favor the AP. While "the White House surely has a legitimate interest in maintaining a degree of control over media access to the White House complex," policy goals may never triumph over the Constitution. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020). Put more simply: "enforcement of an unconstitutional law is always contrary to the public interest." *Id.* The AP has made its final showing.

*    *    *

Because the Court decides the present motion under a First Amendment rubric, it need not reach the AP's Fifth Amendment, right to petition, or compelled-speech claims. *Accord Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 300 n.15 (D.D.C. 2020). While these claims incorporate much of the First Amendment analysis above, the Fifth Amendment also implicates a potentially significant expansion of the due process rights *Sherrill* afforded to journalists when applying for hard passes. *See* 569 F.2d at 130. Perhaps the AP will be ultimately entitled to such relief, but the Court doubts that *Sherrill*'s written notice-and-appeal rights for permanent hard passes map neatly onto potential daily decisions about admittance into the Oval Office and limited access events. This thorny question is not well-suited to an emergency injunction when the Court can grant substantial relief today.[8]

The Government has not requested that the AP post bond. *See* Fed. R. Civ. P. 65(c). District courts have "broad discretion . . . to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). This includes discretion "not only to set the amount of security but to dispense with any security requirement whatsoever where the restraint will do the defendant 'no material damage.'" *Fed. Prescription Serv., Inc. v.*

---

[8] In any event, the AP's proposed order does not include *Sherrill*-like due process requirements. *See* Prop. Order, ECF 27-14.

*Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980).  Exercising this discretion and given no objection from the Government, the Court agrees with the AP that bond is unnecessary because preliminary injunctive relief will not materially damage the Government.  *See* Mot. Preliminary Inj. at 51 n.8.

One final note is in order.  The Government repeatedly characterizes the AP's request as a demand for "extra special access."  Gov't Opp'n Br. at 12; *see also id.* at 10–11, 17.  But that is not what the AP is asking for, and it is not what the Court orders.  All the AP wants, and all it gets, is a level playing field.  *See* Mot. Preliminary Inj. at 45 ("[T]he AP's journalists seek access to a forum—opened by the White House—on the same terms as other journalists." (cleaned up)); *see also* Hr'g Tr. at 186:1–187:25.  In framing things otherwise, the Government fails to fully engage with forum analysis and retaliation caselaw.  Rather than grappling with the implication of these doctrines, the Government tries to sidestep them.  Defendants may pursue their favored litigation tactics, but the Court must address the merits of the relief requested.

The AP seeks restored eligibility for admission to the press pool and limited-access press events, untainted by an impermissible viewpoint-based exclusion.  That is all the Court orders today:  For the Government to put the AP on an equal playing field as similarly situated outlets, despite the AP's use of disfavored terminology.  The Court does not order the Government to grant the AP permanent access to the Oval Office, the East Room, or any other media event.  It does not bestow special treatment upon the AP.  Indeed, the AP is not necessarily entitled to the "first in line every time" permanent press pool access it enjoyed under the WHCA.  But it cannot be treated worse than its peer wire services either.  The Court merely declares that the AP's

exclusion has been contrary to the First Amendment, and it enjoins the Government from continuing down that unlawful path.[9]

## IV.  CONCLUSION

For these reasons, it is

**ORDERED** that Plaintiff's [27] Amended Motion for Preliminary Injunction is **GRANTED**; and it is further

**ORDERED** that

1. Defendants shall immediately rescind the denial of the AP's access to the Oval Office, Air Force One, and other limited spaces based on the AP's viewpoint when such spaces are made open to other members of the White House press pool.

2. Defendants shall immediately rescind their viewpoint-based denial of the AP's access to events open to all credentialed White House journalists.

3. This preliminary injunction shall remain in effect until further order of this Court.

4.  This preliminary injunction issues without the requirement of any security bond.

2025.04.08
16:34:19 -04'00'

Dated: April 8, 2025                          TREVOR N. McFADDEN
                                              United States District Judge

---

[9] The Court notes that the President is not a party to this case, and defense has not argued that an injunction would affect his constitutional authority in any way.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ASSOCIATED PRESS**, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00532 (TNM) |
| **TAYLOR BUDOWICH**, in his official capacity as White House Deputy Chief of Staff, *et al.*, | |
| Defendants. | |

## ORDER

The Associated Press ("AP") moved for a preliminary injunction against the White House Chief of Staff, Deputy Chief of Staff, and Press Secretary (collectively, "the Government"). Am. Mot. Preliminary Inj., ECF No. 27. It sought to enjoin the Government from denying the AP access to the Oval Office, Air Force One, and other limited spaces because of the AP's viewpoint. The Court granted the AP's preliminary injunction request. Mem. Order, ECF No. [46]. The Court now, on its own motion, stays its Memorandum Order imposing a preliminary injunction through April 13, 2025, to provide the Government time to seek an emergency stay from a higher court and to prepare to implement the Court's injunction. This stay automatically dissolves after April 13, absent further relief from a higher court.

For this reason, it is hereby

**ORDERED** that the Court's [46] Memorandum Order Granting Plaintiff's [27] Amended Motion for Preliminary Injunction is **STAYED** through April 13, 2025. **SO ORDERED.**

2025.04.08
16:43:52 -04'00'

Dated: April 8, 2025                    TREVOR N. McFADDEN

ADD.42

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE ASSOCIATED PRESS,

                    Plaintiff,

v.

TAYLOR BUDOWICH, in his official
capacity as White House Deputy Chief of
Staff; KAROLINE LEAVITT, in her official
capacity as White House Press Secretary; and
SUSAN WILES, in her official capacity as
White House Chief of Staff,

                    Defendants.

Case No. 25-cv-532-TNM

*"The AP and the White House Correspondents Association wanted to f--k around.  Now it's finding out time."  -  unnamed White House advisor, speaking to Axios, Feb. 25, 2025*

**<u>AMENDED COMPLAINT</u>**

Plaintiff The Associated Press ("the AP") files this Amended Complaint against Defendants Taylor Budowich, Karoline Leavitt and Susan Wiles, each in their official capacities, and states as follows:

**INTRODUCTION**

1.      The White House has ordered The Associated Press to use certain words in its coverage or else face retaliation with an indefinite denial of access.  The press and all people in the United States have the right to choose their own words and not suffer retaliation at the hands of their government.  The Constitution does not allow the government to control speech.  Allowing government control to stand is a threat to every American's freedom.

2.      Rather than heed this Court's warning that precedent "is uniformly unhelpful" to the government "when the White House has banned reporters in the past," its observation that

ADD.43

the decision to deny the AP access "seems pretty clearly viewpoint discrimination," and its advice that "[i]t might be a good idea for the White House" to reconsider whether "what they're doing is really appropriate in light of the case law," the White House has instead retaliated against the AP further by abandoning the time-tested press pool system for ensuring that the public stays informed about the President of the United States and again barring the AP from the very same spaces – both small and large – that are at issue in this lawsuit.

3.      Notably, this matter is not only about the press pool, as the AP's journalists are also banned from larger events – including press conferences with the President and other world leaders – that are held in some of the White House's biggest spaces or even outside of the White House and that are open to all White House-credentialed journalists so long as they sign up in advance.  The AP's journalists, despite signing up in advance, are turned away.  The net result is that the AP's press credentials now provide its journalists less access to the White House than the same press credentials provide to all other members of the White House press corps.

4.      The AP therefore brings this action to vindicate its freedom of editorial independence guaranteed by the United States Constitution and to prevent the Executive Branch from coercing journalists to report the news using only government-approved language.

5.      The AP is one of the world's oldest and most trusted news organizations.  Since its inception in 1846, the AP, an independent, not-for-profit organization, has been known for its accurate, factual, and nonpartisan reporting, including on the President of the United States and the White House.  The AP's journalism reaches four billion people per day via news outlets around the world – whatever their political orientation – that rely on the AP to gather information and generate reporting that those news outlets republish for the benefit of their audiences.  The AP has received 59 Pulitzer Prizes for its courageous coverage of key moments of world history.

6.      The AP also has participated in the White House press pool since its creation over a century ago, making it possible for the AP to deliver to the public timely and thorough reporting on the President almost everywhere he goes, which is information critical to the public, as well as to the local and state news organizations that rely on the AP's coverage to inform their readers about the news of the day.

7.      In addition to covering press pool events in the Oval Office, Air Force One, and other smaller spaces that can accommodate only a limited number of journalists, AP reporters and photographers also regularly cover events open to greater numbers of journalists or to all journalists with White House press credentials.  These events take place both inside the White House, including in the East Room and other large spaces, and outside the White House, such as at the National Building Museum and at airports where Air Force One is arriving or departing.

8.      On February 11, 2025, without prior notice, White House officials informed the AP that it would be barred from entering certain areas in the White House as a member of the press pool unless the AP began referring to the Gulf of Mexico as the Gulf of America, following President Trump's renaming of a portion of that body of water in Executive Order 14172.

