# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ASSOCIATED PRESS,

    Plaintiff-Appellee,

v.

TAYLOR BUDOWICH, in his official capacity as White House Deputy Chief of Staff; KAROLINE C. LEAVITT, in her official capacity as White House Press Secretary; and SUSAN WILES, in her official capacity as White House Chief of Staff,

    Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

**REPLY IN SUPPORT OF EMERGENCY MOTION
FOR A STAY PENDING APPEAL AND
AN IMMEDIATE ADMINISTRATIVE STAY**

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

MARK R. FREEMAN
JOSHUA M. SALZMAN
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7258*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-4747*

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................... 1

ARGUMENT ...................................................................................... 2

I.  The President Retains Absolute Discretion Over Access To Restricted Presidential Spaces. ...................................................... 2

II.  The Remaining Factors Support A Stay. ........................................ 8

CONCLUSION ................................................................................ 10

CERTIFICATE OF COMPLIANCE

# INTRODUCTION

The district court entered an unprecedented injunction governing the terms on which the President of the United States must admit individuals to the Oval Office, Air Force One, and Mar-a-Lago. The district court assumed that because the President sometimes chooses to invite journalists into these most closely regulated personal spaces, he has relinquished the right to exclude other journalists based on factors such as the slant of their coverage or his beliefs about the accuracy of their reporting. As set out in the stay motion, the district court's order is not supported by the First Amendment, and it grossly encroaches upon the President's Article II authority.

Indeed, the district court's novel application of First Amendment forum analysis to the most tightly regulated, intimate spaces associated with the Presidency creates needless interbranch friction, analogous to the friction that would arise if Congress or the President purported to micromanage who may enter federal judges' chambers. The President's workspace (the Oval Office), mode of transportation (Air Force One), and personal residence (Mar-a-Lago) are not standard government office buildings subject to standard forum analysis. The district court's

error strikes at the separation of powers, and fails to give due regard for the discretion vested in the President. It also implicates the same concerns that underlie the political question doctrine.

Nothing in the Associated Press's (AP's) response undermines those points, and the Court should stay the injunction.

## ARGUMENT

### I. The President Retains Absolute Discretion Over Access To Restricted Presidential Spaces.

**A.** Contrary to the district court's analysis, nonpublic portions of the White House (including the Oval Office), Air Force One, and Mar-a-Lago are not properly subjected to the ordinary forum analysis that governs restrictions on speech on sidewalks, parks, and university campuses. While this Court's recent decision in *Ateba v. Leavitt*, --- F.4th ----, 2025 WL 1036451 (D.C. Cir. Apr. 8, 2025), *cited in* Opp. 10—a case, to be clear, the *government* won—applied forum analysis, it did so only on the assumption that the plaintiff had suffered a First Amendment injury and without considering the government's argument that the journalist's claims "implicate only a 'noncommunicative, preparatory step in the production of speech.'" *Id.* at *4 n.7. Beyond that, the putative forum at issue in *Ateba* was the White House press

2

area (the briefing room, press office space, etc.)—spaces intended specifically for the use of the press. Those facilities, to which the AP's journalists retain full access, are fundamentally different from sensitive, nonpublic spaces intended for the President's exclusive use and into which the President alone chooses to invite the media at his discretion. Decisions addressing the forum status of the briefing room only serve to highlight the unique statute of the Oval Office (and the district court's error in equating the two).

The government is not claiming that forum analysis is inapplicable merely because "title" to the Oval Office resides in the government, *see* Opp. 12-13, nor is the argument that the Oval Office is "private" is any personal sense, Opp. 13. Instead, the point is that the President, as head of the Executive Branch, retains absolute discretion over who may enter the Oval Office, a location so associated with the President's authority that it has become synonymous with the President himself.[1]

---

[1] To the extent the AP suggests the government did not dispute the applicability of forum analysis in district court, *see* Opp. 11, it is simply mistaken, *see* Dkt. No. 33, at 23 (explaining that the AP's request for "access to spaces and people … is not governed by the

*Continued on next page.*

Nor is it relevant that the President permits reporters to use cellular devices to communicate from inside the Oval Office, *contra* Opp. 11. It may be technologically feasible to access the internet from just about anywhere. But the mere fact that it is technically feasible for a journalist to post updates from a particular location does not mean that he has a constitutional entitlement to do so. *Cf.* Media Policy of the U.S. Courts of the D.C. Circuit (June 5, 2018), https://perma.cc/AC7T-XH4E.[2]

B. Irrespective of whether this case is analyzed through forum analysis, the dispositive point is that the Constitution does not prohibit the President from considering a journalist's prior coverage in evaluating how much access he will grant that journalist. That is true whether the access is to information or to physical space. Indeed, the AP has never disputed that the President, in response to editorial decisions, may ignore questions or decline interview requests. *See generally Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 417-18 (4th Cir.

---

traditional forum analysis that is used to assess restrictions on speech").

[2] Indeed, it is unclear whether on the AP's theory, the President would ever be allowed to account for viewpoint in selecting attendees for a speech made on government property.

2006). Yet the AP maintains that an entirely different—and much stricter—constitutional rule applies when an organization seeks physical access to the President. The AP's theory seems to be that once some unidentified number of journalists are admitted to a space, then viewpoint can no longer be considered. *See generally* Opp. 16. But the AP never says what the number is at which the constitutional switch is flicked. And for good reason: No principled or manageable standard exists.

