# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5109**                    **September Term, 2024**

**1:25-cv-00532-TNM**

**Filed On:** June 6, 2025

Associated Press,

        Appellee

    v.

Taylor Budowich, in his official capacity as
White House Deputy Chief of Staff, et al.,

        Appellants

**BEFORE:**    Pillard*, Katsas, and Rao, Circuit Judges

# O R D E R

Upon consideration of the emergency motion for a stay pending appeal and an immediate administrative stay, the opposition thereto and notice of errata, and the reply, it is

**ORDERED** that the motion for a stay pending appeal be granted in part. The district court's preliminary injunction entered on April 8, 2025, is stayed pending further order of this court except to the extent that the preliminary injunction is applicable to the East Room. A concurring statement of Judge Rao, joined by Judge Katsas, and a dissenting statement of Judge Pillard are attached.

**Per Curiam**

                      **FOR THE COURT:**
                      Clifton B. Cislak, Clerk

        BY:   /s/
               Selena R. Gancasz
               Deputy Clerk

* Judge Pillard would deny the motion for a stay pending appeal.

RAO, *Circuit Judge*, joined by KATSAS, *Circuit Judge*: The Associated Press wants to be in the room where it happens. But in February 2025, White House officials excluded the AP from the Oval Office and other restricted spaces. Officials announced that access was denied because the AP continued to use the name Gulf of Mexico in its Stylebook, rather than the President's preferred Gulf of America. The AP sued, alleging that its exclusion violated the First Amendment. The district court held the AP was likely to succeed on its constitutional claims, and it issued a preliminary injunction prohibiting White House officials from denying, on the basis of viewpoint, access to press events held in the Oval Office, on Air Force One, and at the President's home in Mar-a-Lago.[1]

We grant in part the government's motion for a stay pending appeal. The White House is likely to succeed on the merits because these restricted presidential spaces are not First Amendment fora opened for private speech and discussion. The White House therefore retains discretion to determine, including on the basis of viewpoint, which journalists will be admitted. Moreover, without a stay, the government will suffer irreparable harm because the injunction impinges on the President's independence and control over his private workspaces.

I.

A.

Reporters and photographers have long been permitted access to the White House complex to cover the President and his administration. The White House manages access by

---

[1] We use "Oval Office" to refer collectively to the Oval Office, Air Force One, Mar-a-Lago, and similar restricted presidential workspaces. We separately consider access to the East Room, a much larger space that can accommodate more members of the press.

2

requiring journalists to obtain a press credential called a hard pass. More than one thousand journalists hold hard passes, through which they may access spaces such as the James S. Brady Briefing Room, where the White House Press Secretary delivers regular briefings. Hard pass holders may also sign up via a reservation system to attend larger events hosted in the East Room, which is often used for meetings with foreign leaders, executive order signings, and press conferences. Because the White House has opened these press facilities "to all bona fide Washington-based journalists," hard passes may not be denied arbitrarily or based on the content of a journalist's speech. *Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977).

A small subset (around one percent) of hard pass holders is sometimes invited into even more restricted White House spaces, such as the Oval Office and the Cabinet Room. This group of privileged journalists, referred to as the "press pool," has historically been selected by the White House Correspondents' Association, a private organization of which the AP is a founding member. Since its inception, the press pool has had a relatively stable, although not fixed, membership. Journalists selected to be part of the press pool may travel with the President aboard Air Force One and attend small press events at the President's home in Mar-a-Lago, usually to observe presidential speeches and events. For many years, the Correspondents' Association offered the AP a standing invitation to send one reporter and one photographer to press pool events.

On February 11, 2025, White House Press Secretary Karoline Leavitt informed the AP that it would not be permitted in the Oval Office or press pool unless it revised its Stylebook to refer to the Gulf of America, which President Trump had recently renamed from the Gulf of Mexico. The President and

3

other senior White House officials publicly stated that the reason for the AP's exclusion was its continued use of the name Gulf of Mexico. The AP was similarly excluded from events in the East Room, despite signing up in advance through the reservation process. On February 25, the White House announced it would select journalists for participation in press pool events, instead of deferring to the selection made by the Correspondents' Association.

## B.

The AP brought suit, alleging that the White House violated the First Amendment by engaging in viewpoint discrimination and by retaliating against the AP for its protected expression. It sought declaratory relief and a preliminary injunction directing the White House to rescind its new policies targeting the AP.

The district court held that the AP was likely to succeed on the merits of both First Amendment claims. As to viewpoint discrimination, the court determined that the Oval Office and other similar spaces are nonpublic fora and so the White House may not restrict reporters' access based on viewpoint. The President and other White House officials candidly stated that the AP's exclusion turned on its viewpoint, namely its continued use of the name Gulf of Mexico in its Stylebook. The district court concluded that such viewpoint discrimination in a nonpublic forum violates the First Amendment. The district court also held that the White House engaged in unlawful retaliation by excluding the AP from press pool events because of its editorial decision to use Gulf of Mexico. As to the other preliminary injunction factors, the court held the AP's loss of First Amendment freedoms and reporting opportunities constitutes irreparable harm, and enforcement of an unconstitutional policy is contrary to the public interest.

4

The district court granted the AP's motion for a preliminary injunction and required the White House to "rescind the denial of the AP's access to the Oval Office, Air Force One, and other limited spaces based on the AP's viewpoint when such spaces are made open to other members of the White House press pool," and to "rescind [its] viewpoint-based denial of the AP's access to events open to all credentialed White House journalists." Tailoring the injunction to the likely constitutional harm, the court recognized that the White House retained discretion to exclude the AP for "permissible reasons," to deny *all* journalists access to the President in restricted spaces, and to select particular journalists for interviews.[2]

The White House moved for emergency relief in this court. It seeks a stay of the district court's injunction pending appeal.

## II.

As a threshold matter, we reject the White House's contention that this case implicates the political question doctrine. The political question doctrine represents "a narrow exception" to the general rule that "the Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*,

---

[2] On April 14, 2025, while the injunction was in effect, the AP was denied access to the Oval Office. The next day, the White House issued an updated policy abolishing the wire services seat from the press pool. The AP immediately filed a motion arguing the White House violated the terms of the injunction and requesting enforcement. The district court denied that motion because it agreed the White House's new policy was facially neutral. Moreover, the court credited the White House's declaration that it had not excluded the AP from press events based on viewpoint while the district court's injunction was in place.

5

566 U.S. 189, 194–95 (2012) (cleaned up). A case may present a nonjusticiable political question if one of six factors identified by the Supreme Court is present. *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (setting out the modern framework for the political question doctrine); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010) (explaining the six factors from *Baker* are disjunctive). As relevant here, the White House maintains the political question doctrine bars judicial review because there are no "judicially discoverable and manageable standards" governing the selection of journalists for small group press events with the President and because any resolution of the AP's claims would necessarily express a lack of respect for a coordinate branch of government. *Baker*, 369 U.S. at 217. We disagree.

The AP's constitutional challenge lies well within the judicial province. The AP alleges its First Amendment rights have been violated because the White House engaged in viewpoint discrimination and retaliation on account of the AP's speech. The freedoms of speech and press are vital to our constitutional democracy. *See Stromberg v. California*, 283 U.S. 359, 369 (1931) ("The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people ... is a fundamental principle of our constitutional system."). The prohibition on viewpoint discrimination, when it applies, protects speakers against invidious government action. *See, e.g., Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."). "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). The courts regularly adjudicate

6

claims that the government has violated the First Amendment's prohibition on viewpoint discrimination.

The AP's arguments that it has suffered viewpoint discrimination and retaliation in violation of the First Amendment "sound in familiar principles of constitutional interpretation" and do "not turn on standards that defy judicial application." *Zivotofsky*, 566 U.S. at 201 (cleaned up). While the constitutional questions presented arise in a political context, they do not fall within the narrow category of political questions that lie beyond the sphere of the federal courts. Adjudicating the constitutional limits on Executive Branch action does not, on its own, show disrespect to a coordinate branch. *See El-Shifa*, 607 F.3d at 841–42. Due regard for the Executive Branch as an independent and co-equal department must be part of our analysis of the AP's First Amendment challenge, but it does not bar judicial review at the outset.

III.

It is within our traditional equitable authority to "stay the enforcement of a judgment pending the outcome of an appeal." *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9–10 & n.4 (1942) (citing All Writs Act, now codified at 28 U.S.C. § 1651). In deciding whether to grant a stay pending appeal, we consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (cleaned up). While these factors guide our assessment, a stay is an exercise of equitable discretion, and therefore "[t]he propriety of its issue … depend[s] upon the circumstances of

7

the particular case." *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672–73 (1926).

The White House seeks a stay of the preliminary injunction. A preliminary injunction is "an extraordinary remedy" that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Unlike a final judgment, "a preliminary injunction is remarkable because it imposes a constraint on the enjoined party's actions" before a full adjudication of the merits. *Hanson v. District of Columbia*, 120 F.4th 223, 243 (D.C. Cir. 2024) (cleaned up). "[T]o grant a preliminary injunction is normally to make a choice under conditions of grave uncertainty." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022) (cleaned up). Our evaluation of the stay factors is invariably shaped by the interim nature of the district court's relief. "In assessing the lower courts' exercise of equitable discretion, we bring to bear an equitable judgment of our own." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).

IV.

