# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ASSOCIATED PRESS,

Plaintiff-Appellee,

v.

TAYLOR BUDOWICH, in his official capacity as White House Deputy Chief of Staff; KAROLINE C. LEAVITT, in her official capacity as White House Press Secretary; and SUSAN WILES, in her official capacity as White House Chief of Staff,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

# GOVERNMENT'S RESPONSE TO
# EMERGENCY PETITION FOR REHEARING EN BANC

YAAKOV M. ROTH
*Principal Deputy Assistant
Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
STEVEN A. MYERS
*Attorneys, Appellate Staff
Civil Division, Room 7232
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 305-8648*

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................1

BACKGROUND .................................................................2

ARGUMENT .......................................................................5

I.   The Motions Panel Correctly Rejected The AP's First
     Amendment Claims.......................................................5

II.  The Motions Panel Correctly Determined That The
     Remaining Equitable Factors Favor The Government. ................19

CONCLUSION ...................................................................21

CERTIFICATE OF COMPLIANCE

# INTRODUCTION

More than 1300 journalists regularly cover the White House. Just as the President cannot possibly grant interviews to all of them on equal terms, there is not sufficient space in the Oval Office or aboard Air Force One to accommodate the entire press corps when the President invites journalists into these highly restricted spaces. Relying on ample precedent, the historical record, and the Associated Press (AP)'s candid concessions at oral argument, the motions panel correctly held that the First Amendment does not prohibit the President from considering viewpoint when deciding which journalists will receive these limited opportunities.

As the panel recognized, the AP conceded at argument on the stay motion that the President may "invite his favorite twenty journalists into the Oval on a viewpoint basis" because, when he does so, "he's inviting people" rather than "excluding people." Stay.Arg. 1:13:05-1:13:20. That concession makes sense, because the historical record is clear that elected officials, including Presidents, "frequently and without liability evaluate reporters and reward them with advantages of access." *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 417-18 (4th Cir.

2006).  But the AP's concessions also "give away the game," Stay.Op. 18,

because they underscore that the President may condition access to

journalists—whether framed as exclusion or inclusion—based on

considerations that might be protected by the First Amendment in

different contexts.  And that is most obviously true when the access at

issue concerns the Oval Office and Air Force One, spaces over which the

Constitution grants the President "absolute control and discretion."

Stay.Op. 13.

The panel's partial stay merely allows the President to exercise

discretion over some of the most restricted areas in the White House,

Air Force One, and the President's personal residence during the

pendency of this appeal.  The Court should deny the AP's petition for

rehearing en banc.

## BACKGROUND

1.    More than 1300 journalists report on the White House with

such regularity that they hold "hard passes" permitting them to enter

the White House press areas (including the briefing room and office

space) on demand.  Dkt. No. 33-1, ¶¶ 3-4.  The AP's access to these

spaces has not changed.  Dkt. No. 46, at 12 (D.Ct.Op.).  Nor has its

access to other facilities, information, or opportunities "open to all bona fide Washington-based journalists."  *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) (footnote omitted).

This case is instead about discretionary access that is sometimes provided to a tiny portion of the press corps.  In particular, the White House sometimes admits small groups of journalists into restricted spaces like the Oval Office, Air Force One, and Mar-a-Lago.  Given space and security constraints, only a miniscule fraction of the press corps (13 journalists on Air Force One or 21 journalists in the Oval Office) may be admitted at any time.  This smaller group of journalists is traditionally referred to as the "pool."  *See* D.Ct.Op. 2-4.

Before February 25, 2025, the pool was selected by the White House Correspondents' Association, a private organization that provided the AP two guaranteed spots even as nearly all other media outlets only occasionally participated.  D.Ct.Op. 4.  On February 25, 2025, however, the White House announced that prospectively, "the Government—not the [Correspondents' Association]—would now choose which hard pass holders gained access to the press pool."  D.Ct.Op. 5.

As the district court observed, the "AP does not challenge the Government's decision to take control of this process." D.Ct.Op. 5 n.2.

2.      On February 11, 2025, the White House stopped permitting the AP to participate in pool events based on its refusal to refer to the Gulf of America, as opposed to the Gulf of Mexico, in its stylebook and reporting. The AP sued, and the district court entered a preliminary injunction prohibiting the White House from excluding the AP based on viewpoint. *See* D.Ct.Op. The crux of the district court's reasoning was that once the President began permitting journalists to enter spaces like the Oval Office, he created a nonpublic forum in which viewpoint discrimination was impermissible. *See* D.Ct.Op. 20-32. The court also found that the government's actions constituted unlawful retaliation. *See* D.Ct.Op. 32-36.

