## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ASSOCIATED PRESS,

Plaintiff-Appellee,

v.

TAYLOR BUDOWICH, in his official capacity as White House Deputy Chief of Staff; KAROLINE C. LEAVITT, in her official capacity as White House Press Secretary; and SUSAN WILES, in her official capacity as White House Chief of Staff,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

## BRIEF FOR APPELLANTS

YAAKOV M. ROTH
  *Principal Deputy Assistant
    Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
STEVEN A. MYERS
  *Attorneys, Appellate Staff
  Civil Division, Room 7232
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-8648*

# CERTIFICATE AS TO PARTIES,
# RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

## A.    Parties and Amici

Plaintiff-appellee is the Associated Press.  Defendants-appellants are Taylor Budowich, in his official capacity as White House Deputy Chief of Staff; Karoline C. Leavitt, in her official capacity as White House Press Secretary; and Susan Wiles, in her official capacity as White House Chief of Staff.  The White House Correspondents' Association, the Reporters Committee for Freedom of the Press, the Center for American Rights, the Knight First Amendment Institute at Columbia University, and the State Democracy Defenders Fund participated as amici curiae in district court.

## B.    Rulings Under Review

The ruling under review (issued by Judge Trevor N. McFadden) is a memorandum opinion and order filed April 8, 2025, granting the Associated Press's motion for a preliminary injunction.  JA 387-427.  It is reported at 780 F. Supp. 3d 32.

## C. Related Cases

This case has not previously been before this Court or any court other than the district court. Undersigned counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

/s/ Steven A. Myers
Steven A. Myers

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION .......................................................... 3

STATEMENT OF THE ISSUE ................................................................. 4

STATEMENT OF THE CASE .................................................................. 4

    A.    Factual Background ...................................................... 4

    B.    District Court Proceedings ......................................... 10

    C.    Stay Proceedings In This Court And Compliance Proceedings In District Court .................................... 14

SUMMARY OF ARGUMENT .................................................................. 19

STANDARD OF REVIEW ....................................................................... 24

ARGUMENT ............................................................................................ 24

I.    The AP Cannot Succeed On The Merits Because The First Amendment Permits The White House To Consider The Content Of Journalists' Coverage When Providing Discretionary Access To The President In Restricted Spaces ....... 24

    A.    Restrictions On Physical Access To Sensitive Presidential Spaces Are Not Subject To Forum Analysis. ..................................................................... 25

    B.    The First Amendment Permits Government Officials To Consider Viewpoint When Granting Journalists Discretionary Access To Information, People, And Spaces. ..................................................................... 32

          1.     Precedent Makes Clear That Government Officials May Consider Journalists' Coverage When Providing Discretionary Access. ........................ 33

          2.     There Is A Long Historical Tradition Of Presidents Conditioning Discretionary Access On Viewpoint And Related Considerations. ...................... 41

          3.     The District Court's Rule Threatens Unending, Sensitive Compliance Litigation. .................................. 47

  C.    The AP's Claims Equally Fail When Characterized As Challenging Retaliation. ........................................................ 49

II.   The AP Did Not Satisfy The Remaining Preliminary Injunction Factors. ........................................................................... 52

  A.    The AP Failed To Establish Irreparable Harm. ................... 52

  B.    The Preliminary Injunction Harms The Government And The Public Interest ......................................................... 53

CONCLUSION ......................................................................................... 55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Aamer v. Obama,*
   742 F.3d 1023 (D.C. Cir. 2014) ......................................................24, 40

*American Freedom Def. Initiative v. Washington Metro. Area Transit Auth.,*
   901 F.3d 356 (D.C. Cir. 2018) ............................................................26

*Arkansas Educ. Television Comm'n v. Forbes,*
   523 U.S. 666 (1998) ...........................................................................30

*Ateba v. Leavitt,*
   133 F.4th 114 (D.C. Cir. 2025) .......................................................5, 27

*Baltimore Sun Co. v. Ehrlich,*
   437 F.3d 410 (4th Cir. 2006) . 2, 11, 21, 22, 33, 34, 35, 36, 39, 46, 49, 50

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) ............................................................52

*Cheney v. U.S. Dist. Ct. for D.C.,*
   542 U.S. 367 (2004) ...............................................................23, 47, 53

*Chiafalo v. Washington,*
   591 U.S. 578 (2020) ...........................................................................41

*Greer v. Spock,*
   424 U.S. 828 (1976) ...........................................................................30

*Hazelwood Sch. Dist. v. Kuhlmeier,*
   484 U.S. 260 (1988) ...........................................................................37

*Houston Cmty. Coll. Sys. v. Wilson,*
   595 U.S. 468 (2022) ...............................................................22, 49, 51

*International Soc'y for Krishna Consciousness, Inc. v. Lee,*
   505 U.S. 672 (1992) ...........................................................................31

*Judicial Watch, Inc. v. U.S. Secret Serv.*,
726 F.3d 208 (D.C. Cir. 2013) ......................................23, 54

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) .................................................13

*Mexichem Specialty Resins, Inc. v. EPA*,
787 F.3d 544 (D.C. Cir. 2015) ...............................................52

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009) .............................................24

*Minnesota Voters All. v. Mansky*,
585 U.S. 1 (2018) ....................................................................30

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................24

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983) ..................................................................27

*Price v. Garland*,
45 F.4th 1059 (D.C. Cir. 2022)..............................26, 27, 28

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367 (1969) ................................................................54

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995) ..............................................30, 31, 37

*Rutan v. Republican Party of Ill.*,
497 U.S. 62 (1990) ..................................................................37

*Sampson v. Murray*,
415 U.S. 61 (1974) ..................................................................52

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ................................................................36

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977) ..........................................5, 36

*Snyder v. Ringgold,*
  133 F.3d 917, 1998 WL 13528 (4th Cir. 1998) (per curiam)...............34

*Tavoulareas v. Washington Post Co.,*
  724 F.2d 1010 (D.C. Cir.), *rev'd on other grounds en banc and per
  curiam*, 737 F.2d 1170 (D.C. Cir. 1984)...............................29

*The Pocket Veto Case,*
  279 U.S. 655 (1929) .............................................41

*Trump v. United States,*
  603 U.S. 593 (2024) .............................................47

*Widmar v. Vincent,*
  454 U.S. 263 (1981) .............................................37

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ..............................................24

## Statutes

28 U.S.C. § 1292(a)(1).............................................4

28 U.S.C. § 1331..................................................3

## Executive Branch Materials

Exec. Order No. 14,172,
  90 Fed. Reg. 8629 (Jan. 31, 2025)................................8

President Ronald Reagan, *Remarks at the Annual White House
  Correspondents Association Dinner*,
  1 Pub. Papers 497 (Apr. 21, 1988) ...............................36

U.S. Dep't of the Interior,
  Order No. 3423, *The Gulf of America* (Feb. 7, 2025),
  https://perma.cc/3R7R-UPPH ......................................8

U.S. Geological Surv.,
  *As Directed by the President, the Gulf of America Enters the USGS Official Place Names Database* (Feb. 14, 2025),
  https://perma.cc/A37H-3GRY ................................................................ 8

## Other Authorities

*Administration Loses Bid to Exclude Fox News from Pay Czar Interview*,
  Fox News (Oct. 23, 2009), https://perma.cc/S6A9-DRDW .................. 45

Amanda Barrett,
  *AP Style Guidance on Gulf of Mexico, Mount McKinley*,
  AP (Jan. 23, 2025), https://perma.cc/K4WS-FZAB. ............................. 8

Blaire Atherton French,
  *The Presidential Press Conference: Its History and Role in the American Political System* (1982) .......................................... 42, 43, 44

