**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 25-5109**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

ASSOCIATED PRESS,

Plaintiff-Appellee,

v.

TAYLOR BUDOWICH, in his official capacity as White House Deputy Chief of Staff; KAROLINE C. LEAVITT, in her official capacity as White House Press Secretary; and SUSAN WILES, in her official capacity as White House Chief of Staff,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

### JOINT APPENDIX

————————————

Charles D. Tobin
Jay Ward Brown
Maxwell S. Mishkin
Sasha Dudding
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299

YAAKOV M. ROTH
*Principal Deputy Assistant*
*Attorney General*
ERIC D. MCARTHUR
*Deputy Assistant Attorney*
*General*
MARK R. FREEMAN
DANIEL TENNY
STEVEN A. MYERS
*Attorneys, Appellate Staff*
*Civil Division, Room 7232*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8648*

# TABLE OF CONTENTS

District Court Docket Entries ................................................................ JA1

Amended Complaint
    (Mar. 3, 2025) (Dkt. No. 26) ...................................................... JA10

Second Declaration of Zeke Miller with Exhibits A-B
    (Mar. 3, 2025) (Dkt. Nos. 27-5, 27-6, 27-7) .............................. JA42

Declaration of John Elswick
    (Mar. 3, 2025) (Dkt. No. 27-8) ................................................... JA55

Declaration of George E. Condon Jr. with Exhibits A-D
    (Mar. 3, 2025) (Dkt. Nos. 27-9, 27-10, 27-11, 27-12, 27-13) ...... JA61

Corrected Second Declaration of Julie Pace with Exhibits A-C
    (Mar. 3, 2025) (Dkt. Nos. 28, 28-1, 28-2, 28-3) ........................ JA77

Declaration of Taylor Budowich
    (Mar. 11, 2025) (Dkt. No. 33-1) ................................................ JA85

Declaration of Kristin Heitmann
    (Mar. 17, 2025) (Dkt. No. 37-1) ................................................ JA90

Third Declaration of Zeke Miller with Exhibits A-D
    (Mar. 17, 2025) (Dkt. Nos. 37-2, 37-3, 37-4, 37-5, 37-6). .......... JA93

Supplemental Declaration of Taylor Budowich
    (Mar. 25, 2025) (Dkt. No. 40-1) .............................................. JA135

Transcript of March 25, 2025 Preliminary Injunction Hearing
    (Apr. 1, 2205) (Dkt. No. 45).................................................... JA140

Memorandum Order
    (Apr. 8, 2025) (Dkt. No. 46).................................................... JA387

Order
    (Apr. 8, 2025) (Dkt. No. 47).................................................... JA428

Notice of Appeal
    (Apr. 9, 2025) (Dkt. No. 50)......................................................JA429

Memorandum Order
    (Apr. 11, 2025) (Dkt. No. 55)....................................................JA430

Motion to Enforce Preliminary Injuncton, Exhibits A-D, and
    Declaration of Chris Megerian
    (Apr. 16, 2025) (Dkt. Nos. 56, 56-1, 56-2, 56-3, 56-4, 56-5) ....JA435

Third Declaration of Taylor Budowich
    (Apr. 17, 2025) (Dkt. No. 58-1)................................................JA461

Transcript of April 18, 2025, Motion Hearing
    (Apr. 30, 2025) (Dkt. No. 60)....................................................JA463

APPEAL,JURY,STAYED,TYPE−D

## U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25−cv−00532−TNM

| | |
|---|---|
| ASSOCIATED PRESS v. BUDOWICH et al | Date Filed: 02/21/2025 |
| Assigned to: Judge Trevor N. McFadden | Jury Demand: Plaintiff |
| Case in other court:  USCA, 25−05109 | Nature of Suit: 440 Civil Rights: Other |
| Cause: 28:1331 Fed. Question | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**ASSOCIATED PRESS**                   represented by   **Charles D. Tobin**
BALLARD SPAHR LLP
1909 K Street, NW
12th Floor
Washington, DC 20006
202−661−2218
Fax: 202−661−2299
Email: tobinc@ballardspahr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maxwell S. Mishkin**
BALLARD SPAHR LLP
1909 K Street, NW
12th Floor
Washington, DC 20006
(202) 508−1140
Fax: (202) 661−2299
Email: mishkinm@ballardspahr.com
*ATTORNEY TO BE NOTICED*

**Sasha (Alexandra) Dudding**
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
917−583−6114
Email: duddings@ballardspahr.com
*ATTORNEY TO BE NOTICED*

**Jay Ward Brown**
BALLARD SPAHR LLP
1909 K Street, NW
Suite 12th Floor
Washington, DC 20006−1157
202−508−1136
Fax: 202−661−2299
Email: brownjay@ballardspahr.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**TAYLOR BUDOWICH**                   represented by   **Brian P. Hudak**
*in his official capacity as White House*                          U.S. ATTORNEY'S OFFICE FOR THE
*Deputy Chief of Staff*                                            DISTRICT OF COLUMBIA
601 D Street, NW
Washington, DC 20530
(202) 252−2549
Fax: (202) 252−2599
Email: brian.hudak@usdoj.gov
*LEAD ATTORNEY*

JA1

*ATTORNEY TO BE NOTICED*

**Jane M. Lyons**
U.S. ATTORNEY'S OFFICE for D.C.
Civil Division
555 Fourth Street, NW
Washington, DC 20530
(202) 252−2540
Fax: (202) 252−2599
Email: jane.lyons@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**KAROLINE LEAVITT**
*in her official capacity as White House
Press Secretary*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jane M. Lyons**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SUSAN WILES**
*in her official capacity as White House
Chief of Staff*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jane M. Lyons**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**STATE DEMOCRACY DEFENDERS
FUND**

represented by **Norman Larry Eisen**
STATE DEMOCRACY DEFENDERS
ACTION
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
202−594−9958
Email: norman@statedemocracydefenders.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**WHITE HOUSE
CORRESPONDENTS'
ASSOCIATION**

represented by **Simon A. Latcovich**
WILLIAMS & CONOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
202−434−5967
Email: slatcovich@wc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS**

represented by **Bruce D. Brown**
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St, NW
Suite 1020
Washington, DC 20005
(202) 795−9301
Fax: (202) 795−9310

Email: bbrown@rcfp.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CENTER FOR AMERICAN RIGHTS**     represented by **Christopher Ernest Mills**
SPERO LAW LLC
557 East Bay Street
#22251
Charleston, SC 29413
843−606−0640
Email: cmills@spero.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY**     represented by **Jameel Jaffer**
KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY
475 Riverside Drive
Suite 302
New York, NY 10115
(646) 745−8500
Email: jameel.jaffer@knightcolumbia.org
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/21/2025 | 1 | COMPLAINT against TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES with Jury Demand ( Filing fee $ 405 receipt number ADCDC−11497024) filed by THE ASSOCIATED PRESS. (Attachments: # 1 Summons to T. Budowich, # 2 Summons to K. Leavitt, # 3 Summons to S. Wiles, # 4 Summons to US Attorney for District of DC, # 5 Summons to US Attorney General, # 6 Civil Cover Sheet)(Brown, Jay) (Entered: 02/21/2025) |
| 02/21/2025 | 2 | MOTION for Temporary Restraining Order by THE ASSOCIATED PRESS. (Attachments: # 1 Memo in Support, # 2 Rule 65.1 Statement, # 3 Decl. of Z. Miller, # 4 Proposed Order)(Brown, Jay) (Entered: 02/21/2025) |
| 02/21/2025 | 3 | MOTION for Preliminary Injunction by THE ASSOCIATED PRESS. (Attachments: # 1 Memo in Support, # 2 Decl. of Z. Miller, # 3 Proposed Order)(Brown, Jay) (Entered: 02/21/2025) |
| 02/21/2025 | 4 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by THE ASSOCIATED PRESS (Brown, Jay) (Entered: 02/21/2025) |
| 02/21/2025 | 5 | NOTICE of Appearance by Jay Ward Brown on behalf of THE ASSOCIATED PRESS (Brown, Jay) (Entered: 02/21/2025) |
| 02/21/2025 | 6 | NOTICE of Appearance by Charles D. Tobin on behalf of THE ASSOCIATED PRESS (Tobin, Charles) (Entered: 02/21/2025) |
| 02/21/2025 | 7 | NOTICE of Appearance by Maxwell S. Mishkin on behalf of THE ASSOCIATED PRESS (Mishkin, Maxwell) (Entered: 02/21/2025) |
| 02/21/2025 | 8 | NOTICE of Appearance by Sasha (Alexandra) Dudding on behalf of THE ASSOCIATED PRESS (Dudding, Sasha (Alexandra)) (Entered: 02/21/2025) |
| 02/21/2025 | | Case Assigned to Judge Trevor N. McFadden. (zsl) (Entered: 02/21/2025) |
| 02/21/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 1 COMPLAINT against TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES with Jury Demand ( Filing fee $ 405 receipt number ADCDC−11497024) filed by THE ASSOCIATED PRESS. (Attachments: # 1 Summons to T. Budowich, # 2 |

| | | |
|---|---|---|
| | | Summons to K. Leavitt, # 3 Summons to S. Wiles, # 4 Summons to US Attorney for District of DC, # 5 Summons to US Attorney General, # 6 Civil Cover Sheet)(Brown, Jay). |
| | | Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney−renewal. |
| | | Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 2/28/2025. (zsl) 2/24/2025 (zapb). (Entered: 02/21/2025) |
| 02/21/2025 | 9 | ENTERED IN ERROR.....SUMMONS (5) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(zsl) Modified on 2/24/2025 (mg). (Entered: 02/21/2025) |
| 02/22/2025 | 10 | NOTICE of Appearance by Brian P. Hudak on behalf of All Defendants (Hudak, Brian) (Entered: 02/22/2025) |
| 02/22/2025 | | NOTICE of Hearing: The parties shall take notice that a hearing on the 2 Motion for Temporary Restraining Order only is set for February 24, 2025, at 3:00 PM in Courtroom 2 − In Person before Judge Trevor N. McFadden. Given the expedited timeframe, Defendants are not expected to file an opposition brief before the hearing. (lctnm1) (Entered: 02/22/2025) |
| 02/23/2025 | 11 | NOTICE of Filing by ASSOCIATED PRESS re 3 Motion for Preliminary Injunction, 2 Motion for TRO (Attachments: # 1 Declaration J. Pace Decl., # 2 Exhibit Ex. A to J. Pace Decl., # 3 Exhibit Ex. B to J. Pace Decl.)(Tobin, Charles) (Entered: 02/23/2025) |
| 02/23/2025 | 12 | MOTION for Leave to File *Amicus Curiae Brief* by WHITE HOUSE CORRESPONDENTS' ASSOCIATION. (Attachments: # 1 Exhibit Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Latcovich, Simon) (Entered: 02/23/2025) |
| 02/24/2025 | | MINUTE ORDER: The 12 Motion for Leave to File Amicus Curiae Brief by White House Correspondents' Association is GRANTED. The Clerk of Court is directed to docket the [12−1] amicus curiae brief. SO ORDERED. Signed by Judge Trevor N. McFadden on 2/24/2025. (lctnm1) (Entered: 02/24/2025) |
| 02/24/2025 | 13 | STANDING ORDER Establishing Procedures for Cases Before Judge Trevor N. McFadden. The parties are hereby ORDERED to read and comply with the directives in the attached standing order. Signed by Judge Trevor N. McFadden on 2/24/2025. (lctnm2). (Entered: 02/24/2025) |
| 02/24/2025 | 14 | Memorandum in opposition to re 2 Motion for TRO filed by TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES. (Attachments: # 1 Text of Proposed Order)(Hudak, Brian) (Entered: 02/24/2025) |
| 02/24/2025 | 15 | SUMMONS (5) Issued Electronically as to TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(mg) (Entered: 02/24/2025) |
| 02/24/2025 | 16 | NOTICE of Filing (Table of Authorities) by TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES re 14 Memorandum in Opposition (Attachments: # 1 Exhibit Table of Authorities)(Hudak, Brian) (Entered: 02/24/2025) |
| 02/24/2025 | 17 | MOTION for Leave to File *Amicus Brief* by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Brown, Bruce) (Entered: 02/24/2025) |
| 02/24/2025 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Motion Hearing held on 2/24/2025 re 2 MOTION for Temporary Restraining Order filed by ASSOCIATED PRESS. Order Forthcoming. Motion for Preliminary Injunction due by 3/3/2025. Opposition due by 3/11/2025. Reply due by 3/17/2025. Motion Hearing set for 3/20/2025 at 10:00 AM in Courtroom 2− In Person before Judge Trevor N. McFadden.Court Reporter Lisa Edwards. (ztl) Modified to edit Motion for Preliminary |

| | | Injunction due date on 2/25/2025 (hmc). (Entered: 02/24/2025) |
|---|---|---|
| 02/24/2025 | | MINUTE ORDER: The 17 Motion for Leave to File Amicus Curiae Brief by Reporters Committee for Freedom of the Press is GRANTED. The Clerk of Court is directed to docket the [17−1] amicus curiae brief. SO ORDERED. Signed by Judge Trevor N. McFadden on 2/24/2025. (lctnm2). (Entered: 02/24/2025) |
| 02/24/2025 | 18 | ORDER denying Plaintiff's 2 Motion for Temporary Restraining Order. See attached Order for details. Signed by Judge Trevor N. McFadden on 2/24/2025. (lctnm1) (Entered: 02/24/2025) |
| 02/24/2025 | 20 | AMICUS BRIEF by WHITE HOUSE CORRESPONDENTS' ASSOCIATION. (mg) (Entered: 02/25/2025) |
| 02/24/2025 | 21 | AMICUS BRIEF by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (mg) (Entered: 02/25/2025) |
| 02/25/2025 | 19 | TRANSCRIPT OF MOTION HEARING before Judge Trevor N. McFadden held on February 24, 2025; Page Numbers: 1−64. Date of Issuance: February 25, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number Lisa_Edwards@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 3/18/2025. Redacted Transcript Deadline set for 3/28/2025. Release of Transcript Restriction set for 5/26/2025.(Edwards, Lisa) (Entered: 02/25/2025) |
| 02/28/2025 | 22 | NOTICE by TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES (Hudak, Brian) (Entered: 02/28/2025) |
| 02/28/2025 | 23 | RESPONSE re 22 Notice (Other) filed by ASSOCIATED PRESS. (Attachments: # 1 Exhibit Ex. A − List of Events)(Tobin, Charles) (Entered: 02/28/2025) |
| 03/03/2025 | 24 | Unopposed MOTION for Leave to File *Amicus Brief by The Center for American Rights* by THE CENTER FOR AMERICAN RIGHTS. (Attachments: # 1 Exhibit Proposed Brief, # 2 Text of Proposed Order Proposed Order)(Mills, Christopher) (Entered: 03/03/2025) |
| 03/03/2025 | 25 | Unopposed MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Daniel Robert Suhr, Filing fee $ 100, receipt number ADCDC−11513314. Fee Status: Fee Paid. by THE CENTER FOR AMERICAN RIGHTS. (Attachments: # 1 Declaration Declaration for Pro Hac Vice Admission)(Mills, Christopher) (Entered: 03/03/2025) |
| 03/03/2025 | | MINUTE ORDER: The 24 Motion for Leave to File Amicus Curiae Brief by The Center for American Rights is GRANTED. The Clerk of Court is directed to docket the [24−1] amicus curiae brief. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/3/2025. (lctnm2). (Entered: 03/03/2025) |
| 03/03/2025 | | MINUTE ORDER granting 25 Motion for Leave to Appear Pro Hac Vice as to Daniel Robert Suhr. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/3/2025. (lctnm1) Modified event title on 3/3/2025 (hmc). (Entered: 03/03/2025) |
| 03/03/2025 | 26 | AMENDED COMPLAINT against TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES filed by ASSOCIATED PRESS. (Attachments: # 1 Redlined |

| | | |
|---|---|---|
| | | Amended Complaint)(Brown, Jay) (Entered: 03/03/2025) |
| 03/03/2025 | 27 | Amended MOTION for Preliminary Injunction by ASSOCIATED PRESS. (Attachments: # 1 Memorandum in Support, # 2 Second Decl. of Julie Pace, # 3 Ex. A to Second Decl. of Julie Pace, # 4 Ex. B to Second Decl. of Julie Pace, # 5 Second Decl. of Zeke Miller, # 6 Ex. A to Second Decl. of Zeke Miller, # 7 Ex. B to Second Decl. of Zeke Miller, # 8 Decl. of John Elswick, # 9 Decl. of George E. Condon Jr., # 10 Ex. A to Condon Decl., # 11 Ex. B to Condon Decl., # 12 Ex. C to Condon Decl., # 13 Ex. D to Condon Decl., # 14 Proposed Order)(Brown, Jay) Modified docket text on 3/7/2025 (mg). (Entered: 03/03/2025) |
| 03/03/2025 | 28 | DECLARATION *Corrected Second Declaration of Julie Pace* by ASSOCIATED PRESS re 27 MOTION for Preliminary Injunction . (Attachments: # 1 Ex. A to Second Pace Decl., # 2 Ex. B to Second Pace Decl., # 3 Ex. C to Second Pace Decl.)(Brown, Jay) (Entered: 03/03/2025) |
| 03/03/2025 | 30 | AMICUS BRIEF by THE CENTER FOR AMERICAN RIGHTS. (mg) (Entered: 03/05/2025) |
| 03/04/2025 | 29 | NOTICE *Regarding Amicus Brief* by THE CENTER FOR AMERICAN RIGHTS (Mills, Christopher) (Entered: 03/04/2025) |
| 03/04/2025 | | MINUTE ORDER: In light of Plaintiff's 27 Amended Motion for Preliminary Injunction, the Court DENIES AS MOOT Plaintiff's previous 3 Motion for Preliminary Injunction. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/4/2025. (lctnm1) (Entered: 03/04/2025) |
| 03/05/2025 | 31 | MOTION for Leave to File *Amicus Curiae Brief* by KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY. (Attachments: # 1 Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 03/05/2025) |
| 03/07/2025 | | MINUTE ORDER: The 31 Motion for Leave to File Amicus Curiae Brief by the Knight First Amendment Institute is GRANTED. The Clerk of Court is directed to docket the [31−1] amicus curiae brief. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/7/2025. (lctnm2). (Entered: 03/07/2025) |
| 03/07/2025 | 32 | AMICUS BRIEF by KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY. (mg) (Entered: 03/07/2025) |
| 03/11/2025 | 33 | Memorandum in opposition to re 27 Motion for Preliminary Injunction,, filed by TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES. (Attachments: # 1 Exhibit 1 (Budowich Decl.), # 2 Text of Proposed Order)(Hudak, Brian) (Entered: 03/11/2025) |
| 03/12/2025 | 34 | Unopposed MOTION for Leave to File by STATE DEMOCRACY DEFENDERS FUND. (Attachments: # 1 Supplement Amicus Curiae Brief)(Eisen, Norman) (Entered: 03/12/2025) |
| 03/13/2025 | 35 | NOTICE of Proposed Order re 34 by STATE DEMOCRACY DEFENDERS FUND (Eisen, Norman) Modified on 3/13/2025 to add link (mg). (Entered: 03/13/2025) |
| 03/13/2025 | | MINUTE ORDER: The Motion Hearing set for March 20, 2025, is rescheduled to March 27, 2025, at 9:30 AM in Courtroom 2 − In Person before Judge Trevor N. McFadden. In light of the parties' factual disputes, each party may offer up to two live witnesses with a total direct examination time of one hour per side. The Court will allow reasonable time for cross examination and redirect examination. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/13/2025. (lctnm1) (Entered: 03/13/2025) |
| 03/13/2025 | | MINUTE ORDER: The 34 Motion for Leave to File Amicus Curiae Brief by State Democracy Defenders Fund is GRANTED. The Clerk of Court is directed to docket the [34−1] amicus curiae brief. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/13/2025. (lctnm1) (Entered: 03/13/2025) |
| 03/13/2025 | 36 | AMICUS BRIEF by STATE DEMOCRACY DEFENDERS FUND. (mg) (Entered: 03/17/2025) |
| 03/17/2025 | 37 | REPLY to opposition to motion re 27 Motion for Preliminary Injunction,, filed by ASSOCIATED PRESS. (Attachments: # 1 Declaration of K. Heitmann, # 2 Declaration (Third) of Z. Miller, # 3 Exhibit A to 3d Decl. of Z. Miller, # 4 Exhibit B |

| | | |
|---|---|---|
| | | to 3d Decl. of Z. Miller, # 5 Exhibit C to 3d Decl. of Z. Miller, # 6 Exhibit D to 3d Decl. of Z. Miller)(Brown, Jay)(Entered: 03/17/2025) |
| 03/19/2025 | | MINUTE ORDER: The Court recognizes and appreciates the various amici that have filed briefs to date. The Court particularly invites and welcomes originalist research on the First and Fifth Amendment issues in this case. Any filings should be made by March 26, 2025. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/19/2025. (hmc) Modified on 3/19/2025 (hmc). (Entered: 03/19/2025) |
| 03/24/2025 | 38 | NOTICE re 21 Amicus Brief by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Brown, Bruce) Modified to add link on 3/26/2025 (znmw). (Entered: 03/24/2025) |
| 03/25/2025 | 39 | NOTICE of Joinder re 36 Amicus Brief by STATE DEMOCRACY DEFENDERS FUND (Eisen, Norman) Modified to add link on 3/26/2025 (znmw). (Entered: 03/25/2025) |
| 03/25/2025 | 40 | NOTICE of Filing re 27 Amended Motion for Preliminary Injunction by TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES (Attachments: # 1 Affidavit)(Hudak, Brian) Modified to add link on 3/26/2025 (znmw). (Entered: 03/25/2025) |
| 03/26/2025 | 41 | MOTION for Leave to File Amicus Brief by KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY. (Attachments: # 1 Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 03/26/2025) |
| 03/26/2025 | 42 | MOTION to Strike 40 Notice (Other) Supplemental Declaration of Taylor Budowich, ECF No. 40−1 by ASSOCIATED PRESS. (Attachments: # 1 Decl. of Charles D. Tobin, # 2 Ex. 1, # 3 Ex. 2, # 4 Ex. 3, # 5 Ex. 4, # 6 Proposed Order)(Tobin, Charles) (Entered: 03/26/2025) |
| 03/27/2025 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Preliminary Injunction Hearing held on 3/27/2025. Plaintiff's 42 Motion to Strike 40 Notice, DENIED. Plaintiff's Witnesses: Evan Vucci, Zeke Miller. Amended Motion for Preliminary Injunction held under advisement. (Court Reporter: Lisa Edwards.) (hmc) (Entered: 03/28/2025) |
| 03/27/2025 | 43 | Exhibit List by ASSOCIATED PRESS. (hmc) (Entered: 03/28/2025) |
| 03/27/2025 | 44 | Exhibit List by BUDOWICH et al. (hmc) (Entered: 03/28/2025) |
| 04/01/2025 | 45 | TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING before Judge Trevor N. McFadden held on March 27, 2025; Page Numbers: 1−247. Date of Issuance: April 1, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number Lisa_Edwards@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/22/2025. Redacted Transcript Deadline set for 5/2/2025. Release of Transcript Restriction set for 6/30/2025.(Edwards, Lisa) (Entered: 04/01/2025) |
| 04/08/2025 | 46 | MEMORANDUM ORDER GRANTING Plaintiff's 27 Amended Motion for Preliminary Injunction. See attached Order for details. Signed by Judge Trevor N. McFadden on 4/8/2025. (lctnm1) (Entered: 04/08/2025) |

JA7

| | | |
|---|---|---|
| 04/08/2025 | 47 | ORDER STAYING the 46 Memorandum Order Granting Plaintiff's 27 Amended Motion for Preliminary Injunction. See attached Order for details. Signed by Judge Trevor N. McFadden on 4/8/2025. (lctnm1) (Entered: 04/08/2025) |
| 04/08/2025 | | MINUTE ORDER: The 41 Motion for Leave to File Amicus Curiae Brief by Knight First Amendment Institute at Columbia is GRANTED. The Clerk of Court is directed to docket the [41−1] amicus curiae brief. SO ORDERED. Signed by Judge Trevor N. McFadden on 4/8/2025. (lctnm2). (Entered: 04/08/2025) |
| 04/08/2025 | | MINUTE ORDER: After considering the Reporters' Committee for Freedom of the Press's 38 Notice, and the State Democracy Defenders Fund's 39 Notice of Joinder, the amici are directed to file amended briefs with the proper signatories. SO ORDERED. Signed by Judge Trevor N. McFadden on 4/8/2025. (lctnm2). (Entered: 04/08/2025) |
| 04/08/2025 | 48 | AMICUS BRIEF by KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY. (mg) (Entered: 04/09/2025) |
| 04/09/2025 | 49 | AMICUS BRIEF *AMENDED* by STATE DEMOCRACY DEFENDERS FUND. (Eisen, Norman) (Entered: 04/09/2025) |
| 04/09/2025 | 50 | NOTICE OF INTERLOCUTORY APPEAL TO DC CIRCUIT COURT as to 46 Order on Motion for Preliminary Injunction by KAROLINE LEAVITT, TAYLOR BUDOWICH, SUSAN WILES. Fee Status: No Fee Paid. Parties have been notified. (Hudak, Brian) Modified event on 4/9/2025 (mg). (Entered: 04/09/2025) |
| 04/09/2025 | 51 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 50 Notice of Appeal to DC Circuit Court. (mg) (Entered: 04/09/2025) |
| 04/09/2025 | 52 | MOTION to Stay re 46 Order on Motion for Preliminary Injunction by TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES. (Attachments: # 1 Text of Proposed Order)(Hudak, Brian) (Entered: 04/09/2025) |
| 04/10/2025 | | USCA Case Number 25−5109 for 50 Notice of Appeal to DC Circuit Court, filed by KAROLINE LEAVITT, SUSAN WILES, TAYLOR BUDOWICH. (zdp) (Entered: 04/10/2025) |
| 04/10/2025 | 53 | Memorandum in opposition to re 52 Motion to Stay filed by ASSOCIATED PRESS. (Brown, Jay) (Entered: 04/10/2025) |
| 04/11/2025 | 54 | AMICUS BRIEF *amended pursuant to April 8 order* by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (Brown, Bruce) (Entered: 04/11/2025) |
| 04/11/2025 | 55 | MEMORANDUM ORDER DENYING Defendants' 52 Motion to Stay. See attached Order for details. Signed by Judge Trevor N. McFadden on 4/11/2025. (lctnm1) (Entered: 04/11/2025) |
| 04/16/2025 | 56 | MOTION to Enforce *Preliminary Injunction* by ASSOCIATED PRESS. (Attachments: # 1 Exhibit A − Apr 14 Email, # 2 Exhibit B − Apr. 15 Email, # 3 Exhibit C − Pool Policy, # 4 Exhibit D − Apr. 16 Pool Policy, # 5 Declaration of C. Megerian, # 6 Text of Proposed Order)(Tobin, Charles) (Entered: 04/16/2025) |
| 04/16/2025 | | MINUTE ORDER: In light of the Plaintiff's 56 Motion to Enforce, the parties are ORDERED to appear for a Motion Hearing before Judge Trevor N. McFadden on April 18, 2025, at 10:30 AM in Courtroom 2, in person. Defendants should file their response, if any by 5:00 PM on April 17, 2025. SO ORDERED. Signed by Judge Trevor N. McFadden on 4/16/2025. (lctnm2). (Entered: 04/16/2025) |
| 04/16/2025 | 57 | NOTICE of Appearance by Jane M. Lyons on behalf of All Defendants (Lyons, Jane) (Entered: 04/16/2025) |
| 04/17/2025 | 58 | Memorandum in opposition to re 56 Motion to Enforce, filed by TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES. (Attachments: # 1 Declaration Third Declaration of Taylor Budowich)(Lyons, Jane) (Entered: 04/17/2025) |
| 04/18/2025 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Motion Hearing held on 4/18/2025. Plaintiff's 56 Motion to Enforce *Preliminary Injunction*, DENIED |

JA8

| | | |
|---|---|---|
| | | for the reasons stated on the record. (Court Reporter: Lisa Moreira.) (hmc) (Entered: 04/18/2025) |
| 04/25/2025 | 59 | Consent MOTION to Stay by TAYLOR BUDOWICH, KAROLINE LEAVITT, SUSAN WILES. (Attachments: # 1 Text of Proposed Order)(Hudak, Brian) (Entered: 04/25/2025) |
| 04/28/2025 | | MINUTE ORDER: The Court GRANTS the Defendants' 59 Consent Motion to Stay. Except for proceedings to enforce the 46 preliminary injunction, this case is STAYED until further order of the Court. The parties are ORDERED to file a Joint Status Report within fourteen days of the D.C. Circuit's decision on Defendants' pending appeal of the preliminary injunction. SO ORDERED. Signed by Judge Trevor N. McFadden on 4/28/2025. (lctnm1) (Entered: 04/28/2025) |
| 04/30/2025 | 60 | TRANSCRIPT OF MOTIONS HEARING before Judge Trevor N. McFadden held on April 18, 2025; Page Numbers: 1−50. Date of Issuance:April 30, 2025. Court Reporter/Transcriber Lisa A. Moreira, RDR, CRR, Telephone number (202) 354−3187, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/21/2025. Redacted Transcript Deadline set for 5/31/2025. Release of Transcript Restriction set for 7/29/2025.(Moreira, Lisa) (Entered: 04/30/2025) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

               Plaintiff,

v.

TAYLOR BUDOWICH, in his official
capacity as White House Deputy Chief of
Staff; KAROLINE LEAVITT, in her official
capacity as White House Press Secretary; and
SUSAN WILES, in her official capacity as
White House Chief of Staff,

               Defendants.

Case No. 25-cv-532-TNM

*"The AP and the White House Correspondents Association wanted to f--k around.  Now it's finding out time."  -  unnamed White House advisor, speaking to Axios, Feb. 25, 2025*

### AMENDED COMPLAINT

Plaintiff The Associated Press ("the AP") files this Amended Complaint against

Defendants Taylor Budowich, Karoline Leavitt and Susan Wiles, each in their official capacities,

and states as follows:

### INTRODUCTION

1.      The White House has ordered The Associated Press to use certain words in its

coverage or else face retaliation with an indefinite denial of access.  The press and all people in

the United States have the right to choose their own words and not suffer retaliation at the hands

of their government.  The Constitution does not allow the government to control

speech.  Allowing government control to stand is a threat to every American's freedom.

2.      Rather than heed this Court's warning that precedent "is uniformly unhelpful" to

the government "when the White House has banned reporters in the past," its observation that

the decision to deny the AP access "seems pretty clearly viewpoint discrimination," and its

advice that "[i]t might be a good idea for the White House" to reconsider whether "what they're

doing is really appropriate in light of the case law," the White House has instead retaliated

against the AP further by abandoning the time-tested press pool system for ensuring that the

public stays informed about the President of the United States and again barring the AP from the

very same spaces – both small and large – that are at issue in this lawsuit.

      3.     Notably, this matter is not only about the press pool, as the AP's journalists are

also banned from larger events – including press conferences with the President and other world

leaders – that are held in some of the White House's biggest spaces or even outside of the White

House and that are open to all White House-credentialed journalists so long as they sign up in

advance.  The AP's journalists, despite signing up in advance, are turned away.  The net result is

that the AP's press credentials now provide its journalists less access to the White House than the

same press credentials provide to all other members of the White House press corps.

      4.     The AP therefore brings this action to vindicate its freedom of editorial

independence guaranteed by the United States Constitution and to prevent the Executive Branch

from coercing journalists to report the news using only government-approved language.

      5.     The AP is one of the world's oldest and most trusted news organizations.  Since

its inception in 1846, the AP, an independent, not-for-profit organization, has been known for its

accurate, factual, and nonpartisan reporting, including on the President of the United States and

the White House.  The AP's journalism reaches four billion people per day via news outlets

around the world – whatever their political orientation – that rely on the AP to gather information

and generate reporting that those news outlets republish for the benefit of their audiences.  The

AP has received 59 Pulitzer Prizes for its courageous coverage of key moments of world history.

6.    The AP also has participated in the White House press pool since its creation over a century ago, making it possible for the AP to deliver to the public timely and thorough reporting on the President almost everywhere he goes, which is information critical to the public, as well as to the local and state news organizations that rely on the AP's coverage to inform their readers about the news of the day.

7.    In addition to covering press pool events in the Oval Office, Air Force One, and other smaller spaces that can accommodate only a limited number of journalists, AP reporters and photographers also regularly cover events open to greater numbers of journalists or to all journalists with White House press credentials.  These events take place both inside the White House, including in the East Room and other large spaces, and outside the White House, such as at the National Building Museum and at airports where Air Force One is arriving or departing.

8.    On February 11, 2025, without prior notice, White House officials informed the AP that it would be barred from entering certain areas in the White House as a member of the press pool unless the AP began referring to the Gulf of Mexico as the Gulf of America, following President Trump's renaming of a portion of that body of water in Executive Order 14172.

9.    When the AP refused to be coerced into adopting the language dictated by the President, within hours the White House retaliated by banning AP journalists from events open to the press pool.

10.    The White House's actions were taken in response to an editorial decision by the AP to refer to the Gulf of Mexico "by its original name *while acknowledging the new name Trump has chosen*."[1]  The AP explained in its AP Stylebook, which embodies the AP's editorial

---

[1] Amanda Barrett, *AP Style Guidance on Gulf of Mexico, Mount McKinley*, AP (Jan. 23, 2025), https://www.ap.org/the-definitive-source/announcements/ap-style-guidance-on-gulf-of-mexico-mount-mckinley (emphasis added).

standards, that, "[a]s a global news agency that disseminates news around the world, the AP must

ensure that place names and geography are easily recognizable to all audiences."

11.    On February 14, the White House made its ban of the AP indefinite, announcing

on X (formerly Twitter) that, because the AP had not yielded to its demand to use the name Gulf

of America, AP journalists were now indefinitely banned from "access to limited spaces, like the

Oval Office and Air Force One."  To date, the AP's reporters and photographers remain banned

from participating in the press pool in the Oval Office, on Air Force One, and in other locations

where space necessarily limits the number of journalists who could cover the event.

12.    The AP's reporter and photographers also remain barred from larger events that

are open to all White House-credentialed journalists.  The White House has gone so far as to ban

an AP photographer from covering the arrival of Air Force One at Palm Beach International

Airport, even though the event was open to other credentialed media, and despite there being no

space constraints whatsoever on the airport tarmac.

13.    In an email to the AP on February 18, 2025, White House Chief of Staff Susan

Wiles explained "why we arrived in this point."  Wiles wrote that the White House was targeting

the AP because its Stylebook "is used by many as a standard for writing and editing," and that it

"advises journalists, scholars and classrooms around our country."  Wiles finished her email by

noting, "we remain hopeful that the name of the [Gulf] will be appropriately reflected in the

Stylebook where American audiences are concerned," clearly communicating that to resolve the

issue and restore its access, the AP must change its guidance as to American audiences.

14.    President Trump doubled down on the administration's targeting of the AP,

saying, "[w]e're going to keep them out until such time that they agree that it's the Gulf of

America" and that the AP "has been very, very wrong on the election, on Trump and the treatment of Trump."[2]

15.     After the AP filed this lawsuit on February 21, 2025, White House officials continued to confirm, over and over again, that the ban on the AP's access is based on the content and viewpoint of the AP's reporting.  On February 24, 2025, while interim U.S. Attorney for the District of Columbia Ed Martin was seated at counsel's table during the hearing on the AP's motion for a temporary restraining order, the U.S. Attorney's Office for the District of Columbia posted the following statement online attributed to him: "As President Trumps' [sic] lawyers, we are proud to fight to protect his leadership as our President and we are vigilant in standing against entities like the AP that refuse to put America first."[3]

16.     On February 25, 2025, Defendants escalated their retaliation against the AP. Leavitt announced at a press briefing that, going forward, White House officials would determine which news organizations participated in the press pool.  This marked the end of the White House's decades-long deference to the White House Correspondents' Association (WHCA) to organize the pool.  Leavitt announced that the new pool would consist of "legacy media" and "new media," with scant additional details.

17.     Leavitt made clear that the administration would, in her words, "double down" on excluding the AP.  Defendants' access ban on the AP has indeed remained in effect.

---

[2] *See, e.g.*, David Bauder, *Trump Says AP Will Continue to Be Curtailed at White House Until It Changes Style to Gulf of America*, AP (Feb. 18, 2025), https://apnews.com/article/trump-ap-white-house-press-corps-pool-91535a6384d681fee1cd7e384ea6c627; *Trump Restricts AP Access Over Gulf of Mexico Issue*, Reuters (Feb. 18, 2025), https://www.reuters.com/world/us/trump-restricts-ap-access-over-gulf-mexico-issue-2025-02-19/.

[3] @USAO_DC, X (Feb. 24, 2025), https://x.com/USAO_DC/status/1894119675786621225. The U.S. Attorney's Office posted that quote at 3:18 p.m. ET; the hearing began at 3:04 p.m. ET.

18.    The White House has continued to ban AP's journalists from covering the President at pool-only events in the Oval Office and other limited spaces.

19.    The White House also continues to ban AP journalists from larger spaces, such as the East Room and the tarmac at Palm Beach International Airport, during events that were open to all credentialed White House reporters and not just pool reporters.

20.    This Court should order that the White House immediately cease its retaliatory actions against the AP, which are based solely on the content of the AP's speech, and rescind its denial of the AP's access to the Oval Office, Air Force One, and other limited spaces when those spaces are made open to members of the White House press pool, as well as its denial of the AP's access to larger spaces open to all journalists with White House press credentials.

21.    The White House ban of the AP violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  As the D.C. Circuit has made clear, journalists' "first amendment interest" in access to the White House, at events both large and small, "undoubtedly qualifies as liberty which may not be denied without due process of law under the fifth amendment." *Sherrill v. Knight*, 569 F.2d 124, 130-31 (D.C. Cir. 1977).  The AP's liberty interest in access is rooted in the First Amendment's free speech and press guarantees and its related protections for newsgathering.  Defendants gave the AP no prior or written notice of, and no formal opportunity to challenge, their arbitrary determination that the AP would indefinitely lose access to the Oval Office, Air Force One, and other limited areas as a member of the press pool.  Nor did Defendants provide prior or written notice of, or formal opportunity to challenge, the denial of access to larger spaces open to all reporters with White House press credentials

22.    The ban also violates the First Amendment to the U.S. Constitution.  The D.C. Circuit has made clear that denying journalists access to White House press events "based upon

the content of the journalist's speech" is "prohibited under the first amendment." *Sherrill*, 569

F.2d at 129.  Having opened the White House and certain areas to the press, the First

Amendment "requires that this *access not be denied* arbitrarily or for less than compelling

reasons." *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 75-76 (D.D.C. 2023) (quoting *Sherrill*, 569

F.2d at 129) (emphasis in original), *appeal argued*, No. 24-5004 (D.C. Cir. Oct. 15, 2024).

Defendants have not provided, nor could they, any compelling reason for their arbitrary denial of

the AP's access.  Rather, Defendants' actions are impermissibly based on their dislike of the

content of the AP's expression and what they perceive as the AP's viewpoint reflected in the

content of its expression.  The White House ban of the AP also constitutes impermissible

retaliation, as it was instituted to punish the AP for its constitutionally protected speech, and for

filing this case, in ways that would chill the speech of a reasonable person of ordinary firmness.

23.     After making several unsuccessful efforts to persuade Defendants that their

conduct is contrary to well-established law, the AP brought this action to vindicate its

constitutional rights, restore its access to presidential events, and ensure that the press remains

free to report on the administration without fear of selective, arbitrary denials of access – denials

that continue as to the newly constituted press pool and that have expanded to even more large

spaces as well.  The White House responded by "doubling down" on its denial of access and by

discarding the White House press pool system that has worked for decades to keep the public

informed about the President.  The AP now files this Amended Complaint.

## PARTIES

24.     Plaintiff the AP is a not-for-profit news cooperative organized under the laws of

the State of New York.  The AP is one of the world's most trusted news sources, reaching four

billion people per day, including with its coverage of the White House.

25.     Defendant Taylor Budowich is the White House Deputy Chief of Staff.  He is sued in his official capacity.

26.     Defendant Karoline Leavitt is the White House Press Secretary.  She is sued in her official capacity.

27.     Defendant Susan Wiles is the White House Chief of Staff.  She is sued in her official capacity.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

29.     Venue is proper in this judicial district under 5 U.S.C. § 552(a)(4)(B).  A substantial part of the events giving rise to this action occurred in this district, and Defendants are officers of the United States sued in their official capacities.

## FACTUAL BACKGROUND

### The White House Press Pool

30.     Until this lawsuit began, the White House press pool consisted entirely of journalists who regularly report to the public about the President, the White House, and other Executive Branch activity in Washington, DC and globally.  For decades, the press pool has accompanied the President almost everywhere he goes, ensuring that the public is informed of his activity and that the President and his administration are held accountable to the public.

31.     Because there often is not enough space in the Oval Office or on Air Force One to accommodate every journalist who covers the President, the press pool has served as the eyes and ears of the full press corps, of news outlets outside of Washington, DC, and of the public.  In these places, the press pool acts as a witness to history, contemporaneously documenting and promptly reporting on the President's activities.

32.     Prior to February 25, 2025, in all of its permutations, the press pool had consisted of, at minimum, three wire reporters (one each from the AP, Reuters, and Bloomberg), four photographers (one each from the AP, Reuters, AFP, and The New York Times), three network television journalists, a radio correspondent, and at least one print reporter.  Membership in the pool was determined at the sole discretion of the White House Correspondents' Association (WHCA) and the press corps itself.  *See, e.g.*, https://whca.press/covering-the-white-house/resources/guide-to-the-white-house-beat.

33.     On information and belief, until February 25, 2025, the White House had never interfered with the WHCA's and White House press corps' determination of the news organizations that make up the White House press pool.

34.     In circumstances when logistics have dictated that the full press pool could not accompany the President, such as during President Biden's secret trip to Kyiv in 2023 or President Trump's secret trip from Palm Beach to Joint Base Andrews to begin a secret trip to Afghanistan in 2019, the WHCA—not the White House—determined the membership of an even more narrowly limited temporary pool.

35.     Conversely, when logistics have permitted more journalists to accompany the President, the WHCA determined the membership of an expanded pool, and the White House would admit additional journalists as space allowed.

36.     For certain large events in some of the White House's biggest spaces, such as press conferences with the President and other world leaders held in the East Room, any reporter with a White House press credential – regardless of whether that journalist is in the press pool – may attend and report on the event so long as they sign up in advance.

37.    The AP had been a member of the White House press pool since the pool's inception well over a century ago, and as a result, had been able to report to the public first-hand on some of history's most defining events.  In fact, an AP reporter became the first recorded presidential "pooler" in 1881, providing updates to fellow reporters from his post outside the White House sick room of President James A. Garfield after he was shot.  AP pool journalists were also in the motorcade in Dallas when President John F. Kennedy was assassinated, providing the nation with contemporaneous, fact-based reporting as the story developed, and as conspiracy theories spread.  And, AP journalists were in the pool with President George W. Bush when he learned of the September 11 terrorist attacks during an event in Florida, and they accompanied him on Air Force One to secure locations in Louisiana and Nebraska and back to Washington.

38.    The wire services have the broadest reach – particularly among outlets that cannot afford the considerable expense of providing their own coverage of the White House – and the WHCA therefore determined that they should always be present in the pool so that the widest possible audience can be informed of the President's activities.  The wire services have thus delivered nearly instantaneous content from the White House to thousands of news outlets in the U.S. and abroad, and through them to billions of readers around the globe.

39.    As a participant in the White House press pool, the AP has long provided at least two White House-credentialed journalists—one text reporter and one photographer—to the Oval Office and other areas of the White House when events open to the press are held in those areas.

40.    The AP has also long sent one text reporter and one photographer to travel with the President in the 13-seat press pool on Air Force One.  The AP and all other members of the pool have paid for such transportation and other costs, often at considerable expense.

41.     When AP text journalists covered presidential events, they were able to send reports out instantaneously to the AP's global readership.  That instantaneous publication also allowed the information to be distributed to thousands of news outlets all around the world.

42.     Moreover, a journalist covering an event in person is able to observe and report important information that they cannot gather from secondhand reporting, or even from watching a live video feed of the event.  For example, when President George W. Bush met the new Russian President Vladimir Putin in 2001, AP journalist Ron Fournier asked President Bush whether Putin was "a man that Americans can trust," and President Bush responded, "I looked the man in the eye.  I found him to be very straightforward and trustworthy… I was able to get a sense of his soul."  Because Fournier was present at the event, he could see National Security Adviser Condoleezza Rice gasp at the President's answer.[4]

43.     When the AP's text journalists were part of the press pool, there were no customs, expectations, or requirements that they share the information they gathered with other press pool members.  To the contrary, the wire services vigorously competed with each other to provide the fastest and most accurate news reporting at the very moment that the event was happening.  The AP's text journalists have lost the ability to provide such instantaneous reporting, and the AP and its news outlet customers have been harmed, when AP journalists have not been permitted to cover presidential events firsthand.

44.     When the AP's photographers covered presidential events, they were able to send photographs out to AP photo editors, and from there out to the AP's global readership, within a minute of the photographer taking them.  When they did so as part of the press pool, there were

---

[4] *See* Ron Fournier, *Bush, Putin vow new bonds, hint at compromise in first talks*, AP (June 17, 2001) (reporting that President Bush's answer "caught [his] advisers by surprise").

no customs, expectations, or requirements that the AP's photographers share the photos they took with the other press pool members. To the contrary, the photo poolers vigorously competed with one another to provide news organizations and others around the world with the fastest and best photographs of the event as it was taking place. The AP's photographers have lost the ability to provide such near-instantaneous photography, and the AP and its news outlet customers have been harmed, when AP photographers have not been permitted to cover presidential events and observe history on behalf of the public firsthand.

45.     AP journalists have also attended many events open not just to the pool, but to any journalist with a White House press credential, held in large spaces such as the East Room.

46.     Full access to places and events to which other members of the press pool and broader press corps are admitted is essential to the AP's ability to provide the public with fast, accurate, and comprehensive coverage of the President and his administration. When the AP is denied access, the thousands of global news outlets that republish the AP's news reports, and the billions of people that rely on its reporting, also are denied access.

## The White House Attempts to Control the AP's Speech

47.     Upon information and belief, prior to the events giving rise to this lawsuit, the White House had never before attempted to bar an entire news organization from membership in the press pool and from accessing those spaces open to other members of the pool.

48.     During the prior Trump administration, the White House had targeted the press by revoking the "hard pass" press credentials of two White House correspondents, CNN's Jim Acosta and Playboy's Brian Karem, but had not barred all journalists at those organizations from accessing events open to the White House press corps. Other courts in this District held that those access denials were unlawful.

49.    On the morning of February 11, 2025, White House Press Secretary Karoline Leavitt summoned AP Chief White House Correspondent Zeke Miller to her office.  She told him that, at President Trump's direction, the AP would no longer be permitted in the Oval Office as part of the press pool until and unless the AP revised its Stylebook to refer to the body of water known for hundreds of years as the Gulf of Mexico as the Gulf of America.  Leavitt provided no reason for the decision other than to compel the AP to change the language of its reporting, nor did she object to any particular conduct by Miller or any other AP journalist.

50.    Leavitt's proclamation followed an Executive Order President Trump had issued on January 20, 2025, renaming a portion of the Gulf of Mexico as the Gulf of America.  Exec. Order No. 14172.  By its own terms, the Executive Order applies only to those portions of the Gulf within the United States.  The body of water also borders Mexico and Cuba.  It has been known as the Gulf of Mexico for over 400 years and remains known internationally as the Gulf of Mexico.

51.    On January 23, the AP announced that the organization would refer to the Gulf of Mexico "by its original name *while acknowledging the new name Trump has chosen*."[5]  The AP explained that, "[a]s a global news agency that disseminates news around the world, the AP must ensure that place names and geography are easily recognizable to all audiences."  The AP added that it "regularly reviews its style guidance regarding name changes, in part to ensure its guidance reflects common usage," and would do so here.  It also noted that the AP would "make updates as needed."

52.    In the same guidance, the AP noted that President Trump's January 20, 2025 Executive Order had also renamed North America's tallest mountain to Mount McKinley from

---

[5] Barrett, *AP Style Guidance*, *supra* (emphasis added).

Denali, undoing a 2015 name change issued by the Secretary of the Interior during President

Obama's administration.  *See* Dep't of the Interior Order No. 3337 (Aug. 28, 2015).  The AP

announced that it would follow this name change because the mountain is entirely within the

United States and therefore under the federal government's renaming authority.

53.    The AP, however, abided by its carefully considered standards decision when

Leavitt made her February 11, 2025 demand that, with respect to the Gulf, it must begin using

only the Gulf of America name.

54.    Later on the afternoon of February 11, however, White House staff barred the

AP's text journalist from attending a presidential executive order signing and press conference

with Elon Musk in the Oval Office, which was open to the press pool.  The AP's photographer

was allowed to attend.  This was Musk's first time answering questions with President Trump at

the White House.  As a result, the AP's reporting on this highly newsworthy event was delayed

and the AP was unable to ask questions that may have generated additional news.

55.    AP Executive Editor Julie Pace published a statement that same day objecting to

the White House's actions.  Pace wrote that "[l]imiting our access to the Oval Office based on

the content of AP's speech not only severely impedes the public's access to independent news, it

plainly violates the First Amendment."[6]

56.    That night, another AP reporter was barred from an event in the Diplomatic

Reception Room that was open to the press pool, as the President welcomed home an American,

Marc Fogel, freed in a prisoner exchange with Russia.  The AP's photographer was not barred.

As a result of the AP's reporter's exclusion, he was at the distinct disadvantage of relying on the

---

[6] Lauren Easton, *AP Statement on Oval Office Access*, AP (Feb. 11, 2025),
https://www.ap.org/the-definitive-source/announcements/ap-statement-on-oval-office-access.

video feed to pull quotes.  This caused delays in the AP's reporting in an industry where seconds matter, and left the reporter without important in-the-room context.

57.    On February 12, 2025, Pace sent a letter to White House Chief of Staff Susan Wiles objecting to these denials of access, which "were plainly intended to punish the AP for the content of its speech" in violation of the AP's constitutional rights.  The AP "strongly urge[d] the administration to end this practice" and offered to meet to discuss the matter in person.[7]

58.    Also on February 12, Leavitt defended the White House's actions during a press briefing and stated that the AP was telling "lies" by using the Gulf of Mexico name.

59.    That afternoon, the AP was barred from an Oval Office press conference during the swearing-in of Director of National Intelligence Tulsi Gabbard.  The President's statements during the event generated important, breaking news, but the AP could not fully report on the event until it was over.

60.    On February 13, 2025, the AP's text journalist was barred (though its photographer was not) from a White House East Room press conference held by President Trump and Indian Prime Minister Narendra Modi, which was open to members of the press pool and to all other journalists with White House press credentials.  AP reporter Miller had submitted an RSVP for the event but was barred from attending.  At least one journalist from another news organization who did not RSVP was provided access.  The East Room is one of the largest event spaces at the White House, and can accommodate dozens of journalists, as it did for this event:

---

[7] @katie_robertson, X (Feb. 12, 2025),
https://x.com/katie_robertson/status/1889739177169670148.

**Figure 1: East Room Press Conference, Feb. 13, 2025 (AP Photo)**



61.     Also on February 13, the White House barred the AP altogether from three other Oval Office events open to the press pool: a session in which the President signed executive orders, the swearing-in ceremony for Robert F. Kennedy Jr. as Secretary of Health and Human Services, and a bilateral meeting with Prime Minister Modi.

62.     That same day, Pace issued a statement again objecting to the AP's "deeply troubling" exclusion and "urg[ing] the Trump administration in the strongest terms to stop this practice."  Pace wrote that "[t]his is now the third day AP reporters have been barred from covering the president—first as a member of the pool, and now from a formal press conference—an incredible disservice to the billions of people who rely on The Associated Press for nonpartisan news."[8]  Also on February 13, 2025, Pace sent an email to Wiles objecting again to the White House's actions against the AP.

_____

[8] *White House Blocks AP Reporter from Trump-Modi News Conference Because of Gulf of Mexico Fight*, AP (Feb. 13, 2025), https://apnews.com/article/ap-white-house-gulf-name-dispute-media-864f2fbb5cfaeede009d7cea5788515b.

63.    On February 14, 2025, White House Deputy Chief of Staff Taylor Budowich publicly announced that, because the AP would not use the Gulf of America name, AP journalists were now indefinitely barred from "access to limited spaces, like the Oval Office and Air Force One."  Budowich stated that AP "journalists and photographers will retain their credentials to the White House complex."  Budowich's statement further claimed that the AP had a "commitment to misinformation" and published "irresponsible and dishonest reporting."[9]  That same day, Pace sent another email to Wiles again objecting to the White House's actions.

64.    The access denials continued that day, as the AP was barred from an Oval Office executive order signing and an Air Force One flight to Palm Beach, Florida.

65.    An unnamed White House source told journalists that the White House decided to expand its ban to include AP photographers as well as AP text journalists for the express purpose of "depriving the organization of the revenue it earns from selling pictures on its news wire."[10]

66.    On February 15, 2025, White House Deputy Chief of Staff Stephen Miller suggested further punishing the AP by revoking its White House access entirely.[11]  While this has not yet occurred, his statement further evidences the White House's clear intent to target the AP for the content of its speech.  The following day, February 16, Pace sent another email to Wiles objecting to the continued denial of access for the AP.

67.    From February 15 to 19, the AP was barred from coverage of the President while he was in West Palm Beach, Florida, including at a February 18 press conference open to other media organizations in addition to the pool, during which the President signed executive orders.

---

[9] @Taylor47, X (Feb. 14, 2025), https://x.com/Taylor47/status/1890453490398326919.

[10] *See* Erin Doherty et al., *Judge upholds Trump's right to block AP for now*, Axios (Feb. 24, 2025), https://www.axios.com/2025/02/24/trump-ap-access-lawsuit-white-house-filing.

[11] @StephenM, X (Feb. 15, 2025), https://x.com/StephenM/status/1890948850505945264.

68.    On the morning of February 18, five days after receiving the AP's letter protesting

the White House's actions, Wiles responded.  *See* Decl. of Julie Pace Ex. B, ECF No. 11-3.

Wiles wrote that "[t]here is no event that the Associated Press is being barred from covering," a

statement that is plainly false given the AP's exclusion from President Trump's press conference

with Prime Minister Modi and its exclusion from even more events in subsequent days.  Wiles

also wrote that the White House's "view as to why we arrived in this point" is that "the

influence" the AP's "Stylebook has acquired has been misused, and at times weaponized, to push

a divisive and partisan agenda."  Wiles further stated that, as to the Gulf of Mexico specifically,

White House officials "of course[] recognize that this renaming may not formally apply yet

internationally," but Wiles nevertheless insisted that "given the AP's role, it should also

appropriately make the distinction as an American guideline."

69.    Later that same day, President Trump confirmed that his administration would

continue denying the AP access based on its journalism, remarking of the AP, "[w]e're going to

keep them out until such time that they agree that it's the Gulf of America."  The President then

lambasted the AP, stating that the AP "has been very, very wrong on the election, on Trump and

the treatment of Trump" and that "they're doing us no favors and I'm not doing them any

favors."  President Trump made these statements at a Mar-a-Lago press conference from which

AP reporters were barred, even though the AP had requested access from Leavitt and other

White House officials and from security staff on site at Mar-a-Lago.

70.    On February 19, 2025, in a final effort to reach a resolution of this matter short of

litigation, Pace traveled to Miami, Florida, on one day's notice to meet with Wiles.  The meeting

did not result in the White House ceasing its restrictions on the AP's access.  Instead, Wiles

continued to insist that the AP must revise its Stylebook to adopt Gulf of America without

qualification.  Wiles informed Pace that she would discuss the matter with President Trump that evening and follow up with her, but to date, the AP has not heard further from Wiles.

71.    On February 20, 2025, an AP reporter and two AP photographers were barred from a Black History Month reception held in the East Room – a large event open to the press pool and all other White House credentialed journalists.  That evening, an AP reporter and photographer were barred from joining the remainder of the press pool in the President's motorcade to cover his attendance at a dinner hosted by the Republican Governors Association.  An AP Radio reporter, selected by his colleagues as the designated pooler for that format in the pool for events that day, was also barred from providing coverage of the day's events.

72.    Speaking at the Republican Governors Association dinner, held at the National Building Museum, President Trump emphasized that the White House is "holding [the AP] out of any news conferences" because of how the AP refers to the Gulf of Mexico, and he even predicted this very case, remarking that the possibility of the AP prevailing in such a lawsuit "doesn't matter" because the effort to coerce the AP into using the government's preferred words "is something we feel strongly about."[12]

### The AP Files this Lawsuit to Vindicate its Constitutional Rights

73.    On February 21, 2025, to protect its rights and stop the ongoing denials of access, the AP exercised its First Amendment right to petition the court and filed this lawsuit.

74.    The access denials continued, however, as did the White House's statements making clear that the denials are aimed at punishing the AP for the content and perceived viewpoint of its speech.

---

[12] *President Trump Remarks at Republican Governors Association*, C-SPAN (Feb. 20, 2025), https://www.c-span.org/program/white-house-event/president-trump-remarks-at-republican-governors-association/656015, at 46:16-46:43.

75.    For example, the White House responded to this lawsuit by issuing a statement

from Communications Director Steven Cheung, which described this case as "frivolous and

demented," insisted that the AP is "clearly suffering from a severe, debilitating case of Trump

Derangement Syndrome that has rotted their peanut-sized brains," and vowed that "[w]e will

defeat them in court just like we crushed their leftist reporters at the ballot box."[13]

76.    On February 22, 2025, the AP was excluded from covering the President's visit to

the Conservative Political Action Conference, held at a large hotel and convention center in

National Harbor, Maryland, where he met with Polish president Andrzej Duda.  That night, the

AP was barred from covering the National Governors Association Evening Dinner and

Reception in the East Room, where the President delivered remarks and took questions from the

pool.  Due to its exclusion from the event, the AP was unable to confirm whether Democratic

governors had attended, even by asking other journalists after the event was over.

77.    On February 24, 2025, AP journalists were excluded from a press conference with

French President Emmanuel Macron held in the East Room, one of the largest rooms in the

White House, as well as from a bilateral meeting between the two leaders in the Oval Office.

78.    The East Room press conference was open to all journalists with White House

press credentials who signed up in advance.  The AP signed up in advance but never received a

confirmation, and its White House reporter and photographer were blocked from entering.

79.    In a perfect illustration of how arbitrarily the White House has acted in excluding

the AP, a Paris-based AP reporter flown overseas at the AP's expense *was* permitted to enter the

East Room – *but only as part of President Macron's press pool*.  The White House thus forced

---

[13] Jeremy Barr, *Associated Press Sues White House Officials over Press Access Ban*, Wash. Post
(Feb. 21, 2025), https://www.washingtonpost.com/style/media/2025/02/21/associated-press-
lawsuit-white-house-ban.

the AP to incur significant costs, which the AP would not have borne but for this denial of access, to cover first hand President Macron's visit to the U.S. for the AP's global readership.

80.    Also on February 24, 2025, this Court held a hearing on the AP's motion for temporary restraining order, during which it stated that the ban on the AP "seems pretty clearly viewpoint discrimination."  *See* Feb. 24, 2025 Hr'g Tr. at 40:1-2.  At the conclusion of the hearing, the Court declined to enter a TRO against Defendants, but the Court cautioned defense counsel that precedent "is uniformly unhelpful to . . . the White House when the White House has banned reporters in the past," and the Court observed that "[i]t might be a good idea for the White House" to reconsider whether "what they're doing is really appropriate in light of the case law." *See id.* at 60:21-61:6.

**The White House Seizes Control of the Press Pool and Continues to Exclude the AP**

81.    The White House refused to heed this Court's warning.  Instead, in an effort to evade the "uniformly unhelpful" precedent, and as a direct result of this lawsuit, on February 25, 2025 – the afternoon after the TRO hearing – Leavitt announced at a White House press briefing that White House officials would now hand-pick the outlets allowed to cover the President.  The White House thus ended the decades-long deference to the WHCA to select members of the press pool.  Leavitt announced that the pool would consist of "legacy media" and "new media," but she did not describe its membership or how the pool would work.  Leavitt had not notified or sought comment from WHCA or existing pool members before making her announcement.

82.    Regardless of these changes to the pool, however, Leavitt made clear that the White House would "double down" on excluding news organizations at will.  As an unnamed

White House advisor told journalists that day, "The AP and the White House Correspondents Association wanted to f--k around.  Now it's finding out time."[14]

83.    Wire services AP, Reuters, and Bloomberg issued a statement in response, writing that "[i]t is essential in a democracy for the public to have access to news about their government from an independent, free press," which limiting pool members' access endangers.[15]

84.    Following Leavitt's announcement, the number of pool spots allocated to wire service reporters shrank from three (AP, Reuters, and Bloomberg) to one or two (a rotation of Reuters and/or Bloomberg, with the AP still banned), and the AP has remained barred from participating in the four photographer spots as well.  For certain events, the White House has even permitted additional wire service reporters – but still not the AP's reporters – from covering the President.

85.    All other non-rotating, organizational members of the original press pool have, like the AP, continued to use the Gulf of Mexico name, while noting President Trump's Executive Order.  The White House has not barred any other news organization from participating in the press pool, either under the WHCA's oversight or its own, as a result of continuing to use Gulf of Mexico, underscoring the administration's particular animus toward and retaliation against the AP.[16]

---

[14] Marc Caputo et al., *White House strikes back at AP, takes over press pool coverage from reporter group*, Axios (Feb. 25, 2025), https://www.axios.com/2025/02/25/white-house-trump-press-pool.

[15] Lauren Easton, *Statement from AP, Bloomberg News, Reuters on White House Press Pool Access*, AP (Feb. 25, 2025), https://www.ap.org/the-definitive-source/announcements/statement-from-ap-bloomberg-news-reuters-on-white-house-press-pool-access.

[16] *But see* Kevin Robillard, *White House Kicks Out HuffPost Reporter From Press Pool*, HuffPost (Feb. 25, 2025), https://www.huffpost.com/entry/white-house-kicks-out-huffpost-reporter-from-press-pool_n_67be9224e4b0d509934aa224 (noting that the White House reassigned a print pool seat from HuffPost to Axios without explanation).

86.    Since February 14, 2025, the AP's White House journalists have remained barred from the Oval Office, Air Force One, and other locations otherwise open to the White House press pool, as well as from events open to all White House credentialed journalists.

87.    On February 27, 2025, for example, the AP's White House journalists were barred from a press pool event in the Oval Office with the President and UK Prime Minister Starmer.  However, and once more underlining the arbitrariness of the White House's actions, a London-based AP reporter flown overseas at the AP's expense *was* permitted to enter the Oval Office – *but only as part of Prime Minister Starmer's press pool*.

88.    That same day, the AP's White House journalists were barred from a press conference with the President and Prime Minister Starmer in the East Room that was open to all credentialed White House journalists who signed up in advance, which the AP journalists did.

89.    The AP's London-based reporter was permitted to enter the East Room and cover the event.  The White House thus forced the AP to incur significant costs, which the AP would not have borne but for this denial of access, to thoroughly cover Prime Minister Starmer's visit to the U.S. for the AP's global readership.

**Figure 2: Dozens of Journalists Gather for East Room Press Conference (AP Photo)**



90.    The next day, February 28, the AP's White House journalists were barred from a press pool event in the Oval Office with the President and Ukrainian President Volodymyr Zelenskyy.  Yet again, a Ukraine-based AP reporter flown overseas at the AP's expense *was* permitted to enter the Oval Office – *but only as part of President Zelenskyy's press pool.*

91.    On the afternoon of February 28, Pace sent another email to Wiles objecting to the continued exclusion of the AP from both the pool and events open to the larger press corps. As of this filing, Wiles has not responded to that email.

92.    On the evening of February 28, the White House even barred an AP photographer from covering the President's arrival on Air Force One at Palm Beach International Airport, despite opening the event to other credentialed media, and despite there being no space constraints on the airport tarmac.

93.    The White House has not provided the AP with any formal notice of the reasons for, formal opportunity to be heard regarding, or meaningful opportunity to challenge the White House's decision to bar the AP from the press pool, Oval Office, Air Force One, and other

limited areas open to pool members, or its decision to bar the AP from access to larger events open to credentialed journalists. The Constitution guarantees the AP these procedural protections given the AP's liberty interest in access to these spaces and events.

94.    The White House has based its indefinite denial of the AP's access, including after taking control of the press pool, on the content and perceived viewpoint of the AP's reporting and editorial decisions and on the AP's filing of this lawsuit, which constitutes impermissible retaliation against the AP based on its constitutionally protected activity in ways that would chill the speech of similarly situated reasonable individuals.

95.    The AP is harmed every day that it is denied firsthand access to pool events and to larger events open to all White House credentialed journalists. The AP's journalists cannot observe and report on the President's demeanor, appearance, tone, or expressions, or on the presentation of others in the room with him. Nor can the AP take its own photographs, which would satisfy its standards, provide the volume and variety of images that AP customers expect, and best advance the AP's own reporting. The denial of access also hinders the AP's ability to produce reporting and publish photographs quickly – an essential attribute of a wire service – causing delays that harm the AP and, as a result, the thousands of news outlets and billions of readers that rely on the AP's journalism. The AP has also been forced to incur the substantial costs of flying foreign-based AP journalists to the U.S. to cover foreign leaders' visits to the White House, as those foreign-based AP journalists are arbitrarily permitted to cover presidential events even though the AP's White House journalists remain banned from those same spaces.

## CLAIMS FOR RELIEF

### Count I
### Declaratory and Injunctive Relief
### Violation of the Fifth Amendment: Exclusion from the Press Pool

96.     The AP realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

97.     Defendants' decision to indefinitely ban the AP from "access to limited spaces, like the Oval Office and Air Force One" open to members of the White House press pool, violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  Because the White House has made those spaces available to other members of the pool, it cannot constitutionally deny the AP access without due process of law, and cannot deny access arbitrarily or for anything other than legitimate, compelling reasons unrelated to the perceived viewpoint of the press pool member.

98.     The AP's access as a member of the press pool to the Oval Office, Air Force One, and the other limited spaces – which the White House has now revoked indefinitely – is protected by the First and Fifth Amendments.  Being a member of the press pool and reporting from these spaces has, for over a century, allowed the AP to effectively and timely report on the President and White House, information which is critical to an informed public.  The indefinite denial of the AP's access hinders its ability to provide timely, accurate and nonpartisan reporting on the President and White House to the thousands of global news outlets that republish the AP's news reports and to billions of readers globally.

99.     The White House's decision to deny the AP's access was arbitrary.  The AP received no prior notice of the White House's decision.  Leavitt announced the decision verbally, after it had been made, to AP Chief White House Correspondent Miller.  The AP received no written notice of the White House's decision before it took effect.

100.    Defendants also did not provide to the AP any opportunity to challenge their

decision before it took effect, nor have Defendants provided to the AP any formal opportunity to

challenge it since that time.  Instead, the administration repeatedly has made clear that it intends

to continue barring the AP's access indefinitely unless the AP uses the President's preferred

language.

101.    As a result of Defendants' actions, the AP has suffered and continues to suffer

irreparable harm.

**Count II**
**Declaratory and Injunctive Relief**
**<u>Violation of the First Amendment: Exclusion from the Press Pool</u>**

102.    The AP realleges and incorporates by reference all previous paragraphs as if fully

set forth herein.

103.    The White House has ordered the AP to use certain words in its coverage or else

be barred from accessing events open to the White House press pool, as direct retaliation for the

AP's speech and for the AP's decision to file this lawsuit.  Defendants' decision to bar the AP

from reporting in the White House press pool and to deny the AP's access to the Oval Office, Air

Force One, and other limited areas, violates the First Amendment to the U.S. Constitution.  The

AP's access to and reporting on the White House as a member of the press pool, the AP's own

editorial decisions about naming conventions, and the AP's petitioning of the court, are all

protected under the First Amendment.

104.    Defendants have deprived the AP of its right as a member of the White House

press pool to access limited areas in the White House that have been opened to the press pool as

representatives of the press and public.  This attempt to control speech has the impact of

depriving the thousands of global news outlets that republish the AP's news reports, and its

27
**JA36**

billions of readers around the world, from the AP's factual, timely and nonpartisan reporting on the White House.

105.    Defendants have admitted that they acted against the AP based on their dislike of the AP's use of the Gulf of Mexico name and its other editorial choices. The law does not allow the government to control speech based on its likes and dislikes. Such dislike is not a compelling reason to justify the infringement of the AP's First Amendment rights, and it is not narrowly tailored to achieve any compelling government interest.

106.    Defendants' actions against the AP expressly were taken because of the language the AP uses in its reporting and Stylebook, constituting viewpoint-based discrimination that is impermissible even in the most restrictive nonpublic forums.

107.    Defendants' actions against the AP were in retaliation for the AP's exercise of its First Amendment-protected rights of expression and its right to petition the court by filing this very lawsuit. The access denial was intended to have, and has had, a chilling effect on the exercise of the AP's First Amendment rights. Defendants' acts would chill, and have chilled, the speech of similarly situated reasonable people of ordinary firmness.

108.    Defendants' access denial is also intended to compel the speech of the AP, specifically to make the Gulf of America the primary term used in its reporting and Stylebook.

109.    As a result of Defendants' actions, the AP has suffered and continues to suffer irreparable harm.

### Count III
### Declaratory and Injunctive Relief
### Violation of the Fifth Amendment: Exclusion from Credentialed Press Events

110.    The AP realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

111.    Defendants' decision to indefinitely ban the AP from events open to all credentialed White House journalists violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  Because the White House has made those spaces available to all credentialed White House journalists, requiring only that they sign up in advance, it cannot constitutionally deny the AP's access without due process of law, and cannot deny access so arbitrarily or for anything other than legitimate, compelling reasons unrelated to the AP's perceived viewpoint.

112.    The AP's access to events that are open to all White House credentialed journalists—which the White House has now denied indefinitely—is protected by the First and Fifth Amendments.  Access to these events, which include press conferences with the President and other world leaders, allows the AP to effectively and timely report on the President and White House, information which is critical to an informed public.  The indefinite denial of the AP's access hinders its ability to provide timely, accurate and nonpartisan reporting on the President and White House to the thousands of global news outlets that republish the AP's news reports and to billions of readers globally.

113.    The White House's decision to deny the AP's access was arbitrary.  The AP received no prior notice of the White House's decision.  Leavitt announced the decision verbally, after it had been made, to AP Chief White House Correspondent Miller.  The AP received no written notice of the White House's decision.

114.    Defendants also did not provide to the AP any opportunity to challenge their decision before it took effect, nor have Defendants provided to the AP any formal opportunity to challenge it since that time.  Instead, the White House repeatedly has made clear that it intends to

continue barring the AP's access indefinitely unless the AP uses the President's preferred

language.

116.     As a result of Defendants' actions, the AP has suffered and continues to suffer

irreparable harm.

### Count IV
### Declaratory and Injunctive Relief
### Violation of the First Amendment: Exclusion from Credentialed Press Events

116.     The AP realleges and incorporates by reference all previous paragraphs as if fully

set forth herein.

117.     The White House has ordered the AP to use certain words in its coverage or else

be barred from accessing major events open to all other credentialed White House journalists, as

direct retaliation for the AP's speech.  Defendants' decision to bar the AP from these large

events violates the First Amendment to the U.S. Constitution.  The AP's access to and reporting

on the White House, and the AP's own editorial decisions about naming conventions, are

protected under the First Amendment.

118.     Defendants have deprived the AP's journalists of their right as credentialed White

House reporters and photographers to access events in the White House that have been opened to

all other credentialed White House journalists.  This attempt to control speech has the impact of

depriving the thousands of global news outlets that republish the AP's news reports, and its

billions of readers around the world, from the AP's factual, timely and nonpartisan reporting on

the White House.

119.     Defendants have admitted that they acted against the AP based on their dislike of

the AP's use of the Gulf of Mexico name and its other editorial choices.  The law does not allow

the government to control speech based on its likes and dislikes.  Such dislike is not a compelling

reason to justify the infringement of the AP's First Amendment rights, and it is not narrowly

tailored to achieve any compelling government interest.

120.    Defendants' actions against the AP expressly were taken because of the language

the AP uses in its reporting and Stylebook, constituting viewpoint-based discrimination that is

impermissible even in the most restrictive nonpublic forums.

121.    Defendants' actions against the AP were in retaliation for the AP's exercise of its

First Amendment-protected rights of expression and its right to petition the court by filing this

very lawsuit.  The access denial was intended to have, and has had, a chilling effect on the

exercise of the AP's First Amendment rights.  Defendants' acts would chill, and have chilled, the

speech of similarly situated reasonable people of ordinary firmness.

122.    Defendants' access denial is also intended to compel the speech of the AP,

specifically to make the Gulf of America the primary term used in its reporting and Stylebook.

123.    As a result of Defendants' actions, the AP has suffered and continues to suffer

irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, the AP respectfully requests that this Court:

a.    Order the Defendants to immediately rescind their denial of the AP's access to the

Oval Office, Air Force One, and other limited spaces when such spaces are made open to other

White House press pool members;

b.    Declare that the Defendants' conduct in denying the AP access to spaces open to

other members of the White House press pool violated the First and Fifth Amendments;

c.    Order the Defendants to immediately rescind their denial of the AP's access to

events that are open to all credentialed White House journalists;

      d.      Declare that the Defendants' conduct in denying the AP access to events that are open to all credentialed White House journalists violated the First and Fifth Amendments;

      e.      Award to the AP its costs and reasonable attorneys' fees incurred in this action; and

      f.      Grant such further relief as the Court may deem just and proper.

Dated:  March 3, 2025        Respectfully submitted,

        BALLARD SPAHR LLP

        */s/ Jay Ward Brown*
        Jay Ward Brown (#437686)
        Charles D. Tobin (#455593)
        Maxwell S. Mishkin (#1031356)
        Sasha Dudding (#1735532)
        1909 K Street NW, 12th Floor
        Washington, DC 20006
        Tel: (202) 661-2200
        Fax: (202) 661-2299
        brownjay@ballardspahr.com
        tobinc@ballardspahr.com
        mishkinm@ballardspahr.com
        duddings@ballardspahr.com

        *Counsel for Plaintiff The Associated Press*

Docusign Envelope ID: A9494DDA-F7AE-4391-947A-274D18E4B755

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

      Plaintiff,

v.

TAYLOR BUDOWICH, et al.

      Defendants.

Case No. 25-cv-532-TNM

### SECOND DECLARATION OF ZEKE MILLER

Zeke Miller, pursuant to 28 U.S.C. § 1746, declares as follows:

I submit this declaration in support of the Amended Motion for Preliminary Injunction filed by Plaintiff The Associated Press ("the AP") in the above-captioned matter.  I have personal knowledge of the facts set forth herein and would be competent to testify to them.

1.      I am the Chief White House Correspondent for the AP.  I have been employed by the AP for more than seven years, first as a White House Reporter and then White House Correspondent.  I have reported on the White House and other aspects of national politics for more than 13 years.

2.      From 2020 to 2021, I also served as the President of the White House Correspondents' Association ("WHCA"), a non-profit organization that exists to promote excellence in journalism as well as journalism education, and to ensure robust news coverage of the president and the presidency.  Until February 25, 2025 the WHCA administered the White House press pool and coordinated and advocated for independent news coverage of presidential and vice-presidential events.  Additional information about the WHCA's programs, membership, leadership, and history can be found on its website at https://whca.press/about.

1

Docusign Envelope ID: A9494DDA-F7AE-4391-9474-374D18E4B755

Case 1:25-cv-00532-TNM    Document 27-5    Filed 03/03/25    Page 2 of 7
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 46 of 515

### The White House Press Pool Prior To February 25, 2025

3.      Journalists and news organizations from across the country and around the world endeavor to keep their readers, listeners, and viewers as informed as possible about the President of the United States, the single-most powerful public official in the world.

4.      Because the President is often in locations that can accommodate only a limited number of journalists, a smaller group of journalists, known as the White House press pool, has long accompanied the President almost everywhere he goes, including to the Oval Office and Air Force One.  The press pool has thus served as the eyes and ears of fellow journalists and of the public in small yet critically important spaces.

5.      The White House press pool is over a century old, and until the events at issue in this lawsuit, the AP had participated in the pool for that entire time.  Indeed, as my colleague recently reported, "The first known instance of a so-called pool reporter inside the White House was in 1881 after President James A. Garfield was shot.  As the chief executive lay in bed, AP reporter Franklin Trusdell sat outside his sick room, listening to him breathe and sharing updates with other correspondents."  *See* Laurie Kellman, *The relationship between the White House and its press corps is time-tested — and can be contentious*, AP (Feb. 12, 2025),

https://apnews.com/article/trump-gulf-mexico-america-ap-first-amendment-4304433d73ad496f5308c9666cbe8e11.

6.      Prior to February 25, 2025, the White House press pool's membership had been determined, since the Eisenhower administration, by the WHCA and the press corps itself – not by the President or the White House.

7.      Prior to February 25, 2025, while there were different permutations of the White House press pool depending on the nature of the event, it consisted of, at minimum, three wire

reporters (one each from the AP, Reuters, and Bloomberg), four photographers (one each from

the AP, Reuters, AFP, and The New York Times), three network television journalists (from a

rotating group of news organizations), a radio correspondent (also from a rotating group of news

organizations), and at least one print reporter (also from a rotating group of news organizations).

8.    When White House officials opened limited spaces such as the Oval Office or Air

Force One, they generally first provided access to the entire press pool, plus additional

journalists if space permits.

9.    In circumstances when severe logistical constraints further restricted the number

of journalists who could enter a limited space, a subset of the White House press pool – again

selected by the WHCA, not the White House – accompanied the President.  For example, when

President Biden made a secret trip to Kyiv in 2023, two press pool journalists – including an AP

photographer – accompanied him and reported on the events.  A limited pool also accompanied

President Trump on his secret trip from Palm Beach to Joint Base Andrews to begin a secret trip

to Afghanistan in 2019.

10.    When AP text journalists covered presidential events, they were able to send wire

reports out instantaneously to the AP's global readership.  When they did so as part of the press

pool, there were no customs, expectations, or requirements that the AP's text journalists share

the information they gathered with other press pool members.  To the contrary, AP text

journalists have vigorously competed with the other wire service pool journalists to provide the

fastest and most accurate news reporting at the very moment that the event was happening.

11.    Of the 13-member pool, the designated "print pooler" was the only journalist

who, according to WHCA rules, was obligated to or regularly did share information with the rest

of the pool and the press corps. Since the February 25, 2025 takeover by the White House, the

Docusign Envelope ID: A9494DDA-F7AE-4394-9A7A-274D18F4B755

Case 1:25-cv-00532-TNM    Document 27-5    Filed 03/03/25    Page 4 of 7
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 48 of 515

print pool report remains the only freely and widely disseminated pool product.  The journalists

in the other 12 slots, including the wire service slots that previously included the AP, only freely

share information to participants in their rotations – if applicable – or as part of licensing

agreements.

12.    A list of the various permutations of the press pool, with descriptions of each that

I have prepared based on information available on the WHCA website and my own personal

knowledge, is attached as Exhibit A.

13.     The three wire services were granted permanent pool status by the WHCA

because they were viewed as an essential source of news not only for other outlets at the White

House, but also for a larger number of news outlets that could not afford the substantial costs to

provide regular coverage of the presidency, and for those news outlets' readers and viewers.

14.    The AP and other wire services maintained their high standards for speed,

accuracy, and context in reporting on presidential events in large part because they relied on their

own staffers in the pool.  The AP's members, clients, and subscribers could therefore have high

confidence in the quality of the AP's reporting in a breaking news situation and then choose

whether to write their own version of a story after receiving the pool report.

**The White House's Denial of Access**

15.    As a White House correspondent, I have a "hard pass" credential that permits me

to freely enter certain areas of the White House, including the James S. Brady Press Briefing

Room, and the AP's workspace located to the rear of the Briefing Room.

16.    On the morning of February 11, 2025, shortly after I entered the White House to

begin my work there for the day, White House Press Secretary Karoline Leavitt summoned me to

her office.

Docusign Envelope ID: A9494DDA-F7AE-4391-9474-274D18F4B755

Case 1:25-cv-00532-TNM    Document 27-5    Filed 03/03/25    Page 5 of 7
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 49 of 515

17.    Leavitt told me that AP journalists would not be permitted in the Oval Office as press pool members until and unless the AP revised its Stylebook to refer to the body of water known for hundreds of years as the Gulf of Mexico as the Gulf of America.

18.    The only reason that Leavitt provided to me for this decision was to compel the AP to change the language of its reporting, which she said was at President Trump's direction.

19.    Leavitt did not object to any other conduct by AP journalists.

20.    The AP declined to reverse this editorial decision in response to Leavitt's February 11 demand.

21.    White House staff subsequently barred one of my colleagues, an AP print journalist, from attending the signing of a presidential executive order and press conference with Elon Musk in the Oval Office, which was open to the press pool.  Another of my colleagues, an AP photographer, was allowed to attend the event, which was otherwise open to the press pool.

22.    That night, another AP reporter was barred from an event in the Diplomatic Reception Room, open to the press pool, as the President welcomed home an American freed in a prisoner exchange with Russia.  The AP's photographer was not banned.

23.    The access denials continued when, on February 13, 2025, I was barred from an Oval Office event with President Trump and Indian Prime Minister Narendra Modi, which was open to the White House pool and the Indian delegation press pool.  I subsequently was barred from a White House East Room press conference held by the two leaders, which was open to other pool members and journalists with White House press credentials.

24.    I had the night before received an invitation sent to White House-credentialed journalists to sign up to attend that February 13 East Room event, and I promptly signed up to

Docusign Envelope ID: A0494DDA-F7AE-4391-9474-374D18F4B755

Case 1:25-cv-00532-TNM    Document 27-5    Filed 03/03/25    Page 6 of 7
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 50 of 515

indicate that I would attend. On the day of the event, however, I was barred from entering the

East Room. The East Room is one of the largest event spaces in the White House complex.

25.      I understand at least one other journalist from another news organization who did

not sign up in advance was admitted to the East Room.

26.      After the White House's February 14 public statement banning AP reporters and

photographers from "limited spaces," my colleagues and I have been and continue to be barred

from participating in the White House press pool and from covering events that are open to all

White House credentialed journalists. The spaces from which AP has been banned include not

only physically small locations, such as the Oval Office and Air Force One, but also some of the

largest rooms in the White House, such as the East Room.

27.      The White House even banned an AP photographer from covering the arrival of

Air Force One at Palm Beach International Airport, even though the event was open to other

credentialed media, and despite there being no space constraints whatsoever on the airport

tarmac.

28.      A list of the events that AP White House journalists have been barred from

covering since February 11, 2025, is attached as Exhibit B.

29.      At each published "call time" or "gather time" for the White House press pool,

AP journalists have presented themselves to join their colleagues from other outlets in coverage

of the President, only to be excluded by White House Press Office staff members.

30.      Being unable to attend and observe presidential events firsthand has meant that

AP text reporters cannot report on key in-the-room context, such as the President's demeanor,

appearance, tone, or expressions, and publish breaking news with that additional context in real

time. Instead, the AP's text reporters – and by extension hundreds of other news outlets and

Docusign Envelope ID: A9494DDA-F7AE-4391-947A-274D13F4B755

Case 1:25-cv-00532-TNM    Document 27-5    Filed 03/03/25    Page 7 of 7
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 51 of 515

billions of readers around the world – must often wait for the print pool reports or the network

television transmission to get out the news, and the AP's reporters are limited in their reporting

based on the aperture of the camera's lens or a third party's sometimes limited perception.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/3/2025_____

<span> </span>

                                      Signed by:

                                      *Zeke Miller*

_____5397895AE85141C..._____

               Zeke Miller

# Exhibit A

## Types of Pools

The WHCA-run pool includes wire and print reporters, TV, radio and photojournalists. The size and composition depend on where the President is.

**In-town travel pool** – 14 members – Covers the President off-campus within driving distance, for instance when he goes to the Capitol or Walter Reed, or goes out to dinner. The pool includes writers from the Print Pool, AP, Reuters and Bloomberg; six photographers (AP, Reuters, AFP, NYT, Getty, photo agency); radio; and a network TV crew and correspondent. (Getty added to photo contingent in January, 2025, raising the total to 14.)

**In-house pool** – ~21 members – (Often referred to as "Expanded in-house pool") – In-town pool plus reporters from foreign press, AFP and Dow Jones, as well as a second network television crew for the "cuts" angle, and potentially additional photographers. Used for most on-campus pool events.

**In-Town Print Pool Rotation** – 32 outlets as of February 2025. Open to US print outlets that regularly cover the White House, have the proper credentials, and demonstrate a commitment to the beat and to journalistic standards. Poolers are responsible for filling every assigned shift, even on holidays, and agree to abide by WHCA guidelines.

**Domestic Travel Pool** (Often referred to as "Out-of-Town Pool" or "Out -of-Town Travel Pool") – The 13-person group that travels with the President outside the capital region. Sometimes referred to as the "protective pool," because

Air Force One has 13 seats allocated to the press. The WHCA has allocated them to three wire reporters (AP, Reuters and Bloomberg), four photographers (AP, Reuters, AFP and New York Times), three from network TV, a radio correspondent, and two print reporters (in the Print and WHCA seats). Each outlet pays the full cost of travel, except for the Print seat, where costs for each trip are shared 15 ways by the 16 members of that rotation (two outlets share one slot).

Six larger print pool outlets share the WHCA seat (formerly the "Magazine" seat), providing additional opportunities to be in the pool.

**Foreign Travel Pool** – The 13-person group that travels with the President outside the country. Also sometimes referred to as the "protective pool**."** Same composition as the Domestic Travel Pool except that only seven Print outlets participate, and costs are not split.

**Supplemental Pool** – Eligible to volunteer when poolers are needed to cover the Vice President or First Lady, including when they travel, and whenever extra poolers are needed. Outlets in any print pool are always eligible to volunteer. Other outlets, print and non-print, may join this pool, on approval by the WHCA board. A year of supplemental pooling is required before consideration for membership in the Print Pool.

# Exhibit B

**Events From Which AP White House Journalists**
**Have Been Excluded Since February 11, 2025**

- **February 11:**

  o The President signs Executive Orders in the Oval Office (In-House Pool)

  o The President greets and welcomes Marc Fogel back to the United States in the Diplomatic Reception Room (In-House Pool)

- **February 12:**

  o The President participates in a Swearing-In Ceremony for Director of National Intelligence Tulsi Gabbard in the Oval Office (In-House Pool)

- **February 13:**

  o The President signs Executive Orders in the Oval Office (In-House Pool)

  o The President participates in a Swearing-In Ceremony for Secretary of Health and Human Services Robert F. Kennedy Jr. in the Oval Office (In-House Pool)

  o The President hosts a bilateral meeting with the Prime Minister of the Republic of India Narendra Modi in the Oval Office (In-House Pool and Indian press delegation)

  o The President hosts a Press Conference with the Prime Minister of the Republic of India Narendra Modi in the East Room (Pre-Credentialed Media)

- **February 14:**

  o The President signs Executive Orders in the Oval Office (In-House Pool and additional invited press)

  o Air Force One flight from Joint Base Andrews to Palm Beach International Airport (Out-of-Town Pool)

- **February 15:**

  o Drive to Palm Beach International Airport to tour Boeing airplane and coverage of West Palm Beach golf outing (Out-of-Town Pool)

- **February 16:**

  o Travel to and from Daytona 500 on Air Force One (Out-of-Town Pool)

- **February 17:**

  o Coverage of West Palm Beach golf outing (Out-of-Town Pool)

1

- **February 18:**

  o Drive to and from West Palm Beach golf course (Out-of-Town Pool)

  o The President signs Executive Orders at Mar-a-Lago (Expanded Out-of-Town Travel Pool)

- **February 19:**

  o Travel from Palm Beach to Miami on Air Force One (Out-of-Town Pool)

  o FII Priority Event at Faena Hotel & Forum in Miami (Out-of-Town Pool)

  o Travel from Miami to Washington, DC on Air Force One (Out-of-Town Pool)

- **February 20:**

  o Black History Month Reception in the East Room (Pre-Credentialed Media)

  o The President delivers remarks at the Republican Governors Association Meeting at the National Building Museum (In-Town Travel Pool)

- **February 21:**

  o The President delivers remarks at the Governors Working Session in the State Dining Room (In-House Pool)

  o The President participates in a Ceremonial Swearing-In for Secretary of Commerce Howard Lutnick in the Oval Office (In-House Pool and invited others)

- **February 22:**

  o Travel to and from National Harbor to attend CPAC and meet with President of Poland (In-Town Travel Pool)

  o The President and The First Lady participate in the National Governors Association Evening Dinner and Reception in the East Room (In-House Pool)

- **February 24:**

  o The President hosts a bilateral meeting with the President of the French Republic in the Oval Office (In-House Pool and French press delegation)

  o The President holds a press conference with the President of the French Republic in the East Room (Pre-Credentialed Media)

- **February 25:**

  o The President signs Executive Orders in the Oval Office (Press Pool)

2

JA53

- **February 26:**

  o The President participates in a Cabinet Meeting in the Cabinet Room (White House Press Pool)

- **February 27:**

  o The President participates in a bilateral meeting with the Prime Minister of the United Kingdom in the Oval Office (White House Press Pool)

  o The President holds a press conference with the Prime Minister of the United Kingdom in the East Room (Pre-Credentialed Media)

- **February 28:**

  o The President participates in a bilateral meeting with the President of Ukraine in the Oval Office (White House Press Pool)

  o The President holds a press conference with the President of Ukraine in the East Room (Pre-Credentialed Media) – Note that the AP's requests for credentials were never confirmed, though the event was ultimately cancelled.

  o The President arrives at Joint Base Andrews (Out-of-Town Travel Pool)

  o The President departs Joint Base Andrews en route to Palm Beach International Airport (Out-of-Town Travel Pool)

  o The President arrives at Palm Beach International Airport (Out-of-Town Travel Pool) – Note that the White House also opened Air Force One's arrival in Florida to media beyond the press pool to cover the plane landing from the tarmac. An AP photojournalist's RSVP was denied.

  o The President departs Palm Beach International Airport en route Mar-a-Lago (Out-of-Town Travel Pool)

  o The President arrives at Mar-a-Lago (Out-of-Town Travel Pool)

- **March 1:**

  o Coverage of West Palm Beach golf outing (Out-of-Town Pool)

- **March 2:**

  o Coverage of West Palm Beach golf outing (Out-of-Town Pool)

  o Travel from Palm Beach International Airport to Joint Base Andrews on Air Force One (Out-of-Town Pool)

JA54

Docusign Envelope ID: C7678D5A-5EAA-4015-AE99-365BC6523999

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

      Plaintiff,

v.

TAYLOR BUDOWICH, et al.,

      Defendants.

Case No. 25-cv-532-TNM

### DECLARATION OF JON ELSWICK

Jon Elswick, pursuant to 28 U.S.C. § 1746, declares as follows:

I submit this declaration in support of the Amended Motion for Preliminary Injunction filed by Plaintiff The Associated Press ("the AP") in the above-captioned matter. I have personal knowledge of the facts set forth herein and would be competent to testify to them.

1.      I am a photo editor for the AP, a position I have held for more than 35 years. I began my career in Chicago, where I primarily covered professional sports (including the Michael Jordan-era Bulls). I then moved to Washington, DC, where I have edited photos from AP photographers covering the White House and Congress, as well as photos from AP photographers across the country covering national political campaigns.

2.      For more than 15 years, I also served on the board of the White House News Photographers Association ("WHNPA"), a non-profit organization dedicated to promoting, protecting, and advancing the interests and intellectual property rights of its membership, which consists of still and video photographers assigned to cover the White House and other news events in Washington and beyond. Additional information about the WHNPA can be found on its website at https://whnpa.org/.

Docusign Envelope ID: C7678D5A-5EAA-4015-AE90-3658C6523999

Case 1:25-cv-00532-TNM    Document 27-8    Filed 03/03/25    Page 2 of 6
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 59 of 515

**How AP Photographers Covered The White House Before The Access Ban**

3.      The AP is the only wire service in the White House press pool that covered the President, almost exclusively, with staff photographers.  We did this because we wanted to ensure the highest and most consistent quality of photographs for the thousands of news outlets across the country and around the world that rely on our photographers to capture images of the news as it happens in the White House and wherever else the President goes.

4.      Our role in the pool, and the White House press corps more broadly, has been to serve as the eyes and ears for our news organization customers and their readers.  We send our photographers to presidential events large and small not only because of the space restrictions on the smaller events, but also because our news organization customers do not have the staffing and resources to cover even the larger events on a regular basis.  Instead, they rely on the AP to cover the President for them and to deliver nearly instantaneous photos from the White House.

5.      When AP photographers were in the press pool, no customs, expectations, or requirements obligated the AP's photographers to share the photos they took with the other press pool members.  To the contrary, the photographers vigorously competed with one another to provide news organizations and others around the world with the fastest and best photographs of the event as it was taking place.

6.      Indeed, when AP photographers covered a presidential event, they sent images directly from their camera, during the assignment, to AP photo editors.  The AP photo editors looked at the images coming directly from the photographer at the event and, based on the needs of the AP's readership, published images in real-time as news emerged from the event.

Docusign Envelope ID: C7678D5A-5EAA-4015-AE99-368BC6523999

7.      In this way, the AP published photos within a minute of the photographers taking them.  That publication process included the photo editors ensuring proper captioning, cropping, and toning to meet the AP's editorial standards.

8.      The AP permits only minor adjustments to photos.  Per our standards, these permissible adjustments "include cropping, dodging and burning, conversion into grayscale, elimination of dust on camera sensors and scratches on scanned negatives or scanned prints and normal toning and color adjustments," though such adjustments "should be limited to those minimally necessary for clear and accurate reproduction and that restore the authentic nature of the photograph."  The AP does not allow "[c]hanges in density, contrast, color and saturation levels that substantially alter the original scene," and our standards dictate that "[b]ackgrounds should not be digitally blurred or eliminated by burning down or by aggressive toning."  Even the mere "removal of 'red eye' from photographs is not permissible."  *See Telling the Story: Standards*, https://www.ap.org/about/news-values-and-principles/telling-the-story/.

9.      The AP further allows only straightforward photo captions: single sentence "who, what, where, when" descriptions with simple metadata that merely state where a person is, what they are doing, and when they are doing it.  The AP does not editorialize in photo captions.

10.      On February 11, 2025, in one of the last events that the AP's White House photographers were able to cover before the access ban extended to them, for example, an AP photographer transmitted 93 images from their camera during the course of the event and a photo editor provided a constant edited stream of photos as the event continued, making more than 50 photos of Elon Musk's much-reported-on joint appearance with President Trump in the Oval Office available to customers and clients in nearly real time:

Docusign Envelope ID: C7678D5A-5EAA-4015-AE90-3658C6523999

Case 1:25-cv-00532-TNM    Document 27-8    Filed 03/03/25    Page 4 of 6
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 61 of 515



11.    By comparison, another photographer in the in-town pool, not from the AP, transmitted fewer than 30 photographs from the same February 11 Oval Office event.  It was the AP's editorial choice, because of our customer needs, to move a wider edit of images from the same event.

12.    The AP's photographs of presidential events were non-partisan and offered a straightforward visual report of presidential events.  AP photographers, acting for the news outlets around the globe that the AP represents, were present to witness history, however it unfolded, and to show the truth of what happened – nothing more.

**How The White House Access Ban Has Affected The AP's Photojournalism**

13.    The White House access ban has had a substantial impact on the AP's photojournalism.  We no longer have a large and varied amount of content – updated in real time – to provide and use with our own editorial reporting and to distribute to the AP's subscribers.

14.    Because of the access ban, the AP also cannot continue to develop and maintain its journalistically historic archive,[1] which serves clients, customers, and ultimately the public.

---

[1] *AP Newsroom: Editorial Photos & Videos*, https://newsroom.ap.org/editorial-photos-videos.

15.    Though the AP can republish a small number of photographs taken by a couple of other photographers in the press pool, and has done so since the White House began banning the AP, those photographs are no substitute for the AP's own work.  When relying on sporadic delivery of pool photos from other agencies, the AP is not able to deliver images to our customers and clients in real-time.  Instead, we are being delayed by at least 20 minutes, and sometimes by almost 90 minutes, before we receive those images.  Publication is then further delayed as, even after reaching the AP, these photographs need to be toned, cropped, and properly captioned to conform to our editorial standards.

16.    As a result of these delays, and the limits on the photographs that the AP can still make available, AP customers – including U.S. newspapers that typically use AP photographs – are instead selecting photos from other sources for their front pages.  The following composite image shows recent front pages from U.S., UK, and Australian newspapers, many of which would typically be expected to publish AP photos, with photos from sources other than the AP:



17.    As a digital first news organization, the AP wants images to accompany as many text stories as possible and to have those photos available to be used in every way or format the AP provides our journalism.  The AP's customers and clients likewise pay to have our

Docusign Envelope ID: C7678D5A-5EAA-401F-AE99-3658C6523999

photographs to accompany their own reporting.  We have been harmed, and continue to be

harmed, by not being able to provide these photographs, or not provide them as quickly, for

reporting on the President.

      I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/2/2025_____

                                               Signed by:

                                          *Jon Elswick*
_____  BE6A25F22BAC4D8...  _____

          Jon Elswick

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

        Plaintiff,

v.

TAYLOR BUDOWICH, et al.,

        Defendants.

Case No. 25-cv-532-TNM

### DECLARATION OF GEORGE E. CONDON JR.

George E. Condon Jr., pursuant to 28 U.S.C. § 1746, declares as follows:

I submit this declaration in support of the Amended Motion for Preliminary Injunction filed by Plaintiff The Associated Press ("the AP") in the above-captioned matter. I have personal knowledge of the facts set forth herein and would be competent to testify to them.

1.    I am a White House correspondent for National Journal, which I joined at the beginning of the Obama administration. Prior to that, I covered the White House and national politics as Washington bureau chief for Copley News Service and the San Diego Union-Tribune. I led the team that won the 2006 Pulitzer Prize for National Reporting. Over the course of my career, I have interviewed 10 presidents and reported from 88 countries.

2.    I have also served as president of the White House Correspondents' Association ("WHCA"), president of the Gridiron Club, and chairman of the National Press Foundation.

3.    In 2014, I was honored to receive the first-ever President's Award for Exceptional Service to the WHCA for my work on the organization's history. A portion of that work can be found on the WHCA's website at https://whca.press/about/history/. I am now in the process of writing a book about the history of the WHCA and the White House press pool, for which I have

1

JA61

conducted extensive research into the origins of the WHCA, its founding purpose, and its development of the White House press pool in cooperation with the White House.

4.     The White House press pool is an arrangement whereby a relatively small number of news organizations are provided access to the President in settings where the full press corps cannot be reasonably accommodated, effectively serving as representatives for the wider press corps.

5.     The press pool developed as an institutional feature of the modern presidency during the administration of Franklin Delano Roosevelt, when interest in covering the White House grew to the point that it became logistically impractical for all journalists who wanted to attend his press conferences to do so.  The first known instance of the WHCA organizing the pool occurred in 1937.  That first pool consisted of the three wire services of the day, including the Associated Press.

6.     The process by which the White House press pool operated became formalized during the Eisenhower administration in the 1950s, with the White House adopting a system whereby the pool's membership would be selected by the White House press corps itself, through the WHCA.  Since then, and up until last month, the WHCA has organized the press pool.

7.     In selecting members of the pool, the WHCA and the press corps have sought to ensure reliable, high quality, and broadly distributed coverage of presidential events in the White House and everywhere else the President might go.  The AP satisfied these criteria.  Indeed, the AP's membership in the pool helped to ensure that information about the President would get out near-instantaneously to hundreds of other news outlets in the U.S. and abroad that distribute the AP's reporting, and as quickly as possible through them to readers around the globe.

2

JA62

8.    A news organization's participation in the press pool provides its journalists, and ultimately the audience it serves, with firsthand observation of presidential activities and important insights about the presidency that could not have been gleaned from secondhand reporting alone.

9.    In 2001, when President George W. Bush met the new Russian President Vladimir Putin in Slovenia, AP journalist Ron Fournier, who accompanied the President as part of the White House press pool, asked President Bush whether Putin was "a man that Americans can trust." President Bush responded, "I looked the man in the eye. I found him to be very straightforward and trustworthy... I was able to get a sense of his soul." Because Fournier was present at the event, he could see National Security Adviser Condoleezza Rice gasp as the President's answer. A copy of the AP's reporting on the event is attached hereto as Exhibit A.

10.    In 1995, on St. Patrick's Day, President Clinton spoke at the White House, in front of the press pool, of healing the wounds in Ireland and pledged the United States to the cause. But more telling was what the press pool saw in the East Room and State Dining Room that night. President Clinton had invited Irish Taoiseach John Bruton, Sinn Fein leader Gerry Adams, Social Democratic Labor Party leader John Hume, and Unionist Leader David Trimble of Northern Ireland. These were men who never had been in the same room at the same time back in their home country. Only the pool was able to see the interaction, and it informed the AP's reporting. A copy of such reporting is attached hereto as Exhibit B.

11.    In 1989, an hour after President George H.W. Bush learned that East German troops were no longer guarding the border and the Berlin Wall had fallen, the President welcomed the pool into the Oval Office. It did not take long for the pool reporters to focus as much on the president's body language as on his words: this was a big victory in the Cold War,

3

JA63

yet President Bush seemed nonchalant, slouching in his chair.  But the pool also saw what the cameras did not pick up: Secretary of State James A. Baker and National Security Adviser Brent Scowcroft both appeared worried about the Kremlin's reaction if President Bush were seen to be gloating.  The pool thus gained that additional context to write reports about his pivotal day in world history.  A copy of such reporting – my own reporting – is attached hereto as Exhibit C.

12.     In 1984, the pool was invited to President Reagan's Santa Barbara ranch to see the President host the Apostolic Delegate to the United States.  One of the pool reporters asked the President about getting the Soviets into arms control talks.  When the President froze, First Lady Nancy Reagan, in what one reporter described as a "barely discernible voice," whispered "doing everything we can."  President Reagan immediately repeated, "We're doing everything we can."  The pool was close enough to hear the First Lady prompting the President and reported on it.  A copy of such reporting is attached hereto as Exhibit D.

13.     In each of these instances where the press pool covered presidential events, as in many others, journalists reported what they were able to see only by being present at these moments in history.

Executed on __3 MARCH 2025__.

_George E. Condon Jr._
George E. Condon Jr.

4

# Exhibit A

## Bush, Putin vow new bonds, hint at compromise in first talks

June 17, 2001, Sunday, BC cycle

Copyright 2001 Associated Press  All Rights Reserved  The Associated Press

**Section:** International News

**Length:** 887 words

**Byline:** By RON FOURNIER, AP White House Correspondent

**Dateline:** BRDO PRI KRANJU, Slovenia

## Body

Face to face for the first time, President Bush and Russian President Vladimir Putin pledged Saturday to deepen their nations' bonds and to explore the possibility of compromise on U.S. missile defense plans that Moscow has bitterly opposed.

Despite mixed signals from his Russian counterpart, Bush said, "We have a great moment during our tenures to cast aside the suspicions and doubts that used to plague our nations."

Putin showed a surprising "receptivity" to missile defense, particularly the need to conduct research that could violate the 1972 Anti-Ballistic Missile treaty, Bush said.

"Nothing was rejected out of hand," Bush told The Associated Press as he closed his first overseas trip and returned to Washington on Saturday night.

Putin himself hinted at the possibility of a "very constructive development" on the ABM issue. "I think we can work out a common approach," he said.

Still, he warned Bush that any effort to go it alone can only make U.S.-Russian relations "more complicated." Putin coldly declined to restate Russia's opposition: "The official position of the Russian government is known."

Emerging from more than two hours of inaugural talks at Brdo Castle, Bush stressed the positive by announcing that Putin will visit Bush's Texas ranch for an autumn summit. Bush, in turn, will visit Putin at his home in Russia.

Senior officials on both sides were ordered to begin talks, including military-to-military negotiations, designed to bridge differences on issues ranging from missile defense to NATO expansion - both opposed by Moscow.

"The differences in approaches do exist, and naturally in one short moment, it's impossible to overcome all of them," Putin said.

Both sides said no specific breakthroughs were reached, and none were expected in the short term.

JA66

Bush, Putin vow new bonds, hint at compromise in first talks

The summit brought together two men - one a former KGB agent, the other the son of a former CIA chief - whose sprawling nations stood for years on the brink of nuclear destruction. They, as well as their nations, are adjusting to the shifting dynamics of the post-Cold War world.

"Can I trust him?" Bush said. "I can. And from that basis, we can begin a very fruitful relationship." He called Putin a family man, a patriot. "I was able to get a sense of his soul," Bush told reporters.

Such an unimpeachable endorsement caught Bush's advisers by surprise and some worried he may regret his words if Putin strays from democratic reforms.

Bush saluted his Russian counterpart as "an honest, straightforward man who loves his country."

Bush met Putin at the elegant 16th-century estate that was a favorite Alpine resort for the late Yugoslav dictator Josip Broz Tito. Sweeping green fields and a craggy mountain top formed the backdrop as Bush tried to put his signature charm to work.

"I was so impressed that (Putin) was able to simplify his tax code in Russia with a flat tax. I'm not so sure I'll have the same success with Congress," he joked.

Bush hoped to thaw the chill in U.S.-Russian relations over his plan to scrap the 1972 Anti-Ballistic Missile Treaty and pursue missile defense. Bush argues that the offensive capabilities of "rogue" nations such as Iran and Iraq gravely threaten the U.S. and its allies.

Putin called the ABM treaty the "cornerstone of the modern architecture of international security," and added: "Any unilateral actions can only make more complicated various problems and issues."

In the brief interview, Bush told AP, "We talked straightforward. Nothing was rejected out of hand."

Asked if that included missile defense, Bush repeated, "Nothing was rejected out of hand, and there was a receptivity that I was most pleased to see. … It became clear to me in our discussion that the Russians feel the same threats we feel."

At the news conference, Bush said he did not offer incentives to Putin to gain Russian acquiescence.

White House aides had said in advance that Bush hopes to eventually offer Putin inducements such as arms purchases, military aid and joint anti-missile exercises with Russia. But first, advisers must hammer out the details.

Bush asked Secretary of State Colin Powell and Defense Secretary Donald Rumsfeld to work with their Russian counterparts on a "new approach for a new era" in security arrangements. And Treasury Secretary Paul O'Neill and Commerce Secretary Don Evans will head to Moscow soon to work on economic and commercial ties.

Bush and Putin meet again next month in Italy at the G-8 summit of industrial powers.

Asked if Putin seemed open to U.S. research on missile defense, Bush said, "That's obviously the intent of the discussions."

A more muted Putin said the United States and Russia must work together to identify security threats and officials from both countries should sit down to "try to find a way together to solve these problems."

JA67

Bush, Putin vow new bonds, hint at compromise in first talks

Bush's National Security Adviser Condoleezza Rice welcomed that as an invitation to further dialogue.

On another contentious issue, Bush reiterated his support for expanding NATO while Putin went to lengths to explain his apprehension about the Western alliance expanding toward Russia's borders.

Drawing chuckles from Bush, Putin fished around on his lectern for a declassified 1954 memo in which NATO, casting the Soviet Union as an enemy, rejected Soviet interest in membership.

"There is no need to fire up this whole situation," Putin said.

**Load-Date:** June 18, 2001

End of Document

# Exhibit B

## President Promotes Peace at St. Patrick's Gala

The Associated Press

March 18, 1995, Saturday, PM cycle

Copyright 1995 Associated Press  All Rights Reserved

**Section:** Washington Dateline

**Length:** 542 words

**Byline:** By DONALD M. ROTHBERG, AP Diplomatic Writer

**Dateline:** WASHINGTON

## Body

A traditional St. Patrick's Day gala at the White House became a celebration of peace as President Clinton urged blood enemies from Northern Ireland to learn that "strength can be drawn from differences."

Applauding the president's remarks Friday night as they sat no more than 30 feet apart in the East Room were Irish nationalist Gerry Adams and loyalist leader Gary McMichael.

Their enmity is deep and personal.

McMichael's father was killed by the Irish Republican Army, which is allied with Adams' Sinn Fein party. McMichael heads the Ulster Democratic Party, a hard-line Unionist group allied with Protestant vigilante groups that, like the IRA, are outlawed.

Both men had a chance to shake Clinton's hand. But no guest could be found who recalled seeing the two men speak to each other. Earlier, McMichael had said he'd have difficulty being in the same room with Adams.

Adams smiled and chatted with other guests and joined in the singing of Irish songs. McMichael rarely smiled.

"I urge all our guests from Northern Ireland and all parties concerned to put aside all extremism for the common good of peace," said Clinton.

Irish Prime Minister John Bruton, the guest of honor at the annual celebration, prompted a prolonged standing ovation when he turned to Clinton and said: "I want to say how much we in Ireland particularly appreciate the role that you have played personally, Mr. President, in bringing peace to our country."

"There's been a whole weight lifted off our shoulders," he said. "We're a happy land now."

Clinton said he hoped the people of British-governed Northern Ireland would look at America's "example of what is possible when people find unity and strength in their diversity."

Americans know, he said, that "strength can be drawn from differences."

The evening was not all solemnity.

Tenor Frank Patterson set the audience clapping and singing with a selection of Irish songs that included "Danny Boy," and "When Irish Eyes Are Smiling."

Bruton said that after leaving Washington today, he and his wife, Finola, would visit Chicago and then go to "a place called Festus, Missouri."

The prime minister said he had a great grand-uncle who ended up as a prominent banker in the Missouri town.

He also used the occasion to invite the Clinton family to "come to Ireland - North and South."

The 350 guests dined from a buffet that included smoked Irish fish, soda bread, Dublin Bay prawns, and West Cork crabmeat, Irish breakfast canape, Limerick ham, Irish Whiskey truffles and strawberry shamrock pie.

For all the festiveness, it was clear that the parties in Northern Ireland remain a long way from a secure peace.

Clinton and Bruton have appealed to the parties, particularly the IRA, to give up its huge store of arms.

Adams told a news conference that Sinn Fein has "no authority or control over arms."

But Bruton said that even though Adams did not have technical influence over the IRA's arms, "he has tremendous influence over the IRA."

The official U.S. hospitality shown Adams, who has been on a fund-raising visit, has not set well with the British government. Over the past several days, Prime Minister John Major was unavailable to take two telephone calls from Clinton. Spokesmen for the two leaders said they would talk this weekend.


**Load-Date:** March 18, 1995

---

End of Document

# Exhibit C

## Bush praises E. Germany, orders U.S. troops to aid those leaving

The San Diego Union-Tribune

November 10, 1989 Friday

Copyright 1989 The San Diego Union-Tribune

**Section:** NEWS; Pg. A-21

**Length:** 655 words

**Byline:** George E. Condon Jr., Copley News Service

**Dateline:** WASHINGTON

### Body

WASHINGTON -- President Bush, describing himself as elated and surprised, yesterday hailed the decision by East Germany's Communist rulers to permit free travel by citizens and to work toward free elections after four decades of one-party rule. "I can't say that I foresaw this development at this stage," the President told reporters in the Oval Office.

"I'm elated." He said that the Berlin Wall, which has served as a vivid symbol of the Cold War since its construction in 1961, "will have very little relevance" if the East German leaders make good on their promises. Mr. Bush's view on the wall was echoed by Senate Majority Leader George Mitchell, D-Maine, who called for the destruction of what he termed "the most tangible symbol of the failure of communism itself." The White House said last night that Mr. Bush had ordered U.S. forces in West Germany to provide assistance, including temporary housing, for East Germans traveling to the West. The U.S. action was in response to a request from the West German government, the White House said. "The President has instructed all U.S. military authorities in the Federal Republic, as well as our embassy in Bonn, to make available ... all possible assistance," said a statement issued by White House Press Secretary Marlin Fitzwater. The United States will provide temporary housing, for up to six months, at three American facilities in West Germany, the announcement said. However, the President said yesterday he was uncertain about whether a great flood of people would develop. "These are Germans," Mr. Bush said, "and Germans love their country, and at some point, I think, a lot of Germans who have felt pent-in and unable to move are going to say, `Look, we can move; but wouldn't it be better to participate in the reforms that are taking place in our own country?' "So I think it's too early to predict that because these openings are there, that that means ... everybody is going to take off," he said. The President was cautious on the topic of the eventual reunification of Germany, saying, "I don't know whether ... the development of today speeds up the day or not." The President learned of the developments in East Germany while meeting with Secretary of State James A. Baker III and other top advisers as part of his preparation for next month's shipboard summit in the Mediterranean Sea with Soviet President Mikhail Gorbachev. Stating that yesterday's announcement by the East German government leaves him in a stronger position heading into that summit, Mr. Bush said, "When you see citizens wanting to go and flee what has been an oppressive society, clearly that is a message that Mr. Gorbachev will understand." Mr. Bush predicted a "good, lively" discussion with Gorbachev about the changes washing across Eastern Europe. But the President

Bush praises E. Germany , orders U.S. troops to aid those leaving

stopped short of predicting the imminent demise of the Warsaw Pact as a military force opposing NATO forces, preferring to see the change only in terms of "a loosening up in terms of travel." He defended his cautious reaction to the rapid changes in Eastern Europe, saying, "I think it's being handled by the West very well" and "in a proper fashion." He added: "We'll have some that will suggest more flamboyant courses of action for this country.

And we're, I think, handling this properly with allies, staying in close touch." Baker said one reason for administration caution was a desire to wait and analyze exactly what the East Germans are doing. Fitzwater described the announcement as "a surprise," adding, "We had no advance warning." On Capitol Hill, Mitchell praised the East German decision as well.

But he added: "The decision is not an act of democracy.

It is not an act to please or placate the West. It is, rather, a desperate act of survival by the East German government." He urged that government "to take the final step and tear that wall down. It is gone in substance.

It should be gone in form."

**Load-Date:** August 1, 2007

---

**End of Document**

JA74

# Exhibit D

# Reagan gets prompt help

The Globe and Mail

August 2, 1984 Thursday

Copyright 1984 Factiva ®, from Dow Jones
All Rights Reserved



All material copyright Thomson Canada Limited or its licensors. All rights reserved.

**THE GLOBE AND MAIL**

**Section:** NEWS; Pg. P1

**Length:** 73 words

**Byline:** Reuter News Agency

## Body

SANTA BARBARA, Calif.  (Reuter) - President Ronald Reagan got help from his wife when he became tongue-tied yesterday.

Reporters had asked the President how he could persuade the Soviet Union to overcome problems with space weapons talks.

After an appreciable silence, Nancy Reagan leaned toward her husband, and, without moving her lips, muttered, "Doing everything we can."

"We're doing everything we can," the President responded.

**Load-Date:** July 14, 2022

End of Document

Docusign Envelope ID: 548654E1-FBA9-475C-B68F-33B95ABCD633

Case 1:25-cv-00532-TNM    Document 28    Filed 03/03/25    Page 1 of 2
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 80 of 515

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

     Plaintiff,

v.

TAYLOR BUDOWICH, et al.

     Defendants.

Case No. 25-cv-532-TNM

### SECOND DECLARATION OF JULIE PACE

Julie Pace, pursuant to 28 U.S.C. § 1746, declares as follows:

I submit this declaration in support of the Amended Motion for Preliminary Injunction filed by Plaintiff The Associated Press ("the AP") in this matter. I have personal knowledge of the facts set forth herein and would be competent to testify to them.

1.    I am Senior Vice President and Executive Editor for the AP. In that role I lead the AP's global news operations and oversee its news content in all formats. I have been employed by the AP since 2007.

2.    On February 12, 2025, I sent a letter to White House Chief of Staff Susan Wiles objecting to the White House's exclusion of the AP from press events with President Trump. A true and correct copy of my letter to Ms. Wiles is attached hereto as Exhibit A.

3.    On February 18, 2025, I received an email from Ms. Wiles in response to my February 12, 2025 letter. A true and correct copy of that email is attached hereto as Exhibit B.

4.    On February 28, 2025, I sent an email to Wiles objecting to the continued exclusion of the AP. A true and correct copy of that email is attached hereto as Exhibit C. As of this filing, that email is my latest communication to Wiles, and she has not yet responded.

1

JA77

5.      The AP has incurred significant expenses as a result of the White House's denial of access to press events.  The AP's expenses include the cost of flying a Paris-based AP reporter to the U.S. to cover a February 24, 2025 press conference in the East Room with President Trump and French President Emmanuel Macron – an event from which the AP's White House journalists were barred.  The White House thus forced the AP to incur significant costs, which the AP would not have borne but for this denial of access, to cover President Macron's visit to the U.S. for the AP's global readership.

6.      The AP's expenses also include the cost of flying a London-based AP reporter to the U.S. to cover February 27, 2025 events in the Oval Office and the East Room with President Trump and UK Prime Minister Starmer – events from which the AP's White House journalists were again barred.  The White House thus forced the AP to incur significant costs, which the AP would not have borne but for this denial of access, to thoroughly cover Prime Minister Starmer's visit to the U.S. for the AP's global readership.

7.      The AP's expenses also include the cost of flying a Ukraine-based AP reporter to the U.S. to cover a February 28, 2025 event in the Oval Office with President Trump and Ukrainian President Volodymyr Zelenskyy – an event from which the AP's White House journalists were once more barred.[1]  The White House thus forced the AP to incur significant costs, which the AP would not have borne but for this denial of access, to thoroughly cover President Zelenskyy's visit to the U.S. for the AP's global readership.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/3/2025_____

_____
Julie Pace

---

[1] The AP's Ukraine-based reporter also would have covered an event that same day in the East Room, from which the AP's White House journalists were barred, but that event was cancelled.

# Exhibit A

As a global news organization, The Associated Press is committed to providing Americans and billions of people around the world with factual, nonpartisan journalism. The AP is prepared to vigorously defend its constitutional rights and protest the infringement on the public's right to independent news coverage of their government and elected officials.

We are available to meet with you to discuss this matter in person.


Respectfully,

*Julie Pace*

Julie Pace
Senior Vice President and Executive Editor
The Associated Press


cc: Karoline Leavitt, White House Press Secretary

# Exhibit B

**From:** Wiles, Susan S. EOP/WHO < ██████████████████ >
**Date:** Tuesday, February 18, 2025 at 8:49 AM
**To:** Pace, Julie < ██████████ >
**Cc:** Budowich, Taylor A. EOP/WHO < ████████████████ >
**Subject:** Good morning

[EXTERNAL]

Julie,

Thank you for your feedback, and I hope this email addresses your concerns and provides some guidance on how we can best move forward.

We do not agree that this is a First Amendment issue–both as a matter of law and implementation.

President Trump and his administration has provided, and will continue to provide, tremendous access to reporters as he governs the nation. There is no event that the Associated Press is being barred from covering. When occupancy is limited, the Associated Press' journalists are still able to cover these moments alongside the hundreds of other journalists who are credentialed for the White House every day but do not access the President directly.

Instead, this is purely a privilege of access issue. There are certain areas, including the Oval Office and Air Force One, whereby the nature of their size, we are restricted as to how many people can physically be accommodated. The only person who has the absolute right to occupy those spaces is the President of the United States. For the rest of us, it's a privilege, and to suggest otherwise wrong.

It is also important to understand our view as to why we arrived in this point. The Associated Press' Stylebook is used by many as a standard for writing and editing. It advises journalists, scholars, and classrooms around our country. Unfortunately, the influence this Stylebook has acquired has been misused, and at times weaponized, to push a divisive and partisan agenda. I have taken the time to review the Stylebook and I personally observe a multitude of biases that are unfair and biased. The latest instruction which is to deny the renaming of the Gulf of America is yet another example of a guide that appears more like a political tool than a neutral guide for the writers of today and tomorrow.

While we believe there should be a full review of the Stylebook and its potential abuses, more immediately, the guidance relating to the renamed Gulf of America should be appropriately reflected, not denied. The renaming was done according to law and is binding. We, of course, recognize that this renaming may not formally apply yet internationally, but given the AP's role, it should also appropriately make the distinction as an American guideline. Denying such, denies the appropriate authority of the duly elected President.

We believe strongly that the American public deserves neutrality from those privileged enough to enjoy close up access to some of the most important moments of history. Sadly, at this time, the Associated Press is failing to meet that standard.

We look forward to further conversation and remain hopeful that the name of the water body in question will be appropriately reflected in the Stylebook where American audiences are concerned.

Susie Wiles

# Exhibit C

**From:** Pace, Julie <████████████>
**Date:** Friday, February 28, 2025 at 3:23 PM
**To:** Wiles, Susan S. EOP/WHO <████████████████████>
**Subject:** From AP

Susie,

I write to object to the further retaliatory actions taken by the White House this week to take over the decades-long role of the WHCA to select members of the White House press pool.

The designation of a purported new pool continues to exclude the AP and again targets the AP for its refusal to adopt the administration's language directives. It was also a "doubling down," as Press Secretary Karoline Leavitt described it, on the viewpoint discrimination that the federal court had warned the White House about just one day earlier.

For over two weeks now, the AP has been excluded from covering virtually all events involving the President as a member of the White House press corps. The White House has made very clear that these decisions target the AP for its style guidance regarding the Gulf of Mexico and President Trump's executive order renaming a portion to the Gulf of America.

The Constitution does not permit the government to exclude news organizations based on how they report the news. The new press pool arrangement, however, does exactly that: it excludes the AP both from the press pool and from events open to the larger press corps because the President dislikes its editorial decision. The White House's unconstitutional retaliations threaten the freedom and independence of the press, both so essential to our democracy.

We strongly urge the administration to end its exclusion of the AP, from both the pool and events open to the larger press corps. The AP will continue vigorously defending its constitutional rights.

We also remain available to meet with you to discuss this matter in person.

Best,

Julie Pace


Julie Pace
The Associated Press
SVP & Executive Editor
202-379-8902
JPace@ap.org

GOVERNMENT
EXHIBIT

1
_____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

               Plaintiff,

    v.

TAYLOR BUDOWICH,
White House Deputy Chief of Staff, et al.,

               Defendants.

Civil Action No. 25-0532 (TNM)

## DECLARATION OF TAYLOR BUDOWICH

     I, TAYLOR BUDOWICH, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury

that the following is true and correct to the best of my recollection and belief.

     1.     I am Deputy Chief of Staff and Cabinet Secretary at the White House.

     2.     I offer the following declaration based on my personal knowledge and information

that I have learned in the scope of my job responsibilities.

### General Press Access to the White House

     3.     Approximately 1,355 journalists—including 33 journalists (including

photographers) from the Associated Press—have "hard passes" or general media access to the

White House press facilities.  Notably, as part of its commitment to openness and transparency,

the White House press team is working diligently to restore hard passes of approximately 440

journalists whose passes were revoked by the previous presidential administration.

     4.     A journalist with a hard pass is allowed to enter White House grounds through a

secured entry point and have access to "Pebble Beach" (a television standup area on the north

grounds of the White House complex), the driveway from the security gate to the West Wing, the

James S. Brady Briefing Room, the South Lawn for Marine One arrivals and departures, and the

"lower" and "upper" press workspaces located near the Brady Briefing Room (the "general press facilities"). The White House Correspondents' Association ("WHCA") continues to assign, at the White House's discretion, the forty-nine seats in the Brady Briefing Room and the booths and desks in the White House press workspaces.

5.      Journalists with the Associated Press have continued to receive full access to the general press facilities since President Trump was inaugurated on January 20, 2025, including a front row seat in the Brady Briefing Room.

### Special Press Pool Access to the President

6.      The White House "press pool" contains a small fraction of those journalists with White House hard passes. The core press pool typically consists of between thirteen and twenty-one individuals, depending on the President's location and whether he is traveling, among other items.

7.      The press pool is limited to roughly one- or two-percent of the more than 1,000 journalists with White House hard passes that may be selected to enjoy special access to the President in intimate workspaces (the Oval Office and the Cabinet Room), his highly secured means of transportation (Air Force One), and his personal home (the Mar-a-Lago Club) when those spaces are open to the press. Members of the press pool are not mere witnesses to history. They are a small group of privileged journalists that are provided access to represent the broader group of qualified hard pass holders at discretion of the President.

8.      Under the prior selection process for the press pool, which was operated by the White House Correspondents' Association, certain media groups (including the Associated Press) received special access to the President above other outlets. The Correspondents' Association guaranteed the Associated Press two spots of the thirteen core spots in the pool. For example, under the old system, even well-established media companies such as the Washington Post, Los

Angeles Times, CNN, and Wall Street Journal had no guaranteed spots and were forced to rotate into the pool through spots allocated to print and television journalists.

9.      On Tuesday, February 25, 2025, the White House Press Secretary announced the White House's intent to change the way it decides who participates in its press pool.

10.     Under the new process, the press pool is selected among three groups: 1) a television pool selected from a rotation of five television networks; 2) a wire pool selected from two wire services; 3) three wire photojournalists and 4) additional media outlets selected based upon and appropriate to the subject matter of the event.

### East Room and Other Limited Press Events

11.     A similar policy applies to events outside of the Oval Office and other special access spaces, such as those held in the East Room of the White House.

12.     Press conferences with foreign dignitaries held in the East Room of the White House can often accommodate up to approximately 180 press individuals, depending on the room set up and number of guests (inclusive of television and radio journalists, photographers, and cameraman).

13.     Press attendance at these limited press events is typically arranged through an electronic sign-up tool, where journalists seeking access to the event may apply for an RSVP.

14.     Often the White House is unable to accommodate all journalists that seek access to these limited press events, and therefore, RSVPs are not always accepted.

15.     Under the revised policy described above, Associated Press journalists are part of the group of journalists permitted to RSVP for East Room press conferences. Subject to the new press pool system, the Associated Press' journalists are eligible, at the President's discretion, to be admitted to those events consistent with the RSVP process described above and subject to other general requirements for admission.

**Associated Press Admission to White House Events**

16.    Associated Press journalists have been admitted to several events.

17.    On February 24, 2025, the President held an East Room event with President Macron of France.  For that limited access event, 310 journalists requested access and 136 were permitted access.  Among those provided access were a foreign-based correspondent of the Associated Press.

18.    On February 27, 2025, the President held an East Room event with Prime Minister Starmer of the United Kingdom.  For that limited access event, 308 journalists requested access and 172 were permitted access.  Among those provided access were a foreign-based correspondent of the Associated Press.

**Other Relevant Statements**

19.    On February 28, 2025, a small collection of journalists beyond the press pool was provided special access by the President's advance team to the otherwise non-public tarmac of an open airfield at Palm Beach International Airport to observe the President exit his aircraft, walk down stairs, and immediately enter a presidential limousine.  That event was not a limited access event similar to the East Room events described above.

20.    The original statement made on this matter did not constitute a ban of the Associated Press as an outlet, but instead was a rejection of the WHCA policy of giving the Associated Press permanent status in the press pool—an extra-special, "all-access" pass that even the five major television networks did not have.



Further declarant sayeth not,

**TAYLOR BUDOWICH**
Deputy Chief of Staff and Cabinet Secretary

Docusign Envelope ID: 59F3E386-4S47-4299-8F41-4DB7AA75A7B3

Case 1:25-cv-00532-TNM    Document 37-1    Filed 03/17/25    Page 1 of 3
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 93 of 515

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| THE ASSOCIATED PRESS, |
| Plaintiff, |
| v. |
| TAYLOR BUDOWICH, et al. |
| Defendants. |

Case No. 1:25-cv-00532-TNM

**DECLARATION OF KRISTIN HEITMANN**

Kristin Heitmann, pursuant to 28 U.S.C. § 1746, declares as follows:

I submit this declaration in support of the Amended Motion for Preliminary Injunction filed by Plaintiff The Associated Press ("the AP") in this matter. I have personal knowledge of the facts set forth herein and would be competent to testify to them.

1.    I am Senior Vice President and Chief Revenue Officer for the AP. I have been employed by the AP since 2022. Prior to joining the AP, I served as chief commercial officer for media and marketing solutions at Dow Jones.

2.    The AP is a not-for-profit news cooperative. We invest hundreds of millions of dollars every year in newsgathering and distribution, and revenue from licensing this content, across formats, is our main source of funding.

3.    Customers can license individual pieces of content from the AP on an ad hoc basis and obtain permission to use that specific content in a specific way, such as licensing a single photograph for use in a particular publication.

4.    Customers can also enter multi-year subscription contracts with the AP to access and obtain permission to use the AP's content more generally for news and information

Docusign Envelope ID: 59F3E386-4947-4299-8541-4DB7AA75A7B3

purposes.  Those contracts with media organizations around the world provide the majority of the AP's revenue.

     5.     As a result of that subscription agreement, long-term customers rely on the AP for prompt and comprehensive access to news reports, photographs and other content.  Those customers include all four major U.S. broadcast television networks, the two largest daily U.S. newspapers, the largest U.S. local television group, one of the U.S.'s leading radio groups, and similar counterparts outside of the U.S.

     6.     Since February 11, 2025, multiple long-term customers have expressed concerns about the limitations on the AP's coverage of the White House and the President that the administration's access ban has imposed.

     7.     Given the fierce competition between the AP and its peer organizations, a lasting ban on the AP's access to presidential events, or continued restrictions on such access, will negatively impact our ability to remain competitive with long-term customers whose contracts provide the AP with hundreds of millions of dollars of revenue annually.

     8.     The AP also generates revenue, like most news organizations do, by displaying advertisements on our website.

     9.     Since February 11, 2025, advertising customers have expressed concern about the White House's targeting of the AP and have expressed hesitation about entering into new contracts or continuing existing contracts with the AP for this reason.  In early March 2025, for example, an organization that had previously advertised with the AP canceled an upcoming advertising contract "due to the current status of the White House AP ban."  The contract would have provided the AP with $150,000 in revenue.

Docusign Envelope ID: 59F3E386-4C47-4299-8F41-4DB7AA75A7B3

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___3/17/2025___.

Signed by:

*Kristin Heitmann*

CD67F481CA26413...

Kristin Heitmann

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

THE ASSOCIATED PRESS,

      Plaintiff,

v.

TAYLOR BUDOWICH, et al.

      Defendants.

Case No. 25-cv-532-TNM

---

**THIRD DECLARATION OF ZEKE MILLER**

Zeke Miller, pursuant to 28 U.S.C. § 1746, declares as follows:

I submit this declaration in further support of the Amended Motion for Preliminary Injunction filed by Plaintiff The Associated Press ("the AP") in the above-captioned matter. I have personal knowledge of the facts set forth herein and would be competent to testify to them.

1.      My second declaration in this matter listed the events from which AP White House journalists were excluded between February 11, 2025 – when Press Secretary Karoline Leavitt told me that the AP's journalists would not be permitted in the Oval Office as press pool members until and unless the AP revised its Stylebook to refer to the Gulf of Mexico as the Gulf of America – and March 2, 2025. *See* Second Declaration of Zeke Miller, Exhibit B (ECF 27-7).

2.      A supplemental list of the events from which AP White House journalists have been excluded since March 3, 2025 until today is attached as Exhibit A.

3.      On March 4, 2025, President Trump delivered the first congressional address of his second term. Because the congressional press galleries, not the White House, controlled press access to this event, AP reporters and photographers were permitted to attend and cover the speech. AP journalists in the room were able to provide information in real time and better

1

Docusign Envelope ID: 94EBBACB-F66C-482D-A09B-BFFD4B181759

Case 1:25-cv-00532-TNM    Document 37-2    Filed 03/17/25    Page 2 of 5
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 97 of 515

inform my reporting – to thousands of news organizations and billions of readers around the

world – by observing key in-the-room context, such as the President's demeanor, appearance,

tone, and expressions, as well as the reactions of members of Congress and others in the

audience.  For example, our reporters in the House chamber noted that Democratic lawmakers

remained seated and did not applaud or make eye contact with President Trump as he entered,

while Republican lawmakers were boisterous and cheering.  The AP produced more than a dozen

versions of its text story, updated over the course of the night, including the near-real-time

comments, context and photographs from the event.  A true and correct copy of the final version

of my article is attached as Exhibit B.[1]

4.    The next day, March 5, 2025, I received a press release from the White House

stating that "President Trump's speech was the focus of newspapers across America."  The press

release contained front-page images of 18 U.S. newspapers, 11 of which carried an AP-bylined

article that I co-wrote, and 12 of which included AP-credited photographs.  A true and correct

copy of the White House's March 5, 2025 press release is attached as Exhibit C.[2]

5.    Some of the front pages feature different versions of the AP article, reflecting the

publications' earlier press times.  News organizations rely on the AP to provide frequent updates

to wire stories so their papers reflect the most up-to-date information – even if an event has not

yet concluded – when they go to press.

6.    As the White House's press release illustrates, when AP journalists are able to

report live from presidential events, news organizations and their readership across the country

---

[1] The article is also available at https://apnews.com/article/trump-speech-congress-immigration-tariffs-guests-93f6107ede260854f90c65c4bde60de8.

[2] The press release is also available at https://www.whitehouse.gov/articles/2025/03/president-trumps-historic-address-captivates-america.

Docusign Envelope ID: 94EBBACB-F66C-482D-A09B-BFED4B181759

benefit.  Many of the newspapers whose front pages were included in the press release – just like

thousands of other news organizations around the world – do not have the resources to regularly

cover presidential events.  But because those events are important to their readers, they rely on

the AP to attend, observe, and report on them instead.  That is why they are AP members and

customers.

7.      The AP has served that same fundamental purpose for nearly two centuries.  The

AP was formed in 1846 when five New York City newspapers jointly funded a pony express

route to bring news of the Mexican War north faster than the postal service could deliver it.  The

idea was that it would require too much time and resources, and otherwise be impractical, for

each of the five newspapers to send a correspondent to the southern border themselves, so they

pooled their resources and formed a news cooperative to gather news for all of them.  That is the

fundamental purpose of the AP, and it continues to this day – the AP acts as the eyes and ears for

its thousands of news customers, who may not otherwise be able to attend and gather news from

any particular event.  Instead, the AP attends on their behalf, and distributes its journalism to

member news outlets and customers around the world so that they can inform their own

audiences.

8.      For the past month, the AP's White House text reporters have been barred from

covering events open to the press pool and larger events open to credentialed journalists, despite

having submitted RSVPs each time.  The access ban on the AP did not stop after February 25,

2025, when the White House took control of the press pool.  The other wire services and

photographers that were in the pool before February 25, by all appearances, have remained part

of the pool; only the AP is barred.  Attached as Exhibit D is a chart describing the structure of

the pool from before February 11, 2025, to present.

9.       I have read the declaration (ECF 33-1) that White House Deputy Chief of Staff
Taylor Budowich submitted in this matter on March 11, 2025.  In that declaration, Mr. Budowich
stated that "Associated Press journalists are part of the group of journalists permitted to RSVP
for East Room press conferences.  Subject to the new press pool system, the Associated Press'
journalists are eligible, at the President's discretion, to be admitted to those events consistent
with the RSVP process . . . and subject to other general requirements for admission."

10.       On March 12, 2025, President Trump hosted a St. Patrick's Day reception with
the Taoiseach of Ireland in the East Room.  The White House permitted an AP photographer to
attend, but it excluded an AP text journalist.  Both AP journalists timely submitted RSVPs, but
the text journalist never received a response from the White House about whether his RSVP was
accepted or declined.  When he showed up to join other reporters at the event, he was turned
away without explanation.

11.       On March 14, 2025, President Trump gave a speech at the U.S. Department of
Justice, held in the building's large Great Hall.  The event was open to the White House press
pool (which traveled with the President) and additional journalists with Department of Justice
credentials.  The AP's text reporter and photographer were both denied the opportunity to join
the press pool, and two AP text reporters and a photographer were denied entry to the event
despite having promptly submitted RSVPs. Department of Justice staff informed the AP
reporters that the White House was overseeing credentialing for the event.

12.       The White House's ban on the AP has also extended to other non-presidential
events, and the AP is concerned it will extend further still.  An AP text reporter, photographer,
and videographer were barred from attending an event hosted by Vice President JD Vance in
Eagle Pass, Texas on March 5, 2025, which took place in a large park near the U.S.-Mexico

border. AP reporters and photographers were also specifically not permitted to attend First Lady

Melania Trump's event on Capitol Hill on March 3, 2025.

13.     Aside from being permitted to observe the arrival of Air Force One on the tarmac

in Palm Beach on March 7 and March 14, after having been prevented from doing so on

February 28, the White House has not permitted me or any other AP White House text reporter

to attend any event open to the press pool, or any event open to the larger White House press

corps, since February 11, even though my colleagues and I have promptly submitted RSVPs each

time the White House sent out notices of events to the press corps and presented themselves at

the published call time for each event only to be turned away.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____    3/17/2025

_____
Zeke Miller

# Exhibit A

**Events From Which AP White House Journalists
Have Been Excluded Since March 3, 2025**

- **March 3:**

  o The President makes an Investment Announcement in the Roosevelt Room (White House Press Pool)

  o First Lady Melania Trump participates in a roundtable on Capitol Hill promoting the *Take It Down Act.* (Pool organized by the First Lady's office and AP informed it could not join.)

- **March 4:**

  o The President and The First Lady depart The White House en route to The Capitol (White House Press Pool)

  o The President delivers his Joint Address to Congress at The Capitol (White House Press Pool)

  o The President and The First Lady depart The Capitol en route to The White House (White House Press Pool)

  o The President and The First Lady arrive at The White House (White House Press Pool)

- **March 5:**

  o Vice President JD Vance holds a Press Availability at the Southern Border (Pre-credentialed media)

- **March 6:**

  o The President signs Executive Orders in Oval Office (Initially closed to press, but opened to the White House Press Pool)

- **March 7:**

  o The President delivers remarks in the Oval Office (White House Press Pool)

  o The President signs Executive Orders in the Oval Office (White House Press Pool)

  o The President delivers remarks at The White House Digital Assets Summit in the State Dining Room (White House Press Pool)

  o The President arrives at Joint Base Andrews (Out-of-Town Travel Pool)

- o The President departs Joint Base Andrews en route to Palm Beach International Airport (Out-of-Town Travel Pool)

- o The President departs Palm Beach International Airport en route to Mar-a-Lago (Out-of-Town Travel Pool)

- o The President arrives at Mar-a-Lago (Out-of-Town Travel Pool)

- **March 8:**

  - o The President departs Mar-a-Lago to golf at Trump International Golf Club West Palm Beach and returns to Mar-a-Lago (Out-of-Town Travel Pool)

- **March 9:**

  - o The President departs Mar-a-Lago to golf at Trump International Golf Club West Palm Beach and returns to Mar-a-Lago (Out-of-Town Travel Pool)

  - o The President departs Mar-a-Lago en route to Palm Beach International Airport (Out-of-Town Pool)

  - o The President departs Palm Beach International Airport en route to Joint Base Andrews (Out-of-Town Pool)

  - o The President arrives at Joint Base Andrews (Out-of-Town Pool)

  - o The President departs Joint Base Andrews en route to The White House (Out-of-Town Pool)

- **March 11:**

  - o The President holds a photo op with Tesla vehicles at the White House (White House Pool)

  - o The President departs The White House en route to the Business Roundtable Office (In-Town Travel Pool)

  - o The President arrives at the Business Roundtable Office (In-Town Travel Pool)

  - o The President delivers remarks at the Business Roundtable Quarterly Meeting (In-Town Travel Pool)

  - o The President departs Business Roundtable Office en route to The White House (In-Town Travel Pool)

  - o The President arrives at The White House (In-Town Travel Pool)

- **March 12:**

  o The President participates in a bilateral meeting with the Taoiseach of Ireland in the Oval Office (White House Press Pool)

  o The President departs The White House en route to The Capitol (In-Town Travel Pool)

  o The President arrives at The Capitol (In-Town Travel Pool)

  o The President participates in the Friends of Ireland Luncheon at The Capitol (In-Town Travel Pool)

  o The President departs The Capitol en route to The White House (In-Town Travel Pool)

  o The President arrives at The White House (In-Town Travel Pool)

  o The President participates in a St. Patrick's Day Reception with the Taoiseach of Ireland in the East Room (Pre-Credentialed Media) (Note: one AP photographer was allowed into this event, while the AP's text journalist was denied entry.)

- **March 13:**

  o The President participates in a meeting with the Secretary General of NATO in the Oval Office (White House Press Pool)

- **March 14:**

  o The President departs The White House en route to the Department of Justice (In-Town Travel Pool)

  o The President arrives at the Department of Justice (In-Town Travel Pool)

  o The President delivers remarks at the Department of Justice (In-Town Travel Pool and pre-credentialed reporters)

  o The President departs the Department of Justice en route to The White House (In-Town Travel Pool)

  o The President arrives at The White House (In-Town Travel Pool)

  o The President arrives at Joint Base Andrews (In-Town Travel Pool)

  o The President departs Joint Base Andrews en route to Palm Beach International Airport (Out-of-town Travel Pool)

  o The President departs Palm Beach International Airport en route to Mar-a-Lago (Out-of-town Travel Pool)

- o The President arrives at Mar-a-Lago (Out-of-town Travel Pool)

- **March 15:**

  - o The President departs Mar-a-Lago to golf at Trump International Golf Club West Palm Beach and returns to Mar-a-Lago (Out-of-Town Travel Pool)

- **March 16:**

  - o The President departs Mar-a-Lago to golf at Trump International Golf Club West Palm Beach and returns to Mar-a-Lago (Out-of-Town Travel Pool)

  - o The President departs Mar-a-Lago to attend a course championship awards dinner at Trump International Golf Club West Palm Beach (Out-of-Town Travel Pool)

  - o The President departs Trump International Golf Club West Palm Beach en route Palm Beach International Airport (Out-of-Town Travel Pool)

  - o The President arrives Palm Beach International Airport (Out-of-Town Travel Pool)

  - o The President departs Palm Beach International Airport en route Joint Base Andrews (Out-of-Town Travel Pool)

  - o The President arrives Joint Base Andrews (Out-of-Town Travel Pool)

  - o The President departs Joint Base Andrews en route The White House (In-Town Travel Pool)

# Exhibit B

Case 1:25-cv-00532-TNM   Document 37-4   Filed 02/17/25   Page 2 of 10
USCA Case #25-5109    Document #2132694        Filed: 08/29/2025     Page 107 of 515



Live: Trump deportations    Stock market    Men's NCAA bracket    Women's NCAA bracket    Severe weather

AP SETS THE STANDARD FOR POLITICAL REPORTING.
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

**DONATE**

POLITICS

## Trump vows to press ahead on reshaping America in speech to Congress as Democrats register dissent

BY  ZEKE MILLER AND MICHELLE L. PRICE
Updated 6:58 AM EDT, March 5, 2025

WASHINGTON (AP) — President Donald Trump vowed to keep up his campaign of "swift and unrelenting action" in reorienting the nation's economy, immigration and foreign policy in an unyielding address before Congress that left Democratic legislators to register their dissent with stone faces, placards calling out "lies," and one legislator's ejection.

Trump's prime-time speech Tuesday was the latest marker in his takeover of the nation's capital, where the Republican-led House and Senate have done little to restrain the president as he and his allies work to slash the size of the federal government and remake America's place in the world.

Case 1:25-cv-00532-TNM     Document 37-4     Filed 02/17/25     Page 2 of 10
USCA Case #25-5109     Document #2132694     Filed: 06/29/2025     Page: 108 of 515



President Donald Trump addresses a joint session of Congress at the Capitol in Washington, Tuesday, March 4, 2025. (Win McNamee/Pool Photo via AP)



Republicans stand as Democrats sit as President Donald Trump addresses a joint session of Congress in the House chamber at the U.S. Capitol in Washington, Tuesday, March 4, 2025. (AP Photo/Julia Demaree Nikhinson)

The president's address, clocking in at a record 99 minutes, added up to a defiant sales pitch for the policies that Trump promised during his campaign and leaned into during his first weeks back in office. Trump pledged to keep delivering sweeping change to rescue the nation from what he described as destruction and mistakes left by his predecessor. He seldom addressed his comments directly to the American people, who are trying to keep up with the recent upheaval, while repeatedly needling the Democratic lawmakers seated before him.

Michigan Sen. Elissa Slotkin, who delivered the Democratic response following Trump's speech, allowed that "America wants change, but there's a responsible way to make change and a reckless way, and we can make that change without forgetting who we are as a country and as a democracy."

JA105

Case 1:25-cv-00532-TNM    Document 37-4    Filed 02/17/25    Page 4 of 10

USCA Case #25-5109     Document #2132694     Filed: 08/29/2025     Page 109 of 515

Emboldened after overcoming impeachments in his first term, outlasting criminal prosecutions in between his two administrations and getting a tight grip on the GOP-led Congress, Trump has embarked on a mission to dismantle parts of the federal government, remake the relationship with America's allies and slap on tariffs that have sparked a North American trade war.

"It has been nothing but swift and unrelenting action," Trump said of his opening weeks in office. "The people elected me to do the job, and I am doing it."

Trump, who has billionaire adviser Elon Musk orchestrating his efforts to slash the size and scope of the federal government, said he is working to "reclaim democracy from this unaccountable bureaucracy" and threatened federal workers anew with firings if they resist his agenda.



Elon Musk stands and is recognized and applauded as President Donald Trump addresses a joint session of Congress at the Capitol in Washington, Tuesday, March 4, 2025. (AP Photo/J. Scott Applewhite)     Read More

Musk, who was seated in the House gallery, received a pair of standing ovations from Republicans in the chamber, as Trump exaggerated and shared false claims about alleged government abuse uncovered by the Tesla and SpaceX founder and his team of disrupters.

Trump repeated false claims that tens of millions of dead people over 100 years old are receiving Social Security payments, prompting some Democrats to shout, "Not true!" and "Those are lies!"

Trump spoke at a critical juncture in his presidency, as voters who returned him to the White House on his promise to fix inflation are instead finding economic chaos. All the gains the S&P 500 have made since Election Day are now gone, while consumer sentiment surveys show the public sees inflation as worsening.

Trump seemed prepared to double down on his trade policies, which experts have warned will raise prices for consumers.

"Whatever they tariff us, we tariff them. Whatever they tax us, we tax them," Trump said. At the same time, he tried to ease concerns about the resulting price increases, saying, "There'll be a little disturbance, but we're okay with that. It won't be much."

Case 1:25-cv-00532-TNM    Document 37-4    Filed 03/17/25    Page 5 of 10
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 110 of 515



President Donald Trump speaks as Vice President JD Vance, from left, and House Speaker Mike Johnson, R-La., stand and clap as Trump addresses a joint session of Congress at the Capitol in Washington, Tuesday, March 4, 2025. (AP Photo/Alex Brandon)



President Donald Trump arrives to address a joint session of Congress at the Capitol in Washington, Tuesday, March 4, 2025. (AP Photo/Ben Curtis)

Trump said one of his "very highest priorities" was to rescue the economy and offer relief to working families. He promised to organize the federal government to lower costs on eggs and energy, blaming his Democratic predecessor Joe Biden for the situation and offering scant details of his own plans.

Trump also called for the extension of his first-term tax cuts and additional federal funding for his border crackdown, including for his promised efforts at "mass deportation" of people in the U.S. illegally.

He celebrated his crackdown on migration, saying, "But it turned out that all we really needed was a new president."

Speaking about his promised tax cuts, Trump seemed to goad Democrats, saying: "I'm sure you're going to vote for those tax cuts. Because otherwise I don't believe the people will ever vote you into office."

JA107

Case 1:25-cv-00532-TNM    Document 37-4    Filed 02/17/25    Page 6 of 10
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 111 of 515

The backdrop was the new economic uncertainty unleashed after the president opened the day by placing stiff tariffs on imports from the country's neighbors and closest trading partners. A 25% tax on goods from Canada and Mexico went into effect early Tuesday — ostensibly to secure greater cooperation to tackle fentanyl trafficking and illegal immigration — triggering immediate retaliation and sparking fears of a wider trade war. Trump also raised tariffs on goods from China to 20%.



Republican members of Congress applaud as President Donald Trump addresses a joint session of Congress at the Capitol in Washington, Tuesday, March 4, 2025. (AP Photo/Alex Brandon)
                                                                                        Read More

Republicans were boisterous as Trump stepped to the lectern in the House, chanting "USA! USA!" as the president basked in the cheers. The GOP lawmakers were jubilant, having won a trifecta of the White House, Senate and House in the elections. However, they face the challenging task of delivering on Trump's agenda as well as avoiding a government shutdown later this month.

Across the aisle, out-of-power Democrats set the tone early, with most remaining seated without applauding or making eye contact with Trump as he was introduced in the chamber.

After several interruptions, House Speaker Mike Johnson jumped in and called for decorum to be restored in the chamber as Republicans shouted "USA" to drown out the cries from the other side of the aisle. Johnson then ordered Texas Rep. Al Green removed from the chamber.

"It's worth it to let people know that there are some people who are going to stand up" to Trump, Green told reporters after being thrown out of the chamber.

JA108

Case 1:25-cv-00533-TNM    Document 37-4    Filed 02/17/25    Page 7 of 10
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 112 of 515



Rep. Al Green, D-Texas, left, shouts as President Donald Trump addresses a joint session of Congress at the Capitol in Washington, Tuesday, March 4, 2025. (Win McNamee/Pool Photo via AP)

Read More

Other Democrats held up signs criticizing like "Save Medicaid" and "Protect Veterans" during Trump's remarks, seeking to drive public awareness to elements of Trump's agenda they believed might offer them a pathway back to the majority.

Some Democrats chose to highlight the impact of Trump's actions by inviting fired federal workers as guests, including a disabled veteran from Arizona, a health worker from Maryland and a forestry employee who worked on wildfire prevention in California.

Trump also used his speech to address his proposals for fostering peace in Ukraine and the Middle East, where he has unceremoniously upended the policies of the Biden administration in a matter of just weeks. On Monday, Trump ordered a freeze to U.S. military assistance to Ukraine, ending years of staunch American support for the country in fending off Russia's invasion.

Case 1:25-cv-00532-TNM          Document 37-4          Filed 02/17/25          Page 8 of 10
USCA Case #25-5109          Document #2132694          Filed: 08/29/2025          Page 113 of 515

Democrats hold signs as President Donald Trump addresses a joint session of Congress in the House chamber at the U.S. Capitol in Washington, Tuesday, March 4, 2025. (AP Photo/Julia Demaree Nikhinson)



Rep. Nydia Velazquez, D-N.Y., holds a protest sign with fellow Democrats as President Donald Trump addresses a joint session of Congress at the Capitol in Washington, Tuesday, March 4, 2025. (Win McNamee/Pool Photo via AP)

Trump recited a letter he received earlier Tuesday from Ukrainian President Volodymyr Zelenskyy, saying that the wartime president wants to come back to the table after a explosive Oval Office meeting last week broke down negotiations for a peace deal between Russia and Ukraine. "We've had serious discussions with Russia and have received strong signals that they are ready for peace," Trump said. "Wouldn't that be beautiful?"

He also announced the arrest of a suspect in the 2021 suicide bombing at the Kabul airport that killed U.S. troops during the withdrawal from Afghanistan.

Trump's 1 hour and 39 minute speech was the longest annual address a president has ever delivered to Congress, breaking Bill Clinton's record of 1 hour and 28 minutes.

Watching from the gallery with first lady Melania Trump were guests including 15-year-old Elliston Berry, of Aledo, Texas, who was the victim of an explicit deepfake image sent to classmates.

Other White House guests included relatives of Corey Comperatore, the former Pennsylvania fire chief who was killed as he protected his family during an assassination attempt on Trump last summer.

Republican lawmakers cheered the conclusion of Trump's address with chants that echoed his words after he was struck in the ear by a bullet: "Fight! Fight! Fight!"

---

Associated Press writers Lisa Mascaro, Stephen Groves and Kevin Freking in Washington, Darlene Superville in Kissimmee, Fla., and Bill Barrow in Atlanta contributed to this report.



**ZEKE MILLER**

Miller leads coverage of the president and the presidency for The Associated Press. He is based in Washington.

𝕏  ✉

3/17/25, 10:35 AM
President Trump promises to keep up 'swift and unrelenting' action in speech to Congress | AP News

Case 1:25-cv-00532-TNM    Document 37-4    Filed 02/17/25    Page 9 of 10
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 114 of 515

**MICHELLE L. PRICE**

Price covers the White House. She previously covered the 2024 presidential campaign and politics, government and other news in New York, Nevada, Utah and Arizona. She is based in Washington.



---

**MOST READ**

3/17/25, 10:35 AM
Case 1:25-cv-00532-TNM   Document 37-4   Filed 03/17/25   Page 10 of 10
President Trump promises to keep up swift and unrelenting action in speech to Congress | AP News

USCA Case #25-5109      Document #2132694      Filed: 08/29/2025      Page 115 of 515



1   **Trump invokes 18th century law to speed deportations, judge stalls it hours later**

2   **Trump orders strikes on Iran-backed Houthi rebels in Yemen and issues new warning**

3   **At least 39 dead after tornadoes, wildfires and dust storms wreak havoc across multiple US states**

4   **New Canadian Prime Minister Mark Carney seeks alliances in Europe as he deals with Trump**

5   **NASA's stuck astronauts welcome their newly arrived replacements to the space station**

Exhibit C

Case 1:25-cv-00532-TNM    Document 37-5    Filed 03/17/25    Page 2 of 20
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 117 of 515



*The* WHITE HOUSE

↖ **ARTICLES**

### President Trump's Historic Address Captivates America

The White House

March 5, 2025

President Donald J. Trump's <u>address</u> to a joint session of Congress last night was <u>widely acclaimed</u> as among his best — in which he touted his record accomplishments after just six weeks in office and laid out his compelling vision for four years of peace, strength, and prosperity for all Americans.

**This morning, President Trump's speech was the focus of newspapers across America:**

# The Boston Globe

### Serving our community since 1872

WEDNESDAY, MARCH 5, 2025

# Trump has his moment

### In address, he hails his 'swift and unrelenting action' remaking federal government



With the vice president and the speaker behind him, President Trump spoke to Congress on Tuesday night, eight years after his first address.

WIN MCNAMEE/POOL VIA ASSOCIATED PRESS

## Wu prepped and ready for hearing today in D.C.

### By Emma Platoff
GLOBE STAFF

As Boston Mayor Michelle Wu readies to testify Wednesday before the Republican-led House Oversight Committee, the city has turned to an outside law firm, Cahill Gordon & Reindel, to help her prepare, at the rate of $950 per hour.

Hiring outside attorneys — whose tab could rise as high as $650,000, according to city officials — is just one of many steps the mayor has taken to gear up for a hearing that is both a mine-

### By Zeke Miller
### and Michelle L. Price
ASSOCIATED PRESS

WASHINGTON — President Trump vowed Tuesday to keep up his campaign of "swift and unrelenting action" in reorienting the nation's economy, immigration, and foreign policy in an unyielding address to Congress and the nation that left Democratic legislators to register their dissent with stone faces, placards calling out "lies," and one legislator's ejection.

Trump's prime-time speech was the latest marker in his takeover of the nation's capital, where the Republican-led House and Senate have done little to restrain the president as he and his allies work to slash the size of the federal government and remake the country's place in the world.

The more than 90-minute address added up to a defiant sales

pitch for the policies that he promised during his campaign and leaned into during his first weeks back in office. Trump pledged to keep delivering sweeping changes to the country, rescuing it from what he described as dysfunction and mistakes left by his predecessor while repeatedly needling Democratic lawmakers who protested his remarks.

Emboldened after overcoming impeachments in his first term and criminal prosecutions in between his two administrations and with a tight grip on the Republican-controlled Congress, Trump has embarked on a mission to dismantle parts of the federal government, remake the relationship with US allies, and spark a North American trade war that is compounding economic uncertainty.

"It has been nothing but swift and unrelenting action," Trump said

of his opening weeks in office. "The people elected me to do the job, and I am doing it."

Trump, who has billionaire adviser Elon Musk orchestrating his efforts to slash the size and scope of the federal government, said he is working to "reclaim democracy from this unaccountable bureaucracy" and threatened federal workers anew with firings if they resist his agenda.

Musk, who was seated in the House gallery, received a pair of standing ovations from Republicans in the chamber, as Trump exaggerated and shared false claims about alleged government abuse uncovered by the Tesla and SpaceX founder and his team of disrupters.

Trump repeated false claims that tens of millions of dead people over 100 years old are receiving Social Security payments, prompting

**TRUMP, Page A6**

## Insurer of disabled, elderly low on cash

### Commonwealth Care Alliance had been model

### By Jessica Bartlett
GLOBE STAFF

Financial turmoil has engulfed one of the largest insurers of Massachusetts' disabled, elderly, and low-income residents, potentially challenging that vulnerable population's access to care for complex health needs.

Should the organization fail, nearly 50,000 patients in Massachusetts could face disruptions in critical medical services.

Commonwealth Care Alliance has long been regarded as a visionary in the care of people simultaneously eligible for Medicaid, which serves mostly low-income people, and Medicare, which helps largely people over 65 and those with disabilities. Acting as both a health insurer and for some, a service provider, the nonprofit's model is one that is deeply involved in patients' care, often coordinating multiple specialists, appointments, and services.

But after years of multimillion-dollar operating losses, Commonwealth Care's cash reserves have fallen dramatically, triggering MassHealth, the state's Medicaid program, in November to block the insurer from acquiring new members. Disability advocates recently said in a letter to state regulators that they understood the company was looking to be acquired, but that those efforts have so far been unsuccessful.

Executives from Commonwealth Care declined to comment.

The organization's financial struggles come after a period of

**INSURER, Page A10**



Food writer Devra First checks out Somaek, a Korean restau-

***The Boston Globe* (Boston, MA)**

USCA Case #25-5109      Document #2132694           Filed: 08/29/2025      Page 119 of 515



*Chicago Sun-Times* (Chicago, IL)

USCA Case #25-5109     Document #2132694       Filed: 08/29/2025      Page 120 of 515



President Trump, with Vice President JD Vance and House Speaker Mike Johnson behind him, addressed Congress Tuesday night.

# Trump Touts 'Swift and Unrelenting' Actions on Border, Budget, Economy

BY ALEX LEARY

WASHINGTON—President Trump put his disruptive return to power on full display during a prime-time address to Congress on Tuesday night, offering a no-apologies assessment of his decisions to crack down on illegal immigration, slash the federal workforce and impose stiff tariffs on imports.

"I return to this chamber tonight to report that America's momentum is back, our spirit is back, our pride is back, our confidence is back," Trump said, standing in the House chamber five years after his last address to Congress, describing what he called a "swift and unrelenting" campaign to transform the country.

The one-hour, 40-minute address—the longest ever of its kind by a president to a joint session of Congress—gave Trump an opportunity to sell his combative brand of governing to tens of millions of Americans in what is expected to be his largest audience since his inaugural address.

Trump presented a swaggering view of his administration, boasting of the dozens of executive orders he has signed and casting his first month in office as the most successful in history. He made few entreaties for unity, instead attacking Democrats as "radical left lunatics" and blaming his predecessor, Joe Biden, for the country's problems.

"I look at the Democrats in front of me and I realize there is absolutely nothing I can say to make them happy," he said. Democratic lawmakers held signs that read "false" and "Musk steals," a reference to Trump's ally Elon Musk and

the efforts he has led to slash government spending.

Seven minutes into the speech, Rep. Al Green (D., Texas) was removed from the House chamber after rising from his seat and shouting at the president. The disruption prompted Trump to momentarily pause his remarks. Green later told reporters that the outburst was "worth it to let people know that there are some people who are going to
*Please turn to page A5*

◆ Zelensky aims to mend ties with Trump.............. A6

## *The Wall Street Journal* (New York City, NY)

PRESIDENT'S ADDRESS TO CONGRESS

# Trump claims credit for 'swift, unrelenting action'



President Donald Trump addresses a joint session of Congress on Tuesday at the Capitol in Washington as Vice President JD Vance, left, and House Speaker Mike Johnson applaud.

Pool photo by WIN McNAMEE • The Associated Press

## He recounts his flurry of activity since being inaugurated.

By ZEKE MILLER and
MICHELLE L. PRICE
The Associated Press

WASHINGTON - President Donald Trump vowed Tuesday to keep up his campaign of "swift and unrelenting action" in reorienting the nation's economy, immigration and foreign policy in an unyielding address to Congress and the nation that left Democratic legislators to register their dissent with stone faces, placards calling out "lies,"

and one legislator's ejection.

Trump's speech was the latest marker in his takeover of the nation's capital, where the Republican-led House and Senate have done little to restrain the president as he and his allies work to slash the size of the federal government and remake America's place in the world.

The more than 90-minute address added up to a defiant sales pitch for the policies that he promised during his campaign and leaned into during

his first weeks back in office. Trump pledged to keep delivering sweeping changes to the country, rescuing it from what he described as destruction and mistakes left by his predecessor while repeatedly needling Democratic lawmakers who protested his remarks.

Emboldened after overcoming impeachments in his first term and criminal prosecutions in between his two administrations and with a tight grip on
SEE TRUMP ON A4 »



KENNY HOLSTON • The New York Times
Rep. Al Green, D-Texas, was ejected from the House chamber after yelling at Trump that he had "no mandate to cut Medicaid."

> "The people elected me to do the job, and I am doing it."
>
> President Donald Trump

### *The Minnesota Star Tribune* (Minneapolis, MN)

# Pittsburgh Post-Gazette

### ONE OF AMERICA'S GREAT NEWSPAPERS

$4.00    238 YEARS OF SERVICE    WEDNESDAY, MARCH 5, 2025    VOL. 98, NO. 216, 3/5/25    FINAL

## TRUMP'S ADDRESS TO CONGRESS



Win McNamee/Getty Images

President Donald Trump arrives to address a joint session of Congress on Tuesday at the U.S. Capitol in Washington. Speaker of the House Mike Johnson, R-La., and Vice President JD Vance applaud behind him.

# PRESSING FORWARD

President promises to keep up 'swift and unrelenting action'

By Zeke Miller and
Michelle L. Price
Associated Press

WASHINGTON — President Donald Trump vowed Tuesday to keep up his campaign of "swift and unrelenting action" in reorienting the nation's economy, immigration and foreign policy in an unyielding address to Congress and the nation that left Democratic legislators to register their dissent with stone faces, placards calling out "lies," and one legislator's ejection.

Trump's prime-time speech was the latest marker in his takeover of the nation's capital, where the Republican-led House and Senate have done little to restrain the president as he and his allies work to slash the size of the federal government and remake America's place in the world.

The more than 90-minute address added up to an defiant sales pitch for the policies that he promised during his campaign and leaned into during his first weeks back in office.

**INSIDE**

• In Democratic response, first-term Michigan senator assails Trump's policies, **A-6**
• Zelenskyy calls his spat with Trump "regrettable," **A-8**

SEE **SPEECH**, PAGE A-6



Jim Watson/AFP via Getty Images

Oakmont teacher Marc Fogel, center, recently brought home to the U.S. after being held in a Russian prison, stands with his mother, Malphine Fogel, as he is recognized by President Donald Trump.

## PITTSBURGH POLICE

# RAGLAND LEAVING, CITING ETHICS

### Calls process for chief job 'political football'

By Megan Guza and Hallie Lauer
Pittsburgh Post-Gazette

Christopher Ragland, the acting Pittsburgh police chief and Mayor Ed Gainey's nominee to take over the position, is leaving the bureau altogether, citing "demands" made of him that he felt were unethical.

"As a leader, you have to have some bright lines," Chief Ragland said at a Tuesday afternoon briefing. "You have to do things that are moral, ethical and legal, and when you are faced or requested or demanded to do certain things that maybe go against your bright lines, you have to be prepared to walk away.

"That's what I'm doing today," he said.

Assistant Chief Martin Devine will step into the role of acting chief effective Tuesday.

Chief Ragland declined to elaborate on what demands were placed on him or who made them, saying only that "the mayor's office, the mayor himself, have never made any requests to me other than to lead the bureau with integrity and honesty."

SEE **RAGLAND**, PAGE A-3



Sarah Qu/Post-Gazette

Acting Chief Christopher Ragland: "All I'm going to say is that during this process, I

*Pittsburgh Post-Gazette* **(Pittsburgh, PA)**

USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 123 of 515

# The Gazette

gazette.com

**TWO-TIME PULITZER PRIZE WINNER / FOUNDED 1872**

SERVING COLORADO SPRINGS & THE PIKES PEAK REGION                WEDNESDAY, MARCH 5, 2025    **$2.00**



**200 in Springs to be laid off**
Microchip cutting overall workforce, cites automaker issues. **BUSINESS, B1**



**Scorpions sting Hawks**
Late basket lifts Sand Creek boys to first Great 8 since 2014. **SPORTS, C1**

**BONUS COVERAGE**
See gazette.com for more news, photos and videos.

# TRUMP: 'AMERICA IS BACK'

## Colorado Republicans cheer, state's Dems scowl

**BY ERNEST LUNING**
ernest.luning@coloradopolitics.com

President Donald Trump's address to a joint session of Congress on Tuesday night was music to the ears of Colorado's Republican lawmakers, but the state's Democrats turned their thumbs down, with one walking out midway through and another skipping the speech entirely.

"President Trump was saved by God to SAVE AMERICA," tweeted U.S. Rep. Lauren Boebert, a Windsor Republican and vocal Trump supporter, as Trump neared the conclusion of his nearly two-hour speech.

"I've heard enough of the lies, fear mongering, and political attacks," tweeted U.S. Rep. Jason Crow, an Aurora Democrat, more than an hour into the address.

Added Crow, who departed the chamber: "I'm out — and getting back to work to protect Colorado."

Earlier, U.S. Rep. Diana DeGette, D-Denver, announced that she wouldn't attend the address, saying that since taking office Trump had been "(assaulting) the values we hold dear."

Trump delivered the speech flanked by Vice President JD Vance, who presides over the Senate, and House Speaker Mike Johnson, a Louisiana Republican.

Several members of Colorado's congressional delegation provided running

**SEE COLORADO • PAGE 4**



THE ASSOCIATED PRESS
President Donald Trump speaks as Vice President JD Vance, left, and House Speaker Mike Johnson listen Tuesday as Trump addresses a joint session of Congress.

## President promises more vigorous change as Democrats protest

Reuters

**WASHINGTON** - President Donald Trump took a victory lap in an address to Congress on Tuesday, drawing catcalls and interruptions from some Democratic lawmakers who held up signs and walked out midspeech in protest.

The partisan rancor was reflective of the tumult that has accompanied Trump's first six weeks in office upending U.S. foreign policy, igniting a trade war with close allies and slashing the federal workforce.

The prime-time speech, his first to Congress since taking office on Jan. 20, capped a second day of market turmoil after he imposed sweeping new tariffs against Mexico, Canada and China.

"To my fellow citizens, America is back," Trump began to a standing ovation from fellow Republicans. "Our country is

on the verge of a comeback the likes of which the world has never witnessed, and perhaps will never witness again."

Democrats held up signs with messages like "No King" and "This Is NOT Normal,"

**SEE TRUMP • PAGE 4**

**Ukraine and U.S.**
After letter from Zelenskyy, Trump announces he's willing to sign deal with Ukraine on natural resources. **A4**

*Colorado Springs Gazette* **(Colorado Springs, CO)**

# LAS VEGAS REVIEW-JOURNAL

reviewjournal.com

**NEVADA** Henderson City Council meeting over Police Chief Chadwick gets heated **1B**

**SPORTS** Rishwain scores 26 as UNLV upsets San Diego State on senior night **1C** ▶

**WEDNESDAY**
March 5, 2025

## MUST READS



The Associated Press

**NATION**
■ Mardi Gras, roofs, high schools were all affected by major storms nationwide. **6A**

■ NASA's two stuck astronauts are finally closing in on their return to Earth after nine months in space. **6A**

**SPORTS**
■ The Vikings did not place a franchise tag on QB Sam Darnold, opening the door for the Raiders. **1C**

■ Knights coach loved his experience at the 4 Nations Face-Off. **1C**

**WORLD**
■ Under Egypt's postwar plan, Gazans would not be displaced. **8A**

**NEVADA & THE WEST**
■ Two offices in Elko serving Native Americans are subject to cuts from DOGE. **1B**

■ Clark County Manager Kevin Schiller will continue to be the county's top executive for at least three more years. **1B**

**WASHINGTON REPORT**
■ Trump vowed to leverage federal money to fight antisemitism. He's starting at Columbia. **4A**

■ Supreme Court seems likely to block Mexico's $10 billion lawsuit against U.S. gun makers. **4A**

# Trump makes waves

## GOP lawmakers approve boisterously; Democrats sit silently



President Donald Trump addresses Congress on Tuesday night in Washington. He vowed to keep delivering sweeping changes.
Win McNamee The Associated Press

**By Zeke Miller and Michelle L. Price**
The Associated Press

WASHINGTON — President Donald Trump vowed Tuesday to keep up his campaign of "swift and unrelenting action" in reorienting the nation's economy, immigration and foreign policy in an address to Congress and the nation that left Democratic legislators to register their dissent with stone faces, placards calling out "lies," and one legislator's ejection.

The more than 90-minute address added up to a defiant sales pitch for the policies that he promised during his campaign and leaned into during his first weeks back in office.

Trump pledged to keep delivering sweeping changes to the country, rescuing it from what he described as destruction and mistakes left by his predecessor while repeatedly needling Democratic lawmakers who protested his remarks.

Emboldened after over-

See **TRUMP** 2A

**Inside**
■ Sanders: The tension between presidents Donald Trump and Volodymyr Zelenskyy goes back a few years. **2A**

■ Zelenskyy calls the Oval Office spat "regrettable" and adds he's ready to work for peace. **8A**

■ Trudeau slams Trump for starting a trade war with Canada while appeasing Putin. **8A**

*Las Vegas Review-Journal* **(Las Vegas, NV)**

3/17/25, 10:37 AM    President Trump's Historic Address Captivates America · The White House    Case 1:25-cv-00532-TNM   Document 27-5   Filed 03/17/25   Page 12 of 20

USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 125 of 515



# Chicago Tribune

*WINNER OF 28 PULITZER PRIZES FOR EXCELLENCE IN JOURNALISM*

QUESTIONS? CALL 1-800-Tribune    WEDNESDAY, MARCH 5, 2025    BREAKING NEWS AT CHICAGOTRIBUNE.COM

## Illinoisans push for a new clean energy law

Lawmakers introduce bill with ambitious goal for large-scale storage

**By Nara Schoenberg and Addison Wright**
Chicago Tribune

With clean energy under siege in Congress and in the Oval Office, supporters continue to press forward in Illinois.

Lawmakers have introduced the Clean and Reliable Grid Affordability Act, with an ambitious new goal for large-scale energy storage, in which giant batteries absorb wind and solar energy when it's not needed, and release it when it is.

The bill makes it easier to construct high-voltage transmission lines, which bring the cleanest, lowest-cost energy to consumers.

There are also measures promoting energy efficiency, addressing electricity-guzzling data centers and establishing virtual power plants – networks of homes with EVs, solar panels and batteries that, working in tandem, can produce large amounts of energy and save customers money.

"Trump has made it clear he plans to roll back federal funding and programs that support clean energy progress," Democratic state Rep. Ann Williams of Chicago, a sponsor of the bill, said at a news conference Tuesday.

"This is of great concern to all of us in Illinois, but we are not going back. Illinois can and will continue to lead on climate policy," she said.

President Donald Trump's efforts to block funding for solar and wind energy and electric vehicles have hit Illinois hard in recent weeks, with environmentalists reporting chaos and confusion.

But there's also a sense of pride in the state's sweeping 2021 law, the Climate and Equitable Jobs Act, and a determination to meet new challenges.

"Our power grid is struggling to keep up with a surge in demand for energy, largely caused by new data centers," Illinois Clean Jobs Coalition lobbyist Kady McFadden said.

*Turn to Energy, Page 5*



President Donald Trump addresses a joint session of Congress at the Capitol in Washington on Tuesday. WIN MCNAMEE/AP

# Trump vows to remain 'swift and unrelenting'

## GOP allies applaud pledge to continue disruptive policies

**By Zeke Miller and Michelle L. Price**
Associated Press

WASHINGTON — President Donald Trump vowed Tuesday to keep up his campaign of "swift and unrelenting action" in reorienting the nation's economy, immigration and foreign policy in an unyielding address to Congress and the nation that left Democratic legislators to register their dissent with stone faces, placards calling out "lies" and one legislator's ejection.

Trump's prime-time speech was the latest marker in his takeover of the nation's capital, where the Republican-led House and Senate have done little to restrain him as he and his allies work to slash the size of the federal government and remake America's place in the world.

The address, more than 90 minutes long, added up to an defiant sales pitch for the policies that he promised during his campaign and leaned into during his first weeks back in office. Trump pledged to keep delivering sweeping changes to the country, rescuing it from what he described as destruction and mistakes left by his predecessor.

Emboldened after overcoming impeachments in his first term and criminal prosecutions in between his two administrations and with a tight grip on the Republican-controlled Congress, Trump has embarked on a mission to dismantle parts of the federal government, remake the relationship with America's allies and spark a North American trade war that is compounding economic uncertainty.

"It has been nothing but swift and unrelenting action," Trump said of his opening weeks in office. "The people elected me to do the job, and I am doing it."

Trump, who has billionaire adviser Elon Musk orchestrating his efforts to slash the size and scope of the federal government, said he is working to "reclaim democracy from this unaccountable bureaucracy" and threatened federal workers anew with firings if they resist his agenda.

Musk, seated in the House gallery, received a pair of standing ovations from Republicans in the chamber, as Trump exaggerated and shared false claims about alleged government abuse uncovered by Musk and his team.

Trump repeated false claims that tens of millions of dead people over 100 years old are receiving Social Security payments, prompting some Democrats to shout, "Not true!" and "Those are lies!"

Trump spoke at a critical juncture in his presidency, as voters who returned him to the White House on his promise to fix

*Turn to Speech, Page 11*

***Chicago Tribune* (Chicago, IL)**

# The Mercury News

*BayArea NewsGroup* | Volume 174, Issue 239

**WEDNESDAY, MARCH 5, 2025**

24/7 COVERAGE: MERCURYNEWS.COM • $2.00

ADDRESS TO CONGRESS

# Trump lauds his 'swift' moves

'The people elected me to do the job, and I am doing it,' he says of whirlwind first few weeks

**INSIDE:** Demonstrators across every state look to unify opposition to Trump's agenda. A2

**By Zeke Miller and Michelle L. Price**
*The Associated Press*

**WASHINGTON »** President Donald Trump took credit for "swift and unrelenting action" in reorienting the nation's economy, immigration and foreign policy Tuesday in an address to Congress and the American people about his turbulent first weeks in office, as Democratic legislators immediately registered their dissent with stone faces, placards calling out 'lies," and one legislator's ejection.

Trump's joint address to Congress was the latest marker in

Trump's takeover of the nation's capital, where the Republican-led House and Senate have done little to restrain the president as he and his allies work to slash the size of the federal government and remake America's place in the world. With a tight grip on his party, Trump has been emboldened after overcoming impeachments in his first term and criminal prosecutions in between his two administrations to take sweeping actions that have featured a dismantling of the federal government, tensions with America's allies and a trade war compounding economic uncertainty.

"It has been nothing but swift and unrelenting action," Trump said of his opening weeks in office. "The people elected me to do the job, and I am doing it."

Trump, who has billionaire adviser Elon Musk orchestrating his efforts to slash the size and scope of the federal government, said he is working to "reclaim democracy from this unaccountable bureaucracy" and threatened federal workers anew with firings if they resist his agenda.

Musk, who was seated in the House gallery, received a pair of

**TRUMP » PAGE 5**



President Donald Trump delivers an address to a joint session of Congress on Tuesday in front of a rowdy crowd of legislators.

DOUG MILLS — THE NEW YORK TIMES

*The Mercury News* **(Silicon Valley, CA)**

# The Washington Times

HIGH 64, LOW 43

**WEDNESDAY, MARCH 5, 2025**

★★   washingtontimes.com   **$1.50**

RULES AND WHY OUTSIDE METROPOLITAN WASHINGTON AREA.

CONGRESS

# Trump says American dream 'bigger and better than before'

## President gives defiant speech amid Democratic outbursts

**By Jeff Mordock, Alex Miller and Stephen Dinan**
THE WASHINGTON TIMES

President Trump on Tuesday declared that Americans are regaining their confidence and the American dream is now "unstoppable" in an address before a joint session of Congress that was marked by interruptions from Democrats.

"America's momentum is back. Our spirit is back. Our pride is back. Our confidence is back," Mr. Trump said in his first address to Congress since returning to office six weeks ago.

"The American dream is surging bigger and better than ever before. The American dream is unstoppable and our country is on the verge of a comeback the likes of which the world has never witnessed and perhaps will never witness again," he said.

Democrats wasted no time heckling the president, unleashing a chorus of boos as Mr. Trump began his remarks. They interrupted his speech, forcing Mr. Trump to pause from delivering remarks for a few minutes.

"You have no mandate," Rep. Al Green, Texas Democrat, shouted at the president as his speech got underway.

Other Democrats held up signs saying "false" or "lie after lie."

At one point, Mr. Green became so disruptive that House Speaker Mike Johnson, Louisiana Republican, ordered him removed from the chamber.

Mr. Trump admonished the Democrats for their hyperpartisanship.

"There is nothing I could say to make the Democrats happy. Nothing," he said. "It's very sad and it shouldn't be that way."

Mr. Trump immediately zeroed in on the economy amid criticism from

**» see TRUMP | A5**

**BACK IN THE HOUSE:** President Trump, addressing a joint session of Congress on Tuesday night, outlined his administration's flurry of accomplishments during the first six weeks of his term. "The American dream is unstoppable," he declared.

ASSOCIATED PRESS

*The Washington Times* **(Washington, D.C.)**

USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 127 of 515

# Trump touts 'unrelenting action' in speech to Congress



Jim Watson / Getty Images

President Donald Trump's theme in his address to Congress on Tuesday was the "renewal of the American dream." He laid out his achievements and appealed to Congress to provide more money to finance his aggressive immigration crackdown.

## President says he's doing what he was elected for in busy opening weeks

**BY ZEKE MILLER
AND MICHELLE L. PRICE**
Associated Press

President Donald Trump on Tuesday took credit for "swift and unrelenting action" in reorienting the nation's economy, immigration and foreign policy as he updated Congress and the American people on his turbulent first few weeks in office, which have featured a dismantling of the federal government, tensions with America's allies and a trade war compounding economic uncertainty.

His joint address to Congress was the latest marker in Trump's takeover of the nation's capital, where the Republican-led House and Senate have done little to restrain the president as he and his allies work to slash the size of the federal government and remake

**AT DETROITNEWS.COM:**

SCAN THE QR CODE FOR SEN. SLOTKIN'S RESPONSE.



America's place in the world. With a tight grip on his party, Trump has been emboldened to take sweeping actions after overcoming impeachments in his first term and criminal prosecutions in between his two administrations.

"It has been nothing but swift and unrelenting action," Trump

*Please see Trump, Page 5A*



Saul Loeb / Getty Images

Texas Rep. Al Green, a Democrat, was ejected from the chamber after yelling that Trump had no mandate. Republicans, meanwhile, shouted "USA" to drown out the cries from the other side of the aisle.

## *The Detroit News* (Detroit, MI)

JA124

3/17/25, 10:37 AM — President Trump's Historic Address Captivates America – The White House

Case 1:25-cv-00532-TNM — Document 27-5 — Filed 03/17/25 — Page 13 of 20
USCA Case #25-5109 — Document #2132694 — Filed: 08/29/2025 — Page 128 of 515

# 'Swift and unrelenting'

In combative, lengthy address, longest in history, Trump calls rivals 'radical left lunatics,' says more coming



DOUG MILLS/THE NEW YORK TIMES

**President Donald Trump delivers an address to a joint session of Congress on Tuesday at the Capitol. Trump accused Democrats of ignoring the "commonsense revolution" that he and his administration had begun to implement. He addressed his opponents in the audience with contempt, gloating about his election victory, and called former President Joe Biden the worst president in American history.**

By Michael D. Shear and Luke Broadwater
*The New York Times*

WASHINGTON

President Donald Trump faced heckling from Democrats on Tuesday as he declared "America is back," delivering an address to Congress in which he boasted about his efforts to reshape the government and taunted his adversaries with references to his political and legal triumphs.

In the longest presidential address to Congress in history, Trump appeared to cool tensions from a blowup last week with President Volodymyr Zelenskyy of Ukraine, reading aloud a message of gratitude Zelenskyy had posted on social media earlier in the day. Trump said he appreciated the message, and that he had also received "strong signals" from Russia that they were eager for peace with Ukraine.

*Please see story on Page A-5*

## INSIDE

◆ Trump trade war draws swift retaliation. **PAGE A-2**
◆ Slotkin warns of potential recession in Democrat response. **PAGE A-5**
◆ Zelenskyy calls Oval Office spat regrettable, says he is ready to talk peace. **PAGE A-5**

### *Santa Fe New Mexican* (Santa Fe, NM)

3/17/25, 10:37 AM    Case 1:25-cv-00532-TNM    Document 27-5    Filed 03/17/25    Page 154 of 20
President Trump's Historic Address Captivates America – The White House

USCA Case #25-5109        Document #2132694        Filed: 08/29/2025        Page 129 of 515

# Altoona Mirror

$1.50   © Copyright 2025        **WEDNESDAY**        March 5, 2025

## Bellwood rallies to support family

### Fundraiser planned to aid Hostlers after fire ravages home

**BY CONNOR GOETZ**
cgoetz@altoonamirror.com

BELLWOOD — The Bellwood community is pulling together to support a family after their home was ravaged by a fire on Sunday.

According to Leah Hostler, the fire began about 2 a.m. toward the back of the two-story home at South First Street and Martin Street.

Excelsior Fire Department, along with mutual aid fire companies, were dispatched to the scene shortly after the blaze was discovered, but the structure had already sustained substantial damage by the time they extinguished the blaze.

Hostler, her younger brother Ryan, father Ryan, stepmother Lisa and two stepsisters, Emma and Ella, have been staying with friends and family nearby since Sunday, she said.

According to Hostler, the family lost the majority of their possessions in the fire, as well as their three pet cats. Thankfully, their two dogs escaped unharmed, she said.

When Katie Grager, who lives down the street from the Hostlers, heard about the fire, she sprang into action.

Now, Grager has arranged a spaghetti dinner fundraiser to support the family.

The dinner will be held from 1 to 4 p.m. March 16 at the fraternal Order of Eagles Lodge on South First Street, Grager said.

There will be 350 tickets available, which can be bought over the phone from Grager or at the door on the day of the dinner.

All tickets will cost $12, with the proceeds going directly to the Hostler family.

Grager said she expects the tickets to sell out quickly, so potential attendees should call her at 814-381-4771 to reserve their tickets in advance.

In addition to the dinner, there will be a basket raffle during the event, with the proceeds added to the donation pool for the Hostlers, Grager said.

See **Support**/Page **A2**



President Donald Trump addresses a joint session of Congress at the Capitol in Washington, D.C., on Tuesday.

# Trump addresses Congress

### President promises to keep up 'swift and unrelenting action'

**BY ZEKE MILLER AND MICHELLE L. PRICE**
*The Associated Press*

President Donald Trump vowed Tuesday to keep up his campaign of "swift and unrelenting action" in reorienting the nation's economy, immigration and foreign policy in an unyielding address to Congress and the nation that left Democratic legislators to register their dissent with stone faces, placards calling out "lies" and one legislator's ejection.

Trump's prime-time speech was the latest marker in his takeover of the nation's capital, where the Republican-led House and Senate have done little to restrain the president as he and his allies work to slash the size of the federal government and remake America's place in the world.

The more than 90-minute address added up to a sales pitch for the policies that he promised during his campaign and leaned into during his first weeks back in office. Trump pledged to keep delivering sweeping changes to the country, rescuing it from what he described as destruction and mistakes left by his predecessor, while repeatedly needling Democratic lawmakers who protested his remarks.

Emboldened after overcoming impeachments in his first term and criminal prosecutions in between his two administrations, and with a tight grip on the Republican-controlled Congress, Trump has embarked



Members of Congress hold up signs in protest as President Donald Trump addresses a joint session of Congress at the Capitol in Washington, D.C., on Tuesday.

on a mission to dismantle parts of the federal government and remake the relationship with America's allies.

"It has been nothing but swift and unrelenting action," Trump said of his opening weeks in office. "The people elected me to do the job, and I am doing it."

Trump, who has billionaire adviser Elon Musk orchestrating his efforts to slash the size and scope of the federal government, said he is working to "reclaim democracy from this unaccountable bureaucracy" and threatened federal workers anew with firings if they resist his agenda.

Musk, who was seated in the House gallery, received a pair of standing ovations from Republicans in the chamber, as Trump shared claims about alleged government abuse uncovered by the Tesla and SpaceX founder and his team.

Trump repeated claims that tens of millions of dead people over 100 years old are receiving Social Security payments, prompting some Democrats to shout, "Not true!" and "Those are lies!"

See **Trump**/Page **A5**

*Altoona Mirror* (Altoona, PA)

3/17/25, 10:37 AM    President Trump's Historic Address Captivates America - The White House

Case 1:25-cv-00532-TNM    Document 27-5    Filed 03/17/25    Page 15 of 20
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 130 of 515

# Arkansas Democrat Gazette

ARKANSAS' NEWSPAPER

Copyright © 2025. Arkansas Democrat-Gazette, Inc.

Printed at Little Rock • March 5, 2025    ArkansasOnline.com    ★ ★    40 Pages • 6 Sections    $3.00

## In the news

■ **Alexis Wohl**, director of veterinary medicine at the Ramona Wildlife Center in San Diego, said in a news release a gray fox "was left defenseless with life-threatening wounds from the Airport fire ... but in the end, he ultimately overcame his injuries so he could return home."

■ **Maurya Bharwad**, an Indian citizen charged with making a false statement during the purchase of a firearm, admitted to investigators in Kentucky that he planned to use a bomb in New York tunnels to "shut the city down," according to court documents.

■ **Maximillian Yanofsky**, 30, was disarmed and jailed on several charges, including aggravated assault, after police say he shot and wounded a security guard in the emergency room at HonorHealth Scottsdale Shea Medical Center in Scottsdale, Ariz.

■ **Amanda Frances**, a Los Angeles-based financial influencer known as "The Money Queen," said in a statement "burglars ransacked my closet, damaging my home in the process, but they dropped nearly everything, prioritizing the prop money when confronted by a neighbor's security guard."

■ **Umaro Sissoco Embaló**, president of the African nation of Guinea-Bissau, announced that he "will be a candidate for my own succession," seeking reelection amid calls for legislators to expel him.

■ **Evelyn Torres**, 35, pleaded innocent to charges of murder and possessing a gun as a felon in the July 2023 shooting death of a woman who Torres' late uncle, a convicted Mexican Mafia member, referred to as his wife in San Fernando, Calif.

■ **Truong Huy San**, a Vietnamese journalist known



President Donald Trump addresses a joint session of Congress at the Capitol on Tuesday. (AP/Win McNamee)

## Speech, president lauded by Arkansas' delegation

ALEX THOMAS
ARKANSAS DEMOCRAT-GAZETTE

WASHINGTON — Members of Arkansas' congressional delegation spoke highly of President Donald Trump's Tuesday evening address to Congress, optimistic about Trump's second tenure in the White House.

Trump marked the 44th day of his presidency with a 100-minute speech touting his stream of executive actions, including tariffs affecting imports from the nation's top trading partners; rescinding steps addressing diversity, equity and inclusion efforts; and orders addressing illegal immigration.

"Six weeks ago, I stood beneath the dome of this Capitol and proclaimed the dawn of the Golden Age of America," Trump told lawmakers, standing at the front of the House of Representatives chamber. "From that moment on, it has been nothing but swift and unrelenting action to usher in the greatest and most successful era of the history of our country."

Rep. Steve Womack, R-Ark., said Trump's first six weeks in office show he is "determined to make good on his promise."

"I'm optimistic for America's future under President Trump's leadership. He's working to deliver on the status quo in Washington and chart

See **DELEGATION**, Page 5A

## Trump vows to hold steady reforming US

### Elected to do job, am doing it, president tells Congress

COMPILED BY
DEMOCRAT-GAZETTE STAFF
FROM WIRE REPORTS

WASHINGTON — President Donald Trump vowed Tuesday to keep up his campaign of "swift and unrelenting action" in reorienting the nation's economy, immigration and foreign policy in an unyielding address to Congress and the nation that left Democratic legislators to register their dissent with stone faces, placards calling out "lies," and one legislator's ejection.

Trump's prime-time speech was the latest marker in his takeover of the nation's capital, where the Republican-led House and Senate have done little to restrain the president as he and his allies work to slash the size of the federal government and remake America's place in the world.

The more than 90-minute address added up to a defiant sales pitch for the policies that he promised during his campaign and leaned into during his first weeks back in office. Trump pledged to keep delivering sweeping changes to the country, rescuing it from what he described as destruction and mistakes left by his predecessor while repeatedly needling Democratic lawmakers who protested his remarks.

Emboldened after overcoming impeachments in his first term and criminal prosecutions in between his two

**AVOID TOWN HALLS' CRITICS**
Johnson tells lawmakers.
Page 6A.

administrations and with a tight grip on the Republican-controlled Congress, Trump has embarked on a mission to dismantle parts of the federal government, remake the relationship with America's allies and spark a North American trade war that is compounding economic uncertainty.

"It has been nothing but swift and unrelenting action," Trump said of his opening weeks in office. "The people elected me to do the job, and I am doing it."

Trump, who has billionaire adviser Elon Musk orchestrating his efforts to slash the size and scope of the federal government, said he is working to "reclaim democracy from this unaccountable bureaucracy" and threatened federal workers anew with firings if they resist his agenda.

Musk, who was seated in the House gallery, received a pair of standing ovations from Republicans in the chamber, as Trump shared claims about suspected government abuse uncovered by the Tesla and SpaceX founder and his team.

Trump repeated claims that tens of millions of dead people over 100 years old

See **TRUMP**, Page 5A

**Arkansas Democrat Gazette** (Little Rock, AR)

3/17/25, 10:37 AM Case 1:25-cv-00532-TNM Document 27-5 Filed 03/17/25 Page 16 of 20
President Trump's historic Address Captivates America – The White House
USCA Case #25-5109 Document #2132694 Filed: 08/29/2025 Page 131 of 515

# Trump touts 'swift and unrelenting' action



PRESIDENT DONALD Trump addresses a joint session of Congress at the Capitol in Washington, Tuesday, March 4, 2025. (AP Photo/Ben Curtis)

## Border security, tariffs highlight address to Congress

By ZEKE MILLER and
MICHELLE L. PRICE
Associated Press

WASHINGTON (AP) — President Donald Trump on Tuesday took credit for "swift and unrelenting action" in reorienting the nation's economy, immigration and foreign policy as he updated Congress and the American people on his turbulent first few weeks in office, which have featured a dismantling of the federal government, tensions with America's allies and a trade war compounding economic uncertainty.

His joint address to Congress was the latest marker in Trump's takeover of the nation's capital, where the Republican-led House and Senate have done little to restrain the president as he and his allies work to slash the size of the federal government and remake America's place in the world. With a tight grip on his party, Trump has been emboldened to take sweeping actions after overcoming impeachments in his first term and criminal prosecutions in between his two administrations.

"It has been nothing but swift and unrelenting action," Trump said of his opening weeks in office. "The People elected me to do the job, and I am doing it."

Out of power, Democrats made an immediate display of dissent with stone faces, placards calling out 'lies," and Texas Rep. Al Green's ejection from the House

chamber after heckling Trump that he had "no mandate to cut Medicaid."

After several interruptions, House Speaker Mike Johnson jumped in and called for decorum to be restored in the chamber as Republicans shouted "USA" to drown out the cries from the other side of the aisle. Johnson then ordered Green be removed from the chamber.

Trump spoke at a critical juncture in his presidency, as voters who returned him to the White House on his promise to fix inflation are instead finding economic chaos. All the gains the S&P 500 have made since Election Day are now gone, while consumer sentiment surveys show the public sees inflation as worsening.

For a president who believes that announcements of corporate investments can boost attitudes about the economy, the speech was suddenly a test of his ability to rebuild confidence in his economic leadership.

"Among my very highest priorities is to rescue our economy and get dramatic and immediate relief to working families," Trump said. He promised to organize the federal government to lower costs on eggs and energy, though he offered scant details.

Trump also called for the extension of his first-term tax cuts and additional federal funding for his border crackdown, including for his promised efforts at "mass

See TRUMP, A6

JA128
https://www.whitehouse.gov/articles/2025/03/president-trumps-historic-address-captivates-america/ 15/19

*Daily Inter Lake* **(Kalispell, MT)**



# The Herald

**WEDNESDAY**
March 5, 2025
Sharon, Pennsylvania
$2.00
2 sections 16 pages
Volume 161, Number 278
sharonherald.com

## 'America is back'

### Trump promises to keep up 'swift and unrelenting action' in speech to Congress

By ZEKE MILLER
and MICHELLE L. PRICE
*Associated Press*

President Donald Trump addresses a joint session of Congress in the House chamber at the U.S. Capitol in Washington, Tuesday.

WASHINGTON — President Donald Trump vowed Tuesday to keep up his campaign of "swift and unrelenting action" in reorienting the nation's economy, immigration and foreign policy in an unyielding address to Congress and the nation that left Democratic legislators to register their dissent with stone faces, placards calling out "lies," and one legislator's ejection.

Trump's prime-time speech was the latest marker in his takeover of the nation's capital, where the Republican-led House and Senate have done little to restrain the president as he and his allies work to slash the size of the federal government and remake America's place in the world.

The more than 90-minute address added up to a defiant sales pitch for the policies that he

See TRUMP, page A-2

*The Herald* **(Sharon, PA)**

# Chattanooga Times Free Press

VOL. 156 | NO. 81 | $2.00    TIMESFREEPRESS.COM    WEDNESDAY, MARCH 5, 2025

## Trump boasts of 'swift and unrelenting' action

### In address to Congress, Republicans applaud while Dems shout and hold signs in protest

BY ZEKE MILLER AND
MICHELLE L. PRICE
THE ASSOCIATED PRESS



President Donald Trump addresses a joint session of Congress on Tuesday in the House chamber at the U.S. Capitol in Washington.

WASHINGTON — President Donald Trump vowed Tuesday to keep up his campaign of "swift and unrelenting action" in reorienting the nation's economy, immigration and foreign policy in an unyielding address to Congress and the nation that left Democratic legislators to register their dissent with stone faces, placards calling out "lies," and one legislator's ejection.

Trump's prime-time speech was the latest marker in his takeover of the nation's capital, where the Republican-led House and Senate have done little to restrain the president as he and his allies work to slash the size of the federal government and remake America's place in the world.

The more than 90-minute address added up to a defiant sales pitch for the policies that he promised during his campaign and leaned into during his first weeks back in office. Trump pledged to keep delivering sweeping changes to the country, rescuing it from what he described as destruction and mistakes left by his predecessor while repeatedly needling Democratic lawmakers who protested his remarks.

Emboldened after overcoming impeachments in his first term and criminal prosecutions in between his two administrations and with a tight grip on the Republican-controlled Congress, Trump has embarked on a mission to dismantle parts of the federal

See ADDRESS | A5

*Chattanooga Times Free Press* **(Chattanooga, TN)**

3/17/25, 10:37 AM    President Trump's Historic Address Captivates America – The White House

Case 1:25-cv-00532-TNM    Document 27-5    Filed 03/17/25    Page 18 of 20
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 133 of 515



*New York Post* (New York City, NY)

3/17/25, 10:37 AM
President Trump's Historic Address Captivates America — The White House

Case 1:25-cv-00532-TNM    Document 37-5    Filed 03/17/25    Page 19 of 20
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 134 of 515



*The Hill*

NEWS

ADMINISTRATION

ISSUES

USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 135 of 515

CONTACT

VISIT

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

X  Instagram  Facebook

WH.GOV

Copyright

Privacy

Style Guide

JA132

# Exhibit D

## Structure of the White House Press Pool

The White House press pool includes wire service text journalists, print journalists, television journalists, radio journalists, and photojournalists.  Although the size and composition of the pool depend on where the President is, the pool at a minimum contains the spots described in the below chart.  This chart shows the pool's structure during three recent time periods: (1) before White House Press Secretary Karoline Leavitt informed me on February 11, 2025 that AP journalists would no longer be permitted in the Oval Office as pool members unless the AP revised its Stylebook to refer to the Gulf of Mexico as the Gulf of America; (2) after Ms. Leavitt's initial announcement but before February 25, 2025; and (3) as it appears to function after Ms. Leavitt announced on February 25, 2025 that the White House was taking control of the pool:

|  | WHCA-run Press Pool before Feb. 11 | WHCA-run Press Pool (with White House ban on AP) Feb. 11-25 | White House-run Press Pool after Feb. 25 |
|---|---|---|---|
| Wire Services | 3 spots (AP, Bloomberg, and Reuters) (non-rotating) | 2 spots (Bloomberg and Reuters) (non-rotating) | 1-2 spots (Bloomberg and/or Reuters) (sometimes rotating at the insistence of the White House) |
| Photo | 4 spots (AFP, AP, Reuters, and NYT) (non-rotating) | 3 spots (AFP, Reuters, and NYT) (non-rotating) | 3 spots (AFP, NYT, Reuters) (non-rotating) |
| TV | 1 three-person network crew (rotating) | 1 three-person network crew (rotating) | 1 three-person network crew (rotating) |
| Radio | 1 spot (rotating) | 1 spot (rotating) | 1 spot (White House-selected) |
| Print | 1 spot (rotating) | 1 spot (rotating) | 1 spot (White House-selected) |
| Other (now "New Media") | 1 spot (rotating) | 1 spot (rotating) | 3 spots (White House-selected) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

        Plaintiff,

   v.

TAYLOR BUDOWICH,
White House Deputy Chief of Staff, et al.,

        Defendants.

Civil Action No. 25-0532 (TNM)

## SUPPLEMENTAL DECLARATION OF TAYLOR BUDOWICH

I, Taylor Budowich, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct to the best of my recollection and belief.

1.     I am Deputy Chief of Staff and Cabinet Secretary at the White House.

2.     I offer the following supplemental declaration based on my personal knowledge and information that I have learned in the scope of my job responsibilities.

### White House Press Pool Approach

3.     Under the new process for press pool selection, the White House press team selects the journalists that will have special access to the President's most intimate settings on a day-by-day basis (or for out-of-town ventures, on a trip-by-trip basis). Outlets that were among the members of the pool under the old system continue to be eligible for pool selection in the new system, including the Associated Press. That said, the new system affords well-deserving outlets, including new media outlets that were historically excluded from certain pool rotations by the White House Correspondents' Association, to share in the privilege and responsibility of being afforded special access to the President in his intimate work, travel, and home environments.

4.      The White House believes that affording special access to the President under these terms allows both new voices to be heard, while producing an environment that serves to better inform the public on the actions being taken by the administration. For example, on March 24th, the press pool was allowed access to the Roosevelt Room for a steel manufacturing investment announcement with President Trump and executives with Hyundai. Due to the flexibility and control provided by the new process, the press team was able to include CNBC and Bloomberg, whose reporters and audiences have heightened interest on the topic.

5.      Since the inception of the new press pool system, the press teams have been empowered to better perform their jobs by creating a pool that best serves the public by pairing the topics of each event with the reporters and audience who are most curious about them.

6.      It is indisputable that coverage of and access to the White House has only increased since the newly instituted White House Press Pool, and a vast majority of the White House press corps is celebrating these long overdue changes, which put journalists, networks and the American people above the self-important "board" of journalists from WHCA.

**Private Spaces**

7.      In private spaces such as the Oval Office or Air Force One, it is up to the President's discretion whether or not he accepts questions from press pool members.

**East Room Events**

8.      In my earlier declaration, I described the RSVP request process that journalists use to seek access to limited access press events in the East Room of the White House.  Herein, I provide additional information on that process.

9.      When the White House is unable to accommodate all journalists that seek access to these limited access press events at the White House, the White House provides credentials to non-

pool, hard pass holders based on a similar approach as the approach taken with the limited press pool by prioritizing the journalists, outlets and audiences best suited for each individual event.

10.     For events, there is no existing written policy for press admission. The White House exercises its expertise in understanding journalists, their outlets, and the audiences to ensure the widest and most robust coverage and distribution of these events. Due to space limitations, the press team may select news media that is more relevant to an event. For example, foreign press may be given admission preference for foreign-related events, and business or economic-focused media may be prioritized for announcements most relevant to their reporters and audiences, as noted above.

11.     In exercising that discretion, the White House has not systematically or otherwise excluded any members of the credentialed media, including since my last declaration.

12.     On March 12, 2025, the President held a limited access East Room press event with Prime Minister Micheál Martin of Ireland.  For that limited access event, 188 journalists requested access to the East Room for the event and 81 were permitted access.  Based on my understanding, among those provided access were a domestic-based photojournalist from the Associated Press.

13.     On March 20, 2025, the President held a limited access East Room press event for the signing of an Executive Order regarding education.  For that limited access event, 230 journalists requested access to the East Room for the event and 108 were permitted access.  Based on my understanding, among those provided access were two domestic-based photojournalists from the Associated Press.

14.     On March 24, 2025, the President held a limited access East Room press event as part of a Greek Independence Day celebration.  For that limited access event, 159 journalists

requested access to the East Room for the event and 93 were permitted access. Based on my understanding, among those provided access were two photojournalists from the Associated Press.

15.    As these events and those described in my prior declaration demonstrate, the Associated Press remains completely eligible for selection, as all hard pass holders are, for a wide range of White House coordinated press events.

16.    I can confirm that the Associated Press is eligible to access future, limited access East Room press conferences and similar media events.

17.    While the Associated Press' sustained commitment to misinformation and scandalous reporting standards will indeed further erode what limited credibility they maintain, it does not interfere with their eligibility to access events.

**West Palm Beach Tarmac**

18.    In my prior declaration, I noted that press access to the February 28, 2025, landing of Air Force One at Palm Beach International Airport was not a limited access event similar to the East Room events I described in that declaration. Instead, for that specific event, I noted that a small collection of journalists beyond the press pool was provided special access by the President's advance team to the otherwise non-public tarmac.

19.    Non-pool access to the February 28 landing was provided by the advance team, not the White House's press team and was done so on an ad hoc, one-off (or special) basis. The Associated Press has been permitted to attend these ad hoc events.

20.    For example, on March 7, 2025, at the landing of Air Force One at Palm Beach International Airport, a journalist and photojournalist from the Associated Press were permitted access.

21.    As another example, on March 14, 2025, at the landing of Air Force One at Palm Beach International Airport, a domestic-based journalist and photojournalist from the Associated Press were permitted access.

Further declarant sayeth not,

**TAYLOR BUDOWICH**
Deputy Chief of Staff for
Communications and Public Liaison,
and Cabinet Secretary

1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2

3   * * * * * * * * * * * * * * *   )
    ASSOCIATED PRESS,                )   Civil Action
4                                    )   No. 25-00532
              Plaintiff,             )
5                                    )
      vs.                            )
6                                    )
    TAYLOR BUDOWICH, et al.,         )   Washington, D.C.
7                                    )   March 27, 2025
              Defendants.            )   9:38 a.m.
8                                    )
    * * * * * * * * * * * * * * *   )
9

10

            TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
11        BEFORE THE HONORABLE TREVOR N. McFADDEN
              UNITED STATES DISTRICT JUDGE
12

13

    APPEARANCES:
14

    FOR THE PLAINTIFF:    CHARLES D. TOBIN, ESQ.
15                        MAXWELL S. MISHKIN, ESQ.
                          BALLARD SPAHR, LLP
16                        1909 K Street, Northwest
                          Twelfth Floor
17                        Washington, D.C. 20006

18                        SASHA DUDDING, ESQ.
                          BALLARD SPAHR, LLP
19                        1675 Broadway
                          19th Floor
20                        New York, New York 10019

21

    FOR THE DEFENDANTS:   BRIAN P. HUDAK, ESQ.
22                        UNITED STATES ATTORNEY'S OFFICE FOR
                           THE DISTRICT OF COLUMBIA
23                        601 D Street, Northwest
                          Washington, D.C. 20530

24

25

```
 1        REPORTED BY:          LISA EDWARDS, RDR, CRR
                                Official Court Reporter
 2                              United States District Court for the
                                  District of Columbia
 3                              333 Constitution Avenue, Northwest
                                Room 6706
 4                              Washington, D.C. 20001
                                (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                I N D E X

2    <u>WITNESS:</u>                                        <u>PAGE</u>

3    EVAN VUCCI
          Direct Examination                          18
4         Cross-Examination                           45
          Redirect Examination                        79
5

6    ZEKE MILLER
          Direct Examination                          89
7         Cross-Examination                          126
          Redirect Examination                       146
8

9
     <u>EXHIBITS</u>                                      <u>ADMITTED</u>
10
     Plaintiff's Exhibit No. 7                         92
11   Plaintiff's Exhibit Nos. 1 & 2                   119
     Plaintiff's Exhibit No. 10                       125
12   Plaintiff's Exhibit No. 6                        154
     Plaintiff's Exhibit 5 & A                        164
13   Plaintiff's Exhibit No. 8                        166
     Plaintiff's Exhibit B                            172
14   Plaintiff's Exhibit No. 9                        173
     Plaintiff's Exhibit No. 10                       174
15

16   Defendants' Exhibit Nos. 1-32                    189

17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  Your Honor, this is Civil

2     Case 25-532, Associated Press versus Budowich, et al.

3          Counsel, please come forward to identify

4     yourselves for the record, starting with the Plaintiff.

5          MR. TOBIN:  Good morning, your Honor.  It's a

6     pleasure.  Charles Tobin on behalf of the Associated Press

7     from the law firm of Ballard Spahr.  With me are co-counsel

8     Maxwell Mishkin and Sasha Dudding.

9          I'd introduce -- reintroduce the Court to Zeke

10    Miller at counsel table, chief White House correspondent for

11    the Associated Press.  Chief White House photographer Evan

12    Vucci is also with us.  And again, to just reintroduce the

13    Court to Karen Kaiser and Brian Barrett from the in-house

14    legal department at the Associated Press.

15         THE COURT:  All right.  Good morning, folks.

16    Thanks for being here.

17         MR. HUDAK:  Good morning, your Honor.  Brian Hudak

18    from the U.S. Attorney's Office on behalf of the United

19    States.

20         THE COURT:  Good morning, Mr. Hudak.

21         All right.  We're here for a preliminary

22    injunction hearing and evidentiary hearing.

23         I've reviewed the late-filed declaration from the

24    Government and the Plaintiff's motion to strike.

25         I'm going to deny the motion to strike.  I think

1    this is -- I disagree that the local rules cover this

2    situation.  I think the local rules speak to briefing, not

3    necessarily a declaration, especially in an emergency

4    preliminary hearing context.

5          I will say that I suggested an evidentiary hearing

6    because I feel like there are material disputes of fact

7    between the parties, and I think I need to try to resolve

8    them.  And I thought that having live testimony would be a

9    helpful way to do that.

10          I, of course -- and, you know, to the extent that

11    there are disputes here, I think I'll be able to -- being

12    able to hear testimony from a live witness that has gone

13    through the adversarial process of cross-examination may

14    well, at the end of the day, be more convincing than a

15    declaration standing alone, especially a declaration that

16    may well be in conflict with at least the broader record.

17          But I'm certainly not going to force anybody to

18    testify today.  I more wanted to provide an opportunity for

19    both parties to provide additional evidence that I could

20    rely on in making my determination for this preliminary

21    injunction phase.

22          Of course, Mr. Tobin, you have the burden.

23    So nobody is being forced to testify today; but if you would

24    like to present evidence, now is your chance.

25          MR. TOBIN:  I appreciate it, your Honor.

```
 1              THE COURT:  All right.  With that, feel free to

 2     call a witness if you wish.

 3              MR. TOBIN:  Sure.

 4              Your Honor, Mr. Hudak and I discussed, you know,

 5     the order of activities today and wanted to run it by the

 6     Court and see if the Court is okay with it.

 7              THE COURT:  Sure.

 8              MR. TOBIN:  We each wanted to make a brief opening

 9     statement just to frame the evidence that you'll hear today.

10              THE COURT:  Okay.

11              MR. TOBIN:  Then we'll present -- we're going to

12     present two live witnesses.  As the Court knows, the

13     Government has declined the Court's invitation for live

14     witnesses.

15              In light of Mr. Budowich not being here to be

16     cross-examined, we have prepared a series of exhibits that

17     I'd like to present after we have the witnesses testify.

18              THE COURT:  Okay.

19              MR. TOBIN:  And we have an agreement as to the

20     admissibility of the evidence.  And then we'll do a brief

21     summation and call it a day.

22              THE COURT:  All right.  It might not be brief.

23     But I'm happy to generally go in the order that you

24     suggested.

25              MR. TOBIN:  You've worked with me before, your
```

JA145

1    Honor.  It's an apt observation.

2              THE COURT:  I'm not suggesting that you wouldn't

3    be brief.  But I'll have questions.

4              MR. TOBIN:  Certainly.  And I didn't mean to

5    predetermine that, obviously, your Honor.

6              Your Honor, again, we appreciate the expedited

7    briefing.  The AP considers this a matter of urgency, and so

8    we recognize that the Court has given us the opportunity to

9    do this on an accelerated basis, and we really are sincerely

10   grateful for that.

11             Your Honor, AP has now spent 44 days in the

12   penalty box.  We hope to persuade you that -- to remove

13   today the unconstitutional retaliatory roadblocks and let

14   the AP rejoin the press pool.

15             You know, as far as the record, your Honor, since

16   it's opening day of baseball season, I'll quote Yogi Berra:

17   It's déjà vu all over again.

18             We have a situation now that's fairly identical to

19   the last hearing in terms of the facts.  The AP has not been

20   admitted to the press pool for 44 days.  And we've had

21   sporadic admissions, with no pattern and randomness, to a

22   few of the east room events for our photographer and none

23   for our print reporter.

24             So, your Honor -- we also have now the added

25   constitutional violation that the White House changed its

1    policy instead of adhering to the Court's admonishment.  We

2    read the Court at the last hearing as asking the Government

3    to seriously reconsider its position because, in the Court's

4    words, the precedent is uniformly against it in this

5    circuit.  And instead, the Government doubled down on things

6    and they have created some kind of an opaque system, if you

7    want to call it that -- that's what Mr. Budowich calls it in

8    his declaration -- some kind of opaque system that has some

9    rotation process to it that happens to exclude the AP every

10    single time.

11         And as the Court noted, there are -- or suggested,

12    there are contradictions in Mr. Budowich's declaration.  On

13    the one hand, he says that the AP will only be admitted at

14    the president's discretion.  On the other hand, he says in

15    the second declaration that there is no ban, that the AP is

16    just part of the regular system.

17         We ask the Court to pay attention to the record,

18    which shows that in the past 44 days we have not gotten into

19    any Oval Office events and we have only sporadically had our

20    photographer admitted to east room events with no published

21    guidelines, no pattern, no chance to appeal.

22         Your Honor, again, they changed the system in

23    response to this litigation.  That's one reason we filed an

24    amended complaint, in order to state a cause of action for

25    retaliation, not only for the right of free speech and

1    freedom of the press, but for the right to petition the

2    government for grievances.

3            And so, in our amended complaint, we've asserted

4    now four counts, one each for the First Amendment and Fifth

5    Amendment claims over the exclusion from the press pool, and

6    one each from the First Amendment and Fifth Amendment for

7    exclusion from the east room.

8            THE COURT:  Mr. Tobin, there's obviously a couple

9    of different constitutional amendments at play here and, as

10   I understand it, a few different constitutional theories.

11           How do you see this?  What's the clearest way to

12   understand the constitutional right that you're most focused

13   on?

14           MR. TOBIN:  The clearest path to me, having done

15   this work in the previous cases and with this Court, and

16   being part of the *Acosta* litigation, is that there is an

17   underlying liberty interest.  Once you're in the White

18   House, you're being included in any group events.  And

19   there's no denying the pool is still the pool; the east room

20   is still the east room.  The events are opportunities

21   afforded to all of the White House journalists or all of the

22   pool journalists that the AP has been excluded from.

23           So there is a liberty interest under *Sherrill*,

24   under *Acosta*, under *Ateba*, under the First Amendment.  That

25   liberty interest cannot be deprived without due process of

1    law.  Due process of law requires a system in place that is

2    published, that everybody knows that they can follow, that

3    does not include any viewpoint discrimination whatsoever.

4    It has to be reasonable.

5         Number two, there has to be an opportunity to

6    object in writing.  And number three -- or orally.

7         And number three, there must be a written response

8    from the Government, and the reasons for the denial, again,

9    must be non-viewpoint discriminatory.

10        Here, we clearly have that liberty interest.

11   There's no question the pool is still the pool.  The east

12   room events are the same system, according to Mr. Budowich's

13   declaration.  Conveniently, the AP just never gets in.

14        And so we have that same liberty interest from

15   *Sherrill* and the other cases.  And then we have an abject

16   retaliation on the basis of viewpoint that the White House

17   hasn't hidden.  The Court noted that in our earlier hearing,

18   and they've doubled down on it.  We're going to show some

19   evidence today that they have doubled down on the

20   retaliatory motive.

21        That gives rise to a First Amendment liberty

22   interest and a deprivation of Fifth Amendment rights under

23   due process.

24        I do not want to denigrate or give a backseat to

25   our First Amendment argument.  We also have been deprived,

1    retaliated against in ways that have an adverse impact, not

2    only on the Associated Press, but a chilling effect on the

3    entire journalism industry.  And since there is a First

4    Amendment interest in the pool and what we're all calling

5    east room events, that can't be deprived for retaliatory

6    reasons that have an adverse impact on the expression of our

7    First Amendment rights, whether it's the right to free

8    speech, right to free press or right to petition this Court

9    for our grievances.

10          So those are the paths that we see.  And we'd ask

11   the Court to --

12          THE COURT:  I want to pick this up afterwards,

13   arguments.

14          But it will be helpful for me if you help me think

15   through how that liberty interest and *Sherrill* interact with

16   the government speech doctrine; and if I were to believe

17   that at least what happens in the Oval Office is government

18   speech, how do those two interact?  So maybe you can help me

19   remember.  I'd like to hear from you --

20          MR. TOBIN:  I will pick that up, if you'd like, in

21   the summation perhaps.

22          THE COURT:  Yes.

23          And then just so you all know how I'm tentatively

24   thinking about this, I've kind of been thinking about four

25   different scenarios.  On the one end is what happens in the

1    Brady room.  And as I understand it -- I want to get

2    Mr. Hudak to confirm for me here in a minute, but I think

3    the parties agree that the government could not kick the AP

4    out of the Brady room on the basis of concerns over Gulf of

5    America.  I think that's common ground.

6           On the other end, I see an interview with the

7    president, and I think you agree that he can refuse to ever

8    sit for an interview with your client again on the same

9    grounds.

10          Do you agree with me on that?

11          MR. TOBIN:  I can affirm that we are not seeking

12    an order compelling the president to give an interview with

13    the Associated Press.

14          THE COURT:  And so I feel like we're dealing here

15    with what -- maybe this is overly simplistic, but I see two

16    middle grounds.  One is closer to that situation with what

17    is happening in the Oval Office, these press pool visits.

18          And then the next one, which I see as closer to

19    the -- what happens in the Brady briefing room, as these

20    larger events in the east room where I think you agree that

21    there are, you know, several hundred reporters RSVPing.  Not

22    all of them can get in.  I think the White House can, and

23    probably must, pick and choose among them.  But I think your

24    argument is you can't be excluded on retaliatory grounds.

25          MR. TOBIN:  And that we have been excluded on

1    retaliatory, unconstitutional grounds.

2            THE COURT:  And again, my instinct is that is not

3    exactly the Brady press briefing room, but feels to me

4    closer to that end of the continuum.

5            So I more just wanted to let you know that's kind

6    of how I've been understanding where I see -- the case law

7    is pretty clear and I think the parties are in agreement on

8    the extremes; and as I'm seeing this, we have kind of two

9    middle scenarios.

10            MR. TOBIN:  And I appreciate and understand that

11   my burden today is primarily to persuade the Court that the

12   Oval Office is closer to the *Acosta* and *Karem* case than an

13   *Ehrlich* one-on-one interview type of situation.  I do

14   understand that, your Honor.

15            THE COURT:  Thank you, sir.

16            MR. TOBIN:  Thank you.

17            THE COURT:  And, Mr. Hudak, am I correct that you

18   would agree that your client could not exclude the AP from

19   the press room on -- over concerns about what they call the

20   Gulf?

21            MR. HUDAK:  I think under the current factual

22   scenario and the current case law, I think that that is

23   correct.

24            But, you know, for instance, if there was -- I'm

25   going to throw out a wild hypothetical, just to prove the

1    point -- that if somehow the press routinely stormed the

2    White House press secretary's stage and there was additional

3    security concerns about hard pass holders, and they had to

4    revisit the hard pass system and they made the Brady room

5    more similar to the Oval Office, then I think the factual

6    underpinnings of *Sherrill* and other cases that have

7    discussed that right kind of -- there would be a change in

8    circumstance that we would have to evaluate.

9            But I think, under the D.C. Circuit's law as I

10    understand it, under *Sherrill*, under *Acosta*, I believe that

11    the Court [sic] has that right.

12            THE COURT:  And do you agree with kind of my

13    conception here of these four different scenarios, and that

14    we're in the -- Scenario 2 and 3?

15            MR. HUDAK:  I think that's right.

16            I think, in our minds, the Oval Office is very

17    clearly like the sit-down interview.  In fact, *Snyder* from

18    the Fourth Circuit expressly contemplated the White House

19    Oval Office as being very much akin to the sit-down

20    interview when it ruled that there was no First Amendment

21    violation there.

22            The east room events are larger.  And so -- but

23    they're still selective.  So I think that presents some

24    different challenges and probably is a closer question.

25            But I think you will hear from the evidence today,

1    as I understand it, your Honor -- you don't need to reach

2    that question on the PI, because there's a clear showing of

3    no irreparable harm.  The AP has been in every east room

4    event since the TRO hearing.  Every single one.  They have

5    been at every tarmac event since March 1st, as I understand

6    it.

7         So there's simply no irreparable harm that a

8    preliminary injunction is necessary to compel the government

9    to give the AP access.  Whatever -- you know, there isn't a

10   right for the AP to have the White House agree with its

11   views or not, express dismay over its reporting.  You know,

12   people will agree or disagree and like or dislike reporting

13   at times.

14        But they have had access.  And so they cannot show

15   that an injunction from this Court is necessary at this

16   stage for them to continue to have access to the east room.

17        I think it's undisputed in the record that they

18   have not had access to the Oval Office.  And, you know, our

19   argument there is there simply is no liberty interest.  The

20   Supreme Court's holdings in both *Houchins* and in *Zemel*

21   clearly identify that there is no First Amendment right to

22   access facilities by the press beyond what is enjoyed by the

23   general public.

24        The D.C. Circuit in *Sherrill* has created one very

25   narrow exception.  And that is where all general press are

1    provided access even if the general public is not.  Then

2    there is a liberty interest for that class, because it's all

3    of the press.

4          And that has been extended to the current

5    circumstances in the Brady briefing room.  But it certainly

6    has not in the Oval Office.

7          And so we think, your Honor, your Honor has -- is

8    approaching this the same way that we are.  But I think that

9    it doesn't need to really address the east room claims here

10   because there is no showing of irreparable harm.  There's no

11   showing of exclusion, which is necessary, I think, for both

12   likelihood of success on the merits and for the irreparable

13   harm here.

14         THE COURT:  All right.  Thank you, Mr. Hudak.

15         MR. HUDAK:  And one point on witnesses, your

16   Honor.

17         The United States did not bring witnesses not out

18   of a lack of respect for the Court.  Obviously, when we got

19   the Court's questions and were trying to come up with a way

20   to address them while dealing with the practical realities

21   of a very busy White House, we thought submitting a

22   declaration to ensure that the Court had the understandings

23   of the United States was the appropriate way to go.

24         Again, we've been scrambling.  There's a lot going

25   on.  And so my apologies that we did not submit that

1    supplemental declaration earlier.

2              THE COURT:  I'm not offended.  I'm here to try to

3    determine the facts, and I will determine the facts with the

4    evidence that I have.

5              MR. HUDAK:  Great.  Thank you, your Honor.

6              THE COURT:  Mr. Tobin.

7              MR. TOBIN:  Yes, your Honor.  We're going to

8    present two witnesses today, Mr. Miller and Mr. Vucci.  I

9    will examine Mr. Vucci first and then Mr. Mishkin, my

10   colleague, will examine Mr. Miller.  I don't have any

11   exhibits as such to show Mr. Vucci, but we prepared a set of

12   exhibits that we're going to present today at other stages.

13             For efficiency, might I give the Court the entire

14   set now?

15             THE COURT:  Sure.  And are you familiar with our

16   high-tech system here?

17             MR. TOBIN:  The ELMO.

18             THE COURT:  Yes.

19             MR. TOBIN:  I am not, your Honor.

20             THE COURT:  Okay.  Well --

21             MR. TOBIN:  I was going to flip, old school.

22             THE COURT:  That's fine.  Your fans in the

23   audience may like to get to see what we're saying.

24             MR. TOBIN:  We're going to show some video.

25             THE COURT:  All right.  Great.

```
 1              MR. TOBIN:  Your Honor, the Plaintiff calls Evan
 2    Vucci.
 3              THE COURTROOM DEPUTY:  Please raise your right
 4    hand.
 5               EVAN VUCCI, PLAINTIFF WITNESS, SWORN.
 6              THE COURT:  Good morning, sir.
 7              THE WITNESS:  How are you?
 8              THE COURT:  I'm well.  Have a seat.  We've got
 9    water.
10              THE WITNESS:  Very good.  Can you hear me?
11                      DIRECT EXAMINATION
12    BY MR. TOBIN:
13    Q.  Are you comfortable?
14    A.  Yeah.  I'm nervous as can be.
15    Q.  Just where you want to be, I know.
16    A.  Sure.
17    Q.  I understand.
18              Mr. Vucci, what do you do for a living?
19    A.  I am the chief photographer for the Associated Press in
20    Washington.
21              THE COURT:  Sorry.  Can you state and spell your
22    name for the record.
23              THE WITNESS:  Yes.  It's E-V-A-N.  Last name,
24    V-U-C-C-I.
25              THE COURT:  Vucci?
```

```
 1                  THE WITNESS:  Vucci, yes.  V as in Victor.  Yes,
 2       sir.
 3                  THE COURT:  Good morning, sir.
 4       BY MR. TOBIN:
 5       Q.  Mr. Vucci, what are the duties of the chief photographer
 6       in Washington, D.C., for the AP?
 7       A.  Well, I cover the news of the day.  For the last ten
 8       years or so, I've been primarily at the White House,
 9       although I will go out on, you know, bigger assignments
10       around the country.  But the vast majority of my time I
11       spend at the White House.
12       Q.  Are you a hard pass holder for the White House?
13       A.  Yes, sir.
14       Q.  How long have you been a hard pass holder?
15       A.  Twenty-one years, probably.
16       Q.  How long have you held the position at the Associated
17       Press as a photographer?
18       A.  An AP photographer?
19       Q.  Yes.
20       A.  For 21 years.
21       Q.  That's a long time to be with one company.
22       A.  Yeah.  I'm old now, man.
23       Q.  It's relative.  I'm not saying that about you.  Just in
24       my mirror.
25                  But, Mr. Vucci, does it mean something to you to
```

1    be a photographer for the Associated Press?

2    A.  Yes, sir.  So from the flag-raising at Iwo Jima to

3    napalm girl in Vietnam to the fist-raising in Butler,

4    Associated Press photographers are the gold standard.  And

5    every single day I go to work, I carry that burden with me

6    and I'm expected to uphold that standard.  And it's a huge

7    responsibility and a public service, and I take it very

8    seriously.

9    Q.  So you mentioned the fist-raising at Butler.  I think we

10   all know what it is, but for the record, what are you

11   referring to?

12   A.  Yes, sir.  I was there the day that an assassin tried to

13   assassinate President Trump.  And the photograph of him

14   being led offstage by Secret Service agents, he put his fist

15   in the air with a flag in the background, and the image that

16   has sort of gone around the world and become viral is an

17   image that I captured.

18   Q.  That was your photograph?

19   A.  Yes, sir.

20   Q.  Mr. Vucci, I'm going to hold something up and show it to

21   you and the Court and counsel.  What is this photograph that

22   we're looking at?

23   A.  That's the assassination attempt photo in Butler,

24   Pennsylvania.

25   Q.  This is the photograph that you took?

Vucci - DIRECT - By Mr. Tobin

JA159

1    A.  Yes, sir.

2    Q.  All right.  Would you consider this photograph to be an

3    iconic piece of history?

4    A.  I mean, I would hate to say that because I took it, but,

5    I mean, other people have said it.

6    Q.  All right.  We'll waive the hearsay exception and your

7    humility.

8    A.  I've been told it's an iconic photograph, but, you know,

9    I'm trying to keep my ego in check here, sir.

10   Q.  Understood.  And I appreciate that.

11           Where does this photo appear that I'm holding in

12   my hands?

13   A.  That is President Trump's book called *Save America*.  And

14   he used an AP photo on the cover.

15   Q.  He used your photograph on the cover.  Is that right?

16   A.  Yes, sir.

17   Q.  The chief White House photographer's photograph of an

18   iconic moment in American history.

19   A.  Yes, sir.

20   Q.  That's what the president of the United States chose to

21   put on the cover of his book:  an Associated Press

22   photograph.  Is that right?

23   A.  Yeah.  I mean, it's a pretty good photo.  So yes, sir.

24   Q.  Yeah.  I would say it's an excellent photo.

25   A.  Thank you, sir.

1    Q.  How many photographers does AP have working on any given

2    day at the White House?

3    A.  So usually, sir, we have two photographers.  I'm the

4    morning shift and I'll be there from 8:00 a.m. until, you

5    know, 4:30 or so.  And then we'll have an evening shift

6    that -- so they can react to any sort of late-breaking news.

7    They come in at 10:00.  And then, if we have big events

8    coming -- going on or anything like that, we'll have extra

9    photographers come in, depending on the news of the day.

10        So every day there's two photographers.  We're the

11   only organization that will have two full-time photographers

12   at the White House all the time.  And then, you know, like I

13   said, we'll bring in extra help when we need it.

14   Q.  Prior to February 11th, 2025, how often did you serve as

15   the photographer for the AP in the White House press pool?

16   A.  Every day, basically, unless I was on another assignment

17   or on vacation.

18   Q.  And would you travel with the president for events

19   outside of the White House as part of the pool?

20   A.  Yes, sir.

21   Q.  Is there a separate travel pool as opposed to the "in

22   the White House" pool?

23   A.  Yes, sir.  Air Force One -- well, so if we're going on

24   an out-of-town trip, Air Force One only has 13 seats for

25   journalists.  And then the in-town pool has more seats

Vucci - DIRECT - By Mr. Tobin

JA161

```
 1    available to us.
 2                THE COURT REPORTER:  I'm sorry?
 3                THE WITNESS:  The Air Force One travel pool versus
 4    the in-town pool.
 5    BY MR. TOBIN:
 6    Q.  Does any presidential travel stand out that you've
 7    accompanied the president on stand out to you over your 21
 8    years with AP?
 9    A.  Yeah.  For sure.
10    Q.  Which one or ones?
11    A.  Yeah.  I was on a secret trip to Iraq with
12    then-President George W. Bush, and I was in the front of a
13    room during a news conference and a journalist threw a shoe
14    at the president.  So I was there for that, and I captured
15    the image of this Iraqi journalist throwing a shoe at the
16    president.
17    Q.  We have all seen the image of President Bush skillfully
18    ducking the shoe.
19    A.  Yes, sir.
20    Q.  That's the image I remember.  What image did you say you
21    captured?
22    A.  The actual shoe thrower.  I got two or three frames off
23    of him actually throwing the shoe, and that actually became
24    one of my more memorable photographs.
25    Q.  Was that a pool event?
```

Vucci - DIRECT - By Mr. Tobin

JA162

1    A.  Yes, sir.  That was a pool.

2    Q.  And did -- how many other photographers were there in

3    the room that time, if you remember?

4    A.  As part of the pool or in general?

5    Q.  First as part of the pool and then --

6    A.  Yes, sir.  So as part of the pool, there would have been

7    three other photographers.  And then, in general -- I don't

8    know -- dozens.

9    Q.  And of those dozens, perhaps, of photographers, how many

10   captured the same image of the guy throwing the shoe?

11   A.  No one.

12   Q.  You caught the only photograph of the guy throwing the

13   shoe?

14   A.  Yes, sir.

15   Q.  At a pool event?

16   A.  Correct.

17   Q.  Accompanying the president?

18   A.  Yes, sir.

19   Q.  Do you have any other moments you can share with the

20   Court of pool events where you captured a unique moment?

21   A.  Well, I mean, does Butler count?  I mean, you know, that

22   was another --

23   Q.  Other than Butler, since we've talked about that.

24   A.  Yeah.  I mean, so, you know, every single day that we do

25   this, it's -- you know, as a photojournalist, you're looking

Vucci - DIRECT - By Mr. Tobin
JA163

1     to show the world, you know -- show the world through my

2     eyes.  So I'm always looking for moments in the Oval Office

3     or the east room or the Roosevelt Room that, you know, stand

4     out, that tell the story of the day.

5          So -- and the wonderful thing about photography is

6     you can have four photographers within five feet of each

7     other and you'll have four different sets of images.  So the

8     goal -- my goal every day that I go to the White House is to

9     give the American public a better understanding of what's

10    happening in front of my lens, who's in the room, what's

11    going on around me, and try to give you the feel of what's

12    going on in front of me.

13         So, you know, there could be days where, you know,

14    the photos might not stand out.  But sure, I'll capture a

15    moment that is the moment for that day, and it is over in a

16    flash.

17         So -- you know, I've been on the losing end of

18    that, too, where, you know, another photographer made an

19    amazing image and I am like, Oh, man, I can't believe I

20    missed that.  And that's what we're always looking for,

21    is -- you know, when you're covering politics, the image

22    that happens is like that.  It happens in the blink of an

23    eye.  And if you miss it, you miss it.

24         So it's vitally important that the people in that

25    room are on guard at all times, ready to do the job, and

Vucci - DIRECT - By Mr. Tobin

JA164

1    that they're good photographers.

2    Q.  When you're working with AP in, say, the Oval Office,

3    are you operating in isolation from everybody or do you

4    coordinate with anybody?

5    A.  No.  Absolutely, sir, I'm working with a team of people.

6    I rely on Zeke and our other reporters to give me a heads-up

7    on, like, Hey, we're doing a story about this particular

8    aide or we're doing a story about, you know, someone that

9    might be coming to visit.  You know, sometimes I might not

10   know who these people are, so these guys will say, Hey, do

11   us a favor; look in the corners.  Who's hanging out in the

12   Oval?  Who's in this meeting?

13        So a lot of times it's -- not only am I showing

14   you what's happening in front of me, but I'm always, like,

15   Well, who's behind the Resolute Desk?  Why are they there?

16   Who's over there in the corner?  You know, has anything in

17   the Oval Office changed?  Is there new artwork up?  Is

18   there -- you know, all these things, I'm always looking at

19   just to see, is there something different going on?

20        Like I always talk about the photographer's Spidey

21   sense.  Right?  I'll walk into a room and something just

22   feels a little bit different.  Like, what's going on here,

23   man?

24             THE COURT:  What happened to the ivy?  Right?

25             THE WITNESS:  So, you know, those are the things

Vucci - DIRECT - By Mr. Tobin

1    I'm always looking for.  And I rely on Zeke and those guys

2    to help me out because, you know, I'm pretty focused on

3    what's going on in front of me and I'm pretty good about my

4    news judgment but, you know, those guys are far superior

5    than I am.

6    BY MR. TOBIN:

7    Q.  And how many photographs might you take at a given

8    event?

9    A.  I always joke.  I say, if it's a good event, you know,

10    hundreds.  If it's a bad event, thousands.  It's just to try

11    to get the right ones.

12    Q.  Understood.

13          Do the photographs that you take only have value

14    that day?

15    A.  Absolutely not, sir.  It's important that I'm gathering

16    a historical record.  The AP has a wide global reach.  So if

17    I am a photo editor in Des Moines or if I'm a photo editor

18    in Los Angeles or if I'm a photo editor, you know, in Europe

19    somewhere, I would expect that the Associated Press provides

20    a broad edit of things that are happening that day.

21          So it's not just like -- you know, their news

22    needs are very different.  Right?  So I'm expected to give

23    you a wide variety of photographs, and those photographs are

24    not only good for the news of the day, but those photographs

25    are good down the line in future stories you might be

1    working on.

2          So today, I might take a picture of some guy in

3    the corner and, you know, a week or two later, I find out

4    that that's very important, who that person is and why that

5    person was in the Oval.  But at the time, I might not know

6    who they are or what they're doing.  But like I said,

7    sometimes it just goes off in my head:  Hey, I need a

8    picture of that guy.

9    Q.  And when you're taking pictures at an event, what's

10   happening with those photos after you take them?

11   A.  Yes, sir.  So the name of the game in photojournalism

12   now is speed.  It's all about speed.  So if I'm late, a

13   minute or two or three minutes, on a big story, I'm dead in

14   the water.  It's pointless actually, sir.

15         So if my competitors can get an image out a minute

16   before me or three minutes before me on a major story, then

17   I might as well delete my entire take because it's

18   worthless.

19         So with that said, what I'm doing is I'm

20   hard-wired directly into a transmission device, a MiFi.

21   It's like, you know, a portable internet, a MiFi device.

22         So I'm hard-wired directly into the MiFi device.

23   And then I will take an image and I'll look through my

24   camera and I'll pick the image that I really like and I'll

25   send it to my editor.  So by the time -- when I take an

Vucci - DIRECT - By Mr. Tobin

JA167

1    image, by the time I take it, it goes to my editor and is on

2    the wire, the AP wire, it could be, you know, a minute or

3    two.  It's basically realtime.

4            So -- and that speed is vitally important for our

5    clients and, like -- speed is so important, sir, that I

6    carry three devices with me for transmission purposes.  And

7    the reason I do is one is on the T-Mobile network, one is on

8    a Verizon network and one is on an AT&T network.  It's not

9    that I like carrying all this crap.  It's that, you know, I

10   have to send these photos out or -- sorry, sir.  You know, I

11   have to send those photos out quickly.  So the biggest

12   stress of my entire job is getting pictures out quickly to

13   my editors.

14   Q.  Do you carry a cellphone into the Oval Office?

15   A.  Of course.  Yes, sir.

16   Q.  Do you monitor your cellphone?

17   A.  Absolutely, yeah, because I'll get text messages from an

18   editor or a reporter or someone telling me, Hey, I need a

19   photo of this.  Can you give me this?  I need -- you know,

20   or they'll be like, What are you doing, man?  Like, get it

21   together; take better pictures.

22   Q.  Do you ever see the photos that you have just taken

23   posted on your phone?

24   A.  Sure.  Yeah.  Yeah.  Of course.

25   Q.  So it's that instantaneous --

Vucci - DIRECT - By Mr. Tobin

JA168

```
 1    A.  Yeah.  Yeah.

 2    Q.  -- while the event is still going on, you're posting

 3    photos and you're seeing them in realtime?

 4    A.  Yeah.  Yeah, of course.  And not only that; if it's a

 5    big event and -- I know pretty instantly whether or not I'm

 6    going to have a good day or a bad day, because if I see a

 7    website -- a news website that has someone else's photo,

 8    I'll be, like, Oh, man.

 9         But it's that fast.  Yes, sir.

10    Q.  And --

11         THE COURT:  So I've got a question.

12         You're describing sending photos that are going

13    online simultaneously.  My guess is your print journalist

14    colleague is not also sending stories simultaneously.

15         THE WITNESS:  So I can't speak to that, because I

16    don't know, like, what they do, or I couldn't do what they

17    do.

18         But that's not entirely true, sir.  If there's

19    huge news, they'll send, like, an alert.  And they also will

20    send a text message to an editor that they're working with

21    so they can send out alerts in realtime.  So -- and it's

22    really, really important that it's quick.

23         So if we hear something about, like, tariff news

24    or something else that the president says that's, you know,

25    big news, you know, those guys have to get that out
```

1    immediately.  And they have to be in the room to -- to do

2    that.  They can't rely on, like, someone else.

3              So -- I think Zeke will speak to this, but since

4    you asked the question, I'll give you my little take.  If

5    our journalist isn't in the room and the president says

6    something about tariffs or some major news, well, then, our

7    reporters are going to have to wait until the meeting in the

8    Oval Office ends.  Then it goes to get played out on a

9    television monitor for everyone to see.  So by the time he

10   says it and, you know, when we can report that news, it

11   could be, you know, 30, 40 minutes.  So we're that far

12   behind our competitors.

13             Does that make sense, sir?

14             THE COURT:  I guess I was saying just -- kind of a

15   year ago, you and your colleague are both wherever; you can

16   send things out almost immediately.

17             THE WITNESS:  Yes, sir.

18             THE COURT:  I wouldn't think the story is going

19   out that quickly.

20             THE WITNESS:  Yeah.  But there's quotes that go

21   out that quickly that can be added to a story.

22             THE COURT:  Okay.

23             THE WITNESS:  But, sir, I'm, like, the wrong

24   person to ask about that.  Zeke will be able to answer those

25   questions for you.

Vucci - DIRECT - By Mr. Tobin

JA170

```
 1              MR. TOBIN:  Mr. Miller will be the next witness,

 2      your Honor.

 3              THE COURT:  Okay.

 4      BY MR. TOBIN:

 5      Q.  So, Mr. Vucci, you touched on this a little bit.  To put

 6      a fine point on it, if there are two or three other

 7      photographers in the room at the Oval Office, why does it

 8      matter whether the AP is there?

 9      A.  Well, so --

10      Q.  Or does it matter?

11      A.  It matters greatly, because -- speed, number one.  We

12      don't want to rely on someone else that -- where speed isn't

13      their main, you know, issue.  So speed.

14              The -- communication.  They might not be looking

15      for what we need for the day.  They might not be giving a

16      broad edit of everything that we need or our clients need.

17      We're not only serving, like I said -- we are serving,

18      like -- I think 4 billion people or something like that see

19      our news.  So it's vitally important than an AP photographer

20      is in that room.

21              And, you know, here's the other thing I'd say:

22      You know, there's a reason that you're an AP photographer.

23      There's a reason that you're selected.  There's a reason

24      that you got that job.  We are -- I mean, I will say,

25      because I'm a company guy, but it's the gold standard of
```

1   photojournalism.  So there's a reason that an AP

2   photographer is in that room.  And it's not just -- see, the

3   thing about photography is it's not just like -- you can't

4   just give someone an expensive camera and walk into a room

5   and be like, Oh, they're going to get the pictures.  That's

6   not how it is at all.  It's like you don't go to a chef and

7   say, Oh, man, those are really great pots and pans.  You

8   know, it's the person behind the camera.  So we hire the

9   best.

10  Q.  That's why every photograph is subject to its own

11  independent copyright.  It's an original piece of work.

12  A.  Yes, sir.

13  Q.  What about the pace of the distribution of photos by

14  other photographers?  Are they comparable to yours?

15  A.  Yeah.  I mean, we all are doing our best to get the

16  pictures out as quickly as we can.

17  Q.  But what about the distribution to AP members or

18  subscribers?  Is the process equally as fast if you're not

19  in the room?

20  A.  So since we've been excluded, we're really, really

21  struggling to -- to keep up.  And our members are really

22  struggling because we don't -- we're not getting a wide

23  variety of images.  And also, those images are taking a long

24  time to get to our members.

25  Q.  Okay.

Vucci - DIRECT - By Mr. Tobin

JA172

1    A.  So it's hurting us big time.

2    Q.  Since the AP was banned -- you're talking about since

3    the AP has been banned?

4    A.  Yes, sir.

5    Q.  So what has the AP done to provide photographs to its

6    members of, say, Oval Office events or east room events

7    where you're not present?

8    A.  Yes, sir.  We've had other organizations that are

9    absolutely heroes that have been helping us with -- getting

10   us photos, sharing photos with us.  And while we -- it's

11   greatly appreciated, and they're amazing, we're not getting

12   the full take.

13        So if I go into a room, I'm going to move 20 to 50

14   photos.  And we're just getting a selection of those photos

15   because, you know, they're our competitors and they're not

16   going to give us their best, you know, pictures.

17        And then the other thing is, we are waiting for --

18   you know, there's a time delay.  So as I established

19   earlier, we're basically dead in the water on major news

20   stories.

21   Q.  Can you give the Court some idea of the comparable time

22   between when you would be in the Oval Office transmitting a

23   photo and, say, one of your competitors who's graciously

24   providing photos to the AP?

25   A.  Yes, sir.  So if I'm in the Oval Office and I'm -- and

Vucci - DIRECT - By Mr. Tobin

JA173

1   the president walks into the room and sits down, or he's at

2   the chair, I will have photos to my editor within 30 seconds

3   to 45 seconds.

4          We're now waiting on our competitors' photos to go

5   to their desks, and then they send their stuff to their

6   clients or members and then they'll send us a selection of

7   those images.  So I'm not 100 percent sure, but it's -- you

8   know, we're -- as far as, like, news time, we're way, way

9   behind.

10  Q.  And what is the last time that you were made part of the

11  pool for a trip into the Oval Office?

12  A.  It's been a while, sir.  I'm not sure 100 percent, but

13  it's been, you know, a while.

14  Q.  If we said a month, a month and a half --

15  A.  Yeah.

16  Q.  -- would we be far off?

17  A.  A month and a half.  It's been a rough stretch for a

18  photographer to sit around and not do anything.

19  Q.  And in all that time, you've had to rely on the other

20  photographers -- AP has had to rely on the other competitor

21  photographers?

22  A.  Yes, sir.

23  Q.  And has had to experience the delay in the transmittal

24  of photographs?

25  A.  Yes, sir.

```
1    Q.  And does that matter?

2    A.  Big time.  Yes, sir.  I mean -- so if you have, like I

3    said, a major news event and, you know, an editor for the

4    Des Moines Register or whatever is waiting to update their

5    page, they're going to go with, you know, the first images

6    that come.

7    Q.  Now, you are a White House press corps photographer for

8    the AP and you have not had access to a pool event in the

9    Oval Office for several weeks.  Right?

10   A.  Yes, sir.

11   Q.  The AP did have a photographer in the Oval Office at

12   President Trump's now-famous meeting with Ukranian President

13   Zelensky.  Is that right?

14   A.  Yes, sir.

15   Q.  Can you tell the Court the circumstances of that?

16   A.  Yes, sir.  So Zelensky was meeting with Trump.

17   Obviously, we weren't allowed in.  But one of our -- he's a

18   filmmaker from Ukraine.  He's an AP journalist.  He's

19   absolutely amazing.  The guy won an Oscar.  And he somehow

20   got access through Zelensky's office.

21          The issue is, he's the most --

22   Q.  Let me stop you there.  He was not part of the White

23   House press pool?

24   A.  Yes, sir.

25   Q.  So he was not admitted by the White House through the
```

1    press pool process?

2    A.  No, sir.  He got his access through Zelensky's office.

3    Q.  All right.

4    A.  The White House would not let me in, or AP, into the

5    meeting.

6    Q.  So what's the problem as to that event, if there is one?

7    A.  So the guy is amazing.  He's absolutely incredible.

8    He's one of the best journalists in the world.  But he's a

9    filmmaker and he's a video journalist.  So his first thing

10   is not photography, still photography.

11          So while he's an amazing person and human and

12   journalist, when he went into that room, he's not only

13   trying to do still photographs, but he's also trying to take

14   video.

15          Also, I don't know if you guys have ever seen

16   video of, like, what it's like when journalists arrive to

17   the Oval Office, but it's like an all-out sprint -- sort of

18   fight to get into position and...

19          So he wasn't really well-versed in, like, what's

20   going on and how everything works.

21          So I hate thinking about this day, because we just

22   absolutely got slaughtered in the play.  Like, we got

23   destroyed.  But, you know, the images that, you know --

24   fine.  He made images of Trump and Zelensky.  But the very

25   famous meeting, what my competitors got, and what I would

Vucci - DIRECT - By Mr. Tobin
JA176

1    have gotten, is so far superior to what we were able to get

2    out that day.

3    Q.   How?

4    A.   The -- so I always talk about -- when you talk about

5    photography, you talk about, like, peak moments.  Right?  I

6    describe it to people that -- saying, like, if we're doing a

7    Hail Mary in a football game, what does that look like?

8         Well, it's -- the ball is at the top.  The

9    receivers and the defenders are jumping for it.  It's at

10   that peak moment where -- it's the anticipation.  You don't

11   know exactly what's going to happen.  But that's the moment.

12   Right?

13        So for politics, it's very similar.  But -- it

14   could be a look.  It could be a gesture.  And some of the

15   photos that were made that day are absolutely amazing.

16   Like, of --

17   Q.   Not by AP?

18   A.   Not by AP.  No, sir.  Don't remind me.

19   Q.   Why?

20   A.   Oh --

21   Q.   I don't mean to cause you pain.

22   A.   -- it's the worst.

23        THE COURT REPORTER:  Sir, please let counsel

24   finish with his questions before answering.

25        THE WITNESS:  Yes, ma'am.  Sorry.

```
 1    BY MR. TOBIN:

 2    Q.  But just to be clear for the Court and the record.

 3    A.  Yes.

 4    Q.  -- what did you not get that you saw in other --

 5    A.  So --

 6    Q.  Competitors' feeds?

 7    A.  So I --

 8              THE COURT REPORTER:  Sir, please.

 9              THE WITNESS:  Yes, ma'am.  He told me that, too.

10    I keep --

11    BY MR. TOBIN:

12    Q.  That's all right.  We'll get through.

13    A.  Yes, sir.

14    Q.  Thank you.

15    A.  Yeah.  I looked at what my competitors got, and they

16    made amazing images of, like, these interactions between

17    Zelensky and Vice President Vance and Trump and the faces

18    and the gestures.  And I was like, man, I just was -- it was

19    just the most amazing images you've ever seen, and we just

20    didn't have it.

21              And not only that, but the issue was -- you know,

22    he wasn't transmitting live.  So -- and the meeting ran

23    long.  So my competitors, their images went out, you know,

24    within minutes of this happening, and they were constantly

25    feeding the wire.  And by the time I got his disc, you know,
```

1   we're probably 30 or 40 minutes later, and then it took me

2   another, you know, few minutes to start moving picture.

3          So not only did I have, like, one of the wildest

4   meetings in the history of the Oval Office, but, you know,

5   I'm 40 minutes behind.  And then I don't have the images

6   that I need to have because it's just -- you know, it's just

7   a matter of, like, not having the person in the room that

8   understands, like, what's happening, what's going on.

9   Q.  Speed and quality seem to be the underlying theme of

10  what the AP has been missing out on since you've been

11  excluded from the pool?

12  A.  Yes, sir.  It's what we're all about, is speed and

13  quality.

14  Q.  And that puts you at a competitive disadvantage?

15  A.  It kills us, sir.  I mean, we -- I don't know if we had

16  one front page.  I don't know -- I don't remember seeing any

17  news sites that had our photos.  And it's, like, again, one

18  of the wildest things to ever happen on the Oval Office and

19  we just didn't -- we had nothing.

20  Q.  Was that a presidential interview in the Oval Office

21  that day with the press?

22  A.  No, sir.  No.

23  Q.  And you heard my discussion with the Court about

24  interviews versus other things.  When you're called into the

25  Oval Office as part of the pool, is that an interview

```
 1    situation?

 2    A.  No, sir.

 3    Q.  How do you distinguish that?  What's behind your "no"

 4    answer?

 5    A.  That is -- that's a press opportunity.  An interview

 6    would be when -- we had -- the AP had a one-on-one interview

 7    with President Biden a year or so into his term.  It was me

 8    and an AP, you know, writer, and that was it.

 9    Q.  Was it an exclusive?

10    A.  Yes, sir.

11    Q.  It was by special invitation?

12    A.  Yes, sir.  And, you know, look, if Bret Baier has an

13    interview with the president of the United States, I don't

14    expect them to let me into the Oval Office.  I'm not going

15    to be like, Hey, man, Bret, why aren't I in there?  You

16    know, I get it.  I understand how the game works.

17    Q.  Understood.

18          Does it matter to the public -- we talked about

19    that it matters to AP.  In your 21 years of experience in

20    serving the public as a journalist, does it matter to the

21    public that the AP has now been excluded from White House

22    pool events?

23          MR. HUDAK:  Your Honor, I know we're not bound by

24    the Rules of Evidence necessarily here in this hearing.  But

25    asking a witness to speak on behalf of the entire public
```

1    seems to be quite speculative to me.  So we would object to

2    the question to the extent the Court is entertaining

3    objections during this.

4              MR. TOBIN:  Public interest is part of my burden.

5              THE COURT:  So I am entertaining objections, but

6    I'll overrule the objection.

7              You may continue.

8              MR. TOBIN:  Thank you, your Honor.

9              THE WITNESS:  Of course it matters to the public.

10   You know, the AP is seen by, like, 4 billion people around

11   the world.  And not only that; we're -- I hate to keep

12   beating a dead horse, you know, but, sir, we are the gold

13   standard as far as like fact-based, non-partisan news.  And,

14   like, what we do is vitally important.  I take it very

15   seriously.  And the fact that it's -- you know, our

16   journalism isn't being seen by the people it was before,

17   yeah, of course it affects the public.  It's a huge, huge

18   burden.  It's awful.

19   BY MR. TOBIN:

20   Q.  You have not been admitted into any pool events in the

21   Oval Office, or anywhere else, since the period of time

22   we've been talking about?

23   A.  No, sir.

24   Q.  What about the other set of events?  We've all adopted

25   the euphemism the east room events, the non-Oval Office

1    opportunities.  Has the AP been admitted to any of those?

2    A.  Yes, sir.  I believe we've been admitted to a few here

3    and there.  One or two, I believe.

4    Q.  And do you have any understanding of what the White

5    House system for picking you for those was?

6    A.  No idea.

7    Q.  Have you been admitted to as many since this all

8    began -- "this" being the White House announcement that it

9    was banning the AP -- than you did before?

10   A.  Sir -- so, like I said, I've been doing this job for 21

11   years, and I've been basically at the White House full-time

12   for ten years.  And not only would I be in every single

13   event, but I'm literally the first person through the door.

14   There is a pecking order as far as, like, how we walk into

15   the east room, how we walk into the Oval Office.  And the

16   Associated Press photographer is the first person through

17   the door.

18         So I've gone from being in every single event to

19   not being allowed to do anything.

20   Q.  Understood.

21         Just very briefly, we didn't talk about traveling

22   with the president on Air Force One.  Have you accompanied

23   presidents on Air Force One?

24   A.  Yes, sir.

25   Q.  Is that a unique opportunity for a journalist?

1    A.  Yeah.  I mean, I would say it's a responsibility for a

2    journalist.

3    Q.  Have you -- are there events that happen either on Air

4    Force One or in getting on or off Air Force One that you

5    would miss if you weren't there?

6    A.  Yeah, for sure.  I mean, oftentimes the -- President

7    Trump especially, he loves to talk, and he'll come back to

8    the press cab and he'll talk.  You know, there was another

9    time where I was on a trip and Reince Priebus got fired

10   while -- he was fired, like, literally via tweet on the

11   plane.  So he had to walk down the back steps.  And -- you

12   know, we were there for that.

13          So things happen that isn't necessarily what's

14   happening in front of you.  Right?

15          So it's not always just the president walking down

16   the steps to get into the vehicle.  It's like, well, who's

17   walking down the back steps?  Well, not only that.  Who just

18   got fired?

19          So as far as, you know, journalism goes, it's a

20   360.  And yeah.  You've got to be there.

21   Q.  Do you have any idea what the current system is for

22   picking people for pool events at the White House?

23   A.  I am clueless, sir.  I have no idea what -- there's no

24   rhyme or reason.  All I know is the only thing that seems to

25   be consistent is that the AP is not allowed.

1    Q.  And you spend your days still at the White House?

2    A.  Yeah.  I think it's important that we show up every day

3    and that they turn us away, because it's -- you know, it's

4    our duty as journalists to continue to show up to do the

5    job, or try to do the job.  Otherwise, I'd be letting, you

6    know, myself down and the readers down.

7    Q.  And then all these days since the ban began and you've

8    been spending time still at the White House -- you have

9    been.  Right?

10   A.  Yeah.  I'm pretty grumpy.

11   Q.  Understandable.  We feel your pain.

12           In all that time, has anyone at the White House

13   explained to you what the system is for picking people for

14   the White House pool?

15   A.  No.  No, sir.  I don't think anyone knows.

16           MR. TOBIN:  Your Honor, I have no further

17   questions at this time.

18           THE COURT:  Thank you, sir.

19           Mr. Hudak.

20           MR. HUDAK:  Thank you, your Honor.

21                     CROSS-EXAMINATION

22   BY MR. HUDAK:

23   Q.  Good morning, Mr. Vucci.

24   A.  Hey, good morning.

25   Q.  Nice to meet you.

1    A.  Nice to meet you.  Thank you.

2    Q.  My name is Brian Hudak.  I'm an assistant U.S. Attorney

3    in the U.S. Attorney's Office here in D.C.  And I appreciate

4    a long tenure.  I've been with the office 18 years, so I

5    appreciate you being with your job for 21 years.

6              THE COURT:  Mr. Hudak is also being modest.  He's

7    the chief of the civil division.

8              THE WITNESS:  Awesome.

9    BY MR. HUDAK:

10   Q.  As with you, I don't like to inflate my ego.

11             I'm going to be showing you exhibits on the

12   monitor in front of you --

13   A.  Okay.  Sure.

14   Q.  -- if I do this correctly.

15             And I also have my notes on my laptop, so I just

16   need to arrange here.  Okay.

17   A.  I'm seeing this, so you're good.

18   Q.  Good.  Before we get to the image on the screen, just to

19   set the state of play, as I understand it, up until, let's

20   say, the beginning of February, you had a standing seat in

21   the White House press pool.  Correct?

22   A.  Yes, sir.

23   Q.  And you didn't have to rotate in like some other media

24   organizations did.  Correct?

25   A.  No, sir.

1    Q.  Other hard pass journalists at the White House did not

2    have a similar seat in the press pool.  Correct?

3    A.  Correct.  Yes, sir.

4    Q.  And you previously said, I think, on direct examination

5    that even within the press pool, there was kind of a pecking

6    order, if you will.  Is that correct?

7    A.  Yes, sir.  It's based on -- so the idea would be to

8    amplify the president's words as broadly as possible.  So

9    the organizations with the most reach would be the ones that

10    are, you know, in those pools.  And the pecking order would

11    be based on the reach of those organizations.

12    Q.  Got it.

13        And part of being a member of the press pool is to

14    amplify the president's speech in the Oval Office.  Correct?

15    A.  Absolutely; and serve the American public.

16    Q.  Now, in addition to -- in your work, in addition to

17    getting photos out to use in immediate news stories, you

18    also mentioned that part of your job is to take photos to

19    kind of preserve for history the events.  Correct?

20    A.  Yes, sir.

21    Q.  Okay.  Like the Butler photo that we saw, that's an

22    example of it.  Correct?

23    A.  I hope so.  Yes, sir.

24    Q.  The Butler photo, just for clarification, you took not

25    because you were part of the White House press pool.

 1     President Trump at that time was a candidate for office.

 2     Correct?

 3     A.  Yes, sir.

 4     Q.  And as part of preserving history, like any money-making

 5     organization, the AP sells photographs on its websites.

 6     Correct?

 7     A.  I would assume so.  That they license images, yes, sir.

 8     Q.  Okay.

 9     A.  I would be the exact wrong person to speak to that.  I

10     have no idea how the business side of things works.

11     Q.  Okay.  But have you seen -- referring you to Government

12     Exhibit 2 on the screen here, have you seen the editorial

13     photos and videos page on AP's news room before?

14     A.  Yeah.  I'm seeing what you're seeing.  But -- yeah, of

15     course I have.  Yes, sir.

16     Q.  And this is a -- kind of a storefront where AP sells

17     images that it has taken during -- from its reporters and

18     others through licensing agreements.  Correct?

19     A.  Yeah.  I mean -- yeah.  Of course.  Yes, sir.

20     Q.  And we just have a few screen grabs from this website as

21     we discuss your testimony here today.

22           So flipping to Exhibit 3-A, have you ever clicked

23     on a photo on the AP news room and see what information pops

24     up?

25     A.  Yeah.  I mean, I'm looking at this now.  Sure.

1          MR. HUDAK:  And just to orient the Court, this is

2     what one of the photo pages looks like, but we've chopped

3     them in to make it a little more readable for the Court and

4     for the witness here today as we move forward.

5     BY MR. HUDAK:

6     Q.  So this is an example of the chopping, if you will.  And

7     you see this was a photo, it appears, from February 25th in

8     the Brady press room.  Correct?

9     A.  Yes, sir.

10    Q.  And just pausing there for a second, when you still go

11    to the White House, as you said, even though you're not part

12    of the pool, you still have access to the Brady briefing

13    room.  Correct?

14    A.  Yes, sir.

15    Q.  And the other kind of press facilities that are adjacent

16    to the Brady briefing room you still have access to?

17    A.  Yes, sir.

18    Q.  And you have access to what I think is called Pebble

19    Beach?

20    A.  Yes, sir.  Yes, sir.  That's correct.

21    Q.  And kind of the driveway along where media -- both

22    photojournalists and videographers set up to encounter the

23    president meeting foreign dignitaries as they arrive to the

24    White House?

25    A.  Yes, sir.  And not only that, but I'll spend time there

Vucci - CROSS - By Mr. Hudak

JA188

1    looking for people that are doing interviews with, like,

2    say, Fox News or anything like -- because I'm not allowed

3    into these events, so I have to try to, you know, get people

4    any other way I can.  So oftentimes I'll take pictures of,

5    you know, the press secretary or someone that's doing an

6    interview on Pebble Beach.  So, you know, I'll work in those

7    areas as well, sir.

8    Q.  Got it.

9            And you sometimes take photos of, you know,

10   cabinet members walking into the White House?  Yes?

11   A.  Yes, sir.  That's exactly what I'm trying to do.

12   Q.  Yeah.  And also, you know, Elon Musk and his child

13   walking towards the -- Marine One?

14   A.  Yes, sir.

15   Q.  And -- but those type of events in and around the White

16   House you're still able to access with your hard pass.

17   Correct?

18   A.  Yeah.  I am still able to access those events.

19   Q.  On the AP's news room page, if you see that this

20   photograph was taken by a photographer named Aaron

21   Schwartz -- do you see that on the screen?

22   A.  Yes, sir.

23   Q.  And do you know Mr. Schwartz?

24   A.  Probably by face.

25   Q.  And it appears that he is a member of an organization

1    called Sipa USA.  Do you see that?

2    A.  Yes, sir.

3    Q.  Okay.  And does the AP have licensing agreements with

4    other photojournalists that are covering the White House?

5    A.  I have no idea, sir.  So I believe that Sipa uses AP for

6    distribution.  But it doesn't go to, like, our -- all of our

7    members.  It doesn't go to our wire.  So these images

8    wouldn't go to, like, the *Des Moines Register*, I don't

9    think, sir.  But I don't know.  But there is some sort of

10   distribution deal, I would imagine.

11   Q.  And does -- I think, as the AP advertises on its

12   website, it has partnership and licensing agreements with

13   several different photojournalist and videographer outlets.

14   Is that right?

15   A.  If you saw it, I wouldn't dispute that.  Yes, sir.

16   Q.  All right.  And you see that, as part of the preserving

17   history and making money -- preserving history, I don't

18   fault anyone for that, but you see that this is for

19   editorial use only and please contact your AP representative

20   for commercial use.  Do you see that on the screen?

21   A.  Yes, sir.  I do see that.

22   Q.  And on these screens that pop up when you look to go

23   onto the AP news room, there's a, you know, ability to

24   purchase photos.  Is that customary in your industry?

25   A.  I would imagine, yeah.  Of course.

```
 1    Q.  Do you see this at all whenever someone buys licensing

 2    rights to a photo from the AP's site?

 3    A.  No.  I'm just doing the day-to-day work of actual

 4    journalism.  I have no idea about the business side.

 5    Q.  You're paid a salary, not on commission.  Is that

 6    correct?

 7    A.  Yeah.  Although, after Butler, I mean -- well, I

 8    didn't -- we didn't license that image, but -- yeah, I'm

 9    paid a salary, sir.

10    Q.  And you might have some side activities where you

11    receive commission or you do other work, but from the AP at

12    least --

13    A.  I'm paid a salary.  Yes, sir.

14    Q.  And it appears that the AP is selling this image through

15    some licensing rights deal with Sipa, even though the AP

16    photojournalist didn't take it themselves?

17    A.  Correct.  That's what it looks like, sir.  But again,

18    I'm not the business guy.

19    Q.  May I pause here just for a second that -- you talked

20    about your equipment and your ability to kind of push out

21    photos almost instantly over the internet to photo editors

22    and other folks at the AP.

23    A.  Yes, sir.

24    Q.  Do you remember that?

25    A.  Yes, sir.
```

1    Q.  And your counterparts from Reuters, they have the same

2    capabilities.  Is that correct?

3    A.  Yes, sir.

4    Q.  And from *The New York Times*.  Is that correct?

5    A.  Of course.  Yes, sir.

6    Q.  And from AFP.  Is that correct?

7    A.  Yes, sir.

8    Q.  Do you know -- what about Sipa USA?  Does the AP have

9    licensing rights deals with them?

10   A.  I don't know.  I don't know how that works.  And I'm

11   not -- so I'm speculating here, so I don't know if you want

12   me to say this or not.  But I think oftentimes this stuff

13   from Sipa, it could be days later before it's uploaded to

14   our distribution networks.

15   Q.  Okay.

16   A.  So I'm not 100 percent sure, sir.  But I believe that,

17   you know, it could -- you know, they could upload their take

18   days after an event.

19   Q.  All right.  We'll get to that, because I think you might

20   be wrong on that based upon what I'm seeing on your website.

21   A.  Okay.

22   Q.  But fair to say you don't have any real understanding of

23   how Sipa's photos make their way into kind of the AP catalog

24   on the website?

25   A.  That is the perfect way of putting that, sir.  Yeah.  I

Vucci - CROSS - By Mr. Hudak

JA192

1    have absolutely no clue how all that works.

2    Q.  Now, were you in the Brady press room on February 25th,

3    2025?  And just to refresh your recollection, that is when

4    the press secretary announced that there would be a change

5    in the pool selection process.

6    A.  Yes, sir.  I believe I was there with another AP

7    photographer.

8    Q.  And AP -- even though you were there taking photos, AP

9    still, it appears, posts photos from other media

10   organizations for sale on its website.  Is that correct?

11   A.  I'm not sure.  I believe you, sir.  You know, I just

12   don't know.

13   Q.  In February 2020, you were part of the press pool at the

14   White House.  Correct?

15   A.  Yes, sir.

16   Q.  And you regularly attended east room events at that

17   period of time?

18   A.  Yes, sir.

19   Q.  And the AP's practice -- flipping to Government Exhibit

20   4 -- of posting photos from other media organizations

21   through licensing rights deals appears to have been common

22   back in that period of time as well.  Do you see that?

23   A.  Yes, sir.  I'm looking at an image from February 27th,

24   2020.

25   Q.  Do you know who Oliver Contreras is?

```
 1    A.  Yes, sir.

 2    Q.  And is he a good photojournalist?

 3    A.  Yeah.  And a great human.

 4    Q.  And he worked, it appears, at least at the time, for

 5    Sipa USA?

 6    A.  He's a freelance photographer.  So he probably got a day

 7    rate from them.

 8    Q.  Can you explain what you mean by "day rate," just the --

 9    A.  Yes.  Of course, sir.

10    Q.  -- for the Court and myself?

11    A.  So Sipa doesn't really have staff photographers, so

12    they'll hire people for a day.  So they'll say, Hey, Oliver,

13    there's going to be this African-American History Month

14    reception in the Oval Office and a few other things.  Can we

15    hire you for the day to work for us?

16    Q.  Fast-forwarding five years, on the same day, February

17    27th, you see that this is another photo from AP's website

18    from a photojournalist at Sipa USA.  Do you see that?

19    A.  Yes, sir.

20    Q.  Do you know who Samuel Corum is?

21    A.  Yes, sir.

22    Q.  Who is Samuel Corum?

23    A.  He's a former Marine -- there's no former Marine, but

24    he's a Marine, became a photojournalist.  Great guy.

25    Q.  Is he a good photojournalist?
```

1    A.  Yes, sir.

2    Q.  Switching gears a little bit, I want to go through some

3    of the east room events that have occurred recently and your

4    understanding of what AP members were in attendance during

5    those events.  Okay?

6    A.  Sure.

7    Q.  All right.  Can we start with -- on February 24th, the

8    White House east room event with President Macron.  Do you

9    recall that one?

10   A.  Yes, sir.

11   Q.  And would you generally describe how you were able to

12   cover that event for the AP?

13   A.  Well, we weren't in it.  Is that...

14   Q.  And my question is you personally.  Were you in the east

15   room during that event?

16   A.  This is -- which -- is this in 2020 or is this --

17   Q.  No.  In February 2025 --

18   A.  This year.

19   Q.  -- February 24th of this year.

20   A.  I was not.

21   Q.  And you were not in the Oval Office for this event.

22   Correct?

23   A.  No, sir.

24   Q.  But you were, as we discussed earlier, or a member of

25   your staff, was in the area where the French president came

1    to be admitted into the west wing?

2    A.  Yes, sir.  We were -- we have not been banned from

3    taking photos out there.

4    Q.  And you were able to observe President Macron and the

5    surrounding circumstance when he arrived.  Correct?

6    A.  Yeah.  I wasn't there that day, but an AP photographer

7    was.

8    Q.  And in the Oval Office that day, do you understand that

9    an AP text journalist was admitted to the Oval Office as

10   part of President Macron's press detail?

11   A.  I'm not -- so that would be something for Zeke -- I

12   don't know who was in the room.  I'm sorry, sir.

13   Q.  Do you know if any AP photojournalist, whether they were

14   Washington-based or otherwise, was admitted to the Oval

15   Office for that day?

16   A.  I'm not 100 percent sure, sir.  I would imagine that

17   there was -- we probably got photos through Macron's side

18   of -- through some sort of pool agreement on that side.  I'm

19   not sure.

20   Q.  And in addition to maybe licensing agreements or

21   photojournalists that the AP has from foreign areas, the AP

22   also receives photos from pool photojournalists as part of

23   the White House press pool.  Correct?

24   A.  Well, no.  I mean we're not part of the pool now.

25   Q.  But you receive -- so if AFP, for instance, takes a

1    photo as part of the pool, it pushes it out to the other

2    hard pass holders at the White House.  Correct?

3    A.  No.

4    Q.  Well, let me show you Government Exhibit 8.  Do you see

5    this is from the Oval Office meeting with French President

6    Macron and President Trump on February 28th -- 24th?

7    A.  Yes, sir.  So -- I'm sorry.  I was thinking of the

8    American side of things.

9          So yeah.  So there was a pool established that --

10   they traveled with Macron here.  There was one photographer.

11   So that one photographer shared with those other

12   organizations.

13   Q.  So Ludovic -- L-U-D-O-V-I-C -- Marin, M-A-R-I-N -- he

14   was part of a foreign pool for this event?

15   A.  Yes, sir.

16   Q.  And the AP had an arrangement to receive photographs

17   from this pool?

18   A.  Yes, sir.  That's what it looks like.  Yes, sir.

19   Q.  And do you know Mr. Marin?

20   A.  I don't.  Well, I mean, I may have met him somewhere

21   before.  It's a very small community.  But...

22   Q.  Okay.  And AFP's photojournalists are of high quality as

23   well?

24   A.  Sure.

25   Q.  I think, as you testified on direct examination, part of

```
 1    what a photojournalist wants to capture are, you know, the

 2    moments with facial interactions and things like that.

 3    Correct?

 4    A.  Yes, sir.

 5    Q.  And in this one, maybe that's an example of it, with the

 6    French president grabbing President Trump's hand and having

 7    a big, beaming smile, it appears?

 8    A.  Yeah.  It's a great photo.  I wish I took it.

 9    Q.  In the east room of that event, the AP similarly

10    received images -- looking at Government Exhibit 9 -- from

11    its pool relationship with Mr. Marin in the foreign pool.

12    Is that correct?

13    A.  That's what it looks like.  Yes, sir.

14    Q.  And again, if you see the pricing information on there,

15    the AP is currently selling this photograph from between $35

16    and $495, depending on the license?

17    A.  Yes, sir.  That's what it says.  Yes, sir.

18    Q.  And the way that the AP sells photographs and documents

19    history at this event is similar to the way it's covered

20    other events between President Trump and President Macron.

21    Is that correct?

22    A.  Ask that question again.  I'm not sure what you're

23    asking me.

24    Q.  Sure.  The way that AP is selling this photo on its

25    website is similar to the way that the AP sells other photos
```

1    of President Macron and President Trump during other events?

2    A.  Sure.  I guess.

3    Q.  So, for example, looking at Government Exhibit 12, there

4    was a meeting between the presidents at the U.S.

5    ambassador's residence in Brussels on May 25th, 2017.  Do

6    you see that?

7    A.  Yes, sir.

8    Q.  Once again, we see that this is a photo that was taken

9    by an unaccredited photojournalist at Sipa USA?

10   A.  Yes, sir.

11   Q.  And once again, we see that the AP is selling this photo

12   on its website for between $35 and $495, depending on the

13   license.  Do you see that?

14   A.  Yes, sir.

15   Q.  And similarly, on April 24th, 2018, at the White House

16   east room, referring to Government Exhibit 13, you see that

17   there's a similar photo taken by Sipa USA with -- that is

18   available for purchase on the AP's website for similar

19   pricing?

20   A.  Yes, sir.

21   Q.  You see here on this one it is noted that the

22   photographer is the Abaca Press.  Do you see that?

23   A.  Yes, sir.  I see that.

24   Q.  And do you know who the Abaca Press is or what it is?

25   A.  I mean, I guess it's another photo agency.  It is

1    another photo agency, sir.

2    Q.  And it appears, at least because this is being sold on

3    the AP's website, that there's some sort of licensing

4    agreement between Abaca Press and the AP?

5    A.  That's what it looks like.  Because it's, like, slash,

6    Abaca, slash, Sipa USA, slash, you know, via AP images.  So

7    that's what it looks like, sir.

8    Q.  Okay.  And if you note in the by-line it has the

9    photojournalist that took this, Eliot Blondet,

10   B-L-O-N-D-E-T?

11   A.  Uh-huh.

12   Q.  Do you see that?

13   A.  Yes, sir.

14   Q.  And do you know Mr. Blondet?

15   A.  I mean, probably by face.  But no, sir.

16   Q.  And you would say that this photograph -- as a

17   professional photographer, it is a fairly good one,

18   capturing the event, good -- good facial expressions, good,

19   you know, movement, if you will?

20   A.  You're going to make me --

21   Q.  I do not -- well, if you don't want to, I do not want

22   to --

23   A.  No, no.  The -- the exposure is clearly off, sir.  I'm

24   sorry.

25   Q.  Your eye is so good.

1    A.  I'm sorry.  And it could have been his editor; it wasn't

2    him.  I mean, you know -- I don't know.

3    Q.  It also could be Microsoft PowerPoint, through the

4    court's technology as well.  My apologies.

5    A.  Sir, I'm pretty certain that there's no detail on those

6    highlights.  So...

7    Q.  Okay.

8    A.  I would be a subject-matter expert in this.  Just not

9    the business side of things, sir.  I wish I could be more

10    help there.

11    Q.  No, it's all good.  It's all good.

12           All right.  That's enough discussion about

13    President Macron.  Why don't we move to the east room event

14    with the -- Prime Minister Starmer from the United Kingdom.

15    A.  Yes, sir.

16    Q.  Do you recall that event?

17    A.  I was not there, but yeah, sure.  I've paid attention to

18    the news.

19    Q.  But similarly, you were able to observe the prime

20    minister enter the west wing with President Trump.  Correct?

21    A.  Yes, sir.  We are not banned from taking photos there.

22    Q.  And do you know if any AP journalist, photojournalist or

23    text journalist was permitted access to the Oval Office for

24    this event?

25    A.  I'm not sure, sir.

1    Q.  Do you know who Carl Court is, looking at Government

2    Exhibit 15?

3    A.  He's a photographer from the U.K.  I just -- so I would

4    imagine that this came from the U.K. side of the pool.

5    Q.  And do you know what the Press Association is?

6    A.  It's a news organization.

7    Q.  And is it an affiliate of the AP or is there a licensing

8    arrangement?

9    A.  I don't know, man.

10   Q.  Is -- do you know Mr. Court?

11   A.  Yeah.  I've seen him all over the world.  Sure.

12   Q.  And is he a reputable --

13   A.  Yes.

14   Q.  -- photojournalist in your mind?

15   A.  Yes, sir.  I'm sorry.  I keep cutting you off.  Yeah.

16   For sure, he's a great photographer.

17   Q.  And again, the AP appears to be selling this photo from

18   President Trump's interaction with Prime Minister Starmer in

19   the Oval Office on its website.  Is that correct?

20   A.  Yes, sir.  That's what it looks like.

21   Q.  Now, as part of these licensing agreements -- and I'm

22   assuming your answer is going to be "I don't know," but I'm

23   going to ask it anyway.  As part of these licensing

24   agreements, do you know if the AP has the right to not only

25   sell but also to use the photos generated in its news

1    stories?

2    A.  I have no idea.

3    Q.  Okay.

4    A.  I couldn't speculate, sir.  I'm sorry.

5    Q.  Now, the east room event with the prime minister, you

6    see in Government Exhibit 16 that the AP also is selling on

7    its website a photo from a Sipa USA photojournalist.

8    Correct?

9    A.  Yes, sir.

10   Q.  And then flipping to Government Exhibit 17, you also see

11   that they're selling a photo from a journalist from Abaca

12   Press, Yuri Gripas, G-R-I-P-A-S.  Do you see that?

13   A.  Yes, sir.

14   Q.  But you don't know whether any AP photojournalist was

15   admitted to the east room or the Oval Office --

16   A.  I --

17   Q.  -- for this event?

18   A.  I'm not 100 percent sure.  I'd have to look at the wire

19   to see.

20   Q.  Moving on to February 28th, an event with Ukranian

21   President Zelensky -- you testified about that during your

22   direct examination.  Correct?

23   A.  Yes, sir.

24   Q.  And at that event, you and your colleagues were able to

25   witness Mr. Zelensky enter the White House through the west

1    wing doors?

2    A.  Yes, sir.

3    Q.  And I think, as you testified on direct examination,

4    there was a foreign-based photojournalist from the AP that

5    was admitted to the Oval Office for that event.  Correct?

6    A.  Yeah.

7    Q.  And that was Mr. Chernov.  Is that correct?

8    A.  Yes, sir.

9    Q.  And he is the award-winning moviemaker that you referred

10   to in your direct testimony?

11   A.  He's amazing.  Yes, sir.  He is an incredible video

12   journalist.

13   Q.  And this is one of the photographs that he captured.

14   Correct?

15   A.  Yes, sir.

16   Q.  And I think you testified on direct examination that you

17   don't see this photo being used in major news publications.

18   Correct?

19   A.  I think I was talking about the broader -- you know --

20   the vast majority of news sites that I saw, I did not see

21   many AP photos.

22   Q.  National Public Radio, you're familiar with them?

23   A.  Of course.

24   Q.  And they regularly use AP stories on their websites.  Is

25   that correct?

1    A.  Yes, sir.

2    Q.  And they regularly use AP photographs on their websites.

3    Is that correct?

4    A.  Of course.

5    Q.  So while you were talking with my friend Mr. Tobin, I

6    just went online to see if I could find a use of it.  You

7    see that this is a story from NPR on March 2nd, 2025.  Do

8    you see that?

9    A.  Yes, sir.  It looks like an NPR -- you're showing me an

10   NPR news page.

11   Q.  Yes.

12   A.  It has the photo that we were talking about.

13   Q.  Yes.

14        And it's also -- if you look at the by-line, it's

15   attributed to the AP photojournalist.  Correct?

16   A.  Yes, sir.

17   Q.  So when you were talking with Mr. Tobin earlier about,

18   you know, whether the photographs that AP took in this

19   interaction with President Zelensky, whether they were used

20   by the AP's customers, you really don't have one way or

21   another of knowing how many customers use that content

22   versus other content.  Correct?

23   A.  No, sir.  I mean, there's no -- correct.  I don't.  But

24   it's just -- I've been in the news business for a long time,

25   and when we get our butt kicked, I know immediately when

1    that happens.  And that happened this day.

2    Q.  When you -- you haven't talked with any of the

3    businesspeople at the AP to know whether or not the usage of

4    your photographs or the AP's photographs from that day was

5    down compared to other photographs?

6    A.  The businesspeople?

7    Q.  Yes.

8    A.  No, sir.  We don't -- no, sir.

9    Q.  You haven't talked to any of the data analytics people

10   at the AP to understand whether the usage of your -- the

11   photos from that day was down compared --

12   A.  No.

13   Q.  -- to other events?

14   A.  No, sir.

15   Q.  The same question for all these photos that we've been

16   looking at that are being licensed from other media

17   companies:  You don't know whether the reach of those photos

18   from the AP's website has caused it financial harm because

19   of the licensing agreements with the other photojournalists

20   that we've been looking at?

21   A.  No, sir.

22            But can I add something?  The majority of our

23   clients aren't going to our website to get these images.

24   They're not going to download or purchase images.  They're

25   taking a photo stream.  It's a completely separate service,

1    sir.  It's a different service.

2    Q.  I understand.  But --

3    A.  Okay.

4    Q.  -- but as far as what the actual financial impact to the

5    AP was --

6    A.  Yeah, I don't know.  I'm sorry, sir.  I don't know.  I

7    couldn't answer your question.

8    Q.  And as far as the actual impact from kind of a data

9    analytics perspective, that of actual usage, you don't have

10   that information either?

11   A.  I'm sure someone does.

12   Q.  But you do not?

13   A.  I don't.  No, sir.  I take the pictures.

14   Q.  That day, it's my understanding there was an east room

15   event that was planned but was canceled at the last minute.

16   Is that your understanding?

17   A.  Yes, sir.

18   Q.  And did the AP, to the best of your knowledge, either

19   through an AP photojournalist or a licensed partner have

20   access to the east room event that day or was going to have

21   access to the east --

22   A.  I --

23   Q.  -- room?

24   A.  I'm not sure, sir.  It didn't happen.  Sorry to cut you

25   off.  My bad.

1    Q.  My apologies.

2              Just looking at Government Exhibit 20, do you see

3    that is a photograph of the east room on February 28th,

4    2025?  Do you see that?

5    A.  Yes, sir.

6    Q.  And do you see that this was taken by Mr. Corum from

7    Sipa USA?  Do you see that?

8    A.  Yes, sir.

9    Q.  And again, on these photos that we've been looking at,

10   on the credit line that I'm assuming people are directed to

11   use, in reporting the by-line, it has Sipa USA via AP.

12             Do you see that?

13   A.  Yes, sir.

14   Q.  Can we talk about the tarmac for a second?

15   A.  Sure.

16   Q.  It's my understanding that photojournalists from the AP

17   were not permitted on the West Palm Beach International

18   Airport tarmac on February 28th.  Is that correct?

19   A.  I would say that's accurate, sir, if you're saying it.

20   I wouldn't argue with you.

21   Q.  But on March 7th, when the president arrived at West

22   Palm Beach International Airport, the AP had both a text

23   journalist and a photo reporter there.  Correct?

24   A.  I'm not sure.  But I would -- I'd have no reason to

25   dispute that, sir.

1    Q.  And on March 14th, when the president arrived at West

2    Palm Beach International Airport, the AP had both a text

3    journalist and a photojournalist there.  Correct?

4    A.  Again, I'm not 100 percent sure, sir.  I'd have to see

5    the photos.

6    Q.  And on March 22nd, when the president arrived at

7    Philadelphia International Airport, the AP had both text and

8    photojournalists at that event?

9    A.  Yeah.  Again, yes, sir.  I would believe what you're

10   saying.

11   Q.  Are you aware of any tarmac event since March 1st where

12   the AP has been denied photojournalist access on a tarmac

13   event like these with the -- Air Force One arriving?

14   A.  Well, yeah.  I mean, the majority of the ones when he

15   lands in West Palm.  We always apply to see the landing and

16   are usually denied.

17   Q.  Right.

18           Are you aware of any events besides the 7th, the

19   14th and the 22nd where Air Force One has landed and the AP

20   has not been there at -- not had a photojournalist there?

21   A.  Sir, I just don't know.  I'm not sure off the top of my

22   head.  But -- I don't want to speculate.  But if -- I would

23   say that they would allow us to do, you know, one here and

24   there.  But certainly not what we were doing before, which

25   was every single one.

```
 1    Q.  Right.

 2            Well, that's what my question is.  Every single

 3    one since March 1st, the AP has been there.  Correct?

 4    A.  I don't --

 5    Q.  You don't know?

 6    A.  I don't know.  I don't think that's true, though, but I

 7    would have to look.  I'm not calling you a liar, sir.

 8    Q.  Do you recall any landing tarmac event that the AP has

 9    not been at since March 1st?

10    A.  Again, I'm not -- I'm not sure.  Here's the thing, man.

11    I don't work weekends.  So this guy goes -- so --

12            THE COURT:  Seniority does have its privileges.

13            THE WITNESS:  So it's someone else's deal.  I wish

14    I could help you.  I just don't know.

15            You know, I get, like, the text messages saying:

16    Look, we were denied; they're not letting us do this;

17    they're not letting us do that.  But, you know, I'm sure we

18    could sit down and get together and figure out what we have

19    been invited and what we have not, what we've been allowed

20    to do and what we haven't been allowed to do.  We would love

21    to do all of them.  That would be ideal.  That's our role.

22    BY MR. HUDAK:

23    Q.  Sitting here today, you cannot testify on behalf of the

24    AP that they have been excluded from a tarmac event since

25    March 1st?
```

1    A.  I mean, I wouldn't be the person to tell you that, sir.

2    Q.  If we look at Government Exhibit 24, you see this is a

3    photo from the Philadelphia International Airport landing on

4    March 22nd.  Do you see that?

5    A.  Yes, sir, I do.

6    Q.  And you see the photographer here is Chris Szagola,

7    S-Z-A-G-O-L-A?  Do you see that?

8    A.  Yes, sir, I do.

9    Q.  And my apologies if I'm butchering his name.  But --

10   A.  I don't know him either, so you can say it however you

11   want.

12   Q.  Is Mr. Szagola an AP photojournalist?

13   A.  No, sir.  He's a freelancer.

14   Q.  But he appears to have been hired by the AP for this

15   event?

16   A.  Yeah.  Yes, sir.  For that day.  And where it says

17   by-line title, it says FRE.  That means freelancer.  So you

18   can tell a staff photographer versus a freelancer versus --

19   FRE versus STF.  So -- for your future, you know, research.

20   Q.  That's very helpful.  Thank you so much.

21   A.  Yes, sir.

22   Q.  But you see the copyright here is owned by the

23   Associated --

24   A.  Yes.

25   Q.  -- Press?

Vucci - CROSS - By Mr. Hudak

JA211

```
1    A.  Yes, sir.  I'm sorry.  I keep cutting you off.  I'm
2    sorry.  I'm so eager to answer your questions.
3    Q.  You're all good.  I'm not going to be the one that yells
4    at you.  She's going to be the one that yells at you.  So
5    it's fine.
6              But if you would allow me to finish, because it
7    does make it easier on the court reporter.
8              Flipping back to a few more east room events
9    where --
10             THE COURT:  Mr. Hudak, let's --
11             MR. HUDAK:  We're almost done.  I just want to
12   cover the landscape.  We're almost done.  I will speed up.
13   BY MR. HUDAK:
14   Q.  Do you recall the -- an event celebrating St. Patrick's
15   Day at the east room on March 12th, 2025?
16   A.  I was not there, so I'm not 100 percent sure.
17   Q.  Do you know if an AP photojournalist was there?
18   A.  I don't.  We have all this information somewhere -- oh,
19   it looks like Alex Brandon was there.  There is an AP staff
20   photographer.
21   Q.  Right.
22   A.  He's amazing.
23   Q.  Moving to March 20th, there was an east room event
24   with -- for a signing of an executive order on education.
25   Do you recall that?
```

1    A.  Yes, sir.  I saw the news.  I believe I may have been on

2    vacation.

3    Q.  Okay.  And do you know if an AP photojournalist was

4    there?

5    A.  Yeah.  Ben Curtis.  Legendary photographer.

6    Q.  Moving forward to March 24th, there was a Greek

7    Independence Day celebration at the White House in the east

8    room.  Do you recall that?

9    A.  Again, I was -- I believe I was on vacation.

10    Q.  But do you recall whether an AP photojournalist was

11    present at that event?

12    A.  Yes, sir.  I'm looking at a photograph by Jacquelyn

13    Martin, who is an AP staff photographer.

14    Q.  Just yesterday, there was a Women's History Month event

15    in the east room of the White House.  Do you recall that?

16    A.  I wasn't at the White House yesterday.  I was preparing

17    for this.  So -- but yes, sir, I believe you.  Let's see.

18    Who is it this time?

19    Q.  Was there a --

20    A.  Jacquelyn again.

21    Q.  -- a photojournalist there from the AP?

22    A.  Yeah.  So I'm looking at a photo by an AP staff

23    photographer, Jacquelyn Martin.  So we were allowed into

24    that event.

25    Q.  Okay.  And I think you testified on direct examination a

1    little bit of this -- and this is my last line of questions.

2    As a photojournalist, you're not just simply capturing an

3    image of the room.  That's not just your job, is to take

4    random photos.  Correct?

5    A.  Yes, sir.

6    Q.  It is to -- you've been trained as a photojournalist to

7    observe and capture moments such as the one on the screen

8    here that have to do with events surrounding the main

9    activity that is going on in the event.  Correct?

10   A.  The idea as a photojournalist is to show our members,

11   our viewers, what's happening, what's going on here,

12   what's -- you know, everything in this room is important.

13   And of course what the president is saying is extremely

14   important as well.

15   Q.  And through images, you're trying to capture the mood of

16   the room.  Correct?

17   A.  Yes, sir.

18   Q.  And you have the ability to communicate those things to

19   your counterparts at the AP in realtime.  Correct?

20   A.  Yes, sir.  Ideally, it would be realtime.

21   Q.  You also want to capture what notable people are at

22   these events.  Correct?

23   A.  Yes, sir.

24   Q.  And you want to capture things like even when a sleepy

25   child is thinking about women's history in their dreams as

1    opposed to listening to the president's speech.  Correct?

2    A.  Yes, sir.

3    Q.  Again, you have the ability to communicate all that to

4    your AP colleagues, both on the text side and on the

5    photojournalist side.  Correct?

6    A.  Yes, sir.

7            MR. HUDAK:  Your Honor, no further questions.

8    Thank you.

9            THE COURT:  I actually had a couple questions for

10   you, sir.

11           First, it's fair to say that you can take

12   flattering pictures of someone or unflattering pictures.

13   Right?

14           THE WITNESS:  Absolutely, sir.  And that's an

15   extremely important point, actually, sir.  I can go into an

16   event and I can make someone look like a buffoon or I can

17   make someone look like a hero.  So the idea is that a

18   professional photojournalist that has, you know, a good

19   heart, a good soul, and an idea of, like, what's happening

20   in front of them, to be fair, be accurate, be fast -- that's

21   the role of the photojournalist, is to be fair, be accurate

22   and be fast.

23           THE COURT:  And so I understand you have had

24   different access since, well, the last month and a half.

25   Has that caused you to change how you take the photos that

1    you do have access to?  In other words, are you taking more

2    pictures of the president picking his nose or more pictures

3    of the president smiling as a result of this ban?

4              THE WITNESS:  No, sir.  My approach hasn't

5    changed.  I'm a professional.  So I do my job the same now

6    as I would before.

7              THE COURT:  And I think you had a question from

8    Mr. Tobin about, you know, you haven't been able to go into

9    the east room as often as you did in the last

10   administration.

11             How frequently would you say there were east room

12   events last year that you went into?

13             THE WITNESS:  Sir, every single event that ever

14   happened with the president of the United States, I was

15   there or an Associated Press photographer was there.

16             THE COURT:  I understand that.  I'm asking how

17   often.  How many times were there?

18             THE WITNESS:  Depending on the president's

19   schedule.  So if he had five east room events, I would be in

20   five.  Is that what you're asking me, sir?  I'm sorry.

21             THE COURT:  I'm asking -- I mean, Mr. Hudak has

22   gone through -- I don't know -- four or five events, just

23   east room events, just in the last few weeks.  Were there

24   four or five events in the east room per month last year?

25             THE WITNESS:  I mean, I believe there's probably

1    way more than that.  We do have a sheet that would have all

2    the events that we were denied access to.  So you would be

3    able to look at that and say, Hey, they were allowed into

4    three and there were -- and 15 were held, or whatever the

5    numbers are, sir.  I wouldn't be able to speak to that.  I'm

6    sorry.

7         THE COURT:  I'm asking about last year.

8         THE WITNESS:  Last year?

9         THE COURT:  Yes.  Were there a lot of events last

10   year in the east room?

11        THE WITNESS:  With President Biden?

12        THE COURT:  Yes.

13        THE WITNESS:  Sure.  I mean, yeah.  I guess a

14   normal amount.  I don't know -- I would have to look at the

15   numbers, sir.  I'm not 100 percent sure.  But he did use the

16   east room.

17        THE COURT:  Okay.  And how about the Oval Office?

18   How many Oval Office events would you say there were in 2024

19   a month?

20        THE WITNESS:  Gosh, I don't know, sir.  I guess it

21   all depends on the news of the day.  I wish I had this

22   prepared for you.  I would have been better at this.

23        THE COURT:  No, that's fine.

24        THE WITNESS:  But I mean, sort of -- it depends on

25   the news of the day, what's happening.  You know, so it

 1    could be a really busy week and we see him five times, or it

 2    could be -- you know, we're not in the Oval Office; you

 3    know, he's working behind the scenes.  So it really depends

 4    on the president's schedule.

 5              THE COURT:  Okay.  Thank you.

 6              Redirect.

 7              THE WITNESS:  Does that help, sir?

 8              THE COURT:  Yes.

 9              THE WITNESS:  Did I answer your question?

10              THE COURT:  You did.

11                     REDIRECT EXAMINATION

12    BY MR. TOBIN:

13    Q.  Mr. Vucci, I think the Court is trying to get some

14    empirical understanding of whether there is a real decrease,

15    a real chill, in your ability to get into the rooms.  So as

16    best as you can, can you talk about the empirics before and

17    after?  As specifically as you can.

18    A.   Yeah.  I mean, like I said before, if there was ten

19    events that week, we would be in all ten.  Now, it's -- it's

20    a win for us to get into one event a week.  And, you know,

21    we're talking about -- you know, he pointed out, like, you

22    know, three or four east room events, but that's over, like,

23    a monthlong period.  I mean, you know, my colleagues are

24    going into these things every single day.  And we're not.

25    Q.  By your colleagues, do you mean --

```
1    A.  My competitors.  I'm sorry.

2    Q.  And have you ever shown up since the ban -- just call it

3    the ban, to mark the calendar.  Since the ban, have you

4    shown up for events and asked to be admitted?

5    A.  Every single time, sir.

6    Q.  Even when your RSVP isn't accepted?

7    A.  Yes, sir.

8    Q.  And what have you been told?

9    A.  "No."

10   Q.  You've been told that by the White House staffers?

11   A.  Correct.

12   Q.  Have you been given a reason?

13   A.  No, sir.

14   Q.  Have you ever been given a reason why others were

15   allowed in and you weren't?

16   A.  No, sir.

17           THE COURT:  Can you just explain that process?

18   What's the RSVP?

19           THE WITNESS:  Yes, sir.  So the night before, the

20   White House will put out a daily schedule for the next day's

21   events.  And if there's an east room event, they'll put an

22   RSVP link on there and they'll say, "Please RSVP by this

23   time."

24           So AP photographers will -- we will RSVP for

25   tomorrow's event.
```

Vucci - REDIRECT - By Mr. Tobin

1              And then you'll get an email back from the White

2      House saying whether or not you're approved or denied or,

3      you know, logistics of a call time -- what time to show up.

4      So we always fill out the RSVPs and then we will also show

5      up if we're -- if we don't hear back on the RSVP, we will

6      also show up to the meeting point.  So then the White House

7      will tell us face to face that we have been denied access.

8      BY MR. TOBIN:

9      Q.  And when you say "the meeting point," what do you mean

10     by that?

11     A.  Yes, sir.  So if you go into the east room, you meet at,

12     like, the palm room doors, it's called.  And that's where

13     we'll be escorted through the White House up the stairs and

14     to the east room.  So the meeting point will be at the palm

15     room doors.

16     Q.  That's where journalists collect when they're going to

17     an event?

18     A.  Yes, sir.  So if it's a 10:30 call time, meeting time,

19     we'll be there at, you know, 10:15, waiting.  The White

20     House will show up and they'll escort everyone upstairs.

21     And at that point we'll ask, Hey, can we cover this event

22     today?  They'll say no.  And we'll move on.

23     Q.  Do you know whether the capacity of the east room for

24     press people was filled to capacity for the events that you

25     were excluded from that you showed up for?

1    A.  I'm not sure, sir.

2    Q.  That's fair.

3    A.  It's a big room.

4         THE COURT:  And so -- thanks for explaining how it

5    works for the east room.

6         How about for the Oval Office?

7         THE WITNESS:  So the Oval Office, it would be --

8    the pool would gather at the briefing room doors, we call

9    it.  And so if they say the White House -- that the in-town

10   pool is going to meet at the briefing room doors at 10:00

11   a.m., I would show up at 10:00 a.m., hoping to get into the

12   event that day in the Oval.  And then they would deny me

13   access.

14        THE COURT:  So that process, has that been the

15   same process both this year and last year?

16        THE WITNESS:  Yes, sir.  It's the same process.

17   It's just -- and it's mostly the same organizations.  It's

18   just that the AP has been removed.

19        So -- and not only that, sir, but, like, what I

20   talked about earlier, like how we line up, so even -- it's

21   kind of like school.  You know, so we'll go to the doors

22   and --

23        THE COURT:  You're the line leader?

24        THE WITNESS:  Yes, sir.  I'm the line leader.  But

25   there is an order in which we line up.  So once we go to the

1    doors, we'll be in that order before the White -- the people

2    from the White House will show up to escort us in.  But

3    we're ready to go in that order.

4    BY MR. TOBIN:

5    Q.  Just a couple of quick questions.

6            The photographs that my friend Mr. Hudak showed to

7    you from the tarmac, those all appear to me to be the

8    president's arrival at a certain location.  Did you note

9    that?

10   A.  Yes, sir.  That's what it looked like to me.

11   Q.  Do you know if -- are departures -- when the president

12   leaves, say, from Andrews Air Force Base or from West Palm

13   Beach Airport, are those pool events as well?

14   A.  The Air Force One pool would cover those.

15   Q.  And have you been -- has the AP had an opportunity to

16   cover any of the president's departures since the ban began?

17   A.  I don't believe so, sir.

18   Q.  Has the AP asked and been denied the opportunity to

19   cover them?

20   A.  I'm sure anytime that a signup went out to cover

21   anything with the president of the United States, the AP

22   begged to be included.

23   Q.  And was not included, to the best of your knowledge, in

24   the --

25   A.  Correct.

```
 1    Q.  -- departures?

 2    A.  Correct.

 3    Q.  I'll also remind you that Mr. Hudak showed you an NPR

 4    website cover that had an AP photograph on it.  You saw

 5    that?

 6    A.  Yes, sir.

 7    Q.  And you expressed your views about --

 8    A.  Well, seeing an AP photo from that day on one website

 9    doesn't make me feel better about the play.  So it was -- it

10    was a slaughter.

11    Q.  Understood.

12              Just to focus on NPR for a minute, though, do you

13    know if AP -- certain AP subscribers have any obligations to

14    use only AP photographs and not anyone else's?

15    A.  I'm not sure, sir.  I don't know about that.  I wish I

16    could help you.  I'm sorry.

17    Q.  No.  That's fine.

18              THE COURT:  Do you know the relationship between

19    AP and AFP?

20              THE WITNESS:  They're a competing wire service,

21    sir.

22              THE COURT:  Okay.  There's no relationship?

23              THE WITNESS:  Yes, sir.

24              THE COURT:  Okay.

25              THE WITNESS:  No relationship.
```

1    BY MR. TOBIN:

2    Q.  For the east room events where AP is relying on others'

3    photographs, do you have any idea who else is in the room

4    who's not pictured in a photograph?

5    A.  I don't, sir.  And that's part of the problem with this

6    whole thing, is that we're relying on, you know, others to

7    provide us images.  But those -- and they're graciously

8    doing it.

9         But the issue is, like we talked about earlier,

10   like Zeke might give me a heads-up on a story that we're

11   working on.  Well, you know, my competitors that are

12   graciously providing these images, they don't know what

13   we're doing, what we are working on.  So I might have a big

14   story coming up about someone that's going to be in this

15   east room event.  You know, they're not going to know.

16        So it's -- you know, there's a whole rack of

17   issues.  But that's one of them.  The speed, again, is the

18   most important thing.  And -- it's a real lag time.

19   Q.  It's not just about the photograph, the thing itself.

20   It's about the opportunity to be there, to decide what else

21   you want to photograph?

22   A.  100 percent.  Yes, sir.  Absolutely.  Being in that room

23   is vitally important.

24   Q.  I'm going to ask Mr. Mishkin to display an image.  I'm

25   going to ask you just a couple of questions about it.

1          Do you see an image in front of you on the --

2     A.  Yes, sir.  It's an image of a bunch of front pages.

3     Q.  Okay.

4              MR. TOBIN:  For the Court's reference, this is

5     contained in Mr. Elswick's declaration, Paragraph 16.

6     BY MR. TOBIN:

7     Q.  Can you tell the Court, what is the image that we're

8     looking at?

9     A.  It's an Oval Office meeting with Zelensky and President

10    Trump, a wild Oval Office meeting.

11    Q.  All right.  And these -- it's displayed on a variety of

12    media on the image you're looking at.  Just -- can you put

13    words to what that media is that we're looking at?

14    A.  As far as -- I'm sorry.  Say that one more time, sir.

15    Q.  You talked about the photograph.  But there's more here

16    than the photograph.  It's a photograph displayed in certain

17    places.

18    A.  Yeah.

19    Q.  What is it?

20    A.  Yes.  So I'm looking at front pages from -- it looks

21    like all over the country, with this meeting between

22    Zelensky and --

23              THE COURT:  All over the world, right?  All over

24    the world?

25              THE WITNESS:  I'm sorry.  Yes, sir.  All over the

Vucci - REDIRECT - By Mr. Tobin

JA225

1    world where -- between -- this meeting with Zelensky and

2    Trump.

3            And so when he showed us the photo from -- our

4    photo from that room -- I established that he's an amazing

5    journalist.  But you see some of the photos in here and the

6    moments that we have here with -- if you look at this

7    *New York Post* cover here, with -- that moment with Trump

8    pointing and kind of like -- not yelling, but, like, really

9    adamant about it, and Zelensky has this -- I mean, as a

10   photographer, that's what I need.  That's what I'm looking

11   for.  And if I don't have that, then we're going to take a

12   big loss.

13   BY MR. TOBIN:

14   Q.  And on that image that you referred to on *The New York*

15   *Post*, is that an Associated Press photograph?

16   A.  I don't believe so.  No, sir.

17   Q.  Looking at this page and being familiar with the events

18   that day, does it appear to you that any of these are

19   Associated Press photographs?

20   A.  No.  No, sir.  Not that -- no, sir.  I don't see any of

21   ours.

22   Q.  Does this represent a good visual depiction of the loss

23   of opportunity that the AP has been suffering by being

24   excluded from -- photographers being excluded from events in

25   the Oval Office?

1    A.  Sir, I would argue it's bigger than this.  I mean, these

2    are front pages, and that's important.  But I mean, it was

3    also the websites, the phone apps.  Everything.  We got

4    absolutely -- we're getting destroyed as far as the play

5    goes.

6    Q.  Okay.  And Mr. Hudak asked you about analytics and, you

7    know, quantitative analyses.  And you were candid; you don't

8    have that.  How do you know that the AP lost all the

9    opportunities that you're talking about, apart from this

10   visual that I'm showing you?

11   A.  I mean, it's the same way I know that the sky is blue.

12   It's what I do for a living.  You know, I can clearly see

13   it.

14   Q.  It's based on your 21 years as a professional

15   photographer for the AP?

16   A.  Yes, sir.

17            MR. TOBIN:  Your Honor, we have nothing further

18   for Mr. Vucci.

19            MR. HUDAK:  Your Honor, just a few followups,

20   based upon what Mr. Tobin said.  I'm sorry.  He introduced

21   something about the tarmac and issues that they haven't been

22   at the tarmac.

23            They've been at every tarmac even since March 1st.

24   He talked about --

25            THE COURT:  Mr. Hudak, we're not going to do

```
 1    re-redirect.

 2              MR. HUDAK:  Thank you, your Honor.

 3              THE COURT:  All right.  Let's take a ten-minute

 4    break.

 5              Thank you, sir, for your testimony.

 6              THE WITNESS:  Yes, sir.  I appreciate it.

 7              (Witness excused.)

 8              (Thereupon a recess was taken, after which the

 9    following proceedings were had:)

10              THE COURT:  All right.  Mr. Tobin.

11              MR. TOBIN:  Your Honor, the Plaintiff calls Zeke

12    Miller.  And Mr. Mishkin will question Mr. Miller.

13              THE COURT:  All right.  Thank you.  Mr. Mishkin.

14              THE COURTROOM DEPUTY:  Please raise your right

15    hand.

16              ZEKE MILLER, PLAINTIFF WITNESS, SWORN.

17              THE COURT:  Good morning, sir.

18              THE WITNESS:  Good morning.

19                       DIRECT EXAMINATION

20    BY MR. MISHKIN:

21    Q.  Good morning, Mr. Miller.

22    A.  Good morning.

23    Q.  What's your current job title?

24    A.  The chief White House correspondent for the Associated

25    Press.
```

Miller - DIRECT - By Mr. Mishkin

```
 1              THE COURT REPORTER:  Sorry.  Could I get the
 2      spelling of the witness's name for the record?
 3      BY MR. MISHKIN:
 4      Q.  Would you mind giving and spelling your full name for
 5      the record, please.
 6      A.  Sure.  Zeke, Z-E-K-E, Miller, M-I-L-L-E-R.
 7      Q.  Thank you.
 8              How long have you worked for the Associated Press?
 9      A.  About seven and a half years.
10      Q.  And how many White House reporters are working for the
11      AP at any given time?
12      A.  Our team is about seven or eight people and then, on any
13      given day, probably two to five of us are at the White
14      House, depending on the schedule.
15      Q.  You've submitted some declarations in connection with
16      this case, haven't you?
17      A.  Yes.
18      Q.  And have you read the pleadings and the filings in the
19      case?
20      A.  I have.
21      Q.  And are you aware that the Court provided the parties
22      with some questions that it was hoping we would answer today
23      at this hearing?
24      A.  Yes, I am.
25      Q.  And are you prepared to answer the questions that are
```

1    directed at AP?

2    A.   Absolutely.

3    Q.   Okay.  So focusing for now on the period before February

4    11, 2025, how often would you report on presidential events

5    and activities?

6    A.   That was our daily responsibility.  So any day I was at

7    the White House or working, essentially, at something I was

8    doing, it was going to be relating to the president, pretty

9    much.

10   Q.   How would you know on any given day what events you'd be

11   covering?

12   A.   The White House publishes a daily schedule -- I believe

13   Evan referred to it -- that usually goes out the night

14   before or sometimes early in the morning of a given day that

15   details that day's events.  Before you go on a trip, you may

16   get a more comprehensive trip schedule.  And then other

17   events that are sort of on the calendar that you know are

18   coming up.

19   Q.   Thanks.

20        Would you mind taking a look at the -- at what's

21   been premarked as AP Exhibit 7?

22   A.   Yes.

23   Q.   Is that the type of daily guidance that you were

24   referring to?

25   A.   Yes.  This is an example of the daily -- various daily

1    emails that we get.

2    Q.  And these are records that you're familiar with and you

3    receive on a regular basis?

4    A.  Yes.

5         MR. MISHKIN:  Your Honor, I'd move to admit AP

6    Exhibit 7 into evidence.

7         THE COURT:  Any objection?

8         MR. HUDAK:  No, your Honor.

9         THE COURT:  Without objection, 7 is in.

10        (Whereupon, Plaintiff's Exhibit No. 7 was entered

11   into evidence.)

12   BY MR. MISHKIN:

13   Q.  So if you look, the first day is February 24, 2025,

14   which is the last day operating under the old pool system.

15        There are some phrases here, when you look at the

16   calendar, that goes on from Page 1 to Page 2 -- I see the

17   phrase "closed press, open press, in-house pool and

18   pre-credentialed media."  I'd like briefly to just nail down

19   what each of those terms mean.

20        What is closed press?

21   A.  Closed press is an event that the president holds that

22   is generally not -- not intended to be open to the press.

23   Sometimes it's ultimately -- that designation changes.  It

24   can also be something like the president's intelligence

25   briefing which stays closed press, which is a meeting that

1    they are advising us that is happening, they want us to know

2    about, but not necessarily invite us into.

3              THE COURT REPORTER:  Sir, I'm going to ask you to

4    speak more slowly, please.

5              THE WITNESS:  Sure.

6    BY MR. MISHKIN:

7    Q.  What does open press mean?

8    A.  Open press means an event at the White House complex or

9    somewhere else that is open to anybody.

10   Q.  And what does pre-credentialed media mean?

11   A.  That's the White House soliciting RSVPs for an event, a

12   large event, where they can accommodate a large number of

13   journalists.  In this case, it was the east room for a press

14   conference.  So -- east room for a press conference.

15   Q.  And how --

16             MR. MISHKIN:  I'm sorry, your Honor.

17             THE COURT:  I guess, would pre-credentialed --

18   who's eligible for that pre-credentialed media?

19             THE WITNESS:  So an email like this goes out to,

20   in my experience, you know, thousands and thousands of

21   people around the White House's email distribution lists.

22             THE COURT:  So is that more than the hard pass

23   holders?

24             THE WITNESS:  I believe so.  I don't have the hard

25   pass list, but I just know, from our own shop, the number of

1    people who get White House emails who are not White House

2    hard pass members who could plausibly RSVP.  It's a vastly

3    different universe.

4              THE COURT:  Okay.

5              MR. MISHKIN:  Thank you, your Honor.

6    BY MR. MISHKIN:

7    Q.  And just to round it out, the in-house pool -- we heard

8    Mr. Vucci testify about the pool.  Is that what he was

9    testifying about, of the group of 13 or larger --

10   A.  Yeah.  In-house pool generally refers to a larger group,

11   roughly 21 journalists that cover -- that's a formulation

12   that was built for sort of intermediate spaces in the White

13   House, including the Oval Office, state dining room,

14   diplomatic reception room.  Basically, any event the

15   president did on the complex, sort of the smaller pool, the

16   13-person pool, is really built off of the limitations and

17   space constraints of Air Force One where there are 13 seats

18   in that press cabin for journalists.  And the 14th seat is

19   for a White House press wrangler.  But it's 13 for

20   journalists.

21   Q.  So you were saying pool events is not synonymous with

22   Oval Office events.  There could be an east room event that

23   is a pool event -- or an event in the east room that is open

24   only to the pool.  Am I understanding that right?

25   A.  Yes.  It's not -- there can be the president is hosting

```
1    a meeting of the nation's governors in the east room, and it

2    is only open to the pool, or the president is hosting a

3    state dinner in the east room and only the pool is brought

4    in.  And usually the pool that's brought in is that in-house

5    pool configuration.

6    Q.  Thank you.

7          So let's focus for now on pool events.  Prior to

8    February 11, how did AP participate in the pool?

9    A.  The AP was sort of a foundational member of the pool.

10   AP journalists were there for texts and for photos at every

11   pool opportunity, there every day physically at the White

12   House, when the president traveled, from call time, as Evan

13   described, to the lid.

14         THE COURT REPORTER:  Did you say "lid"?

15         THE WITNESS:  Yes, like a pot lid, L-I-D.  And

16   that's what we refer to -- it's sort of a term of art for

17   there's nothing more happening today.  And, on a trip,

18   that's sort of when you get back to the hotel or you drop

19   the president back off at the White House at the end of the

20   day.

21   BY MR. MISHKIN:

22   Q.  Thank you.

23         So prior to February 11, who selected the

24   membership of the pool?

25   A.  The pool was run by the White House Correspondents'
```

1    Association.

2    Q.  And did they pick the AP for two spots in the pool

3    because they really like the AP?

4    A.  No.  They granted AP that position of responsibility

5    given its reach.  You know, we talk a lot about the outlets

6    who are in the Washington press corps.  AP is there -- sort

7    of a pool within a pool, given its membership and an

8    audience that would reach to hundreds, thousands of outlets

9    across the country and around the world that don't have a

10    presence in Washington or the staffing or the budgetary

11    constraints to allow them to cover the president to serve in

12    the other pools.  So the AP is sort of there as their eyes

13    and ears on their behalf and, by extension, then, on behalf

14    of their readers, viewers, listeners.

15    Q.  Was the AP just sharing this information freely as a

16    public service?

17    A.  We'd be sharing it, distributing it -- distributing it,

18    sorry, with our clients, members and subscribers, whether

19    they'd be, you know, the *Des Moines Register* or a local news

20    station that takes a headline that we write and sort of

21    reads it out on air as breaking news, a radio station doing

22    the same thing, or a news website around the world.  So they

23    would all be -- you know, they are all members, subscribers,

24    and they get what we write and report.

25    Q.  So does any member of the -- and I'll flag this --

Miller - DIRECT - By Mr. Mishkin

```
 1              MR. MISHKIN:  This is a question directed from

 2    your Honor.

 3    BY MR. MISHKIN:

 4    Q.  Would any member of the press pool routinely share --

 5    freely share their work?  And was -- was that the AP who did

 6    so?

 7    A.  So the only -- every pool rotation -- so if we just go

 8    off the 13-member Air Force One pool, because that's the

 9    smallest configuration that's generally used -- three of

10    those slots are for television -- or for one television

11    outlet per day, and it rotates among the five major

12    television [indiscernible] --

13              THE COURT REPORTER:  I'm sorry.  Could you repeat

14    the last phrase?

15              THE WITNESS:  Three of those seats on -- in that

16    13-person rotation are given to one television outlet.  And

17    so -- today is -- on the 24th, it is Fox.  So Fox would have

18    a camera person, a sound person and a producer or

19    correspondent there that day.  And they would share what

20    they news-gather with everybody else in that television

21    pool, so the other four networks -- so that would be CBS,

22    CNN, NBC and ABC -- but to nobody else.  It would go to

23    their licensees beyond that universe.  It would be the same

24    for the radio pool.

25              Within the print pool, it's a slightly different
```

1    situation.  They do share their print text reports with the

2    other members of the print rotations.  In the pre-February

3    25th universe, the White House Correspondents' Association,

4    as part of its policies and procedures, had mandated that

5    those print pool reports be shared publicly and would be

6    emailed out publicly to everyone as a public service.  There

7    would be a delay in that just because it's a manual process

8    where they are -- how they're distributed.  It's not

9    instantaneous.

10    BY MR. MISHKIN:

11    Q.  Can I -- sorry to interrupt, but can I ask you how long

12    a delay we're talking?

13    A.  Well, it would depend on the event.  But if there are --

14    if there's a busy news event, the time it takes for those

15    pool reports to go out to the broader list that is

16    administered by the White House -- it goes out like a press

17    release.  You know, sometimes -- some of those delays have

18    been -- you know, have taken as long as hours.

19    Q.  Okay.  So -- and again, just to be clear, AP does not

20    freely share its -- when it was in the pool, AP did not

21    freely share its text reporting with other members of the

22    pool.  Only if those members of the pool happened to be AP

23    customers?

24    A.  Which was the vast majority of -- not just outlets in

25    the pool, but news outlets in the country and around the

Miller - DIRECT - By Mr. Mishkin

JA237

1    world.  In fact, those outlets relied on us to get their

2    initial stories out if breaking news was happening.  Even if

3    they were in the pool, they would often rely on our coverage

4    to determine if they needed to write something themselves.

5            In this era of, you know, contracting media

6    business, you know, a news organization might only have one

7    person to cover all of Washington, or maybe nobody to cover

8    Washington.  So they would rely on us to fill that gap and

9    they can figure out how best to allocate their own

10   resources.

11   Q.  Let's --

12           THE COURT:  I want to make sure I understand this.

13           MR. MISHKIN:  Please.

14           THE COURT:  So you said one television outlet

15   would share among the other television outlets.  Correct?

16           THE WITNESS:  Yes.

17           THE COURT:  And one print reporter would share

18   among the other print reporters; is that correct?  Go

19   through with me again how the sharing is.

20           THE WITNESS:  Yeah.  They would share with the

21   other print reporters.  And then that print report would

22   also be shared to the broader public as sort of a public

23   record of the president's activities.

24           It usually gets distributed by the White House, by

25   the press wranglers who are the press assistants at the

1    White House.

2         And just -- just to be very careful, in the Air

3    Force One travel pool, it came up in some of the

4    declarations that the WHC seat was a second print person.

5    So at times, depending on the configuration of the pool,

6    there might be two print people distributing all of their

7    reporting.  But it was -- they were the only -- they

8    produced the only work product that was freely disseminated

9    to anyone outside of those who were participating in the

10   pool who are footing the expense and -- in both time and

11   money of contributing to the pool.

12        THE COURT:  And to be clear, you are not a print

13   reporter?

14        THE WITNESS:  I write text, but I'm a wire service

15   reporter.

16        THE COURT:  Okay.  And so under the old regime,

17   there was no requirement for you to share with anyone.  Is

18   that correct?

19        THE WITNESS:  Outside of our distributing to our

20   licensing customer/subscriber -- that's what I did.  I

21   distributed to our clients and members and customers.

22        THE COURT:  Okay.  Thank you.

23   BY MR. MISHKIN:

24   Q.  And just to button that up, under the old system, the

25   other wire service reporters were not sharing with you -- I

1     suppose if AP happened to be a customer of another wire

2     service, they might, you know, receive their reporting, but

3     otherwise it's not -- the other wire service reporters

4     weren't sharing.  Is that right?

5     A.   Exactly.  My understanding is some of them are customers

6     of the AP and subscribed to the AP.  But we were

7     competitors.

8     Q.   So I want to talk physically about how you reported the

9     news when you were in -- participating in the pool.  And

10    again, I'd sort of like to ask a question that your Honor

11    posed to Mr. Vucci, which is, you know, I think we've heard

12    about how quickly -- how, in real time, AP photographers

13    could get their photography out on the wire.

14          How quickly, when you were in the pool, could you

15    be reporting the news out to the public?

16    A.   In near real time.  I mean, in some cases, it's really

17    the speed of electrons.  I technically have the ability to

18    direct-file to the wire from my phone.  It's not something I

19    use.  We like to have a couple of eyes on something just to

20    be absolutely safe.

21          But usually -- I mentioned we have seven or eight

22    people on my team.  We have two White House editors.  At any

23    given event, there are three or four of us watching; we're

24    communicating in real time in Slack, which is our

25    messaging -- in-house messaging, you know, provider.  And we

1     are having a running conversation.  They're asking me

2     questions.  I'm reporting on what I'm seeing.

3          I will type out a proposed news alert, and then my

4     editor may grab that verbatim and plug it into our CMS and

5     hit "publish" on that quickly.  It could be -- you know, I

6     am regularly in events and seeing, you know, a push alert

7     from our digital team of, you know, the headline I had

8     written minutes before while the event is still going on.

9          THE COURT:  So utilizing my rudimentary

10    understanding of how this works, you know, I'll see a news

11    alert, quite possibly from you, on my iPhone.  I hit it and

12    that brings up a story, though.  Right?  Like, that --

13    you're not doing the story on your iPhone in real time?

14          THE WITNESS:  Hopefully -- sometimes -- if it's

15    truly a breaking news situation, you actually might not see

16    a story, depending on how quickly you click.

17          Our goal is to get -- is to follow up a news

18    alert, which is limited to 120 characters; that's sort of

19    the -- that product, and that's a major news event -- is to

20    follow that up within three to five minutes with some form

21    of sort of -- of the beginnings of a story.  We call it a

22    fast file.  Roughly 120 words with, you know -- if we have

23    nothing else on the wire.  If we have an existing story for

24    an event that we're anticipating and then we are updating

25    it, we can -- it might link back to that older story, and

1    then we will -- we call it a write-through to that story and

2    update it.  And we may do dozens of write-throughs on a

3    story on a given day.

4    BY MR. MISHKIN:

5    Q.  Can I follow up on the judge's question?

6          In that process -- you're in the room.  You are

7    communicating live with your colleagues at the AP.  Your

8    text reporting may be going out live, or functionally live.

9    Your colleague, Mr. Vucci, might be in the room.  He's

10   taking photographs.  Those photographs, as he said, are

11   transmitting live.  At what point do they get wedded

12   together?

13   A.  They get wedded together by our editors in our bureau

14   who will match that breaking news story with a photo.  They

15   also have the ability to -- if we have a story out, to

16   attach new photos on it while one of my colleagues is adding

17   the latest quotes in.  You know, it's an iterative process.

18   So we might start off with 120 characters and one photo --

19   sorry; 120 characters and no photo -- then 100 words and one

20   photo, and then 300 words and, you know, five photos, and

21   then building up to a fuller story.  And that will be what

22   you might see in your newspaper that day, the next morning

23   or, you know, somewhere -- in some other format later that

24   day.  But it's -- you know, at any given point, it's

25   designed to be utilized by a different media provider, you

1    know, at that very instant.

2    Q.  So when you were in these Oval Office events -- well,

3    when you were in pool events -- and let's focus for a second

4    on Oval Office events -- did the president always take

5    questions?

6    A.  No.  It's purely at the discretion of the president.  We

7    may ask questions, depending on the event and the tone of

8    the event.  There are certainly events where we might not

9    necessarily ask questions, you know, but it's purely at the

10   discretion of the president whether or not to take them or

11   not.

12   Q.  And are there pool events where you're not -- you are

13   purely observing what's happening in the room?  You're not

14   interacting with, you know, the officials and guests who are

15   in the room?

16   A.  Very, very many of them.  We may be, you know, 20, 30

17   yards from the president, not -- you know, plausibly in

18   shouting distance.  I'm not the loudest person.  But, you

19   know, you would have to -- it's not conducive to an

20   interview.

21        You would -- you know, at most, somebody can hear

22   a word, and it's analogous to -- you might be able to hear a

23   word, but you can't have sort of a substantive conversation

24   like you would in an interview.  It's -- you're at great

25   distance.  It would be like me sitting here to the folks

1    sitting out there in the gallery, you know.  They're the

2    attendees at the event.  I'm just there to witness what is

3    said and what the reaction is, what else is happening in the

4    room.

5    Q.  Have you conducted interviews of presidents or other

6    sort of senior government officials?

7    A.  Yes.

8    Q.  I want to get back to a question the judge asked very

9    early in the hearing, which is, can you illustrate the

10    difference between an interview and participating in a pool

11    event?

12    A.  Yes.  An interview is one on one or a small group on --

13    the president and maybe a small group of advisors.  When I

14    said -- during President Trump's first term, he did an

15    interview with myself and two other Associated Press

16    journalists.  We had a photographer in the room.  It was

17    *Time Magazine* before that.  We did a joint interview with

18    the president.  It was myself and two of my colleagues.  And

19    then we had an on-the-record dinner with the president

20    that -- that he invited the vice president to and some other

21    folks to.  And so it was a smaller group setting, you know,

22    in the Oval Office or the blue room or somewhere else.  But

23    it was exclusive.  We determined when it ran.  We had

24    control over how it was -- you know, we decided it's going

25    to run on Tuesday; here's what the framing was going to be.

Miller - DIRECT - By Mr. Mishkin

JA244

1          So there's not necessarily the sense of

2     competitive pressure that you get from a pool event where,

3     you know, the president is having an event; he's doing

4     something; we are there to see him sign a bill, executive

5     order, meet with a foreign leader.  We're there to witness

6     it.  You know, it's possible he may take questions.  He may

7     not.  But that meeting was going to happen whether or not we

8     were there.  The interview, you know, was with myself or one

9     of my colleagues.

10    Q.  And when you're at a pool event or a larger event, does

11    the White House have its own content creators there?

12    A.  Oh, absolutely.  In addition to the press pool, there is

13    what's known as the White House communications agency.  It's

14    a military service -- they're service members.  They provide

15    a camera crew that documents everything the president does.

16    They travel with us on Air Force One.  They're at the White

17    House, around the world.  There are White House

18    stenographers who provide a true written record of

19    everything the president says.  They're in the pool sprays

20    with us in the Oval Office.

21               THE COURT REPORTER:  Sprays?

22               THE WITNESS:  Sprays.  It's -- sorry -- a term of

23    art.

24               And then they also have official photographers and

25    videographers and social media folks who are, you know,

Miller - DIRECT - By Mr. Mishkin

JA245

1    taking photos, videos and vertical video for, you know, X or

2    whatever platform that they can push out in real time.  And

3    they're in some ways doing that from the same Oval Office

4    events next to sort of bona fide journalists.

5    BY MR. MISHKIN:

6    Q.  And the White House has editorial control, so to speak,

7    of that content from the camera, the stenographer, the

8    video, the social media that's, you know -- in the White

9    House communications office.  Is that correct?

10   A.  Yes.  That's not journalism.  That's the White House's

11   media.

12   Q.  Okay.  Thank you.

13            So when you were reporting on a pool event -- we

14   heard from Mr. Vucci that he was sometimes in live

15   communication with his editors.  Were you in live

16   communication with your colleagues?

17   A.  At pretty much every event, there's -- at times there's

18   signal issues or connectivity issues.  But, you know, the

19   vast, vast, vast majority of the time, it's a running

20   conversation where I'm sending them notes or feeds, or I'm

21   on the receiving end of notes and feeds from my colleagues.

22            I'm thinking of, you know, when President Trump in

23   his first term went -- met with Kim Jong Un at the DMZ and

24   at one point briefly crossed into North Korea.  And we sort

25   of knew that was a possibility, and so we had had a

Miller - DIRECT - By Mr. Mishkin

JA246

1    conversation before, like, that's an alert-worthy event.  So

2    we alerted the -- the meeting of these two leaders.  We

3    alerted the president stepping into North Korean territory,

4    the first American leader to do so.  We alerted when he was

5    safely back in the south.  And then, additionally, we

6    alerted the substantive discussions of that meeting.

7              So -- and that was a running conversation between

8    myself, who was in our workspace on a trip in South Korea,

9    and one of my colleagues, who was physically on the ground

10   in the DMZ crossing the border back and forth.

11   Q.  So the pool report -- the pool wire service reporter

12   who's participating in these events might be in

13   communication with AP colleagues all around the world in

14   real time as the reporting is happening?

15   A.  That's the strength and -- and expertise that he brings

16   to it is that our colleagues in Europe or Ukraine or Asia or

17   anywhere else around the world can join that conversation

18   and lend their expertise in real time.  So I can be in the

19   Oval Office and they can point out something interesting to

20   me or respond in real time to an announcement or "This is

21   important" or "This is significant," and help inform my

22   reporting, and that of my colleagues as well.

23   Q.  You mentioned sending alerts when President Trump

24   entered North Korea.  Who decides what's worthy of an alert?

25   A.  That's our own editorial judgment.  It's AP reporters

1    and editors who decide that.

2    Q.  The White House doesn't tell you this is alert-worthy or

3    not alert-worthy?

4    A.  Absolutely not.

5    Q.  And do all the wire services agree on what's worthy of

6    an alert and what's not?

7    A.  No.  We all have different standards and different

8    traditions and focus areas.  You know, for instance,

9    Bloomberg is well-established as sort of more focused on the

10   financial news services -- financial news wires -- sorry;

11   the financial industry -- and they may alert some things in

12   that space a little bit more freely than we might with an

13   audience that's more -- geared more to sort of the general

14   interest, you know, domestic and global public.

15   Q.  So again, let's focus just for one or two more questions

16   about before February 11.  When you were participating in a

17   pool event, who decided what details you should notice and

18   what you should write about and what was worthy of reporting

19   on?

20   A.  The Associated Press did.

21   Q.  And during those events -- can you recall any times

22   where you observed something by being in the room that you

23   might not have seen if you were, for instance, just seeing

24   it on a video feed?

25   A.  We talked about -- a few minutes ago about a governors'

Miller - DIRECT - By Mr. Mishkin

JA248

1        meeting, a hypothetical governors' meetings in the east

2        room.  And there was one in early 2022, like -- kind of the

3        height of one of -- of the Omicron wave of COVID-19.  And

4        then-President Biden was hosting the National Governors

5        Association in the east room for a pool event.  It was a big

6        rectangular table with, you know, 30 or 40 governors who

7        were in attendance sitting around there, and it was open to

8        just the pool, the in-house pool, I believe.

9             And I remember the press was escorted into the

10        room a few minutes before the president got there.  And I

11        remember noticing that the president's seat was the -- which

12        was doubly distant from all the other governors from each

13        other was the only one that had a glass of water on it and

14        that White House staff were going around encouraging

15        everybody to upgrade their masks from a surgical mask to an

16        N95 mask and that, when the president was in the room, he

17        was the only one permitted to remove his mask while he was

18        speaking.

19             We used that -- I mention that -- sort of going

20        into that detail because it became a story not that day, but

21        a day or two later about the extraordinary lengths that that

22        White House was going to to protect then-President Biden, at

23        that height of that public health emergency, from

24        contracting COVID-19.  And --

25        Q.  If I might, wasn't there a video panning around the

1    room, seeing all the people, so that you could have seen

2    there's a glass of water only in front of one person?

3    A.  Generally not.  In my experience, the television pool

4    cameras and the other cameras in the room are pretty solidly

5    trained on the president.  They may pan around if he's

6    talking to somebody else and there may be a separate cuts

7    camera, but they don't show the expanse of the space.  And

8    to my knowledge, no other reporter in the room had noticed

9    that detail in that moment.  It didn't make it into a pool

10    report or anything else.  We saved that in our notebook and

11    we used it a couple of days later for -- to inform our

12    reporting.

13    Q.  So would you say you agree with Mr. Vucci that when

14    you're in the room, you're looking at who's in the corner,

15    who's behind you, you know, the other people in the room

16    other than the president who might -- the people who might

17    not be on the camera?

18    A.  Absolutely.

19    Q.  So let's turn to February 11.  You're walking into the

20    White House for work.  Can you briefly tell me what happened

21    that morning?

22    A.  I was summoned to Press Secretary Karoline Leavitt's

23    office, which is located in -- so sort of the upper press

24    from the west wing.  It's the press suite up in one corner

25    of the west wing.  It's a three- or four-minute

1    conversation.  And she said she was just the messenger, but

2    the president wasn't happy about the Associated Press's

3    editorial decisions around the Gulf of Mexico, which he had

4    renamed the Gulf of America, that he had decided that we

5    would not be permitted into the Oval Office and that she

6    said that there was an event that day at around 3:00 for him

7    to sign executive orders and that we would not be permitted

8    into the Oval Office until we changed our policy, and said

9    that we should act quickly if we wanted to get into that

10   event at 3:00.

11   Q.  She directly said that the condition of getting into

12   that event was changing your editorial policy?

13   A.  Yes.

14   Q.  Did she hand you any information in writing?

15   A.  No.

16   Q.  Did you understand at the time the full extent of what

17   AP reporters would come to be excluded from?

18   A.  At that time, I did not.

19   Q.  What -- how did that scope of exclusion change?

20   A.  Immediately, I knew that 3:00 event on that -- on the

21   11th was at risk.  I didn't know that that later event that

22   the president added that was not in the Oval Office -- that

23   was in the diplomatic reception room -- that we would be

24   barred from -- we would be barred from for text.

25              I also didn't conceive at the time that we would

Miller - DIRECT - By Mr. Mishkin

JA251

1    be banned from press conferences in the east room, from

2    tarmacs in, you know, West Palm Beach, that it would extend

3    from our text reporters to our photographers.  So at the

4    time, I could not have conceived of it.

5    Q.  I mean, you're the chief White House correspondent.  As

6    the scope of the exclusion has spread, has the White House

7    updated you?  Now you're no longer -- you know, you're not

8    going to be getting into pre-credentialed events anymore, or

9    now you're getting back into pre-credentialed events?  Has

10   that information been communicated to you?

11   A.  Nothing formally or directed towards me or to the

12   Associated Press.  The only -- so outside of the written

13   correspondence that I'm aware of between our executive

14   editor and the White House chief of staff.  And that is in

15   the record.

16         And then the public tweet from the deputy chief of

17   staff, Taylor Budowich, on the 14th, which is how I, and I

18   believe everyone, learned that the White House was extending

19   the ban from AP text reporters to AP photographers, and not

20   just at the White House, but also, later that day, when the

21   president was set to travel on Air Force One.

22   Q.  So we've seen from Mr. Vucci's examination that the AP

23   is continuing to report on presidential events after

24   February 11.  How are you still reporting on the White House

25   and other presidential events?

Miller - DIRECT - By Mr. Mishkin

JA252

1    A.  We're reporting in delayed fashion.  It is not at the

2    same speed we would be able to accomplish that reporting as

3    when we were there in person.  It's also not necessarily the

4    same level of completeness that it would have been had we

5    been there in person.  We don't -- in some cases, we don't

6    know what we're not there to see.  But we're able to write

7    and report based off of secondhand observations, whether

8    they be from the pool report, the narrow lens of a

9    television camera what somebody is saying.  We capture some

10    of that at delay.

11          The Oval Office often is not fed -- we call it fed

12    live to the world.  They -- as Evan described, they play it

13    back after the event concludes most of the time.  Sometimes

14    that changes.

15          But even when the events are live, we're limited

16    by what the camera is focused on, and we can't swivel our

17    heads, like we would if we were there in person.  We're

18    relying on print pool reports that are delayed, other

19    communications, the AI transcripts and things like that that

20    are not nearly as reliable as having a real, live human

21    being there who you can engage with and say, Is this what

22    the president just said?  Or, What's happening in that

23    corner?  Who else is in that room?  What else is happening

24    there?

25          We can't have that back-and-forth anymore.  And

Miller - DIRECT - By Mr. Mishkin

JA253

1    that's really impacted our ability to do our jobs.

2    Q.  Can you still ask your colleague, Mr. Vucci, Hey, I'm

3    going to be doing a feature on some White House aide in a

4    week; can you get a photograph of them for me?

5    A.  Certainly not with the same ease.  We don't see White

6    House officials.  We don't see the president nearly as much

7    as we did before this ban took effect.

8    Q.  So can you give me an example of reporting -- of your or

9    AP's reporting that's been delayed as a result of not being

10    in the room?

11    A.  I believe in early March, the president was -- there was

12    a -- was holding an Oval Office event where we knew he was

13    going to extend the deadline for when tariffs were going to

14    kick in on Canada -- sorry -- on Mexico.  And while the

15    event was taking place, the president, we now know, had

16    volunteered to reporters who were in the Oval Office as he

17    was signing this additional paperwork to effectuate the

18    delay that he was also delaying those tariffs on Canada as

19    well.

20            Our competitors, who were in the room, were able

21    to -- they were able to understand what was happening and

22    able to get that news out in, basically, real time.  The AP

23    being barred, at that point, for a few weeks, we were not

24    there.  We didn't see it.  It took us nearly 40 minutes, I

25    believe, until we were able to actually get that reporting

1    out.

2    Q.  Let me see if I can make that precise for you.  Can you

3    take out what's been premarked AP Exhibit 1 and AP Exhibit

4    2, please?

5    A.  Yes.

6    Q.  Do you recognize AP Exhibit 1?

7    A.  Yes.  It's an AP news alert.  It's just an example of

8    what an alert looks like.  That's the one from that event

9    after the -- that event had already concluded at the -- or

10    maybe towards the tail end of that event.  I can't remember

11    the exact timestamp, but it was well into that event when

12    the president signed the order delaying the tariffs on

13    Canada for a month.

14    Q.  And do you recognize AP Exhibit 2?

15    A.  I'm sorry.  I'll try to slow down.

16         Exhibit 2 is a screen grab, I believe, of a page

17    on X, the platform formerly known as Twitter, of an alert

18    filed by our competitors at Bloomberg:  The U.S. pauses

19    tariffs on Canada, Mexico USMCA trade until April 2nd.  And

20    that was filed at 2:48 p.m., is when that was on X.  And our

21    alert was not filed -- just doing the math on GMT, that

22    would be 3:27 p.m. Eastern time versus 2:48 p.m. Eastern

23    time by Bloomberg.

24    Q.  So you're behind your competitors now?

25    A.  Yes.  39 minutes.

1    Q.  Okay.  Why can't your customers just see the alert on

2    Bloomberg?  Aren't they getting both alerts?

3    A.  No.  I mean, in fact, you're only seeing this as a

4    printout on X because that Bloomberg News wire is not shared

5    widely outside of its own subscribers.  In that interim

6    period, they might have seen some social media posts, but

7    they wouldn't have had any original reporting to verify

8    that.  Many of our members, customers and subscribers only

9    subscribe to the AP.  They rely on us for the vast majority,

10   in some cases, of their primary-source news.

11        And so until we are able to verify it and

12   understand what the president said to a level that met our

13   standards -- you know, we understand that they were hurting,

14   but we were hurting.  We couldn't put it out on the wire

15   until we were able to verify it.

16   Q.  Sure.  So I want to turn to pre-credentialed events,

17   briefly.  And, you know, we can go past some of what

18   Mr. Vucci testified to about the RSVP process.

19        I want to talk about since the ban, has any AP

20   text reporter, AP White House text reporter, been able to

21   attend any east room or other pre-credentialed media events

22   in the White House?

23   A.  I mean, since February 11th, AP text reporters have been

24   excluded from every single -- AP White House text reporters

25   have been excluded from every single White House event other

1    than a handful of -- less -- fewer than a handful of West

2    Palm Beach tarmac arrivals.

3    Q.  You say tarmac arrivals.  Is that to distinguish from

4    tarmac departures?

5    A.  Yes.  Departures on the tarmac are generally open only

6    to the pool that will be with the president on Air Force

7    One.  So that shot of the president getting on Air Force One

8    is generally -- you know, from Palm Beach is open only to

9    those who -- the reporters that take a photo or a video of

10    the president boarding the plane from under the wing and

11    then board the plane themselves.

12    Q.  For some of those east room events where AP has not been

13    admitted, have you seen other journalists who didn't even

14    RSVP get permitted to attend?

15    A.  I'm aware of at least one where the journalist in

16    question mentioned it to me at the Indian -- when the

17    president hosted the Indian prime minister, when the AP text

18    was banned -- I believe it would have been the 13th of

19    February -- that -- I was turned away by a White House

20    staffer.

21            And the journalist said to me:  I didn't RSVP.  I

22    got in anyway.

23            I was turned -- I was personally turned away --

24            MR. HUDAK:  Your Honor, I would object.  This is

25    hearsay and inadmissible.  To the extent the Court is taking

Miller - DIRECT - By Mr. Mishkin

JA257

1    objections based upon the Rules of Evidence, this would be

2    hearsay.

3            MR. MISHKIN:  I think it's a present sense

4    impression being offered by the other journalist as to how

5    he was able to get into an event.

6            THE COURT:  I'm going to overrule the objection.

7            MR. MISHKIN:  Thank you, your Honor.

8            THE WITNESS:  I personally was turned away by the

9    White House staffer.  And then the other journalists

10   communicated with me that they were not -- they had not

11   RSVPed, they had forgotten to, and were subsequently allowed

12   into the event, and they communicated that to me.

13   BY MR. MISHKIN:

14   Q.  Thanks.

15           MR. MISHKIN:  And we're done with AP Exhibits 1

16   and 2, so I'd like to move them -- move their admission,

17   your Honor.

18           THE COURT:  Any objection to 1 and 2?

19           MR. HUDAK:  No objection.

20           THE COURT:  Without objection, 1 and 2 are in.

21           (Whereupon, Plaintiff's Exhibit Nos. 1 and 2 were

22   entered into evidence.)

23           MR. MISHKIN:  Thank you.

24   BY MR. MISHKIN:

25   Q.  Have you seen any east room events or pre-credentialed

Miller - DIRECT - By Mr. Mishkin

JA258

1    media events in the White House where AP journalists were

2    excluded and multiple journalists from other news

3    organizations were admitted?

4    A.  Yes.  It's fairly common practice.  You see those iconic

5    shots of news anchors or correspondents in the east room who

6    are speaking before the president held a press conference or

7    some other event, or after the event is over.  One of those

8    television outlets will then -- any individual -- one of

9    them will have multiple camera people, sound technicians,

10   producers, in that space in order to enable that to happen.

11           So many of them -- and then, in addition to that,

12   you know, you may have multiple -- if -- if Reuters was --

13   Reuters is in the photo pool.  And they might have a second

14   photographer in for an event, so they can have one person at

15   the back and one person on the side.

16           So there have been many instances where multiple

17   journalists from the same outlet were getting into these

18   events, and AP was not.

19   Q.  So there are instances where, say, Reuters might have

20   two photographers admitted, AP has zero photographers

21   admitted.  Is that correct?

22   A.  Certainly in that late February period.

23   Q.  Now, I understand -- and this is in answer to your

24   Honor's question -- there are some events where foreign

25   correspondents, foreign AP correspondents, were able to

1    attend these east room events.  Were they in your -- were

2    they able to adequately substitute for the AP White House

3    reporters in covering those events?

4    A.   They were not.  Evan got -- was able to speak

5    specifically to my colleague Mr. Chernov's work when

6    President Zelensky visited.  We flew in Sylvie Corbet from

7    our France -- our Paris bureau when President Macron visited

8    and Jill Lawless from our London bureau when Prime Minister

9    Starmer visited.

10          And they -- you know, they're very good

11   journalists, but they are not familiar, as we are, with

12   President Trump, with his team, with the physical space of

13   the White House.  They were communicating -- they weren't

14   familiar -- they don't work with our White House team that

15   often.  They come in and help when these events happen.  We

16   communicate, you know, on Slack, but not in the same

17   real-time fashion.  So -- and they don't know all the

18   players in the room in the same fashion as we would.

19   Q.   Would they have been doing something else if they hadn't

20   been at the -- in the east room at the time?

21   A.   Oh, absolutely.  I mean, we would almost certainly not

22   have spent the expense to fly them in to cover an event in

23   the Oval Office or in the east room when, you know, myself

24   and my colleagues weren't 30 feet away and barred from

25   entry.  They have plenty of news to be covering in Europe

1    that we then had to find some way to cover, you know, either

2    with freelancers or overtime or -- you know, in both London

3    and Paris.

4            THE COURT:  Sorry.  I've got a question on that.

5            I take it when -- in the olden days, when the

6    president would travel internationally, you'd accompany him

7    in the press pool.  Right?

8            THE WITNESS:  Absolutely.  I mean, this is one of

9    those, you know, incredibly American exceptional moments

10   where the U.S. -- nobody travels like the U.S. president

11   with a truly -- at least before February 25th, with a truly

12   independent press pool.  That was -- you know, no other

13   foreign leader did it in quite the same way.

14           It was a point of pride, I think, for the United

15   States, certainly for the journalists who had the privilege

16   of accompanying any president.  I've had the privilege of

17   accompanying multiple presidents in that role.  You're

18   representing the United States the best -- you know, of the

19   First Amendment, freedom of the press.  We're out trying to

20   do our jobs --

21           THE COURT:  Sure.  But what I'm trying to get at

22   is, you would travel internationally to countries where you

23   had AP colleagues and, nonetheless, you would go?

24           THE WITNESS:  Yes.  Yes.  We don't do that

25   reciprocally.  A lot of foreign leaders don't travel with

Miller - DIRECT - By Mr. Mishkin

JA261

 1    larger -- with a large press corps or, in some cases, any

 2    press corps.  And also, we're predominantly U.S.-focused.

 3    We have a ton of international clients, but a lot of our

 4    members -- and our focus is heavily focused on the U.S.

 5    market.

 6            And also, we don't cover -- the -- no other world

 7    leader is covered like the president with sort of this,

 8    like, almost 24/7/365 coverage.  If the president does an

 9    event at any point, any time, any day, any -- you know,

10    Christmas, New Year's, Thanksgiving, somebody from the AP

11    will be there.  Actually, two people from the AP will be

12    there, at least, with a text and photo person, at least

13    before this all started.

14            THE COURT:  All right.  Thanks.

15    BY MR. MISHKIN:

16    Q.  Mr. Miller, how long have you reported on the White

17    House?

18    A.  About 12 and a half years.

19    Q.  And have you noticed a difference in the White House

20    press corps' interaction with the president, President

21    Trump, since AP's exclusion?

22    A.  In my expertise and my -- from what I have observed of

23    watching the events that have taken place since February

24    11th and reading the transcripts of those events afterwards,

25    I have noticed what I believe to be a softening tone and

1     tenor of questions that some reporters are asking of the

2     president in those formats.  Not every question; but as a

3     general matter, that's my general perception, is that

4     there's a change from after February 11th to before.

5     Q.  I'd like you to take a quick look at AP Exhibit 10.

6     It's a one-page tweet from Defendant Mr. Budowich.

7                 THE COURT:  I see it.

8     BY MR. MISHKIN:

9     Q.  Do you recognize that tweet?

10    A.  Yes.

11    Q.  Did you see it when it was tweeted?

12    A.  I did.

13    Q.  What was your understanding of that when you read it?

14    A.  I saw that tweet and immediately thought that what the

15    White House had done to the Associated Press reporters and

16    photographers a couple of weeks before, they were

17    threatening to do that to one of our competitors and our

18    colleagues and friends at Reuters over the content of -- of

19    their reporting and their editorial decisionmaking, even

20    extending it further by, you know, going into the briefing

21    room as well to -- in retribution.

22                 MR. MISHKIN:  I'd like to move the admission of AP

23    Exhibit 10.

24                 MR. HUDAK:  No objection.

25                 THE COURT:  Without objection, 10 is in.

Miller - DIRECT - By Mr. Mishkin

JA263

```
 1              (Whereupon, Plaintiff's Exhibit No. 10 was entered

 2     into evidence.)

 3              MR. MISHKIN:  Thank you.

 4              THE COURT:  And let's --

 5              MR. MISHKIN:  This is the last question, your

 6     Honor.  Thank you.  Well --

 7     BY MR. MISHKIN:

 8     Q.  Have these kind of messages from the White House chilled

 9     the AP's reporting?

10     A.  Have we been intimidated?  I mean, no.  We're here.

11     We're committed to our values and our independence.  But

12     undoubtedly, our reporting has suffered.  Our ability to

13     cover the news speedily in its totality for our public and

14     for the world writ large and members and subscribers has

15     been diminished.

16              And also I mentioned we're relying on secondhand

17     information now for a lot of this reporting.  We have -- you

18     know, given the threats -- the action against us, the

19     threats against other outlets, we don't know what those

20     other outlets are including or are not including, given the

21     situation that they are finding themselves in of having to

22     fear for their position in the White House, in the White

23     House press pool or more broadly, that their reporting can

24     have the White House take similar viewpoint discrimination

25     against -- retaliatory viewpoint discrimination actions
```

Miller - DIRECT - By Mr. Mishkin

 1    against them.  And so we don't know what we're missing out

 2    on.  And that's, you know, in some ways a huge loss to our

 3    ability to do our jobs.

 4              MR. MISHKIN:  Thank you, Mr. Miller.  No further

 5    questions.

 6              THE COURT:  Thank you, sir.

 7                        CROSS-EXAMINATION

 8    BY MR. HUDAK:

 9    Q.  Good afternoon, Mr. Miller.

10    A.  Good afternoon.

11    Q.  It's nice to meet you.  My name is Brian Hudak.  I am

12    with the U.S. Attorney's Office here in D.C.  I'm going to

13    ask you a few questions here today.

14    A.  All right.

15    Q.  You were talking on direct examination about the

16    coverage of the White House and events that the AP has not

17    been allowed to enter.  Do you recall that?

18    A.  Yes.

19    Q.  You also talked about how these events, from at least a

20    TV perspective, the TV rotational member only shares their

21    video feed with other TV members.  Is that correct?

22    A.  That's correct.

23    Q.  But at the same time, in addition to the TV

24    correspondents feed, the White House livestreams these

25    events on its YouTube channel and on its WhiteHouse.gov

1    website.  Correct?

2    A.  Not every event is livestreamed or every presidential

3    interaction is captured on a livestream, certainly.

4    Q.  So, for example, yesterday, there was a Women's History

5    Month event at the east room.  Correct?

6    A.  Yes.

7    Q.  You see on YouTube, under the live tab, that it was

8    streamed live by the White House.  Is that correct?

9    A.  I wasn't watching myself, but I wouldn't dispute that.

10   Q.  Then, similarly, earlier in the day, there was a

11   briefing by the White House press secretary.  Correct?

12   A.  Yes.

13   Q.  And it appears, at least from the YouTube web page, that

14   that was also livestreamed.  Correct?

15   A.  It appears to be.  Yes.

16   Q.  And I can scroll down, but the White House has been

17   consistently livestreaming events at the White House.  Is

18   that your understanding?

19   A.  They've consistently been streaming some events.  I

20   don't know -- I don't believe that this is the full totality

21   of presidential events of the last, you know, two, three

22   weeks here.  He's done -- to my knowledge, he's done a lot

23   more than are represented here.

24   Q.  Now, you mentioned an anecdote regard regarding a

25   meeting with the National Governors Association and

Miller - CROSS - By Mr. Hudak

JA266

1    President Biden during your direct testimony.  Do you recall

2    that?

3    A.  I do.

4    Q.  And you recall that your anecdote there was to reinforce

5    that being in the room is vital to observe things like the

6    president having a glass of water in front of him and that

7    his spacing with the governors was different.  Correct?

8    A.  For that particular story, yes, it was material.

9    Q.  And you used that as an example of the feed is typically

10   focused on the president, so you can't observe these items

11   in the room.  Do you recall that?

12   A.  Yes.

13   Q.  My apologies.  Given this just came up, I was just able

14   to do this on my laptop while you were talking.

15         You see that this appears to be the event that

16   you're talking about?

17   A.  Uh-huh.  Yes.

18   Q.  You see, you know, just from the very first frame of the

19   event that the things that you mentioned are readily

20   noticeable from this stream.  Correct?

21   A.  In this particular --

22         MR. MISHKIN:  Objection, your Honor.  This video

23   that he's showing is credited to NowThis Impact.  I have no

24   idea what this is.

25         THE COURT:  Overruled.

1              THE WITNESS:  In this particular screen grab, I

2     see the additional spacing and I see a water glass by the

3     president.  I don't see the staff around the president here.

4     BY MR. HUDAK:

5     Q.  Got it.

6              Talking about pre-credentialed media events or

7     things that we've been discussing or calling east room

8     events, but I'll use "pre-credentialed media" to be a little

9     more specific, you would agree that since February 24th of

10    this year, the AP has had at least one journalist or

11    photojournalist in every pre-credentialed media event that

12    the White House has had.  Is that correct?

13    A.  Since February 24th?

14    Q.  The last time we were here in this courtroom.

15    A.  The 24th?  My understanding is -- I would have to

16    double-check on the totality of those events, but I

17    understand the White House has opened up some limited access

18    to only AP photographers for some east room events and then

19    those tarmac events which are sometimes listed as open

20    press; other times, it's pre-credentialed.  You know, we've

21    had text reporters there at some of them.

22              But there was that February 28th event where -- so

23    if you're asking about after February 24th, then no, because

24    February 28th, AP text and photo were turned away at the

25    tarmac in West Palm Beach.

1    Q.  Was that a pre-credentialed media event?

2    A.  I don't have the guidance of the invitation in front of

3    me; but those were often listed, in my experience, as open

4    press or pre-credentialed media.

5    Q.  Let me show you what's been marked as Government Exhibit

6    31.  Are you aware of a publication called *Roll Call*?

7    A.  I am.

8    Q.  And as part of the services they offer, they offer

9    retrospective looks at the -- at the president's schedule,

10   public schedule?

11   A.  Yes.

12   Q.  If we look at February 28th -- that's the day of the

13   President Zelensky visit and then, subsequent, that is the

14   day that you were -- you suggest the AP was excluded from a

15   pre-credentialed media event --

16   A.  Yes.

17   Q.  -- if we look -- it's on your screen right here.

18   A.  Uh-huh.

19   Q.  If we scroll down to the arrival of West Palm Beach

20   International Airport, you can see that that's not a

21   pre-credentialed media event; it was an out-of-town travel

22   pool event.  Do you see that?

23   A.  It's not listed that way on here.  However, there was a

24   separate solicitation by the White House a couple of days

25   before the president's arrival on the tarmac for journalists

1    to RSVP to cover his arrival there in West Palm Beach on the

2    28th.

3    Q.  But at least from the *Roll Call* record, it was not a

4    pre-credentialed media event?

5    A.  It was not listed that way on the daily guidance.  But

6    the daily guidance also captures pool movements.  Some

7    events that are open to the pool, as I previously discussed,

8    are also open to other journalists on top of that, so

9    whether they be -- there would be an RSVP system or because

10   the -- others are in attendance.  So it's not -- I would say

11   it's not dispositive, you know, that it was an

12   out-of-town -- it was restricted to out-of-town pool.  There

13   was a separate solicitation and RSVP process for that tarmac

14   on the 28th.

15   Q.  Yeah.  Regardless of whether the advance team may have

16   let a few other media members to the tarmac, it wasn't,

17   though, formally a pre-credentialed media event?

18   A.  I got that email from the White House press -- White

19   House office.  I'm happy to work with our counsel to make

20   that available to the Court, if necessary.

21   Q.  Let me direct you to Government Exhibit 32.  And this is

22   the March *Roll Call* public event listing.  And you can see

23   that, on March 7th, the arrival at West Palm Beach is

24   identified as a pre-credentialed media event.  Do you see

25   that?

1    A.  Yes.  I see it there.

2    Q.  And at that pre-credentialed media event, the AP had

3    both a reporter and a photojournalist.  Is that correct?

4    A.  I was the reporter there, so yes.  But our -- I never

5    personally -- our photographer received an affirmative RSVP

6    response.  I did not.  I showed up, and that was the only

7    way I knew I was granted access.  The White House never

8    bothered to respond to my RSVP.

9    Q.  But you were permitted access?

10   A.  After a bit of haranguing by Secret Service, yes.

11   Q.  So aside -- let's put our quibble about the West Palm

12   Beach arrival on the 28th aside.  So let me ask it this way:

13   Aside from that event, the West Palm Beach arrival on the

14   28th, the AP has had a journalist or photojournalist at

15   every pre-credentialed media event since February 24th.  Is

16   that correct?

17   A.  The White House has allowed AP photojournalists only

18   into some east room events.

19   Q.  The White House has also allowed foreign AP journalists

20   into some east room events.  Correct?

21   A.  I know AP journalists were allowed in.  I don't know

22   that the White House necessarily played a role.  In my

23   experience, those foreign press pool delegations were

24   coordinated by the State Department.  If that's the case,

25   then potentially, yes.  But I know that they are escorted by

Miller - CROSS - By Mr. Hudak

JA271

1    State Department staffers around the White House complex.

2    Q.  But they -- however they got in there, there was an AP

3    foreign-based text journalist in those events -- those -- AP

4    foreign text journalists were admitted to certain east room

5    or pre-credentialed events since February 24th?

6    A.  They were in the room.  I don't know if the White House

7    played any role in that, or even if the White House was

8    aware of it.

9            THE COURT:  Sorry.  Are you suggesting that people

10    get into the White House that the White House does not allow

11    in?

12            THE WITNESS:  I'm suggesting that it -- was the

13    White House press office aware that its protocol team

14    working with, say -- I guess the first one was the Macron

15    delegation -- that an AP journalist was a member of that?  I

16    don't know that to be true.  It very well may be true that

17    they had a list of -- manifests of the French journalists

18    who were going to be traveling with President Macron.  They

19    very well may not have.  They may have just said, Here's who

20    is traveling with the French president.

21            It would have created a diplomatic uproar if they

22    would have --

23            THE COURT REPORTER:  Sir --

24            THE COURT:  You need to slow down, sir.

25            THE WITNESS:  I'm really sorry.

1              I don't know that the White House gets a manifest

2      of who -- which press -- what is the press delegation

3      traveling with the French presidency.  And I imagine it

4      would create a diplomatic uproar if they were to pick and

5      choose among it.  So I don't know the level of White House

6      awareness or responsibility for, you know, letting those

7      people in.  They just -- might have just let them all in as

8      the French delegation.

9      BY MR. HUDAK:

10     Q.  In your experience, does anyone get into the White House

11     complex without the White House knowing about it?

12     A.  Secret Service controls access to the White House

13     complex.  I'm aware of instances where senior White House

14     officials were unaware of other officials who were in the

15     White House complex, including stories in President Trump's

16     first term where senior White House staffers were surprised

17     that some people were taking meetings on the White House

18     complex.

19     Q.  Do you know who Taylor Budowich is?

20     A.  Yes.

21     Q.  And he is part of the White House press staff.  Correct?

22     A.  He's the deputy chief of staff.  I believe he oversees

23     the press office.

24     Q.  And he submitted a declaration -- it's on your screen --

25     Government Exhibit 1.  Do you see that?

1    A.  I do.

2    Q.  Let me scroll down.  Do you see in Paragraph 17 he

3    writes:  On February 24th, 2025, the president held an east

4    room event with President Macron of France.  For that

5    limited-access event, 310 journalists requested access and

6    136 were permitted access.  Among those provided access were

7    a foreign-based correspondent of the Associated Press.

8         Do you see that?

9    A.  I see that.

10   Q.  Okay.  So at least Mr. Budowich was aware that a

11   foreign-based correspondent of the Associated Press was in

12   that pre-credentialed media event.  Correct?

13   A.  I think he was aware of it when he signed this

14   declaration.  I don't know if he was aware of it beforehand.

15   Q.  You have no way to know one way or another?

16   A.  I don't.

17   Q.  Who is Aamer -- and that's A-A-M-E-R -- last name

18   Madhani, M-A-D-H-A-N-I?

19   A.  Aamer Madhani is a White House reporter for the

20   Associated Press, a member of my team.

21   Q.  And isn't it true that he was admitted to yesterday's

22   pre-credentialed media event for the Women's History Month

23   event in the east room of the White House?

24   A.  He did not get into the east room for that event.  He

25   was turned away because -- I don't know exactly why.  But he

1    was -- he did not get into that event.

2    Q.  He did not get into that event?

3    A.  He got an email RSVP yes, but did not actually enter the

4    east room.

5          And that's not the first time that we got an RSVP

6    "yes" and ended up not getting into an event.  A different

7    colleague of mine, Ayanna Pressley, for the Black History

8    Month reception in late February, received a confirmation

9    response to an RSVP from the White House press office and

10   was again -- came onto the White House complex.  She's not

11   generally a White House reporter, so she got a day pass in

12   for the event after she received her "yes" RSVP for that

13   event, and was still turned away from the door because she

14   works for the Associated Press, so she was not permitted to

15   enter the east room.

16   Q.  We will double-check on that.

17         Aside from February 28th, is there any

18   pre-credentialed media tarmac event that the AP has been

19   excluded from?

20   A.  Not to my knowledge.  But obviously, that is after these

21   proceedings began.

22   Q.  Well, you understand that the purpose of these

23   proceedings here today is to determine whether an order from

24   the Court is required to ensure that the AP's rights,

25   whatever they may be, are secured during the pendency of the

1    litigation?

2              MR. MISHKIN:  Objection, your Honor.  I don't see

3    how the witness's -- it's clearly calling for a legal

4    question [sic] about what the purpose of today's hearing is

5    for and what at least AP is seeking.

6              THE COURT:  Overruled.

7              THE WITNESS:  I'm not a lawyer.  But I

8    understand -- my lawyers have advised me that this is sort

9    of the next step in these legal proceedings as we try to

10   restore our ability to do our jobs and report on behalf of

11   the American public.

12   BY MR. HUDAK:

13   Q.  Are you aware of any non-pool organization -- so let me

14   take a point in time to define what non-pool is.  You're

15   aware, under the new policy, certain media organizations are

16   being permitted to participate in the pool and the AP has

17   not yet been permitted to participate in the pool.  Correct?

18   A.  I'm not aware of that because I've not seen any White

19   House policy about what this new pool is or how it

20   functions.

21   Q.  You're aware that certain media organizations have been

22   part of the pool and the AP has not to this date.  Correct?

23   A.  Yes.  There has been a pool and AP has never been

24   allowed to participate.  Correct.

25   Q.  Okay.  But there are certain organizations that have

1   been allowed to participate.  Correct?

2   A.  That is my understanding.

3   Q.  I'm going to call those the pool organizations.  Okay?

4   A.  Okay.

5   Q.  Aside from the pool organizations, are you aware of any

6   media organization that has had as much access to the White

7   House as the AP has since February 24th?

8   A.  Had as much since February 24th?  I don't know the level

9   of staffing or, you know, the extent to which these other

10  organizations commit to the White House.  I know of no

11  outlet that has the reach and commitment to covering the

12  White House that has been excluded the way the AP has, you

13  know, in my -- if -- you know, consistently by this White

14  House.

15  Q.  My question was a little bit different.

16          MR. HUDAK:  I would ask that the court reporter

17  read it back.

18          So please pay attention to my question.  I would

19  appreciate an answer to it.

20          (The question referred to was read by the

21  reporter.)

22          THE WITNESS:  I don't know.

23  BY MR. HUDAK:

24  Q.  Looking at the chart that I put up here as Government

25  Exhibit 6, this, at least, is from the White House

Miller - CROSS - By Mr. Hudak

JA277

1    Correspondents' Association.  This is the seating chart in

2    the Brady briefing room.  Have you seen this before?

3    A.  I've seen versions of this.  Yes.

4    Q.  Okay.  And it depicts that the AP has a front-row center

5    seat in the briefing room.  Is that correct?

6    A.  Yes, it does.

7    Q.  And it still enjoys that front-row center seat today.

8    Correct?

9    A.  For now, it does.  Yes.

10   Q.  And you referred to a tweet from Mr. Budowich from March

11   6th of 2025 during your direct testimony.  Do you recall

12   that?

13   A.  Yes.

14   Q.  And that was about Reuters.  Correct?

15   A.  Yes.

16   Q.  And he mentioned in his tweet that Reuters has a primo

17   seat in the briefing room.  Do you recall that?

18   A.  Yes.

19   Q.  And Reuters, at least in this diagram, has a front-row

20   seat, too, off from you.  Do you see that?

21   A.  Yes.

22   Q.  And to your knowledge, Reuters continues to have that

23   seat today.  Correct?

24   A.  To my knowledge, yes.  This chart is from 2021, I

25   believe.  There are more current versions of this.

Miller - CROSS - By Mr. Hudak

JA278

1    Q.  I'll represent to you that I'm the -- I pulled this off

2    of the White House Correspondents website yesterday.  So if

3    there are, it's just not published.

4           But is there any material difference in the first

5    row?  Let me ask that.

6    A.  No.

7    Q.  What about the second row?

8    A.  There may be.  I'm not -- it's been a few years since

9    I've been on the White House Correspondents' Association

10   board myself, so I'm not as well-versed in this as I used to

11   be.  There may have been minor changes.  I think definitely

12   by -- when you start looking at the third row, there have

13   probably been changes.

14          Either way, these were assigned by the White House

15   Correspondents' Association and not the White House.

16   Q.  Correct.  But you would agree with me that if the White

17   House wants to mix up the briefing room, instead of

18   deferring to the White House Correspondents' Association, it

19   certainly has the right to do so?

20   A.  I mean, it sounds like --

21          MR. MISHKIN:  Objection, your Honor.  That clearly

22   calls for a legal conclusion.

23          THE COURT:  If you know.

24          THE WITNESS:  I can't offer a legal rationale

25   whether they can do that.  I can see that they've threatened

1   to do that, and it's retaliation for journalism.  So I

2   definitely know that that's something that they've talked

3   about.

4   BY MR. HUDAK:

5   Q.  Now, one thing that's not depicted on this chart is the

6   new media seat.  Is that correct?

7   A.  That's correct.

8   Q.  And the new media seat, if I understand it, sits

9   somewhat to the left of the NBC News seat in the front row.

10  Correct?

11  A.  And you're referring to the recent creation of the

12  incumbent White House press office and not the new media

13  outlets that are represented within this chart.  Correct?

14  Q.  I'm talking about what's been commonly referred to in

15  the press as the new media seat, that the White -- that

16  President Trump's White House established shortly after his

17  inauguration.

18  A.  Yes.  The White House press office, in my understanding,

19  has turned over one of the seats reserved for its staffers

20  and has called it a new media seat.  And it hand-selected

21  some reporters or individuals to sit in that seat during

22  press briefings.

23          I would also note that there are a number of new

24  media outlets, by basically any definition of new media,

25  that are represented on this chart from December 15th, 2021.

Miller - CROSS - By Mr. Hudak

JA280

1   Q.  But the purpose of the new media seat was to offer

2   nontraditional media an additional seat that is relatively

3   close to the press secretary's lectern in the briefing room.

4   Is that correct?

5   A.  I can't speak for the White House on that, but I

6   wouldn't dispute that.

7   Q.  Let me just show you the calendar of events, as I

8   understand it, since the beginning of -- or since

9   February 24th.

10          On February 24th, there was an east room event

11  with the French president.  Correct?

12  A.  Correct.

13  Q.  And there was an AP foreign correspondent admitted to

14  that event.  Correct?

15  A.  Yes.

16  Q.  And there were hundreds of hard pass holders that

17  applied to that event and were not admitted to that event.

18  Correct?

19  A.  I don't know if there were hundreds and if the people

20  who RSVPed were hard pass holders.  Anyone can RSVP to that

21  link.

22  Q.  On February 27th, there was an east room event with the

23  prime minister of the United Kingdom.  Correct?

24  A.  Yes.

25  Q.  There was a foreign correspondent of the AP that was

1    admitted to that event.  Correct?

2    A.  Yes.

3    Q.  And there were hundreds of other media members that

4    applied to be in that room, but weren't.  Correct?

5    A.  I don't even know if those hundreds of people were media

6    members.  Those White House RSVP lists -- the daily

7    guidelines goes out to half of Congress, you know, PR folks.

8    It's a list that -- my knowledge of it is that it sort of

9    has grown and grown and grown over the years, across

10    multiple administrations.

11    Q.  On March 7th, there was a pre-credentialed media event,

12    as we saw, on the tarmac at West Palm Beach International

13    Airport.  Correct?

14    A.  Yes.

15    Q.  And there was a White House [sic] text reporter and

16    photojournalist that were admitted access to that event.

17    Correct?

18    A.  Yes.

19    Q.  On March 12th, there was an east room event to celebrate

20    St. Patrick's Day.  Correct?

21    A.  Yes.

22    Q.  And a White House [sic] photojournalist was admitted to

23    that event.  Correct?

24    A.  That's my understanding.  But a text reporter was not.

25    Q.  On March 14th, there was a pre-credentialed media event

1    at West Palm Beach International Airport where the AP had a

2    text reporter and photojournalist admitted.  Correct?

3    A.  Yes.

4    Q.  On March 20th, there was an east room event for the

5    signing of an executive order regarding education, and a

6    photojournalist from the AP was admitted.  Correct?

7    A.  That's my understanding.  But not a text reporter.

8    Q.  On March 22nd, there was an arrival of Air Force One at

9    West Palm -- at Philadelphia International Airport.

10   Correct?

11   A.  Correct.

12   Q.  And both a text journalist and, I think, two

13   photojournalists were admitted to that event.  Is that

14   correct?

15   A.  I think they received RSVP yes's.  I think we ended up

16   sending one.  We had a double -- we had a staffing snafu.

17   But it was -- yes, they got onto the tarmac.

18   Q.  On March 24th, earlier this week, there was an east room

19   event celebrating Greek Independence Day.

20   A.  Yes.

21   Q.  Correct?

22   A.  Yes.

23   Q.  And a photojournalist from the AP was admitted to that

24   event.  Correct?

25   A.  Just a photojournalist, not a text reporter.

1    Q.  And then we've talked about the event from yesterday,

2    the Women's History Month event.  Correct?

3    A.  Yes.

4    Q.  And at least an AP photojournalist was admitted to that

5    event.  Correct?

6    A.  Just an AP photojournalist was admitted to that event.

7    Q.  Okay.  And so for each of the pre-credentialed media

8    events, aside from maybe -- we have a dispute over

9    February 28th -- at each of those, the AP has had a

10   journalist, be it a text journalist, through a foreign

11   correspondent, or a photojournalist at each of those events.

12   Correct?

13   A.  In one way, shape or form.  Yes.

14   Q.  And in one way, shape or form, then, those folks that

15   were admitted could observe things like the water glass

16   sitting in front of the president, the anecdote that you

17   mentioned.  Correct?

18   A.  They might have.

19   Q.  And in one shape or form, those folks could have noticed

20   the spacing between the president and the other governors at

21   that event that you discussed?

22   A.  They might have.

23   Q.  Similarly, you know, occasionally -- I don't mean to

24   impugn your skills at all, but occasionally you miss

25   something and another -- one of your reporter colleagues

Miller - CROSS - By Mr. Hudak

JA284

1    picks up on something.  Correct?

2    A.  That does happen.  We try not to let it happen.

3         MR. HUDAK:  I believe that's all the questions I

4    have, your Honor.  Thank you.

5         THE COURT:  Mr. Mishkin?

6         MR. MISHKIN:  I have three questions, your Honor.

7         THE COURT:  Great.

8         MR. MISHKIN:  Sorry.  Four.  I miscounted.

9                    REDIRECT EXAMINATION

10   BY MR. MISHKIN:

11   Q.  Mr. Miller, you read the supplemental declaration that

12   Mr. Budowich filed?

13   A.  Yes.

14   Q.  And did you see that Mr. Budowich purported to --

15   Mr. Budowich stated that AP is now eligible, in his words --

16   quote, "eligible" -- to be included in both the pool and

17   east room events?

18   A.  I did read that.

19   Q.  It's your testimony that, despite such eligibility to be

20   in the pool, AP has not participated in the pool for 44

21   days.  Is that right?

22   A.  Yeah.  Forty-four days since February 11th for text and

23   the 14th for photos, totaling, you know, more than 60 events

24   and movements over that timespan.

25   Q.  Sitting here today, do you have any confidence that an

1  east room event next week for which AP is purportedly

2  eligible to be admitted, that you won't be excluded from

3  that?

4  A.  Absolutely none.  And, if anything, all I have to look

5  back on is my experience and that of my colleagues over the

6  last 44 days, which is AP is barred time and again because

7  of our journalism.

8  Q.  Do you have any assurance that if you are excluded from

9  an east room event, that it's not on the basis of AP's

10  editorial decision?

11  A.  That's the only information that I've ever been given

12  about that decision.

13          MR. MISHKIN:  Thank you.  That's all.

14          THE COURT:  Mr. Miller, I had a question.  You

15  mentioned to Mr. Mishkin earlier that you had the impression

16  that other media outlets, but not your own, have softened

17  its coverage of the administration since you've been banned.

18  What media organizations did you have in mind?

19          THE WITNESS:  Not a specific media organization

20  comes to mind.  It's sort of just the tone and tenor of

21  questions that are -- that I hear thrown at the president in

22  Oval Office sprays and the like.  One of the things that has

23  happened as a result of this White House takeover of the

24  pool process and the ban of AP is that they've removed, in

25  most events inside the White House, two wire services from

1  the mix, and they were generally asking -- you know, known

2  for asking "news of the day" questions and -- relevant

3  questions.

4       There have been moments where I've heard questions

5  in the Oval Office that I was kind of surprised to hear in

6  that setting.  They weren't on topic.  They didn't seem to

7  me particularly relevant to the world or the news of the

8  day.

9       I'd have to go back and review every single event.

10  It's a subjective impression that I have formed since the

11  11th in watching presidential events.

12       MR. MISHKIN:  If I may --

13       THE COURT:  I'll ask the question.

14       But sitting here today, you don't have any

15  specific organization in mind that's changed its tone as a

16  result of the ban that the AP has faced?

17       THE WITNESS:  I mean, I have noticed a change in

18  the way news outlets cover the Gulf of Mexico, which the

19  president renamed the Gulf of America.

20       I'm a bit of a space buff, and I watched the

21  SpaceX landing with the astronauts last week.  And I heard

22  some of the coverage and then I read a summary of some of

23  that coverage where a number of news outlets -- news

24  organizations or anchors were referring to it as the Gulf,

25  and that struck me as odd, and not as the Gulf of Mexico or

```
 1        the Gulf of America.  They were calling it the Gulf.  It
 2        seemed to me like they were trying to sort of skirt around
 3        the issue.  That's -- that's the closest thing I can think
 4        of on that question.
 5                    THE COURT:  Okay.  Thank you.
 6                    Mr. Mishkin?
 7                    MR. MISHKIN:  He answered the question I was going
 8        to ask.  Thank you.
 9                    THE COURT:  Thanks.
10                    You may step down.  Thank you for your testimony,
11        sir.
12                    THE WITNESS:  Thank you.
13                    (Witness excused.)
14                    THE COURT:  So it's almost 1:00.  Why don't we
15        take a lunch break.  I've got a quick criminal hearing at
16        2:00, and we'll resume after that.
17                    Thanks, gents.
18                    MR. TOBIN:  Thank you, your Honor.
19                    MR. HUDAK:  Thank you, your Honor.
20                    (Thereupon, a luncheon recess was taken, after
21        which the following proceedings were had:)
22                    THE COURTROOM DEPUTY:  We're back on the record in
23        Civil Action 25-532, Associated Press versus Budowich, et
24        al.
25                    THE COURT:  All right.
```

```
 1                    MR. TOBIN:  Thank you.

 2                    THE COURT:  Mr. Tobin?

 3                    MR. TOBIN:  Thank you.  I hope the Court and

 4    personnel had some time for lunch.

 5                    Your Honor, at this point, I'd like to proceed to

 6    present documentary evidence to the Court.

 7                    THE COURT:  Oh, sure.

 8                    MR. TOBIN:  I want to walk the Court through some

 9    other items that we'd like to have in the record.

10                    And, your Honor, an important --

11                    THE COURT:  Are those all in this binder you gave

12    me --

13                    MR. TOBIN:  They are, your Honor.

14                    THE COURT:  -- this Redweld?

15                    MR. TOBIN:  And we've tabbed the longer ones to

16    facilitate the process when I refer to them.

17                    Your Honor, these would have been examination

18    exhibits for the cross-examination of Mr. Budowich.  The

19    White House decided not to bring him here and to have him

20    only attest by declaration.

21                    What I hope to highlight for the Court are, number

22    one, the declarations that he submitted are indeed

23    contradictory.  The Court saw some examples in the motion to

24    strike.  I just want to recite some of them.

25                    And, number two, across both declarations, the
```

 1    testimony he's given is just flatly contradicted by things

 2    that are in the evidentiary record that I've placed before

 3    the Court.  And so I'd like to walk the Court through those

 4    documents.

 5              And I'm going to start by noting that the Court

 6    asked in Question 4:  Under current White House policies and

 7    practices, is there any type of event where the AP is not

 8    eligible for consideration but other media are?

 9              The answer in the documents, the answer in the

10    record, the answer from the witnesses today, is a clear yes,

11    at least certainly as to the press pool.  And, to be honest,

12    I have no idea what the routine is for the east room, other

13    than the fact that Mr. Miller, the text reporter, just

14    doesn't ever seem to be admitted to that.

15              But to just focus for a moment --

16              THE COURT:  Mr. Tobin, on that point, am I -- is

17    it your understanding that the record shows that, at least

18    this last month, a photojournalist has frequently, perhaps

19    not invariably, but frequently, been admitted -- have other,

20    I guess, maybe foreign AP print journalists been allowed in?

21    What's your understanding of what the record shows at this

22    point?

23              MR. TOBIN:  For text purposes?

24              THE COURT:  Well, for the east room, where do

25    things stand?

1           MR. TOBIN:  We have had a few foreign journalists

2    come in.  I don't know whether they snuck in in the sense

3    that the White House knew that Chuck Tobin was coming, but

4    didn't know Chuck Tobin was an AP reporter assigned to cover

5    President Macron, or whether they knew and decided that they

6    weren't going to create an international incident.

7           THE COURT:  And so Mr. Miller hasn't come in.

8    Have any of Mr. Miller's colleagues, print colleagues, come

9    in?

10          MR. TOBIN:  Who were assigned to cover the White

11   House, that's correct.

12          THE COURT:  None have?

13          MR. TOBIN:  None have at any of the east room-type

14   events.  The only exception may be when the president

15   addressed the joint session of Congress.  And I would note

16   we put in the record when the president addressed the joint

17   session of Congress --

18          THE COURT:  I remember that.

19          MR. TOBIN:  -- and issued a press release, it was

20   about the AP.  I mean, your Honor -- I was going to say this

21   in closing.  I'll just say it now.  It's ironic to us the

22   president chooses AP images to brag about, to talk about his

23   administration and, at the same token, calls us liars and

24   misanthropes at every turn.

25          So, your Honor, just to now to focus on the press

```
 1    pool and our exclusion from -- our text exclusion from all

 2    events -- actually, both text and photo -- from all events,

 3    Mr. Budowich says, in his supplemental declaration at

 4    Paragraph 3, he says that:  Outlets that were among the

 5    members of the pool under the old system continue to be

 6    eligible for press pool selection in the new system,

 7    including the Associated Press.

 8            He says that in -- despite, in his first

 9    declaration, saying that people are chosen for the pool at

10    the discretion of the president.  And, again, the

11    "discretion of the president," we just don't have any

12    factors; we don't know what those are.

13            So there's a subtle distinction -- not-so-subtle

14    distinction between those two declarations just on their

15    face.

16            And as we'll see in a minute, your Honor, there

17    just is no record to support that the journalists -- that

18    any system that allows the AP to come in is employed in the

19    pool; and, in fact, they have not.

20            And so if I could call the Court's attention for a

21    moment to Exhibit 7, which the Court looked at earlier

22    during some of the testimony.  Exhibit 7 is the daily press

23    guidance from the White House.

24            THE COURT:  I have it.

25            MR. TOBIN:  This is from the White House's own
```

1    publication.  And so I would ask to admit that as -- I'm

2    sorry, your Honor.  That's already been admitted.  I don't

3    need to go through that formality.

4            THE COURT:  Yes.

5            MR. TOBIN:  So, your Honor, Exhibit 6 is our own

6    summary.  We created this document.  It's a spreadsheet.  So

7    it's an "at a glance" of the information contained in that

8    document.  I'd like to ask the Court to admit that Exhibit 6

9    also as evidence in the case.

10           MR. HUDAK:  One moment, your Honor.

11           MR. TOBIN:  Sure.

12           MR. HUDAK:  No objection, your Honor.

13           THE COURT:  Without objection, 6 is in.

14           (Whereupon, Plaintiff's Exhibit No. 6 was entered

15    into evidence.)

16           MR. TOBIN:  Thank you.

17           And thank you, Mr. Hudak.

18           THE COURT:  Explain to me what I'm looking at

19    here, sir.

20           MR. TOBIN:  Sure.  So this is a summary of the

21    information in the longer document.  Exhibit 6 is a summary

22    of Exhibit 7.  It shows you every day since February 24

23    where there has been an event.  And it shows you who the

24    wire -- a pool event --

25           THE COURT:  I see.

1            MR. TOBIN:  -- and it shows you each --

2            THE COURT:  I see.

3            MR. TOBIN:  The top axis is the type of journalist

4    that's been allowed in.

5            And so, your Honor, this document reflects that

6    the AP has never been included in the pool at all since

7    February 24.  You won't see the AP's name mentioned in any

8    of those documents.

9            And so just on the sheer historical record of what

10   we're looking at, it's completely contradictory with

11   Mr. Budowich's testimony.  And it's supported -- this is

12   supported by the exhibit to Mr. Miller's declaration where

13   he has updated the Court -- or we've updated the Court

14   periodically as to the events where the AP has not been

15   included but other of its colleagues were.

16           So the historical record shows us that if there is

17   a system that allows the AP in, ostensibly, as Mr. Budowich

18   attested to in his second declaration, it doesn't include

19   the AP.  And the AP is excluded.  And the only thing we have

20   to fill the gap as to the why, the causation, are the

21   statements from the White House.  And I'm going to ask the

22   Court to look at those so we have our record on the

23   retaliation issue.

24           I'd also note that, in Mr. Budowich's first

25   declaration, he stated that the pool has three wire

1    photojournalists.  And you'll see, your Honor, in the

2    Exhibit 6, and as reflected in the longer document, Exhibit

3    7, those three wire journalists have always been, since

4    February 24th, AFP, *The New York Times* and Reuters.  And --

5    I'm sorry.  There's three wire photojournalists.  Not the

6    AP.

7         And so Mr. Budowich in his declaration has given

8    us the number, and this chart gives us the identities, of

9    the people who -- the entities who have been admitted to the

10   pool for photojournalism.

11        Similarly, Mr. Budowich stated in his first

12   declaration -- that's at Paragraph 10 -- that the wire pool

13   is now selected from two wire services.  Previously, it had

14   been three.

15        Again, as we'll see, those are rotating on this

16   chart between Bloomberg and Reuters, not the AP.

17        So Mr. Budowich's statement in his supplemental

18   declaration, that I would have loved to have cross-examined

19   him on today, is flatly contradicted by the objective

20   evidence before the Court.  And we would ask the Court to

21   completely discredit that self-serving, broad statement.

22        If they wanted an opportunity to persuade the

23   Court otherwise and to contradict the documents themselves

24   and the live testimony of Mr. Miller and Mr. Vucci, they

25   should have brought Mr. Budowich or another White House

1    witness to explain the flaws in the analysis that I've just

2    provided to you, your Honor.

3             And so as to the press pool, the clear answer to

4    the Court's question is, under current White House policies

5    and practice, is there any type of event where AP is not

6    eligible for consideration but other media organizations

7    are?

8             The answer is, affirmatively, heck, yeah.  All of

9    the events they've been excluded for -- from when it comes

10   to the pool.  And that's the objective evidence before the

11   Court.

12            Any questions, your Honor?

13            THE COURT:  No.

14            MR. TOBIN:  As to the east room, the events that

15   the journalist today testified you have to RSVP for and

16   queue up at the palm door, your Honor, Mr. Budowich again

17   contradicts himself.  In his second declaration, Paragraph

18   15, he testifies:  The AP remains completely eligible for

19   selection, as all hard pass holders are.

20            So first of all, your Honor, when he refers to

21   hard pass holders, he is not referring to the AP's

22   correspondent in Paris who covers President Macron, or the

23   correspondent in Kyiv who covers President Zelensky.  So

24   that statement by him defining the universe there "remains

25   completely eligible for selection, as all hard pass holders

1    are," is his acknowledgement of the distinction between

2    those two types of reporters.

3         And so if we're going to look and define the

4    universe as he has done with hard pass holders here,

5    clearly, the president has decided not to exercise his

6    discretion, the phrase we previously talked about, as to the

7    text reporter at the very least.  Mr. Miller and his text

8    colleagues have been excluded, have not been admitted, into

9    any east room-type press events since this whole ban began.

10        And unfortunately, Mr. Hudak was misinformed by

11   his client.  They were not admitted yesterday.  They did not

12   get into the room yesterday when it came to the White House

13   event on the Women's History Month.  So they have been --

14   the text reporters have been excluded completely.

15        And, your Honor, we have some -- we have a record,

16   and we candidly admit that at some point some White House

17   photographers have been admitted into east room events.  But

18   it has been random.  It has been unpredictable.  We have no

19   idea when or where we'll be admitted to one of these events.

20   And that is a violation of our due process in light of the

21   statements by the White House that people will not be

22   admitted from the Associated Press because of the content of

23   their journalism.

24        THE COURT:  So maybe now is just as good a time as

25   any to talk about that with the east room.

1          I mean, I guess -- my impression is that, at this

2     point, your client enjoys the same access to the east room

3     that general members of the White House press corps have.

4     In other words, they are sometimes admitted; they're

5     sometimes not.

6          I certainly understand that your client is not

7     getting the same what I would describe as privileged access

8     that it had --

9          MR. TOBIN:  "Line leader" is the phrase -- the

10    phrase that we heard Mr. Vucci say, is he was the line

11    leader.

12         THE COURT:  The line leader.  Yes.  That he'd had

13    in the past.

14         So feel free to correct me if I'm wrong, if you

15    think the evidence shows something different.  But if I'm

16    right about that, maybe you can help me think about where

17    that leaves you as to the east room.

18         MR. TOBIN:  Absolutely.

19         I would dispute the Court's recollection or

20    understanding of the evidence as to the text journalists.

21    As I said, the text journalists at the White House, the hard

22    pass holders, as Mr. Budowich defined the universe of east

23    room invitees, text journalists have not been admitted.

24    They do not enjoy the same access as their competitors, as

25    other hard pass holders in the White House, because they

1    have not been admitted.  Mr. Miller was quite explicit in

2    his testimony about that.

3          As to the photographer, Mr. Vucci testified he

4    never knows.  Sometimes he has RSVPed and shown up at the

5    palm door and his RSVP has been accepted, and he's been told

6    he can't get in.

7          And so there is some opaque -- and opacity is

8    really the problem here, your Honor.  There is some opaque

9    criteria that the White House is applying, and the only

10   criteria that anybody has seen in this case that has any

11   direct statement from the White House with any credibility

12   is the statement of Ms. Wiles.  We have it in response to

13   Ms. Pace's communications with her back at the beginning of

14   all of this.  We submitted that in affidavit form with an

15   attachment.  It's Ms. Wiles saying, "You're not going to get

16   in because you're liars and you're purveyors of

17   misinformation to the American public.  We're not going to

18   let you in."

19         We have Ms. Leavitt, Defendant Leavitt, the press

20   secretary, saying from the podium that we are not going to

21   let liars like the AP in.

22         We have the president of the United States talking

23   about it.

24         We have Mr. Budowich, the deputy White House chief

25   of staff, on X talking about it, and even threatening

1       Reuters and other people with that kind of retaliation.

2               And so, your Honor, as to the text reporters, the

3       facts are completely uniform and in AP's favor as to the

4       exclusion.

5               THE COURT:  And so what's the remedy there?  I

6       mean, do you think you're entitled to front-of-the-line

7       access again?

8               MR. TOBIN:  Absolutely not.  We're entitled to an

9       order that says that the AP shall not be excluded from pool

10      or east room -- broadly defined -- events in any

11      viewpoint-discriminatory way, whether it's because of Gulf

12      of America or Gulf of Mexico or anything else that they

13      report.  That would be what we would ask in the order.

14              And, number two, that the White House, as was the

15      remedy in *Acosta* and *Karem*, publish and post -- if they're

16      going to have criteria, they have to tell the press and the

17      public what they are.  They have to provide for an appeal

18      window when you're denied access.  And they must provide a

19      reason for denying the appeal that is reasonable and does

20      not have viewpoint discrimination.

21              THE COURT:  But I mean -- so focusing for the

22      moment on the east room, I'm wondering about, you know, is

23      there really going to be an appeal every time that one of

24      the 300 people who apply don't get their RSVP granted?  That

25      just -- I don't think that's been happening to date, and

1      that feels like a lot of judge-made law there for telling

2      the White House how to run its --

3           MR. TOBIN:  Well, the White House, as with any

4      court order, is going to have to administer it as

5      efficiently and as it sees fit.  We've never had a situation

6      before the Court that I'm aware of where there have been

7      retaliatory and discriminatory exclusions from the east

8      room.  So I can't point to a case where that remedy was

9      given.

10          I will say, if the Court agrees with us, that

11     there is a First Amendment liberty interest that attaches

12     and that, therefore, there is a Fifth Amendment due -- right

13     to due process.  The remedy the D.C. Circuit has prescribed,

14     and in the district court cases, is exactly what I have

15     described.  It's a published set of standards, an

16     opportunity to appeal and a written explanation of reasons

17     that does not involve viewpoint discrimination.

18          And that's all I can suggest.  It's all we have

19     from the case law.  That is what the case law tells us is

20     the appropriate remedy in these circumstances, whether it

21     creates an added burden to the White House or not.

22          THE COURT:  Yeah.  And, you know, maybe that makes

23     sense for getting a hard pass, which is kind of a

24     one-and-done type of thing.  But that just seems asking a

25     lot for these daily events, that there be an appeal process

1    for everyone who doesn't get in.

2              MR. TOBIN:  We can have discussion, your Honor,

3    and work out a system acceptable to everybody to make it fit

4    within the due process case law.  But our position is we are

5    entitled to that kind of a remedy, however fashioned,

6    because that's what *Sherrill* tells us.  That's what

7    *Acosta* -- Judge Kelly did in the *Acosta* case, and that's

8    what Judge Tatel's decision in the *Karem* case tells us.

9              How we put that into practice, into play, your

10   Honor, we can talk about what that looks like.  But for

11   purposes of the injunction order, that's what we would be

12   requesting, is that due process attaches and due process

13   requires these three elements, and the fourth element must

14   not be viewpoint discrimination.

15             THE COURT:  Okay.  Thank you.

16             MR. TOBIN:  So, your Honor, that's the paper

17   record and the oral record that you heard today as to

18   exclusions from the press pool and from east room type of

19   events.

20             Your Honor, that puts -- that belies -- I don't

21   want to call anybody outright a liar.  That belies the

22   testimony of Mr. Budowich that the AP, quote, "remains

23   completely eligible for selection, as all hard pass holders

24   are," closed quote.  That's just not what the record shows,

25   your Honor, and that is not credible.

1          Your Honor, as to motivation, one day after we

2     were all in the courtroom on February 24th for the TRO

3     hearing, White House Press Secretary Karoline Leavitt held a

4     press briefing in the White House briefing room.  The White

5     House reports those briefings and posts those recordings on

6     YouTube.  I want to show the Court a brief clip from

7     Ms. Leavitt's press briefing the day after this Court told

8     the White House that the case law was uniformly against it.

9     And I'm also going to ask the Court to -- we're going to

10    label the clip Exhibit A, and I'll provide a flash drive to

11    the Court and to counsel.

12          THE COURT:  All right.

13          MR. TOBIN:  We also have a transcript of it at

14    Exhibit 5.  And so maybe we'll watch it and then I'll ask

15    counsel if he has any objection to moving it into evidence.

16          Unless you --

17          MR. HUDAK:  I've seen it.  I have no objection.

18          MR. TOBIN:  Then, your Honor, at this time, we ask

19    to move exhibit -- video Exhibit A and transcript Exhibit 5

20    into evidence without objection.

21          THE COURT:  Without objection.

22          (Whereupon, Plaintiff's Exhibits 5 and A were

23    entered into evidence.)

24          MR. TOBIN:  Your Honor, we'd now like to play

25    Ms. Leavitt at the podium in the press briefing room.

1          (Whereupon, Plaintiff's Exhibit A was published in

2     open court.)

3          MR. TOBIN:  So, your Honor, Ms. Leavitt on

4     February 25 said that the White House -- said that she and

5     White House Chief of Staff Susan Wiles had made a decision

6     to remove the Associated Press from the White House pool.

7     That's part of the evidence in Exhibit 5.

8          Ms. Leavitt, on February 25, also reinforced with

9     the words that she and Susie Wiles had made "our decision to

10    remove the Associated Press from the White House press pool

11    for certain and special events."

12         Your Honor, that testimony completely contradicts,

13    again, Mr. Budowich's declaration in which he says that the

14    AP is completely eligible for selection, as all hard pass

15    holders are.  That is not what the White House has been

16    messaging to the public and to AP.

17         And so, your Honor, that part of Mr. Budowich's

18    declaration also falls apart by the direct statements from

19    the White House and from the White House press secretary.

20         Your Honor, additionally, Mr. Budowich testified

21    about the reasons why the White House makes its pool

22    selection.  Paragraph 5 of his supplemental declaration

23    states that, quote, "Since the inception of the new press

24    pool system, the press teams have been empowered to better

25    inform their jobs by creating a pool that best serves the

1    public by pairing the topics of each event with the

2    reporters in the audience who are most curious about them."

3            Well, the actual pool rotation since February 25

4    also belies that testimony.  So to walk the Court through a

5    few examples, on Exhibit 7, your Honor, the tab -- first tab

6    that the Court will see is for February 28 in White House

7    Daily Guidance and Press Schedule.  There were four events,

8    all of them involving the president of Ukraine that day.

9            THE COURT:  Okay.

10            MR. TOBIN:  All of them involved the president of

11    Ukraine.  And that day, as the pool sheet, Exhibit 6,

12    reflects, the White House chose the *L.A. Times* as the -- as

13    a pool participant.  So Exhibit 8, your Honor, which is

14    right behind that thick exhibit, is the *L.A. Times* website.

15    And what we did was we took down -- took and did a search

16    for all of its coverage of Ukraine in recent months and we

17    put it into a document.

18            If there's no objection, I'd like to admit that as

19    Exhibit 8.

20            MR. HUDAK:  No objection, your Honor.

21            THE COURT:  Without objection, 8 is in.

22            (Whereupon, Plaintiff's Exhibit No. 8 was entered

23    into evidence.)

24            MR. TOBIN:  Thank you, your Honor.

25            Thank you, Mr. Hudak.

1        Your Honor, the second page and third page are all

2    of the headlines of the articles that the *Los Angeles Times*

3    ran on the Ukraine.  Your Honor, I'll represent all 21 of

4    those articles bear the AP by-line.  They were not reported

5    by the *Los Angeles Times*.

6        And the *L.A. Times* report on the February 28th

7    event where the AP was banned but the *L.A. Times* was

8    included even credits some, quote, "reporting from the

9    Associated Press along with the White House's *L.A. Times*

10   correspondent."

11       So under the White House's own reasoning, it would

12   make no sense that the White House picked the *L.A. Times* as

13   the pool participant instead of the AP that day on

14   Ukraine-related events even though the *L.A. Times* relies on

15   AP for the vast majority, if not the entirety, of its

16   reporting.

17       So that rationale falls apart in Mr. Budowich's

18   declaration.  He says that the White House thinks that they

19   are picking -- pairing people with, quote, "the audience who

20   are most curious about them."  Why the White House would

21   think the *Los Angeles Times* audience is the most curious

22   about Ukraine when the *L.A. Times* relies on AP for its

23   reporting completely defies logic.

24       So, again, your Honor, that part of Mr. Budowich's

25   testimony is completely discredited.  It seems more likely,

1    your Honor, if the Court were to study the pool rotation,

2    the majority of the dates, and certainly all of them after

3    Monday, March 3rd, the print reporters are chosen

4    alphabetically by the agency, not by any curiosity, not by

5    any audience reach or any audience interest.  It's a pure

6    alphabetical rotation.  And so that additionally belies

7    Mr. Budowich's representation as to how the pool operates.

8            Your Honor, I'm now going to ask the Court to take

9    a look at the second tab of Exhibit 7, which reflects the

10    March 3rd schedule at the White House daily press guidance.

11    There are no events listed on that page, your Honor.  It's

12    just a blank page with the headers on it.

13            But I'll represent to the Court that the only

14    event President Trump participated in that day was an

15    announcement that Taiwan Semiconductor is investing $100

16    billion in Arizona.  Obviously, important business and

17    national news.

18            But the White House that day, if the Court would

19    refer to the chart on Exhibit 6, shows Reuters, not

20    Bloomberg, which is the leading wire service for business

21    news in the United States, for the wire service spot on that

22    day.

23            So if the White House was really picking the pool

24    based on the events themselves and the audience and the

25    particular curiosity of the audience, it would make sense to

1     use the Bloomberg wire service and not Reuters for that

2     particular day.

3          Additionally, the White House also selected, as

4     Exhibits 6 and 7 reflect, *Newsday*, my hometown newspaper

5     from when I was growing up on Long Island -- it chose

6     *Newsday* as the print reporter for the pool that day.

7          Well, again, it's just not credible that *Newsday*,

8     a Long Island-based newspaper, would be the appropriate

9     place for the most curious eyeballs for an Arizona story

10    about Taiwan Semiconductor coming in and investing

11    100 million into the Arizona -- I'm sorry -- 100 billion

12    into the Arizona economy.  It just doesn't hold up.

13         And so, your Honor, I'm going to ask the Court to

14    take a look at one more example in Exhibit 7, the Daily

15    Guidance and Press Schedule for March 20, '25.  The only

16    event listed there is an education event and the executive

17    order.  That was the executive order about taking steps to

18    eliminate the Department of Education.

19         The White House selected Bloomberg that day for

20    that wire spot.  Is the White House really saying that it

21    selected Bloomberg for some reason other than that it

22    alternates between Bloomberg and Reuters, and Reuters had

23    the day before?

24         The list will show you, your Honor, that the

25    selection of the wire service -- again, it's limited to two,

1    not three -- the AP is not eligible, as Mr. Budowich's

2    declaration says.  At least history shows us that.  And they

3    alternate between Bloomberg and Reuters.  That's the

4    documentary evidence about the reason why these particular

5    wire services were chosen on those particular days.

6          The White House also selected the *Boston Globe* for

7    the pool that day, your Honor.  And again, the *Boston Globe*

8    is alphabetically between Bloomberg Government, which was in

9    the pool the day before, and the *Christian Science Monitor*,

10   which was in the pool the day after.

11         So that shows us an alphabetical rotation system,

12   at least as to the print journalists, not some selection

13   based on some criteria they want the Court to believe is

14   objective on pairing audiences and predilections and reader

15   curiosity.

16         Mr. Budowich also says the Defendants didn't

17   select White House text reporters for these events in his

18   second declaration, Paragraph 10, to ensure the widest and

19   most robust coverage and distribution of these events.

20         Your Honor, the testimony here today educated the

21   Court.  Our distribution at AP is 4 billion people.  That's

22   4 billion people in this country and, obviously, worldwide.

23   The Court noted that yourself, your Honor.

24         Clearly, by excluding AP, they are shrinking the

25   coverage and distribution of the coverage of these events.

1    And so where the White House says that it wanted to ensure

2    the widest and most robust coverage and distribution of

3    these events, it doesn't get wider -- you don't get more

4    robust and wider distribution when you exclude the AP, which

5    has the largest distribution of any of these entities that

6    we've talked about.

7            Your Honor, as far as more evidence that I'd like

8    to point to the Court about AP not being banned,

9    Mr. Budowich's latest statement -- and these also answer

10   that question that I talked about at the beginning:  Are

11   there any type of events for which AP is not eligible?  At

12   Paragraph 17 of his second declaration, Mr. Budowich says

13   the AP has a commitment to misinformation but does not --

14   and he does not -- this does not interfere with their

15   eligibility to access events.

16           Well, "commitment to misinformation," which he put

17   in his declaration, also appeared in his February 14th tweet

18   back when this all began.  And that's how he characterized

19   AP's decision, as a commitment to misinformation by, quote,

20   "ignoring the lawful geographic name change of the Gulf of

21   America."  And then he said it's not just divisive, but it

22   also exposes the Associated Press's commitment to

23   misinformation.

24           So if he is saying now that the AP's commitment to

25   misinformation does not interfere with their eligibility to

1    access events, that's completely contradicted.  What was the

2    point of his tweet back on February 14th, when he was

3    announcing and celebrating the exclusion of AP because he

4    felt they had a commitment to misinformation?

5          Mr. Budowich also testified on February 14 that he

6    did not -- that the February 14th tweet did not constitute a

7    ban of the Associated Press as an outlet.  He attested to

8    that in Exhibit -- in Paragraph 20 of his first declaration.

9          Well, your Honor, this is the same tweet that

10   outright said the AP would no longer, quote, "have access to

11   limited spaces like Oval Office and Air Force One."

12         So if he's saying that it did not constitute a ban

13   of the AP as an outlet, we don't speak the same language,

14   because that's exactly what he said in that exact same

15   tweet.

16         And so, your Honor, we discussed earlier the

17   post -- or I showed you earlier the post on YouTube.  Just

18   to reinforce the point, I'd like Mr. Mishkin's help to show

19   the Court another YouTube clip.  We'll ask for that to be

20   admitted as exhibit -- video Exhibit B.  This is President

21   Trump in Mar-a-Lago.

22         MR. HUDAK:  No objection, your Honor.

23         THE COURT:  Without objection, B is in.

24         (Whereupon, Plaintiff's Exhibit B was entered into

25   evidence.)

```
 1              MR. TOBIN:  Thank you, Judge.

 2              This is February 18 at Mar-a-Lago.

 3              (Whereupon, Plaintiff's Exhibit B was published in

 4      open court.)

 5              MR. TOBIN:  So, your Honor, we've also submitted a

 6      transcript of that press statement, President Trump's

 7      appearance, as Exhibit 9.  If we can move that into evidence

 8      as well.

 9              MR. HUDAK:  No objection, your Honor.

10              THE COURT:  Without objection, 9 is in.

11              (Whereupon, Plaintiff's Exhibit No. 9 was entered

12      into evidence.)

13              MR. TOBIN:  So, your Honor, Mr. Budowich's

14      February 14th tweet makes very clear the AP was banned for

15      its content.

16              The president's statements about AP four days

17      later reinforce that AP is being punished because, according

18      to President Trump, it's called the Gulf of America now.

19      And he says later on, "We're going to keep them out until

20      such time as they agree it's the Gulf of America," end

21      quote.

22              So how can we say that the White House [sic] isn't

23      banned -- how can we say the White House isn't banned due to

24      its editorial decisionmaking regarding --

25              THE COURT:  You mean AP?
```

1          MR. TOBIN:  Yes.  Thank you, your Honor.

2          And so, your Honor, further showing the selective

3     retaliation against pool members and the dangerous chilling

4     effect it can and has had.

5          I think Mr. Mishkin showed the Court Exhibit 10,

6     which is the Taylor Budowich post on X in which he said that

7     Reuters has a coveted primo seat in the briefing room and

8     two slots in the pool.  Reuters regularly betrays its

9     responsibility to the public by printing anonymously sourced

10    lies.  More to come, question mark.

11         Well, "more to come," obviously, is more exclusion

12    of other journalists on the basis of their editorial

13    content.

14         And so, your Honor, as with AP's testimony today,

15    the Defendants' own words in this documentary evidence on

16    the comings and goings within the White House press pool

17    amply belie the assertion in Mr. Budowich's declarations.

18    And if he wanted to persuade the Court otherwise, he should

19    have been here himself.

20         So, your Honor, I just want to protectively ask

21    for admission of AP Exhibit 10, the Budowich X post, in case

22    we hadn't done that earlier.

23         MR. HUDAK:  No objection, your Honor.

24         THE COURT:  Without objection, 10 is in.

25         (Whereupon, Plaintiff's Exhibit No. 10 was entered

 1    into evidence.)

 2           MR. TOBIN:  And, your Honor, that concludes the

 3    AP's presentation of evidence today.

 4           THE COURT:  All right.  So, Mr. Tobin, I guess I

 5    wanted to shift to kind of a few more legal questions here.

 6           First, can you help me think through how I

 7    reconcile government speech doctrine with protected liberty

 8    interest that you're arguing that you have in participating

 9    in the pool?

10           MR. TOBIN:  Yes, your Honor.

11           In the record is an *amicus* brief from the Knight

12    Foundation.  They filed two, one on their own behalf --

13           THE COURT:  This is Knight First Amendment?

14           MR. TOBIN:  Correct, your Honor.

15           Their brief -- first brief really speaks to the

16    whole government speech doctrine.  If the pool were

17    government speech, your Honor, every press event where the

18    president speaks and has communicated a message that

19    journalists report would be considered protected by the

20    government speech doctrine.  There really is no functional

21    distinction between the president standing in one place and

22    standing in another reporting on information.

23           I mean, what they would want the Court to hold as

24    government speech we call journalism, your Honor.  It's

25    reporting the information that a source says that is of

1    public interest to the public.

2            The role of the pool is to independently cover the

3    president.  It is not an organ of the government, which is

4    what the government speech doctrine principally talks about,

5    your Honor.  The government doesn't control what the pool

6    reports.  It controls access.  The pool decides what it

7    reports.

8            Mr. Vucci testified in vivid detail about how he

9    looks at the frames and looks in the room and then tweets

10   out without a filter, without a censor, which would be

11   unconstitutional, what he reports.  That's not the

12   government's speech.  That's Mr. Vucci and the AP's

13   expression of news events that they are witnessing.

14           It's very different from the one-on-one interview

15   situation, which I think is kind of apples and oranges to

16   government speech.  But I'm sure we're going to talk about

17   that.  It's a different set of circumstances, which is where

18   the government interacts with an individual or groups of

19   people, but on an exclusive invitation-only.

20           It's also not the speech or the expression that

21   we're litigating here of the White House press apparatus.

22   It has its own press people.  They're very capably

23   represented by Ms. Leavitt and by Mr. Cheung and other

24   professionals in the communications department.  It has its

25   own photography staff.  And their photography staff takes

1    beautiful -- as a matter of art, beautiful images.  The

2    president can control, obviously, what messaging comes out

3    of that organ.  He does not get to control what the

4    Associated Press publishes.  And that takes it from outside

5    of the entire government speech doctrine.

6         Just because the government lets you in and

7    decides you can cover a specific event doesn't turn it -- an

8    ordinary act of journalism into government speech.

9         And Justice Alito warned about the expansion of

10   government speech -- I'm sorry.  The Court had a question?

11        THE COURT:  I think I know the quote you're going

12   to use, but go ahead.  You can give it.

13        MR. TOBIN:  All right.  So it's from *Matal v. Tam*.

14   It's a trademark case.  The argument was being made by the

15   Government that by forcing us to put what some consider to

16   be a racially insensitive trademark, granted trademark, for

17   a dance rock band, that that was the imprimatur of the

18   government, and that turned it into a government speech

19   event.

20        Justice Alito warned, and for a unanimous court,

21   that government speech, quote, "is a doctrine that is

22   susceptible to dangerous misuse.  If private speech could be

23   passed off as government speech simply by affixing a

24   government seal of approval, government could silence or

25   mute the expression of disfavored viewpoints."

1            And so, you know, that principle applies equally

2    here, your Honor.  There is a protected liberty interest

3    rooted in the First Amendment and to having access not

4    denied into these places for retaliatory reasons.

5            That's the liberty interest that underlies the

6    Fifth Amendment right to due process, and that's entirely

7    different.  It is a dangerous expansion of executive

8    authority into the First Amendment, sacred First Amendment

9    ground, to hold that, when the president allows reporters

10   into the Oval Office in a pool event, that's government

11   speech, and he gets to control the message that they send

12   out by telling them what to say.

13           That's exactly what he's doing here by insisting

14   that the AP use the Gulf of America instead of the Gulf of

15   Mexico as a precondition for not being kicked out of the

16   Oval Office.

17           THE COURT:  I want to -- there's a few things

18   you've said here I want to follow up on.

19           First, if I'm following you correctly, your

20   argument is that the violation is you being kept out on --

21   for retaliatory reasons.  Is that correct?

22           MR. TOBIN:  Yes, your Honor.

23           THE COURT:  And so the fact that you've been

24   allowed in forever is really beside the point.  You would

25   stand in the same position as one of these new media people

1    who just started and have their hard pass.

2           The difference -- if they're being kept out

3    because they're saying Gulf of Mexico, they would have the

4    same -- no more nor fewer rights than your client does.  Am

5    I thinking about that correctly?

6           MR. TOBIN:  Everybody would have the same rights

7    not to be retaliated by the president of the United States.

8           THE COURT:  And then the second point -- help me

9    think through why this is different than a one-on-one

10   interview --

11          MR. TOBIN:  Sure.

12          THE COURT:  -- and why this is not my bucket 4, if

13   you will.

14          MR. TOBIN:  Sure.

15          Your Honor, the *Ehrlich* case itself -- I'm

16   sorry -- the *Sherrill* case itself distinguishes between the

17   two situations.  There's a quote in *Sherrill* that says,

18   Certainly the press does not have a right to one-on-one

19   interviews.

20          And so if they were the same thing for purposes of

21   analysis, there would be no liberty interest doctrine.

22          So, you know, the question is:  Does the Oval

23   Office setting change it and make it -- take away the

24   liberty interest to get in there and make it more akin to a

25   one-on-one interview?

1          We've heard testimony from both sides, according

2     to Mr. Budowich --

3          THE COURT:  Yeah.  And so just on *Sherrill*, I

4     mean, one of the reasons I'm struggling with its

5     applicability to you is it says these press facilities are

6     perceived as being open to all bona fide Washington-based

7     journalists.  And obviously, that's not true for the Oval

8     Office.

9          MR. TOBIN:  It is, by decision -- by proxy, at the

10    very least, because of the pool system, that all of the

11    press cooperates in, and by virtue of the limitation on

12    space.  I mean, granted, only so many people can get in.

13    The issue is, once the pool is created and that becomes the

14    system to select which people are let in.  And then the pool

15    can be selected by nonviewpoint-discriminatory criteria.

16    That's where the liberty interest attaches.  That's where it

17    becomes on all fours with the *Sherrill* case.

18          And again, *Sherrill* itself has the distinction

19    buried within it for the situation where the White House is

20    inviting people on one-on-one interviews.  And it says you

21    don't have a right to it -- proxy for the word "liberty

22    interest" -- in a one-on-one interview with the president.

23    But when a system is established, whether it's a system to

24    select hard pass holders by objective criteria that were

25    litigated in all three of the precedent cases we're relying

1    on, or a pool system that's established for the limited

2    number of people who go into the Oval Office, that system

3    must be created with objective criteria.  There must be

4    notice of what that criteria is before somebody gets kicked

5    out.

6              THE COURT:  Yeah, and --

7              MR. TOBIN:  And if you remember the --

8              THE COURT:  So I'm just -- is it really the

9    system, though, that does -- I mean, let's say, you know,

10    President Biden would meet with one member of the press

11    corps for a one-on-one interview every week.  Does that mean

12    that President Trump would have to do so as well?  In other

13    words, the fact that -- I could certainly imagine a system,

14    you know, interacting with this one-on-one interview.  Would

15    that change the -- your agreement that you're not entitled

16    to a one-on-one interview?

17              MR. TOBIN:  I don't know that it necessarily

18    would, unless he announced, I'm canceling the one-on-one

19    interview situation that is now a regular rotating system in

20    the White House to go with your hypothetical.

21              I'll add to it:  regular rotating system in the

22    White House.  AP was going to be next on the rotation.  The

23    White House now cancels the entire one-on-one interview

24    system because it doesn't like AP using Gulf of Mexico, and

25    it boldly announces that.  You bet we would have some

1    constitutional concerns over that kind of an issue if it's

2    an established system, an established pool, an established

3    rotation.  The journalists who are part of that have an

4    established liberty interest under *Sherrill*, and it cannot

5    be taken away without due process.

6              THE COURT:  So how does that work with government

7    speech, then?  Because I thought that the one-on-one

8    interview is not problematic because it's government speech.

9              MR. TOBIN:  Oh, that's not what I said, your

10   Honor.  Maybe I'm -- maybe I was --

11             THE COURT:  I could have been thinking about it

12   wrong in my head.

13             MR. TOBIN:  No.  The one-on-one interview, the

14   president does -- if the president grants a one-on-one

15   interview, he doesn't control the message that comes out.

16   He controls himself.  He can regulate what he says or how he

17   expresses himself or gestures, the tone of voice, how he

18   looks, and all of that.

19             He can't grant the interview and then tell CBS

20   News, I have to see, you know, the outtakes and I will tell

21   you I don't want to use this part or that part.  That would

22   be a constitutional violation.

23             He can do the same thing by inviting his White

24   House press secretary to come in with a videographer -- and

25   White Houses do this -- and prepare their own message.

1    That's government speech, because government controls the

2    record; government has the imprimatur of the message through

3    that record.

4         And those are the hallmarks of the government

5    speech doctrine:  control that gives the suggestion of the

6    imprimatur of the government speaking.  That's what the *Tam*

7    case taught us.

8         And in a situation where the AP or CBS or ABC or

9    anybody is reporting on the president, that is not the

10   imprimatur of the government's approval.  That's independent

11   reporting.  As I said, we call that journalism, your Honor,

12   and that is not anything remotely resembling a government

13   speech type of case where the government is being regulated

14   or forced by regulation to give a message that it

15   disapproves of.

16        Here, the only thing we're asking the Court to

17   apply, regulatorily, is the Constitution of the United

18   States.  And that entitles us to be able to vindicate our

19   liberty interest unless the government takes it away for

20   reasons that comport with due process.  And that's simply

21   not what we have here.  And the facts just don't reflect the

22   one-on-one type of interview situation.

23        I mean, the *Ehrlich* case -- *Ehrlich* didn't -- the

24   *Ehrlich* court found that the reporters had no freestanding

25   First Amendment right to have oral questions from the

1    executive branch.

2        I think the Court focused some questions at the

3    earlier hearing -- and the witnesses testified -- that's not

4    what's going on in these Oval Office events.  That's not

5    what's going on in the east room events.

6        The press is brought in for a spray.  The press is

7    brought in for an opportunity to observe, report, take

8    photographs, and then leave the Oval Office after that

9    opportunity is done, on a rotating pool basis.

10        THE COURT:  But it's more than that.  Right?  I

11    mean, we have the -- I think you described it as the famous

12    Zelensky interview.  And as I understand it, I mean, that

13    arguably went off track because one of the reporters asked

14    why Zelensky wasn't wearing a suit.  Right?  I mean, that

15    was pivotal to that whole event.  And so I'm not sure I can

16    agree that what's happening there is just kind of observing

17    history.  Aren't they making history, too, by the questions

18    they pose?

19        MR. TOBIN:  Well, the *Ateba* case, your Honor --

20    A-T-E-B-A -- which the journalist lost, the *Ateba* case was

21    all about a journalist who was shouting questions during a

22    hard pass entry event.  The Court didn't say that, because

23    he was asking questions, he was deprived of his liberty

24    interest.  The Court said that there were -- the criteria

25    had been shifted over to Congress and he had not submitted

1    his application over there, and therefore those objective

2    criteria had not been fulfilled.

3            So just because a reporter can shout questions

4    doesn't turn it into a demand for oral information.  We are

5    not asking for the right to have the president or Zelensky

6    or anybody respond to questions.  That is a red herring

7    argument.  What we are -- and the case law, I can't

8    emphasize enough, discusses both of those circumstances,

9    your Honor, and distinguishes drastically between them.

10           What you have before you, your Honor, is evidence

11   of what the Oval Office event is like.  It is an opportunity

12   for the press to observe and report things going on behind

13   the Resolute Desk or between foreign leaders which could

14   take place in the east room; it could take place in the

15   press briefing room; sometimes there are joint conferences

16   between the president and a foreign leader in the press

17   room, and sometimes the press do ask questions, and

18   sometimes they shout them, and sometimes the president

19   answers them and doesn't answer them.

20           But the functionality and the, more importantly,

21   liberty interest doesn't extinguish when you move from room

22   to room.  They're entirely different events.  And so the

23   functional analysis we think the Court ought to apply, and

24   we would ask you to apply, is that when the Oval Office is

25   used as an opportunity for the president --

1              THE COURT:  Sorry.  So -- I mean, Mr. Hudak is

2     about to talk, and he's about to tell me about -- that

3     you're seeking special access.

4              MR. TOBIN:  Of course.

5              THE COURT:  And, you know, it does feel like it is

6     special access vis-à-vis the press briefing room and

7     vis-à-vis many other services that have never gotten into

8     the Oval Office, or certainly don't get into the Oval Office

9     on a daily basis.

10             Is your argument that, sure, it is special access,

11    but we can't be retaliated against, have our special access

12    revoked on a retaliatory basis?  Is that how you see this?

13    Or do you disagree that it's special access at all?

14             MR. TOBIN:  I would say, if we are going to

15    characterize it as special access, the same rules apply.  I

16    don't view it as special access.  I think I said this at the

17    last hearing.  *Zemel v. Rusk*:  Nobody has a right to be in

18    the White House.  It's all special in some sense.  You have

19    to earn it.  You have to apply for it.  You have to justify

20    it.  You have to be a White House dedicated reporter to get

21    in there.

22             I don't think it's any more or less special if

23    you're admitted into the Oval Office versus the press room

24    versus the east room if the functionality of the event is to

25    observe and report statements and interactions between other

1          people, and it is not a one-on-one invitation event.

2                    That's what takes it from outside of the *Ehrlich*

3          case.  The *Sherrill* case foreshadows that.  Your Honor, we

4          cited a litany of cases in our briefing in which courts have

5          analyzed, laid side by side, as this Court, I know, is going

6          to have to do -- laid side by side the *Sherrill* case and the

7          *Ehrlich* case, even post-*Ehrlich*, *Snyder v. Ringgold*,

8          *McKelvey v. Youngstown*.  There are four of them that are

9          cited in our brief.

10                   In each of those cases, it distinguishes between

11         opportunities presented to a group of journalists to come in

12         on a regular basis for press briefings, press events, and

13         the individual one-on-one interviews or three-on-one

14         interviews or five-on-one interviews.

15                   Even the *Ehrlich* case -- we talked about at the

16         last hearing the gaggle that took place in a side room in

17         the governor's mansion.  Even that specifically says

18         there -- that was by invitation only by the governor, having

19         his people go in and tap people and say, The governor is

20         inviting you to come in and see him.

21                   If the White House was starting over and there was

22         no press pool, we would not have any right to special,

23         general or regular access under *Zemel v. Rusk*, and the

24         president could go to a press outfit and say, We're inviting

25         you and we're inviting your competitor, or we're not.

1          Entirely different circumstances, your Honor.  I

2    don't know how to characterize it any differently to try and

3    persuade the Court.  But it is not -- it is not the fact

4    that it is in the Oval Office that makes it any more or less

5    sacred, the opportunity to report on the president, than in

6    the briefing room or than in the east room.  And the system

7    just has to comport with due process because of the First

8    Amendment liberty interest --

9          THE COURT:  Should I be thinking about the free

10   speech clause versus freedom of the press clause differently

11   or does that really -- is that a distinction without a

12   difference as far as our case is concerned?

13         MR. TOBIN:  Lovely question, and I appreciate it,

14   your Honor.  We're actually having, with a group of scholars

15   from Yale, a series of discussions in our office -- we

16   invite professors in -- about reinvigorating the free press

17   clause and whether there is a distinction to be had.  And we

18   have lots of examples from the case law where the Supreme

19   Court has characterized things under the free speech clause

20   or under the free press clause.

21         I would say it applies to both.  Writ large, it's

22   the freedom of expression we're talking about, whether it's

23   by oral or written word or visual medium.

24         And a liberty interest attaches once you recognize

25   that there is a free expression right, whether it's

1    characterized as speech or press.

2                THE COURT:  Okay.  Thank you.

3                MR. TOBIN:  Thank you, your Honor.

4                THE COURT:  Mr. Hudak?

5                MR. HUDAK:  Thank you, your Honor.

6           Just as a housekeeping matter, I provided counsel

7    our exhibits, which are numbered 1 through 32.  And I think

8    I displayed many of them during our examinations today.  I

9    would just -- they're all publicly available materials, and

10   I would move that they be admitted for purposes of this

11   hearing.

12               MR. TOBIN:  No objection, your Honor.

13               THE COURT:  Without objection, to the extent they

14   were not already admitted, 1 to 32 are admitted.

15               (Whereupon, Defendants' Exhibit Nos. 1 through 32

16   were entered into evidence.)

17               MR. HUDAK:  Your Honor, I don't know if you want

18   me to start with the pool or the pre-credentialed media or

19   east room, as we're calling it these days.  Which one?  I'm

20   happy to go with whichever one --

21               THE COURT:  Haven't we been always calling it the

22   east room?

23               MR. HUDAK:  We called it -- so east room,

24   pre-credentialed media.  I think we've had the same --

25   different words for the same concept, though.  The larger

1     audience.

2                THE COURT:  Well, maybe you can start where we

3     just -- Mr. Tobin started.  Are you claiming that the AP

4     has -- is eligible to be coming into the Oval Office at this

5     point and it's just been serendipity that it hasn't been for

6     the last month and a half?

7                MR. HUDAK:  I think we just are talking around the

8     word "eligible."  And I'm going to explain how I understand

9     it.

10               I'm eligible to be drafted by the Washington

11    Nationals.  I would love to be on that field today playing

12    baseball.  I can't hit a fastball, so there is no way that

13    I'm going in there.

14               So although the AP is eligible, like any hard pass

15    holder, to be selected, they are not being selected.

16               THE COURT:  Okay.

17               MR. HUDAK:  And they're not being selected, as I

18    understand it -- and I think the record is clear; I don't

19    quibble with the record that has been presented -- they are

20    not being selected for Oval Office access because they

21    refuse to adhere to what the president believes is the law

22    of the United States, and is the law of the United States,

23    that the body of water is called the Gulf of America.  That

24    is my understanding of why they are not in the Oval Office.

25               THE COURT:  Okay.  And so I should understand -- I

1    mean, as you see it, there's not been a real change of

2    position from the White House that AP -- that the ban still

3    exists and will continue to exist unless and until the AP

4    start -- changes its style guide?

5            MR. HUDAK:  Or until the president believes that

6    something else should occur or --

7            THE COURT:  Sure.

8            MR. HUDAK:  -- the White House press corps --

9    again, I think --

10           THE COURT:  But that's the record that I'm looking

11   at.

12           MR. HUDAK:  That's the record you are looking at.

13           I think, when we were last here -- and I think the

14   reason that Mr. Budowich uses the word "eligibility" in his

15   declaration is that it's part of the process they have

16   implemented to change the way that the pool is selected.

17           Before, those eligible for the pool were only

18   those that were on the list and had standing seats or were

19   on the rotator list.

20           Now it has been broadened to include new media

21   members and members of the media that have never been in the

22   pool before.  That's kind of the eligibility universe.  Who

23   is actually selected for the pool is up to the discretion of

24   the White House and the president.

25           THE COURT:  And I think the record provides one,

1        and only one, basis for denial thus far, and that is this

2        use of Gulf of Mexico.  Is that a fair description of the

3        state of events?

4                MR. HUDAK:  I think it's the -- it's the style

5        guide and their treatment of the legal name Gulf of America

6        in their style guide, I think, is the reason that the record

7        currently reveals for that treatment.

8                THE COURT:  All right.  So one other thing I

9        wanted your take on.  Government speech -- you're arguing

10       that I should not engage in forum analysis as to the Oval

11       Office, that this is government speech and, therefore, you

12       don't even kind of consider whether it's a nonpublic forum

13       or a limited forum, what have you?

14               MR. HUDAK:  I don't -- I mean, I wouldn't go so

15       far as saying government speech.  I think this falls in the

16       right-of-access cases.

17               So I think our point is that it is not a

18       restriction on an ability to speak.  It's not a prior

19       restraint.  We aren't telling someone they can't publish X.

20       What we are saying is:  You can't go into here.

21               And we think that that is kind of on all fours

22       with *Pell* from the Supreme Court.  And the quote there was:

23       It is one thing to say that a journalist is free to speak

24       out sources of information -- seek out sources of

25       information not available to members of the general public,

1       and that he's entitled to have some constitutional

2       protection of the confidentiality of such sources, and that

3       the government cannot restrain the publication of news

4       emanating from such sources.  It is quite another thing to

5       suggest that the Constitution imposes upon the government

6       the affirmative duty to make available to journalists

7       sources of information not available to members of the

8       public generally.  That proposition finds no support in the

9       words of the Constitution or any decision of this Court.

10              That's the baseline that we start with.  No

11      journalist can access anywhere that the general public can't

12      access.

13              THE COURT:  Yeah.

14              MR. HUDAK:  The D.C. Circuit has created one small

15      exception in *Sherrill*, which is where, even if the general

16      public can't go in there, if the general media can, then the

17      media has a liberty interest in there.

18              It has never gone further than that from general

19      access.  And what we clearly are dealing with here is not

20      general access.  There is only 13 -- 21 spots available to

21      go into the Oval Office.  And certainly not all 1300 hard

22      pass members can go in there.

23              THE COURT:  And so why -- I mean, it sounds like

24      you all really agree that I should be thinking about this as

25      a right-of-access case.  And so why isn't Mr. Tobin correct

1      that you can't discriminate against someone on viewpoint

2      discrimination to exclude them?  In other words, I think I

3      understand Mr. Tobin to be agreeing with you that, as an

4      initial matter, he doesn't -- his client doesn't have a

5      right to go into the Oval Office; but that you can't, A,

6      invite in these other media organizations and, B, exclude

7      his client on the sole basis of their viewpoint.

8                MR. HUDAK:  Right.

9                So I think we can -- and I think your Honor

10     started with -- today with saying the proposition that

11     viewpoint discrimination can occur when you are doling out a

12     special interview.  "I want to go with this reporter.  I

13     think he reports my stories fairly.  I've been impressed

14     with the way he's doing things."

15               That's not going to offend the Constitution if I'm

16     making a content-based determination about who I interview

17     with.

18               THE COURT:  Yeah.  But are interview cases

19     right-of-access cases?

20               MR. HUDAK:  I believe they are, your Honor, and I

21     think that we've cited several of them, including some of

22     the ones that my friend on the other side cited in their

23     belief.  For example, in *Youngstown Publishing* -- which is

24     an unreported district court opinion, granted -- there's a

25     quote in there that says:  Access to individual comments and

1    off-the-record statements is privileged access to

2    information, not generally made available to the entire

3    press or public.  A limited constitutional right of access

4    applies only where comments by government officials are

5    offered in a forum effectively open to all members of the

6    press.

7           I believe that was a First Amendment case that was

8    talking about when officials can decide who to convey their

9    statements to, including based upon the content of their

10    speech.

11           We cited several others -- *Bartley* from the Middle

12    District of Pennsylvania in 2014, and *Raycom National* from

13    the Northern District of Ohio in 2004 -- where it's similar.

14    It's content-based, who we're going to give access to.

15           I think it creates a weird incentive here that if

16    the president were to reduce the size of the pool down to

17    something that would be considered interview, so maybe one

18    news reporter that he likes, one print reporter that he

19    likes, one member of the new media, the case for the

20    government excluding everyone else would be much stronger,

21    but it would not promote freedom of the press or freedom of

22    access to the White House.

23           And that seems to be a choice that the

24    Constitution can't contemplate, that if the executive wants

25    to allow in a certain population of journalists, albeit

1    based upon their content, whether it's because they cover

2    particular subject matters or because they, you know, have a

3    particular reporter that the president is friends with and

4    believes his speech is most in line with the messaging he's

5    trying to convey, I don't think that offends the

6    Constitution on the First Amendment side.

7            And I think if you look at not only the *Ehrlich*

8    case, the *Baltimore Sun* case, if you will, or *Snyder* -- in

9    *Snyder*, it went to specifically contemplate -- this is,

10   again, a Fourth Circuit case.  It went to specifically

11   contemplate this scenario, saying that the argument

12   that some reporters must be afforded the same access as

13   others would preclude the equally widespread practice of

14   public officials declining to speak to reporters whom they

15   view as untrustworthy because the reporters have previously

16   violated a promise of confidentiality or otherwise distorted

17   their comments.

18            The Court went on:  Additionally, if the right was

19   somehow limited to situations where access is provided to a

20   broad spectrum of -- is somehow -- even if the right was

21   somehow limited to situations in which access is provided to

22   a broad spectrum of reporters, the plaintiff's role would

23   still presumably preclude the White House's practice of

24   allowing only certain reporters to attend White House press

25   conferences even though space constraints make it

1    impracticable to open the conference to all media

2    organizations.

3            Again, in that case, the Court found no

4    constitutional violation even though there was content-based

5    determinations of access.

6            THE COURT:  And so you feel like *Baltimore Sun* is

7    best understood as a right-of-access case?

8            MR. HUDAK:  I think *Baltimore Sun* is -- and *Snyder*

9    kind of merge the line between right of access and right of

10   inquiry.  But I think they're still -- you know, do we get

11   access to the person and the information source from the

12   government?

13           And I think that if they are viewed in that light,

14   I think a government official can say, I want these three

15   people because they cover me fairly and I'm going to give

16   them the skinny about this, you know, upcoming event that

17   isn't yet publicly known.  That happens all the time in the

18   press from what we see in these cases.

19           The fact that any contrary rule would require

20   somehow someone in the White House press conference to

21   arbitrarily or, like, systematically go down, saying, Well,

22   now the *Baltimore Sun* is getting the scoop this week because

23   it's next alphabetically, that just doesn't make any sense.

24           When you don't have a full general access, or

25   maybe even if the rule is more limited here, and all the

1    Court needs to decide is that the press pool, with its 13 to

2    21 members, which is a tiny fraction of hard pass holders,

3    that's special access; that's like a briefing to select

4    journalists.

5            That's the type of situation in *Sherrill* that they

6    contemplated.  In fact, *Sherrill* said that it would be

7    unreasonable -- it would be certainly unreasonable to

8    suggest that because the president allows interviews with

9    some bona fide journalists, he must give the opportunity to

10   all.

11           And, you know, that's, I think -- and it also

12   mentioned briefings in there.  The D.C. Circuit noted this

13   case did not concern the discretion of the president to

14   grant interviews or briefings with selected journalists.

15           So I really think the Circuit, the D.C. Circuit,

16   went out of its way in *Sherrill* to create the dichotomy of,

17   Look, we're creating a very narrow exception to the *Pell*

18   rule where press do not have any rights of access beyond the

19   general public.

20           We are creating a rule that if there's general

21   press access, they have a liberty interest.  If they don't,

22   they don't.

23           From the First Amendment side, I think that the

24   executive choosing who to speak with in special-access cases

25   is not a First Amendment violation based upon the content of

1        their prior speech.

2                 THE COURT:  All right.  And so for the east room,

3        then, this larger group, I mean, regardless of whether

4        *Baltimore Sun* is helpful to you, in the Oval Office, I don't

5        think it does you much good there.

6                 MR. HUDAK:  Yes, your Honor.

7                 And I think our argument, without getting into the

8        likelihood of success on the merits, although it blends

9        somewhat, is that I think the evidence reveals that the AP

10       has had access to the east room events commensurate, and

11       probably better than, any other non-pool media organization.

12       In fact, I believe, after the court reporter read back the

13       question to Mr. Miller, he agreed with that.

14                 If we want to go through the timeline of events --

15       and I'll just put up the final slide so I do not belabor the

16       point, your Honor --

17                 THE COURT:  While you're looking for that, I'll

18       ask you to -- I'll try to ask you the same question I asked

19       Mr. Tobin.

20                 MR. HUDAK:  Sure.

21                 THE COURT:  Do you agree that the state of the

22       evidence in front of me is that, at least this month,

23       photojournalists have been regularly, if not invariably,

24       admitted into the east room from the AP and foreign print

25       journalists have been occasionally admitted in, but that

1    Mr. Miller has not been allowed in and hard pass holders

2    from the AP who are print journalists have not been allowed

3    in?

4            MR. HUDAK:  I believe that's the record as

5    presented through the declarations and Mr. Miller's

6    testimony.

7            It is my -- I think there's probably a dispute

8    about the east room women's event yesterday.  It's my

9    understanding -- and I think Mr. Miller confirmed -- that

10   one of the print journalist's RSVP was approved, but wasn't

11   physically admitted into the room.

12           I have learned over the lunch break that was

13   because of a security situation and that they showed up

14   towards the back half and then, along with 40 other folks

15   that had an RSVP approved, weren't admitted because the

16   president moved quicker than they expected and had to close

17   down various areas of the White House.  So it's my

18   understanding that they are being provided access to the

19   east room events.

20           I would also say that, on the tarmac events, which

21   are pre-credentialed media, they have had a domestic print

22   reporter there at the three that are on our chart here.

23           So I think, if you look at the realm of

24   pre-credentialed media events, they've had both foreign

25   correspondents, photographers, sometimes multiple

1    photographers, and domestic print journalists, at least at

2    the tarmac, and it's my understanding there was at least an

3    intent to get them into the event yesterday, albeit the

4    circumstances did not allow for it.

5            THE COURT:  All right.  And so I guess you're

6    saying there's no irreparable harm as to the east room?

7            MR. HUDAK:  That's correct.  Because the --

8    whether it's a photojournalist or a text-based journalist or

9    a foreign correspondent, they're able to observe the things

10   that we heard at the TRO hearing that you can't get from a

11   livestream.  Again, it's my understanding the White House is

12   livestreaming a lot of these events.  I don't know if it's

13   all.  Mr. Miller said it wasn't.  I need to go back and

14   verify that.

15           But, you know, the smell of the room -- I think

16   Mr. Tobin mentioned, how heavy is the president breathing?

17   I think folks mentioned, who else is in the room?  I think

18   Mr. Vucci confirmed that he's trained to do that.  He's

19   trained to be the eyes and ears of his organization in these

20   rooms.  And when he's in these rooms, as a professional

21   photojournalist, he's looking to capture not just the main

22   speaker, but the dozing child on the shoulder of her mother

23   during the women's history event.  He is looking to capture

24   the reaction and movement of the participants in the event.

25   He's looking to capture what is the ambiance and mood of the

```
 1    room.

 2              He has all the communication equipment necessary

 3    to do that immediately, including his phone to text the --

 4    any text reporter, Hey, you know, Secretary Rubio is here

 5    for this, or something of that that would be noteworthy, or

 6    there's a water glass in front of President Biden and he's

 7    separated by, you know, two blanks, what everyone else is

 8    separated by, even if you couldn't have picked that up on

 9    the livestream, which I think we demonstrated in a very

10    short notice you could.

11              So I think the harm that was identified and the

12    harm that continues to be identified in the papers is a lack

13    of access to these non-, you know, core, substantive, if you

14    will, items that you get from perceiving someone in

15    person -- I think they're getting that access.  I mean, I

16    don't know how else we can measure irreparable harm in this

17    case, or what harm there could be.

18              THE COURT:  Thank you.

19              Anything else, sir?

20              MR. HUDAK:  No, your Honor.  Thank you.

21              THE COURT:  All right.  Mr. Tobin, I'll give you

22    the last word, sir.

23              MR. TOBIN:  Yes.

24              Your Honor, I just want to reinforce, as I open a

25    short closing, your Honor, there is no principal distinction
```

1    between the events that go on in the east room and the Oval

2    Office for analytical purposes under the *Sherrill* doctrine.

3    They're both limited spaces, your Honor.  They're both

4    spaces where the president sits down with foreign leaders

5    and other newsmakers and conducts events.  They're both

6    areas that only allow for so many people.  It happens to be

7    bigger in the east room than in the Oval Office.  And

8    they're both areas where journalists observe and report the

9    news.

10           As the *Sherrill* court put it, they're both sources

11    for -- of news-gathering for journalists.  And under the

12    *Sherrill* doctrine, once those sources are established, a

13    rooted liberty interest resides in the press, and it cannot

14    be deprived without due process.

15           So, your Honor, we don't think that there is an

16    analytical distinction.  We understand there's a physical

17    limitation distinction.  But for analytical purposes,

18    they're the same kinds of forums for purposes of

19    news-gathering.  And we would ask the Court to analyze them

20    both together under *Sherrill*.

21           Your Honor, to touch on a couple of issues that

22    have been raised throughout the day today --

23           THE COURT:  Yes.

24           MR. TOBIN:  -- in terms of the chilling effect,

25    your Honor, AP is not going to stand here and tell you that

1      they're intimidated into reporting any differently on the

2      president because the president is trying to bully them,

3      trying to coerce them into toeing an official party line, or

4      letting the White House dictate its vocabulary.

5            But if the question in First Amendment retaliation

6      comes down to, you have to succumb to have a cause of

7      action, we'd be swimming upstream against decades,

8      generations, of First Amendment activity.  The First

9      Amendment protects journalists who have the courage of their

10     convictions, as well as journalists who succumb to the will

11     of government --

12            THE COURT:  Yeah, and so on that point -- I mean,

13     that's why I asked Mr. Miller about other journalists who

14     have.  And frankly, I didn't hear a lot of specificity from

15     him there.

16            MR. TOBIN:  May I have leave to submit a

17     declaration to show the Court what NBC, ABC, MSNBC, CBS and

18     CNN did with its reporting on the splashdown in the Gulf,

19     just as an illustration --

20            THE COURT:  We can talk about that.  I'm not sure

21     that you want continued fact-gathering here.  We might get a

22     third declaration from the White House.  So let's talk about

23     whether -- I anticipated this being a lid, so to speak, on

24     the factual --

25            MR. TOBIN:  I understand.

```
1              THE COURT:  -- development.

2              But anyway, on the chilling point, is it

3    relevant -- I mean, even if I -- I'll tell you, you know, my

4    instinct is that this has not changed how your client is

5    exercising its free speech rights, nor do I think you've

6    shown that other organizations have changed.

7              It looks to me like maybe that's not the -- the

8    chilling is also kind of whether it's restrained your

9    ability to exercise your free speech rights.  And I'd think,

10   there -- in other words, you know, it may be easiest going

11   back to Mr. Vucci's testimony.  He's not taking -- he gets

12   fewer opportunities to take pictures even if he is still

13   exercising the same editorial discretion that he did before.

14             And so those feel different to me.  But perhaps

15   you win either way.

16             MR. TOBIN:  Well, we would say whichever way the

17   Court feels the evidence lies most strongly for us would be

18   what we would urge --

19             THE COURT:  Well --

20             MR. TOBIN:  -- but --

21             THE COURT:  -- I'm trying to ask you --

22             MR. TOBIN:  But --

23             THE COURT:  -- about the law.

24             MR. TOBIN:  No, I understand.  I don't think

25   there's a distinction -- I do think that when Mr. Vucci
```

1    testifies that he can't get the photographs because he would

2    have been in the pool but for the exclusion, and we have to

3    rely on -- not to offend any competitors, but

4    inferior-to-AP-standards photography or delays in the

5    release of information, that is a material impact on the way

6    AP expresses itself to its subscribers.

7         And we know from the declarations that the AP

8    subscribers and advertising base feel that the coverage is

9    materially different, that there are subscribers -- we have

10   that in one of our declarations -- who have said, We're not

11   sure that we'll continue with the AP.

12        We had an advertiser pull out -- a $150,000

13   advertiser pull out because they were concerned about the

14   White House ban and the conflict with the White House over

15   this.  So it is causing real and material harm, not just to

16   the AP's business, but to the way in which the AP expresses

17   itself before and after the ban.  So I would say that is, in

18   and of itself, a chill.

19        I would also note that the First Amendment cases

20   on retaliation generally fall out on --

21        THE COURT:  So is that the right way to think

22   about chill, though?  Like it almost sounds to me like

23   you're analogizing it to injury.  And I guess I thought

24   chill was more making me act in a way I wouldn't have acted

25   otherwise.

1          MR. TOBIN:  And there are two elements.  We can

2     look to the *Ehrlich* case for that, that the adverse impact,

3     the overarching legal standard, is:  Has there been an

4     adverse impact on exercise of First Amendment rights?

5          That -- in the *Ehrlich* decision, they drilled down

6     to a substantial adverse impact or chill.  They

7     characterized it in the disjunctive.  Judge Niemeyer then

8     went on to analyze:  Adverse impact is *de minimis*.  And he

9     looked at the fact that the reporters themselves -- I'm

10    sorry -- that the coverage had not been materially changed.

11         Your Honor, I can't do any better than the record

12    we've done today to show that the AP's coverage has been

13    materially changed, that there has been an adverse impact,

14    and it has not been *de minimis*.  It's substantial and

15    fulsome in the way this retaliation has affected the AP.

16         And then the Court went on to say:  And there's

17    been no chill in the way the reporters individually are

18    expressing themselves.

19         So there are two paths to adverse impact.  If the

20    Court wants to rest on -- express on how they express

21    themselves, I would say the Court would be committing

22    reversible error.  The way to look at this is in the

23    disjunctive:  Has there been a chill in the way they express

24    themselves?

25         I do think that the loss of opportunities for

1    AP -- and AP is the Plaintiff here -- the loss of

2    opportunities for AP and having to put other people's

3    products out that it deems not meeting its own criteria, and

4    because it's slow -- and AP is an organization that, as part

5    of its free speech, exercise of free expression, relies on

6    rapidity -- I think that there has been a chill in the

7    individual way AP expresses itself and that the impact

8    cannot be characterized, as the *Ehrlich* impact was, as

9    *de minimus* because of all of the lost opportunities, all of

10   the missed moments, all of the things you heard these

11   journalists talk about that they would have and hope to have

12   captured.  But they were unable to do that.

13            THE COURT:  And so you're saying, even if I agree

14   with Mr. Hudak that *Baltimore Sun* is the right way to think

15   about this, the Oval Office opportunities, that the

16   Government loses under kind of the chill analysis?

17            MR. TOBIN:  I could see the Court, yes, putting in

18   its opinion that -- even if I were to analyze it under

19   *Ehrlich*.

20            But *Ehrlich* is really just -- the analytical model

21   is First Amendment retaliation, and it is one of our -- two

22   of our four causes of action.  So the Court will need to

23   perform the adverse impact analysis under the First

24   Amendment, whether it uses *Ehrlich* or whether it uses the

25   case *Heffernan* in the U.S. Supreme Court, *Heffernan v. City*

1    *of Paterson*, decided in 2016.  The cite, your Honor, is 578

2    U.S. 266.  I'm going to quote in a minute from Pages 273 to

3    274.

4              Your Honor, in that case, it was a law enforcement

5    officer who was seen carrying signs for the opponent of the

6    mayor to his car.  He happened to be carrying them for his

7    mother.  He was a supporter of the mayor's.  On the city's

8    instructions, he was demoted, as I remember the facts in

9    that case, in retaliation for what was perceived to be his

10   expression.

11             The District Court and the Court of Appeals said

12   that just because he was demoted, it was not a sufficient

13   adverse impact; there had been no showing of the necessary

14   elements.

15             The U.S. Supreme Court said -- and he hadn't

16   changed his point of view.  He actually was a supporter of

17   the mayor's.  He disagreed with his mom.

18             But the Supreme Court said that the actual test

19   there was not whether he himself was chilled and changed his

20   political expression or his vote.  The issue in this case is

21   whether the discharge of one employee, the plaintiff, tells

22   others that if they engage in that activity, they do so at

23   their peril.

24             And so -- and *Ehrlich* talks about this.  It is an

25   objective standard:  Would a reasonable person be chilled in

1    the expression of their activity?  And there's no question.

2    We've seen people change their expression from Gulf of

3    America to Gulf of Mexico -- or from Gulf of Mexico to Gulf

4    of America, who previously had reported otherwise, because

5    the president told them so.

6         And so there is not only a tendency to chill, but

7    we've seen in just our recent experiences an actual impact

8    on the way people speak, which is what the president wants,

9    which he may want and he can message as many times as he

10   wants, but he cannot deprive people of a liberty interest

11   and he cannot retaliate against them if they make a

12   different choice, consistent with either the Fifth Amendment

13   or the First Amendment.

14        THE COURT:  So -- and I think you told me this

15   last time, but you'd see -- you don't see *Baltimore Sun* as a

16   right-of-access case.  You disagree with Mr. Hudak there?

17        MR. TOBIN:  You know, your Honor, I practice First

18   Amendment law, and I'm so wonky on it I think of it in a

19   certain specific way.

20        THE COURT:  Yeah --

21        MR. TOBIN:  And I apologize if my -- the way I

22   express myself isn't completely aligned with you both.

23        And I don't think it's adverse to us for you to

24   say the word "access."  I think of it as a right not to be

25   excluded once access is provided.  And those are two

1    fundamentally constitutionally different events.

2            THE COURT:  And that's what you're describing

3    *Baltimore Sun* as or that's what you're describing this

4    situation as?

5            MR. TOBIN:  This situation.

6            THE COURT:  Okay.

7            MR. TOBIN:  That we've been provided with access;

8    we've been provided with a system that's given us a rooted

9    liberty interest that we are being excluded from on the

10   basis of viewpoint discrimination on the Fifth Amendment

11   claim without any due process, and on the First Amendment

12   claim we're being retaliated against.

13           THE COURT:  But I'm asking you about *Baltimore*

14   *Sun*.  Should I understand *Baltimore Sun* as a right-of-access

15   case?

16           MR. TOBIN:  No.  I would say *Baltimore Sun* was a

17   right of -- oral communications from the government, right

18   to demand equal oral communications from the government as

19   everybody else.  So the one-on-one interview with anybody in

20   the government.  That's what the facts were in *Baltimore*

21   *Sun*.

22           I think the Court knows it was an edict to the

23   entire executive branch:  Don't answer Mr. Nitkin's or

24   Mr. Olesker's questions from anybody in the executive

25   branch.

1            That's the analogy to the one-on-one interview.

2     So it's a one-on-one interview case.

3            THE COURT:  And if I disagreed with you and

4     followed *Baltimore Sun*, I get to the chill factor.  Why

5     wouldn't this evidence that Mr. Hudak presented this morning

6     showing -- I think it was primarily with Mr. Vucci, that

7     you're still getting all of these pictures and in fact

8     charging people for them -- why doesn't that really vitiate

9     your adverse impact evidence?

10           MR. TOBIN:  Well, I think what he was shown --

11    what Mr. Vucci was shown were largely other people's

12    photographs, not ours.  And the Sipa photographs are not our

13    news product or even distributed, I think the testimony

14    said, for our news stream.  They're put up on our website to

15    be sold, just like in a Walmart you might have two different

16    brands of bathrobes for sale.  It's the distribution

17    mechanism.

18           AP has a distribution hub as part of its business

19    for other people's journalism in addition to sending out to

20    its members and subscribers its journalism.  And the fact

21    that Reuters and others, *New York Times*, have been kind

22    enough, in solidarity for this conflict, to give the AP

23    licenses to send out their photographs is no substitute,

24    especially when Mr. Vucci testifies they don't give them the

25    good stuff and they don't give it to them in the same

1     timeliness.  And that is all impacting the AP's brand.

2               And so it is not -- it does not equate under

3     *Baltimore Sun* with -- I think the numerics were 142 articles

4     covering the state house by Mr. Nitkin and Mr. Olesker

5     before the ban, 144 after the ban.  No material impact, or

6     any impact was *de minimis*.

7               This is not a *de minimis* impact to force us to put

8     someone else's product out as our own or -- to our

9     customers.  And the customers certainly, as the evidence

10    shows, haven't been satisfied with that.

11              THE COURT:  All right.  Thanks, gentlemen.  It's

12    been a long day.  I appreciate your thoughtful briefing and

13    arguments here.

14              As I say, I think if I'm going to get a ruling out

15    in any sort of timely fashion, I think we need to call a

16    halt to additional factual submissions.  I think one

17    exception to that is if the parties would like to tell me

18    that AP is now being admitted to the Oval Office, I think

19    that could be a very different situation.

20              But right now, why don't we stick with what we

21    have, and I'll take the matter under advisement and get back

22    to you all as soon as I can.

23              MR. TOBIN:  We appreciate the Court's careful

24    attention.

25              THE COURT:  Thanks.

1              MR. HUDAK:   Thank you, your Honor.

2              (Proceedings concluded at 3:43 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                               **CERTIFICATE**

2

3            I, LISA EDWARDS, RDR, CRR, do hereby

4 certify that the foregoing constitutes a true and accurate

5 transcript of my stenographic notes, and is a full, true,

6 and complete transcript of the proceedings produced to the

7 best of my ability.

8

9

10            Dated this 1st day of April, 2025.

11

12        <u>/s/ Lisa Edwards, RDR, CRR</u>
        Official Court Reporter

13         United States District Court for the
          District of Columbia

14         333 Constitution Avenue, Northwest
        Washington, D.C. 20001

15         (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$100** [1] - 168:15
**$150,000** [1] - 206:12
**$35** [2] - 59:15, 60:12
**$495** [2] - 59:16, 60:12

## '

**'25** [1] - 169:15

## /

**/s** [1] - 215:12

## 1

**1** [12] - 3:11, 92:16, 116:3, 116:6, 119:15, 119:18, 119:20, 119:21, 134:25, 189:7, 189:14, 189:15
**1-32** [1] - 3:16
**10** [12] - 3:11, 3:14, 124:5, 124:23, 124:25, 125:1, 156:12, 170:18, 174:5, 174:21, 174:24, 174:25
**100** [12] - 35:7, 35:12, 53:16, 57:16, 64:18, 70:4, 73:16, 78:15, 85:22, 103:19, 169:11
**10019** [1] - 1:20
**10:00** [3] - 22:7, 82:10, 82:11
**10:15** [1] - 81:19
**10:30** [1] - 81:18
**11** [6] - 91:4, 95:8, 95:23, 109:16, 111:19, 113:24
**119** [1] - 3:11
**11th** [7] - 22:14, 112:21, 117:23, 123:24, 124:4, 146:22, 148:11
**12** [2] - 60:3, 123:18
**120** [4] - 102:18, 102:22, 103:18, 103:19
**125** [1] - 3:11
**126** [1] - 3:7
**12th** [2] - 73:15, 143:19
**13** [7] - 22:24, 60:16,

94:9, 94:17, 94:19, 193:20, 198:1
**13-member** [1] - 97:8
**13-person** [2] - 94:16, 97:16
**1300** [1] - 193:21
**136** [1] - 135:6
**13th** [1] - 118:18
**14** [1] - 172:5
**142** [1] - 213:3
**144** [1] - 213:5
**146** [1] - 3:7
**14th** [10] - 70:1, 70:19, 94:18, 113:17, 143:25, 146:23, 171:17, 172:2, 172:6, 173:14
**15** [3] - 63:2, 78:4, 157:18
**154** [1] - 3:12
**15th** [1] - 141:25
**16** [2] - 64:6, 86:5
**164** [1] - 3:12
**166** [1] - 3:13
**1675** [1] - 1:19
**17** [3] - 64:10, 135:2, 171:12
**172** [1] - 3:13
**173** [1] - 3:14
**174** [1] - 3:14
**18** [3] - 3:3, 46:4, 173:2
**189** [1] - 3:16
**1909** [1] - 1:16
**19th** [1] - 1:19
**1:00** [1] - 149:14
**1st** [7] - 15:5, 70:11, 71:3, 71:9, 71:25, 88:23, 215:10

## 2

**2** [11] - 3:11, 14:14, 48:12, 92:16, 116:4, 116:14, 116:16, 119:16, 119:18, 119:20, 119:21
**20** [5] - 34:13, 69:2, 104:16, 169:15, 172:8
**20001** [2] - 2:4, 215:14
**20006** [1] - 1:17
**2004** [1] - 195:13
**2014** [1] - 195:12
**2016** [1] - 209:1
**2017** [1] - 60:5
**2018** [1] - 60:15
**202** [2] - 2:4, 215:15
**2020** [3] - 54:13,

54:24, 56:16
**2021** [2] - 139:24, 141:25
**2022** [1] - 110:2
**2024** [1] - 78:18
**2025** [12] - 1:7, 22:14, 54:3, 56:17, 66:7, 69:4, 73:15, 91:4, 92:13, 135:3, 139:11, 215:10
**20530** [1] - 1:23
**20th** [2] - 73:23, 144:4
**21** [10] - 19:20, 23:7, 41:19, 43:10, 46:5, 88:14, 94:11, 167:3, 193:20, 198:2
**22nd** [4] - 70:6, 70:19, 72:4, 144:8
**24** [4] - 72:2, 92:13, 154:22, 155:7
**24/7/365** [1] - 123:8
**24th** [20] - 56:7, 56:19, 58:6, 60:15, 74:6, 97:17, 129:9, 129:13, 129:15, 129:23, 132:15, 133:5, 135:3, 138:7, 138:8, 142:9, 142:10, 144:18, 156:4, 164:2
**25** [3] - 165:4, 165:8, 166:3
**25-00532** [1] - 1:4
**25-532** [2] - 4:2, 149:23
**25th** [5] - 49:7, 54:2, 60:5, 98:3, 122:11
**266** [1] - 209:2
**27** [1] - 1:7
**273** [1] - 209:2
**274** [1] - 209:3
**27th** [3] - 54:23, 55:17, 142:22
**28** [1] - 166:6
**28th** [14] - 58:6, 64:20, 69:3, 69:18, 129:22, 129:24, 130:12, 131:2, 131:14, 132:12, 132:14, 136:17, 145:9, 167:6
**2:00** [1] - 149:16
**2:48** [2] - 116:20, 116:22
**2nd** [2] - 66:7, 116:19

## 3

**3** [2] - 14:14, 153:4
**3-A** [1] - 48:22
**30** [6] - 31:11, 35:2, 40:1, 104:16, 110:6, 121:24
**300** [2] - 103:20, 161:24
**31** [1] - 130:6
**310** [1] - 135:5
**32** [4] - 131:21, 189:7, 189:14, 189:15
**333** [2] - 2:3, 215:14
**354-3269** [2] - 2:4, 215:15
**360** [1] - 44:20
**39** [1] - 116:25
**3:00** [3] - 112:6, 112:10, 112:20
**3:27** [1] - 116:22
**3:43** [1] - 214:2
**3rd** [2] - 168:3, 168:10

## 4

**4** [7] - 32:18, 42:10, 54:20, 151:6, 170:21, 170:22, 179:12
**40** [6] - 31:11, 40:1, 40:5, 110:6, 115:24, 200:14
**44** [5] - 7:11, 7:20, 8:18, 146:20, 147:6
**45** [2] - 3:4, 35:3
**4:30** [1] - 22:5

## 5

**5** [6] - 3:12, 164:14, 164:19, 164:22, 165:7, 165:22
**50** [1] - 34:13
**578** [1] - 209:1

## 6

**6** [11] - 3:12, 138:25, 154:5, 154:8, 154:13, 154:14, 154:21, 156:2, 166:11, 168:19, 169:4
**60** [1] - 146:23
**601** [1] - 1:23
**6706** [1] - 2:3
**6th** [1] - 139:11

## 3

**3** [2] - 14:14, 153:4

## 7

**7** [13] - 3:10, 91:21, 92:6, 92:9, 92:10, 153:21, 153:22, 154:22, 156:3, 166:5, 168:9, 169:4, 169:14
**79** [1] - 3:4
**7th** [4] - 69:21, 70:18, 131:23, 143:11

## 8

**8** [6] - 3:13, 58:4, 166:13, 166:19, 166:21, 166:22
**89** [1] - 3:6
**8:00** [1] - 22:4

## 9

**9** [5] - 3:14, 59:10, 173:7, 173:10, 173:11
**92** [1] - 3:10
**9:38** [1] - 1:7

## A

**a.m** [4] - 1:7, 22:4, 82:11
**Aamer** [2] - 135:17, 135:19
**AAMER** [1] - 135:17
**Aaron** [1] - 50:20
**Abaca** [5] - 60:22, 60:24, 61:4, 61:6, 64:11
**ABC** [3] - 97:22, 183:8, 204:17
**ability** [14] - 51:23, 52:20, 75:18, 76:3, 79:15, 101:17, 103:15, 115:1, 125:12, 126:3, 137:10, 192:18, 205:9, 215:7
**abject** [1] - 10:15
**able** [30] - 5:11, 5:12, 31:24, 38:1, 50:16, 50:18, 56:11, 57:4, 62:19, 64:24, 77:8, 78:3, 78:5, 104:22, 114:2, 114:6, 115:20, 115:21, 115:22, 115:25, 117:11, 117:15, 117:20, 119:5, 120:25, 121:2,

121:4, 128:13,
183:18, 201:9
  **absolutely** [23] -
26:5, 27:15, 29:17,
34:9, 36:19, 37:7,
37:22, 38:15, 47:15,
54:1, 76:14, 85:22,
88:4, 91:2, 101:20,
106:12, 109:4,
111:18, 121:21,
122:8, 147:4, 159:18,
161:8
  **accelerated** [1] - 7:9
  **acceptable** [1] -
163:3
  **accepted** [2] - 80:6,
160:5
  **access** [85] - 15:9,
15:14, 15:16, 15:18,
15:22, 16:1, 36:8,
36:20, 37:2, 49:12,
49:16, 49:18, 50:16,
50:18, 62:23, 68:20,
68:21, 70:12, 76:24,
77:1, 78:2, 81:7,
82:13, 129:17, 132:7,
132:9, 134:12, 135:5,
135:6, 138:6, 143:16,
159:2, 159:7, 159:24,
161:7, 161:18,
171:15, 172:1,
172:10, 176:6, 178:3,
186:3, 186:6, 186:10,
186:11, 186:13,
186:15, 186:16,
187:23, 190:20,
192:16, 193:11,
193:12, 193:19,
193:20, 193:25,
194:19, 194:25,
195:1, 195:3, 195:14,
195:22, 196:12,
196:19, 196:21,
197:5, 197:7, 197:9,
197:11, 197:24,
198:3, 198:18,
198:21, 198:24,
199:10, 200:18,
202:13, 202:15,
210:16, 210:24,
210:25, 211:7, 211:14
  **accommodate** [1] -
93:12
  **accompanied** [2] -
23:7, 43:22
  **accompany** [1] -
122:6
  **accompanying** [3] -
24:17, 122:16, 122:17
  **accomplish** [1] -

114:2
  **according** [3] -
10:12, 173:17, 180:1
  **accurate** [4] - 69:19,
76:20, 76:21, 215:4
  **acknowledgement**
[1] - 158:1
  **Acosta** [7] - 9:16,
9:24, 13:12, 14:10,
161:15, 163:7
  **act** [3] - 112:9, 177:8,
206:24
  **acted** [1] - 206:24
  **action** [4] - 8:24,
125:18, 204:7, 208:22
  **Action** [2] - 1:3,
149:23
  **actions** [1] - 125:25
  **activities** [4] - 6:5,
52:10, 91:5, 99:23
  **activity** [4] - 75:9,
204:8, 209:22, 210:1
  **actual** [8] - 23:22,
52:3, 68:4, 68:8, 68:9,
166:3, 209:18, 210:7
  **adamant** [1] - 87:9
  **add** [2] - 67:22,
181:21
  **added** [4] - 7:24,
31:21, 112:22, 162:21
  **adding** [1] - 103:16
  **addition** [7] - 47:16,
57:20, 106:12,
120:11, 126:23,
212:19
  **additional** [6] - 5:19,
14:2, 115:17, 129:2,
142:2, 213:16
  **additionally** [5] -
108:5, 165:20, 168:6,
169:3, 196:18
  **address** [2] - 16:9,
16:20
  **addressed** [2] -
152:15, 152:16
  **adequately** [1] -
121:2
  **adhere** [1] - 190:21
  **adhering** [1] - 8:1
  **adjacent** [1] - 49:15
  **administer** [1] -
162:4
  **administered** [1] -
98:16
  **administration** [3] -
77:10, 147:17, 152:23
  **administrations** [1] -
143:10
  **admissibility** [1] -
6:20

  **admission** [3] -
119:16, 124:22,
174:21
  **admissions** [1] -
7:21
  **admit** [5] - 92:5,
154:1, 154:8, 158:16,
166:18
  **ADMITTED** [1] - 3:9
  **admitted** [55] - 7:20,
8:13, 8:20, 36:25,
42:20, 43:1, 43:2,
43:7, 57:1, 57:9,
57:14, 64:15, 65:5,
80:4, 118:13, 120:3,
120:20, 120:21,
133:4, 135:21,
142:13, 142:17,
143:1, 143:16,
143:22, 144:2, 144:6,
144:13, 144:23,
145:4, 145:6, 145:15,
147:2, 151:14,
151:19, 154:2, 156:9,
158:8, 158:11,
158:17, 158:19,
158:22, 159:4,
159:23, 160:1,
172:20, 186:23,
189:10, 189:14,
199:24, 199:25,
200:11, 200:15,
213:18
  **admonishment** [1] -
8:1
  **adopted** [1] - 42:24
  **advance** [1] - 131:15
  **adversarial** [1] - 5:13
  **adverse** [12] - 11:1,
11:6, 207:2, 207:4,
207:6, 207:8, 207:13,
207:19, 208:23,
209:13, 210:23, 212:9
  **advertiser** [2] -
206:12, 206:13
  **advertises** [1] -
51:11
  **advertising** [1] -
206:8
  **advised** [1] - 137:8
  **advisement** [1] -
213:21
  **advising** [1] - 93:1
  **advisors** [1] - 105:13
  **affected** [1] - 207:15
  **affects** [1] - 42:17
  **affidavit** [1] - 160:14
  **affiliate** [1] - 63:7
  **affirm** [1] - 12:11
  **affirmatively** [1] -

157:8
  **affixing** [1] - 177:23
  **afforded** [2] - 9:21,
196:12
  **AFP** [4] - 53:6, 57:25,
84:19, 156:4
  **AFP's** [1] - 58:22
  **African** [1] - 55:13
  **African-American**
[1] - 55:13
  **afternoon** [2] -
126:9, 126:10
  **afterwards** [2] -
11:12, 123:24
  **agency** [4] - 60:25,
61:1, 106:13, 168:4
  **agents** [1] - 20:14
  **ago** [2] - 31:15,
109:25
  **agree** [17] - 12:3,
12:7, 12:10, 12:20,
13:18, 14:12, 15:10,
15:12, 109:5, 111:13,
129:9, 140:16,
173:20, 184:16,
193:24, 199:21,
208:13
  **agreed** [1] - 199:13
  **agreeing** [1] - 194:3
  **agreement** [5] - 6:19,
13:7, 57:18, 61:4,
181:15
  **agreements** [7] -
48:18, 51:3, 51:12,
57:20, 63:21, 63:24,
67:19
  **agrees** [1] - 162:10
  **ahead** [1] - 177:12
  **AI** [1] - 114:19
  **aide** [2] - 26:8, 115:3
  **air** [2] - 20:15, 96:21
  **Air** [20] - 22:23,
22:24, 23:3, 43:22,
43:23, 44:3, 44:4,
70:13, 70:19, 83:12,
83:14, 94:17, 97:8,
100:2, 106:16,
113:21, 118:6, 118:7,
144:8, 172:11
  **Airport** [10] - 69:18,
69:22, 70:2, 70:7,
72:3, 83:13, 130:20,
143:13, 144:1, 144:9
  **akin** [2] - 14:19,
179:24
  **al** [3] - 1:6, 4:2,
149:24
  **albeit** [2] - 195:25,
201:3
  **alert** [16] - 30:19,

102:3, 102:6, 102:11,
102:18, 108:1,
108:24, 109:2, 109:3,
109:6, 109:11, 116:7,
116:8, 116:17,
116:21, 117:1
  **alert-worthy** [3] -
108:1, 109:2, 109:3
  **alerted** [4] - 108:2,
108:3, 108:4, 108:6
  **alerts** [3] - 30:21,
108:23, 117:2
  **Alex** [1] - 73:19
  **aligned** [1] - 210:22
  **Alito** [2] - 177:9,
177:20
  **all-out** [1] - 37:17
  **allocate** [1] - 99:9
  **allow** [7] - 70:23,
73:6, 96:11, 133:10,
195:25, 201:4, 203:6
  **allowed** [21] - 36:17,
43:19, 44:25, 50:2,
71:19, 71:20, 74:23,
78:3, 80:15, 119:11,
126:17, 132:17,
132:19, 132:21,
137:24, 138:1,
151:20, 155:4,
178:24, 200:1, 200:2
  **allowing** [1] - 196:24
  **allows** [4] - 153:18,
155:17, 178:9, 198:8
  **almost** [8] - 31:16,
52:21, 73:11, 73:12,
121:21, 123:8,
149:14, 206:22
  **alone** [1] - 5:15
  **alphabetical** [2] -
168:6, 170:11
  **alphabetically** [3] -
168:4, 170:8, 197:23
  **alternate** [1] - 170:3
  **alternates** [1] -
169:22
  **amazing** [11] - 25:19,
34:11, 36:9, 37:7,
37:11, 38:15, 39:16,
39:19, 65:11, 73:22,
87:4
  **ambassador's** [1] -
60:5
  **ambiance** [1] -
201:25
  **amended** [2] - 8:24,
9:3
  **Amendment** [38] -
9:4, 9:5, 9:6, 9:24,
10:21, 10:22, 10:25,
11:4, 11:7, 14:20,

15:21, 122:19,
162:11, 162:12,
175:13, 178:3, 178:6,
178:8, 183:25, 188:8,
195:7, 196:6, 198:23,
198:25, 204:5, 204:8,
204:9, 206:19, 207:4,
208:21, 208:24,
210:12, 210:13,
210:18, 211:10,
211:11
  **amendments** [1] -
9:9
  **America** [14] - 12:5,
21:13, 112:4, 148:19,
149:1, 161:12,
171:21, 173:18,
173:20, 178:14,
190:23, 192:5, 210:3,
210:4
  **American** [9] - 21:18,
25:9, 47:15, 55:13,
58:8, 108:4, 122:9,
137:11, 160:17
  **amicus** [1] - 175:11
  **amount** [1] - 78:14
  **amplify** [2] - 47:8,
47:14
  **amply** [1] - 174:17
  **analogizing** [1] -
206:23
  **analogous** [1] -
104:22
  **analogy** [1] - 212:1
  **analyses** [1] - 88:7
  **analysis** [6] - 157:1,
179:21, 185:23,
192:10, 208:16,
208:23
  **analytical** [4] -
203:2, 203:16,
203:17, 208:20
  **analytics** [3] - 67:9,
68:9, 88:6
  **analyze** [3] - 203:19,
207:8, 208:18
  **analyzed** [1] - 187:5
  **anchors** [2] - 120:5,
148:24
  **and..** [1] - 37:18
  **Andrews** [1] - 83:12
  **anecdote** [1] -
127:24, 128:4, 145:16
  **Angeles** [4] - 27:18,
167:2, 167:5, 167:21
  **announced** [2] -
54:4, 181:18
  **announcement** [1] -
43:8, 108:20, 168:15
  **announces** [1] -

181:25
  **announcing** [1] -
172:3
  **anonymously** [1] -
174:9
  **answer** [18] - 31:24,
41:4, 63:22, 68:7,
73:2, 79:9, 90:22,
90:25, 120:23,
138:19, 151:9,
151:10, 157:3, 157:8,
171:9, 185:19, 211:23
  **answered** [1] - 149:7
  **answering** [1] -
38:24
  **answers** [1] - 185:19
  **anticipated** [1] -
204:23
  **anticipating** [1] -
102:24
  **anticipation** [1] -
38:10
  **anytime** [1] - 83:20
  **anyway** [3] - 63:23,
118:22, 205:2
  **AP** [287] - 7:7, 7:11,
7:14, 7:19, 8:9, 8:13,
8:15, 9:22, 10:13,
12:3, 13:18, 15:3,
15:9, 15:10, 19:6,
19:18, 21:14, 22:1,
22:15, 23:8, 26:2,
27:16, 29:2, 32:8,
32:19, 32:22, 33:1,
33:17, 34:2, 34:3,
34:5, 34:24, 35:20,
36:8, 36:11, 36:18,
37:4, 38:17, 38:18,
40:10, 41:6, 41:8,
41:19, 41:21, 42:10,
43:1, 43:9, 44:25,
48:5, 48:16, 48:23,
51:3, 51:5, 51:11,
51:19, 51:23, 52:11,
52:14, 52:15, 52:22,
53:8, 53:23, 54:6,
54:8, 56:4, 56:12,
57:6, 57:9, 57:13,
57:21, 58:16, 59:9,
59:15, 59:18, 59:24,
59:25, 60:11, 61:4,
61:6, 62:22, 63:7,
63:17, 63:24, 64:6,
64:14, 65:4, 65:21,
65:24, 66:2, 66:15,
66:18, 67:3, 67:10,
68:5, 68:18, 68:19,
69:11, 69:16, 69:22,
70:2, 70:7, 70:12,
70:19, 71:3, 71:8,

71:24, 72:12, 72:14,
73:17, 73:19, 74:3,
74:10, 74:13, 74:21,
74:22, 75:19, 76:4,
80:24, 82:18, 83:15,
83:18, 83:21, 84:4,
84:8, 84:13, 84:14,
84:19, 85:2, 87:23,
88:8, 88:15, 90:11,
91:1, 91:21, 92:5,
95:8, 95:9, 95:10,
96:2, 96:3, 96:4, 96:6,
96:12, 96:15, 97:5,
98:19, 98:20, 98:22,
101:1, 101:6, 101:12,
103:7, 108:13,
108:25, 112:17,
113:19, 113:22,
115:22, 116:3, 116:6,
116:7, 116:14, 117:9,
117:19, 117:20,
117:23, 117:24,
118:12, 118:17,
119:15, 120:1,
120:18, 120:20,
120:25, 121:2,
122:23, 123:10,
123:11, 124:5,
124:22, 126:16,
129:10, 129:18,
129:24, 130:14,
132:2, 132:14,
132:17, 132:19,
132:21, 133:2, 133:3,
133:15, 136:18,
137:5, 137:16,
137:22, 137:23,
138:7, 138:12, 139:4,
142:13, 142:25,
144:1, 144:6, 144:23,
145:4, 145:6, 145:9,
146:15, 146:20,
147:1, 147:6, 147:24,
148:16, 151:7,
151:20, 152:4,
152:20, 152:22,
153:18, 155:6,
155:14, 155:17,
155:19, 156:6,
156:16, 157:5,
157:18, 160:21,
161:9, 163:22,
165:14, 165:16,
167:4, 167:7, 167:13,
167:15, 167:22,
170:1, 170:21,
170:24, 171:4, 171:8,
171:11, 171:13,
172:3, 172:10,
172:13, 173:14,
173:16, 173:17,

173:25, 174:21,
178:14, 181:22,
181:24, 183:8, 190:3,
190:14, 191:2, 191:3,
199:9, 199:24, 200:2,
203:25, 206:4, 206:6,
206:7, 206:11,
206:16, 207:15,
208:1, 208:2, 208:4,
208:7, 212:18,
212:22, 213:18
  **AP's** [26] - 48:13,
50:19, 52:2, 54:19,
55:17, 60:18, 61:3,
66:20, 67:4, 67:18,
115:9, 123:21, 125:9,
136:24, 147:9, 155:7,
157:21, 161:3,
171:19, 171:24,
174:14, 175:3,
176:12, 206:16,
207:12, 213:1
  **apart** [3] - 88:9,
165:18, 167:17
  **apologies** [5] -
16:25, 62:4, 69:1,
72:9, 128:13
  **apologize** [1] -
210:21
  **apparatus** [1] -
176:21
  **appeal** [6] - 8:21,
161:17, 161:19,
161:23, 162:16,
162:25
  **Appeals** [1] - 209:11
  **appear** [3] - 21:11,
83:7, 87:18
  **appearance** [1] -
173:7
  **aPPEARANCES** [1] -
1:13
  **appeared** [1] -
171:17
  **apples** [1] - 176:15
  **applicability** [1] -
180:5
  **application** [1] -
185:1
  **applied** [2] - 142:17,
143:4
  **applies** [3] - 178:1,
188:21, 195:4
  **apply** [7] - 70:15,
161:24, 183:17,
185:23, 185:24,
186:15, 186:19
  **applying** [1] - 160:9
  **appreciate** [11] -
5:25, 7:6, 13:10,

21:10, 46:3, 46:5,
89:6, 138:19, 188:13,
213:12, 213:23
  **appreciated** [1] -
34:11
  **approach** [1] - 77:4
  **approaching** [1] -
16:8
  **appropriate** [3] -
16:23, 162:20, 169:8
  **approval** [2] -
177:24, 183:10
  **approved** [3] - 81:2,
200:10, 200:15
  **apps** [1] - 88:3
  **April** [3] - 60:15,
116:19, 215:10
  **apt** [1] - 7:1
  **arbitrarily** [1] -
197:21
  **area** [1] - 56:25
  **areas** [6] - 50:7,
57:21, 109:8, 200:17,
203:6, 203:8
  **arguably** [1] - 184:13
  **argue** [2] - 69:20,
88:1
  **arguing** [2] - 175:8,
192:9
  **argument** [9] -
10:25, 12:24, 15:19,
177:14, 178:20,
185:7, 186:10,
196:11, 199:7
  **arguments** [2] -
11:13, 213:13
  **Arizona** [4] - 168:16,
169:9, 169:11, 169:12
  **arrange** [1] - 46:16
  **arrangement** [2] -
58:16, 63:8
  **arrival** [8] - 83:8,
130:19, 130:25,
131:1, 131:23,
132:12, 132:13, 144:8
  **arrivals** [2] - 118:2,
118:3
  **arrive** [2] - 37:16,
49:23
  **arrived** [4] - 57:5,
69:21, 70:1, 70:6
  **arriving** [1] - 70:13
  **art** [3] - 95:16,
106:23, 177:1
  **articles** [3] - 167:2,
167:4, 213:3
  **artwork** [1] - 26:17
  **Asia** [1] - 108:16
  **aside** [6] - 132:11,
132:12, 132:13,

136:17, 138:5, 145:8
**assassin** [1] - 20:12
**assassinate** [1] - 20:13
**assassination** [1] - 20:23
**asserted** [1] - 9:3
**assertion** [1] - 174:17
**assigned** [3] - 140:14, 152:4, 152:10
**assignment** [1] - 22:16
**assignments** [1] - 19:9
**assistant** [1] - 46:2
**assistants** [1] - 99:25
**ASSOCIATED** [1] - 1:3
**Associated** [37] - 4:2, 4:6, 4:11, 4:14, 11:2, 12:13, 18:19, 19:16, 20:1, 20:4, 21:21, 27:19, 43:16, 72:23, 77:15, 87:15, 87:19, 89:24, 90:8, 105:15, 109:20, 112:2, 113:12, 124:15, 135:7, 135:11, 135:20, 136:14, 149:23, 153:7, 158:22, 165:6, 165:10, 167:9, 171:22, 172:7, 177:4
**Association** [9] - 63:5, 96:1, 98:3, 110:5, 127:25, 139:1, 140:9, 140:15, 140:18
**assume** [1] - 48:7
**assuming** [2] - 63:22, 69:10
**assurance** [1] - 147:8
**astronauts** [1] - 148:21
**AT&T** [1] - 29:8
**ATEBA** [1] - 184:20
**Ateba** [3] - 9:24, 184:19, 184:20
**attach** [1] - 103:16
**attaches** [4] - 162:11, 163:12, 180:16, 188:24
**attachment** [1] - 160:15
**attempt** [1] - 20:23
**attend** [4] - 117:21, 118:14, 121:1, 196:24
**attendance** [3] -

56:4, 110:7, 131:10
**attended** [1] - 54:16
**attendees** [1] - 105:2
**attention** [5] - 8:17, 62:17, 138:18, 153:20, 213:24
**attest** [1] - 150:20
**attested** [2] - 155:18, 172:7
**Attorney** [1] - 46:2
**ATTORNEY'S** [1] - 1:22
**Attorney's** [3] - 4:18, 46:3, 126:12
**attributed** [1] - 66:15
**audience** [11] - 17:23, 96:8, 109:13, 166:2, 167:19, 167:21, 168:5, 168:24, 168:25, 190:1
**audiences** [1] - 170:14
**authority** [1] - 178:8
**available** [9] - 23:1, 60:18, 131:20, 189:9, 192:25, 193:6, 193:7, 193:20, 195:2
**Avenue** [2] - 2:3, 215:14
**award** [1] - 65:9
**award-winning** [1] - 65:9
**aware** [18] - 70:11, 70:18, 90:21, 113:13, 118:15, 130:6, 133:8, 133:13, 134:13, 135:10, 135:13, 135:14, 137:3, 137:15, 137:18, 137:21, 138:5, 162:6
**awareness** [1] - 134:6
**awesome** [1] - 46:8
**awful** [1] - 42:18
**axis** [1] - 155:3
**Ayanna** [1] - 136:7

**B**

**back-and-forth** [1] - 114:25
**background** [1] - 20:15
**backseat** [1] - 10:24
**bad** [3] - 27:10, 30:6, 68:25
**Baier** [1] - 41:12
**ball** [1] - 38:8
**BALLARD** [2] - 1:15,

1:18
**Ballard** [1] - 4:7
**Baltimore** [14] - 196:8, 197:6, 197:8, 197:22, 199:4, 208:14, 210:15, 211:3, 211:13, 211:14, 211:16, 211:20, 212:4, 213:3
**ban** [20] - 8:15, 45:7, 77:3, 80:2, 80:3, 83:16, 113:19, 115:7, 117:19, 147:24, 148:16, 158:9, 172:7, 172:12, 191:2, 206:14, 206:17, 213:5
**band** [1] - 177:17
**banned** [12] - 34:2, 34:3, 57:2, 62:21, 113:1, 118:18, 147:17, 167:7, 171:8, 173:14, 173:23
**banning** [1] - 43:9
**barred** [5] - 112:24, 115:23, 121:24, 147:6
**Barrett** [1] - 4:13
**Bartley** [1] - 195:11
**base** [1] - 206:8
**Base** [1] - 83:12
**baseball** [2] - 7:16, 190:12
**based** [24] - 42:13, 47:7, 47:11, 53:20, 57:14, 65:4, 88:14, 88:20, 114:7, 119:1, 133:3, 135:7, 135:11, 168:24, 169:8, 170:13, 180:6, 194:16, 195:9, 195:14, 196:1, 197:4, 198:25, 201:8
**baseline** [1] - 193:10
**basis** [12] - 7:9, 10:16, 12:4, 92:3, 147:9, 174:12, 184:9, 186:9, 186:12, 187:12, 192:1, 194:7, 211:10
**bathrobes** [1] - 212:16
**Beach** [17] - 49:19, 50:6, 69:17, 69:22, 70:2, 83:13, 113:2, 118:2, 118:8, 129:25, 130:19, 131:1, 131:23, 132:12, 132:13, 143:12, 144:1
**beaming** [1] - 59:7
**bear** [1] - 167:4
**beating** [1] - 42:12

**beautiful** [2] - 177:1
**became** [3] - 23:23, 55:24, 110:20
**become** [1] - 20:16
**becomes** [2] - 180:13, 180:17
**BEFORE** [1] - 1:11
**beforehand** [1] - 135:14
**began** [6] - 43:8, 45:7, 83:16, 136:21, 158:9, 171:18
**begged** [1] - 83:22
**beginning** [4] - 46:20, 142:8, 160:13, 171:10
**beginnings** [1] - 102:21
**behalf** [8] - 4:6, 4:18, 41:25, 71:23, 96:13, 137:10, 175:12
**behind** [16] - 26:15, 31:12, 33:8, 35:9, 40:5, 41:3, 79:3, 111:15, 116:24, 166:14, 185:12
**belabor** [1] - 199:15
**belie** [1] - 174:17
**belief** [1] - 194:23
**belies** [4] - 163:20, 163:21, 166:4, 168:6
**believes** [3] - 190:21, 191:5, 196:4
**Ben** [1] - 74:5
**Berra** [1] - 7:16
**beside** [1] - 178:24
**best** [12] - 33:9, 33:15, 34:16, 37:8, 68:18, 79:16, 83:23, 99:9, 122:18, 165:25, 197:7, 215:7
**bet** [1] - 181:25
**betrays** [1] - 174:8
**better** [7] - 25:9, 29:21, 78:22, 84:9, 165:24, 199:11, 207:11
**between** [30] - 5:7, 34:22, 39:16, 59:15, 59:20, 60:4, 60:12, 61:4, 84:18, 86:21, 87:1, 105:10, 108:7, 113:13, 145:20, 153:14, 156:16, 158:1, 169:22, 170:3, 170:8, 175:21, 179:16, 185:9, 185:13, 185:16, 186:25, 187:10, 197:9, 203:1

**beyond** [3] - 15:22, 97:23, 198:18
**Biden** [7] - 41:7, 78:11, 110:4, 110:22, 128:1, 181:10, 202:6
**big** [11] - 22:7, 28:13, 30:5, 30:25, 34:1, 36:2, 59:7, 82:3, 85:13, 87:12, 110:5
**bigger** [3] - 19:9, 88:1, 203:7
**biggest** [1] - 29:11
**bill** [1] - 106:4
**billion** [6] - 32:18, 42:10, 168:16, 169:11, 170:21, 170:22
**binder** [1] - 150:11
**bit** [8] - 26:22, 32:5, 56:2, 75:1, 109:12, 132:10, 138:15, 148:20
**Black** [1] - 136:7
**blank** [1] - 168:12
**blanks** [1] - 202:7
**blends** [1] - 199:8
**blink** [1] - 25:22
**Blondet** [2] - 61:9, 61:14
**BLONDET** [1] - 61:10
**Bloomberg** [13] - 109:9, 116:18, 116:23, 117:2, 117:4, 156:16, 168:20, 169:1, 169:19, 169:21, 169:22, 170:3, 170:8
**blue** [2] - 88:11, 105:22
**board** [2] - 118:11, 140:10
**boarding** [1] - 118:10
**body** [1] - 190:23
**boldly** [1] - 181:25
**bona** [3] - 107:4, 180:6, 198:9
**book** [2] - 21:13, 21:21
**border** [1] - 108:10
**Boston** [2] - 170:6, 170:7
**bothered** [1] - 132:8
**bound** [1] - 41:23
**box** [1] - 7:12
**Brady** [11] - 12:1, 12:4, 12:19, 13:3, 14:4, 16:5, 49:8, 49:12, 49:16, 54:2,

139:2
**brag** [1] - 152:22
**branch** [3] - 184:1, 211:23, 211:25
**brand** [1] - 213:1
**Brandon** [1] - 73:19
**brands** [1] - 212:16
**break** [3] - 89:4, 149:15, 200:12
**breaking** [5] - 22:6, 96:21, 99:2, 102:15, 103:14
**breathing** - 201:16
**Bret** [2] - 41:12, 41:15
**BRIAN** [1] - 1:21
**Brian** [4] - 4:13, 4:17, 46:2, 126:11
**brief** [9] - 6:8, 6:20, 6:22, 7:3, 164:6, 175:11, 175:15, 187:9
**briefing** [28] - 5:2, 7:7, 12:19, 13:3, 16:5, 49:12, 49:16, 82:8, 82:10, 92:25, 124:20, 127:11, 139:2, 139:5, 139:17, 140:17, 142:3, 164:4, 164:7, 164:25, 174:7, 185:15, 186:6, 187:4, 188:6, 198:3, 213:12
**briefings** [5] - 141:22, 164:5, 187:12, 198:12, 198:14
**briefly** [5] - 43:21, 92:18, 107:24, 111:20, 117:17
**bring** [3] - 16:17, 22:13, 150:19
**brings** [2] - 102:12, 108:15
**broad** [5] - 27:20, 32:16, 156:21, 196:20, 196:22
**broadened** [1] - 191:20
**broader** [4] - 5:16, 65:19, 98:15, 99:22
**broadly** [3] - 47:8, 125:23, 161:10
**Broadway** [1] - 1:19
**brought** [5] - 95:3, 95:4, 156:25, 184:6, 184:7
**Brussels** [1] - 60:5
**bucket** [1] - 179:12
**budgetary** [1] - 96:10

**Budowich** [30] - 4:2, 6:15, 8:7, 113:17, 124:6, 134:19, 135:10, 139:10, 146:12, 146:14, 146:15, 149:23, 150:18, 153:3, 155:17, 156:7, 156:11, 156:25, 157:16, 159:22, 160:24, 163:22, 165:20, 170:16, 171:12, 172:5, 174:6, 174:21, 180:2, 191:14
**BUDOWICH** [1] - 1:6
**Budowich's** [14] - 8:12, 10:12, 155:11, 155:24, 156:17, 165:13, 165:17, 167:17, 167:24, 168:7, 170:1, 171:9, 173:13, 174:17
**buff** [1] - 148:20
**buffoon** [1] - 76:16
**building** [1] - 103:21
**built** [2] - 94:12, 94:16
**bully** [1] - 204:2
**bunch** [1] - 86:2
**burden** [6] - 5:22, 13:11, 20:5, 42:4, 42:18, 162:21
**bureau** [3] - 103:13, 121:7, 121:8
**buried** [1] - 180:19
**Bush** [2] - 23:12, 23:17
**business** [10] - 48:10, 52:4, 52:18, 62:9, 66:24, 99:6, 168:16, 168:20, 206:16, 212:18
**businesspeople** [2] - 67:3, 67:6
**busy** [3] - 16:21, 79:1, 98:14
**but..** [1] - 58:21
**butchering** [1] - 72:9
**Butler** [8] - 20:3, 20:9, 20:23, 24:21, 24:23, 47:21, 47:24, 52:7
**butt** [1] - 66:25
**button** [1] - 100:24
**buys** [1] - 52:1
**BY** [43] - 2:1, 18:12, 19:4, 23:5, 27:6, 32:4, 39:1, 39:11, 42:19, 45:22, 46:9, 49:5, 71:22, 73:13, 79:12,

81:8, 83:4, 85:1, 86:6, 87:13, 89:20, 90:3, 92:12, 93:6, 94:6, 95:21, 97:3, 98:10, 100:23, 103:4, 107:5, 119:13, 119:24, 123:15, 124:8, 125:7, 126:8, 129:4, 134:9, 137:12, 138:23, 141:4, 146:10
**by-line** [5] - 61:8, 66:14, 69:11, 72:17, 167:4

**C**

**cab** [1] - 44:8
**cabin** [1] - 94:18
**cabinet** [1] - 50:10
**calendar** [4] - 80:3, 91:17, 92:16, 142:7
**camera** [9] - 28:24, 33:4, 33:8, 97:18, 106:15, 107:7, 111:7, 111:17, 114:9, 114:16, 120:9
**cameras** [2] - 111:4
**Canada** [4] - 115:14, 115:18, 116:13, 116:19
**canceled** [1] - 68:15
**canceling** [1] - 181:18
**cancels** [1] - 181:23
**candid** [1] - 88:7
**candidate** [1] - 48:1
**candidly** [1] - 158:16
**cannot** [9] - 9:25, 15:14, 71:23, 182:4, 193:3, 203:13, 208:8, 210:10, 210:11
**capabilities** [1] - 53:2
**capably** [1] - 176:22
**capacity** [2] - 81:23, 81:24
**capture** [10] - 25:14, 59:1, 75:7, 75:15, 75:21, 75:24, 114:9, 201:21, 201:23, 201:25
**captured** [8] - 20:17, 23:14, 23:21, 24:10, 24:20, 65:13, 127:3, 208:12
**captures** [1] - 131:6
**capturing** [2] - 61:18, 75:2
**car** [1] - 209:6

**careful** [2] - 100:2, 213:23
**Carl** [1] - 63:1
**carry** [3] - 20:5, 29:6, 29:14
**carrying** [3] - 29:9, 209:5, 209:6
**Case** [1] - 4:2
**case** [52] - 13:6, 13:12, 13:22, 90:16, 90:19, 93:13, 132:24, 154:9, 160:10, 162:8, 162:19, 163:4, 163:7, 163:8, 164:8, 174:21, 177:14, 179:15, 179:16, 180:17, 183:7, 183:13, 183:23, 184:19, 184:20, 185:7, 187:3, 187:6, 187:7, 187:15, 188:12, 188:18, 193:25, 195:7, 195:19, 196:8, 196:10, 197:3, 197:7, 198:13, 202:17, 207:2, 208:25, 209:4, 209:9, 209:20, 210:16, 211:15, 212:2
**cases** [17] - 9:15, 10:15, 14:6, 101:16, 114:5, 117:10, 123:1, 162:14, 180:25, 187:4, 187:10, 192:16, 194:18, 194:19, 197:18, 198:24, 206:19
**catalog** [1] - 53:23
**caught** [1] - 24:12
**causation** [1] - 155:20
**caused** [2] - 67:18, 76:25
**causes** [1] - 208:22
**causing** [1] - 206:15
**CBS** [4] - 97:21, 182:19, 183:8, 204:17
**celebrate** [1] - 143:19
**celebrating** [3] - 73:14, 144:19, 172:3
**celebration** [1] - 74:7
**cellphone** [2] - 29:14, 29:16
**censor** [1] - 176:10
**center** [2] - 139:4, 139:7
**certain** [12] - 62:5, 83:8, 84:13, 86:16, 133:4, 137:15, 137:21, 137:25,

165:11, 195:25, 196:24, 210:19
**certainly** [19] - 5:17, 7:4, 16:5, 70:24, 104:8, 115:5, 120:22, 121:21, 122:15, 127:3, 140:19, 151:11, 159:6, 168:2, 181:13, 186:8, 193:21, 198:7, 213:9
**Certainly** [1] - 179:18
**CERTIFICATE** [1] - 215:1
**certify** [1] - 215:4
**chair** [1] - 35:2
**challenges** [1] - 14:24
**chance** [2] - 5:24, 8:21
**change** [12] - 14:7, 54:4, 76:25, 112:19, 124:4, 148:17, 171:20, 179:23, 181:15, 191:1, 191:16, 210:2
**changed** [12] - 7:25, 8:22, 26:17, 77:5, 112:8, 148:15, 205:4, 205:6, 207:10, 207:13, 209:16, 209:19
**changes** [5] - 92:23, 114:14, 140:11, 140:13, 191:4
**changing** [1] - 112:12
**channel** [1] - 126:25
**characterize** [2] - 186:15, 188:2
**characterized** [5] - 171:18, 188:19, 189:1, 207:7, 208:8
**characters** [3] - 102:18, 103:18, 103:19
**charging** [1] - 212:8
**CHARLES** [1] - 1:14
**Charles** [1] - 4:6
**chart** [10] - 138:24, 139:1, 139:24, 141:5, 141:13, 141:25, 156:8, 156:16, 168:19, 200:22
**check** [3] - 21:9, 129:16, 136:16
**chef** [1] - 33:6
**Chernov** [1] - 65:7
**Chernov's** [1] - 121:5
**Cheung** [1] - 176:23

**Chief** [1] - 165:5
**chief** [12] - 4:10, 4:11, 18:19, 19:5, 21:17, 46:7, 89:24, 113:5, 113:14, 113:16, 134:22, 160:24
**child** [3] - 50:12, 75:25, 201:22
**chill** [11] - 79:15, 206:18, 206:22, 206:24, 207:6, 207:17, 207:23, 208:6, 208:16, 210:6, 212:4
**chilled** [3] - 125:8, 209:19, 209:25
**chilling** [5] - 11:2, 174:3, 203:24, 205:2, 205:8
**choice** [2] - 195:23, 210:12
**choose** [2] - 12:23, 134:5
**chooses** [1] - 152:22
**choosing** [1] - 198:24
**chopped** [1] - 49:2
**chopping** [1] - 49:6
**chose** [3] - 21:20, 166:12, 169:5
**chosen** [3] - 153:9, 168:3, 170:5
**Chris** [1] - 72:6
**Christian** [1] - 170:9
**Christmas** [1] - 123:10
**Chuck** [2] - 152:3, 152:4
**Circuit** [8] - 14:18, 15:24, 162:13, 193:14, 196:10, 198:12, 198:15
**circuit** [1] - 8:5
**Circuit's** [1] - 14:9
**circumstance** [2] - 14:8, 57:5
**circumstances** [7] - 16:5, 36:15, 162:20, 176:17, 185:8, 188:1, 201:4
**cite** [1] - 209:1
**cited** [5] - 187:4, 187:9, 194:21, 194:22, 195:11
**City** [1] - 208:25
**city's** [1] - 209:7
**civil** [1] - 46:7
**Civil** [3] - 1:3, 4:1, 149:23

**claim** [2] - 211:11, 211:12
**claiming** [1] - 190:3
**claims** [2] - 9:5, 16:9
**clarification** [1] - 47:24
**class** [1] - 16:2
**clause** [5] - 188:10, 188:17, 188:19, 188:20
**clear** [9] - 13:7, 15:2, 39:2, 98:19, 100:12, 151:10, 157:3, 173:14, 190:18
**clearest** [2] - 9:11, 9:14
**clearly** [10] - 10:10, 14:17, 15:21, 61:23, 88:12, 137:3, 140:21, 158:5, 170:24, 193:19
**click** [1] - 102:16
**clicked** [1] - 48:22
**client** [9] - 12:8, 13:18, 158:11, 159:2, 159:6, 179:4, 194:4, 194:7, 205:4
**clients** [7] - 29:5, 32:16, 35:6, 67:23, 96:18, 100:21, 123:3
**clip** [3] - 164:6, 164:10, 172:19
**close** [2] - 142:3, 200:16
**closed** [5] - 92:17, 92:20, 92:21, 92:25, 163:24
**closer** [5] - 12:16, 12:18, 13:4, 13:12, 14:24
**closest** [1] - 149:3
**closing** [2] - 152:21, 202:25
**clue** [1] - 54:1
**clueless** [1] - 44:23
**CMS** [1] - 102:4
**CNN** [2] - 97:22, 204:18
**co** [1] - 4:7
**co-counsel** [1] - 4:7
**coerce** [1] - 204:3
**colleague** [7] - 17:10, 30:14, 31:15, 103:9, 115:2, 121:5, 136:7
**colleagues** [23] - 64:24, 76:4, 79:23, 79:25, 103:7, 103:16, 105:18, 106:9, 107:16, 107:21, 108:9, 108:13,

108:16, 108:22, 121:24, 122:23, 124:18, 145:25, 147:5, 152:8, 155:15, 158:8
**collect** [1] - 81:16
**COLUMBIA** [2] - 1:1, 1:22
**Columbia** [2] - 2:2, 215:13
**comfortable** [1] - 18:13
**coming** [7] - 22:8, 26:9, 85:14, 91:18, 152:3, 169:10, 190:4
**comings** [1] - 174:16
**commensurate** [1] - 199:10
**comments** [3] - 194:25, 195:4, 196:17
**commercial** [1] - 51:20
**commission** [2] - 52:5, 52:11
**commit** [1] - 138:10
**commitment** [7] - 138:11, 171:13, 171:16, 171:19, 171:22, 171:24, 172:4
**committed** [1] - 125:11
**committing** [1] - 207:21
**common** [3] - 12:5, 54:21, 120:4
**commonly** [1] - 141:14
**communicate** [3] - 75:18, 76:3, 121:16
**communicated** [4] - 113:10, 119:10, 119:12, 175:18
**communicating** [3] - 101:24, 103:7, 121:13
**communication** [5] - 32:14, 107:15, 107:16, 108:13, 202:2
**communications** [7] - 106:13, 107:9, 114:19, 160:13, 176:24, 211:17, 211:18
**community** [1] - 58:21
**companies** [1] - 67:17
**company** [2] - 19:21, 32:25
**comparable** [2] - 33:14, 34:21

**compared** [2] - 67:5, 67:11
**compel** [1] - 15:8
**compelling** [1] - 12:12
**competing** [1] - 84:20
**competitive** [2] - 40:14, 106:2
**competitor** [2] - 35:20, 187:25
**competitors** [16] - 28:15, 31:12, 34:15, 34:23, 37:25, 39:15, 39:23, 80:1, 85:11, 101:7, 115:20, 116:18, 116:24, 124:17, 159:24, 206:3
**competitors'** [2] - 35:4, 39:6
**complaint** [2] - 8:24, 9:3
**complete** [1] - 215:6
**completely** [14] - 67:25, 155:10, 156:21, 157:18, 157:25, 158:14, 161:3, 163:23, 165:12, 165:14, 167:23, 167:25, 172:1, 210:22
**completeness** [1] - 114:4
**complex** [8] - 93:8, 94:15, 133:1, 134:11, 134:13, 134:15, 134:18, 136:10
**comport** [2] - 183:20, 188:7
**comprehensive** [1] - 91:16
**conceive** [1] - 112:25
**conceived** [1] - 113:4
**concept** [1] - 189:25
**conception** [1] - 14:13
**concern** [1] - 198:13
**concerned** [2] - 188:12, 206:13
**concerns** [4] - 12:4, 13:19, 14:3, 182:1
**concluded** [2] - 116:9, 214:2
**concludes** [2] - 114:13, 175:2
**conclusion** [1] - 140:22
**condition** [1] -

112:11
**conducive** [1] - 104:19
**conducted** [1] - 105:5
**conducts** [1] - 203:5
**conference** [6] - 23:13, 93:14, 120:6, 197:1, 197:20
**conferences** [3] - 113:1, 185:15, 196:25
**confidence** [1] - 146:25
**confidentiality** [2] - 193:2, 196:16
**configuration** [3] - 95:5, 97:9, 100:5
**confirm** [1] - 12:2
**confirmation** [1] - 136:8
**confirmed** [2] - 200:9, 201:18
**conflict** [3] - 5:16, 206:14, 212:22
**Congress** [4] - 143:7, 152:15, 152:17, 184:25
**connection** [1] - 90:15
**connectivity** [1] - 107:18
**consider** [3] - 21:2, 177:15, 192:12
**consideration** [2] - 151:8, 157:6
**considered** [2] - 175:19, 195:17
**considers** [1] - 7:7
**consistent** [2] - 44:25, 210:12
**consistently** [3] - 127:17, 127:19, 138:13
**constantly** [1] - 39:24
**constitute** [2] - 172:6, 172:12
**constitutes** [1] - 215:4
**Constitution** [8] - 2:3, 183:17, 193:5, 193:9, 194:15, 195:24, 196:6, 215:14
**constitutional** [9] - 7:25, 9:9, 9:10, 9:12, 182:1, 182:22, 193:1, 195:3, 197:4
**constitutionally** [1] - 211:1
**constraints** [3] -

94:17, 96:11, 196:25
**contact** [1] - 51:19
**contained** [2] - 86:5, 154:7
**contemplate** [3] - 195:24, 196:9, 196:11
**contemplated** [2] - 14:18, 198:6
**content** [14] - 66:21, 66:22, 106:11, 107:7, 124:18, 158:22, 173:15, 174:13, 194:16, 195:9, 195:14, 196:1, 197:4, 198:25
**content-based** [3] - 194:16, 195:14, 197:4
**context** [1] - 5:4
**continue** [6] - 15:16, 42:7, 45:4, 153:5, 191:3, 206:11
**continued** [1] - 204:21
**continues** [2] - 139:22, 202:12
**continuing** [1] - 113:23
**continuum** [1] - 13:4
**contracting** [2] - 99:5, 110:24
**contradict** [1] - 156:23
**contradicted** [3] - 151:1, 156:19, 172:1
**contradictions** [1] - 8:12
**contradictory** [2] - 150:23, 155:10
**contradicts** [2] - 157:17, 165:12
**contrary** [1] - 197:19
**Contreras** [1] - 54:25
**contributing** [1] - 100:11
**control** [8] - 105:24, 107:6, 176:5, 177:2, 177:3, 178:11, 182:15, 183:5
**controls** [4] - 134:12, 176:6, 182:16, 183:1
**conveniently** [1] - 10:13
**conversation** [7] - 102:1, 104:23, 107:20, 108:1, 108:7, 108:17, 112:1
**convey** [2] - 195:8, 196:5
**convictions** [1] - 204:10

**convincing** [1] - 5:14
**cooperates** [1] - 180:11
**coordinate** [1] - 26:4
**coordinated** [1] - 132:24
**copyright** [2] - 33:11, 72:22
**Corbet** [1] - 121:6
**core** [1] - 202:13
**corner** [5] - 26:16, 28:3, 111:14, 111:24, 114:23
**corners** [1] - 26:11
**corps** [7] - 36:7, 96:6, 123:1, 123:2, 159:3, 181:11, 191:8
**corps'** [1] - 123:20
**correct** [122] - 13:17, 13:23, 24:16, 46:21, 46:24, 47:2, 47:3, 47:6, 47:14, 47:19, 47:22, 48:2, 48:6, 48:18, 49:8, 49:13, 49:20, 50:17, 52:6, 52:17, 53:2, 53:4, 53:6, 54:10, 54:14, 56:22, 57:5, 57:23, 58:2, 59:3, 59:12, 59:21, 62:20, 63:19, 64:8, 64:22, 65:5, 65:7, 65:14, 65:18, 65:25, 66:3, 66:15, 66:22, 66:23, 69:18, 69:23, 70:3, 71:3, 75:4, 75:9, 75:16, 75:19, 75:22, 76:1, 76:5, 80:11, 83:25, 84:2, 99:15, 99:18, 100:18, 107:9, 120:21, 126:21, 126:22, 127:1, 127:5, 127:8, 127:11, 127:14, 128:7, 128:20, 129:12, 132:3, 132:16, 132:20, 134:21, 135:12, 137:17, 137:22, 137:24, 138:1, 139:5, 139:8, 139:14, 139:23, 140:16, 141:6, 141:7, 141:10, 141:13, 142:4, 142:11, 142:12, 142:14, 142:18, 142:23, 143:1, 143:4, 143:13, 143:17, 143:20, 143:23, 144:2, 144:6, 144:10, 144:11,

144:14, 144:21, 144:24, 145:2, 145:5, 145:12, 145:17, 146:1, 152:11, 159:14, 175:14, 178:21, 193:25, 201:7
**correctly** [3] - 46:14, 178:19, 179:5
**correspondence** [1] - 113:13
**correspondent** [13] - 4:10, 89:24, 97:19, 113:5, 135:7, 135:11, 142:13, 142:25, 145:11, 157:22, 157:23, 167:10, 201:9
**Correspondents** [1] - 140:2
**correspondents** [5] - 120:5, 120:25, 126:24, 200:25
**Correspondents'** [6] - 95:25, 98:3, 139:1, 140:9, 140:15, 140:18
**Corum** [3] - 55:20, 55:22, 69:6
**counsel** [9] - 4:3, 4:7, 4:10, 20:21, 38:23, 131:19, 164:11, 164:15, 189:6
**count** [1] - 24:21
**counterparts** [2] - 53:1, 75:19
**countries** [1] - 122:22
**country** [5] - 19:10, 86:21, 96:9, 98:25, 170:22
**counts** [1] - 9:4
**couple** [9] - 9:8, 76:9, 83:5, 85:25, 101:19, 111:11, 124:16, 130:24, 203:21
**courage** [1] - 204:9
**course** [16] - 5:10, 5:22, 29:15, 29:24, 30:4, 42:9, 42:17, 48:15, 48:19, 51:25, 53:5, 55:9, 65:23, 66:4, 75:13, 186:4
**court** [12] - 63:10, 73:7, 138:16, 162:4, 162:14, 165:2, 173:4, 177:20, 183:24, 194:24, 199:12, 203:10
**Court** [106] - 2:1, 2:2, 4:9, 4:13, 6:6, 6:12, 7:8, 8:2, 8:11, 8:17,

9:15, 10:17, 11:8, 11:11, 13:11, 14:11, 15:15, 16:18, 16:22, 17:13, 20:21, 24:20, 34:21, 36:15, 39:2, 40:23, 42:2, 49:1, 49:3, 55:10, 63:1, 79:13, 86:7, 90:21, 118:25, 131:20, 136:24, 150:3, 150:6, 150:8, 150:21, 150:23, 151:3, 151:5, 153:21, 154:8, 155:13, 155:22, 156:20, 156:23, 157:11, 162:6, 162:10, 164:6, 164:7, 164:9, 164:11, 166:4, 166:6, 168:1, 168:8, 168:13, 168:18, 169:13, 170:13, 170:21, 170:23, 171:8, 172:19, 174:5, 174:18, 175:23, 177:10, 183:16, 184:2, 184:22, 184:24, 185:23, 187:5, 188:3, 188:19, 192:22, 193:9, 196:18, 197:3, 198:1, 203:19, 204:17, 205:17, 207:16, 207:20, 207:21, 208:17, 208:22, 208:25, 209:11, 209:15, 209:18, 211:22, 215:12, 215:13
**COURT** [195] - 1:1, 4:15, 4:20, 6:1, 6:7, 6:10, 6:18, 6:22, 7:2, 9:8, 11:12, 11:22, 12:14, 13:2, 13:15, 13:17, 14:12, 16:14, 17:2, 17:6, 17:15, 17:18, 17:20, 17:22, 17:25, 18:6, 18:8, 18:21, 18:25, 19:3, 23:2, 26:24, 30:11, 31:14, 31:18, 31:22, 32:3, 38:23, 39:8, 42:5, 45:18, 46:6, 71:12, 73:10, 76:9, 76:23, 77:7, 77:16, 77:21, 78:7, 78:9, 78:12, 78:17, 78:23, 79:5, 79:8, 79:10, 80:17, 82:4, 82:14, 82:23, 84:18, 84:22, 84:24, 86:23, 88:25, 89:3, 89:10, 89:13,

89:17, 90:1, 92:7, 92:9, 93:3, 93:17, 93:22, 94:4, 95:14, 97:13, 99:12, 99:14, 99:17, 100:12, 100:16, 100:22, 102:9, 106:21, 119:6, 119:18, 119:20, 122:4, 122:21, 123:14, 124:7, 124:25, 125:4, 126:6, 128:25, 133:9, 133:23, 133:24, 137:6, 140:23, 146:5, 146:7, 147:14, 148:13, 149:5, 149:9, 149:14, 149:25, 150:2, 150:7, 150:11, 150:14, 151:16, 151:24, 152:7, 152:12, 152:18, 153:24, 154:4, 154:13, 154:18, 154:25, 155:2, 157:13, 158:24, 159:12, 161:5, 161:21, 162:22, 163:15, 164:12, 164:21, 166:9, 166:21, 172:23, 173:10, 173:25, 174:24, 175:4, 175:13, 177:11, 178:17, 178:23, 179:8, 179:12, 180:3, 181:6, 181:8, 182:6, 182:11, 184:10, 186:1, 186:5, 188:9, 189:2, 189:4, 189:13, 189:21, 190:2, 190:16, 190:25, 191:7, 191:10, 191:25, 192:8, 193:13, 193:23, 194:18, 197:6, 199:2, 199:17, 199:21, 201:5, 202:18, 202:21, 203:23, 204:12, 204:20, 205:1, 205:19, 205:21, 205:23, 206:21, 208:13, 210:14, 210:20, 211:2, 211:6, 211:13, 212:3, 213:11, 213:25
**Court's** [10] - 6:13, 8:1, 8:3, 15:20, 16:19, 86:4, 153:20, 157:4, 159:19, 213:23
**court's** [1] - 62:4
**courtroom** [2] -

129:14, 164:2
**COURTROOM** [4] - 4:1, 18:3, 89:14, 149:22
**courts** [1] - 187:4
**cover** [30] - 5:1, 19:7, 21:14, 21:15, 21:21, 56:12, 73:12, 81:21, 83:14, 83:16, 83:19, 83:20, 84:4, 87:7, 94:11, 96:11, 99:7, 121:22, 122:1, 123:6, 125:13, 131:1, 148:18, 152:4, 152:10, 176:2, 177:7, 196:1, 197:15
**coverage** [14] - 99:3, 123:8, 126:16, 147:17, 148:22, 148:23, 166:16, 170:19, 170:25, 171:2, 206:8, 207:10, 207:12
**covered** [2] - 59:19, 123:7
**covering** [7] - 25:21, 51:4, 91:11, 121:3, 121:25, 138:11, 213:4
**covers** [2] - 157:22, 157:23
**coveted** [1] - 174:7
**COVID-19** [2] - 110:3, 110:24
**crap** [1] - 29:9
**create** [3] - 134:4, 152:6, 198:16
**created** [7] - 8:6, 15:24, 133:21, 154:6, 180:13, 181:3, 193:14
**creates** [2] - 162:21, 195:15
**creating** [3] - 165:25, 198:17, 198:20
**creation** [1] - 141:11
**creators** [1] - 106:11
**credentialed** [33] - 92:18, 93:10, 93:17, 93:18, 113:8, 113:9, 117:16, 117:21, 119:25, 129:6, 129:8, 129:11, 129:20, 130:1, 130:4, 130:15, 130:21, 131:4, 131:17, 131:24, 132:2, 132:15, 133:5, 135:12, 135:22, 136:18, 143:11, 143:25, 145:7, 189:18, 189:24, 200:21, 200:24

**credibility** [1] - 160:11
**credible** [2] - 163:25, 169:7
**credit** [1] - 69:10
**credited** [1] - 128:23
**credits** [1] - 167:8
**crew** [1] - 106:15
**criminal** [1] - 149:15
**criteria** [11] - 160:9, 160:10, 161:16, 170:13, 180:15, 180:24, 181:3, 181:4, 184:24, 185:2, 208:3
**CROSS** [2] - 45:21, 126:7
**cross** [4] - 5:13, 6:16, 150:18, 156:18
**Cross** [2] - 3:4, 3:7
**CROSS-EXAMINATION** [2] - 45:21, 126:7
**Cross-Examination** [2] - 3:4, 3:7
**cross-examination** [2] - 5:13, 150:18
**cross-examined** [2] - 6:16, 156:18
**crossed** [1] - 107:24
**crossing** [1] - 108:10
**CRR** [3] - 2:1, 215:3, 215:12
**curiosity** [3] - 168:4, 168:25, 170:15
**curious** [4] - 166:2, 167:20, 167:21, 169:9
**current** [8] - 13:21, 13:22, 16:4, 44:21, 89:23, 139:25, 151:6, 157:4
**Curtis** [1] - 74:5
**customary** [1] - 51:24
**customer** [1] - 101:1
**customer/subscriber** [1] - 100:20
**customers** [9] - 66:20, 66:21, 98:23, 100:21, 101:5, 117:1, 117:8, 213:9
**cut** [1] - 68:24
**cuts** [1] - 111:6
**cutting** [2] - 63:15, 73:1

## D

**D.C** [14] - 1:6, 1:17,

1:23, 2:4, 14:9, 15:24, 19:6, 46:3, 126:12, 162:13, 193:14, 198:12, 198:15, 215:14
**daily** [13] - 80:20, 91:6, 91:12, 91:23, 91:25, 131:5, 131:6, 143:6, 153:22, 162:25, 168:10, 186:9
**Daily** [2] - 166:7, 169:14
**dance** [1] - 177:17
**dangerous** [3] - 174:3, 177:22, 178:7
**data** [2] - 67:9, 68:8
**date** [2] - 137:22, 161:25
**Dated** [1] - 215:10
**dates** [1] - 168:2
**day's** [2] - 80:20, 91:15
**day-to-day** [1] - 52:3
**days** [17] - 7:11, 7:20, 8:18, 25:13, 45:1, 45:7, 53:13, 53:18, 111:11, 122:5, 130:24, 146:21, 146:22, 147:6, 170:5, 173:16, 189:19
**de** [5] - 207:8, 207:14, 208:9, 213:6, 213:7
**dead** [3] - 28:13, 34:19, 42:12
**deadline** [1] - 115:13
**deal** [3] - 51:10, 52:15, 71:13
**dealing** [3] - 12:14, 16:20, 193:19
**deals** [2] - 53:9, 54:21
**decades** [1] - 204:7
**December** [1] - 141:25
**decide** [4] - 85:20, 109:1, 195:8, 198:1
**decided** [7] - 105:24, 109:17, 112:4, 150:19, 152:5, 158:5, 209:1
**decides** [3] - 108:24, 176:6, 177:7
**decision** [9] - 147:10, 147:12, 163:8, 165:5, 165:9, 171:19, 180:9, 193:9, 207:5
**decisionmaking** [2] - 124:19, 173:24

**decisions** [1] - 112:3
**declaration** [36] - 4:23, 5:3, 5:15, 8:8, 8:12, 8:15, 10:13, 16:22, 17:1, 86:5, 134:24, 135:14, 146:11, 150:20, 153:3, 153:9, 155:12, 155:18, 155:25, 156:7, 156:12, 156:18, 157:17, 165:13, 165:18, 165:22, 167:18, 170:2, 170:18, 171:12, 171:17, 172:8, 191:15, 204:17, 204:22
**declarations** [9] - 90:15, 100:4, 150:22, 150:25, 153:14, 174:17, 200:5, 206:7, 206:10
**declined** [1] - 6:13
**declining** [1] - 196:14
**decrease** [1] - 79:14
**dedicated** [1] - 186:20
**deems** [1] - 208:3
**Defendant** [2] - 124:6, 160:19
**Defendants** [2] - 1:7, 170:16
**DEFENDANTS** [1] - 1:21
**Defendants'** [3] - 3:16, 174:15, 189:15
**defenders** [1] - 38:9
**deferring** [1] - 140:18
**defies** [1] - 167:23
**define** [2] - 137:14, 158:3
**defined** [2] - 159:22, 161:10
**defining** [1] - 157:24
**definitely** [2] - 140:11, 141:2
**definition** [1] - 141:24
**delay** [6] - 34:18, 35:23, 98:7, 98:12, 114:10, 115:18
**delayed** [3] - 114:1, 114:18, 115:9
**delaying** [2] - 115:18, 116:12
**delays** [2] - 98:17, 206:4
**delegation** [3] -

**133:15, 134:2, 134:8
**delegations** [1] - 132:23
**delete** [1] - 28:17
**demand** [2] - 185:4, 211:18
**demonstrated** [1] - 202:9
**demoted** [2] - 209:8, 209:12
**denial** [2] - 10:8, 192:1
**denied** [9] - 70:12, 70:16, 71:16, 78:2, 81:2, 81:7, 83:18, 161:18, 178:4
**denigrate** [1] - 10:24
**deny** [2] - 4:25, 82:12
**denying** [2] - 9:19, 161:19
**Department** [3] - 132:24, 133:1, 169:18
**department** [2] - 4:14, 176:24
**departures** [5] - 83:11, 83:16, 84:1, 118:4, 118:5
**depicted** [1] - 141:5
**depiction** [1] - 87:22
**depicts** [1] - 139:4
**deprivation** [1] - 10:22
**deprive** [1] - 210:10
**deprived** [5] - 9:25, 10:25, 11:5, 184:23, 203:14
**DEPUTY** [4] - 4:1, 18:3, 89:14, 149:22
**deputy** [3] - 113:16, 134:22, 160:24
**Des** [4] - 27:17, 36:4, 51:8, 96:19
**describe** [3] - 38:6, 56:11, 159:7
**described** [4] - 95:13, 114:12, 162:15, 184:11
**describing** [3] - 30:12, 211:2, 211:3
**description** [1] - 192:2
**designation** [1] - 92:23
**designed** [1] - 103:25
**Desk** [2] - 26:15, 185:13
**desks** [1] - 35:5
**despite** [2] - 146:19,

153:8
**destroyed** [2] - 37:23, 88:4
**detail** [5] - 57:10, 62:5, 110:20, 111:9, 176:8
**details** [2] - 91:15, 109:17
**determination** [2] - 5:20, 194:16
**determinations** [1] - 197:5
**determine** [4] - 17:3, 99:4, 136:23
**determined** [1] - 105:23
**development** [1] - 205:1
**device** [3] - 28:20, 28:21, 28:22
**devices** [1] - 29:6
**diagram** [1] - 139:19
**dichotomy** [1] - 198:16
**dictate** [1] - 204:4
**difference** [5] - 105:10, 123:19, 140:4, 179:2, 188:12
**different** [34] - 9:9, 9:10, 11:25, 14:13, 14:24, 25:7, 26:19, 26:22, 27:22, 51:13, 68:1, 76:24, 94:3, 97:25, 103:25, 109:7, 128:7, 136:6, 138:15, 159:15, 176:14, 176:17, 178:7, 179:9, 185:22, 188:1, 189:25, 205:14, 206:9, 210:12, 211:1, 212:15, 213:19
**differently** [3] - 188:2, 188:10, 204:1
**digital** [1] - 102:7
**dignitaries** [1] - 49:23
**diminished** [1] - 125:15
**dining** [1] - 94:13
**dinner** [2] - 95:3, 105:19
**diplomatic** [4] - 94:14, 112:23, 133:21, 134:4
**DIRECT** [2] - 18:11, 89:19
**direct** [14] - 47:4, 58:25, 64:22, 65:3, 65:10, 65:16, 74:25, 101:18, 126:15,

128:1, 131:21, 139:11, 160:11, 165:18
**Direct** [2] - 3:3, 3:6
**direct-file** [1] - 101:18
**directed** [4] - 69:10, 91:1, 97:1, 113:11
**directly** [3] - 28:20, 28:22, 112:11
**disadvantage** [1] - 40:14
**disagree** [4] - 5:1, 15:12, 186:13, 210:16
**disagreed** [2] - 209:17, 212:3
**disapproves** [1] - 183:15
**disc** [1] - 39:25
**discharge** [1] - 209:21
**discredit** [1] - 156:21
**discredited** [1] - 167:25
**discretion** [9] - 8:14, 104:6, 104:10, 153:10, 153:11, 158:6, 191:23, 198:13, 205:13
**discriminate** [1] - 194:1
**discrimination** [9] - 10:3, 125:24, 125:25, 161:20, 162:17, 163:14, 194:2, 194:11, 211:10
**discriminatory** [4] - 10:9, 161:11, 162:7, 180:15
**discuss** [1] - 48:21
**discussed** [6] - 6:4, 14:7, 56:24, 131:7, 145:21, 172:16
**discusses** [1] - 185:8
**discussing** [1] - 129:7
**discussion** [3] - 40:23, 62:12, 163:2
**discussions** [2] - 108:6, 188:15
**disfavored** [1] - 177:25
**disjunctive** [2] - 207:7, 207:23
**dislike** [1] - 15:12
**dismay** [1] - 15:11
**display** [1] - 85:24
**displayed** [3] - 86:11, 86:16, 189:8

**dispositive** [1] - 131:11
**dispute** [7] - 51:15, 69:25, 127:9, 142:6, 145:8, 159:19, 200:7
**disputes** [2] - 5:6, 5:11
**disseminated** [1] - 100:8
**distance** [2] - 104:18, 104:25
**distant** [1] - 110:12
**distinction** [11] - 153:13, 153:14, 158:1, 175:21, 180:18, 188:11, 188:17, 202:25, 203:16, 203:17, 205:25
**distinguish** [2] - 41:3, 118:3
**distinguishes** [3] - 179:16, 185:9, 187:10
**distorted** [1] - 196:16
**distributed** [4] - 98:8, 99:24, 100:21, 212:13
**distributing** [4] - 96:17, 100:6, 100:19
**distribution** [14] - 33:13, 33:17, 51:6, 51:10, 53:14, 93:21, 170:19, 170:21, 170:25, 171:2, 171:4, 171:5, 212:16, 212:18
**DISTRICT** [4] - 1:1, 1:1, 1:11, 1:22
**district** [3] - 162:14, 194:24, 215:13
**District** [6] - 2:2, 2:2, 195:12, 195:13, 209:11, 215:13
**division** [1] - 46:7
**divisive** [1] - 171:21
**DMZ** [2] - 107:23, 108:10
**doctrine** [11] - 11:16, 175:7, 175:16, 175:20, 176:4, 177:5, 177:21, 179:21, 183:5, 203:2, 203:12
**document** [6] - 154:6, 154:8, 154:21, 155:5, 156:2, 166:17
**documentary** [3] - 150:6, 170:4, 174:15
**documents** [6] - 59:18, 106:15, 151:4, 151:9, 155:8, 156:23

**doing** [1] - 194:11
**domestic** [3] - 109:14, 200:21, 201:1
**done** [13] - 9:14, 34:5, 73:11, 73:12, 119:15, 124:15, 127:22, 158:4, 162:24, 174:22, 184:9, 207:12
**door** [5] - 43:13, 43:17, 136:13, 157:16, 160:5
**doors** [7] - 65:1, 81:12, 81:15, 82:8, 82:10, 82:21, 83:1
**double** [3] - 129:16, 136:16, 144:16
**double-check** [2] - 129:16, 136:16
**doubled** [3] - 8:5, 10:18, 10:19
**doubly** [1] - 110:12
**down** [29] - 8:5, 10:18, 10:19, 14:17, 14:19, 27:25, 35:1, 44:11, 44:15, 44:17, 45:6, 67:5, 67:11, 71:18, 92:18, 116:15, 127:16, 130:19, 133:24, 135:2, 149:10, 166:15, 195:16, 197:21, 200:17, 203:4, 204:6, 207:5
**download** [1] - 67:24
**dozens** [3] - 24:8, 24:9, 103:2
**dozing** [1] - 201:22
**drafted** [1] - 190:10
**drastically** [1] - 185:9
**dreams** [1] - 75:25
**drilled** [1] - 207:5
**drive** [1] - 164:10
**driveway** [1] - 49:21
**drop** [1] - 95:18
**ducking** [1] - 23:18
**DUDDING** [1] - 1:18
**Dudding** [1] - 4:8
**due** [16] - 9:25, 10:1, 10:23, 158:20, 162:12, 162:13, 163:4, 163:12, 173:23, 178:6, 182:5, 183:20, 188:7, 203:14, 211:11
**during** [17] - 23:13, 42:3, 48:17, 56:4, 56:15, 60:1, 64:21, 105:14, 109:21,

128:1, 136:25, 139:11, 141:21, 153:22, 184:21, 189:8, 201:23
**duties** [1] - 19:5
**duty** [2] - 45:4, 193:6
**déjà** [1] - 7:17

## E

**E-V-A-N** [1] - 18:23
**eager** [1] - 73:2
**early** [4] - 91:14, 105:9, 110:2, 115:11
**earn** [1] - 186:19
**ears** [2] - 96:13, 201:19
**ease** [1] - 115:5
**easier** [1] - 73:7
**easiest** [1] - 205:10
**east** [113] - 7:22, 8:20, 9:7, 9:19, 9:20, 10:11, 11:5, 12:20, 14:22, 15:3, 15:16, 16:9, 25:3, 34:6, 42:25, 43:15, 54:16, 56:3, 56:8, 56:14, 59:9, 60:16, 62:13, 64:5, 64:15, 68:14, 68:20, 68:21, 69:3, 73:8, 73:15, 73:23, 74:7, 74:15, 77:9, 77:11, 77:19, 77:23, 77:24, 78:10, 78:16, 79:22, 80:21, 81:11, 81:14, 81:23, 82:5, 85:2, 85:15, 93:13, 93:14, 94:22, 94:23, 95:1, 95:3, 110:1, 110:5, 113:1, 117:21, 118:12, 119:25, 120:5, 121:1, 121:20, 121:23, 127:5, 129:7, 129:18, 132:18, 132:20, 133:4, 135:3, 135:23, 135:24, 136:4, 136:15, 142:10, 142:22, 143:19, 144:4, 144:18, 146:17, 147:1, 147:9, 151:12, 151:24, 152:13, 157:14, 158:9, 158:17, 158:25, 159:2, 159:17, 159:22, 161:10, 161:22, 162:7, 163:18, 184:5, 185:14, 186:24, 188:6, 189:19,

189:22, 189:23,
199:2, 199:10,
199:24, 200:8,
200:19, 201:6, 203:1,
203:7
  **Eastern** [2] - 116:22
  **economy** [1] -
169:12
  **edict** [1] - 211:22
  **edit** [2] - 27:20,
32:16
  **editor** [12] - 27:17,
27:18, 28:25, 29:1,
29:18, 30:20, 35:2,
36:3, 62:1, 102:4,
113:14
  **editorial** [11] - 48:12,
51:19, 107:6, 108:25,
112:3, 112:12,
124:19, 147:10,
173:24, 174:12,
205:13
  **editors** [6] - 29:13,
52:21, 101:22,
103:13, 107:15, 109:1
  **educated** [1] -
170:20
  **education** [3] -
73:24, 144:5, 169:16
  **Education** [1] -
169:18
  **Edwards** [1] - 215:12
  **EDWARDS** [2] - 2:1,
215:3
  **effect** [4] - 11:2,
115:7, 174:4, 203:24
  **effectively** [1] -
195:5
  **effectuate** [1] -
115:17
  **efficiency** [1] - 17:13
  **efficiently** [1] - 162:5
  **ego** [2] - 21:9, 46:10
  **Ehrlich** [17] - 13:13,
179:15, 183:23,
183:24, 187:2, 187:7,
187:15, 196:7, 207:2,
207:5, 208:8, 208:19,
208:20, 208:24,
209:24
  **eight** [2] - 90:12,
101:21
  **either** [8] - 44:3,
68:10, 68:18, 72:10,
122:1, 140:14,
205:15, 210:12
  **electrons** [1] -
101:17
  **element** [1] - 163:13
  **elements** [3] -

163:13, 207:1, 209:14
  **eligibility** [5] -
146:19, 171:15,
171:25, 191:14,
191:22
  **eligible** [18] - 93:18,
146:15, 146:16,
147:2, 151:8, 153:6,
157:6, 157:18,
157:25, 163:23,
165:14, 170:1,
171:11, 190:4, 190:8,
190:10, 190:14,
191:17
  **eliminate** [1] -
169:18
  **Eliot** [1] - 61:9
  **ELMO** [1] - 17:17
  **Elon** [1] - 50:12
  **Elswick's** [1] - 86:5
  **email** [5] - 81:1,
93:19, 93:21, 131:18,
136:3
  **emailed** [1] - 98:6
  **emails** [2] - 92:1,
94:1
  **emanating** [1] -
193:4
  **emergency** [2] - 5:3,
110:23
  **emphasize** [1] -
185:8
  **empirical** [1] - 79:14
  **empirics** [1] - 79:16
  **employed** [1] -
153:18
  **employee** [1] -
209:21
  **empowered** [1] -
165:24
  **enable** [1] - 120:10
  **encounter** [1] -
49:22
  **encouraging** [1] -
110:14
  **end** [9] - 5:14, 11:25,
12:6, 13:4, 25:17,
95:19, 107:21,
116:10, 173:20
  **ended** [2] - 136:6,
144:15
  **ends** [1] - 31:8
  **enforcement** [1] -
209:4
  **engage** [3] - 114:21,
192:10, 209:22
  **enjoy** [1] - 159:24
  **enjoyed** [1] - 15:22
  **enjoys** [2] - 139:7,
159:2

  **ensure** [4] - 16:22,
136:24, 170:18, 171:1
  **enter** [5] - 62:20,
64:25, 126:17, 136:3,
136:15
  **entered** [11] - 92:10,
108:24, 119:22,
125:1, 154:14,
164:23, 166:22,
172:24, 173:11,
174:25, 189:16
  **entertaining** [2] -
42:2, 42:5
  **entire** [9] - 11:3,
17:13, 28:17, 29:12,
41:25, 177:5, 181:23,
195:2, 211:23
  **entirely** [4] - 30:18,
178:6, 185:22, 188:1
  **entirety** [1] - 167:15
  **entities** [2] - 156:9,
171:5
  **entitled** [5] - 161:6,
161:8, 163:5, 181:15,
193:1
  **entitles** [1] - 183:18
  **entry** [2] - 121:25,
184:22
  **equal** [1] - 211:18
  **equally** [3] - 33:18,
178:1, 196:13
  **equate** [1] - 213:2
  **equipment** [2] -
52:20, 202:2
  **era** [1] - 99:5
  **error** [1] - 207:22
  **escort** [2] - 81:20,
83:2
  **escorted** [3] - 81:13,
110:9, 132:25
  **especially** [4] - 5:3,
5:15, 44:7, 212:24
  **ESQ** [4] - 1:14, 1:15,
1:18, 1:21
  **essentially** [1] - 91:7
  **established** [12] -
34:18, 58:9, 87:4,
109:9, 141:16,
180:23, 181:1, 182:2,
182:4, 203:12
  **et** [3] - 1:6, 4:2,
149:23
  **euphemism** [1] -
42:25
  **Europe** [3] - 27:18,
108:16, 121:25
  **evaluate** [1] - 14:8
  **EVAN** [2] - 3:3, 18:5
  **Evan** [6] - 4:11, 18:1,
91:13, 95:12, 114:12,

121:4
  **evening** [1] - 22:5
  **event** [178] - 15:4,
15:5, 23:25, 24:15,
27:8, 27:9, 27:10,
28:9, 30:2, 30:5, 36:3,
36:8, 37:6, 43:13,
43:18, 53:18, 56:8,
56:12, 56:15, 56:21,
58:14, 59:9, 59:19,
61:18, 62:13, 62:16,
62:24, 64:5, 64:17,
64:20, 64:24, 65:5,
68:15, 68:20, 70:8,
70:11, 70:13, 71:8,
71:24, 72:15, 73:14,
73:23, 74:11, 74:14,
74:24, 75:9, 76:16,
77:13, 79:20, 80:21,
80:25, 81:17, 81:21,
82:12, 85:15, 92:21,
93:8, 93:11, 93:12,
94:14, 94:22, 94:23,
98:13, 98:14, 101:23,
102:8, 102:19,
102:24, 104:7, 104:8,
105:2, 105:11, 106:2,
106:3, 106:10,
107:13, 107:17,
108:1, 109:17, 110:5,
112:6, 112:10,
112:12, 112:20,
112:21, 114:13,
115:12, 115:15,
116:8, 116:9, 116:10,
116:11, 117:25,
119:5, 119:12, 120:7,
120:14, 121:22,
123:9, 127:2, 127:5,
128:15, 128:19,
129:11, 129:22,
130:1, 130:15,
130:21, 130:22,
131:4, 131:17,
131:22, 131:24,
132:2, 132:13,
132:15, 135:4, 135:5,
135:12, 135:22,
135:23, 135:24,
136:1, 136:2, 136:6,
136:12, 136:13,
136:18, 142:10,
142:14, 142:17,
142:22, 143:1,
143:11, 143:16,
143:19, 143:23,
143:25, 144:4,
144:13, 144:19,
144:24, 145:1, 145:2,
145:5, 145:6, 145:21,
147:1, 147:9, 148:9,

151:7, 154:23,
154:24, 157:5,
158:13, 166:1, 167:7,
168:14, 169:16,
175:17, 177:7,
177:19, 178:10,
184:15, 184:22,
185:11, 186:24,
187:1, 197:16, 200:8,
201:3, 201:23, 201:24
  **events** [146] - 7:22,
8:19, 8:20, 9:18, 9:20,
10:12, 11:5, 12:20,
14:22, 22:7, 22:18,
24:20, 34:6, 41:22,
42:20, 42:24, 42:25,
44:3, 44:22, 47:19,
50:3, 50:15, 50:18,
54:16, 56:3, 56:5,
59:20, 60:1, 67:13,
70:18, 73:8, 75:8,
75:22, 77:12, 77:19,
77:22, 77:23, 77:24,
78:2, 78:9, 78:18,
79:19, 79:22, 80:4,
80:21, 81:24, 83:13,
85:2, 87:17, 87:24,
91:4, 91:10, 91:15,
91:17, 94:21, 94:22,
95:7, 102:6, 104:2,
104:3, 104:4, 104:8,
104:12, 107:4,
108:12, 109:21,
113:8, 113:9, 113:23,
113:25, 114:15,
117:16, 117:21,
118:12, 119:25,
120:1, 120:18,
120:24, 121:1, 121:3,
121:15, 123:23,
123:24, 126:16,
126:19, 126:25,
127:17, 127:19,
127:21, 129:6, 129:8,
129:16, 129:18,
129:19, 131:7,
132:18, 132:20,
133:3, 133:5, 142:7,
145:8, 145:11,
146:17, 146:23,
147:25, 148:11,
152:14, 153:2,
155:14, 157:9,
157:14, 158:9,
158:17, 158:19,
161:10, 162:25,
163:19, 165:11,
166:7, 167:14,
168:11, 168:24,
170:17, 170:19,
170:25, 171:3,

171:11, 171:15, 172:1, 176:13, 184:4, 184:5, 185:22, 187:12, 192:3, 199:10, 199:14, 200:19, 200:20, 200:24, 201:12, 203:1, 203:5, 211:1

**Evidence** [2] - 41:24, 119:1

**evidence** [39] - 5:19, 5:24, 6:9, 6:20, 10:19, 14:25, 17:4, 92:6, 92:11, 119:22, 125:2, 150:6, 154:9, 154:15, 156:20, 157:10, 159:15, 159:20, 164:15, 164:20, 164:23, 165:7, 166:23, 170:4, 171:7, 172:25, 173:7, 173:12, 174:15, 175:1, 175:3, 185:10, 189:16, 199:9, 199:22, 205:17, 212:5, 212:9, 213:9

**evidentiary** [3] - 4:22, 5:5, 151:2

**exact** [3] - 48:9, 116:11, 172:14

**exactly** [8] - 13:3, 38:11, 50:11, 101:5, 135:25, 162:14, 172:14, 178:13

**EXAMINATION** [6] - 18:11, 45:21, 79:11, 89:19, 126:7, 146:9

**Examination** [6] - 3:3, 3:4, 3:4, 3:6, 3:7, 3:7

**examination** [11] - 5:13, 47:4, 58:25, 64:22, 65:3, 65:16, 74:25, 113:22, 126:15, 150:17, 150:18

**examinations** [1] - 189:8

**examine** [2] - 17:9, 17:10

**examined** [2] - 6:16, 156:18

**example** [11] - 47:22, 49:6, 59:5, 60:3, 91:25, 115:8, 116:7, 127:4, 128:9, 169:14, 194:23

**examples** [3] - 150:23, 166:5, 188:18

**excellent** [1] - 21:24

**exception** [6] - 15:25, 21:6, 152:14, 193:15, 198:17, 213:17

**exceptional** [1] - 122:9

**exclude** [5] - 8:9, 13:18, 171:4, 194:2, 194:6

**excluded** [26] - 9:22, 12:24, 12:25, 33:20, 40:11, 41:21, 71:24, 81:25, 87:24, 112:17, 117:24, 117:25, 120:2, 130:14, 136:19, 138:12, 147:2, 147:8, 155:19, 157:9, 158:8, 158:14, 161:9, 210:25, 211:9

**excluding** [2] - 170:24, 195:20

**exclusion** [12] - 9:5, 9:7, 16:11, 112:19, 113:6, 123:21, 153:1, 161:4, 172:3, 174:11, 206:2

**exclusions** [2] - 162:7, 163:18

**exclusive** [3] - 41:9, 105:23, 176:19

**excused** [2] - 89:7, 149:13

**executive** [1] - 73:24, 106:4, 112:7, 113:13, 144:5, 169:16, 169:17, 178:7, 184:1, 195:24, 198:24, 211:23, 211:24

**exercise** [4] - 158:5, 205:9, 207:4, 208:5

**exercising** [2] - 205:5, 205:13

**exhibit** [5] - 116:16, 155:12, 164:19, 166:14, 172:20

**Exhibit** [70] - 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:16, 48:12, 48:22, 54:19, 58:4, 59:10, 60:3, 60:16, 63:2, 64:6, 64:10, 69:2, 72:2, 91:21, 92:6, 92:10, 116:3, 116:6, 116:14, 119:21, 124:5, 124:23, 125:1, 130:5, 131:21, 134:25, 138:25, 153:21, 153:22,

154:5, 154:8, 154:14, 154:21, 154:22, 156:2, 164:10, 164:14, 164:19, 165:1, 165:7, 166:5, 166:11, 166:13, 166:19, 166:22, 168:9, 168:19, 169:14, 172:8, 172:20, 172:24, 173:3, 173:7, 173:11, 174:5, 174:21, 174:25, 189:15

**Exhibits** [3] - 119:15, 164:22, 169:4

**EXHIBITS** [1] - 3:9

**exhibits** [6] - 6:16, 17:11, 17:12, 46:11, 150:18, 189:7

**exist** [1] - 191:3

**existing** [1] - 102:23

**exists** [1] - 191:3

**expanse** [1] - 111:7

**expansion** [2] - 177:9, 178:7

**expect** [2] - 27:19, 41:14

**expected** [3] - 20:6, 27:22, 200:16

**expedited** [1] - 7:6

**expense** [2] - 100:10, 121:22

**expensive** [1] - 33:4

**experience** [8] - 35:23, 41:19, 93:20, 111:3, 130:3, 132:23, 134:10, 147:5

**experiences** [1] - 210:7

**expert** [1] - 62:8

**expertise** [3] - 108:15, 108:18, 123:22

**explain** [5] - 55:8, 80:17, 154:18, 157:1, 190:8

**explained** [1] - 45:13

**explaining** [1] - 82:4

**explanation** [1] - 162:16

**explicit** [1] - 160:1

**exposes** [1] - 171:22

**exposure** [1] - 61:23

**express** [5] - 15:11, 207:20, 207:23, 210:22

**expressed** [1] - 84:7

**expresses** [4] - 182:17, 206:6, 206:16, 208:7

**expressing** [1] - 207:18

**expression** [11] - 11:6, 176:13, 176:20, 177:25, 188:22, 188:25, 208:5, 209:10, 209:20, 210:1, 210:2

**expressions** [1] - 61:18

**expressly** [1] - 14:18

**extend** [2] - 113:2, 115:13

**extended** [1] - 16:4

**extending** [2] - 113:18, 124:20

**extension** [1] - 96:13

**extent** [6] - 5:10, 42:2, 112:16, 118:25, 138:9, 189:13

**extinguish** [1] - 185:21

**extra** [2] - 22:8, 22:13

**extraordinary** [1] - 110:21

**extremely** [2] - 75:13, 76:15

**extremes** [1] - 13:8

**eye** [2] - 25:23, 61:25

**eyeballs** [1] - 169:9

**eyes** [4] - 25:2, 96:12, 101:19, 201:19

---

**F**

**face** [5] - 50:24, 61:15, 81:7, 153:15

**faced** [1] - 148:16

**faces** [1] - 39:17

**facial** [2] - 59:2, 61:18

**facilitate** [1] - 150:16

**facilities** [3] - 15:22, 49:15, 180:5

**fact** [18] - 5:6, 14:17, 42:13, 42:15, 99:1, 117:3, 151:13, 153:19, 178:23, 181:13, 188:3, 197:19, 198:6, 199:12, 204:21, 207:9, 212:7, 212:10

**fact-based** [1] - 42:13

**fact-gathering** [1] - 204:21

**factor** [1] - 212:4

**factors** [1] - 153:12

**facts** [7] - 7:19, 17:3, 161:3, 183:21, 209:8, 211:20

**factual** [4] - 13:21, 14:5, 204:24, 213:16

**fair** [6] - 53:22, 76:11, 76:20, 76:21, 82:2, 192:2

**fairly** [5] - 7:18, 61:17, 120:4, 194:13, 197:15

**fall** [1] - 206:20

**falls** [3] - 165:18, 167:17, 192:15

**familiar** [6] - 17:15, 65:22, 87:17, 92:2, 121:11, 121:14

**famous** [3] - 36:12, 37:25, 184:11

**fans** [1] - 17:22

**far** [17] - 7:15, 27:4, 31:11, 35:8, 35:16, 38:1, 42:13, 43:14, 44:19, 68:4, 68:8, 86:14, 88:4, 171:7, 188:12, 192:1, 192:15

**fashion** [4] - 114:1, 121:17, 121:18, 213:15

**fashioned** [1] - 163:5

**fast** [6] - 30:9, 33:18, 55:16, 76:20, 76:22, 102:22

**fast-forwarding** [1] - 55:16

**fastball** [1] - 190:12

**fault** [1] - 51:18

**favor** [2] - 26:11, 161:3

**fear** [1] - 125:22

**feature** [1] - 115:3

**February** [61] - 22:14, 46:20, 49:7, 54:2, 54:13, 54:23, 55:16, 56:7, 56:17, 56:19, 58:6, 64:20, 69:3, 69:18, 91:3, 92:13, 95:8, 95:23, 98:2, 109:16, 111:19, 113:24, 117:23, 118:19, 120:22, 122:11, 123:23, 124:4, 129:9, 129:13, 129:22, 129:23, 129:24, 130:12, 132:15, 133:5, 135:3, 136:8, 136:17, 138:7, 138:8, 142:9, 142:10, 142:22, 145:9, 146:22, 154:22,

155:7, 156:4, 164:2, 165:4, 165:8, 166:3, 166:6, 167:6, 171:17, 172:2, 172:5, 172:6, 173:2, 173:14
**fed** [2] - 114:11
**feed** [4] - 109:24, 126:21, 126:24, 128:9
**feeding** [1] - 39:25
**feeds** [3] - 39:6, 107:20, 107:21
**feet** [2] - 25:6, 121:24
**felt** [1] - 172:4
**few** [19] - 7:22, 9:10, 40:2, 43:2, 48:20, 55:14, 73:8, 77:23, 88:19, 109:25, 110:10, 115:23, 126:13, 131:16, 140:8, 152:1, 166:5, 175:5, 178:17
**fewer** [1] - 118:1, 179:4, 205:12
**fide** [3] - 107:4, 180:6, 198:9
**field** [1] - 190:11
**Fifth** [7] - 9:4, 9:6, 10:22, 162:12, 178:6, 210:12, 211:10
**fight** [1] - 37:18
**figure** [2] - 71:18, 99:9
**file** [2] - 101:18, 102:22
**filed** [7] - 4:23, 8:23, 116:18, 116:20, 116:21, 146:12, 175:12
**filings** [1] - 90:18
**fill** [3] - 81:4, 99:8, 155:20
**filled** [1] - 81:24
**filmmaker** [2] - 36:18, 37:9
**filter** [1] - 176:10
**final** [1] - 199:15
**financial** [5] - 67:18, 68:4, 109:10, 109:11
**fine** [6] - 17:22, 32:6, 37:24, 73:5, 78:23, 84:17
**finish** [2] - 38:24, 73:6
**fired** [3] - 44:9, 44:10, 44:18
**firm** [1] - 4:7
**first** [57] - 17:9, 24:5, 36:5, 37:9, 43:13, 43:16, 76:11, 92:13,

105:14, 107:23, 108:4, 128:18, 133:14, 134:16, 136:5, 140:4, 153:8, 155:24, 156:11, 157:20, 166:5, 172:8, 175:6, 175:15, 178:19
**First** [31] - 9:4, 9:6, 9:24, 10:21, 10:25, 11:3, 11:7, 14:20, 15:21, 122:19, 162:11, 175:13, 178:3, 178:8, 183:25, 188:7, 195:7, 196:6, 198:23, 198:25, 204:5, 204:8, 206:19, 207:4, 208:21, 208:23, 210:13, 210:17, 211:11
**fist** [3] - 20:3, 20:9, 20:14
**fist-raising** [2] - 20:3, 20:9
**fit** [2] - 162:5, 163:3
**five** [12] - 25:6, 55:16, 77:19, 77:20, 77:22, 77:24, 79:1, 90:13, 97:11, 102:20, 103:20, 187:14
**five-on-one** [1] - 187:14
**flag** [3] - 20:2, 20:15, 96:25
**flag-raising** [1] - 20:2
**flash** [2] - 25:16, 164:10
**flatly** [2] - 151:1, 156:19
**flattering** [1] - 76:12
**flaws** [1] - 157:1
**flew** [1] - 121:6
**flip** [1] - 17:21
**flipping** [4] - 48:22, 54:19, 64:10, 73:8
**Floor** [2] - 1:16, 1:19
**fly** [1] - 121:22
**focus** [8] - 84:12, 95:7, 104:3, 109:8, 109:15, 123:4, 151:15, 152:25
**focused** [7] - 9:12, 27:2, 109:9, 114:16, 123:4, 128:10, 184:2
**focusing** [2] - 91:3, 161:21
**folks** [10] - 4:15, 52:22, 104:25, 105:21, 106:25, 143:7, 145:14,

145:19, 200:14, 201:17
**follow** [5] - 10:2, 102:17, 102:20, 103:5, 178:18
**followed** [1] - 212:4
**following** [3] - 89:9, 149:21, 178:19
**followups** [1] - 88:19
**football** [1] - 38:7
**footing** [1] - 100:10
**FOR** [4] - 1:1, 1:14, 1:21, 1:22
**force** [2] - 5:17, 213:7
**Force** [20] - 22:23, 22:24, 23:3, 43:22, 43:23, 44:4, 70:13, 70:19, 83:12, 83:14, 94:17, 97:8, 100:3, 106:16, 113:21, 118:6, 118:7, 144:8, 172:11
**forced** [2] - 5:23, 183:14
**forcing** [1] - 177:15
**foregoing** [1] - 215:4
**foreign** [27] - 49:23, 57:21, 58:14, 59:11, 65:4, 106:5, 120:24, 120:25, 122:13, 122:25, 132:19, 132:23, 133:3, 133:4, 135:7, 135:11, 142:13, 142:25, 145:10, 151:20, 152:1, 185:13, 185:16, 199:24, 200:24, 201:9, 203:4
**foreign-based** [4] - 65:4, 133:3, 135:7, 135:11
**foreshadows** [1] - 187:3
**forever** [1] - 178:24
**forgotten** [1] - 119:11
**form** [5] - 102:20, 145:13, 145:14, 145:19, 160:14
**formality** [1] - 154:3
**formally** [2] - 113:11, 131:17
**format** [1] - 103:23
**formats** [1] - 124:2
**formed** [1] - 148:10
**former** [2] - 55:23
**formerly** [1] - 116:17
**formulation** [1] - 94:11

**forth** [2] - 108:10, 114:25
**forty** [1] - 146:22
**forty-four** [1] - 146:22
**forum** [4] - 192:10, 192:12, 192:13, 195:5
**forums** [1] - 203:18
**forward** [3] - 4:3, 49:4, 74:6
**forwarding** [1] - 55:16
**Foundation** [1] - 175:12
**foundational** [1] - 95:9
**four** [17] - 9:4, 11:24, 14:13, 25:6, 25:7, 77:22, 77:24, 79:22, 97:21, 101:23, 111:25, 146:8, 146:22, 166:7, 173:16, 187:8, 208:22
**four-minute** [1] - 111:25
**fours** [2] - 180:17, 192:21
**fourth** [1] - 163:13
**Fourth** [2] - 14:18, 196:10
**Fox** [3] - 50:2, 97:17
**fraction** [1] - 198:2
**frame** [2] - 6:9, 128:18
**frames** [2] - 23:22, 176:9
**framing** [1] - 105:25
**France** [2] - 121:7, 135:4
**frankly** [1] - 204:14
**FRE** [2] - 72:17, 72:19
**free** [15] - 6:1, 8:25, 11:7, 11:8, 159:14, 188:9, 188:16, 188:19, 188:20, 188:25, 192:23, 205:5, 205:9, 208:5
**freedom** [6] - 9:1, 122:19, 188:10, 188:22, 195:21
**freelance** [1] - 55:6
**freelancer** [3] - 72:13, 72:17, 72:18
**freelancers** [1] - 122:2
**freely** [6] - 96:15, 97:5, 98:20, 98:21, 100:8, 109:12
**freestanding** [1] -

183:24
**French** [8] - 56:25, 58:5, 59:6, 133:17, 133:20, 134:3, 134:8, 142:11
**frequently** [3] - 77:11, 151:18, 151:19
**friend** [3] - 66:5, 83:6, 194:22
**friends** [2] - 124:18, 196:3
**front** [24] - 23:12, 25:10, 25:12, 26:14, 27:3, 40:16, 44:14, 46:12, 76:20, 86:1, 86:2, 86:20, 88:2, 111:2, 128:6, 130:2, 139:4, 139:7, 139:19, 141:9, 145:16, 161:6, 199:22, 202:6
**front-of-the-line** [1] - 161:6
**front-row** [2] - 139:4, 139:7, 139:19
**fulfilled** [1] - 185:2
**full** [8] - 22:11, 34:12, 43:11, 90:4, 112:16, 127:20, 197:24, 215:5
**full-time** [2] - 22:11, 43:11
**fuller** [1] - 103:21
**fulsome** [1] - 207:15
**functional** [2] - 175:20, 185:23
**functionality** [2] - 185:20, 186:24
**functionally** [1] - 103:8
**functions** [1] - 137:20
**fundamentally** [1] - 211:1
**future** [2] - 27:25, 72:19

**G**

**G-R-I-P-A-S** [1] - 64:12
**gaggle** [1] - 187:16
**gallery** [1] - 105:1
**game** [3] - 28:11, 38:7, 41:16
**gap** [2] - 99:8, 155:20
**gather** [2] - 82:8, 97:20
**gathering** [4] -

27:15, 203:11, 203:19, 204:21

**geared** [1] - 109:13

**gears** [1] - 56:2

**general** [19] - 15:23, 15:25, 16:1, 24:4, 24:7, 109:13, 124:3, 159:3, 187:23, 192:25, 193:11, 193:15, 193:16, 193:18, 193:20, 197:24, 198:19, 198:20

**generally** [13] - 6:23, 56:11, 92:22, 94:10, 97:9, 111:3, 118:5, 118:8, 136:11, 148:1, 193:8, 195:2, 206:20

**generated** [1] - 63:25

**generations** [1] - 204:8

**gentlemen** [1] - 213:11

**gents** [1] - 149:17

**geographic** [1] - 171:20

**George** [1] - 23:12

**gesture** [1] - 38:14

**gestures** [2] - 39:18, 182:17

**girl** [1] - 20:3

**given** [23] - 7:8, 22:1, 27:7, 80:12, 80:14, 90:11, 90:13, 91:10, 91:14, 96:5, 96:7, 97:16, 101:23, 103:3, 103:24, 125:18, 125:20, 128:13, 147:11, 151:1, 156:7, 162:9, 211:8

**glance** [1] - 154:7

**glass** [6] - 110:13, 111:2, 128:6, 129:2, 145:15, 202:6

**global** [2] - 27:16, 109:14

**Globe** [2] - 170:6, 170:7

**GMT** [1] - 116:21

**goal** [3] - 25:8, 102:17

**goings** [1] - 174:16

**gold** [3] - 20:4, 32:25, 42:12

**gosh** [1] - 78:20

**government** [50] - 9:2, 11:16, 11:17, 12:3, 15:8, 105:6, 175:7, 175:16, 175:17, 175:20,

175:24, 176:3, 176:4, 176:5, 176:16, 176:18, 177:5, 177:6, 177:8, 177:10, 177:18, 177:21, 177:23, 177:24, 178:10, 182:6, 182:8, 183:1, 183:2, 183:4, 183:6, 183:12, 183:13, 183:19, 192:9, 192:11, 192:15, 193:3, 193:5, 195:4, 195:20, 197:12, 197:14, 204:11, 211:17, 211:18, 211:20

**Government** [23] - 4:24, 6:13, 8:2, 8:5, 10:8, 48:11, 54:19, 58:4, 59:10, 60:3, 60:16, 63:1, 64:6, 64:10, 69:2, 72:2, 130:5, 131:21, 134:25, 138:24, 170:8, 177:15, 208:16

**government's** [2] - 176:12, 183:10

**governor** [2] - 187:18, 187:19

**governor's** [1] - 187:17

**Governors** [2] - 110:4, 127:25

**governors** [5] - 95:1, 110:6, 110:12, 128:7, 145:20

**governors'** [2] - 109:25, 110:1

**grab** [3] - 102:4, 116:16, 129:1

**grabbing** [1] - 59:6

**grabs** [1] - 48:20

**graciously** [1] - 34:23, 85:7, 85:12

**grant** [2] - 182:19, 198:14

**granted** [6] - 96:4, 132:7, 161:24, 177:16, 180:12, 194:24

**grants** [1] - 182:14

**grateful** [1] - 7:10

**great** [11] - 17:5, 17:25, 33:7, 55:3, 55:24, 59:8, 63:16, 104:24, 146:7

**greatly** [2] - 32:11, 34:11

**Greek** [2] - 74:6, 144:19

**grievances** [2] - 9:2, 11:9

**Gripas** [1] - 64:12

**ground** [3] - 12:5, 108:9, 178:9

**grounds** [4] - 12:9, 12:16, 12:24, 13:1

**group** [9] - 9:18, 94:9, 94:10, 105:12, 105:13, 105:21, 187:11, 188:14, 199:3

**groups** [1] - 176:18

**growing** [1] - 169:5

**grown** [3] - 143:9

**grumpy** [1] - 45:10

**guard** [1] - 25:25

**guess** [13] - 30:13, 31:14, 60:2, 60:25, 78:13, 78:20, 93:17, 133:14, 151:20, 159:1, 175:4, 201:5, 206:23

**guests** [1] - 104:14

**Guidance** [2] - 166:7, 169:15

**guidance** [6] - 91:23, 130:2, 131:5, 131:6, 153:23, 168:10

**guide** [3] - 191:4, 192:5, 192:6

**guidelines** [2] - 8:21, 143:7

**Gulf** [27] - 12:4, 13:20, 112:3, 112:4, 148:18, 148:19, 148:24, 148:25, 149:1, 161:11, 161:12, 171:20, 173:18, 173:20, 178:14, 179:3, 181:24, 190:23, 192:2, 192:5, 204:18, 210:2, 210:3

**guy** [10] - 24:10, 24:12, 28:2, 28:8, 32:25, 36:19, 37:7, 52:18, 55:24, 71:11

**guys** [5] - 26:10, 27:1, 27:4, 30:25, 37:15

**H**

**Hail** [1] - 38:7

**half** [8] - 35:14, 35:17, 76:24, 90:9, 123:18, 143:7, 190:6, 200:14

**hallmarks** [1] - 183:4

**halt** [1] - 213:16

**hand** [7] - 8:13, 8:14, 18:4, 59:6, 89:15, 112:14, 141:20

**hand-selected** [1] - 141:20

**handful** [2] - 118:1

**hands** [1] - 21:12

**hanging** [1] - 26:11

**happy** [4] - 6:23, 112:2, 131:19, 189:20

**haranguing** [1] - 132:10

**hard** [30] - 14:3, 14:4, 19:12, 19:14, 28:20, 28:22, 47:1, 50:16, 58:2, 93:22, 93:24, 94:2, 142:16, 142:20, 157:19, 157:21, 157:25, 158:4, 159:21, 159:25, 162:23, 163:23, 165:14, 179:1, 180:24, 184:22, 190:14, 193:21, 198:2, 200:1

**hard-wired** [2] - 28:20, 28:22

**harm** [11] - 15:3, 15:7, 16:10, 16:13, 67:18, 201:6, 202:11, 202:12, 202:16, 202:17, 206:15

**hate** [3] - 21:4, 37:21, 42:11

**head** [3] - 28:7, 70:22, 182:12

**headers** [1] - 168:12

**headline** [2] - 96:20, 102:7

**headlines** [1] - 167:2

**heads** [3] - 26:6, 85:10, 114:17

**heads-up** [2] - 26:6, 85:10

**health** [1] - 110:23

**hear** [12] - 5:12, 6:9, 11:19, 14:25, 18:10, 30:23, 81:5, 104:21, 104:22, 147:21, 148:5, 204:14

**heard** [11] - 40:23, 94:7, 101:11, 107:14, 148:4, 148:21, 159:10, 163:17, 180:1, 201:10, 208:10

**HEARING** [1] - 1:10

**hearing** [19] - 4:22, 5:4, 5:5, 7:19, 8:2, 10:17, 15:4, 41:24,

90:23, 105:9, 137:4, 149:15, 164:3, 184:3, 186:17, 187:16, 189:11, 201:10

**hearsay** [3] - 21:6, 118:25, 119:2

**heart** [1] - 76:19

**heavily** [1] - 123:4

**heavy** [1] - 201:16

**heck** [1] - 157:8

**Heffernan** [2] - 208:25

**height** [2] - 110:3, 110:23

**held** [5] - 19:16, 78:4, 120:6, 135:3, 164:3

**help** [14] - 11:14, 11:18, 22:13, 27:2, 62:10, 71:14, 79:7, 84:16, 108:21, 121:15, 159:16, 172:18, 175:6, 179:8

**helpful** [4] - 5:9, 11:14, 72:20, 199:4

**helping** [1] - 34:9

**hereby** [1] - 215:3

**hero** [1] - 76:17

**heroes** [1] - 34:9

**herring** [1] - 185:6

**hidden** [1] - 10:17

**high** [2] - 17:16, 58:22

**high-tech** [1] - 17:16

**highlight** [1] - 150:21

**highlights** [1] - 62:6

**himself** [5] - 157:17, 174:19, 182:16, 182:17, 209:19

**hire** [3] - 33:8, 55:12, 55:15

**hired** [1] - 72:14

**historical** [3] - 27:16, 155:9, 155:16

**History** [7] - 55:13, 74:14, 127:4, 135:22, 136:7, 145:2, 158:13

**history** [13] - 21:3, 21:18, 40:4, 47:19, 48:4, 51:17, 59:19, 75:25, 170:2, 184:17, 201:23

**hit** [3] - 102:5, 102:11, 190:12

**hold** [4] - 20:20, 169:12, 175:23, 178:9

**holder** [3] - 19:12, 19:14, 190:15

**holders** [16] - 14:3, 58:2, 93:23, 142:16,

142:20, 157:19,
157:21, 157:25,
158:4, 159:22,
159:25, 163:23,
165:15, 180:24,
198:2, 200:1
  **holding** [2] - 21:11,
115:12
  **holdings** [1] - 15:20
  **holds** [1] - 92:21
  **hometown** [1] -
169:4
  **honest** [1] - 151:11
  **Honor** [144] - 4:1,
4:5, 4:17, 5:25, 6:4,
7:1, 7:5, 7:6, 7:11,
7:15, 7:24, 8:22,
13:14, 15:1, 16:7,
16:16, 17:5, 17:7,
17:19, 18:1, 32:2,
41:23, 42:8, 45:16,
45:20, 76:7, 88:17,
88:19, 89:2, 89:11,
92:5, 92:8, 93:16,
94:5, 97:2, 101:10,
118:24, 119:7,
119:17, 125:6,
128:22, 137:2,
140:21, 146:4, 146:6,
149:18, 149:19,
150:5, 150:10,
150:13, 150:17,
152:20, 152:25,
153:16, 154:2, 154:5,
154:10, 154:12,
155:5, 156:1, 157:2,
157:12, 157:16,
157:20, 158:15,
160:8, 161:2, 163:2,
163:10, 163:16,
163:20, 163:25,
164:1, 164:18,
164:24, 165:3,
165:12, 165:17,
165:20, 166:5,
166:13, 166:20,
166:24, 167:1, 167:3,
167:24, 168:1, 168:8,
168:11, 169:13,
169:24, 170:7,
170:20, 170:23,
171:7, 172:9, 172:16,
172:22, 173:5, 173:9,
173:13, 174:1, 174:2,
174:14, 174:20,
174:23, 175:2,
175:10, 175:14,
175:17, 175:24,
176:5, 178:2, 178:22,
179:15, 182:10,

183:11, 184:19,
185:9, 185:10, 187:3,
188:1, 188:14, 189:3,
189:5, 189:12,
189:17, 194:9,
194:20, 199:6,
199:16, 202:20,
202:24, 202:25,
203:3, 203:15,
203:21, 203:25,
207:11, 209:1, 209:4,
210:17, 214:1
  **Honor's** [1] - 120:24
  **HONORABLE** [1] -
1:11
  **hope** [5] - 7:12,
47:23, 150:3, 150:21,
208:11
  **hopefully** [1] -
102:14
  **hoping** [2] - 82:11,
90:22
  **horse** [1] - 42:12
  **hosted** [1] - 118:17
  **hosting** [3] - 94:25,
95:2, 110:4
  **hotel** [1] - 95:18
  **Houchins** [1] - 15:20
  **hours** [1] - 98:18
  **House** [241] - 4:10,
4:11, 7:25, 9:18, 9:21,
10:16, 12:22, 14:2,
14:18, 15:10, 16:21,
19:8, 19:11, 19:12,
21:17, 22:2, 22:12,
22:15, 22:19, 22:22,
25:8, 36:7, 36:23,
36:25, 37:4, 41:21,
43:5, 43:8, 43:11,
44:22, 45:1, 45:8,
45:12, 45:14, 46:21,
47:1, 47:25, 49:11,
49:24, 50:10, 50:16,
51:4, 54:14, 56:8,
57:23, 58:2, 60:15,
64:25, 74:7, 74:15,
74:16, 80:10, 80:20,
81:2, 81:6, 81:13,
81:20, 82:9, 83:2,
89:24, 90:10, 90:14,
91:7, 91:12, 93:8,
93:11, 94:1, 94:13,
94:19, 95:12, 95:19,
95:25, 98:3, 98:16,
99:24, 100:1, 101:22,
106:11, 106:13,
106:17, 107:6, 107:9,
109:2, 110:14,
110:22, 111:20,
113:5, 113:6, 113:14,

113:18, 113:20,
113:24, 115:3, 115:6,
117:20, 117:22,
117:24, 117:25,
118:19, 119:9, 120:1,
121:2, 121:13,
121:14, 123:17,
123:19, 124:15,
125:8, 125:22,
125:23, 125:24,
126:16, 126:24,
127:8, 127:11,
127:16, 127:17,
129:12, 129:17,
130:24, 131:18,
131:19, 132:7,
132:17, 132:19,
132:22, 133:1, 133:6,
133:7, 133:10,
133:13, 134:1, 134:5,
134:10, 134:11,
134:12, 134:13,
134:15, 134:16,
134:17, 134:21,
135:19, 135:23,
136:9, 136:10,
136:11, 137:19,
138:7, 138:10,
138:12, 138:14,
138:25, 140:2, 140:9,
140:14, 140:15,
140:17, 140:18,
141:12, 141:16,
141:18, 142:5, 143:6,
143:15, 143:22,
147:23, 147:25,
150:19, 151:6, 152:3,
152:11, 153:23,
155:21, 156:25,
157:4, 158:12,
158:16, 158:21,
159:3, 159:21,
159:25, 160:9,
160:11, 160:24,
161:14, 162:2, 162:3,
162:21, 164:3, 164:4,
164:5, 164:8, 165:4,
165:5, 165:6, 165:10,
165:15, 165:19,
165:21, 166:6,
166:12, 167:12,
167:18, 167:20,
168:10, 168:18,
168:23, 169:3,
169:19, 169:20,
170:6, 170:17, 171:1,
173:22, 173:23,
174:16, 176:21,
180:19, 181:20,
181:22, 181:23,
182:24, 186:18,

186:20, 187:21,
191:2, 191:8, 191:24,
195:22, 196:24,
197:20, 200:17,
201:11, 204:4,
204:22, 206:14
  **house** [8] - 4:13,
92:17, 94:7, 94:10,
95:4, 101:25, 110:8,
213:4
  **House's** [6] - 93:21,
107:10, 153:25,
167:9, 167:11, 196:23
  **housekeeping** [1] -
189:6
  **Houses** [1] - 182:25
  **hub** [1] - 212:18
  **HUDAK** [58] - 1:21,
4:17, 13:21, 14:15,
16:15, 17:5, 41:23,
45:20, 45:22, 46:9,
49:1, 49:5, 71:22,
73:11, 73:13, 76:7,
88:19, 89:2, 92:8,
118:24, 119:19,
124:24, 126:8, 129:4,
134:9, 137:12,
138:16, 138:23,
141:4, 146:3, 149:19,
154:10, 154:12,
164:17, 166:20,
172:22, 173:9,
174:23, 189:5,
189:17, 189:23,
190:7, 190:17, 191:5,
191:8, 191:12, 192:4,
192:14, 193:14,
194:8, 194:20, 197:8,
199:6, 199:20, 200:4,
201:7, 202:20, 214:1
  **Hudak** [24] - 4:17,
4:20, 6:4, 12:2, 13:17,
16:14, 45:19, 46:2,
46:6, 73:10, 77:21,
83:6, 84:3, 88:6,
88:25, 126:11,
154:17, 158:10,
166:25, 186:1, 189:4,
208:14, 210:16, 212:5
  **huge** [5] - 20:6,
30:19, 42:17, 126:2
  **human** [3] - 37:11,
55:3, 114:20
  **humility** [1] - 21:7
  **hundred** [1] - 12:21
  **hundreds** [6] -
27:10, 96:8, 142:16,
142:19, 143:3, 143:5
  **hurting** [3] - 34:1,
117:13, 117:14

**hypothetical** [3] -
13:25, 110:1, 181:20

## I

  **iconic** [4] - 21:3,
21:8, 21:18, 120:4
  **idea** [16] - 34:21,
43:6, 44:21, 44:23,
47:7, 48:10, 51:5,
52:4, 64:2, 75:10,
76:17, 76:19, 85:3,
128:24, 151:12,
158:19
  **ideal** [1] - 71:21
  **ideally** [1] - 75:20
  **identical** [1] - 7:18
  **identified** [3] -
131:24, 202:11,
202:12
  **identify** [2] - 4:3,
15:21
  **identities** [1] - 156:8
  **ignoring** [1] - 171:20
  **illustrate** [1] - 105:9
  **illustration** [1] -
204:19
  **image** [24] - 20:15,
20:17, 23:15, 23:17,
23:20, 24:10, 25:19,
25:21, 28:15, 28:23,
28:24, 29:1, 46:18,
52:8, 52:14, 54:23,
75:3, 85:24, 86:1,
86:2, 86:7, 86:12,
87:14
  **images** [23] - 25:7,
33:23, 35:7, 36:5,
37:23, 37:24, 39:16,
39:19, 39:23, 40:5,
48:7, 48:17, 51:7,
59:10, 61:6, 67:23,
67:24, 75:15, 85:7,
85:12, 152:22, 177:1
  **imagine** [6] - 51:10,
51:25, 57:16, 63:4,
134:3, 181:13
  **immediate** [1] -
47:17
  **immediately** [6] -
31:1, 31:16, 66:25,
112:20, 124:14, 202:3
  **impact** [20] - 11:1,
11:6, 68:4, 68:8,
206:5, 207:2, 207:4,
207:6, 207:8, 207:13,
207:19, 208:7, 208:8,
208:23, 209:13,
210:7, 212:9, 213:5,

213:6, 213:7
**Impact** [1] - 128:23
**impacted** [1] - 115:1
**impacting** [1] - 213:1
**implemented** [1] - 191:16
**important** [18] - 25:24, 27:15, 28:4, 29:4, 29:5, 30:22, 32:19, 42:14, 45:2, 75:12, 75:14, 76:15, 85:18, 85:23, 88:2, 108:21, 150:10, 168:16
**importantly** [1] - 185:20
**imposes** [1] - 193:5
**impracticable** [1] - 197:1
**impressed** [1] - 194:13
**impression** [4] - 119:4, 147:15, 148:10, 159:1
**imprimatur** [4] - 177:17, 183:2, 183:6, 183:10
**impugn** [1] - 145:24
**in-house** [6] - 4:13, 92:17, 94:7, 95:4, 101:25, 110:8
**In-house** [1] - 94:10
**in-town** [3] - 22:25, 23:4, 82:9
**inadmissible** [1] - 118:25
**inauguration** [1] - 141:17
**incentive** [1] - 195:15
**inception** [1] - 165:23
**incident** [1] - 152:6
**include** [3] - 10:3, 155:18, 191:20
**included** [7] - 9:18, 83:22, 83:23, 146:16, 155:6, 155:15, 167:8
**including** [8] - 94:13, 125:20, 134:15, 153:7, 194:21, 195:9, 202:3
**incredible** [2] - 37:7, 65:11
**incredibly** [1] - 122:9
**incumbent** [1] - 141:12
**indeed** [1] - 150:22
**independence** [1] - 125:11

**Independence** [2] - 74:7, 144:19
**independent** [3] - 33:11, 122:12, 183:10
**independently** [1] - 176:2
**Indian** [2] - 118:16, 118:17
**indiscernible** [1] - 97:12
**individual** [5] - 120:8, 176:18, 187:13, 194:25, 208:7
**individually** [1] - 207:17
**individuals** [1] - 141:21
**industry** [3] - 11:3, 51:24, 109:11
**inferior** [1] - 206:4
**inferior-to-AP-standards** [1] - 206:4
**inflate** [1] - 46:10
**inform** [1] - 108:21, 111:11, 165:25
**information** [20] - 48:23, 59:14, 68:10, 73:18, 96:15, 112:14, 113:10, 125:17, 147:11, 154:7, 154:21, 175:22, 175:25, 185:4, 192:24, 192:25, 193:7, 195:2, 197:11, 206:5
**initial** [2] - 99:2, 194:4
**INJUNCTION** [1] - 1:10
**injunction** [5] - 4:22, 5:21, 15:8, 15:15, 163:11
**injury** [1] - 206:23
**inquiry** [1] - 197:10
**insensitive** [1] - 177:16
**inside** [1] - 147:25
**insisting** [1] - 178:13
**instance** [4] - 13:24, 57:25, 109:8, 109:23
**instances** [3] - 120:16, 120:19, 134:13
**instant** [1] - 104:1
**instantaneous** [2] - 29:25, 98:9
**instantly** [1] - 30:5, 52:21
**instead** [5] - 8:1, 8:5, 140:17, 167:13,

178:14
**instinct** [1] - 13:2, 205:4
**instructions** [1] - 209:8
**intelligence** [1] - 92:24
**intended** [1] - 92:22
**intent** [1] - 201:3
**interact** [2] - 11:15, 11:18
**interacting** [2] - 104:14, 181:14
**interaction** [4] - 63:18, 66:19, 123:20, 127:3
**interactions** [3] - 39:16, 59:2, 186:25
**interacts** [1] - 176:18
**interest** [33] - 9:17, 9:23, 9:25, 10:10, 10:14, 10:22, 11:4, 11:15, 15:19, 16:2, 42:4, 109:14, 162:11, 168:5, 175:8, 176:1, 178:2, 178:5, 179:21, 179:24, 180:16, 180:22, 182:4, 183:19, 184:24, 185:21, 188:8, 188:24, 193:17, 198:21, 203:13, 210:10, 211:9
**interesting** [1] - 108:19
**interfere** [2] - 171:14, 171:25
**interim** [1] - 117:5
**intermediate** [1] - 94:12
**International** [9] - 69:17, 69:22, 70:2, 70:7, 72:3, 130:20, 143:12, 144:1, 144:9
**international** [2] - 123:3, 152:6
**internationally** [2] - 122:6, 122:22
**internet** [2] - 28:21, 52:21
**interrupt** [1] - 98:11
**interview** [41] - 12:6, 12:8, 12:12, 13:13, 14:17, 14:20, 40:20, 40:25, 41:5, 41:6, 41:13, 50:6, 104:20, 104:24, 105:10, 105:12, 105:15, 105:17, 106:8, 176:14, 179:10,

179:25, 180:22, 181:11, 181:14, 181:16, 181:19, 181:23, 182:8, 182:13, 182:15, 182:19, 183:22, 184:12, 194:12, 194:16, 194:18, 195:17, 211:19, 212:1, 212:2
**interviews** [10] - 40:24, 50:1, 105:5, 179:19, 180:20, 187:13, 187:14, 198:8, 198:14
**intimidated** [2] - 125:10, 204:1
**introduce** [1] - 4:9
**introduced** [1] - 88:20
**invariably** [2] - 151:19, 199:23
**investing** [2] - 168:15, 169:10
**invitation** [6] - 6:13, 4:11, 130:2, 176:19, 187:1, 187:18
**invitation-only** [1] - 176:19
**invite** [3] - 93:2, 188:16, 194:6
**invited** [2] - 71:19, 105:20
**invitees** [1] - 159:23
**inviting** [5] - 180:20, 182:23, 187:20, 187:24, 187:25
**involve** [1] - 162:17
**involved** [1] - 166:10
**involving** [2] - 102:11, 102:13
**IPhone** [2] - 102:11, 102:13
**Iraq** [1] - 23:11
**Iraqi** [1] - 23:15
**ironic** [1] - 152:21
**irreparable** [6] - 15:3, 15:7, 16:10, 16:12, 201:6, 202:16
**Island** [2] - 169:5, 169:8
**Island-based** [1] - 169:8
**isolation** [1] - 26:3
**issue** [9] - 32:13, 36:21, 39:21, 85:9, 149:3, 155:23, 180:13, 182:1, 209:20
**issued** [1] - 152:19
**issues** [5] - 85:17, 88:21, 107:18, 203:21

**items** [3] - 128:10, 150:9, 202:14
**iterative** [1] - 103:17
**itself** [8] - 85:19, 179:15, 179:16, 180:18, 206:6, 206:17, 206:18, 208:7
**ivy** [1] - 26:24
**Iwo** [1] - 20:2

**J**

**Jacquelyn** [3] - 74:12, 74:20, 74:23
**Jill** [1] - 121:8
**Jima** [1] - 20:2
**job** [11] - 25:25, 29:12, 32:24, 43:10, 45:5, 46:5, 47:18, 75:3, 77:5, 89:23
**jobs** [5] - 115:1, 122:20, 126:3, 137:10, 165:25
**join** [1] - 108:17
**joint** [4] - 105:17, 152:15, 152:16, 185:15
**joke** [1] - 27:9
**Jong** [1] - 107:23
**journalism** [13] - 11:3, 42:16, 44:19, 52:4, 107:10, 141:1, 147:7, 158:23, 175:24, 177:8, 183:11, 212:19, 212:20
**journalist** [35] - 23:13, 23:15, 30:13, 31:5, 36:18, 37:9, 37:12, 41:20, 43:25, 44:2, 57:9, 62:22, 62:23, 64:11, 65:12, 69:23, 70:3, 87:5, 118:15, 118:21, 119:4, 129:10, 132:14, 133:3, 133:15, 144:12, 145:10, 155:3, 157:15, 184:20, 184:21, 192:23, 193:11, 201:8
**journalist's** [1] - 200:10
**journalists** [56] - 9:21, 9:22, 22:25, 37:8, 37:16, 45:4, 47:1, 81:16, 93:13, 94:11, 94:18, 94:20, 95:10, 105:16, 107:4,

118:13, 119:9, 120:1,
120:2, 120:17,
121:11, 122:15,
130:25, 131:8,
132:19, 132:21,
133:4, 133:17, 135:5,
151:20, 152:1,
153:17, 156:3,
159:20, 159:21,
159:23, 170:12,
174:12, 175:19,
180:7, 182:3, 187:11,
193:6, 195:25, 198:4,
198:9, 198:14,
199:25, 200:2, 201:1,
203:8, 203:11, 204:9,
204:10, 204:13,
208:11

**Judge** [4] - 163:7,
163:8, 173:1, 207:7
**judge** [2] - 105:8,
162:1
**JUDGE** [1] - 1:11
**judge's** [1] - 103:5
**judge-made** [1] -
162:1
**judgment** [2] - 27:4,
108:25
**jumping** [1] - 38:9
**Justice** [2] - 177:9,
177:20
**justify** [1] - 186:19

### K

**Kaiser** [1] - 4:13
**Karem** [3] - 13:12,
161:15, 163:8
**Karen** [1] - 4:13
**Karoline** [2] -
111:22, 164:3
**keep** [7] - 21:9,
33:21, 39:10, 42:11,
63:15, 73:1, 173:19
**Kelly** [1] - 163:7
**kept** [2] - 178:20,
179:2
**kick** [2] - 12:3,
115:14
**kicked** [3] - 66:25,
178:15, 181:4
**kills** [1] - 40:15
**Kim** [1] - 107:23
**kind** [35] - 8:6, 8:8,
11:24, 13:5, 13:8,
14:7, 14:12, 31:14,
47:5, 47:19, 48:16,
49:15, 49:21, 52:20,
53:23, 68:8, 82:21,

87:8, 110:2, 125:8,
148:5, 161:1, 162:23,
163:5, 175:5, 176:15,
182:1, 184:16,
191:22, 192:12,
192:21, 197:9, 205:8,
208:16, 212:21
**kinds** [1] - 203:18
**Kingdom** [2] - 62:14,
142:23
**Knight** [2] - 175:11,
175:13
**knowing** [1] - 66:21,
134:11
**knowledge** [8] -
68:18, 83:23, 111:8,
127:22, 136:20,
139:22, 139:24, 143:8
**known** [4] - 106:13,
116:17, 148:1, 197:17
**knows** [5] - 6:12,
10:2, 45:15, 160:4,
211:22
**Korea** [3] - 107:24,
108:8, 108:24
**Korean** [1] - 108:3
**Kyiv** [1] - 157:23

### L

**L-I-D** [1] - 95:15
**L.A** [8] - 166:12,
166:14, 167:6, 167:7,
167:9, 167:12,
167:14, 167:22
**label** [1] - 164:10
**lack** [2] - 16:18,
202:12
**lag** [1] - 85:18
**Lago** [2] - 172:21,
173:2
**laid** [2] - 187:5, 187:6
**landed** [1] - 70:19
**landing** [4] - 70:15,
71:8, 72:3, 148:21
**lands** [1] - 70:15
**landscape** [1] -
73:12
**language** [1] -
172:13
**laptop** [2] - 46:15,
128:14
**large** [5] - 93:12,
123:1, 125:14, 188:21
**largely** [1] - 212:11
**larger** [8] - 12:20,
14:22, 94:9, 94:10,
106:10, 123:1,
189:25, 199:3

**largest** [1] - 171:5
**last** [31] - 7:19, 8:2,
18:23, 19:7, 35:10,
68:15, 75:1, 76:24,
77:9, 77:12, 77:23,
77:24, 78:7, 78:8,
78:9, 82:15, 92:14,
97:14, 125:5, 127:21,
129:14, 135:17,
147:6, 148:21,
151:18, 186:17,
187:16, 190:6,
191:13, 202:22,
210:15
**late** [5] - 4:23, 22:6,
28:12, 120:22, 136:8
**late-breaking** [1] -
22:6
**late-filed** [1] - 4:23
**latest** [2] - 103:17,
171:9
**law** [18] - 4:7, 10:1,
13:6, 13:22, 14:9,
162:1, 162:19, 163:4,
164:8, 185:7, 188:18,
190:21, 190:22,
205:23, 209:4, 210:18
**lawful** [1] - 171:20
**Lawless** [1] - 121:8
**lawyer** [1] - 137:7
**lawyers** [1] - 137:8
**leader** [10] - 82:23,
82:24, 106:5, 108:4,
122:13, 123:7, 159:9,
159:11, 159:12,
185:16
**leaders** [4] - 108:2,
122:25, 185:13, 203:4
**leading** [1] - 168:20
**learned** [2] - 113:18,
200:12
**least** [27] - 5:16,
11:17, 52:12, 55:4,
61:2, 118:15, 122:11,
123:12, 126:19,
127:13, 129:10,
131:3, 135:10, 137:5,
138:25, 139:19,
145:4, 151:11,
151:17, 158:7, 170:2,
170:12, 180:10,
199:22, 201:1, 201:2
**leave** [2] - 184:8,
204:16
**leaves** [2] - 83:12,
159:17
**Leavitt** [7] - 160:19,
164:3, 164:25, 165:3,
165:8, 176:23
**Leavitt's** [2] -

111:22, 164:7
**lectern** [1] - 142:3
**led** [1] - 20:14
**left** [1] - 141:9
**legal** [8] - 4:14,
137:3, 137:9, 140:22,
140:24, 175:5, 192:5,
207:3
**legendary** [1] - 74:5
**lend** [1] - 108:18
**lengths** [1] - 110:21
**lens** [2] - 25:10,
114:8
**less** [3] - 118:1,
186:22, 188:4
**letting** [5] - 45:5,
71:16, 71:17, 134:6,
204:4
**level** [4] - 114:4,
117:12, 134:5, 138:8
**liar** [2] - 71:7, 163:21
**liars** [3] - 152:23,
160:16, 160:21
**liberty** [28] - 9:17,
9:23, 9:25, 10:10,
10:14, 10:21, 11:15,
15:19, 16:2, 162:11,
175:7, 178:2, 178:5,
179:21, 179:24,
180:16, 180:21,
182:4, 183:19,
184:23, 185:21,
188:8, 188:24,
193:17, 198:21,
203:13, 210:10, 211:9
**license** [4] - 48:7,
52:8, 59:16, 60:13
**licensed** [2] - 67:16,
68:19
**licensees** [1] - 97:23
**licenses** [1] - 212:23
**licensing** [14] -
48:18, 51:3, 51:12,
52:1, 52:15, 53:9,
54:21, 57:20, 61:3,
63:7, 63:21, 63:23,
67:19, 100:20
**lid** [4] - 95:13, 95:14,
95:15, 204:23
**lies** [2] - 174:10,
205:17
**light** [3] - 6:15,
158:20, 197:13
**likelihood** [2] -
16:12, 199:8
**likely** [1] - 167:25
**limitation** [2] -
180:11, 203:17
**limitations** [1] -
94:16

**limited** [13] - 102:18,
114:15, 129:17,
135:5, 169:25,
172:11, 181:1,
192:13, 195:3,
196:19, 196:21,
197:25, 203:3
**limited-access** [1] -
135:5
**line** [19] - 27:25,
61:8, 66:14, 69:10,
69:11, 72:17, 75:1,
82:20, 82:23, 82:24,
82:25, 159:9, 159:10,
159:12, 161:6, 167:4,
196:4, 197:9, 204:3
**link** [3] - 80:22,
102:25, 142:21
**Lisa** [1] - 215:12
**LISA** [2] - 2:1, 215:3
**list** [7] - 93:25, 98:15,
133:17, 143:8,
169:24, 191:18,
191:19
**listed** [6] - 129:19,
130:3, 130:23, 131:5,
168:11, 169:16
**listeners** [1] - 96:14
**listening** [1] - 76:1
**listing** [1] - 131:22
**lists** [2] - 93:21,
143:6
**litany** [1] - 187:4
**literally** [2] - 43:13,
44:10
**litigated** [1] - 180:25
**litigating** [1] - 176:21
**litigation** [3] - 8:23,
9:16, 137:1
**live** [17] - 5:8, 5:12,
6:12, 6:13, 39:22,
103:7, 103:8, 103:11,
107:14, 107:15,
114:12, 114:15,
114:20, 127:7, 127:8,
156:24
**livestream** [3] -
127:3, 201:11, 202:9
**livestreamed** [1] -
127:2, 127:14
**livestreaming** [1] -
127:17, 201:12
**livestreams** [1] -
126:24
**living** [2] - 18:18,
88:12
**LLP** [2] - 1:15, 1:18
**local** [3] - 5:1, 5:2,
96:19
**located** [1] - 111:23

location [1] - 83:8
logic [1] - 167:23
logistics [1] - 81:3
London [2] - 121:8, 122:2
look [31] - 26:11, 28:23, 38:7, 38:14, 41:12, 51:22, 64:18, 66:14, 71:7, 71:16, 72:2, 76:16, 76:17, 78:3, 78:14, 87:6, 91:20, 92:13, 92:15, 124:5, 130:12, 130:17, 147:4, 155:22, 158:3, 168:9, 169:14, 196:7, 200:23, 207:2, 207:22
Look [1] - 198:17
looked [4] - 39:15, 83:10, 153:21, 207:9
looking [36] - 20:22, 24:25, 25:2, 25:20, 26:18, 27:1, 32:14, 48:25, 50:1, 54:23, 59:10, 60:3, 63:1, 67:16, 67:20, 69:2, 69:9, 74:12, 74:22, 86:8, 86:12, 86:13, 86:20, 87:10, 87:17, 111:14, 138:24, 140:12, 154:18, 155:10, 191:10, 191:12, 199:17, 201:21, 201:23, 201:25
looks [17] - 49:2, 52:17, 58:18, 59:13, 61:5, 61:7, 63:20, 66:9, 73:19, 86:20, 116:8, 130:9, 163:10, 176:9, 182:18, 205:7
Los [4] - 27:18, 167:2, 167:5, 167:21
loses [1] - 208:16
losing [1] - 25:17
loss [5] - 87:12, 87:22, 126:2, 207:25, 208:1
lost [3] - 88:8, 184:20, 208:9
loudest [1] - 104:18
love [2] - 71:20, 190:11
loved [1] - 156:18
lovely [1] - 188:13
loves [1] - 44:7
Ludovic [1] - 58:13
LUDOVIC [1] - 58:13
lunch [3] - 149:15, 150:4, 200:12

luncheon [1] - 149:20

## M

M-I-L-L-E-R [1] - 90:6
ma'am [2] - 38:25, 39:9
Macron [13] - 56:8, 57:4, 58:6, 58:10, 59:20, 60:1, 62:13, 121:7, 133:14, 133:18, 135:4, 152:5, 157:22
Macron's [2] - 57:10, 57:17
Madhani [2] - 135:18, 135:19
MADHANI [1] - 135:18
Magazine [1] - 105:17
main [3] - 32:13, 75:8, 201:21
major [7] - 28:16, 31:6, 34:19, 36:3, 65:17, 97:11, 102:19
majority [9] - 19:10, 65:20, 67:22, 70:14, 98:24, 107:19, 117:9, 167:15, 168:2
man [10] - 19:22, 25:19, 26:23, 29:20, 30:8, 33:7, 39:18, 41:15, 63:9, 71:10
mandated [1] - 98:4
manifest [1] - 134:1
manifests [1] - 133:17
mansion [1] - 187:17
manual [1] - 98:7
Mar [2] - 172:21, 173:2
Mar-a-Lago [2] - 172:21, 173:2
March [28] - 1:7, 15:5, 66:7, 69:21, 70:1, 70:6, 70:11, 71:3, 71:9, 71:25, 72:4, 73:15, 73:23, 74:6, 88:23, 115:11, 131:22, 131:23, 139:10, 143:11, 143:19, 143:25, 144:4, 144:8, 144:18, 168:3, 168:10, 169:15
Marin [3] - 58:13, 58:19, 59:11

MARIN [1] - 58:13
Marine [4] - 50:13, 55:23, 55:24
mark [2] - 80:3, 174:10
marked [1] - 130:5
market [1] - 123:5
Martin [2] - 74:13, 74:23
Mary [1] - 38:7
mask [3] - 110:15, 110:16, 110:17
masks [1] - 110:15
Matal [1] - 177:13
match [1] - 103:14
material [6] - 5:6, 128:8, 140:4, 206:5, 206:15, 213:5
materially [3] - 206:9, 207:10, 207:13
materials [1] - 189:9
math [1] - 116:21
matter [13] - 7:7, 32:8, 32:10, 36:1, 40:7, 41:18, 41:20, 62:8, 124:3, 177:1, 189:6, 194:4, 213:21
matters [4] - 32:11, 41:19, 42:9, 196:2
Maxwell [1] - 4:8
MAXWELL [1] - 1:15
mayor [1] - 209:6
mayor's [2] - 209:7, 209:17
McFADDEN [1] - 1:11
McKelvey [1] - 187:8
mean [74] - 7:4, 19:25, 21:4, 21:5, 21:23, 24:21, 24:24, 32:24, 33:15, 36:2, 38:21, 40:15, 44:1, 44:6, 48:19, 48:25, 52:7, 55:8, 57:24, 58:20, 60:25, 61:15, 62:2, 66:23, 70:14, 72:1, 77:21, 77:25, 78:13, 78:24, 79:18, 79:23, 79:25, 81:9, 87:9, 88:1, 88:2, 88:11, 92:19, 93:7, 93:10, 101:16, 113:5, 117:3, 117:23, 121:21, 122:8, 125:10, 140:20, 145:23, 148:17, 152:20, 159:1, 161:6, 161:21, 173:25, 175:23, 180:4, 180:12, 181:9,

181:11, 183:23, 184:11, 184:12, 184:14, 186:1, 191:1, 192:14, 193:23, 199:3, 202:15, 204:12, 205:3
means [2] - 72:17, 93:8
measure [1] - 202:16
mechanism [1] - 212:17
media [69] - 46:23, 49:21, 54:9, 54:20, 67:16, 86:12, 86:13, 92:18, 93:10, 93:18, 99:5, 103:25, 106:25, 107:8, 107:11, 117:6, 117:21, 120:1, 129:6, 129:8, 129:11, 130:1, 130:4, 130:15, 130:21, 131:4, 131:16, 131:17, 131:24, 132:2, 132:15, 135:12, 135:22, 136:18, 137:15, 137:21, 138:6, 141:6, 141:8, 141:12, 141:15, 141:20, 141:24, 142:1, 142:2, 143:3, 143:5, 143:11, 143:25, 145:7, 147:16, 147:18, 147:19, 151:8, 157:6, 178:25, 189:18, 189:24, 191:20, 191:21, 193:16, 193:17, 194:6, 195:19, 197:1, 199:11, 200:21, 200:24
medium [1] - 188:23
meet [7] - 45:25, 46:1, 81:11, 82:10, 106:5, 126:11, 181:10
meeting [26] - 26:12, 31:7, 36:12, 36:16, 37:5, 37:25, 39:22, 49:23, 58:5, 60:4, 81:6, 81:9, 81:14, 81:18, 86:9, 86:10, 86:21, 87:1, 92:25, 95:1, 106:7, 108:2, 108:6, 110:1, 127:25, 208:3
meetings [3] - 40:4, 110:1, 134:17
member [1] - 47:13, 50:25, 56:24, 95:9, 96:25, 97:4, 126:20,

133:15, 135:20, 181:10, 195:19
members [35] - 33:17, 33:21, 33:24, 34:6, 35:6, 50:10, 51:7, 56:4, 75:10, 94:2, 96:18, 96:23, 98:2, 98:21, 98:22, 100:21, 106:14, 117:8, 123:4, 125:14, 126:21, 131:16, 143:3, 143:6, 153:5, 159:3, 174:3, 191:21, 192:25, 193:7, 193:22, 195:5, 198:2, 212:20
membership [2] - 95:24, 96:7
memorable [1] - 23:24
mention [1] - 110:19
mentioned [15] - 20:9, 47:18, 101:21, 108:23, 118:16, 125:16, 127:24, 128:19, 139:16, 145:17, 147:15, 155:7, 198:12, 201:16, 201:17
merge [1] - 197:9
merits [2] - 16:12, 199:8
message [8] - 30:20, 175:18, 178:11, 182:15, 182:25, 183:2, 183:14, 210:9
messages [3] - 29:17, 71:15, 125:8
messaging [5] - 101:25, 165:16, 177:2, 196:4
messenger [1] - 112:1
met [3] - 58:20, 107:23, 117:12
Mexico [12] - 112:3, 115:14, 116:19, 148:18, 148:25, 161:12, 178:15, 179:3, 181:24, 192:2, 210:3
Microsoft [1] - 62:3
middle [2] - 12:16, 13:9
Middle [1] - 195:11
MiFi [3] - 28:20, 28:21, 28:22
might [40] - 6:22, 17:13, 25:14, 26:9, 27:7, 27:25, 28:2,

28:5, 28:17, 32:14, 32:15, 52:10, 53:19, 85:10, 85:13, 99:6, 100:6, 101:2, 102:15, 102:25, 103:9, 103:18, 103:22, 104:8, 104:22, 108:12, 109:12, 109:23, 110:25, 111:16, 117:6, 120:13, 120:19, 134:7, 145:18, 145:22, 204:21, 212:15

**military** [1] - 106:14
**MILLER** [2] - 3:6, 89:16
**Miller** [23] - 4:10, 17:8, 17:10, 32:1, 89:12, 89:21, 90:6, 123:16, 126:4, 126:9, 146:11, 147:14, 151:13, 152:7, 156:24, 158:7, 160:1, 199:13, 200:1, 200:9, 201:13, 204:13
**Miller's** [3] - 152:8, 155:12, 200:5
**million** [1] - 169:11
**mind** [6] - 63:14, 90:4, 91:20, 147:18, 147:20, 148:15
**minds** [1] - 14:16
**mine** [1] - 136:7
**minimis** [4] - 207:8, 207:14, 213:6, 213:7
**minimus** [1] - 208:9
**Minister** [3] - 62:14, 63:18, 121:8
**minister** [4] - 62:20, 64:5, 118:17, 142:23
**minor** [1] - 140:11
**minute** [10] - 12:2, 28:13, 28:15, 29:2, 68:15, 84:12, 89:3, 111:25, 153:16, 209:2
**minutes** [13] - 28:13, 28:16, 31:11, 39:24, 40:1, 40:2, 40:5, 102:8, 102:20, 109:25, 110:10, 115:24, 116:25
**mirror** [1] - 19:24
**misanthropes** [1] - 152:24
**miscounted** [1] - 146:8
**Mishkin** [9] - 4:8, 17:9, 85:24, 89:12, 89:13, 146:5, 147:15,

149:6, 174:5
**MISHKIN** [39] - 1:15, 89:20, 90:3, 92:5, 92:12, 93:6, 93:16, 94:5, 94:6, 95:21, 97:1, 97:3, 98:10, 99:13, 100:23, 103:4, 107:5, 119:3, 119:7, 119:13, 119:15, 119:23, 119:24, 123:15, 124:8, 124:22, 125:3, 125:5, 125:7, 126:4, 128:22, 137:2, 140:21, 146:6, 146:8, 146:10, 147:13, 148:12, 149:7
**Mishkin's** [1] - 172:18
**misinformation** [7] - 160:17, 171:13, 171:16, 171:19, 171:23, 171:25, 172:4
**misinformed** [1] - 158:10
**miss** [4] - 25:23, 44:5, 145:24
**missed** [2] - 25:20, 208:10
**missing** [2] - 40:10, 126:1
**misuse** [1] - 177:22
**mix** [2] - 140:17, 148:1
**Mobile** [1] - 29:7
**model** [1] - 208:20
**modest** [1] - 46:6
**Moines** [4] - 27:17, 36:4, 51:8, 96:19
**mom** [1] - 209:17
**moment** [2] - 21:18, 24:20, 25:15, 38:10, 38:11, 87:7, 111:9, 151:15, 153:21, 154:10, 161:22
**moments** [8] - 24:19, 25:2, 38:5, 59:2, 75:7, 87:6, 122:9, 148:4, 208:10
**Monday** [1] - 168:3
**money** [3] - 48:4, 51:17, 100:11
**money-making** [1] - 48:4
**monitor** [3] - 29:16, 31:9, 46:12
**Monitor** [1] - 170:9
**Month** [7] - 55:13, 74:14, 127:5, 135:22, 136:8, 145:2, 158:13
**month** [10] - 35:14,

35:17, 76:24, 77:24, 78:19, 116:13, 151:18, 190:6, 199:22
**monthlong** [1] - 79:23
**months** [1] - 166:16
**mood** [2] - 75:15, 201:25
**morning** [17] - 4:5, 4:15, 4:17, 4:20, 18:6, 19:3, 22:4, 45:23, 45:24, 89:17, 89:18, 89:21, 89:22, 91:14, 103:22, 111:21, 212:5
**most** [16] - 9:12, 36:21, 39:19, 47:9, 85:18, 104:21, 114:13, 147:25, 166:2, 167:20, 167:21, 169:9, 170:19, 171:2, 196:4, 205:17
**mostly** [1] - 82:17
**mother** [2] - 201:22, 209:7
**motion** [3] - 4:24, 4:25, 150:23
**motivation** [1] - 164:1
**motive** [1] - 10:20
**move** [12] - 34:13, 49:4, 62:13, 81:22, 92:5, 119:16, 124:22, 164:19, 173:7, 185:21, 189:10
**moved** [1] - 200:16
**movement** [2] - 61:19, 201:24
**movements** [2] - 131:6, 146:24
**moviemaker** [1] - 65:9
**moving** [5] - 40:2, 64:20, 73:23, 74:6, 164:15
**MR** [207] - 4:5, 4:17, 5:25, 6:3, 6:8, 6:11, 6:19, 6:25, 7:4, 9:14, 11:20, 12:11, 12:25, 13:10, 13:16, 13:21, 14:15, 16:15, 17:5, 17:7, 17:17, 17:19, 17:21, 17:24, 18:1, 18:12, 19:4, 23:5, 27:6, 32:1, 32:4, 39:1, 39:11, 41:23, 42:4, 42:8, 42:19, 45:16, 45:20, 45:22, 46:9, 49:1, 49:5, 71:22, 73:11, 73:13, 76:7,

79:12, 81:8, 83:4, 85:1, 86:4, 86:6, 87:13, 88:17, 88:19, 89:2, 89:11, 89:20, 90:3, 92:5, 92:8, 92:12, 93:6, 93:16, 94:5, 94:6, 95:21, 97:1, 97:3, 98:10, 99:13, 100:23, 103:4, 107:5, 118:24, 119:3, 119:7, 119:13, 119:15, 119:19, 119:23, 119:24, 123:15, 124:8, 124:22, 124:24, 125:3, 125:5, 125:7, 126:4, 126:8, 128:22, 129:4, 134:9, 137:2, 137:12, 138:16, 138:23, 140:21, 141:4, 146:3, 146:6, 146:8, 146:10, 147:13, 148:12, 149:7, 149:18, 149:19, 150:1, 150:3, 150:8, 150:13, 150:15, 151:23, 152:1, 152:10, 152:13, 152:19, 153:25, 154:5, 154:10, 154:11, 154:12, 154:16, 154:20, 155:1, 155:3, 157:14, 159:9, 159:18, 161:8, 162:3, 163:2, 163:16, 164:13, 164:17, 164:18, 164:24, 165:3, 166:10, 166:20, 166:24, 172:22, 173:1, 173:5, 173:9, 173:13, 174:1, 174:23, 175:2, 175:10, 175:14, 177:13, 178:22, 179:6, 179:11, 179:14, 180:9, 181:7, 181:17, 182:9, 182:13, 184:19, 186:4, 186:14, 188:13, 189:3, 189:5, 189:12, 189:17, 189:23, 190:7, 190:17, 191:5, 191:8, 191:12, 192:4, 192:14, 193:14, 194:8, 194:20, 197:8, 199:6, 199:20, 200:4, 201:7, 202:20, 202:23, 203:24, 204:16, 204:25,

205:16, 205:20, 205:22, 205:24, 207:1, 208:17, 210:17, 210:21, 211:5, 211:7, 211:16, 212:10, 213:23, 214:1
**MSNBC** [1] - 204:17
**multiple** [7] - 120:2, 120:9, 120:12, 120:16, 122:17, 143:10, 200:25
**Musk** [1] - 50:12
**must** [9] - 10:7, 10:9, 12:23, 161:18, 163:13, 181:3, 196:12, 198:9
**mute** [1] - 177:25

**N**

**N95** [1] - 110:16
**nail** [1] - 92:18
**name** [12] - 18:22, 18:23, 28:11, 46:2, 72:9, 90:2, 90:4, 126:11, 135:17, 155:7, 171:20, 192:5
**named** [1] - 50:20
**napalm** [1] - 20:3
**narrow** [3] - 15:25, 114:8, 198:17
**nation's** [1] - 95:1
**National** [4] - 65:22, 110:4, 127:25, 195:12
**national** [1] - 168:17
**Nationals** [1] - 190:11
**NBC** [3] - 97:22, 141:9, 204:17
**near** [1] - 101:16
**nearly** [3] - 114:20, 115:6, 115:24
**necessarily** [9] - 5:3, 41:24, 44:13, 93:2, 104:9, 106:1, 114:3, 132:22, 181:17
**necessary** [6] - 15:8, 15:15, 16:11, 131:20, 202:2, 209:13
**need** [18] - 5:7, 15:1, 16:9, 22:13, 28:7, 29:18, 29:19, 32:15, 32:16, 40:6, 46:16, 87:10, 133:24, 154:3, 201:13, 208:22, 213:15
**needed** [1] - 99:4
**needs** [2] - 27:22, 198:1

**nervous** [1] - 18:14
**network** [3] - 29:7, 29:8
**networks** [2] - 53:14, 97:21
**never** [10] - 10:13, 132:4, 132:7, 137:23, 155:6, 160:4, 162:5, 186:7, 191:21, 193:18
**New** [8] - 1:20, 53:4, 87:7, 87:14, 123:10, 156:4, 212:21
**new** [1] - 26:17, 103:16, 137:15, 137:19, 141:6, 141:8, 141:12, 141:15, 141:20, 141:23, 141:24, 142:1, 153:6, 165:23, 178:25, 191:20, 195:19
**News** [4] - 50:2, 117:4, 141:9, 182:20
**news** [74] - 19:7, 22:6, 22:9, 23:13, 27:4, 27:21, 27:24, 30:7, 30:19, 30:23, 30:25, 31:6, 31:10, 32:19, 34:19, 35:8, 36:3, 40:17, 42:13, 47:17, 48:13, 48:23, 50:19, 51:23, 62:18, 63:6, 63:25, 65:17, 65:20, 66:10, 66:24, 74:1, 78:21, 78:25, 96:19, 96:21, 96:22, 97:20, 98:14, 98:25, 99:2, 99:6, 101:9, 101:15, 102:3, 102:10, 102:15, 102:17, 102:19, 103:14, 109:10, 115:22, 116:7, 117:10, 120:2, 120:5, 121:25, 125:13, 148:2, 148:7, 148:18, 148:23, 168:17, 168:21, 176:13, 193:3, 195:18, 203:9, 203:11, 203:19, 212:13, 212:14
**news-gather** [1] - 97:20
**news-gathering** [2] - 203:11, 203:19
**Newsday** [3] - 169:4, 169:6, 169:7
**newsmakers** [1] - 203:5
**newspaper** [3] - 103:22, 169:4, 169:8

**next** [9] - 12:18, 32:1, 80:20, 103:22, 107:4, 137:9, 147:1, 181:22, 197:23
**nice** [3] - 45:25, 46:1, 126:11
**Niemeyer** [1] - 207:7
**night** [2] - 80:19, 91:13
**Nitkin** [1] - 213:4
**Nitkin's** [1] - 211:23
**nobody** [5] - 5:23, 97:22, 99:7, 122:10, 186:17
**non** [7] - 10:9, 42:13, 42:25, 137:13, 137:14, 199:11, 202:13
**non-Oval** [1] - 42:25
**non-partisan** [1] - 42:13
**non-pool** [3] - 137:13, 137:14, 199:11
**non-viewpoint** [1] - 10:9
**none** [4] - 7:22, 147:4, 152:12, 152:13
**nonetheless** [1] - 122:23
**nonpublic** [1] - 192:12
**nontraditional** [1] - 142:2
**nonviewpoint** [1] - 180:15
**nonviewpoint-discriminatory** [1] - 180:15
**normal** [1] - 78:14
**North** [3] - 107:24, 108:3, 108:24
**Northern** [1] - 195:13
**Northwest** [4] - 1:16, 1:23, 2:3, 215:14
**Nos** [4] - 3:11, 3:16, 119:21, 189:15
**nose** [1] - 77:2
**not-so-subtle** [1] - 153:13
**notable** [1] - 75:21
**note** [6] - 61:8, 83:8, 141:23, 152:15, 155:24, 206:19
**notebook** [1] - 111:10
**noted** [5] - 8:11, 10:17, 60:21, 170:23, 198:12
**notes** [4] - 46:15,

107:20, 107:21, 215:5
**noteworthy** [1] - 202:5
**nothing** [5] - 40:19, 88:17, 95:17, 102:23, 113:11
**notice** [3] - 109:17, 181:4, 202:10
**noticeable** [1] - 128:20
**noticed** [5] - 111:8, 123:19, 123:25, 145:19, 148:17
**noticing** [1] - 110:11
**noting** [1] - 151:5
**now-famous** [1] - 36:12
**NowThis** [1] - 128:23
**NPR** [5] - 66:7, 66:9, 66:10, 84:3, 84:12
**number** [13] - 10:5, 10:6, 10:7, 32:11, 93:12, 93:25, 141:23, 148:23, 150:21, 150:25, 156:8, 161:14, 181:2
**numbered** [1] - 189:7
**numbers** [2] - 78:5, 78:15
**numerics** [1] - 213:3

**O**

**object** [3] - 10:6, 42:1, 118:24
**objection** [29] - 42:6, 92:7, 92:9, 119:6, 119:18, 119:19, 119:20, 124:24, 124:25, 128:22, 137:2, 140:21, 154:12, 154:13, 164:15, 164:17, 164:20, 164:21, 166:18, 166:20, 166:21, 172:22, 172:23, 173:9, 173:10, 174:23, 174:24, 189:12, 189:13
**objections** [3] - 42:3, 42:5, 119:1
**objective** [7] - 156:19, 157:10, 170:14, 180:24, 181:3, 185:1, 209:25
**obligations** [1] - 84:13

**observation** [1] - 7:1
**observations** [1] - 114:7
**observe** [11] - 57:4, 62:19, 75:7, 128:5, 128:10, 145:15, 184:7, 185:12, 186:25, 201:9, 203:8
**observed** [2] - 109:22, 123:22
**observing** [2] - 104:13, 184:16
**obviously** [10] - 7:5, 9:8, 16:18, 36:17, 136:20, 168:16, 170:22, 174:11, 177:2, 180:7
**occasionally** [3] - 145:23, 145:24, 199:25
**occur** [2] - 191:6, 194:11
**occurred** [1] - 56:3
**odd** [1] - 148:25
**OF** [3] - 1:1, 1:10, 1:22
**off-the-record** [1] - 195:1
**offend** [2] - 194:15, 206:3
**offended** [1] - 17:2
**offends** [1] - 196:5
**offer** [4] - 130:8, 140:24, 142:1
**offered** [2] - 119:4, 195:5
**OFFICE** [1] - 1:22
**Office** [94] - 4:18, 8:19, 11:17, 12:17, 13:12, 14:5, 14:16, 14:19, 15:18, 16:6, 25:2, 26:2, 26:17, 29:14, 31:8, 32:7, 34:6, 34:22, 34:25, 35:11, 36:9, 36:11, 37:17, 40:4, 40:18, 40:20, 40:25, 41:14, 42:21, 42:25, 43:15, 46:3, 47:14, 55:14, 56:21, 57:8, 57:9, 57:15, 58:5, 62:23, 63:19, 64:15, 65:5, 78:17, 78:18, 79:2, 82:6, 82:7, 86:9, 86:10, 87:25, 94:13, 94:22, 104:2, 104:4, 105:22, 106:20, 107:3, 108:19, 112:5, 112:8, 112:22, 114:11, 115:12,

115:16, 121:23, 126:12, 147:22, 148:5, 172:11, 178:10, 178:16, 179:23, 180:8, 181:2, 184:4, 184:8, 185:11, 185:24, 186:8, 186:23, 188:4, 190:4, 190:20, 190:24, 192:11, 193:21, 194:5, 199:4, 203:2, 203:7, 208:15, 213:18
**office** [13] - 36:20, 37:2, 46:4, 48:1, 107:9, 111:23, 131:19, 133:13, 134:23, 136:9, 141:12, 141:18, 188:15
**officer** [1] - 209:5
**official** [4] - 106:24, 197:14, 204:3, 215:12
**Official** [1] - 2:1
**officials** [8] - 104:14, 105:6, 115:6, 134:14, 195:4, 195:8, 196:14
**offstage** [1] - 20:14
**often** [8] - 22:14, 77:9, 77:17, 91:4, 99:3, 114:11, 121:15, 130:3
**oftentimes** [3] - 44:6, 50:4, 53:12
**Ohio** [1] - 195:13
**old** [6] - 17:21, 19:22, 92:14, 100:16, 100:24, 153:5
**olden** [1] - 122:5
**older** [1] - 102:25
**Olesker** [1] - 213:4
**Olesker's** [1] - 211:24
**Oliver** [2] - 54:25, 55:12
**Omicron** [1] - 110:3
**on-the-record** [1] - 105:19
**once** [8] - 9:17, 60:8, 60:11, 82:25, 180:13, 188:24, 203:12, 210:25
**One** [20] - 22:23, 22:24, 23:3, 43:22, 43:23, 44:4, 50:13, 70:13, 70:19, 83:14, 94:17, 97:8, 100:3, 106:16, 113:21, 118:7, 144:8, 172:11
**one** [160] - 8:13, 8:23, 9:4, 9:6, 11:25,

12:16, 12:18, 13:13, 15:4, 15:24, 16:15, 19:15, 19:21, 23:10, 23:24, 24:11, 29:7, 29:8, 32:11, 34:23, 36:17, 37:6, 37:8, 40:3, 40:16, 40:17, 41:6, 43:3, 49:2, 56:9, 58:10, 58:11, 59:5, 60:21, 61:17, 65:13, 66:20, 70:23, 70:25, 71:3, 73:3, 73:4, 75:7, 79:20, 84:8, 85:17, 86:14, 97:10, 97:16, 99:6, 99:14, 99:17, 103:16, 103:18, 103:19, 105:12, 106:8, 107:24, 108:9, 109:15, 110:2, 110:3, 110:13, 110:17, 111:2, 111:24, 116:8, 118:15, 120:7, 120:8, 120:14, 120:15, 122:8, 124:6, 124:17, 129:10, 133:14, 135:15, 141:5, 141:19, 144:16, 145:13, 145:14, 145:19, 145:25, 147:22, 150:22, 154:10, 158:19, 161:23, 162:24, 164:1, 169:14, 175:12, 175:21, 176:14, 178:25, 179:9, 179:18, 179:25, 180:4, 180:20, 180:22, 181:10, 181:11, 181:14, 181:16, 181:18, 181:23, 182:7, 182:13, 182:14, 183:22, 184:13, 187:1, 187:13, 187:14, 189:19, 189:20, 191:25, 192:1, 192:8, 192:23, 193:14, 195:17, 195:18, 195:19, 200:10, 206:10, 208:21, 209:21, 211:19, 212:1, 212:2, 213:16
**one-and-done** [1] - 162:24
**one-on-one** [22] - 13:13, 41:6, 176:14, 179:9, 179:18, 179:25, 180:20, 180:22, 181:11, 181:14, 181:16,

181:18, 181:23, 182:7, 182:13, 182:14, 183:22, 187:1, 187:13, 211:19, 212:1, 212:2
**one-page** [1] - 124:6
**ones** [6] - 23:10, 27:11, 47:9, 70:14, 150:15, 194:22
**online** [2] - 30:13, 66:6
**opacity** [1] - 160:7
**opaque** [4] - 8:6, 8:8, 160:7, 160:8
**open** [20] - 92:17, 92:22, 93:7, 93:8, 93:9, 94:23, 95:2, 110:7, 118:5, 118:8, 129:19, 130:3, 131:7, 131:8, 165:2, 173:4, 180:6, 195:5, 197:1, 202:24
**opened** [1] - 129:17
**opening** [2] - 6:8, 7:16
**operates** [1] - 168:7
**operating** [2] - 26:3, 92:14
**opinion** [2] - 194:24, 208:18
**opponent** [1] - 209:5
**opportunities** [9] - 9:20, 43:1, 88:9, 187:11, 205:12, 207:25, 208:2, 208:9, 208:15
**opportunity** [18] - 5:18, 7:8, 10:5, 41:5, 43:25, 83:15, 83:18, 85:20, 87:23, 95:11, 156:22, 162:16, 184:7, 184:9, 185:11, 185:25, 188:5, 198:9
**opposed** [2] - 22:21, 76:1
**oral** [6] - 163:17, 183:25, 185:4, 188:23, 211:17, 211:18
**orally** [1] - 10:6
**oranges** [1] - 176:15
**order** [22] - 6:5, 6:23, 8:24, 12:12, 43:14, 47:6, 47:10, 73:24, 82:25, 83:1, 83:3, 106:5, 116:12, 120:10, 136:23, 144:5, 161:9, 161:13, 162:4, 163:11, 169:17
**orders** [1] - 112:7

**ordinary** [1] - 177:8
**organ** [2] - 176:3, 177:3
**organization** [12] - 22:11, 48:5, 50:25, 63:6, 99:6, 137:13, 138:6, 147:19, 148:15, 199:11, 201:19, 208:4
**organizations** [21] - 34:8, 46:24, 47:9, 47:11, 54:10, 54:20, 58:12, 82:17, 120:3, 137:15, 137:21, 137:25, 138:3, 138:5, 138:10, 147:18, 148:24, 157:6, 194:6, 197:2, 205:6
**orient** [1] - 49:1
**original** [2] - 33:11, 117:7
**Oscar** [1] - 36:19
**ostensibly** [1] - 155:17
**others'** [1] - 85:2
**otherwise** [8] - 45:5, 57:14, 101:3, 156:23, 174:18, 196:16, 206:25, 210:4
**ought** [1] - 185:23
**out-of-town** [4] - 22:24, 130:21, 131:12
**outfit** [1] - 187:24
**outlet** [7] - 97:11, 97:16, 99:14, 120:17, 138:11, 172:7, 172:13
**outlets** [15] - 51:13, 96:5, 96:8, 98:24, 98:25, 99:1, 99:15, 120:8, 125:19, 125:20, 141:13, 141:24, 147:16, 148:18, 148:23
**Outlets** [1] - 153:4
**outright** [2] - 163:21, 172:10
**outside** [7] - 22:19, 100:9, 100:19, 113:12, 117:5, 177:4, 187:2
**outtakes** [1] - 182:20
**Oval** [94] - 8:19, 11:17, 12:17, 13:12, 14:5, 14:16, 14:19, 15:18, 16:6, 25:2, 26:2, 26:12, 26:17, 28:5, 29:14, 31:8, 32:7, 34:6, 34:22, 34:25, 35:11, 36:9, 36:11, 37:17, 40:4,

40:18, 40:20, 40:25, 41:14, 42:21, 42:25, 43:15, 47:14, 55:14, 56:21, 57:8, 57:9, 57:14, 58:5, 62:23, 63:19, 64:15, 65:5, 78:17, 78:18, 79:2, 82:6, 82:7, 82:12, 86:9, 86:10, 87:25, 94:13, 94:22, 104:2, 104:4, 105:22, 106:20, 107:3, 108:19, 112:5, 112:8, 112:22, 114:11, 115:12, 115:16, 121:23, 147:22, 148:5, 172:11, 178:10, 178:16, 179:22, 180:7, 181:2, 184:4, 184:8, 185:11, 185:24, 186:8, 186:23, 188:4, 190:4, 190:20, 190:24, 192:10, 193:21, 194:5, 199:4, 203:1, 203:7, 208:15, 213:18
**overarching** [1] - 207:3
**overly** [1] - 12:15
**overrule** [2] - 42:6, 119:6
**overruled** [2] - 128:25, 137:6
**oversees** [1] - 134:22
**overtime** [1] - 122:2
**own** [17] - 33:10, 93:25, 99:9, 106:11, 108:25, 117:5, 147:16, 153:25, 154:5, 167:11, 174:15, 175:12, 176:22, 176:25, 182:25, 208:3, 213:8
**owned** [1] - 72:22

**P**

**p.m** [4] - 116:20, 116:22, 214:2
**pace** [1] - 33:13
**pace's** [1] - 160:13
**page** [13] - 36:5, 40:16, 48:13, 50:19, 66:10, 87:17, 116:16, 124:6, 127:13, 167:1, 168:11, 168:12
**Page** [2] - 92:16
**PAGE** [1] - 3:2
**Pages** [1] - 209:2

**pages** [4] - 49:2, 86:2, 86:20, 88:2
**paid** [4] - 52:5, 52:9, 52:13, 62:17
**pain** [2] - 38:21, 45:11
**pairing** [3] - 166:1, 167:19, 170:14
**palm** [4] - 81:12, 81:14, 157:16, 160:5
**Palm** [17] - 69:17, 69:22, 70:2, 70:15, 83:12, 113:2, 118:2, 118:8, 129:25, 130:19, 131:1, 131:23, 132:11, 132:13, 143:12, 144:1, 144:9
**pan** [1] - 111:5
**panning** [1] - 110:25
**pans** [1] - 33:7
**paper** [1] - 163:16
**papers** [1] - 202:12
**paperwork** [1] - 115:17
**Paragraph** [9] - 86:5, 135:2, 153:4, 156:12, 157:17, 165:22, 170:18, 171:12, 172:8
**Paris** [3] - 121:7, 122:3, 157:22
**part** [39] - 8:16, 9:16, 22:19, 24:4, 24:5, 24:6, 35:10, 36:22, 40:25, 42:4, 47:13, 47:18, 47:25, 48:4, 49:11, 51:16, 54:13, 57:10, 57:22, 57:24, 58:1, 58:14, 58:25, 63:21, 63:23, 85:5, 98:4, 130:8, 134:21, 137:22, 165:7, 165:17, 167:24, 182:3, 182:21, 191:15, 208:4, 212:18
**participant** [2] - 166:13, 167:13
**participants** [1] - 201:24
**participate** [5] - 95:8, 137:16, 137:17, 137:24, 138:1
**participated** [2] - 146:20, 168:14
**participating** [6] - 100:9, 101:9, 105:10, 108:12, 109:16, 175:8
**particular** [10] - 26:7, 128:8, 128:21, 129:1, 168:25, 169:2, 170:4,

170:5, 196:2, 196:3
**particularly** [1] - 148:7
**parties** [6] - 5:7, 5:19, 12:3, 13:7, 90:21, 213:17
**partisan** [1] - 42:13
**partner** [1] - 68:19
**partnership** [1] - 51:12
**party** [1] - 204:3
**pass** [29] - 14:3, 14:4, 19:12, 19:14, 47:1, 50:16, 58:2, 93:22, 93:25, 94:2, 136:11, 142:16, 142:20, 157:19, 157:21, 157:25, 158:4, 159:22, 159:25, 162:23, 163:23, 165:14, 179:1, 180:24, 184:22, 190:14, 193:22, 198:2, 200:1
**passed** [1] - 177:23
**past** [3] - 8:18, 117:17, 159:13
**Paterson** [1] - 209:1
**path** [1] - 9:14
**paths** [2] - 11:10, 207:19
**Patrick's** [2] - 73:14, 143:20
**pattern** [2] - 7:21, 8:21
**pause** [1] - 52:19
**pauses** [1] - 116:18
**pausing** [1] - 49:10
**pay** [2] - 8:17, 138:18
**peak** [2] - 38:5, 38:10
**Pebble** [2] - 49:18, 50:6
**pecking** [3] - 43:14, 47:5, 47:10
**Pell** [2] - 192:22, 198:17
**penalty** [1] - 7:12
**pendency** [1] - 136:25
**Pennsylvania** [2] - 20:24, 195:12
**people** [58] - 15:12, 21:5, 25:24, 26:5, 26:10, 32:18, 38:6, 42:10, 42:16, 44:22, 45:13, 50:1, 50:3, 55:12, 67:9, 69:10, 75:21, 81:24, 83:1, 90:12, 93:21, 94:1, 100:6, 101:22, 111:1,

111:15, 111:16, 120:9, 123:11, 133:9, 134:7, 134:17, 142:19, 143:5, 153:9, 156:9, 158:21, 161:1, 161:24, 167:19, 170:21, 170:22, 176:19, 176:22, 178:25, 180:12, 180:14, 180:20, 181:2, 187:1, 187:19, 197:15, 203:6, 210:2, 210:8, 210:10, 212:8
**people's** [3] - 208:2, 212:11, 212:19
**per** [2] - 77:24, 97:11
**perceived** [2] - 180:6, 209:9
**perceiving** [1] - 202:14
**percent** [9] - 35:7, 35:12, 53:16, 57:16, 64:18, 70:4, 73:16, 78:15, 85:22
**perception** [1] - 124:3
**perfect** [1] - 53:25
**perform** [1] - 208:23
**perhaps** [4] - 11:21, 24:9, 151:18, 205:14
**peril** [1] - 209:23
**period** [7] - 42:21, 54:17, 54:22, 79:23, 91:3, 117:6, 120:22
**periodically** [1] - 155:14
**permitted** [11] - 62:23, 69:17, 110:17, 112:5, 112:7, 118:14, 132:9, 135:6, 136:14, 137:16, 137:17
**person** [25] - 28:4, 28:5, 31:24, 33:8, 37:11, 40:7, 43:13, 43:16, 48:9, 72:1, 97:18, 99:7, 100:4, 104:18, 111:2, 114:3, 114:5, 114:17, 120:14, 120:15, 123:12, 197:11, 202:15, 209:25
**personally** [4] - 56:14, 118:23, 119:8, 132:5
**personnel** [1] - 150:4
**perspective** [2] - 68:9, 126:20
**persuade** [5] - 7:12, 13:11, 156:22, 174:18, 188:3

**petition** [2] - 9:1, 11:8
**phase** [1] - 5:21
**Philadelphia** [3] - 70:7, 72:3, 144:9
**phone** [4] - 29:23, 88:3, 101:18, 202:3
**photo** [48] - 20:23, 21:11, 21:14, 21:23, 21:24, 27:17, 27:18, 29:19, 30:7, 34:23, 47:21, 47:24, 48:23, 49:2, 49:7, 52:2, 52:21, 55:17, 58:1, 59:8, 59:24, 60:8, 60:11, 60:17, 60:25, 61:1, 63:17, 64:7, 64:11, 65:17, 66:12, 67:25, 69:23, 72:3, 74:22, 84:8, 87:3, 87:4, 103:14, 103:18, 103:19, 103:20, 118:9, 120:13, 123:12, 129:24, 153:2
**photograph** [25] - 20:13, 20:18, 20:21, 20:25, 21:2, 21:8, 21:15, 21:17, 21:22, 24:12, 33:10, 50:20, 59:15, 61:16, 69:3, 74:12, 84:4, 85:4, 85:19, 85:21, 86:15, 86:16, 87:15, 115:4
**photographer** [40] - 4:11, 7:22, 8:20, 18:19, 19:5, 19:17, 19:18, 20:1, 22:15, 25:18, 32:19, 32:22, 33:2, 35:18, 36:7, 36:11, 43:16, 50:20, 54:7, 55:6, 57:6, 58:10, 58:11, 60:22, 61:17, 63:3, 63:16, 72:6, 72:18, 73:20, 74:5, 74:13, 74:23, 77:15, 87:10, 88:15, 105:16, 120:14, 132:5, 160:3
**photographer's** [2] - 21:17, 26:20
**photographers** [29] - 20:4, 22:1, 22:3, 22:9, 22:10, 22:11, 24:2, 24:7, 24:9, 25:6, 26:1, 32:7, 33:14, 35:20, 35:21, 55:11, 80:24, 87:24, 101:12, 106:24, 113:3, 113:19, 120:20, 124:16, 129:18,

158:17, 200:25, 201:1
**photographs** [29] - 23:24, 27:7, 27:13, 27:23, 27:24, 34:5, 35:24, 37:13, 48:5, 58:16, 59:18, 65:13, 66:2, 66:18, 67:4, 67:5, 83:6, 84:14, 85:3, 87:19, 103:10, 184:8, 206:1, 212:12, 212:23
**photography** [9] - 25:5, 33:3, 37:10, 38:5, 101:13, 176:25, 206:4
**photojournalism** [3] - 28:11, 33:1, 156:10
**photojournalist** [47] - 24:25, 51:13, 52:16, 55:2, 55:18, 55:24, 55:25, 57:13, 59:1, 60:9, 61:9, 62:22, 63:14, 64:7, 64:14, 65:4, 66:15, 68:19, 70:3, 70:12, 70:20, 72:12, 73:17, 74:3, 75:6, 75:10, 76:5, 76:18, 76:21, 129:11, 132:3, 132:14, 143:16, 143:22, 144:2, 144:6, 144:23, 144:25, 145:4, 145:6, 145:11, 151:18, 201:8, 201:21
**photojournalists** [13] - 49:22, 51:4, 57:21, 57:22, 58:22, 67:19, 69:16, 70:8, 132:17, 144:13, 156:1, 156:5, 199:23
**photos** [47] - 25:14, 28:10, 29:10, 29:11, 29:22, 30:3, 30:12, 33:13, 34:10, 34:14, 34:24, 35:2, 35:4, 38:15, 40:17, 47:17, 47:18, 48:13, 50:9, 51:24, 52:21, 53:23, 54:8, 54:9, 54:20, 57:3, 57:17, 57:22, 59:25, 62:21, 63:25, 65:21, 67:11, 67:15, 67:17, 69:9, 70:5, 75:4, 76:25, 87:5, 95:10, 103:16, 103:20, 107:1, 146:23
**phrase** [5] - 92:17, 97:14, 158:6, 159:9, 159:10

**phrases** [1] - 92:15
**physical** [2] - 121:12, 203:16
**physically** [4] - 95:11, 101:8, 108:9, 200:11
**PI** [1] - 15:2
**pick** [6] - 11:12, 11:20, 12:23, 28:24, 96:2, 134:4
**picked** [2] - 167:12, 202:8
**picking** [6] - 43:5, 44:22, 45:13, 77:2, 167:19, 168:23
**picks** [1] - 146:1
**picture** [3] - 28:2, 28:8, 40:2
**pictured** [1] - 85:4
**pictures** [14] - 28:9, 29:12, 29:21, 33:5, 33:16, 34:16, 50:4, 68:13, 76:12, 77:2, 205:12, 212:7
**piece** [2] - 21:3, 33:11
**pivotal** [1] - 184:15
**place** [8] - 10:1, 115:15, 123:23, 169:9, 175:21, 185:14, 187:16
**placed** [1] - 151:2
**places** [2] - 86:17, 178:4
**Plaintiff** [5] - 1:4, 4:4, 18:1, 89:11, 208:1
**plaintiff** [1] - 209:21
**PLAINTIFF** [3] - 1:14, 18:5, 89:16
**Plaintiff's** [31] - 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 4:24, 92:10, 119:21, 125:1, 154:14, 164:22, 165:1, 166:22, 172:24, 173:3, 173:11, 174:25
**plaintiff's** [1] - 196:22
**plane** [3] - 44:11, 118:10, 118:11
**planned** [1] - 68:15
**platform** [2] - 107:2, 116:17
**plausibly** [2] - 94:2, 104:17
**play** [8] - 9:9, 37:22, 46:19, 84:9, 88:4, 114:12, 163:9, 164:24
**played** [3] - 31:8,

132:22, 133:7
**players** [1] - 121:18
**playing** [1] - 190:11
**pleadings** [1] - 90:18
**pleasure** [1] - 4:6
**plenty** [1] - 121:25
**plug** [1] - 102:4
**podium** [2] - 160:20,
164:25
**point** [33] - 14:1,
16:15, 32:6, 76:15,
81:6, 81:9, 81:14,
81:21, 103:11,
103:24, 107:24,
108:19, 115:23,
122:14, 123:9,
137:14, 150:5,
151:16, 151:22,
158:16, 159:2, 162:8,
171:8, 172:2, 172:18,
178:24, 179:8, 190:5,
192:17, 199:16,
204:12, 205:2, 209:16
**pointed** [1] - 79:21
**pointing** [1] - 87:8
**pointless** [1] - 28:14
**policies** [3] - 98:4,
151:6, 157:4
**policy** [5] - 8:1,
112:8, 112:12,
137:15, 137:19
**political** [1] - 209:20
**politics** [2] - 25:21,
38:13
**pool** [196] - 7:14,
7:20, 9:5, 9:19, 9:22,
10:11, 11:4, 12:17,
22:15, 22:19, 22:21,
22:22, 22:25, 23:3,
23:4, 23:25, 24:1,
24:4, 24:5, 24:6,
24:15, 24:20, 35:11,
36:8, 36:23, 37:1,
40:11, 40:25, 41:22,
42:20, 44:22, 45:14,
46:21, 47:2, 47:5,
47:13, 47:25, 49:12,
54:5, 54:13, 57:18,
57:22, 57:23, 57:24,
58:1, 58:9, 58:14,
58:17, 59:11, 63:4,
82:8, 82:10, 83:13,
83:14, 92:14, 92:17,
94:7, 94:8, 94:10,
94:15, 94:16, 94:21,
94:23, 94:24, 95:2,
95:3, 95:4, 95:5, 95:7,
95:8, 95:9, 95:11,
95:24, 95:25, 96:2,
96:7, 97:4, 97:7, 97:8,

97:21, 97:24, 97:25,
98:5, 98:15, 98:20,
98:22, 98:25, 99:3,
100:3, 100:5, 100:10,
100:11, 101:9,
101:14, 104:3,
104:12, 105:10,
106:2, 106:10,
106:12, 106:19,
107:13, 108:11,
109:17, 110:5, 110:8,
111:3, 111:9, 114:8,
114:18, 118:6,
120:13, 122:7,
122:12, 125:23,
130:22, 131:6, 131:7,
131:12, 132:23,
137:13, 137:14,
137:16, 137:17,
137:19, 137:22,
137:23, 138:3, 138:5,
146:16, 146:20,
147:22, 151:11,
153:1, 153:5, 153:6,
153:9, 153:19,
154:24, 155:6,
155:25, 156:10,
156:12, 157:3,
157:10, 161:9,
163:18, 165:6,
165:10, 165:21,
165:24, 165:25,
166:3, 166:11,
166:13, 167:13,
168:1, 168:7, 168:23,
169:6, 170:7, 170:9,
170:10, 174:3, 174:8,
174:16, 175:9,
175:16, 176:2, 176:5,
176:6, 178:10,
180:10, 180:13,
180:14, 181:1, 182:2,
184:9, 187:22,
189:18, 191:16,
191:17, 191:22,
191:23, 195:16,
198:1, 199:11, 206:2
**pools** [2] - 47:10,
96:12
**pop** [1] - 51:22
**pops** [1] - 48:23
**population** [1] -
195:25
**portable** [1] - 28:21
**pose** [1] - 184:18
**posed** [1] - 101:11
**position** [8] - 8:3,
9:16, 37:18, 96:4,
125:22, 163:4,
178:25, 191:2

**possibility** [1] -
107:25
**possible** [2] - 47:8,
106:6
**possibly** [1] - 102:11
**post** [6] - 161:15,
172:17, 174:6,
174:21, 187:7
**Post** [2] - 87:7, 87:15
**post-Ehrlich** [1] -
187:7
**posted** [1] - 29:23
**posting** [2] - 30:2,
54:20
**posts** [3] - 54:9,
117:6, 164:5
**pot** [1] - 95:15
**potentially** [1] -
132:25
**pots** [1] - 33:7
**PowerPoint** [1] -
62:3
**PR** [1] - 143:7
**practical** [1] - 16:20
**practice** [7] - 54:19,
120:4, 157:5, 163:9,
196:13, 196:23,
210:17
**practices** [1] - 151:7
**pre** [34] - 92:18,
93:10, 93:17, 93:18,
98:2, 113:8, 113:9,
117:16, 117:21,
119:25, 129:6, 129:8,
129:11, 129:20,
130:1, 130:4, 130:15,
130:21, 131:4,
131:17, 131:24,
132:2, 132:15, 133:5,
135:12, 135:22,
136:18, 143:11,
143:25, 145:7,
189:18, 189:24,
200:21, 200:24
**pre-credentialed** [33]
- 92:18, 93:10, 93:17,
93:18, 113:8, 113:9,
117:16, 117:21,
119:25, 129:6, 129:8,
129:11, 129:20,
130:1, 130:4, 130:15,
130:21, 131:4,
131:17, 131:24,
132:2, 132:15, 133:5,
135:12, 135:22,
136:18, 143:11,
143:25, 145:7,
189:18, 189:24,
200:21, 200:24
**pre-February** [1] -

98:2
**precedent** [2] - 8:4,
180:25
**precise** [1] - 116:2
**preclude** [2] -
196:13, 196:23
**precondition** [1] -
178:15
**predetermine** [1] -
7:5
**predilections** [1] -
170:14
**predominantly** [1] -
123:2
**PRELIMINARY** [1] -
1:10
**preliminary** [4] -
4:21, 5:4, 5:20, 15:8
**premarked** [2] -
91:21, 116:3
**prepare** [1] - 182:25
**prepared** [4] - 6:16,
17:11, 78:22, 90:25
**preparing** [1] - 74:16
**prescribed** [1] -
162:13
**presence** [1] - 96:10
**present** [10] - 5:24,
6:11, 6:12, 6:17, 17:8,
17:12, 34:7, 74:11,
119:3, 150:6
**presentation** [1] -
175:3
**presented** [4] -
187:11, 190:19,
200:5, 212:5
**presents** [1] - 14:23
**preserve** [1] - 47:19
**preserving** [3] -
48:4, 51:16, 51:17
**presidency** [1] -
134:3
**President** [52] -
20:13, 21:13, 23:12,
23:17, 36:12, 39:17,
41:7, 44:6, 48:1, 56:8,
57:4, 57:10, 58:5,
58:6, 59:6, 59:20,
60:1, 62:13, 62:20,
63:18, 64:21, 66:19,
78:11, 86:9, 105:14,
107:22, 108:23,
110:4, 110:22, 121:6,
121:7, 121:12,
123:20, 128:1,
130:13, 133:18,
134:15, 135:4,
141:16, 152:5,
157:22, 157:23,
168:14, 172:20,

173:6, 173:18,
181:10, 181:12, 202:6
**president** [121] -
12:7, 12:12, 21:20,
22:18, 23:7, 23:14,
23:16, 24:17, 30:24,
31:5, 35:1, 41:13,
43:22, 44:15, 49:23,
56:25, 59:6, 69:21,
70:1, 70:6, 75:13,
77:2, 77:3, 77:14,
83:11, 83:21, 91:8,
92:21, 94:15, 94:25,
95:2, 95:12, 95:19,
96:11, 104:4, 104:6,
104:10, 104:17,
105:13, 105:18,
105:19, 105:20,
106:3, 106:15,
106:19, 108:3,
110:10, 110:16,
111:5, 111:16, 112:2,
112:22, 113:21,
114:22, 115:6,
115:11, 115:15,
116:12, 117:12,
118:6, 118:7, 118:10,
118:17, 120:6, 122:6,
122:10, 122:16,
123:7, 123:8, 123:20,
124:2, 128:6, 128:10,
129:3, 133:20, 135:3,
142:11, 145:16,
145:20, 147:21,
148:19, 152:14,
152:16, 152:22,
153:10, 153:11,
158:5, 160:22, 166:8,
166:10, 175:18,
175:21, 176:3, 177:2,
178:9, 179:7, 180:22,
182:14, 183:9, 185:5,
185:16, 185:18,
185:25, 187:24,
188:5, 190:21, 191:5,
191:24, 195:16,
196:3, 198:8, 198:13,
200:16, 201:16,
203:4, 204:2, 210:5,
210:8
**president's** [14] -
8:14, 47:8, 47:14,
76:1, 77:18, 79:4,
83:8, 83:16, 92:24,
99:23, 110:11, 130:9,
130:25, 173:16
**presidential** [8] -
23:6, 40:20, 91:4,
113:23, 113:25,
127:2, 127:21, 148:11
**presidents** [4] -

43:23, 60:4, 105:5, 122:17

**PRESS** [1] - 1:3
**press** [136] - 7:14, 7:20, 9:1, 9:5, 11:8, 12:17, 13:3, 13:19, 14:1, 14:2, 15:22, 15:25, 16:3, 22:15, 36:7, 36:23, 37:1, 40:21, 41:5, 44:8, 46:21, 47:2, 47:5, 47:13, 47:25, 49:8, 49:15, 50:5, 54:2, 54:4, 54:13, 57:10, 57:23, 81:24, 92:17, 92:20, 92:21, 92:22, 92:25, 93:7, 93:8, 93:13, 93:14, 94:18, 94:19, 96:6, 97:4, 98:16, 99:25, 106:12, 110:9, 111:23, 111:24, 113:1, 120:6, 122:7, 122:12, 122:19, 123:1, 123:2, 123:20, 125:23, 127:11, 129:20, 130:4, 131:18, 132:23, 133:13, 134:2, 134:21, 134:23, 136:9, 141:12, 141:15, 141:18, 141:22, 142:3, 151:11, 152:19, 152:25, 153:6, 153:22, 157:3, 158:9, 159:3, 160:19, 161:16, 163:18, 164:4, 164:7, 164:25, 165:10, 165:19, 165:23, 165:24, 168:10, 173:6, 174:16, 175:17, 176:21, 176:22, 179:18, 180:5, 180:11, 181:10, 182:24, 184:6, 185:12, 185:15, 185:16, 185:17, 186:6, 186:23, 187:12, 187:22, 187:24, 188:10, 188:16, 188:20, 189:1, 191:8, 195:3, 195:6, 195:21, 196:24, 197:18, 197:20, 198:1, 198:18, 198:21, 203:13
**Press** [44] - 4:2, 4:6, 4:11, 4:14, 11:2, 12:13, 18:19, 19:17,

20:1, 20:4, 21:21, 27:19, 43:16, 60:22, 60:24, 61:4, 63:5, 64:12, 72:25, 77:15, 87:15, 87:19, 89:25, 90:8, 105:15, 109:20, 111:22, 113:12, 124:15, 135:7, 135:11, 135:20, 136:14, 149:23, 153:7, 158:22, 164:3, 165:6, 165:10, 166:7, 167:9, 169:15, 172:7, 177:4
**Press's** [2] - 112:2, 171:22
**Pressley** [1] - 136:7
**pressure** [1] - 106:2
**presumably** [1] - 196:23
**pretty** [10] - 13:7, 21:23, 27:2, 27:3, 30:5, 45:10, 62:5, 91:8, 107:17, 111:4
**previous** [1] - 9:15
**previously** [6] - 47:4, 131:7, 156:13, 158:6, 196:15, 210:4
**pricing** [2] - 59:14, 60:19
**pride** [1] - 122:14
**Priebus** [1] - 44:9
**primarily** [2] - 13:11, 19:8, 212:6
**primary** [1] - 117:10
**primary-source** [1] - 117:10
**Prime** [3] - 62:14, 63:18, 121:8
**prime** [4] - 62:19, 64:5, 118:17, 142:23
**primo** [2] - 139:16, 174:7
**principal** [1] - 202:25
**principally** [1] - 176:4
**principle** [1] - 178:1
**print** [25] - 7:23, 30:13, 97:25, 98:1, 98:2, 98:5, 99:17, 99:18, 99:21, 100:4, 100:6, 100:12, 114:18, 151:20, 152:8, 168:3, 169:6, 170:12, 195:18, 199:24, 200:2, 200:10, 200:21, 201:1
**printing** [1] - 174:9
**printout** [1] - 177:4
**private** [1] - 177:22

**privilege** [2] - 122:15, 122:16
**privileged** [2] - 159:7, 195:1
**privileges** [1] - 71:12
**problem** [3] - 37:6, 85:5, 160:8
**problematic** [1] - 182:8
**procedures** [1] - 98:4
**proceed** [1] - 150:5
**proceedings** [6] - 89:9, 136:21, 136:23, 137:9, 149:21, 215:6
**Proceedings** [1] - 214:2
**process** [32] - 5:13, 8:9, 9:25, 10:1, 10:23, 33:18, 37:1, 54:5, 80:17, 82:14, 82:15, 82:16, 98:7, 103:6, 103:17, 117:18, 131:13, 147:24, 150:16, 158:20, 162:13, 162:25, 163:4, 163:12, 178:6, 182:5, 183:20, 188:7, 191:15, 203:14, 211:11
**produced** [2] - 100:8, 215:6
**producer** [1] - 97:18
**producers** [1] - 120:10
**product** [4] - 100:8, 102:19, 212:13, 213:8
**products** [1] - 208:3
**professional** [5] - 61:17, 76:18, 77:5, 88:14, 201:20
**professionals** [1] - 176:24
**professors** [1] - 188:16
**promise** [1] - 196:16
**promote** [1] - 195:21
**proposed** [1] - 102:3
**proposition** [2] - 193:8, 194:10
**protect** [1] - 110:22
**protected** [3] - 175:7, 175:19, 178:2
**protection** [1] - 193:2
**protectively** [1] - 174:20
**protects** [1] - 204:9
**protocol** [1] - 133:13
**prove** [1] - 13:25

**provide** [9] - 5:18, 5:19, 34:5, 85:7, 106:14, 106:18, 161:17, 161:18, 164:10
**provided** [11] - 16:1, 90:21, 135:6, 157:2, 189:6, 196:19, 196:21, 200:18, 210:25, 211:7, 211:8
**provider** [2] - 101:25, 103:25
**provides** [2] - 27:19, 191:25
**providing** [2] - 34:24, 85:12
**proxy** [2] - 180:9, 180:21
**Public** [1] - 65:22
**public** [38] - 15:23, 16:1, 20:7, 25:9, 41:18, 41:20, 41:21, 41:25, 42:4, 42:9, 42:17, 47:15, 96:16, 98:6, 99:22, 101:15, 109:14, 110:23, 113:16, 125:13, 130:10, 131:22, 137:11, 160:17, 161:17, 165:16, 166:1, 174:9, 176:1, 192:25, 193:8, 193:11, 193:16, 195:3, 196:14, 198:19
**publication** [3] - 130:6, 154:1, 193:3
**publications** [1] - 65:17
**publicly** [4] - 98:5, 98:6, 189:9, 197:17
**publish** [3] - 102:5, 161:15, 192:19
**published** [6] - 8:20, 10:2, 140:3, 162:15, 165:1, 173:3
**publishes** [2] - 91:12, 177:4
**Publishing** [1] - 194:23
**pull** [2] - 206:12, 206:13
**pulled** [1] - 140:1
**punished** [1] - 173:17
**purchase** [3] - 51:24, 60:18, 67:24
**pure** [1] - 168:5
**purely** [3] - 104:6, 104:9, 104:13
**purported** [1] -

146:14
**purportedly** [1] - 147:1
**purpose** [3] - 136:22, 137:4, 142:1
**purposes** [8] - 29:6, 151:23, 163:11, 179:20, 189:10, 203:2, 203:17, 203:18
**purveyors** [1] - 160:16
**push** [3] - 52:20, 102:6, 107:2
**pushes** [1] - 58:1
**put** [19] - 20:14, 21:21, 32:5, 80:20, 80:21, 86:12, 117:14, 132:11, 138:24, 152:16, 163:9, 166:17, 171:16, 177:15, 199:15, 203:10, 208:2, 212:14, 213:7
**puts** [2] - 40:14, 163:20
**putting** [2] - 53:25, 208:17

## Q

**quality** [3] - 40:9, 40:13, 58:22
**quantitative** [1] - 88:7
**questions** [39] - 7:3, 16:19, 31:25, 38:24, 45:17, 73:2, 75:1, 76:7, 76:9, 83:5, 85:25, 90:22, 90:25, 102:2, 104:5, 104:7, 104:9, 106:6, 109:15, 124:1, 126:5, 126:13, 146:3, 146:6, 147:21, 148:2, 148:3, 148:4, 157:12, 175:5, 183:25, 184:2, 184:17, 184:21, 184:23, 185:3, 185:6, 185:17, 211:24
**queue** [1] - 157:16
**quibble** [2] - 132:11, 190:19
**quick** [4] - 30:22, 83:5, 124:5, 149:15
**quicker** [1] - 200:16
**quickly** [10] - 29:11, 29:12, 31:19, 31:21, 33:16, 101:12, 101:14, 102:5,

**102:16, 112:9**
**quite** [5] - 42:1, 102:11, 122:13, 160:1, 193:4
**quote** [16] - 7:16, 146:16, 163:22, 163:24, 165:23, 167:8, 167:19, 171:19, 172:10, 173:21, 177:11, 177:21, 179:17, 192:22, 194:25, 209:2
**quotes** [2] - 31:20, 103:17

## R

**racially** [1] - 177:16
**rack** [1] - 85:16
**radio** [2] - 96:21, 97:24
**Radio** [1] - 65:22
**raise** [2] - 18:3, 89:14
**raised** [1] - 203:22
**raising** [3] - 20:2, 20:3, 20:9
**ran** [3] - 39:22, 105:23, 167:3
**random** [2] - 75:4, 158:18
**randomness** [1] - 7:21
**rapidity** [1] - 208:6
**rate** [2] - 55:7, 55:8
**rationale** [2] - 140:24, 167:17
**Raycom** [1] - 195:12
**RDR** [3] - 2:1, 215:3, 215:12
**re** [1] - 89:1
**re-redirect** [1] - 89:1
**reach** [9] - 15:1, 27:16, 47:9, 47:11, 67:17, 96:5, 96:8, 138:11, 168:5
**react** [1] - 22:6
**reaction** [2] - 105:3, 201:24
**read** [9] - 8:2, 90:18, 124:13, 138:17, 138:20, 146:11, 146:18, 148:22, 199:12
**readable** [1] - 49:3
**reader** [1] - 170:14
**readers** [2] - 45:6, 96:14
**readily** [1] - 128:19

**reading** [1] - 123:24
**reads** [1] - 96:21
**ready** [2] - 25:25, 83:3
**real** [17] - 53:22, 79:14, 79:15, 85:18, 101:12, 101:16, 101:24, 102:13, 107:2, 108:14, 108:18, 108:20, 114:20, 115:22, 121:17, 191:1, 206:15
**real-time** [1] - 121:17
**realities** [1] - 16:20
**really** [33] - 7:9, 16:9, 28:24, 30:22, 33:7, 33:20, 33:21, 37:19, 55:11, 66:20, 79:1, 79:3, 87:8, 94:16, 96:3, 101:16, 115:1, 133:25, 160:8, 161:23, 168:23, 169:20, 175:15, 175:20, 178:24, 181:8, 188:11, 193:24, 198:15, 208:20, 212:8
**realm** [1] - 200:23
**realtime** [5] - 29:3, 30:3, 30:21, 75:19, 75:20
**reason** [15] - 8:23, 29:7, 32:22, 32:23, 33:1, 44:24, 69:24, 80:12, 80:14, 161:19, 169:21, 170:4, 191:14, 192:6
**reasonable** [3] - 10:4, 161:19, 209:25
**reasoning** [1] - 167:11
**reasons** [8] - 10:8, 11:6, 162:16, 165:21, 178:4, 178:21, 180:4, 183:20
**receive** [5] - 52:11, 57:25, 58:16, 92:3, 101:2
**received** [5] - 59:10, 132:5, 136:8, 136:12, 144:15
**receivers** [1] - 38:9
**receives** [1] - 57:22
**receiving** [1] - 107:21
**recent** [3] - 141:11, 166:16, 210:7
**recently** [1] - 56:3
**reception** [4] - 55:14, 94:14, 112:23, 136:8

**recess** [2] - 89:8, 149:20
**reciprocally** [1] - 122:25
**recite** [1] - 150:24
**recognize** [5] - 7:8, 116:6, 116:14, 124:9, 188:24
**recollection** [2] - 54:3, 159:19
**reconcile** [1] - 175:7
**reconsider** [1] - 8:3
**record** [43] - 4:4, 5:16, 7:15, 8:17, 15:17, 18:22, 20:10, 27:16, 39:2, 90:2, 90:5, 99:23, 105:19, 106:18, 113:15, 131:3, 149:22, 150:9, 151:2, 151:10, 151:17, 151:21, 152:16, 153:17, 155:9, 155:16, 155:22, 158:15, 163:17, 163:24, 175:11, 183:2, 183:3, 190:18, 190:19, 191:10, 191:12, 191:25, 192:6, 195:1, 200:4, 207:11
**recordings** [1] - 164:5
**records** [1] - 92:2
**rectangular** [1] - 110:6
**red** [1] - 185:6
**Redirect** [2] - 3:4, 3:7
**redirect** [2] - 79:6, 89:1
**REDIRECT** [2] - 79:11, 146:9
**reduce** [1] - 195:16
**Redweld** [1] - 150:14
**refer** [2] - 95:16, 150:16, 168:19
**reference** [1] - 86:4
**referred** [6] - 65:9, 87:14, 91:13, 138:20, 139:10, 141:14
**referring** [7] - 20:11, 48:11, 60:16, 91:24, 141:11, 148:24, 157:21
**refers** [2] - 94:10, 157:20
**reflect** [2] - 169:4, 183:21
**reflected** [1] - 156:2
**reflects** [3] - 155:5,

**166:12, 168:9**
**refresh** [1] - 54:3
**refuse** [2] - 12:7, 190:21
**regard** [1] - 127:24
**regarding** [3] - 127:24, 144:5, 173:24
**regardless** [2] - 131:15, 199:3
**regime** [1] - 100:16
**Register** [3] - 36:4, 51:8, 96:19
**regular** [6] - 8:16, 92:3, 181:19, 181:21, 187:12, 187:23
**regularly** [6] - 54:16, 65:24, 66:2, 102:6, 174:8, 199:23
**regulate** [1] - 182:16
**regulated** [1] - 183:13
**regulation** [1] - 183:14
**regulatorily** [1] - 183:17
**Reince** [1] - 44:9
**reinforce** [4] - 128:4, 172:18, 173:17, 202:24
**reinforced** [1] - 165:8
**reintroduce** [2] - 4:9, 4:12
**reinvigorating** [1] - 188:16
**rejoin** [1] - 7:14
**related** [1] - 167:14
**relating** [1] - 91:8
**relationship** [4] - 59:11, 84:18, 84:22, 84:25
**relative** [1] - 19:23
**relatively** [1] - 142:2
**release** [3] - 98:17, 152:19, 206:5
**relevant** [3] - 148:2, 148:7, 205:3
**reliable** [1] - 114:20
**relied** [1] - 99:1
**relies** [3] - 167:14, 167:22, 208:5
**rely** [11] - 5:20, 26:6, 27:1, 31:2, 32:12, 35:19, 35:20, 99:3, 99:8, 117:9, 206:3
**relying** [5] - 85:2, 85:6, 114:18, 125:16, 180:25
**remains** [3] - 157:18, 157:24, 163:22

**remedy** [6] - 161:5, 161:15, 162:8, 162:13, 162:20, 163:5
**remember** [11] - 11:19, 23:20, 24:3, 40:16, 52:24, 110:9, 110:11, 116:10, 152:18, 181:7, 209:8
**remind** [2] - 38:18, 84:3
**remotely** [1] - 183:12
**remove** [4] - 7:12, 110:17, 165:6, 165:10
**removed** [2] - 82:18, 147:24
**renamed** [2] - 112:4, 148:19
**repeat** [1] - 97:13
**report** [18] - 31:10, 91:4, 96:24, 99:21, 108:11, 111:10, 113:23, 114:7, 114:8, 137:10, 161:13, 167:6, 175:19, 184:7, 185:12, 186:25, 188:5, 203:8
**reported** [4] - 101:8, 123:16, 167:4, 210:4
**REPORTED** [2] - 2:1
**REPORTER** [9] - 23:2, 38:23, 39:8, 90:1, 93:3, 95:14, 97:13, 106:21, 133:23
**Reporter** [2] - 2:1, 215:12
**reporter** [36] - 7:23, 29:18, 69:23, 73:7, 99:17, 100:13, 100:15, 108:11, 111:8, 117:20, 132:3, 132:4, 135:19, 136:11, 138:16, 138:21, 143:15, 143:24, 144:2, 144:7, 144:25, 145:25, 151:13, 152:4, 158:7, 169:6, 185:3, 186:20, 194:12, 195:18, 196:3, 199:12, 200:22, 202:4
**reporters** [38] - 12:21, 26:6, 31:7, 48:17, 90:10, 99:18, 99:21, 100:25, 101:3, 108:25, 112:17, 113:3, 113:19, 115:16, 117:23, 117:24, 118:9, 121:3, 124:1, 124:15, 129:21, 141:21,

158:2, 158:14, 161:2,
166:2, 168:3, 170:17,
178:9, 183:24,
184:13, 196:12,
196:14, 196:15,
196:22, 196:24,
207:9, 207:17
  **reporting** [35] -
15:11, 15:12, 69:11,
98:21, 100:7, 101:2,
101:15, 102:2, 103:8,
107:13, 108:14,
108:22, 109:18,
111:12, 113:24,
114:1, 114:2, 115:8,
115:9, 115:25, 117:7,
124:19, 125:9,
125:12, 125:17,
125:23, 167:8,
167:16, 167:23,
175:22, 175:25,
183:9, 183:11, 204:1,
204:18
  **reports** [9] - 98:1,
98:5, 98:15, 114:18,
164:5, 176:6, 176:7,
176:11, 194:13
  **represent** [4] -
87:22, 140:1, 167:3,
168:13
  **representation** [1] -
168:7
  **representative** [1] -
51:19
  **represented** [4] -
127:23, 141:13,
141:25, 176:23
  **representing** [1] -
122:18
  **reputable** [1] - 63:12
  **requested** [1] - 135:5
  **requesting** [1] -
163:12
  **require** [1] - 197:19
  **required** [1] - 136:24
  **requirement** [1] -
100:17
  **requires** [2] - 10:1,
163:13
  **research** [1] - 72:19
  **resembling** [1] -
183:12
  **reserved** [1] - 141:19
  **residence** [1] - 60:5
  **resides** [1] - 203:13
  **Resolute** [2] - 26:15,
185:13
  **resolve** [1] - 5:7
  **resources** [1] - 99:10
  **respect** [1] - 16:18

  **respond** [3] - 108:20,
132:8, 185:6
  **response** [5] - 8:23,
10:7, 132:6, 136:9,
160:12
  **responsibility** [6] -
20:7, 44:1, 91:6, 96:4,
134:6, 174:9
  **rest** [1] - 207:20
  **restore** [1] - 137:10
  **restrain** [1] - 193:3
  **restrained** [1] -
205:8
  **restraint** [1] - 192:19
  **restricted** [1] -
131:12
  **restriction** [1] -
192:18
  **result** [4] - 77:3,
115:9, 147:23, 148:16
  **resume** [1] - 149:16
  **retaliate** [1] - 210:11
  **retaliated** [4] - 11:1,
179:7, 186:11, 211:12
  **retaliation** [11] -
8:25, 10:16, 141:1,
155:23, 161:1, 174:3,
204:5, 206:20,
207:15, 208:21, 209:9
  **retaliatory** [10] -
7:13, 10:20, 11:5,
12:24, 13:1, 125:25,
162:7, 178:4, 178:21,
186:12
  **retribution** [1] -
124:21
  **retrospective** [1] -
130:9
  **Reuters** [20] - 53:1,
120:12, 120:13,
120:19, 124:18,
139:14, 139:16,
139:19, 139:22,
156:4, 156:16, 161:1,
168:19, 169:1,
169:22, 170:3, 174:7,
174:8, 212:21
  **reveals** [2] - 192:7,
199:9
  **reversible** [1] -
207:22
  **review** [1] - 148:9
  **reviewed** [1] - 4:23
  **revisit** [1] - 14:4
  **revoked** [1] - 186:12
  **rhyme** [1] - 44:24
  **right-of-access** [6] -
192:16, 193:25,
194:19, 197:7,
210:16, 211:14

  **rights** [13] - 10:22,
11:7, 52:2, 52:15,
53:9, 54:21, 136:24,
179:4, 179:6, 198:18,
205:5, 205:9, 207:4
  **Ringgold** [1] - 187:7
  **rise** [1] - 10:21
  **risk** [1] - 112:21
  **roadblocks** [1] - 7:13
  **robust** [3] - 170:19,
171:2, 171:4
  **rock** [1] - 177:17
  **role** [7] - 71:21,
76:21, 122:17,
132:22, 133:7, 176:2,
196:22
  **Roll** [3] - 130:6,
131:3, 131:22
  **room** [205] - 7:22,
8:20, 9:7, 9:19, 9:20,
10:12, 11:5, 12:1,
12:4, 12:19, 12:20,
13:3, 13:19, 14:4,
14:22, 15:3, 15:16,
16:5, 16:9, 23:13,
24:3, 25:3, 25:10,
25:25, 26:21, 31:1,
31:5, 32:7, 32:20,
33:2, 33:4, 33:19,
34:6, 34:13, 35:1,
37:12, 40:7, 42:25,
43:15, 48:13, 48:23,
49:8, 49:13, 49:16,
50:19, 51:23, 54:2,
54:16, 56:3, 56:8,
56:15, 57:12, 59:9,
60:16, 62:13, 64:5,
64:15, 68:14, 68:20,
68:23, 69:3, 73:8,
73:15, 73:23, 74:8,
74:15, 75:3, 75:12,
75:16, 77:9, 77:11,
77:19, 77:23, 77:24,
78:10, 78:16, 79:22,
80:21, 81:11, 81:12,
81:14, 81:15, 81:23,
82:3, 82:5, 82:8,
82:10, 85:2, 85:3,
85:15, 85:22, 87:4,
93:13, 93:14, 94:13,
94:14, 94:22, 94:23,
95:1, 95:3, 103:6,
103:9, 104:13,
104:15, 105:4,
105:16, 105:22,
109:22, 110:2, 110:5,
110:10, 110:16,
111:1, 111:4, 111:8,
111:14, 111:15,
112:23, 113:1,

114:23, 115:10,
115:20, 117:21,
118:12, 119:25,
120:5, 121:1, 121:18,
121:20, 121:23,
124:21, 127:5, 128:5,
128:11, 129:7,
129:18, 132:18,
132:20, 133:4, 133:6,
135:4, 135:23,
135:24, 136:4,
136:15, 139:2, 139:5,
139:17, 140:17,
142:3, 142:10,
142:22, 143:4,
143:19, 144:4,
144:18, 146:17,
147:1, 147:9, 151:12,
151:24, 152:13,
157:14, 158:9,
158:12, 158:17,
158:25, 159:2,
159:17, 159:23,
161:10, 161:22,
162:8, 163:18, 164:4,
164:25, 174:7, 176:9,
184:5, 185:14,
185:15, 185:17,
185:21, 185:22,
186:6, 186:23,
186:24, 187:16,
188:6, 189:19,
189:22, 189:23,
199:2, 199:10,
199:24, 200:8,
200:11, 200:19,
201:6, 201:15,
201:17, 202:1, 203:1,
203:7
  **Room** [2] - 2:3, 25:3
  **room-type** [2] -
152:13, 158:9
  **rooms** [3] - 79:15,
201:20
  **Roosevelt** [1] - 25:3
  **rooted** [3] - 178:3,
203:13, 211:8
  **rotate** [1] - 46:23
  **rotates** [1] - 97:11
  **rotating** [4] - 156:15,
181:19, 181:21, 184:9
  **rotation** [9] - 8:9,
97:7, 97:16, 166:3,
168:1, 168:6, 170:11,
181:22, 182:3
  **rotational** [1] -
126:20
  **rotations** [1] - 98:2
  **rotator** [1] - 191:19
  **rough** [1] - 35:17

  **roughly** [2] - 94:11,
102:22
  **round** [1] - 94:7
  **routine** [1] - 151:12
  **routinely** [2] - 14:1,
97:4
  **row** [7] - 139:4,
139:7, 139:19, 140:5,
140:7, 140:12, 141:9
  **RSVP** [27] - 80:6,
80:18, 80:22, 80:24,
81:5, 94:2, 117:18,
118:14, 118:21,
131:1, 131:9, 131:13,
132:5, 132:8, 136:3,
136:5, 136:9, 136:12,
142:20, 143:6,
144:15, 157:15,
160:5, 161:24,
200:10, 200:15
  **RSVPed** [3] - 119:11,
142:20, 160:4
  **RSVPing** [1] - 12:21
  **RSVPs** [2] - 81:4,
93:11
  **Rubio** [1] - 202:4
  **rudimentary** [1] -
102:9
  **rule** [4] - 197:19,
197:25, 198:18,
198:20
  **ruled** [1] - 14:20
  **Rules** [2] - 41:24,
119:1
  **rules** [3] - 5:1, 5:2,
186:15
  **ruling** [1] - 213:14
  **run** [4] - 6:5, 95:25,
105:25, 162:2
  **running** [3] - 102:1,
107:19, 108:7
  **Rusk** [2] - 186:17,
187:23

## S

  **sacred** [2] - 178:8,
188:5
  **safe** [1] - 101:20
  **safely** [1] - 108:5
  **salary** [2] - 52:5,
52:9, 52:13
  **sale** [2] - 54:10,
212:16
  **Samuel** [2] - 55:20,
55:22
  **Sasha** [1] - 4:8
  **SASHA** [1] - 1:18
  **satisfied** [1] - 213:10

**Save** [1] - 21:13
**saved** [1] - 111:10
**saw** [9] - 39:4, 47:21, 51:15, 65:20, 74:1, 84:4, 124:14, 143:12, 150:23
**scenario** [2] - 13:22, 196:11
**Scenario** [1] - 14:14
**scenarios** [1] - 11:25, 13:9, 14:13
**scenes** [1] - 79:3
**Schedule** [2] - 166:7, 169:15
**schedule** [9] - 77:19, 79:4, 80:20, 90:14, 91:12, 91:16, 130:9, 130:10, 168:10
**scholars** [1] - 188:14
**school** [2] - 17:21, 82:21
**Schwartz** [2] - 50:21, 50:23
**Science** [1] - 170:9
**scoop** [1] - 197:22
**scope** [2] - 112:19, 113:6
**scrambling** [1] - 16:24
**screen** [10] - 46:18, 48:12, 48:20, 50:21, 51:20, 75:7, 116:16, 129:1, 130:17, 134:24
**screens** [1] - 51:22
**scroll** [3] - 127:16, 130:19, 135:2
**seal** [1] - 177:24
**search** [1] - 166:13
**season** [1] - 7:16
**seat** [20] - 18:8, 46:20, 47:2, 94:18, 100:4, 110:11, 139:5, 139:7, 139:17, 139:20, 139:23, 141:6, 141:8, 141:9, 141:15, 141:20, 141:21, 142:1, 142:2, 174:7
**seating** [1] - 139:1
**seats** [6] - 22:24, 22:25, 94:17, 97:15, 141:19, 191:18
**second** [15] - 8:15, 49:10, 52:19, 69:14, 100:4, 104:3, 120:13, 140:7, 155:18, 157:17, 167:1, 168:9, 170:18, 171:12, 179:8
**secondhand** [2] - 114:7, 125:16

**seconds** [2] - 35:2, 35:3
**secret** [1] - 23:11
**Secret** [3] - 20:14, 132:10, 134:12
**Secretary** [3] - 111:22, 164:3, 202:4
**secretary** [6] - 50:5, 54:4, 127:11, 160:20, 165:19, 182:24
**secretary's** [2] - 14:2, 142:3
**secured** [1] - 136:25
**security** [2] - 14:3, 200:13
**see** [113] - 6:6, 9:11, 11:10, 12:6, 12:15, 12:18, 13:6, 17:23, 26:19, 29:22, 30:6, 31:9, 32:18, 33:2, 48:23, 49:7, 50:19, 50:21, 51:1, 51:16, 51:18, 51:20, 51:21, 52:1, 54:22, 55:17, 55:18, 58:4, 59:14, 60:6, 60:8, 60:11, 60:13, 60:16, 60:21, 60:22, 60:23, 61:12, 64:6, 64:10, 64:12, 64:19, 65:17, 65:20, 66:6, 66:7, 66:8, 69:2, 69:4, 69:6, 69:7, 69:12, 70:4, 70:15, 72:2, 72:4, 72:6, 72:7, 72:22, 74:17, 79:1, 86:1, 87:5, 87:20, 88:12, 92:16, 102:10, 102:15, 103:22, 106:4, 114:6, 115:5, 115:6, 115:24, 116:2, 117:1, 120:4, 124:7, 124:11, 127:7, 128:15, 128:18, 129:2, 129:3, 130:20, 130:22, 131:22, 131:24, 132:1, 134:25, 135:2, 135:8, 135:9, 137:2, 139:20, 140:25, 146:14, 153:16, 154:25, 155:2, 155:7, 156:1, 156:15, 166:6, 182:20, 186:12, 187:20, 191:1, 197:18, 208:17, 210:15
**seeing** [13] - 13:8, 30:3, 40:16, 46:17, 48:14, 53:20, 84:8, 102:2, 102:6, 109:23,

111:1, 117:3
**seek** [1] - 192:24
**seeking** [3] - 12:11, 137:5, 186:3
**seem** [3] - 40:9, 148:6, 151:14
**sees** [1] - 162:5
**select** [4] - 170:17, 180:14, 180:24, 198:3
**selected** [16] - 32:23, 95:23, 141:20, 156:13, 169:3, 169:19, 169:21, 170:6, 180:15, 190:15, 190:17, 190:20, 191:16, 191:23, 198:14
**selection** [11] - 34:14, 35:6, 54:5, 153:6, 157:19, 157:25, 163:23, 165:14, 165:22, 169:25, 170:12
**selective** [2] - 14:23, 174:2
**self** [1] - 156:21
**self-serving** [1] - 156:21
**sell** [1] - 63:25
**selling** [7] - 52:14, 59:15, 59:24, 60:11, 63:17, 64:6, 64:11
**sells** [4] - 48:5, 48:16, 59:18, 59:25
**Semiconductor** [2] - 168:15, 169:10
**send** [11] - 28:25, 29:10, 29:11, 30:19, 30:20, 30:21, 31:16, 35:5, 35:6, 178:11, 212:23
**sending** [6] - 30:12, 30:14, 107:20, 108:23, 144:16, 212:19
**senior** [3] - 105:6, 134:13, 134:16
**seniority** [1] - 71:12
**sense** [10] - 26:21, 31:13, 106:1, 119:3, 152:2, 162:23, 167:12, 168:25, 186:18, 197:23
**separate** [5] - 22:21, 67:25, 111:6, 130:24, 131:13
**separated** [2] - 202:7, 202:8
**serendipity** [1] - 190:5

**series** [2] - 6:16, 188:15
**seriously** [3] - 8:3, 20:8, 42:15
**serve** [3] - 22:14, 47:15, 96:11
**serves** [1] - 165:25
**service** [7] - 20:7, 67:25, 68:1, 84:20, 96:16, 98:6, 100:14, 100:25, 101:2, 101:3, 106:14, 108:11, 168:20, 168:21, 169:1, 169:25
**Service** [3] - 20:14, 132:10, 134:12
**services** [7] - 109:5, 109:10, 130:8, 147:25, 156:13, 170:5, 186:7
**serving** [4] - 32:17, 41:20, 156:21
**session** [2] - 152:15, 152:17
**set** [8] - 17:11, 17:14, 42:24, 46:19, 49:22, 113:21, 162:15, 176:17
**sets** [1] - 25:7
**setting** [3] - 105:21, 148:6, 179:23
**seven** [3] - 90:9, 90:12, 101:21
**several** [5] - 12:21, 36:9, 51:13, 194:21, 195:11
**shall** [1] - 161:9
**shape** [3] - 145:13, 145:14, 145:19
**share** [11] - 24:19, 97:4, 97:5, 97:19, 98:1, 98:20, 98:21, 99:15, 99:17, 99:20, 100:17
**shared** [4] - 58:11, 98:5, 99:22, 117:4
**shares** [1] - 126:20
**sharing** [6] - 34:10, 96:15, 96:17, 99:19, 100:25, 101:4
**sheer** [1] - 155:9
**sheet** [2] - 78:1, 166:11
**Sherrill** [23] - 9:23, 10:15, 11:15, 14:6, 14:10, 15:24, 163:6, 179:16, 179:17, 180:3, 180:17, 180:18, 182:4, 187:3, 187:6, 193:15, 198:5,

198:6, 198:16, 203:2, 203:10, 203:12, 203:20
**shift** [3] - 22:4, 22:5, 175:5
**shifted** [1] - 184:25
**shoe** [7] - 23:13, 23:15, 23:18, 23:22, 23:23, 24:10, 24:13
**shop** [1] - 93:25
**short** [2] - 202:10, 202:25
**shortly** [1] - 141:16
**shot** [1] - 118:7
**shots** [1] - 120:5
**shoulder** [1] - 201:22
**shout** [2] - 185:3, 185:18
**shouting** [2] - 104:18, 184:21
**show** [25] - 10:18, 15:14, 17:11, 17:24, 20:20, 25:1, 45:2, 45:4, 58:4, 75:10, 81:3, 81:4, 81:6, 81:20, 82:11, 83:2, 111:7, 130:5, 142:7, 164:6, 169:24, 172:18, 204:17, 207:12
**showed** [8] - 81:25, 83:6, 84:3, 87:3, 132:6, 172:17, 174:5, 200:13
**showing** [11] - 15:2, 16:10, 16:11, 26:13, 46:11, 66:9, 88:10, 128:23, 174:2, 209:13, 212:6
**shown** [6] - 80:2, 80:4, 160:4, 205:6, 212:10, 212:11
**shows** [13] - 8:18, 151:17, 151:21, 154:22, 154:23, 155:1, 155:16, 159:15, 163:24, 168:19, 170:2, 170:11, 213:10
**shrinking** [1] - 170:24
**sic** [5] - 14:11, 137:4, 143:15, 143:22, 173:22
**side** [19] - 48:10, 52:4, 52:10, 57:17, 57:18, 58:8, 62:9, 63:4, 76:4, 76:5, 120:15, 187:5, 187:6, 187:16, 194:22,

196:6, 198:23
**sides** [1] - 180:1
**sign** [2] - 106:4,
112:7
**signal** [1] - 107:18
**signed** [2] - 116:12,
135:13
**significant** [1] -
108:21
**signing** [3] - 73:24,
115:17, 144:5
**signs** [1] - 209:5
**signup** [1] - 83:20
**silence** [1] - 177:24
**similar** [9] - 14:5,
38:13, 47:2, 59:19,
59:25, 60:17, 60:18,
125:24, 195:13
**similarly** [6] - 59:9,
60:15, 62:19, 127:10,
145:23, 156:11
**simplistic** [1] - 12:15
**simply** [5] - 15:7,
15:19, 75:2, 177:23,
183:20
**simultaneously** [2] -
30:13, 30:14
**sincerely** [1] - 7:9
**single** [14] - 8:10,
15:4, 20:5, 24:24,
43:12, 43:18, 70:25,
71:2, 77:13, 79:24,
80:5, 117:24, 117:25,
148:9
**Sipa** [15] - 51:1, 51:5,
52:15, 53:8, 53:13,
55:5, 55:11, 55:18,
60:9, 60:17, 61:6,
64:7, 69:7, 69:11,
212:12
**Sipa's** [1] - 53:23
**sit** [6] - 12:8, 14:17,
14:19, 35:18, 71:18,
141:21
**sit-down** [2] - 14:17,
14:19
**site** [1] - 52:2
**sites** [2] - 40:17,
65:20
**sits** [3] - 35:1, 141:8,
203:4
**sitting** [7] - 71:23,
104:25, 105:1, 110:7,
145:16, 146:25,
148:14
**situation** [19] - 5:2,
7:18, 12:16, 13:13,
41:1, 98:1, 102:15,
125:21, 162:5,
176:15, 180:19,

181:19, 183:8,
183:22, 198:5,
200:13, 211:4, 211:5,
213:19
**situations** [3] -
179:17, 196:19,
196:21
**size** [1] - 195:16
**skillfully** [1] - 23:17
**skills** [1] - 145:24
**skinny** [1] - 197:16
**skirt** [1] - 149:2
**sky** [1] - 88:11
**Slack** [2] - 101:24,
121:16
**slash** [3] - 61:5, 61:6
**slaughter** [1] - 84:10
**slaughtered** [1] -
37:22
**sleepy** [1] - 75:24
**slide** [1] - 199:15
**slightly** [1] - 97:25
**slots** [2] - 97:10,
174:8
**slow** [3] - 116:15,
133:24, 208:4
**slowly** [1] - 93:4
**small** [4] - 58:21,
105:12, 105:13,
193:14
**smaller** [2] - 94:15,
105:21
**smallest** [1] - 97:9
**smell** [1] - 201:15
**smile** [1] - 59:7
**smiling** [1] - 77:3
**snafu** [1] - 144:16
**snuck** [1] - 152:2
**Snyder** [5] - 14:17,
187:7, 196:8, 196:9,
197:8
**so..** [1] - 62:6
**social** [3] - 106:25,
107:8, 117:6
**softened** [1] - 147:16
**softening** [1] -
123:25
**sold** [2] - 61:2,
212:15
**sole** [1] - 194:7
**solicitation** [2] -
130:24, 131:13
**soliciting** [1] - 93:11
**solidarity** [1] -
212:22
**solidly** [1] - 111:4
**someone** [19] - 26:8,
29:18, 30:7, 31:2,
32:12, 33:4, 50:5,
52:1, 68:11, 71:13,

76:12, 76:16, 76:17,
85:14, 192:19, 194:1,
197:20, 202:14, 213:8
**sometimes** [18] -
26:9, 28:7, 50:9,
91:14, 92:23, 98:17,
102:14, 107:14,
114:13, 129:19,
159:4, 159:5, 160:4,
185:15, 185:17,
185:18, 200:25
**somewhat** [2] -
141:9, 199:9
**somewhere** [6] -
27:19, 58:20, 73:18,
93:9, 103:23, 105:22
**soon** [1] - 213:22
**Sorry** [1] - 38:25
**sorry** [41] - 18:21,
23:2, 29:10, 57:12,
58:7, 61:24, 62:1,
63:15, 64:4, 68:6,
68:24, 73:1, 73:2,
77:20, 78:6, 80:1,
84:16, 86:14, 86:25,
88:20, 90:1, 93:16,
96:18, 97:13, 98:11,
103:19, 106:22,
109:10, 115:14,
116:15, 122:4, 133:9,
133:25, 146:8, 154:2,
156:5, 169:11,
177:10, 179:16,
186:1, 207:10
**sort** [34] - 20:16,
22:6, 37:17, 51:9,
57:18, 61:3, 78:24,
91:17, 94:12, 94:15,
95:9, 95:16, 95:18,
96:6, 96:12, 96:20,
99:22, 101:10,
102:18, 102:21,
104:23, 105:6, 107:4,
107:24, 109:9,
109:13, 110:19,
111:23, 123:7, 137:8,
143:8, 147:20, 149:2,
213:15
**soul** [1] - 76:19
**sound** [2] - 97:18,
120:9
**sounds** [3] - 140:20,
193:23, 206:22
**source** [3] - 117:10,
175:25, 197:11
**sourced** [1] - 174:9
**sources** [7] - 192:24,
193:2, 193:4, 193:7,
203:10, 203:12
**south** [1] - 108:5

**South** [1] - 108:8
**space** [8] - 94:17,
109:12, 111:7,
120:10, 121:12,
148:20, 180:12,
196:25
**spaces** [4] - 94:12,
172:11, 203:3, 203:4
**SpaceX** [1] - 148:21
**spacing** [3] - 128:7,
129:2, 145:20
**SPAHR** [2] - 1:15,
1:18
**Spahr** [1] - 4:7
**speaker** [1] - 201:22
**speaking** [3] -
110:18, 120:6, 183:6
**speaks** [2] - 175:15,
175:18
**special** [15] - 41:11,
165:11, 186:3, 186:6,
186:10, 186:11,
186:13, 186:15,
186:16, 186:18,
186:22, 187:22,
194:12, 198:3, 198:24
**special-access** [1] -
198:24
**specific** [5] - 129:9,
147:19, 148:15,
177:7, 210:19
**specifically** [5] -
79:17, 121:5, 187:17,
196:9, 196:10
**specificity** [1] -
204:14
**spectrum** [2] -
196:20, 196:22
**speculate** [2] - 64:4,
70:22
**speculating** [1] -
53:11
**speculative** [1] -
42:1
**speech** [40] - 8:25,
11:8, 11:16, 11:18,
47:14, 76:1, 175:7,
175:16, 175:17,
175:20, 175:24,
176:4, 176:12,
176:16, 176:20,
177:5, 177:8, 177:10,
177:18, 177:21,
177:22, 177:23,
178:11, 182:7, 182:8,
183:1, 183:5, 183:13,
188:10, 188:19,
189:1, 192:9, 192:11,
192:15, 195:10,
196:4, 199:1, 205:5,

205:9, 208:5
**speed** [13] - 28:12,
29:4, 29:5, 32:11,
32:12, 32:13, 40:9,
40:12, 73:12, 85:17,
101:17, 114:2
**speedily** [1] - 125:13
**spell** [1] - 18:21
**spelling** [2] - 90:2,
90:4
**spend** [3] - 19:11,
45:1, 49:25
**spending** [1] - 45:8
**spent** [2] - 7:11,
121:22
**Spidey** [1] - 26:20
**splashdown** [1] -
204:18
**sporadic** [1] - 7:21
**sporadically** [1] -
8:19
**spot** [2] - 168:21,
169:20
**spots** [2] - 96:2,
193:20
**spray** [1] - 184:6
**sprays** [3] - 106:19,
106:22, 147:22
**Sprays** [1] - 106:21
**spread** [1] - 113:6
**spreadsheet** [1] -
154:6
**sprint** [1] - 37:17
**St** [2] - 73:14, 143:20
**Staff** [1] - 165:5
**staff** [15] - 55:11,
56:25, 72:18, 73:19,
74:13, 74:22, 110:14,
113:14, 113:17,
129:3, 134:21,
134:22, 160:25,
176:25
**staffer** [2] - 118:20,
119:9
**staffers** [4] - 80:10,
133:1, 134:16, 141:19
**staffing** [2] - 96:10,
138:9, 144:16
**stage** [2] - 14:2,
15:16
**stages** [1] - 17:12
**stairs** [1] - 81:13
**stand** [7] - 23:6,
23:7, 25:3, 25:14,
151:25, 178:25,
203:25
**standard** [6] - 20:4,
20:6, 32:25, 42:13,
207:3, 209:25
**standards** [4] -

109:7, 117:13, 162:15, 206:4
**standing** [5] - 5:15, 46:20, 175:21, 175:22, 191:18
**Starmer** [3] - 62:14, 63:18, 121:9
**start** [9] - 40:2, 56:7, 103:18, 140:12, 151:5, 189:18, 190:2, 191:4, 193:10
**started** [4] - 123:13, 179:1, 190:3, 194:10
**starting** [2] - 4:4, 187:21
**state** [8] - 8:24, 18:21, 46:19, 94:13, 95:3, 192:3, 199:21, 213:4
**State** [2] - 132:24, 133:1
**statement** [8] - 6:9, 156:17, 156:21, 157:24, 160:11, 160:12, 171:9, 173:6
**statements** [7] - 155:21, 158:21, 165:18, 173:16, 186:25, 195:1, 195:9
**States** [17] - 2:2, 4:19, 16:17, 16:23, 21:20, 41:13, 77:14, 83:21, 122:15, 122:18, 160:22, 168:21, 179:7, 183:18, 190:22, 215:13
**states** [1] - 165:23
**STATES** [3] - 1:1, 1:11, 1:22
**station** [2] - 96:20, 96:21
**stays** [1] - 92:25
**stenographer** [1] - 107:7
**stenographers** [1] - 106:18
**stenographic** [1] - 215:5
**step** [2] - 137:9, 149:10
**stepping** [1] - 108:3
**steps** [4] - 44:11, 44:16, 44:17, 169:17
**STF** [1] - 72:19
**stick** [1] - 213:20
**still** [25] - 9:19, 9:20, 10:11, 14:23, 30:2, 37:10, 37:13, 45:1, 45:8, 49:10, 49:12,

49:16, 50:16, 50:18, 54:9, 102:8, 113:24, 115:2, 136:13, 139:7, 191:2, 196:23, 197:10, 205:12, 212:7
**stop** [1] - 36:22
**storefront** [1] - 48:16
**stories** [9] - 27:25, 30:14, 34:20, 47:17, 64:1, 65:24, 99:2, 134:15, 194:13
**stormed** [1] - 14:1
**story** [24] - 25:4, 26:7, 26:8, 28:13, 28:16, 31:18, 31:21, 66:7, 85:10, 85:14, 102:12, 102:13, 102:16, 102:21, 102:23, 102:25, 103:1, 103:3, 103:14, 103:21, 110:20, 128:8, 169:9
**stream** [3] - 67:25, 128:20, 212:14
**streamed** [1] - 127:8
**streaming** [1] - 127:19
**Street** [2] - 1:16, 1:23
**strength** [1] - 108:15
**stress** [1] - 29:12
**stretch** [1] - 35:17
**strike** [3] - 4:24, 4:25, 150:24
**stronger** [1] - 195:20
**strongly** [1] - 205:17
**struck** [1] - 148:25
**struggling** [3] - 33:21, 33:22, 180:4
**study** [1] - 168:1
**stuff** [3] - 35:5, 53:12, 212:25
**style** [3] - 191:4, 192:4, 192:6
**subject** [3] - 33:10, 62:8, 196:2
**subject-matter** [1] - 62:8
**subjective** [1] - 148:10
**submissions** [1] - 213:16
**submit** [2] - 16:25, 204:16
**submitted** [6] - 90:15, 134:24, 150:22, 160:14, 173:5, 184:25
**submitting** [1] - 16:21
**subscribe** [1] - 117:9

**subscribed** [1] - 101:6
**subscribers** [11] - 33:18, 84:13, 96:18, 96:23, 117:5, 117:8, 125:14, 206:6, 206:8, 206:9, 212:20
**subsequent** [1] - 130:13
**subsequently** [1] - 119:11
**substantial** [2] - 207:6, 207:14
**substantive** [3] - 104:23, 108:6, 202:13
**substitute** [2] - 121:2, 212:23
**subtle** [2] - 153:13
**success** [2] - 16:12, 199:8
**succumb** [2] - 204:6, 204:10
**suffered** [1] - 125:12
**suffering** [1] - 87:23
**sufficient** [1] - 209:12
**suggest** [4] - 130:14, 162:18, 193:5, 198:8
**suggested** [3] - 5:5, 6:24, 8:11
**suggesting** [3] - 7:2, 133:9, 133:12
**suggestion** [1] - 183:5
**suit** [1] - 184:14
**suite** [1] - 111:24
**summary** [4] - 148:22, 154:6, 154:20, 154:21
**summation** [2] - 6:21, 11:21
**summoned** [1] - 111:22
**Sun** [14] - 196:8, 197:6, 197:8, 197:22, 199:4, 208:14, 210:15, 211:3, 211:14, 211:16, 211:21, 212:4, 213:3
**superior** [2] - 27:4, 38:1
**supplemental** [5] - 17:1, 146:11, 153:3, 156:17, 165:22
**support** [2] - 153:17, 193:8
**supported** [2] - 155:11, 155:12
**supporter** [2] - 209:7, 209:16

**suppose** [1] - 101:1
**Supreme** [6] - 15:20, 188:18, 192:22, 208:25, 209:15, 209:18
**surgical** [1] - 110:15
**surprised** [2] - 134:16, 148:5
**surrounding** [2] - 57:5, 75:8
**Susan** [1] - 165:5
**susceptible** [1] - 177:22
**Susie** [1] - 165:9
**swimming** [1] - 204:7
**switching** [1] - 56:2
**swivel** [1] - 114:16
**SWORN** [2] - 18:5, 89:16
**Sylvie** [1] - 121:6
**synonymous** [1] - 94:21
**system** [35] - 8:6, 8:8, 8:16, 8:22, 10:1, 10:12, 14:4, 17:16, 43:5, 44:21, 45:13, 92:14, 100:24, 131:9, 153:5, 153:6, 153:18, 155:17, 163:3, 165:24, 170:11, 180:10, 180:14, 180:23, 181:1, 181:2, 181:9, 181:13, 181:19, 181:21, 181:24, 182:2, 188:6, 211:8
**systematically** [1] - 197:21
**Szagola** [2] - 72:6, 72:12
**SZAGOLA** [1] - 72:7

**T**

**T-Mobile** [1] - 29:7
**tab** [4] - 127:7, 166:5, 168:9
**tabbed** [1] - 150:15
**table** [2] - 4:10, 110:6
**tail** [1] - 116:10
**Taiwan** [2] - 168:15, 169:10
**takeover** [1] - 147:23
**talks** [2] - 176:4, 209:24
**Tam** [2] - 177:13, 183:6

**tap** [1] - 187:19
**tariff** [1] - 30:23
**tariffs** [5] - 31:6, 115:13, 115:18, 116:12, 116:19
**tarmac** [25] - 15:5, 69:14, 69:18, 70:11, 70:12, 71:8, 71:24, 83:7, 88:21, 88:22, 88:23, 118:2, 118:3, 118:4, 118:5, 129:19, 129:25, 130:25, 131:13, 131:16, 136:18, 143:12, 144:17, 200:20, 201:2
**tarmacs** [1] - 113:2
**Tatel's** [1] - 163:8
**taught** [1] - 183:7
**TAYLOR** [1] - 1:6
**Taylor** [3] - 113:17, 134:19, 174:6
**team** [9] - 26:5, 90:12, 101:22, 102:7, 121:12, 121:14, 131:15, 133:13, 135:20
**teams** [1] - 165:24
**tech** [1] - 17:16
**technically** [1] - 101:17
**technicians** [1] - 120:9
**technology** [1] - 62:4
**television** [11] - 31:9, 97:10, 97:12, 97:16, 97:20, 99:14, 99:15, 111:3, 114:9, 120:8
**ten** [5] - 19:7, 43:12, 79:18, 79:19, 89:3
**ten-minute** [1] - 89:3
**tendency** [1] - 210:6
**tenor** [2] - 124:1, 147:20
**tentatively** [1] - 11:23
**tenure** [1] - 46:4
**term** [6] - 41:7, 95:16, 105:14, 106:22, 107:23, 134:16
**terms** [3] - 7:19, 92:19, 203:24
**territory** [1] - 108:3
**test** [1] - 209:18
**testified** [12] - 58:25, 64:21, 65:3, 65:16, 74:25, 117:18, 157:15, 160:3, 165:20, 172:5, 176:8, 184:3

**testifies** [3] - 157:18, 206:1, 212:24

**testify** [5] - 5:18, 5:23, 6:17, 71:23, 94:8

**testifying** [1] - 94:9

**testimony** [24] - 5:8, 5:12, 48:21, 65:10, 89:5, 128:1, 139:11, 146:19, 149:10, 151:1, 153:22, 155:11, 156:24, 160:2, 163:22, 165:12, 166:4, 167:25, 170:20, 174:14, 180:1, 200:6, 205:11, 212:13

**text** [49] - 29:17, 30:20, 57:9, 62:23, 69:22, 70:2, 70:7, 71:15, 76:4, 98:1, 98:21, 100:14, 103:8, 112:24, 113:3, 113:19, 117:20, 117:23, 117:24, 118:17, 123:12, 129:21, 129:24, 133:3, 133:4, 143:15, 143:24, 144:2, 144:7, 144:12, 144:25, 145:10, 146:22, 151:13, 151:23, 153:1, 153:2, 158:7, 158:14, 159:20, 159:21, 159:23, 161:2, 170:17, 201:8, 202:3, 202:4

**text-based** [1] - 201:8

**texts** [1] - 95:10

**Thanksgiving** [1] - 123:10

**that..** [1] - 56:13

**THE** [263] - 1:1, 1:11, 1:14, 1:21, 1:22, 4:1, 4:15, 4:20, 6:1, 6:7, 6:10, 6:18, 6:22, 7:2, 9:8, 11:12, 11:22, 12:14, 13:2, 13:15, 13:17, 14:12, 16:14, 17:2, 17:6, 17:15, 17:18, 17:20, 17:22, 17:25, 18:3, 18:6, 18:7, 18:8, 18:10, 18:21, 18:23, 18:25, 19:1, 19:3, 23:2, 23:3, 26:24, 26:25, 30:11, 30:15, 31:14, 31:17, 31:18, 31:20, 31:22, 31:23, 32:3, 38:23,

38:25, 39:8, 39:9, 42:5, 42:9, 45:18, 46:6, 46:8, 71:12, 71:13, 73:10, 76:9, 76:14, 76:23, 77:4, 77:7, 77:13, 77:16, 77:18, 77:21, 77:25, 78:7, 78:8, 78:9, 78:11, 78:12, 78:13, 78:17, 78:20, 78:23, 78:24, 79:5, 79:7, 79:8, 79:9, 79:10, 80:17, 80:19, 82:4, 82:7, 82:14, 82:16, 82:23, 82:24, 84:18, 84:20, 84:22, 84:23, 84:24, 84:25, 86:23, 86:25, 88:25, 89:3, 89:6, 89:10, 89:13, 89:14, 89:17, 89:18, 90:1, 92:7, 92:9, 93:3, 93:5, 93:17, 93:19, 93:22, 93:24, 94:4, 95:14, 95:15, 97:13, 97:15, 99:12, 99:14, 99:16, 99:17, 99:20, 100:12, 100:14, 100:16, 100:19, 100:22, 102:9, 102:14, 106:21, 106:22, 119:6, 119:8, 119:18, 119:20, 122:4, 122:8, 122:21, 122:24, 123:14, 124:7, 124:25, 125:4, 126:6, 128:25, 129:1, 133:9, 133:12, 133:23, 133:24, 133:25, 137:6, 137:7, 138:22, 140:23, 140:24, 146:5, 146:7, 147:14, 147:19, 148:13, 148:17, 149:5, 149:9, 149:12, 149:14, 149:22, 149:25, 150:2, 150:7, 150:11, 150:14, 151:16, 151:24, 152:7, 152:12, 152:18, 153:24, 154:4, 154:13, 154:18, 154:25, 155:2, 157:13, 158:24, 159:12, 161:5, 161:21, 162:22, 163:15, 164:12, 164:21, 166:9, 166:21, 172:23, 173:10, 173:25, 174:24, 175:4, 175:13,

177:11, 178:17, 178:23, 179:8, 179:12, 180:3, 181:6, 181:8, 182:6, 182:11, 184:10, 186:1, 186:5, 188:9, 189:2, 189:4, 189:13, 189:21, 190:2, 190:16, 190:25, 191:7, 191:10, 191:25, 192:8, 193:13, 193:23, 194:18, 197:6, 199:2, 199:17, 199:21, 201:5, 202:18, 202:21, 203:23, 204:12, 204:20, 205:1, 205:19, 205:21, 205:23, 206:21, 208:13, 210:14, 210:20, 211:2, 211:6, 211:13, 212:3, 213:11, 213:25

**theme** [1] - 40:9

**themselves** [10] - 52:16, 99:4, 118:11, 125:21, 156:23, 168:24, 207:9, 207:18, 207:21, 207:24

**then-President** [3] - 23:12, 110:4, 110:22

**theories** [1] - 9:10

**therefore** [3] - 162:12, 185:1, 192:11

**Thereupon** [2] - 89:8, 149:20

**they've** [8] - 10:18, 88:23, 127:19, 140:25, 141:2, 147:24, 157:9, 200:24

**thick** [1] - 166:14

**thinking** [10] - 11:24, 37:21, 58:7, 75:25, 107:22, 179:5, 182:11, 188:9, 193:24

**thinks** [1] - 167:18

**third** [3] - 140:12, 167:1, 204:22

**thoughtful** [1] - 213:12

**thousands** [4] - 27:10, 93:20, 96:8

**threatened** [1] - 140:25

**threatening** [2] - 124:17, 160:25

**threats** [2] - 125:18, 125:19

**three** [27] - 10:6,

10:7, 23:22, 24:7, 28:13, 28:16, 29:6, 32:6, 78:4, 79:22, 97:9, 97:15, 101:23, 102:20, 111:25, 127:21, 146:6, 155:25, 156:3, 156:5, 156:14, 163:13, 170:1, 180:25, 187:13, 197:14, 200:22

**three-on-one** [1] - 187:13

**threw** [1] - 23:13

**throughout** [1] - 203:22

**throughs** [1] - 103:2

**throw** [1] - 13:25

**thrower** [1] - 23:22

**throwing** [4] - 23:15, 23:23, 24:10, 24:12

**thrown** [1] - 147:21

**timeline** [1] - 199:14

**timeliness** [1] - 213:1

**timely** [1] - 213:15

**timespan** [1] - 146:24

**timestamp** [1] - 116:11

**tiny** [1] - 198:2

**title** [2] - 72:17, 89:23

**TOBIN** [113] - 1:14, 4:5, 5:25, 6:3, 6:8, 6:11, 6:19, 6:25, 7:4, 9:14, 11:20, 12:11, 12:25, 13:10, 13:16, 17:7, 17:17, 17:19, 17:21, 17:24, 18:1, 18:12, 19:4, 23:5, 27:6, 32:1, 32:4, 39:1, 39:11, 42:4, 42:8, 42:19, 45:16, 79:12, 81:8, 83:4, 85:1, 86:4, 86:6, 87:13, 88:17, 89:11, 149:18, 150:1, 150:3, 150:8, 150:13, 150:15, 151:23, 152:1, 152:10, 152:13, 152:19, 153:25, 154:5, 154:11, 154:16, 154:20, 155:1, 155:3, 157:14, 159:9, 159:18, 161:8, 162:3, 163:2, 163:16, 164:13, 164:18, 164:24, 165:3, 166:10, 166:24,

173:1, 173:5, 173:13, 174:1, 175:2, 175:10, 175:14, 177:13, 178:22, 179:6, 179:11, 179:14, 180:9, 181:7, 181:17, 182:9, 182:13, 184:19, 186:4, 186:14, 188:13, 189:3, 189:12, 202:23, 203:24, 204:16, 204:25, 205:16, 205:20, 205:22, 205:24, 207:1, 208:17, 210:17, 210:21, 211:5, 211:7, 211:16, 212:10, 213:23

**Tobin** [20] - 4:6, 5:22, 9:8, 17:6, 66:5, 66:17, 77:8, 88:20, 89:10, 150:2, 151:16, 152:3, 152:4, 175:4, 190:3, 193:25, 194:3, 199:19, 201:16, 202:21

**today** [36] - 5:18, 5:23, 6:5, 6:9, 7:13, 10:19, 13:11, 14:25, 17:8, 17:12, 28:2, 48:21, 49:4, 71:23, 81:22, 90:22, 95:17, 97:17, 126:13, 136:23, 139:7, 139:23, 146:25, 148:14, 151:10, 156:19, 157:15, 163:17, 170:20, 174:14, 175:3, 189:8, 190:11, 194:10, 203:22, 207:12

**today's** [1] - 137:4

**toeing** [1] - 204:3

**together** [5] - 29:21, 71:18, 103:12, 103:13, 203:20

**token** [1] - 152:23

**tomorrow's** [1] - 80:25

**ton** [1] - 123:3

**tone** [5] - 104:7, 123:25, 147:20, 148:15, 182:17

**took** [12] - 20:25, 21:4, 40:1, 47:24, 59:8, 61:9, 66:18, 115:7, 115:24, 166:15, 187:16

**top** [4] - 38:8, 70:21, 131:8, 155:3

**topic** [1] - 148:6
**topics** [1] - 166:1
**totaling** [1] - 146:23
**totality** [3] - 125:13,
127:20, 129:16
**touch** [1] - 203:21
**touched** [1] - 32:5
**towards** [4] - 50:13,
113:11, 116:10,
200:14
**town** [7] - 22:24,
22:25, 23:4, 82:9,
130:21, 131:12
**track** [1] - 184:13
**trade** [1] - 116:19
**trademark** [3] -
177:14, 177:16
**traditions** [1] - 109:8
**trained** [4] - 75:6,
111:5, 201:18, 201:19
**TRANSCRIPT** [1] -
1:10
**transcript** [5] -
164:13, 164:19,
173:6, 215:5, 215:6
**transcripts** [2] -
114:19, 123:24
**transmission** [2] -
28:20, 29:6
**transmittal** [1] -
35:23
**transmitting** [3] -
34:22, 39:22, 103:11
**travel** [11] - 22:18,
22:21, 23:3, 23:6,
100:3, 106:16,
113:21, 122:6,
122:22, 122:25,
130:21
**traveled** [2] - 58:10,
95:12
**traveling** [4] - 43:21,
133:18, 133:20, 134:3
**travels** [1] - 122:10
**treatment** [2] -
192:5, 192:7
**TREVOR** [1] - 1:11
**tried** [1] - 20:12
**trip** [8] - 22:24,
23:11, 35:11, 44:9,
91:15, 91:16, 95:17,
108:8
**TRO** [3] - 15:4,
164:2, 201:10
**true** [9] - 30:18, 71:6,
106:18, 133:16,
135:21, 180:7, 215:4,
215:5
**truly** [1] - 102:15,
122:11

**Trump** [21] - 20:13,
36:16, 37:24, 39:17,
44:7, 48:1, 58:6,
59:20, 60:1, 62:20,
86:10, 87:2, 87:7,
107:22, 108:23,
121:12, 123:21,
168:14, 172:21,
173:18, 181:12
**Trump's** [8] - 21:13,
36:12, 59:6, 63:18,
105:14, 134:15,
141:16, 173:6
**try** [11] - 5:7, 17:2,
25:11, 27:10, 45:5,
50:3, 116:15, 137:9,
146:2, 188:2, 199:18
**trying** [14] - 16:19,
21:9, 37:13, 50:11,
75:15, 79:13, 122:19,
122:21, 149:2, 196:5,
204:2, 204:3, 205:21
**Tuesday** [1] - 105:25
**turn** [6] - 45:3,
111:19, 117:16,
152:24, 177:7, 185:4
**turned** [9] - 118:19,
118:23, 119:8,
129:24, 135:25,
136:13, 141:19,
177:18
**TV** [4] - 126:20,
126:21, 126:23
**tweet** [13] - 44:10,
113:16, 124:6, 124:9,
124:14, 139:10,
139:16, 171:17,
172:2, 172:6, 172:9,
172:15, 173:14
**tweeted** [1] - 124:11
**tweets** [1] - 176:9
**Twelfth** [1] - 1:16
**twenty** [1] - 19:15
**twenty-one** [1] -
19:15
**Twitter** [1] - 116:17
**two** [44] - 6:12, 10:5,
11:18, 12:15, 13:8,
17:8, 22:3, 22:10,
22:11, 23:22, 28:3,
28:13, 29:3, 32:6,
43:3, 90:13, 96:2,
100:6, 101:22,
105:15, 105:18,
108:2, 109:15,
110:21, 120:20,
123:11, 127:21,
144:12, 147:25,
150:25, 153:14,
156:13, 158:2,

161:14, 169:25,
174:8, 175:12,
179:17, 202:7, 207:1,
207:19, 208:21,
210:25, 212:15
**type** [15] - 13:13,
50:15, 91:23, 102:3,
151:7, 152:13, 155:3,
157:5, 158:9, 162:24,
163:18, 171:11,
183:13, 183:22, 198:5
**types** [1] - 158:2
**typically** [1] - 128:9

### U

**U.K** [2] - 63:3, 63:4
**U.S** [12] - 4:18, 46:2,
46:3, 60:4, 116:18,
122:10, 123:4,
126:12, 208:25,
209:2, 209:15
**U.S.-focused** [1] -
123:2
**Ukraine** [8] - 36:18,
108:16, 166:8,
166:11, 166:16,
167:3, 167:14, 167:22
**Ukraine-related** [1] -
167:14
**Ukrainian** [2] - 36:12,
64:20
**ultimately** [1] - 92:23
**unable** [1] - 208:12
**unaccredited** [1] -
60:9
**unanimous** [1] -
177:20
**unaware** [1] - 134:14
**unconstitutional** [3]
- 7:13, 13:1, 176:11
**under** [30] - 9:23,
9:24, 10:22, 13:21,
14:9, 14:10, 92:14,
100:16, 100:24,
118:10, 127:7,
137:15, 153:5, 157:4,
167:11, 182:4,
187:23, 188:19,
188:20, 203:2,
203:11, 203:20,
208:16, 208:18,
208:23, 213:2, 213:21
**Under** [1] - 151:6
**underlies** [1] - 178:5
**underlying** [2] -
9:17, 40:9
**underpinnings** [1] -
14:6

**understandable** [1] -
45:11
**understandings** [1] -
16:22
**understood** [6] -
21:10, 27:12, 41:17,
43:20, 84:11, 197:7
**undisputed** [1] -
15:17
**undoubtedly** [1] -
125:12
**unflattering** [1] -
76:12
**unfortunately** [1] -
158:10
**uniform** [1] - 161:3
**uniformly** [2] - 8:4,
164:8
**unique** [2] - 24:20,
43:25
**UNITED** [3] - 1:1,
1:11, 1:22
**United** [8] - 4:18,
16:17, 16:23, 21:20,
41:13, 62:14, 77:14,
83:21, 122:14,
122:18, 142:23,
160:22, 168:21,
179:7, 183:17,
190:22, 215:13
**united** [1] - 2:2
**universe** [7] - 94:3,
97:23, 98:3, 157:24,
158:4, 159:22, 191:22
**unless** [5] - 22:16,
164:16, 181:18,
183:19, 191:3
**unpredictable** [1] -
158:18
**unreasonable** [2] -
198:7
**unreported** [1] -
194:24
**untrustworthy** [1] -
196:15
**up** [55] - 11:12,
11:20, 16:19, 20:20,
26:6, 26:17, 33:21,
45:2, 45:4, 46:19,
48:24, 49:22, 51:22,
73:12, 80:2, 80:4,
81:3, 81:5, 81:6,
81:13, 81:20, 81:25,
82:11, 82:20, 82:25,
83:2, 85:10, 85:14,
91:18, 100:3, 100:24,
102:12, 102:17,
102:20, 103:5,
103:21, 111:24,
128:13, 129:17,

132:6, 136:6, 138:24,
140:17, 144:15,
146:1, 157:16, 160:4,
169:5, 169:12,
178:18, 191:23,
199:15, 200:13,
202:8, 212:14
**upcoming** [1] -
197:16
**update** [2] - 36:4,
103:2
**updated** [3] - 113:7,
155:13
**updating** [1] - 102:24
**upgrade** [1] - 110:15
**uphold** [1] - 20:6
**upload** [1] - 53:17
**uploaded** [1] - 53:13
**upper** [1] - 111:23
**uproar** [2] - 133:21,
134:4
**upstairs** [1] - 81:20
**upstream** [1] - 204:7
**urge** [1] - 205:18
**urgency** [1] - 7:7
**USA** [10] - 51:1, 53:8,
55:5, 55:18, 60:9,
60:17, 61:6, 64:7,
69:7, 69:11
**usage** [3] - 67:3,
67:10, 68:9
**uses** [4] - 51:5,
191:14, 208:24
**USMCA** [1] - 116:19
**utilized** [1] - 103:25
**utilizing** [1] - 102:9

### V

**V-U-C-C-I** [1] - 18:24
**vacation** [3] - 22:17,
74:2, 74:9
**value** [1] - 27:13
**values** [1] - 125:11
**Vance** [1] - 39:17
**variety** [3] - 27:23,
33:23, 86:11
**various** [2] - 91:25,
200:17
**vast** [8] - 19:10,
65:20, 98:24, 107:19,
117:9, 167:15
**vastly** [1] - 94:2
**vehicle** [1] - 44:16
**verbatim** [1] - 102:4
**verify** [4] - 117:7,
117:11, 117:15,
201:14
**Verizon** [1] - 29:8

**versed** [2] - 37:19, 140:10

**versions** [2] - 139:3, 139:25

**versus** [12] - 4:2, 23:3, 40:24, 66:22, 72:18, 72:19, 116:22, 149:23, 186:23, 186:24, 188:10

**vertical** [1] - 107:1

**via** [3] - 44:10, 61:6, 69:11

**vice** [1] - 105:20

**Vice** [1] - 39:17

**Victor** [1] - 19:1

**video** [14] - 17:24, 37:9, 37:14, 37:16, 65:11, 107:1, 107:8, 109:24, 110:25, 118:9, 126:21, 128:22, 164:19, 172:20

**videographer** [2] - 51:13, 182:24

**videographers** [2] - 49:22, 106:25

**videos** [2] - 48:13, 107:1

**Vietnam** [1] - 20:3

**view** [3] - 186:16, 196:15, 209:16

**viewed** [1] - 197:13

**viewers** [2] - 75:11, 96:14

**viewpoint** [13] - 10:3, 10:9, 10:16, 125:24, 125:25, 161:11, 161:20, 162:17, 163:14, 194:1, 194:7, 194:11, 211:10

**viewpoint-discriminatory** [1] - 161:11

**viewpoints** [1] - 177:25

**views** [2] - 15:11, 84:7

**vindicate** [1] - 183:18

**violated** [1] - 196:16

**violation** [7] - 7:25, 14:21, 158:20, 178:20, 182:22, 197:4, 198:25

**viral** [1] - 20:16

**virtue** [1] - 180:11

**vis-à-vis** [2] - 186:6, 186:7

**visit** [2] - 26:9, 130:13

**visited** [3] - 121:6, 121:7, 121:9

**visits** [1] - 12:17

**visual** [3] - 87:22, 88:10, 188:23

**vital** [1] - 128:5

**vitally** [5] - 25:24, 29:4, 32:19, 42:14, 85:23

**vitiate** [1] - 212:8

**vivid** [1] - 176:8

**vocabulary** [1] - 204:4

**voice** [1] - 182:17

**volunteered** [1] - 115:16

**vote** [1] - 209:20

**vs** [1] - 1:5

**vu** [1] - 7:17

**Vucci** [32] - 4:12, 17:8, 17:9, 17:11, 18:2, 18:18, 18:25, 19:1, 19:5, 19:25, 20:20, 32:5, 45:23, 79:13, 88:18, 94:8, 101:11, 103:9, 107:14, 111:13, 115:2, 117:18, 156:24, 159:10, 160:3, 176:8, 176:12, 201:18, 205:25, 212:6, 212:11, 212:24

**VUCCI** [2] - 3:3, 18:5

**Vucci's** [2] - 113:22, 205:11

**W**

**wait** [1] - 31:7

**waiting** [4] - 34:17, 35:4, 36:4, 81:19

**waive** [1] - 21:6

**walk** [8] - 26:21, 33:4, 43:14, 43:15, 44:11, 150:8, 151:3, 166:4

**walking** [5] - 44:15, 44:17, 50:10, 50:13, 111:19

**walks** [1] - 35:1

**Walmart** [1] - 212:15

**wants** [6] - 59:1, 140:17, 195:24, 207:20, 210:8, 210:10

**warned** [2] - 177:9, 177:20

**Washington** [14] - 1:6, 1:17, 1:23, 2:4, 18:20, 19:6, 57:14,

96:6, 96:10, 99:7, 99:8, 180:6, 190:10, 215:14

**Washington-based** [2] - 57:14, 180:6

**watch** [1] - 164:14

**watched** [1] - 148:20

**watching** [4] - 101:23, 123:23, 127:9, 148:11

**water** [10] - 18:9, 28:14, 34:19, 110:13, 111:2, 128:6, 129:2, 145:15, 190:23, 202:6

**wave** [1] - 110:3

**ways** [3] - 11:1, 107:3, 126:2

**wearing** [1] - 184:14

**web** [1] - 127:13

**website** [23] - 30:7, 48:20, 51:12, 53:20, 53:24, 54:10, 55:17, 59:25, 60:12, 60:18, 61:3, 63:19, 64:7, 67:18, 67:23, 84:4, 84:8, 96:22, 127:1, 140:2, 166:14, 212:14

**websites** [4] - 48:5, 65:24, 66:2, 88:3

**wedded** [2] - 103:11, 103:13

**week** [10] - 28:3, 79:1, 79:19, 79:20, 115:4, 144:18, 147:1, 148:21, 181:11, 197:22

**weekends** [1] - 71:11

**weeks** [5] - 36:9, 77:23, 115:23, 124:16, 127:22

**weird** [1] - 195:15

**well-established** [1] - 109:9

**well-versed** [2] - 37:19, 140:10

**West** [16] - 69:17, 69:21, 70:1, 70:15, 83:12, 113:2, 118:1, 129:25, 130:19, 131:1, 131:23, 132:11, 132:13, 143:12, 144:1, 144:9

**west** [5] - 57:1, 62:20, 64:25, 114:24, 111:25

**whatsoever** [1] - 10:3

**WHC** [1] - 100:4

**whichever** [2] - 189:20, 205:16

**White** [250] - 4:10, 4:11, 7:25, 9:17, 9:21, 10:16, 12:22, 14:2, 14:18, 15:10, 16:21, 19:8, 19:11, 19:12, 21:17, 22:2, 22:12, 22:15, 22:19, 22:22, 25:8, 36:7, 36:22, 36:25, 37:4, 41:21, 43:4, 43:8, 43:11, 44:22, 45:1, 45:8, 45:12, 45:14, 46:21, 47:1, 47:25, 49:11, 49:24, 50:10, 50:15, 51:4, 54:14, 56:8, 57:23, 58:2, 60:15, 64:25, 74:7, 74:15, 74:16, 80:10, 80:20, 81:1, 81:6, 81:13, 81:19, 82:9, 83:1, 83:2, 89:24, 90:10, 90:13, 91:7, 91:12, 93:8, 93:11, 93:21, 94:1, 94:12, 94:19, 95:11, 95:19, 95:25, 98:3, 98:16, 99:24, 100:1, 101:22, 106:11, 106:13, 106:16, 106:17, 107:6, 107:8, 107:10, 109:2, 110:14, 110:22, 111:20, 113:5, 113:6, 113:14, 113:18, 113:20, 113:24, 115:3, 115:5, 117:20, 117:22, 117:24, 117:25, 118:19, 119:9, 120:1, 121:2, 121:13, 121:14, 123:16, 123:19, 124:15, 125:8, 125:22, 125:24, 126:16, 126:24, 127:8, 127:11, 127:16, 127:17, 129:12, 129:17, 130:24, 131:18, 132:7, 132:17, 132:19, 132:22, 133:1, 133:6, 133:7, 133:10, 133:13, 134:1, 134:5, 134:10, 134:11, 134:12, 134:13, 134:15, 134:16, 134:17, 134:21, 135:19, 135:23, 136:9, 136:10, 136:11, 137:18, 138:6, 138:10, 138:12, 138:13,

138:25, 140:2, 140:9, 140:14, 140:15, 140:16, 140:18, 141:12, 141:15, 141:16, 141:18, 142:5, 143:6, 143:15, 143:22, 147:23, 147:25, 150:19, 151:6, 152:3, 152:10, 153:23, 153:25, 155:21, 156:25, 157:4, 158:12, 158:16, 158:21, 159:3, 159:21, 159:25, 160:9, 160:11, 160:24, 161:14, 162:2, 162:3, 162:21, 164:3, 164:4, 164:8, 165:4, 165:5, 165:6, 165:10, 165:15, 165:19, 165:21, 166:6, 166:12, 167:9, 167:11, 167:12, 167:18, 167:20, 168:10, 168:18, 168:23, 169:3, 169:19, 169:20, 170:6, 170:17, 171:1, 173:22, 173:23, 174:16, 176:21, 180:19, 181:20, 181:22, 181:23, 182:23, 182:25, 186:18, 186:20, 187:21, 191:2, 191:8, 191:24, 195:22, 196:23, 196:24, 197:20, 200:17, 201:11, 204:4, 204:22, 206:14

**WhiteHouse.gov** [1] - 126:25

**whole** [5] - 85:6, 85:16, 158:9, 175:16, 184:15

**wide** [3] - 27:16, 27:23, 33:22

**widely** [1] - 117:5

**wider** [2] - 171:3, 171:4

**widespread** [1] - 196:13

**widest** [2] - 170:18, 171:2

**wild** [2] - 13:25, 86:10

**wildest** [2] - 40:3, 40:18

**Wiles** [4] - 160:12,

160:15, 165:5, 165:9
**win** [2] - 79:20, 205:15
**window** [1] - 161:18
**wing** [6] - 57:1, 62:20, 65:1, 111:24, 111:25, 118:10
**winning** [1] - 65:9
**wire** [30] - 29:2, 39:5, 51:7, 64:18, 84:20, 100:14, 100:25, 101:1, 101:3, 101:13, 101:18, 102:23, 108:11, 109:5, 117:4, 117:14, 147:25, 154:24, 155:25, 156:3, 156:5, 156:12, 156:13, 168:20, 168:21, 169:1, 169:20, 169:25, 170:5
**wired** [2] - 28:20, 28:22
**wires** [1] - 109:10
**wish** [6] - 6:2, 59:8, 62:9, 71:13, 78:21, 84:15
**WITNESS** [63] - 3:2, 18:5, 18:7, 18:10, 18:23, 19:1, 23:3, 26:25, 30:15, 31:17, 31:20, 31:23, 38:25, 39:9, 42:9, 46:8, 71:13, 76:14, 77:4, 77:13, 77:18, 77:25, 78:8, 78:11, 78:13, 78:20, 78:24, 79:7, 79:9, 80:19, 82:7, 82:16, 82:24, 84:20, 84:23, 84:25, 86:25, 89:6, 89:16, 89:18, 93:5, 93:19, 93:24, 95:15, 97:15, 99:16, 99:20, 100:14, 100:19, 102:14, 106:22, 119:8, 122:8, 122:24, 129:1, 133:12, 133:25, 137:7, 138:22, 140:24, 147:19, 148:17, 149:12
**witness** [11] - 5:12, 6:2, 32:1, 41:25, 49:4, 64:25, 89:7, 105:2, 106:5, 149:13, 157:1
**witness's** [2] - 90:2, 137:3
**witnesses** [8] - 6:12, 6:14, 6:17, 16:15, 16:17, 17:8, 151:10,

184:3
**witnessing** [1] - 176:13
**Women's** [5] - 74:14, 127:4, 135:22, 145:2, 158:13
**women's** [3] - 75:25, 200:8, 201:23
**won** [1] - 36:19
**wonderful** [1] - 25:5
**wondering** [1] - 161:22
**wonky** [1] - 210:18
**word** [8] - 104:22, 104:23, 180:21, 188:23, 190:8, 191:14, 202:22, 210:24
**words** [16] - 8:4, 47:8, 77:1, 86:13, 102:22, 103:19, 103:20, 146:15, 159:4, 165:9, 174:15, 181:13, 189:25, 193:9, 194:2, 205:10
**works** [8] - 37:20, 41:16, 48:10, 53:10, 54:1, 82:5, 102:10, 136:14
**workspace** [1] - 108:8
**world** [19] - 20:16, 25:1, 37:8, 42:11, 63:11, 86:23, 86:24, 87:1, 96:9, 96:22, 99:1, 106:17, 108:13, 108:17, 114:12, 123:6, 125:14, 148:7
**worldwide** [1] - 170:22
**worst** [1] - 38:22
**worthless** [1] - 28:18
**worthy** [6] - 108:1, 108:24, 109:2, 109:3, 109:5, 109:18
**wrangler** [1] - 94:19
**wranglers** [1] - 99:25
**writ** [2] - 125:14, 188:21
**write** [8] - 96:20, 96:24, 99:4, 100:14, 103:1, 103:2, 109:18, 114:6
**write-through** [1] - 103:1
**write-throughs** [1] - 103:2
**writer** [1] - 41:8
**writes** [1] - 135:3
**writing** [2] - 10:6,

112:14
**written** [6] - 10:7, 102:8, 106:18, 113:12, 162:16, 188:23

## Y

**Yale** [1] - 188:15
**yards** [1] - 104:17
**year** [12] - 31:15, 41:7, 56:18, 56:19, 77:12, 77:24, 78:7, 78:8, 78:10, 82:15, 129:10
**Year's** [1] - 123:10
**years** [15] - 19:8, 19:15, 19:20, 23:8, 41:19, 43:11, 43:12, 46:4, 46:5, 55:16, 88:14, 90:9, 123:18, 140:8, 143:9
**yelling** [1] - 87:8
**yells** [2] - 73:3, 73:4
**yes's** [1] - 144:15
**yesterday** [9] - 74:14, 74:16, 127:4, 140:2, 145:1, 158:11, 158:12, 200:8, 201:3
**yesterday's** [1] - 135:21
**Yogi** [1] - 7:16
**York** [7] - 1:20, 53:4, 87:7, 87:14, 156:4, 212:21
**Youngstown** [2] - 187:8, 194:23
**yourself** [1] - 170:23
**yourselves** [1] - 4:4
**YouTube** [6] - 126:25, 127:7, 127:13, 164:6, 172:17, 172:19
**Yuri** [1] - 64:12

## Z

**ZEKE** [3] - 3:6, 89:16, 90:6
**Zeke** [9] - 4:9, 26:6, 27:1, 31:3, 31:24, 57:11, 85:10, 89:11, 90:6
**Zelensky** [17] - 36:13, 36:16, 37:24, 39:17, 64:21, 64:25, 66:19, 86:9, 86:22, 87:1, 87:9, 121:6, 130:13, 157:23,

184:12, 184:14, 185:5
**Zelensky's** [2] - 36:20, 37:2
**Zemel** [3] - 15:20, 186:17, 187:23
**zero** [1] - 120:20

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **ASSOCIATED PRESS**, |
| Plaintiff, |
| v. |
| **TAYLOR BUDOWICH**, in his official capacity as White House Deputy Chief of Staff, *et al.*, |
| Defendants. |

Case No. 1:25-cv-00532 (TNM)

## <u>MEMORANDUM ORDER</u>

About two months ago, President Donald Trump renamed the Gulf of Mexico the Gulf of America.  The Associated Press did not follow suit.  For that editorial choice, the White House sharply curtailed the AP's access to coveted, tightly controlled media events with the President.  The AP now sues the White House chief of staff, her communications deputy, and the press secretary (collectively, "the Government"), seeking a preliminary injunction enjoining the Government from excluding it because of its viewpoint.

Today, the Court grants that relief.  But this injunction does not limit the various permissible reasons the Government may have for excluding journalists from limited-access events.  It does not mandate that all eligible journalists, or indeed *any* journalists at all, be given access to the President or nonpublic government spaces.  It does not prohibit government officials from freely choosing which journalists to sit down with for interviews or which ones' questions they answer.  And it certainly does not prevent senior officials from publicly expressing their own views.

No, the Court simply holds that under the First Amendment, if the Government opens its doors to some journalists—be it to the Oval Office, the East Room, or elsewhere—it cannot then shut those doors to other journalists because of their viewpoints. The Constitution requires no less.

## I.  BACKGROUND

The White House has been abuzz with journalists for nearly 150 years.  *See* Am. Compl., ECF No. 26, ¶ 37.  Today, about 1,355 reporters have access to the White House in some capacity.  Not all journalists enjoy the same level of access though, and White House reporters are split into two main groups.

The first is the "press pool"—one or two percent of credentialed White House journalists. The press pool (1) attends limited-space events in the Oval Office, the Cabinet Room, and elsewhere; (2) travels with the President domestically and abroad on Air Force One; and (3) attends any other limited-access events to which the President may invite them, including at his personal home in Mar-a-Lago.  Decl. of Taylor Budowich, ECF No. 33-1, ¶¶ 6–10.  The press pool acts as "the eyes and ears of the full press corps, of news outlets outside of Washington, DC, and of the public."  Am. Compl. ¶ 31.  Traditionally, the pool has had a set number of spots distributed between different types of media; those spots have rotated between "well-established" outlets.  Gov't Opp'n Br., ECF No. 33, at 11.[1]  And the AP had two permanent spots—one print reporter and one photographer—for over a century.   Gov't Opp'n Br. at 11; Am. Compl. ¶ 40; Second Decl. of Zeke Miller, ECF No. 27-5, ¶ 5.

---

[1]  This opinion uses CM/ECF pagination rather than internal pagination.

The second group of journalists is the larger White House press corps, currently numbering well above 1,000 members.  Budowich Decl. ¶¶ 3–4.  They undergo a rigorous application process to earn a "hard pass," a credential allowing general access to all White House press facilities between 5:30 a.m. and 10:30 p.m.  *Id.*; Gov't Opp'n Br. at 9; *see generally Ateba v. Leavitt*, --- F.4th ---, No. 24-5004, slip op. at 3–6 (D.C. Cir. 2025).  The D.C. Circuit has imbued these hard passes with significant due process protections.  *See Sherrill v. Knight*, 569 F.2d 124, 126 (D.C. Cir. 1977).  Press pool members also belong to this larger, second group.  Journalists without hard passes can still attend events at the White House, but they must seek a temporary "day pass" from the Secret Service.  Gov't Opp'n Br. at 9.

The White House has long voluntarily opened certain spaces for hard pass holders to report on the news of the day.  *Id.* at 8–9; *Sherrill*, 569 F.2d at 129.  Prime among them is the James S. Brady Briefing Room, which has 49 seats that 65 media outlets occupy or share to receive daily press briefings from the White House press secretary.  Budowich Decl. ¶ 4; Gov't Opp'n Br. at 9.  The AP has the front-row, center seat in that room.  Gov't Opp'n Br. at 9; Second Miller Decl. ¶ 15.  Then there is the East Room, which can accommodate up to 180 journalists for press conferences, meetings with foreign leaders, and the like.  Budowich Decl. ¶ 12.  Journalists may RSVP for the East Room and similar space-capped events through an online tool.  *Id.* ¶ 13.  Other areas have acquired nicknames over the years, including "Pebble Beach," a space on the north grounds where television journalists record standups, and the South Lawn, where Marine One arrives and departs.  *Id.* ¶ 4.

### A. The Press Pool

There are several iterations of the press pool of varying sizes for different spaces.  Pl. Ex. A to Second Miller Decl., ECF No. 27-6.  For example, the "in-house pool" that attends most

White House events in the Oval Office and other small spaces has 21 members. *Id.* at 2. The

smallest iteration travels with the President on Air Force One and includes only 13 journalists.

*Id.* The pool has historically included four photographers, three network television journalists, a

radio correspondent, three wire reporters, and one print reporter. Second Miller Decl. ¶ 7.

News wire services, like the AP, are syndicated outlets that distribute their text reporting

and photography by "wire" to subscribers across the country and the globe. *Wire Service*,

Merriam Webster (2025) [https://perma.cc/9H6G-JNAC]. So wire services generally have the

broadest reach. Am. Compl. ¶ 38. The AP, for example, boasts that "[m]ore than half the

world's population sees AP journalism every day." *Associated Press: Advancing the Power of*

*Facts*, AP.org (2025) (bottom page caption) [https://perma.cc/DU66-VCDD]. Local news

outlets are particularly reliant on wire services for news from Washington, D.C. *The Role of*

*Wire Services*, Pew Rsch. Ctr. (Dec. 3, 2015) [https://perma.cc/HWW3-4CG5].

Getting a spot in any version of the press pool has always been difficult. At minimum,

journalists needed to be hard-pass holders. But that was not enough. Gov't Opp'n Br. at 10.

Eligible journalists still had to be selected by the White House Press Correspondents'

Association ("WHCA"), a private entity that controlled the pool's composition. Budowich Decl.

¶ 8; Compl., ECF No. 1, ¶¶ 22–25. The AP says that the WHCA had always prioritized wire

services because they have the "broadest reach." Am. Compl. ¶ 38. The AP was a founding

member of the WHCA. *Id.* ¶ 37.

Seniority offered privileges. The AP was "guaranteed" two of the 13 core spots in the

pool. Budowich Decl. ¶ 8. And the AP's photographer was always "the line leader" and "first

person through the door." Hr'g Tr., ECF No. 45, at 43:10–17, 82:24. The remaining pool seats

typically rotated among the largest and most well-established media companies. Gov't Opp'n

Br. at 11; Hr'g Tr. at 97:15–24.  Generally, a member of the White House communications office

joined to document the President's activities and prepare its own press releases.  Hr'g Tr. at

106:12–107:11 (Miller testimony).  The White House maintained editorial control of its own

media team.  *Id.*

But during this litigation, press pool procedures abruptly changed.  White House Press

Secretary Karoline Leavitt announced on February 25 that the Government—not the WHCA—

would now choose which hard pass holders gained access to the press pool.[2]  Notice, ECF No.

22, at 1.  She said that the Government wanted to promote "new media" that "historically" "have

long been denied the privilege" of participating in the pool.  *Id.*; White House, Press Secretary

Karoline Leavitt Briefs Members of the Media, YouTube (Feb. 25, 2025), at 5:30–7:30

[https://perma.cc/F3ZN-MMW7].  According to the AP, the practical result has been that the

newly arranged press pool trades out one wire service seat and one photography seat for two

"new media" seats, leaving one rotating wire service seat.  *See* Pl. Reply Br., ECF No. 37, at 25.

The White House has permitted a second wire service reporter at some pool events—just not the

AP.  Am. Compl. ¶ 84.  In fact, during the pendency of this litigation, one or both of the other

two wire services have always obtained a press pool slot.  *See* Pl. Ex. D to Third Miller Decl.,

ECF No. 37-6.  The WHCA continues to assign, "at the White House's discretion," the seats in

the Brady Briefing Room.  Budowich Decl. ¶ 4.  In short, new media has benefitted at AP's

expense under the new management.  Little else has changed.

The Government maintains that under these new procedures, "[t]here is no categorical

ban on media outlets that are critical of the President or that refuse to use the proper name for the

Gulf of America."  Gov't Opp'n Br. at 12.  Indeed, it has continued to admit outlets to the pool,

---

[2]  The AP does not challenge the Government's decision to take control of this process.

such as the New York Times, that "have been highly critical of the President and have continued to refer to the former name." *Id.* In fact, all members of the original press pool have continued to use the Gulf of Mexico name while noting President Trump's order. Am. Compl. ¶ 85.

So why has the AP alone been penalized? The AP claims, and the Court now finds, that the Government has singled out the AP because of its refusal to update the Gulf's name in its Stylebook, an influential writing and editing guide. Am. Compl. ¶ 13. On February 11, shortly after the AP refused to rename the Gulf, Leavitt summoned AP Chief White House Correspondent Zeke Miller to her office. Am. Compl. ¶ 49. "She told [Miller] that, at President Trump's direction, the AP would no longer be permitted in the Oval Office as part of the press pool until and unless the AP revised its Stylebook" to use Gulf of America instead. *Id.*

Later that day, an AP text journalist was barred from an executive order signing and press conference with Elon Musk in the Oval Office that was open to the press pool. *Id.* ¶ 54. That night, an AP reporter again was excluded from a press pool event in the Diplomatic Reception Room. *Id.* ¶ 56. The AP photographer still could attend that event. *Id.* But for the AP's text reporting, journalists had to wait for a video feed to issue breaking news alerts, which "caused delays." *Id.*

Two days later, the Government barred the AP altogether from attending three other Oval Office press pool events. *Id.* ¶ 61. The AP protested. *Id.* ¶ 62. In response, Deputy Chief of Staff Taylor Budowich issued a stronger statement: "The Associated Press continues to ignore the lawful geographic name change of the Gulf of America." @Taylor47, X (Feb. 14, 2025) [https://perma.cc/KB7A-HUVB]. He acknowledged that "their right to irresponsible and dishonest reporting is protected by the First Amendment," but stressed that "it does not ensure their privilege of unfettered access to limited spaces, like the Oval Office and Air Force One."

*Id.* After this statement issued, the AP was not allowed on an Air Force One flight to Palm Beach. Am. Compl. ¶¶ 64, 67.

On February 18, White House Chief of Staff Susan Wiles responded to the AP's repeated complaints. Pl. Ex. B to Second Pace Decl., ECF No. 28-2, at 2. She said that the AP's "Stylebook" had "misused, and at times weaponized" its "influence" to "push a divisive and partisan agenda." *Id.* "[T]he guidance relating to the renamed Gulf of America should be appropriately reflected, not denied. . . . Denying such, denies the appropriate authority of the duly elected President. . . . [We] remain hopeful that the name of the water body in question will be appropriately reflected in the Stylebook where American audiences are concerned." *Id.*

Later that day, the President publicly stated that the AP "ha[d] been very, very wrong on the election, on Trump and the treatment of Trump," and that "they're doing us no favors and I'm not doing them any favors." Am. Compl. ¶ 69. The AP had been barred from the press conference at Mar-a-Lago where he said this. *Id.* Four days later, an AP photographer and text journalist were barred from the Republican Governors Association dinner in Washington, D.C., a press-pool event, where the President delivered remarks asserting that he was "holding [the AP] out of any news conferences" because of the AP's "Gulf-of-Mexico" terminology. *Remarks by President Trump at Republican Governors Association*, The White House (Feb. 20, 2025) [https://perma.cc/MF2F-CYNG].

Since then, the AP's hard pass holders have not been admitted to meetings like President Trump's Oval Office discussion with Ukrainian President Volodymyr Zelenskyy and his meeting with Polish President Andrzej Duda at a Maryland convention center. Am. Compl. ¶¶ 76, 90. The AP's veteran White House photographer, Evan Vucci, testified that a Ukraine-based AP videographer managed to get into the Zelenskyy meeting as part of Zelenskyy's entourage. Hr'g

Tr. at 36:16–40:22 (Vucci testimony).  But even so, the AP's reporting quality suffered.  *Id.*  The foreign correspondent did not transmit photos and text updates live, so the AP had to wait for the long meeting to conclude before issuing photography, "40 minutes behind" competitors.  *Id.* at 39:21–40:8.  More, because the foreign correspondent specialized in video rather than photography, he did not produce images that conformed to the usual AP standards.  *Id.* at 37:15–38:22.

        In sum, AP hard pass holders have not been admitted in any form or fashion to the press pool since February 14.  Hr'g Tr. at 117:23–118:2; 146:19–24 (Miller testimony and redirect).  And although the Government claims the AP is still "eligible" for these pool events, this eligibility hinges on the outlet changing its terminology.  Suppl. Decl. T. Budowich, ECF No. 40-1, ¶ 3; Hr'g Tr. at 190:10–13.  The Government offers no reason besides the Gulf issue for the exclusion.  Hr'g Tr. at 190:14–24 (Government counsel: "[A]lthough the AP is eligible, like any hard pass holder, to be selected, they are not being selected. . . .  And they're not being selected, as I understand it – and I think the record is clear . . . because they refuse to adhere to what the President believes is the law . . . that the body of water is called the Gulf of America.  That is my understanding of why they are not in the Oval Office.").

### B.  East Room and Limited-Access Events

        Now consider the larger, pre-credentialed media events.  The AP complains that it has been systematically excluded from nearly every East Room event and other large limited-access briefings open to the broader White House press corps.  Am. Compl. ¶ 3.  The Government contests that the AP's concerns are unfounded.  Gov't Opp'n Br. at 7, 13 (stating that the AP "enjoy[s] the same general media access to the White House press facilities as all other hard pass holders").  The AP journalists, it says, are "eligible, at the President's discretion, to be admitted

to those events" by the reservation process.  Budowich Decl. ¶ 15.  The parties agree that no AP employee's hard pass has been revoked.  Gov't Opp'n Br. at 9.

The Court finds that the AP indeed has been excluded from large events far more often than its peers.  Hr'g Tr. at 79:18–80:4 (Vucci cross) ("[B]efore, if there w[ere] ten events that week, we would be in all ten.  Now, [] it's a win for us to get into one event a week. . . .  [M]y competitors . . . are going into these things every single day."); Pl. Ex. B to Second Miller Decl., ECF No. 27-7, at 2–4 (detailing East Room and similar limited-access events on February 13, 20, 24, and 27 that the AP was not allowed to attend); Pl. Ex. A to Third Decl. of Zeke Miller, ECF No. 37-3, at 2–5 (detailing limited-access events on March 3, 5, and 14 that the AP was excluded from and on March 12 allowing only the photographer without the text journalist).

At an evidentiary hearing, the AP's witnesses made clear that its text reporters have been systematically and almost completely excluded from events open to the broader White House press corps since February 13, while its photographers have suffered curtailed access.  The Government declined to offer witnesses in rebuttal.  The Court credits the detailed timeline that the AP built through testimony and evidence.

On February 13, two days after Leavitt's first indication of the Government's displeasure, an AP text journalist was barred from an East Room press conference, though an AP photographer was allowed to attend.  Am. Compl. ¶ 60; Second Miller Decl. ¶¶ 24–25.  Miller testified that another journalist told him that he did not RSVP as Miller had, but that the other journalist was still admitted to the event.  Hr'g Tr. at 118:12–119:12.  The next week, in West Palm Beach, the Government excluded the AP from an executive-order signing ceremony and from the President's subsequent speech.  Am. Compl. ¶¶ 67–68.  Two days later, the AP was barred from the East Room for a Black History Month reception open to dozens of White House

press corps members, even though it had a confirmed RSVP.  Pl. Ex. B to Second Miller Decl. at

3; Hr'g Tr. at 136:5–15.  In late February, AP journalists were excluded from the National

Governors Association Evening Dinner in the East Room.  Am. Compl. ¶ 76.

Sometimes, *foreign* AP correspondents got into White House events.  French President

Macron and British Prime Minister Starmer visited the East Room for press conferences.  Gov't

Opp'n Br. at 13.  AP correspondents from these countries attended the press conferences as part

of the foreign dignitaries' entourages.  *Id.*; Hr'g Tr. at 132:19–133:18 (Miller cross); Am.

Compl. ¶ 79 ("[A] Paris-based AP reporter flown overseas at the AP's expense *was* permitted to

enter the East Room—but only as part of President Macron's press pool.").  But the AP's hard

pass holders were not admitted to either event.  Second Decl. of Julie Pace, ECF No. 27-2, ¶¶ 5–

6; Am. Compl. ¶ 77.  Admittedly, these were limited-access events to which many journalists

could not gain admission.  Gov't Opp'n Br. at 13.  For the event with Macron, 310 media

members requested access and only 136 received it; for the event with Starmer, 308 asked to

attend and only 172 were allowed.  Budowich Decl. ¶¶ 17–18.

The AP also has been excluded from limited-access press events beyond the White

House.  For example, members of the broader White House press corps usually observe the

President alight from Air Force One on a nonpublic airport tarmac in West Palm Beach and

elsewhere.  *Id.* ¶ 19; Am. Compl. ¶ 19; Hr'g Tr. at 70:6–8.  The AP contends that there are "no

space constraints whatsoever on the airport tarmac" yet it was still prohibited from accessing this

reporting space on February 28.  Hr'g Tr. at 69:16–18 (government implying agreement); Am.

Compl. ¶¶ 12, 92.  Nonetheless, its photographers and text journalists have been admitted to all

subsequent tarmac events.  Hr'g Tr. at 136:17–21 (Miller cross).

AP reporters were also excluded from President Trump's March 14 speech at the Department of Justice in its "sizable Great Hall" even though the Government opened it to the press pool and DOJ-credentialed media.  Third Decl. of Zeke Miller, ECF No. 37-2, ¶ 11. Finally, the Government refused the AP access to the First Lady's Capitol Hill event and the Vice President's Texas event in a large park near the U.S.-Mexico border.  *Id.* ¶ 12.

As winter has turned to spring, the AP's freeze out has thawed slightly.  In March, the Government began allowing AP photographers into some East Room and limited-access events while continuing to bar its text journalists.  On March 12, an AP photographer gained access to the East Room for a St. Patrick's Day reception with the President and the Taoiseach of Ireland, though the text journalist was rejected.  Third Miller Decl. ¶ 10.  Ditto for an education executive order signing, a Greek Independence Day celebration, and a Women's Day Event in the East Room, held on March 20, 24, and 26 respectively.  Hr'g Tr. at 144:18–145:6 (Miller cross), 73:23–74:5 (Vucci cross).  An AP text reporter was also excluded from the Women's Day event even though the Government had approved the RSVP.  *Id.* at 200:7–19.  (The Government proffered without evidence that a security issue required excluding 40 confirmed RSVPs.  *See id.*).

The Government's questioning on cross-examination implied that the AP has had at least one journalist or photographer in every "pre-credentialed media event," that is, every limited-access event open to the White House press corps.  Hr'g Tr. at 129:6–12.  The Court credits the AP's abundant evidence and testimony that this is incorrect.  *E.g.*, Pl. Ex. B to Second Miller Decl. (detailing "pre-credentialed" limited-access events on February 13, 20, 24, and 27 that AP was not allowed to attend); Pl. Ex. A to Third Miller Decl. at 2–5 (detailing limited-access events

on March 3, 5, and 14 that AP was excluded from and on March 12 allowing only the

photographer without the text journalist).

      In sum, the Court credits the AP's testimony and evidence that its text journalists have

been systematically banned from large, limited-access events open to the entire White House

press corps since, at the latest, February 13.  Hr'g Tr. at 132:10–18 (Miller testimony); Am.

Compl. ¶ 60 (detailing the first East Room exclusion on February 13).  The Court also credits the

AP's testimony and evidence that its photographers have experienced more limited access to

such events compared to other hard pass holders.  Hr'g Tr. at 79:18–80:5 (Vucci cross).

### C.  Procedural History

      The AP filed this suit on February 21, 2025, about ten days after the first signs of its

exclusion from the press pool.  *See* Compl.  After a subsequent hearing, the Court denied the

AP's motion for a temporary restraining order.  Order, ECF No. 18.  Among other reasons, the

Court noted that there were "differences between this case and prior cases that ma[d]e full

briefing particularly important."  Hr'g Tr., ECF No. 19, at 57:13–18.  *Sherrill v. Knight*, 569

F.2d 124 (D.C. Cir. 1977), the leading case on White House press access, dealt with hard passes.

*Id.*  But both parties agreed that the AP's hard pass status had been unchanged.  *Id.* at 57:19–21.

More, there were important contested questions about the scope of the AP's ban and the resulting

effect on its business.  *Id.* at 57:19–58:3.  The Court thus ordered expedited briefing for a

preliminary injunction and allowed both parties to present up to two live witnesses.  *Id.* at 57:2–

7; 03/13/2025 Min. Order.  The AP presented its two most senior hard pass holders.  The

Government offered no witnesses.  The issues are now fully briefed and ripe for consideration.

## II.  LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right," but as an exercise of discretion by a court sitting in equity.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The movant faces a high bar for success, as it must establish four elements "upon a clear showing": (1) that it is likely to succeed on the merits; (2) that it likely will suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities supports granting the relief; and (4) that the public interest favors the injunction.  *Id.* at 20, 22.  Where, as here, the Government is the party opposing injunctive relief, the latter two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A district court should hold an evidentiary hearing and make factual findings if faced with disputed issues of material fact on a motion for a preliminary injunction.  *See Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004).  These findings of fact receive "special deference" on appeal and will not be disturbed absent clear error.  *City of Las Vegas v. Lujan*, 891 F.2d 927, 931 (D.C. Cir. 1989).  Given the contested factual issues here, the Court held such a hearing, and its factual determinations are reflected in this Memorandum Order.

## III.  ANALYSIS

### A.  First Amendment History

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.

By now these words are familiar.  But at the founding, their necessity and import were hotly debated.  Indeed, the Anti-Federalists resisted ratification of the Constitution until it

contained an express guarantee of a free press, among other things. *See* Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L. J. 246, 296–99 (2017); *see also* Andrew S. Oldham, *The Anti-Federalists: Past As Prologue*, 12 NYU J. L. & Liberty 451, 456 (2019) ("[T]he Anti-Federalists' papers [help] to elucidate the original public understanding of the Constitution.").[3]  Pseudonymic writer Philadelphiensis, for instance, stressed that the free press was "the scourge of tyrants, oppressors, villains, and bloodsuckers; the bulwark of freedom, that causes the haughtiest lordling to tremble; an inestimable jewel, that places the poorest citizen on a level with the richest demagogue." 3 *The Complete Anti-Federalist* 124 (Herbert J. Storing, ed., 1981).  Federal Farmer likewise argued that "the freedom of the press is a fundamental right" that "ought not to be restrained by any taxes, duties, or in any manner whatever." 2 *The Complete Anti-Federalist* 329 (Herbert J. Storing, ed., 1981).  And he feared that the right could be eroded if it were not explicitly enshrined in the new Constitution. *Id.* at 329–30.  It is no spoiler to reveal that the Anti-Federalists' position here triumphed.  The precious right was ultimately protected in parchment.

But that was only half the battle.  Liquidation of this right's reach came next.  In 1789, Representative Aedanus Burke believed newspapermen reporting from the floor of the House chamber "misrepresented the[] debates in the most glaring deviations from the truth, often distorting the arguments of the members from the true meaning." 1 Annals of Cong. 917

---

[3]  The founding generation likely saw more pronounced distinctions between the freedom of speech and the freedom of the press than modern doctrine allows.  Campbell, 127 Yale L. J. at 298–99.  But the concepts were "equivalent as natural rights," meaning the founders understood their right to speech included the right to disseminate their "well-intentioned statements of one's thoughts." *Id.* at 286, 288–89.

(1789).[4]  So he introduced a resolution to censure them.  Burke's resolution would bar newspapers from reporting on House debates altogether or, at the least, remove reporters from the House floor and relegate them to the public gallery.  *Id.* at 952, 954.

But it was Burke who would be rebuked.  Congressmen lined up to condemn his proposal.  James Madison stressed that it was "improper to throw impediments in the way" of the reporting "as the House had hitherto permitted from the purest motives."  *Id.* at 919–20.  Representative Thomas Hartley proclaimed that Burke's resolution was "an attack upon the liberty of the press."  *Id.* at 919.  Other members agreed.  *See id.* at 918.  Burke ultimately withdrew the resolution.  *Id.*  In the aftermath, the House settled on a practice of reserving space for reporters on the House floor but permitting the reporters to allocate the slots among themselves.  *See* Elizabeth Gregory McPherson, *Reporting the Debates of Congress*, 28 Quarterly J. Speech 141, 142 (1942); Congressional Rsch. Serv., *Congressional News Media and the House and Senate Press Galleries,* at 1 (Apr. 13, 2017).  The Senate took a similar approach, and it soundly rejected an effort by a senator several decades later to exclude reporters from the upper house chamber.  *See* Second Brief for the Knight First Amendment Institute at Columbia University as Amicus Curiae in Support of Plaintiff, ECF No. 41-1, at 20–22.

To be sure, as anyone familiar with the Sedition Act knows, the Founding Fathers did not always live up to the promise of the First Amendment.  For instance, the Sedition Act of 1798 made it a crime to "publish[] any false, scandalous and malicious writing or writings against the government of the United States."  1 Stat. 596 (1798).  Yet the Act faced immediate constitutional challenges.  *See, e.g.*, James Madison, *Virginia Resolutions of 1798*, 4 The Debates

---

[4]  This anecdote, among others, comes from the Knight First Amendment Institute's helpful amicus brief.  ECF No. 41-1.  The Court acknowledges the many amici who offered their valuable insights to this case.

in the Several State Conventions on the Adoption of the Federal Constitution, 553–54 (1836)

(state resolution declaring the Act "exercises . . . a power not delegated by the Constitution, but,

on the contrary, expressly and positively forbidden").  The next President promptly pardoned all

those who had been convicted under the Sedition Act on constitutional grounds, and Congress

ultimately repaid their fines, agreeing that the Act had been unconstitutional.  *See* Second Brief

for the Knight Institute as Amicus Curiae at 11; *see also N.Y. Times Co. v. Sullivan*, 376 U.S.

254, 276 (1964) ("Although the Sedition Act was never tested in this Court, the attack upon its

validity has carried the day in the court of history.").

These immediate and forceful backlashes to attacks on the press underscore how

Americans understood the First Amendment in the early centuries.  They saw this foremost

protection as safeguarding their natural right to heap honest criticism upon the Government

without fear of official reprisal.  *See* Campbell, 127 Yale L. J. at 280 ("[B]y the late eighteenth

century, Americans widely embraced the idea that the government could not prohibit well-

intentioned statements of one's thoughts."); *see also The People v. Croswell,* 3 Johns.Cas. 337,

352 (Sup. Ct. of N.Y. Feb. 13, 1804) ("The liberty of the press consist[s] in publishing with

impunity, truth with good motives, and for justifiable ends, whether it related to men or to

measures.").

All of this to say:  The AP's predicament comes with considerable prologue.  *See*

William Faulkner, *Requiem for a Nun* 73 (1951) ("The past is never dead.  It's not even past.").

History and tradition guide the Court's understanding of the First Amendment, but that does not

settle this matter.  Modern First Amendment caselaw—binding on this Court—is an intricate

web, and more is needed to untangle it.  *See, e.g.*, *Vidal v. Elster*, 602 U.S. 286, 311 (2024)

(Kavanaugh, J., concurring in part); *id.* at 311–17 (Barrett, J., concurring in part).  So the Court

now turns to contemporary speech doctrine.

## B.  Modern Forum Jurisprudence

In modern jurisprudence, forum analysis controls the extent to which the government

may restrict access to public property for First Amendment activities.  *Price v. Garland*, 45 F.4th

1059, 1067 (D.C. Cir. 2022).  The type of forum dictates the scope of permissible government

regulation there.  *Id.*  To classify a space, courts look to its nature, how it is used, and whether the

public has traditionally had access to it for First Amendment activities.  *Id.*  Under this rubric, the

public and the press enjoy coextensive access.  *See Branzburg v. Hayes*, 408 U.S. 665, 684

(1972) ("[T]he First Amendment does not guarantee the press a constitutional right of special

access to information not available to the public generally.").

On one end of the spectrum are traditional public fora—places that have historically

fostered societal discourse by the public.  Parks and streets are quintessential examples.  *Perry*

*Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).  The law zealously

safeguards First Amendment activities in these locations and permits only "narrowly tailored"

government interference.  *Id.*

Then comes the designated public forum, which is "government property that has not

traditionally been regarded as a public forum, but [that] the Government has intentionally opened

up for that purpose."  *Price*, 45 F.4th at 1067 (cleaned up).  To fit this description, the location

must have been opened to the public for expressive activity; not merely for a select few people or

groups.  *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021).

Think:  a state university expressly opening its meeting facilities to registered student groups.

*Widmar v. Vincent*, 454 U.S. 263, 267 (1981).  First Amendment protections for these spaces are

the same as for public forums. *Evers*, 994 F.3d at 609. That is because "[s]o long as the government chooses to retain the open character of the property, it is bound by the same standards" as a traditional public forum. *Price*, 45 F.4th at 1067–68.

On the other side of the spectrum are fora that may be more tightly regulated by the government. A nonpublic forum is "government property that is not by tradition or designation a forum for public communication"—such as "museums *and offices*." *Price*, 45 F.4th at 1068 (emphasis added). Limited-access press conferences in government facilities can also fit the bill. *Evers*, 994 F.3d at 610. Ditto for the U.S. Capitol buildings. *See United States v. Nassif,* 97 F.4th 968, 976–77 (D.C. Cir. 2024).

In nonpublic fora, restrictions on First Amendment activities are "examined only for reasonableness." *Price*, 45 F.4th at 1068. So the Government may discriminate "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). Safe to say, the Government has extensive control over access to nonpublic fora. But even in nonpublic fora, it must wield that control in a way that is viewpoint neutral and not a subterfuge "to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46. Viewpoint discrimination is an "egregious form of content discrimination," which occurs when the government "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). And the D.C. Circuit has accorded significance to government actions that "preclude some speakers from using a forum altogether" even in the nonpublic forum context. *Ateba*, No. 24-5004, slip op. at 10.

In *Evers*, for example, two journalists alleged viewpoint discrimination after being excluded from a state governor's limited-access press event in a conference room. The Seventh Circuit classified the conference room as a nonpublic forum because the "event [was] not open to the public" and the government had not otherwise "dedicated [the room] to open communication." 994 F.3d at 610. The government can properly "consider limited space constraints, address security concerns, and ensure that those in attendance will maximize the public's access to newsworthy information, and be more likely to abide by professional journalistic standards." *Id*. In that same vein, the government can also "prioritize[] access by journalists whose reporting will reach wider audiences, while also allowing room for smaller media outlets." *Id*. The only thing the government cannot do is suppress expression because of the reporters' viewpoint. *Id*. Because the governor offered an unrebutted viewpoint-neutral justification for his limitations, the journalists' case was doomed. *Id.* at 615.

### C. The AP's Likelihood of Success on the Merits

The AP seeks restored eligibility for two categories of White House media events: press pool events and larger events held in the East Room and other limited-access spaces. It contends that its exclusion from consideration for these events based on the AP's viewpoint violates its First Amendment rights. It also argues that it has suffered unlawful retaliation for exercising its speech rights. The Court concludes that the AP is likely to succeed on the merits of its First Amendment viewpoint-discrimination and retaliation claims for both its press pool and East Room allegations.

### 1. First Amendment Viewpoint-Discrimination Claims

#### a. Press Pool Events

The Court starts with the AP's allegations that its exclusion from the press pool is impermissible viewpoint discrimination.  Recall that the press pool is selectively invited for various small events with the President.  At the heart of this case lies one press pool site in particular: the Oval Office.  It scarcely need be said that the Oval Office is a highly controlled location.  It is shrouded behind a labyrinth of security protocols, and few members of the public will ever approach the *Resolute* Desk.  Thus, the AP has no standalone right of access to the Oval Office.  *Houchins v. KQED, Inc.*, 438 U.S. 1, 10 (finding no "constitutional right of access to news sources" or restricted locations).  The Government could exclude all journalists from the Oval Office without offending the First Amendment.  On this, the parties agree.  *Compare* Gov't Opp'n Br. at 18 (stating there is no "First Amendment right . . . [to] access[] the White House) *with* Pl. Reply Br. at 16 ("The AP does not claim otherwise.").

But the Government has chosen to open the Oval Office to reporters in limited circumstances.  That is, it has opened government property for "selective access" to a "particular class of speakers" whose members must "obtain permission" to be there in the first place.  *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998); *see also Perry*, 460 U.S. at 47 (nonpublic forum created in school mailbox system where it was not "open for use by the general public" and "[p]ermission to use the system" had to be "secured from the . . . principal.").  Thus the Oval Office is properly classified as a nonpublic forum, at least when the Government has

voluntarily opened it and journalists are present. *Accord Evers*, 994 F.3d at 610 (holding that a "limited-access press conference" hosted by a state governor was a nonpublic forum).[5]

This means official authority to restrict expression in the Oval Office is at its zenith. But still, there is a limit: Access restrictions must be reasonable and not viewpoint based. *Cornelius*, 473 U.S. at 806; *see also Forbes*, 523 U.S. at 682 (stressing that "the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property"). So while the AP does not have a constitutional right to enter the Oval Office, it does have a right to not be excluded *because of its viewpoint*. And the AP says that is exactly what is happening. *See* Mot. Preliminary Inj., ECF No. 27-1, at 45.

The Court agrees. Indeed, the Government has been brazen about this. Several high-ranking officials have repeatedly said that they are restricting the AP's access *precisely* because of the organization's viewpoint. *See supra* Section I.A. Government counsel admitted that the AP was not being chosen for access, despite its "eligibility," because of its viewpoint. Hr'g Tr. at 190:17–24 ("I think the record is clear. . . . [T]hey are not being selected for Oval Office access because they refuse to adhere to what the President believes is the law of the United States . . . that the body of water is called the Gulf of America."). The Government offers no other plausible explanation for its treatment of the AP. The Constitution forbids viewpoint discrimination, even in a nonpublic forum like the Oval Office.

---

[5] If the government opens a nonpublic forum for "use by certain groups" or for the "discussion of certain subjects," the space becomes a "limited public forum." *Price*, 45 F.4th at 1068 (quoting *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009)). But the distinction appears analytically irrelevant here. *Id.* at 1067–68 (applying the same "reasonableness" and "viewpoint neutral" analysis to both). The Court need not decide whether the Oval Office has been used as a limited public forum because the Government's defenses fail regardless.

That the Government recently took control of press pool composition and now exercises

sole discretion over who enters the Oval Office only bolsters this conclusion.  The Government

is still "reserv[ing] eligibility for participation" in Oval Office media events to certain "classes of

speakers" and, indeed, the Government is explicitly the one that is "ma[king] individual, non-

ministerial judgments as to which of the eligible [outlets] would participate."  *Forbes*, 523 U.S.

at 680.  Indeed, the Government's enhanced discretion is a fundamental feature of nonpublic

fora, where the "government retains the choice of whether to designate its property as a forum

for specified classes of speakers."  *Id.*  This change did not alter the Government's constitutional

obligation to refrain from viewpoint discrimination in selecting media outlets for participation.

This conclusion is also unaffected by the government speech doctrine.  This doctrine

recognizes that "[a] government entity has the right to 'speak for itself'" because the "Free

Speech Clause . . . does not regulate government speech."  *Pleasant Grove City, Utah v.

Summum*, 555 U.S. 460, 467 (2009) (cleaned up).  Put plainly, when expressing its own views,

the Government can freely decide what message to convey.  *See Shurtleff v. City of Boston,* 596

U.S. 243, 251 (2022).  The question, of course, is what counts as government speech.  Courts

look to "the history of the expression at issue; the public's likely perception as to who (the

government or a private person) is speaking; and the extent to which the government has actively

shaped or controlled the expression."  *Id.* at 252.

But the Government expressly disclaims this doctrine, and for good reason.  Hr'g Tr. at

192:14–16 (Government counsel: "I wouldn't go so far as saying government speech.  I think

this falls in the right-of-access cases.").  The undisputed focal point of this case is the

Government's selection of reporters for Oval Office access—not anything the Government has

said or any message it has conveyed.   The act of curating the press pool is not itself a form of

speech.  The press pool "independently cover[s] the President" and is "not an organ of the

Government."  *Id.* at 176:2–3 (argument of AP counsel).  Indeed, for decades and until weeks

ago, the WHCA—not the White House—decided which reporters participated in the press pool.

Curating press pool membership thus looks more like "government inten[t] . . . to regulate

private expression" than an attempt by the Government to "speak for itself."  *Shurtleff*, 596 U.S.

at 252; *see also id.* at 267 (Alito, J, concurring) ("[G]overnment speech occurs if—but only if—a

government purposefully expresses a message of its own through persons authorized to speak on

its behalf.").  And even now, the only notable change from the *ancien régime* is the AP's total

exclusion.

        Finally, the Government's ability to convey its own message does not turn on the

composition of the press pool.  The White House media team speaks for the Government and

"push[es] out [messages] in real time . . . from the same Oval Office events" that "bona fide

journalists" are covering.  Hr'g Tr. at 106:24–107:11.  This reinforces the conclusion that control

of the press pool is a method by which the Government modulates private speech rather than

expressing itself.  The government speech doctrine thus plays no role here.

        Forum analysis offers a difficult path to victory for the Government.  So it comes as no

surprise that the Government disputes the threshold applicability of forum analysis to the Oval

Office.  *See* Gov't Opp'n Br. at 29–30.  In support, it points to *Price*.  There, the D.C. Circuit

concluded that forum analysis did not apply when evaluating restrictions on filming a

documentary in a national park.  Because the final documentary would be disseminated "at some

other time . . . in some other location," the filming was not itself "speech" and instead was

"merely a noncommunicative step in the *production* of speech."  *Price*, 45 F.4th at 1068, 1070

(emphasis added). The court warned against "apply[ing] the speech-protective rules of [forum analysis] to regulation of" pre-speech activities. *Id.* at 1068.

The Government implicitly contends that the media's photojournalism and notetaking in the Oval Office are also pre-speech. And *Price* admonishes that courts should be wary of "extending the public forum doctrine in a mechanical way to contexts that meaningfully differ from those in which the doctrine has traditionally been applied." *Id.* (cleaned up). Thus, the Government insists, forum analysis is the wrong test.

But *Price* does not help the Government. For starters, while *Price* involved only pre-speech, AP journalists are engaged in full-fledged expression when they report from the Oval Office. AP photographer Vucci described near-instantaneous transmission of photos to his editors when covering events in the Oval Office. The lag time between a picture's creation and its publication online to the entire world is sometimes as short as "30 seconds to 45 seconds." Hr'g Tr. at 35:2–3. Real-time publication is so vital to his role that he is "hard-wired directly into" three mobile internet devices, each on a different network, to ensure he can always transmit from the White House. *Id.* at 28:19–21, 29:4–13. He also brings his cellphone into the Oval Office because "an editor or a reporter" may text him asking for specific photographic content— content he can provide on the spot by taking a photo and sending it in under a minute. *Id.* at 29:16–21, 35:2–3.

Vucci is not the only journalist who communicates live from the Oval Office. Print journalists sometimes text their editors "[i]f there's huge news" so the editors can "send out [news] alerts in real time" to the public. Hr'g Tr. at 30:18–22. Miller can draft news alerts on his phone "while the event is still going on." *Id.* at 102:3–8. He is also in constant contact with his colleagues "[a]t pretty much every event" he covers. *Id.* at 107:13–17. He keeps a "running

conversation" going where they all exchange "notes and feeds" as events unfold in front of them. *Id.* at 107:19–21.  When Miller is covering an Oval Office event, other reporters from around the world "can point out something interesting" to him and "respond in real time to an announcement"—all of which "help[s] inform" his reporting.  *Id.* at 108:15–22.  Simply put, AP journalists are "speaking" from inside the Oval Office.  *See Price*, 45 F.4th at 1070.

In any case, even restrictions on *noncommunicative* activity are subject to reasonableness review, and thus pre-speech acts are also immune from viewpoint discrimination.  *Price*, 45 F.4th at 1072.  And *Price* explained that "blanket prohibition[s] against the recording of a public official performing public duties on public property" are per se unreasonable, as that activity "implicates unique first amendment interests."  *Id.* at 1071–72.  In short, *Price* counsels that even if any of the reporters' actions are noncommunicative, the proper inquiry is still a nonpublic forum analysis which never tolerates viewpoint discrimination.

Finally, newsgathering was not at issue in *Price* because the statute there had an express carveout exempting newsgathering activities from its restrictions.  *Price*, 45 F.4th at 1064.  So *Price* did not disapprove of applying forum analysis to journalistic endeavors like "[g]athering information about government officials in a form that can readily be disseminated to others."  *Id.* at 1070–71.

The Court heeds the Circuit's admonition that it should not "mechanical[ly]" extend the public forum doctrine to non-traditional contexts.  *Price*, 45 F.4th at 1068.  It also takes the Government's point that the Oval Office is no ordinary government space.  *See* Gov't Opp'n Br. at 7.  But given the square directive of *Price* that forum analysis applies to communicative activity, this Court is bound to follow that precedent.

To recap, unlike in *Price*, the communication here is not deferred to some future time and location; it is happening in real time as reporters gather information about government officials and witness history in the Oval Office. *See also Price*, 45 F.4th at 1071 n.*** ("Forum analysis may well apply to live streaming, which is communicative activity" and not merely a "step[] in the creation of speech."). Thus AP reporters are actively "communicating thoughts," "discussing public questions," and "disseminat[ing] information and opinion" while in the Oval Office. *Id.* at 1069. This is precisely the sort of newsgathering that *Price* distinguished, and these activities make forum analysis the appropriate paradigm here. And once forum analysis applies, the D.C. Circuit has long been clear that the Government may not exercise "unbridled discretion" without offending the First Amendment. *Ateba*, No. 24-5004, slip op. at 18.

The Government's other primary talisman is *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006). There, two journalists annoyed Maryland's governor by "failing to objectively report" on his administration. *Id.* at 413. In response, the governor forbade state government officials from speaking with them. Yet the Fourth Circuit found the conduct unobjectionable. *Baltimore Sun* is undoubtedly the Government's strongest case because it involved a government edict that inhibited journalists' contact with government officials in situations that bear some similarity to the circumstances here. Still, *Baltimore Sun* does not get the Government where it needs to go.

For one, *Baltimore Sun* did not discuss the forum doctrine and thus is of little weight in countering the analysis above. *Baltimore Sun* was a retaliation case focused on *dialogue* with government officials, not restrictions on *physical access* to government property for newsgathering. As the plaintiffs described it, they were challenging "a no-comment policy." *Id.* at 417. The chief complaint was that government officials were "not return[ing] [the reporters']

telephone calls." *See id.* at 413–14.  While one of the reporters lost access to two small, invite-only press briefings, his colleagues could attend them.  *Id.* at 414.  So the Fourth Circuit did not apply forum analysis because it was not the appropriate test:  The case turned on an alleged right to interact and speak with government officials, not a right of access to a physical forum for observational newsgathering.

To be sure, the Government seemingly views these Oval Office events as akin to dialogues, not observational newsgathering.  And perhaps there is something to that comparison.  After all, intimate events in places like the Oval Office might be framed as more closely resembling sit-down, one-on-one interviews—which are clearly "dialogue"—than broader press briefings.  *See* Gov't Opp'n Br. at 21–22.  And the AP concedes that the Government may engage in viewpoint discrimination in selecting what reporters can *interview* senior officials.  *See* Pl. Reply Br. at 17, 20.  But the Government neither called witnesses nor presented any evidence to support this analogy.

The Court instead credits the AP's chief White House correspondent's testimony that there is a clear distinction between interviews and the press pool availabilities at issue.  Miller is well-suited to offer these observations as he has taken part in the press pool and presidential interviews.  *See* Hr'g Tr. at 104:2–11, 105:12–22.  Interviews usually involve a one-on-one or small-group conversation at the invitation of the President.  *See id.*  They are "exclusive" and the press has more "control" over the process than it does over journalistic conditions in Oval Office press pool events.  *Id*. at 105:22–24.  The news outlet works with the White House to decide the time and place of interviews.  *Id.*  The interview would not happen but for the outlet's presence.  *Id.*  Interviews also lack the "sense of competitive pressure that you get from a pool event." *Id*. at 106:1–2.

In contrast, Oval Office press pool availabilities involve a gaggle of reporters, all vying for space and information. In "very many" of these "pool sprays," journalists are relegated to watching events unfold from 20–30 yards away and have no interaction with the President or other officials. Hr'g Tr. at 104:16–20; 106:12–23. The event would happen whether any particular outlet had a reporter there or not. *Id.*

In these conditions, journalists "can't have . . . a substantive conversation" with officials like they can "in an interview." Hr'g Tr. at 104:21–24. Instead, the reporters are "just there to witness what is said and what the reaction is, [and] what else is happening in the room." *Id.* at 105:2–4. And though journalists in the Oval Office do engage in dialogue, that dialogue is directed to other members of the media and the public to whom they are transmitting news in real time—not to government officials. More, unlike in exclusive interviews, the Government is not dependent on private media organizations to convey its messages to the American people; the White House's media team is present to broadcast events and can do so whether or not other journalists do so. *See Id.* at 106:10–107:11.

It would be a strange affair for the President to accept an interview and then refuse to speak with his interviewer, but it is commonplace for the President to invite journalists into the Oval Office without speaking to them. *See* Hr'g Tr. at 104:12–20. This is typical of the misfit between the journalistic activities in *Balitmore Sun* and those here. In *Balitmore Sun*, the plaintiffs claimed a right to interact with government officials—a right to ask questions and have them answered. In contrast, the AP expressly disavows any right to interact or speak with the President and disputes only its physical exclusion from places like the Oval Office. Pl. Reply Br. at 17.

Though the Government does not concede this distinction, it agrees that it is solely up to the President whether he takes questions in the Oval Office. Suppl. Decl. T. Budowich ¶ 7. Miller's testimony and the Government's declaration both reflect *Baltimore Sun*'s position that government officials cannot be forced to speak with reporters. And both implicitly demonstrate that this is a dispute over forum access for firsthand journalistic observation, not a right to speak with the President. *See* Pl. Reply Br. at 20 (acknowledging that "the First Amendment does not require officials to *interact* with [] journalists). In short, the Court is persuaded that press pool activities in the Oval Office are not analogous to exclusive interviews, so *Baltimore Sun* is inapposite.

The comparison is further ill-suited because the *Baltimore Sun* reporters experienced only unremediable, "*de minimis* inconvenience." *Balt. Sun*, 437 F.3d at 420. As discussed below, the AP is in a much different position, having suffered significant, concrete harms. *See infra* Section III.C.2. *Baltimore Sun* thus cannot support the weight the Government places on it.

In sum, precedent is unequivocal that the press does not enjoy any standalone right of access to highly restricted government locations like the Oval Office. Instead, forum analysis applies because the Government has chosen to open the Oval Office to some reporters for newsgathering. Under forum analysis, the Oval Office is a nonpublic forum, so the Government enjoys wide latitude on its restrictions, if they are viewpoint neutral. The AP presented evidence that the Government has discriminated against it based on its viewpoint, a claim the Government all but concedes. The AP is thus likely to succeed on its claim that its exclusion from eligibility to access the Oval Office violates its First Amendment rights.

The same reasoning and conclusions apply to other press pool locations and events. Whether the press pool travels on Air Force One, goes to a Mar-a-Lago press briefing, or attends

a press-pool-only event elsewhere, the Government has chosen to open the doors of nonpublic spaces for some journalists.  The Government thus cannot exclude the AP from access based on its viewpoint.  The parties' evidence and arguments have understandably focused on the Oval Office, but nothing before the Court suggests Oval Office press pool events are analytically distinct from the other press pool environments.  The Court makes the same factual findings on the Government's rationale for exclusion in these spaces as in the Oval Office context.  *See supra* Sections I.A–I.B.  So the Court reaches the same legal conclusions and finds the AP is likely to succeed on its claims of viewpoint discrimination in these other press-pool-only locations.

### b.  East Room and Limited-Access Events

Now consider the AP's contention that its exclusion from the East Room and similar limited-access events rests on impermissible viewpoint discrimination.  Like the Oval Office, the East Room fits snugly into the definition of a nonpublic forum.  It is a government facility closed to the public that has not historically been a place for societal discourse.  *Price*, 45 F.4th at 1068.  The Government voluntarily opens it for limited-access press briefings.  Thus viewpoint-based criteria are constitutionally unacceptable.

The Government portrays the East Room claim as moot because all hard pass holders, including the AP, are "eligible" to attend events there.  Gov't Opp'n Br. at 33–34.  But the facts belie mootness.  Sure, foreign-based AP journalists accessed one East Room event through the French president's press entourage.  *See* Am. Compl. ¶ 79.  But it is unclear whether the Government knew the reporter worked for the AP before granting her access.  *See* Hr'g Tr. at 133:2–134:8.  And, more saliently, the relevant comparison here is access among journalists seeking entry through the established channels for *hard pass holders*.  Foreign correspondents do

not have hard passes. *Id.* at 157:20–158:2. So a foreigner's periodic admittance to the East

Room and the Oval Office does not dampen the AP's claim that other hard pass holders enjoy

greater access and fewer restrictions than its hard pass holders.

No AP text reporters have been admitted to the East Room since February 11, despite

submitting RSVPs and showing up in person. *See* Hr'g Tr. at 117:23–118:23; 136:5–15. The

Government does not dispute this record. Instead, it argues that all is well because an AP

photographer sometimes gets access to the East Room. *See* Gov't Opp'n Br. at 16. And true,

Vucci testified that he has been allowed in to photograph a handful of events. *See* Hr'g Tr. at

79:18–24. Still, Vucci's access has been sporadic and inconsistent, even though he has followed

the RSVP process. *See Id.* at 81:1–7. In contrast, photographers working for AP competitors

attend limited access-events nearly every day. *Id.* at 79:23–80:1. So even if all media outlets

remain theoretically "eligible" for admission, the practical outcome for the AP has been frequent

exclusion.

While it is possible to theorize viewpoint-neutral reasons the AP is not getting into the

East Room, the Court must deal in facts, not conjecture. The only evidence favoring the

Government is a declaration from Deputy Chief of Staff Taylor Budowich, who did not testify at

the hearing and thus was not subject to cross-examination. *See* Suppl. Decl. T. Budowich ¶ 15

("[T]he Associated Press remains completely eligible for selection, as all hard pass holders are,

for a wide range of White House coordinated press events."). And even this averment was

undermined at oral argument, when the Government placed it in context. *See* Hr'g Tr. at

190:14–21 ("So although the AP is eligible, like any hard pass holder, to be selected, they are not

being selected[] . . . because they refuse to adhere to what the President believes."). On the other

side of the scale is ample evidence that the AP is being intentionally excluded from East Room

events because it refuses to endorse the "Gulf of America" designation.  *See supra* Section I.A.

Thus the evidence before the Court shows that the AP is being largely kept out of East Room

events based on its viewpoint.  The Court finds the AP is likely to succeed in its claim that the

Government is impermissibly excluding it from the East Room.

      The Court reaches the same conclusions for limited-access events held in places other

than the East Room:  the President's speech at the Department of Justice, the First Lady's

Capitol Hill event, and the Vice President's event in Texas.  *See* Third Miller Decl. ¶¶ 11–12.

The one exception is the tarmac at Palm Beach when Air Force One lands.  *See* Am. Compl. ¶¶

12, 19.  The Court finds the Government is not limiting the AP's tarmac access.  Despite initially

being excluded from one presidential arrival on February 28, text and photojournalists from the

AP have since enjoyed regular access to the Palm Beach tarmac.  *See* Hr'g Tr. at 69:16–70:10.

So for purposes of a preliminary injunction, the AP has not shown it is likely to succeed vis-à-vis

tarmac access.  But that is the exception:  It has shown it is likely to succeed on the merits of its

First Amendment claims for the other limited access events.

### 2.  Retaliation Claims

      Next the Court turns to the AP's likelihood of success on its retaliation claim.  The AP

alleges that its exclusion from press pool, East Room, and limited-access events is in retaliation

for its speech.  It is well-established that the Government "may not deny a benefit to a person on

a basis that infringes his constitutionally protected interests—especially, his interest in freedom

of speech."  *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).  Even when the Government can

withhold a benefit, "[a]n ordinarily permissible exercise of discretion may become a

constitutional deprivation if performed in retaliation for the exercise of a First Amendment

right."  *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) (cleaned up).

Any rule to the contrary "would allow the government to produce a result which it could not command directly." *Sindermann*, 408 U.S. at 597 (cleaned up).

Thus, an organization alleging retaliation "must establish that the government responded to [its] constitutionally protected activity with conduct or speech that would chill or adversely affect [its] protected activity." *Baltimore Sun*, 437 F.3d at 416. Courts use an objective standard when evaluating adverse effect; whether a plaintiff himself was chilled is relevant but not dispositive. *Id.* at 416, 419.

The analysis is straightforward. The AP made an editorial decision to continue using "Gulf of Mexico" in its Stylebook. The Government responded publicly with displeasure and explicitly announced it was curtailing the AP's access to the Oval Office, press pool events, and East Room activities. If there is a benign explanation for the Government's decision, it has not been presented here. At the evidentiary hearing, the Government conceded that the record reveals viewpoint-discriminatory motives, so all indicators point to retaliation. Hr'g Tr. at 192:4–7 ("[I]t's the style guide and their treatment of the legal name Gulf of America . . . [that] is the reason that the record currently reveals for that treatment."). All that remains is whether the Government's conduct has chilled or adversely affected the AP.

The ramifications for the AP have undoubtedly been adverse. Start with photography. The AP's total loss of access to the Oval Office and stifled East Room access has sent damaging ripples across its reporting capabilities. Put more bluntly, the AP is getting "absolutely [] slaughtered." Hr'g Tr. at 37:22 (Vucci testimony). Though some other photographers have let the AP use a selection of their own photos out of solidarity, they are not providing it with the most desirable pictures. *Id.* at 34:5–20. These images are qualitatively and quantitatively inferior to what the AP would produce itself. *See id.* Considerable artistic discretion and

individual creativity factor into the production of each image, and there is no real replacement

for the missed photos.  *Cf. United States v. Long*, 92 F.4th 481, 486 (3d Cir. 2024) ("[W]ritten

descriptions . . . are imperfect substitutes because photos and videos convey a pictorial accuracy

and detail that words cannot duplicate." (cleaned up)).  More, the AP does not get access to its

competitors' photos in real time, so whatever images it eventually uses are delayed.  Hr'g Tr. at

34:17–20.  And this time lapse has a significant adverse impact on AP's competitive profile.  *See*

*Id.* at 35:19–36:6.  All told, as for photographing these events, the AP is "basically dead in the

water."  *Id.* at 34:19.  Thus, there are not any "other sources" the AP can resort to as an adequate

substitute.  *Balt. Sun*, 437 F.3d at 419.

This erosion of quality and capability is not limited to AP photojournalists—its wire

reporting service for White House news is a shadow of its former self too.  Text and print wire

services "vigorously compete[] with each other to provide the fastest and most accurate news

reporting" during and after the press pool events.[6]  Am. Compl. ¶ 43.  Often this reporting is

"instantaneous" and reporters can live-post breaking news alerts directly or notify their editors of

important developments from the inside of a meeting or briefing.  *Id.*; Pl. Reply Br. at 11.

To state the obvious, if the AP's wire reporters are not in the room when news happens,

they can hardly be the first to break the news.  Instead, they are forced to wait and pick up

---

[6]  The Government claimed that all press pool members share notes, video, and audio after an event.  Gov't Opp'n Br. at 10–11.  But it offered little support for that position, while the AP offered testimony to the contrary from a press pool member.  Hr'g Tr. at 98:2–9, 98:19–99:4 (Miller testimony).  The Court credits the AP's testimony that only the *print* (not wire) pool reporter must share notes with other print organizations, and only after the event is over.  *Id*. at 98:2–9, 98:19–99:4 (Miller testimony); Pl. Reply Br. at 11.  More, the Government's evidence relied on WHCA protocols, but the Government recently eliminated the WHCA's press pool role.  *See* White House, Press Secretary Karoline Leavitt Briefs Members of the Media, YouTube (Feb. 25, 2025), at 6:15–6:47 [https://perma.cc/F3ZN-MMW7].  Even if the Government were right—and it is not—the AP would still be disadvantaged by having to wait until *after* an event for the shared reports.

whatever scraps of verifiable information they can find as they watch their competitors break the story first. *See* Hr'g Tr. at 115:20–117:15 (discussing how lack of access significantly delays the AP in sending news alerts because it cannot immediately verify the information), 28:15–18 ("So if my competitors can get an image out a minute before me or three minutes before me on a major story, then I might as well delete my entire take because it's worthless."). True, the wire reporters sometimes get access to a video feed of an event. *See Id.* at 113:23–115:1. But reporting through secondhand sources simply does not allow for the "same level of completeness" in their reporting as if they had "been there in person." *Id.* They cannot look around the room and use all five senses to craft a unique message for publication. And, as Miller pointed out, reporters "don't know what [they're] not there to see." *Id.* Finally, and obviously, they cannot ask questions from outside a closed door. Those questions, if the President chose to answer, could lead to incisive and cutting-edge reporting that the AP cannot reproduce by watching from afar.

These disadvantages have poisoned the AP's business model. As its ability to rapidly supply new photographs and breaking news has dwindled, the AP's customers have expressed concerns and turned to other sources for their needs. *See* Decl. of Kristin Heitmann, ECF No. 37-1, ¶ 9; *see also* Hr'g Tr. at 87:22–88:16 (discussing the AP's "loss of opportunity" to have customers use its reporting). These concerns also led an advertiser to cancel a $150,000 deal. Heitmann Decl. ¶ 9. The facts reflect the precarious realities of life in the fast-paced world of journalism: A delay in capturing photos and details of breaking news can be catastrophic.

In the face of this evidence, the Government doubles down. It compares the situation to *Baltimore Sun* and maintains that any potential retaliation is not actionable. Recall that in *Baltimore Sun*, a governor ordered his employees not to speak with two reporters who had failed

to "objectively report" on his administration.  437 F.3d at 413.  The Fourth Circuit found the newspaper's subsequent retaliation claim was unactionable because the reporters suffered only "*de minimis* inconvenience."  437 F.3d at 420.  The reporters "continue[d] to write as frequently as before" the no-comment policy was put into place, "despite the inconvenience of relying on sources other than government officials for information.  *Id.* at 419.  Neither reporter claimed to have been chilled.  *Id.* at 419 & n.1.

Not so here.  As discussed above, there are not adequate alternative sources the AP can use for photographs or breaking news reports and the exclusion has unquestionably harmed the AP's reporting.  This is no mere "*de minimis* inconvenience."  Although the AP's witnesses testified the ban has not impacted their editorial tone in reporting at the White House, *see* Hr'g Tr. at 76:23–77:6 (Vucci testimony), nor is there evidence that the Court credits that other outlets have altered their tone in reaction to the AP's ban, the AP has demonstrated that its business has been adversely affected by the Government's discrimination.  And the Court finds that these impacts are objectively likely under the circumstances the AP currently faces.  The AP has thus shown that the Government retaliated against it for an exercise of its First Amendment freedoms, and that its speech has been adversely affected as a result.  It is therefore likely to succeed on the merits of its retaliation claim.

*    *    *

In short, the AP has shown that it is likely to succeed on the merits of its First Amendment and retaliation claims, both for its exclusion from eligibility for press pool and limited-access events.  The Court therefore turns to the remaining preliminary injunction factors.

### D. Irreparable Harm and Balancing the Equities

The AP's showing of irreparable harm flows naturally from the analysis above. "The loss of First Amendment freedoms, for even minimal periods of time," constitutes irreparable harm when the plaintiff demonstrates that its "First Amendment interests are either threatened or in fact being impaired at the time relief is sought." *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (Thomas, J.) (cleaned up). The AP provided abundant evidence that its First Amendment right to gather and quickly disseminate news about the President has been severely hampered by—and continues to be hampered by—the ban on press pool admission and the highly circumscribed access to limited-access events. *See supra* Section III.C.2; *see also Branzburg*, 408 U.S. at 681 ("Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated."). And the AP has shown that it remains subject to viewpoint discriminatory exclusions from places that the Government has opened as nonpublic fora. *See Sherrill*, 569 F.2d at 129–30. Because the AP has shown that the ban "directly limits" its protected activity, it has established irreparable harm. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006).

The AP's irreparable harm is not limited to constitutional injuries. This situation has cut deeply into the AP's business, both financially and in terms of lost opportunities. *See supra* Section III.C.2. While solely financial harm is typically not irreparable, the dynamic can change in suits against the Government. *See Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335–36 (D.D.C. 2012). The Government "generally enjoy[s] sovereign immunity for any monetary damages," so there is no guarantee of future remediation—making the financial harm irreparable. *Wages & White Lion Invs., L.L.C. v.*

*United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); *see also Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm.").[7] Still, *de minimis* harm does not trigger this paradigm shift; "[t]he wiser formula requires that the economic harm be significant, even where it is irretrievable because a defendant has sovereign immunity." *Air Transp. Ass'n*, 840 F. Supp. 2d at 335.

      The AP has been economically hemorrhaging for the last two months, and its condition will only worsen as its customers flee to other news services absent injunctive relief. *See supra* Section III.C.2; *see also* Heitmann Decl. ¶¶ 6–9; *Air Transp. Ass'n*, 840 F. Supp. 2d at 335 ("The loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms."). Yet despite this ongoing financial harm, the AP's prospect of recovering monetary damages in a future suit are dim in the face of sovereign immunity. And the Government never suggests the AP will be able to recoup these damages. So the AP's "lack of a guarantee of eventual recovery is another reason that its alleged harm is irreparable." *Wages & White Lion.*, 16 F.4th at 1142 (cleaned up).

---

[7] Both cases involved agency defendants, but the premise translates easily because the AP likely has no path to recover monetary damages against the White House officials. The Supreme Court "repeatedly has observed that the [Federal Tort Claims Act] does not cover claims against Government employees for violations of the Constitution of the United States." *Egbert v. Boule*, 596 U.S. 482, 524 n.7 (2022) (Sotomayor, J., concurring in part) (cleaned up); *see also F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994) (holding the same). Instead, the AP's path to monetary damages runs through *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). *See Boule*, 596 U.S. at 524 n.7. But the Supreme Court has "never held that *Bivens* extends to First Amendment claims" and has expressly rejected its use for First Amendment retaliation claims. *Id.* at 498 (cleaned up). Even if there were a *Bivens* cause of action, the White House officials would still have qualified immunity from civil damages. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).

The balance of equities and public interest also favor the AP.  While "the White House surely has a legitimate interest in maintaining a degree of control over media access to the White House complex," policy goals may never triumph over the Constitution.  *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020).  Put more simply: "enforcement of an unconstitutional law is always contrary to the public interest."  *Id.*  The AP has made its final showing.

*   *   *

Because the Court decides the present motion under a First Amendment rubric, it need not reach the AP's Fifth Amendment, right to petition, or compelled-speech claims.  *Accord Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 300 n.15 (D.D.C. 2020).  While these claims incorporate much of the First Amendment analysis above, the Fifth Amendment also implicates a potentially significant expansion of the due process rights *Sherrill* afforded to journalists when applying for hard passes.  *See* 569 F.2d at 130.  Perhaps the AP will be ultimately entitled to such relief, but the Court doubts that *Sherrill*'s written notice-and-appeal rights for permanent hard passes map neatly onto potential daily decisions about admittance into the Oval Office and limited access events.  This thorny question is not well-suited to an emergency injunction when the Court can grant substantial relief today.[8]

The Government has not requested that the AP post bond.  *See* Fed. R. Civ. P. 65(c).  District courts have "broad discretion . . . to determine the appropriate amount of an injunction bond."  *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).  This includes discretion "not only to set the amount of security but to dispense with any security requirement whatsoever where the restraint will do the defendant 'no material damage.'"  *Fed. Prescription Serv., Inc. v.*

---

[8] In any event, the AP's proposed order does not include *Sherrill*-like due process requirements. *See* Prop. Order, ECF 27-14.

*Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980).  Exercising this discretion and given no

objection from the Government, the Court agrees with the AP that bond is unnecessary because

preliminary injunctive relief will not materially damage the Government.  *See* Mot. Preliminary

Inj. at 51 n.8.

One final note is in order.  The Government repeatedly characterizes the AP's request as

a demand for "extra special access."  Gov't Opp'n Br. at 12; *see also id.* at 10–11, 17.  But that is

not what the AP is asking for, and it is not what the Court orders.  All the AP wants, and all it

gets, is a level playing field.  *See* Mot. Preliminary Inj. at 45 ("[T]he AP's journalists seek access

to a forum—opened by the White House—on the same terms as other journalists." (cleaned up));

*see also* Hr'g Tr. at 186:1–187:25.  In framing things otherwise, the Government fails to fully

engage with forum analysis and retaliation caselaw.  Rather than grappling with the implication

of these doctrines, the Government tries to sidestep them.  Defendants may pursue their favored

litigation tactics, but the Court must address the merits of the relief requested.

The AP seeks restored eligibility for admission to the press pool and limited-access press

events, untainted by an impermissible viewpoint-based exclusion.  That is all the Court orders

today:  For the Government to put the AP on an equal playing field as similarly situated outlets,

despite the AP's use of disfavored terminology.  The Court does not order the Government to

grant the AP permanent access to the Oval Office, the East Room, or any other media event.  It

does not bestow special treatment upon the AP.  Indeed, the AP is not necessarily entitled to the

"first in line every time" permanent press pool access it enjoyed under the WHCA.  But it cannot

be treated worse than its peer wire services either.  The Court merely declares that the AP's

exclusion has been contrary to the First Amendment, and it enjoins the Government from
continuing down that unlawful path.[9]

### IV.  CONCLUSION

For these reasons, it is

**ORDERED** that Plaintiff's [27] Amended Motion for Preliminary Injunction is
**GRANTED**; and it is further

**ORDERED** that

1. Defendants shall immediately rescind the denial of the AP's access to the Oval Office,
Air Force One, and other limited spaces based on the AP's viewpoint when such spaces are made
open to other members of the White House press pool.

2. Defendants shall immediately rescind their viewpoint-based denial of the AP's access
to events open to all credentialed White House journalists.

3. This preliminary injunction shall remain in effect until further order of this Court.

4.  This preliminary injunction issues without the requirement of any security bond.

2025.04.08
16:34:19 -04'00'

Dated: April 8, 2025

TREVOR N. McFADDEN
United States District Judge

---

[9] The Court notes that the President is not a party to this case, and defense has not argued that an
injunction would affect his constitutional authority in any way.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ASSOCIATED PRESS,**

        Plaintiff,

        v.                                    Case No. 1:25-cv-00532 (TNM)

**TAYLOR BUDOWICH**, in his official
capacity as White House Deputy Chief of
Staff, *et al.*,

        Defendants.

---

## ORDER

The Associated Press ("AP") moved for a preliminary injunction against the White House

Chief of Staff, Deputy Chief of Staff, and Press Secretary (collectively, "the Government"). Am.

Mot. Preliminary Inj., ECF No. 27. It sought to enjoin the Government from denying the AP

access to the Oval Office, Air Force One, and other limited spaces because of the AP's

viewpoint. The Court granted the AP's preliminary injunction request. Mem. Order, ECF No.

[46]. The Court now, on its own motion, stays its Memorandum Order imposing a preliminary

injunction through April 13, 2025, to provide the Government time to seek an emergency stay

from a higher court and to prepare to implement the Court's injunction. This stay automatically

dissolves after April 13, absent further relief from a higher court.

For this reason, it is hereby

**ORDERED** that the Court's [46] Memorandum Order Granting Plaintiff's [27] Amended

Motion for Preliminary Injunction is **STAYED** through April 13, 2025. **SO ORDERED.**

2025.04.08
16:43:52 -04'00'

Dated: April 8, 2025                          TREVOR N. McFADDEN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

             Plaintiff,

    v.

TAYLOR BUDOWICH,
White House Deputy Chief of Staff, et al.,

             Defendants.

Civil Action No. 25-0532 (TNM)

## <u>NOTICE OF APPEAL</u>

Defendants—Taylor Budowich, in his official capacity as White House Deputy Chief of Staff; Karoline Leavitt, in her official capacity as White House Press Secretary; and Susan Wiles, in her official capacity as White House Chief of Staff—respectfully provide notice that they hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Court's Memorandum Order of April 8, 2025 (ECF No. 46), which granted the motion for a preliminary injunction filed by Plaintiff the Associated Press and entered a preliminary injunction against Defendants.

Dated: April 9, 2025
      Washington, DC

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

By: _____*/s/ Brian P. Hudak*_____
    BRIAN P. HUDAK
    Chief, Civil Division
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2549

*Attorneys for the United States of America*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ASSOCIATED PRESS**,

Plaintiff,

v.

**TAYLOR BUDOWICH**, in his official
capacity as White House Deputy Chief of
Staff, *et al.*,

Defendants.

Case No. 1:25-cv-00532 (TNM)

## <u>MEMORANDUM ORDER</u>

The Government moves for a stay of this Court's preliminary injunction pending appeal.

Mot. Stay, ECF No. 52.  The Court has already stayed its injunction, on its own motion, until

April 13, 2025, to allow the Government time to appeal.  Order, ECF No. 47.  The Court will not

extend that stay further.

"[A] stay pending appeal is always an extraordinary remedy."  *United States v. Philip*

*Morris USA, Inc.*, 449 F. Supp. 2d 988, 990 (D.D.C. 2006) (quoting *Bhd. of Ry. & S.S. Clerks v.*

*Nat'l Mediation Bd.*, 374 F.2d 269, 275 (D.C. Cir. 1966)).  The moving party thus faces a "heavy

burden" to justify its request.  *Id.*  Courts evaluate four factors in this decision: "(1) whether the

stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether

the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

substantially injure the other parties interested in the proceeding; and (4) where the public

interest lies."  *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  After considering these factors,

the Court denies the Government's request to stay the injunction pending appeal.

1

Most importantly, the Government has not shown it is likely to succeed on the merits. The Government sidesteps traditional forum analysis by invoking an "intimate spaces" exception to the First Amendment.  Mot. Stay at 1, 3.  But this label is untethered from precedent, which is likely why the Government did not advance this notion at all in its merits arguments for the injunction briefing.  To the contrary, the D.C. Circuit suggests that government offices fit squarely into the definition of nonpublic fora.  *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022); *see also Ateba v. Leavitt*, 2025 WL 1036451, at *5 (D.C. Cir. Apr. 8, 2025) ("government office building").  And the Government's motion does not begin to address First Amendment retaliation caselaw, an independent justification for the Court's decision.  So the motion fails on the law.  But it also misconstrues the facts.

The *first* so-called intimate space the Government addresses is the Oval Office.  But the Oval Office is not just a "personal workspace."  Mot. Stay at 1.  It is the President's formal office, to which Defendants regularly invite a rotating group of 21 journalists for "pool sprays" and historic meetings with world leaders.  *Associated Press v. Budowich*, --- F. Supp. 3d ---, 25-cv-00532, 2025 WL 1039572, at *13 (D.D.C. Apr. 8, 2025).  The President has other personal workspaces to which Defendants do *not* routinely invite a gaggle of reporters.  *See* Angela Tchou, *See Where Does Obama Work?,* Slate (Sept. 10, 2010) [https://perma.cc/U4EC-G545]; *Oval Office Study*, Wikipedia [https://perma.cc/A47T-ZSRD] (small study adjacent to the Oval Office); *see also The Second Floor*, The White House Historical Association [https://perma.cc/3GQ6-RFAG] (Treaty Room on second floor of White House residence). *Those* are truly "intimate spaces," and they are so precisely because Defendants do not regularly invite in prying reporters and the like.

2

JA431

The *second* "intimate space" the Government highlights is Air Force One.  Mot. Stay at 1.  To be clear, the President travels in first class territory in the nose of this Boeing 747, while the press pool is confined to the rear of the plane.  *Cf. Air Force One*, The White House (2025) [https://perma.cc/9P4J-BFRH].  The Government's claim that this jumbo jet configuration is an intimate space is simply not credible.

The Government's *third* intimate space is the Mar-a-Lago Club.  True, Mar-a-Lago contains the President's private residential apartment, but it is also an exclusive golf club, with large public rooms open for rental.  *See Welcome*, The Mar-a-Lago Club [https://perma.cc/ZP5F-J64L].  The event at issue was an Executive Order signing ceremony with many journalists and local officers in the audience.  *See President Trump Signs Executive Orders at Mar-a-Lago*, The White House, 36:45–36:55 (Feb. 18, 2025) [https://perma.cc/6UAE-TJG4]*.*  Whether forum analysis applies to private property in this Government-use context is a close question that the Court need not resolve now—especially considering that the parties did not brief it.

Recall that the Court's Order rests not just on forum analysis, but also on retaliation precedent.  *Associated Press*, 2025 WL 1039572, at *17 ("[T]he AP has shown that it is likely to succeed on the merits of its . . . retaliation claims . . . for its exclusion from eligibility for . . . limited-access events").  And under that precedent, "[a]n ordinarily permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for the exercise of a First Amendment right."  *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) (cleaned up).  Whether or not forum analysis applies here, the Government has given no reason to believe that the First Amendment's retaliation doctrine stops at the threshold of private buildings used for Government functions.  And the burden, at this juncture, is the Government's.  *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 990.

3

This Court's conclusion did not rebuff *Sherrill*.  Mot. Stay at 1.  It did not reach the *Sherrill* question at all.  *Associated Press,* 2025 WL 1039572, at *18.  *Sherrill* predated modern forum analysis, and while it discussed viewpoint discrimination, it focused on the Fifth Amendment—a claim that the Order does not reach.  *Id.*; *Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977).  But insofar as *Sherrill* suggests that "arbitrary" discrimination is anathema, that principle supports Plaintiff, not the Government.  *Id.* at 129 ("[A]rbitrary or content-based criteria for press pass issuance are prohibited under the first amendment.").

Next, the parties' competing asserted harms and the relevant equities do not alter the Court's original calculus.  The Government's cherry-picked quote from the cross-examination of an AP witness does not undermine the Court's comprehensive findings of fact.  *See* Mot. Stay at 6 n.2.  As the Court previously found, the AP's text journalists have been systematically banned from large, limited-access events open to the entire White House press corps, and its photographers have experienced more limited access to such events compared to other hard pass holders.  *Associated Press,* 2025 WL 1039572, at *4.  The ban Plaintiff experienced need not be complete to be unconstitutional or irreparable.

In short, the equitable considerations do not favor the Government; the AP will be irreparably harmed without the injunction and that harm would revive upon staying it, while the Government's "policy goals may never triumph over the Constitution." *Id*. at *18.

Finally, invoking a vague separation-of-powers argument for the first time in a motion to stay does not help the Government's case.  Mot. Stay at 5.  It cites no precedent that would allow this Court to overcome the clear commands of First Amendment precedent in the interest of a greater separation-of-powers concern.  Constitutional protections would be worth little indeed if they wilt in the face of presidential incursion.

4

For these reasons, it is

   **ORDERED** that Defendants' [52] Motion to Stay the Preliminary Injunction is

**DENIED.**

   **SO ORDERED.**

Dated: April 11, 2025

2025.04.11
15:13:55 -04'00'

TREVOR N. McFADDEN
United States District Judge

5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE ASSOCIATED PRESS,

        Plaintiff,

v.

        Case No. 25-cv-532-TNM

TAYLOR BUDOWICH, et al.,

        Defendants.

**PLAINTIFF THE ASSOCIATED PRESS'S COMBINED
MOTION TO ENFORCE PRELIMINARY INJUNCTION
AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

Plaintiff The Associated Press ("the AP"), by its attorneys, hereby moves the Court to order the relief necessary to ensure Defendants' immediate compliance with the Court's April 8, 2025 Memorandum Order granting the AP's Amended Motion for Preliminary Injunction (the "Injunction Order") (ECF 46).

After continuing to exclude the AP from the press pool since the injunction took effect on Monday, April 14, the White House last night announced a new "White House Press Pool Policy." This new policy declares, in clear violation of the Court's Injunction Order, that "[t]he President retains absolute discretion over access to the Oval Office, Air Force One, and other comparably sensitive spaces." Moreover, as reflected in the daily pool guidance for today (April 16), even under this new policy, the White House has <u>again</u> excluded the AP from the pool. Specifically, the new policy abolishes the wire service seat that the White House itself established on February 25, replacing it with a second print reporter seat for which wire services are ostensibly eligible – but the AP was immediately skipped over for that second print seat. Moreover, AP photographers are <u>still</u> excluded from the four photo seats, which continue to be

assigned exclusively to AFP, Getty, The New York Times, and Reuters.  The AP therefore

requests the Court's immediate assistance in enforcing its Injunction Order.

1.      On April 8, 2025, this Court entered a preliminary injunction requiring

Defendants to "immediately rescind the denial of the AP's access to the Oval Office, Air Force

One, and other limited spaces based on the AP's viewpoint when such spaces are made open to

other members of the White House press pool," and to "immediately rescind their viewpoint-

based denial of the AP's access to events open to all credentialed White House journalists."

Injunction Order at 41.

2.      The Court correctly concluded, based on a largely uncontested record, that the AP

is likely to establish that Defendants unconstitutionally discriminated against it on the basis of its

viewpoint, and unconstitutionally retaliated against the AP for its exercise of First Amendment

freedoms, by excluding AP journalists from events open to the White House press pool and

White House press corps because of the AP's continued use of the name Gulf of Mexico.  *Id.* at

29-30, 32, 36.  The Court thus ordered Defendants to cease their unconstitutional behavior and

"put the AP on an equal playing field as similarly situated outlets."  *Id.* at 21, 40.

3.      Though the Court recognized that Defendants' actions were causing the AP

irreparable harm, *see id.* at 37-38, the Court *sua sponte* ordered a brief stay through April 13,

2025, "to provide the Government time to seek an emergency stay from a higher court and to

prepare to implement the Court's injunction," *see* Apr. 8, 2025 Order (ECF 47).

4.      Defendants subsequently asked this Court to enter a longer stay, and the Court

promptly and firmly rejected that motion, explaining that "the Government has not shown that it

is likely to succeed on the merits," and that "the equitable considerations do not favor the

Government; the AP will be irreparably harmed without the injunction and that harm would

revive upon staying it, while the Government's policy goals may never triumph over the Constitution." *See* Apr. 11, 2025 Mem. Order at 2 (ECF 55) (cleaned up).

5.      Defendants also sought a stay pending appeal and an administrative stay from the Court of Appeals, which the AP opposed, and the Court of Appeals responded by promptly setting a hearing on that stay motion and <u>not</u> further staying the Injunction Order. *See* Order, *AP v. Budowich*, No. 25-5109 (D.C. Cir. Apr. 13, 2025) (Doc. 2110733) (per curiam). As Defendants acknowledged in a subsequent letter to the Court of Appeals, the Injunction Order has therefore "now taken effect." *See* Apr. 14, 2025 Ltr. from Defendants' Counsel to Clerk of Court, *id.* (Doc. 2110741).

6.      Despite this acknowledgment, the Principal Deputy White House Press Secretary informed the AP on April 14, 2025, that AP journalists will continue to be excluded from press pool events because this case is "ongoing." *See* Declaration of Chris Megerian ¶¶ 2-5. An AP text journalist and an AP photographer were therefore not permitted to attend a press pool event in the Oval Office on April 14. *Id.*[1]

7.      When undersigned counsel contacted Defendants' counsel on April 14 to confer regarding this motion, pursuant to Local Civil Rule 7(m), Defendants' stated, at around 7:00 pm ET, that "the AP was not excluded today on the basis of the litigation" but rather "because it was not its turn under the policy allowing one wire service access each day." Counsel added, "[w]e

---

[1] At this time, the AP is not moving to enforce the injunction as to claims regarding access to the East Room and other pre-credentialed media events. Although an AP text journalist was excluded from an event on April 14 that was open to the White House press corps, an AP text journalist was allowed into an East Room event open to the press corps yesterday, April 15. AP photographers were allowed into both events. Should Defendants resume their discriminatory, retaliatory access denials of the AP from events open to the White House press corps, however, the AP will seek appropriate relief.

anticipate a new press policy will be announced in the next 24 hours that also conforms to Judge

McFadden's order." A true and correct copy of the April 14 email is attached as Exhibit A.

8.      On April 15, yesterday, the AP was again excluded from the press pool's wire and

photography spots. Undersigned counsel therefore contacted Defendants' counsel that morning,

objecting to the exclusion and explaining that, "today is the fifth business day since the District

Court ordered the White House to 'immediately' include the AP in the pool. Under a non-

discriminatory system, the AP should have been selected for either the wire or photo pool, or

both, by today." Undersigned counsel requested the "White House's firm commitment by close

of business today that the AP will be restored to the pool 'immediately' and regularly receive a

rotating assignment to daily pool opportunities, as well as pre-credentialed events." A true and

correct copy of the April 15 email is attached as Exhibit B.

9.      Instead of providing any such commitment, the White House instead announced a

new policy for the press pool. A true and correct copy is attached as Exhibit C.

10.     The new policy abandons the longstanding role of wire services, which have been

included in the pool since its inception to assure that White House reporting reaches the broadest

possible audience in the United States and around the globe as quickly and reliably as possible.

This change marks the latest reduction in wire service participation, which the White House

continues to use as a pretext for targeting the AP: from three non-rotating wire spots (AP,

Bloomberg, and Reuters) before the White House barred the AP on February 11, to two wire

spots between February 11 and 25 (Bloomberg and Reuters), to one or two wire spots until April

16 (Bloomberg and/or Reuters), to zero dedicated wire spots now.

11.     Now, the pool will instead have two print seats: "One print journalist to serve as

'print pooler'" and "[o]ne additional print journalist." *Id.* at 4. The policy provides that "[w]ire-

based outlets will be eligible for selection as part of the Pool's daily print-journalist rotation." *Id.* at 5.  The rest of the pool now consists of four photo spots, one radio seat, one "new media/independent journalist" seat, one TV network, and one secondary TV network or streaming service.  *Id.* at 4.

12.    The policy claims that "[o]utlets will be eligible for participation in the Pool, irrespective of the substantive viewpoint expressed by an outlet," but – repeating the same gamesmanship over the phrase "eligibility" that this Court has seen before – the policy further asserts that "[a]lthough eligible outlets will generally rotate through these slots, the White House Press Secretary shall retain day-to-day discretion to determine composition of the pool."  *Id.* at 4-5.  Moreover, ignoring this Court's clear instructions, the policy declares that regardless of who may be eligible for the pool, the President "retains *absolute discretion* over access to the Oval Office, Air Force One, and other comparably sensitive spaces."  *Id.* at 5 (emphasis added).

13.    The White House's daily pool guidance for April 16 does not include the AP at all, in either the four photo spots or two print pool spots.  Under any non-discriminatory policy, however, the AP would have been selected for participation in the pool at least once since the injunction took effect.  A true and correct copy of the April 16 daily pool guidance is attached as Exhibit D.

14.    The new policy did not include any list of participating outlets or schedule for their rotation into the pool, further underscoring the lack of *any* indication that the White House has in fact "immediately rescinded" its viewpoint-based exclusion of the AP's text journalists and photographers.  *See* Ex. C.

15.    "The power of a federal court to protect and enforce its judgments is unquestioned."  *Marshall v. Loc. Union No. 639*, 593 F.2d 1297, 1302 (D.C. Cir. 1979).  Courts

"have the power to enter such orders as may be necessary to enforce and effectuate their lawful orders and judgments, and to prevent them from being thwarted and interfered with by force, guile, or otherwise." *Sec. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*, 628 F. Supp. 1438, 1441 (D.D.C. 1986) (cleaned up).  That remains the case even though Defendants have appealed from the Injunction Order, because "[a] district court retains jurisdiction to enforce the terms of a previously entered injunction." *Am. Min. Cong. v. Army Corps of Eng'rs*, 120 F. Supp. 2d 23, 27 (D.D.C. 2000) (collecting cases).

16.    Given Defendants' refusal to obey this Court's Injunction Order on its own terms, the AP respectfully requests that this Court enter such further relief as the Court deems necessary to ensure that Defendants immediately comply with the Injunction Order.

17.    Pursuant to Local Civil Rule 7(m), as reflected in Exhibits A to C, counsel for the AP conferred by email with counsel for Defendants in advance of filing this motion. Defendants' counsel contested the basis for this motion and the need for the relief sought.

Dated:  April 16, 2025         Respectfully submitted,

                                           BALLARD SPAHR LLP

                                           */s/ Charles D. Tobin*
                                           Charles D. Tobin (#455593)
                                           Jay Ward Brown (#437686)
                                           Maxwell S. Mishkin (#1031356)
                                           Sasha Dudding (#1735532)
                                           1909 K Street NW, 12th Floor
                                           Washington, DC 20006
                                           Tel: (202) 661-2200
                                           Fax: (202) 661-2299
                                           tobinc@ballardspahr.com
                                           brownjay@ballardspahr.com
                                           mishkinm@ballardspahr.com
                                           duddings@ballardspahr.com

                                           *Counsel for Plaintiff The Associated Press*

# Exhibit A

| From: | Tobin, Charles D. |
|---|---|
| Sent: | Monday, April 14, 2025 8:43 PM |
| To: | Lyons, Jane (USADC); Hudak, Brian (USADC); Freeman, Mark (CIV); Myers, Steven A. (CIV); Salzman, Joshua M. (CIV); Walker, Johnny (USADC); McArthur, Eric (CIV) |
| Cc: | Mishkin, Maxwell S.; Dudding, Sasha |
| Subject: | RE: Associated Press v. Taylor Budowich, et al. |

Thanks for your response, Jane.  In reliance on the government's representation that the new White House press policy will comply with the District Court's injunction order, we will forbear from filing the motion to enforce for tonight.  We look forward to receiving the new policy tomorrow.  Thank you.

Best,
Chuck


**Charles D. Tobin**

**Ballard Spahr** LLP

1909 K Street, NW, 12th Floor
Washington, DC 20006-1157
202.661.2218 DIRECT
202.661.2299 FAX

tobinc@ballardspahr.com
VCARD

- - - - - - - - - - - - - - - - - - - - - - - - - - - -
www.ballardspahr.com

---

**From:** Lyons, Jane (USADC) <Jane.Lyons@usdoj.gov>
**Sent:** Monday, April 14, 2025 6:59 PM
**To:** Tobin, Charles D. <TobinC@ballardspahr.com>; Hudak, Brian (USADC) <Brian.Hudak@usdoj.gov>; Freeman, Mark (CIV) <Mark.Freeman2@usdoj.gov>; Myers, Steven A. (CIV) <Steven.A.Myers@usdoj.gov>; Salzman, Joshua M. (CIV) <Joshua.M.Salzman@usdoj.gov>; Walker, Johnny (USADC) <Johnny.Walker@usdoj.gov>; McArthur, Eric (CIV) <Eric.McArthur@usdoj.gov>
**Cc:** Mishkin, Maxwell S. <MishkinM@ballardspahr.com>; Dudding, Sasha <duddings@ballardspahr.com>
**Subject:** RE: Associated Press v. Taylor Budowich, et al.

⚠ **EXTERNAL**
Hi Chuck,

  We respectfully disagree with your characterization of what happened today at the White House.  AP was not selected today because it was not its turn under the policy allowing one wire service access each day.  Notwithstanding any references to the litigation, the AP was not excluded today on the basis of the litigation.  We anticipate a new press policy will be announced in the next 24 hours that also conforms to Judge McFadden's order.

Best,
Jane


**Jane M. Lyons** | Appellate Counsel (Civil)

Civil Division, U.S. Attorney's Office
601 D Street, NW, Washington, D.C. 20530
Ph: (202) 252-2540 | jane.lyons@usdoj.gov

---

**From:** Tobin, Charles D. <TobinC@ballardspahr.com>
**Sent:** Monday, April 14, 2025 4:54 PM
**To:** Hudak, Brian (USADC) <Brian.Hudak@usdoj.gov>; Freeman, Mark (CIV) <Mark.Freeman2@usdoj.gov>; Lyons, Jane (USADC) <Jane.Lyons@usdoj.gov>; Myers, Steven A. (CIV) <Steven.A.Myers@usdoj.gov>; Salzman, Joshua M. (CIV) <Joshua.M.Salzman@usdoj.gov>; Walker, Johnny (USADC) <Johnny.Walker@usdoj.gov>; McArthur, Eric (CIV) <Eric.McArthur@usdoj.gov>
**Cc:** Mishkin, Maxwell S. <MishkinM@ballardspahr.com>; Dudding, Sasha <duddings@ballardspahr.com>
**Subject:** [EXTERNAL] RE: Associated Press v. Taylor Budowich, et al.

Counsel – The Associated Press was informed today by the White House that, because the litigation is ongoing, it would not include the AP in the rotation for the White House press pool, even though the stay on the District Court's injunction order expired at midnight on Sunday.

In light of this, we plan to file a motion this evening asking the District Court to order the defendants to immediately restore the AP in the press pool rotation.

Please let us know, by 7 p.m. this evening, whether the defendants consent to this relief.

Thank you,
Chuck Tobin

**Charles D. Tobin**

1909 K Street, NW, 12th Floor
Washington, DC 20006-1157
202.661.2218 DIRECT
202.661.2299 FAX

tobinc@ballardspahr.com
VCARD

www.ballardspahr.com

---

**From:** Tobin, Charles D.
**Sent:** Monday, April 14, 2025 8:25 AM
**To:** Hudak, Brian (USADC) <Brian.Hudak@usdoj.gov>; mark.freeman2@usdoj.gov; jane.lyons@usdoj.gov; steven.a.myers@usdoj.gov; joshua.m.salzman@usdoj.gov
**Cc:** Mishkin, Maxwell S. <MishkinM@ballardspahr.com>; Dudding, Sasha <duddings@ballardspahr.com>
**Subject:** Associated Press v. Taylor Budowich, et al.

Counsel, our office represents The Associated Press in this matter.

As you know, the district court's injunction order, rendered on April 8 in favor of The Associated Press, became operative today, April 14. The injunction order requires the White House to "immediately rescind" the denial of AP's

access to the Oval Office and Air Force One, and to "immediately rescind [your] viewpoint-based denial of the AP's access to events open to all credentialed White House journalists."

We expect the White House to restore the AP's participation in the pool as of today, as provided in the injunction order.

Thank you,
Chuck Tobin

**Charles D. Tobin**

1909 K Street, NW, 12th Floor
Washington, DC 20006-1157
202.661.2218 DIRECT
202.661.2299 FAX

tobinc@ballardspahr.com
VCARD

www.ballardspahr.com

# Exhibit B

| | |
|---|---|
| **From:** | Tobin, Charles D. |
| **Sent:** | Tuesday, April 15, 2025 10:13 AM |
| **To:** | Lyons, Jane (USADC); Hudak, Brian (USADC); Freeman, Mark (CIV); Myers, Steven A. (CIV); Salzman, Joshua M. (CIV); Walker, Johnny (USADC); McArthur, Eric (CIV) |
| **Cc:** | Mishkin, Maxwell S.; Dudding, Sasha |
| **Subject:** | The White House's ongoing failure to include the AP in the press pool, in violation of the Court's injunction order |
| **Attachments:** | FW: DAILY GUIDANCE AND PRESS SCHEDULE FOR MONDAY, APRIL 14, 2025; FW: DAILY GUIDANCE AND PRESS SCHEDULE FOR TUESDAY, APRIL 15, 2025 |

Counsel, attached are the White House Daily Guidance and Press Schedules for yesterday, April 14, and today, April 15.

Despite the District Court's April 8 injunction order that required the White House to "immediately rescind" the denial of the Associated Press's access to the press pool, and the Court's denial on April 11 of the government's stay motion, the AP has not been selected for either the wire service or photo slots in the pool in the past five business days. In fact, as to photos, the White House has included the same four members of that pool both yesterday and today, excluding only the AP.

Again, today is the fifth business day since the District Court ordered the White House to "immediately" include the AP in the pool. Under a non-discriminatory system, the AP should have been selected for either the wire or photo pool, or both, by today.

Its continued failure to include the AP strongly indicates that the White House, as an official there told the AP yesterday, continues to be excluded because of the litigation the AP brought, and because the AP will not accede to the President's demands that it change *The AP Stylebook* to reflect his executive order's re-designation of the "Gulf of America."

We are waiting for the White House's firm commitment by close of business today that the AP will be restored to the pool "immediately" and regularly receive a rotating assignment to daily pool opportunities, as well as pre-credentialed events. If none is forthcoming, we will ask the District Court to enforce the injunction order.

Thank you,
Chuck Tobin

**Charles D. Tobin**

**Ballard Spahr** LLP

1909 K Street, NW, 12th Floor
Washington, DC 20006-1157
202.661.2218 DIRECT
202.661.2299 FAX

tobinc@ballardspahr.com
VCARD

---------------------------------
www.ballardspahr.com

**Dudding, Sasha**

| | |
|---|---|
| **From:** | Tobin, Charles D. |
| **Sent:** | Tuesday, April 15, 2025 9:10 AM |
| **To:** | Tobin, Charles D. |
| **Subject:** | FW: DAILY GUIDANCE AND PRESS SCHEDULE FOR MONDAY, APRIL 14, 2025 |



**FOR IMMEDIATE RELEASE**

04/13/25

**DAILY GUIDANCE AND PRESS SCHEDULE**

**FOR MONDAY, APRIL 14, 2025**

**In-Town Pool**

Wire: Reuters

Photos: AFP, NYT, Reuters, Getty

TV Corr & Crew: CNN

Secondary TV Corr & Crew: Telemundo

Print: Washington Examiner

Radio: CBS Radio

**EDT**

**9:00 AM**        **In-Town Pool Call Time**

**11:00 AM**        **THE PRESIDENT greets the President of the Republic of El Salvador**

*Stakeout Location*

*Open Press*

**11:05 AM**     **THE PRESIDENT participates in a Bilateral Meeting with the President of the Republic of El Salvador**

*Oval Office*

*White House Press Pool*

**11:35 AM**     **THE PRESIDENT participates in a Bilateral Lunch with the President of the Republic of El Salvador**

*Cabinet Room*

*Closed Press*

**3:00 PM**     **THE PRESIDENT participates in a visit with the 2025 College Football National Champions – The Ohio State University**

*South Lawn*

*Pre-Credentialed Media*

*Media Sign-Up Link Here*

*(Link closes Monday, April 14 at 8:00 AM)*

To ensure uninterrupted delivery of these emails, please add press@mail.whitehouse.gov to your Address Book and/or Safe Sender list.

The Office of Communications · 1600 Pennsylvania Ave NW · Washington, DC 20500-0005 · USA · 202-456-1111

Privacy Policy | Unsubscribe

**Dudding, Sasha**

| | |
|---|---|
| **From:** | Tobin, Charles D. |
| **Sent:** | Tuesday, April 15, 2025 9:09 AM |
| **To:** | Tobin, Charles D. |
| **Subject:** | FW: DAILY GUIDANCE AND PRESS SCHEDULE FOR TUESDAY, APRIL 15, 2025 |



**THE WHITE HOUSE**

WASHINGTON

**FOR IMMEDIATE RELEASE**

04/14/25

**DAILY GUIDANCE AND PRESS SCHEDULE**

**FOR TUESDAY, APRIL 15, 2025**

**In-Town Pool**

Wire: Bloomberg

Photos: AFP, NYT, Reuters, Getty

TV Corr & Crew: FOX

Secondary TV Corr & Crew: Sinclair

Print: Washington Post

New Media: Spectrum News

Radio: FOX Radio

**EDT**

**9:00 AM        In-Town Pool Call Time**

**12:30 PM**          **THE PRESIDENT and the Vice President have lunch**

*Private Dining Room*

*Closed Press*


**2:30 PM**          **THE PRESIDENT signs Executive Orders**

*Oval Office*

*Closed Press*


**3:30 PM**          **THE PRESIDENT participates in a Commander-in-Chief Trophy**

**Presentation to the Navy Midshipmen - the United States Naval Academy**

*East Room*

*Pre-Credentialed Media*

*Media Sign-Up Link Here*

*Media Link closes Tuesday at 10:00 AM*


**Briefing Schedule**

**1:00 PM**          **Press Briefing by the White House Press Secretary Karoline Leavitt**

*James S. Brady Press Briefing Room*

*On Camera*

To ensure uninterrupted delivery of these emails, please add press@mail.whitehouse.gov to your Address
Book and/or Safe Sender list.

The Office of Communications · 1600 Pennsylvania Ave NW · Washington, DC 20500-0005 · USA · 202-
456-1111

Privacy Policy | Unsubscribe

# Exhibit C

| | |
|---|---|
| **From:** | Lyons, Jane (USADC) <Jane.Lyons@usdoj.gov> |
| **Sent:** | Tuesday, April 15, 2025 5:14 PM |
| **To:** | Tobin, Charles D.; Hudak, Brian (USADC); Freeman, Mark (CIV); Myers, Steven A. (CIV); Salzman, Joshua M. (CIV); Walker, Johnny (USADC); McArthur, Eric (CIV) |
| **Cc:** | Mishkin, Maxwell S.; Dudding, Sasha |
| **Subject:** | RE: The White House's ongoing failure to include the AP in the press pool, in violation of the Court's injunction order |

## ⚠ EXTERNAL

Hi Chuck,

 I just want to acknowledge that we have received your email.  We've confirmed that an updated pool policy should be issuing this evening.  If we learn of any last-minute delays, we'll let you know.

 Have a nice evening.

Best,
Jane


**Jane M. Lyons** | Appellate Counsel (Civil)
Civil Division, U.S. Attorney's Office
601 D Street, NW, Washington, D.C. 20530
Ph:  (202) 252-2540 | jane.lyons@usdoj.gov

---

**From:** Tobin, Charles D. <TobinC@ballardspahr.com>
**Sent:** Tuesday, April 15, 2025 10:13 AM
**To:** Lyons, Jane (USADC) <Jane.Lyons@usdoj.gov>; Hudak, Brian (USADC) <Brian.Hudak@usdoj.gov>; Freeman, Mark (CIV) <Mark.Freeman2@usdoj.gov>; Myers, Steven A. (CIV) <Steven.A.Myers@usdoj.gov>; Salzman, Joshua M. (CIV) <Joshua.M.Salzman@usdoj.gov>; Walker, Johnny (USADC) <Johnny.Walker@usdoj.gov>; McArthur, Eric (CIV) <Eric.McArthur@usdoj.gov>
**Cc:** Mishkin, Maxwell S. <MishkinM@ballardspahr.com>; Dudding, Sasha <duddings@ballardspahr.com>
**Subject:** [EXTERNAL] The White House's ongoing failure to include the AP in the press pool, in violation of the Court's injunction order

Counsel, attached are the White House Daily Guidance and Press Schedules for yesterday, April 14, and today, April 15.

Despite the District Court's April 8 injunction order that required the White House to "immediately rescind" the denial of the Associated Press's access to the press pool, and the Court's denial on April 11 of the government's stay motion, the AP has not been selected for either the wire service or photo slots in the pool in the past five business days.  In fact, as to photos, the White House has included the same four members of that pool both yesterday and today, excluding only the AP.

Again, today is the fifth business day since the District Court ordered the White House to "immediately" include the AP in the pool.  Under a non-discriminatory system, the AP should have been selected for either the wire or photo pool, or both, by today.

Its continued failure to include the AP strongly indicates that the White House, as an official there told the AP yesterday, continues to be excluded because of the litigation the AP brought, and because the AP will not accede to the President's demands that it change *The AP Stylebook* to reflect his executive order's re-designation of the "Gulf of America."

We are waiting for the White House's firm commitment by close of business today that the AP will be restored to the pool "immediately" and regularly receive a rotating assignment to daily pool opportunities, as well as pre-credentialed events.  If none is forthcoming, we will ask the District Court to enforce the injunction order.

Thank you,
Chuck Tobin

**Charles D. Tobin**

1909 K Street, NW, 12th Floor
Washington, DC 20006-1157
202.661.2218 DIRECT
202.661.2299 FAX

tobinc@ballardspahr.com
VCARD

www.ballardspahr.com

THE WHITE HOUSE

WASHINGTON

FROM:          THE WHITE HOUSE COMMUNICATIONS OFFICE

SUBJECT:       PRESS POOL POLICY

DATE:          April 15, 2025

## WHITE HOUSE PRESS POOL POLICY

Hundreds of journalists show up each day to report from the White House.  And there are thousands of journalists across the country who seek special access to cover the President in the Oval Office, aboard Air Force One, and in other sensitive locations.

The President, at his discretion, affords special media access to a small group of reporters each day.  This group of reporters is known as the White House Press Pool.  As previously announced by the White House Press Secretary, the group of reporters in the White House Press Pool is chosen by the White House Press Secretary.  This memorandum outlines the criteria to select the White House Press Pool.

## PRESS POOL SELECTION

The White House Press Pool will consist of the following:

- One print journalist to serve as 'print pooler'
- One additional print journalist
- A television network head-on crew (ABC, CBS, CNN, FOX, NBC)
- A secondary television network or streaming service
- One radio journalist
- One new media/independent journalist
- Four photo-journalists

The White House Communications Office will use the following criteria when selecting members of the daily Pool:

- Eligible outlets will be chosen for the White House Press Pool on a rotating basis.

- Although eligible outlets will generally rotate through these slots, the White House Press Secretary shall retain day-to-day discretion to determine

composition of the pool. This is necessary to ensure that the President's message reaches targeted audiences and that outlets with applicable subject-matter expertise are present as events warrant.

- The White House Press Secretary reserves the right to add additional journalists to an expanded Pool based on capacity and day-to-day needs.

- Wire-based outlets will be eligible for selection as part of the Pool's daily print-journalist rotation.

- Outlets will be eligible for participation in the Pool, irrespective of the substantive viewpoint expressed by an outlet.

## APPLICABILITY

The policy outlined in this memorandum is effective immediately. This policy is subject to amendment or modification at any time, including if the injunction is stayed, modified, or reversed in *Associated Press v. Budowich*, No. 1-25-cv-532 (D.D.C.). The President retains absolute discretion over access to the Oval Office, Air Force One, and other comparably sensitive spaces.

# Exhibit D

USCA Case #25-5109     Document #2132694     Filed: 08/29/2025     Page 460 of 515



☰ Forth.

< WHITE HOUSE POOL

# DAILY GUIDANCE AND PRESS SCHEDULE FOR WEDNESDAY, APRIL 16, 2025



**White House Pool**
POSTED AUTOMATICALLY

**4/15/2025** · **10:21:21 PM EDT**

FOR IMMEDIATE RELEASE

04/15/25

DAILY GUIDANCE AND PRESS SCHEDULE

FOR WEDNESDAY, APRIL 16, 2025

In-Town Pool

TV Corr & Crew: NBC

Photos: AFP, NYT, Reuters, Getty

Print: Washington Times

Radio: iHeartMedia

Secondary TV Corr & Crew: EWTN

Secondary Print: The Daily Signal

New Media: Christian Broadcasting Network


EDT

9:00 AM In-Town Pool Call Time


11:30 AM THE PRESIDENT receives his Intelligence Briefing

Oval Office

Closed Press


6:30 PM THE PRESIDENT participates in an Easter Prayer Service and Dinner

Blue Room

White House Press Pool

Loading...

 Your Feed    Top Stories    More

Case 1:25-cv-06682-TAM   Document 56-4   Filed 04/16/25   Page 2 of 3
USCA Case #25-5109     Document #2132694     Filed: 08/29/2025     Page 461 of 515

To ensure uninterrupted delivery of these emails, please add [EMAIL ADDRESS] to your Address Book and/or Safe Sender list.

The Office of Communications . 1600 Pennsylvania Ave NW . Washington, DC 20500-0005 . USA XXX-XXX-XXXX

** Privacy Policy (https://www.whitehouse.gov/privacy/)

SPONSORED

# Start Applying for Grants

Updated weekly with the newest grant applications. Start applying to multiple sources.

USA Fundir







Your Feed     Top Stories

Docusign Envelope ID: 9D21275B-8A5D-4C6A-9879-57D4034FCE29

Case 1:25-cv-00532-TNM    Document 56-5    Filed 04/16/25    Page 1 of 2
USCA Case #25-5109    Document #2132694    Filed: 08/29/2025    Page 462 of 515

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

      Plaintiff,

v.                                                          Case No. 25-cv-532-TNM

TAYLOR BUDOWICH, et al.,

      Defendants.

### DECLARATION OF CHRIS MEGERIAN

Chris Megerian, pursuant to 28 U.S.C. § 1746, declares as follows:

I submit this declaration in support of the Motion to Enforce Preliminary Injunction filed by Plaintiff The Associated Press ("the AP") in the above-captioned matter. I have personal knowledge of the facts set forth herein and would be competent to testify to them.

1.      I am a White House reporter for the AP. Before joining the AP, I worked at the *Los Angeles Times* in Washington and California and *The Star-Ledger* in New Jersey.

2.      On April 14, 2025, I spoke in the White House with Harrison Fields, who serves as Special Assistant to the President and Principal Deputy Press Secretary.

3.      In light of the order entered in this case, I asked Mr. Fields if an AP photographer and I could join the pool for an event that was about to start in the Oval Office. Mr. Fields refused and said the White House had established a rotation.

4.      I asked Mr. Fields how the AP would be included in the text wire service rotation and whether the photographer could enter the Oval Office as part of what is currently the non-rotating group of pool photographers.

5.    Mr. Fields told me that because this is an ongoing legal matter, there will be no changes made to the pool at this point. I reminded Mr. Fields that the court order in this case is not stayed, and Mr. Fields responded again that it is an ongoing legal matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____4/14/2025_____

Signed by:

Chris Megerian

8CAFEE3CEA0A476...

Chris Megerian

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

        Plaintiff,

    v.

TAYLOR BUDOWICH,
White House Deputy Chief of Staff, et al.,

        Defendants.

Civil Action No. 25-0532 (TNM)

## THIRD DECLARATION OF TAYLOR BUDOWICH

I, TAYLOR BUDOWICH, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury

that the following is true and correct to the best of my recollection and belief.

1.    I am Deputy Chief of Staff and Cabinet Secretary at the White House.

2.    I offer the following declaration based on my personal knowledge and information

that I have learned in the scope of my job responsibilities.

3.    Based on my present knowledge, since April 14, 2025, the Associated Press has not

been excluded from the White House Press Pool based on its viewpoint.

4.    On Monday, April 14, 2025, Reuters was selected for the then-existing daily press

pool slot for wire services because it was Reuters's regular turn in the rotation.

5.    On Tuesday, April 15, 2025, the White House announced a new Press Pool Policy.

Under that policy, the Associated Press's treatment is not based on its viewpoint. I understand that

absent a stay of the Court's injunction in this matter, the Associated Press is expected to receive a

spot in the Press Pool for print journalists by April 20, 2025. I also understand that photojournalists

from the Associated Press are eligible for rotation into the pool and will not be denied access based

on viewpoint. I understand that an AP photojournalist was admitted to the pool today.

Dated:  April 17, 2025.

**TAYLOR BUDOWICH**

Deputy Chief of Staff and Cabinet Secretary

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     ASSOCIATED PRESS,
                                     CA No:  1:25-cv-00532-TNM
 4                  Plaintiff,
                                     Washington, D.C.
 5     v.                            Friday, April 18, 2025
                                     10:27 a.m.
 6
       TAYLOR BUDOWICH, et al.,
 7
                    Defendants.
 8     - - - - - - - - - - - - - - - x

 9     _____

10                TRANSCRIPT OF MOTIONS HEARING
           HELD BEFORE THE HONORABLE TREVOR N. McFADDEN
11                UNITED STATES DISTRICT JUDGE

12     _____

       APPEARANCES:
13

14     For the Plaintiff:        CHARLES D. TOBIN, ESQ.
                                  SASHA DUDDING, ESQ.
15                                BALLARD SPAHR LLP
                                  1909 K Street, NW, 12th Floor
16                                Washington, DC 20006
                                  (202) 661-2218
17                                tobinc@ballardspahr.com
                                  duddings@ballardspahr.com

18     For the Defendants:       JANE M. LYONS, ESQ.
                                  U.S. ATTORNEY'S OFFICE for D.C.
19                                Civil Division
                                  555 Fourth Street, NW
20                                Washington, DC 20530
                                  (202) 252-2540
21                                jane.lyons@usdoj.gov

22     Court Reporter:           Lisa A. Moreira, RDR, CRR
                                  Official Court Reporter
23                                U.S. Courthouse, Room 6718
                                  333 Constitution Avenue, NW
24                                Washington, DC  20001
                                  (202) 354-3187
25
```

```
 1                    P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Your Honor, this is Civil
 3     Action 25-532, Associated Press v. Budowich, et al.
 4            Counsel, please come forward to identify
 5     yourselves for the record starting with the plaintiff.
 6            MR. TOBIN:  Good morning, Your Honor; Charles
 7     Tobin with the law firm of Ballard Spahr on behalf of the
 8     Associated Press.  With me at counsel table is co-counsel,
 9     Sasha Dudding, and our client representative, Zeke Miller,
10     from the Associated Press.
11            THE COURT:  Good morning, folks.
12            MS. LYONS:  Good morning, Your Honor; I'm Jane
13     Lyons.  I'm with the U.S. Attorney's Office for the District
14     of Columbia in the civil division.
15            I'm a colleague of Mr. Hudak's, and he's not in
16     the country right now.
17            THE COURT:  All right.  Good morning, Ms. Lyons.
18            All right.  We're here on the plaintiff's motion
19     to enforce.
20            Mr. Tobin, why don't I start with you.  First, do
21     you agree with the government that one of your clients was
22     able to participate in the press pool yesterday?
23            MR. TOBIN:  Yes, Your Honor, the photography --
24     the photographer was permitted into the press pool for the
25     first time in a long time, since mid-February.
```

```
 1              THE COURT:  Okay.  And do you agree that the new

 2    policy from earlier this week is at least facially compliant

 3    with my order and then would be sufficient for nonpublic

 4    forum analysis?

 5              MR. TOBIN:  It is not, Your Honor.  It's a flat

 6    violation of your order in several respects, and it would

 7    not comport with either the First Amendment or the Court's

 8    order.

 9              THE COURT:  Okay.

10              MR. TOBIN:  If I can explain?

11              THE COURT:  Please, yes.

12              MR. TOBIN:  Yes.  Your Honor, in fact, we think

13    that the new pool policy really is a thumb in the nose --

14    thumbing the nose at the Associated Press and at this Court.

15    One of the judges yesterday, when we had the stay hearing,

16    characterized it as a poke in the eye, and that's a poke in

17    the eye of AP and this Court.  That policy permits at the

18    very bottom absolute discretion over access to the Oval

19    Office, Air Force One, and other comparably sensitive spaces

20    for the President of the United States.

21              Your Honor, they bury the lede in this policy by

22    putting that phrasing last.  That is the overarching

23    principle that governs the entire policy, that the President

24    has absolute discretion over the press pool.  And if he's

25    reserving absolute discretion to himself without
```

1    qualification, he is not complying with the Court's order

2    because he is permitting himself the authority to exclude on

3    the basis of viewpoint.  That's what the words "absolute

4    discretion" mean.

5            The order -- the policy additionally, Your Honor,

6    contains the word, in several places, "eligible"; so, Your

7    Honor, the policy recites that people will be eligible for

8    -- eligible outlets, it's the first bullet, will be chosen

9    for the White House press pool on a rotating basis.

10           The second bullet says, "Although eligible outlets

11   will generally rotate, the White House press secretary shall

12   retain day-to-day discretion to determine the composition of

13   the pool."

14           The fourth bullet says, "Wire-based outlets will

15   be eligible for selection as part of the pool's daily print

16   journalist rotation."

17           And then the final bullet says, "Outlets will be

18   eligible for participation in the pool irrespective of

19   substantive viewpoint."

20           "Eligible," "eligible," "eligible," "eligible,"

21   and another qualifying word "generally."

22           And then, again, all of that is cabined at the

23   very bottom by the phrase:  The President retains absolute

24   discretion over access to the Oval Office, Air Force One,

25   and other comparably sensitive spaces.

1              Your Honor, we had had a colloquy in this Court

2    over the word "eligible" when it appeared in the second

3    Budowich declaration.  Your Honor had very pointedly asked

4    government counsel "What does that mean?"  And government

5    counsel candidly -- and I salute him for his candor with the

6    Court -- said to you that "'Eligible' means that just like

7    I'm eligible to play for the Washington Nationals, I ain't

8    going to get chosen."

9              And then you asked him specifically about

10   viewpoint, does that reserve the right to exclude by

11   viewpoint?  And he said yes, and he, in sum and substance,

12   told the Court the Associated Press under the White House's

13   policy would not get into the press pool because it is

14   violating what the President views as the law in refusing to

15   yield its editorial discretion to the White House.

16             And so, Your Honor, for this policy to incorporate

17   the word "eligible" as guiding criteria over and over again,

18   we have to interpret that in the way that counsel has

19   represented to the Court, and that is to leave plenty of

20   room for the exclusion based on viewpoint.  And certainly if

21   the press secretary can control day-to-day access of who's

22   -- of the eligible people and who actually gets into the

23   pool, and the President retains absolute discretion to

24   decide who gets into the pool, they are not conforming with

25   this Court's order, and, in fact, this new policy is a

1    direct violation of that order.

2            Your Honor, if you aggregate that with the fact

3    that your order went into effect, the stay expired, and the

4    Court was very gracious in granting -- and deferential in

5    granting the White House a stay until Monday.  You entered

6    the stay for purposes of allowing them to seek an appeal in

7    the higher court.  They sought an appeal from you -- I'm

8    sorry, a stay in the higher court.  They sought a stay from

9    you, Your Honor, and Your Honor strongly rejected that stay

10   request, and the other part of your order was an order to

11   prepare to comply with the Court's order.

12            So on Monday we asked, "How are you complying with

13   the Court's order?  What preparations have you made?  Are we

14   getting into the pool?"

15            We did not get into the pool Monday or Tuesday or

16   Wednesday, and, Your Honor, if we were to do the math, at

17   the very least the photographer should have gotten into the

18   pool under any rotation system because in the most generous

19   view, if there are five people in the photo pool and under

20   their policy there were previously four slots, including all

21   five of them, then by the math we should have gotten in

22   either Monday or Tuesday and certainly by Wednesday.

23            THE COURT:  It really didn't look like there was a

24   rotation at all, did it?

25            MR. TOBIN:  It does not seem like there's any

1      rotation system at all.

2              And this is part of the problem, is the opacity of

3      this order.  It sets out a lot of words about eligibility

4      and viewpoint neutrality.  It makes a statement about

5      viewpoint neutrality -- a self-serving statement we think --

6      in an attempt to paper over noncompliance with this Court's

7      order, both in terms of the pattern of the conduct Monday,

8      Tuesday, and Wednesday in defiance of this Court's order,

9      and then telling us don't worry about it, we're going to

10      issue a new policy that complies with the Court's order.

11              I mean, Your Honor, that's why we didn't file the

12      first few days.  We actually were very mindful of the

13      history and the discussion we had at the TRO hearing where

14      the Court said, "I commend you for trying to work with the

15      White House, but part of a TRO requires pace, haste, moving

16      quickly."

17              So, Your Honor, we refrained as long as we thought

18      reasonable in order to have the conversation with the White

19      House.  We refrained as long as we thought would be

20      tolerable for the Court under the guidance the Court gave

21      us.  And once we saw that we were not getting in the pool

22      Wednesday, and once we saw this policy that is a stick in

23      the Court's eye and violates the injunction order, we moved

24      as quickly as we could for relief.

25              And so we would ask the Court to enforce its order

1        against this policy.

2                THE COURT:  So the eligible point, I certainly

3        remember that conversation with Mr. Hudak.

4                MR. TOBIN:  You cited it four times in your order.

5                THE COURT:  Nonetheless, I mean, your client now

6        has gotten into the press pool, and so I guess regardless of

7        Mr. Hudak's understanding or regardless of how it was being

8        operated before Tuesday, it seems like "eligible" does --

9        well, one couldn't say your client is now being kept out in

10       the way that it had been kept out before, and thus

11       "eligibility" must mean something slightly different than

12       what it did before.

13               MR. TOBIN:  Well, it's still subject to the

14       absolute discretion of the President, so tomorrow the

15       President can exercise, without this Court stepping in, his

16       absolute discretion to exclude the photographer.

17               I think they're playing a wait-and-see game in

18       what the Court does next in order to tailor their action.

19       After all, he reserves the right to go back to viewpoint

20       discrimination flat out and patently.  He reserves the right

21       to do that at the bottom of this policy if a stay is entered

22       or the Court modifies its injunction, and so we think that

23       this policy really is part and parcel of gamesmanship at the

24       White House in order to continue to exclude the AP.

25               We've talked about the photography pool and what's

1    happening with the photographer.

2            On the print pool, Mr. Miller and his colleagues,

3    the print journalists on the text side, have now been

4    aggregated with now a larger print population of hard

5    passholders.  They did away with the wire service category

6    entirely in that pool.  We think that they did that

7    punitively in order to dilute the AP's access.  They did

8    that in order to put the AP in a larger rotation pool,

9    again, to dilute the access.

10            The very first pool opportunity they've given to

11    the AP is on the President's golfing day, on Saturday.  So

12    it's not even an Oval Office or a White House presidential

13    event.  It's accompanying the President as he shoots the

14    links.  And, Your Honor, they did that all in reaction to

15    the Court's injunction order.

16            And so there's some semblance of a rotation

17    involving the text journalists, but it certainly is vastly

18    inferior to what it had before, and relegating us to an

19    inferior class is a punitive act taken directly in violation

20    of this Court's order.

21            And so, you know, to us, what the White House

22    ought to do and what we would ask this Court to do is to

23    strike this order as a violation of the Court's injunction.

24    And if the White House wants to, it can easily go back to

25    the system that it announced on February 25, right after the

1    TRO hearing, in which Ms. Leavitt got up at the podium and

2    said:  We're going to have a new rotation.  We're increasing

3    and creating new opportunities for newer media -- which is

4    fine -- and we're going to have a wire rotation and a photo

5    rotation, and the entities that are a part of that rotation

6    are in the record, but we're going to exclude the AP.

7         They can easily comply with the Court's order by

8    going back to what they have said was going to be their new

9    system on February 25 so long as they include the AP in

10   those rotations.  That, to us, would satisfy the Court's

11   order if they were to adopt that.

12        This order does not because it relegates the AP to

13   a much more subordinated status than it had before.  It does

14   it in reaction to our exercising our right to petition this

15   Court, and we petitioned this Court because of the violation

16   of our right to exercise our freedom of the press, freedom

17   of expression.

18        And they really are playing -- again, Your Honor,

19   I'll just say they're playing games in order to try and

20   reserve to themselves the absolute discretion of the

21   President to continue to exclude the AP.

22        THE COURT:  What sort of enforcement mechanisms do

23   you think are available to me at this point?

24        MR. TOBIN:  We have a few suggestions, Your Honor.

25        The one that we would most strongly recommend and

1    ask the Court is to find that the items we've complained

2    about in this order violate the preliminary injunction and

3    cannot be forced consistent with the preliminary injunction,

4    and so the remedy there would be to strike the new press

5    policy.  And we could do it just a simple -- we could ask

6    the Court to just simply say the press policy is invalid

7    because it violates the Court's injunction order, and then,

8    again, if the White House wants to do the sensible thing and

9    ensure compliance, I'm just putting on the record the prior

10    policy from February 25.  So long as the rotations in both

11    wire and photo include the Associated Press on a regular

12    rotating basis equal to every other member of that category

13    of the pool, that would be perfectly consistent with the

14    Court's injunction order.  So that would be our primary

15    suggestion and request to the Court for a remedy.

16         The secondary suggestion might be that the Court

17    order the government to explain how this new policy complies

18    and provide us with an opportunity to respond.  For example,

19    require the government to file a detailed submission

20    explaining what is behind each of those criteria --

21    eligibility, general assignment, and the President's

22    absolute discretion -- and we can hold another hearing, Your

23    Honor, to discuss whether that's appropriate if the Court

24    felt that oral argument was necessary, or the Court could

25    rule on those papers.

1         And then finally, Your Honor, if this were

2    ordinary litigation -- and clearly it is not -- I would

3    offer to submit a proposed order.  The Court could fashion

4    some kind of a dialogue or mediated remedy in which we

5    participated in a discussion with the White House and tried

6    to come to the Court with some kind of a policy that we

7    believe would conform with the Court's order and with the

8    Constitution.

9         So those are three different directions that we

10    came to the Court prepared today to suggest as a remedy.

11         THE COURT:  I mean, my -- I don't have a lot of

12    experience with parties arguably violating my injunctions,

13    but it strikes me that the typical route is some sort of

14    civil contempt with -- I mean, some sort of monetary penalty

15    that would accumulate.  Is that your understanding of how

16    this would work?

17         MR. TOBIN:  Your Honor, that's certainly within

18    the Court's tools to administer, absolutely.

19         THE COURT:  So the policy here -- I mean, we had

20    -- we've had various iterations of the press pool over the

21    last few months.  I think the preexisting kind of White

22    House correspondents policy was quite favorable to your

23    client having two permanent seats, and I think you

24    implicitly acknowledge your client is not necessarily

25    entitled to that, and your suggestion of going back to the I

1    guess February policy --

2           MR. TOBIN:  February 25th, Your Honor.  It's at

3    Exhibit D to Mr. Miller's second declaration -- third

4    declaration, Exhibit D.  He outlines what the White House

5    announced was the policy on February 25.

6           THE COURT:  Right.  And so that took away your

7    permanent seats and gave you a rotating basis, and this week

8    you've now been -- still have kind of a rotating seat but

9    now it's with a larger denominator, if you will.

10           I mean, it strikes me that all three of those

11    policies are -- well, these -- I guess I don't see how, if

12    the last policy was facially neutral, this one is not.  I

13    guess I'm trying to understand why this policy would not

14    meet nonpublic forum analysis assuming that I don't agree

15    with you on the eligibility point.

16           MR. TOBIN:  Fair enough.  Fair enough to frame the

17    question that way.

18           First of all, the absolute discretion to the

19    President is a flat out problem for the Constitution and, we

20    think, should be a problem for this Court in terms of the

21    authority of the Court to enforce its own order.  It is a

22    violation of the order for the President to continue to

23    declare absolute discretion.

24           That's exactly where we started on this.  It's

25    exactly the argument Mr. Hudak made.  It's exactly the

1    argument that the Court rejected resoundingly in not one but

2    two orders.  So that order, at least as to that provision,

3    is problematic, Your Honor, and is grounds enough to grant

4    the remedy that we seek.

5         Second of all, Your Honor, when the rotation --

6    the rotation for photos back in the February 25th, the White

7    House announced that there would be three spots among three

8    outlets for photographs, and so every photographer got in

9    the room.  There was no rotation per se when it came to the

10   February 25 policy.  So for now --

11        THE COURT:  For the photographers.

12        MR. TOBIN:  For the photographers.

13        And so we are now in a position where if we're

14   rotating, we have been -- if they've changed the entire

15   system in order to diminish the position of the AP in a very

16   material way by putting us in some sort of a rotation that's

17   opaque on the face of this order, there is a diminution,

18   there is a substantially inferior opportunity, and it was

19   done in reaction to this Court's order, and that should be

20   of concern.

21        And within the language of the Court's order, the

22   Court pointed out that if you're placed in an inferior

23   position in a retaliatory fashion, that is of constitutional

24   concern, and so that should remain a concern for the Court.

25        Second of all, there was -- had been -- a wire

1    service category.  That wire service category was eliminated

2    for the express purpose, we believe, of diminishing the AP's

3    opportunities to get into the Oval Office, and we need to

4    look no further for evidence of that than the fact that the

5    AP has now been told, fine, you can be in the print

6    rotation, and you can go watch the President golf.  Not

7    exactly a moment in history that animated, we think, the

8    Court's entire view of what the AP was being deprived of in

9    the first place.

10        So the elimination of the wire spot was a punitive

11    act in violation of this Court's order, and if this Court

12    were to strike the policy, I'm not saying the Court should

13    order the White House to go back to the February 25th.  We

14    would enjoy it, if the Court would.  But the Court could

15    certainly -- in striking the order, the White House could

16    certainly go back to that system, and we would not be back

17    here complaining to the Court that it was a violation of the

18    Court's order or the Constitution.

19        THE COURT:  So, you know, my opinion focused a lot

20    on the peer wire services, and I thought some of your most

21    salient evidence was that they're really not being treated

22    as they were despite this long history of equal treatment.

23        Why shouldn't I just kind of look at the proof in

24    the pudding and say, regardless what the policy is, I would

25    expect that the AP should be getting into the press pool on

1    roughly equivalent terms as Bloomberg and Reuters?

2         MR. TOBIN:  I think that would be a leap of faith

3    in the face of a policy that reserves absolute discretion

4    for viewpoint discrimination.  The Court was appropriately

5    concerned with the representations that were made in the

6    Budowich declarations.  They contradicted each other.  They

7    used the word "eligible," which the Court got behind.  And,

8    again, you relied on it four times in your order.

9         I think given that we are under the supervision of

10   the Court for the conduct of this litigation, this Court has

11   now issued an order -- a very strongly worded order -- to

12   the White House, strongly worded opinion, actually a very

13   elegantly narrow order itself to the White House.  The Court

14   should not accept the White House's representations that

15   we've now issued an order, and that order was completely

16   viewpoint neutral.  It is not.  And we've now conveniently

17   started assigning the AP to different pool events in a

18   larger diluted pool after excluding us for three days

19   despite the Court's order, and now relegating us to a larger

20   diluted population again in response to the Court's order

21   that there be no viewpoint discrimination.

22        THE COURT:  So I guess I'm still -- I'm not sure

23   that I would be trusting anybody.  I would just be looking

24   at what's happening.  And if your photographer is getting

25   into the press pool comparably to Reuters, Bloomberg, AFP --

1    is AFP a wire service as well?

2         MR. TOBIN:  Yes.  No, I'm sorry, it is not a wire

3    service.

4         THE COURT:  Okay.  Then things look good there

5    regardless what the policy says.  If Mr. Miller is getting

6    into the press pool roughly similarly to the other wire

7    reporters, that's fine regardless of the policy.

8         Why isn't that the more straightforward approach

9    rather than trying to battle over different policies that I

10    think you would say can be pretty easily manipulated

11    regardless of what the policy says?

12         MR. TOBIN:  Well, I think the policy on February

13    25, if it included the AP, would not be easy to manipulate

14    as long as it was clear that that is the policy.

15         Your Honor, I don't think this Court is in a

16    position to disregard an unconstitutional White House press

17    policy, so I would resist the Court's suggestion that we

18    only look at what's happened, that conveniently after we

19    moved to enforce -- I mean, the pool assignments were made

20    one hour after we moved to enforce the Court's order, Your

21    Honor.  It is a direct staging and a manipulation of the

22    process, if you will, in order to be able to stand up here

23    and for the White House to say, "Everything is just fine,

24    Your Honor.  No need to look any further."

25         They've issued a policy that does have a flat

1        violation of the Court's order and the Constitution, and

2        that's part of the relief we're seeking today, is for the

3        Court to address that order.

4               So I don't think we can start the conversation

5        regardless of what the order says, "Here's what's

6        happening."  So I think the order is a principal problem for

7        the Court and for us that we would ask the Court to help

8        resolve today in terms of what's actually happening.

9               What's happening in the photo pool on its face

10       right now looks like there is a regular access to pool

11       events by the photo along with the other photographers.

12              What's happening on the text side is they've

13       eliminated the category that they had before the

14       retaliation, and that's obviously what we're here to talk

15       about.  What was it before, and what is it now?  They've

16       eliminated the category of wire service expressly to provide

17       the AP with inferior coverage as to other hard passholders

18       and other categories, and the fact that they're being

19       treated as poorly as other wire service agencies doesn't

20       diminish the constitutional violation.

21              THE COURT:  All right.  Thank you, sir.

22              MR. TOBIN:  Thank you, Your Honor.

23              THE COURT:  Ms. Lyons.

24              MS. LYONS:  Good morning, Your Honor.  This matter

25       is obviously moving at high speed, but I think we need to

1    take a step back here for a moment and focus on what are we

2    here about today.

3           We're here on a motion to enforce a preliminary

4    injunction that has barely been briefed in terms of the

5    issues that were just discussed with the Court, which were

6    very serious, and if the Court pursued much of what my

7    colleague on the other side has proposed today, it would be

8    a very extraordinary jumping ahead to the merits of a

9    challenge that isn't even in the lawsuit yet.  So I think we

10   need to slow down a little bit.

11          Today we're here on an enforcement of an

12   injunction, and the injunction required two things:

13   rescinding the denials of access based on the AP's viewpoint

14   when certain spaces are made available, made open to other

15   members of the White House press pool.  The other thing the

16   injunction required is rescinding viewpoint-based denials of

17   the AP's access to events open to all credentialed White

18   House journalists.  That's exactly what it required.

19          And the reason we're very careful about throwing

20   around words like "violation of orders" and "violation of

21   injunctions" is that these are very serious matters.  And

22   nothing in the record shows that they are in -- that the

23   White House has violated either of these two things.

24          When the rescission of -- in response to the first

25   item, when rescission happened, it did not automatically

1    require constructing the press pools in any particular way

2    on Monday or Tuesday of this week.  It did not require

3    anything more than rescinding a policy, and that was done.

4         As to the second point with these ideas that the

5    policy of the White House is something we can go back to, we

6    can't go back.  The previous policy allowed for viewpoint-

7    based factors to be considered in the composition of the

8    press pools.  That's precisely what the Court has

9    disallowed.  So that is not possible.

10        The Court's injunction required change, and that

11   change has been made.

12        As to what the White House press pool policy now

13   is, and these complaints about it being -- "eligibility"

14   being a gamesmanship word or that it is somehow a poke in

15   the eye, nothing could be further from the truth.  The point

16   is that the policy -- it even refers to this case and refers

17   to the injunction, and it makes it clear that the viewpoint-

18   based denials of access or consideration of them is no

19   longer allowed under this policy.

20        And this is the White House we are talking about.

21   We're talking about the White House chief of staff and the

22   deputy chief of staff and the press secretary.  They are

23   high-level government officials.  When they issue a policy,

24   they mean it.  And a facial challenge -- I'm going to have

25   to rely on just my memory of being a lawyer here for the

1    government for a long time, but a facial challenge is not

2    usually something that a party can challenge if it can be

3    applied constitutionally.  So the exercise of discretion is

4    not uncommon in government decision-making and government

5    policies and their implementation.

6              So if there is a policy, and it can be interpreted

7    constitutionally certainly on its third day of application,

8    which is today -- today is the third day; it must be around

9    11:00, but I haven't turned around to check -- it's early in

10   the application of this policy.  It is way too soon to start

11   saying that any particular compositions of the press pools

12   or who's getting what access is a problem at this point, and

13   it is far, far more than this record will support.

14             THE COURT:  Why shouldn't I be concerned about the

15   lack of a rotation on the photojournalist that Monday it's

16   four photojournalists, not including the AP; Tuesday, it's

17   the same four photojournalists, not including the AP;

18   Wednesday, it's the same four photojournalists, not

19   including the AP?  I mean, that doesn't look like a

20   rotation.

21             MS. LYONS:  I want to understand your question.

22   That's what happened this week.

23             THE COURT:  Yes.

24             MS. LYONS:  But there is not a rotation -- it's

25   not like a junior high school cafeteria where Monday is

1    meatball sub day and Tuesday is, I don't know, mac and

2    cheese.  There is a -- there are different press pools

3    created each week.  The press secretary retains discretion

4    under this policy to do that, and different considerations

5    can be taken into account in composing those pools.

6         This lawsuit is about eliminating viewpoint-based

7    factors, and that's all.  There are other factors that can

8    be taken into account.  This Court's injunction doesn't

9    require otherwise, and it didn't disallow the White House

10   from making a change.  In fact, it compelled the White House

11   to make a change to its policy.

12         The policy is constitutional on its face, and as

13   it's being applied --

14         THE COURT:  But, Ms. Lyons, I'm talking about the

15   results here.  I mean, I think the evidence before me was

16   that there was a rotation of everybody except for the AP,

17   and it seems like that was still happening here.

18         MS. LYONS:  I am not an expert in all of the

19   operations of the White House, but I think I heard this

20   morning that somebody said something about there are five

21   slots, and that's more than three.  So they --

22         THE COURT:  I'm not sure.  That was the

23   photojournalists.

24         MS. LYONS:  That's for the photojournalists, and

25   there is always a bit of -- my tendency as well is to sort

1    of have a little trouble with the two different pools.  But

2    the photojournalists rotate -- you know, the

3    photojournalists rotate however they rotate, but there

4    aren't enough slots for everyone to get what they want.

5           THE COURT:  But my point, Ms. Lyons, is that there

6    wasn't a rotation.  Looking at the daily guidance from the

7    White House, In-Town Pool, Monday:  AFP, New York Times,

8    Reuters, Getty.

9           Tuesday:  AFP, New York Times, Reuters, Getty.

10           Wednesday:  AFP, New York Times --

11           MS. LYONS:  No one --

12           THE COURT:  -- Reuters --

13           MS. LYONS:  No one --

14           THE COURT:  -- Getty.

15           MS. LYONS:  I understand that, Your Honor, but

16    there is nothing in a policy that anyone has pointed me to

17    that I've read that says the rotation has to be on a daily

18    basis.  Rotations can happen in wide varieties of

19    periodicity.

20           THE COURT:  I understand your point, but I'm --

21    we're coming from a backdrop of the defendants, as I found

22    it, explicitly discriminating against the AP, and it's very

23    hard to see how there's compliance when the record is that

24    nothing changed for three days.

25           MS. LYONS:  That's not true, Your Honor.  You have

1    evidence before you in the third declaration of Mr. Budowich

2    that on Monday morning the policy changed, and the

3    viewpoint-based access that had been in effect since

4    February was eliminated.  You have evidence of that.  You

5    can't just ignore it.  It is the evidence in the record.

6         And it is unqualified.  There are no weasel words

7    in it.  The word "eligible" isn't in it.

8         You ordered the rescinding of a policy.  That's

9    what happened.

10        You ordered a resigning of viewpoint-based denials

11   of AP's access, and that has happened as well.

12        You have evidence of both of those things.

13        THE COURT:  And you're saying in Mr. Budowich's

14   declaration?

15        MS. LYONS:  Yes.

16        THE COURT:  Okay.

17        MS. LYONS:  The third supplemental one that we

18   filed with our opposition yesterday afternoon.

19        THE COURT:  Right.  And so why isn't Mr. Tobin

20   correct that the policy itself does have, to use your word,

21   a weasel word of "eligible" repeatedly and the final

22   declaration that the President retains absolute discretion?

23   Doesn't that eviscerate whatever viewpoint neutrality is

24   suggested in the rest of the policy?

25        MS. LYONS:  No.  The reservation of discretion for

1    the President, who I remind you respectfully is not a party

2    to the case and whom you have in your order and in your

3    memorandum opinion appropriately recognized is a person who

4    has a prerogative here.  I think particularly the argument

5    that the D.C. Circuit had yesterday was a very interesting

6    exploration of the possibility that the President's

7    prerogatives and the spaces and the way the First Amendment

8    can apply might be getting revisited, might have some nuance

9    to it.  It might have some other things.

10            THE COURT:  Well, those certainly weren't

11    arguments you made in front of me.

12            MS. LYONS:  I wasn't here.

13            THE COURT:  You, the government.

14            MS. LYONS:  The government did not make these

15    arguments at the time.

16            This lawsuit is rapidly evolving, Your Honor, and

17    you have made a decision, and it is being respected by the

18    defendants.  They are in full compliance with your order

19    today, and they will be.  And we won't have much of a sense

20    of how this new policy plays out until we have more time.

21    Today is the third day.

22            And I know that AP mentioned to you that they had

23    been excluded since February, but the injunction is what

24    we're here about this morning, and the injunction has only

25    been in effect now for five days.

```
1              THE COURT:  So I'm not interested in micromanaging

2     the White House press pool.  I'm sure your client does not

3     want me to do that.  How do you think that I should be

4     ensuring compliance with my order unless and until it's

5     stayed or modified?

6              MS. LYONS:  I think for now you should deny the

7     existing motion to enforce.  It's based on practically no

8     evidence other than a belief that it required the White

9     House to admit the AP photojournalists on Monday morning.

10    That's not what the injunction says.

11             If you want to issue a more specific injunction, I

12    don't think you have evidence here that there's any need for

13    it.  But we are in compliance with the injunction that you

14    have issued.

15             THE COURT:  All right.  That wasn't my question

16    now.

17             MS. LYONS:  Sorry.  Let me try to answer your

18    question better.

19             THE COURT:  Yes.  How should I be ensuring

20    compliance with my injunction moving forward in a way that

21    is not micromanaging your clients but also ensuring that

22    Mr. Tobin's client gets the relief I found that they

23    deserve?

24             MS. LYONS:  Your Honor, I think we're going to

25    have to give this a little more time.  I would recommend
```

1      that for now.  You trust that the defendants, who are high-

2      level government officials, who have very serious jobs

3      communicating the President's daily message and coordinating

4      a press pool of so many people, that we let this -- we let

5      this play out and see what happens going forward.

6              I believe the policy is constitutional, that they

7      are not -- they're now operating under.

8              I'm sorry, I'm still not answering the question.

9              THE COURT:  No, no.

10             MS. LYONS:  You want to know how to be the vice

11     principal of the junior high school that is the Washington

12     press pool?

13             THE COURT:  I certainly don't, ma'am.  I want to

14     know how you think I should be enforcing this injunction.

15             MS. LYONS:  I think the injunction needs no

16     further enforcement in the sense that as written the

17     government is in compliance with it.

18             But if you disagree with that, then I think we

19     should have some thoughtful measured briefing on exactly

20     what the problems might be or might be claimed to be and

21     some careful legal analysis of what would be appropriate

22     remedies.

23             In terms of what my friend on the other side has

24     suggested, I do not think striking the new press policy is

25     appropriate.  That will turn us back to the problem that you

JA489

1    are trying to fix.  I don't think that's a good idea.

2            Having the government explain or submit detailed

3    declarations to you treads into some very uncomfortable

4    territory, and I think you are recognizing it yourself; that

5    there are interbranch conflicts here and too much intrusion

6    into the management of the White House on a daily basis.  So

7    I don't think that's a good idea.

8            THE COURT:  You're telling me a lot about what

9    doesn't work.  I'm trying to understand from you how we

10   ensure this is enforced, and as I say, I -- you know, I'm

11   kind of inclined to agree with you that the policy on its

12   face is not necessarily problematic, but I'll say the

13   results from the last few days -- and I take your point it's

14   a few days, but they do give me some concern that the

15   defendants are not proceeding in compliance here or perhaps

16   malicious compliance, but that we're just going to continue

17   coming back to deal with this issue every few days.

18           I'm not -- that's something nobody wants.  I'm

19   trying to understand how you recommend we proceed to ensure

20   this is enforced.

21           MS. LYONS:  I recommend that we proceed to wait

22   for -- I understand that -- well, let me say this.  The

23   Court's injunctive authorities, particularly when exercised

24   in this manner, are enormous.  They are powerful, and they

25   have commanded change at the White House.  At this point,

1    the White House is in compliance, and we should let that

2    play out.

3         The problem with trying to enforce the spirit of

4    the injunction or the understanding that happened during the

5    TRO hearing or whatever, you know, anybody referred to from

6    earlier in the litigation is not a way that courts have

7    generally succeeded in enforcing injunctions, is I guess

8    what I would observe.

9         It has to be -- the words chosen for the

10   injunctive relief have to be carefully chosen.  And you did,

11   and the White House complied with those carefully chosen

12   words.  But those carefully chosen words did not require the

13   AP to be in any particular press pool on Monday or Tuesday

14   or Wednesday.  They happened to have gotten a spot for the

15   photojournalist on Thursday, and they are getting a spot

16   this weekend for a print journalist.

17        The frequency with which that happens in

18   comparison to other comparable media is something that we

19   need more data on before we can conclude there's any kind of

20   problem.

21        THE COURT:  All right.  So let me ask you maybe a

22   different question.  How would I know if there's a problem?

23        MS. LYONS:  I think there are, perhaps -- I'm

24   going to give you a lawyerly answer, I'm afraid, but there

25   are a variety of ways in which you might.  Some of them were

1    in my nightmares last night.  Fortunately none of them have

2    come true this morning.  So there are a variety of ways.

3          I think someone at the White House, you know,

4    could say something.  That would be a problem.  What we have

5    evidence of in the record is someone in the White House on

6    Monday, on Monday morning in the first context or between

7    the press and the AP, knew about the lawsuit, knew about the

8    litigation, and that's amazing.  That's great that someone

9    is that aware on Monday morning as your injunction took

10    effect.

11          It's very powerful evidence that the government is

12    aware of and in compliance with the order, and nobody --

13    nobody -- is poking you in the eye.

14          THE COURT:  All right.  So I agree with you that

15    some sort of Tweet or other statement along the lines that

16    we've seen in the past would be a problem.

17          Let's go to just the results though.  Let's say

18    that two weeks had gone by and Mr. Vucci was never invited

19    into the press pool.  Would that be evidence of

20    noncompliance, or would I just be looking to the policy and

21    saying, "Well, the policy is facially neutral.  There must

22    be no problem"?

23          MS. LYONS:  The policy is facially neutral.  It

24    forbids any viewpoint-based denials of access, but it allows

25    the consideration of other factors, which admittedly are not

1      particularly laid out in the policy itself but could lead to

2      -- it's not -- it might not look random in data.  And I

3      don't want to go anywhere near having to do math so I don't

4      want to say that a two-week sample space is big enough to

5      draw a statistically significant conclusion from, but I

6      think that's the kind of evidence that, if it comes to it,

7      if we really get down to distrusting government officials

8      that profoundly say they are following your injunction would

9      be a sad day to me as a DOJ lawyer, but it would be

10     something we will contend with, if it happens.

11            Today, this morning, it hasn't happened, and so

12     you should deny this motion to enforce.

13            THE COURT:  What about evidence that Mr. Miller is

14     only invited on weekends to participate in the press pool?

15     Is that evidence of nefarious decision-making going on, or

16     should I just look at the policy and say the policy on its

17     face is neutral and he's getting in occasionally, so it must

18     be okay?

19            MS. LYONS:  In light of the fact that I -- as I

20     understand it, this is a continuing injunction, right?

21            THE COURT:  Yes.

22            MS. LYONS:  We can't go back to considering

23     viewpoint-based factors in making up these things.  If it

24     turned out that a prominent AP print journalist was -- I

25     don't know if those are the right words, and I apologize if

```
 1     I'm wrong --

 2               THE COURT:  I'm sure "prominent" is correct.

 3               MS. LYONS:  I'm sure "prominent" is correct.  I

 4     recognize his name.

 5               MR. TOBIN:  We'll accept that.  We'll stipulate.

 6               MS. LYONS:  So stipulated.  Thank you.  I

 7     appreciate that.

 8               If you have evidence after a period of time that

 9     there is a very prominent AP journalist who is only getting

10     to cover on Saturdays, then yes, Your Honor, they would have

11     perhaps a legitimate claim to bring us back to explain that

12     to you.  But we are nowhere near there now.

13               THE COURT:  So, you know, you're right about there

14     potentially being other motivations that are

15     nondiscriminatory for people getting in the press pool, but

16     as you say, I mean, inviting declarations for why people

17     were chosen when feels frankly more intrusive and quite

18     time-consuming for all of us.  That's why, you know, it

19     could be kind of crude, but just looking at how often

20     they're getting in compared to Reuters, compared to the

21     other -- their peers feels like the obvious way to determine

22     whether or not this is being followed.

23               MS. LYONS:  I am not in any way suggesting, Your

24     Honor, that might not be, in the future, a perfectly valid

25     lens, perhaps among others, to examine that question.  I'm
```

1    not suggesting that.

2         And I love math.  My undergraduate degree is in

3    math, so I'm fine.  But we have three days of data right

4    now.

5         THE COURT:  Well, we have five days of data for --

6         MS. LYONS:  Not under the new policy.

7         THE COURT:  Okay.  But my --

8         MS. LYONS:  And it is a new policy --

9         THE COURT:  Ma'am, ma'am --

10        MS. LYONS:  -- under the injunction.

11        THE COURT:  -- ma'am, I don't need you to talk

12   over me.

13        MS. LYONS:  So sorry.

14        THE COURT:  We have five days under the

15   injunction.  That's my primary concern.  I appreciate that

16   the policy has not been in place for five days, but --

17        MS. LYONS:  And I appreciate your point, Your

18   Honor.  The injunction is why we're here today, and it

19   matters.  It's changed things at the White House.

20   Appropriately, in conformance with your order.

21        It's not a small thing.  I am -- this is a very

22   serious lawsuit.  It presents very serious legal questions.

23        THE COURT:  Yes.  I agree.

24        MS. LYONS:  But we are -- and we are at a stage,

25   and there are going to be more stages.

34

```
 1                THE COURT:  Right.

 2                All right.  Anything else, Ms. Lyons?

 3                MS. LYONS:  No, Your Honor.  I'd just ask that you

 4   deny this motion, and we'll see where we go from here.

 5   Thank you.

 6                THE COURT:  All right.  Thank you.

 7                Mr. Tobin.

 8                MR. TOBIN:  Your Honor, the Court understands our

 9   argument clearly on the empirics issue, the math issue.  I

10   was a math minor; journalism major, which is why I do what I

11   do for a living.

12                Just --

13                THE COURT:  Perhaps both of your educational

14   backgrounds come in handy here.

15                MR. TOBIN:  It's a good day when I can deploy them

16   both.

17                Your Honor, I just want to address very briefly

18   the order, the policy itself, because I am concerned that

19   the Court has said that you're inclined to think that it's

20   facially neutral.

21                Your Honor, I just don't see the Court writing an

22   order denying the enforcement as to the order because that

23   would require you to say that absolute discretion on the

24   part of the President is not violative of the Constitution

25   and the underlying reason of your order and the violation of
```

1    the injunction order.

2        The President of the United States may not be a

3    party to the litigation, but if he can reserve the

4    discretion to exclude the AP, it's certainly a violation of

5    this Court's injunction because the end result could be that

6    the AP could be excluded on the basis of viewpoint

7    discrimination.

8        It just happens that we didn't sue the President

9    in his official capacity because we were instructed in the

10    *Karem* decision.  As you remember, the Court modified the

11    injunction on appeal in order to -- I don't remember, the

12    appeal or the district court -- in order to exclude the

13    President, and so we took our lesson from that.  But

14    certainly the injunction order is enforceable against the

15    press secretary regardless of whether the President says

16    exclude them because of their viewpoint.

17        And so I would just hate to see the Court issue an

18    order that allows them to, to coin a phrase, weasel out of

19    the entire purpose of the Court's order and the entire

20    purpose of this litigation.

21        THE COURT:  So my guess is you have not

22    thought much about this either, but what would you say to

23    Ms. Lyons's point about a facial challenge to a government

24    policy?  And that's a pretty high burden at this point, to

25    say that it is facially invalid.

1          MR. TOBIN:  We could amend the complaint and go

2    through that drill.  We're here on a motion to enforce, and

3    my argument today -- and I think we're right, obviously,

4    Your Honor -- is that reserving absolute discretion to the

5    President is a violation of the Court's order that the White

6    House, the defendants, rescind any policy of viewpoint

7    discrimination against the AP because allowing the absolute

8    discretion of the President allows for exactly that result.

9          THE COURT:  All right.  Thank you, sir.

10          MR. TOBIN:  Thank you, Your Honor.

11          THE COURT:  Why don't we take about a ten-minute

12   break.  Thanks.

13          (Recess taken)

14          THE COURT:  All right.  Before the Court is

15   plaintiff's motion to enforce.  I've considered the briefing

16   and the arguments of counsel here.  I'm going to deny the

17   motion without prejudice.  I do want to give a couple of

18   thoughts about where we are and how I expect to handle these

19   issues moving forward.

20          First, I don't intend to micromanage the White

21   House.  I agree with Ms. Lyons that the defendants are

22   senior government officials, very senior government

23   officials.  I certainly expect to entitle -- I think they're

24   entitled to a presumption of good faith in their actions,

25   and I expect to afford them that presumption.  I recognize

1      that there are a number of issues that they're dealing with

2      and that there are factors in press selection that are not

3      necessarily apparent to me.

4            I also agree that -- recognize that the White

5      House has substantial discretion in determining who can

6      access a nonpublic forum.  I think the opinion was very

7      clear on that, that there's wide discretion there.

8            The one thing the government cannot do is choose

9      people on a viewpoint discriminatory bases.

10           Given that, I think Mr. Tobin has acknowledged

11     that the AP is not entitled to the first-in-line-every-time

12     position that it enjoyed for many years.

13           I'm not definitively finding, but at this point

14     I'm inclined to agree with the government that the policy

15     from earlier this week is facially neutral.  I'm not

16     inclined to see anything wrong with it.

17           I understand Mr. Tobin's point about the repeated

18     use of the term "eligibility," but I think some of his and

19     my understanding of "eligibility" is certainly colored by

20     prior explanations from prior counsel, and I'm inclined to,

21     again, presume that this policy is issued in good faith.  I

22     think it very importantly states outlets would be eligible

23     for participation in the pool irrespective of the

24     substantive viewpoint expressed by an outlet, and in light

25     of that, I don't think the final statement that the

1    President retains absolute discretion necessarily vitiates

2    that statement or suggests that the policy is, in fact,

3    discriminatory.

4         I also note Mr. Budowich's most recent declaration

5    where he emphatically states that the White House -- or the

6    Associated Press has not been excluded from the White House

7    press pool based on its viewpoint.  I think, again, at this

8    point that statement is entitled to a presumption of

9    credibility and good faith.

10        I think I'm inclined to construe the statement in

11   the policy about the President's absolute discretion as a

12   pretty straightforward statement that, of course, would

13   assume the constitutional structure that we've all

14   recognized and also, of course, the prior statement within

15   the policy that it is not going to be enforced in a

16   viewpoint discriminatory way.

17        I'm not convinced by Mr. Tobin's suggestion that

18   striking it and just going back to the old policy would be

19   actually all that helpful.  I think, A, it's a little

20   unclear to me how solidified that old policy was, but in any

21   event, I think the evidence showed that it was being

22   utilized in a discriminatory way, and that that was what

23   made the old policy problematic.

24        I appreciate the attorneys' thoughts about how to

25   ensure that this order is being enforced in a

1    nondiscriminatory way going forward.  I agree with Ms. Lyons

2    that certainly statements suggesting that the AP is being

3    discriminated against would be very strong evidence that my

4    order was not being followed, but I think also, as I say,

5    the proof is in the pudding, and if the AP is repeatedly

6    receiving second-class treatment, especially compared to its

7    peer wire services, I think that would be pretty strong

8    evidence here that -- and in light of what's happened over

9    the last couple of months -- that the discrimination is

10   ongoing.

11        Perhaps the government could rebut that

12   presumption, but I think that would likely entail the very

13   type of intrusive declarations, possibly testimony, that I

14   can understand the government not being interested in

15   providing and frankly I am not very excited about requiring

16   either.  But I do think that, thus, just kind of the pure

17   statistics are going to be pretty telling over time as to

18   whether the AP is being discriminated against or not.

19        I agree with Ms. Lyons, though, that we are not

20   yet at the point where we can make much of a determination

21   one way or the other on pure statistics whether the AP is

22   being discriminated against given the emphatic statements

23   from the White House that they are not proceeding in a

24   viewpoint discriminatory way.

25        I do note President Trump recently said, "I always

1    abide by the Courts, and then I appeal."  Obviously the

2    government has appealed here, which, of course, is their

3    right, but I also expect the President's subordinates to

4    follow the first part of that statement, which I think was a

5    very admirable statement and important recognition of the

6    rule of law and the need for a constitutional structure in

7    which all branches are respecting one another and working

8    cooperatively.

9        I certainly expect the defendants here will abide

10    by the order unless and until it's stayed or modified, and I

11    think if there was evidence of noncompliance, that would be

12    a very serious problem, and there can be significant

13    consequences that I think we'd all like to avoid.

14        The last thing that I'm going to say is I think I

15    would encourage the AP to be wise and judicious in filing

16    motions.  I'm not faulting you for filing a motion earlier

17    this week, but I would -- I'm going to take your motions

18    seriously, but I'm also going to expect that you are

19    judicious and not jumping the gun and following the lesson

20    of the boy who cried wolf.  I'm also going to direct the AP,

21    before you file a motion to enforce in the future, to notify

22    the government, as I think you did here, and give the

23    government 24 hours to respond to you and hopefully to try

24    to rectify whatever issue you're seeing.

25        As I say, I think it is in nobody's interest for

1    us to be here week in and week out trying to enforce this

2    subpoena.  I think -- or this order.  I think it requires

3    good faith from the defendants.  It requires patience from

4    the plaintiff.  And I think if we do that, I think this will

5    be quite administrable.

6        All right.  Mr. Tobin, any questions about my

7    ruling or about where we go from here?

8        MR. TOBIN:  I do have one question, Your Honor.

9    Do we take away from the Court's ruling today the

10   understanding that the White House press office, in

11   executing the absolute discretion reserved to the President

12   under the policy, may not exercise it in a fashion that

13   discriminates against the AP because of viewpoint?

14       THE COURT:  Yes, and I take -- I understand your

15   concern from that policy, but I also -- I'm inclined to

16   understand that policy as -- and the statement about the

17   President's absolute discretion as including the statement

18   that they're not going to be acting in a viewpoint

19   discriminatory way.  And I think if there is clear evidence

20   that they are, then that would be a serious problem with

21   that policy, but more importantly with my order.

22       MR. TOBIN:  Okay.  We appreciate the Court's

23   consideration.  Thank you.

24       THE COURT:  All right.  Thank you, Mr. Tobin.

25       Ms. Lyons, any questions about my order about

1    moving forward?

2            MS. LYONS:  No, Your Honor.  Thank you very much.

3            THE COURT:  All right.  Thanks, folks.  Have a

4    good weekend.

5            (Whereupon the hearing was

6            concluded at 11:43 a.m.)

7

8

9            **CERTIFICATE OF OFFICIAL COURT REPORTER**

10

11            I, LISA A. MOREIRA, RDR, CRR, do hereby

12    certify that the above and foregoing constitutes a true and

13    accurate transcript of my stenographic notes and is a full,

14    true and complete transcript of the proceedings to the best

15    of my ability.

16        Dated this 18th day of April, 2025.

17

18                            /s/Lisa A. Moreira, RDR, CRR
                              Official Court Reporter
19                            United States Courthouse
                              Room 6718
20                            333 Constitution Avenue, NW
                              Washington, DC 20001
21

22

23

24

25

'

**'Eligible'** [1] - 5:6

**/**

**/s/Lisa** [1] - 42:18

**1**

**10:27** [1] - 1:5
**11:00** [1] - 21:9
**11:43** [1] - 42:6
**12th** [1] - 1:15
**18** [1] - 1:15
**18th** [1] - 42:16
**1909** [1] - 1:15
**1:25-cv-00532-TNM** [1] - 1:3

**2**

**20001** [2] - 1:24, 42:21
**20006** [1] - 1:15
**202** [3] - 1:16, 1:20, 1:24
**2025** [2] - 1:5, 42:16
**20530** [1] - 1:20
**24** [1] - 40:23
**25** [6] - 9:25, 10:9, 11:10, 13:5, 14:10, 17:13
**25-532** [1] - 2:3
**252-2540** [1] - 1:20
**25th** [3] - 13:2, 14:6, 15:13

**3**

**333** [2] - 1:23, 42:20
**354-3187** [1] - 1:24

**5**

**555** [1] - 1:19

**6**

**661-2218** [1] - 1:16
**6718** [2] - 1:23, 42:20

**A**

**a.m** [2] - 1:5, 42:6
**abide** [2] - 40:1, 40:9
**ability** [1] - 42:15
**able** [2] - 2:22, 17:22
**absolute** [21] - 3:18, 3:24, 3:25, 4:3, 4:23, 5:23, 8:14, 8:16, 10:20, 11:22, 13:18, 13:23, 16:3, 24:22,

34:23, 36:4, 36:7, 38:1, 38:11, 41:11, 41:17
**absolutely** [1] - 12:18
**accept** [2] - 16:14, 32:5
**access** [14] - 3:18, 4:24, 5:21, 9:7, 9:9, 18:10, 19:13, 19:17, 20:18, 21:12, 24:3, 24:11, 30:24, 37:6
**accompanying** [1] - 9:13
**account** [2] - 22:5, 22:8
**accumulate** [1] - 12:15
**accurate** [1] - 42:13
**acknowledge** [1] - 12:24
**acknowledged** [1] - 37:10
**act** [2] - 9:19, 15:11
**acting** [1] - 41:18
**Action** [1] - 2:3
**action** [1] - 8:18
**actions** [1] - 36:24
**additionally** [1] - 4:5
**address** [2] - 18:3, 34:17
**administer** [1] - 12:18
**administrable** [1] - 41:5
**admirable** [1] - 40:5
**admit** [1] - 26:9
**admittedly** [1] - 30:25
**adopt** [1] - 10:11
**afford** [1] - 36:25
**AFP** [5] - 16:25, 17:1, 23:7, 23:9, 23:10
**afraid** [1] - 29:24
**afternoon** [1] - 24:18
**agencies** [1] - 18:19
**aggregate** [1] - 6:2
**aggregated** [1] - 9:4
**agree** [11] - 2:21, 3:1, 13:14, 28:11, 30:14, 33:23, 36:21, 37:4, 37:14, 39:1, 39:19
**ahead** [1] - 19:8
**ain't** [1] - 5:7
**Air** [2] - 3:19, 4:24
**al** [2] - 1:6, 2:3
**allowed** [2] - 20:6, 20:19
**allowing** [2] - 6:6, 36:7
**allows** [3] - 30:24, 35:18, 36:8
**amazing** [1] - 30:8
**amend** [1] - 36:1
**Amendment** [2] - 3:7,

25:7
**analysis** [3] - 3:4, 13:14, 27:21
**animated** [1] - 15:7
**announced** [3] - 9:25, 13:5, 14:7
**answer** [2] - 26:17, 29:24
**answering** [1] - 27:8
**AP** [37] - 3:17, 8:24, 9:8, 9:11, 10:6, 10:9, 10:12, 10:21, 14:15, 15:5, 15:8, 15:25, 16:17, 17:13, 18:17, 21:16, 21:17, 21:19, 22:16, 23:22, 25:22, 26:9, 29:13, 30:7, 31:24, 32:9, 35:4, 35:6, 36:7, 37:11, 39:2, 39:5, 39:18, 39:21, 40:15, 40:20, 41:13
**AP's** [5] - 9:7, 15:2, 19:13, 19:17, 24:11
**apologize** [1] - 31:25
**apparent** [1] - 37:3
**appeal** [5] - 6:6, 6:7, 35:11, 35:12, 40:11
**appealed** [1] - 40:2
**APPEARANCES** [1] - 1:12
**appeared** [1] - 5:2
**application** [2] - 21:7, 21:10
**applied** [2] - 21:3, 22:13
**apply** [1] - 25:8
**appreciate** [5] - 32:7, 33:15, 33:17, 38:24, 41:22
**approach** [1] - 17:8
**appropriate** [3] - 11:23, 27:21, 27:25
**appropriately** [3] - 16:4, 25:3, 33:20
**April** [2] - 1:5, 42:16
**arguably** [1] - 12:12
**argument** [6] - 11:24, 13:25, 14:1, 25:4, 34:9, 36:3
**arguments** [2] - 25:11, 25:15, 36:16
**assigning** [1] - 16:17
**assignment** [1] - 11:21
**assignments** [1] - 17:19
**ASSOCIATED** [1] - 1:3
**Associated** [7] - 2:3, 2:8, 2:10, 3:14, 5:12,

11:11, 38:6
**assume** [1] - 38:13
**assuming** [1] - 13:14
**attempt** [1] - 7:6
**ATTORNEY'S** [1] - 1:18
**Attorney's** [1] - 2:13
**attorneys'** [1] - 38:24
**authorities** [1] - 28:23
**authority** [2] - 4:2, 13:21
**automatically** [1] - 19:25
**available** [2] - 10:23, 19:14
**Avenue** [1] - 1:23, 42:20
**avoid** [1] - 40:13
**aware** [2] - 30:9, 30:12

**B**

**backdrop** [1] - 23:21
**backgrounds** [1] - 34:14
**Ballard** [1] - 2:7
**BALLARD** [1] - 1:14
**barely** [1] - 19:4
**based** [13] - 4:14, 5:20, 19:13, 19:16, 20:7, 20:18, 22:6, 24:3, 24:10, 26:7, 30:24, 31:23, 38:7
**bases** [1] - 37:9
**basis** [7] - 4:3, 4:9, 4:11, 11:12, 13:7, 23:18, 28:6, 35:6
**battle** [1] - 17:9
**BEFORE** [1] - 1:10
**behalf** [1] - 7:1
**behind** [2] - 11:20, 16:7
**belief** [1] - 26:8
**best** [1] - 42:14
**better** [1] - 26:18
**between** [1] - 30:6
**big** [1] - 31:4
**bit** [2] - 19:10, 22:25
**Bloomberg** [2] - 16:1, 16:25
**bottom** [3] - 3:18, 4:23, 8:21
**boy** [1] - 40:20
**branches** [1] - 40:7
**break** [1] - 36:12
**briefed** [1] - 19:4
**briefing** [2] - 27:19, 36:15
**briefly** [1] - 34:17
**bring** [1] - 32:11

**Budowich** [4] - 2:3, 5:3, 16:6, 24:1
**BUDOWICH** [1] - 1:6
**Budowich's** [2] - 24:13, 38:4
**bullet** [4] - 4:8, 4:10, 4:14, 4:17
**burden** [1] - 35:24
**bury** [1] - 3:21

**C**

**CA** [1] - 1:3
**cabined** [1] - 4:22
**cafeteria** [1] - 21:25
**candidly** [1] - 5:5
**candor** [1] - 5:5
**cannot** [2] - 11:3, 37:8
**capacity** [1] - 35:9
**careful** [2] - 19:19, 27:21
**carefully** [3] - 29:10, 29:11, 29:12
**case** [2] - 20:16, 25:2
**categories** [1] - 18:18
**category** [9] - 9:5, 11:12, 15:1, 18:13, 18:16
**certain** [1] - 19:14
**certainly** [16] - 5:20, 6:22, 8:2, 9:17, 12:17, 15:15, 15:16, 21:7, 25:10, 27:13, 35:4, 35:14, 36:23, 37:19, 39:2, 40:9
**CERTIFICATE** [1] - 42:9
**certify** [1] - 42:12
**challenge** [5] - 19:9, 20:24, 21:1, 21:2, 35:23
**change** [5] - 20:10, 20:11, 22:10, 22:11, 28:25
**changed** [4] - 14:14, 23:24, 24:2, 33:19
**characterized** [1] - 3:16
**CHARLES** [1] - 1:13
**Charles** [1] - 2:6
**check** [1] - 21:9
**cheese** [1] - 22:2
**chief** [2] - 20:21, 20:22
**choose** [1] - 37:8
**chosen** [6] - 4:8, 5:8, 29:9, 29:10, 29:11, 29:12, 32:17
**Circuit** [1] - 25:5
**cited** [1] - 8:4
**civil** [2] - 2:14, 12:14

**Civil** [2] - 1:19, 2:2
**claim** [1] - 32:11
**claimed** [1] - 27:20
**class** [2] - 9:19, 39:6
**clear** [4] - 17:14, 20:17, 37:7, 41:19
**clearly** [2] - 12:2, 34:9
**client** [7] - 2:9, 8:5, 8:9, 12:23, 12:24, 26:2, 26:22
**clients** [2] - 2:21, 26:21
**co** [1] - 2:8
**co-counsel** [1] - 2:8
**coin** [1] - 35:18
**colleague** [2] - 2:15, 19:7
**colleagues** [1] - 9:2
**colloquy** [1] - 5:1
**colored** [1] - 37:19
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 2:14
**coming** [2] - 23:21, 28:17
**commanded** [1] - 28:25
**commend** [1] - 7:14
**communicating** [1] - 27:3
**comparable** [1] - 29:18
**comparably** [3] - 3:19, 4:25, 16:25
**compared** [3] - 32:20, 39:6
**comparison** [1] - 29:18
**compelled** [1] - 22:10
**complained** [1] - 11:1
**complaining** [1] - 15:17
**complaint** [1] - 36:1
**complaints** [1] - 20:13
**complete** [1] - 42:14
**completely** [1] - 16:15
**compliance** [11] - 11:9, 23:23, 25:18, 26:4, 26:13, 26:20, 27:17, 28:15, 28:16, 29:1, 30:12
**compliant** [1] - 3:2
**complied** [1] - 29:11
**complies** [2] - 7:10, 11:17
**comply** [2] - 6:11, 10:7
**complying** [2] - 4:1, 6:12
**comport** [1] - 3:7
**composing** [1] - 22:5

**composition** [2] - 4:12, 20:7
**compositions** [1] - 21:11
**concern** [6] - 14:20, 14:24, 28:14, 33:15, 41:15
**concerned** [2] - 16:5, 21:14, 34:18
**conclude** [1] - 29:19
**concluded** [1] - 42:6
**conclusion** [1] - 31:5
**conduct** [2] - 7:7, 16:10
**conflicts** [1] - 28:5
**conform** [1] - 12:7
**conformance** [1] - 33:20
**conforming** [1] - 5:24
**consequences** [1] - 40:13
**consideration** [3] - 20:18, 30:25, 41:23
**considerations** [1] - 22:4
**considered** [2] - 20:7, 36:15
**considering** [1] - 31:22
**consistent** [2] - 11:3, 11:13
**constitutes** [1] - 42:12
**Constitution** [7] - 1:23, 12:8, 13:19, 15:18, 18:1, 34:24, 42:20
**constitutional** [6] - 14:23, 18:20, 22:12, 27:6, 38:13, 40:6
**constitutionally** [2] - 21:3, 21:7
**constructing** [1] - 20:1
**construe** [1] - 38:10
**consuming** [1] - 32:18
**contains** [1] - 4:6
**contempt** [1] - 12:14
**contend** [1] - 31:10
**context** [1] - 30:6
**continue** [4] - 8:24, 10:21, 13:22, 28:16
**continuing** [1] - 31:20
**contradicted** [1] - 16:6
**control** [1] - 5:21
**conveniently** [2] - 16:16, 17:18
**conversation** [3] - 7:18, 8:3, 18:4
**convinced** [1] - 38:17
**cooperatively** [1] - 40:8

**coordinating** [1] - 27:3
**correct** [3] - 24:20, 32:2, 32:3
**correspondents** [1] - 12:22
**counsel** [8] - 2:4, 2:8, 5:4, 5:5, 5:18, 36:16, 37:20
**country** [1] - 2:16
**couple** [2] - 36:17, 39:9
**course** [3] - 38:12, 38:14, 40:2
**Court** [57] - 1:22, 1:22, 3:14, 3:17, 5:1, 5:6, 5:12, 5:19, 6:4, 7:14, 7:20, 7:25, 8:15, 8:18, 8:22, 9:22, 10:15, 11:1, 11:6, 11:15, 11:16, 11:23, 11:24, 12:3, 12:6, 12:10, 13:20, 13:21, 14:1, 14:22, 14:24, 15:11, 15:12, 15:14, 15:17, 16:4, 16:7, 16:10, 16:13, 17:15, 18:3, 18:7, 19:5, 19:6, 20:8, 34:8, 34:19, 34:21, 35:10, 35:17, 36:14, 42:19
**COURT** [61] - 1:1, 2:11, 2:17, 3:1, 3:9, 3:11, 6:23, 8:2, 8:5, 10:22, 12:11, 12:19, 13:6, 14:11, 15:19, 16:22, 17:4, 18:21, 18:23, 21:14, 21:23, 22:14, 22:22, 23:5, 23:12, 23:14, 23:20, 24:13, 24:16, 24:19, 25:10, 25:13, 26:1, 26:15, 26:19, 27:9, 27:13, 28:8, 29:21, 30:14, 31:13, 31:21, 32:2, 32:13, 33:5, 33:7, 33:9, 33:11, 33:14, 33:23, 34:1, 34:6, 34:13, 35:21, 36:9, 36:11, 36:14, 41:14, 41:24, 42:3, 42:9
**court** [3] - 6:7, 6:8, 35:12
**Court's** [36] - 3:7, 4:1, 5:25, 6:11, 6:13, 7:6, 7:8, 7:10, 7:23, 9:15, 9:20, 9:23, 10:7, 10:10, 11:7, 11:14, 12:7, 12:18, 14:19, 14:21, 15:8, 15:11,

15:18, 16:19, 16:20, 17:17, 17:20, 18:1, 20:10, 22:8, 28:23, 35:5, 35:19, 36:5, 41:9, 41:22
**Courthouse** [2] - 1:23, 42:19
**COURTROOM** [1] - 2:2
**Courts** [1] - 40:1
**courts** [1] - 29:6
**cover** [1] - 32:10
**coverage** [1] - 18:17
**created** [1] - 22:3
**creating** [1] - 10:3
**credentialed** [1] - 19:17
**credibility** [1] - 38:9
**cried** [1] - 40:20
**criteria** [2] - 5:17, 11:20
**CRR** [3] - 1:22, 42:11, 42:18
**crude** [1] - 32:19

**D**

**D.C** [3] - 1:4, 1:18, 25:5
**daily** [5] - 4:15, 23:6, 23:17, 27:3, 28:6
**data** [4] - 29:19, 31:2, 33:3, 33:5
**Dated** [1] - 42:16
**day-to-day** [2] - 4:12, 5:21
**days** [11] - 7:12, 16:18, 23:24, 25:25, 28:13, 28:14, 28:17, 33:3, 33:5, 33:14, 33:16
**DC** [4] - 1:15, 1:20, 1:24, 42:21
**deal** [1] - 28:17
**dealing** [1] - 37:1
**decide** [1] - 5:24
**decision** [4] - 21:4, 25:17, 31:15, 35:10
**decision-making** [2] - 21:4, 31:15
**declaration** [7] - 5:3, 13:3, 13:4, 24:1, 24:14, 24:22, 38:4
**declarations** [4] - 16:6, 28:3, 32:16, 39:13
**declare** [1] - 13:23
**Defendants** [2] - 1:7, 1:18
**defendants** [8] - 23:21, 25:18, 27:1,

28:15, 36:6, 36:21, 40:9, 41:3
**deferential** [1] - 6:4
**defiance** [1] - 7:8
**definitively** [1] - 37:13
**degree** [1] - 33:2
**denials** [5] - 19:13, 19:16, 20:18, 24:10, 30:24
**denominator** [1] - 13:9
**deny** [4] - 26:6, 31:12, 34:4, 36:16
**denying** [1] - 34:22
**deploy** [1] - 34:15
**deprived** [1] - 15:8
**deputy** [1] - 20:22
**DEPUTY** [1] - 2:2
**deserve** [1] - 26:23
**despite** [2] - 15:22, 16:19
**detailed** [2] - 11:19, 28:2
**determination** [1] - 39:20
**determine** [2] - 4:12, 32:21
**determining** [1] - 37:5
**dialogue** [1] - 12:4
**different** [8] - 8:11, 12:9, 16:17, 17:9, 22:2, 22:4, 23:1, 29:22
**dilute** [2] - 9:7, 9:9
**diluted** [2] - 16:18, 16:20
**diminish** [2] - 14:15, 18:20
**diminishing** [1] - 15:2
**diminution** [1] - 14:17
**direct** [3] - 6:1, 17:21, 40:20
**directions** [1] - 12:9
**directly** [1] - 9:19
**disagree** [1] - 27:18
**disallow** [1] - 22:9
**disallowed** [1] - 20:9
**discretion** [29] - 3:18, 3:24, 3:25, 4:4, 4:12, 4:24, 5:15, 5:23, 8:14, 8:16, 10:20, 11:22, 13:18, 13:23, 16:3, 21:3, 22:3, 24:22, 24:25, 34:23, 35:4, 36:4, 36:8, 37:5, 37:7, 38:1, 38:11, 41:11, 41:17
**discriminated** [3] - 39:3, 39:18, 39:22
**discriminates** [1] - 41:13

discriminating [1] - 23:22
discrimination [6] - 8:20, 16:4, 16:21, 35:7, 36:7, 39:9
discriminatory [6] - 37:9, 38:3, 38:16, 38:22, 39:24, 41:19
discuss [1] - 11:23
discussed [1] - 19:5
discussion [2] - 7:13, 12:5
disregard [1] - 17:16
District [1] - 2:13
DISTRICT [3] - 1:1, 1:1, 1:11
district [1] - 35:12
distrusting [1] - 31:7
Division [1] - 1:19
division [1] - 2:14
DOJ [1] - 31:9
done [2] - 14:19, 20:3
down [2] - 19:10, 31:7
draw [1] - 31:5
drill [1] - 36:2
DUDDING [1] - 1:14
Dudding [1] - 2:9
duddings@ballardspahr.com [1] - 1:17
during [1] - 29:4

**E**

early [1] - 21:9
easily [3] - 9:24, 10:7, 17:10
easy [1] - 17:13
editorial [1] - 5:15
educational [1] - 34:13
effect [4] - 6:3, 24:3, 25:25, 30:10
either [5] - 3:7, 6:22, 19:23, 35:22, 39:16
elegantly [1] - 16:13
eligibility [7] - 7:3, 8:11, 11:21, 13:15, 20:13, 37:18, 37:19
eligible [20] - 4:6, 4:7, 4:8, 4:10, 4:15, 4:18, 4:20, 5:2, 5:7, 5:17, 5:22, 8:2, 8:8, 16:7, 24:7, 24:21, 37:22
eliminated [4] - 15:1, 18:13, 18:16, 24:4
eliminating [1] - 22:6
elimination [1] - 15:10
emphatic [1] - 39:22
emphatically [1] - 38:5

empirics [1] - 34:9
encourage [1] - 40:15
end [1] - 35:5
enforce [13] - 2:19, 7:25, 13:21, 17:19, 17:20, 19:3, 26:7, 29:3, 31:12, 36:2, 36:15, 40:21, 41:1
enforceable [1] - 35:14
enforced [4] - 28:10, 28:20, 38:15, 38:25
enforcement [4] - 10:22, 19:11, 27:16, 34:22
enforcing [2] - 27:14, 29:7
enjoy [1] - 15:14
enjoyed [1] - 37:12
enormous [1] - 28:24
ensure [4] - 11:9, 28:10, 28:19, 38:25
ensuring [3] - 26:4, 26:19, 26:21
entail [1] - 39:12
entered [2] - 6:5, 8:21
entire [5] - 3:23, 14:14, 15:8, 35:19
entirely [1] - 9:6
entities [1] - 10:5
entitle [1] - 36:23
entitled [4] - 12:25, 36:24, 37:11, 38:8
equal [2] - 11:12, 15:22
equivalent [1] - 16:1
especially [1] - 39:6
ESQ [3] - 1:13, 1:14, 1:18
et [2] - 1:6, 2:3
event [2] - 9:13, 38:21
events [3] - 16:17, 18:11, 19:17
evidence [21] - 15:4, 15:21, 22:15, 24:1, 24:4, 24:5, 24:12, 26:8, 26:12, 30:5, 30:11, 30:19, 31:6, 31:13, 31:15, 32:8, 38:21, 39:3, 39:8, 40:11, 41:19
eviscerate [1] - 24:23
evolving [1] - 25:16
exactly [3] - 13:24, 13:25, 15:7, 19:18, 27:19, 36:8
examine [1] - 32:25
example [1] - 11:18
except [1] - 22:16
excited [1] - 39:15

exclude [9] - 4:2, 5:10, 8:16, 8:24, 10:6, 10:21, 35:4, 35:12, 35:16
excluded [3] - 25:23, 35:6, 38:6
excluding [1] - 16:18
exclusion [1] - 5:20
executing [1] - 41:11
exercise [4] - 8:15, 10:16, 21:3, 41:12
exercised [1] - 28:23
exercising [1] - 10:14
Exhibit [1] - 13:3, 13:4
existing [1] - 26:7
expect [7] - 15:25, 36:18, 36:23, 36:25, 40:3, 40:9, 40:18
experience [1] - 12:12
expert [1] - 22:18
expired [1] - 6:3
explain [4] - 3:10, 11:17, 28:2, 32:11
explaining [1] - 11:20
explanations [1] - 37:20
explicitly [1] - 23:22
exploration [1] - 25:6
express [1] - 15:2
expressed [1] - 37:24
expression [1] - 10:17
expressly [1] - 18:16
extraordinary [1] - 19:8
eye [5] - 3:16, 3:17, 7:23, 20:15, 30:13

**F**

face [6] - 14:17, 16:3, 18:9, 22:12, 28:12, 31:17
facial [3] - 20:24, 21:1, 35:23
facially [7] - 3:2, 13:12, 30:21, 30:23, 34:20, 35:25, 37:15
fact [8] - 3:12, 5:25, 6:2, 15:4, 18:18, 22:10, 31:19, 38:2
factors [6] - 20:7, 22:7, 30:25, 31:23, 37:2
fair [2] - 13:16
faith [5] - 16:2, 36:24, 37:21, 38:9, 41:3
far [2] - 21:13
fashion [3] - 12:3, 14:23, 41:12
faulting [1] - 40:16

favorable [1] - 12:22
February [13] - 2:25, 9:25, 10:9, 11:10, 13:1, 13:2, 13:5, 14:6, 14:10, 15:13, 17:12, 24:4, 25:23
felt [1] - 11:24
few [7] - 7:12, 10:24, 12:21, 28:13, 28:14, 28:17
file [3] - 7:11, 11:19, 40:21
filed [1] - 24:18
filing [2] - 40:15, 40:16
final [3] - 4:17, 24:21, 37:25
finally [1] - 12:1
fine [5] - 10:4, 15:5, 17:7, 17:23, 33:3
firm [1] - 2:7
first [2] - 2:20, 2:25, 4:8, 7:12, 9:10, 13:18, 15:9, 19:24, 30:6, 36:20, 37:11, 40:4
First [2] - 3:7, 25:7
first-in-line-every-time [1] - 37:11
five [7] - 6:19, 6:21, 22:20, 25:25, 33:5, 33:14, 33:16
fix [1] - 28:1
flat [4] - 3:5, 8:20, 13:19, 17:25
Floor [1] - 1:15
focus [1] - 19:1
focused [1] - 15:19
folks [2] - 2:11, 42:3
follow [1] - 40:4
followed [2] - 32:22, 39:4
following [1] - 31:8, 40:19
FOR [1] - 1:1
forbids [1] - 30:24
Force [2] - 3:19, 4:24
forced [1] - 11:3
foregoing [1] - 42:12
fortunately [1] - 30:1
forum [3] - 3:4, 13:14, 37:6
forward [6] - 2:4, 26:20, 27:5, 36:19, 39:1, 42:1
four [6] - 6:20, 8:4, 16:8, 21:16, 21:17, 21:18
fourth [1] - 4:14
Fourth [1] - 1:19
frame [1] - 13:16

frankly [2] - 32:17, 39:15
freedom [2] - 10:16
frequency [1] - 29:17
Friday [1] - 1:5
friend [1] - 27:23
front [1] - 25:11
full [2] - 25:18, 42:13
future [2] - 32:24, 40:21

**G**

game [1] - 8:17
games [1] - 10:19
gamesmanship [2] - 8:23, 20:14
general [1] - 11:21
generally [3] - 4:11, 4:21, 29:7
generous [1] - 6:18
Getty [3] - 23:8, 23:9, 23:14
given [4] - 9:10, 16:9, 37:10, 39:22
golf [1] - 15:6
golfing [1] - 9:11
government [26] - 2:21, 5:4, 11:17, 11:19, 20:23, 21:1, 21:4, 25:13, 25:14, 27:2, 27:17, 28:2, 30:11, 31:7, 35:23, 36:22, 37:8, 37:14, 39:11, 39:14, 40:2, 40:22, 40:23
governs [1] - 3:23
gracious [1] - 6:4
grant [1] - 14:3
granting [2] - 6:4, 6:5
great [1] - 30:8
grounds [1] - 14:3
guess [7] - 8:6, 13:1, 13:11, 13:13, 16:22, 29:7, 35:21
guidance [2] - 7:20, 23:6
guiding [1] - 5:17
gun [1] - 40:19

**H**

handle [1] - 36:18
handy [1] - 34:14
hard [3] - 9:4, 18:17, 23:23
haste [1] - 7:15
hate [1] - 35:17
heard [1] - 22:19
HEARING [1] - 1:10

**hearing** [6] - 3:15, 7:13, 10:1, 11:22, 29:5, 42:5
**HELD** [1] - 1:10
**help** [1] - 18:7
**helpful** [1] - 38:19
**hereby** [1] - 42:11
**high** [6] - 18:25, 20:23, 21:25, 27:1, 27:11, 35:24
**high-level** [1] - 20:23
**higher** [2] - 6:7, 6:8
**himself** [2] - 3:25, 4:2
**history** [3] - 7:13, 15:7, 15:22
**hold** [1] - 11:22
**Honor** [47] - 2:2, 2:6, 2:12, 2:23, 3:5, 3:12, 3:21, 4:5, 4:7, 5:1, 5:3, 5:16, 6:2, 6:9, 6:16, 7:11, 7:17, 9:14, 10:18, 10:24, 11:23, 12:1, 12:17, 13:2, 14:3, 14:5, 17:15, 17:21, 17:24, 18:22, 18:24, 23:15, 23:25, 25:16, 26:24, 32:10, 32:24, 33:18, 34:3, 34:8, 34:17, 34:21, 36:4, 36:10, 41:8, 42:2
**HONORABLE** [1] - 1:10
**hopefully** [1] - 40:23
**hour** [1] - 17:20
**hours** [1] - 40:23
**House** [48] - 4:9, 4:11, 5:15, 6:5, 7:15, 7:19, 8:24, 9:12, 9:21, 9:24, 11:8, 12:5, 12:22, 13:4, 14:7, 15:13, 15:15, 16:12, 16:13, 17:16, 17:23, 19:15, 19:18, 19:23, 20:5, 20:12, 20:20, 20:21, 22:9, 22:10, 22:19, 23:7, 26:2, 26:9, 28:6, 28:25, 29:1, 29:11, 30:3, 30:5, 33:19, 36:6, 36:21, 37:5, 38:5, 38:6, 39:23, 41:10
**House's** [2] - 5:12, 16:14
**Hudak** [2] - 8:3, 13:25
**Hudak's** [2] - 2:15, 8:7

**I**

**idea** [2] - 28:1, 28:7

**ideas** [1] - 20:4
**identify** [1] - 2:4
**ignore** [1] - 24:5
**implementation** [1] - 21:5
**implicitly** [1] - 12:24
**important** [1] - 40:5
**importantly** [2] - 37:22, 41:21
**IN** [1] - 1:1
**In-Town** [1] - 23:7
**inclined** [7] - 28:11, 34:19, 37:14, 37:16, 37:20, 38:10, 41:15
**include** [2] - 10:9, 11:11
**included** [1] - 17:13
**including** [5] - 6:20, 21:16, 21:17, 21:19, 41:17
**incorporate** [1] - 5:16
**increasing** [1] - 10:2
**inferior** [5] - 9:18, 9:19, 14:18, 14:22, 18:17
**injunction** [34] - 7:23, 8:22, 9:15, 9:23, 11:2, 11:3, 11:7, 11:14, 19:4, 19:12, 19:16, 20:10, 20:17, 22:8, 25:23, 25:24, 26:10, 26:11, 26:13, 26:20, 27:14, 27:15, 29:4, 30:9, 31:8, 31:20, 33:10, 33:15, 33:18, 35:1, 35:5, 35:11, 35:14
**injunctions** [3] - 12:12, 19:21, 29:7
**injunctive** [2] - 28:23, 29:10
**instructed** [1] - 35:9
**intend** [1] - 36:20
**interbranch** [1] - 28:5
**interest** [1] - 40:25
**interested** [2] - 26:1, 39:14
**interesting** [1] - 25:5
**interpret** [1] - 5:18
**interpreted** [1] - 21:6
**intrusion** [1] - 28:5
**intrusive** [2] - 32:17, 39:13
**invalid** [2] - 11:6, 35:25
**invited** [2] - 30:18, 31:14
**inviting** [1] - 32:16
**involving** [1] - 9:17
**irrespective** [2] - 4:18,

37:23
**issue** [8] - 7:10, 20:23, 26:11, 28:17, 34:9, 35:17, 40:24
**issued** [5] - 16:11, 16:15, 17:25, 26:14, 37:21
**issues** [3] - 19:5, 36:19, 37:1
**item** [1] - 19:25
**items** [1] - 11:1
**iterations** [1] - 12:20
**itself** [4] - 16:13, 24:20, 31:1, 34:18

**J**

**Jane** [1] - 2:12
**JANE** [1] - 1:18
**jane.lyons@usdoj. gov** [1] - 1:21
**jobs** [1] - 27:2
**journalism** [1] - 34:10
**journalist** [4] - 4:16, 29:16, 31:24, 32:9
**journalists** [3] - 9:3, 9:17, 19:18
**JUDGE** [1] - 1:11
**judges** [1] - 3:15
**judicious** [2] - 40:15, 40:19
**jumping** [2] - 19:8, 40:19
**junior** [2] - 21:25, 27:11

**K**

**Karem** [1] - 35:10
**kept** [2] - 8:9, 8:10
**kind** [10] - 12:4, 12:6, 12:21, 13:8, 15:23, 28:11, 29:19, 31:6, 32:19, 39:16

**L**

**lack** [1] - 21:15
**laid** [1] - 31:1
**language** [1] - 14:21
**larger** [5] - 9:4, 9:8, 13:9, 16:18, 16:19
**last** [7] - 3:22, 12:21, 13:12, 28:13, 30:1, 39:9, 40:14
**law** [3] - 2:7, 5:14, 40:6
**lawsuit** [5] - 19:9, 22:6, 25:16, 30:7, 33:22
**lawyer** [2] - 20:25,

31:9
**lawyerly** [1] - 29:24
**lead** [1] - 31:1
**leap** [1] - 16:2
**least** [3] - 3:2, 6:17, 14:2
**leave** [1] - 5:19
**Leavitt** [1] - 10:1
**lede** [1] - 3:21
**legal** [2] - 27:21, 33:22
**legitimate** [1] - 32:11
**lens** [1] - 33:25
**lesson** [2] - 35:13, 40:19
**level** [2] - 20:23, 27:2
**light** [3] - 31:19, 37:24, 39:8
**likely** [1] - 39:12
**line** [1] - 37:11
**lines** [1] - 30:15
**links** [1] - 9:14
**LISA** [1] - 42:11
**Lisa** [1] - 1:22
**litigation** [6] - 12:2, 16:10, 29:6, 30:8, 35:3, 35:20
**living** [1] - 34:11
**LLP** [1] - 1:14
**look** [9] - 6:23, 15:4, 15:23, 17:4, 17:18, 17:24, 21:19, 31:2, 31:16
**looking** [4] - 16:23, 23:6, 30:20, 32:19
**looks** [1] - 18:10
**love** [1] - 33:2
**LYONS** [37] - 1:18, 2:12, 18:24, 21:21, 21:24, 22:18, 22:24, 23:11, 23:13, 23:15, 23:25, 24:15, 24:17, 24:25, 25:12, 25:14, 26:6, 26:17, 26:24, 27:10, 27:15, 28:21, 29:23, 30:23, 31:19, 31:22, 32:3, 32:6, 32:23, 33:6, 33:8, 33:10, 33:13, 33:17, 33:24, 34:3, 42:2
**Lyons** [10] - 2:13, 2:17, 18:23, 22:14, 23:5, 34:2, 36:21, 39:1, 39:19, 41:25
**Lyons's** [1] - 35:23

**M**

**ma'am** [4] - 27:13, 33:9, 33:11
**mac** [1] - 22:1

**major** [1] - 34:10
**malicious** [1] - 28:16
**management** [1] - 28:6
**manipulate** [1] - 17:13
**manipulated** [1] - 17:10
**manipulation** [1] - 17:21
**manner** [1] - 28:24
**material** [1] - 14:16
**math** [7] - 6:16, 6:21, 31:3, 33:2, 33:3, 34:9, 34:10
**matter** [1] - 18:24
**matters** [2] - 19:21, 33:19
**McFADDEN** [1] - 1:10
**mean** [14] - 4:4, 5:4, 7:11, 8:5, 8:11, 12:11, 12:14, 12:19, 13:10, 17:19, 20:24, 21:19, 22:15, 32:16
**means** [1] - 5:6
**measured** [1] - 27:19
**meatball** [1] - 22:1
**mechanisms** [1] - 10:22
**media** [2] - 10:3, 29:18
**mediated** [1] - 12:4
**meet** [1] - 13:14
**member** [1] - 11:12
**members** [1] - 19:15
**memorandum** [1] - 25:3
**memory** [1] - 20:25
**mentioned** [1] - 25:22
**merits** [1] - 19:8
**message** [1] - 27:3
**micromanage** [1] - 36:20
**micromanaging** [2] - 26:1, 26:21
**mid** [1] - 2:25
**mid-February** [1] - 2:25
**might** [9] - 11:16, 25:8, 25:9, 27:20, 29:25, 31:2, 32:24
**Miller** [4] - 2:9, 9:2, 17:5, 31:13
**Miller's** [1] - 13:3
**mindful** [1] - 7:12
**minor** [1] - 34:10
**minute** [1] - 36:11
**modified** [3] - 26:5, 35:10, 40:10
**modifies** [1] - 8:22
**moment** [2] - 15:7, 19:1

**Monday** [15] - 6:5, 6:12, 6:15, 6:22, 7:7, 20:2, 21:15, 21:25, 23:7, 24:2, 26:9, 29:13, 30:6, 30:9
**monetary** [1] - 12:14
**months** [2] - 12:21, 39:9
**MOREIRA** [1] - 42:11
**Moreira** [2] - 1:22, 42:18
**morning** [13] - 2:6, 2:11, 2:12, 2:17, 18:24, 22:20, 24:2, 25:24, 26:9, 30:2, 30:6, 30:9, 31:11
**most** [4] - 6:18, 10:25, 15:20, 38:4
**motion** [10] - 2:18, 19:3, 26:7, 31:12, 34:4, 36:2, 36:15, 36:17, 40:16, 40:21
**MOTIONS** [1] - 1:10
**motions** [2] - 40:16, 40:17
**motivations** [1] - 32:14
**moved** [3] - 7:23, 17:19, 17:20
**moving** [5] - 7:15, 18:25, 26:20, 36:19, 42:1
**MR** [24] - 2:6, 2:23, 3:5, 3:10, 3:12, 6:25, 8:4, 8:13, 10:24, 12:17, 13:2, 13:16, 14:12, 16:2, 17:2, 17:12, 18:22, 32:5, 34:8, 34:15, 36:1, 36:10, 41:8, 41:22
**MS** [36] - 2:12, 18:24, 21:21, 21:24, 22:18, 22:24, 23:11, 23:13, 23:15, 23:25, 24:15, 24:17, 24:25, 25:12, 25:14, 26:6, 26:17, 26:24, 27:10, 27:15, 28:21, 29:23, 30:23, 31:19, 31:22, 32:3, 32:6, 32:23, 33:6, 33:8, 33:10, 33:13, 33:17, 33:24, 34:3, 42:2
**must** [4] - 8:11, 21:8, 30:21, 31:17

**N**

**name** [1] - 32:4
**narrow** [1] - 16:13

**Nationals** [1] - 5:7
**near** [2] - 31:3, 32:12
**necessarily** [4] - 12:24, 28:12, 37:3, 38:1
**necessary** [1] - 11:24
**need** [8] - 15:3, 17:24, 18:25, 19:10, 26:12, 29:19, 33:11, 40:6
**needs** [1] - 27:15
**nefarious** [1] - 31:15
**neutral** [7] - 13:12, 16:16, 30:21, 30:23, 31:17, 34:20, 37:15
**neutrality** [3] - 7:4, 7:5, 24:23
**never** [1] - 30:18
**new** [13] - 3:1, 3:13, 5:25, 7:10, 10:2, 10:3, 10:8, 11:4, 11:17, 25:20, 27:24, 33:6, 33:8
**New** [2] - 23:7, 23:9, 23:10
**newer** [1] - 10:3
**next** [1] - 8:18
**night** [1] - 30:1
**nightmares** [1] - 30:1
**nobody** [3] - 28:18, 30:12, 30:13
**nobody's** [1] - 40:25
**noncompliance** [3] - 7:6, 30:20, 40:11
**nondiscriminatory** [1] - 32:15, 39:1
**none** [1] - 30:1
**nonetheless** [1] - 8:5
**nonpublic** [3] - 3:3, 13:14, 37:6
**nose** [2] - 3:13, 3:14
**note** [2] - 38:4, 39:25
**notes** [1] - 42:13
**nothing** [4] - 19:22, 20:15, 23:16, 23:24
**notify** [1] - 40:21
**nowhere** [1] - 32:12
**nuance** [1] - 25:8
**number** [1] - 37:1
**NW** [4] - 1:15, 1:19, 1:23, 42:20

**O**

**observe** [1] - 29:8
**obvious** [1] - 32:21
**obviously** [4] - 18:14, 18:25, 36:3, 40:1
**occasionally** [1] - 31:17
**OF** [3] - 1:1, 1:10, 42:9

**offer** [1] - 12:3
**Office** [5] - 2:13, 3:19, 4:24, 9:12, 15:3
**office** [1] - 41:10
**OFFICE** [1] - 1:18
**official** [2] - 35:9, 42:19
**Official** [1] - 1:22
**OFFICIAL** [1] - 42:9
**officials** [5] - 20:23, 27:2, 31:7, 36:22, 36:23
**often** [1] - 30:19
**old** [3] - 38:18, 38:20, 38:23
**once** [2] - 7:21, 7:22
**one** [14] - 2:21, 3:15, 8:9, 10:25, 13:12, 14:1, 17:20, 23:11, 23:13, 24:17, 37:8, 39:21, 40:7, 41:8
**One** [2] - 3:19, 4:24
**ongoing** [1] - 39:10
**opacity** [1] - 7:2
**opaque** [1] - 14:17
**open** [2] - 19:14, 19:17
**operated** [1] - 8:8
**operating** [1] - 27:7
**operations** [1] - 22:19
**opinion** [4] - 15:19, 16:12, 25:3, 37:6
**opportunities** [2] - 10:3, 15:3
**opportunity** [3] - 9:10, 11:18, 14:18
**opposition** [1] - 24:18
**oral** [1] - 11:24
**order** [84] - 3:3, 3:6, 3:8, 4:1, 4:5, 5:25, 6:1, 6:3, 6:10, 6:11, 6:13, 7:3, 7:7, 7:8, 7:10, 7:18, 7:23, 7:25, 8:4, 8:18, 8:24, 9:7, 9:8, 9:15, 9:20, 9:23, 10:7, 10:11, 10:12, 10:19, 11:2, 11:7, 11:14, 11:17, 12:3, 12:7, 13:21, 13:22, 14:2, 14:15, 14:17, 14:19, 14:21, 15:11, 15:13, 15:15, 15:18, 16:8, 16:11, 16:13, 16:15, 16:19, 16:20, 17:20, 17:22, 18:1, 18:3, 18:5, 18:6, 25:2, 25:18, 26:4, 30:12, 33:20, 34:18, 34:22, 34:25, 35:1, 35:11, 35:12, 35:14, 35:18, 35:19,

36:5, 38:25, 39:4, 40:10, 41:2, 41:21, 41:25
**ordered** [2] - 24:8, 24:10
**orders** [2] - 14:2, 19:20
**ordinary** [1] - 12:2
**otherwise** [1] - 22:9
**ought** [1] - 9:22
**outlet** [1] - 37:24
**outlets** [5] - 4:8, 4:10, 4:14, 14:8, 37:22
**Outlets** [1] - 4:17
**outlines** [1] - 13:4
**Oval** [3] - 3:18, 4:24, 9:12, 15:3
**overarching** [1] - 3:22
**own** [1] - 13:21

**P**

**pace** [1] - 7:15
**paper** [1] - 7:6
**papers** [1] - 11:25
**parcel** [1] - 8:23
**part** [9] - 4:15, 6:10, 7:2, 7:15, 8:23, 10:5, 18:2, 34:24, 40:4
**participate** [2] - 2:22, 31:14
**participated** [1] - 12:5
**participation** [2] - 4:18, 37:23
**particular** [3] - 20:1, 21:11, 29:13
**particularly** [3] - 25:4, 28:23, 31:1
**parties** [1] - 12:12
**party** [3] - 21:2, 25:1, 35:3
**passholders** [2] - 9:5, 18:17
**past** [1] - 30:16
**patently** [1] - 8:20
**patience** [1] - 41:3
**pattern** [1] - 7:7
**peer** [2] - 15:20, 39:7
**peers** [1] - 32:21
**penalty** [1] - 12:14
**people** [7] - 4:7, 5:22, 6:19, 27:4, 32:15, 32:16, 37:9
**per** [1] - 14:9
**perfectly** [2] - 11:13, 32:24
**perhaps** [6] - 28:15, 29:23, 32:11, 32:25, 34:13, 39:11
**period** [1] - 32:8

**periodicity** [1] - 23:19
**permanent** [2] - 12:23, 13:7
**permits** [1] - 3:17
**permitted** [1] - 2:24
**permitting** [1] - 4:2
**person** [1] - 25:3
**petition** [1] - 10:14
**petitioned** [1] - 10:15
**photo** [5] - 6:19, 10:4, 11:11, 18:9, 18:11
**photographer** [6] - 2:24, 6:17, 8:16, 9:1, 14:8, 16:24
**photographers** [3] - 14:11, 14:12, 18:11
**photographs** [1] - 14:8
**photography** [2] - 2:23, 8:25
**photojournalist** [2] - 21:15, 29:15
**photojournalists** [8] - 21:16, 21:17, 21:18, 22:23, 22:24, 23:2, 23:3, 26:9
**photos** [1] - 14:6
**phrase** [2] - 4:23, 35:18
**phrasing** [1] - 3:22
**place** [2] - 15:9, 33:16
**placed** [1] - 14:22
**places** [1] - 4:6
**Plaintiff** [2] - 1:4, 1:13
**plaintiff** [2] - 2:5, 41:4
**plaintiff's** [2] - 2:18, 36:15
**play** [3] - 5:7, 27:5, 29:2
**playing** [3] - 8:17, 10:18, 10:19
**plays** [1] - 25:20
**plenty** [1] - 5:19
**podium** [1] - 10:1
**point** [17] - 8:2, 10:23, 13:15, 20:4, 20:15, 21:12, 23:5, 23:20, 28:13, 28:25, 33:17, 35:23, 35:24, 37:13, 37:17, 38:8, 39:20
**pointed** [2] - 14:22, 23:16
**pointedly** [1] - 5:3
**poke** [3] - 3:16, 20:14
**poking** [1] - 30:13
**policies** [3] - 13:11, 17:9, 21:5
**policy** [83] - 3:2, 3:13, 3:17, 3:21, 3:23, 4:5, 4:7, 5:13, 5:16, 5:25,

6:20, 7:10, 7:22, 8:1, 8:21, 8:23, 11:5, 11:6, 11:10, 11:17, 12:6, 12:19, 12:22, 13:1, 13:5, 13:12, 13:13, 14:10, 15:12, 15:24, 16:3, 17:5, 17:7, 17:11, 17:12, 17:14, 17:17, 17:25, 20:3, 20:5, 20:6, 20:12, 20:16, 20:19, 20:23, 21:6, 21:10, 22:4, 22:11, 22:12, 23:16, 24:2, 24:8, 24:20, 24:24, 25:20, 27:6, 27:24, 28:11, 30:20, 30:21, 30:23, 31:1, 31:16, 33:6, 33:8, 33:16, 34:18, 35:24, 36:6, 37:14, 37:21, 38:2, 38:11, 38:15, 38:18, 38:20, 38:23, 41:12, 41:15, 41:16, 41:21
**Pool** [1] - 23:7
**pool** [42] - 2:22, 2:24, 3:13, 3:24, 4:9, 4:13, 4:18, 5:13, 5:23, 5:24, 6:14, 6:15, 6:18, 6:19, 7:21, 8:6, 8:25, 9:2, 9:6, 9:8, 9:10, 11:13, 12:20, 15:25, 16:17, 16:18, 16:25, 17:6, 17:19, 18:9, 18:10, 19:15, 20:12, 26:2, 27:4, 27:12, 29:13, 30:19, 31:14, 32:15, 37:23, 38:7
**pool's** [1] - 4:15
**pools** [6] - 20:1, 20:8, 21:11, 22:2, 22:5, 23:1
**poorly** [1] - 18:19
**population** [2] - 9:4, 16:20
**position** [5] - 14:13, 14:15, 14:23, 17:16, 37:12
**possibility** [1] - 25:6
**possible** [1] - 20:9
**possibly** [1] - 39:13
**potentially** [1] - 32:14
**powerful** [2] - 28:24, 30:11
**practically** [1] - 26:7
**precisely** [1] - 20:8
**preexisting** [1] - 12:21
**prejudice** [1] - 36:17
**preliminary** [3] - 11:2,

11:3, 19:3
**preparations** [1] - 6:13
**prepare** [1] - 6:11
**prepared** [1] - 12:10
**prerogative** [1] - 25:4
**prerogatives** [1] - 25:7
**presents** [1] - 33:22
**President** [24] - 3:20, 3:23, 4:23, 5:14, 5:23, 8:14, 8:15, 9:13, 10:21, 13:19, 13:22, 15:6, 24:22, 25:1, 34:24, 35:2, 35:8, 35:13, 35:15, 36:5, 36:8, 38:1, 39:25, 41:11
**President's** [7] - 9:11, 11:21, 25:6, 27:3, 38:11, 40:3, 41:17
**presidential** [1] - 9:12
**Press** [7] - 2:3, 2:8, 2:10, 3:14, 5:12, 11:11, 38:6
**press** [37] - 2:22, 2:24, 3:24, 4:9, 4:11, 5:13, 5:21, 8:6, 10:16, 11:4, 11:6, 12:20, 15:25, 16:25, 17:6, 17:16, 19:15, 20:1, 20:8, 20:12, 20:22, 21:11, 22:2, 22:3, 26:2, 27:4, 27:12, 27:24, 29:13, 30:7, 30:19, 31:14, 32:15, 35:15, 37:2, 38:7, 41:10
**PRESS** [1] - 1:3
**presume** [1] - 37:21
**presumption** [4] - 36:24, 36:25, 38:8, 39:12
**pretty** [5] - 17:10, 35:24, 38:12, 39:7, 39:17
**previous** [1] - 20:6
**previously** [1] - 6:20
**primary** [2] - 11:14, 33:15
**principal** [2] - 18:6, 27:11
**principle** [1] - 3:23
**print** [7] - 4:15, 9:2, 9:3, 9:4, 15:5, 29:16, 31:24
**problem** [14] - 7:2, 13:19, 13:20, 18:6, 21:12, 27:25, 29:3, 29:20, 29:22, 30:4, 30:16, 30:22, 40:12, 41:20

**problematic** [3] - 14:3, 28:12, 38:23
**problems** [1] - 27:20
**proceed** [2] - 28:19, 28:21
**proceeding** [2] - 28:15, 39:23
**proceedings** [1] - 42:14
**process** [1] - 17:22
**profoundly** [1] - 31:8
**prominent** [4] - 31:24, 32:2, 32:3, 32:9
**proof** [2] - 15:23, 39:5
**proposed** [2] - 12:3, 19:7
**provide** [2] - 11:18, 18:16
**providing** [1] - 39:15
**provision** [1] - 14:2
**pudding** [2] - 15:24, 39:5
**punitive** [2] - 9:19, 15:10
**punitively** [1] - 9:7
**pure** [2] - 39:16, 39:21
**purpose** [3] - 15:2, 35:19, 35:20
**purposes** [1] - 6:6
**pursued** [1] - 19:6
**put** [1] - 9:8
**putting** [3] - 3:22, 11:9, 14:16

**Q**

**qualification** [1] - 4:1
**qualifying** [1] - 4:21
**questions** [3] - 33:22, 41:6, 41:25
**quickly** [2] - 7:16, 7:24
**quite** [3] - 12:22, 32:17, 41:5

**R**

**random** [1] - 31:2
**rapidly** [1] - 25:16
**rather** [1] - 17:9
**RDR** [3] - 1:22, 42:11, 42:18
**reaction** [3] - 9:14, 10:14, 14:19
**read** [1] - 23:17
**really** [6] - 3:13, 6:23, 8:23, 10:18, 15:21, 31:7
**reason** [2] - 19:19, 34:25
**reasonable** [1] - 7:18

**rebut** [1] - 39:11
**receiving** [1] - 39:6
**recent** [1] - 38:4
**recently** [1] - 39:25
**Recess** [1] - 36:13
**recites** [1] - 4:7
**recognition** [1] - 40:5
**recognize** [3] - 32:4, 36:25, 37:4
**recognized** [2] - 25:3, 38:14
**recognizing** [1] - 28:4
**recommend** [4] - 10:25, 26:25, 28:19, 28:21
**record** [8] - 2:5, 10:6, 11:9, 19:22, 21:13, 23:23, 24:5, 30:5
**rectify** [1] - 40:24
**referred** [1] - 29:5
**refers** [2] - 20:16
**refrained** [2] - 7:17, 7:19
**refusing** [1] - 5:14
**regardless** [8] - 8:6, 8:7, 15:24, 17:5, 17:7, 17:11, 18:5, 35:15
**regular** [2] - 11:11, 18:10
**rejected** [2] - 6:9, 14:1
**relegates** [1] - 10:12
**relegating** [2] - 9:18, 16:19
**relied** [1] - 16:8
**relief** [4] - 7:24, 18:2, 26:22, 29:10
**rely** [1] - 20:25
**remain** [1] - 14:24
**remedies** [1] - 27:22
**remedy** [5] - 11:4, 11:15, 12:4, 12:10, 14:4
**remember** [3] - 8:3, 35:10, 35:11
**remind** [1] - 25:1
**repeated** [1] - 37:17
**repeatedly** [2] - 24:21, 39:5
**Reporter** [3] - 1:22, 1:22, 42:19
**REPORTER** [1] - 42:9
**reporters** [1] - 17:7
**representations** [2] - 16:5, 16:14
**representative** [1] - 2:9
**represented** [1] - 5:19
**request** [2] - 6:10, 11:15

**require** [6] - 11:19, 20:1, 20:2, 22:9, 29:12, 34:23
**required** [5] - 19:12, 19:16, 19:18, 20:10, 26:8
**requires** [3] - 7:15, 41:2, 41:3
**requiring** [1] - 39:15
**rescind** [1] - 36:6
**rescinding** [4] - 19:13, 19:16, 20:3, 24:8
**rescission** [2] - 19:24, 19:25
**reservation** [1] - 24:25
**reserve** [3] - 5:10, 10:20, 35:3
**reserved** [1] - 41:11
**reserves** [3] - 8:19, 8:20, 16:3
**reserving** [2] - 3:25, 36:4
**resigning** [1] - 24:10
**resist** [1] - 17:17
**resolve** [1] - 18:8
**resoundingly** [1] - 14:1
**respected** [1] - 25:17
**respectfully** [1] - 25:1
**respecting** [1] - 40:7
**respects** [1] - 3:6
**respond** [2] - 11:18, 40:23
**response** [2] - 16:20, 19:24
**rest** [1] - 24:24
**result** [2] - 35:5, 36:8
**results** [3] - 22:15, 28:13, 30:17
**retain** [1] - 4:12
**retains** [5] - 4:23, 5:23, 22:3, 24:22, 38:1
**retaliation** [1] - 18:14
**retaliatory** [1] - 14:23
**Reuters** [6] - 16:1, 16:25, 23:8, 23:9, 23:12, 32:20
**revisited** [1] - 25:8
**Room** [2] - 1:23, 42:20
**room** [2] - 5:20, 14:9
**rotate** [4] - 4:11, 23:2, 23:3
**rotating** [5] - 4:9, 11:12, 13:7, 13:8, 14:14
**rotation** [21] - 4:16, 6:18, 6:24, 7:1, 9:8, 9:16, 10:2, 10:4, 10:5, 14:5, 14:6, 14:9, 14:16, 15:6,

21:15, 21:20, 21:24,
22:16, 23:6, 23:17
**rotations** [3] - 10:10,
10:10, 23:18
**roughly** [2] - 16:1,
17:6
**route** [1] - 12:13
**rule** [2] - 11:25, 40:6
**ruling** [2] - 41:7, 41:9

**S**

**sad** [1] - 31:9
**salient** [1] - 15:21
**salute** [1] - 5:5
**sample** [1] - 31:4
**Sasha** [1] - 2:9
**SASHA** [1] - 1:14
**satisfy** [1] - 10:10
**Saturday** [1] - 9:11
**Saturdays** [1] - 32:10
**saw** [2] - 7:21, 7:22
**school** [2] - 21:25,
27:11
**se** [1] - 14:9
**seat** [1] - 13:8
**seats** [2] - 12:23, 13:7
**second** [7] - 4:10, 5:2,
13:3, 14:5, 14:25,
20:4, 39:6
**second-class** [1] -
39:6
**secondary** [1] - 11:16
**secretary** [5] - 4:11,
5:21, 20:22, 22:3,
35:15
**see** [8] - 8:17, 13:11,
23:23, 27:5, 34:4,
34:21, 35:17, 37:16
**seeing** [1] - 40:24
**seek** [2] - 6:6, 14:4
**seeking** [1] - 18:2
**seem** [1] - 6:25
**selection** [2] - 4:15,
37:2
**self** [1] - 7:5
**self-serving** [1] - 7:5
**semblance** [1] - 9:16
**senior** [2] - 36:22
**sense** [2] - 25:19,
27:16
**sensible** [1] - 11:8
**sensitive** [2] - 3:19,
4:25
**serious** [7] - 19:6,
19:21, 27:2, 33:22,
40:12, 41:20
**seriously** [1] - 40:18
**service** [7] - 9:5, 15:1,
17:1, 17:3, 18:16,

18:19
**services** [2] - 15:20,
39:7
**serving** [1] - 7:5
**sets** [1] - 7:3
**several** [2] - 3:6, 4:6
**shall** [1] - 4:11
**shoots** [1] - 9:13
**showed** [1] - 38:21
**shows** [1] - 19:22
**side** [8] - 9:3, 18:12,
19:7, 27:23
**significant** [2] - 31:5,
40:12
**similarly** [1] - 17:6
**simple** [1] - 11:5
**simply** [1] - 11:6
**slightly** [1] - 8:11
**slots** [3] - 6:20, 22:21,
23:4
**slow** [1] - 19:10
**small** [1] - 33:21
**solidified** [1] - 38:20
**someone** [3] - 30:3,
30:5, 30:8
**soon** [1] - 21:10
**sorry** [5] - 6:8, 17:2,
26:17, 27:8, 33:13
**sort** [6] - 10:22, 12:13,
12:14, 14:16, 22:25,
30:15
**sought** [2] - 6:7, 6:8
**space** [1] - 31:4
**spaces** [4] - 3:19,
4:25, 19:14, 25:7
**SPAHR** [1] - 1:14
**Spahr** [1] - 2:7
**specific** [1] - 26:11
**specifically** [1] - 5:9
**speed** [1] - 18:25
**spirit** [1] - 29:3
**spot** [3] - 15:10, 29:14,
29:15
**spots** [1] - 14:7
**staff** [2] - 20:21, 20:22
**stage** [1] - 33:24
**stages** [1] - 33:25
**staging** [1] - 17:21
**stand** [1] - 17:22
**start** [3] - 2:20, 18:4,
21:10
**started** [2] - 13:24,
16:17
**starting** [1] - 2:5
**statement** [13] - 7:4,
7:5, 30:15, 37:25,
38:2, 38:8, 38:10,
38:12, 38:14, 40:4,
40:5, 41:16, 41:17

**statements** [2] - 39:2,
39:22
**States** [3] - 3:20, 35:2,
42:19
**states** [2] - 37:22, 38:5
**STATES** [2] - 1:1, 1:11
**statistically** [1] - 31:5
**statistics** [2] - 39:17,
39:21
**status** [1] - 10:13
**stay** [8] - 3:15, 6:3,
6:5, 6:6, 6:8, 6:9,
8:21
**stayed** [2] - 26:5,
40:10
**stenographic** [1] -
42:13
**step** [1] - 19:1
**stepping** [1] - 8:15
**stick** [1] - 7:22
**still** [5] - 8:13, 13:8,
16:22, 22:17, 27:8
**stipulate** [1] - 32:5
**stipulated** [1] - 32:6
**straightforward** [2] -
17:8, 38:12
**Street** [2] - 1:15, 1:19
**strike** [3] - 9:23, 11:4,
15:12
**strikes** [2] - 12:13,
13:10
**striking** [3] - 15:15,
27:24, 38:18
**strong** [2] - 39:3, 39:7
**strongly** [4] - 6:9,
10:25, 16:11, 16:12
**structure** [2] - 38:13,
40:6
**sub** [1] - 22:1
**subject** [1] - 8:13
**submission** [1] -
11:19
**submit** [2] - 12:3, 28:2
**subordinated** [1] -
10:13
**subordinates** [1] -
40:3
**subpoena** [1] - 41:2
**substance** [1] - 5:11
**substantial** [1] - 37:5
**substantially** [1] -
14:18
**substantive** [2] - 4:19,
37:24
**succeeded** [1] - 29:7
**sue** [1] - 35:8
**sufficient** [1] - 3:3
**suggest** [1] - 12:10
**suggested** [2] - 24:24,
27:24

**suggesting** [3] -
32:23, 33:1, 39:2
**suggestion** [5] -
11:15, 11:16, 12:25,
17:17, 38:17
**suggestions** [1] -
10:24
**suggests** [1] - 38:2
**sum** [1] - 5:11
**supervision** [1] - 16:9
**supplemental** [1] -
24:17
**support** [1] - 21:13
**system** [6] - 6:18, 7:1,
9:25, 10:9, 14:15,
15:16

**T**

**table** [1] - 2:8
**tailor** [1] - 8:18
**TAYLOR** [1] - 1:6
**ten** [1] - 36:11
**ten-minute** [1] - 36:11
**tendency** [1] - 22:25
**term** [1] - 37:18
**terms** [6] - 7:7, 13:20,
16:1, 18:8, 19:4,
27:23
**territory** [1] - 28:4
**testimony** [1] - 39:13
**text** [3] - 9:3, 9:17,
18:12
**THE** [63] - 1:1, 1:1,
1:10, 2:2, 2:11, 2:17,
3:1, 3:9, 3:11, 6:23,
8:2, 8:5, 10:22,
12:11, 12:19, 13:6,
14:11, 15:19, 16:22,
17:4, 18:21, 18:23,
21:14, 21:23, 22:14,
22:22, 23:5, 23:12,
23:14, 23:20, 24:13,
24:16, 24:19, 25:10,
25:13, 26:1, 26:15,
26:19, 27:9, 27:13,
28:8, 29:21, 30:14,
31:13, 31:21, 32:2,
32:13, 33:5, 33:7,
33:9, 33:11, 33:14,
33:23, 34:1, 34:6,
34:13, 35:21, 36:9,
36:11, 36:14, 41:14,
41:24, 42:3
**themselves** [1] - 10:20
**they've** [5] - 9:10,
14:14, 17:25, 18:12,
18:15
**third** [6] - 13:3, 21:7,
21:8, 24:1, 24:17,

25:21
**thoughtful** [1] - 27:19
**thoughts** [2] - 36:18,
38:24
**three** [8] - 12:9, 13:10,
14:7, 16:18, 22:21,
23:24, 33:3
**throwing** [1] - 19:19
**thumb** [1] - 3:13
**thumbing** [1] - 3:14
**Thursday** [1] - 29:15
**time-consuming** [1] -
32:18
**TOBIN** [25] - 1:13, 2:6,
2:23, 3:5, 3:10, 3:12,
6:25, 8:4, 8:13,
10:24, 12:17, 13:2,
13:16, 14:12, 16:2,
17:2, 17:12, 18:22,
32:5, 34:8, 34:15,
36:1, 36:10, 41:8,
41:22
**Tobin** [7] - 2:7, 2:20,
24:19, 34:7, 37:10,
41:6, 41:24
**Tobin's** [3] - 26:22,
37:17, 38:17
**tobinc@**
**ballardspahr.com**
[1] - 1:16
**today** [14] - 12:10,
18:2, 18:8, 19:2,
19:7, 19:11, 21:8,
25:19, 25:21, 31:11,
33:18, 36:3, 41:9
**tolerable** [1] - 7:20
**tomorrow** [1] - 8:14
**took** [3] - 13:6, 30:9,
35:13
**tools** [1] - 12:18
**Town** [1] - 23:7
**transcript** [2] - 42:13,
42:14
**TRANSCRIPT** [1] -
1:10
**treads** [1] - 28:3
**treated** [2] - 15:21,
18:19
**treatment** [2] - 15:22,
39:6
**TREVOR** [1] - 1:10
**tried** [1] - 12:5
**TRO** [4] - 7:13, 7:15,
10:1, 29:5
**trouble** [1] - 23:1
**true** [4] - 23:25, 30:2,
42:12, 42:14
**Trump** [1] - 39:25
**trust** [1] - 27:1
**trusting** [1] - 16:23

**truth** [1] - 20:15
**try** [3] - 10:19, 26:17, 40:23
**trying** [8] - 7:14, 13:13, 17:9, 28:1, 28:9, 28:19, 29:3, 41:1
**Tuesday** [9] - 6:15, 6:22, 7:8, 8:8, 20:2, 21:16, 22:1, 23:9, 29:13
**turn** [1] - 27:25
**turned** [2] - 21:9, 31:24
**Tweet** [1] - 30:15
**two** [7] - 12:23, 14:2, 19:12, 19:23, 23:1, 30:18, 31:4
**two-week** [1] - 31:4
**type** [1] - 39:13
**typical** [1] - 12:13

**U**

**U.S** [3] - 1:18, 1:23, 2:13
**unclear** [1] - 38:20
**uncomfortable** [1] - 28:3
**uncommon** [1] - 21:4
**unconstitutional** [1] - 17:16
**under** [12] - 5:12, 6:18, 6:19, 7:20, 16:9, 20:19, 22:4, 27:7, 33:6, 33:10, 33:14, 41:12
**undergraduate** [1] - 33:2
**underlying** [1] - 34:25
**United** [3] - 3:20, 35:2, 42:19
**UNITED** [2] - 1:1, 1:11
**unless** [2] - 26:4, 40:10
**unqualified** [1] - 24:6
**up** [3] - 10:1, 17:22, 31:23
**utilized** [1] - 38:22

**V**

**valid** [1] - 32:24
**varieties** [1] - 23:18
**variety** [2] - 29:25, 30:2
**various** [1] - 12:20
**vastly** [1] - 9:17
**vice** [1] - 27:10
**view** [2] - 6:19, 15:8

**viewpoint** [31] - 4:3, 4:19, 5:10, 5:11, 5:20, 7:4, 7:5, 8:19, 16:4, 16:16, 16:21, 19:13, 19:16, 20:6, 20:17, 22:6, 24:3, 24:10, 24:23, 30:24, 31:23, 35:6, 35:16, 36:6, 37:9, 37:24, 38:7, 38:16, 39:24, 41:13, 41:18
**viewpoint-based** [6] - 19:16, 22:6, 24:3, 24:10, 30:24, 31:23
**views** [1] - 5:14
**violate** [1] - 11:2
**violated** [1] - 19:23
**violates** [2] - 7:23, 11:7
**violating** [2] - 5:14, 12:12
**violation** [15] - 3:6, 6:1, 9:19, 9:23, 10:15, 13:22, 15:11, 15:17, 18:1, 18:20, 19:20, 34:25, 35:4, 36:5
**violative** [1] - 34:24
**vitiates** [1] - 38:1
**Vucci** [1] - 30:18

**W**

**wait** [2] - 8:17, 28:21
**wait-and-see** [1] - 8:17
**wants** [3] - 9:24, 11:8, 28:18
**Washington** [7] - 1:4, 1:15, 1:20, 1:24, 5:7, 27:11, 42:21
**watch** [1] - 15:6
**ways** [2] - 29:25, 30:2
**weasel** [3] - 24:6, 24:21, 35:18
**Wednesday** [7] - 6:16, 6:22, 7:8, 7:22, 21:18, 23:10, 29:14
**week** [10] - 3:2, 13:7, 20:2, 21:22, 22:3, 31:4, 37:15, 40:17, 41:1
**weekend** [2] - 29:16, 42:4
**weekends** [1] - 31:14
**weeks** [1] - 30:18
**White** [50] - 4:9, 4:11, 5:12, 5:15, 6:5, 7:15, 7:18, 8:24, 9:12, 9:21, 9:24, 11:8, 12:5, 12:21, 13:4,

14:6, 15:13, 15:15, 16:12, 16:13, 16:14, 17:16, 17:23, 19:15, 19:17, 19:23, 20:5, 20:12, 20:20, 20:21, 22:9, 22:10, 22:19, 23:7, 26:2, 26:8, 28:6, 28:25, 29:1, 29:11, 30:3, 30:5, 33:19, 36:5, 36:20, 37:4, 38:5, 38:6, 39:23, 41:10
**wide** [2] - 23:18, 37:7
**wire** [13] - 9:5, 10:4, 11:11, 14:25, 15:1, 15:10, 15:20, 17:1, 17:2, 17:6, 18:16, 18:19, 39:7
**Wire** [1] - 4:14
**Wire-based** [1] - 4:14
**wise** [1] - 40:15
**wolf** [1] - 40:20
**word** [9] - 4:6, 4:21, 5:2, 5:17, 16:7, 20:14, 24:7, 24:20, 24:21
**worded** [2] - 16:11, 16:12
**words** [8] - 4:3, 7:3, 19:20, 24:6, 29:9, 29:12, 31:25
**worry** [1] - 7:9
**writing** [1] - 34:21
**written** [1] - 27:16

**Y**

**years** [1] - 37:12
**yesterday** [4] - 2:22, 3:15, 24:18, 25:5
**yield** [1] - 5:15
**York** [3] - 23:7, 23:9, 23:10
**yourself** [1] - 28:4
**yourselves** [1] - 2:5

**Z**

**Zeke** [1] - 2:9