SCHEDULED FOR ORAL ARGUMENT ON NOVEMBER 24, 2025

**No. 25-5109**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

ASSOCIATED PRESS,

_Plaintiff-Appellee_,

v.

TAYLOR BUDOWICH, in his official capacity
as White House Deputy Chief of Staff, et al.

_Defendants-Appellants_.

_____

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-cv-532-TNM
Hon. Trevor N. McFadden, J.

_____

**BRIEF OF PLAINTIFF-APPELLEE THE ASSOCIATED PRESS**

Charles D. Tobin
Jay Ward Brown
Maxwell S. Mishkin
Sasha Dudding
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com

_Counsel for Plaintiff-Appellee_

## CERTIFICATE OF PLAINTIFF-APPELLEE
## AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28, Plaintiff-Appellee the Associated Press certifies as follows:

### A.    Parties and Amici

Plaintiff-Appellee is the Associated Press.

Defendants-Appellants are Taylor Budowich, in his official capacity as White House Deputy Chief of Staff; Karoline C. Leavitt, in her official capacity as White House Press Secretary; and Susan Wiles, in her official capacity as White House Chief of Staff.[1]

The White House Correspondents' Association, the Reporters Committee for Freedom of the Press, the Center for American Rights, the Knight First Amendment Institute at Columbia University, twelve First Amendment scholars,[2] and the State Democracy Defenders Fund participated as amici curiae in the District Court.

---

[1] Mr. Budowich will reportedly leave the White House at the end of September 2025. *See* Alex Isenstadt, *Scoop: Longtime Trump adviser Budowich departing White House*, Axios (Sept. 24, 2025), https://www.axios.com/2025/09/24/top-white-house-aide-budowich-leaving-trump.  Pursuant to Rule 43(c)(2) of the Federal Rules of Appellate Procedure, his successor to the position of White House Deputy Chief of Staff will automatically be substituted as a party.

[2] The First Amendment scholars were Genevieve Lakier, RonNell Andersen Jones, Jack M. Balkin, Erin Carroll, Erwin Chemerinsky, Heidi Kitrosser, Christina Koningisor, Michael W. McConnell, Robert Post, Jacob M. Schriner-Briggs, Geoffrey R. Stone, and Sonja R. West.

i

**B.    Rulings Under Review**

The ruling under review, published at 780 F. Supp. 3d 32 (D.D.C. 2025), is a Memorandum Order issued by the Honorable Trevor N. McFadden on April 8, 2025, granting the Associated Press's Amended Motion for Preliminary Injunction.

**C.    Related Cases**

This case has not previously been before this Court – except on the government's motion to stay pending appeal, which was decided by a special panel – or any court other than the District Court.  Undersigned counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

**D.    Rule 26.1 Corporate Disclosure Statement**

The Associated Press is a news cooperative incorporated under the Not-for-Profit Corporation Law of New York and has no parents, subsidiaries or affiliates that have any outstanding securities issued to the public.

*/s/ Charles D. Tobin*
Charles D. Tobin

## TABLE OF CONTENTS

Page

CERTIFICATE OF PLAINTIFF-APPELLEE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................... i

TABLE OF AUTHORITIES ......................................................................... v

GLOSSARY OF ABBREVIATIONS ............................................................ xi

PRELIMINARY STATEMENT ................................................................... 1

STATEMENT OF THE ISSUES ................................................................... 3

STATEMENT OF THE CASE ...................................................................... 3

    A.    The AP and the White House Press Pool .............................. 3

    B.    The Gulf of Mexico and Mount McKinley ........................... 6

    C.    The White House Tries to Coerce the AP into Changing its Journalism ...................................................................... 6

    D.    The AP Files This Lawsuit to Vindicate its Constitutional Rights ......................................................... 8

    E.    The District Court Grants a Preliminary Injunction............ 8

    F.    The Government Seeks a Stay and the AP Moves to Enforce .................................................................. 10

    G.    The Divided Special Panel Grants a Partial Stay ............... 11

STANDARD OF REVIEW .......................................................................... 13

SUMMARY OF THE ARGUMENT ............................................................ 13

ARGUMENT .............................................................................................. 16

I.    THE AP IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIRST AMENDMENT CLAIMS ...................................................... 16

    A.    The AP is Likely to Succeed Under Forum Doctrine ......... 17

i.    Forum analysis applies because the AP engages in communicative activity as part of the press pool......................20

ii.   There is no "intimate presidential spaces" exception to forum doctrine................................................................23

B.   The AP Is Likely to Succeed in Showing That the Government Has Unconstitutionally Targeted Disfavored Speech...................................................................................26

i.    Precedent is clear that viewpoint discrimination is anathema to the First Amendment ..............................................27

ii.   History supports the AP's position, not the government's.................................................................................32

iii.  The District Court's injunction is "quite administrable" ............................................................................35

C.   The AP Is Likely to Succeed on Its Retaliation Claims.....................37

II.   THE AP IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIFTH AMENDMENT CLAIMS ...................................................43

A.   Defendants' Actions Deprived the AP of a Liberty Interest..............44

B.   The Government Failed to Provide the AP with Due Process .....................................................................................46

III.  THE AP SATISFIES EACH OF THE OTHER FACTORS WARRANTING A PRELIMINARY INJUNCTION..................................48

A.   The AP Showed it Will Suffer Irreparable Harm Absent a Preliminary Injunction.......................................................48

B.   The Balance of the Equities and Public Interest Favor the AP ..........52

CONCLUSION .........................................................................55

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023).........................................................................27

*ABC, Inc. v. Cuomo*,
  570 F.2d 1080 (2d Cir. 1977) ...........................................................55

*ABC, Inc. v. Stewart*,
  360 F.3d 90 (2d Cir. 2004) ...............................................................49

*Arkansas Education Television Commission v. Forbes*,
  523 U.S. 666 (1998)...........................................................................24

*Arkansas Dairy Co-op Association, Inc. v. USDA*,
  573 F.3d 815 (D.C. Cir. 2009) ..........................................................13

*Ateba v. Leavitt*,
  133 F.4th 114 (D.C. Cir. 2025)..................................... 18, 21, 22, 23, 25, 26, 32

*Baltimore Sun Co. v. Ehrlich*,
  437 F.3d 410 (4th Cir. 2006) .........................................14, 17, 28, 29

*Banks v. York*,
  515 F. Supp. 2d 89 (D.D.C. 2007).....................................................41

*Board of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972)...........................................................................44

*Benning v. Commissioner, Georgia Department of Corrections*,
  71 F.4th 1324 (11th Cir. 2023) ..........................................................44

*Black Lives Matter D.C. v. Trump*,
  544 F. Supp. 3d 15 (D.D.C. 2021).....................................................41

*Borough of Duryea, Pennsylvania v. Guarnieri*,
  564 U.S. 379 (2011)...........................................................................39

*Chicago Reader v. Sheahan*,
  141 F. Supp. 2d 1142 (N.D. Ill. 2001)...............................................50

*Citizens United v. FEC,*
    558 U.S. 310 (2010).......................................................................33

*CNN v. Trump,*
    2018 WL 9436958 (D.D.C. Nov. 16, 2018) .......................................45

*CNN, Inc. v. ABC, Inc.,*
    518 F. Supp. 1238 (N.D. Ga. 1981)..................................45, 50, 53, 54

*Cole v. Buchanan County School Board,*
    504 F. Supp. 2d 81 (W.D. Va. 2007)..................................................40

*Consumers Union of U.S. v. Periodical Correspondents' Association,*
    365 F. Supp. 18 (D.D.C. 1973)...........................................................45

*Cornelius v. NAACP Legal Defense & Education Fund, Inc.,*
    473 U.S. 788 (1985).............................................................................22

*Cox Broadcasting Corp. v. Cohn,*
    420 U.S. 469 (1975).............................................................................55

*EEOC v. Aramark Corp.,*
    208 F.3d 266 (D.C. Cir. 2000)............................................................43

*El Dia, Inc. v. Governor Rossello,*
    165 F.3d 106 (1st Cir. 1999)...............................................................42

*Elrod v. Burns,*
    427 U.S. 347 (1976).............................................................................52

*Frank v. Herter,*
    269 F.2d 245 (D.C. Cir. 1959).......................................................39, 45

*Frederick Douglass Foundation, Inc. v. D.C.,*
    82 F.4th 1122 (D.C. Cir. 2023)...........................................................17

*Gannett Co. v. DePasquale,*
    443 U.S. 368 (1979).............................................................................51

*Getty Images News Services Corp. v. Department of Defense,*
    193 F. Supp. 2d 112 (D.D.C. 2002).....................................................45

*Greatness v. FEC*,
     831 F.3d 500 (D.C. Cir. 2016)...........................................................................13

*Greer v. Spock*,
     424 U.S. 828 (1976)...........................................................................................24

*Hannegan v. Esquire, Inc.*,
     327 U.S. 146 (1946)...........................................................................................34

*Heffernan v. City of Paterson, N.J.*,
     578 U.S. 266 (2016)...........................................................................................40

*Homer v. Richmond*,
     292 F.2d 719 (D.C. Cir. 1961)............................................................................44

*Huisha-Huisha v. Mayorkas*,
     27 F.4th 718 (D.C. Cir. 2022)............................................................................55

*Huminski v. Corsones*,
     396 F.3d 53 (2d Cir. 2005) ................................................................................50

*International Society for Krishna Consciousness v. Lee*,
     505 U.S. 672 (1992)...........................................................................................24

*Jenner & Block LLP v. Department of Justice*,
     784 F. Supp. 3d 76 (D.D.C. 2025).........................................................17, 27, 28

*John K. MacIver Institute for Public Policy, Inc. v. Evers*,
     994 F.3d 602 (7th Cir. 2021) ......................................................................31, 42

*Karem v. Trump*,
     960 F.3d 656 (D.C. Cir. 2020).......................................... 15, 25, 45, 46, 49, 52

*Matthews v. Eldridge*,
     424 U.S. 319 (1976)...........................................................................................44

*Media Matters for America v. Paxton*,
     138 F.4th 563 (D.C. Cir. 2025)..........................................................................48

*Miami Herald Publishing Co. v. Tornillo*,
     418 U.S. 241 (1974)...........................................................................................38

