ORAL ARGUMENT SCHEDULED FOR NOVEMBER 24, 2025

**No. 25-5109**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

Associated Press,

*Plaintiff–Appellee*

v.

Taylor Budowich, in his official capacity as White House Deputy Chief of Staff;
Karoline C. Leavitt, in her official capacity as White House Press Secretary; and
Susan Wiles, in her official capacity as White House Chief of Staff,

*Defendants–Appellants.*

———————————

On appeal from the United States District Court for the
District of Columbia — No. 1:25-CV-00532 (McFadden, J.)

**BRIEF OF THE KNIGHT FIRST AMENDMENT INSTITUTE AT
COLUMBIA UNIVERSITY AND REPORTERS WITHOUT BORDERS, INC.
AS AMICI CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE**

Katherine Fallow
Jake Karr
Jameel Jaffer
Alex Abdo
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
katie.fallow@knightcolumbia.org

*Counsel for Amici Curiae*

## Certificate as to Parties, Rulings, and Related Cases

Pursuant to D.C. Circuit Rule 28, the undersigned counsel certifies as follows:

### (A)    Parties and Amici

The parties include plaintiff–appellee, the Associated Press, and the following defendant–appellants: Taylor Budowich, in his official capacity as White House Deputy Chief of Staff; Karoline C. Leavitt, in her official capacity as White House Press Secretary; and Susan Wiles, in her official capacity as White House Chief of Staff.

The White House Correspondents' Association, the Reporters Committee for Freedom of the Press, the Center for American Rights, the Knight First Amendment Institute at Columbia University, twelve First Amendment scholars, and the State Democracy Defenders Fund submitted amicus briefs in the district court.

### (B)    Rulings Under Review

The ruling under review, published at 780 F. Supp. 3d 32 (D.D.C. 2025), is a Memorandum Order issued by the Honorable Trevor N. McFadden on April 8, 2025, granting the Associated Press's Amended Motion for Preliminary Injunction.

### (C)    Related Cases

This case was not previously before this Court or any other court, except the district court and the special panel appointed by this Court to address the

i

government's motion for a stay pending appeal. Amici are not aware of any other related cases pending before this or any other court.

Dated: October 6, 2025                    */s/ Katherine Fallow*
                                           Katherine Fallow

## Certificate Regarding Separate Briefing

Pursuant to D.C. Circuit Rule 29(d), the undersigned counsel certifies that a separate brief is necessary. Counsel has coordinated with other amici supporting plaintiff–appellee the Associated Press and sought to ensure that this brief will aid in the Court's consideration of the case by raising novel points not made by the Associated Press or other amici. In particular, as organizations devoted to free speech and the press, amici are in a unique position to provide the Court with broader context for the history of and First Amendment values underlying the public forum doctrine and to explain the importance of its application in this case for civic discourse and democratic self-governance.

Dated: October 6, 2025                    */s/ Katherine Fallow*
                                          Katherine Fallow

**Corporate Disclosure Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 28(a)(1)(A), the undersigned counsel certifies that amici curiae the Knight First Amendment Institute at Columbia University and Reporters Without Borders, Inc. have no parent corporations and that no publicly held corporation owns 10 percent or more of their stock.

Dated: October 6, 2025              */s/ Katherine Fallow*
                                    Katherine Fallow

# Table of Contents

Certificate as to Parties, Rulings, and Related Cases ................................. i

Certificate Regarding Separate Briefing...................................................... iii

Corporate Disclosure Statement ................................................................. iv

Table of Authorities ................................................................................... vi

Glossary ...................................................................................................... 1

Interest of Amici Curiae ............................................................................. 2

Summary of Argument ............................................................................... 3

Argument .................................................................................................... 6

    I.    The public forum doctrine underwrites self-government by
        ensuring the availability and integrity of expressive spaces in
        which speech important to our democracy takes place. ........................... 6

    II.    The White House press pool is a First Amendment–protected
        forum in which viewpoint discrimination is unconstitutional................. 12

        A.    The White House creates a forum when it opens up
               government space for expressive activity by the press pool. ........ 12

        B.    The Court should not adopt the special panel's conclusion
               that the press pool is not a forum. ................................................. 18

             1.    The Court has held that the public forum doctrine
                  applies to "restricted" government spaces. ......................... 19

             2.    The Court should not deprive newsgathering of the
                  protections of the public forum doctrine. ........................... 21

             3.    The presence of government speech in the forum does
                  not alter the analysis. ......................................................... 23

Conclusion ................................................................................................. 27

Certificate of Compliance .......................................................................... 28

# Table of Authorities

## Cases

*Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) ............................ 11

*Ateba v. Leavitt*, 133 F.4th 114 (D.C. Cir. 2025) ............................ 9, 12, 18, 19, 20

*Bryant v. Gates*, 532 F.3d 888 (D.C. Cir. 2008) ..................................................... 12

*Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50 (D.D.C. 2000) .................... 19

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) ........................................................................................ 8, 9, 10, 11, 22

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ............................................................. 6

*Greer v. Spock*, 424 U.S. 828 (1976) ................................................................ 10, 20

