No. 25-5109

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

ASSOCIATED PRESS,

Plaintiff-Appellee,

v.

TAYLOR BUDOWICH, in his official capacity as White House Deputy Chief of Staff; KAROLINE C. LEAVITT, in her official capacity as White House Press Secretary; and SUSAN WILES, in her official capacity as White House Chief of Staff,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

## BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION AND AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA IN SUPPORT OF APPELLEE AND AFFIRMANCE

————————————

Scott Michelman
  *Counsel of Record*
Arthur B. Spitzer
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION OF THE
  DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
Tel.: (202) 457-0800
Email: smichelman@acludc.org
       aspitzer@acludc.org

Ben Wizner
Brian Hauss
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
Email: bwizner@aclu.org
       bhauss@aclu.org

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

### A. Parties and *Amici*

Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief of Defendants-Appellants: *amici curiae* the American Civil Liberties Union and the American Civil Liberties Union of the District of Columbia, which file this brief in support of Plaintiff-Appellee.

*Amici curiae* the American Civil Liberties Union and the American Civil Liberties Union of the District of Columbia state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

### B. Rulings Under Review

References to the rulings at issue appear in the Brief for Defendants-Appellants.

### C. Related Cases

This case has not previously been before this Court—except on the government's motion for a stay—or any court other than the district

court. Undersigned counsel is unaware of any related cases within the

meaning of D.C. Circuit Rule 28(a)(1)(C).


/s/ *Scott Michelman*
Scott Michelman

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
CASES AND CORPORATE DISCLOSURE STATEMENT ..................... i

TABLE OF AUTHORITIES ....................................................................... iv

GLOSSARY OF ABBREVIATIONS .......................................................... xii

INTEREST OF *AMICI CURIAE* ............................................................... 1

SUMMARY OF ARGUMENT ..................................................................... 3

ARGUMENT ................................................................................................ 5

I.   American history teaches that the First Amendment
     demands vigilance against all intrusions on free expression. .......... 5

     A.   Early American history ............................................... 6

     B.   World War I and the postwar years ........................................ 9

     C.   The Second Red Scare ............................................................. 12

II.  Press freedom in the United States is being tested again
     today. ........................................................................................... 16

III. Other countries' experiences caution that intrusions on free
     expression, if allowed to persist, often lead to democratic
     backsliding. ................................................................................. 20

     A.   The Philippines ...................................................... 22

     B.   Hungary .................................................................. 24

     C.   Turkey and Russia ................................................................. 27

CONCLUSION ........................................................................................... 31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. Bd. of Educ.,*
  342 U.S. 485 (1952) ........................................................................... 13, 14

*Brandenburg v. Ohio,*
  395 U.S. 444 (1969) ................................................................................. 12

*Bridges v. Wixon,*
  326 U.S. 135 (1945) ................................................................................. 17

*Communist Party of the United States v. Subversive*
  *Activities Control Bd.,*
  367 U.S. 1 (1961) ............................................................................... 13, 14

*Debs v. United States,*
  249 U.S. 211 (1919) ................................................................................. 10

*Dennis v. United States,*
  341 U.S. 494 (1951) ........................................................................... 13, 14

*Frohwerk v. United States,*
  249 U.S. 204 (1919) ................................................................................. 10

*Gideon v. Wainwright,*
  372 U.S. 335 (1963) ................................................................................. 17

*Gilbert v. Minnesota,*
  254 U.S. 325 (1920) ................................................................................. 11

*Gitlow v. New York,*
  268 U.S. 652 (1925) ................................................................................. 11

*Hartman v. Moore,*
  547 U.S. 250 (2006) ................................................................................. 17

*Iancu v. Brunetti,*
  588 U.S. 388 (2019) ................................................................................. 20

iv

*Keyishan v. Bd. of Regents of the Univ. of the State of N.Y.*,
    385 U.S. 589 (1967) ................................................................ 15, 18

*Legal Servs. Corp. v. Velasquez*,
    531 U.S. 533 (2001) ....................................................................... 17

*Mills v. Alabama*,
    384 U.S. 214 (1966) ......................................................................... 6

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ...................................................................... 19

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..................................................................... 8, 9

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ...................................................................... 18

*NRA v. Vullo*,
    602 U.S. 175 (2024) .................................................................... 1, 19

*Ozturk v. Hyde*,
    136 F.4th 382 (2d Cir. 2025)........................................................ 17

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health
& Hum. Servs.*,
    2025 WL 2528380 (D. Mass. Sept. 3, 2025)....................... 18

*Rankin v. McPherson*,
    483 U.S. 378 (1987) ...................................................................... 16

*Regents of the Univ. of Mich. v. Ewing*,
    474 U.S. 214 (1985) ...................................................................... 18

*R.I. Latino Arts v. Nat'l Endowment for the Arts*,
    2025 WL 2689296 (D.R.I. Sept. 19, 2025) ......................... 19

*Rossignol v. Voorhaar*,
    316 F.3d 516 (4th Cir. 2003)........................................................ 20

*Roth v. United States*,
    354 U.S. 476 (1957) ........................................................................ 5

*Schenck v. United States,*
    249 U.S. 47 (1919) ............................................................... 10

*Susman Godfrey LLP v. Exec. Off. of the President,*
    2025 WL 1779830 (D.D.C. June 27, 2025) ......................... 18

*United States v. Helstoski,*
    442 U.S. 477 (1979) ................................................................ 7

*United States v. Robel,*
    389 U.S. 258 (1967) .............................................................. 15

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) .............................................................. 20

*Whitney v. California,*
    274 U.S. 357 (1927) ........................................................ 11, 12

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the
    President,*
    784 F. Supp. 3d 127 (D.D.C. 2025) ....................................... 1

*Yates v. United States,*
    354 U.S. 298 (1957) .............................................................. 15

**Scholarly Authorities**

Adam Shinar, *Democratic Backsliding, Subsidized Speech,
    and the New Majoritarian Entrenchment,*
    69 Am. J. Comp. L. 335, 347 (2021) .............................. 24, 25

Adrienne Koch & Harry Ammon, *The Virginia and Kentucky
    Resolutions: An Episode in Jefferson's and Madison's
    Defense of Civil Liberties,* 5 Wm. & Mary Q. 145 (1948) ...... 7