9.      When the AP refused to be coerced into adopting the language dictated by the President, within hours the White House retaliated by banning AP journalists from events open to the press pool.

10.      The White House's actions were taken in response to an editorial decision by the AP to refer to the Gulf of Mexico "by its original name *while acknowledging the new name Trump has chosen*."[1]  The AP explained in its AP Stylebook, which embodies the AP's editorial

---

[1] Amanda Barrett, *AP Style Guidance on Gulf of Mexico, Mount McKinley*, AP (Jan. 23, 2025), https://www.ap.org/the-definitive-source/announcements/ap-style-guidance-on-gulf-of-mexico-mount-mckinley (emphasis added).

standards, that, "[a]s a global news agency that disseminates news around the world, the AP must ensure that place names and geography are easily recognizable to all audiences."

11.     On February 14, the White House made its ban of the AP indefinite, announcing on X (formerly Twitter) that, because the AP had not yielded to its demand to use the name Gulf of America, AP journalists were now indefinitely banned from "access to limited spaces, like the Oval Office and Air Force One."  To date, the AP's reporters and photographers remain banned from participating in the press pool in the Oval Office, on Air Force One, and in other locations where space necessarily limits the number of journalists who could cover the event.

12.     The AP's reporter and photographers also remain barred from larger events that are open to all White House-credentialed journalists.  The White House has gone so far as to ban an AP photographer from covering the arrival of Air Force One at Palm Beach International Airport, even though the event was open to other credentialed media, and despite there being no space constraints whatsoever on the airport tarmac.

13.     In an email to the AP on February 18, 2025, White House Chief of Staff Susan Wiles explained "why we arrived in this point."  Wiles wrote that the White House was targeting the AP because its Stylebook "is used by many as a standard for writing and editing," and that it "advises journalists, scholars and classrooms around our country."  Wiles finished her email by noting, "we remain hopeful that the name of the [Gulf] will be appropriately reflected in the Stylebook where American audiences are concerned," clearly communicating that to resolve the issue and restore its access, the AP must change its guidance as to American audiences.

14.     President Trump doubled down on the administration's targeting of the AP, saying, "[w]e're going to keep them out until such time that they agree that it's the Gulf of

America" and that the AP "has been very, very wrong on the election, on Trump and the treatment of Trump."[2]

15.     After the AP filed this lawsuit on February 21, 2025, White House officials continued to confirm, over and over again, that the ban on the AP's access is based on the content and viewpoint of the AP's reporting.  On February 24, 2025, while interim U.S. Attorney for the District of Columbia Ed Martin was seated at counsel's table during the hearing on the AP's motion for a temporary restraining order, the U.S. Attorney's Office for the District of Columbia posted the following statement online attributed to him: "As President Trumps' [sic] lawyers, we are proud to fight to protect his leadership as our President and we are vigilant in standing against entities like the AP that refuse to put America first."[3]

16.     On February 25, 2025, Defendants escalated their retaliation against the AP. Leavitt announced at a press briefing that, going forward, White House officials would determine which news organizations participated in the press pool.  This marked the end of the White House's decades-long deference to the White House Correspondents' Association (WHCA) to organize the pool.  Leavitt announced that the new pool would consist of "legacy media" and "new media," with scant additional details.

17.     Leavitt made clear that the administration would, in her words, "double down" on excluding the AP.  Defendants' access ban on the AP has indeed remained in effect.

_____

[2] *See, e.g.*, David Bauder, *Trump Says AP Will Continue to Be Curtailed at White House Until It Changes Style to Gulf of America*, AP (Feb. 18, 2025), https://apnews.com/article/trump-ap-white-house-press-corps-pool-91535a6384d681fee1cd7e384ea6c627; *Trump Restricts AP Access Over Gulf of Mexico Issue*, Reuters (Feb. 18, 2025), https://www.reuters.com/world/us/trump-restricts-ap-access-over-gulf-mexico-issue-2025-02-19/.

[3] @USAO_DC, X (Feb. 24, 2025), https://x.com/USAO_DC/status/1894119675786621225. The U.S. Attorney's Office posted that quote at 3:18 p.m. ET; the hearing began at 3:04 p.m. ET.

ADD.47

18.    The White House has continued to ban AP's journalists from covering the President at pool-only events in the Oval Office and other limited spaces.

19.    The White House also continues to ban AP journalists from larger spaces, such as the East Room and the tarmac at Palm Beach International Airport, during events that were open to all credentialed White House reporters and not just pool reporters.

20.    This Court should order that the White House immediately cease its retaliatory actions against the AP, which are based solely on the content of the AP's speech, and rescind its denial of the AP's access to the Oval Office, Air Force One, and other limited spaces when those spaces are made open to members of the White House press pool, as well as its denial of the AP's access to larger spaces open to all journalists with White House press credentials.

21.    The White House ban of the AP violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  As the D.C. Circuit has made clear, journalists' "first amendment interest" in access to the White House, at events both large and small, "undoubtedly qualifies as liberty which may not be denied without due process of law under the fifth amendment." *Sherrill v. Knight*, 569 F.2d 124, 130-31 (D.C. Cir. 1977).  The AP's liberty interest in access is rooted in the First Amendment's free speech and press guarantees and its related protections for newsgathering.  Defendants gave the AP no prior or written notice of, and no formal opportunity to challenge, their arbitrary determination that the AP would indefinitely lose access to the Oval Office, Air Force One, and other limited areas as a member of the press pool.  Nor did Defendants provide prior or written notice of, or formal opportunity to challenge, the denial of access to larger spaces open to all reporters with White House press credentials

22.    The ban also violates the First Amendment to the U.S. Constitution.  The D.C. Circuit has made clear that denying journalists access to White House press events "based upon

the content of the journalist's speech" is "prohibited under the first amendment."  *Sherrill*, 569

F.2d at 129.  Having opened the White House and certain areas to the press, the First

Amendment "requires that this *access not be denied* arbitrarily or for less than compelling

reasons."  *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 75-76 (D.D.C. 2023) (quoting *Sherrill*, 569

F.2d at 129) (emphasis in original), *appeal argued*, No. 24-5004 (D.C. Cir. Oct. 15, 2024).

Defendants have not provided, nor could they, any compelling reason for their arbitrary denial of

the AP's access.  Rather, Defendants' actions are impermissibly based on their dislike of the

content of the AP's expression and what they perceive as the AP's viewpoint reflected in the

content of its expression.  The White House ban of the AP also constitutes impermissible

retaliation, as it was instituted to punish the AP for its constitutionally protected speech, and for

filing this case, in ways that would chill the speech of a reasonable person of ordinary firmness.

23.     After making several unsuccessful efforts to persuade Defendants that their

conduct is contrary to well-established law, the AP brought this action to vindicate its

constitutional rights, restore its access to presidential events, and ensure that the press remains

free to report on the administration without fear of selective, arbitrary denials of access – denials

that continue as to the newly constituted press pool and that have expanded to even more large

spaces as well.  The White House responded by "doubling down" on its denial of access and by

discarding the White House press pool system that has worked for decades to keep the public

informed about the President.  The AP now files this Amended Complaint.

## PARTIES

24.     Plaintiff the AP is a not-for-profit news cooperative organized under the laws of

the State of New York.  The AP is one of the world's most trusted news sources, reaching four

billion people per day, including with its coverage of the White House.

25.    Defendant Taylor Budowich is the White House Deputy Chief of Staff.  He is sued in his official capacity.

26.    Defendant Karoline Leavitt is the White House Press Secretary.  She is sued in her official capacity.

27.    Defendant Susan Wiles is the White House Chief of Staff.  She is sued in her official capacity.

## JURISDICTION AND VENUE

28.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

29.    Venue is proper in this judicial district under 5 U.S.C. § 552(a)(4)(B).  A substantial part of the events giving rise to this action occurred in this district, and Defendants are officers of the United States sued in their official capacities.

## FACTUAL BACKGROUND

### The White House Press Pool

30.    Until this lawsuit began, the White House press pool consisted entirely of journalists who regularly report to the public about the President, the White House, and other Executive Branch activity in Washington, DC and globally.  For decades, the press pool has accompanied the President almost everywhere he goes, ensuring that the public is informed of his activity and that the President and his administration are held accountable to the public.

31.    Because there often is not enough space in the Oval Office or on Air Force One to accommodate every journalist who covers the President, the press pool has served as the eyes and ears of the full press corps, of news outlets outside of Washington, DC, and of the public.  In these places, the press pool acts as a witness to history, contemporaneously documenting and promptly reporting on the President's activities.

32.    Prior to February 25, 2025, in all of its permutations, the press pool had consisted of, at minimum, three wire reporters (one each from the AP, Reuters, and Bloomberg), four photographers (one each from the AP, Reuters, AFP, and The New York Times), three network television journalists, a radio correspondent, and at least one print reporter.  Membership in the pool was determined at the sole discretion of the White House Correspondents' Association (WHCA) and the press corps itself.  *See, e.g.*, https://whca.press/covering-the-white-house/resources/guide-to-the-white-house-beat.