Nor is the government's suggestion that restrictions on information and physical access are logically subject to the same constitutional rule inconsistent with *Sherill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), *contra* Opp. 16. *Sherrill* explained that it would be "unreasonable to suggest that because the President allows interviews with some bona fide journalists, he must give this opportunity to all," while simultaneously recognizing that reporters may have First Amendment interests in access to "press facilities" that are "perceived as being open to all bona fide Washington-based journalists." *Sherill*, 569 F.2d at 129 (footnote omitted). *Sherrill*'s point is not that the First Amendment protects physical access over all other forms of journalist

access. Instead, *Sherill* concerned the constitutional interests that attaches to spaces open to all hard pass holders. Those quasi-public space are unquestionably *not* at issue here. So this case is fundamentally different.

Ultimately, under the AP's view of the law, there are only two options available to a President that does not want to spend his time fending off First Amendment litigation from the many journalists who must necessarily be excluded from Oval Office events—shut the doors entirely to the media, *see* Opp. 19 (suggesting this option), or cede all authority to an outside organization (like the White House Correspondents Association). Either way, the district court's rule would functionally strip the President of authority over who may and may not enter core presidential spaces. Such a rule fails to accord appropriate respect to the head of the Executive Branch, has no basis in history or tradition, and is sure to entangle the judiciary in vexing litigation for decades to come.

The far better approach is to recognize, as the Fourth Circuit did in *Ehrlich*, that the President's relationship with the reporters who cover him is fundamentally different from prototypical exercises of

regulatory authority, to which requirements of viewpoint neutrality apply. *Cf. Branti v. Finkel*, 445 U.S. 507, 518 (1980); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 74 (1990). Instead, as the Fourth Circuit has explained, "government officials frequently and without liability evaluate reporters and reward them with advantages of access—*i.e.*, … government officials regularly subject all reporters to some form of differential treatment based on whether they approve of the reporters' expression." *Ehrlich,* 437 F.3d at 418. Nor does the AP offer a theory of why it serves the public interest to require the President to allocate scarce seats on Air Force One to journalists whose questions he may lawfully ignore.

Contrary to the AP's assertion, *see* Opp. 17-19, this fundamental point—that the normal interactions between journalists and elected officials involve both attempts by officials to influence journalists and attempts by journalists to cultivate sources—also dooms the AP's retaliation claim. Indeed, *Ehrlich* itself involved retaliation claims, and its central holding is that a journalist operating in a competitive media environment understands full well that jockeying for access is part of the job description. *See* 437 F.3d at 417-18.

7

For all these reasons, the political question doctrine is indeed implicated here—a point that the AP notably does not dispute. *See Lee v. Garland*, 120 F.4th 880, 888, 895 (D.C. Cir. 2024). The Constitution permits the President to control access to his office, just as members of Congress control access to their offices and federal judges control access to their chambers. It would be impossible for other branches to resolve such questions "without expressing lack of the respect due coordinate branches of government." *Baker v. Carr*, 369 U.S. 186, 217 (1962). And as the above discussion demonstrates, there is no workable way for courts to police the President's decisions about whom he will or will not admit to the Oval Office, particularly given the AP's inability to articulate a clear rule about how many journalists must be invited to a press event before a neutrality requirement attaches. This "lack of judicially discoverable and manageable standards for resolving" such disputes underscores why the President retains unreviewable discretion in this area. *Id.*

## II. The Remaining Factors Support A Stay.

The remaining factors favor a stay. As set out in our motion, no court has ever before restricted the grounds on which the President may

control access to any part of the White House other than the limited areas set aside for the press. And once the President has been forced to relinquish control over who may enter the Oval Office, the fact that he is not required to call on a particular journalist is cold comfort. *But see* Opp. 19 (highlighting President's ability to ignore a reporter he has been required to admit). It is true that the AP has historically enjoyed special access in Oval Office press pools, *id.*, but the mere fact that other presidents have ceded their constitutional authority to the White House Correspondents Association does not require the current President to do so.

On the other side of the coin, the AP observes that its inability to enter the Oval Office has impeded its journalism, insofar as its reporters and photographers can no longer immediately transmit alerts and photographs from inside the Oval Office. That may be true to some extent, though as noted, the AP's journalists have retained access to many East Room events. *See* Mot. 22-23. The more fundamental point, however, is that no other news organization in the United States receives the level of guaranteed access previously bestowed upon the AP. The AP may have grown accustomed to its favored status, but the

Constitution does not require that such status endure in perpetuity.

For related reasons, the AP's claims of harm to the public interest, *see* Opp. 22, ring hollow. The President is the most covered public figure on the planet, and he will remain so whether the AP covers the administration from inside or outside the Oval Office.[3]

## CONCLUSION

This Court should grant an administrative stay and stay the preliminary injunction pending appeal.

---

[3] Finally, the AP suggests that the preliminary injunction preserves the last uncontested status quo. *See* Opp. 22. That contention depends entirely upon how the last uncontested status quo is defined. In the government's view, the last uncontested status quo is that the President enjoyed plenary power over whom he chooses to invite into the Oval Office or aboard Air Force One. In any event, "[m]aintenance of the status quo is only a sometimes concomitant of preventing irreparable harm" but is "never the touchstone for such injunctive relief." *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975) (per curiam).

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

MARK R. FREEMAN

*/s/ Joshua M. Salzman*
JOSHUA M. SALZMAN
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7258*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-4747*
  *joshua.m.salzman@usdoj.gov*

APRIL 2025

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this reply satisfies the type-volume requirements set out in Rule 27(d)(2)(C) because it contains 1,963 words. This motion was prepared using Microsoft Word in Century Schoolbook, 14-point font, a proportionally spaced typeface.

                                                */s/ Joshua M. Salzman*
                                                Joshua M. Salzman