Because we are considering a stay pending appeal of a preliminary injunction, the government can demonstrate likelihood of success on the merits by showing that the district court misapplied the *Winter* factors—the first of which is whether the *plaintiff* has shown likelihood of success on the merits. *See NTEU v. Trump*, No. 25-5157, 2025 WL 1441563, at *1 & n.1 (D.C. Cir. May 16, 2025). Here, the AP is not likely to succeed on its viewpoint discrimination and retaliation claims, which weighs heavily in favor of granting the stay pending appeal.

8

A.

The district court held the Oval Office, Air Force One, and similar restricted spaces are nonpublic fora when members of the press pool are present, and therefore the AP's exclusion on the basis of viewpoint violates the First Amendment. We conclude the spaces to which the AP seeks access are not any type of forum. As such, the White House may consider journalists' viewpoints when deciding whether to grant access.

1.

To determine the extent of any First Amendment protection, we must first identify the relevant government space or spaces to which the AP claims access. "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983). Forum analysis guides our assessment of whether and to what extent the government may restrict speech on its property. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985). But we are mindful that courts should not "extend[] the public forum doctrine in a mechanical way to contexts that meaningfully differ from those in which the doctrine has traditionally been applied." *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022) (cleaned up).

The AP argues that it suffers harm through its viewpoint-based exclusion from press pool events. The district court identified the press pool as the relevant forum because the AP has "not been admitted in any form or fashion to the press pool since February 14" and therefore "seeks restored eligibility for … press pool events." Focusing on the press pool, however, distracts from the actual fora relevant to our analysis. The press pool is an historically privileged group of reporters that is at

9

times given access to spaces like the Oval Office. Reporters and photographers within the pool gather news and speak to the public about what they have seen and heard, but the pool is a not an "instrumentality used for communication" by the AP or other journalists. *Cornelius*, 473 U.S. at 803. The press pool is simply a mechanism for granting a select group of reporters access to the most private spaces in the White House.[3]

Although the AP emphasizes its storied place in the history of the press pool, the pool is relevant only because it is often granted access to spaces in which the President conducts business. *See id.* at 801 ("[I]n defining the forum we have focused on the access sought by the speaker."). If the press pool were not allowed in the Oval Office, membership in the pool would be irrelevant to the access that the AP seeks.

The proper context for our First Amendment analysis is therefore the restricted *spaces* to which the AP seeks access, namely the Oval Office, Air Force One, Mar-a-Lago, and the East Room, when they are opened to a small group of journalists to observe presidential events.

2.

Courts apply forum analysis to determine the character of government property and the extent to which it is open to private speech. Government property may be one of "three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Id.* at 802. Some government properties, however, are "not for a at all." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S.

---

[3] The press pool is not, and has never been, a government benefit. *Cf.* Pillard, J., dissenting, at 9, 21. Until recently, membership in the pool was determined by a private organization, the Correspondents' Association.

10

666, 677 (1998); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 (2015). The degree of First Amendment protection turns on both the characterization of the property and the type of activity occurring there.[4] "[F]orum analysis applies only to communicative activities, not to activities that, even if generally protected by the First Amendment, are not communicative." *Price*, 45 F.4th at 1070.

No one suggests the Oval Office is a traditional public forum such as a park or sidewalk held in trust for expressive activity. Nor is the Oval Office a designated public forum that the government has made generally available to the public for discourse and communication. The disagreement between the parties is whether the spaces at issue are nonpublic fora or not fora at all, and so we focus on this distinction.

"A nonpublic forum is government property that is not by tradition or designation a forum for public communication." *Id.* at 1068 (cleaned up). The government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Greer v. Spock*, 424 U.S. 828, 836 (1976) (cleaned up). Government property does not become a nonpublic forum unless and until the government takes some affirmative step to open the space for private communication. While the government need not open up property "that is not by tradition or designation a forum for public communication," the government "creates a

---

[4] While viewpoint discrimination is often unconstitutional, we reject the dissent's primary argument that the White House's viewpoint-based exclusion of the AP is *per se* unconstitutional. *See* Pillard, J., dissenting, at 6–9. This blanket conclusion finds no support in our First Amendment jurisprudence, which carefully assesses the type of government property at issue and recognizes that some government spaces are not fora at all and therefore are not subject to prohibitions on viewpoint discrimination.

11

nonpublic forum when it provides selective access for individual speakers." *Ateba v. Leavitt*, 133 F.4th 114, 121–22 (D.C. Cir. 2025) (cleaned up). Until the government opens a restricted space to private speech between private parties, such a space is not a First Amendment forum at all.

Our cases provide guideposts for applying forum analysis to spaces in the White House. When the White House opens its facilities to the press generally, as it does in the Brady Briefing Room, it cannot exclude journalists based on viewpoint. In *Sherrill*, we held that the "White House press facilities having been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the [F]irst [A]mendment guarantee of freedom of the press" attached, requiring that "access not be denied arbitrarily or for less than compelling reasons." 569 F.2d at 129 (cleaned up). We recently explained that "[a]lthough *Sherrill* predated modern forum analysis, its description of the Press Area fits the definition of a nonpublic First Amendment forum." *Ateba*, 133 F.4th at 122–23. Thus, "access to the White House Press Area can be restricted as long as the restrictions are viewpoint neutral and reasonable." *Id.* at 123 (cleaned up). *Sherrill* and *Ateba* stand for the proposition that White House spaces generally open to the press are nonpublic fora, and therefore access cannot be restricted based on viewpoint.[5]

On the other hand, we have never suggested that there are any First Amendment restrictions on "the discretion of the President to grant interviews or briefings with selected

---

[5] The White House has substantial discretion to control press access based on considerations such as security or space limitations, and this court has declined to micromanage or intrude on the White House's discretion to set such policies. *See Sherrill*, 569 F.2d at 130; *Ateba*, 133 F.4th at 122–23.

12

journalists." *Sherrill*, 569 F.2d at 129. In deciding which journalists to speak with, the President may of course take into account their viewpoint. If President Trump sits down for an interview with Laura Ingraham, he is not required to do the same with Rachel Maddow. The First Amendment does not control the President's discretion in choosing with whom to speak or to whom to provide personal access. It is a time honored and entirely mundane aspect of our competitive and free press that public officials "regularly subject all reporters to some form of differential treatment based on whether they approve of the reporters' expression." *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 418 (4th Cir. 2006).

These uncontested principles provide the framework for assessing the AP's claim that the Oval Office and other restricted spaces become nonpublic fora when the White House selects a small group of journalists (such as the press pool) to be present for observational newsgathering and reporting.

3.

To properly characterize the Oval Office and like spaces, we examine their history and the government's "policy and practice" with respect to allowing access. *Cornelius*, 473 U.S. at 802. We also consider whether "the tradition of … activity" in these spaces demonstrates that they "have historically been made available for speech activity." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992); *see also Perry*, 460 U.S. at 45 (evaluating whether the space has "by long tradition … been devoted to assembly and debate"). The design and function of the space is also relevant when determining whether the government has created any type of forum for private speech. *United States v. Kokinda*, 497 U.S. 720, 727–30 (1990) (plurality opinion).

13

The Oval Office is the President's office, over which he has absolute control and discretion to exclude the public or members of the press. As the district court explained, the Oval Office "is a highly controlled location … shrouded behind a labyrinth of security protocols," which "few members of the public will ever" enter. The President uses the space for myriad purposes, including speeches, signing ceremonies, and meetings with senior officials or heads of state. When events in the Oval Office are broadcast to the public, they feature the President's speech and expressive activity.

It hardly needs to be said that the Oval Office, Air Force One, or even the East Room are not places "traditionally open to assembly and debate," nor are they open to the public for expressive activity. *Cornelius*, 473 U.S. at 802. The parties agree the White House could, consistent with the First Amendment, exclude press from these spaces entirely. *Cf. Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (explaining there is no First Amendment right to enter the White House); *Pell v. Procunier*, 417 U.S. 817, 833 (1974) ("It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.") (cleaned up); *Houchins v. KQED, Inc.*, 438 U.S. 1, 9, 12 (1978) (holding the press has no First Amendment "right of access to all sources of information within government control").

The AP's primary contention, however, is that when the Oval Office and similar spaces are opened to the press pool, they become nonpublic fora and therefore the White House may not withhold access on the basis of viewpoint. We disagree.

First, the press events to which the AP seeks access do not involve the type of communicative activities that transform a

14

restricted government space into a nonpublic forum. "[F]orum analysis applies only to communicative activities." *Price*, 45 F.4th at 1070. In each of the Supreme Court's forum analysis cases, the activity triggering application of the doctrine involved "assembly, the exchange of ideas to and among citizens, the discussion of public issues, the dissemination of information and opinion, and debate—all of which are communicative activities." *Id.* at 1069 (canvassing cases). Where, as here, a small group of journalists is permitted to attend events in restricted White House spaces like the Oval Office, the primary activity is observational newsgathering. The district court found that at so-called press pool events, "journalists are relegated to watching events unfold" and very often "have no interaction with the President or other officials." At these events, journalists do not expect to "have a substantive conversation with officials." Instead, journalists are present "just to witness what is said and what the reaction is, and what else is happening in the room." The AP admits as much and identifies the harms from exclusion as the loss of opportunities to "gather and quickly disseminate news about the President." Newsgathering may enjoy some First Amendment protections from government interference. *See Branzburg v. Hayes*, 408 U.S. 665, 707 (1972). But newsgathering is not itself a communicative activity. When journalists are invited to observe events in the Oval Office, they are gathering information for their reporting, which is "a noncommunicative step in the production of speech." *Price*, 45 F.4th at 1068.