3.      The government sought a stay pending appeal, which the motions panel substantially granted. *See* Stay.Op. The Court held that "the spaces to which the AP seeks access are not any type of forum." Stay.Op. 8. Instead, the fact that the President sometimes invites journalists into core presidential spaces was insufficient to create a forum, as any communication in which journalists engage from those

spaces has "little if any nexus to the restricted spaces in which it occurs." Stay.Op. 15. The Court further found that the AP was unlikely to succeed on its retaliation claim, relying on the history of journalists "jockey[ing] for access to certain privileged spaces and to senior administration officials." Stay.Op. 23. Finally, the remaining stay factors favored the government because the injunction intruded on the President's Article II prerogatives, whereas the AP "may continue to exercise its free speech rights in other spaces" and any financial injury "does not … justify an intrusion on presidential prerogatives." Stay.Op. 25. The Court thus stayed the injunction as to "the Oval Office, Air Force One, Mar-a-Lago, and other similar spaces." Stay.Op. 26. Judge Pillard dissented.

## ARGUMENT

### I. The Motions Panel Correctly Rejected The AP's First Amendment Claims.

**A.** The AP's theory rests on the extraordinary premise—never accepted by any other court of appeals—that the personal workspace of the President is subject to garden-variety forum analysis. *See* Pet. 7-12. That premise is mistaken, for "restricted presidential spaces are not First Amendment fora opened for private speech and discussion."

5

Stay.Op. 1.  While the President sometimes chooses to admit journalists to such spaces, he has not relinquished his absolute discretion to determine who should be admitted.

At the outset, forum doctrine concerns restrictions on expressive activity, not "activities that, even if generally protected by the First Amendment, are not communicative." *Price v. Garland*, 45 F.4th 1059, 1070 (D.C. Cir. 2022); *see American Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 364 (D.C. Cir. 2018) ("Our analysis of *a restriction on speech* on government property begins with the forum doctrine." (emphasis added)).  But this case is about restrictions on physical access, not speech.  And courts "should not 'extend[] the public forum doctrine in a mechanical way to contexts that meaningfully differ from those in which the doctrine has traditionally been applied.'"  Stay.Op. 8 (alteration in original) (quoting *Price*, 45 F.4th at 1068).

The AP observes that its journalists communicate with their editors in real time from presidential spaces.  Pet. 9-10.  But if the ability to send emails were sufficient to create a forum, every governmental space would be subject to forum analysis.  Such a theory would presumably prohibit the White House from selecting political

allies to attend a bill signing or a State of the Union address, so long as invited guests could post on social media.  That result is obviously wrong, and this Court should not adopt a "rule that would turn any government space in which smart phones or computers are allowed into a nonpublic forum simply because individuals can communicate with the outside world."  Stay.Op. 17.[1]

Even if forum analysis were relevant to non-expressive activity in ordinary cases, there would still be no basis for analyzing the unique spaces at issue here under the rules that apply to parks, sidewalks, and government office buildings, *contra* Pet. 10-11.  As the Supreme Court has recognized, some "government properties" are "not fora at all." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). That category includes secure and limited-capacity spaces reserved for the President's exclusive use.  Such spaces bear no resemblance to the places to which courts have applied forum analysis, where the

---

[1] Though *Price* reserved on whether livestreaming might transform a space into a forum, *Price*, 45 F.4th at 1071 n.***; *see* Pet. 10, forum analysis should not hinge on whether information is shared immediately or after a delay.  And while *Price* did not concern newsgathering, *see* Pet. 9, it arose in a context, unlike this one, where "the government generally had opened the parks to the public for commercial uses."  Stay.Op. 17 n.7.

government permits the use of its property to "encourage a diversity" of private speakers' views. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 834 (1995). Forum analysis is inapplicable where, as here, a government actor designates private individuals to witness a presentation that the government designs and controls. *See id.* at 833-34. The President may therefore take the same reasonable measures that a private party might pursue in comparable circumstances to ensure that "[his] message is neither garbled nor distorted." *Id.* at 833*; cf.* Stay.Op. 19 (noting that the "messages conveyed in the Oval Office are government speech and opportunities for the President's administration to express its message."). The point is not that the AP is a "channe[l] of communication" that the President controls, Pet. 12, but that the threshold choice of whom to admit into the Oval Office in the first place is constitutionally reserved for the President.