George E. Reedy,
  *The President and the Press: Struggle for Dominance*,
  427 Annals Am. Acad. Pol. & Soc. Sci. 65 (1976) ................................ 44

Harold Holzer,
  *The Presidents vs. The Press: The Endless Battle Between the White House and the Media—from the Founding Fathers to Fake News* (2020) ................................................................ 42, 43, 44, 45

J. Frederick Essary,
  *Covering Washington: Government Reflected to the Public in the Press 1822-1926* (1927) ........................................... 43, 46

James Deakin,
  *Press Rejects Nessen's Plan for Coverage*, St. Louis Post Dispatch,
  Aug. 19, 1976, at 20A ........................................................ 46

# GLOSSARY

AP              Associated Press

JA              Joint Appendix

## INTRODUCTION

Thousands of journalists cover the President of the United States, including more than 1,300 who do so with such frequency that they have credentials permitting them to enter the White House press facilities on demand.  Just as the President cannot possibly grant interviews to all of those journalists on equal terms, there is not sufficient space in the Oval Office, aboard Air Force One, or in other nonpublic areas of the White House to accommodate every journalist who would like to attend events in these spaces.  The basic question presented in this case is therefore whether, when the White House decides which journalists will receive these limited opportunities, the First Amendment prohibits it from considering a journalist's viewpoint, prior reporting, or other similar factors.

The Associated Press (AP) has never disputed that when the President selects a journalist to conduct an interview, he may consider any factors he thinks appropriate to best amplify his message and reach his intended audiences.  And at argument on the government's stay motion in this Court, the AP expressly conceded that the President may "invite his favorite twenty journalists into the Oval [Office] on a

viewpoint basis" because, when he does so, "he's inviting people" rather than "excluding people." Stay Arg. 1:13:05-1:13:20; *see also* Stay Arg. 1:14:58-1:15:03 ("He can pick a couple of people and say, follow me for the day, absolutely."). Those concessions make sense, both because elected officials "frequently and without liability evaluate reporters and reward them with advantages of access," *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 417-18 (4th Cir. 2006), and because there is a long historical tradition of American presidents considering journalists' prior coverage when deciding who should receive discretionary access. But these concessions also "give away the game," Order 18, June 6, 2025 (Stay Op.), because they underscore that the Constitution permits the President to provide or withhold certain things of value to journalists— whether that is access to information, to people, or to places—based on considerations that might be precluded by the First Amendment in other contexts.

The district court nevertheless entered an extraordinary injunction barring the President from considering such factors when deciding which journalists to invite into core presidential spaces like the Oval Office or Air Force One. Its theory, which is premised on the idea

that restrictions on physical access to these unique spaces is governed by the same rules governing restrictions on private expression in parks and on university campuses, is unsupported by any decision of this Court or the Supreme Court. It is deeply ahistorical. It threatens to constitutionalize every interaction between elected officials and the journalists who cover them—as demonstrated by this very case, in which the AP promptly accused the government of violating the injunction because it was not invited into the President's close proximity on its preferred day of the week. And it utterly disregards the President's "absolute control and discretion" over presidential spaces under Article II, Stay Op. 13: just as a member of Congress decides who may enter his office and a federal judge decides who may enter her chambers, the President decides who may enter the Oval Office. The district court's injunction is legally indefensible, and this Court should vacate it.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court pursuant to 28 U.S.C. § 1331. *See* JA17, ¶ 28. The district court entered a preliminary injunction on April 8, 2025, *see* JA387-427, and the

government filed a notice of appeal on April 9, 2025, *see* JA429.  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

To amplify their intended messages and reach their preferred audiences, government officials routinely consider whatever factors they deem appropriate when deciding who should receive an exclusive interview, an off-the-record tip, or other privileged access to people, information, and spaces.  The district court nevertheless entered a preliminary injunction prohibiting the President from considering his opinions about the AP's coverage when deciding whether to permit it access to the Oval Office, Air Force One, and other highly restricted presidential spaces.  The question presented is whether the district court erred because the First Amendment permits consideration of these factors.

## STATEMENT OF THE CASE

### A.  Factual Background

**1.**  Across the country, thousands of journalists—representing news outlets large and small and leaning left, right, and center—cover the White House.  Of those journalists, more than 1,300 report on the White House with such regularity that they hold so-called "hard

passes," which permit them to come and go from the White House press areas (including the briefing room and dedicated press office space) on demand. JA85-86; *see generally Ateba v. Leavitt*, 133 F.4th 114 (D.C. Cir. 2025) (rejecting constitutional challenge to hard pass program). Thirty-three AP journalists hold hard passes, JA85, and the AP's access to the White House press areas via hard passes has not changed, JA398. Nor has its access to any other facilities, information, or opportunities "perceived as being open to all bona fide Washington-based journalists." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) (footnote omitted).

This case is instead about discretionary access that is only available to a tiny portion of the White House press corps on an intermittent basis. In particular, in addition to providing access to dedicated press facilities, the White House sometimes selectively admits small groups of journalists into more restricted areas. Depending on the President's obligations on any given day, these areas may include the Oval Office, Air Force One, and Mar-a-Lago. Given space and security constraints, only a miniscule fraction of the White House press corps (13 journalists on Air Force One or 21 journalists in the Oval

Office) may be admitted into these locations at any one time. This smaller group of journalists is traditionally referred to as the "pool." *See generally* JA388-90.

Before February 25, 2025, the pool's composition was determined by the White House Correspondents' Association. JA390. Under that system, the AP had two guaranteed, permanent spots in the pool—one for a reporter and one for a photographer. *See* JA390. Guaranteed spaces were also available for reporters from Reuters and Bloomberg, as well as for photographers from Reuters, AFP, and the New York Times. *See* JA18. No other media organization in the country—including brand-name publications like the Washington Post, the Wall Street Journal, USA Today, Politico, etc.—enjoyed such guaranteed access. Instead, their reporters rotated in and out of the pool on an ad hoc basis. JA86-87.

On February 25, 2025, the Press Secretary announced that on a prospective basis, "the Government—not the [White House Correspondents' Association]—would now choose which hard pass holders gained access to the press pool." JA391. As the district court

observed, the "AP does not challenge the Government's decision to take control of this process." JA391 n.2.

In addition to events open only to the pool, the President sometimes holds events in spaces like the East Room, "which can accommodate up to 180 journalists for press conferences, meetings with foreign leaders, and the like." JA389. Journalists typically "RSVP for the East Room and similar space-capped events through an online tool." JA389. There are often more journalists who want to attend these events than there is space available. *See* JA396 (referencing one event in which 310 media members requested access and only 136 were admitted and another in which 308 journalists requested access and only 172 were admitted).

**2.** On January 20, 2025, the President signed Executive Order 14,172, which directed the Secretary of the Interior to "take all appropriate actions to rename as the 'Gulf of America' the U.S. Continental Shelf area bounded on the northeast, north, and northwest by the States of Texas, Louisiana, Mississippi, Alabama and Florida and extending to the seaward boundary with Mexico and Cuba in the area formerly named as the Gulf of Mexico." Exec. Order No. 14,172,

§ 4(b), 90 Fed. Reg. 8629, 8630 (Jan. 31, 2025).  The Department of the Interior effectuated that order by revising the Geographic Names Information System to reflect that new name.  *See* U.S. Dep't of the Interior, Order No. 3423, *The Gulf of America* (Feb. 7, 2025), https://perma.cc/3R7R-UPPH; *see also* U.S. Geological Surv., *As Directed by the President, the Gulf of America Enters the USGS Official Place Names Database* (Feb. 14, 2025), https://perma.cc/A37H-3GRY.  Nevertheless, on January 23, 2025, the AP announced that it would refer to the Gulf "by its original name while acknowledging the new name Trump has chosen."  Amanda Barrett, *AP Style Guidance on Gulf of Mexico, Mount McKinley*, AP (Jan. 23, 2025), https://perma.cc/K4WS-FZAB.