*Minnesota Voters Alliance v. Mansky*,
 585 U.S. 1 (2018) ................................................................24

*N.Y. Times Co. v. United States*,
 403 U.S. 713 (1971) .............................................................16

*National Endowment for the Arts v. Finley*,
 524 U.S. 569 (1998) .............................................................25

*Nation Magazine v. Department of Defense*,
 762 F. Supp. 1558 (S.D.N.Y. 1991) .....................................45

*Nieves v. Bartlett*,
 587 U.S. 391 (2019) .............................................................37

*NRA of America v. Vullo*,
 602 U.S. 175 (2024) .........................................................2, 17

*Perkins Coie LLP v. Department of Justice*,
 783 F. Supp. 3d 105 (D.D.C. 2025) .....................................28

*Perry v. Sindermann*,
 408 U.S. 593 (1972) .............................................................42

*Police Department of City of Chicago v. Mosley*,
 408 U.S. 92 (1972) ...............................................................27

*President & Fellows of Harvard College v. Department of Health &*
 *Human Services*,
 2025 WL 2528380 (D. Mass. Sept. 3, 2025) ........................28

*Price v. Garland*,
 45 F.4th 1059 (D.C. Cir. 2022) ...........................18, 19, 20, 22

*Quad-City Community News Service, Inc. v. Jebens*,
 334 F. Supp. 8 (S.D. Iowa 1971) .........................................45

*Reed v. Town of Gilbert*,
 576 U.S. 155 (2015) .............................................................28

*Reuters Ltd. v. United Press International, Inc.*,
 903 F.2d 904 (2d Cir. 1990) .................................................50

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980)................................................................49, 54

*Ridley v. MBTA*,
    390 F.3d 65 (1st Cir. 2004)....................................................27

*Rosenberger v. Rector & Visitors of the University of Virginia*,
    515 U.S. 819 (1995)................................................................27

*Sherrill v. Knight*,
    569 F.2d 124 (D.C. Cir. 1977)..................................38, 44, 45, 46, 47

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022)....................................................55

*Snyder v. Ringgold*,
    133 F.3d 917 (4th Cir. 1998) ..................................................29

*Stevens v. N.Y. Racing Association, Inc.*,
    665 F. Supp. 164 (E.D.N.Y. 1987) ..........................................41

*Susman Godfrey LLP v. Executive Office of President*,
    --- F. Supp. 3d ----, 2025 WL 1779830 (D.D.C. June 27, 2025)....................28

*Toolasprashad v. Bureau of Prisons*,
    286 F.3d 576 (D.C. Cir. 2002)................................................42

*United States v. Nassif*,
    97 F.4th 968 (D.C. Cir. 2024)................................................25

*Wilkie v. Robbins*,
    551 U.S. 537 (2007)............................................................36, 37

*Wilkinson v. Austin*,
    545 U.S. 209 (2005)............................................................44

*Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of President*,
    784 F. Supp. 3d 127 (D.D.C. 2025)..........................................28

*Winter v. Natural Resource Defense Council, Inc.*,
    555 U.S. 7 (2008)................................................................13

ix

**Other Authorities**

Burt Neuborne, *Madison's Music: On Reading The First Amendment*
(2015) ................................................................................................1

*Restoring Names That Honor American Greatness*, Exec. Order No.
14172 (Jan. 20, 2025) ........................................................................6

## GLOSSARY OF ABBREVIATIONS

**AP**          The Associated Press

**JA**          Joint Appendix

**TRO**         Temporary restraining order

**WHCA**        The White House Correspondents' Association

## PRELIMINARY STATEMENT

The ability to think, write, and speak freely, without state coercion, is the foundation for all the freedoms that uniquely define American society.[3]  Yet the President now asks this Court to uphold an unconstitutional fiat that he has imposed on the press.  He has ordered the Associated Press ("the AP"), and by implication all journalists, to adopt his official vocabulary or be banned from first-hand coverage of the seat of his power.  The First and Fifth Amendments to the United States Constitution, if they stand for nothing else, prohibit this blatant government coercion of the media.

In February 2025, the government began trying to coerce the AP by barring its journalists from spaces open to White House-credentialed journalists, unless the AP agreed to primarily use the name Gulf of America to report on the body of water known for 400 years as the Gulf of Mexico.  In addition to the Oval Office, AP journalists were also banned from larger events, held in the White House's biggest spaces, that are open to all White House-credentialed journalists who sign up in advance.

As a result, for the first time – and solely because of its journalism – AP's credentials provided inferior access to the White House than the same credentials

---

[3] "There is the music of poetry in the order, cadence, structure, and content of the Bill of Rights, especially the First Amendment, if we are wise enough to hear it." Burt Neuborne, *Madison's Music: On Reading The First Amendment* 197 (2015).

granted to all other members of the White House press corps.  That severely

hampered the AP from reporting to thousands of customers and four billion people

worldwide.  This targeted attack on the AP's editorial independence attacked the

First Amendment itself, because "[a]t the heart of the First Amendment's Free

Speech Clause is the recognition that viewpoint discrimination is uniquely harmful

to a free and democratic society."  *NRA of Am. v. Vullo*, 602 U.S. 175, 187 (2024).

The AP filed this lawsuit to stop the White House from coercing journalists

into adopting government-approved language or else face official retaliation.  The

AP moved for a preliminary injunction to expeditiously stop these unconstitutional

actions and vindicate its First and Fifth Amendment rights.  Based on detailed

factual findings made following a six-hour evidentiary hearing, the District Court

concluded that the AP is likely to establish that the government violated its First

Amendment rights, that the AP has been irreparably harmed, and that the balance

of equities and public policy weigh in the AP's favor.  It therefore entered a

preliminary injunction requiring the government to "immediately rescind" this

viewpoint-discriminatory and retaliatory exclusion.

The District Court's decision was well-reasoned, and although a special

panel of this Court stayed the preliminary injunction in part, that 2-1 panel

majority erred by embracing "a novel and unsupported exception to the First

Amendment's prohibition of viewpoint-based restrictions of private speech."  June

2

6, 2025 Order ("Stay Order") at 53 (Pillard, J., dissenting).[4]  Now that the decision is on appeal on the merits, this Court should correct the special panel's error, affirm the ruling below, and promptly reinstate the preliminary injunction.

## STATEMENT OF THE ISSUES

Under the First Amendment, the government may not coerce the press and public into using state-preferred language, or punish those who do not comply. The government violated those basic principles when it excluded the AP from the White House press pool and from events open to the White House press corps based solely on the government's dislike of the term Gulf of Mexico.  The White House also took this action without notice to the AP, content-neutral guidelines, or an opportunity for the AP to be heard, violating its Fifth Amendment rights.

The questions presented are: whether the District Court correctly entered a preliminary injunction ordering the government to immediately rescind this access ban, pursuant to the First Amendment; and whether the Fifth Amendment also prevents such targeting in the absence of due process.

## STATEMENT OF THE CASE

### A.    The AP and the White House Press Pool

The AP is one of the world's oldest and most trusted news organizations, reaching four billion people every day.  JA11.  The AP's journalism has achieved

---

[4] Stay Order pagination refers to PDF page numbers.

global recognition for its fast, accurate, and thorough reporting. *Id*. The AP is also known for its Stylebook, in which it publishes standards for usage, spelling, and grammar to facilitate consistency in news writing. JA12-13.

The AP was a founding part of the group of journalists covering the White House and the President – a group today known as the White House press pool. *Id.*, JA19. The pool accompanies the President almost everywhere he goes, serving as the public's eyes and ears. *Id*. AP also attends events open to any journalist with a White House press credential, in large spaces such as the East Room, which can accommodate over 100 journalists. JA12.

The press pool is over a century old. In fact, an AP reporter became the first documented presidential "pooler" in 1881, reporting on the condition of President Garfield from the White House after he was shot. JA19. AP pool journalists were in the motorcade in Dallas when President Kennedy was assassinated, and with President Bush on September 11 – providing fast, first-hand reporting to a nation in crisis. *Id.*

From the Eisenhower administration until February 25, 2025, when the President altered the process during this litigation, the White House Correspondents' Association ("WHCA") and the press corps – not the President – determined the pool's membership. JA62. As Judge Pillard aptly noted in dissenting from the stay panel's ruling, the WHCA and press corps served an

important public purpose by independently determining which outlets served as witnesses to history. "The right of journalists in the Press Pool to participate free from discrimination based on viewpoint 'has endured even during the eras of rockiest relations between the White House and the press—during the Watergate investigations, and Independent Counsel Kenneth Starr's investigation of President Bill Clinton.'" Stay Order at 31 (Pillard, J., dissenting) (citing Knight Inst. Br. at 8, ECF 31-1).

The modern White House press pool traditionally included at least three wire reporters (AP, Reuters, and Bloomberg), four photographers (AP, Reuters, AFP, and The New York Times), three television journalists, a radio correspondent, and at least one print reporter. JA18. The wire services have the broadest reach – particularly among outlets that cannot afford their own White House coverage.

By observing events in person, pool reporters gain insights that they cannot glean secondhand. JA63-64; JA248-250. They publish wire reports and photos "in near real time." JA240-241. Pool journalists vigorously compete to provide the best and fastest news reporting and photography. JA44, JA56. The AP's journalism has always included the fastest fact-based accounts of the President leading the country from the Oval Office.

### B.    The Gulf of Mexico and Mount McKinley

On January 20, 2025, President Trump issued an Executive Order renaming the portion of the Gulf of Mexico within the United States as the Gulf of America. JA22; Exec. Order No. 14172. The same Executive Order renamed the mountain Denali as Mount McKinley. JA22-23. The AP issued guidance addressing both name changes on January 23, 2025, saying it would refer to the Gulf of Mexico "by its original name while acknowledging the new name Trump has chosen." *Id*. The AP explained that, "as a global news agency . . . the AP must ensure that place names and geography are easily recognizable to all audiences." JA22. The AP announced it would follow the Mount McKinley name change because the federal government has authority to rename locations within the United States. JA22-23.

### C.    The White House Tries to Coerce the AP into Changing its Journalism

On February 11, 2025, White House Press Secretary Karoline Leavitt summoned AP Chief White House Correspondent Zeke Miller to her office. JA250-251. Leavitt told Miller that AP journalists would not be permitted in the Oval Office as press pool members until and unless the AP revised its Stylebook to refer to the Gulf of America. *Id*.