*Hague v. CIO*, 307 U.S. 496 (1939) .................................................................... 4, 7

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) ............................................................ 4

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) .......... 10, 19

*John K. MacIver Inst. for Pub. Pol'y v. Evers*, 994 F.3d 602 (7th Cir. 2021) ................................................................................................................ 26

*Mahoney v. Babbitt*, 105 F.3d 1452 (D.C. Cir. 1997) ........................................... 26

*Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133 (2d Cir. 2004) ................ 22

*Matal v. Tam*, 582 U.S. 218 (2017) ................................................................ 10, 27

*McCullen v. Coakley*, 573 U.S. 464 (2014) ............................................................. 9

*Mills v. Alabama*, 384 U.S. 214 (1966) .................................................................. 6

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) .................................................... 8

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) ............ 9, 11

*PETA v. Tabak*, 109 F.4th 627 (D.C. Cir. 2024) ..................................................... 26

*Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92 (1972) ............................ 11

*Price v. Garland*, 45 F.4th 1059 (D.C. Cir. 2022)................................. 20, 21, 22, 26

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)............ 8, 10

*Roth v. United States*, 354 U.S. 476 (1957)............................................................. 8

*Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977) ................................................ 18

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) ............................................. 24, 25

*Stewart v. D.C. Armory Bd.*, 863 F.2d 1013 (D.C. Cir. 1988)................................ 12

*Stromberg v. California*, 283 U.S. 359 (1931) ..................................................... 3, 7

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949)................................................... 7

*United States v. Grace*, 461 U.S. 171 (1983) ........................................................ 20

*United States v. Kokinda*, 497 U.S. 720 (1990)..................................................... 19

*United States v. Nassif*, 97 F.4th 968 (D.C. Cir. 2024) ......................................... 19

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015).......................................................................................................... 9, 20

*White v. City of Norwalk*, 900 F.2d 1421 (9th Cir. 1990)...................................... 26

**Other Authorities**

Alexandria Symonds, *When the President Travels, Who's Allowed to Join Him?*, N.Y. Times (July 17, 2017), https://perma.cc/2A83-E64X ............................................................................................................ 14, 17

Anthony Zurcher, *New Era Beckons for Air Force One After Qatari Offer - but What's It Like Inside?*, BBC (May 17, 2025), https://perma.cc/6LTL-877W .......................................................................... 17

*Covering the White House*, White House Correspondents' Ass'n, https://perma.cc/Q868-VAKZ ..................................................... 13, 16

Eric Talmadge, *In a Summit First, Kim Jong Un Takes US Media Questions*, AP (Feb. 28, 2019), https://perma.cc/GQN6-HTJG ........................ 15

Harry Kalven, Jr., *The Concept of the Public Forum:* Cox v. Louisiana, 1965 Sup. Ct. Rev. 1, 11–12 (1965) .................................................. 7

John D. Inazu, *The First Amendment's Public Forum*, 56 Wm. & Mary L. Rev. 1159, 1165 (2015) ......................................................... 8

Paul Farhi, *Will Others Dive into the White House Press Pool?*, Colum. Journalism Rev. (Feb. 26, 2025), https://perma.cc/GZ2T-DCBM .......................................................................... 14

Tamara Keith, *Trump Uses Media Pool Spray to His Communication Advantage*, NPR (Mar. 13, 2017), https://perma.cc/TB4S-WGZS .................. 14

*The President's News Conference with Soviet President Mikhail Gorbachev in London, United Kingdom*, Am. Presidency Project (July 17, 1991), https://perma.cc/G4A4-H4RV ................................................ 15

White House Correspondents' Ass'n, *Practices and Principles of Coverage Access for Independent White House Press* (2015), https://perma.cc/TZG5-HKSQ ..................................................... 14, 16

White House Correspondents' Ass'n, *Print Pool Guidelines* (2025), https://perma.cc/92H3-L2H4 ........................................................ 25

White House Off. of Commc'ns, *Daily Guidance and Press Schedule for Friday, September 5, 2025*, Forth (Sept. 4, 2025), https://perma.cc/S7LL-HNZN ....................................................... 17

**Glossary**

| | |
|---|---|
| **AP** | Associated Press |
| **JA** | Joint Appendix |
| **RSF** | Reporters sans frontières |
| **RSF USA** | Reporters Without Borders, Inc. |
| **WHCA** | White House Correspondents' Association |

**Interest of Amici Curiae[1]**

The Knight First Amendment Institute at Columbia University ("Knight Institute") is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government.

Reporters Without Borders, Inc. ("RSF USA") is the U.S. affiliate of the independent international non-profit organization Reporters sans frontières ("RSF") that defends the right of every human being to have access to free and reliable information. RSF acts for the freedom, pluralism, and independence of journalism and defends those who embody these ideals. RSF advocates for press freedom throughout the world by monitoring and communicating on abuses committed against journalists and on all forms of censorship.[2]

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than amici curiae, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief. The parties have consented to the filing of this amicus brief.

[2] Amici would like to thank Kiran Wattamwar, legal fellow at the Knight Institute, for her significant contributions to this brief.