Floyd Abrams et al., *The Press Clause: The Forgotten First
    Amendment,* 5 J. Free Speech L. 561 (2024) ......................... 5

Jack M. Balkin, *Nine Perspectives on Living Originalism,*
    2012 U. Ill. L. Rev. 815 (2012) ............................................... 8

vi

Kriszta Kovács & Gábor Attila Tóth, *Hungary's Constitutional Transformation*, 7 Eur. Const. L. Rev. 183 (2011).....................................................................................24

Laura M. Weinrib, *Freedom of Conscience in War Time: World War I and the Limits of Civil Liberties*, 65 Emory L.J. 1051 (2016).......................................................9

Louis Fisher, *Correcting Judicial Errors: Lessons from History*, 72 Me. L. Rev. 1 (2020) .........................................8

Maria J. Stephan & Erica Chenoweth, *Why Civil Resistance Works: The Strategic Logic of Nonviolent Conflict*, 33 Int'l Sec. 7 (2008)...............................................................22

Martha Minow, *Storytelling and Political Resistance: Remembering Derrick Bell (with a Story About Dalton Trumbo)*, 28 Harv. J. Racial & Ethnic Just. 1 (2012).........................13

Nancy Murray & Sarah Wunsch, *Civil Liberties in Times of Crisis: Lessons from History*, 87 Mass L. Rev. 72 (2002) ................7, 9

Richard A. Primus, *Canon, Anti-Canon, and Judicial Dissent*, 48 Duke L.J. 243 (1998) ...........................................11

Samantha Barbas, New York Times v. Sullivan*: A Civil Rights Story*, 12 Tex. A&M L. Rev. 1 (2024) .......................................13

William M. Wiecek, *The Legal Foundations of Domestic Anticommunism: The Background of Dennis v. United States*, 2001 Sup. Ct. Rev. 375 (2001) ....................................12

Zechariah Chafee, Jr., *Freedom of Speech in War Time*, 32 Harv. L. Rev. 932 (1919)..............................................9, 11

**Other Authorities**

1 Annals of Cong. 434 (1789) (Joseph Gales ed., 1834)............................7

Article 19, *Hungarian Media Laws Q&A* (2011) ....................................25

*Associated Press*, Encyc. Britannica (Sept. 18, 2025),
   https://tinyurl.com/2ba9x5xd.................................................... 3

Attila Mong, *Hungarian Journalists Fear Orbán Will Use
   Election Win to Tighten Grip on Independent Media*,
   Comm. to Protect Journalists (Apr. 5, 2022),
   https://tinyurl.com/mry7vrsz..................................................... 26

Collin Binkley & Aamer Madhani, *Trump Asks 9 Colleges to
   Commit to His Political Agenda and Get Favorable Access
   to Federal Money*, AP (Oct. 2, 2025), https://tinyurl.com/
   4d7j6vu4....................................................................................... 18

Comm. to Protect Journalists, *Turkey's Press Freedom Crisis:
   The Dark Days of Jailing Journalists and Criminalizing
   Dissent* (2012), https://tinyurl.com/2u8sy2um .................................... 28

Erica Frantz et al., *The Origins of Elected Strongmen* (2024) .............. 24

Francesca Regalado, *Philippine Senate Shelves Impeachment
   of Vice President Sara Duterte*, N.Y. Times (Aug. 7, 2025) ................ 22

Gen. George Washington, Address to Officers of the Army
   (Mar. 15, 1783), *reprinted by Nat'l Archives: Founders
   Online*, https://tinyurl.com/5n6j5wus (last visited Sept. 18,
   2025)............................................................................................... 6

Gene Maddaus, *FCC Chairman Threatens ABC Over Jimmy
   Kimmel's Remarks About Charlie Kirk's Killer*, Variety
   (Sept. 17, 2025), https://tinyurl.com/ytd3amd4.................................. 19

Geoffrey R. Stone, *Perilous Times: Free Speech in Wartime*
   (2004)......................................................................................... 9–13

*Hungarian Media Law Further Endangers Media Freedom,
   Says OSCE Media Freedom Representative*, Org. for Sec.
   & Coop. in Eur. (Dec. 21, 2010), https://tinyurl.com/
   3mc6dztx....................................................................................... 25

*Hungary: Freedom in the World 2024 Country Report,*
    Freedom House, https://tinyurl.com/2s43t9vb (last visited
    Sept. 18, 2025) ................................................................ 27

*Hungary's Media Control Unprecedented in EU, Joint*
    *Mission Finds*, Comm. to Protect Journalists (Dec. 3,
    2019), https://tinyurl.com/4s6w259w .................................... 25

Int'l Press Inst., *Conclusions of the Joint International Press*
    *Freedom Mission to Hungary* (Dec. 3, 2019),
    https://tinyurl.com/3vnm733f .............................................. 26

James FitzGerald, *US Disaster Agency Suspends Workers*
    *Who Criticised Trump Cuts, Reports Say*, BBC (Aug. 27,
    2025), https://tinyurl.com/yfzfbnrk ...................................... 16

Julia Gabriel, V-Dem Inst., *Hungary: A Country Report*
    *Based on Data 1918–2012,* (V-Dem Country Rep. Series
    No. 12, 2016), https://tinyurl.com/2z9s5f7a ............................ 24

Kaela Malig, *How Russia's Press Freedom has Deteriorated*
    *Over the Decades Since Putin Came to Power*, PBS (Sept.
    26, 2023), https://tinyurl.com/4krjhk76 ................................. 30

Kate Musgrave, *Tipping Point: Democratic Erosion and the*
    *Assault on Press Freedom*, Ctr. for Int'l Media Assistance
    (Oct. 27, 2021), https://tinyurl.com/4sykpxst ......................... 29

Kemal Kirişci & İlke Toygür, Brookings, *Turkey's New*
    *Presidential System and a Changing West: Implications*
    *for Turkish Foreign Policy and Turkey-West Relations* 4
    (Turkey Project Pol'y Paper No. 15, 2019),
    https://tinyurl.com/mv2tn69b .............................................. 28

Letter from Thomas Jefferson to James Currie (Jan. 28,
    1786), *reprinted by Nat'l Archives: Founders Online*,
    https://tinyurl.com/33mzybyr (last visited Oct. 3, 2025) ............. 30, 31

Maria Meco, *Hungary's Assault on Academic Freedom*,
    Democratic Erosion Consortium (May 2, 2024),
    https://tinyurl.com/5af4eu8p ............................................... 26