33.    On information and belief, until February 25, 2025, the White House had never interfered with the WHCA's and White House press corps' determination of the news organizations that make up the White House press pool.

34.    In circumstances when logistics have dictated that the full press pool could not accompany the President, such as during President Biden's secret trip to Kyiv in 2023 or President Trump's secret trip from Palm Beach to Joint Base Andrews to begin a secret trip to Afghanistan in 2019, the WHCA—not the White House—determined the membership of an even more narrowly limited temporary pool.

35.    Conversely, when logistics have permitted more journalists to accompany the President, the WHCA determined the membership of an expanded pool, and the White House would admit additional journalists as space allowed.

36.    For certain large events in some of the White House's biggest spaces, such as press conferences with the President and other world leaders held in the East Room, any reporter with a White House press credential – regardless of whether that journalist is in the press pool – may attend and report on the event so long as they sign up in advance.

37.    The AP had been a member of the White House press pool since the pool's inception well over a century ago, and as a result, had been able to report to the public first-hand on some of history's most defining events.  In fact, an AP reporter became the first recorded presidential "pooler" in 1881, providing updates to fellow reporters from his post outside the White House sick room of President James A. Garfield after he was shot.  AP pool journalists were also in the motorcade in Dallas when President John F. Kennedy was assassinated, providing the nation with contemporaneous, fact-based reporting as the story developed, and as conspiracy theories spread.  And, AP journalists were in the pool with President George W. Bush when he learned of the September 11 terrorist attacks during an event in Florida, and they accompanied him on Air Force One to secure locations in Louisiana and Nebraska and back to Washington.

38.    The wire services have the broadest reach – particularly among outlets that cannot afford the considerable expense of providing their own coverage of the White House – and the WHCA therefore determined that they should always be present in the pool so that the widest possible audience can be informed of the President's activities.  The wire services have thus delivered nearly instantaneous content from the White House to thousands of news outlets in the U.S. and abroad, and through them to billions of readers around the globe.

39.    As a participant in the White House press pool, the AP has long provided at least two White House-credentialed journalists—one text reporter and one photographer—to the Oval Office and other areas of the White House when events open to the press are held in those areas.

40.    The AP has also long sent one text reporter and one photographer to travel with the President in the 13-seat press pool on Air Force One.  The AP and all other members of the pool have paid for such transportation and other costs, often at considerable expense.

41.    When AP text journalists covered presidential events, they were able to send reports out instantaneously to the AP's global readership.  That instantaneous publication also allowed the information to be distributed to thousands of news outlets all around the world.

42.    Moreover, a journalist covering an event in person is able to observe and report important information that they cannot gather from secondhand reporting, or even from watching a live video feed of the event.  For example, when President George W. Bush met the new Russian President Vladimir Putin in 2001, AP journalist Ron Fournier asked President Bush whether Putin was "a man that Americans can trust," and President Bush responded, "I looked the man in the eye.  I found him to be very straightforward and trustworthy… I was able to get a sense of his soul."  Because Fournier was present at the event, he could see National Security Adviser Condoleezza Rice gasp at the President's answer.[4]

43.    When the AP's text journalists were part of the press pool, there were no customs, expectations, or requirements that they share the information they gathered with other press pool members.  To the contrary, the wire services vigorously competed with each other to provide the fastest and most accurate news reporting at the very moment that the event was happening.  The AP's text journalists have lost the ability to provide such instantaneous reporting, and the AP and its news outlet customers have been harmed, when AP journalists have not been permitted to cover presidential events firsthand.

44.    When the AP's photographers covered presidential events, they were able to send photographs out to AP photo editors, and from there out to the AP's global readership, within a minute of the photographer taking them.  When they did so as part of the press pool, there were

---

[4] *See* Ron Fournier, *Bush, Putin vow new bonds, hint at compromise in first talks*, AP (June 17, 2001) (reporting that President Bush's answer "caught [his] advisers by surprise").

no customs, expectations, or requirements that the AP's photographers share the photos they took with the other press pool members.  To the contrary, the photo poolers vigorously competed with one another to provide news organizations and others around the world with the fastest and best photographs of the event as it was taking place.  The AP's photographers have lost the ability to provide such near-instantaneous photography, and the AP and its news outlet customers have been harmed, when AP photographers have not been permitted to cover presidential events and observe history on behalf of the public firsthand.

45.    AP journalists have also attended many events open not just to the pool, but to any journalist with a White House press credential, held in large spaces such as the East Room.

46.    Full access to places and events to which other members of the press pool and broader press corps are admitted is essential to the AP's ability to provide the public with fast, accurate, and comprehensive coverage of the President and his administration.  When the AP is denied access, the thousands of global news outlets that republish the AP's news reports, and the billions of people that rely on its reporting, also are denied access.

**The White House Attempts to Control the AP's Speech**

47.    Upon information and belief, prior to the events giving rise to this lawsuit, the White House had never before attempted to bar an entire news organization from membership in the press pool and from accessing those spaces open to other members of the pool.

48.    During the prior Trump administration, the White House had targeted the press by revoking the "hard pass" press credentials of two White House correspondents, CNN's Jim Acosta and Playboy's Brian Karem, but had not barred all journalists at those organizations from accessing events open to the White House press corps.  Other courts in this District held that those access denials were unlawful.

49.    On the morning of February 11, 2025, White House Press Secretary Karoline Leavitt summoned AP Chief White House Correspondent Zeke Miller to her office.  She told him that, at President Trump's direction, the AP would no longer be permitted in the Oval Office as part of the press pool until and unless the AP revised its Stylebook to refer to the body of water known for hundreds of years as the Gulf of Mexico as the Gulf of America.  Leavitt provided no reason for the decision other than to compel the AP to change the language of its reporting, nor did she object to any particular conduct by Miller or any other AP journalist.

50.    Leavitt's proclamation followed an Executive Order President Trump had issued on January 20, 2025, renaming a portion of the Gulf of Mexico as the Gulf of America.  Exec. Order No. 14172.  By its own terms, the Executive Order applies only to those portions of the Gulf within the United States.  The body of water also borders Mexico and Cuba.  It has been known as the Gulf of Mexico for over 400 years and remains known internationally as the Gulf of Mexico.

51.    On January 23, the AP announced that the organization would refer to the Gulf of Mexico "by its original name *while acknowledging the new name Trump has chosen*."[5]  The AP explained that, "[a]s a global news agency that disseminates news around the world, the AP must ensure that place names and geography are easily recognizable to all audiences."  The AP added that it "regularly reviews its style guidance regarding name changes, in part to ensure its guidance reflects common usage," and would do so here.  It also noted that the AP would "make updates as needed."

52.    In the same guidance, the AP noted that President Trump's January 20, 2025 Executive Order had also renamed North America's tallest mountain to Mount McKinley from

---

[5] Barrett, *AP Style Guidance*, *supra* (emphasis added).

Denali, undoing a 2015 name change issued by the Secretary of the Interior during President

Obama's administration.  *See* Dep't of the Interior Order No. 3337 (Aug. 28, 2015).  The AP

announced that it would follow this name change because the mountain is entirely within the

United States and therefore under the federal government's renaming authority.

53.    The AP, however, abided by its carefully considered standards decision when

Leavitt made her February 11, 2025 demand that, with respect to the Gulf, it must begin using

only the Gulf of America name.

54.    Later on the afternoon of February 11, however, White House staff barred the

AP's text journalist from attending a presidential executive order signing and press conference

with Elon Musk in the Oval Office, which was open to the press pool.  The AP's photographer

was allowed to attend.  This was Musk's first time answering questions with President Trump at

the White House.  As a result, the AP's reporting on this highly newsworthy event was delayed

and the AP was unable to ask questions that may have generated additional news.

55.    AP Executive Editor Julie Pace published a statement that same day objecting to

the White House's actions.  Pace wrote that "[l]imiting our access to the Oval Office based on

the content of AP's speech not only severely impedes the public's access to independent news, it

plainly violates the First Amendment."[6]

56.    That night, another AP reporter was barred from an event in the Diplomatic

Reception Room that was open to the press pool, as the President welcomed home an American,

Marc Fogel, freed in a prisoner exchange with Russia.  The AP's photographer was not barred.

As a result of the AP's reporter's exclusion, he was at the distinct disadvantage of relying on the

---

[6] Lauren Easton, *AP Statement on Oval Office Access*, AP (Feb. 11, 2025),
https://www.ap.org/the-definitive-source/announcements/ap-statement-on-oval-office-access.

video feed to pull quotes.  This caused delays in the AP's reporting in an industry where seconds matter, and left the reporter without important in-the-room context.