Second, the communicative acts identified by the district court cannot transform these restricted White House spaces into nonpublic fora. The AP stressed that the "quick[] disseminat[ion]" of presidential news is essential to its business model as a global wire service. And the district court concluded that journalists are in fact "speaking" from these limited-access spaces because they transmit stories, observations, and

15

photographs in real time.[6] Without question, such reporting constitutes speech and expressive activity. That speech, however, has little if any nexus to the restricted spaces in which it occurs such that the spaces become nonpublic fora.

In every case in which the Court has concluded a government property constitutes a traditional public forum, designated forum, or even nonpublic forum, there exists a close relationship between the forum and the protected speech. Since Roman times, a forum has been emblematic of a space for citizens to participate in public discussion and dialogue, to exchange ideas, and to engage in political debate. In modern doctrine, the "traditional public forum" is closely tethered to this historical conception: It is a place which, "time out of mind, [has] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry*, 460 U.S. at 45 (cleaned up). *See also Cornelius*, 473 U.S. at 800 ("[A] principal purpose of traditional public fora is the free exchange of ideas."). In a similar way, a designated public forum is a space the government opens "for use by the public *as a place for expressive activity*." *Perry*, 460 U.S. at 45 (emphasis added).

---

[6] The district court relied heavily on a Seventh Circuit decision, which concluded that an "invitation-only, limited-access press event" hosted by the governor of Wisconsin was a nonpublic forum. *See John K. MacIver Inst. for Public Policy, Inc. v. Evers*, 994 F.3d 602, 610 & n.1 (7th Cir. 2021). In that case, however, while the Governor argued that his press events were likely not a forum at all, he acknowledged that nonpublic forum analysis "might apply" under the circumstances. *Id.* at 610 n.1. Without explanation, the Seventh Circuit held "the non-public forum analysis is the appropriate one" and concluded that the Governor's access policies were constitutional even under this more demanding standard. The case is therefore of limited relevance to the inquiry here, where the parties dispute whether these spaces are fora at all.

16

So, for example, a university created a designated public forum when it made its facilities available for student groups and speakers to use for meetings, discussions, and other communicative purposes. *Widmar v. Vincent*, 454 U.S. 263, 267–73 (1981). In all of these cases, there is a clear nexus between the forum and the protected speech.

Even with respect to less conventional nonpublic fora, the Supreme Court has carefully considered the connection between the speech and the forum. In *Cornelius*, the plaintiffs wanted to solicit donations (a form of protected speech) through a charity drive brochure targeted at federal employees. 473 U.S. at 797–801. The Court concluded that the charity drive with its government-distributed materials was a nonpublic forum because "the *nexus* between solicitation and the communication of information and advocacy of causes is present in the [charity drive brochure] as in other contexts." *Id.* at 799 (emphasis added). The plaintiffs sought "access to a particular means of communication," namely, speaking to government workers within the nonpublic forum of the charity drive brochure. *Id.* at 801.

These cases illustrate why AP's communicative activities here have no nexus to the Oval Office. When a small number of press observe presidential events, they are not using the Oval Office as the location or means of communication. And when the White House opens events in the Oval Office to a select group of journalists for observational newsgathering, the journalists generally are not speaking with the President or other officials, nor are they engaged in dialogue with each other. The AP's reporting on presidential events through electronic dissemination of news to editors or the public outside the White House is the only communicative activity at issue. But this activity could occur anywhere and therefore

17

lacks the essential connection to the government space required to create even a nonpublic forum.

We decline to adopt a rule that would turn any government space in which smart phones or computers are allowed into a nonpublic forum simply because individuals can communicate with the outside world by blogging, posting comments and pictures, or other otherwise disseminating messages in real time. Smart phone ownership is ubiquitous. The mere possibility of communicating through the internet while on government property cannot transform every government space into a forum protected by the First Amendment.[7] Indeed, we are not aware of any forum analysis case in which the relevant expressive or communicative activity was directed *outside the forum*. When the courts determine that government property serves as a forum, the property is the essential situs for the communicative activity.

Third, these spaces should not be classified as nonpublic fora because access to them is tightly controlled and highly selective. Only about one percent of hard pass holders can fit in spaces like the Oval Office. When access to government property is very limited, considerations of viewpoint may be permissible. *Cf. Nat'l Endowment for the Arts v. Finley*, 524

---

[7] In *Price*, we said in dicta that livestreaming may be a kind of communicative activity, "albeit to people who are not necessarily located in the forum in which the streaming is conducted." 45 F.4th at 1071 n.***. Livestreaming was not at issue in that case, but instead used as an example to distinguish communicative activity from noncommunicative steps in the creation of speech. Moreover, although we stated in *Price* that the government could not restrict filmmaking in national parks on the basis of viewpoint, *see id.* at 1071–72, the government generally had opened the parks to the public for commercial uses, *see id.* at 1064–65. This aspect of *Price* has no relevance to highly restricted spaces such as the Oval Office.

18

U.S. 569, 585–86 (1998) (upholding discretionary funding scheme against First Amendment challenge and explaining that with such a competitive grant program "absolute neutrality is simply inconceivable") (cleaned up).

At oral argument, the AP agreed that the President or White House could select a group of journalists each day to observe events in these spaces and that such selection would not be subject to forum analysis. The AP further conceded that the President could abolish the existing press pool or establish a new pool based on different criteria, including viewpoint.[8] And the AP agrees the White House or President can discriminate on the basis of viewpoint in granting exclusive interviews, answering journalists' questions, or selecting journalists to attend an event about a particular subject matter.

The AP's concessions give away the game, because such scenarios cannot be distinguished from so-called press pool events, which are at bottom small press availabilities with the President. Allowing a handful of selected journalists into the President's personal office cannot transform it into the Brady

---

[8] Both the AP and the district court at various points suggest that if the White House maintains something like the press pool, it must allow access on a viewpoint neutral basis. For the reasons already explained, a group of journalists observing presidential events is not a forum of any sort. Accordingly, the White House should not have to choose between excluding all journalists and admitting journalists under the restrictions of a nonpublic forum. By recognizing the distinctions between different fora "we encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all." *Forbes*, 523 U.S. at 680; *see also Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 480 (2009) ("[W]here the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place.").

19

Briefing Room. The AP therefore must place great weight on the *historical press pool* as the forum to which it seeks access. But as we have already explained, the only potential fora here are the restricted physical spaces, like the Oval Office, to which AP seeks access, not the historical press pool.

Finally, the fact that the President is communicating at these events further distances this context from forum analysis. When the government is speaking, forum analysis is usually inapplicable because while the First Amendment "restricts government regulation of private speech[,] it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009); *see also Walker*, 576 U.S. at 215 ("Because the State is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply.").

Although the White House disclaims primary reliance on the government speech doctrine, the events to which the AP seeks access by their nature involve presidential, i.e. government, speech. The messages conveyed in the Oval Office are government speech and opportunities for the President's administration to express its message. "When government speech is involved, forum analysis does not apply and the Government may favor or espouse a particular viewpoint." *Bryant v. Gates*, 532 F.3d 888, 898–99 (D.C. Cir. 2008) (Kavanaugh, J., concurring). Forum analysis is also inappropriate when government speech occurs within a limited space, such as the Oval Office, the "essential function" of which would be defeated by compelling the President to support private speech on a viewpoint-neutral basis. *Summum*, 555 U.S. at 478.

20

* * *

In sum, forum analysis is the wrong framework for analyzing the First Amendment protections for journalists observing presidential events in the Oval Office. Opening restricted White House and presidential spaces to small groups of journalists does not transform these spaces into nonpublic fora to which access must be granted on a viewpoint neutral basis. The AP's claim to access is inconsistent with longstanding First Amendment principles and would "plant the seed of a constitutional case" in every decision the White House makes about which reporters to include at presidential events. *Connick v. Myers*, 461 U.S. 138, 149 (1983); *Baltimore Sun*, 437 F.3d at 418. For the foregoing reasons, the White House is likely to prevail against AP's viewpoint discrimination claim.

### B.

With respect to the AP's First Amendment retaliation claim, the district court concluded that the White House unlawfully retaliated against the AP for its protected speech, namely its decision to continue using Gulf of Mexico, rather than Gulf of America, in its Stylebook. We disagree. Picking and choosing journalists on the basis of viewpoint might be actionable in some contexts, such as when the White House opens its facilities "to all bona fide Washington-based journalists," but this is not one of those circumstances. *Sherrill*, 569 F.2d at 129 (cleaned up). The White House's decision to exclude the AP from limited-access presidential events is not the type of action that counts as materially adverse for purposes of a retaliation claim.

"[T]he First Amendment prohibits government officials from subjecting individuals to retaliatory actions … for having engaged in protected speech." *Houston Cmty. Coll. System v.*

21

*Wilson*, 142 S. Ct. 1253, 1259 (2022) (cleaned up). The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The retaliation doctrine is rooted in the principle that "[o]fficial reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (cleaned up).