Nor is this argument in tension with *Ateba v. Leavitt*, 133 F.4th 114 (D.C. Cir. 2025), which considered a journalist's claim regarding "hard pass" access. *But see* Pet. 10. The space at issue in *Ateba* was the press area, which is open to any journalist who satisfies the hard-pass

eligibility criteria. That space fundamentally differs from far more restricted spaces intended for the President's exclusive use.

**B.** Irrespective of how forum analysis might apply to presidential spaces as a general matter, in the journalism context, it is well established that government officials may consider any factors they wish when deciding whom to call on, whom to provide exclusive interviews, and whom to grant discretionary access unavailable to other members of the press corps. That basic insight explains why if "President Trump sits down for an interview with Laura Ingraham, he is not required to do the same with Rachel Maddow." Stay.Op. 12. And it is why the AP expressly conceded that the President may invite "his five favorite journalists," or even "his favorite twenty journalists into the Oval on a viewpoint basis." Stay.Arg. 1:11:53-1:13:25; *see* Stay.Arg. 1:14:58-1:15:03 ("He can pick a couple of people and say, follow me for the day, absolutely."). As the motions panel observed, those concessions "give away the game." Stay.Op. 18.

*Ehrlich*, 437 F.3d 410, is particularly instructive. There, the Governor of Maryland instructed his staff not to speak with reporters he believed were "failing to objectively report" on his administration.

9

*Id.* at 413 (quotation marks omitted). In a unanimous opinion rejecting the newspaper's First Amendment claims, the Fourth Circuit explained that there is a "common and widely accepted practice among politicians of granting an exclusive interview to a particular reporter" and an "equally widespread practice of public officials declining to speak to reporters whom they view as untrustworthy because the reporters have previously violated a promise of confidentiality or otherwise distorted their comments." *Id.* at 418 (quoting *Snyder v. Ringgold*, 133 F.3d 917, 1998 WL 13528, at *4 (4th Cir. Jan. 15, 1998) (per curiam) (unpublished)). Indeed, the newspaper conceded that "government officials frequently and without liability evaluate reporters and reward them with advantages of access—i.e., that government officials regularly subject all reporters to some form of differential treatment based on whether they approve of the reporters' expression." *Id.*

What is true for a single state's governor is especially true for the President, in whom the Constitution vests "all" of "the 'executive Power.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (citation omitted). No less than the Governor of Maryland, the President "seeks to wield power to accomplish his goals for the people" and will

accordingly "try to use the press to his best advantage and to avoid those situations that aren't to his advantage." President Ronald Reagan, Remarks at the Annual White House Correspondents Association Dinner, 1 Pub. Papers 497, 497 (Apr. 21, 1988).[2]

Although the AP has conceded that the President may *invite* "his five favorite journalists," or even "his favorite twenty journalists into the Oval on a viewpoint basis," Stay.Arg. 1:11:53-1:13:25, it contends that an entirely different rule applies when the President *excludes* journalists. *See* Stay.Arg 1:13:05-1:13:20 (distinguishing between "excluding people" and "inviting people"). That distinction is illusory: given space constraints, whenever one journalist is invited, another must be excluded. It is also immaterial, since whether the President is inviting someone or excluding someone, he is doing so on the basis of the same considerations. In any case, since February 25, the White House alone has decided which journalists to invite into the pool; it is not removing the AP from a list generated by the Correspondents'

---

[2] Other First Amendment principles reinforce that conclusion. For example, the government may make viewpoint-based judgments in appointing senior "policymaking" officials. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 70 (1990). And "when the State is the speaker, it may make content-based choices." *Rosenberger*, 515 U.S. at 833.

Association, a private organization that no longer plays any role regarding the pool. *See* D.Ct.Op. 4-5; Stay.Op. 2-3. As the stay panel observed, the viewpoint-based invitations that the AP has conceded are lawful "cannot be distinguished from so-called press pool events, which are at bottom small press availabilities with the President." Stay.Op. 18.

The AP also suggests that *Ehrlich* is distinguishable because it concerns interviews instead of physical access. *See* Pet. 13. Yet that distinction lacks constitutional significance. As the cases make clear, the President may consider the nature of a journalist's coverage in deciding how much access to give him because that is part of the ordinary interplay between elected officials and journalists. There is no logical reason why the form of access (*i.e.*, verbal or physical) should matter. Indeed, given the parties' agreement that the President has no obligation to speak to the reporters he admits into the Oval Office or Air Force One, it would disserve both the public and the government to require him to admit a journalist to whom he has no intention of speaking.