**3.**     On February 11, 2025, the Press Secretary informed the AP's lead White House reporter that in light of the AP's unwillingness to refer to the Gulf of America by its legal name, its journalists would not be permitted to access the Oval Office as members of the press pool.  JA392.  Three days later, the White House Deputy Chief of Staff posted online that the AP's journalists would be prohibited from "access to limited spaces, like the Oval Office and Air Force One," in light of its

refusal to use the Gulf of America terminology.  JA392 (quotation marks omitted).  And on February 18, the White House Chief of Staff wrote to the AP to explain that it had no constitutional right to access "certain areas, including the Oval Office and Air Force One"; given "the nature of their size, [the White House is] restricted as to how many people can physically be accommodated."  JA82.  "The only person who has the absolute right to occupy those spaces," she explained, "is the President of the United States."  JA82.  It is therefore undisputed that the White House used its discretion to exclude the AP from participation in the pool—and from corresponding access to the Oval Office, Air Force One, and other intimate presidential spaces—based on its refusal to refer to the Gulf of America in its stylebook and news reporting.

As noted above, on February 25, 2025, the White House announced that going forward, it would alone determine which media outlets could access intimate presidential spaces as part of the press pool on any given day, rather than outsourcing that function to the White House Correspondents' Association.  The result was that as of that date, the White House was no longer excluding the AP from a list

generated by the Correspondents' Association; it was exercising its own discretion not to invite AP reporters.

In addition to protesting its exclusion from the pool, the AP has also complained of certain instances in which some of its journalists were denied access to events in the East Room. Although the AP remained "eligib[le]" to be admitted to East Room events, JA138, the district court found that the AP "has been excluded from large events far more often than its peers," though sometimes "foreign AP correspondents got into White House events" and "[i]n March, the Government began allowing AP photographers into some East Room and limited-access events." JA394-97 (emphasis omitted).

## B. District Court Proceedings

The AP commenced this action by filing a complaint, alongside a motion for a temporary restraining order, on February 21, 2025, contending that the government's actions violated its rights under the First and Fifth Amendments. *See* Dkt. Nos. 1, 2. On February 24, the district court denied the AP's motion for a temporary restraining order. *See* Dkt. No. 18.

On April 8, 2025, the district court granted the AP's motion for a preliminary injunction. The court found that the AP was likely to succeed on its claims of viewpoint discrimination. *See* JA406-18. The court recognized that "the AP has no standalone right of access to the Oval Office" and that the government "could exclude all journalists from the Oval Office without offending the First Amendment." JA406. It nevertheless held that because the President sometimes invites reporters into the Oval Office, that space "is properly classified as a nonpublic forum, at least when the Government has voluntarily opened it and journalists are present." JA406-07. The court thus concluded that the White House has no discretion to bar access based on viewpoint. JA407.

The district court rejected the government's contention that forum analysis did not apply because the act of entering and being present in the Oval Office is not speech. Instead, the court reasoned, "AP journalists are engaged in full-fledged expression when they report from the Oval Office." JA410. The district court further rejected the government's reliance on *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006), which held that the Governor of Maryland could

lawfully instruct his staff not to speak with or provide discretionary information to certain reporters based on the content of their reporting. *See* JA412.

The district court likewise held that the East Room is a nonpublic forum in which the government has no discretion to engage in viewpoint discrimination. *See* JA416. The court reached the "same conclusions for limited-access events held in places other than the East Room," except for "the tarmac at Palm Beach when Air Force One lands," as the court found that the AP has "enjoyed regular access to the Palm Beach tarmac." JA418.

The district court also concluded that the AP was likely to succeed on its retaliation claims. The court observed that the government has "conceded that the record reveals viewpoint-discriminatory motives" and that the ramifications for the AP "have undoubtedly been adverse." JA419.[1]

The district court held that the remaining preliminary injunction factors were satisfied. It concluded that the AP's asserted loss of First

---

[1] Because it held that the AP was likely to succeed on its First Amendment claims, the district court did not reach its Fifth Amendment claims. *See* JA425.

Amendment freedoms represented per se irreparable harm and that the AP was also suffering injuries to its journalism and business. JA423. And while the court recognized the government's "legitimate interest in maintaining a degree of control over media access to the White House complex," JA425 (quoting *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020)), it held that these concerns did not apply on the theory that the government was acting unconstitutionally, JA425.

The district court thus entered a preliminary injunction providing that (1) the government must "immediately rescind the denial of the AP's access to the Oval Office, Air Force One, and other limited spaces based on the AP's viewpoint when such spaces are made open to other members of the White House press pool," and (2) the government must "immediately rescind their viewpoint-based denial of the AP's access to events open to all credentialed White House journalists." JA427. Immediately thereafter, the district court entered a separate order staying the injunction through April 13, 2025, "to provide the Government time to seek an emergency stay from a higher court and to prepare to implement the Court's injunction." JA428.

### C. Stay Proceedings In This Court And Compliance Proceedings In District Court

**1.** The government promptly filed a notice of appeal and sought an emergency stay from this Court. JA429; Mot. for Stay Pending Appeal, Apr. 10, 2025. Although the government had requested an immediate administrative stay, the motions panel did not enter one, and the injunction took effect on April 14, 2025.

On April 15, 2025, the White House announced a pool policy intended to comply with the district court's injunction. *See* JA454-55. Under that policy, guaranteed spaces are no longer reserved for wire service reporters—the category that includes the AP. Instead, two spaces are reserved for print reporters, and "[w]ire-based outlets will be eligible for selection as part of the Pool's daily print-journalist rotation." JA454-55. Four spaces are also reserved for photojournalists. JA454. Although the policy noted the President's "absolute discretion over access to the Oval Office, Air Force One, and other comparably sensitive spaces," it made clear that "[o]utlets will be eligible for participation in

the Pool, irrespective of the substantive viewpoint expressed by an outlet." JA455.[2]

Although the district court had been clear that it was not ordering "the Government to grant the AP permanent access to the Oval Office, the East Room, or any other media event," JA426, the AP promptly accused the White House of failing to comply with the injunction because its journalists were not selected for inclusion in the pool during the first three days that the injunction was in effect, *see* JA435-60. At a hearing on the AP's motion, the AP acknowledged that one of its reporters would join the pool on Saturday, April 19, but it argued that the government was nevertheless in violation of the injunction because the President's schedule that day would not include "an Oval Office or a White House presidential event." JA471.[3]

On April 18, the district court denied the motion, underscoring that "AP is not entitled to the first-in-line-every-time position that it enjoyed for many years." JA499. The district court acknowledged the

_____

[2] The policy noted that it was subject to amendment or modification at any time, including if the district court's injunction were disturbed on appeal. JA455.

[3] An AP photojournalist was also selected for inclusion in the pool on Thursday, April 17. *See* JA461.

possibility that the AP might be entitled to relief if it could demonstrate that it "is repeatedly receiving second-class treatment, especially compared to its peer wire services." JA501. Nevertheless, the district court explained, "it is in nobody's interest for us to be here week in and week out trying to enforce" the injunction. JA502-03.