The AP declined to reverse its editorial decision. JA23. As a result, that same day, White House staff barred AP text journalists from attending an

6

Executive Order signing and press conference with Elon Musk in the Oval Office and an event in the Diplomatic Reception Room.  JA23-24.

The AP promptly objected.  AP Executive Editor Julie Pace published a statement explaining that "limiting our access to the Oval Office based on the content of AP's speech not only severely impedes the public's access to independent news, it plainly violates the First Amendment."  JA23.  Leavitt defended the White House's decision during a press briefing by claiming that the AP was telling "lies" by using the Gulf of Mexico name.  JA24.  The access denials continued.  JA24-25.  Pace's objections did too, with a February 12 letter to White House Chief of Staff Susan Wiles.  JA24.

On February 14, White House Deputy Chief of Staff Taylor Budowich posted online that the AP's journalists were now indefinitely barred from "access to limited spaces, like the Oval Office and Air Force One" due to the AP's refusal to exclusively use the Gulf of America name, adding that the AP's "journalists and photographers will retain their credentials to the White House complex."  JA26.

On February 18, Wiles responded to Pace's letter, stating that the White House's "view as to why we arrived in this point" is that the AP's Stylebook "has been misused, and at times weaponized, to push a divisive and partisan agenda" and that the AP should use the Gulf of America name "as an American guideline."  JA27.  At a Mar-a-Lago press conference (from which the AP was barred),

President Trump confirmed that the White House would "keep [the AP] out until such time that they agree that it's the Gulf of America."  *Id*.

### D.    The AP Files This Lawsuit to Vindicate its Constitutional Rights

The AP filed this lawsuit on February 21, 2025, to vindicate its rights to free expression under the First Amendment and due process under the Fifth Amendment.  JA28.  The District Court promptly held a hearing on the AP's temporary restraining order ("TRO") motion.  JA30.  The District Court declined that motion to allow for additional expedited briefing and fact-finding, but instructed the government that precedent "is uniformly unhelpful to . . . the White House when the White House has banned reporters in the past," such that "[i]t might be a good idea for the White House" to reconsider whether "what they're doing is really appropriate in light of the case law."  *Id*.

Flouting the District Court, Leavitt announced at a February 25, 2025 press briefing that White House officials, not the WHCA, would now select the pool.  *Id*.  After Leavitt's announcement, the number of wire service pool spots shrank from three (AP, Reuters, and Bloomberg) to one or two (Reuters and/or Bloomberg), and the AP remained barred from the four photographer spots.  JA31.

### E.    The District Court Grants a Preliminary Injunction

Given the change in control over the press pool, the AP filed an Amended Complaint and Preliminary Injunction Motion on March 3, 2025.  JA10-41.  The

District Court held a six-hour evidentiary hearing, with testimony from two AP witnesses – Miller and AP Chief White House photographer Evan Vucci – but no government witnesses. JA140-353. Miller and Vucci testified that AP White House journalists had been excluded from many newsworthy events, including meetings with world leaders, speeches, and executive order signings. *See* JA33, JA46, JA96, JA99. Their testimony also reflected the irony that the White House cited primarily AP reporting in a press release about nationwide news coverage of the President's address to a joint session of Congress, *see* JA114-132, and that President Trump, for the cover of his book *Save America*, chose an AP photograph taken by Vucci himself, *see* JA160:



After carefully considering the facts and law, on April 8, 2025, the District Court entered a 41-page order granting injunctive relief on the AP's First

Amendment viewpoint discrimination and retaliation claims.[5]  JA387-427.  The

District Court ordered the government to "immediately rescind the denial of the

AP's access."  JA427.  It entered a brief stay until April 13 so the government

could appeal and "prepare to implement the Court's injunction."  JA428.

### F.    The Government Seeks a Stay and the AP Moves to Enforce

The government appealed the injunction order and moved this Court on

April 10 to stay it pending appeal.  JA429; Gov't Stay Mot. (Doc. 2110443).  This

Court did not enter an administrative stay, and the injunction took effect on April

14.  Yet the White House continued excluding the AP.  JA438-443.  On April 14, a

press official informed the AP that it remained excluded from pool events because

this case was "ongoing."  JA463.  The next day, the White House announced a new

"White House Press Pool Policy," declaring, in violation of the injunction order,

that "[t]he President retains absolute discretion over access to the Oval Office, Air

Force One, and other comparably sensitive spaces."  JA457-58.  It also replaced

the pool's wire service seat with a second print seat for which wire services were

ostensibly eligible – but the AP was immediately skipped.  *Id.*, JA460.

These actions prompted the AP to file a motion to enforce the injunction on

April 16.  JA435-62.  The District Court held a hearing and denied the motion

---

[5] The Court found it therefore "need not reach the AP's Fifth Amendment, right to
petition, or compelled speech claims."  JA425.

without prejudice, noting that "it's very hard to see how there's compliance" when the AP had not been allowed into the pool for three days after the injunction took effect, but concluding that not enough time had passed to determine whether the government was impermissibly excluding the AP. JA488, JA504. The District Court noted that the AP could refile if its exclusion continued. JA504-05. To date, the AP has not done so.

### G.    The Divided Special Panel Grants a Partial Stay

A special panel of this Court held oral argument on the government's stay motion on April 17, 2025. Apr. 13 Order. On June 6, 2025, the divided special panel granted a stay pending appeal in part. The majority concluded that the government would likely prevail on the merits as to the pool because the Oval Office and other spaces open to the pool are not subject to First Amendment forum analysis, such that *viewpoint discrimination is permitted there*. Stay Order at 9-21. The panel further held that the government was likely to prevail on the retaliation claim, as it was entitled to use its "bully pulpit" to exclude the AP. *Id.* at 21-25. Though the injunction had been in effect for nearly two months with no demonstrable injury to the White House, the panel also held that the injunction irreparably harmed the government. *Id.* at 25-28. The panel denied the stay as to the East Room. *Id.* at 26.

11

Judge Pillard dissented, observing that "[u]ntil now, every United States president has had the fortitude to tolerate the presence in the White House and Oval Office of credentialed journalists known to disagree with one or more government-preferred viewpoints." *Id.* at 34 (Pillard, J., dissenting). Indeed, "[t]he First Amendment demands no less." *Id.* Targeting the AP based on its speech violates the First Amendment's prohibition on viewpoint discrimination, including under forum analysis, and constitutes unconstitutional retaliation. *Id.* at 34-51. Judge Pillard further noted the government's failure to show how allowing AP journalists into the pool caused *any* harm – whereas the ban irreparably harms the AP and the public. *Id.* at 51-55.

On June 10, the AP filed an emergency petition for en banc rehearing of the special panel's order, which was denied on July 22. *See* Rehr'g Order. Concurring, Judge Walker, joined in relevant part by Judge Pan, expressed "reservations about the panel's decision," observed that "the district court analyzed this case with force and eloquence," and noted that "some First Amendment precedents suggest that if the Government cannot exclude journalists based on viewpoint from a presidential press conference in the Brady Briefing Room, then the Government cannot exclude journalists from a presidential press conference in the Oval Office merely because public officials oppose the [journalists'] view." *Id.* at 3 (citations omitted). Although Judge Walker believed en banc review

unnecessary, he emphasized that "the emergency panel's unpublished stay is a nonprecedential order that did not purport to resolve the appeal's merits." *Id.*

## STANDARD OF REVIEW

This Court "review[s] the district court's weighing of the preliminary injunction factors under the abuse of discretion standard, and its findings of fact under the clearly erroneous standard. To the extent the district court's decision hinges on questions of law, however, this court's review is essentially *de novo*." *Arkansas Dairy Co-op Ass'n, Inc. v. USDA*, 573 F.3d 815, 821 (D.C. Cir. 2009).

A preliminary injunction is warranted when the moving party can show: (1) a likelihood of success on the merits, (2) that it is likely to suffer irreparable harm in the absence of such relief, (3) that the balance of equities tips in its favor, and (4) that granting an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because the "[t]he loss of First Amendment 'freedoms'" and other constitutional rights "unquestionably constitutes irreparable injury," "the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## SUMMARY OF THE ARGUMENT

The District Court carefully assessed the facts about the White House's coercion of the AP and correctly applied the law in entering a preliminary

13

injunction and ordering the government to immediately rescind its unconstitutional access ban on the AP.  This Court should affirm.

**First**, the AP is likely to succeed on the merits of its First Amendment claims.  When the White House opens spaces to the press pool and the press corps to observe and report on the President, those spaces are nonpublic fora.  Conditions governing journalists' access to those spaces in those circumstances, whether the Oval Office or the East Room, must therefore be reasonable and viewpoint-neutral.  The government's coercive condition on the AP's access – requiring that it use state-approved language – violates the First Amendment in multiple ways, whether viewed under forum analysis, as viewpoint-based discrimination, or as retaliation.  The government's reliance on the Fourth Circuit's *Baltimore Sun Co. v. Ehrlich* case, 437 F.3d 410 (4th Cir. 2006), is also misplaced, as that decision approved restrictions on journalists' ability to *interact* with officials, not to access and report from limited spaces.  Under this Circuit's clear precedent, the government's exclusion of the AP was plainly unconstitutional.

**Second**, the AP is likely to succeed on the merits of its Fifth Amendment due process claims, which provide independent and alternative grounds for relief.  The AP has a protected liberty interest in newsgathering and the access needed to gather the news, which the government deprived without *any* process.  The government does not speak to those claims here, let alone refute them.

14

**Third**, while the law *presumes* injury when constitutional rights are violated, the AP also has powerfully established irreparable harm due to the government's access denials – as demonstrated during the District Court's six-hour evidentiary hearing.  The AP's exclusion severely impedes the timeliness and comprehensiveness of the work of its text reporters and photographers, who must rely on others' notes and photos and after-the-fact transcripts instead of live, firsthand reporting, which captures irreplaceable nuances.  The AP also has been financially harmed, incurring substantial costs to fly foreign-based AP journalists to the U.S. to cover foreign leaders' White House visits.  The exclusion of the AP's White House journalists hinders the AP's ability to produce timely and complete reporting on the President and White House to the AP's vast readership, which harms the public's awareness of governmental actions.  The government has made clear that threats of future such harm have not dissipated, and that, absent an injunction, it may exclude the AP based on its journalism at any time.