## Summary of Argument

The White House press pool serves a unique function in our democracy. For over a century, it has played a singular role in ensuring that Americans have access to accurate and timely information about the President, benefitting the government and the public alike. In establishing and maintaining the press pool to enable newsgathering and reporting on the President in limited-access spaces like the Oval Office or Air Force One, the government has created a First Amendment–protected forum from which it may not exclude a news organization due to its viewpoints. Yet that is precisely what the White House is doing, by its own admission.

The First Amendment promotes multiple values—the search for truth, individual autonomy, tolerance, and accountability, among them—but it is intended first and foremost to serve self-government. It is intended to protect the free discussion of public figures and public affairs "to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means." *Stromberg v. California*, 283 U.S. 359, 369 (1931). The public forum doctrine serves this purpose by ensuring both the availability and the integrity of certain spaces in which speech important to democracy takes place. The Supreme Court developed the doctrine in relation to spaces like parks and sidewalks—spaces that "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," *Hague v. CIO*, 307 U.S.

3

496, 515 (1939)—but courts have also applied the doctrine to a wide range of government-controlled spaces made available to the public or press for expressive activity. Courts have applied different frameworks to different kinds of forums, as discussed further below, but viewpoint discrimination is prohibited in every type of forum, because the rule against viewpoint discrimination is essential to protecting these spaces from government manipulation, and to protecting the freedom of thought and speech that are essential to democracy.

The rule against viewpoint discrimination applies here because the White House press pool is at the very least a nonpublic forum. It is a space the government has intentionally opened up to members of the press for newsgathering and reporting on the President. The White House has long sanctioned and maintained the pool, a small group of reporters assigned and allowed to cover the President's movements and activities in limited-access spaces like the Oval Office or Air Force One. The White House affirmatively invites members of the pool into these spaces for the purpose of engaging in quintessentially expressive activities—asking questions about, contemporaneously reporting on, and observing and recording presidential events. Across decades and multiple presidential administrations, the White House has maintained its policy and practice with respect to the press pool, and the press pool's members have served as the public's "eyes and ears," *Houchins v. KQED, Inc.*, 438 U.S. 1, 8 (1978), covering the President at bill signings, briefings, meetings

with foreign leaders, retreats, and celebrations, and during his travel within the nation's capital, across the country, and around the world.

Accordingly, amici respectfully disagree with the special panel's preliminary conclusion that the press pool does not constitute any type of forum, a conclusion it reached because the press pool sometimes meets in "highly restricted" spaces, because the special panel believed that members of the press pool are not engaged in expressive activities within the reach of the public forum doctrine, and because the forum includes speech by the President and other officials. As explained below, this Court and others have not hesitated to recognize forums in restricted spaces in other contexts. Members of the press pool engage in a range of expressive activities, notwithstanding the special panel's conclusion to the contrary. And the fact that government officials speak in the forum does not alter the public forum analysis, because the newsgathering and reporting conducted by members of the press pool are not government speech.

The Court should reconsider the special panel's analysis. The right to access public forums without being required to kowtow to authority is a hallmark of democracy. From courtrooms to city council meetings, Americans—and the press, as their proxies—can watch their government in action without needing to pledge loyalty to its leaders. To allow the President to expel a member of the press pool on the basis of its views would give the government broad authority to suppress

disfavored viewpoints. It would also cast a chill on news organizations that remain in the forum, because those outlets would know that their continuing participation in the pool could depend upon their willingness to toe the White House line. And this in turn would have dire implications for citizens' ability to access independent reporting about the President and his policies. As explained further below, the First Amendment does not permit this result.

<b>Argument</b>

**I.    The public forum doctrine underwrites self-government by ensuring the availability and integrity of expressive spaces in which speech important to our democracy takes place.**

The public forum questions at the heart of this case implicate not just the Associated Press's ("AP") own First Amendment rights, but, more fundamentally, the ability of the American public to receive speech that is essential to self-government, free from government censorship or distortion.

A central purpose of the First Amendment's speech clause is to facilitate and protect self-government. The Supreme Court has long endorsed the "practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs," including "discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." *Mills v. Alabama*, 384 U.S. 214, 218–19 (1966); *see also Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)

6

("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."). A "fundamental principle of our constitutional system" is the "maintenance of the opportunity for free political discussion," *Stromberg*, 283 U.S. at 369, and it is "one of the chief distinctions that sets us apart from totalitarian regimes," *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). The public forum doctrine effectuates this central First Amendment value by ensuring the availability of spaces for the discourse necessary to democracy, and by insulating those spaces from government manipulation.