Matt Grossman, *Fired BLS Chief Breaks Silence, Calls Her Dismissal a 'Dangerous Step'*, Wall St. J. (Sept. 16, 2025), https://tinyurl.com/65e7xy9j .................................................... 16

Nate Schenkkan, *The End of Competitive Authoritarianism in Turkey, Freedom House* (Mar. 26, 2025), https://tinyurl.com/5cjyw9m9 ............................................... 29

Nick Thorpe, *Hungary Broke EU Law by Forcing out University, Says European Court*, BBC (Oct. 6, 2020), https://tinyurl.com/2mc28hn9 ............................................. 26

Press Release, Off. of Chairman Brendan Carr, *FCC Approves Skydance's Acquisition of Paramount CBS* (July 24, 2025), https://tinyurl.com/3w9zy2hf ............................................. 19

*RSF Condemns the Latest Murder of a Radio Journalist in the Philippines*, RSF (July 21, 2025), https://tinyurl.com/mub8b7pk ........................................................ 23, 24

*Russia*, RSF, https://tinyurl.com/574z6dmh (last visited Sept. 18, 2025)................................................................ 29, 30

Stephen Lee, *EPA Suspends Dozens of Employees Who Signed Letter of Dissent*, Bloomberg Law (Sept. 5, 2025), https://tinyurl.com/486fe9r2 ............................................... 16

Steven Levitsky & Daniel Ziblatt, *How Democracies Die* (2018).................................................................... 4, 7, 22

Tom Ginsburg & Aziz Z. Huq, *How to Save a Constitutional Democracy* (2018) ......................................... 21, 22

*Türkiye*, RSF, https://tinyurl.com/bdzkcj7m (last visited Sept. 18, 2025) ............................................................ 28

*The United States Supports Press Freedom Worldwide*, U.S. Dep't of State, Bureau of Democracy, H.R. & Lab. (May 5, 2008), https://tinyurl.com/2n2wua3y ................................... 21

U.S. Dep't of State, Bureau of Democracy, H.R. & Lab.,
   *Hungary 2016 Human Rights Report* (2017),
   https://tinyurl.com/4duf29k8 .......................................................... 25, 26

U.S. Dep't of State, Bureau of Democracy, H.R. & Lab.,
   *Hungary 2023 Human Rights Report* (2024),
   https://tinyurl.com/4jwar53k ................................................................ 27

U.S. Dep't of State, Bureau of Democracy, H.R. & Lab.,
   *Philippines 2020 Human Rights Report* (2021),
   https://tinyurl.com/3jjcsujj ..................................................................... 23

U.S. Dep't of State, Bureau of Democracy, H.R. & Lab.,
   *Philippines 2023 Human Rights Report* (2024),
   https://tinyurl.com/ym7bjy6d ................................................................ 23

U.S. Dep't of State, Bureau of Democracy, H.R. & Lab.,
   *Russia 2024 Human Rights Report* (2025),
   https://tinyurl.com/3xfvm63s ................................................................. 29

U.S. Dep't of State, Bureau of Democracy, H.R. & Lab.,
   *Turkey (Türkiye) 2023 Human Rights Report* (2024),
   https://tinyurl.com/jpax758m ................................................................ 29

*Virginia Resolutions of 1798, in* 4 *The Debates in the Several
   Conventions on the Adoption of the Federal Constitution*
   (Jonathan Elliot ed., 1891) ..................................................................... 8

# GLOSSARY OF ABBREVIATIONS

ABS-CBN   Alto Broadcasting System – Chronicle Broadcasting Network

ACLU        American Civil Liberties Union

ACLU-DC  American Civil Liberties Union of the District of Columbia

AP            Associated Press

EU            European Union

NATO        North Atlantic Treaty Organization

## INTEREST OF *AMICI CURIAE*[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit organization that since 1920 has sought to protect the civil liberties and civil rights of all Americans. The ACLU of the District of Columbia ("ACLU-DC") is the ACLU's Washington, D.C. affiliate. The ACLU and ACLU-DC have frequently appeared in this Court, as counsel to parties or as *amici curiae*, in cases raising significant questions about the meaning of the Constitution, its limitations on government power, and the breadth of rights it grants.

The ACLU and its affiliates have also participated as counsel or *amici curiae* in many consequential First Amendment cases, including those involving retaliation. *See, e.g., NRA v. Vullo*, 602 U.S. 175 (2024) (counsel); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127 (D.D.C. 2025) (*amicus*); ECF 25-1, *Nat'l*

---

[1] Counsel of record for all parties have been notified of *amici curiae*'s intent to file this brief and have consented to its filing. Under Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* state that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

*Pub. Radio, Inc. v. Trump*, No. 25-cv-01674 (D.D.C. filed June 20, 2025)

(*amicus*).

## SUMMARY OF ARGUMENT

Though the disagreement about geographic nomenclature that began this controversy is a small one, the constitutional implications of the dispute itself are profound. The White House has barred the Associated Press—"one of the oldest, largest, and most respected news agencies in the world," *Associated Press*, Encyc. Britannica (Sept. 18, 2025), https://tinyurl.com/2ba9x5xd—from press pool events for refusing to parrot the administration's preferred name for the Gulf of Mexico. As the AP shows, *see* Pl.-Appellee Br. 13–43, the government's retaliation for disfavored speech strikes at the heart of the First Amendment and requires this Court to affirm the district court's injunction.

*Amici curiae* the American Civil Liberties Union and the American Civil Liberties Union of the District of Columbia—organizations devoted to free expression—submit that our Nation's history and other countries' modern trajectories demonstrate the importance of upholding First Amendment protections here. When officials are allowed to muzzle press outlets that refuse to toe the government's line, repression and democratic backsliding often follow.

**I.** American history shows that scrupulous protection of the press's right to disseminate information, without fear or favor to those in power, is essential to our democracy. That hard-won lesson was learned several times over, from early American history, to World War I, to the Second Red Scare. These dark chapters in our Nation's past illustrate what happens when we stray from our commitment to First Amendment freedoms.

**II.** The White House's exclusion of the AP is, alarmingly, part of a broader assault on free expression. The administration has attempted to muzzle institutions like the bar, the academy, and the media that are at the heart of civil society. Constant vigilance for our liberties is as critical as ever.