57.    On February 12, 2025, Pace sent a letter to White House Chief of Staff Susan Wiles objecting to these denials of access, which "were plainly intended to punish the AP for the content of its speech" in violation of the AP's constitutional rights.  The AP "strongly urge[d] the administration to end this practice" and offered to meet to discuss the matter in person.[7]

58.    Also on February 12, Leavitt defended the White House's actions during a press briefing and stated that the AP was telling "lies" by using the Gulf of Mexico name.

59.    That afternoon, the AP was barred from an Oval Office press conference during the swearing-in of Director of National Intelligence Tulsi Gabbard.  The President's statements during the event generated important, breaking news, but the AP could not fully report on the event until it was over.

60.     On February 13, 2025, the AP's text journalist was barred (though its photographer was not) from a White House East Room press conference held by President Trump and Indian Prime Minister Narendra Modi, which was open to members of the press pool and to all other journalists with White House press credentials.  AP reporter Miller had submitted an RSVP for the event but was barred from attending.  At least one journalist from another news organization who did not RSVP was provided access.  The East Room is one of the largest event spaces at the White House, and can accommodate dozens of journalists, as it did for this event:

---

[7] @katie_robertson, X (Feb. 12, 2025),
https://x.com/katie_robertson/status/1889739177169670148.

**Figure 1: East Room Press Conference, Feb. 13, 2025 (AP Photo)**



61.     Also on February 13, the White House barred the AP altogether from three other Oval Office events open to the press pool: a session in which the President signed executive orders, the swearing-in ceremony for Robert F. Kennedy Jr. as Secretary of Health and Human Services, and a bilateral meeting with Prime Minister Modi.

62.     That same day, Pace issued a statement again objecting to the AP's "deeply troubling" exclusion and "urg[ing] the Trump administration in the strongest terms to stop this practice."  Pace wrote that "[t]his is now the third day AP reporters have been barred from covering the president—first as a member of the pool, and now from a formal press conference—an incredible disservice to the billions of people who rely on The Associated Press for nonpartisan news."[8]  Also on February 13, 2025, Pace sent an email to Wiles objecting again to the White House's actions against the AP.

---

[8] *White House Blocks AP Reporter from Trump-Modi News Conference Because of Gulf of Mexico Fight*, AP (Feb. 13, 2025), https://apnews.com/article/ap-white-house-gulf-name-dispute-media-864f2fbb5cfaeede009d7cea5788515b.

63.     On February 14, 2025, White House Deputy Chief of Staff Taylor Budowich publicly announced that, because the AP would not use the Gulf of America name, AP journalists were now indefinitely barred from "access to limited spaces, like the Oval Office and Air Force One."  Budowich stated that AP "journalists and photographers will retain their credentials to the White House complex."  Budowich's statement further claimed that the AP had a "commitment to misinformation" and published "irresponsible and dishonest reporting."[9]  That same day, Pace sent another email to Wiles again objecting to the White House's actions.

64.     The access denials continued that day, as the AP was barred from an Oval Office executive order signing and an Air Force One flight to Palm Beach, Florida.

65.     An unnamed White House source told journalists that the White House decided to expand its ban to include AP photographers as well as AP text journalists for the express purpose of "depriving the organization of the revenue it earns from selling pictures on its news wire."[10]

66.     On February 15, 2025, White House Deputy Chief of Staff Stephen Miller suggested further punishing the AP by revoking its White House access entirely.[11]  While this has not yet occurred, his statement further evidences the White House's clear intent to target the AP for the content of its speech.  The following day, February 16, Pace sent another email to Wiles objecting to the continued denial of access for the AP.

67.     From February 15 to 19, the AP was barred from coverage of the President while he was in West Palm Beach, Florida, including at a February 18 press conference open to other media organizations in addition to the pool, during which the President signed executive orders.

---

[9] @Taylor47, X (Feb. 14, 2025), https://x.com/Taylor47/status/1890453490398326919.

[10] *See* Erin Doherty et al., *Judge upholds Trump's right to block AP for now*, Axios (Feb. 24, 2025), https://www.axios.com/2025/02/24/trump-ap-access-lawsuit-white-house-filing.

[11] @StephenM, X (Feb. 15, 2025), https://x.com/StephenM/status/1890948850505945264.

68.     On the morning of February 18, five days after receiving the AP's letter protesting the White House's actions, Wiles responded.  *See* Decl. of Julie Pace Ex. B, ECF No. 11-3. Wiles wrote that "[t]here is no event that the Associated Press is being barred from covering," a statement that is plainly false given the AP's exclusion from President Trump's press conference with Prime Minister Modi and its exclusion from even more events in subsequent days.  Wiles also wrote that the White House's "view as to why we arrived in this point" is that "the influence" the AP's "Stylebook has acquired has been misused, and at times weaponized, to push a divisive and partisan agenda."  Wiles further stated that, as to the Gulf of Mexico specifically, White House officials "of course[] recognize that this renaming may not formally apply yet internationally," but Wiles nevertheless insisted that "given the AP's role, it should also appropriately make the distinction as an American guideline."

69.     Later that same day, President Trump confirmed that his administration would continue denying the AP access based on its journalism, remarking of the AP, "[w]e're going to keep them out until such time that they agree that it's the Gulf of America."  The President then lambasted the AP, stating that the AP "has been very, very wrong on the election, on Trump and the treatment of Trump" and that "they're doing us no favors and I'm not doing them any favors."  President Trump made these statements at a Mar-a-Lago press conference from which AP reporters were barred, even though the AP had requested access from Leavitt and other White House officials and from security staff on site at Mar-a-Lago.

70.     On February 19, 2025, in a final effort to reach a resolution of this matter short of litigation, Pace traveled to Miami, Florida, on one day's notice to meet with Wiles.  The meeting did not result in the White House ceasing its restrictions on the AP's access.  Instead, Wiles continued to insist that the AP must revise its Stylebook to adopt Gulf of America without

qualification.  Wiles informed Pace that she would discuss the matter with President Trump that evening and follow up with her, but to date, the AP has not heard further from Wiles.

71.    On February 20, 2025, an AP reporter and two AP photographers were barred from a Black History Month reception held in the East Room – a large event open to the press pool and all other White House credentialed journalists.  That evening, an AP reporter and photographer were barred from joining the remainder of the press pool in the President's motorcade to cover his attendance at a dinner hosted by the Republican Governors Association. An AP Radio reporter, selected by his colleagues as the designated pooler for that format in the pool for events that day, was also barred from providing coverage of the day's events.

72.    Speaking at the Republican Governors Association dinner, held at the National Building Museum, President Trump emphasized that the White House is "holding [the AP] out of any news conferences" because of how the AP refers to the Gulf of Mexico, and he even predicted this very case, remarking that the possibility of the AP prevailing in such a lawsuit "doesn't matter" because the effort to coerce the AP into using the government's preferred words "is something we feel strongly about."[12]

### The AP Files this Lawsuit to Vindicate its Constitutional Rights

73.    On February 21, 2025, to protect its rights and stop the ongoing denials of access, the AP exercised its First Amendment right to petition the court and filed this lawsuit.

74.    The access denials continued, however, as did the White House's statements making clear that the denials are aimed at punishing the AP for the content and perceived viewpoint of its speech.

---

[12] *President Trump Remarks at Republican Governors Association*, C-SPAN (Feb. 20, 2025), https://www.c-span.org/program/white-house-event/president-trump-remarks-at-republican-governors-association/656015, at 46:16-46:43.

75.    For example, the White House responded to this lawsuit by issuing a statement from Communications Director Steven Cheung, which described this case as "frivolous and demented," insisted that the AP is "clearly suffering from a severe, debilitating case of Trump Derangement Syndrome that has rotted their peanut-sized brains," and vowed that "[w]e will defeat them in court just like we crushed their leftist reporters at the ballot box."[13]

76.    On February 22, 2025, the AP was excluded from covering the President's visit to the Conservative Political Action Conference, held at a large hotel and convention center in National Harbor, Maryland, where he met with Polish president Andrzej Duda.  That night, the AP was barred from covering the National Governors Association Evening Dinner and Reception in the East Room, where the President delivered remarks and took questions from the pool.  Due to its exclusion from the event, the AP was unable to confirm whether Democratic governors had attended, even by asking other journalists after the event was over.

77.    On February 24, 2025, AP journalists were excluded from a press conference with French President Emmanuel Macron held in the East Room, one of the largest rooms in the White House, as well as from a bilateral meeting between the two leaders in the Oval Office.

78.    The East Room press conference was open to all journalists with White House press credentials who signed up in advance.  The AP signed up in advance but never received a confirmation, and its White House reporter and photographer were blocked from entering.

79.    In a perfect illustration of how arbitrarily the White House has acted in excluding the AP, a Paris-based AP reporter flown overseas at the AP's expense *was* permitted to enter the East Room – *but only as part of President Macron's press pool*.  The White House thus forced

---

[13] Jeremy Barr, *Associated Press Sues White House Officials over Press Access Ban*, Wash. Post (Feb. 21, 2025), https://www.washingtonpost.com/style/media/2025/02/21/associated-press-lawsuit-white-house-ban.

the AP to incur significant costs, which the AP would not have borne but for this denial of

access, to cover first hand President Macron's visit to the U.S. for the AP's global readership.