To prevail on its First Amendment retaliation claim, the AP must demonstrate that (1) it engaged in protected expression; (2) a government actor took a materially adverse action against it; and (3) there is a causal relationship between the protected expression and the adverse action. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016); *Wilson*, 142 S. Ct. at 1260–61. The White House has narrowed our inquiry by frankly and publicly stating that it excluded the AP because of its protected speech, specifically, the AP's refusal to adopt Gulf of America in its Stylebook. The only disputed question, therefore, is whether the AP's exclusion from these spaces was a "materially" adverse action for the purposes of a First Amendment retaliation claim. *Wilson*, 142 S. Ct. at 1261 (distinguishing between "material" and "immaterial" adverse actions, only the former of which gives rise to an actionable retaliation claim).

A materially adverse action is generally one that deprives a person of certain property rights or infringes a liberty interest. For instance, loss of employment or the withdrawal of a business license or permit may qualify as a materially adverse action. *See, e.g.*, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–85 (1977) (decision not to rehire employee); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (suspension of regulated entity's permits).

22

Other materially adverse actions include retaliatory arrest or prosecution. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1721–22 (2019) (arrest); *Hartman*, 547 U.S. at 256–57 (prosecution). By contrast, courts have held that criticisms or reprimand do not constitute adverse actions. *See, e.g.*, *Wilson*, 142 S. Ct. at 1259–60 (holding that a verbal censure by the board of a public college was not a materially adverse action, in part because censures have been a common feature of government assemblies since colonial times).

The White House's choice of who to allow into the Oval Office is simply not like a decision about a government benefit or license. First Amendment concerns may be raised "[w]hen the government interacts with private individuals as sovereign, employer, educator, or licensor, … [b]ut those cases are not this one." *Id.* at 1262. Choosing who may observe or possibly speak with the President in these spaces is not the type of action that supports a retaliation claim. Rather, it is more akin to a decision about how the President wields the bully pulpit.[9]

Furthermore, in determining whether a First Amendment retaliation claim is actionable, courts may be guided by "long settled and established practice[s]." *Id.* at 1259. White House

---

[9] Our dissenting colleague emphasizes that the denial of a government benefit based on speech is often actionable. Pillard, J., dissenting, at 7–8. While this is generally true, the press pool is in no way a government benefit program. Denying unemployment benefits, tax exemptions, or trademarks on the basis of viewpoint can support a First Amendment retaliation claim. Denying access to observe or speak with the President in his private spaces cannot. The dissent acknowledges that the President may take viewpoint into account when granting interviews to select journalists. *Id.* at 17–18. Our holding today reflects the fact that granting access to spaces such as the Oval Office is more like granting interviews than like denying unemployment benefits.

23

staff, not to mention the President, often form relationships with reporters who cover the administration. James A. Jacobs, *The President, the Press, and Proximity*, WHITE HOUSE HISTORICAL ASSOCIATION (Mar. 1, 2015), https://www.whitehousehistory.org/the-president-the-press-and-proximity. Hard pass holders and press pool members daily jockey for access to certain privileged spaces and to senior administration officials. As the AP acknowledges (and the district court recognized), the White House can and does reward journalists with advantages like interviews with the President and the opportunity to ask questions at press events. Such viewpoint-based preferences occur at every level of government in the relationship between elected officials and the press. *See Baltimore Sun*, 457 F.3d at 417 (describing how reporters routinely "cultivate access" to government officials). These pervasive practices simply do not give rise to a retaliation claim, regardless of how valuable the access may be.

The AP and the district court again lean heavily on the history of the press pool as an institution. But the AP cannot adversely possess a seat in the Oval Office, no matter how long its tradition of access. The press pool was a creation of the White House Correspondents' Association, a private organization established by the press to manage itself. The press pool gave privileged access to certain outlets in the established media. Although the White House for many years accepted this private arrangement between journalists, that arrangement had no First Amendment status. Prior to the Correspondents' Association's inception, no defined press group covered the White House. Presidents decided which journalists received privileged access, and the type and frequency of access varied by administration. Jacobs, *The President, the Press, and Proximity*. The Trump administration has returned to the old system. It will no longer rely on the Correspondents' Association to select the members of the press

24

pool and instead will determine for itself which journalists to admit to the Oval Office and other similar spaces for presidential events.

The AP also relies on the fact that the White House has not abolished or replaced the press pool and therefore cannot exclude journalists from the pool on the basis of viewpoint. The emphasis on the press pool as a standalone entity does not transform the AP's exclusion into a materially adverse action. This is particularly true because the AP concedes it has no First Amendment right to privileged access within the press pool or to events in such restricted spaces as the Oval Office. The AP also acknowledges that the White House could, consistent with the First Amendment, discriminate on the basis of viewpoint in one-on-one interviews, small events on a particular subject matter, or even newsgathering by groups other than the established press pool. These realities of press coverage in the White House reinforce our conclusion that the AP's exclusion from small group press events does not rise to the level of First Amendment retaliation.

V.

We turn now to the remaining stay factors: "(2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 426 (cleaned up). In granting equitable relief, the stay factors are not applied mechanically and require "individualized judgments." *Id.* at 433 (cleaned up). We must focus on the particular facts of the case, exercising judgment "to balance the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087 (cleaned up). In doing so, we are

25

mindful that a stay of a preliminary injunction involves the equitable review of an extraordinary and interim equitable remedy.

Both the AP and the Government have identified substantial harms if they are denied relief. The White House seeks a stay because the injunction intrudes upon "essential Presidential prerogatives." *Nixon v. Fitzgerald*, 457 U.S. 731, 743 (1982). It is "incontestable" that the Presidency comes with the power to use the office's "bully pulpit." *Blassingame v. Trump*, 87 F.4th 1, 14–15 (D.C. Cir. 2023) (cleaned up). The President's discretion to choose with whom he will speak and travel is part of that power. On the other hand, the AP maintains that the deprivation of its First Amendment right to be free from unlawful viewpoint discrimination is an ongoing and substantial harm, one that also includes significant economic loss to its business. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Although the constitutional interests are weighty on both sides, the harm to the White House outweighs the harm to the AP. Absent a stay, the injunction threatens to impede the President's ability to select which members of the press to invite into his otherwise private workspaces. The AP, however, may continue to exercise its free speech rights in other spaces, including White House press facilities such as the Brady Briefing Room. While the AP has alleged financial loss from being denied access to the Oval Office, that harm does not, in our view, justify an intrusion on presidential prerogatives during this litigation.

Even if we considered the harms to be more evenly balanced, that would simply require us "to decide the emergency [stay] application by assessing likelihood of success on the merits." *Labrador v. Poe*, 144 S. Ct. 921, 929 (2024) (Kavanaugh, J., concurring in the grant of stay); *see also*

26

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (explaining that careful parsing of likelihood of success on the merits "may be necessary ... when interim relief would cause substantial harm" or "when the balance of equities" so requires). Here, we have already explained that the White House is likely to succeed against the AP's challenge because the President has discretion to determine who is admitted to highly restricted presidential workspaces such as the Oval Office.

For the same reasons, the public interest favors a stay. *See Nken*, 556 U.S. at 435 (explaining the balance of harms and public interest factors "merge when the Government is the opposing party"). We conclude that the preliminary injunction intrudes on the independence of the Executive Branch and burdens the President's exercise of core executive powers, and these harms warrant a stay with respect to the Oval Office, Air Force One, Mar-a-Lago, and other similar spaces.

We decline to stay the part of the preliminary injunction applicable to the East Room. The identified harms are less clear with respect to the East Room, which does not share the hallmarks of spaces like the Oval Office.

\* \* \*

Throughout our nation's history, presidents have held crucial meetings and made historic decisions in the Oval Office and on Air Force One. On occasion, they have welcomed the press to observe. But these restricted presidential spaces are not First Amendment fora, and the President retains discretion over who has access. Because we conclude the President may, consistent with the Constitution, exclude journalists from these spaces based on viewpoint, the White House is likely to prevail on its appeal of the preliminary injunction. Without a stay, the White House will suffer irreparable harm from the court's

27

intrusion on presidential prerogatives. We therefore grant in part the White House's motion for a stay pending appeal.

PILLARD, *Circuit Judge*, dissenting: For almost a century, the White House has enabled the White House Press Pool, a limited number of credentialed media organizations, to cover the President at close range from inside the Oval Office, Air Force One, and other government-controlled spaces. White House staff determines which presidential activities and trips the Press Pool covers. But participation in the Press Pool or the broader White House press corps has never been conditioned on the viewpoint expressed outside the Pool by any participating news organization—until now. The issue here is whether, when the White House authorizes the Press Pool to travel with the President or observe an Oval Office meeting or signing, the White House may exclude journalists or news organizations based on their expression outside the Pool of views the President disfavors. Neither this court nor the Supreme Court has ever upheld the exclusion from a forum or denial of a benefit based on a private recipient's viewpoint outside the forum or benefit program. Because the district court correctly enjoined just such exclusion here, I see no basis for a stay pending appeal.

In late January, the White House barred the Associated Press (AP) from the Press Pool solely and explicitly because the AP uses the term "Gulf of Mexico" in its reporting and editorial Stylebook rather than the President's preferred "Gulf of America" moniker. The AP challenged its exclusion as unconstitutional viewpoint discrimination. Following a hearing, the district court issued a preliminary injunction requiring White House staff to readmit the AP to Press Pool privileges on a viewpoint-neutral basis.