Finally, the AP's position is deeply ahistorical, for there is a long tradition of Presidents considering viewpoint when deciding which journalists will receive discretionary access to people, information, and spaces. For most of American history, "no defined press group covered the White House." Stay.Op. 23. Instead, "Presidents decided which journalists received privileged access, and the type and frequency of access varied by administration." *Id.*

To take just a few examples, President Washington selected, based on political considerations, the newspaper that would print his Farewell Address. *See* Harold Holzer, *The Presidents vs. The Press: The Endless Battle Between the White House and the Media—from the Founding Fathers to Fake News* 16 (2020). President Jefferson "encouraged the establishment of a new gazette … that would remain reliably favorable to his administration"; its "reward would be first access to official news." *Id.* at 39. President Theodore Roosevelt "picked and chose those he would allow to attend [off-the-record Oval Office press briefings]; he used the conference as an occasion for reward and punishment, screening out the reporters who were the least likely to be sympathetic to his policies." Blaire Atherton French, *The Presidential*

*Press Conference: Its History and Role in the American Political System*
3 (1982).  Indeed, President Roosevelt warned reporters that if they
were to "violate a confidence or publish news that the President thought
ought not to be published," then "he should be punished by having
legitimate news withheld from him."  Holzer, *supra*, at 100 (quotation
marks omitted).

Although President Wilson initially determined that "all
accredited reporters should have equal access" to press conferences,
French, *supra*, at 4, he later "reduced access for Washington
correspondents" while "remain[ing] available for one-on-one interviews
with friendly journalists," Holzer, *supra*, at 130.  President Hoover
"screened out reporters whose stories he did not like."  Carolyn Smith,
*Presidential Press Conferences: A Critical Approach* 31 (1990).
President Kennedy sought to "court star correspondents" and thus gave
certain reporters "special access" and "advance notice of administration
announcements."  Holzer, *supra*, at 213.  And President Johnson "tried
to use personal interviews as a means of reward and punishment."
French, *supra*, at 18.

After *Newsweek* printed an unflattering cover calling him a "wimp," Vice President George H.W. Bush's staff "cut off all communications with *Newsweek* until a summit could be arranged at the vice president's Washington residence." Holzer, *supra*, at 325. President Obama appeared on "five different Sunday talk shows" to promote the Affordable Care Act in 2009, but he refused to appear on *Fox News Sunday* as an "act of revenge" for Fox's refusal to broadcast a speech that he had made to Congress two weeks earlier. *Id.* at 379. The administration later arranged for "pay czar" Kenneth Feinberg to refuse to appear on Fox News even as he appeared on all other networks. *Id.* at 380. It also "excluded Fox News from … a series of White House and CIA backgrounders on the September terrorist attack against the U.S. Consulate at Benghazi." *Id.*

To be sure, the White House did not win all these confrontations. After other television networks refused to interview Feinberg unless Fox could participate, the Obama administration relented. *See Administration Loses Bid to Exclude Fox News from Pay Czar Interview*, Fox News (Oct. 23, 2009), https://perma.cc/S6A9-DRDW. And after President Theodore Roosevelt sought to punish a reporter for reporting

on his sons' pursuit of a turkey across the White House lawn, the reporter's "friends went to his rescue," providing him "all news of the executive end of the Government." J. Frederick Essary, *Covering Washington: Government Reflected to the Public in the Press 1822-1926*, at 94 (1927). Eventually, the order "was forgotten by administration officials." *Id.* But while these clashes have ended in a variety of ways, they have generally been resolved in the "'rough and tumble' political arena," *Ehrlich*, 437 F.3d at 419, not federal court.

C.     The AP's approach risks constant, sensitive compliance litigation. *See* Stay.Op. 20. When journalists are not selected to participate in the pool, they will demand that the White House justify their exclusion. Courts will then be asked to make findings on the actual motivation for such decisions—inevitably generating serious discovery disputes about how to discern the state of mind of senior White House officials. Such judicial inquiries are "highly intrusive," which is why in other contexts "courts may not inquire into the President's motives." *Trump v. United States*, 603 U.S. 593, 618-619 (2024). To avoid a deluge of First Amendment litigation, a President would have only two choices—shut the doors to the media or cede all

authority to an outside organization like the Correspondents' Association. Either way, the AP's rule would strip the White House of authority to "determine for itself which journalists to admit to the Oval Office and other similar spaces for presidential events." Stay.Op. 24. Such a rule fails to accord appropriate respect to the Executive Branch, has no basis in history or tradition, and is sure to entangle the judiciary in vexing litigation. At a minimum, there is no reason to second-guess the panel's determination not to countenance this state of affairs during the pendency of this appeal.