**2.** After hearing argument, a motions panel of this Court substantially granted the government's motion on June 6, 2025. *See* Stay Op. The Court first concluded that the government was likely to succeed on the merits as to both the AP's viewpoint-discrimination claim and its retaliation claim. With respect to viewpoint discrimination, the Court held that the government was likely to succeed because "the spaces to which the AP seeks access are not any type of forum." Stay Op. 8. Instead, the Court explained, "[t]he Oval Office is the President's office, over which he has absolute control and discretion to exclude the public or members of the press." Stay Op. 13. And the mere fact that the President sometimes permits journalists into the Oval Office (and other core presidential spaces) was insufficient to create a forum, for "newsgathering is not itself a communicative activity," Stay Op. 14, and any communication in which journalists

engage from those spaces has "little if any nexus to the restricted spaces in which it occurs," Stay Op. 15. As the Court explained, it was unwilling "to adopt a rule that would turn any government space in which smart phones or computers are allowed into a nonpublic forum simply because individuals can communicate with the outside world by blogging, posting comments and pictures, or … otherwise disseminating messages in real time." Stay Op. 17.

The Court's analysis was bolstered by the AP's concession at oral argument "that the President or White House could select a group of journalists each day to observe events in these spaces and that such selection would not be subject to forum analysis." Stay Op. 18; *see also* Stay Op. 24 (noting the AP's concession that the President may "discriminate on the basis of viewpoint in … newsgathering by groups other than the established press pool"). As the Court observed, those "concessions give away the game, because such scenarios cannot be distinguished from so-called press pool events, which are at bottom small press availabilities with the President." Stay Op. 18.

The Court further found that the government was likely to succeed on the AP's retaliation claim. As the Court explained,

"[c]hoosing who may observe or possibly speak with the President in [core presidential] spaces is not the type of action that supports a retaliation claim." Stay Op. 22. "Rather, it is more akin to a decision about how the President wields the bully pulpit." *Id.* The Court also looked to the long history of journalists "jockey[ing] for access to certain privileged spaces and to senior administration officials," recognizing that "viewpoint-based preferences occur at every level of government in the relationship between elected officials and the press" and concluding that such "pervasive practices simply do not give rise to a retaliation claim, regardless of how valuable the access may be." Stay Op. 23.

The Court found that the remaining stay factors favored the government. It explained that the injunction intrudes on the President's Article II prerogatives, as "[t]he President's discretion to choose with whom he will speak and travel" is part of his constitutional authority. Stay Op. 25. On the other hand, the AP "may continue to exercise its free speech rights in other spaces," and to the extent it had suffered any financial loss, "that harm does not … justify an intrusion on presidential prerogatives." *Id.*

Because the injunction "intrudes on the independence of the Executive Branch and burdens the President's exercise of core executive powers," the Court stayed the injunction as to "the Oval Office, Air Force One, Mar-a-Lago, and other similar spaces." Stay Op. 26. The Court did not stay the injunction as to the East Room, which in the Court's view "does not share the hallmarks of spaces like the Oval Office." *Id.* Judge Pillard dissented. *See* Stay Op. Dissent 1-27.

Four days after the Court entered its stay order, the AP filed an emergency petition for rehearing en banc. *See* Emergency Pet. for Reh'g En Banc, June 10, 2025. The en banc court denied the petition without noted dissent. *See* Order, July 22, 2025.

## SUMMARY OF ARGUMENT

The district court's preliminary injunction is legally indefensible, and this Court should vacate it. Just as the Constitution permits members of Congress to decide whom to invite into their offices and members of this Court to decide whom to invite into their chambers, it permits the President to decide which reporters will enter highly restricted presidential spaces like the Oval Office and Air Force One.

**I.A.**   The district court's analysis proceeds from the remarkable premise that restrictions on physical access to the Oval Office are governed by the same forum principles that govern restrictions on private speech in parks and on university campuses.  As the motions panel recognized, that premise is mistaken.  Forum doctrine concerns places that are generally held open for public expression, either in general or on specified topics.  The ability of a reporter to use his cellphone to post to the internet does not convert a highly restricted space into a forum.  Beyond that, whatever forum principles might apply to ordinary government buildings cannot be mechanically extended to highly restricted spaces intended for the President's exclusive use.  That is especially true because it is undisputed that the President could permissibly bar all expressive activity within the Oval Office and similar presidential spaces.

**B.**   Irrespective of how forum analysis might apply to access to presidential spaces as a general matter, in the journalism context it is well established that "government officials frequently and without liability evaluate reporters and reward them with advantages of access—i.e., that government officials regularly subject all reporters to

some form of differential treatment based on whether they approve of the reporters' expression." *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 418 (4th Cir. 2006). Indeed, the AP expressly conceded that the President may invite "his five favorite journalists"—or even "his favorite twenty journalists into the Oval [Office] on a viewpoint basis." Stay Arg. 1:11:55-1:13:25; *see also* Stay Arg. 1:14:58-1:15:03 ("He can pick a couple of people and say, follow me for the day, absolutely."). That concession disposes of this appeal because that is all the President is doing. *See* Stay Op. 18. And the concession aligns with the historical record, which makes clear that, since the Founding, presidents have considered the nature of journalists' coverage when deciding who should receive discretionary access.

Constitutionalizing the President's decisions over which reporters may access intimate presidential spaces threatens to enmesh the federal courts in endless litigation. If the district court's injunction is reinstated, journalists denied access to particular events will seek to test the White House's actual motivations for such decisions, inevitably generating serious discovery disputes about how to discern the state of mind of senior White House officials, potentially including the

President. Indeed, this case proves the point—only days after the district court's injunction took effect, the AP sought judicial relief because the White House had not selected it to participate in the pool on its preferred day of the week.

**C.** The AP's claims are no stronger when presented through the lens of retaliation, for only "material" adverse actions will "give rise to an actionable" claim of retaliation. *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). Competition among journalists for access and the cultivation of journalists by government officials for messaging purposes form part of the "pervasive and everyday relationship between government officials and the press." *Ehrlich*, 437 F.3d at 418; *see id.* at 418-19 (rejecting First Amendment retaliation claims in light of "the journalist's accepted role in the 'rough and tumble' political arena"). Once again, this is presumably why the AP conceded that the President could lawfully cancel a "one-on-one scheduled with a favored reporter" if the reporter "says something the President doesn't like." Stay Arg. 1:15:09-1:16:35.

**II.A.** The AP failed to satisfy the remaining preliminary injunction factors. The district court's principal holding with respect to

irreparable harm was that the AP's First Amendment injury represented irreparable harm per se, but that analysis is entirely derivative of the court's flawed merits analysis. The district court also suggested that the AP would suffer financial loss from its exclusion from the pool, but any such loss is no greater than that suffered by the overwhelming majority of media organizations that cover the President of the United States without privileged access to the Oval Office, Air Force One, and other intimate presidential spaces.

**B.** The preliminary injunction severely harms the government and the public interest by intruding upon "the Executive Branch's interests in maintaining the autonomy of its office." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004). This Court has already alluded to the "serious separation-of-powers concerns" that would be "raised by a statute mandating disclosure of the President's daily activities," *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 216 (D.C. Cir. 2013), and those concerns are significantly exacerbated by a judicial order governing whom the President must permit to observe him while those activities are occurring in real time.

# STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion, but the district court's legal conclusions are subject to de novo review. *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009). To establish entitlement to preliminary injunctive relief, the moving party must carry the burdens of showing that (1) it is likely to prevail on the merits, (2) it will suffer irreparable injury in the absence of an injunction, (3) the balance of harms favors an injunction, and (4) the injunction is in the public interest. *See, e.g.*, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20-21 (2008). The third and fourth factors merge when the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

# ARGUMENT

## I. The AP Cannot Succeed On The Merits Because The First Amendment Permits The White House To Consider The Content Of Journalists' Coverage When Providing Discretionary Access To The President In Restricted Spaces.