**Fourth**, the balance of the equities and the public interest strongly favor injunctive relief.  These factors merge where, as here, the government is the defendant.  *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020).  There is no governmental or public interest in the deprivation of constitutional rights.  *Id.* Neither the government nor the public will experience any cognizable harm from affirming the District Court's order requiring the government to cease impeding

the AP's access to spaces open to the pool and other credentialed journalists based on perceived viewpoint. To the contrary, affirmance would advance the public interest by safeguarding the access that the AP relies on to deliver accurate, nonpartisan, thorough, and timely reporting about the government to billions of global readers daily.

For these reasons, the Court should affirm the District Court's preliminary injunction and prevent the unconstitutional exclusion of the AP from spaces open to members of the White House press pool and the broader press corps.

## ARGUMENT

## I.    THE AP IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIRST AMENDMENT CLAIMS

The AP is likely to establish that, by barring the AP from spaces open to the press pool and spaces open to other credentialed journalists in an attempt to coerce changes in the AP's reporting, the government violated the AP's First Amendment rights to freedom of speech and of the press. The government's explicit effort to coerce the AP into using its preferred language is the very sort of harm the First Amendment was enacted to prevent. The First Amendment enshrines the principle that "[t]he press was to serve the governed, not the governors. . . so that it could bare the secrets of the government and inform the people." *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring). Courts have repeatedly upheld that core principle and blocked this Administration's targeting of

16

"speaker[s] they don't like." *Jenner & Block LLP v. Dep't of Justice*, 784 F. Supp. 3d 76, 108 (D.D.C. 2025).

The government's arguments to the contrary rely almost exclusively on the out-of-circuit decision *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006), which held that Maryland's Governor did not act unconstitutionally in denying interviews to certain journalists. Gov't Br. at 33-41. Here, however, the AP is not seeking to *interact* with officials, but rather *not to be banned* from the spaces opened to the pool to observe and report on official business. Once that essential distinction is understood, it is clear that the government's attempted coercion violates the First Amendment under any analysis, whether forum doctrine or unlawful retaliation.

### A.    The AP is Likely to Succeed Under Forum Doctrine

By denying the AP access to areas open to other members of the press pool and press corps, the government has engaged in unconstitutional viewpoint-based discrimination. *Cf.* Gov't Br. at 25-32. "Viewpoint discrimination, whether by legislative enactment or executive action, violates the First Amendment." *Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1146 (D.C. Cir. 2023). It "is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187; *see also infra* Part I.B (discussing viewpoint discrimination as standalone basis for affirming).

17

As the District Court correctly noted, "[i]n modern jurisprudence, forum analysis controls the extent to which the government may restrict access to public property for First Amendment activities."  JA403 (citing *Price v. Garland*, 45 F.4th 1059, 1067 (D.C. Cir. 2022)).  In a forum analysis, courts "first consider the level of First Amendment scrutiny that should be applied," which "depends on the type of forum for speech that has been created by the government."  *Ateba v. Leavitt*, 133 F.4th 114, 121 (D.C. Cir. 2025), *cert. pet. docketed*, No. 25-338 (U.S. Sept. 23, 2025).

One type is "[a] traditional public forum," which "is property that has 'time out of mind' been used to assemble and to communicate with others," such as "public streets and city parks."  *Price*, 45 F.4th at 1067 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).  Alternatively, "[a] designated public forum is government property that has not traditionally been regarded as a public forum, but the Government has intentionally opened up for that purpose," such as "municipal theaters."  *Id.* (cleaned up).  In both, "the law zealously safeguards First Amendment activities in these locations and permits only narrowly tailored government interference."  JA403 (cleaned up).

"The default category in forum analysis," however, "is the nonpublic forum, which includes 'all remaining public property' that does not qualify as a traditional, designated, or limited public forum."  Stay Order at 39 (Pillard, J.,

18

dissenting) (quoting *Int'l Soc'y for Krishna Consciousness v. Lee (ISKCON)*, 505 U.S. 672, 678-79 (1992)).  In a nonpublic forum, a speech "restriction is constitutional if it is reasonable given 'the purpose of the forum and all the surrounding circumstances,' and is viewpoint neutral."  *Price*, 45 F.4th at 1067 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806, 809 (1985)).  Importantly, "[e]very type of forum . . . shares a baseline prohibition on viewpoint discrimination."  Stay Order at 39.

In applying the nonpublic forum category here, and requiring the White House's restrictions to be "viewpoint neutral" and "reasonable in light of the purpose served by the forum," the District Court followed binding precedent. JA404.  Because "the Government has chosen to open the Oval Office," "other press pool locations and events," and larger spaces such as "the East Room" to "some reporters for newsgathering," these are "nonpublic for[a]," from which "[t]he Government . . . cannot exclude the AP from access based on its viewpoint." JA415-416.  Thus, "while the AP does not have a constitutional right to enter the Oval Office, it does have a right to not be excluded *because of its viewpoint*." JA407.  Based on uncontested facts, the District Court found "that is exactly what is happening," as "the Government has been brazen about . . . restricting the AP's access *precisely* because of the organization's viewpoint."  *Id.*; *cf.* Gov't Br. at 32-

46 (defending viewpoint-based exclusion of the AP).  The AP is thus likely to succeed on its First Amendment claims under forum analysis.

In seeking reversal, the government wrongly claims that forum doctrine does not apply because (1) this case does not "concern[] restrictions on communicative activity," and (2) "the personal workspace of the President" and other purportedly "intimate spaces" defy "ordinary forum analysis."  Gov't Br. at 25-32.  These arguments fly in the face of the precedent this Circuit has established and reinforced for decades.

### i.    Forum analysis applies because the AP engages in communicative activity as part of the press pool

Forum analysis is proper because the AP engages in communicative activity when it reports from the press pool, and the government's erroneous argument to the contrary relies on misreading *Price v. Garland*, 45 F.4th at 1068-70.  *See* Gov't Br. at 26-32.  There, a filmmaker sued the government claiming that a statute requiring permits to film in a national park was unconstitutional under forum doctrine.  *Price*, 45 F.4th at 1067-70.  *Price* held that forum doctrine did not apply because recording video "is merely a step in the creation of speech that will be communicated at some other time, usually in some other location."  *Id.* at 1070.  But *Price* did not involve *newsgathering*, as the statute permitted newsgathering in parks.  *Id.* at 1064.  Therefore, "*Price* did not disapprove of applying forum analysis to journalistic endeavors."  JA411 (quoting *id.* at 1070-71).

AP journalists, by contrast, engage in "the dissemination of information" from the pool, which *is* a "communicative activity" under *Price*. The District Court found after an evidentiary hearing that "AP journalists are engaged in full-fledged expression when they report from the Oval Office" and other limited spaces. JA410. From these spaces, AP journalists "break the news," "use all five senses to craft a unique message for publication," and "ask questions" of the President and others – and the loss of these opportunities, as punishment for the AP's expression, "unquestionably harmed the AP's reporting." JA420-22. "The government makes no clearly-erroneous challenge to that finding." Stay Order at 43 (Pillard, J., dissenting). Moreover, "*Price* counsels that even if any of the reporters' actions are noncommunicative, the proper inquiry is still a nonpublic forum analysis which *never* tolerates viewpoint discrimination." JA411 (citing *Price*, 45 F.4th at 1071-72) (emphasis added).

The government misreads *Price*'s warning against "extending the public forum doctrine 'in a mechanical way' to contexts that meaningfully differ from those in which the doctrine has traditionally been applied," Gov't Br. at 27 (quoting *Price*, 45 F.4th at 1068), because forum doctrine *is* applied to analogous contexts. This Court held in *Ateba* that the White House Press Briefing Room is a nonpublic forum, as journalists there – like those in the pool – gather and report news instantaneously to readers elsewhere. 133 F.4th at 122-23. Likewise,

"although *Sherrill* predated modern forum analysis, its description of the [White House] Press Area fits the definition of a nonpublic First Amendment forum." *Id.* at 122-23 (citing *Sherrill v. Knight*, 569 F.2d 124, 130-31 (D.C. Cir. 1977)).

The government attempts to manufacture a slippery slope by claiming the difference between this case and *Price* is a mere tape "delay" and that the AP's arguments would create a forum "wherever individuals can use their cellphones to post content online." Gov't Br. at 28. However, the government ignores that *Price* does not discuss newsgathering at all, on *any* time delay, because, as that panel noted, newsgathering was already protected by the statute at issue. *Price*, 45 F.4th at 1072.[6] Here, the White House has opened the Oval Office, Air Force One, and other spaces to the pool and other journalists for the purpose of gathering and communicating news about the President's official business. Those spaces are accordingly nonpublic fora, in which viewpoint-based speech restrictions are unconstitutional.

---

[6] The government's claim that applying forum analysis contravenes the rule that "'member[s] of the institutional press [have] no greater constitutional interest in free expression than' anyone else," is equally inapposite. Gov't Br. at 28-29 (quoting *Tavoulareas v. Washington Post Co.*, 724 F.2d 1010, 1025 (D.C. Cir.), *rev'd on other grounds*, 737 F.2d 1170 (D.C. Cir. 1984)). When the government *chooses* to open a forum to a class of speakers – here, the press pool – it cannot discriminate *among that class* based on viewpoint. *See Cornelius*, 473 U.S. at 806.

### ii. There is no "intimate presidential spaces" exception to forum doctrine

The government next asserts the novel claim that the Oval Office, Air Force One, and the East Room are "intimate presidential spaces" exempt from forum analysis. Gov't Br. at 21, 29-32. As the District Court correctly found, this argument "is untethered from precedent." JA431. "To the contrary, the D.C. Circuit suggests that government offices fit squarely into the definition of nonpublic fora." *Id.* (citing *Price*, 45 F.4th at 1068; *Ateba*, 133 F.4th at 122).

The essence of forum doctrine is that "although the government is not required to open such spaces for any speech at all," once it does, it cannot then restrict access based on viewpoint. *Ateba*, 133 F.4th at 122 (citation omitted). This analysis is not triggered "merely because title to the building reside[s] in the government," *id.*, but because the government has consistently invited in certain speakers. That is why, even though the public has no general right of access to the White House, the White House still contains nonpublic fora. *See id.* at 117 (White House contains both "*the President's* private living quarters" and "*government* office space") (emphasis added).