The public forum doctrine evolved from the Supreme Court's recognition, nearly a century ago, that certain government-controlled spaces must be preserved for the public to engage in speech important to democracy. Thus, traditional public forums—including parks, streets, and sidewalks—are spaces that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague*, 307 U.S. at 515. "Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Id.*; *see also* Harry Kalven, Jr., *The Concept of the Public Forum: Cox v. Louisiana*, 1965 Sup. Ct. Rev. 1, 11–12 (1965) (noting that "in an open democratic society the streets, the parks, and other public places are an important facility for public discussion and political process. They are in brief a

public forum that the citizen can commandeer; the generosity and empathy with which such facilities are made available is an index of freedom"); John D. Inazu, *The First Amendment's Public Forum*, 56 Wm. & Mary L. Rev. 1159, 1165 (2015) ("The ideal of the public forum represents one of the most important aspects of a healthy democracy. It signifies a willingness to tolerate dissent, discomfort, and even instability."). Public forums are indispensable to civic discourse and democratic self-governance, assuring the "interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). They allow people with different viewpoints to participate in our "profound national commitment" to "debate on public issues" that is "uninhibited, robust, and wide-open"—and to do so without "any kind of authoritative selection." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Since *Hague*, the Supreme Court has extended the public forum doctrine beyond traditional public forums to encompass a wide range of other tangible and intangible government-controlled spaces. In doing so, it has recognized at least three other categories of public forums. First, "designated" public forums are spaces that the government intentionally opens up "for use by the public at large for assembly and speech." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Second, "limited" public forums are spaces that the government has opened

8

to "certain groups or for the discussion of certain topics." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (quoting *Rosenberger*, 515 U.S. at 829). Third, "nonpublic" forums encompass "all remaining" government-controlled spaces, "[w]here the government is acting as a proprietor, managing its internal operations." *Id*. at 216 (quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678–79 (1992)). This Court has held that nonpublic forums include spaces where the government "provides selective access for individual speakers" in otherwise restricted spaces. *Ateba v. Leavitt*, 133 F.4th 114, 122 (D.C. Cir. 2025) (quoting *Bryant v. Gates*, 532 F.3d 888, 895 (D.C. Cir. 2008)). And even where the government has not explicitly offered up a space "for purposes of providing a forum for expressive activity," that space may nevertheless constitute a nonpublic forum if "such activity occurs" there. *Cornelius*, 473 U.S. at 805.

The public forum doctrine ensures the integrity of these forums by requiring that government restrictions on speech within them satisfy First Amendment scrutiny. The applicable level of scrutiny depends on the type of forum the government has created. *See Ateba*, 133 F.4th at 121. In both traditional and designated public forums, speech regulations that discriminate based on content are subject to strict scrutiny. *See McCullen v. Coakley*, 573 U.S. 464, 478 (2014); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). In limited public forums and nonpublic forums, content-based speech restrictions must be viewpoint

9

neutral and "reasonable in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806.

The cornerstone of the public forum doctrine is its flat prohibition on viewpoint discrimination, which is impermissible in any forum, including nonpublic forums. *See Matal v. Tam*, 582 U.S. 218, 243 (2017); *Rosenberger*, 515 U.S. at 829. It is "axiomatic" that the government may not discriminate against speech in a forum "based on its substantive content or the message it conveys," and "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828; *see Cornelius*, 473 U.S. at 806 ("The government violates the First Amendment when it denies" a speaker access to a forum "solely to suppress the point of view he espouses."). The rule of viewpoint neutrality ensures the integrity of public and nonpublic forums by protecting against government attempts to censor critics of the government or to distort the public discourse occurring in these spaces. While the government "has power to preserve the property under its control for the use to which it is lawfully dedicated," *Greer v. Spock*, 424 U.S. 828, 836–37 (1976) (internal citation omitted), the public forum doctrine promotes First Amendment values by constraining the government's ability to restrict private speech that occurs in those spaces, *see, e.g.*, *Lee*, 505 U.S. at 687 (noting that nonpublic forum status "does not mean that the government can restrict speech in whatever way it likes"). As the Supreme Court has recognized, "[t]here is

an 'equality of status in the field of ideas,'" and the "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 & n.4 (1972) (quoting Alexander Meiklejohn, *Political Freedom: The Constitutional Powers of the People* 27 (1948)).

The public forum doctrine's requirement that restrictions on speech in even limited and nonpublic forums be viewpoint neutral protects the freedom of thought and speech that are essential to self-government. This requirement reflects a strong presumption that, despite the government's indisputable interest in managing its property, when it opens up that property for expressive activity by members of the public or the press, it is prohibited from singling out any one of them for exclusion based on their viewpoints. Thus, for example, the Supreme Court has applied the rule of viewpoint neutrality to nonpublic forums such as a charity drive aimed at federal employees and military personnel, *Cornelius*, 473 U.S. at 812–13, a candidate debate broadcast on public television, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682 (1998), and teacher mailboxes and an interschool mail system of a public school, *Perry*, 460 U.S. at 46, 49. In each of these cases, the Court acknowledged the government's interest in limiting access for private speech in tightly controlled spaces but made clear that the government cannot use its power over government property to control private expression and distort civic discourse.