**III.** Developments in other democracies and former democracies highlight the dangers of allowing the government to infringe on speech and press freedoms. Across the world—including in the Philippines, Hungary, Turkey, and Russia—democracies have backslid into repressive regimes with few freedoms after their institutions failed to hold the line on free expression. Backsliding does not happen in leaps but "takes place piecemeal." Steven Levitsky & Daniel Ziblatt, *How*

*Democracies Die* 77 (2018). It often begins with a crackdown on speech and the press.

This Court should not condone the White House's discharge of the AP from the press pool for refusing the administration's demand to use its preferred language. To do so would not only fly in the face of First Amendment jurisprudence, as the AP demonstrates, but also ignore the warnings from our Nation's history and from recent history around the world: that incursions on free expression, left unchecked, lead to increasing repression.

## ARGUMENT

## I.   American history teaches that the First Amendment demands vigilance against all intrusions on free expression.

Even among democracies, the United States is exceptional in its robust protections for free speech and the free press. *See* Floyd Abrams et al., *The Press Clause: The Forgotten First Amendment*, 5 J. Free Speech L. 561, 563 (2024). Our country holds fast to the belief that, without the "unfettered interchange of ideas," a democracy cannot "brin[g] about ... political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). And in disseminating information about the government's actions, and ideas about how to respond to them, the press

"serve[s] as a powerful antidote to any abuses of power by governmental officials." *Mills v. Alabama*, 384 U.S. 214, 219 (1966).

But America's embrace of free expression has not always been steady, as three chapters in our history illustrate: the "Quasi-War" with France in the 1790s, World War I, and the Second Red Scare following World War II. Each time, our Nation came to regret its faithlessness to the First Amendment. This Court should heed that lesson today, and prohibit the Administration from punishing a news organization that refuses to echo its view of the world.

## A.    Early American history

Since our founding, the freedoms of speech and of the press were understood as fundamental guardrails of our democracy. In a 1783 speech, George Washington told Continental Army officers that without "the freedom of Speech," "dumb & silent we may be led, like sheep, to the Slaughter." Gen. George Washington, Address to Officers of the Army (Mar. 15, 1783), *reprinted by Nat'l Archives: Founders Online*, https://tinyurl.com/5n6j5wus (last visited Sept. 18, 2025). And when proposing the First Amendment in Congress, James Madison proclaimed the people's "right to speak, to write, or to publish their sentiments"

together with "the freedom of the press" to be among "the great bulwarks of liberty." 1 Annals of Cong. 451 (1789) (Joseph Gales ed., 1834).

Even so, the founding generation faltered in its commitment to protecting free expression. The distrust between the two first political parties—the Federalists and the Jeffersonians—was so severe that they equated dissent with disloyalty. *See* Levitsky & Ziblatt, *supra*, at 103. So Federalists sought "to destroy [their] political opponents." *United States v. Helstoski*, 442 U.S. 477, 493 (1979). In the midst of the Quasi-War with France, Federalists enacted the Alien and Sedition Acts to empower the president to deport the suspicious without notice or a trial and to criminalize criticism. *See* Nancy Murray & Sarah Wunsch, *Civil Liberties in Times of Crisis: Lessons from History*, 87 Mass L. Rev. 72, 73 (2002). Anti-Federalist papers were put out of business; dozens were arrested. *See id*.

Jeffersonians cried foul. The Virginia and Kentucky legislatures adopted resolutions, anonymously penned by Madison and Jefferson, respectively, that became the banner for the opposition. *See* Adrienne Koch & Harry Ammon, *The Virginia and Kentucky Resolutions: An Episode in Jefferson's and Madison's Defense of Civil Liberties*, 5 Wm. &

Mary Q. 145, 147 (1948). "[The Sedition Act] exercises … a power not delegated by the Constitution," the Virginia Resolution read, "but, on the contrary, is expressly and positively forbidden by [the First Amendment]." *Virginia Resolutions of 1798*, *in* 4 *The Debates in the Several Conventions on the Adoption of the Federal Constitution* 528, 528–29 (Jonathan Elliot ed., 1891). The power to silence critics "more than any other, ought to produce universal alarm, because it is levelled against that right of freely examining public characters and measures, and of free communication among the people thereon, which has ever been justly deemed the only effectual guardian of every other right." *Id.*

This "great controversy … first crystallized a national awareness of the central meaning of the First Amendment." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964); *see also* Jack M. Balkin, *Nine Perspectives on Living Originalism*, 2012 U. Ill. L. Rev. 815, 837 (2012) (noting that the Jeffersonians' electoral victory in 1800 "led to new constructions of the First Amendment that were confirmed by executive and legislative practices"). After assuming the presidency in 1800, Jefferson called the Sedition Act unconstitutional and pardoned all those convicted under it. *See* Louis Fisher, *Correcting Judicial Errors: Lessons*

*from History*, 72 Me. L. Rev. 1, 8 (2020); Murray & Wunsch, *supra*, at 74. "Although the Sedition Act was never tested in [the Supreme Court], the attack upon its validity has carried the day in the court of history." *N.Y. Times*, 376 U.S. at 276.

**B.    World War I and the postwar years**

Throughout World War I, as "public hysteria and intolerance" of dissent gripped the Nation, our fidelity to free expression faltered again. Geoffrey R. Stone, *Perilous Times: Free Speech in Wartime* 533 (2004). Congress passed the Espionage Act in April 1917 to stymie interference with military recruitment. Soon after, Congress amended the law through the Sedition Act of 1918 to silence criticism of the government and the war effort. *See* Murray & Wunsch, *supra*, at 76. A wave of prosecutions followed. *See* Laura M. Weinrib, *Freedom of Conscience in War Time: World War I and the Limits of Civil Liberties*, 65 Emory L.J. 1051, 1052 (2016); Stone, *supra*, at 12. Activist Rose Pastor Stokes was sentenced to ten years in prison for writing to a newspaper: "I am for the people and the Government is for the profiteers." Zechariah Chafee, Jr., *Freedom of Speech in War Time*, 32 Harv. L. Rev. 932, 972 (1919). Eugene Debs—who had received almost a million votes in the 1912 presidential

election—was sentenced to ten years in prison for denouncing the war and conscription. *See* Stone, *supra*, at 196–97. "[A]ny genuine debate about the merits of the war was effectively squelched." *Id.* at 12.