80.    Also on February 24, 2025, this Court held a hearing on the AP's motion for

temporary restraining order, during which it stated that the ban on the AP "seems pretty clearly

viewpoint discrimination."  *See* Feb. 24, 2025 Hr'g Tr. at 40:1-2.  At the conclusion of the

hearing, the Court declined to enter a TRO against Defendants, but the Court cautioned defense

counsel that precedent "is uniformly unhelpful to . . . the White House when the White House

has banned reporters in the past," and the Court observed that "[i]t might be a good idea for the

White House" to reconsider whether "what they're doing is really appropriate in light of the case

law."  *See id.* at 60:21-61:6.

**The White House Seizes Control of the Press Pool and Continues to Exclude the AP**

81.    The White House refused to heed this Court's warning.  Instead, in an effort to

evade the "uniformly unhelpful" precedent, and as a direct result of this lawsuit, on February 25,

2025 – the afternoon after the TRO hearing – Leavitt announced at a White House press briefing

that White House officials would now hand-pick the outlets allowed to cover the President.  The

White House thus ended the decades-long deference to the WHCA to select members of the

press pool.  Leavitt announced that the pool would consist of "legacy media" and "new media,"

but she did not describe its membership or how the pool would work.  Leavitt had not notified or

sought comment from WHCA or existing pool members before making her announcement.

82.    Regardless of these changes to the pool, however, Leavitt made clear that the

White House would "double down" on excluding news organizations at will.  As an unnamed

White House advisor told journalists that day, "The AP and the White House Correspondents Association wanted to f--k around.  Now it's finding out time."[14]

83.    Wire services AP, Reuters, and Bloomberg issued a statement in response, writing that "[i]t is essential in a democracy for the public to have access to news about their government from an independent, free press," which limiting pool members' access endangers.[15]

84.    Following Leavitt's announcement, the number of pool spots allocated to wire service reporters shrank from three (AP, Reuters, and Bloomberg) to one or two (a rotation of Reuters and/or Bloomberg, with the AP still banned), and the AP has remained barred from participating in the four photographer spots as well.  For certain events, the White House has even permitted additional wire service reporters – but still not the AP's reporters – from covering the President.

85.    All other non-rotating, organizational members of the original press pool have, like the AP, continued to use the Gulf of Mexico name, while noting President Trump's Executive Order.  The White House has not barred any other news organization from participating in the press pool, either under the WHCA's oversight or its own, as a result of continuing to use Gulf of Mexico, underscoring the administration's particular animus toward and retaliation against the AP.[16]

---

[14] Marc Caputo et al., *White House strikes back at AP, takes over press pool coverage from reporter group*, Axios (Feb. 25, 2025), https://www.axios.com/2025/02/25/white-house-trump-press-pool.

[15] Lauren Easton, *Statement from AP, Bloomberg News, Reuters on White House Press Pool Access*, AP (Feb. 25, 2025), https://www.ap.org/the-definitive-source/announcements/statement-from-ap-bloomberg-news-reuters-on-white-house-press-pool-access.

[16] *But see* Kevin Robillard, *White House Kicks Out HuffPost Reporter From Press Pool*, HuffPost (Feb. 25, 2025), https://www.huffpost.com/entry/white-house-kicks-out-huffpost-reporter-from-press-pool_n_67be9224e4b0d509934aa224 (noting that the White House reassigned a print pool seat from HuffPost to Axios without explanation).

86.     Since February 14, 2025, the AP's White House journalists have remained barred from the Oval Office, Air Force One, and other locations otherwise open to the White House press pool, as well as from events open to all White House credentialed journalists.

87.     On February 27, 2025, for example, the AP's White House journalists were barred from a press pool event in the Oval Office with the President and UK Prime Minister Starmer.  However, and once more underlining the arbitrariness of the White House's actions, a London-based AP reporter flown overseas at the AP's expense *was* permitted to enter the Oval Office – *but only as part of Prime Minister Starmer's press pool*.

88.     That same day, the AP's White House journalists were barred from a press conference with the President and Prime Minister Starmer in the East Room that was open to all credentialed White House journalists who signed up in advance, which the AP journalists did.

89.     The AP's London-based reporter was permitted to enter the East Room and cover the event.  The White House thus forced the AP to incur significant costs, which the AP would not have borne but for this denial of access, to thoroughly cover Prime Minister Starmer's visit to the U.S. for the AP's global readership.

**Figure 2: Dozens of Journalists Gather for East Room Press Conference (AP Photo)**



90.     The next day, February 28, the AP's White House journalists were barred from a press pool event in the Oval Office with the President and Ukrainian President Volodymyr Zelenskyy.  Yet again, a Ukraine-based AP reporter flown overseas at the AP's expense *was* permitted to enter the Oval Office – *but only as part of President Zelenskyy's press pool*.

91.     On the afternoon of February 28, Pace sent another email to Wiles objecting to the continued exclusion of the AP from both the pool and events open to the larger press corps. As of this filing, Wiles has not responded to that email.

92.     On the evening of February 28, the White House even barred an AP photographer from covering the President's arrival on Air Force One at Palm Beach International Airport, despite opening the event to other credentialed media, and despite there being no space constraints on the airport tarmac.

93.     The White House has not provided the AP with any formal notice of the reasons for, formal opportunity to be heard regarding, or meaningful opportunity to challenge the White House's decision to bar the AP from the press pool, Oval Office, Air Force One, and other

limited areas open to pool members, or its decision to bar the AP from access to larger events open to credentialed journalists. The Constitution guarantees the AP these procedural protections given the AP's liberty interest in access to these spaces and events.

94.     The White House has based its indefinite denial of the AP's access, including after taking control of the press pool, on the content and perceived viewpoint of the AP's reporting and editorial decisions and on the AP's filing of this lawsuit, which constitutes impermissible retaliation against the AP based on its constitutionally protected activity in ways that would chill the speech of similarly situated reasonable individuals.

95.     The AP is harmed every day that it is denied firsthand access to pool events and to larger events open to all White House credentialed journalists. The AP's journalists cannot observe and report on the President's demeanor, appearance, tone, or expressions, or on the presentation of others in the room with him. Nor can the AP take its own photographs, which would satisfy its standards, provide the volume and variety of images that AP customers expect, and best advance the AP's own reporting. The denial of access also hinders the AP's ability to produce reporting and publish photographs quickly – an essential attribute of a wire service – causing delays that harm the AP and, as a result, the thousands of news outlets and billions of readers that rely on the AP's journalism. The AP has also been forced to incur the substantial costs of flying foreign-based AP journalists to the U.S. to cover foreign leaders' visits to the White House, as those foreign-based AP journalists are arbitrarily permitted to cover presidential events even though the AP's White House journalists remain banned from those same spaces.

## CLAIMS FOR RELIEF

### Count I
### Declaratory and Injunctive Relief
### <u>Violation of the Fifth Amendment: Exclusion from the Press Pool</u>

96.     The AP realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

97.     Defendants' decision to indefinitely ban the AP from "access to limited spaces, like the Oval Office and Air Force One" open to members of the White House press pool, violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  Because the White House has made those spaces available to other members of the pool, it cannot constitutionally deny the AP access without due process of law, and cannot deny access arbitrarily or for anything other than legitimate, compelling reasons unrelated to the perceived viewpoint of the press pool member.

98.     The AP's access as a member of the press pool to the Oval Office, Air Force One, and the other limited spaces – which the White House has now revoked indefinitely – is protected by the First and Fifth Amendments.  Being a member of the press pool and reporting from these spaces has, for over a century, allowed the AP to effectively and timely report on the President and White House, information which is critical to an informed public.  The indefinite denial of the AP's access hinders its ability to provide timely, accurate and nonpartisan reporting on the President and White House to the thousands of global news outlets that republish the AP's news reports and to billions of readers globally.

99.     The White House's decision to deny the AP's access was arbitrary.  The AP received no prior notice of the White House's decision.  Leavitt announced the decision verbally, after it had been made, to AP Chief White House Correspondent Miller.  The AP received no written notice of the White House's decision before it took effect.

100.    Defendants also did not provide to the AP any opportunity to challenge their decision before it took effect, nor have Defendants provided to the AP any formal opportunity to challenge it since that time.  Instead, the administration repeatedly has made clear that it intends to continue barring the AP's access indefinitely unless the AP uses the President's preferred language.