Defendants concede that they ousted the AP from the Press Pool based on the AP's expression of its own views outside the Press Pool. They disavow any argument that the AP's press coverage of the presidency, much less its Stylebook, constitutes government speech. They insist that they have not disbanded the Press Pool. And defendants' only claim of "irreparable

2

harm" is the continued operation of the White House Press Pool during this litigation in the same way it had operated since the Eisenhower Administration without apparent objection or challenge.

The panel's stay of the preliminary injunction cannot be squared with longstanding First Amendment precedent, multiple generations of White House practice and tradition, or any sensible understanding of the role of a free press in our constitutional democracy. Both its public-forum and retaliation analyses contravene the fundamental principle that the government may not leverage its allocation of valuable support to punish recipients for the viewpoints they express with their own time and resources. In my view, the clear and only choice is to deny the stay.

## I.

The White House Press Pool is a subset of the credentialled White House press corps that is regularly admitted to smaller spaces to facilitate press coverage of the President. The full press corps consists of more than 1,300 "hard pass" holders whom the government has vetted and permitted to use dedicated press facilities in the White House, Budowich Decl. ¶ 3, ECF No. 33-1;[1] *Ateba v. Leavitt*, 133 F.4th 114, 117-18 (D.C. Cir. 2025), whereas the Press Pool ranges from 13 to 32 journalists depending on the specific event and space, Pl. Ex. A to Second Miller Decl., ECF No. 27-6. The criteria for press corps membership have evolved over time, but it is undisputed that the White House may not exclude reporters from the press corps based solely on their viewpoint. *Ateba*, 113 F.4th at 122-23.

---

[1] All citations to ECF numbers are to *Associated Press v. Budowich*, No. 25-00532.

3

When the White House decides to allow members of the press corps to cover newsworthy events occurring in limited spaces such as the Oval Office, it does so by inviting the Press Pool. *See* Hearing Tr. 82:6-13, ECF No. 45. Journalists in the Pool generate coverage for their own organizations and distribute "pool reports" to other media outlets that use them to inform their own coverage of the presidency. Knight Inst. Br. 3-4, 8, ECF No. 31-1. By custom dating back to the Eisenhower Administration, presidential staff have relied on the White House Correspondents' Association to determine which news organizations are eligible to participate in the Press Pool, either on a permanent or rotating basis. Knight Inst. Br. 4; Hearing Tr. 97:4-24.

The right of journalists in the Press Pool to participate free from discrimination based on viewpoint "has endured even during the eras of rockiest relations between the White House and the press—during the Watergate investigations, and Independent Counsel Kenneth Starr's investigation of President Bill Clinton." Knight Inst. Br. 8. The Reagan Administration briefly sought to bar television journalists from the Press Pool—not based on viewpoint, but in an attempt to pressure TV outlets to come to consensus on which broadcasters would receive the available slots. Even that temporary and viewpoint-neutral exclusion was enjoined based on the "enduring and vital tradition of public entree . . . to the presidential activities covered by press pools." *Cable News Network, Inc. v. Am. Broadcasting Cos., Inc.*, 518 F. Supp. 1238, 1244 (N.D. Ga. 1981). Until this case, Presidents might have openly criticized press coverage they received—including from outlets in the Press Pool—but none had ousted a participant from the Pool based on viewpoint. *See* Reporters Comm. Br. 8-9, ECF No. 54.

4

In addition to allowing the Press Pool into the Oval Office, Air Force One, and other limited spaces like the Cabinet Room and Mar-a-Lago, the White House also holds larger "limited-access" events in the East Room and other locations. Because the East Room can only accommodate approximately 180 people, when such events are open to members of the press corps their attendance is typically capped and managed through an online RSVP tool. Budowich Decl. ¶¶ 12-13. Similar limited-access events occasionally take place at other locations, including outside the White House when the President travels. *See Associated Press v. Budowich*, No. 25-00532, __ F. Supp. 3d__, 2025 WL 1039572, at *5 (D.D.C. Apr. 8, 2025) (discussing limited-access event in West Palm Beach). White House staff confirms acceptance of press RSVPs to those events only up to the event's press capacity. *See* Hearing Tr. 80-81. Access to those events has also long been provided without regard to a journalist's viewpoints expressed outside the event.

The AP, the plaintiff in this case, is a not-for-profit wire service founded in New York in 1846 that now licenses its text reporting and photojournalism to subscribers around the world. Heitmann Decl. ¶¶ 2-5, ECF No. 37-1. The AP's customers include leading television networks, newspapers, and radio broadcasters both in the United States and abroad; the AP claims its journalism reaches four billion people every day. Compl. ¶ 3, ECF No. 1; Heitmann Decl. ¶ 5. Befitting its historical stature, the AP also is a founding member of the White House Press Pool. Compl. ¶ 26; *Budowich*, 2025 WL 1039572, at *2. For decades, the White House Correspondents' Association assigned two of the 13 "core" spots in the Press Pool to the AP—one for a photographer, and one for a text reporter. *Budowich*, 2025 WL 1039572, at *2; Budowich Decl. ¶ 8; Compl. ¶ 27.

5

The AP's inclusion in the Press Pool and ability to enter limited-access events on the same terms as other journalists was uncontested until this administration deemed its presence intolerable, expressly because of the AP's failure to use President Trump's new "Gulf of America" nomenclature in the AP's own writing outside any official events.  On January 20, 2025, President Trump issued Executive Order 14172, "Restoring Names That Honor American Greatness," which directed that the "area formerly known as the Gulf of Mexico" be renamed the "Gulf of America."  Exec. Order No. 14,172, 90 Fed. Reg. 8629, 8630 (Jan. 31, 2025).  The AP acknowledged the renaming in its reporting, but for its own purposes continued to use the name "Gulf of Mexico," including in its influential Stylebook, a writing and editing guide used throughout the media industry.  *Budowich*, 2025 WL 1039572, at *3.  Defendants do not dispute that they excluded the AP's reporters from the Press Pool and other press events solely because the AP's reporting and Stylebook continued to refer to the Gulf of Mexico.  *See id.* at *3-4; Pl. Ex. B to Second Pace Decl., ECF No. 28-2.

The AP sued the White House Chief of Staff, Deputy Chief of Staff, and Press Secretary in their official capacities. Following expedited briefing on the AP's motion for a preliminary injunction, the district court held an evidentiary hearing and ruled in the AP's favor.  In a thorough and well-reasoned decision, the court preliminarily enjoined defendants from excluding the AP based on its viewpoint from the Press Pool or from other "limited-access" events open on a timely-RSVP basis to members of the larger press corps.  The court ordered defendants to "immediately rescind the denial of the AP's access" to spaces the White House opens to the Press Pool "when such spaces are made open to other members" of the Pool, and to "immediately rescind their viewpoint-based denial

6

of the AP's access to events open to all credentialed White House journalists." *Budowich*, 2025 WL 1039572, at *19.

The government appealed and sought an emergency stay of the district court's preliminary injunction pending our decision on its merits. "A stay pending appeal is an 'extraordinary' remedy." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024). Defendants have not carried their burden to demonstrate a "strong showing" of likely success on the merits. *Id.* Nor have they shown any legally cognizable harm from allowing the AP to participate in the Press Pool during the pendency of this appeal. I accordingly respectfully dissent from the order granting a stay.

**II.**

No precedent of this court or the Supreme Court countenances denial of a government benefit or exclusion from a government-created program to otherwise eligible participants solely because of disagreement with a participant's point of view expressed outside the benefit or program. Public officials often and inevitably disagree with publicly expressed views of the journalists or news organizations that cover them. Until now, every United States president has had the fortitude to tolerate the presence in the White House and Oval Office of credentialed journalists known to disagree with one or more government-preferred viewpoints. The First Amendment demands no less.

**A.**

Defendants have not made the showing critical to their stay application that they are likely to succeed in establishing that the First Amendment allows them to oust journalists from the White House Press Pool based on their employing organization's viewpoint. *See Nken v. Holder*, 556 U.S. 418,

7

434 (2009).  Forum analysis readily confirms that failure.  My colleagues' effort to distinguish forum analysis is nonetheless beside the point because the bar on viewpoint discrimination in nonpublic forums for private speech is but one iteration of a broader First Amendment principle strongly supportive of the AP's claims.

The majority's defense of defendants' viewpoint-based exclusion of the AP from the Press Pool utterly disregards that broader principle.  So, too, does its assumption that the AP's retaliation claim is likely to fail.  Denial of a tangible benefit in retaliation for a recipient's own viewpoint expressed elsewhere violates the First Amendment.

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024).  Few constitutional doctrines are as firmly established as the principle that "ideologically driven attempts to suppress a particular point of view are presumptively unconstitutional." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 830 (1995).  It is unsurprising, then, that the government could not identify a single case approving viewpoint discrimination—the most "egregious" form of speech restriction, *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (citation omitted)—in circumstances bearing any material similarity to this case.  Oral Argument Tr. 14:24-15:19.  Given government officials' perennial frustration with unflattering press coverage, the absence of supportive precedent for defendants' action is striking.