**D.** The AP's claims equally fail when analyzed through a retaliation lens. Only "material" adverse actions "give rise to an actionable" claim of retaliation. *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The White House's decision not to grant the AP special access to the President's personal spaces does not rise to that level, particularly given "the relationship between speaker and [alleged] retaliator and the nature of the government action in question." *Id.* at 478. Instead, choosing whom to invite into highly secure presidential spaces "is more akin to a decision about how the President wields the bully pulpit." Stay.Op. 22.

As *Ehrlich* makes plain, competition among journalists for access is how modern media and government function.  Indeed, *Ehrlich* itself involved retaliation claims, and its holding is that a journalist operating in a competitive media environment understands that competing for access is part of the job.  *See* 437 F.3d at 417-18.  The stay panel similarly recognized that journalists "daily jockey for access to certain privileged spaces and to senior administration officials" and that "viewpoint-based preferences occur at every level of government in the relationship between elected officials and the press."  Stay.Op. 23.

These background principles explain the AP's concession at oral argument that the President may lawfully cancel a "one-on-one scheduled with a favored reporter" if the reporter "says something the President doesn't like."  Stay.Arg. 1:15:09-1:16:35.  That concession is correct, but it is irreconcilable with the AP's current insistence that the Constitution universally prohibits conditioning "discretionary support or benefits" on viewpoint-related factors, no matter the context.  *See* Pet. 12 (quotation marks omitted).

## II. The Motions Panel Correctly Determined That The Remaining Equitable Factors Favor The Government.

The AP is also wrong on the equitable factors. Its principal contention is that its First Amendment injury is irreparable harm per se, Pet. 14, but that abstract harm, which simply restates the AP's flawed merits theory, hardly justifies the extraordinary remedy of en banc review of a stay decision. Any other harms that the AP is experiencing, *see* Pet. 15, are no greater than those suffered by any other media outlet that lacks a guaranteed presence in the press pool. It is true that the Correspondents' Association previously granted the AP privileged status, but "that arrangement had no First Amendment status" and "the AP cannot adversely possess a seat in the Oval Office, no matter how long its tradition of access." Stay.Op. 23.

On the other side of the ledger, the preliminary injunction intrudes upon "the Executive Branch's interests in maintaining the autonomy of its office." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 385 (2004). This Court has already alluded to the "serious separation-of-powers concerns that would be raised by a statute mandating disclosure of the President's daily activities," *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 216 (D.C. Cir. 2013), and those concerns are

significantly exacerbated by a judicial order governing whom the President must permit to observe him while those activities are occurring in real time. As the stay panel observed, the "President's discretion to choose with whom he will speak and travel is part of" his constitutional authority. Stay.Op. 25.

To be clear: there is unquestionably value (to both the President and the public) in the media being able to report on the President's public events, *see* Pet. 15, but such coverage will continue irrespective of whether the AP provides it from inside or outside the Oval Office. The President is the most covered public figure on the planet, and he will remain so no matter how this litigation is resolved.[3]

---

[3] Finally, the AP suggests that the preliminary injunction preserves the last uncontested status quo. Pet. 16-17. That contention depends entirely upon how the last uncontested status quo is defined. *See United States v. Texas*, 144 S. Ct. 797, 798 n.2 (2024) (Barrett, J., concurring) (noting that status quo "is a tricky metric, because there is no settled way of defining the status quo" (quotation marks omitted)). Here, before the dispute arose, the President enjoyed plenary power over whom to invite into the Oval Office or aboard Air Force One.

**CONCLUSION**

This Court should deny the petition for rehearing en banc.

Respectfully submitted,

YAAKOV M. ROTH
  *Principal Deputy Assistant*
  *Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney*
  *General*

MARK R. FREEMAN
DANIEL TENNY
 */s/ Steven A. Myers*
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8648*
  *Steven.A.Myers@usdoj.gov*

JUNE 2025

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this response satisfies the type-volume requirements set out in Rule 40(d)(3)(A) because it contains 3900 words. It was prepared using Microsoft Word in Century Schoolbook, 14-point font, a proportionally spaced typeface.

*/s/ Steven A. Myers*
Steven A. Myers