In considering a request for preliminary injunctive relief, the "first and most important factor" is whether the moving party has "established a likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). This Court should vacate the

preliminary injunction for the principal reason that the AP is not likely to—indeed cannot—succeed on the merits of its First Amendment claims. Although the district court believed that this case is governed by the same forum principles that apply to restrictions on private speech on ordinary government property, those principles do not apply to restrictions on physical access to some of the most restricted spaces on the planet, including the Oval Office and Air Force One. Beyond that, the district court's rule ignores the basic reality—readily conceded by the AP and supported by a long historical record—that government officials may permissibly consider a journalist's prior coverage when providing discretionary access to information and interviews. Finally, the district court's ruling is no more defensible when the AP's claims are analyzed through the lens of retaliation.

### A. Restrictions On Physical Access To Sensitive Presidential Spaces Are Not Subject To Forum Analysis.

The district court's analysis proceeds from the startlingly counterintuitive premise that physical access to the personal workspace of the President of the United States—one of the most highly restricted locations in the world—is subject to ordinary forum analysis. *See*

JA406-07. That premise is badly mistaken, for "these restricted presidential spaces are not First Amendment fora opened for private speech and discussion." Stay Op. 1; *see also* Stay Op. 8 (explaining that these spaces "are not any type of forum"). While the President sometimes elects to admit journalists to his most intimate spaces, he has not relinquished his absolute discretion to determine who should be admitted.

1. At the outset, forum doctrine concerns restrictions on communicative activity, not "activities that, even if generally protected by the First Amendment, are not communicative." *Price v. Garland*, 45 F.4th 1059, 1070 (D.C. Cir. 2022); *see also American Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*, 901 F.3d 356, 364 (D.C. Cir. 2018) ("Our analysis of *a restriction on speech* on government property begins with the forum doctrine." (emphasis added)). In other words, courts use forum analysis to determine the level of First Amendment scrutiny applicable to limitations on private speech that, while delivered on (or by means of) public property, is not itself part of a government actor's own expressive presentation to the public. *See, e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-

46 (1983).  But this case is about restrictions on physical access—not speech.[4]  And courts "should not 'extend[] the public forum doctrine in a mechanical way to contexts that meaningfully differ from those in which the doctrine has traditionally been applied.'"  Stay Op. 8 (alteration in original) (quoting *Price*, 45 F.4th at 1068).  Forum doctrine does not logically apply to secure presidential spaces like the Oval Office—spaces not intended for private communication and where it is undisputed that the President may bar all expressive activities.

Like the filmmaking at issue in *Price*, observation of the President for the purposes of gathering news is plainly not communicative activity to which forum doctrine applies.  In an attempt to distinguish that holding, the district court observed that AP journalists and photographers engage in expression through their contemporaneous communications with their editors and, ultimately, the news-reading

---

[4] This Court's decision in *Ateba v. Leavitt*, 133 F.4th 114 (D.C. Cir. 2025), employed forum analysis in rejecting a journalist's claim regarding "hard pass" access to the White House press areas.  But the spaces at issue in *Ateba*—the briefing room, press office space, etc.—are specifically intended for the use of the press and made available to all journalists who satisfy the hard pass criteria.  Such spaces are fundamentally different from nonpublic spaces intended for the President's exclusive use and into which the President only chooses to invite the media at his discretion.

public.  JA410.  But the restrictions at issue here do not relate to the activity in which a journalist might engage while in sensitive spaces; rather, the President was exercising control over access to those sensitive spaces in the first place.  Conflating the two leads to reasoning that proves far too much:  if the ability to post online were sufficient to transform a secure location into a "forum" for expressive activity, then nearly every governmental space would be subject to forum analysis. And though *Price* reserved the question of whether livestreaming might transform a space into a forum because it involves real-time communication, *Price*, 45 F.4th at 1071 n.***, the applicability of forum analysis should not hinge on whether information is shared immediately or after a delay.[5]

The district court's theory—that a forum is created wherever individuals can use their cellphones to post content online—would have extraordinary consequences.  After all, "member[s] of the institutional press [have] no greater constitutional interest in free expression than" anyone else.  *Tavoulareas v. Washington Post Co.*, 724 F.2d 1010, 1025

---

[5] In addition, while *Price* did not concern newsgathering, it arose in a context, unlike this one, where "the government generally had opened the parks to the public for commercial uses."  Stay Op. 17 n.7.

(D.C. Cir.), *rev'd on other grounds en banc and per curiam*, 737 F.2d 1170 (D.C. Cir. 1984). The district court's reasoning would thus apparently prohibit the White House from selecting political allies to attend a bill signing or a State of the Union address, so long as the individuals who were chosen could use their phones to post on social media. Such a result is obviously wrong, and this Court should not adopt a constitutional "rule that would turn any government space in which smart phones or computers are allowed into a nonpublic forum simply because individuals can communicate with the outside world." Stay Op. 17. Because this case concerns restrictions on physical access rather than restrictions on expressive activity, forum analysis does not apply.

**2.** Even if forum analysis were relevant to restrictions on non-expressive activity in ordinary cases, there would still be no basis for analyzing the sui generis presidential spaces at issue here—including Air Force One, the Oval Office, and the President's private residence—under the rules that apply to parks and sidewalks. "Generally speaking," the Supreme Court has recognized "three types" of forums for private speech: "traditional public forums, designated public

forums, and nonpublic forums." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). Some "government properties," however, are "not fora at all" and thus are not subject to forum analysis. *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677-78 (1998). In those contexts, "[t]he fact that other civilian speakers" have "sometimes been invited to appear" on government property does not "of itself serve to convert" a location into a forum, nor does it categorically "confer" a First Amendment right to engage in expression in that location. *Greer v. Spock*, 424 U.S. 828, 838 n.10 (1976).

Highly secure spaces reserved for the President's exclusive use—including the Oval Office, Air Force One, the East Room, and Mar-a-Lago—are not forums for private speech. They bear no resemblance to the places to which courts have applied forum analysis, where the government permits the use of its property to "encourage a diversity" of private speakers' views. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 834 (1995). Forum analysis is inapplicable where, as here, a government actor designates private individuals to witness—on restricted government or personal property—a presentation that the government actor himself designs and controls.

*See id.* at 833-34.  The President may therefore take the same
reasonable measures that a private party might pursue in comparable
circumstances to ensure that "[his] message is neither garbled nor
distorted."  *Id.* at 833*; cf. International Soc'y for Krishna Consciousness,
Inc. v. Lee,* 505 U.S. 672, 678 (1992) (distinguishing, for First
Amendment purposes, between government "as lawmaker" and
government "as a proprietor"); Stay Op. 19 (noting that the "messages
conveyed in the Oval Office are government speech and opportunities
for the President's administration to express its message").

At bottom, the government is unaware of any case in this Circuit
that has applied forum analysis to the personal office space of a public
official merely because title to the building resided in the government—
let alone to highly secure spaces within the White House or to a private
residence like Mar-a-Lago.  And how the President decides to spend his
time in the Oval Office, on Air Force One, or at his private residence
falls far afield from the usual application of forum analysis.
Accordingly, the district court's conclusion that the President creates a
forum in the Oval Office, aboard Air Force One, or at his private

residence whenever he chooses to permit journalists into those spaces is mistaken.

**B.    The First Amendment Permits Government Officials To Consider Viewpoint When Granting Journalists Discretionary Access To Information, People, And Spaces.**

Irrespective of how forum analysis might apply to access to presidential spaces as a general matter, in the journalism context it is well established that government officials may permissibly consider any factors they deem appropriate when evaluating which journalists to call on, which journalists to provide exclusive interviews, and which journalists to grant discretionary access unavailable to other members of the press corps.  That basic insight explains why "[i]f President Trump sits down for an interview with Laura Ingraham, he is not required to do the same with Rachel Maddow."  Stay Op. 12.  And it is why the AP has expressly conceded that the President may invite "his five favorite journalists"—or even "his favorite twenty journalists into the Oval [Office] on a viewpoint basis."  Stay Arg. at 1:11:55-1:13:25; *see also* Stay Arg. 1:14:58-1:15:03 ("He can pick a couple of people and say, follow me for the day, absolutely.").  As the stay panel observed, those "concessions give away the game."  Stay Op. 18.