The government cites *no* precedent supporting the novel proposition that forum analysis evaporates when the President wants to deem a space "private." To the contrary, *every one* of its cited cases found the space at issue was a nonpublic forum, where access restrictions must be reasonable and viewpoint neutral. *See*

23

Gov't Br. at 29-30; *Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018) (reviewing viewpoint-neutral speech restriction in nonpublic forum, a polling place, for reasonableness); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677-78, 682 (1998) (congressional candidate "debate was a nonpublic forum" in which selection "must not be based on the speaker's viewpoint and must otherwise be reasonable"); *ISKCON*, 505 U.S. at 679 (airport terminals were nonpublic fora in which the "challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view"); *Greer v. Spock*, 424 U.S. 828, 838-39 (1976) (restriction on campaigning on military base was permissible where "there is no claim that the military authorities discriminated . . . based upon the candidates' supposed political views").

Finding no support in the precedent it cites, the government continues to "misconstrue[] the facts" regarding these "so-called intimate space[s]." JA431-32. They are hardly "reserved for the President's exclusive use." Gov't Br. at 30. The President uses them for official business, and he continues to open these spaces to the pool and other journalists to cover his work. The Oval Office "is not just 'a personal workspace,'" the East Room is "voluntarily open[ed] for limited-access press briefings," and claiming Air Force One "is an intimate space is simply not

24

credible." JA431-432, JA416. Even Mar-a-Lago hosted "an Executive Order signing ceremony" open to "many journalists and local officers." JA432.

That these spaces are "highly secure" is legally irrelevant. Gov't Br. at 30. The places where the President's Administration and Congress govern the country are security zones, yet this Court has found nonpublic fora in the White House and U.S. Capitol. *See Ateba*, 133 F.4th at 122 (White House Press Area); *United States v. Nassif*, 97 F.4th 968, 977-88 (D.C. Cir. 2024) (U.S. Capitol); *see also Karem*, 960 F.3d at 662, 667-68 (revocation of reporter's hard pass following Rose Garden event was impermissible). "The entire White House is under tight security, but when spaces within are open to White House-credentialed journalists, exclusions are impermissible if 'based upon the content of the journalist's speech.'" Stay Order at 42 (Pillard, J., dissenting) (quoting *Sherrill*, 569 F.2d at 129).

Nor do the limited size of the pool or the spaces it reports from change the analysis—a forum does not require a minimum of square feet or foot traffic, but rather that the government has decided to open one for a specific purpose. *See, e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 585-87 (1998) (upholding selective government arts funding program because it did *not* "raise[] concern about the suppression of disfavored viewpoints").[7]

---

[7] The government does not rely on the special panel's holding that while "the White House disclaims primary reliance on the government speech doctrine," "the fact that the President is communicating at these events further distances this

The government's forum arguments "violate[] the bedrock principle," Stay Order at 39 (Pillard, J., dissenting), that access to nonpublic fora, including within the White House, may only "be restricted as long as the restrictions are viewpoint neutral and reasonable." *Ateba*, 133 F.4th at 123 (citation omitted). Because the AP is therefore likely to succeed on the merits of its forum doctrine arguments, the Court should affirm the decision below.

### B. The AP Is Likely to Succeed in Showing That the Government Has Unconstitutionally Targeted Disfavored Speech

The White House candidly admits that it barred the AP from the pool and events open to credentialed journalists because of its perceived viewpoint. *See* Gov't Br. at 32-46. In doing so, the government violated the rule that "under the First Amendment, if the Government opens its doors to some journalists—be it to the Oval Office, the East Room, or elsewhere—it cannot then shut those doors to other journalists because of their viewpoints." JA388; *accord* Stay Order at 48 (Pillard, J., dissenting). The First Amendment's prohibition on viewpoint discrimination bars the government's actions in this case whether viewed through the lens of forum doctrine, retaliation, or otherwise. Under *any* analysis, the

---

context from forum analysis." Stay Order at 20. Nor should it. The President controls ample channels of communication, from the Press Office to social media accounts. The AP is not one of them. *See* JA408-09.

government is unlikely to succeed in establishing that the First Amendment allows its blatant viewpoint discrimination against the AP.

### i. Precedent is clear that viewpoint discrimination is anathema to the First Amendment

Though "the government rarely flatly admits it is engaging in viewpoint discrimination," *Ridley v. MBTA*, 390 F.3d 65, 86 (1st Cir. 2004), this is that rare case. The government continues to unabashedly assert that it may exclude the AP based on the AP's editorial decisions. Gov't Br. at 32-46. Yet "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 603 (2023) ("The First Amendment envisions the United States as a rich and complex place where all persons are free to think and speak as they wish, not as the government demands."); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 830 (1995) ("[I]deologically driven attempts to suppress a particular point of view are presumptively unconstitutional.").

Courts have repeatedly reaffirmed this core precept in blocking the current Administration from targeting "speaker[s] they don't like," in cases involving entities from law firms to universities to nonprofits and more. *Jenner & Block*,

784 F. Supp. 3d at 108.[8]  "It is unsurprising, then, that the government could not

identify a single case approving viewpoint discrimination—the most 'egregious'

form of speech restriction, *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015)

(citation omitted)—in circumstances bearing any material similarity to this case."

Stay Order at 35 (Pillard, J., dissenting); *cf.* Gov't Br. at 32-46.

To justify its brazen viewpoint discrimination, the government relies almost

exclusively on *Ehrlich*, 437 F.3d 410.  *See* Gov't Br. at 33-41.  That case, however,

"does not get the Government where it needs to go."  JA412.  It "is both inapposite

and not binding on this court."  Stay Order at 45 (Pillard, J., dissenting).  There,

Governor Ehrlich instructed Maryland officials not to speak with two *Baltimore*

---

[8] *See President & Fellows of Harvard Coll. v. Dep't of Health & Hum. Servs.*, 2025 WL 2528380, at *23 (D. Mass. Sept. 3, 2025) (ruling for Harvard on First Amendment challenge to government efforts to make university "overhaul its governance, hiring, and academic programs to comport with the government's ideology and prescribed viewpoint"); *Susman Godfrey LLP v. Exec. Off. of President*, --- F. Supp. 3d ----, 2025 WL 1779830, at *11 (D.D.C. June 27, 2025) (enjoining viewpoint-discriminatory executive order targeting law firm); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 155 (D.D.C. 2025) (holding that executive order which "suppresses [] disfavored speech by imposing severe sanctions on WilmerHale both directly and indirectly" "is 'an egregious' violation of the First Amendment!"); *Jenner & Block*, 784 F. Supp. 3d at 93 (enjoining executive order targeting law firm as "offensive[] to the freedoms the First Amendment guarantees" for "viewpoint discrimination"); *Perkins Coie LLP v. Dep't of Justice*, 783 F. Supp. 3d 105, 165 (D.D.C. 2025) (executive order targeting law firm "express[ed] President Trump's disapproval of plaintiff's First Amendment activity" amounting to "viewpoint discrimination, plain and simple").

*Sun* reporters, but he did not "restric[t] *physical access* to government property for newsgathering." JA412. The *Sun* journalists continued attending press conferences – they were solely banned from being called on or granted interviews. *Ehrlich*, 437 F.3d at 413-14. The governor also held smaller press "briefings" in a private conference room, which other *Sun* reporters attended. *Id.* The *Sun* thus "ha[d] not maintained. . . that the Governor's directive actually chilled its reporting on state government matters." *Id.* at 415.[9]

This case is vastly different from *Ehrlich*. It involves the entire news organization, and it does not ask whether officials may refuse to answer the AP's questions. JA412. The AP instead seeks not to be *excluded wholesale* – based on its perceived viewpoint – from the *spaces* where White House journalists *observe* and *report on* the President while he conducts official business. *See* JA414 (noting "the misfit between the journalistic activities in *Baltimore Sun* and those here").

The First Amendment does not allow such viewpoint discrimination, and the AP has not conceded otherwise. *Cf.* Gov't Br. at 32. As the District Court found, *Ehrlich* recognizes only that government officials need not grant *interviews* to

_____

[9] *Snyder v. Ringgold*, 133 F.3d 917 (4th Cir. 1998), is equally inapposite. *Cf.* Gov't Br. at 24. There, the Fourth Circuit held a police chief did not violate the First Amendment in deciding not to *speak to or provide exclusive interviews* to certain journalists. *Snyder*, like *Ehrlich*, did not conclude that government officials may discriminate based on viewpoint when deciding which journalists can *observe and report on* official business in areas with limited space.

every journalist.  It is no "concession," and certainly not one that "give[s] away the game," to recognize that under *Ehrlich*, the President may give an exclusive interview to his "five favorite journalists," and that if he "sits down for an interview with Laura Ingraham, he is not required to do the same with Rachel Maddow."  Gov't Br. at 32.  Those hypothetical interviews involve the "right to interact and speak with government officials, not a right of access to a physical forum for observational newsgathering."  JA413.  The interviews are "exclusive"; "the press has more 'control' over the process than it does over journalistic conditions in Oval Office press pool events"; they "would not happen but for the outlet's presence"; and they "lack the 'sense of competitive pressure that you get from a pool event.'"  *Id*.  Press pool events, conversely, "involve a gaggle of reporters, all vying for space and information," with journalists often "relegated to watching events unfold from 20-30 yards away and have no interaction with the President or other officials"; the "event would happen whether any particular outlet had a reporter there or not"; and "the White House's media team is present to broadcast events."  JA413-414.  The District Court was therefore correctly "persuaded that press pool activities in the Oval Office are not analogous to exclusive interviews, so *Baltimore Sun* is inapposite."  JA415.

The government "do[es] not engage with those distinctions but sweep[s] them aside to assert a legal prerogative of unprecedented breadth."  Stay Order at

46 (Pillard, J., dissenting).  The government claims that "it does not implicate the First Amendment to grant some journalists better access than others because that sort of conduct is part of the ordinary interplay between government officials and the journalists who cover them."  Gov't Br. at 35-36.  Yet the government erroneously conflates "access" to interviews with "access" to limited spaces open to the pool.  As to physical spaces, this Court has "held that the White House may not deny those reporters *that* 'special access' solely because they dislike the reporters' viewpoints."  Stay Order at 46 (Pillard, J., dissenting) (citing *Sherrill*, 569 F.2d at 129); *see also John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610-11 (7th Cir. 2021) (exclusion from governor's limited-access press event could not be viewpoint-based).