II.    **The White House press pool is a First Amendment–protected forum in which viewpoint discrimination is unconstitutional.**

A.    **The White House creates a forum when it opens up government space for expressive activity by the press pool.**

The "touchstone" for determining the existence and type of a given forum is "the government's intent in establishing and maintaining" the space. *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1016 (D.C. Cir. 1988). To determine intent, this Court looks to objective factors, including the "nature" of the space, its "compatibility with expressive activity," and the "*consistent* policy and practice of the government." *Bryant*, 532 F.3d at 896 (quoting *Stewart*, 863 F.2d at 1016–17). Each of these factors favors the conclusion that the White House press pool is at least a nonpublic forum whose restrictions on speech must be reasonable and viewpoint neutral.[3]

First, the nature of the press pool indicates the government's intent to create and sustain a forum. As an initial matter, the relevant forum here consists of a small group of reporters invited into government-controlled spaces to engage in expressive

---

[3] In the district court, the Knight Institute filed an amicus brief arguing that the press pool is a limited public forum because the White House has opened the forum to a class of speakers to cover specific topics, including presidential events. *See* Knight Amicus Br. 7–11. Recently, however, this Court held that the White House Press Area constitutes a nonpublic forum, rather than a limited public forum. *Ateba*, 133 F.4th at 117, 122. The Knight Institute continues to believe that the press pool is best characterized as a limited public forum, but in light of the Court's holding in *Ateba*, and because the level of scrutiny is the same for both limited and nonpublic forums, amici address here only the question of whether the press pool is at least a nonpublic forum.

activities—newsgathering about and reporting on the President. These reporters are assigned and allowed to cover the President's movements and activities on behalf of the larger group of credentialed White House correspondents. *See Covering the White House*, White House Correspondents' Ass'n, https://perma.cc/Q868-VAKZ. The size of the pool depends on the President's location but the pool typically includes wire and print reporters, photographers, and radio and network television correspondents. JA50 (Second Miller Decl., Ex. A). The pool is invited to cover events when they occur in White House spaces like the Oval Office or aboard Air Force One while the President travels. *Id.*; *see also* JA19 (Am. Compl. ¶¶ 39–40). The forum, therefore, encompasses the White House press pool as well as those spaces that the White House opens up to newsgathering and reporting by the pool at the specific times set by the White House. The nature of the press pool—a group of private individuals invited into government-controlled spaces to engage in expressive activities—suggests a quintessential forum.

Second, the press pool is compatible with the expressive activities of its members. When the White House opens up certain government-controlled spaces to the press pool, it is intentionally dedicating these spaces for the pool to engage in First Amendment–protected newsgathering and reporting for a specified duration. The White House invites pool reporters to ask questions about, contemporaneously

13

report on, and observe events in the Oval Office and Air Force One. These activities are all plainly expressive in nature.

Pool reporters routinely engage in expressive activity by asking questions, including during events in the Oval Office and on Air Force One. *See* JA20 (Am. Compl. ¶ 42); JA63–64 (Condon Decl. ¶¶ 11–13); White House Correspondents' Ass'n ("WHCA"), *Practices and Principles of Coverage Access for Independent White House Press* (2015), https://perma.cc/TZG5-HKSQ. Before and after these events, pool reporters are also invited to pool "sprays" where they are given the opportunity to question the President. Tamara Keith, *Trump Uses Media Pool Spray to His Communication Advantage*, NPR (Mar. 13, 2017), https://perma.cc/TB4S-WGZS. Participating in the press pool is generally coveted among White House reporters because "it's the primary way to get interaction with the president." Paul Farhi, *Will Others Dive into the White House Press Pool?*, Colum. Journalism Rev. (Feb. 26, 2025), https://perma.cc/GZ2T-DCBM. Pool reporters who join the President for long-distance travel aboard Air Force One regularly question the President during their travel. *See* Alexandria Symonds, *When the President Travels, Who's Allowed to Join Him?*, N.Y. Times (July 17, 2017), https://perma.cc/2A83-E64X. Pool reporters have covered diplomatically sensitive trips during which they ask questions not only of the President, but also of foreign leaders like Mikhail Gorbachev and Kim Jong Un. *See The President's News Conference with Soviet*

14

*President Mikhail Gorbachev in London, United Kingdom*, Am. Presidency Project (July 17, 1991), https://perma.cc/G4A4-H4RV; Eric Talmadge, *In a Summit First, Kim Jong Un Takes US Media Questions*, AP (Feb. 28, 2019), https://perma.cc/GQN6-HTJG.

Pool reporters also engage in expressive activity in the form of newsgathering. When journalists and photojournalists observe the President and official events, interpret, frame, and record their impressions, and communicate news reports to their editors and the public, they are making individualized, editorial judgments. Pool reporters may "focus as much on the president's body language as on his words," often catching "what the cameras d[o] not pick up," and those judgments inform their reporting. JA63–64 (Condon Decl. ¶¶ 11–13). Pool reporters within the forum also communicate with their editors or audiences outside of the forum, serving as the public's eyes and ears covering the President. As the record here demonstrates, these journalists and photojournalists are frequently reporting out in real time. *See, e.g.*, JA44 (Miller Decl. ¶ 10); JA57 (Elswick Decl. ¶ 10).