Unfortunately, the Supreme Court yielded to the anxieties of the time in a series of decisions allowing the government wide latitude to suppress speech. In *Schenck v. United States*, the Court upheld convictions for conspiring and attempting to cause "insubordination," and to "obstruct" enlistment, based on pamphlets criticizing the draft as "monstrous" and urging readers to seek its end. *See* 249 U.S. 47, 49–51 (1919). A week later, the Court upheld convictions for attempted "disloyalty" and "mutiny" based on newspaper articles "declaring it a monumental and inexcusable mistake to send our soldiers to France" and extoling Germany. *Frohwerk v. United States*, 249 U.S. 204, 207 (1919). And the same day, it affirmed Eugene Debs's conviction for causing "insubordination, disloyalty, [and] mutiny" based on a public speech opposing the war and praising others convicted for resisting the draft. *Debs v. United States*, 249 U.S. 211, 212–13 (1919).

This criminalization of war criticism persisted into the postwar years. In *Gilbert v. Minnesota*, over the dissent of Justice Brandeis, the

Court upheld a conviction of a speaker who denounced enlistment in the war. 254 U.S. 325, 333 (1920). *Gitlow v. New York* upheld, over the dissent of Justice Holmes, a conviction for publishing a left-wing manifesto that was found to have advocated the overthrow of government. *See* 268 U.S. 652, 661 (1925). And *Whitney v. California* upheld a conviction based on membership in a group that taught the propriety of violence as a means of accomplishing political change. *See* 274 U.S. 357, 371 (1927).

These efforts to stamp out dissent did not go unchallenged. Zechariah Chafee—"possibly the most important First Amendment scholar of the first half of the twentieth century," Richard A. Primus, *Canon, Anti-Canon, and Judicial Dissent*, 48 Duke L.J. 243, 293–94 (1998)—argued in 1919 that the Espionage Act "ha[d] been interpreted in such a way as to violate the free speech clause," Chafee, *supra*, at 968.

Justices Holmes—whose "views of the First Amendment" had "shift[ed]" since 1919, Stone, *supra*, at 208—and Brandeis also gave voice to a competing vision that embraced disagreement not as disloyalty, but as diversifying the marketplace of ideas. *See, e.g.*, *Gitlow*, 268 U.S. at 672–73 (Holmes, J., dissenting) ("Every idea is an incitement. It offers

11

itself for belief and if believed it is acted on unless some other belief outweighs it or some failure of energy stifles the movement at its birth."); *Whitney*, 274 U.S. at 372–80 (Brandeis, J., concurring) ("Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. It is the function of speech to free men from the bondage of irrational fears.").

The civil libertarian views of Justices Holmes and Brandeis ultimately "w[on] the day," as both the American public and the Supreme Court came to repudiate the "dismal precedents" of the World War I era. Stone, *supra*, at 138, 211; *see, e.g.*, *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam) ("*Whitney* has been thoroughly discredited by later decisions.").

## C.     The Second Red Scare

During the Cold War, an "antiradical crusade … demonized Communists," conceiving of them as having "extraordinary powers and malignity, making them both covert and ubiquitous." William M. Wiecek, *The Legal Foundations of Domestic Anticommunism: The Background of Dennis v. United States*, 2001 Sup. Ct. Rev. 375, 428 (2001). "In an aggressive effort to uncover subversion, the federal government initiated

abusive loyalty programs, legislative investigations, and criminal prosecutions of the leaders and members of the Community Party of the United States." Stone, *supra*, at 12–13. The House Un-American Activities Committee, headed by Senator Joseph McCarthy, targeted even those with tenuous—or no—connections to the Communist Party and blacklisted members of the film industry. *See*, *e.g.*, Martha Minow, *Storytelling and Political Resistance: Remembering Derrick Bell (with a Story About Dalton Trumbo)*, 28 Harv. J. Racial & Ethnic Just. 1, 3–4 (2012).

The Court "rubber-stamped" many of these legal efforts. Samantha Barbas, New York Times v. Sullivan*: A Civil Rights Story*, 12 Tex. A&M L. Rev. 1, 27 (2024). For example, *Dennis v. United States* upheld convictions under the Smith Act for conspiring to overthrow the government based on no specific plans but only the general philosophy espoused in communist pamphlets and books. *See* 341 U.S. 494, 497–98, 510–11 (1951). In *Adler v. Board of Education*, the Court upheld screening public school teachers for "loyalty" and ties to communism. 342 U.S. 485, 492–93 (1952). And *Communist Party of the United States v. Subversive Activities Control Board* upheld compulsory registration

requirements for Communist Party members, officers, and funds. *See* 367 U.S. 1, 88–105 (1961).

Justice Black predicted that respect for the First Amendment would return. "Public opinion being what it now is, few will protest the conviction of these Communist petitioners," he stated in his *Dennis* dissent. 341 U.S. at 581 (Black, J., dissenting). "There is hope, however, that in calmer times, when present pressures, passions and fears subside, this or some later Court will restore the First Amendment liberties to the high preferred place where they belong in a free society." *Id.*; *see also Adler*, 342 U.S. at 496–97 (Black, J., dissenting) ("This is another of those rapidly multiplying legislative enactments which make it dangerous … to think or say anything except what a transient majority happen to approve at the moment."); *Subversive Activities Control Bd.*, 367 U.S. at 148 (Black, J, dissenting) ("The same arguments that are used to justify the outlawry of Communist ideas here could be used to justify an outlawry of the ideas of democracy in other countries.").

As Justice Black predicted, "calmer times" returned. The Court turned the page on speech-restrictive decisions, rejecting precedents that paid short shrift to free expression rights and recognizing important First

Amendment protections that still govern today. *See, e.g.*, *Yates v. United States*, 354 U.S. 298, 318–19 (1957) ("The distinction between advocacy of abstract doctrine and advocacy directed at promoting unlawful action is one that has been consistently recognized …. [W]e should not assume that Congress chose to disregard a constitutional danger zone so clearly marked …."); *Keyishan v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 595 (1967) ("[T]o the extent that *Adler* sustained … membership in an organization advocating forceful overthrow of government [as] a ground for disqualification, pertinent constitutional doctrines have since rejected the premises upon which that conclusion rested."); *United States v. Robel*, 389 U.S. 258, 263 (1967) ("[T]he operative fact upon which the job disability depends is the exercise of an individual's right of association, which is protected by the provisions of the First Amendment.").