101.    As a result of Defendants' actions, the AP has suffered and continues to suffer irreparable harm.

**Count II**
**Declaratory and Injunctive Relief**
**Violation of the First Amendment: Exclusion from the Press Pool**

102.    The AP realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

103.    The White House has ordered the AP to use certain words in its coverage or else be barred from accessing events open to the White House press pool, as direct retaliation for the AP's speech and for the AP's decision to file this lawsuit.  Defendants' decision to bar the AP from reporting in the White House press pool and to deny the AP's access to the Oval Office, Air Force One, and other limited areas, violates the First Amendment to the U.S. Constitution.  The AP's access to and reporting on the White House as a member of the press pool, the AP's own editorial decisions about naming conventions, and the AP's petitioning of the court, are all protected under the First Amendment.

104.    Defendants have deprived the AP of its right as a member of the White House press pool to access limited areas in the White House that have been opened to the press pool as representatives of the press and public.  This attempt to control speech has the impact of depriving the thousands of global news outlets that republish the AP's news reports, and its

billions of readers around the world, from the AP's factual, timely and nonpartisan reporting on the White House.

106.    Defendants have admitted that they acted against the AP based on their dislike of the AP's use of the Gulf of Mexico name and its other editorial choices.  The law does not allow the government to control speech based on its likes and dislikes.  Such dislike is not a compelling reason to justify the infringement of the AP's First Amendment rights, and it is not narrowly tailored to achieve any compelling government interest.

106.    Defendants' actions against the AP expressly were taken because of the language the AP uses in its reporting and Stylebook, constituting viewpoint-based discrimination that is impermissible even in the most restrictive nonpublic forums.

107.    Defendants' actions against the AP were in retaliation for the AP's exercise of its First Amendment-protected rights of expression and its right to petition the court by filing this very lawsuit.  The access denial was intended to have, and has had, a chilling effect on the exercise of the AP's First Amendment rights.  Defendants' acts would chill, and have chilled, the speech of similarly situated reasonable people of ordinary firmness.

108.    Defendants' access denial is also intended to compel the speech of the AP, specifically to make the Gulf of America the primary term used in its reporting and Stylebook.

109.    As a result of Defendants' actions, the AP has suffered and continues to suffer irreparable harm.

**Count III**
**Declaratory and Injunctive Relief**
**Violation of the Fifth Amendment: Exclusion from Credentialed Press Events**

110.    The AP realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

111.    Defendants' decision to indefinitely ban the AP from events open to all credentialed White House journalists violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  Because the White House has made those spaces available to all credentialed White House journalists, requiring only that they sign up in advance, it cannot constitutionally deny the AP's access without due process of law, and cannot deny access so arbitrarily or for anything other than legitimate, compelling reasons unrelated to the AP's perceived viewpoint.

112.    The AP's access to events that are open to all White House credentialed journalists—which the White House has now denied indefinitely—is protected by the First and Fifth Amendments.  Access to these events, which include press conferences with the President and other world leaders, allows the AP to effectively and timely report on the President and White House, information which is critical to an informed public.  The indefinite denial of the AP's access hinders its ability to provide timely, accurate and nonpartisan reporting on the President and White House to the thousands of global news outlets that republish the AP's news reports and to billions of readers globally.

113.    The White House's decision to deny the AP's access was arbitrary.  The AP received no prior notice of the White House's decision.  Leavitt announced the decision verbally, after it had been made, to AP Chief White House Correspondent Miller.  The AP received no written notice of the White House's decision.

114.    Defendants also did not provide to the AP any opportunity to challenge their decision before it took effect, nor have Defendants provided to the AP any formal opportunity to challenge it since that time.  Instead, the White House repeatedly has made clear that it intends to

continue barring the AP's access indefinitely unless the AP uses the President's preferred language.

115.    As a result of Defendants' actions, the AP has suffered and continues to suffer irreparable harm.

**Count IV**
**Declaratory and Injunctive Relief**
**Violation of the First Amendment: Exclusion from Credentialed Press Events**

116.    The AP realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

117.    The White House has ordered the AP to use certain words in its coverage or else be barred from accessing major events open to all other credentialed White House journalists, as direct retaliation for the AP's speech.  Defendants' decision to bar the AP from these large events violates the First Amendment to the U.S. Constitution.  The AP's access to and reporting on the White House, and the AP's own editorial decisions about naming conventions, are protected under the First Amendment.

118.    Defendants have deprived the AP's journalists of their right as credentialed White House reporters and photographers to access events in the White House that have been opened to all other credentialed White House journalists.  This attempt to control speech has the impact of depriving the thousands of global news outlets that republish the AP's news reports, and its billions of readers around the world, from the AP's factual, timely and nonpartisan reporting on the White House.

119.    Defendants have admitted that they acted against the AP based on their dislike of the AP's use of the Gulf of Mexico name and its other editorial choices.  The law does not allow the government to control speech based on its likes and dislikes.  Such dislike is not a compelling

reason to justify the infringement of the AP's First Amendment rights, and it is not narrowly tailored to achieve any compelling government interest.

120.    Defendants' actions against the AP expressly were taken because of the language the AP uses in its reporting and Stylebook, constituting viewpoint-based discrimination that is impermissible even in the most restrictive nonpublic forums.

121.    Defendants' actions against the AP were in retaliation for the AP's exercise of its First Amendment-protected rights of expression and its right to petition the court by filing this very lawsuit.  The access denial was intended to have, and has had, a chilling effect on the exercise of the AP's First Amendment rights.  Defendants' acts would chill, and have chilled, the speech of similarly situated reasonable people of ordinary firmness.

122.    Defendants' access denial is also intended to compel the speech of the AP, specifically to make the Gulf of America the primary term used in its reporting and Stylebook.

123.    As a result of Defendants' actions, the AP has suffered and continues to suffer irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, the AP respectfully requests that this Court:

a.    Order the Defendants to immediately rescind their denial of the AP's access to the Oval Office, Air Force One, and other limited spaces when such spaces are made open to other White House press pool members;

b.    Declare that the Defendants' conduct in denying the AP access to spaces open to other members of the White House press pool violated the First and Fifth Amendments;

c.    Order the Defendants to immediately rescind their denial of the AP's access to events that are open to all credentialed White House journalists;

d.      Declare that the Defendants' conduct in denying the AP access to events that are open to all credentialed White House journalists violated the First and Fifth Amendments;

e.      Award to the AP its costs and reasonable attorneys' fees incurred in this action; and

f.      Grant such further relief as the Court may deem just and proper.

Dated:  March 3, 2025                    Respectfully submitted,

                                         BALLARD SPAHR LLP

                                         */s/ Jay Ward Brown*
                                         Jay Ward Brown (#437686)
                                         Charles D. Tobin (#455593)
                                         Maxwell S. Mishkin (#1031356)
                                         Sasha Dudding (#1735532)
                                         1909 K Street NW, 12th Floor
                                         Washington, DC 20006
                                         Tel: (202) 661-2200
                                         Fax: (202) 661-2299
                                         brownjay@ballardspahr.com
                                         tobinc@ballardspahr.com
                                         mishkinm@ballardspahr.com
                                         duddings@ballardspahr.com

                                         *Counsel for Plaintiff The Associated Press*

# Exhibit B



D

<span style="color:red">[EXTERNAL]</span>

Julie,

Thank you for your feedback, and I hope this email addresses your concerns and provides some guidance on how we can best move forward.

We do not agree that this is a First Amendment issue-both as a matter of law and implementation.

President Trump and his administration has provided, and will continue to provide, tremendous access to reporters as he governs the nation. There is no event that the Associated Press is being barred from covering. When occupancy is limited, the Associated Press' journalists are still able to cover these moments alongside the hundreds of other journalists who are credentialed for the White House every day but do not access the President directly.

Instead, this is purely a privilege of access issue. There are certain areas, including the Oval Office and Air Force One, whereby the nature of their size, we are restricted as to how many people can physically be accommodated. The only person who has the absolute right to occupy those spaces is the President of the United States. For the rest of us, it's a privilege, and to suggest otherwise wrong.

It is also important to understand our view as to why we arrived in this point. The Associated Press' Stylebook is used by many as a standard for writing and editing. It advises journalists, scholars, and classrooms around our country. Unfortunately, the influence this Stylebook has acquired has been misused, and at times weaponized, to push a divisive and partisan agenda. I have taken the time to review the Stylebook and I personally observe a multitude of biases that are unfair and biased. The latest instruction which is to deny the renaming of the Gulf of America is yet another example of a guide that appears more like a political tool than a neutral guide for the writers of today and tomorrow.

While we believe there should be a full review of the Stylebook and its potential abuses, more immediately, the guidance relating to the renamed Gulf of America should be appropriately reflected, not denied. The renaming was done according to law and is binding. We, of course, recognize that this renaming may not formally apply yet internationally, but given the AP's role, it should also appropriately make the distinction as an American guideline. Denying such, denies the appropriate authority of the duly elected President.

We believe strongly that the American public deserves neutrality from those privileged enough to enjoy close up access to some of the most important moments of history. Sadly, at this time, the Associated Press is failing to meet that standard.

R                                            M



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

               Plaintiff,

     v.

TAYLOR BUDOWICH,
White House Deputy Chief of Staff, et al.,

             Defendants.