The prohibition on viewpoint discrimination applies equally to the imposition of penalties and the denial of benefits.  The government may not condition receipt of any otherwise-

8

available benefit or opportunity on a recipient's endorsement or avoidance of a particular viewpoint. That rule applies to government benefits generally, including federal funding, tax exemptions, trademarks, government contracts, and public-sector employment. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 213-14 (2013); *Speiser v. Randall*, 357 U.S. 513, 528-29 (1958); *Matal v. Tam*, 582 U.S. 218, 243-44 (2017) (plurality opinion); *id.* at 248-49 (Kennedy, J., concurring); *Iancu v. Brunetti*, 588 U.S. 388, 393-94 (2019); *Bd. of Cnty. Comm'rs v. Umbehr,* 518 U.S. 668, 678-81, 686 (1996); *Elrod v. Burns*, 427 U.S. 347, 356-57 (1976). Even where a government program is designed to support a small number of speakers selected on discretionary, aesthetic criteria, it may not impose restrictions intended to punish "certain ideas or viewpoints." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586-87 (1998) (citation omitted). And even discretionary support to public broadcasters cannot be allocated to "curtail expression of a particular point of view." *FCC v. League of Women Voters*, 468 U.S. 364, 380, 383-84 (1984) (citation omitted). The majority errs in assuming that that deprivation of a property or liberty interest need be shown. Maj. at 21.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Indeed, the government may not criminalize acts based on the viewpoint that motivated them, even if the conduct itself is criminal and not First Amendment protected. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391-92 (1992). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828. The only exception to the general rule is when the government engages in

9

expression of the government's own viewpoint, that is, when it is engaged in government speech.  *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009).  But defendants expressly disavow that the AP's Stylebook or other references to the Gulf of Mexico constitute government speech.  The upshot is that no general program for admitting the press to the White House or the Oval Office can exclude a press outlet based on its viewpoint.

The President's use of the Oval Office as a platform for his official speech does not entail governmental authority to impose viewpoint restrictions on the Press Pool.  Even where the government funds private organizations to advance official policy and therefore can control the viewpoint expressed within the funded program, it may not deny support based on disapproval of the recipient's speech outside that program.  The government may not require private participants to "adopt—as their own—the Government's view on an issue of public concern as a condition of funding."  *Agency for Int'l Dev.*, 570 U.S. at 218.  That is why the Supreme Court in *Agency for International Development* held that the government violated the First Amendment rights of an organization receiving public support to advance the government's HIV/AIDS prevention mission when it required the organization to echo the government's opposition to prostitution in the organization's own work with its own funds.  *Id*. at 218-21.  The rule that public funds may be limited to the purpose for which they are granted does not empower the government to impose viewpoint restrictions on grantees' private speech.  *Rust v. Sullivan*, 500 U.S. 173, 197 (1991) (holding that the government may not restrict "the recipient from engaging in the protected conduct outside the scope of the federally funded program" as a condition of funding).

10

Whatever my colleagues mean by emphasizing that Oval Office events "involve" governmental speech because the President typically speaks there, Maj. at 19, the Press Pool's coverage of those events—let alone the content of the AP's Stylebook—is not governmental speech legitimately subject to official viewpoint control.  My colleagues are also wrong that the "essential function" of the Oval Office is "defeated" by the presence of a Press Pool free from viewpoint discrimination. *Id*.  The Press Pool has operated without viewpoint control for almost a century during which presidents have communicated directly from the Oval Office.  The purpose of the Press Pool has never been to propagandize for the President, but only to enable reliable news coverage of his leadership.   Public officials' prerogative to speak for the government does not include any ability to control private parties' speech on their own behalf, even when that speech relates to the government's message.

Defendants concede that the AP had been barred from the Press Pool solely because of references to the Gulf of Mexico in its own writing.  Hearing Tr. 190:17-24; *see also Budowich*, 2025 WL 1039572, at *3.  They gave no other, constitutionally defensible basis for the AP's exclusion.  There is no finding— nor was there any evidence—that the AP's activity within the Press Pool was inappropriate, disruptive, distracting, an invasion of privacy, or in any other way distinguishable from that of representatives of the media outlets that the White House still allows to report from the Oval Office.   And defendants have (correctly) disavowed the argument that their discriminatory treatment of the AP can be understood as regulation of the government's own speech.  *Budowich*, 2025 WL 1039572, at *10; *see* Oral Argument Tr. 4:8-17.

The only basis for defendants' action is that the AP had expressed—outside the Oval Office and while speaking in its

11

own capacity with no government support—a point of view that the White House disagreed with and sought to "suppress." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018) (quoting *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 46 (1983)). Even without any forum analysis, that resolves this case.

## B.

Forum analysis powerfully reinforces that conclusion. The AP's exclusion from the Press Pool violates the bedrock principle that the government may not exclude private speakers from a government-created forum, even a nonpublic forum, based on their viewpoint. *See, e.g., Mansky*, 585 U.S. at 11-12; *Perry Educ. Ass'n*, 460 U.S. at 46; *Int'l Soc'y for Krishna Consciousness v. Lee* (*ISKCON*), 505 U.S. 672, 678-79 (1992). When the government imposes restrictions on the use of public property for private expression, such as by limiting speech "only in a specific location," the government must abide by the First Amendment's public forum doctrine. *Mansky*, 585 U.S. at 11. Every type of forum recognized under the First Amendment, be it a "traditional public forum," "designated public forum," "limited public forum," or "nonpublic forum," shares a baseline prohibition on viewpoint discrimination. *See ISKCON*, 505 U.S. at 678-79.

The Press Pool readily qualifies as at least a nonpublic forum. Spaces that White House staff open for journalists' newsgathering and nongovernmental communication have consistently been held to be nonpublic forums. *See Ateba*, 133 F.4th at 122-23. The default category in forum analysis is the nonpublic forum, which includes "all remaining public property" that does not qualify as a traditional, designated, or limited public forum. *ISKCON*, 505 U.S. at 678-79. Nonpublic forums include any government-controlled space

12

that "is not by tradition or designation a forum for public communication," but where private expressive activity nonetheless occurs. *Mansky*, 585 U.S. at 11 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46). A space can qualify as a nonpublic forum even if it was not specifically opened "for purposes of providing a forum for expressive activity," so long as "such [private expressive] activity occurs." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 805 (1985).

The White House Press Pool is a forum even when it convenes outside the White House, such as on Air Force One or at Mar-a-Lago. A public "space" may refer to "a forum more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable." *Rosenberger*, 515 U.S. at 830; *see id.* (public university funding opportunity for student activities); *Cornelius*, 473 U.S. at 797 (federal government's Combined Federal Campaign charity drive); *Perry Educ. Ass'n*, 460 U.S. at 48-49 (public school's internal mail system). In a nonpublic forum, the government enjoys the most "flexibility to craft rules limiting speech" and "may reserve such a forum 'for its intended purposes, communicative or otherwise,'" but any such limits must be "'reasonable *and not an effort to suppress expression merely because public officials oppose the speaker's view*.'" *Mansky*, 585 U.S. at 11-12 (emphasis added) (quoting *Perry Educ. Ass'n*, 460 U.S. at 46).

The application of nonpublic forum analysis in this case is straightforward. The Press Pool is not materially distinguishable from previously recognized nonpublic forums. In *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), we held that, in light of the "important [F]irst [A]mendment rights implicated by refusal to grant White House press passes to bona fide Washington journalists, such refusal must be based on a compelling governmental interest" and cannot be "based upon

13

the content of the journalist's speech." *Id*. at 129-30.  In *Ateba*, we had "no trouble" confirming that, while "*Sherrill* predated modern forum analysis, its description of the [White House] Press Area fits the definition of a nonpublic First Amendment forum" for which regulations on expression must be "viewpoint neutral." 133 F.4th at 122-23.

There is no principled basis for exempting the press's activities in any White House "press area" from the requirement of viewpoint neutrality.  When the White House Press Pool convenes in the Oval Office, just as when the broader press corps convenes in another White House location, it does so to engage in newsgathering.  To that end, Pool members communicate text and photos to editors and the broader public, all of which is nongovernmental "expressive activity occurring on federal property." *Cornelius*, 473 U.S. at 805.  The Press Pool convenes at times identified by White House staff.  It works in proximity to the President because the White House itself has established, through decades of practice and formal policy, that one of the "intended purposes" of the spaces closest to him is to enable the press to cover the President.  *See Perry Educ. Ass'n*, 460 U.S. at 46; *see also* Reporters Comm. Br. 7-10 (discussing the history of the Press Pool).  "Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs." *Price v. Garland*, 45 F.4th 1059, 1070-71 (D.C. Cir. 2022) (quoting *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011)).

The government confirmed that the White House has not abolished the Press Pool.  Oral Argument Tr. 69:13-18.  First Amendment questions as to how and why the government might replace the Pool with a different system for press access are not before us.  Nor is this a case of permissible restrictions

14

on expression within the Pool "based on subject matter [or] speaker identity." *Cf. Cornelius*, 473 U.S. at 806. Defendants identify nothing about the AP—apart from its own viewpoint expressed outside the forum—as disqualifying it from the Press Pool. What the government seeks to defend here is the exclusion of one news outlet based on its disfavored viewpoint.

Defendants insist that applying forum analysis here is "startlingly counterintuitive," because the Press Pool convenes in "intimate spaces" that are "restricted" and function as "the personal office space" of the President. Stay Mot. 13. As discussed above, even apart from forum analysis, the White House is barred from denying benefits based on the recipient's viewpoint expressed outside the program, so it is hardly startling that forum analysis leads to the same conclusion.