1. **Precedent Makes Clear That Government Officials May Consider Journalists' Coverage When Providing Discretionary Access.**

**a.** Precedent makes clear that the action challenged here is consistent with the First Amendment. The Fourth Circuit's decision in *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 417-18 (4th Cir. 2006), is particularly instructive. In that case, the Governor of Maryland instructed his staff not to speak with or respond to requests for information from certain reporters because they were "failing to objectively report on any issue dealing with the" Governor's administration. *Id.* at 413 (quotation marks omitted). The newspaper argued that the restriction violated the First Amendment because it was retaliatory and a content-based regulation of the newspaper's speech. *Id.*

The Fourth Circuit disagreed. In a unanimous opinion, it explained that there is a "common and widely accepted practice among politicians of granting an exclusive interview to a particular reporter" and an "equally widespread practice of public officials declining to speak to reporters whom they view as untrustworthy because the reporters have previously violated a promise of confidentiality or

otherwise distorted their comments." *Ehrlich*, 437 F.3d at 418 (quoting

*Snyder v. Ringgold*, 133 F.3d 917, 1998 WL 13528, at *4 (4th Cir. 1998)

(per curiam) (unpublished table decision)); *see also* Stay Op. 12.[6]

Indeed, the newspaper conceded that "government officials frequently

and without liability evaluate reporters and reward them with

advantages of access—i.e., that government officials regularly subject

all reporters to some form of differential treatment based on whether

they approve of the reporters' expression." *Ehrlich*, 437 F.3d at 418.

Accordingly, the court concluded that permitting the newspaper to

proceed with its constitutional claim would "'plant the seed of a

---

[6] *Snyder* involved a claim that a police department's press officer refused to permit a journalist to participate in an interview or obtain information because of "his displeasure with her stories." 1998 WL 13528, at *2. The court rejected the reporter's claim, noting the absence of authority holding "that reporters have a constitutional right of equal or nondiscriminatory access to government information." *Id.* at *3. A contrary rule, the court explained, "would presumably preclude the common and widely accepted practice among politicians of granting an exclusive interview to a particular reporter," and it "would preclude the equally widespread practice of public officials declining to speak to reporters whom they view as untrustworthy." *Id.* at *4. Beyond that, the court explained, it would presumably "preclude the White House's practice of allowing only certain reporters to attend White House press conferences, even though space constraints make it impractical to open up the conference to all media organizations." *Id.*

constitutional case' in 'virtually every' interchange between public official and press." *Id.*

The analogy to cases like *Ehrlich* may be most obvious for spaces like the Oval Office and Air Force One, which can only accommodate one or two dozen journalists. In selecting the tiny fraction of journalists from the broader White House press corps who will be permitted to enter such spaces, it is entirely reasonable for the White House to consider which journalists it thinks will best serve its communications strategy. Thus, just as the President might permissibly invite his five preferred business reporters to a financial briefing in the Oval Office, *see* JA136, he likewise may exclude journalists that he does not believe are providing fair coverage.

The essential insight, however, extends beyond small spaces like the Oval Office and Air Force One and applies equally to larger spaces like the East Room or Mar-a-Lago. The point is not that space constraints give the government license to violate the First Amendment, but instead that it does not implicate the First Amendment to grant some journalists better access than others because that sort of conduct is part of the ordinary interplay between

government officials and the journalists who cover them.  To the extent

that space constraints are required, however, the record shows that

there are routinely more journalists who want to be admitted to East

Room events than there are spaces available.  *See supra* p.7.

What was true of a single state's governor in *Ehrlich* carries even

greater force for the President of the United States, in whom the

Constitution vests "all" of "the 'executive Power.'"  *Seila Law LLC v.*

*CFPB*, 591 U.S. 197, 203 (2020).  No less than the Governor of

Maryland, the President of the United States "seeks to wield power to

accomplish his goals for the people" and will accordingly "try to use the

press to his best advantage and to avoid those situations that aren't to

his advantage."  President Ronald Reagan, *Remarks at the Annual*

*White House Correspondents Association Dinner*, 1 Pub. Papers 497, 497

(Apr. 21, 1988).  Thus, as this Court has explained, just because the

President opens his private space to selected journalists for an

interview or briefing does not mean he surrenders discretion to

determine who has access to him in those settings.  *See Sherrill v.*

*Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) ("Nor is the discretion of the

President to grant interviews or briefings with selected journalists

challenged.  It would certainly be unreasonable to suggest that because the President allows interviews with some bona fide journalists, he must give this opportunity to all."); *see also* Stay Op. 11-12 (quoting this passage).  The President has his own speech and associational rights, and he does not forfeit those rights because he is a government official.

Other First Amendment principles reinforce that conclusion.  For example, the Supreme Court has recognized the commonsense and traditional rule that, when the government acts as employer, it may make viewpoint-based judgments in appointing senior "policymaking" officials.  *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 70 (1990).  It has similarly recognized that "when the State is the speaker, it may make content-based choices."  *Rosenberger*, 515 U.S. at 833.  Much as a state university may invite outside speakers to give a diversity of opinions on a topic without thereby bestowing on individuals with additional opinions a constitutional right of access to the podium, *cf. Widmar v. Vincent*, 454 U.S. 263, 276 (1981), *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 267-73 (1988), so too may the White House structure an event by selecting which (if any) private individuals will be present, without incurring a First Amendment obligation to ensure that

all available viewpoints are represented.  The First Amendment thus permits the President and his subordinates to structure a focused presentation for a discrete public purpose by selecting some private individuals, but not others, to participate or attend.

**b.**    Although the AP has conceded that the President may *invite* "his five favorite journalists"—or even "his favorite twenty journalists into the Oval [Office] on a viewpoint basis," Stay Arg. 1:11:55-1:13:25, it contends that an entirely different constitutional rule applies when the President *excludes* journalists he does not favor.  *See* Stay Arg. 1:13:05-1:13:20.  That distinction is illusory: given space constraints, whenever one journalist is invited, another must be excluded.  It is also immaterial, since whether the President is inviting someone or excluding someone, he is doing so on the basis of the same considerations.  In any case, since February 25, the White House has been solely responsible for determining which journalists to invite into the press pool; it is not excluding the AP from a list generated by the Correspondents' Association.  *See* JA391; Stay Op. 3 (describing White House's announcement that "it would select journalists for participation in press pool events, instead of deferring to the selection made by the

Correspondents' Association").  Whatever constitutional rule might apply if the White House were excluding journalists selected by the Correspondents' Association is entirely beside the point because the Correspondents' Association is no longer selecting anyone for the White House to approve or reject.  As the stay panel observed, the viewpoint-based invitations that the AP has expressly conceded are lawful "cannot be distinguished from so-called press pool events, which are at bottom small press availabilities with the President."  Stay Op. 18.

**c.**     For its part, the district court rejected the government's reliance on *Ehrlich* because that case "focused on *dialogue* with government officials, not restrictions on *physical access* to government property."  JA412; *see also* JA413 ("The case turned on an alleged right to interact and speak with government officials, not a right of access to a physical forum for observational newsgathering.").  But *Ehrlich* concerned more than just dialogue with government officials; the Governor's ban also extended to providing discretionary information to the disfavored reporters.  *See* 437 F.3d at 413-14.  And that is how the court analyzed the case: as one involving "unequal access to nonpublic information."  *Id.* at 418.  That is not materially different from what the

AP is complaining about here: unequal access to information about what the President and his guests are doing in nonpublic spaces.