Adopting the government's unbounded reading of *Ehrlich* would also abrogate this Court's holding in *Ateba*.  The President surely can, if he chooses, invite his favorite journalists to join other press for a Briefing Room event.[10]  But under binding Circuit precedent, the Briefing Room nevertheless remains a nonpublic forum from which journalists may not be excluded on the basis of

---

[10] Indeed, the White House has done so during this litigation.  *See* Ben Goggin, *White House brings conspiracy theorists, former Trump officials and a family friend to its 'influencer briefings'*, NBC News (May 3, 2025), https://www.nbcnews.com/politics/trump-administration/white-house-influencer-briefings-conspiracy-theorists-rcna204437 (reporting that "[o]f the 25 influencers identified by NBC News who attended the briefings, all but one have a history of explicit support for President Donald Trump's administration").

viewpoint. *Ateba*, 133 F.4th at 121-23. So, too, for the Oval Office, the East Room, and other spaces in the White House.

## ii. History supports the AP's position, not the government's

The government further errs in arguing that the historical record supports viewpoint-discriminatory access bans. Gov't Br. at 41-46. It is the government's position, not the AP's, that is "deeply ahistorical." *Id.* at 41.

The government's examples—from President Washington picking the newspaper to print his Farewell Address to President Kennedy giving "star correspondents" exclusive previews of new policies, *id.* at 41-46—are inapposite. Those examples are akin to the interactions addressed in *Ehrlich*, involving journalists' efforts to obtain interviews and information from public officials. By contrast, the AP does not seek an exclusive interview with the President through this litigation, but rather seeks not to be ejected, based on its reporting, from limited-access pool events.

Viewpoint-neutral access to *that* sort of opportunity is supported by the historical record dating to the Founding, as *amici* First Amendment scholars "helpful[ly]" explained below. JA401. Excluding the AP based on its perceived viewpoint "is contrary to the Founding generation's concern that the government not be able to control the press, the great 'bulwark of liberty,' by penalizing them for their editorial and expressive choices." Scholars' Br. at 4 (ECF 41) (quoting

Thomas Gordon, *Cato's Letter No. 15*: *Of Freedom of Speech: That the same is inseparable from publick Liberty*, FIRE, https://perma.cc/MDG7-RM4N).

The First Amendment was "a response to the repression of speech and the press that had existed in England and the heavy taxes on the press that were imposed in the Colonies" to punish newspapers critical of the crown. *Citizens United v. FEC*, 558 U.S. 310, 353 (2010); *see* Scholars' Br. at 8-9. From the start, too, "[l]awmakers recognized that even when they acted not to *restrain* the press but to *empower* it—by providing newspapers and others with subsidies or benefits," the "freedom of the press required that [they] do so in a viewpoint-neutral manner." *Id*. at 12-14.

Early lawmakers understood that once they allowed the press into the House chamber, for example, the First Amendment limited the ways in which they could restrict that access. Thus, when Representative Aedanus Burke introduced a resolution in 1789 to bar from the House floor newspapers that had reported on House debates, as he found their coverage contained "misrepresentation and error," James Madison—who drafted the First Amendment—found it "improper to throw impediments in the way of such information as the House had hitherto permitted." *Id*. at 18 (quoting 1 Annals of Cong. 952, 955 (1789)). Another representative argued that reporters themselves should decide "the admission of such persons as thought themselves qualified[.]" *Id.* (quoting 1 Annals of Cong. 1097). Burke

33

withdrew his resolution, and the House continued providing access on viewpoint-neutral terms. *Id.* at 19.

Early Americans similarly opposed excluding certain press from sending their newspapers through the U.S. Postal Service. Colonial officials used the postal service to favor certain publishers and punish others, and when Congress enacted the Post Office Act of 1792, it granted newspapers subsidized rates to facilitate the free flow of information. *Id.* at 14-15. But Congress *rejected* a proposal to subsidize only certain publishers, as it "worried that selective admission would provide the government with a tool for propaganda." *Id.* at 15 (citation omitted). The Supreme Court would later adopt this viewpoint-neutrality requirement. *See Hannegan v. Esquire, Inc.*, 327 U.S. 146, 155-56 (1946) ("[G]rave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld on any grounds whatsoever," such as "on condition that certain economic or political ideas not be disseminated").

As the District Court recognized in this case, "[t]hese immediate and forceful backlashes to attacks on the press underscore how Americans understood the First Amendment in the early centuries. They saw this foremost protection as safeguarding their natural right to heap honest criticism upon the Government without fear of official reprisal." JA402. This history underscores what modern

34

First Amendment doctrine makes plain: the government may not exclude the AP from the press pool or events open to the press corps on the basis of viewpoint.

### iii.    The District Court's injunction is "quite administrable"

Finally, the government raises the specter of "a constant stream of litigation by journalists" who are not in the pool on a particular day.  Gov't Br. at 47-48.  Its sole basis for this speculation is that the AP moved below to enforce the preliminary injunction.  The AP brought that motion, however, only after the government refused to allow it back into the pool after the injunction had taken effect and the government had enacted a new pool policy declaring – contrary to the injunction – that it retained "*absolute discretion*" over pool participation. JA435-40, JA455.  Indeed, at the motion hearing, the District Court observed that "it's very hard to see how there's compliance" when the AP remained excluded from the pool for three days after the injunction took effect, even though at that time the pool's one wire service seat ostensibly rotated between only three wire services.  JA485.  The AP also filed its motion in the shadow of the District Court's statement at the initial TRO hearing that the AP had not filed suit quickly enough to warrant immediate judicial relief.  JA438-43.

Moreover, the District Court expressly permitted the AP to seek relief under the preliminary injunction if it was "repeatedly receiving second-class treatment, especially compared to its peer wire services."  JA501-02.  The District Court thus

found that so long as the government exercised "good faith" and the AP was "judicious" in seeking enforcement, the injunction was "quite administrable" and would not require "micromanaging" the pool.  JA488, JA503.  The District Court found it could assess future claims based on data about pool participation, avoiding the need for government testimony or declarations, and directed the parties to confer before filing a motion.  JA498-99.

Contrary to the government's argument, therefore, experience shows the injunction's workability: the White House created a new press pool policy, the District Court decided not to take action in response to that policy, and the parties maintained an appropriate method to raise any future disputes.  *Cf.* Gov't Br. at 47. Experience also shows that no flood of litigation has followed each of the press pass cases.  Journalists denied passes have not filed suit, and the government has ceased revoking passes based on viewpoint.

Additionally, this case is not the first time a party has raised an "open-the-floodgates-to-litigation" argument.  Justice Ginsburg addressed and rejected precisely this concern in *Wilkie v. Robbins*, 551 U.S. 537, 581 (2007) (Ginsburg, J., concurring in part and dissenting in part), observing that the plaintiff's retaliation "suit [wa]s predicated upon the [government] agents' vindictive motive, and the presence of this element in his claim minimizes the risk of making everyday bureaucratic overreaching fare for constitutional litigation."  *Id.*  Justice

Ginsburg further drew an analogy to Title VII suits, where not "every epithet or offensive remark" is actionable. *Id.* Here, too, a future claim could conceivably arise if the government again banned a particular outlet from the pool based on its reporting.[11] And if the government does so, the judiciary's role is to protect the rights of the press and public just as the District Court did here.

### C.    The AP Is Likely to Succeed on Its Retaliation Claims

The AP is also likely to succeed on its First Amendment retaliation claims—an independent and alternative basis for relief that the government barely addresses. *Cf.* Gov't Br. at 49-51. Because the government "curtail[ed] the AP's access" based on its "editorial decision to continue using 'Gulf of Mexico' in its Stylebook," causing material "adverse" impacts to its journalism and finances, the AP "straightforward[ly]" satisfies the retaliation test, as the District Court correctly concluded. JA419.

In arguing to the contrary, the government shouts past the clear command that "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up). Whether the government is

---

[11] *See, e.g.*, Katie Robertson, *White House Bans Wall Street Journal From Press Pool on Trump's Scotland Trip*, N.Y. Times (July 21, 2025), https://www.nytimes.com/2025/07/21/business/media/trump-scotland-wsj-press-pool.html.

awarding "federal funding, tax exemptions, trademarks, government contracts, [or] public sector employment," it cannot condition those decisions on recipients' views, even though the recipients have no freestanding "right" to government support.  Stay Order at 36, 49 (Pillard, J., dissenting) (citing, *inter alia*, *Matal v. Tam*, 582 U.S. 218, 243-44 (2017) (plurality opinion); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 213-14 (2013)).

Unconstitutional retaliation claims require the plaintiff to show (1) plaintiff "engaged in conduct protected under the First Amendment"; (2) "defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again"; and (3) "a causal link" exists "between the exercise of a constitutional right and the adverse action" against plaintiff. *Ateba*, 706 F. Supp. 3d at 86 n.10 (cleaned up).  The AP satisfies each element.

**First**, the AP engaged in First Amendment protected activity in making editorial decisions, including to keep the name Gulf of Mexico in its journalists' vocabulary.  Because "a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs," it protects the press's "exercise of editorial control and judgment."  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 257-58 (1974).  The First Amendment also protects newsgathering and the access which facilitates that newsgathering.  *See Sherrill*, 569 F.2d at 129.

The AP is also being targeted for the exercise of its constitutionally protected right to petition.  The First Amendment's "Petition Clause protects the right of individuals to appeal to courts . . . for resolution of legal disputes." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011).  Due to this lawsuit, the government expressly "double[d] down" on excluding the AP, subjecting it to punishment for exercising its right to petition the courts.  JA14.

Therefore, *if* the government decides to open a space like the Oval Office or the East Room to the press, *then* the Constitution forbids the government from banning journalists from those places based on their perceived views.  "If, for example, the choice" by the government of "a limited number, approximately 40, news representatives [] permitted to go to the Chinese mainland" were "limited only to Democrats or only to Republicans, obviously that would be improper and would fall."  *Frank v. Herter*, 269 F.2d 245, 247 (D.C. Cir. 1959) (per curiam) (Burger, J., concurring).