Third, the White House's consistent policy and practice demonstrate an intent to open up government spaces for press pool members to engage in expressive activities. Although until recently the WHCA organized the press pool, the White House has always played a role in the management of the pool. Indeed, the White House has invited members of the press pool, chosen without reference to viewpoint,

to observe and report from limited-access spaces for over a century. The pool dates back to 1881, when an AP reporter was posted outside President James Garfield's sick room to provide updates on his condition from his shooting in July to his death in September. *See* JA19 (Am. Compl. ¶ 37). Pool reporters have traveled directly with the President since Franklin Delano Roosevelt's presidency, and the pool was present when he died in Warm Springs, Georgia. *See Covering the White House*, *supra*. They accompanied President George W. Bush when he learned about the September 11, 2001 attacks and as he traveled to various secure locations later that day. *See* JA19 (Am. Compl. ¶ 37). In the past few decades and continuing until today, the White House has opened official events to the press pool, maintaining the pool's robust access to bill signings, briefings, meetings with foreign leaders, retreats, celebrations on the South Lawn, in-town travel, and international trips. *See* WHCA, *Practices and Principles*, *supra*; JA17 (Am. Compl. ¶¶ 30–31).

The White House has incorporated the press pool into the schedule and structure of its events in the Oval Office, on Air Force One, and elsewhere. The White House circulates daily guidance and press schedules and distributes pool reports to a public White House mailing list. *See Covering the White House*, *supra*. The White House Office of Communications refers to the press pool in its official schedules. *See e.g.*, White House Off. of Commc'ns, *Daily Guidance and Press Schedule for Friday, September 5, 2025*, Forth (Sept. 4, 2025),

16

https://perma.cc/S7LL-HNZN. Aboard Air Force One, a press cabin of fourteen seats at the back of the plane is reserved for traveling pool members who cover the President's official trips. *See* Anthony Zurcher, *New Era Beckons for Air Force One After Qatari Offer - but What's It Like Inside?*, BBC (May 17, 2025), https://perma.cc/6LTL-877W. There, President Trump has continued a decades-long tradition of joining the press cabin to engage the pool in conversation. *See* Alexandria Symonds, *When the President Travels, Who's Allowed to Join Him?*, N.Y. Times (July 17, 2017), https://perma.cc/2A83-E64X.

The White House's recent changes to the selection of the press pool have not altered the status of the forum. Even after the current White House decided to take over the organization of the pool from the WHCA, it has continued to allow members of the pool to access events on a rotating basis. JA485 (Tr. Mot. Hearing Apr. 18, 2025). The government's stated rationale for wresting control away from the WHCA only confirms that it still conceives of the pool as a forum: "to open access to a wide range of media outlets that have not historically been members of the pool while continuing to provide access to legacy members of the pool." Defs.' Notice, *AP v Taylor Budowich, et al.*, No. 1:25−cv−00532–TNM (D.D.C. Feb. 28, 2025), ECF No. 22. The new policies eliminated at least one rotating spot originally reserved for three wire service organizations—the AP, Reuters and Bloomberg—and installed two seats for new media correspondents selected by the White House. JA454−55

(AP Mot. Enforce Prelim. Inj., Ex. C). As the district court observed, despite nominally taking control over the press pool, aside from new press pool seats allotted to "new media," "little else has changed." JA391 (Dist. Ct. Op. 5).

The press pool is therefore at the very least a nonpublic forum—a conclusion consistent with two opinions of this Court decided nearly fifty years apart. Even before the Supreme Court articulated the modern public forum doctrine, this Court recognized that the "protection afforded newsgathering under the [F]irst [A]mendment" applies "where the White House has voluntarily decided to establish press facilities for correspondents who need to report therefrom." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977). More recently, in *Ateba v. Leavitt*, this Court concluded that "[t]he White House Press Area," consisting of "the briefing room, the press offices, and certain other locations in and around the White House that are open to correspondents," is a nonpublic forum in which viewpoint discrimination is impermissible. 133 F.4th at 117.

**B.    The Court should not adopt the special panel's conclusion that the press pool is not a forum.**

Amici respectfully urge the Court to revisit certain preliminary conclusions that the special panel drew in granting in part the government's earlier emergency motion for a stay pending appeal. First, the Court should reconsider the special panel's suggestion that forum analysis does not apply to the press pool when the White House invites its members into otherwise "highly restricted" spaces. *See* Stay

Op. 17–18, 20, 26. Second, the Court should reconsider the special panel's suggestion that newsgathering and reporting by the pool are not expressive activity recognized by forum doctrine. And third, the Court should reconsider the special panel's suggestion that press pool events reflect only government speech.

### 1. The Court has held that the public forum doctrine applies to "restricted" government spaces.

The fact that members of the press pool are invited into "highly restricted" areas of the White House does not mean that the public forum doctrine is inapplicable there. Stay Op. 26; *see* Gov't Br. 30. This Court has already held that "strictly regulate[d]" spaces in the White House may constitute nonpublic forums. *Ateba*, 133 F.4th at 123. This Court has also held that "the inside of the United States Capitol is a nonpublic forum for First Amendment forum analysis purposes," *Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50, 56 (D.D.C. 2000), even though entry to the building is "strictly regulated," *United States v. Nassif*, 97 F.4th 968, 976–77 (D.C. Cir. 2024). Similarly, the Supreme Court has applied the standard governing nonpublic forums to restricted government facilities such as military installations and airport terminals. *See United States v. Kokinda*, 497 U.S. 720, 727 (1990) ("[W]e held that . . . a military base . . . was a nonpublic forum" (citing *Greer v. Spock*, 424 U.S. 828 (1976))); *Lee*, 505 U.S. at 679, 682 ("[P]ublic access to air terminals is . . . not infrequently restricted."); *see also United States v. Grace*, 461 U.S. 171,

178 (1983) (suggesting that "the Supreme Court building and grounds fit neatly within the description of non-public forum property").