These chapters in American history show a pattern: the courts and the Nation ultimately repudiate government action and judicial decisions curtailing the freedoms of speech and of the press.

15

## II.   Press freedom in the United States is being tested again today.

Unfortunately, the lessons of our history have been lost on the current administration. In relatively short order, it has undertaken a series of retaliatory attacks on individuals and institutions—including federal employees, immigrants, attorneys, universities, artists, and broadcasters—who refuse to toe the administration's ideological line on public issues.

**A.** "[P]ublic employers [may] not use authority over employees to silence discourse ... simply because superiors disagree with the content of employees' speech." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987). Yet the administration has moved quickly to quell non-conformity in the federal government, suspending or firing employees who voiced concern about the direction of their respective agencies or published politically inconvenient information. *See* Stephen Lee, *EPA Suspends Dozens of Employees Who Signed Letter of Dissent*, Bloomberg L. (Sept. 5, 2025), https://tinyurl.com/486fe9r2; James FitzGerald, *US Disaster Agency Suspends Workers Who Criticised Trump Cuts, Reports Say*, BBC (Aug. 27, 2025), https://tinyurl.com/yfzfbnrk; Matt Grossman, *Fired BLS Chief*

16

*Breaks Silence, Calls Her Dismissal a 'Dangerous Step'*, Wall St. J. (Sept. 16, 2025), https://tinyurl.com/65e7xy9j.

**B.** "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). That holds true for resident noncitizens. *See Bridges v. Wixon*, 326 U.S. 135, 147–48 (1945). The administration nonetheless has taken aim at even lawfully admitted immigrants who hold opinions that the administration disfavors. For example, the government swept Rumeysa Öztürk, a Turkish graduate school student at Tufts University, off the street, revoked her visa, and placed her in a detention facility in Louisiana—all for co-authoring an op-ed criticizing the Tufts administration's response to a student government resolution concerning the Israel-Palestine conflict. *See Ozturk v. Hyde*, 136 F.4th 382, 387–88 (2d Cir. 2025).

**C.** Attorneys' advocacy to courts on clients' behalf is protected expression, *see Legal Servs. Corp. v. Velasquez*, 531 U.S. 533, 542–43 (2001), and is essential to securing all our liberties, *see, e.g.*, *Gideon v. Wainwright*, 372 U.S. 335, 343–45 (1963). Even so, the President has issued a series of executive orders against law firms for their

17

representation of disfavored clients and causes. *See, e.g., Susman Godfrey LLP v. Exec. Off. of the President*, — F. Supp. 3d — , 2025 WL 1779830, at *1 (D.D.C. June 27, 2025).

**D.** Academic freedom is "a special concern of the First Amendment," *Keyishian*, 385 U.S. at 603, and "thrives not only on the independent and uninhibited exchange of ideas among teachers and students but also … on autonomous decisionmaking by the academy itself," *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985) (citations omitted). The administration has undermined that freedom, conditioning or canceling funding based on curricula, hiring, and research choices. *See, e.g., President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, — F. Supp. 3d — , 2025 WL 2528380, at *27 (D. Mass. Sept. 3, 2025); Collin Binkley & Aamer Madhani, *Trump Asks 9 Colleges to Commit to His Political Agenda and Get Favorable Access to Federal Money*, AP (Oct. 2, 2025), https://tinyurl.com/4d7j6vu4.

**E.** The government may not discriminate against disfavored ideas or views "even in the provision of subsidies." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998). The President has sought to do just that, issuing an Executive Order directing the National Endowment

for the Arts to disfavor applications that "promote gender ideology." *R.I. Latino Arts v. Nat'l Endowment for the Arts*, — F. Supp. 3d — , 2025 WL 2689296, at *1 (D.R.I. Sept. 19, 2025).

**F.** "[I]t is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased," *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024), nor may it "coerce a private party to punish or suppress disfavored speech on [its] behalf," *NRA v. Vullo*, 602 U.S. 175, 190 (2024). The FCC has done both. It demanded that Skydance change CBS's programming to reflect "a diversity of [political] viewpoints" and hire an ombudsman to evaluate journalistic "bias" before approving its acquisition. Press Release, Off. of Chairman Brendan Carr, *FCC Approves Skydance's Acquisition of Paramount CBS* (July 24, 2025), https://tinyurl.com/3w9zy2hf. And it threatened companies that broadcast Jimmy Kimmel's show after he criticized political allies of the administration. *See* Gene Maddaus, *FCC Chairman Threatens ABC Over Jimmy Kimmel's Remarks About Charlie Kirk's Killer*, Variety (Sept. 17, 2025), https://tinyurl.com/ytd3amd4.

\*     \*     \*

19

The Court should treat the White House's ban of the AP seriously—not only for its own sake, but also for what it portends in the context of the administration's wide-ranging attacks on free expression. If courts allow the government to begin chipping away at free expression, the pervasive political repression experienced during the dark chapters in our country's history may yet return.

"[T]he First Amendment to our Constitution was designed to avoid [such an] en[d] by avoiding th[e] beginnin[g]." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943).

## III.    Other countries' experiences caution that intrusions on free expression, if allowed to persist, often lead to democratic backsliding.

Courts routinely remind us that America's commitments to free speech and the free press separate us from other countries. The suppression of free expression is thought to happen elsewhere, not here. As Justice Alito has observed, "Viewpoint discrimination is poison to a free society. But in many countries with constitutions or legal traditions that claim to protect freedom of speech, serious viewpoint discrimination is now tolerated." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring); *see also Rossignol v. Voorhaar*, 316 F.3d 516, 527–28 (4th

Cir. 2003) (Wilkinson, J.) (suppression of political criticism "belongs to a society much different and more oppressive than our own"). This distinction we proudly draw will hold only for as long as our institutions and our courts actively enforce the First Amendment; absent that vigilance, we might find ourselves following other countries down an unpleasant path.

Experiences beyond our borders underscore that violations of the freedom of the press frequently precede wider repression of civil society. *See The United States Supports Press Freedom Worldwide*, U.S. Dep't of State, Bureau of Democracy, H.R. & Lab. (May 5, 2008), https://tinyurl.com/2n2wua3y ("In countries where independent journalists and media are at risk, the fundamental freedoms of all citizens are at stake.").