Civil Action No. 25-0532 (TNM)

## DECLARATION OF TAYLOR BUDOWICH

I, TAYLOR BUDOWICH, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct to the best of my recollection and belief.

1.      I am Deputy Chief of Staff and Cabinet Secretary at the White House.

2.      I offer the following declaration based on my personal knowledge and information that I have learned in the scope of my job responsibilities.

### General Press Access to the White House

3.      Approximately 1,355 journalists—including 33 journalists (including photographers) from the Associated Press—have "hard passes" or general media access to the White House press facilities.  Notably, as part of its commitment to openness and transparency, the White House press team is working diligently to restore hard passes of approximately 440 journalists whose passes were revoked by the previous presidential administration.

4.      A journalist with a hard pass is allowed to enter White House grounds through a secured entry point and have access to "Pebble Beach" (a television standup area on the north grounds of the White House complex), the driveway from the security gate to the West Wing, the James S. Brady Briefing Room, the South Lawn for Marine One arrivals and departures, and the

ADD.77

"lower" and "upper" press workspaces located near the Brady Briefing Room (the "general press facilities"). The White House Correspondents' Association ("WHCA") continues to assign, at the White House's discretion, the forty-nine seats in the Brady Briefing Room and the booths and desks in the White House press workspaces.

5.    Journalists with the Associated Press have continued to receive full access to the general press facilities since President Trump was inaugurated on January 20, 2025, including a front row seat in the Brady Briefing Room.

## Special Press Pool Access to the President

6.    The White House "press pool" contains a small fraction of those journalists with White House hard passes. The core press pool typically consists of between thirteen and twenty-one individuals, depending on the President's location and whether he is traveling, among other items.

7.    The press pool is limited to roughly one- or two-percent of the more than 1,000 journalists with White House hard passes that may be selected to enjoy special access to the President in intimate workspaces (the Oval Office and the Cabinet Room), his highly secured means of transportation (Air Force One), and his personal home (the Mar-a-Lago Club) when those spaces are open to the press. Members of the press pool are not mere witnesses to history. They are a small group of privileged journalists that are provided access to represent the broader group of qualified hard pass holders at discretion of the President.

8.    Under the prior selection process for the press pool, which was operated by the White House Correspondents' Association, certain media groups (including the Associated Press) received special access to the President above other outlets. The Correspondents' Association guaranteed the Associated Press two spots of the thirteen core spots in the pool. For example, under the old system, even well-established media companies such as the Washington Post, Los

Angeles Times, CNN, and Wall Street Journal had no guaranteed spots and were forced to rotate into the pool through spots allocated to print and television journalists.

9.      On Tuesday, February 25, 2025, the White House Press Secretary announced the White House's intent to change the way it decides who participates in its press pool.

10.     Under the new process, the press pool is selected among three groups: 1) a television pool selected from a rotation of five television networks; 2) a wire pool selected from two wire services; 3) three wire photojournalists and 4) additional media outlets selected based upon and appropriate to the subject matter of the event.

**East Room and Other Limited Press Events**

11.     A similar policy applies to events outside of the Oval Office and other special access spaces, such as those held in the East Room of the White House.

12.     Press conferences with foreign dignitaries held in the East Room of the White House can often accommodate up to approximately 180 press individuals, depending on the room set up and number of guests (inclusive of television and radio journalists, photographers, and cameraman).

13.     Press attendance at these limited press events is typically arranged through an electronic sign-up tool, where journalists seeking access to the event may apply for an RSVP.

14.     Often the White House is unable to accommodate all journalists that seek access to these limited press events, and therefore, RSVPs are not always accepted.

15.     Under the revised policy described above, Associated Press journalists are part of the group of journalists permitted to RSVP for East Room press conferences. Subject to the new press pool system, the Associated Press' journalists are eligible, at the President's discretion, to be admitted to those events consistent with the RSVP process described above and subject to other general requirements for admission.

**<u>Associated Press Admission to White House Events</u>**

16.     Associated Press journalists have been admitted to several events.

17.     On February 24, 2025, the President held an East Room event with President Macron of France.  For that limited access event, 310 journalists requested access and 136 were permitted access.  Among those provided access were a foreign-based correspondent of the Associated Press.

18.     On February 27, 2025, the President held an East Room event with Prime Minister Starmer of the United Kingdom.  For that limited access event, 308 journalists requested access and 172 were permitted access.  Among those provided access were a foreign-based correspondent of the Associated Press.

**<u>Other Relevant Statements</u>**

19.     On February 28, 2025, a small collection of journalists beyond the press pool was provided special access by the President's advance team to the otherwise non-public tarmac of an open airfield at Palm Beach International Airport to observe the President exit his aircraft, walk down stairs, and immediately enter a presidential limousine.  That event was not a limited access event similar to the East Room events described above.

20.     The original statement made on this matter did not constitute a ban of the Associated Press as an outlet, but instead was a rejection of the WHCA policy of giving the Associated Press permanent status in the press pool—an extra-special, "all-access" pass that even the five major television networks did not have.



Further declarant sayeth not,

**TAYLOR BUDOWICH**
Deputy Chief of Staff and Cabinet Secretary

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE ASSOCIATED PRESS,<br><br>              Plaintiff,<br><br>    v.<br><br>TAYLOR BUDOWICH,<br>White House Deputy Chief of Staff, et al.,<br><br>           Defendants. | Civil Action No. 25-0532 (TNM) |

**SUPPLEMENTAL DECLARATION OF TAYLOR BUDOWICH**

I, Taylor Budowich, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct to the best of my recollection and belief.

1.      I am Deputy Chief of Staff and Cabinet Secretary at the White House.

2.      I offer the following supplemental declaration based on my personal knowledge and information that I have learned in the scope of my job responsibilities.

**White House Press Pool Approach**

3.      Under the new process for press pool selection, the White House press team selects the journalists that will have special access to the President's most intimate settings on a day-by-day basis (or for out-of-town ventures, on a trip-by-trip basis).  Outlets that were among the members of the pool under the old system continue to be eligible for pool selection in the new system, including the Associated Press.  That said, the new system affords well-deserving outlets, including new media outlets that were historically excluded from certain pool rotations by the White House Correspondents' Association, to share in the privilege and responsibility of being afforded special access to the President in his intimate work, travel, and home environments.

ADD.82

4.     The White House believes that affording special access to the President under these terms allows both new voices to be heard, while producing an environment that serves to better inform the public on the actions being taken by the administration. For example, on March 24th, the press pool was allowed access to the Roosevelt Room for a steel manufacturing investment announcement with President Trump and executives with Hyundai. Due to the flexibility and control provided by the new process, the press team was able to include CNBC and Bloomberg, whose reporters and audiences have heightened interest on the topic.

5.     Since the inception of the new press pool system, the press teams have been empowered to better perform their jobs by creating a pool that best serves the public by pairing the topics of each event with the reporters and audience who are most curious about them.

6.     It is indisputable that coverage of and access to the White House has only increased since the newly instituted White House Press Pool, and a vast majority of the White House press corps is celebrating these long overdue changes, which put journalists, networks and the American people above the self-important "board" of journalists from WHCA.

**Private Spaces**

7.     In private spaces such as the Oval Office or Air Force One, it is up to the President's discretion whether or not he accepts questions from press pool members.

**East Room Events**

8.     In my earlier declaration, I described the RSVP request process that journalists use to seek access to limited access press events in the East Room of the White House.  Herein, I provide additional information on that process.

9.     When the White House is unable to accommodate all journalists that seek access to these limited access press events at the White House, the White House provides credentials to non-

pool, hard pass holders based on a similar approach as the approach taken with the limited press pool by prioritizing the journalists, outlets and audiences best suited for each individual event.

10.     For events, there is no existing written policy for press admission. The White House exercises its expertise in understanding journalists, their outlets, and the audiences to ensure the widest and most robust coverage and distribution of these events. Due to space limitations, the press team may select news media that is more relevant to an event. For example, foreign press may be given admission preference for foreign-related events, and business or economic-focused media may be prioritized for announcements most relevant to their reporters and audiences, as noted above.

11.     In exercising that discretion, the White House has not systematically or otherwise excluded any members of the credentialed media, including since my last declaration.

12.     On March 12, 2025, the President held a limited access East Room press event with Prime Minister Micheál Martin of Ireland.  For that limited access event, 188 journalists requested access to the East Room for the event and 81 were permitted access.  Based on my understanding, among those provided access were a domestic-based photojournalist from the Associated Press.

13.     On March 20, 2025, the President held a limited access East Room press event for the signing of an Executive Order regarding education.  For that limited access event, 230 journalists requested access to the East Room for the event and 108 were permitted access.  Based on my understanding, among those provided access were two domestic-based photojournalists from the Associated Press.

14.     On March 24, 2025, the President held a limited access East Room press event as part of a Greek Independence Day celebration.  For that limited access event, 159 journalists

requested access to the East Room for the event and 93 were permitted access. Based on my understanding, among those provided access were two photojournalists from the Associated Press.