In any event, defendants offer no support for excepting the Press Pool from forum analysis. The fact that the Oval Office is generally closed to the public is simply another way of saying that it is "not by tradition or designation a forum for public communication," *i.e.* that it is a nonpublic forum. *Mansky*, 585 U.S. at 11 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46). Government office buildings are paradigmatic nonpublic forums. *Ateba*, 133 F.4th at 121-22. And the security restrictions applicable to the Oval Office do not alter the calculus. The entire White House is under tight security, but when spaces within are open to White House-credentialed journalists, exclusions are impermissible if "based upon the content of the journalist's speech." *Sherrill*, 569 F.2d at 129; *see also Ateba*, 133 F.4th at 122-23. That same principle applies when the Oval Office is open to the Press Pool.

Defendants' suggestion that the First Amendment is inapplicable because journalists' activities in the Press Pool are not communicative, *see* Stay Mot. 14-15, is wrong as a factual

15

and legal matter. As for the facts, the district court found that, when journalists are in the Press Pool, they consistently engage in "near-instantaneous" communication with editors, other reporters, and (by extension) the broader public when in the Oval Office. *Budowich*, 2025 WL 1039572, at *11. The government makes no clearly-erroneous challenge to that finding.

The law, too, is on the AP's side in treating newsgathering as communicative. Defendants rely on *Price v. Garland*, which held public forum analysis inapplicable to a restriction on filmmaking in public parks insofar as the restriction applied to the noncommunicative act of taping the film for potential future screening. 45 F.4th at 1069-71. But *Price* itself distinguishes its facts from newsgathering. It disclaims the applicability of its holding to "[g]athering information about government officials in a form that can readily be disseminated to others"—that is, "news-gathering." *Id*. at 1070-71, 1075 (formatting altered); *see also id.* at 1071 n.*** (noting that "[f]orum analysis may well apply to live streaming, which is communicative activity, albeit to people who are not necessarily located in the forum in which the streaming is conducted.").

More to the point, even as *Price* declined to apply *public* forum analysis to filmmaking that it deemed "noncommunicative," it applied the *nonpublic* forum standard that the AP relies on here, confirming that any "restriction *must not discriminate against speech on the basis of viewpoint*, and the restriction must be reasonable in light of the purpose served by the forum." *Id*. at 1072 (emphasis added) (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001)); *see also id.* at 1076 (Henderson, J., concurring). The same is true of *Bryant v. Gates*, on which the majority also relies, Maj. at 19. 532 F.3d 888, 897 (D.C. Cir. 2008) (noting that a

16

military newspaper's advertising section that rejected plaintiff ads was a "nonpublic forum" for which restrictions on speech "need only be reasonable in light of the purposes of the forum *and viewpoint-neutral*.") (emphasis added).  Both *Price* and *Bryant* affirmatively support the AP's claim that the government's action to suppress its viewpoint violates the First Amendment.

Contrary to defendants' suggestion, forum analysis does not require the intended audience to be "physically present in the putative forum."  Stay Mot. 14.  *See* Maj. at 17 (similarly suggesting that forum analysis does not apply when the expressive activity is directed "outside the forum").  The importance of free expression via radio, broadcast, and—increasingly—digital communication confirms why applying a "physical presence" requirement to forum analysis would be nonsensical and arbitrary.  The Supreme Court in *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666 (1998), used forum analysis to consider a candidate's claim of exclusion from a debate on public television even though its audience was doubtlessly not limited to people "physically present in the putative forum."  *Id*. at 676.  What is more, neither the government nor the majority makes any effort to explain how, if newsgathering in the Oval Office is directed "outside the forum," the same is not equally true of the admittedly protected activity of the broader press corps in places like the Brady Briefing Room.  They cannot square viewpoint-based prohibitions on uses of digital media on government property with the First Amendment.

Defendants' (and the majority's) principal argument is that the President has unlimited discretion to pick "which journalists to grant special access unavailable to other members of the press corps."  Stay Mot. 16.  Their sole precedent is *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006),

17

which is both inapposite and not binding on this court.  The
plaintiff journalists in *Baltimore Sun* objected to government
officials' refusal to grant them interviews or return their calls.
*Id*. at 413.  Judicial relief would have required the defendants
to speak with certain reporters.  Any such command would
have strained the basic principle that "[t]he First Amendment's
Free Speech Clause does not prevent the government from
declining to express a view," and that the government may
choose for itself "what to say and what not to say."  *Shurtleff v.
City of Boston*, 596 U.S. 243, 251 (2022); *see also Pleasant
Grove City*, 555 U.S. at 467 ("A government entity has the right
to 'speak for itself.'") (quoting *Bd. of Regents of Univ. of Wis.
Sys. v. Southworth*, 529 U.S. 217, 229 (2000)).

The AP does not assert a right to have the President return
its phone calls, or to "interact and speak with government
officials."  *See Budowich*, 2025 WL 1039572, at *12-13.  What
the AP challenges is its reporters' and photographers'
exclusion from a government program for which it is otherwise
fully eligible and has long participated, based solely on the
AP's own expression in its Stylebook and reporting.  The
district court assumed that "government officials cannot be
forced to speak with reporters," but distinguished Press Pool
participation from the individualized invitations to interview
the President or other government officials at issue in
*Baltimore Sun*.  *Id*. at *13.  Unlike invited interviews that
"would not happen but for the outlet's presence," the Press
Pool covers events that "would happen whether any particular
outlet had a reporter there or not."  *Id*.  The district court also
noted that Press Pool members are often at a distance that
prevents them from having interview-like "substantive
conversation[s]" with officials the Pool covers.  *Id*.  Moreover,
when the President decides whom to call back or invite in for
an exclusive interview, he is engaged in government speech
and choosing who to employ in expressing his message.  That

18

government speech function is simply not at issue here, and defendants have properly disavowed that their exclusion of the AP turns on any government speech. The fact that one need not return every press call does not mean one can exclude journalists from general newsgathering opportunities based on their disfavored views outside the program.

The defendants do not engage with those distinctions but sweep them aside to assert a legal prerogative of unprecedented breadth. In their view, "when the President deals with the press, he is permitted to consider the nature of a journalist's coverage in deciding how much access to give them." Stay Mot. 19. But the "access" to interview government sources in *Baltimore Sun* should not be conflated with "access" to forums on government property that are established to enable journalists to report on the government's activities. We have held that the White House may not deny those reporters *that* "special access" solely because they dislike the reporters' viewpoints. *Sherrill*, 569 F.2d at 129; *see Ateba*, 133 F.4th at 121-23. The Seventh Circuit in *John K. MacIver Inst. for Pub. Policy, Inc. v. Evers*, 994 F.3d 602 (7th Cir. 2021)—an out-of-circuit case that, unlike *Baltimore Sun*, is directly relevant to the issue before us—recognized the same distinction when it held that the Wisconsin governor's limited-access press conferences (unlike individual interviews) were nonpublic forums as to which viewpoint discrimination was constitutionally prohibited. *Id*. at 607, 610.

My colleagues further reason that the President has an unlimited power to allocate necessarily restricted benefits like Press Pool membership, and that the Press Pool's activities are sufficiently closely related to government speech to lose independent First Amendment protection. Maj. at 17-19. Both steps of that analysis are off base. The limited size of the Press Pool does not open the door to viewpoint-based selection.

19

Contrary to my colleagues' characterization of *Finley*, Maj. at 17-18, even when analyzing the limited set of grants at issue there, the Supreme Court acknowledged that would have been a "different case" if the government engaged in "invidious viewpoint discrimination" in its allocation of arts grants. 524 U.S. at 586-87. And, while my colleagues suggest that forum analysis is inapplicable because the AP's activities somehow "involve" government speech, Maj. at 19, the government itself disavows reliance on government speech—for good reason. The Supreme Court has expressly warned against such "dangerous misuse" of the government speech doctrine: "If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal*, 582 U.S. at 235 (Alito, J., delivering the opinion of the court). The AP's references to the Gulf of Mexico speak only for the AP, not the government.

The majority's characterization of the Press Pool is also problematic because it seems equally applicable to the entire White House press corps, which we have squarely held is protected from viewpoint discrimination. The press corps, like the Pool, is a select subset of journalists seeking to gather news and engage in nongovernmental expression in a manner that, by the majority's terms, apparently "involves" the government's efforts to communicate to the public. But my colleagues duck the question whether their position applies to access to other White House spaces like the East Room. Maj. at 26. Their attempts to distinguish the Brady Room are also contrary to precedent, as they seem to rest either on arbitrary numerical cutoffs or the notion that a space must be opened "for purposes of providing a forum for expressive activity" to merit First Amendment protections—a prerequisite the Supreme Court has expressly disavowed for nonpublic forums. *Cornelius*, 473 U.S. at 805; *cf.* Maj. at 11, 18-19.