If anything, a restriction on dialogue would seem to be more closely tied to First Amendment interests than a restriction on physical access. But the relevant point, as the cases make clear, is that when the President deals with the press, he is permitted to consider the nature of a journalist's coverage in deciding how much access to give him. There is no logical reason why the form of access at issue (verbal or physical) would be imbued with constitutional import.[7] Indeed, given the parties' agreement that the President has no constitutional obligation to speak to the reporters he admits into the Oval Office, Air Force One, and similar locations, it would disserve both the public and the government to require the government to admit a journalist to

---

[7] The stay dissent suggested that *Ehrlich* is logically limited to "relief [that] would have required the defendants to speak with certain reporters" because any command to engage in such speech would involve coerced government speech. *See* Stay Op. Dissent 17. Yet *Ehrlich* does not turn on avoiding coerced government speech, and obviously the government *can* be compelled to engage in speech in some circumstances—which is why it would presumably violate the First Amendment for National Park Service rangers to only give directions to members of one political party. *Ehrlich* is instead about the nature of the relationship between journalists and elected officials, and its analysis applies equally to access to spaces and access to information.

whom the President has no intention of speaking, especially in the context of confined spaces where the President must be particularly selective.

## 2. There Is A Long Historical Tradition Of Presidents Conditioning Discretionary Access On Viewpoint And Related Considerations.

In addition to being inconsistent with precedent, the AP's position is deeply ahistorical, for there is a long tradition of presidents considering viewpoint when deciding which journalists will receive discretionary access to people, information, and spaces. That history further supports the constitutionality of the challenged actions, for "'[l]ong settled and established practice' may have 'great weight in a proper interpretation of constitutional provisions.'" *Chiafalo v. Washington*, 591 U.S. 578, 592 (2020) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)); *see also* Stay Op. 22 (same).

For most of American history, "no defined press group covered the White House." Stay Op. 23. Instead, "Presidents decided which journalists received privileged access, and the type and frequency of access varied by administration." *Id.*

In the founding era, President Washington hand-picked, based on political considerations, the newspaper that would print his Farewell Address. *See* Harold Holzer, *The Presidents vs. The Press: The Endless Battle Between the White House and the Media—from the Founding Fathers to Fake News* 16 (2020) (explaining that President Washington selected a paper "never stained with the ribaldry and violence of party recriminations" (quotation marks omitted)). And President Jefferson "encouraged the establishment of a new gazette … that would remain reliably favorable to his administration"; its "reward would be first access to official news." *Id.* at 39.

In the early Twentieth Century, President Theodore Roosevelt began a practice of regularly inviting reporters into the Oval Office for off-the-record press conferences while he received his "regularly midday shave." Holzer, *supra*, at 93. He "picked and chose those he would allow to attend these sessions; he used the conference as an occasion for reward and punishment, screening out the reporters who were the least likely to be sympathetic to his policies." Blaire Atherton French, *The Presidential Press Conference: Its History and Role in the American Political System* 3 (1982). Indeed, President Roosevelt warned

reporters that if they were to "violate a confidence or publish news that the President thought ought not to be published," then "he should be punished by having legitimate news withheld from him." Holzer, *supra*, at 100 (quotation marks omitted); *see also id.* (reporters who violated President Roosevelt's rules "earned symbolic membership in TR's so-called Ananias Club, a purgatory of ostracism named for the biblical character struck dead before Saint Peter for lying to God").[8]

Although President Wilson initially determined that "all accredited reporters should have equal access" to his press conferences, French, *supra*, at 4, he later "reduced access for Washington correspondents" while "remain[ing] available for one-on-one interviews with friendly journalists," Holzer, *supra*, at 130. President Hoover "screened out reporters whose stories he did not like." Carolyn Smith,

---

[8] After Jesse Carmichael, a reporter from the *New York World*, published an embarrassing story about President Roosevelt's sons "chasing a frightened turkey around the White House lawn," the President responded by "issu[ing] an executive order barring [the reporter] from receiving White House press announcements." Holzer, *supra*, at 101. Indeed, it appears that President Roosevelt's order barred the journalist "from the White House and from all executive departments for an indefinite period." J. Frederick Essary, *Covering Washington: Government Reflected to the Public in the Press 1822-1926*, at 94 (1927).

*Presidential Press Conferences: A Critical Approach* 31 (1990); *accord*
French, *supra*, at 7 (noting that Hoover "broke the then established rule
of equal access and followed T.R.'s practice of screening out those
reporters he suspected").

Decades later, President Kennedy sought to "court star
correspondents" and thus gave certain reporters "special access" and
"advance notice of administration announcements."  Holzer, *supra*, at
213.  President Johnson "tried to use personal interviews as a means of
reward and punishment."  French, *supra*, at 18; *see also* George E.
Reedy, *The President and the Press: Struggle for Dominance*, 427
Annals Am. Acad. Pol. & Soc. Sci. 65, 67 (1976) (noting Johnson's
"implied offer of exclusive stories in return for favorable treatment").

In more recent times, after *Newsweek* printed an unflattering
cover calling him a "wimp," then-Vice President George H.W. Bush's
staff "cut off all communications with *Newsweek* until a summit could
be arranged at the vice president's Washington residence."  Holzer,
*supra*, at 325.  For his part, President Obama appeared on "five
different Sunday talk shows" on September 20, 2009, to promote the
Affordable Care Act, but he refused to appear on *Fox News Sunday* as

an "act of revenge" for Fox's refusal to broadcast a speech that he had

made to Congress two weeks earlier. *Id.* at 379. The administration

later arranged for the Treasury Department's "pay czar" Kenneth

Feinberg to refuse to appear on Fox News even as he appeared on all

other networks. *Id.* at 380. It also "excluded Fox News from … a series

of White House and CIA backgrounders on the September terrorist

attack against the U.S. Consulate at Benghazi." *Id.* In addition, after

C-SPAN aired an interview that the White House found embarrassing,

the White House "cut [it] off for the rest of his term," declining

interview requests and even reducing the number of C-SPAN employees

invited to a White House Christmas party. *Id.* at 381 (quotation marks

omitted).

Not all of these confrontations ended as the White House would

have preferred. For example, after other television networks refused to

interview Feinberg unless Fox News could participate, the Obama

administration relented. *See Administration Loses Bid to Exclude Fox

News from Pay Czar Interview*, Fox News (Oct. 23, 2009),

https://perma.cc/S6A9-DRDW. And after President Theodore Roosevelt

sought to exclude Carmichael for reporting on his sons' pursuit of a

turkey across the White House lawn, *see supra* n.8, Carmichael's "friends went to his rescue," providing him "all news of the executive end of the government." Essary, *supra*, at 94. Eventually, the order "was forgotten by administration officials and Carmichael came and went as he pleased." *Id.* Similarly, after the Ford administration sought to exclude television and radio networks from a press pool, it changed course because wire service and newspaper reporters refused to participate if their television and radio colleagues were excluded. *See* James Deakin, *Press Rejects Nessen's Plan for Coverage*, St. Louis Post Dispatch, Aug. 19, 1976, at 20A. These examples illustrate that rather than being resolved in the courts, clashes between the President and the press about access have generally been resolved in the "'rough and tumble' political arena." *Ehrlich*, 437 F.3d at 419. It is the AP's approach, not the government's that is deeply ahistorical. *Contra* Stay Op. Dissent 6 (incorrectly suggesting that "every United States president" has welcomed journalists into the White House and Oval Office irrespective of viewpoint).