**Second**, the government retaliated against the AP in ways sufficient to chill the speech of a similarly situated person of ordinary firmness.  *Cf.* Gov't Br. at 51. By barring the AP from areas open to the press pool or the entire press corps, until and unless the AP turns over its reporters' vocabulary to the White House, the government chilled the AP's exercise of its First Amendment rights.  JA34.  The uncontested testimony of the AP's witnesses demonstrated that the AP's text

reporters and photographers have been harmed in their ability to capture key in-the-room context and report out in real time.  JA44, JA47-48, JA56-59.

Other news organizations' First Amendment rights are also likely chilled. *See Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 273 (2016) (retaliation against one speaker "tells the others that they engage in protected activity at their peril"); *see also Cole v. Buchanan Cnty. Sch. Bd.*, 504 F. Supp. 2d 81, 87 (W.D. Va. 2007) (noting that a reporter "is now significantly restricted in his ability to report on school activities," and that the speech of similarly situated reporters "could reasonably be chilled"), *rev'd on other grounds*, 328 F. App'x 204 (4th Cir. 2009).  The same chilling effect is present here as well.  *See* Former Officials' Br. at 11-12, ECF 36 ("That concern is undoubtedly one reason such outlets as Fox News and Newsmax have objected to the actions of the White House here.").

**Third**, as the government concedes, this access denial is based *entirely* on the AP's constitutionally protected speech.  The White House could not have made its retaliatory motives clearer: Leavitt blamed the ban on the AP's alleged "lies," JA24, Budowich said it resulted from the AP's "commitment to misinformation" and "irresponsible and dishonest reporting," JA26, and Wiles attributed it to the AP's supposedly "divisive and partisan agenda," JA27.  Even President Trump said of the decision to "keep [the AP] out" that "the Associated Press has been

very, very wrong on the election, on Trump and the treatment of Trump," and that the ban "is something we feel strongly about."  JA27-28.

This explicit punishment for the AP's expression is a textbook example of retaliation against protected First Amendment activity.  *See Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 47 (D.D.C. 2021) (finding, as to First Amendment retaliation claim arising from forcible displacement of protesters, that "plaintiffs have plausibly alleged that the defendants did not have a non-retaliatory motive for their actions"), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023); *see also Stevens v. N.Y. Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987) (finding that "the first amendment prohibits government from restricting a journalist's access to areas otherwise open to the press based upon the content of the journalist's publications").

**<u>Fourth</u>**, even an "ordinarily permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for the exercise of a First Amendment right."  *Banks v. York*, 515 F. Supp. 2d 89, 112 (D.D.C. 2007) (cleaned up).  For example, addressing non-renewal of a university employee's contract allegedly "made in retaliation for his exercise of the constitutional right of free speech," the Supreme Court noted that, even when "a person has no right to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, . . . [i]t may not deny a benefit to a person on a

basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. . . . This would allow the government to produce a result which it could not command directly." *Perry v. Sindermann*, 408 U.S. 593, 597-98 (1972) (cleaned up); *see also Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) (government "may not transfer an inmate 'to a new prison in retaliation for exercising his or her First Amendment rights'"); *El Dia, Inc. v. Governor Rossello*, 165 F.3d 106, 110 (1st Cir. 1999) (government officials may not retaliate against newspapers by withdrawing advertising or removing the paper's designation as an outlet for the publication of official notices, even if they were not required to buy ads or designate the paper initially).

The government's unconstitutional exclusion of the AP from access provided to other journalists, expressly based on dislike of the AP's perceived viewpoint, warranted preliminary injunctive relief. The government's argument to the contrary rests, again, on *Ehrlich*, but there the Maryland Governor's instruction to officials not to speak with *Sun* reporters, without "restric[ting] *physical access* to government property for newsgathering," was fundamentally different from the access ban at issue here. JA412. "What the AP challenges is its reporters' and photographers' exclusion from a government program for which it is otherwise fully eligible and has long participated, based solely on the AP's own expression in its Stylebook and reporting." Stay Order at 45 (Pillard, J., dissenting); *cf. John K.*

42

*MacIver Inst.*, 994 F.3d at 610-11 (exclusion from governor's press event could not be viewpoint-based). The First Amendment does not allow such retaliation, and this Court should affirm the District Court's ruling on this additional basis.

## II. THE AP IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIFTH AMENDMENT CLAIMS

The AP also asserts claims for violation of its Fifth Amendment due process rights, which the government completely ignores on appeal. The AP has a protected liberty interest in newsgathering, access, and speech, which is implicated by the government's exclusion of the AP from spaces open to the pool and larger spaces open to all credentialed journalists. Under the Fifth Amendment, therefore, the AP's access cannot be denied without due process of law. Yet the AP received none of the required procedural protections, and its exclusion was based on arbitrary and viewpoint-discriminatory reasons.

The District Court found that since it granted the AP's preliminary injunction motion "under a First Amendment rubric, it need not reach the AP's Fifth Amendment . . . claims." JA425. Because this Court may affirm for any reason supported by the record, however, these claims provide independent and alternative grounds for affirmance. *See EEOC v. Aramark Corp.*, 208 F.3d 266, 268 (D.C. Cir. 2000).

## A.    Defendants' Actions Deprived the AP of a Liberty Interest

The Due Process Clause "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests." *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976).  The law broadly defines liberty interests to encompass any activity that implicates constitutional rights.  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571-72, 575 n.14 (1972) (due process is required "[w]hen a State would directly impinge upon interests in free speech or free press"); *Homer v. Richmond*, 292 F.2d 719, 722 (D.C. Cir. 1961) ("One may not have a constitutional right to go to Baghdad, but the Government may not prohibit one from going there unless by means consonant with due process of law."); *Benning v. Comm'r, Ga. Dep't of Corr.*, 71 F.4th 1324, 1332 (11th Cir. 2023) ("[T]he First Amendment . . . creates a liberty interest" in prisoners' use of prison email regardless of the lack of "a free-standing constitutional . . . right to use [that] email system").

Newsgathering is among the liberty interests protected by the First Amendment.  *Sherrill*, 569 F.2d at 129-30.  "Not only newsmen and the publications for which they write, but also the public at large have an interest protected by" the First and Fifth Amendments "in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." *Id*.  The liberty interest

in newsgathering includes an interest in the *access* required to gather the news. After all, "a paper may be prevented from bearing public witness, as much by restricting its access in the first instance to the event as by subsequently restricting distribution of its printed views." *Quad-City Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8, 16-17 (S.D. Iowa 1971).

It is beyond dispute that journalists have a liberty interest in White House press passes. *See Sherrill*, 569 F.2d at 130-31; *Karem*, 960 F.3d at 665; *CNN v. Trump*, 2018 WL 9436958 (D.D.C. Nov. 16, 2018) (Mot. Hr'g). But the liberty interest in access is not *limited* to press passes. Rather, it encompasses "the protection afforded newsgathering" generally. *Sherrill*, 569 F.2d at 129. The government's criteria for providing press access to observe and report on presidential events – even where officials were not required to admit journalists in the first place – must therefore be reasonable and viewpoint-neutral, in accordance with due process. *See Frank*, 269 F.2d at 247 (per curiam) (Burger, J., concurring) (40-person group of reporters permitted to visit China); *Getty Images News Servs. Corp. v. Dep't of Def.*, 193 F. Supp. 2d 112, 115, 123 n.10 (D.D.C. 2002) (flights to Guantanamo with 20 press seats); *Nation Magazine v. Dep't of Def.*, 762 F. Supp. 1558, 1573 (S.D.N.Y. 1991) (Gulf War pool coverage); *CNN, Inc. v. ABC, Inc.*, 518 F. Supp. 1238, 1239 (N.D. Ga. 1981) (White House pool coverage); *Consumers Union of U.S. v. Periodical Correspondents' Ass'n*, 365 F. Supp. 18,

26 (D.D.C. 1973) (congressional press galleries), *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975).

The AP has a liberty interest in access to spaces made available to the press pool and other credentialed White House journalists. While the White House is not obligated to open those spaces to the pool or press corps in the first instance, once the White House does so, each journalist already granted admission under neutral criteria has a liberty interest in continued access, rooted in the First Amendment. Accordingly, the White House may not exclude the AP from those spaces without due process.

It also bears reiterating "what this case does not involve." *Sherrill*, 569 F.2d at 129. Unlike the *Baltimore Sun* in the *Ehrlich* case, "which focused on *dialogue* with government officials," the AP challenges "restrictions on *physical access* to government property for newsgathering." JA412. The First and Fifth Amendments protect that access from discrimination on the basis of viewpoint.

## B. The Government Failed to Provide the AP with Due Process

Due process requires the government to follow constitutionally "adequate procedures" before denying a protected liberty interest. *Sherrill*, 569 F.2d at 131 n.24. Because a denial of access "implicates important first amendment rights," due process must be applied in a "particularly stringent" manner. *Karem*, 960 F.3d at 665 (cleaned up). The government was required to provide to the AP, before

reaching a final decision (1) "notice of the factual bases for denial," (2) "an opportunity for the applicant to respond to these," and (3) "a final written statement of the reasons for denial" of access, (4) which reasons may not be "arbitrar[y]" or "less than compelling." *Sherrill*, 569 F.2d at 129-30.

The government failed to provide the AP with due process in all of these respects—a failure it has not contested. The AP learned of its exclusion when Leavitt announced the government's already-final decision. JA22. The government did not provide the AP an opportunity to challenge its exclusion, or a final written statement of the reasons for it. JA38-39. The government denied the AP access "arbitrarily" and "for less than compelling reasons." *Sherrill*, 569 F.2d at 129. The AP was the only news organization banned, even though other pool members continued to use the name Gulf of Mexico. JA31. And, as discussed, the government's access denial rests on an impermissible desire to punish the AP for the perceived viewpoint of its speech. JA27; *Sherrill*, 569 F.2d at 129 (access denials are "violative of the first amendment" when "based upon the content of the journalist's speech").

The government's failure to satisfy *any* of the requirements of due process provides another basis to affirm the decision below.