These restricted spaces, like the "presidential spaces" at issue here, may have primary uses other than as forums for expressive activity—but that does not preclude application of the public forum doctrine. *See, e.g.*, *Greer*, 424 U.S. at 839–40 (applying requirement of viewpoint neutrality to restrictions on speech in a military installation). The very definition of a nonpublic forum is a space that "is not by tradition or designation a forum for public communication." *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022) (quoting *Perry*, 460 U.S. at 46). It is therefore of no moment that the Oval Office or Air Force One contain the President's "personal workspace" or are dedicated "for the President's exclusive use," Gov't Br. 20, 25; *see* Stay Op. 13, 18–19. The relevant inquiry for nonpublic forum purposes is whether the government, "acting as a proprietor," has opened up the space at issue for some type of private expressive activity—not for all time, but for a limited duration set by the government itself. *Walker*, 576 U.S. at 216. This is indisputably the case here, where the White House invites the press pool into areas, like the President's office and plane, that are otherwise reserved for government business and travel. *See Ateba*, 133 F.4th at 117 (describing the White House as the President's "official residence," consisting of his "private living quarters as well as

20

government office space," before concluding that certain areas of the White House are nonpublic forums).

> **2.    The Court should not deprive newsgathering of the protections of the public forum doctrine.**

Respectfully, the conclusion by the special panel that members of the press pool do not engage in "the type of communicative activities that transform a restricted government space into a nonpublic forum," Stay Op. 13–14, is factually incorrect and inconsistent with this Court's precedent. As noted above, pool reporters in fact regularly ask the President questions when invited into the Oval Office and aboard Air Force One, and that speech is communicative. Further, pool reporters engage in other newsgathering activities that are also expressive in nature.

*Price v. Garland* is not to the contrary, despite the stay panel's reliance on that decision. *See* Stay Op. 13–14. In *Price*, the Court considered a facial challenge to National Park Service permit and fee requirements for commercial filmmaking on federal land. In rejecting the challenge, the Court concluded that filmmaking in national parks does not warrant the heightened scrutiny applicable to speech restrictions in *traditional* public forums because filmmaking is "merely a noncommunicative step in the production of speech." 45 F.4th at 1068 (emphasis added). Yet despite this conclusion, the Court in *Price* still required the regulations at issue to be reasonable and viewpoint neutral, which are the requirements applicable in nonpublic forums. *Id.* Moreover, the filmmaking regulations in *Price*

21

explicitly excepted "news-gathering activities," *id.* at 1075, and the Court took pains to distinguish filmmaking from "[g]athering information about government officials in a form that can readily be disseminated to others," which "serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs," *id.* at 1070–71 (citation and quotation marks omitted). At most, then, even if this Court were to conclude that the press pool's observational newsgathering is not itself communicative, *Price* instructs that the standard governing nonpublic forums, including its requirement of viewpoint neutrality, would still apply to the White House's exclusion of the AP from press pool events.[4]

---

[4] Likewise, amici urge the Court to reject the conclusion that the public forum doctrine does not apply to the press pool because there is not a sufficient "nexus" between the expressive activity of the pool and the restricted spaces into which the pool is invited. *See* Stay Op. 14–17. Nothing in the doctrine requires "a clear nexus between the forum and the protected speech." *Id.* at 16; *see Cornelius*, 473 U.S. at 799 (noting merely that a "nexus" existed between charitable solicitation and "the communication of information and advocacy of causes"). This is especially true for nonpublic forums, where "expressive activity may take place" that "is entirely incidental to the purpose" or primary intended use of the physical space. *See, e.g.*, *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 146–47 (2d Cir. 2004) (describing the "casual conversations" in "welfare office waiting rooms" that are protected from viewpoint discrimination even though they may be "entirely incidental" to the rooms' purpose of "ensur[ing] an orderly flow of claimants to the interviewers."). But even assuming a nexus requirement were to exist, it would most appropriately apply to the forum that the government intended to create—not to the other, primary uses of the physical spaces where the forum happens to convene. Here, any such nexus requirement would be amply met. As discussed above, the purpose of the relevant forum, the White House press pool, is to enable exactly the type of expressive activity that takes place within it—newsgathering and reporting on the President.

### 3.   The presence of government speech in the forum does not alter the analysis.

The special panel assumed that "the fact that the President is communicating at [White House] events" alongside the members of the press pool "distances this context from forum analysis." Stay Op. 19. But amici respectfully submit that the presence of government speech in the forum does not diminish the protections that the public forum doctrine provides to the private speech that also takes place there. The contrary suggestion by the special panel would gut the public forum doctrine, which has long protected speech necessary for democratic self-governance by applying to events like town halls, at which members of the public engage with their elected officials, who are of course themselves engaging in government speech.