Democratic backsliding is "a process of incremental, but ultimately still substantial decay in the three basic predicates of democracy— competitive elections, liberal rights to speech and association, and the rule of law." Tom Ginsburg & Aziz Z. Huq, *How to Save a Constitutional Democracy* 43 (2018). The word "process" is critical. Some democracies have died suddenly, but in the twenty-first century, gradual erosion of

democracy is more common. That process plays out "often in baby steps"—and so slowly that it hardly "set[s] off alarm bells." Levitsky & Ziblatt, *supra*, at 6, 77; *see also* Ginsburg & Huq, *supra*, at 35–39.

The experiences in countries like the Philippines, Hungary, Turkey, and Russia show that when resolve for free expression and a free press weakens, democratic backsliding follows. The road back is steep at best.

## A.    The Philippines

Democracy came to the Philippines in 1986, when a pro-democracy movement successfully ousted Ferdinand Marcos and initiated democratic reform. *See* Maria J. Stephan & Erica Chenoweth, *Why Civil Resistance Works: The Strategic Logic of Nonviolent Conflict*, 33 Int'l Sec. 7, 32–35 (2008). But democracy regressed with President Rodrigo Duterte's election in 2016. Duterte is currently awaiting trial at the Hague on charges of crimes against humanity, and is estimated to have ordered extrajudicial killings of many thousands of people. *See* Francesca Regalado, *Philippine Senate Shelves Impeachment of Vice President Sara Duterte*, N.Y. Times (Aug. 7, 2025), https://tinyurl.com/bde9xu6b.

Suppression of the press was part of Duterte's playbook. In January 2018, the Philippines' Securities and Exchange Commission ordered

*Rappler*, an independent news website known for criticizing the president, to shut down for allegedly violating foreign-ownership rules. *See* U.S. Dep't of State, Bureau of Democracy, H.R. & Lab., *Philippines 2020 Human Rights Report* 20–21 (2021), https://tinyurl.com/3jjcsujj. *Rappler*'s president was arrested on related charges, as well as for libel. *See id.* Duterte accused the broadcaster ABS-CBN of various crimes, including failure to air his political advertisements, and the government ordered ABS-CBN to cease broadcasting after the legislature refused to renew its license for supposed bias. *See id.* Journalists also "face[d] harassment and threats of violence, including from politicians and government authorities critical of their reporting." *Id.* at 21.

Despite the decrease in abuses under current President Ferdinand Marcos, Jr., "[s]ignificant human rights issues" persist, including continued extrajudicial killings, forced disappearances, and torture or cruel punishment by and on behalf of the government. U.S. Dep't of State, Bureau of Democracy, H.R. & Lab., *Philippines 2023 Human Rights Report* 1 (2024), https://tinyurl.com/ymuhkc8u. Five journalists have been murdered since Marcos, Jr., took office. *See RSF Condemns the*

23

*Latest Murder of a Radio Journalist in the Philippines*, RSF (July 21, 2025), https://tinyurl.com/mub8b7pk.

## B. Hungary

When the Iron Curtain fell, Hungary transitioned to a multiparty democratic system. *See* Julia Gabriel, V-Dem Inst., *Hungary: A Country Report Based on Data 1918–2012,* at 6 (V-Dem Country Rep. Series No. 12, 2016), https://tinyurl.com/2z9s5f7a; Kriszta Kovács & Gábor Attila Tóth, *Hungary's Constitutional Transformation*, 7 Eur. Const. L. Rev. 183, 184 (2011). By 2004, Hungary had joined NATO and the EU and was widely considered a stable democracy. *See* Erica Frantz et al., *The Origins of Elected Strongmen* 104 (2024); Gabriel, *supra*, at 6. But then Hungary underwent "the sharpest transition from liberal constitutionalism" to an illiberal regime in modern history. Adam Shinar, *Democratic Backsliding, Subsidized Speech, and the New Majoritarian Entrenchment*, 69 Am. J. Comp. L. 335, 347 (2021). To reach that end, Prime Minister Viktor Orbán and his Fidesz party paved their path with attacks on free speech and the free press.

Orbán and Fidesz capitalized on their electoral victories in 2010 to rewrite the constitution "through a highly defective process surrounded

by secrecy and the nonparticipation of broader society and scholars." *Id.* at 348. The government enacted vague bans on any speech that does not respect "the constitutional order," or offends "human dignity" and "private life," or discriminates against "any majority" or "church or religious group." Article 19, *Hungarian Media Laws Q&A* 4 (2011) (citations omitted), https://tinyurl.com/mr2f7h6y. It required all media— whether broadcast, print, or online—to register with a governmental authority and threatened high fines for "unbalanced coverage" and ill-defined legal violations. *Hungarian Media Law Further Endangers Media Freedom, Says OSCE Media Freedom Representative*, Org. for Sec. & Coop. in Eur. (Dec. 21, 2010), https://tinyurl.com/3mc6dztx.

Orbán and Fidesz have "systematically dismantled media independence and used verbal attacks, lawsuits and other means to harass critical journalists in Hungary." *Hungary's Media Control Unprecedented in EU, Joint Mission Finds*, Comm. to Protect Journalists (Dec. 3, 2019), https://tinyurl.com/4s6w259w. Hungary's parliamentary speaker indefinitely barred three publications from the building for "their questions about possible corruption." U.S. Dep't of State, Bureau of Democracy, H.R. & Lab., *Hungary 2016 Human Rights Report* 19 (2017),

https://tinyurl.com/4duf29k8. The government forcibly closed the largest independent daily newspaper and blocked the license of a prominent radio station. *See id.*; Attila Mong, *Hungarian Journalists Fear Orbán Will Use Election Win to Tighten Grip on Independent Media*, Comm. to Protect Journalists (Apr. 5, 2022), https://tinyurl.com/mry7vrsz. And it has further "silence[d] the critical press" by "engineering" the "takeover of once-independent media." Int'l Press Inst., *Conclusions of the Joint International Press Freedom Mission to Hungary* 1–2 (Dec. 3, 2019), https://tinyurl.com/3vnm733f.