15.     As these events and those described in my prior declaration demonstrate, the Associated Press remains completely eligible for selection, as all hard pass holders are, for a wide range of White House coordinated press events.

16.     I can confirm that the Associated Press is eligible to access future, limited access East Room press conferences and similar media events.

17.     While the Associated Press' sustained commitment to misinformation and scandalous reporting standards will indeed further erode what limited credibility they maintain, it does not interfere with their eligibility to access events.

### West Palm Beach Tarmac

18.     In my prior declaration, I noted that press access to the February 28, 2025, landing of Air Force One at Palm Beach International Airport was not a limited access event similar to the East Room events I described in that declaration. Instead, for that specific event, I noted that a small collection of journalists beyond the press pool was provided special access by the President's advance team to the otherwise non-public tarmac.

19.     Non-pool access to the February 28 landing was provided by the advance team, not the White House's press team and was done so on an ad hoc, one-off (or special) basis. The Associated Press has been permitted to attend these ad hoc events.

20.     For example, on March 7, 2025, at the landing of Air Force One at Palm Beach International Airport, a journalist and photojournalist from the Associated Press were permitted access.

21.     As another example, on March 14, 2025, at the landing of Air Force One at Palm

Beach International Airport, a domestic-based journalist and photojournalist from the Associated

Press were permitted access.

Further declarant sayeth not,

**TAYLOR BUDOWICH**
Deputy Chief of Staff for
Communications and Public Liaison,
and Cabinet Secretary

<pre>
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3     * * * * * * * * * * * * * *   )
      ASSOCIATED PRESS,             )    Civil Action
4                                   )    No. 25-00532
                  Plaintiff,        )
5                                   )
        vs.                         )
6                                   )
      TAYLOR BUDOWICH, et al.,      )    Washington, D.C.
7                                   )    March 27, 2025
                  Defendants.       )    9:38 a.m.
8                                   )
      * * * * * * * * * * * * * *   )
9


10
            TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
11            BEFORE THE HONORABLE TREVOR N. McFADDEN
                   UNITED STATES DISTRICT JUDGE
12


13
      APPEARANCES:
14
      FOR THE PLAINTIFF:      CHARLES D. TOBIN, ESQ.
15                            MAXWELL S. MISHKIN, ESQ.
                              BALLARD SPAHR, LLP
16                            1909 K Street, Northwest
                              Twelfth Floor
17                            Washington, D.C. 20006

18                            SASHA DUDDING, ESQ.
                              BALLARD SPAHR, LLP
19                            1675 Broadway
                              19th Floor
20                            New York, New York 10019

21
      FOR THE DEFENDANTS:     BRIAN P. HUDAK, ESQ.
22                            UNITED STATES ATTORNEY'S OFFICE FOR
                                THE DISTRICT OF COLUMBIA
23                            601 D Street, Northwest
                              Washington, D.C. 20530
24


25
</pre>

1    REPORTED BY:           LISA EDWARDS, RDR, CRR
                            Official Court Reporter
2                           United States District Court for the
                               District of Columbia
3                           333 Constitution Avenue, Northwest
                            Room 6706
4                           Washington, D.C. 20001
                            (202) 354-3269
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    admitted to that event.  Correct?

2    A.  Yes.

3    Q.  And there were hundreds of other media members that

4    applied to be in that room, but weren't.  Correct?

5    A.  I don't even know if those hundreds of people were media

6    members.  Those White House RSVP lists -- the daily

7    guidelines goes out to half of Congress, you know, PR folks.

8    It's a list that -- my knowledge of it is that it sort of

9    has grown and grown and grown over the years, across

10   multiple administrations.

11   Q.  On March 7th, there was a pre-credentialed media event,

12   as we saw, on the tarmac at West Palm Beach International

13   Airport.  Correct?

14   A.  Yes.

15   Q.  And there was a White House [sic] text reporter and

16   photojournalist that were admitted access to that event.

17   Correct?

18   A.  Yes.

19   Q.  On March 12th, there was an east room event to celebrate

20   St. Patrick's Day.  Correct?

21   A.  Yes.

22   Q.  And a White House [sic] photojournalist was admitted to

23   that event.  Correct?

24   A.  That's my understanding.  But a text reporter was not.

25   Q.  On March 14th, there was a pre-credentialed media event

1  at West Palm Beach International Airport where the AP had a
2  text reporter and photojournalist admitted.  Correct?
3  A.  Yes.
4  Q.  On March 20th, there was an east room event for the
5  signing of an executive order regarding education, and a
6  photojournalist from the AP was admitted.  Correct?
7  A.  That's my understanding.  But not a text reporter.
8  Q.  On March 22nd, there was an arrival of Air Force One at
9  West Palm -- at Philadelphia International Airport.
10  Correct?
11  A.  Correct.
12  Q.  And both a text journalist and, I think, two
13  photojournalists were admitted to that event.  Is that
14  correct?
15  A.  I think they received RSVP yes's.  I think we ended up
16  sending one.  We had a double -- we had a staffing snafu.
17  But it was -- yes, they got onto the tarmac.
18  Q.  On March 24th, earlier this week, there was an east room
19  event celebrating Greek Independence Day.
20  A.  Yes.
21  Q.  Correct?
22  A.  Yes.
23  Q.  And a photojournalist from the AP was admitted to that
24  event.  Correct?
25  A.  Just a photojournalist, not a text reporter.

1  Q.  And then we've talked about the event from yesterday,

2  the Women's History Month event.  Correct?

3  A.  Yes.

4  Q.  And at least an AP photojournalist was admitted to that

5  event.  Correct?

6  A.  Just an AP photojournalist was admitted to that event.

7  Q.  Okay.  And so for each of the pre-credentialed media

8  events, aside from maybe -- we have a dispute over

9  February 28th -- at each of those, the AP has had a

10  journalist, be it a text journalist, through a foreign

11  correspondent, or a photojournalist at each of those events.

12  Correct?

13  A.  In one way, shape or form.  Yes.

14  Q.  And in one way, shape or form, then, those folks that

15  were admitted could observe things like the water glass

16  sitting in front of the president, the anecdote that you

17  mentioned.  Correct?

18  A.  They might have.

19  Q.  And in one shape or form, those folks could have noticed

20  the spacing between the president and the other governors at

21  that event that you discussed?

22  A.  They might have.

23  Q.  Similarly, you know, occasionally -- I don't mean to

24  impugn your skills at all, but occasionally you miss

25  something and another -- one of your reporter colleagues

1    picks up on something.  Correct?

2    A.  That does happen.  We try not to let it happen.

3         MR. HUDAK:  I believe that's all the questions I

4    have, your Honor.  Thank you.

5         THE COURT:  Mr. Mishkin?

6         MR. MISHKIN:  I have three questions, your Honor.

7         THE COURT:  Great.

8         MR. MISHKIN:  Sorry.  Four.  I miscounted.

9                    REDIRECT EXAMINATION

10   BY MR. MISHKIN:

11   Q.  Mr. Miller, you read the supplemental declaration that

12   Mr. Budowich filed?

13   A.  Yes.

14   Q.  And did you see that Mr. Budowich purported to --

15   Mr. Budowich stated that AP is now eligible, in his words --

16   quote, "eligible" -- to be included in both the pool and

17   east room events?

18   A.  I did read that.

19   Q.  It's your testimony that, despite such eligibility to be

20   in the pool, AP has not participated in the pool for 44

21   days.  Is that right?

22   A.  Yeah.  Forty-four days since February 11th for text and

23   the 14th for photos, totaling, you know, more than 60 events

24   and movements over that timespan.

25   Q.  Sitting here today, do you have any confidence that an

1    east room event next week for which AP is purportedly

2    eligible to be admitted, that you won't be excluded from

3    that?

4    A.  Absolutely none.  And, if anything, all I have to look

5    back on is my experience and that of my colleagues over the

6    last 44 days, which is AP is barred time and again because

7    of our journalism.

8    Q.  Do you have any assurance that if you are excluded from

9    an east room event, that it's not on the basis of AP's

10   editorial decision?

11   A.  That's the only information that I've ever been given

12   about that decision.

13          MR. MISHKIN:  Thank you.  That's all.

14          THE COURT:  Mr. Miller, I had a question.  You

15   mentioned to Mr. Mishkin earlier that you had the impression

16   that other media outlets, but not your own, have softened

17   its coverage of the administration since you've been banned.

18   What media organizations did you have in mind?

19          THE WITNESS:  Not a specific media organization

20   comes to mind.  It's sort of just the tone and tenor of

21   questions that are -- that I hear thrown at the president in

22   Oval Office sprays and the like.  One of the things that has

23   happened as a result of this White House takeover of the

24   pool process and the ban of AP is that they've removed, in

25   most events inside the White House, two wire services from

Miller - REDIRECT - By Mr. Mishkin