20

None of this analysis rests on any affirmative right of AP reporters to be present in the Oval Office. Plaintiffs do not argue that the White House is constitutionally obliged to operate a Press Pool, any more than the government in *Cornelius* was required to organize the Combined Federal Campaign for charitable fundraising, the school district in *Perry Education Association* was required to establish an internal school mail system, or the television station in *Arkansas Educational Television Commission* was required to host a candidate debate. But once the government chooses to permit a forum for private expression in a government-controlled space, the First Amendment forbids viewpoint-based restrictions on who may participate. That is why neither government counsel nor my colleagues cite a single case permitting viewpoint-based exclusion from nonpublic forums—or, indeed, any case permitting the government to condition a government benefit on a private recipient's viewpoint expressed outside the government funded program. Defendants have not shown a "strong likelihood" under existing precedent that they will succeed on the merits, as they must do to establish entitlement to a stay pending appeal of the district court's injunction.

## C.

The government's defense against the retaliation claim is unlikely to succeed for all the same reasons. The majority concludes that the AP suffered no retaliation because its exclusion from the Press Pool was "not a materially adverse action" for First Amendment purposes. Maj. at 22. The majority reasons that the government did not impose a punishment on the AP or deprive it of property, and so no retaliation occurred. But as discussed above, the exclusion was retributive, and in any event the First Amendment prohibits even the denial of wholly discretionary support or benefits in

21

retaliation for a recipient's exercise of speech rights outside the supported activity or program.

When an organization accepts government support— including support to advance the government's message—the government cannot condition it on viewpoint-based restrictions on private recipients' independent speech. Thus, the government could not deny HIV/AIDS prevention funding to Alliance for Open Society based on that group's viewpoint, even though the Alliance had no independent right to receive government funding for such activity. *Agency for Int'l Dev.*, 570 U.S. at 218. It could require recipients of Title X funding to refrain from abortion advocacy in the Title X program itself, but could not impose viewpoint restrictions on recipient organizations' "separate and independent" activities. *Rust*, 500 U.S. at 196-97. Artists have no freestanding "right" to government funding by the National Endowment for the Arts, nor does the Corporation for Public Broadcasting have any independent "right" to government support. But in each instance, denying such benefits based on the recipients' viewpoints would violate the First Amendment, especially where those views were expressed outside the government benefit altogether as the AP's were here. The majority's novel contention that speech-based retaliation claims require a deprivation of a property right or infringement of a liberty interest are directly at odds with the principles outlined in *Agency for International Development, Rust v. Sullivan, FCC v. League of Women Voters,* and *NEA v. Finley*.

My colleagues seek to analogize the AP's treatment to that suffered by the plaintiff in *Houston Community College System v. Wilson*, 595 U.S. 468 (2022). But in *Wilson*, an elected official received only a "purely verbal censure" in response to his expression. *Id*. at 475. Nobody disputes that the White House may, in its own speech, criticize the AP's viewpoint.

22

But excluding the AP from even a wholly discretionary federal benefit goes far beyond that.

## III.

Defendants have also failed to demonstrate the second "critical" *Nken* factor—that they will suffer irreparable harm absent a stay. 556 U.S. at 434. The district court's preliminary injunction forbids exclusion of the AP's journalists "based on the AP's viewpoint when such spaces are made open to other members of the White House press pool." *Budowich*, 2025 WL 1039572, at *19. The district judge observed that the "defense has not argued that an injunction would affect [the President's] constitutional authority in any way." *See id.* at *19 n.9.

Defendants assert they are harmed because the injunction "restricts the White House's discretion from making its own judgments about whom it will admit into some of the most restricted spaces on the planet." Stay Mot. 21-22; *see* Stay Reply 9 (asserting that "the President has been forced to relinquish control over who may enter the Oval Office"). But it is the White House staff, not the members of the Press Pool, who decide when the Pool reports from the Oval Office. And the injury as defendants define it would seem to flow from the presence of unaligned reporters anywhere in the White House. Yet our circuit's precedent is clear that viewpoint-based restrictions on White House press access to other areas violate the First Amendment. *Sherrill*, 569 F.2d at 129. We have so held even though we thereby restrict the White House's discretion over places under the highest levels of government control. Inherent in the notion of forum analysis is that, when it permits the use of public resources for private expression, the government cannot exclude selected private speakers whose views it dislikes.

23

Counsel for the government belatedly argued that the presence in the Oval Office of journalists with disfavored viewpoints irreparably harms the President's "dignity" or "autonomy." Oral Argument Tr. 28-29, 70-71. In a similar vein, my colleagues assert that barring viewpoint discrimination against Press Pool members impairs Executive "independence." Maj. at 1, 26. But the effect of the preliminary injunction is confined to disabling defendants from "suppress[ing] expression merely because public officials oppose the speaker's view." *Mansky*, 585 U.S. at 12 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46). The uncontested record evidence establishes that every President since at least Eisenhower has endured the only real-world injury asserted by the government here: the proximity on government property of some member of the press associated with a view the President disfavors. That "injury" is ubiquitous and inescapable in every single public official's engagement in the rough and tumble of the political arena. The notion that any public official—let alone the President of the United States—could be irreparably harmed by attendance within the Press Pool of the carefully vetted, nondisruptive journalists who work for the AP is extraordinary.

Finding irreparable harm to Executive dignity, autonomy, or independence in the context of this case so attenuates *Nken*'s irreparable harm factor as to nullify it in cases in which the Executive seeks a stay. I cannot credit such a novel and amorphous approach to the requirement of a showing of irreparable harm.

**IV.**

The balance of equities and the public interest also disfavor staying the district court's injunction. As the district court correctly found, the AP suffers irreparable injury when it

24

is excluded from press events because of its viewpoint. "The loss of First Amendment freedoms, for even minimal periods of time," constitutes irreparable harm when the plaintiff "demonstrates that First Amendment interests are either threatened or in fact being impaired at the time relief is sought." *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (Thomas, J.) (formatting altered). And the AP is also suffering significant competitive harms as its exclusion undermines its position in the global media market. In its stay motion, the government did not dispute the district court's conclusion that those losses, too, are likely to be irreparable. *See Budowich*, 2025 WL 1039572, at *18.

The public interest also overwhelmingly favors press outlets' ability to report on public officials, including the President in the Oval Office, without the government punishing some and thereby chilling others into self-censorship if they use words that politicians dislike. The harm of publicly punishing disfavored viewpoints "does not end" with an individual target but extends "to other pillars of our constitutional order" who thereby learn "they engage in protected activity at their peril." *Jenner & Block LLP v. U.S. Dep't of Justice*, No. 25-916, __F. Supp. 3d__, 2025 WL 1482021, at *23 (D.D.C. May 23, 2025) (formatting altered).

"Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the [F]irst [A]mendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." *Sherrill*, 569 F.2d at 129-30. That is why the Supreme Court recognized that "news gathering is not without its First Amendment protections," and that "[o]fficial harassment of the press . . . to disrupt a reporter's relationship with his news sources would have no justification." *Branzburg*

25

*v. Hayes*, 408 U.S. 665, 707-08 (1972).  Even Newsmax, a media outlet not known for criticizing President Trump, joined with scores of news outlets to express dismay at the AP's ban because "a future administration may not like something Newsmax writes and seek to ban us."  Reporters Comm. Br. 5.

The First Amendment recognizes press freedom as vital to an informed citizenry.  Constitutional protection of news organizations from official punishment for what they say is essential to "the free discussion of governmental affairs" that the public relies on to "effectively participate in and contribute to our republican system of self-government."  *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 604 (1982) (formatting altered).  The central function of press freedom is fatally weakened when the government bullies press outlets into compliance by depriving them of otherwise available forums for expression based on their viewpoint.  The public interest is powerfully served by the district court's order preliminarily enjoining defendants' undisputedly viewpoint-based punishment of the AP.

## V.

In granting a stay, my colleagues assert a novel and unsupported exception to the First Amendment's prohibition of viewpoint-based restrictions of private speech—one that not even the government itself advanced.  And they accept an equally unprecedented notion of harm to presidential "independence" when professional journalists are "permit[ted] to observe him" from the Press Pool despite the President's disagreement with something their news organization published.  Stay Mot. 1, 22.

Make no mistake as to why it matters that the panel majority accepts these theories.  In the short term, the court allows the White House to rely on viewpoint to exclude the AP

26

from the Press Pool pending a final decision on the merits, a process that typically takes months. And, looking further ahead, if any merits panel were to accept those theories, the result would be a Press Pool—and perhaps an entire press corps—limited during Republican administrations to the likes of Fox News and limited to outlets such as MSNBC when a Democrat is elected. More to the point, if the White House were privileged to exclude journalists based on viewpoint, each and every member of the White House press corps would hesitate to publish anything an incumbent administration might dislike. Factually accurate journalism unflattering to the incumbent administration would not long endure.

The press corps and its avatar Press Pool were established and preserved for generations to foster the objective coverage of the United States presidency that has been a defining element of our constitutional democracy. The Press Pool is one of the most consequential forums for national political news reporting. And the AP is a respected and established wire service that functions as a vital source of news for a daily domestic and international audience of billions of readers, including countless news organizations at home and around the world that rely on the AP's coverage. The First Amendment undeniably protects the AP's right to its own opinion. Yet the White House has defiantly conditioned the AP's participation in the Press Pool on the organization's endorsement of the President's official decision to rename the Gulf of Mexico as the Gulf of America. Purporting to respect the First Amendment while allowing exclusion of journalists from the Press Pool based on viewpoint will quickly erode the

27

independence of any press outlet hoping to retain the chance to cover the White House at close range.

In my view, the government does not come close to establishing entitlement to a stay. I therefore respectfully dissent.