### 3. The District Court's Rule Threatens Unending, Sensitive Compliance Litigation.

Beyond the fact that the district court's rule is not compelled by the First Amendment and is incompatible with the historical record, it will invite a constant stream of litigation by journalists of at least two kinds. *See* Stay Op. 20. First, when journalists are not selected to participate in the pool on particular days, they will demand that the White House provide a reason their exclusion. Courts will then be asked to make factual findings on the actual motivation for such decisions—inevitably generating serious discovery disputes about how to discern the state of mind of senior White House officials, potentially including the President. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004). Such judicial inquiries into the White House's motivations for official actions are "highly intrusive," which is why in other contexts "courts may not inquire into the President's motives." *Trump v. United States*, 603 U.S. 593, 618-19 (2024) (quotation marks omitted).

Second, even when journalists are selected to cover particular events, they may contend that the access that they received was not satisfactory. This case proves the point: only days after the injunction

took effect, the AP filed a motion accusing the White House of violating the injunction because its journalists were not immediately selected for inclusion in the pool. JA435-60. Then, after the White House made clear that the AP would be included in the pool that weekend, the AP complained it had been included "on Saturday," and so would not be able to observe "an Oval Office or a White House presidential event." JA471. If the injunction is reinstated, the district court will likely be asked to micromanage the White House's dealings with the press corps in perpetuity.

Under the AP's view of the law, then, there are only two options available to a President that does not want to spend his time fending off First Amendment litigation from the many journalists who must necessarily be excluded from Oval Office and other limited-capacity events—either shut the doors entirely to the media, or cede all authority to an outside organization like the White House Correspondents' Association. Either way, the district court's rule would strip the White House of authority to "determine for itself which journalists to admit to the Oval Office and other similar spaces for presidential events." Stay Op. 24. Such a rule fails to accord

appropriate respect to the head of the Executive Branch, has no basis in history or tradition, and is sure to entangle the judiciary in vexing litigation for decades to come.

## C. The AP's Claims Equally Fail When Characterized As Challenging Retaliation.

The analysis set out above—that the President is permitted to consider a journalist's prior coverage when deciding how much discretionary access to provide him—is equally dispositive of the AP's retaliation claim. Only "material" adverse actions will "give rise to an actionable" claim of retaliation. *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The White House's decision not to grant the AP special access to the President's personal spaces does not rise to that level, particularly given "the relationship between speaker and [alleged] retaliator and the nature of the government action in question." *Id.* at 478. Instead, choosing whom to invite into highly secure presidential spaces "is more akin to a decision about how the President wields the bully pulpit." Stay Op. 22.

As *Ehrlich* makes plain, competition among journalists for access and cultivation of journalists for messaging purposes is how modern media and government function—not the stuff of which constitutional

claims are made. Indeed, *Ehrlich* itself involved retaliation claims, and its central holding is that a journalist operating in a competitive media environment understands that competing for access is part of the job description. *See* 437 F.3d at 417-18. Similarly, as the stay panel recognized, journalists "daily jockey for access to certain privileged spaces and to senior administration officials." Stay Op. 23. In other words, "viewpoint-based preferences occur at every level of government in the relationship between elected officials and the press." *Id.*

Granting some journalists better access than others does not constitute First Amendment retaliation because such decisions form part of the "pervasive and everyday relationship between government officials and the press." *Ehrlich*, 437 F.3d at 418; *see id.* at 418-19 (rejecting First Amendment retaliation claims in light of "the journalist's accepted role in the 'rough and tumble' political arena"). That is presumably why the AP conceded that the President may lawfully cancel a "one-on-one scheduled with a favored reporter" if the reporter "says something the President doesn't like," without incurring First Amendment liability. Stay Arg. 1:15:09-1:16:35. That concession is correct, but it is irreconcilable with the AP's simultaneous insistence

that the Constitution universally prohibits conditioning access on viewpoint-related factors, no matter the context.

The district court's factual findings further confirm that no unlawful retaliation occurred. The court recognized that the AP's loss of special access "has not impacted [the AP's] editorial tone in reporting at the White House" and that "other outlets have [not] altered their tone in reaction" to the AP's treatment. JA422. That finding shows that the "government's challenged conduct" would not "'chill a person of ordinary firmness' in the plaintiff's position from engaging in 'future First Amendment activity.'" *Houston Cmty. Coll.*, 595 U.S. at 477. In concluding otherwise, the court invoked the kinds of run-of-the-mill "disadvantages" that would affect *any* journalist that is not a member of the White House press pool (or is denied special access to the President during any given event). *See* JA421-22 (citing the AP's reduced capacity "to rapidly supply new photographs and breaking news" and diminished revenue). But those concerns are inherent in the nature of a competitive press corps competing for influence and coverage, and they do not constitute a sufficiently adverse action to support a First Amendment claim in this context.

## II.    The AP Did Not Satisfy The Remaining Preliminary Injunction Factors.

The AP also failed to satisfy the remaining factors governing the entry of preliminary injunctive relief: while the injunction does not cause the AP irreparable harm, it seriously intrudes on the President's constitutional prerogatives.

### A.    The AP Failed To Establish Irreparable Harm.

This Court "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "Such injury must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (emphasis omitted) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

The district court's principal holding with respect to irreparable harm was that the AP's First Amendment injury represented irreparable harm per se. JA423. That analysis is entirely derivative of

the district court's flawed merits analysis.  And any financial harms

that the AP is experiencing, *see* JA423-44, are no greater than those

suffered by any other media outlet that lacks a guaranteed presence in

the press pool.  Such costs are merely the costs of doing business in a

competitive journalistic environment that often turns on being provided

discretionary access to newsmakers.  While it is true that the

Correspondents' Association long granted the AP privileged

membership in the press pool, "that arrangement had no First

Amendment status," and "the AP cannot adversely possess a seat in the

Oval Office, no matter how long its tradition of access."  Stay Op. 23.

### B.  The Preliminary Injunction Harms The Government And The Public Interest.

On the other side of the ledger, the district court's preliminary

injunction—which restricts the President from making his own

decisions about whom to admit into core presidential spaces like the

Oval Office—unquestionably harms the government and the public

interest by intruding upon "the Executive Branch's interests in

maintaining the autonomy of its office."  *Cheney*, 542 U.S. at 385.  This

Court has already alluded to the "serious separation-of-powers

concerns" that would be "raised by a statute mandating disclosure of

the President's daily activities," *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 216 (D.C. Cir. 2013), and those concerns are significantly exacerbated by a judicial order governing whom the President must permit to observe him while those activities are occurring in real time. As the stay panel observed, the "President's discretion to choose with whom he will speak and travel is part of" his constitutional authority. Stay Op. 25. Beyond that, by installing a single district judge as the arbiter of the political considerations that the White House may contemplate when granting special access to the President, the injunction incentivizes the President not to provide press access at all and thereby undermines "the First Amendment goal of producing an informed public capable of conducting its own affairs." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 392 (1969).

Nor would vacating the injunction cause any appreciable harm to the public interest. There is unquestionably value (to both the President and the public) in the media being able to report about the President's public events, but coverage of such events will continue irrespective of whether the AP provides it from inside or outside the

Oval Office.  The President is the most covered public figure on the

planet, and he will remain so no matter how this litigation is resolved.

## CONCLUSION

For the foregoing reasons, this Court should vacate the

preliminary injunction.

Respectfully submitted,

YAAKOV M. ROTH
  *Principal Deputy Assistant
    Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney
    General*

MARK R. FREEMAN
DANIEL TENNY
  */s/ Steven A. Myers*
STEVEN A. MYERS
  *Attorneys, Appellate Staff
  Civil Division, Room 7232
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-8648
  Steven.A.Myers@usdoj.gov*

August 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,685 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Steven A. Myers*

Steven A. Myers

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Steven A. Myers*
Steven A. Myers