### III.   THE AP SATISFIES EACH OF THE OTHER FACTORS WARRANTING A PRELIMINARY INJUNCTION

#### A.   The AP Showed it Will Suffer Irreparable Harm Absent a Preliminary Injunction

The AP amply demonstrated that it has experienced concrete harm due to the government's attempts to coerce the AP to adopt the government's preferred speech through denials of access.  *Cf.* Gov't Br. at 52-53.  The AP's exclusion hinders its ability to produce wide-ranging and timely White House reporting, which impacts the billions of people who read AP content.  These harms are not "merely the costs of doing business," as the government claims, but rather direct, irreparable injuries suffered because of the government's targeting.  *Cf. id*. at 53. Nor did the District Court impermissibly rely on a finding "that the AP's First Amendment injury represented irreparable harm per se."  *Id.*  While irreparable harm *is* presumed where plaintiff's First Amendment rights have been violated, *see Media Matters for Am. v. Paxton,* 138 F.4th 563, 585 (D.C. Cir. 2025) ("Appellees are suffering from a campaign of retaliation against them in response to their exercise of their First Amendment rights.  That is also an irreparable injury."), the District Court's findings rested on "abundant evidence" put forth by the AP, including at the evidentiary hearing.  JA423.

**First**, the government makes no serious effort to rebut that this unlawful exclusion harms the AP's ability to provide the comprehensive and informative

reporting on which its members, customers (including thousands of news outlets), and readers rely. *See Karem*, 960 F.3d at 666 (for White House reporters, "sustained access is essential currency"); *cf.* Gov't Br. at 52-53. When barred from the pool, the AP's text reporters must rely on limited video feeds and notes, and computer-generated transcripts, instead of their own observations. JA44, JA47. The AP's photographers cannot take their own photos and transmit them to editors for near-instantaneous global publication, cannot capture the details that are unavailable from transcripts, cannot ask questions if the President decides to take them, and cannot make their own editorial judgments on which parts of events are newsworthy. JA56-57, JA59, JA243.

Courts have made clear that there is no substitute for live, in-person access. This is a key reason why courtrooms must generally be open to the press and public. "[T]he availability of a trial transcript is no substitute for a public presence at the trial itself" because "the 'cold' record is a very imperfect reproduction of events that transpire in the courtroom." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 597 n.22 (1980) (Brennan, J., concurring). "[O]ne cannot transcribe an anguished look or a nervous tic." *ABC, Inc. v. Stewart*, 360 F.3d 90, 99-100 (2d Cir. 2004). Because of the inadequacy of transcripts, "[a] person singled out for exclusion from the courtroom, who is thereby barred from first-hand knowledge of what is happening there, . . . is placed at an extraordinary disadvantage in his or her

attempt to compete in the 'marketplace of ideas.'" *Huminski v. Corsones*, 396 F.3d 53, 84 (2d Cir. 2005).

For the same reasons, the AP's forced reliance on after-the-fact transcripts and others' notes and photos is no substitute for the live, in-person access it had before the ban. "Reporters frequently do resort to alternate sources when first-hand observations are not possible, but that in no way negates that actually being there is optimal." *Chicago Reader v. Sheahan*, 141 F. Supp. 2d 1142, 1146 (N.D. Ill. 2001). In-person photography by AP journalists is also essential, because "[e]ach picture tells a story and carries a reminder of the truth contained in the old adage that weighs one picture against a thousand words." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990); *see also ABC*, 518 F. Supp. at 1245 ("visual impressions can and sometimes do add a material dimension to one's impression of particular news events"). The AP cannot observe and report on the President's demeanor, appearance, tone, or expressions, or that of others in the room. JA47-48; JA63-64. That is meaningful, irreparable First Amendment harm.

Nor can the AP take its own straightforward photographs to accompany its own nonpartisan reporting. JA58. Instead, AP can only republish a small number of photos taken by a few other photographers in the pool, which greatly delays delivery of images to AP customers and clients and provides fewer options. JA59. As a result, AP customers – including U.S. newspapers that typically use AP

photographs – instead select other organizations' photos even for their front pages. *Id*. The AP is thus harmed every day that it is denied first-hand access to pool events and to larger events open to the White House press corps.

**Second**, the government ignores that its access denials harm the AP's ability to produce reporting quickly—an essential attribute of a wire service. *See* JA44-45, JA47-48; *cf.* Gov't Br. at 52-53. "[T]he element of time is not unimportant if press coverage is to fulfill its traditional function of bringing news to the public promptly." *Gannett Co. v. DePasquale*, 443 U.S. 368, 442 n.17 (1979) (Blackmun, J., concurring in part). Because absent pool access, the AP must base its reporting on transcripts and limited notes and video feeds, it cannot publish the news as it breaks. JA47-48. These delays have harmed the AP and, as a result, the thousands of news outlets and billions of readers that rely on the AP's journalism. Many of those customers do not have the resources to cover White House events on a daily basis. Instead, they count on the AP to deliver news as quickly as possible from the White House.

**Third**, "this situation has cut deeply into the AP's business." JA423. These financial harms *are* "greater than those suffered by any other media outlet that lacks a guaranteed presence in the press pool." Gov't Br. at 53. The AP's customers and readers rely on its first-hand, real-time reporting from the pool, forcing it to incur unrecoverable costs to meet those needs to the extent possible

under the access ban.  The AP has had to pay to fly foreign-based AP journalists to the U.S. to cover foreign leaders' White House visits, as those journalists were arbitrarily permitted to cover presidential events while the AP's White House journalists remain banned from the same spaces.  JA78.  The AP's "condition will only worsen as its customers flee to other news services absent injunctive relief."  JA424.  None of these costs are recoverable due to sovereign immunity.  *Id.*

Even without this record, irreparable injury is *presumed* where the plaintiff has shown a substantial likelihood of success on the merits of its constitutional claims.  *Cf.* Gov't Br. at 52.  Indeed, it is axiomatic that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  "[A] violation of Fifth Amendment due process rights" also constitutes irreparable injury that "support[s] injunctive relief."  *Karem*, 960 F.3d at 668.  The extensive record of the AP's harms, however, makes the need for relief even clearer.  The District Court correctly recognized these harms, and this Court should affirm.

## B.    The Balance of the Equities and Public Interest Favor the AP

The District Court also correctly held that the balance of the equities and the public interest favor the AP.  These factors merge when, as here, the government is the opposing party.  *Karem*, 960 F.3d at 668 (cleaned up).  "While 'the White House surely has a legitimate interest in maintaining a degree of control over

media access to the White House complex,'" "'enforcement of an unconstitutional law is always contrary to the public interest.'" JA425 (quoting *Karem*, 960 F.3d at 668).

The government has no legitimate interest in denying the AP access, based on the content of the AP's speech, to spaces open to other members of the press pool and spaces open to members of the White House press corps. To the contrary, the government's interest in coercing the AP into using government-mandated words is *illegitimate*.

Nor will rescinding the AP's exclusion harm or even inconvenience the government, as "[t]he proposed injunctive relief would not require the White House to create a particular type of pool system, it would merely prohibit the . . . total exclusion" of the AP from the places the White House makes open to the pool and to other credentialed journalists. *ABC*, 518 F. Supp. at 1246. Even operating under the injunction, the White House crafted two new pool policies. Pursuant to those policies, AP journalists have, *inter alia*, traveled on Air Force One to cover the President's attendance at Pope Francis's funeral and a rally in Pennsylvania, and reported from the Oval Office for his farewell to Elon Musk, all without causing the President harm. *See* AP's Reh'g Pet. at 14. Indeed, "[t]he notion that" the President "could be irreparably harmed by attendance within the Press Pool of the carefully vetted, nondisruptive journalists who work for the AP is

extraordinary." Stay Order at 51 (Pillard, J., dissenting). The injunction also does not require the President to open *any* particular events to the press or speak to reporters, or prevent him from restricting access based on *other* viewpoint-neutral and reasonable grounds, such as security concerns or space constraints. *See* JA387. Nor does it "mandat[e] disclosure of the President's daily activities"—he may, as always, choose to open any event to the pool or not. Gov't Br. at 53-54 (quoting *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 216 (D.C. Cir. 2013)).

Conversely, ending the ban will benefit the government and public. As to the government, observation by "the people generally—and representatives of the media" on their behalf "historically has been thought to enhance the integrity and quality of what takes place." *Richmond Newspapers*, 448 U.S. at 578. Press and "pool coverage of presidential activities" thus fosters "public awareness and understanding of the President's behavior" which "facilitates his effectiveness as President." *ABC*, 518 F. Supp. at 1244.

As to the public, the AP's "participation in White House pool coverage benefits the public by informing it of the activities of its government," as does the AP's presence at larger press events. *Id.* at 1246. "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to

54

him in convenient form the facts of those operations." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975).  When only "those of the media who are in opposition or who the [official] thinks are not treating him fairly [are] excluded" from access, "it is the public which w[ill] lose." *ABC, Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977).  Barring the government from excluding the AP from spaces open to the press pool and the larger press corps will serve the public's powerful interest in staying informed about what the President is doing.  This Court should therefore protect the AP's constitutional rights, and promote the public interest, by affirming the decision below.[12]

On all factors of the preliminary injunction analysis, the District Court correctly and carefully applied binding precedent to a well-developed factual record.  This Court should affirm.

## CONCLUSION

For the foregoing reasons, the AP respectfully requests that this Court affirm the decision below.

---

[12] Moreover, "courts are institutionally wary of granting relief that disrupts, rather than preserves, the status quo." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022). The status quo is "the last uncontested status which preceded the pending controversy." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733-34 (D.C. Cir. 2022). Here, the status quo, for decades before this controversy, was the AP participating in the pool.

Dated:  September 29, 2025

Respectfully submitted,

BALLARD SPAHR LLP

*/s/ Charles D. Tobin*
Charles D. Tobin
Jay Ward Brown
Maxwell S. Mishkin
Sasha Dudding
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
brownjay@ballardspahr.com
mishkinm@ballardspahr.com
duddings@ballardspahr.com

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel certifies that this document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief was composed using Microsoft Word in 14-point Times New Roman font, a proportionally spaced font.  The word count is 12,997 words.

September 29, 2025                    */s/ Charles D. Tobin*
                                     Charles D. Tobin

## CERTIFICATE OF SERVICE

I hereby certify that, on this 29th day of September, 2025, a true and correct copy of the foregoing was served on counsel for all parties via the Court's ECF system.

*/s/ Charles D. Tobin*_____
Charles D. Tobin