Under the public forum doctrine, the question is not whether the government engages in some speech in the forum, but instead whether the expressive activity of those invited in reflects their own speech or instead the speech of the government. Here, the expressive activity of the press pool is emphatically not government speech. To determine whether the expressive activity constitutes government speech, courts look to "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Shurtleff*

*v. City of Boston*, 596 U.S. 243, 252 (2022). With regard to the first factor, the history of the century-old press pool makes clear that the press has long exercised its independent curatorial judgment in deciding how to report on the President's words and actions. The pool transmits messages from the government and from the press, authoring their own pool reports and shaping the discussion that takes place within the forum via the questions that reporters ask the President.

Second, the press pool is not associated with the government in the public mind. It is understood that the journalists present report on the President's words and deeds based on their own editorial judgments; that they independently determine what warrants dissemination to the public and how precisely to disseminate it; and that they ask questions, if any are taken, to serve the interests of their audience rather than those of the government. Indeed, given the press's frequently adversarial relationship with the President, a group of reporters posing questions to him is rarely viewed as an instrument of his own speech.

Third, the government has not "maintain[ed] direct control" over the press pool. *Shurtleff*, 596 U.S. at 257. For decades until February 2025, the composition of the pool was independently determined by the WHCA from the wider press corps based on the WHCA's internal pool standards—the White House did not play a role in the selection of individual reporters and there is no evidence in the record of any prior White House attempt to bar a news organization from membership in the press

pool. *See* AP Br. 5; JA18 (Am. Comp. ¶ 33); JA21 (Am. Comp. ¶ 47). And even after announcing that it will determine pool membership going forward, the White House does not purport to exercise "direct control" over the pool, including over the "content and meaning" of the speech produced by the pool. *Shurtleff*, 596 U.S. at 256–57 (explaining that even where the government "maintain[s] control over an event's date and time" as well as its "physical premises," it is the government's control over the "content and meaning" of the speech that occurs there that is "key"). The WHCA continues to set reporting standards and deadlines guiding pool reporters' journalism, WHCA, *Print Pool Guidelines* (2025), https://perma.cc/92H3-L2H4, and the White House does not direct the content of pool reporters' expression or their work product. As in *Shurtleff*, here the White House has not sought to "actively shape[] or control[] the expression" of press pool journalists. 596 U.S. at 252.

"[T]he fact that the President is communicating" his own messages to and through the press pool does not change this calculus or negate the existence of a forum. Stay Op. 19. If that fact were dispositive, then any reporting on presidential speech could be shoehorned into the government speech doctrine. Content provided by the government is certainly incorporated into press pool coverage—after all, the purpose of the pool is to observe and report on government activity and government speech. But the confluence of government speech and private speech is a hallmark

of the public forum doctrine. Take, for example, the paradigmatic public forum of a town hall or city council meeting, hosted by the government, in which government officials and members of the public alike engage in expressive activity. *See, e.g.*, *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990) (noting that "City Council meetings . . . once opened, have been regarded as public forums" even though "[t]he Council has an agenda to be addressed and dealt with"). In other cases, the presence of government speech did not render forum analysis inapplicable to comments posted on a government social media page, *PETA v. Tabak*, 109 F.4th 627, 634 (D.C. Cir. 2024), demonstrations along the President's inauguration parade route, *Mahoney v. Babbitt*, 105 F.3d 1452, 1457 (D.C. Cir. 1997), and attendance at a governor's limited-access press conference, *John K. MacIver Inst. for Pub. Pol'y v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021). And government "museums and offices" are still nonpublic forums subject to the First Amendment even though those spaces are principally dedicated to government activity and government speech. *Price*, 45 F.4th at 1068.

To hold otherwise would have dangerous and far-reaching implications for the press pool, which is a significant forum for civic discourse and self-government precisely because it is the President himself who opens it up for access by the press. The application of the government speech doctrine to the pool would permit the President to convert this crucial forum into a mere microphone. But the public forum

26

doctrine stands as a bulwark against this very risk—where the President or any government officials purport to provide a space for members of the public or their proxies in the press to engage in expressive activity, the First Amendment prohibits them from manipulating the private expression that occurs there. As the Supreme Court has warned, courts "must exercise great caution before extending" the government speech doctrine because it is "susceptible" to just such "dangerous misuse" *See Matal*, 582 U.S. at 235 ("If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints.").

## Conclusion

For the foregoing reasons, amici respectfully urge this Court to affirm the preliminary injunction.

Dated: October 6, 2025                    Respectfully submitted,

                                          */s/ Katherine Fallow*
                                          Katherine Fallow
                                          Jake Karr
                                          Jameel Jaffer
                                          Alex Abdo
                                          Knight First Amendment Institute at
                                             Columbia University
                                          475 Riverside Drive, Suite 302
                                          New York, NY 10115
                                          (646) 745-8500
                                          katie.fallow@knightcolumbia.org

                                          *Counsel for Amici Curiae*

27

## Certificate of Compliance

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), it contains 6,450 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: October 6, 2025                              */s/ Katherine Fallow*
                                                     Katherine Fallow