The Hungarian government also launched "a targeted assault on academic freedom." Maria Meco, *Hungary's Assault on Academic Freedom*, Democratic Erosion Consortium (May 2, 2024), https://tinyurl.com/5af4eu8p. A higher-education law, which the European Union's highest court subsequently deemed illegal, pushed the Central European University out of Hungary. *See* Nick Thorpe, *Hungary Broke EU Law by Forcing out University, Says European Court*, BBC (Oct. 6, 2020), https://tinyurl.com/2mc28hn9. The government privatized thirteen state universities and put them in the hands of loyalists. *See id.* "Authorities have increasingly threatened the academic autonomy of

26

well-established institutions, pulling support, interfering in their affairs, and landing progovernment supporters in leading positions." *Hungary: Freedom in the World 2024 Country Report*, Freedom House, https://tinyurl.com/2s43t9vb (last visited Sept. 18, 2025). In October 2023, a professor at Corvinus University was dismissed after criticizing Fidesz-linked university leadership. *See id.*

Hungary's human rights situation remains "[s]ignificant": serious press, expression, and association restrictions, "including censorship," persist; the judiciary is no longer independent; and violence or threats of violence against marginalized groups continue. U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *Hungary 2023 Human Rights Report* 1–2 (2024), https://tinyurl.com/4jwar53k.

## C.    Turkey and Russia

Some regimes that have backslid from democracy in the last quarter century have gone much further, starting with suppression and ending with full-blown authoritarianism. Although repression of dissent in these regimes today ranges far beyond anything we see now in the United States, widespread curtailment of democratic freedoms in these

other nations began with smaller, methodical steps to undermine free expression.

**1.** In Turkey, when now-President Recep Tayyip Erdoğan's AK PARTİ came to power in 2002, it initially expanded freedom of association and expression. *See* Kemal Kirişci & İlke Toygür, Brookings, *Turkey's New Presidential System and a Changing West: Implications for Turkish Foreign Policy and Turkey-West Relations* 4 (Turkey Project Pol'y Paper No. 15, 2019), https://tinyurl.com/mv2tn69b. But hopes of a reform-minded government were short-lived. Erdoğan "has waged one of the world's biggest crackdowns on press freedom in recent history." Comm. to Protect Journalists, *Turkey's Press Freedom Crisis: The Dark Days of Jailing Journalists and Criminalizing Dissent* 6 (2012), https://tinyurl.com/2u8sy2um.

Thousands of journalists have faced criminal charges. *See id.* Judges under the government's thumb censor online articles on corruption or other sensitive topics. *See id.* And 90% of the media is under state control. *See Türkiye*, RSF, https://tinyurl.com/bdzkcj7m (last visited Sept. 18, 2025). With the recent arrest of Erdoğan's most popular political rival, "Turkey is on the cusp of a transition to a consolidated

dictatorship." Nate Schenkkan, *The End of Competitive Authoritarianism in Turkey*, Freedom House (Mar. 26, 2025), https://tinyurl.com/5cjyw9m9. The U.S. Department of State has considered Turkey's "serious restrictions on freedom of expression and media freedom" to be "[s]ignificant human rights issues." *E.g.*, U.S. Dep't of State, Bureau of Democracy, H.R. & Lab., *Turkey (Türkiye) 2023 Human Rights Report* 1–2 (2024), https://tinyurl.com/jpax758m.

**2.** Although Russia was a burgeoning democracy after the Soviet bloc broke up, "the government [has] increasingly restricted" the freedoms of speech and of the press since then. U.S. Dep't of State, Bureau of Democracy, H.R. & Lab., *Russia 2024 Human Rights Report* 8 (2025), https://tinyurl.com/3xfvm63s.

Within a year of President Vladimir Putin coming to power at the end of 1999, "all three federal [TV] networks were under state control." Kate Musgrave, *Tipping Point: Democratic Erosion and the Assault on Press Freedom*, Ctr. for Int'l Media Assistance (Oct. 27, 2021), https://tinyurl.com/4sykpxst. "All privately owned independent TV channels are banned from the air, except for cable entertainment," and many Western outlets are inaccessible. *Russia*, RSF,

https://tinyurl.com/574z6dmh (last visited Sept. 18, 2025). Russia's media regulator has censored the most popular independent news sources. *See id.* "No journalists, even those in exile, are safe from the threat of serious charges based on vaguely worded draconian laws …." *Id.* Hundreds of journalists have been arrested since Putin's rise, and forty-three have been killed—including at least twenty-five in retaliation for their reporting. *See* Kaela Malig, *How Russia's Press Freedom has Deteriorated Over the Decades Since Putin Came to Power*, PBS (Sept. 26, 2023), https://tinyurl.com/4krjhk76.

*     *     *

Obviously, the United States is not Russia, nor any of these other countries. *Amici* catalogue these examples from recent world history to underscore that the stakes of permitting the government to punish media outlets it dislikes are much larger than what we call the body of water east of Mexico. Indeed, the gap between the freedoms we enjoy and their erosion or even erasure in the erstwhile democracies *amici* have discussed is the most important "Gulf of America" we have. As Jefferson said, "[o]ur liberty depends on the freedom of the press, and that cannot be limited without being lost." Letter from Thomas Jefferson to James

30

Currie (Jan. 28, 1786), *reprinted by Nat'l Archives: Founders Online*,

https://tinyurl.com/33mzybyr (last visited Oct. 3, 2025).

## CONCLUSION

The Court should affirm the district court's injunction.

Respectfully submitted,

/s/ *Scott Michelman*
Scott Michelman
   *Counsel of Record*
Arthur B. Spitzer
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF THE DISTRICT
   OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
Tel.: (202) 457-0800
Email: smichelman@acludc.org
     aspitzer@acludc.org

Ben Wizner
Brian Hauss
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
Email: bwizner@aclu.org
     bhauss@aclu.org

*Counsel for Amici Curiae*

October 6, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that my word processing program, Microsoft Word, counted 5,514 words of the foregoing brief, excluding the items exempted by Federal Rule of Appellate Procedure 32(f) and that this complies with the word limit set forth in Federal Rule of Appellate Procedure 29(a)(5).

/s/ *Scott Michelman*
Scott Michelman

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2025, I electronically filed the

foregoing brief in support of Plaintiff-Appellee with the Clerk of the Court

of the U.S. Court of Appeals for the D.C. Circuit by using the Appellate

CM/ECF system which will send notice to all counsel who are registered

CM/ECF users.

/s/ *Scott Michelman*
Scott Michelman